# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ADVENTIST HEALTH SYSTEM SUNBELT HEALTHCARE CORPORATION, | Case No. 1:23-cv-07031-ER |
| Plaintiff, | |
| v. | |
| MULTIPLAN, INC., | |
| Defendant. | |

## ADVENTIST HEALTH SYSTEM SUNBELT HEALTHCARE CORPORATION'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND .............................................................................................. 2

I.      MultiPlan Competes with Other Payors ................................................................... 2

II.      MultiPlan Enters into Agreements with its Competitors That Eliminate Pricing
Competition Between Them ..................................................................................... 4

III.     MultiPlan's Agreements Harm Market-Wide Competition ..................................... 6

ARGUMENT ....................................................................................................................... 8

I.      MultiPlan Cannot Use a Motion to Dismiss to Rewrite AHS' Complaint, Resolve
Factual Disputes, or Lock this Court into a Particular Mode of Analysis ................ 8

II.      The MultiPlan Cartel is Illegal *Per Se* ................................................................. 10

      A.      MultiPlan's Agreements With Its Competitors Are *Per Se* Unlawful ........... 11

      B.      This is Not a "Hybrid Restraint" or "Dual Distribution" Case. ................... 15

      C.      MultiPlan Does Not Have Two Separate Businesses ................................... 18

III.     In the Alternative, AHS Alleges an Unlawful "Hub-And-Spoke" Cartel ................ 19

      A.      AHS Alleges Agreements Between the "Hub" and "Spokes" of the Cartel ...... 19

      B.      AHS Alleges an Agreement Along the "Rim" of the Cartel ........................ 22

          1.      Direct Evidence is Not Required ..................................................... 22

          2.      AHS Alleges Parallel Conduct ....................................................... 23

          3.      AHS Plausibly Alleges a Series of Plus Factors ............................. 26

IV.     AHS Also Alleges an Antitrust Claim under the Rule of Reason ........................... 31

      A.      AHS Alleges a Relevant Market for the Reimbursement of OON Services ..... 31

      B.      MultiPlan's Factual Arguments Concerning Market Definition Fail ........... 32

      C.      AHS Alleges Harm to Competition in the Relevant Market ....................... 36

      D.      There Are No Procompetitive Justifications for MultiPlan's Conduct .......... 38

V.      AHS Alleges Antitrust Injury ............................................................................... 39

VI.     Alternatively, Leave to Amend Should be Granted ............................................... 40

CONCLUSION .................................................................................................................. 40

i

# TABLE OF AUTHORITIES

**Cases**

*2238 Victory Corp. v. Fjallraven USA Retail, LLC,*
    2021 WL 76334 (S.D.N.Y. 2021) ........................................................................... 16

*Am. Needle, Inc. v. NFL,*
    560 U.S. 183 (2010) ..................................................................................... 11, 18

*Anderson News, L.L.C. v. Am. Media, Inc.,*
    680 F.3d 162 (2d Cir. 2012) ............................................................................. 8, 9

*Apex Oil Co. v. DiMauro,*
    822 F.2d 246 (2d Cir. 1987) ................................................................................ 28

*Apple AT&TM Antitrust Litig.,*
    596 F. Supp. 2d 1288 (N.D. Cal. 2008) ................................................................. 36

*Arizona v. Maricopa Cnty. Med. Soc.,*
    457 U.S. 332 (1982) .......................................................................................... 19

*Barry's Cut Rate Stores Inc. v. Visa, Inc.,*
    2019 WL 7584728 (E.D.N.Y. 2019) .................................................................... 20

*BCBSM v. GS Labs, LLC,*
    2023 WL 2044329 (D. Minn. 2023) .................................................................... 35

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ..................................................................................... passim

*Bellevue Drug Co. v. Advance PCS,*
    2004 WL 724490 (E.D. Pa. 2004) ....................................................................... 13

*Brown Shoe Co. v. United States,*
    370 U.S. 294 (1962) .......................................................................................... 31

*Carbone v. Brown University,*
    621 F. Supp. 3d 878 (N.D. Ill. 2022) ............................................................. 10, 37

*Caruso Mgmt. Co. Ltd. v. Int'l Council of Shopping Ctrs.,*
    403 F. Supp. 3d 191 (S.D.N.Y. 2019) ............................................................. 9, 10

*City of New York v. Grp. Health Inc.,*
    649 F.3d 151 (2d Cir. 2011) ............................................................................... 34

*City of Phila. v. Bank of Am. Corp.,*
    498 F. Supp. 3d 516 (S.D.N.Y. 2020) .................................................................. 26

*Concord Assocs., L.P. v. Ent. Props. Tr.,*
    817 F.3d 46 (2d Cir. 2016) ................................................................................... 9

*Copperweld v. Independence Tube Corporation,*
    467 U.S. 752 (1984) .......................................................................................... 19

*Copy-Data Sys., Inc. v. Toshiba Am., Inc.,*
    663 F.2d 405 (2d Cir. 1981) ............................................................................... 16

*Davitashvili v. Grubhub Inc.*,
  2022 WL 958051 (S.D.N.Y. 2022) ........................................................................ 36, 39

*Deslandes v. McDonald's USA, LLC*,
  81 F.4th 699 (7th Cir. 2023) ........................................................................................ 39

*Duty Free Americas, Inc. v. Estee Lauder Cos., Inc.*,
  797 F.3d 1248 (11th Cir. 2015) .................................................................................. 35

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
  637 F.3d 435 (4th Cir. 2011) ...................................................................................... 35

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
  504 U.S. 451 (1992) .................................................................................................... 36

*Elecs. Commc'ns Corp. v. Toshiba Consumer Prods., Inc.*,
  129 F.3d 240 (2d Cir. 1997) ....................................................................................... 16

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023) ....................................................................................... 33

*Erie Cnty. v. Morton Salt, Inc.*,
  702 F.3d 860 (6th Cir. 2012) ................................................................................ 26, 27

*Franco v. Conn. Gen. Life Ins. Co.*,
  818 F. Supp. 2d 792 (D.N.J. 2011) ............................................................................ 34

*FTC v. IQVIA Holdings, Inc.*,
  2024 WL 81232 (S.D.N.Y. 2024) ............................................................................... 32

*FTC v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ...................................................................................... 37

*FTC v. Sanford Health*,
  2017 WL 10810016 (D.N.D. 2017) ............................................................................ 35

*FTC v. Super. Ct. Trial Lawyers Ass'n*,
  493 U.S. 411 (1990) .................................................................................................... 12

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
  2011 WL 1044898 (S.D.N.Y. 2011) ........................................................................... 16

*Gelboim v. Bank of Am. Corp.*,
  823 F.3d 759 (2d Cir. 2016) ................................................................................. 11, 12

*Gibson v. MGM Resorts International*,
  2023 WL 7025996 (D. Nev. 2023) ....................................................................... 25, 26

*Global Discount Travel Servs., LLC v. TWA, Inc.*,
  960 F. Supp. 701 (S.D.N.Y. 1997) ............................................................................. 36

*Haller v. U.S. Dep't of Health & Human Servs.*,
  621 F. Supp. 3d 343 (E.D.N.Y. 2022) .......................................................................... 7

*Hinds Cnty., Miss. v. Wachovia Bank N.A*,
  700 F. Supp. 2d 378 (S.D.N.Y. 2010) ........................................................................ 20

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
2023 WL 6006525 (S.D.N.Y. 2023) .......................................................................28

*In re Blue Cross Blue Shield Antitrust Litig.*,
2017 WL 2797267 (N.D. Ala. 2017) .......................................................................35

*In re Broiler Chicken Antitrust Litig.*,
290 F. Supp. 3d 772 (N.D. Ill. 2017) .......................................................22, 23, 30

*In re Commodity Exch., Inc.*,
213 F. Supp. 3d 631 (S.D.N.Y. 2016) .......................................................... 22, 23

*In re Crude Oil Commodity Futures Litig.*,
913 F. Supp. 2d 41 (S.D.N.Y. 2012) .......................................................................31

*In re Currency Conversion Fee Antitrust Litig.*,
264 F.R.D. 100 (S.D.N.Y. 2010) .......................................................................24

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
360 F. Supp. 3d 788 (N.D. Ill. 2019) .......................................................................31

*In re Delta Dental Antitrust Litig.*,
484 F. Supp. 3d 641 (N.D. Ill. 2020) ..................................................... 34, 37, 39, 40

*In re Elec. Books Antitrust Litig.*,
859 F. Supp. 2d 689 (S.D.N.Y. 2012) .......................................................... 23, 27

*In re Flat Glass Antitrust Litig.*,
385 F.3d 350 (3d Cir. 2004) .......................................................................12

*In re Google Digital Advertising Antitrust Litig.*,
627 F. Supp. 3d 346 (S.D.N.Y. 2022) .......................................................................8

*In re High Fructose Corn Syrup Antitrust Litig.*,
295 F.3d 651 (7th Cir. 2002) .......................................................... 12, 26

*In re Interest Rate Swaps Antitrust Litig.*,
261 F. Supp. 3d 430 (S.D.N.Y. 2017) .......................................................... 21, 24

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
383 F. Supp. 3d 187 (S.D.N.Y. 2019) .......................................................... 9, 15, 22

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) .......................................................... 21, 22, 25

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
764 F. Supp. 2d 991 (N.D. Ill. 2011) .......................................................................23

*In re RealPage Antitrust Litig.*,
2023 WL 9004806 (M.D. Tenn. 2023) .......................................................................passim

*In re Se. Milk Antitrust Litig.*,
739 F.3d 262 (6th Cir. 2014) .......................................................................16

*In re Suboxone Antitrust Litig.*,
2021 WL 662292 (E.D. Pa. 2021) .......................................................................27

*In re Sulfuric Acid Antitrust Litig.*,
    703 F.3d 1004 (7th Cir. 2012) ............................................................................... 19

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010) ................................................................................. 29

*In re Turkey Antitrust Litig.*,
    642 F. Supp. 3d 711 (N.D. Ill. 2022) ..................................................................... 29

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
    865 F. Supp. 2d 1002 (C.D. Cal. 2011) ....................................... 12, 13, 18, 29

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
    903 F. Supp. 2d 880 (C.D. Cal. 2012) ................................................................. 13

*In re Wheat Rail Freight Antitrust Litig.*,
    579 F. Supp. 517 (N.D. Ill. 1984) ......................................................................... 11

*Intel Corp. v. Fortress Invest. Grp. LLC*,
    511 F. Supp. 3d 1006 (N.D. Cal. 2021) ............................................................... 37

*Interstate Circuit v. United States*,
    306 U.S. 208 (1939) ............................................................................................. 23

*Jeffrey Farkas, M.D., LLC v. Cigna Health & Life Ins. Co.*,
    386 F. Supp. 3d 238 (E.D.N.Y. 2019) ................................................................... 7

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) .............................................................................. 22

*Kleen Prods., LLC v. Packaging Corp. of Am.*,
    775 F. Supp. 2d 1071 (N.D. Ill. 2011) ........................................................... 23, 24

*Leegin Creative Leather Prods. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ....................................................................................... 16, 27

*Little Rock Cardiology Clinic PA v. Baptist Health*,
    591 F.3d 591 (8th Cir. 2009) ................................................................................ 35

*Long Island Anesthesiologists PLLC v. United Healthcare Insurance Company of New York, Inc.*,
    2023 WL 8096909 (E.D.N.Y. 2023) ............................................................... 16, 17

*Luv N' Care, Ltd. v. Shiboleth LLP*,
    2017 WL 3671039 (S.D.N.Y. 2017) ....................................................................... 8

*Marion Healthcare LLC v. S. Ill. Healthcare*,
    2013 WL 4510168 (S.D. Ill. 2013) ....................................................................... 35

*Matter of Wheat Rail Freight Rate Antitrust Litig.*,
    759 F.2d 1305 (7th Cir. 1985) .............................................................................. 11

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*,
    2015 WL 1399229 (C.D. Ill. 2015) ....................................................................... 35

*Meyer v. Kalanick*,
    174 F. Supp. 3d 817 (S.D.N.Y. 2016) ............................................................ 11, 29

v

*Moehrl v. Nat'l Ass'n of Realtors,*
    492 F. Supp. 3d 768 (N.D. Ill. 2020) ............................................................. 23

*Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC,*
    2022 WL 4017895 (W.D.N.Y. 2022) ............................................................. 24

*Nat'l Soc'y of Pro. Eng'rs v. United States,*
    435 U.S. 679 (1978) ...................................................................................... 11

*Nostalgic Partners, LLC v. Office of Comm'r of Baseball,*
    637 F. Supp. 3d 45 (S.D.N.Y. 2022) ............................................................. 19

*Noto v. 22nd Century Grp., Inc.,*
    35 F.4th 95 (2d Cir. 2022) ............................................................................ 40

*O.E.M. Glass Network, Inc. v. Mygrant Glass Co., Inc.,*
    436 F. Supp. 3d 576 (E.D.N.Y. 2020) ........................................................... 21

*Ohio v. Am. Express Co.,*
    138 S. Ct. 2274 (2018) ................................................................................. 31

*Omnicare, Inc. v. Unitedhealth Grp., Inc.,*
    524 F. Supp. 2d 1031 (N.D. Ill. 2007) .......................................................... 40

*Pac. Recovery Sols. v. United Behavioral Health,*
    508 F. Supp. 3d 606 (N.D. Cal. 2020) .................................................... 13, 17

*Park Irmat Drug Corp. v. Express Scripts Holding Co.,*
    911 F.3d 505 (8th Cir. 2018) ........................................................................ 24

*Penske Media Corp. v. Shutterstock, Inc.,*
    548 F. Supp. 3d 370 (S.D.N.Y. 2021) ........................................................... 40

*Peretti v. Authentic Brands Grp. LLC,*
    33 F.4th 131 (2d Cir. 2022) ........................................................................... 8

*Premier Concrete LLC v. Argos N. Am. Corp.,*
    2021 WL 1209354 (N.D. Ga. 2021) .............................................................. 30

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,*
    124 F.3d 430 (3d Cir. 1997) ......................................................................... 36

*Relevent Sports, LLC v. United States Soccer Fed'n, Inc.,*
    61 F.4th 299 (2d Cir. 2023) .......................................................................... 18

*Ross v. Am. Exp. Co.,*
    35 F. Supp. 3d 407 (S.D.N.Y. 2014) , *aff'd* 630 F. App'x 79 (2d Cir. 2015) ....... 24

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,*
    792 F.2d 210 (D.C. Cir. 1986) ..................................................................... 15

*SD3, LLC v. Black & Decker (U.S.) Inc.,*
    801 F.3d 412 (4th Cir. 2015) ................................................................... 23, 27

*Spinelli v. NFL,*
    96 F. Supp. 3d 81 (S.D.N.Y. 2016) .............................................................. 38

*St. Francis Hosp. & Med. Ctr., Inc. v. Hartford Healthcare Corp.,*
   655 F. Supp. 3d 52 (D. Conn. 2023) .................................................................................35

*Starr v. Sony BMG Music Ent.,*
   592 F.3d 314 (2d Cir. 2010) ................................................................................... 20, 26

*TechReserves Inc. v. Delta Controls Inc.,*
   2014 WL 1325914 (S.D.N.Y. 2014) ...........................................................................19

*Tera Grp., Inc. v. Citigroup, Inc.,*
   2019 WL 3457242 (S.D.N.Y. 2019) .................................................................... 21, 29

*Todd v. Exxon Corp.,*
   275 F.3d 191 (2d Cir. 2001) ............................................................................... passim

*Transource Int'l, Inc. v. Trinity Indus., Inc.,*
   725 F.2d 274 (5th Cir. 1984) ......................................................................................15

*TSI Prods., Inc. v. Armor All/STP Prods. Co.,*
   2019 WL 4600310 (D. Conn. 2019) ..........................................................................38

*United States v. Am. Airlines Grp. Inc.,*
   2023 WL 3560430 (D. Mass. 2023) ...........................................................................37

*United States v. Apple, Inc.,*
   791 F.3d 290 (2d Cir. 2015) ............................................................................... passim

*United States v. Brewbaker,*
   87 F.4th 563 (4th Cir. 2023) ......................................................................................16

*United States v. Columbia Pictures Corp.,*
   169 F. Supp. 888 (S.D.N.Y. 1959) ............................................................................15

*United States v. Davita Inc.,*
   2022 WL 1288585 (D. Colo. 2022) ...........................................................................15

*United States v. E.I. du Pont de Nemours,*
   351 U.S. 377 (1956) ...................................................................................................15

*United States v. eBay, Inc.,*
   968 F. Supp. 2d 1030 (N.D. Cal. 2013) .....................................................................10

*United States v. Socony-Vacuum Oil Co.,*
   310 U.S. 150 (1940) ............................................................................................ 11, 30

*United States v. Trenton Potteries Co.,*
   273 U.S. 392 (1927) ...................................................................................................12

*USFL v. NFL,*
   842 F.2d 1335 (2d Cir 1988) .....................................................................................29

# INTRODUCTION

MultiPlan is an economic parasite. It leeches away billions of dollars a year that should be used to compensate U.S. healthcare providers for the life-saving services they provide to patients, and it redirects that money to itself and its competitors. It does this by agreeing with competing payors to suppress reimbursements to healthcare providers for out-of-network ("OON") services.[1] Those collusive agreements have three essential terms. First, MultiPlan and its competitors stop competing to provide adequate OON compensation to healthcare providers, and instead agree to use a common "repricing" formula to set artificially low reimbursement rates to pay healthcare providers. Second, MultiPlan takes over negotiations with the providers on those collusively-set reimbursement rates. Third, MultiPlan and its co-conspirators divvy up the money that they take from providers. Despite hollow proclamations of savings to patients, MultiPlan's cartel (the "MultiPlan Cartel") provides no benefit to anyone other than MultiPlan and its co-conspirators.

The harm caused by the Cartel is astounding. MultiPlan offers to pay providers 61-80% less on each submitted OON claim, leading to up to $18.8 billion per year in losses for providers. Providers are in no position to push back on the MultiPlan Cartel. Federal and state laws require them to treat many patients, regardless of whether they are OON, and prohibit them from billing patients for the balance of the OON charges that MultiPlan refuses to pay. Because the Cartel involves nearly every commercial payor, it is practically impossible for providers to challenge MultiPlan's OON reimbursements on an individual basis. This key dynamic helps the Cartel maintain its power. As a result, some victims of the Cartel have gone bankrupt, while others are on the brink of insolvency. All victims are denied revenue that they could reinvest in improving access to care and quality of care.

---

[1] "Payor" refers to entities engaged in pricing OON reimbursements to healthcare providers for services provided to patients enrolled in a commercial health insurance network, such as the networks operated by MultiPlan and its competitors. *See* Compl. ¶ 2, n.1 (referring to such entities as "payors," "plans," and "networks"). Prior to the MultiPlan Cartel, these entities competed with each other by independently pricing OON reimbursements for services provided to patients enrolled in their respective networks. *Id.* ¶¶ 5, 221-22. The Cartel ended that pricing competition. *Id.* ¶ 5.

1

MultiPlan's conduct is a *per se* violation of Section 1 of the Sherman Act. Competitors may not agree to stop competing on the prices that they should be setting independently. Because MultiPlan's conduct is *per se* illegal, its purported excuses for it are immaterial.

Adventist Health System Sunbelt Healthcare Corporation's ("AHS") 87-page, 341-paragraph Complaint is full of direct evidence of cartel conduct rarely found in antitrust actions. For instance:

- MultiPlan admits that it competes against other payors, Compl. ¶¶ 43-60;

- MultiPlan invited its competitors to collude on OON pricing and instructed them on how they to be in "alignment" on OON reimbursements, *id.* ¶¶ 99-109;

- MultiPlan entered into dozens of agreements with its competitors to suppress OON pricing competition, *id.* ¶¶ 84-98, 110; and

- By suppressing OON reimbursements, MultiPlan and its competitors have redirected billions of dollars from providers to themselves, *id.* ¶¶ 116-118, 263, 268, 271, 300.

MultiPlan's motion to dismiss should be denied for several reasons. **First**, MultiPlan ignores the *Twombly* standard by asking the Court to weigh disputed facts and accept MultiPlan's counter-narrative. **Second**, AHS pleads a plausible claim for a *per se* violation of Section 1 of the Sherman Act, and MultiPlan's arguments to the contrary misread the law and the Complaint. **Third**, MultiPlan ignores well-pled facts showing a plausible hub-and-spoke cartel. **Fourth**, AHS pleads a rule of reason claim for unlawful vertical agreements in restraint of trade, while MultiPlan's counter-arguments misunderstand the relevant market. **Finally**, when the MultiPlan Cartel underpays providers, those providers suffer an antitrust injury.

## FACTUAL BACKGROUND

## I.    MultiPlan Competes with Other Payors

The MultiPlan Cartel is in the business of taking money from healthcare providers. MultiPlan competes against other commercial payors that adjudicate and price health insurance claims. Compl.

¶¶ 48-60, 286, 300. MultiPlan operates one such commercial payment scheme, a preferred provider organization or PPO. *Id.* ¶¶ 43, 46. It markets some of its PPO networks as "primary" networks for subscribers, which include employers, union benefit plans, and Native American tribes. *Id.* ¶ 50.

MultiPlan's PPO networks operate similarly to the PPO networks offered by other commercial payors. *Id.* ¶ 58. MultiPlan recruits healthcare providers to join its networks. *Id.* It maintains credentialing standards to ensure the quality of the providers on its networks. *Id.* It enters into agreements with physicians, hospitals, and other healthcare facilities to join its PPO networks. *Id.* It publishes fee schedules explaining how much healthcare providers will be paid for their services when seeing an "in-network" patient. *Id.* It holds accreditations and licenses from trade groups and state governments to operate its PPO networks. *Id.* ¶¶ 59-60. And, importantly, MultiPlan administers, adjudicates, and prices claims made by healthcare providers in its PPO networks. *Id.* ¶¶ 286, 300.

MultiPlan ***admits that it competes against other payors***. MultiPlan's PPO networks compete against networks operated by other payors like Aetna, Cigna, and UnitedHealth. *Id.* ¶ 54. As MultiPlan confirmed in its March 1, 2023 Annual Report: "**We also compete with PPO networks owned by our large Payor customers.**" *Id.* ¶ 55 (emphasis added). The same report states, "**We compete directly** with other independent PPO networks." MultiPlan 2023 Annual Report at 19 (Mar. 1, 2023), https://shorturl.at/tuE46 (emphasis added). Moreover, MultiPlan's CEO, Dale White, has explained "**our clients are our competitors [and] our competitors are our clients.**" Dale White, Remarks at the Piper Sandler Healthcare Conference, at 4:38-4:43 (Nov. 29, 2023), https://shorturl.at/enDKU (emphasis added).

One key mechanism for competition between MultiPlan and rival payors is independently setting the prices for reimbursement claims. Prior to the MultiPlan Cartel, pricing competition among payors served as a check on reimbursement rates for OON services. Compl. ¶ 5. All payors had a competitive incentive to keep their OON reimbursement rates at reasonable levels to ensure providers

remained willing to provide a broad spectrum of OON services to patients enrolled in their networks, and to preserve the possibility that OON providers would ultimately agree to join their networks. *Id.* ¶¶ 134-135, 302-303. The MultiPlan Cartel extinguished this horizontal competition by delegating industry-wide pricing and negotiation authority to MultiPlan, making individualized reimbursement negotiations impossible, and thereby allowing the co-conspirators to dramatically suppress OON reimbursement rates far below what they would have been but-for the Cartel. *Id.* ¶¶ 10-11.

## II. MultiPlan Enters into Agreements with its Competitors That Eliminate Pricing Competition Between Them

MultiPlan enters into agreements with its admitted competitors—*i.e.*, other payors—to refrain from independently setting OON prices and to suppress payments to providers for OON claims. *Id.* ¶¶ 84-86. These agreements have three key terms. MultiPlan and its competitors agree to (1) stop competing on OON reimbursement pricing, and to use MultiPlan's proprietary OON pricing methodology rather than exercising independent pricing discretion; (2) have MultiPlan take over the negotiation of the OON reimbursement rate with the provider; and (3) split the revenue generated by underpaying the providers. *Id.* ¶¶ 10, 16, 300.

For example, in 2017 MultiPlan approached its competitor, UnitedHealth, and informed UnitedHealth that its OON reimbursements were too high and needed to be brought "back into alignment." *Id.* ¶ 100. MultiPlan informed UnitedHealth that it had already entered into agreements with seven competing commercial payors "on managing out-of-network costs" and offered to enter into a similar agreement with UnitedHealth. *Id.* UnitedHealth considered the offer. *See id.* ¶ 101. It was comforted by the fact that its competitors also agreed to use MultiPlan's pricing methodology to slash OON reimbursement rates. *Id.* ¶¶ 101, 108. Internally, UnitedHealth determined that it would generate tremendous revenues—in excess of $900 million per year—by entering into the agreement and cutting its OON payments to healthcare providers. *Id.* ¶ 105. UnitedHealth and MultiPlan discussed and agreed upon how little UnitedHealth would pay for OON claims using MultiPlan's pricing

methodology. *Id.* ¶¶ 102-103. As a part of that agreement, MultiPlan instructed UnitedHealth to suppress OON reimbursements in a manner that would be in the "middle of the pack with its peers." *Id.* ¶ 106. UnitedHealth tracked the performance of its agreement with MultiPlan in an internal spreadsheet that showed that the MultiPlan agreement was generating hundreds of millions of dollars in underpayments to healthcare providers by UnitedHealth alone. *Id.* ¶ 109.

MultiPlan has entered into similar agreements with hundreds of other payors. *Id.* ¶ 84. State insurance commissioners records show that MultiPlan has similar agreements with Aetna, Anthem, Cigna, Kaiser Foundation Health Plan, Asuris Northwest Health, Regence Blue Shield, Bridgespan Health Company, Regence Blue Shield of Oregon, and Regence Blue Shield of Idaho. *Id.* ¶¶ 16, 87-90, 96, 99-109. MultiPlan also brags that it has agreements with each of the top 15 payors, which represent more than 60% of the commercial reimbursement market. *Id.* ¶¶ 84, 110-11, 132, 144, 147.

MultiPlan is not merely offering a "recommendation" or an "option" on how to pay an OON claim. *Id.* ¶ 73. The OON prices that MultiPlan's proprietary methodology generates are accepted and passed on to providers ***99.4%*** of the time. *Id.* ¶ 74. In many cases, MultiPlan takes over the OON claim negotiation, and threatens that if the provider does not accept MultiPlan's collusively low offer, the negotiation will simply get worse for the provider. *Id.* ¶¶ 16, 95-97.

MultiPlan also left telltale economic fingerprints of its collusive activity. For years payors saw OON claims as a pain point, but they were unable to unilaterally deviate from the usual, customary, reasonable ("UCR") OON reimbursement rates and OON claims priced using the FAIR Health benchmarking database. *Id.* ¶¶ 121, 127, 221. Beginning at least as early as 2017, MultiPlan upended the prior OON pricing consensus by entering into agreements with payors that represented 90% of the relevant market. *Id.* ¶¶ 121, 140, 298. Suddenly, payors not only offered to pay much less than UCR and FAIR Health rates, but turned over their negotiations to MultiPlan. *Id.* ¶¶ 272, 277. The payors could do so secure in the knowledge that it would be extraordinarily difficult for maverick

payors to enter the market and disrupt this scheme. *Id.* ¶¶ 138-60. The constant flow of information between MultiPlan and other payors ensured that everyone stayed in line. *Id.* ¶¶ 99-108, 208-212. The payors sent MultiPlan real-time data on submitted OON claims. *Id.* ¶ 210. MultiPlan provided the payors with information on whether they were in "alignment" or the "middle of the pack" with their competitors, along with secret white papers explaining the purpose, implementation, and effect of MultiPlan's OON pricing methodology. *Id.* ¶¶ 100, 106. When UnitedHealth threatened to defect from the understanding that the payors would use MultiPlan to suppress their OON payments, MultiPlan bought off UnitedHealth's continued participation in the Cartel at a significant financial loss to MultiPlan. *Id.* ¶¶ 199-207. By acting in this manner, the Cartel achieved something that payors could never have achieved acting unilaterally. *Id.* ¶¶ 221-223. Payors could not cut their OON reimbursements unilaterally, because providers could play the payors off of one another in negotiations and undermine any unilateral payment decrease. *Id.* ¶¶ 197, 221. By agreeing not to compete and authorizing MultiPlan to act as a clearinghouse for OON pricing, the payors reaped massive profits. *Id.* ¶¶ 188-198, 225-26, 300.

## III.  MultiPlan's Agreements Harm Market-Wide Competition

There is a relevant market consisting of all reimbursements paid by payors of commercial OON claims in the United States. *Id.* ¶¶ 19, 138. This market is comprised of multiple sub-markets for OON reimbursements made by a particular payor. *Id.* ¶¶ 19, 138, 150, 152. Competition for commercial OON reimbursements is distinct from other forms of healthcare reimbursement because the healthcare sector is segmented. In the first segment, providers negotiate with payors to determine if they will be in-network or OON with respect to that payor. *Id.* ¶ 2. In the second segment, healthcare providers market their services to the community in an effort to attract potential patients to their facilities. *Id.* ¶¶ 2, 3, 140, 243. In the third segment, after a provider has treated a patient who is OON, the provider submits a claim for reimbursement to that patient's commercial payor and attempts to

collect that amount from the payor. *Id.* ¶¶ 3, 16, 69-70, 95-97.

This case focuses on the third segment. In that segment, providers are easy victims for the MultiPlan Cartel. The law requires providers to treat all patients needing emergency medical care. *Id.* ¶¶ 238-48. The time and effort spent stabilizing patients with life-threatening conditions and injuries, such as strokes, heart attacks, and gunshot wounds can be extremely high. *Id.* ¶ 247-49. If that patient is OON, federal law also prohibits the healthcare provider from billing the patient for the balance of any charges that are unpaid by a commercial payor. *Id.* ¶¶ 139, 277. If payors collude on OON pricing, providers are effectively stuck with those collusive prices. *Id.* ¶¶ 232, 247-49.

In an example MultiPlan strangely highlights in its brief, a 41-year-old patient was rushed to the emergency room after suffering a life-threatening stroke and multiple brain aneurysms, and neurosurgeons saved her life. *Jeffrey Farkas, M.D., LLC v. Cigna Health & Life Ins. Co.*, 386 F. Supp. 3d 238, 241-42 (E.D.N.Y. 2019). When the neurosurgeons submitted a $332,300 claim for the life-saving brain surgery, Cigna sent that OON claim to MultiPlan. *Id.* at 242. MultiPlan took over the negotiation of the charge and offered to pay only $12,407 for the life-saving brain surgery and related aftercare. *Id.* When the provider refused that offer, MultiPlan repriced the claim again and offered to only pay $7,499.77. *Id.* After multiple rounds of MultiPlan "repricing," Cigna sent the neurosurgeons a check for $6,893.20 for only the "inpatient pre-stabilization services" portion of their submitted charges— i.e., a payment for services rendered prior to the emergency brain surgery. *Id.* at 242, 246-47.[2]

This same pattern has played out throughout the relevant market. MultiPlan's agreements led to as much as $18.8 billion dollars per year being siphoned from hospitals via systematic and dramatic underpayments of OON claims. Compl. ¶¶ 12, 82. MultiPlan also benefits from the conspiracy by

---

[2] MultiPlan suggests that it offered to pay three times the Medicare cost of emergency brain surgery. Mot. 9. That is untrue. The amount paid was more than 300% of Medicare cost for the pre-surgical services, not 300% of all of the services provided by the neurosurgeons. 386 F. Supp. 3d at 242, 246-47. MultiPlan is also wrong to suggest that the balance would have been billed to the patient. Mot. 9-10. New York adopted a prohibition on that form of balance billing in 2014. *Haller v. U.S. Dep't of Health & Human Servs.*, 621 F. Supp. 3d 343, 350-51 (E.D.N.Y. 2022).

using the same proprietary methodology to underpay claims on its own network. *Id.* ¶¶ 7, 304, 306.

Those underpayments harmed AHS, other providers, and patients. *Id.* ¶¶ 228-56, 269-79. The Cartel harmed providers by underpaying for their labor. *Id.* ¶ 256. It harmed patients by leaving providers with less money to reinvest in the availability and quality of care. *Id.* ¶¶ 235-37. There are hundreds of hospitals that are financially underwater. *Id.* ¶ 236. For those hospitals, each underpayment from the MultiPlan Cartel is a step closer to closure—leaving communities without readily-available access to care. *Id.* ¶¶ 235, 256.[3] MultiPlan has no valid justification for its conduct; the conspiracy only serves to enrich MultiPlan and its fellow conspirators. *Id.* ¶¶ 252-56.

## ARGUMENT

**I.  MultiPlan Cannot Use a Motion to Dismiss to Rewrite AHS' Complaint, Resolve Factual Disputes, or Lock this Court into a Particular Mode of Analysis**

Though masquerading as a motion to dismiss, MultiPlan repeatedly asks the Court to ignore AHS' factual allegations and instead adopt the counter-narrative that MultiPlan would like to present at trial. But, at the pleading stage, the Court must "accept factual allegations in the complaint as true and draw all reasonable inferences" in AHS' favor. *Peretti v. Authentic Brands Grp. LLC*, 33 F.4th 131, 137 (2d Cir. 2022). "Fact-specific questions cannot be resolved on the pleadings." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012). Therefore, "a motion to dismiss neither allows for a factual narrative that supplements the four corners of the pleading nor a counter-narrative by the defendant." *In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 359 (S.D.N.Y. 2022). While a defendant "may vehemently contest the validity of Plaintiffs' allegations, a motion to dismiss is not the proper avenue for raising" those challenges. *Luv N' Care, Ltd. v. Shiboleth LLP*, 2017 WL 3671039, at *11 (S.D.N.Y. 2017). Instead, the plaintiff need only provide facts necessary to "nudge[]

---

[3] *See also* Dkt. 69-1 at 2 (American Hospital Association amicus brief explaining, that due to underpayments from commercial payors, "nearly half of all U.S. hospitals have negative operating margins, bond defaults are up, and hundreds of hospitals are on the brink of collapse.").

[its] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[4]

MultiPlan ignores these principles and relies on a counter-narrative that appears nowhere in the Complaint and directly contradicts AHS' well-pled factual allegations. For example:

- MultiPlan claims that it does not compete against other payors, *see* Dkt. 65 at 11-12 ("Mot."), but the Complaint cites evidence, including MultiPlan's own statements, confirming that they directly compete, Compl. ¶¶ 54-60;

- MultiPlan argues that its pricing methodology results in savings for patients, Mot. 4-5, 9, but the Complaint alleges that those purported savings are not passed on to patients, Compl. ¶¶ 13, 252-56;

- MultiPlan contends that its generates optional pricing recommendations, Mot. 10-11; the Complaint alleges that they are not recommendations, are not optional, and are accepted more than 99% of the time, Compl. ¶¶ 73-74; and

- MultiPlan claims that the true victims here are MultiPlan and its multi-billion-dollar co-conspirators, Mot. 1, not the providers from which the MultiPlan Cartel took billions of dollars, Compl. ¶ 12.

Indeed, a large portion of MultiPlan's argument is premised on the notion that the Court should infer that the phrase "We compete" means either "We compete in limited ways." *Compare* Mot. 11-12, *with* Compl. ¶ 55. But courts should not choose "between two plausible inferences that may be drawn from factual allegations" at the pleading stage. *Anderson News*, 680 F.3d at 185. The reality is that these are disputed facts that await determination by a jury, not adjudication via a motion to dismiss. *See, e.g.,*

---

[4] In addition, "there is no heightened pleading standard in antitrust cases." *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016). Thus, in antitrust cases "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 218 (S.D.N.Y. 2019) (citation omitted).

*Caruso Mgmt. Co. Ltd. v. Int'l Council of Shopping Ctrs.*, 403 F. Supp. 3d 191, 206-07 (S.D.N.Y. 2019) (denying summary judgment where parties presented "starkly different conceptions regarding every feature of the relevant market."). A jury can decide whether to credit MultiPlan's statements to its investors in SEC filings or treat as a gloss invented solely for purposes of this litigation.

MultiPlan also attempts to lock the Court into analyzing Counts 1 and 2 under the rule of reason, rather than the *per se* rule. But a motion to dismiss is not the appropriate vehicle for determining the mode of antitrust analysis to be applied to a defendant's conduct. *See, e.g., United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1040 (N.D. Cal. 2013) ("At this stage in this action, the court simply cannot determine with certainty the nature of the restraint, and by extension, the level of analysis to apply."). Moreover, courts have deferred this question in similar circumstances. In *Carbone v. Brown Univ.*, for instance, the district court determined that the plaintiffs plausibly alleged a violation of Section 1 of the Sherman Act where the defendants used a common methodology to set reimbursements they paid to admitted students for financial aid and "defer[red] the question of which framework to use for later in the litigation." 621 F. Supp. 3d 878, 889 (N.D. Ill. 2022). The Court should not prematurely adjudicate factual disputes and the applicable legal standard. It can simply hold that AHS has alleged sufficient facts to state a Section 1 claim under either the *per se* rule or the rule of reason, and leave the ultimate determination of which standard to apply to a later phase of the case. *Id.*

## II.     The MultiPlan Cartel is Illegal *Per Se*

If the Court applies any analytical standard to Count 1 of the Complaint at this stage, it should be the *per se* rule. Relying on assertions that appear nowhere in the Complaint, MultiPlan insists that it does not compete against other payors and the *per se* rule should not apply. Mot. 14-15. That argument fails for three reasons: (1) MultiPlan admits that it competes against other payors, (2) MultiPlan cannot rewrite AHS' allegations to make this a dual-distribution or hybrid restraint case, and (3) MultiPlan's factual argument that its claims suppression and PPO networks are "separate" is irrelevant and

improper for a motion to dismiss.

### A. MultiPlan's Agreements With Its Competitors Are *Per Se* Unlawful

The "central evil" addressed by Section 1 of the Sherman Act is an agreement resulting in "the elimination of competition that would otherwise exist." *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 195 (2010) (citation omitted). That is true regardless of "the machinery employed" by the agreement. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940). Any "agreement that interferes with the setting of price[s] by free market forces" among competitors is illegal *per se*. *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 692 (1978). It makes no difference whether the parties to an unlawful agreement operate on the seller side of the market or, as here, on the buyer side. *Todd v. Exxon Corp.*, 275 F.3d 191, 201 (2d Cir. 2001) ("[A] horizontal conspiracy among buyers to stifle competition is as unlawful as one among sellers."). All those agreements are a "threat to the central nervous system of the economy," "[t]hey are all banned" regardless of their purported justification. *Socony-Vacuum*, 310 U.S. at 224 n.59.

The *per se* rule squarely applies to agreements between competitors to use a common method to set prices, regardless of whether that methodology results in uniform prices. *Socony-Vacuum*, 310 U.S. at 222 ("Hence prices are fixed . . . if the prices paid . . . are to be at a certain level or on ascending or descending scales, if they are to be uniform, or if by various formulae they are related to the market prices."); *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 771 (2d Cir. 2016) (agreeing to fix a component of a price is a *per se* violation of the Sherman Act); *Meyer v. Kalanick*, 174 F. Supp. 3d 817, 824-26 (S.D.N.Y. 2016) (plaintiff plausibly alleged a *per se* violation of Sherman Act where all Uber drivers agreed to use a pricing algorithm); *In re Wheat Rail Freight Antitrust Litig.*, 579 F. Supp. 517, 538 (N.D. Ill. 1984) ("an agreement on how rates are to be calculated effectively fixes prices"), *aff'd sub nom. Matter of Wheat Rail Freight Rate Antitrust Litig.*, 759 F.2d 1305 (7th Cir. 1985).

Whether the horizontal agreement only affects the "starting point" for price negotiations, or

that some sellers are able to negotiate from the collusively-set price is irrelevant. *See, e.g.*, *Gelboim*, 823 F.3d at 776 (a plaintiff may allege an antitrust claim "based on the influence that a conspiracy exerts on the starting point for prices"); *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 362-63 (3d Cir. 2004) ("An agreement to fix prices is . . . a per se violation of the Sherman Act even if most or for that matter all transactions occurred at lower prices."). After all, a *per se* illegal restraint of trade need not "be aimed at a complete elimination of price competition." *FTC v. Super. Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 435 (1990) (quotation omitted); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002) (fixing the starting price for negotiations is illegal *per se*; courts should avoid the "trap" of "failing to distinguish between the existence of a conspiracy and its efficacy").[5] When competitors abdicate their independent pricing discretion by adopting a common pricing formula, they commit a *per se* violation of the Sherman Act. *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d 1002 (C.D. Cal. 2011).

In fact, courts have applied the *per se* rule to agreements strikingly similar to the MultiPlan Cartel. In *WellPoint*, UnitedHealth owned a large health insurance network and also had a subsidiary, Ingenix, that used a proprietary pricing methodology to reprice OON claims for UnitedHealth and competing payors. *Id.* at 1016-17. Payors sent their OON claims data to Ingenix, and Ingenix told them how to reprice those claims. *Id.* at 1017. Ingenix also facilitated communications between payors concerning OON pricing. *Id.* at 1016. The payors had other opportunities to discuss OON pricing with one another at trade association meetings. *Id.* at 1026. The district court concluded that the facts established the existence of an agreement. *Id.* at 1026. The district court also applied the *per se* rule, finding that although plaintiffs did "allege a vertical dimension to the conspiracy," the gist of the

---

[5] MultiPlan insinuates that its collusive agreements should be excused because they set reimbursement rates above AHS' marginal cost of providing healthcare. *See* Mot. 11. That is incorrect. When competitors agree to stop competing on price, the prices they collectively set are illegal "[w]hether the prices actually agreed upon [are] reasonable or unreasonable." *United States v. Trenton Potteries Co.*, 273 U.S. 392, 401 (1927).

complaint was that competing payors agreed among themselves to suppress OON rates using a common pricing method. *Id.* at 1028. The district court also found that the mere fact that one of the payors also acted as a middle-man was not enough to "escape the *per se* rule." *Id.* Finally, the district court rejected the defendants' arguments that the agreement simply helped payors set prices more efficiently and realize savings, finding that it would be improper to read the complaint with the defendants' suggested gloss. *Id.*[6]

As in *WellPoint*, MultiPlan both operates PPO networks and provides an OON claims repricing methodology to its competitors. Compl. ¶¶ 1-3. Prior to entering into agreements with other payors, MultiPlan and other payors were independent sources of decision-making regarding claims pricing. *Id.* ¶¶ 5, 221-22. MultiPlan, for example, used proprietary "repricing" algorithms in setting reimbursement rates on its own PPO networks, while other PPO networks used their own methodologies or negotiation strategies. *Id.* ¶ 5, 7, 304, 306. Now, MultiPlan and its competitors have delegated this independent decision-making to a single, common agent: MultiPlan. *Id.* ¶ 16, 73, 95-97. MultiPlan not only determines the OON reimbursement rates, it then acts as an "enforcer" by compelling providers to accept those suppressed rates more than 99% of the time. *Id.* ¶¶ 11, 74, 252. The *per se* rule should apply here too. *See WellPoint*, 865 F. Supp. 2d at 1028; *see also Bellevue Drug Co. v. Advance PCS*, 2004 WL 724490, at *6 (E.D. Pa. 2004) (applying *per se* rule where pharmacy benefit managers used a single competitor's pricing methodology).

The factual contrast with *In re RealPage Antitrust Litig.*, where the district court applied the rule of reason to the wide-spread use of a pricing algorithm, also demonstrates why the *per se* rule should

---

[6] *WellPoint* was decided prior to state and federal laws prohibiting providers from billing for the unpaid balance of a claim for certain OON emergency services went into effect. *See* Compl. ¶¶ 277. For that reason, the *WellPoint* court subsequently determined that harm to the providers was too attenuated to plausibly demonstrate antitrust standing. *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 903 F. Supp. 2d 880, 902 (C.D. Cal. 2012). The subsequent prohibition of balance billing (and MultiPlan's insistence that providers sign agreements promising not to balance bill in order to receive any payment) means that AHS has antitrust standing, *see* Compl. ¶¶ 95, 97, 275-279, and distinguishes prior antitrust standing case law regarding balance billing. *See Pac. Recovery Sols. v. United Behavioral Health*, 508 F. Supp. 3d 606, 614-15 (N.D. Cal. 2020) (granting motion to dismiss where plaintiff's theory of harm relied on balance billing).

apply here. 2023 WL 9004806 (M.D. Tenn. 2023). In *RealPage*, a vendor licensed its revenue management software to apartment managers. *Id.* at *1-2. However, there was no dispute at the motion to dismiss stage that the vendor was not a landlord and did not compete with its landlord-customers. *Id.* at *1. Likewise, the vendor did not handle the negotiation of apartment rental prices. *Id.* at *23. The landlords retained ultimate pricing discretion, and deviated from the prices recommended by the vendor up to 20% of the time. *Id.* at *2, 23. In fact, there was no evidence that the vendor did anything to ensure that the landlords actually abided by its pricing recommendations. *Id.* at *23. Moreover, the complaint appeared to allege that landlords were using the revenue management software prior to the beginning of the alleged conspiracy, so there was no change in industry pricing conduct. *Id.*

MultiPlan's conduct is much more pernicious. Unlike in *RealPage*, MultiPlan admits that is a competing payor. Compl. ¶ 55; *supra* 3. MultiPlan does far more than make pricing recommendations, it takes over the negotiations and ensures that its pricing recommendations are passed along to healthcare providers more than 99% of the time. And when payors threatened to leave the conspiracy, MultiPlan brought them back into the fold. *Supra* 4-6. Because this case contains the facts that *RealPage* lacked, the *per se* rule applies here.

MultiPlan cannot escape that conclusion by attempting to rewrite the Complaint. MultiPlan claims that currently it only competes against other payors "in the PPO network space" and not with respect to claims pricing. Mot. 14-15. But, before the MultiPlan Cartel, the independent OON pricing decisions were affected by competitive considerations: a PPO network could not routinely under-compensate providers for OON services without running the risk that providers would refuse to provide various OON services to patients enrolled in the network, or refuse to consider joining the network in the future, making the network less attractive to potential subscribers and damaging the network's ability to compete with other networks who offered market-level reimbursement rates. Compl. ¶¶ 134-35, 189-90. This is the competition that was snuffed out by the MultiPlan Cartel. *Id.* ¶

7. Simply analyzing a market where MultiPlan and other payors have agreed not to compete, does not lead to the conclusion that the Cartel members would not compete absent those agreements. *See United States v. E.I. du Pont de Nemours*, 351 U.S. 377, 400 (1956) (courts cannot draw conclusions based on market that is already affected by anticompetitive conduct).[7]

### B.    This is Not a "Hybrid Restraint" or "Dual Distribution" Case

MultiPlan argues that its agreements with its competitors are hybrid agreements that should be analyzed under the rule of reason, because they have vertical aspects. Mot. 14-17. MultiPlan bases this argument on its factual contentions—which, again, appear nowhere in the Complaint—that it is not an "insurance plan" and does not reimburse AHS for OON charges, Mot. 2. That is wrong.

***First***, MultiPlan is wrong to recast its horizontal agreements as hybrid restraints. MultiPlan admits that it enters into agreements with its competitors concerning OON pricing. *Supra* 3. And even if MultiPlan did not concede that it actually competes with its co-conspirators, MultiPlan and other payors would still be at least potential competitors. Compl. ¶¶ 199-207. And where companies are "actual or potential competitors at the same level of the market structure," they are "horizontal competitors." *United States v. Davita Inc.*, 2022 WL 1288585, at *2 (D. Colo. 2022). All such agreements are illegal *per se. Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 229 (D.C. Cir. 1986) (horizontal restraints "eliminate some degree of rivalry" among "actual or potential competitors.").[8] MultiPlan ignores that alternative theory and raises no argument on this point in its motion to dismiss. *Keurig*, 383 F. Supp. 3d at 244 (distinguishing dual distribution and hybrid restraint cases because plaintiff alleged that defendant entered into agreements with potential competitors, which are purely horizontal agreements).

---

[7] MultiPlan's argument that only some of MultiPlan's collusive agreements are with PPOs (*see* Mot. 14-15) is irrelevant. The relevant area of competition in this case is for pricing OON claims. Regardless of whether that pricing was done by a PPO or another entity prior to the MultiPlan Cartel, that competition no longer occurs. *Infra* at 17-18.

[8] *Transource Int'l, Inc. v. Trinity Indus., Inc.*, 725 F.2d 274, 280 (5th Cir. 1984) ("agreements not to compete among potential competitors are . . . illegal per se."); *United States v. Columbia Pictures Corp.*, 169 F. Supp. 888, 893 (S.D.N.Y. 1959) (same).

In addition, the cases that MultiPlan relies upon for its hybrid restraint theory are plainly inapposite, as they deal with the relationship between a manufacturer and a distributor that sell a single brand of goods or services in the same distribution chain. *United States v. Brewbaker*, 87 F.4th 563, 581 (4th Cir. 2023) (using example of Nike and one of its authorized retailers both selling Nike shoes directly to consumers). For example, in *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, the plaintiff and the defendant both sold Vertex-branded radios and related Vertex-branded equipment to police departments. 2011 WL 1044898, at *3 (S.D.N.Y. 2011), *aff'd on other grounds*, 711 F.3d 68 (2d Cir. 2013). Likewise, in *2238 Victory Corp. v. Fjallraven USA Retail, LLC*, the plaintiff and defendant both sold the same high-end brand of backpacks. 2021 WL 76334, at *1 (S.D.N.Y. 2021).[9] Those cases have no application here. MultiPlan and its competitors do not sell a single brand of health coverage or operate a single network of providers. While the payors should be competing to set reimbursement rates for OON services independently, as a consequence of the conspiracy, a healthcare provider who submits a claim to Cigna winds up getting a repricing letter from MultiPlan. *See, e.g.*, Compl. ¶¶ 94-95.[10]

MultiPlan's reliance on *Long Island Anesthesiologists PLLC v. United Healthcare Ins. Company of N.Y., Inc.*, 2023 WL 8096909 (E.D.N.Y. 2023) ("*LIA*") is similarly misplaced. *See* Mot. 15. In *LIA*, the plaintiff "d[id] not include specific details about [MultiPlan]" in its complaint other than the fact that "MultiPlan provides billing support services to United [Healthcare]." *Id.* at *1; *see also id.* at *6. *LIA* asserted that the relevant market was "the provision of medically necessary anesthesia services to patients," and did not analyze competition between payors of those services. Complaint at ¶¶ 152-58, *Long Island Anesthesiologists PLLC v. United Healthcare Insurance Company of N.Y., Inc.*, 2:233-cv-04040-HG (E.D.N.Y. July 11, 2022). *LIA* argued that patients participated in that relevant market. *Id.* ¶ 165.

---

[9] *See also Copy-Data Sys., Inc. v. Toshiba Am., Inc.*, 663 F.2d 405, 406-07 (2d Cir. 1981) (distributing Toshiba copiers); *Elecs. Commc'ns Corp. v. Toshiba Consumer Prods., Inc.*, 129 F.3d 240, 241-42 (2d Cir. 1997) (distributing Toshiba cell phones).

[10] Moreover, MultiPlan's leading cases for its hybrid restraint argument are trial or summary judgment opinions, not motion to dismiss opinions. *See Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 884 (2007) (post-trial); *Copy-Data*, 663 F.2d at 406 (post-trial); *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 269 (6th Cir. 2014) (summary judgment).

LIA alleged that MultiPlan's anticompetitive conduct consisted solely of its agreement with UnitedHealth and a single reimbursement rate cut to LIA. *Id.* ¶¶ 173-78. LIA also made passing references to anticompetitive harm to "other anesthesia providers," but provided no specifics on how anyone other than LIA was harmed by MultiPlan's agreement with UnitedHealth. *Id.* ¶¶ 179-82. LIA also failed to allege facts showing that MultiPlan and UnitedHealth were competitors, noting only that they might both be "payors" in some sense. *Id.* ¶ 167.

AHS' Complaint is entirely different. It alleges a different relevant market. *See* Compl. ¶¶ 138-143. It explains that the participants in the commercial reimbursement market are payors and providers, because providers are locked in to negotiating with a single payor after providing OON services. *Id.* ¶ 8. It names other providers that MultiPlan harmed. *Id.* ¶¶ 235-37. It details how MultiPlan's scheme to underpay healthcare providers works. *See id.* ¶¶ 43–115. Unlike in *LIA*, AHS alleges that, prior to the conspiracy, MultiPlan competed against other PPO networks as independent payors of commercial healthcare claims. *See, e.g.*, *id.* ¶¶ 29-36, 43-62, 301, 302. And, unlike LIA, AHS has catalogued direct admissions from MultiPlan that it does compete against other payors. *Id.* ¶ 55. MultiPlan cannot credibly invoke *LIA* as a basis for why it should prevail at the pleading stage.[11]

**Second**, MultiPlan's assertions that it does not pay OON reimbursements and allegedly is not an insurance plan are immaterial. As an initial matter, MultiPlan is again relying on a counternarrative that appears nowhere in the Complaint. Even if it were true that MultiPlan does not always cut the check for an OON reimbursement (and even if it were appropriate to resolve that factual dispute on a motion to dismiss), the restraint on competition at issue in this case is not about writing checks or charging premiums; it is about setting reimbursement *prices*. Compl. ¶ 5. Prior to the conspiracy, each

---

[11] As MultiPlan begrudgingly admits (Mot. 17 n.5), these same facts distinguish *Pac. Recovery Sols. v. United Behavioral Health*, 481 F. Supp. 3d 1011, 1123-24 (N.D. Cal. 2020). In that case, the plaintiff also failed to plead facts showing that MultiPlan was a horizontal competitor and failed to explain how the prohibitions on balance billing meant that providers were harmed directly by MultiPlan's conduct. *Id.* at 1122-24.

payor was an "independent source of decisionmaking" regarding the reimbursement rates for OON services. *Id.* ¶¶ 5, 54-62; *see Am. Needle*, 560 U.S. at 195 (competitors engage in *per se* unlawful conduct when their conduct "joins together separate decisionmakers," thereby "depriv[ing] the marketplace of independent centers of decisionmaking."). The MultiPlan Cartel eliminated that competition. *Id.* ¶ 1-3. Now, virtually every payor in the U.S. uses MultiPlan's pricing methodology for OON claims instead of their own independent pricing judgment. *See Relevent Sports, LLC v. United States Soccer Fed'n, Inc.*, 61 F.4th 299, 309 (2d Cir. 2023) (allegations that competing entities "have surrendered [their] freedom of action…and agreed to abide by the will of" a group are "enough" to warrant *per se* liability).[12]

Even if the Court accepts MultiPlan's unpled defense that it operates at two levels—i.e., running a PPO network and repricing OON claims, that does not mean that the MultiPlan Cartel should be analyzed as a series of vertical agreements. *United States v. Apple, Inc.*, 791 F.3d 290, 314-16 (2d Cir. 2015) (series of vertical agreements was evidence of a horizontal conspiracy); *infra* 27-28. The restraint at issue here is entirely horizontal, because MultiPlan and its co-conspirators priced claims independently prior to the Cartel and agreed to no longer independently set the price of OON claims. Compl. ¶¶ 286, 300. When competitors agree to remove a form of rivalry that previously existed between them, that is a horizontal restraint and the *per se* rule applies *See* Compl. ¶ 300; *WellPoint*, 865 F. Supp. 2d at 1028 (applying *per se* rule despite UnitedHealth playing two roles in industry).

### C.      MultiPlan Does Not Have Two Separate Businesses

In a last ditch attempt to avoid the *per se* rule, MultiPlan claims that its "repricing" conduct is somehow a "separate business" from its PPO business. Mot. 14. AHS' Complaint alleges the opposite.

---

[12] If MultiPlan is claiming that it adjudicates claims on its PPO networks while the actual payment of those claims is made by another party that also underwrites claims risk, that is no different from competing payors that offer administrative services only ("ASO") plans. Compl. ¶ 122. Under an ASO plan, the subscriber pays a third-party a fixed fee to administer a health insurance network, including recruiting providers, setting network rules, promulgating fee schedules, and receiving and adjudicating claims. *Id.* The subscriber pays claims as directed and underwrites the risk associated with those claims. *Id.* That is exactly what MultiPlan does. *Id.* ¶¶ 46-60, 286.

MultiPlan has no separately incorporated business, no separate board of directors, no separate financial statements, and no separate executive team for its purportedly separate claims-suppression business. MultiPlan operates as a single integrated business with a single board and executive team; a single set of financial statements; and a single corporate entity overseeing its PPO networks and its claims-suppression business. Compl. ¶¶ 81, 271. MultiPlan never claims otherwise in its brief.[13] At most, MultiPlan has a division that operates its PPO and a division that operates its claims-suppression service. Since "there can be little doubt that the operations of a corporate enterprise organized into divisions must be judged as the conduct of a single actor," *Copperweld v. Indep. Tube Corp.*, 467 U.S. 752, 770 (1984), MultiPlan's separate business argument fails.[14]

## III.  In the Alternative, AHS Alleges an Unlawful "Hub-And-Spoke" Cartel

Count 2 alleges that MultiPlan has entered into a hub-and-spoke cartel that is illegal under both the *per se* rule and the rule of reason. MultiPlan raises two arguments in opposition. First, it claims that AHS was required to allege the who, what, and where of each of MultiPlan's agreements with the spokes of the cartel. Mot. 19. Second, it argues that there is no direct or circumstantial evidence of an agreement between the payors on the rim of the conspiracy. *Id.* at 21-27. Both arguments fail.

### A.  AHS Alleges Agreements Between the "Hub" and "Spokes" of the Cartel

In a hub-and-spoke cartel, "an entity at one level of the market structure, the 'hub,' coordinates

---

[13] MultiPlan's claim that AHS "carved out" any allegations concerning MultiPlan's PPO networks is equally baseless. Mot. 2. AHS is not seeking damages based on in-network claims it submitted to MultiPlan's PPOs, Compl. ¶ 7, n.2, but that does not mean that MultiPlan's PPO networks have no relevance to this case.

[14] Courts apply the rule of reason at the pleading stage where the complaint concedes that an agreement has pro-competitive benefits, *TechReserves Inc. v. Delta Controls Inc.*, 2014 WL 1325914, at *4 (S.D.N.Y. 2014), where courts traditionally apply the rule of reason to a particular industry, *Nostalgic Partners, LLC v. Office of Comm'r of Baseball*, 637 F. Supp. 3d 45, 53-54 (S.D.N.Y. 2022) (applying rule of reason due to unique dynamics of sports leagues), or where the defendants are engaged in "novel way[s] of doing business." *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1011 (7th Cir. 2012). None of those exceptions applies here. AHS alleges that the agreement had no pro-competitive virtue, Compl. ¶¶ 252-56, and the Supreme Court has applied the *per se* rule to healthcare pricing agreements. *See Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 349-54 (1982). MultiPlan does not even attempt to argue that it is engaged in a novel way of doing business, nor could it do so. The Complaint specifically alleges that payors have attempted to use a common method to reprice OON claims on at least one prior occasion. Compl. ¶¶ 166-70, 222.

an agreement among competitors at a different level, the 'spokes.'" *Apple*, 791 F.3d at 314. Here, MultiPlan is the hub. It's agreements with payors to suppress OON reimbursements are the spokes; the agreement among payors to participate in the scheme is the rim. Compl. ¶¶ 321-26.

MultiPlan argues that AHS must plead the who, what, and where of each "spoke" agreement between MultiPlan and other payors. Mot. 19. But, in cases where a plaintiff alleges "parallel conduct," the Second Circuit "does not require such specificity." *Barry's Cut Rate Stores Inc. v. Visa, Inc.*, 2019 WL 7584728, at *31 (E.D.N.Y. 2019) (citation omitted). In those cases, the plaintiff is "not required to mention a specific time, place or person." *See Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 325 (2d Cir. 2010). For instance, the defendants in *Hinds Cnty., Miss. V. Wachovia Bank N.A.* contended that the complaint "fail[ed] to specify the who, when or where of each allegation of conspiratorial conduct and thus must be dismissed for failing to state an antitrust conspiracy claim." 700 F. Supp. 2d 378, 394 (S.D.N.Y. 2010). The Court disagreed, holding that a complaint only need to allege "a factual basis sufficient to establish a plausible inference of an anticompetitive agreement among defendants." *Id.* A complaint "need not necessarily provide any particular details about conduct undertaken by [a defendant] in furtherance of the conspiracy" for there to be "a plausible inference that [the defendant] participated in the alleged conspiracy." *Id.* at 395. Thus, AHS had no duty to allege the who, what, and where of the spoke agreements between MultiPlan and other payors; it just had to allege facts plausibly demonstrating that those agreements exist. *Id.*

Regardless, AHS alleges the who, what, and where of multiple agreements between MultiPlan and other payors. For example, from mid-2016 to mid-2017 MultiPlan's Chief Revenue Officer, Dale White, communicated with John Haben and Rebecca Paradise at UnitedHealth to invite UnitedHealth to join the conspiracy. Compl. ¶¶ 99-109. Mr. White invited UnitedHealth to enter into an agreement with MultiPlan to suppress OON reimbursement payments, telling UnitedHealth that they were out of "alignment" with their competitors and that MultiPlan already had agreements with several of

UnitedHealth's competitors on OON reimbursements. *Id.* ¶ 100. UnitedHealth then entered into an agreement with MultiPlan that contained similar terms. *Id.* ¶¶ 99, 104. Mr. White instructed UnitedHealth to set its OON rates so that it could return to the "middle of the pack" and be "in line with" other competitors. *Id.* ¶¶ 103, 106. As a result, UnitedHealth paid $900 million per year less to providers for OON claims that it did under its prior unilateral pricing method. *Id.* ¶ 105.

AHS pled the dates when MultiPlan entered into agreements with other payors, *id.* ¶¶ 87-91, and concessions from MultiPlan that more agreements exist, *id.* ¶ 110. AHS has also collected statements from payors admitting that they have agreements with MultiPlan. *Id.* ¶¶ 94-97.

Such detail is sufficient to plead the existence of an agreement between MultiPlan and payors on the spokes of the hub-and-spoke cartel. *See O.E.M. Glass Network, Inc. v. Mygrant Glass Co., Inc.*, 436 F. Supp. 3d 576, 592 (E.D.N.Y. 2020) (allegations that were "detailed, including the names of people involved, dates of conversations, and direct quotations" sufficiently alleged an agreement). What MultiPlan effectively takes issue with is whether AHS has pled a cartel that has dozens of spokes or a cartel that has hundreds of spokes. The exact magnitude of the cartel is a factual issue for discovery. *See, e.g., In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 479 (S.D.N.Y. 2017) ("failure to allege that a [conspirator] engaged in a given practice may simply reflect that plaintiffs' information is as-yet incomplete"); *Tera Grp., Inc. v. Citigroup, Inc.*, 2019 WL 3457242, at *18 (S.D.N.Y. 2019) (declining to "'draw a negative inference from the absence' of certain allegations in the Complaint"). This is especially true as MultiPlan took deliberate steps—suing other payors to stop them from revealing their agreements with MultiPlan—to make it impossible for AHS to plead the details of each agreement without discovery. *See* Compl. ¶ 91.

To the extent that the who-what-where standard has any application, it applies only where a motion to dismiss is filed after substantial discovery has taken place, which indisputably has not occurred here. For example, in *In re Musical Instruments & Equip. Antitrust Litig.* the plaintiff took 8

depositions and received document productions and interrogatory answers prior to litigating a motion to dismiss. 798 F.3d 1186, 1191 n.2 (9th Cir. 2015); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1046 (9th Cir. 2008) ("[t]he district court . . . allowed appellants to conduct discovery so they would have the facts needed to plead an antitrust violation"). Thus, it is improper for MultiPlan to insist that AHS cite specific calls, emails, text messages, average payments, and margins. Mot. 6, 19. *Twombly* requires plausibility, not clairvoyance. *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 788 (N.D. Ill. 2017) (plaintiffs cannot know all of the "details about the formation, operation, and communications constituting the conspiracy . . . without discovery"). Nor does a plaintiff need to append an expert report to a complaint addressing "margin spread[s];" "profit margin[s];" or differences in reimbursements by specialty, region, and other factors. Mot. 6-7, n.2; *Keurig*, 383 F. Supp. 3d at 240 ("precise mathematical allegations are not required at the pleading stage"). The fact that MultiPlan and payors admitted to the existence of dozens of agreements, and MultiPlan's attempted cover-up of other agreements, is more than sufficient to plead spoke agreements.

### B. AHS Alleges an Agreement Along the "Rim" of the Cartel

MultiPlan claims that AHS failed to allege an agreement between payors on the rim of the cartel to use MultiPlan's services to underpay OON claims because there is no direct or circumstantial evidence of that agreement. Mot. 19-27. But AHS is not required to have direct evidence of a rim agreement.[15] Moreover, there is ample circumstantial factual material, in the form of parallel conduct and plus factors, from which this Court can infer a rim agreement.

#### 1. Direct Evidence is Not Required

Direct evidence is never required to prove an agreement, and the fact that direct evidence does

---

[15] To be clear, AHS alleges direct evidence in support of Count 1, including agreements between MultiPlan and its competitors. Compl. ¶¶ 83-114. MultiPlan does not argue otherwise. The issue of circumstantial evidence of a "rim agreement" between payors arises only under AHS' alternative Second Count alleging a hub-and-spoke conspiracy, which, unlike the first claim, assumes that the agreements between MultiPlan and its co-conspirators are to be treated as vertical rather than horizontal.

not yet exist "cannot [be] take[n] . . . as a sign that no conspiracy existed" because the vast majority of conspiracies are "proven through inferences that may fairly be drawn from the behavior of the alleged conspirators." *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 659 (S.D.N.Y. 2016) (citation omitted). Courts infer the existence of an agreement on the basis of "interdependent conduct [] accompanied by circumstantial evidence and plus factors." *Todd.*, 275 F.3d at 198.

## 2. AHS Alleges Parallel Conduct

Members of the MultiPlan Cartel engaged in parallel conduct. Each of them ceded their OON pricing decisions to MultiPlan. *Supra* 4-6. MultiPlan claims that, because these events did not occur "around the same time," AHS cannot show parallel conduct. Mot. 22. That is incorrect.

"It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators." *Interstate Circuit v. United States*, 306 U.S. 208, 227 (1939); *see also SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 429 (4th Cir. 2015) ("[P]arallel conduct need not be exactly simultaneous . . . to give rise to an inference of agreement."); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1000 (N.D. Ill. 2011) (inferring cartel from conduct that was "sequential rather than simultaneous"). The mere fact that not every co-conspirator was a founding member of the MultiPlan Cartel does not mean there was no conspiracy— "a conspirator may join a conspiracy at any time that it is ongoing; there is no requirement that a conspirator join in a conspiracy from its inception." *See In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 689 (S.D.N.Y. 2012). Indeed, conspiracies can begin with fewer members and then expand. *See, e.g.*, *Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp. 3d 768, 780 (N.D. Ill. 2020) (denying motion to dismiss where plaintiff alleged real estate brokerages joined conspiracy over time by agreeing to adhere to a common pricing rule). Moreover, "courts have found allegations of defendants joining or effectuating a conspiracy" over several years to "sufficiently allege parallel conduct." *Broiler Chicken*, 290 F. Supp. 3d at 791 (denying motions to dismiss even though plaintiffs did not allege that each

defendant acted at the same time); *see also Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1077-78 (N.D. Ill. 2011) ("variation in the . . . timing" of price increases over a 5-year period was "not substantial enough to overcome the otherwise strong suggestion of conscious parallelism"); *Ross v. Am. Express Co.*, 35 F. Supp. 3d 407, 440 (S.D.N.Y. 2014) (defendants adopted similar contractual provision over a 2-year period), *aff'd* 630 F. App'x 79 (2d Cir. 2015).

MultiPlan argues that there was variation in the co-conspirators' usage of MultiPlan's products, and therefore there was no parallel conduct. Mot. 22-23. As an initial matter, the Complaint does not allege that payors used MultiPlan's pricing methodology differently. Instead, it claims that all payors used that methodology to underpay providers and enrich themselves. Compl. ¶¶ 120-36. Furthermore, "[u]nanimity of action . . . is not required." *Interest Rate Swaps*, 261 F. Supp. 3d at 479 ("Conspiracies, particularly when alleged among a large group, are not always tidy and symmetric. Conspirators may aid the common venture via techniques and stratagems that are consistent and reinforcing but not entirely overlapping.").[16]

MultiPlan's cases on this point are easily distinguished. AHS did allege the co-conspirators "achieved the same or a substantially similar end result," *Mosaic Health*, 2022 WL 4017895, at *6— specifically, MultiPlan became their sole decision-maker on price, they abandoned then-standard UCR reimbursement rates in favor of MultiPlan's repricing scheme, and they sent nearly identical pricing offers for the same procedure regardless of where and how it was performed. *Supra* 4-5; Compl. ¶ 120-36. In *Park Irmat Drug Corp. v. Express Scripts Holding Co.,* no parallel conduct occurred because the defendants took literally opposite actions. 911 F.3d 505, 516 (8th Cir. 2018). In contrast, AHS alleges that MultiPlan and its conspirators engaged in the same conduct with the same result. *Supra* 4-6. In *Musical Instruments*, the only fact that the plaintiff pled concerning parallel conduct was the "slow

---

[16] *See also Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*, 2022 WL 4017895, at *5 (W.D.N.Y. 2022) ("Conduct need not be completely uniform"); *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 114 (S.D.N.Y. 2010) ("[T]he law does not require every [conspirator] to participate in the conspiracy by identical means.").

adoption" of similar minimum-advertised pricing policies. 798 F.3d at 1189, 1196. Here, AHS alleges

far more, including payors simultaneously sending their OON claims to MultiPlan, MultiPlan applying

a common pricing methodology to those claims, and repriced OON claims that were remarkably

similar. *Supra* 4-5; *see also RealPage*, 2023 WL 9004806, at *11 (distinguishing same cases).

The same is true of *Gibson v. MGM Resorts Int'l*, 2023 WL 7025996 (D. Nev. 2023). In *Gibson*,

the plaintiffs alleged that a group of Las Vegas hotels licensed one of three pricing algorithms from a

common vendor, which they used to make pricing decisions. *Id.* at *1, *4. However, the complaint did

not allege which pricing algorithm each of the defendants used or even how often the hotel operators

accepted the prices recommended by those algorithms. *Id.* at *3. Moreover, the complaint failed to

allege that the hotel operators engaged in any relevant parallel conduct. *Id.* In particular, there was no

allegation that the hotel operators agreed to license the vendor's software at roughly the same time, or

that they used the same algorithm, or that the algorithm resulted in roughly similar pricing. *Id.*

Here, by contrast, the members of the MultiPlan Cartel agreed to use MultiPlan's formula for

suppressing reimbursements paid to healthcare providers—while that formula is sold under various

brand names it operates in the same fashion for hospital claims. Compl. ¶¶ 68-71. Unlike in *Gibson*,

AHS alleges that 99.4% of all prices set using MultiPlan's formula are offered to healthcare providers.

*Id.* ¶¶ 73-74. Also unlike *Gibson*, where hotels used an algorithm as one input in making diverging

pricing decisions, MultiPlan and its competitors used the same formula to "reprice" OON claims,

MultiPlan took over negotiations of those claims, and providers were offered similar reimbursements

for OON claims. *Supra* 4-5.

The market in *Gibson* was considerably different than the market at issue here. A prospective

hotel guest at a resort can decide that the price for a room is too high and stay somewhere else. Here,

AHS cannot avoid the effect of the conspiracy. AHS has already provided healthcare services (many

times because it had a legal obligation to do so) and its sole means of receiving OON compensation

is by submitting a claim to a member of the MultiPlan Cartel. *Id.* ¶¶ 3, 238-49; *see also RealPage*, 2023 WL 9004806, at \*17 (distinguishing *Gibson* because the "devil is in the details" of how industry pricing actually worked).

### 3.    AHS Plausibly Alleges a Series of Plus Factors

MultiPlan claims that because each payor has a motive to pay the lowest price possible for OON claims, none of the plus factors that AHS identifies suggest the existence of a rim agreement. Mot. 23-24. Then, MultiPlan analyzes the asserted plus factors one-by-one and finds them wanting. Mot. 24-27. But plus factors must be considered as a whole, not considered individually. When considered as a whole, the plus factors present here show that MultiPlan and its co-conspirators were not merely seeking to unilaterally set the lowest price possible for their OON claims.

In antitrust cases, "the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Apple*, 791 F.3d at 319 (citing *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)). The Second Circuit rejects attempts to "explain[] how each piece of evidence standing alone is . . . insufficient to support an inference of conspiracy." *Id.*[17] AHS only needs to allege "enough" plus factors to support the inference of a conspiracy when taken as a whole; it need not prevail on every plus factor. *City of Phila. v. Bank of Am. Corp.*, 498 F. Supp. 3d 516, 528 (S.D.N.Y. 2020).

MultiPlan claims that these plus factors must "tend to exclude the possibility of independent conduct." Mot. 21. But that language "traces its provenance to . . . decisions dealing with summary judgment and the standard of proof required to submit an issue to the jury." *Erie Cnty. v. Morton Salt, Inc.*, 702 F.3d 860, 869 (6th Cir. 2012). Multiple Courts of Appeals, including the Second Circuit, have refused to apply the "tends to exclude" standard at the motion to dismiss stage. *Starr*, 592 F.3d at 325

---

[17] While MultiPlan will certainly argue that, with respect to the plus factor evidence, "zero plus zero equals zero," that argument ignores the fact that "evidence can be susceptible to different interpretations" when considered as a whole. *In re High Fructose Corn Syrup*, 295 F.3d at 655 (denying summary judgment).

(holding that it was "incorrect" to apply the "tends to exclude" standard at the pleading stage); *Morton Salt*, 702 F.3d at 869 (same); *SD3, LLC*, 801 F.3d at 425 ("courts must be careful not to import the summary-judgment standard into the motion-to-dismiss stage."). AHS need not disprove alternative explanations to survive a motion to dismiss. *Elec. Books*, 859 F. Supp. 2d at 688 (courts should not "dismiss a complaint that states a plausible version of events merely because the court finds a different version more plausible"). All that AHS must do is plead sufficient facts to "nudge[]" its claims concerning a rim agreement "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

When AHS' plus factors are considered as a whole, they plausibly show the existence of an agreement along the rim of the hub-and-spoke cartel. *Supra* 5-6. Courts may infer a conspiracy among horizontal competitors from a set of vertical relations organized by a company that acts as the "hub." *See Leegin*, 551 U.S. at 893 (vertical agreements can, in context, "be useful evidence for a plaintiff attempting to prove the existence of a horizontal cartel"); *In re Suboxone Antitrust Litig.*, 2021 WL 662292, at *17 n.12 (E.D. Pa. 2021) ("[V]ertical relationships can give rise to horizontal conspiracies.").

*United States v. Apple, Inc.*, is a prime example of a horizontal conspiracy organized by a non-competing, central hub—yet MultiPlan does not even mention it, let alone distinguish it. That case concerned Apple's role as a distributor of e-books. 791 F.3d at 301-02. Apple, which does not publish e-books, facilitated meetings with e-book publishers at which pricing for new releases and best sellers was discussed. *Id.* at 302-03. Apple entered into vertical agreements with the publishers that caused them to increase e-book prices, thus fundamentally changing the pricing model that prevailed in the industry prior to Apple orchestrating the agreements. *Id.* at 303-08, 310. The Second Circuit rejected Apple's argument that it merely entered into parallel vertical agreements, holding that "the vertical organizer of a horizontal price-fixing conspiracy . . . [cannot] escape application of the *per se* rule." *Id.* at 325. It found that Apple's agreements with the publishers "in context . . . provide[d] strong evidence that Apple consciously orchestrated a conspiracy among the [competitor publishers]." *Id.* at 316.

Among other things, Apple invited each publisher to adopt an entirely new pricing model that only made sense if all publishers adopted the same model. *Id.* Apple facilitated meetings where it extolled the new pricing model, and then offered identical contractual terms to each of the publishers. *Id.* Therefore, "[b]y the very act of signing a [c]ontract with Apple," each publisher committed itself to a common scheme of raising e-book prices. *Id.* at 317. In other words, the publishers did not need to explicitly contract with each other to join the conspiracy, because Apple orchestrated the horizontal agreement between them.

As in *Apple*, MultiPlan "consciously orchestrated a conspiracy among" OON payors. *Apple*, 791 F.3d at 316. As explained above, MultiPlan entered into a series of agreements that caused the industry to suddenly move from the UCR and FAIR Health pricing paradigm that payors could not break out of, to a newer much lower collective OON pricing scheme. *Supra* 5-6. To do this, payors took actions against their own unilateral self-interest that would make economic sense only if a cartel existed. *Supra* 6.[18] Thus, "when viewed in conjunction with the parallel acts [these plus factors] . . . serve to allow a fact-finder to infer a conspiracy" to suppress OON reimbursement payments. *See Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253–54 (2d Cir. 1987); *RealPage*, 2023 WL 9004806, at *8 ("Courts review . . . plus factors holistically rather than in isolation").

Even viewed separately, the alleged plus factors differentiate the Cartel from parallel conduct. Indeed, MultiPlan barely contests many of the nine plus factors AHS cites. *See* Compl. ¶¶ 138-219.

**Market concentration, barriers to entry, and prior collusion.** AHS alleges high market concentration, high barriers to entry, and a history of prior industry collusion. Compl. ¶¶ 138-60, 165-

---

[18] Unlike in *In re Amazon.com, Inc. eBook Antitrust Litig.*, it did not made unilateral economic sense for commercial payors to agree with MultiPlan to suppress OON reimbursements. 2023 WL 6006525, at *23-24 (S.D.N.Y. 2023) (each e-book publisher had an interest in having its books distributed by Amazon). If a single company entered into an agreement with MultiPlan to achieve below-market OON reimbursement rates, that company would suffer competitively as providers declined to provide a full scope of OON services to patients enrolled in that company's network and rejected future offers to join the company's network. Compl. ¶ 221.

70. Each of these factors can differentiate parallel conduct from a cartel: (1) extreme market concentration may suggest a cartel particularly when accompanied by other plausible plus factors, *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010); (2) high barriers to entry in a market also supports the existence of a cartel, *In re Turkey Antitrust Litig.*, 642 F. Supp. 3d 711, 727 (N.D. Ill. 2022); and (3) prior antitrust violations can also establish the "intent, motive and method of a conspiracy under Section 1," *USFL v. NFL*, 842 F.2d 1335, 1371 (2d Cir 1988).

**Motive to Conspire.** MultiPlan claims that AHS is just pleading facts showing that "[e]very business in America" has a desire to increase its profits. Mot. 24. But MultiPlan ignores the fact that AHS alleges more than a "generic interest in generating increased profit." *Tera Grp., Inc.*, 2019 WL 3457242, at *20. Rather, AHS alleges that MultiPlan and its co-conspirators have a specific motive to enter into agreements that restrain trade and earn supra-competitive profits. Compl. ¶¶ 161-64. The less that MultiPlan and its co-conspirators pay on OON claims, the more money they can funnel into the pockets of their executives and investors. *Id.*

**Opportunities to conspire.** MultiPlan claims that "mere participation in a trade association or attendance at industry events is not sufficient" to show an agreement. Mot. 24. But AHS alleges much more. MultiPlan and its co-conspirators attend the same trade association meetings, hold secret meetings among themselves at luxury hotels, and exchange secret white papers. Compl. ¶¶ 8, 112-14, 171-87. MultiPlan also uses private discussions with payors to tell them that they are out of "alignment" with the industry and to suggest how they can get back to the "middle of the pack" on OON reimbursement. *Id.* ¶¶ 99-109. Thus, the fact that the cartel members were all in the same place, at the same time, while they were engaging in parallel conduct that makes no economic sense, is certainly a plus factor. *Meyer*, 174 F. Supp. 3d at 825 (organizing "events for [participants] to get together" provides support for the inference of a conspiracy); *WellPoint*, 865 F. Supp. 2d at 1026 (payors attended same trade association meetings).

***Actions against self-interest.*** MultiPlan claims that the payors were not acting against their unilateral self-interest by cutting OON reimbursements because they stood to make billions of dollars by doing so. Mot. 25. That misses the mark. It was against a payor's unilateral self-interest to cut OON reimbursements because providers could push back on those unilateral cuts. Compl. ¶¶ 134-36, 188-98, 221.

***Exchanging competitively-sensitive information.*** MultiPlan claims it does not provide any confidential OON pricing information to other payors. Mot. 26. That is wrong. Payors send their real-time OON claims data to MultiPlan in a granular and unblinded form, Compl. ¶¶ 209-10, and in return MultiPlan tells payors when they are out of "alignment" with their competitors and what it will take to bring them "in line with another competitor" and into the "middle of the pack" with competitors. *Id.* ¶¶ 77, 114, 211, 223. This is exactly the type of information exchange that the courts have recognized is likely to have anticompetitive effects. *Todd*, 275 F.3d at 212 ("Price exchanges that identify . . . parties, transactions, and prices are seen as potentially anticompetitive.").

MultiPlan insists that those facts are "speculation" and "do not reflect how the real world works." Mot. 25-26. A defendant cannot win a motion to dismiss by claiming that it has a more plausible factual argument. *Broiler Chicken*, 290 F. Supp. 3d at 788 ("it is improper at this stage of the proceedings to weigh alternatives and which is more plausible.").[19] This factual dispute cannot be resolved on the pleadings. *See, e.g., Premier Concrete LLC v. Argos N. Am. Corp.*, 2021 WL 1209354, at *18 (N.D. Ga. 2021) ("arguments concerning conscious parallelism may be sufficient at summary judgment," but "at the motion to dismiss stage" they are "misplaced"). AHS plausibly alleges a rim

---

[19] It is not "speculation" that payors would compete with one another absent the conspiracy. Mot. 25. Prior to the MultiPlan Cartel, payors competed and OON pricing was up to 49-times higher than the OON prices generated by the MultiPlan Cartel. Compl. ¶ 272. If payors compete again, reimbursement rates for OON services will be higher. MultiPlan confuses competitive competition with an "overpayment," and claims that this ruinous competition would "undermine" payors' networks. Mot. 25. That is not a defense to AHS' antitrust claims. *Socony-Vacuum*, 310 U.S. at 221 (rejecting "[r]uinous competition [and] financial disaster" as justifications for a cartel).

agreement and a *per se* illegal hub-and-spoke cartel.

## IV.    AHS Also Alleges an Antitrust Claim under the Rule of Reason

MultiPlan contends that Count 3 fails to state a rule of reason claim. MultiPlan disagrees with AHS' definition of the relevant market, and argues that its agreements with other payors were procompetitive. Mot. 27-34. But, again, MultiPlan ignores the Complaint's well-pled facts and improperly seeks to have this Court adjudicate factual disputes via a motion to dismiss.

The rule of reason "requires courts to conduct a fact-specific assessment" to determine a restraint's "actual effect" on competition. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). Courts follow a three-step analysis to apply the rule. *Id.* First, the plaintiff must show that "the challenged restraint has a substantial anticompetitive effect" and harms competition in a relevant market. *Id.* If the plaintiff does so, the burden shifts to the defendant to show a non-pretextual procompetitive rationale for the restraint. *Id.* If the defendant can do so, then the plaintiff must show that the procompetitive justification could be achieved by less anticompetitive means. *Id.* This fact-intensive test is not well-suited to a motion to dismiss because "whether challenged conduct has a procompetitive effect on balance . . . presents a factual issue that cannot be resolved at this stage of the case." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 360 F. Supp. 3d 788, 803 (N.D. Ill. 2019).

### A.    AHS Alleges a Relevant Market for the Reimbursement of OON Services

MultiPlan argues that the relevant product market should be broader than the market for commercial reimbursement of OON claims, but it ignores well-pled facts. Market definition is a "pragmatic" and "factual" exercise, "not a formal, legalistic one." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962). Because "market definition is a deeply fact-intensive inquiry," market definition arguments are not typically fit for dismissal at the pleadings stage. *Todd*, 275 F.3d at 199-200; *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 54 (S.D.N.Y. 2012) (relevant market issues are an "area[] for discovery."). Dismissal is only appropriate where a plaintiff has provided no basis for

its proposed market definition. *Todd*, 275 F.3d at 200 (dismissal appropriate where plaintiff "fail[s] even to attempt a plausible explanation" for the relevant market).

"The fact that this case involves a buyer-side conspiracy affects how the market is defined." *Id.* at 201. Rather than focusing on concepts like "reasonable interchangeability" and "cross-elasticity of demand," as one would in a seller-side case, the market should be defined in terms of "buyers who are seen by sellers as being reasonably good substitutes." *Id.* at 201-02.

MultiPlan argues that the relevant market does not "encompass[] all competing buyers that are reasonably interchangeable substitutes for the purchase of the relevant good or service, from the perspective of the seller." Mot. 28. But that is exactly what AHS alleges. The Commercial Reimbursement Market is the market for reimbursements paid by commercial insurers to healthcare providers for OON services. Compl. ¶ 138. The Complaint specifically alleges that "[h]ealthcare providers have no reasonable substitutes for reimbursements provided by commercial insurers for [OON] medical services." *Id.* ¶ 139. Other payors, such as government payors, do not compete against commercial payors because they address different patient populations and have different subscriber screening criteria. *Id.* ¶ 140. Thus, from the perspective of sellers in this market—*i.e.*, AHS and other providers—the only reasonably interchangeable buyers of OON services are commercial payors like MultiPlan and its co-conspirators. *Id.* ¶¶ 138-141, 150-51, 247, 249; *see also FTC v. IQVIA Holdings, Inc.*, 2024 WL 81232, at *17, 24 (S.D.N.Y. 2024) (while some forms of advertising competed against healthcare professional programmatic advertising "in a broad sense" they were not in the same relevant market because of the different characteristics of the services).

### B. MultiPlan's Factual Arguments Concerning Market Definition Fail

Failing to attack the pleadings, MultiPlan raises a number of factual arguments against the commercial reimbursement market. It claims that no such market exists because reimbursements are not a product that is bought and sold, and providers are merely haggling over the form of payment

for services that have already been bought and paid for. Mot. 29-30. Finally, it claims that no court has ever recognized the precise market that AHS alleges here. *Id.* 29. Each of these arguments fails.

MultiPlan contends that reimbursements are not a product that companies "buy or sell." Mot. 29. But market definition does not necessarily turn on whether a product is bought or sold. *See, e.g.,* *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 978-79 (9th Cir. 2023) (district court erred by limiting relevant market to products that are bought and sold because it "puts form over substance"). Moreover, compensation paid to workers can form a relevant market. *See Todd*, 275 F.3d at 199-200 (compensation paid to broad categories of oil industry employees constituted a relevant market). When commercial payors reimburse providers for OON services, they are buying those services. Compl. ¶ 138. And contrary to MultiPlan's counter-narrative, commercial payors previously competed with each other with respect to the pricing of such reimbursements, until they agreed to eliminate that price competition. *Id.* ¶ 141.

MultiPlan claims that AHS is challenging the result of "one-on-one negotiations" over the "method for payment" that occurs after the service has "already been . . . sold." Mot. 29. Even assuming that MultiPlan's take-it-or-leave-it demands to providers somehow constitute "negotiations," *see* Compl. ¶¶ 230-231, MultiPlan's conduct does not merely affect the "method for payment"; it directly suppresses the amount that AHS and other providers are paid for their services. *Supra* 3-6. The notion that a provider's healthcare services have "already been bought and sold" prior to MultiPlan's involvement, Mot. 29, is also incorrect. As the Complaint explains, those services have been *provided*, but providers have not been compensated for them. Compl. ¶¶ 3, 69. In many cases, the price imposed by MultiPlan through its "repricing" scheme is a provider's first and only opportunity to be *paid anything* for those services. *Supra* 6-7. The mere fact that some transactions in a market are individually negotiated does not render AHS' market definition implausible. *See Todd*, 275 F.3d at 201.

MultiPlan insists that courts have rejected "reimbursement-only market[s]." Mot. 29. That is

wrong. Courts have long recognized that paying for services is a relevant product market. *See, e.g., In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d 627, 641-642 (N.D. Ill. 2020) (plaintiffs sufficiently alleged a relevant product market consisting of reimbursements to dentists); *Todd*, 275 F.3d at 199-200 (relevant market for compensation paid to certain categories of employees in the oil industry).

Ignoring those cases, MultiPlan relies almost entirely on *Franco v. Conn. Gen. Life Ins. Co.*, which dealt with an alleged market for "data used to calculate . . . reimbursement of claims by health insurance beneficiaries for [OON], non-negotiated medical services." 818 F. Supp. 2d 792, 834 (D.N.J. 2011), *aff'd in part* 647 F. App'x 67 (3d Cir. 2016). In that case, subscribers to health insurance plans alleged that health insurers conspired to maintain a database containing faulty information about OON rates. *Id.* at 832. That theory had two dispositive flaws. *Id.* at 833-37. First, the agreement to maintain a database did not pertain to the pricing of any product or service. *Id.* at 833. Second, the subscribers were not buyers or sellers of claims data and lacked antitrust standing to pursue their claims. *Id.* at 837-40. Neither of those flaws are present here. MultiPlan's agreements directly relate to the prices paid for OON services—MultiPlan and its co-conspirators agree to stop competing on prices and split the spoils from that agreement. *Supra* 4-5. Moreover, AHS and other providers are clearly participants in the relevant market: they submit claims which payors adjudicate, and they receive payments for their OON services. *Supra* 4-5. Unlike in *Franco*, which involved an alleged seller-side conspiracy with the plaintiff-subscribers as *buyers*, this case alleges a buyer-side conspiracy in which payors colluded to slash the reimbursements paid for OON services. While subscribers do not purchase OON coverage separately from in-network coverage, providers certainly do submit discrete claims for reimbursement for OON services. *See* Compl. ¶¶ 3, 69-70, 276. Thus, *Franco* is inapposite.[20]

MultiPlan argues that the relevant market should include in-network reimbursements because

---

[20] The same is true of *City of New York v. Grp. Health Inc.* 649 F.3d 151, 154-55 (2d Cir. 2011) (employer could not define market consisting solely of its current health insurance provider).

AHS markets its services to both in-network and OON patients. Mot. 31. But this case is about the market for reimbursement of claims, not the market for attracting patients. Tellingly, all of MultiPlan's cases deal with that separate market. *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 597 (8th Cir. 2009) (cardiologists could attract patients that used both private and government insurance); *BCBSM v. GS Labs, LLC*, 2023 WL 2044329, at *17-18 (D. Minn. 2023) (same for testing lab); *Marion Healthcare LLC v. S. Ill. Healthcare*, 2013 WL 4510168, at *10 (S.D. Ill. 2013) (same for surgical center).

MultiPlan's cases focus on the question "to whom can the supplier sell?" *Little Rock Cardiology Clinic*, 591 F.3d at 598. But, because AHS has already provided OON services to a patient, the relevant question here is: from whom can AHS seek reimbursement? For OON charges, the answer is only commercial payors. *See St. Francis Hosp. & Med. Ctr., Inc. v. Hartford Healthcare Corp.*, 655 F. Supp. 3d 52, 85 (D. Conn. 2023) (distinguishing *Little Rock Cardiology* because, "from the perspective of a hospital system, the sale of healthcare services to commercially insured patients was not necessarily interchangeable with the sale of healthcare services to government insured patients"). That is why courts have recognized that commercial reimbursement markets are plausible. *See, e.g., In re Blue Cross Blue Shield Antitrust Litig.*, 2017 WL 2797267, at *9 (N.D. Ala. 2017) (rejecting argument that relevant market included government and individual payors); *FTC v. Sanford Health*, 2017 WL 10810016, at *10 (D.N.D. 2017) (relevant market included only commercial health plans); *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 2015 WL 1399229, at *7 (C.D. Ill. 2015) (rejecting all-payor market), *aff'd* 859 F.3d 408 (7th Cir. 2017).

Finally, MultiPlan ignores the commercial reality of the relevant market. In the commercial reimbursement market, when a patient receives OON care from AHS, AHS is locked into seeking reimbursement from that patient's PPO network. Compl. ¶ 151. In that submarket,[21] AHS cannot or

---

[21] Defining a relevant submarket is also "a fact-intensive endeavor," *Duty Free Americas, Inc. v. Estee Lauder Cos., Inc.*, 797 F.3d 1248, 1264 (11th Cir. 2015), and a "dismissal of an antitrust claim for failure to adequately plead the relevant market [or submarket] can be problematic." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 443 (4th Cir. 2011).

does not bill patients for the unpaid balance of out-of-network claims. *Id.* ¶¶ 80, 97, 139, 277. For these patients, there is a single payor to which AHS can submit its charges—the patient's network. *Id.* ¶¶ 151. Courts have recognized that these lock-in antitrust markets exist in the case where a party is locked in to dealing with a particular buyer or seller. *See, e.g., Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461-79 (1992) (relevant market existed for a single brand of aftermarket parts where owners of Kodak brand copiers could only use Kodak-brand parts and aftermarket repair services); *In re Apple AT&TM Antitrust Litig.*, 596 F. Supp. 2d 1288, 1310 (N.D. Cal. 2008) (relevant market consisted of consumers were "locked into" using a certain wireless telephone provider). This is not a submarket that relies "[o]nly [on] customer preference for a product," but rather one that relies on the "compulsion" of AHS to deal with a single commercial payor for any OON claim. *Global Discount Travel Servs., LLC v. TWA, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997). There are no substitutes for commercial payors because, prior to the claim being submitted, the patient has agreed to use a single commercial payor, and the government and MultiPlan have mandated that AHS only submit claims to the commercial payor.[22] Compl. ¶¶ 80, 243-46, 277. Whether this lock-in occurs must be resolved "on a case-by-case basis, focusing on the particular facts disclosed by the record," *Kodak*, 504 U.S. at 467, making it inapt for resolution on the pleadings.

## C.    AHS Alleges Harm to Competition in the Relevant Market

A plaintiff satisfies this requirement by pleading either (1) "direct evidence" of harm in the form of an "actual adverse effect on competition as a whole in the relevant market," or (2) "indirect evidence" that MultiPlan and its co-conspirators "ha[d] sufficient market power to cause an adverse effect on competition." *Davitashvili v. Grubhub Inc.*, 2022 WL 958051, at *6 (S.D.N.Y. 2022). Here, AHS alleges both, and MultiPlan's claim that its conduct is procompetitive is wrong.

---

[22] Because AHS did not agree to these limitations on the payors from which it can seek reimbursement for OON claims, this is not a case where the plaintiff is relying on "the particular contractual restraints [it] assumed" to define a relevant market. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 443 (3d Cir. 1997).

**Direct Evidence.** The MultiPlan Cartel suppresses reimbursement rates for OON services to virtually all healthcare providers in the United States. *Supra* 3-4. MultiPlan itself credits its "repricing" scheme for these market-wide anticompetitive effects, claiming responsibility for as much as 81% of the suppression of reimbursement rates since the formation of the MultiPlan Cartel. Compl. ¶ 271. The Cartel's suppression of market-wide reimbursement rates results in decreased revenue available for improving care or making community healthcare improvements. *See* Compl. ¶¶ 229, 235-36. For a revenue-constrained hospital system, chronic underpayment on a key revenue stream (OON patients) could threaten bankruptcy, cutting out a key source of healthcare goods and services for many communities. *Id.* ¶¶ 235-37. These allegations are more than sufficient to plead direct evidence of anticompetitive effects at the pleading stage. *See, e.g.*, *Todd*, 275 F.3d at 214 (depressing compensation to employees was an anticompetitive effect); *see also Carbone*, 621 F. Supp. 3d at 890 (anticompetitive harm existed when defendants adopted a common method for calculating financial aid); *Delta Dental*, 484 F. Supp. 3d at 640 (competition harmed through decreased compensation to providers and decreased quality of care).

**Indirect evidence.** Indirect evidence of anticompetitive effect is not necessary where, as here, a plaintiff alleges that the defendant's conduct directly harmed prices or supply. *Intel Corp. v. Fortress Inv. Grp. LLC*, 511 F. Supp. 3d 1006, 1014 (N.D. Cal. 2021) (where a plaintiff can show actual anticompetitive effects, "a full-blown market analysis is not necessary.").

Regardless, AHS pleads circumstantial evidence too. Circumstantial evidence of anticompetitive harm requires "proof of market power plus some evidence that the challenged restraint harms competition." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 989 (9th Cir. 2020) (citation omitted). Where direct evidence requires "proof of actual harm to the competitive process," indirect evidence only requires facts showing that a competitive harm "is likely to arise from the restraint" at issue. *United States v. Am. Airlines Grp. Inc.*, 2023 WL 3560430, at *30 (D. Mass. 2023). Here, AHS

alleges that the MultiPlan Cartel controls at least 90% of the relevant market (and 100% of each relevant submarket) and is protected by extensive barriers to entry. Compl. ¶¶ 144, 153-160. *See TSI Prods., Inc. v. Armor All/STP Prods. Co.*, 2019 WL 4600310, at \*14 (D. Conn. 2019) (plaintiff alleged harm to the relevant market by alleging "reduced competition, reduced consumer choice, and lower quality products," specifically, "that at least three of the six retailers that comprise 80% of the market for value-added auto AC recharge kits have agreed not to carry TSI's auto AC recharge products due to anticompetitive agreements made with [Armor All]"). MultiPlan and its co-conspirators have wielded that market power to pay providers less than the price that would have prevailed in a competitive market. Compl. ¶¶ 134-36, 228-51, 271-75.

MultiPlan contends that its agreements were not anticompetitive because "[i]nsurance plans are free to decide which cost-management products, if any, they want to use." Mot. 33. That is a non-sequitur. Companies are free to switch suppliers, but they are not free to agree to join a cartel. *Spinelli v. NFL*, 96 F. Supp. 3d 81, 116 n.16 (S.D.N.Y. 2016). MultiPlan's argument assumes, contrary to the Complaint's allegations, that its pricing methodology is procompetitive and that there is nothing wrong with payors using it. That is a disputed issue of material fact. *See supra* 9.

MultiPlan also asserts that AHS alleges only "injury to AHS itself." Mot. 32. But MultiPlan ignores the many allegations in the Complaint cataloging how the MultiPlan Cartel suppressed OON reimbursements paid to virtually *all* healthcare providers, not just AHS. *Supra* 5-6.

### D.    There Are No Procompetitive Justifications for MultiPlan's Conduct

MultiPlan relies on a counter-narrative that its conduct is "procompetitive," because the MultiPlan Cartel benefits subscribers. Mot. 33. But AHS **does not** allege that the MultiPlan Cartel "lowered costs to subscribers." *Id.* It alleges that MultiPlan's scheme benefits only the payors by inflating their already-exorbitant profits, at the expense of reasonably reimbursing providers for their services. Compl. ¶¶ 13, 252-54. AHS further alleges that the MultiPlan Cartel harms patients by

artificially reducing providers' ability to fund improvements to care and threatening the economic viability of healthcare providers, citing examples of hospitals that have gone bankrupt or are close to insolvency. *Id.* ¶¶ 229, 235-36. And the Complaint specifically disavows MultiPlan's baseless notion that its "repricing" scheme has lowered healthcare or health insurance costs for patients. *Supra* 5-6.

MultiPlan cannot prevail on its motion simply by asking this Court to ignore these facts. For example, in *Delta Dental*, dentists claimed that dental insurers had conspired to underpay them for their services. 484 F. Supp. 3d at 640. Their complaint contained allegations that these underpayments harmed both the provider side and the patient side of the dental practice. *Id.* Still, the defendants argued that "lower premiums for policyholders are the necessary corollary of lower reimbursement rates." *Id.* The District Court denied defendants' motion to dismiss, finding that those arguments were "contrary to plaintiffs' allegations." *Id.* As in *Delta Dental*, now is not the time for the court to pick between the facts in AHS' Complaint and MultiPlan's counter-narrative. *See, e.g.*, *Davitashvili*, 2022 WL 958051, at *6 ("the ultimate judgment of whether any procompetitive effects 'outweigh' any anticompetitive effects is inappropriate on a motion addressed to the sufficiency of the complaint.").

In addition, the type of balancing between providers and subscribers that MultiPlan suggests is off limits in antitrust cases. Courts may not "treat[] benefits to consumers," i.e., savings for subscribers, "as justifying detriments to workers," such as lower reimbursements to providers. *Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 703 (7th Cir. 2023).

## V.    AHS Alleges Antitrust Injury

MultiPlan argues that AHS fails to plead antitrust injury for two reasons: (1) MultiPlan claims that providers charge too much for OON claims, so MultiPlan and its co-conspirators were justified in underpaying those claims, and (2) MultiPlan asserts that there can be no antitrust injury because it is merely giving payors optional pricing recommendations. Mot. 34-35. Neither argument holds water.

*First*, MultiPlan's claim that AHS and other providers are charging "supra-competitive" prices

39

finds no support in the pleadings. Likewise, MultiPlan's insistence that "lower reimbursement rates necessarily mean lower" patient costs "is not susceptible to resolution as a matter of law." *Delta Dental*, 484 F. Supp. 3d at 642.

*Second*, MultiPlan is not making recommendations. It reprices OON claims, transmits the repriced offers to the providers, and handles any negotiations on behalf of the insurers. Compl. ¶¶ 11, 73. MultiPlan's repricing methodology is accepted 99.4% of the time. *Id.* ¶ 73. Where payors deviate from MultiPlan's methodology they frequently do so by paying providers even less, knowing that they can do so because MultiPlan has orchestrated an industry-wide understanding that OON claims should be underpaid. *Supra* 4-6.

In reality, when buyers collectively agree to underpay workers, the workers who are underpaid by reason of that agreement suffer an antitrust injury. *See, e.g., Omnicare, Inc. v. Unitedhealth Grp., Inc.*, 524 F. Supp. 2d 1031, 1040 (N.D. Ill. 2007) ("In a buyers' conspiracy case, a seller sufficiently alleges antitrust injury by pleading that is has received excessively low prices from members of the buyers' cartel."). That is what AHS alleges here. *Supra* 5-6.[23]

## VI. Alternatively, Leave to Amend Should be Granted

Although AHS has alleged more than enough to move its claims "across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570, if this Court determines there are pleading deficiencies, leave to amend should be granted. *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 107 (2d Cir. 2022). MultiPlan presents no substantive argument to the contrary.

## CONCLUSION

MultiPlan's motion to dismiss should be denied in its entirety.

Dated: January 9, 2024                         Respectfully submitted,

---

[23] MultiPlan's footnote-only argument concerning arbitration and antitrust standing should not be considered. Mot. 12 n.4. *Penske Media Corp. v. Shutterstock, Inc.*, 548 F. Supp. 3d 370, 376 (S.D.N.Y. 2021) (declining to address footnote arguments).

**VINSON & ELKINS LLP**

*/s/ Stephen M. Medlock*
Christopher E. Duffy
Mackenzie Newman
1114 Avenue of the Americas
New York, NY 10036
Tel: (212) 237-0000

Stephen M. Medlock*
Tyler Somes*
Michael McCambridge*
Rami Abdallah E. Rashmawi*
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, DC 20037
Tel: (202) 639–6500

Michael W. Scarborough*
Dylan I. Ballard*
Madison Lo*
555 Mission Street, Suite 2000
San Francisco, CA 94105
Tel: (415) 979–6900

*Attorneys for Plaintiff*

*Admitted *Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 9, 2024, a copy of the foregoing document was electronically filed through the ECF system and will be sent electronically to all persons identified on the Notice of Electronic Filing.

/s/ *Stephen M. Medlock*
Stephen M. Medlock