# EXHIBIT 6

**LATHAM & WATKINS** LLP

300 Colorado Street, Suite 2400
Austin, TX 78701
Tel: +1.737.910.7300 Fax: +1.737.910.7301
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | San Diego |
| Düsseldorf | San Francisco |
| Frankfurt | Seoul |
| Hamburg | Silicon Valley |
| Hong Kong | Singapore |
| Houston | Tel Aviv |
| London | Tokyo |
| Los Angeles | Washington, D.C. |
| Madrid | |

May 10, 2024

**VIA ECF**

The Honorable Judge Edgardo Ramos
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

    Re: *Adventist Health System Sunbelt Healthcare Corp. v. MultiPlan, Inc.* (No. 23-cv-07031)

Dear Judge Ramos:

    I write on behalf of Defendant MultiPlan, Inc. to submit, as supplemental authority for the Court's consideration, the District of Nevada's decision in *Gibson v. Cendyn Group, LLC*, No. 2:23-cv-00140-MMD-DJA (D. Nev. May 8, 2024), ECF No. 183, which is attached hereto as Exhibit A. In their briefings on MultiPlan's pending Motion to Dismiss, both MultiPlan and Plaintiff Adventist Health System Sunbelt Healthcare Corp. referenced the Nevada court's dismissal of the first complaint in that action. *See* ECF No. 65 (Motion) at 22–23, 26; ECF No. 70 (Opposition) at 25–26; ECF No. 75 (Reply) at 3, 9–10. On Wednesday, May 8, 2024 Judge Du in Nevada dismissed the amended complaint with prejudice and granted judgement for defendants in that action.

    Respectfully submitted,

    */s/ Sadik Huseny*
    LATHAM & WATKINS LLP
    Sadik Huseny (admitted pro hac vice)

cc:    All counsel of record (via ECF)

# EXHIBIT A

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| RICHARD GIBSON, *et al.*, | Case No. 2:23-cv-00140-MMD-DJA |
| Plaintiffs, | ORDER |
| v. | |
| CENDYN GROUP, LLC, *et al.*, | |
| Defendants. | |

## I.    SUMMARY

Plaintiffs Richard Gibson and Roberto Manzo, on behalf of themselves and all others similarly situated, allege that Defendants, a software company, and companies that operate hotels on the Las Vegas Strip, unlawfully restrained trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.* ("Sherman Act") by artificially inflating the price of hotel rooms after agreeing to all use software marketed by the software company, Defendant Cendyn Group, LLC. (ECF No. 144 ("FAC").) Before the Court is Defendants Blackstone Real Estate Partners VII L.P., Blackstone, Inc., CENDYN Group, LLC, Caesar's Entertainment, Inc., The Rainmaker Unlimited, Inc., Treasure Island, LLC, and Wynn Resorts Holdings, LLC's joint motion to dismiss the FAC.[1] (ECF No. 160 (the "Motion").)[2] The Court held a hearing (the "Hearing") on the Motion on April 24, 2024. (ECF Nos. 170 (setting hearing), 175 (clarifying the Hearing is only on this Motion), 181 (hearing minutes).) As further explained below, the Court will

---

[1]The Court refers herein to Blackstone Real Estate Partners VII L.P. and Blackstone, Inc. collectively as Blackstone. The Court refers herein to Cendyn Group, LLC, and The Rainmaker Unlimited Inc. collectively as Cendyn unless context requires the Court to refer to Rainmaker before it was acquired by Cendyn. The Court refers to all Defendants except for Cendyn collectively as Hotel Defendants herein.

[2]Plaintiffs filed a response (ECF No. 167), and Defendants filed a reply (ECF No. 168).

1    dismiss the FAC with prejudice because Plaintiffs have not plausibly alleged a tacit

2    agreement between Defendants or a restraint on trade in part because Hotel Defendants

3    are not required to and often do not accept the pricing recommendations generated by

4    Cendyn's products, Plaintiffs have already been given an opportunity to amend, and they

5    have given no indication that they could further amend to remedy the deficiencies of their

6    FAC.

7    **II.    BACKGROUND**

8        The broad contours of the factual background of this case remain unchanged since

9    the Court's prior order dismissing the original complaint in its entirety, but with leave to

10   amend. (ECF No. 141 at 2-3.) The FAC adds many paragraphs of allegations going to

11   the same 'hub-and-spoke' conspiracy alleged in the original complaint and adds a second

12   claim for relief alleging a violation of Section 1 of the Sherman Act that challenges a set

13   of vertical agreements between Cendyn and Hotel Defendants, which combine to

14   allegedly restrain trade. (ECF No. 144 at 219-220; *see also generally id.*) Thus, the Court

15   incorporates by reference the background discussion from the prior order (ECF No. 141

16   at 2-3) along with summarizing the following additional allegations adapted from the FAC.

17       Hotel Defendants own and/or operate hotel/casinos on the Las Vegas Strip. (*Id.* at

18   18-20.) Rainmaker, and then Cendyn after it acquired Rainmaker in 2019, offers two

19   products licensed and used by all Hotel Defendants—which contain integrated sets of

20   pricing algorithms—called GuestRev and GroupRev. (*Id.* at 8, 34-76.) Among other

21   features, these two products—GuestRev for individual rooms and GroupRev for groups

22   (like conferences)—recommend to customers how to price their hotel rooms. (*Id.* at 34-

23   72 (as to GuestRev), 72-76 (as to GroupRev).) Rainmaker launched the product it

24   eventually rebranded as GuestRev in 2001. (*Id.* at 34.) Rainmaker launched GroupRev

25   in 2013. (*Id.* at 72.) Starting in 2015, both products began to incorporate a feature called

26   RevCaster, a "rate shopper product for collecting public pricing information[,]" "so that

27   competitor pricing is easily incorporated as a factor in setting pricing." (*Id.* at 36, 47.)

28   ///

1   Hotel "Defendants began using Rainmaker's revenue management system at

2   various points in time." (*Id.* at 86.) Specifically, Caesars began using GuestRev around

3   2004, and the Cosmopolitan began using it in 2014; the other Hotel Defendants began

4   using it at different times between those two points in time. (*Id.* at 86-106.)

5   The FAC also includes many allegations going to how the products work and how

6   Hotel Defendants use them, which the Court discusses in more detail below as part of its

7   analysis.

8   **III.   DISCUSSION**

9   Defendants move to dismiss both claims for relief asserted in the FAC. The Court

10   addresses Defendants' Motion as to both claims in turn, below.

11   **A.   First Claim: Hub and Spoke**

12   Plaintiffs allege that Defendants violated the Sherman Act by entering a hub and

13   spoke conspiracy, consisting of a series of vertical agreements between Cendyn (the hub)

14   and Hotel Defendants (the spokes), with a rim made from the tacit agreements between

15   Hotel Defendants to use Cendyn's GuestRev and GroupRev products knowing that their

16   competitors were as well.[3] (ECF No. 144 at 218-219.) Defendants argue that this claim

17   should be dismissed because Plaintiffs do not plausibly allege a tacit agreement between

18   Hotel Defendants, more specifically arguing the FAC does not cure four of the key

19   defects[4] the Court previously identified in the original complaint, and further arguing that

20   _____

21   [3]"A traditional hub-and-spoke conspiracy has three elements: (1) a hub, such as a dominant purchaser; (2) spokes, such as competing manufacturers or distributors that

22   enter into vertical agreements with the hub; and (3) the rim of the wheel, which consists of horizontal agreements among the spokes." *In re Musical Instruments & Equip. Antitrust*

23   *Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015) (citation omitted).

24   [4]The Court agrees with Plaintiffs that their FAC has cured one of the four key deficiencies that the Court previously identified: which algorithm each of the Hotel Defendants uses. (ECF No. 141 at 4-5 (pointing out this deficiency).) Defendants argue

25   Plaintiffs have not cured this deficiency because each user can customize the algorithms within the revenue management products it uses by selecting the criteria and competitors

26   that a customer would like to use to generate room price predictions, but do not allege which specific criteria any Hotel Defendant used, and thus have not alleged which

27   algorithm each Hotel Defendant uses. (ECF No. 160 at 17-18.) Plaintiffs counter that this argument is too granular, and they have adequately addressed the Court's concerns

28   regarding the original complaint: that they now allege each Hotel Defendant used

1    the new allegations in the FAC (as opposed to the initial complaint) merely expose further

2    fatal defects with Plaintiffs' first claim. (ECF No. 160 at 17-35.) The Court agrees with

3    Defendants in pertinent part.

4          "The 'crucial question' prompting Section 1 liability is 'whether the challenged

5    anticompetitive conduct 'stems from [lawful] independent decision or from an agreement,

6    tacit or express.'"" *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser*

7    *Antitrust Litig.*, 28 F.4th 42, 46 (9th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550

8    U.S. 544, 553 (2007)). In granting Plaintiffs leave to amend their original complaint, the

9    Court was essentially giving Plaintiffs another chance to answer this question. And even

10   though the FAC contains many more allegations than the original complaint did, Plaintiffs

11   have not plausibly alleged that the challenged conduct stems from a tacit agreement

12   between Hotel Defendants.

13         The Court took the approach in its prior dismissal order of elaborating on a non-

14   exhaustive list of deficiencies, but all these deficiencies are best understood as different

15   reasons why Plaintiffs had not plausibly alleged a tacit agreement among Hotel

16

17   ─────────────────

     GuestRev and GroupRev during the pertinent time. (ECF No. 167 at 18-19.) The Court
18   agrees with Plaintiffs.

19        Plaintiffs allege in their FAC, unlike in their original complaint, that each Hotel
     Defendant used GuestRev and GroupRev during the pertinent time. (ECF No. 144 at 86-
20   106.) This remedies the issue that the Court pointed out in its prior order. (ECF No. 141
     at 4-5.) Indeed, Defendants seek in their Motion a new, higher level of specificity than the
21   Court contemplated requiring in its prior order without citing any legal authority beyond
     the Court's prior order. (ECF No. 160 at 18.)  But the Court's prior order does not
22   sufficiently support Defendants' argument. (ECF No. 141 at 4-5.) Requiring that each
     Defendant use the same algorithms in the same way, by selecting the same inputs,
23   requires too much. An algorithm is not defined by its inputs, but instead by its rules. *See,
     e.g.*, Kristian Lum and Rumman Chowdhury, *Opinion: What is an "algorithm"? It depends
24   whom you ask*, MIT Technology Review (Feb. 26, 2021), https://perma.cc/4YZH-38BW
     ("While there's no universally accepted definition, a common one comes from a 1971
25   textbook written by computer scientist Harold Stone, who states: 'An algorithm is a set of
     rules that precisely define a sequence of operations.'") (hyperlink omitted).

26        More broadly, the Court agrees with Plaintiffs that, particularly drawing all
     inferences in their favor as the Court must at the pleading stage, they now allege enough
27   in the FAC in terms of alleging that all Hotel Defendants used GuestRev and GroupRev
     during the pertinent time. (ECF No. 144 at 86-106.) *See also Khoja v. Orexigen
28   Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018) (stating that the Court must draw
     "all reasonable inferences in favor of the" Plaintiffs) (citation omitted).

Defendants to raise prices for hotel rooms by all using Cendyn's software. And while the Court discusses below the three key deficiencies that the Court both identified in its prior order and persist in the FAC, those too are best understood as alternative and determinative reasons why Plaintiffs have not plausibly alleged a tacit agreement in the FAC, either. Said otherwise, Plaintiffs' allegations that Defendants entered into a tacit agreement to fix prices still have not crossed the line from conceivable to plausible despite the multitude of additional allegations in the FAC. This case remains a relatively novel antitrust theory premised on algorithmic pricing going in search of factual allegations that could support it.

Defendants first argue in pertinent part that Plaintiffs still have not alleged that Hotel Defendants began using GuestRev and GroupRev around the same time, which—as the Court found in its prior order—tends to undermine Plaintiffs' argument that Hotel Defendants' decisions to use these products evidence an agreement instead of independent conduct. (ECF No. 160 at 18-19.) Plaintiffs counter that this argument ignores the substance of Plaintiffs' alleged claims of parallel conduct, which are not tied to the dates that Hotel Defendants began using GuestRev but rather their parallel use of GuestRev starting in 2015 when GuestRev integrated public competitor prices from RevCaster for the first time—and Hotel Defendants began charging higher prices shortly thereafter. (ECF No. 167 at 19-20.) Plaintiffs further argue that Hotel Defendants agree to continue participating in the conspiracy each year when they renew their licensing agreements with Cendyn for GuestRev. (*Id.* at 20.) The Court continues to find that the timing of when Hotel Defendants began to use GuestRev and GroupRev renders a tacit agreement among them implausible.

On the one hand, "[i]t is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators." *Interstate Cir. v. United States*, 306 U.S. 208, 227 (1939); *see also United States v. Masonite Corp.*, 316 U.S. 265, 275 (1942) (citing *Interstate Cir.*). But on the other hand, allegations that defendants "adopted [] policies over a period of several years, not

simultaneously" did "not raise the specter of collusion" in *Musical Instruments*, 798 F.3d at 1196. So is this case more like *Interstate Cir.* and *Masonite*, as Plaintiffs argued at the Hearing, or *Musical Instruments*, as Defendants did?

This case is more like *Musical Instruments*. Indeed, there is a key difference between the allegations in the FAC and *Interstate Cir.* and *Masonite*. In those cases, competitors all agreed to charge the same prices. *See Interstate Cir.*, 306 U.S. at 231 ("the 25 cents admission price was to be required of all alike, forcing increases in admission price ranging from 25 per cent. to 150 per cent[.]"); *Masonite*, 316 U.S. at 271 (explaining how Masonite set the minimum and maximum sale prices and retained the sole right to set prices under the pertinent agreements). As further explained below (because the parties also address it as a standalone argument), Plaintiffs do not allege that all Defendants agreed to be bound by GuestRev or GroupRev's pricing recommendations, much less that they all agreed to charge the same prices—and indeed allege to the contrary that Cendyn has difficulty getting its customers to accept the prices it recommends in GuestRev and GroupRev. (ECF No. 144 at 10 ("CW 1 stated that Rainmaker engaged in a 'never-ending battle' to convince clients not to override its pricing recommendations[…]").) And it would be more plausible to infer a tacit rim when each spoke agreed to charge the price that the hub demanded as each spoke decided to enter into an agreement with the hub requiring each of the spokes to charge a certain price. But here, Plaintiffs do not allege that each spoke—Hotel Defendants—ever agreed to charge a price that the hub—Cendyn—demanded them to charge. The analogy to *Interstate Cir.* and *Masonite* accordingly does not quite work. And it would thus be too implausible to infer that each Hotel Defendant was signing up for a price fixing conspiracy when it agreed to license and use GuestRev and GroupRev. As alleged, there is no existing agreement to fix prices that a later-arriving spoke could join.

Instead, given the allegations in the FAC—which have not materially changed from the original complaint—that Hotel Defendants began licensing GuestRev and GroupRev

at different times over an approximately 10-year period[5] and never agreed to charge the prices GuestRev and GroupRev recommended to them, the only plausible inference that the Court can draw is that the timing "does not raise the specter of collusion." *Musical Instruments*, 798 F.3d at 1196. Instead, and even drawing all inferences in Plaintiffs' favor, the allegations to the effect that Hotel Defendants agreed to license GuestRev and GroupRev—perhaps in response to Cendyn's marketing materials listing all their customers, the golf outings and open bars Cendyn hosts, or because GuestRev has various useful features[6]—over the course of some 10 years merely suggest that Hotel Defendants had a "similar reaction to similar pressures within an interdependent market, or conscious parallelism." *Musical Instruments,* 798 F.3d at 1196. This contrasts with the implausible inference of a tacit agreement between Hotel Defendants that Plaintiffs would like the Court to draw. And the allegations about Defendants' parallel use of GuestRev starting in 2015 do not plausibly allow for such an inference either because, as Defendants pointed out, GuestRev and GroupRev merely integrated public competitor prices through RevCaster starting in 2015. (ECF No. 167 at 19-20.) That technical change does not speak to any agreement between Hotel Defendants. The Court thus again finds that the gaps in time between when Hotel Defendants agreed to license GuestRev and GroupRev suggest a tacit agreement between them is implausible.

Defendants then argue that Plaintiffs still do not, and cannot, allege that Hotel Defendants exchange any non-public information with each other by using GuestRev or GroupRev—and as the Court previously found, consulting public sources to see your competitors' rates in reaching decisions about how to price hotel rooms does not violate the Sherman Act. (ECF No. 160 at 19-20.) Defendants further argue that, like in their

---

[5]Defendants made a timeline that is helpful in terms of visualizing the gaps in time between each Hotel Defendant's decision to license GuestRev. (ECF No. 160 at 18.)

[6]Defendants persuasively argued at the Hearing that even Plaintiffs allege in their FAC that GuestRev has various features that might make it useful to Hotel Defendants beyond providing pricing recommendations, which further undermines the plausibility of Plaintiffs' theory that Hotel Defendants licensed GuestRev so that they could collude to raise prices. (ECF No. 160 at 13 (summarizing allegations in the FAC describing GuestRev's various features).)

1    original complaint, Plaintiffs attempt to create an inference that GuestRev facilitates the

2    exchange of nonpublic information without quite alleging it by alleging that GuestRev uses

3    machine learning techniques on data input into it—though Defendants suggest the most

4    plausible inference that can be drawn from those allegations is that GuestRev seeks to

5    improve itself as it receives more data. (*Id.* at 20.)

6         Plaintiffs counter that they need not allege the exchange of non-public information

7    between Hotel Defendants because they allege that Hotel Defendants delegated their

8    pricing decisions to Cendyn by using GuestRev and GroupRev and changed their

9    behavior to optimize for revenue instead of occupancy—as they had historically done.

10   (ECF No. 167 at 24-27.) However, Plaintiffs cite sources in this section—a Department of

11   Justice ("DOJ") statement of interest in a case called *Yardi* and comments from former

12   FTC chairman Maureen Ohlhausen—that both discuss the exchange of confidential

13   information between the spokes and the hub even in the quotations excerpted in Plaintiffs'

14   brief. (*Id.*) Moreover, Plaintiffs state that "Defendants make no serious attempt to

15   distinguish this case from *RealPage*[,]" and hold that case up as an analogue the Court

16   should consider (*id.* at 26-27), but the *RealPage* court distinguished that case from this

17   one precisely because the complaint in that case included allegations of the exchange of

18   otherwise confidential information between competitors through the algorithm, while this

19   case did not. *See In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, Case No.

20   3:23-MD-03071, --- F.Supp.3d ----, 2023 WL 9004806, at *17 (M.D. Tenn. Dec. 28,

21   2023).[7] Thus, even Plaintiffs' proffered persuasive authority—they offer no binding

22   authority—does not support Plaintiffs' argument.

23   ///

24

25        [7]To the extent it is not obvious, the Court distinguishes *RealPage*, 2023 WL
     9004806, for the same reason that the *RealPage* court distinguished this case. This case
26   does not involve allegations of competitors pooling their confidential or proprietary
     information in the dataset that the pertinent algorithm runs on, while that case did. *See*
27   *id.* at *17 ("the Multifamily Complaint unequivocally alleges that RealPage's revenue
     management software inputs a melting pot of confidential competitor information through
28   its algorithm and spits out price recommendations based on that private competitor
     data[.]").

But more to the point, the Court agrees with Defendants that Plaintiffs' failure to plausibly allege the exchange of confidential information from one of the spokes to the other through the hub's algorithms is another fatal defect with their first claim because it too compels the conclusion that there is no rim. And to be clear, Plaintiffs do not explicitly allege or argue that Hotel Defendants share confidential information with each other by using GuestRev or GroupRev. (ECF Nos. 144 at 47 ("Rainmaker itself has publicly touted how RevCaster, its rate shopper product for collecting public pricing information, is integrated with GuestRev so that competitor pricing is easily incorporated as a factor in setting pricing."), 167 at 26 ("While the competitor pricing data incorporated into GuestRev via RevCaster may be public[…]").) As the Court held in its prior order, consulting your competitors' public rates to determine how to price your hotel room—without more—does not violate the Sherman Act. (ECF No. 141 at 11 (citing *In re Citric Acid Litig.*, 191 F.3d 1090, 1103 (9th Cir. 1999)).) This is in part because the Supreme Court has interpreted the Sherman Act to "prohibit only *unreasonable* restraints of trade." *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 833 (9th Cir. 2022), *cert. denied sub nom. The Nat'l Ass'n of Realtors v. The PLS.com, LLC.*, 143 S. Ct. 567 (2023) (citation omitted).

There is nothing unreasonable about consulting public sources to determine how to price your product. Indeed, in *Prosterman v. Am. Airlines, Inc.*, 747 F. App'x 458, 462 (9th Cir. 2018), the United States Court of Appeals for the Ninth Circuit found that a third party clearinghouse of public pricing and rules information for airline fares did not plausibly facilitate collusion between the defendant airlines who both used it and simultaneously changed their rules to eliminate a loophole allowing for lower fares on some flights, rejecting the plaintiffs' attempts to point to this arrangement as a plus factor, affirming the district court's decision to dismiss the pertinent complaint, and also noting its skepticism that membership in trade organizations was suggestive of collusion. *See id.* Extending from *Prosterman*, Plaintiffs only allege that Hotel Defendants are getting public data about other Hotel Defendants by using GuestRev or GroupRev, and that does not suggest collusion.

9

1      Plaintiffs also suggested in their briefing and at the Hearing that their allegations

2 about 'machine learning' plausibly suggest that Hotel Defendants exchange confidential

3 information with each other by using GuestRev, but those allegations do not plausibly

4 give rise to such an inference upon closer inspection. Plaintiffs specifically point to

5 paragraphs 257-265 of the FAC. (ECF No. 167 at 24.)

6      As mentioned, these paragraphs do not plausibly allege that Hotel Defendants

7 exchange confidential or proprietary information with each other by using GuestRev. That

8 said, the first two paragraphs in this section allege it in a conclusory fashion. (ECF No.

9 144 at 152-53 (¶¶ 257-58).) But the factual allegations supporting these conclusory

10 allegations that follow do not plausibly support them. *See Twombly*, 550 U.S. at 557

11 (2007) (noting that a conclusory allegation "[g]ets the complaint close to stating a claim,

12 but without some further factual enhancement it stops short of the line between possibility

13 and plausibility of 'entitle[ment] to relief.") (citation omitted). Specifically, "CW 1 stated that

14 'we used data across all our customers for research.'" (*Id.* at 153.) But using data across

15 all your customers for research does not plausibly suggest that one customer has access

16 to the confidential information of another customer—it instead plausibly suggests that

17 Cendyn uses data from various customers to improve its products. Paragraphs 259 and

18 260 discuss and excerpt a white paper that Cendyn paid to have written, but neither the

19 excerpts nor the rest of the white paper reference GuestRev or GroupRev. (*Id.* at 153-

20 55.) And Plaintiffs' counsel conceded at the Hearing that the white paper is not specifically

21 discussing GuestRev or GroupRev. The following paragraph excerpts a blog post from

22 Cendyn's website written by Dan Skodol, but it generally discusses the benefits of

23 optimizing for revenue instead of occupancy, accurate demand forecasting, and machine

24 learning—he does not say anything about GuestRev or GroupRev, much less that they

25 facilitate the exchange of confidential information between competitors. (*Id.* at 156-57.)

26 Similarly, the following paragraph generally explains what machine learning is and why it

27 may be beneficial in the context of the hotel/casino business. (*Id.* at 157.) And Paragraph

28 263 describes the backgrounds of several data scientists who have worked for

Rainmaker, highlighting their experience with machine learning techniques. (*Id.* at 157-159.) These paragraphs do not plausibly suggest the exchange of confidential information between competitors.

Paragraphs 264 and 265 get closer to plausibly supporting Plaintiffs' theory, but notably exclude any mention of confidential information. (*Id.* at 159.) Indeed, paragraph 265 states, "Defendant hotel operators have not directly exchanged information with each other." (*Id.*) But other sentences in these paragraphs describe how GuestRev can be integrated with each hotel's property management system, and state that Hotel Defendants have 'pooled' their data in a central hub—Rainmaker's revenue management system. (*Id.*) But the pool of data is not described as containing confidential or proprietary information, so these allegations do not plausibly suggest the "melting pot of confidential competitor information" that the *RealPage* court found important in permitting that case to proceed. 2023 WL 9004806, at *17. So, overall, these two paragraphs do not plausibly suggest that Hotel Defendants exchange confidential information with each other by using GuestRev or GroupRev, either.

Indeed, Plaintiffs' counsel conceded at the Hearing that, to the extent the FAC alleges anything about the exchange of confidential information, those allegations are based on their "machine learning" theory—that the algorithms improved over time by running on confidential information provided by each Hotel Defendant. No Hotel Defendant gets direct access to the confidential information of another but gets the benefit of a system that has gotten better since it was launched in 2001 because it has run on the confidential data of many others in the past. In other words, the algorithms got better at predicting optimal hotel room pricing with the benefit of information provided by each customer. But this does not plausibly suggest that Hotel Defendants tacitly agreed to fix prices by licensing GuestRev or GroupRev. Even drawing all inferences in Plaintiffs' favor, it merely suggests GuestRev or GroupRev might be compelling to a Hotel Defendant because it offers better pricing recommendations than it used to. That is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted

1    by common perceptions of the market." *Twombly*, 550 U.S. at 554 (2007). It does not

2    render Plaintiffs' first claim plausible.

3         Defense counsel persuasively analogized the pricing algorithms to an attorney's

4    practice at the Hearing. He argued you can think of Plaintiffs' machine learning theory as

5    to GuestRev and GroupRev as no different than an attorney improving her skills over time

6    with the benefit of experience and access to confidential client information she gains with

7    each client engagement. The attorney does not share one client's confidential information

8    with another, but over time, she (ideally) gets smarter because of what she has learned

9    from each client engagement she has successfully completed. And in time, clients seek

10   her out because she has, for example, developed expertise in antitrust law. But that does

11   not plausibly suggest that each new client who seeks out the attorney is entering into an

12   agreement with every client she has ever worked with. How could it? And the same goes

13   for Plaintiffs' machine learning theory. Thus, mere use of algorithmic pricing based on

14   artificial intelligence by a commercial entity, without any allegations about any agreement

15   between competitors—whether explicit or implicit—to accept the prices that the algorithm

16   recommends does not plausibly allege an illegal agreement, or "raise a reasonable

17   expectation that discovery will reveal evidence of illegal agreement" sufficient to survive

18   the Motion. *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).

19        Moreover, and to the extent Plaintiffs contend their theory alleged in the FAC does

20   not strictly depend on the exchange of confidential information between competitors,

21   Defendants' counsel also persuasively pointed out at the Hearing that this argument is

22   based on Hotel Defendants having allegedly 'delegated' their decisionmaking on price to

23   Cendyn—but Plaintiffs have not actually alleged such a delegation. (ECF No. 167 at 24-

24   25 (arguing about delegation).) This is because Plaintiffs have not alleged that Hotel

25   Defendants agreed to be bound by GuestRev or GroupRev's pricing recommendations—

26   Hotel Defendants may accept or reject them, and apparently often did. (ECF No. 144 at

27   10.) The most plausible definition of delegate that Plaintiffs seem to be relying on here is

28   "[t]o send as a representative with authority to act[.]" DELEGATE, Black's Law Dictionary

1  (11th ed. 2019). But Plaintiffs have not alleged that Hotel Defendants have given Cendyn

2  authority to act. GuestRev and GroupRev cannot set prices for Hotel Defendants. These

3  products can merely make recommendations that Hard Rock, for example, accepted "in

4  some circumstances while Hard Rock overrode the recommendations in other cases."

5  (ECF No. 144 at 102.) Despite their argument to the contrary, Plaintiffs have not alleged

6  that Hotel Defendants delegated their pricing decisions to Cendyn.

7  In sum, the Court does not find that Plaintiffs have plausibly alleged that Hotel

8  Defendants exchange confidential information with each other—directly or indirectly—by

9  using GuestRev. This matters because exchanging confidential information with your

10  competitors by all agreeing to use GuestRev would be more suggestive of an agreement.

11  But merely using GuestRev or GroupRev without exchanging confidential information with

12  your competitors is more suggestive of a "[lawful] independent decision" to use a product

13  that allegedly helps hotels do more than just decide how to price their hotel rooms in any

14  event—such as analyzing potential guest value and forecasting demand based on

15  historical data. (ECF No. 160 at 13 (referring to allegations in the FAC).) *See also In re*

16  *DRAM*, 28 F.4th at 46 (the source of the quotation).

17  Defendants next—and finally, for purposes of Plaintiffs' first claim—argue that

18  Plaintiffs' allegations in the FAC cannot overcome the Court's prior finding that Plaintiffs

19  cannot make out a Sherman Act violation without alleging that Hotel Defendants are

20  required to accept the pricing recommendations made by GuestRev, highlighting

21  pertinent allegations in the FAC to the effect that GuestRev's pricing allegations are

22  frequently rejected to underline the point. (ECF No. 160 at 20-21.) Plaintiffs counter that

23  they need not allege that GuestRev's pricing recommendations are accepted 100 percent

24  of the time, instead contending that they have plausibly alleged Hotel Defendants either

25  accept GuestRev's pricing recommendations enough of the time to disrupt an otherwise

26  competitive market or that Hotel Defendants at least use GuestRev's recommendations

27  as starting points to set prices. (ECF No. 167 at 22-24.) Plaintiffs rely on two DOJ

28  statements of interest in the *RealPage* and *Yardi* cases, along with the Court's decision

in *Alvarado v. W. Range Ass'n*, Case No. 3:22-cv-00249-MMD-CLB, 2023 WL 4534624, at *8 (D. Nev. Mar. 21, 2023), to support this argument. (ECF No. 167 at 22-23.) The Court again agrees with Defendants.

As mentioned several times, Plaintiffs allege in the FAC that Hotel Defendants are not required to accept the prices that GuestRev proposes for their hotels. (ECF No. 144 at 10 (alleging that customers may override GuestRev's proposed prices, and indeed, that they often did because "Rainmaker engaged in a 'never-ending battle' to convince clients not to override its pricing recommendation"), 39-40 (citing Cendyn marketing materials that GuestRev recommendations are accepted 90% of the time), 60 (explaining how customers may override pricing recommendations), 68 (describing a training video that explains how a customer can override a pricing recommendation), 102 ("CW 4 further stated that Hard Rock automatically accepted Rainmaker's pricing recommendations in some circumstances while Hard Rock overrode the recommendations in other cases.").) Indeed, as indicated by the final excerpt in that citation, the FAC only contains specific allegations regarding Hard Rock, and Plaintiffs only allege as to Hard Rock that Hard Rock accepted the pricing recommendations sometimes. (*Id.* at 102.) Thus, as in the original complaint, Plaintiffs do not allege that Hotel Defendants are required to accept the pricing recommendations provided by GuestRev or GroupRev.

This matters because an agreement to accept pricing recommendations from GuestRev or GroupRev could more plausibly give rise to an inference of an agreement between Hotel Defendants. If they all agreed to outsource their pricing decisions to a third party, and all agreed to price according to the recommendations provided by that third party, it would be plausible to infer the existence of a collusive agreement to fix prices. But the allegations that could plausibly support that sort of inference do not exist in the FAC.

And Plaintiffs' arguments to the effect that the Court should draw implausible inferences from the pertinent allegations in the FAC are unpersuasive. For example, Plaintiffs again included the figure from Cendyn marketing material that GuestRev's

1   pricing recommendations are accepted 90% of the time, but the Court rejected an

2   identical allegation based on that same figure as not determinative in its order dismissing

3   the original complaint. (ECF No. 141 at 5-6.) The Court rejects that argument for the same

4   reason here. And Plaintiffs go to some lengths in terms of allegations included in the FAC

5   to allege that GuestRev's user interface is set up to encourage customers to accept

6   GuestRev's pricing recommendations—that pricing recommendations must be

7   overridden, and graphical elements within the software itself discourage overriding

8   recommended prices—but these allegations are ultimately contradicted by Plaintiffs'

9   allegation that "Rainmaker engaged in a 'never-ending battle' to convince clients not to

10  override its pricing recommendation[.]" (ECF No. 144 at 10.) Plaintiffs also argue that

11  Hotel Defendants' decisions to continue using GuestRev and public praise for the product

12  suggest that 'the competitive process was disrupted' but that argument does not account

13  for Plaintiffs' other allegations to the effect that GuestRev has other features that

14  customers may select for, such as demand forecasting based on historical data and

15  predictions regarding guest revenue. (*Compare* ECF No. 167 at 23 *with* ECF No. 160 at

16  13 (summarizing pertinent allegations in the FAC).) Thus, it is implausible to infer that

17  Hotel Defendants only use GuestRev because they have entered into a tacit agreement

18  to accept Cendyn's pricing recommendations, let alone to fix prices.

19          This brings the Court back to perhaps the primary issue with the FAC that links the

20  three issues described above together and renders Defendants' persuasive authority

21  further distinguishable—Plaintiffs do not plausibly allege in the FAC that Hotel Defendants

22  tacitly agreed to fix prices. The gap in time between when they all began using GuestRev,

23  the missing allegations regarding the exchange of confidential information, and the lack

24  of any allegations to the effect that Hotel Defendants were required to accept GuestRev's

25  pricing recommendations all point to the conclusion that Hotel Defendants never agreed

26  to fix prices by using GuestRev or GroupRev. And to the extent it needs to be mentioned,

27  there are also no specific, nonconclusory allegations in the FAC that Hotel Defendants

28  ever agreed to fix prices. These key absences render the Court's other recent Sherman

1  Act decision distinguishable, where the Court found the defendants had agreed to fix

2  wages at a certain level, though some defendants later departed from that agreement

3  and paid some sheepherders more. *See Alvarado v. W. Range Ass'n*, Case No. 3:22-cv-

4  00249-MMD-CLB, 2023 WL 4534624, at *8 (D. Nev. Mar. 21, 2023). In contrast, in the

5  FAC, there are no plausible allegations suggesting that any Hotel Defendants ever agreed

6  to fix prices or agreed to accept pricing recommendations. Thus here, unlike there, there

7  is no agreed-upon price to depart from.

8      Without a plausible agreement, Plaintiffs' first claim cannot proceed. The Court

9  grants Defendants' Motion as to the first claim for relief.

10  **B.  Second Claim: Set of Vertical Agreements**

11      Plaintiffs allege in their second claim that Defendants violated the Sherman Act

12  because Hotel Defendants entered into a series of vertical agreements with Cendyn to

13  use GuestRev or GroupRev, which had the anticompetitive effect of artificially inflating

14  hotel room prices, and thus harmed consumers. (ECF No. 144 at 220.) Plaintiffs further

15  allege there are no procompetitive justifications for these arrangements, and to the extent

16  Defendants offer any justifications, Defendants' combination could have been achieved

17  by less anticompetitive means. (*Id.*)

18      "Vertical agreements [ . . .] are analyzed under the rule of reason, whereby courts

19  examine 'the facts peculiar to the business, the history of the restraint, and the reasons

20  why it was imposed,' to determine the effect on competition in the relevant product

21  market." *In re Musical Instruments*, 798 F.3d at 1191-92. More specifically, courts use a

22  three-step burden shifting framework under which, "the plaintiff has the initial burden to

23  prove that the challenged restraint has a substantial anticompetitive effect that harms

24  consumers in the relevant market." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018)

25  (citation omitted). If the plaintiff carries that burden, the burden shifts back to the

26  defendant to show a procompetitive rationale for the restraint. *See id.* "If the defendant

27  makes this showing, then the burden shifts back to the plaintiff to demonstrate that the

28

16

procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* at 542 (citation omitted).

Defendants first argue that the vertical agreements between Cendyn and individual Hotel Defendants do not restrain trade because Plaintiffs identify no agreements that constrain Hotel Defendants' ability to unilaterally set prices. (ECF No. 160 at 35-36.) In response, Plaintiffs point to their allegations to the effect that Hotel Defendants' average room prices became more expensive relative to the Venetian, a hotel that does not use GuestRev, and Las Vegas Strip hotels became more expensive relative to hotel rooms in other markets, particularly starting in 2015 when RevCaster was integrated into GuestRev and accordingly incorporated competitors' prices. (ECF No. 167 at 38-41.) Plaintiffs further argue that this harmed competition in at least two ways; higher prices and because the vertical agreements facilitated collusion between Hotel Defendants. (*Id.* at 41-43.) Alternatively, Plaintiffs counter that they have plausibly alleged indirect harm to competition because they have plausibly alleged that Hotel Defendants have market power in their defined market area, and they have alleged based on economic research that having multiple competitors in the same market using the same pricing algorithm harms competition. (*Id.* at 43-46.) The Court again agrees with Defendants.

As described above, Plaintiffs do not allege that Hotel Defendants are required to accept the prices that GuestRev and GroupRev (the products offered by the other side of the challenged vertical agreements, Cendyn) recommend to them—and indeed allege that the recommendations are often rejected. Thus, Hotel Defendants have not agreed to restrain their ability to price their hotel rooms in any way by licensing GuestRev or GroupRev. It accordingly cannot be that the vertical agreements between Cendyn and Hotel Defendants to license GuestRev and GroupRev restrain trade. And "[i]t is axiomatic that '[t]o constitute a Section 1 violation, the contract, combination, or conspiracy must be in restraint of trade.'" *Newman v. Universal Pictures*, 813 F.2d 1519, 1522 (9th Cir. 1987) (citation omitted); *see also generally id.* (affirming dismissal of Sherman Act claim). In sum, the Court also grants Defendant's Motion as to Plaintiffs' second claim for relief.

17

Turning more broadly back to considering both claims in the FAC, the Court will not grant Plaintiffs leave to amend. Plaintiffs:

> were already granted leave to amend once and were given an opportunity to conduct discovery to discover the facts needed to plead their causes of action, yet their First Amended Complaint contained [some of] the same defects as their original Complaint. Appellants fail to state what additional facts they would plead if given leave to amend, or what additional discovery they would conduct to discover such facts. Accordingly, amendment would be futile.

*Kendall*, 518 F.3d at 1051-52.[8] The Court will dismiss the FAC with prejudice.

## IV.    CONCLUSION

The Court notes that the parties made several arguments and cited several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motion before the Court.

It is therefore ordered that the Motion (ECF No. 160) is granted.

It is further ordered that the FAC (ECF No. 144) is dismissed, in its entirety, with prejudice.

The Clerk of Court is directed to enter judgment accordingly and close this case.

DATED THIS 8th Day of May 2024.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE

---

[8]Plaintiffs merely state at the end of their response to the Motion, "[h]owever, Plaintiffs respectfully request that, if the Court grants Defendants' motions in whole or in part, it provide Plaintiffs with 21 days to file a motion for leave to amend pursuant to Local Rule 15-1." (ECF No. 167 at 48.) They do not explain how they could amend to state plausible claims, nor do they otherwise address amendment in their response. Amendment would thus be futile.