**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re MULTIPLAN HEALTH INSURANCE PROVIDER LITIGATION | Case No. 1:24-cv-06795 |
| | MDL No. 3121 |
| *This Document Relates To:* ALL DIRECT ACTION PLAINTIFF ACTIONS | Hon. Matthew F. Kennelly |


**CONSOLIDATED MASTER DIRECT ACTION PLAINTIFF COMPLAINT**

# Table of Contents

Page

I.   Introduction and Nature of the Action ...............................................................1

II.  Purpose and Nature of this Master Complaint ................................................16

III. The Parties ..........................................................................................................16

    A.   Plaintiffs ......................................................................................................16

    B.   Defendants and Co-Conspirators ..............................................................17

IV.  Jurisdiction, Venue, and Interstate Commerce ...............................................27

V.   The MultiPlan Cartel is a Horizontal Price-Fixing Conspiracy.......................30

    A.   MultiPlan Competes Against Other Payors .............................................30

        i.    There are Several Types of Competing Payors in the United States ........30

        ii.   MultiPlan is a Payor and Directly Competes with the Other Members of the MultiPlan Cartel ...............................................35

    B.   MultiPlan Enters into Agreements with Its Competitors to Use a Common Pricing Methodology to Set the Prices Paid for Out-of-Network Goods and Services.......................................................................42

        i.    Overview of MultiPlan's Agreements with Competing Payors ...............42

        ii.   There is Direct Evidence of MultiPlan's Agreements with Competing Payors to Use a Common Pricing Methodology to Set Prices for Out-of-Network Goods and Services ........................................50

        iii.  MultiPlan and its Competitors Engaged in Parallel Pricing Conduct........88

    C.   MultiPlan Receives, Pools, and Commingles Proprietary and Confidential Pricing Data to Set and Negotiate Prices for its Competitors' Out-of-Network Goods and Services...............................................................94

    D.   MultiPlan Enters into Agreements with its Competitors to Set the Maximum Price for Out-of-Network Goods and Services .................................104

    E.   MultiPlan Enters into Agreements with its Competitors to Act as the Sole Negotiator for Out-of-Network Prices .................................................108

    F.   There is Substantial Circumstantial Evidence that MultiPlan Enters Into Agreements with Competing Payors to Suppress Prices Paid for Out-of-Network Goods and Services...............................................................110

        i.    High Collective Market Concentration...................................................111

        ii.   High Barriers to Entry............................................................................112

        iii.  Motive to Conspire ................................................................................113

        iv.   Prior Industry Collusion.........................................................................115

        v.    Opportunities to Conspire ......................................................................118

        vi.   Actions Against Self-Interest.................................................................119

|   | vii. | Pervasive Exchanges of Competitively Sensitive Information | 123 |

vii. Pervasive Exchanges of Competitively Sensitive Information................123

viii. Monitoring and Enforcement Structures....................................127

ix. Customary Patterns, Formulas, and Leadership ......................132

G. The MultiPlan Cartel Can be Evaluated as Either Traditional or Algorithmic Price Fixing ...............................................................................133

H. Alternatively, the MultiPlan Cartel Is a Hub-and-Spoke Cartel .........................136

I. Alternatively, MultiPlan Acted As An Agent, Facilitator, or Conduit of Each of The Other Members of the MultiPlan Cartel..........................................139

VI. Even if this Case Were Evaluated Under the Rule of Reason, the MultiPlan Cartel Has Market Power, Harms Competition Throughout the Relevant Market, and Has No Procompetitive Effects...............................................................................................141

A. The MultiPlan Cartel has Collective Market Power in the Relevant Market for Out-of-Network Goods and Services ...........................................................141

B. The MultiPlan Cartel Harmed Providers, Patients, and Subscribers ..................158

C. There is No Procompetitive Justification for the MultiPlan Cartel ....................170

VII. DAPs Have Suffered Antitrust Injury and Have Antitrust Standing ..............................177

VIII. DAPs' Claims are Not Arbitrable ...............................................................................185

IX. The Defendants Also Use Deceptive and Unfair Tactics to Further Their Unlawful Scheme .........................................................................................................................188

X. The Statute of Limitations Should be Tolled Under the Fraudulent Concealment and Continuing Violation Doctrines .....................................................................................190

A. Fraudulent Concealment .................................................................................190

B. Continuing Violation ........................................................................................196

XI. Causes of Action ...............................................................................................................198

XII. Prayer for Relief.................................................................................................................238

XIII. Jury Demand .....................................................................................................................239

## I. Introduction and Nature of the Action

1. For years, the companies that set the prices for out-of-network healthcare goods and services in the United States have been running a cartel. The goal of that buyers' cartel is to pay doctors and hospitals as little as possible for their life-saving and life-sustaining out-of-network care—and to generate huge fees for the cartel members.

2. The cartel members do this by agreeing to stop competing against each other on pricing for out-of-network goods and services, stop using their independent judgment on how much to pay for such goods and services, and instead pool their non-public pricing *data* and their pricing *decisions* in one entity—MultiPlan, Inc. ("MultiPlan"). MultiPlan uses the cartel's commingled competitively sensitive pricing data, a common pricing methodology, a coordinated regime of pricing caps, and regular meetings and communications so that the cartel members can do in concert what none of them could do by competing independently—force ever-decreasing, below-market pricing on providers for out-of-network goods and services. All providers of out-of-network goods and services are harmed by the actions of this buyers' cartel. As a result of the cartel, they were paid less than they would have been paid for the same out-of-network goods and services absent the cartel.

3. That should sound familiar. The cartel members, commercial third-party healthcare payors for out-of-network goods and services ("payors"), are antitrust recidivists.[1] Payors have colluded previously with one another to underpay doctors and hospitals for out-of-network goods and services in the past, and enforcers have caught them red-handed doing so. Rather than learning from their wrongdoing, the payors repeated it by colluding with another payor, MultiPlan, to slash the prices they pay for out-of-network goods and services.

---

[1] The term "payor" is further defined in ¶ 88.

4.     From about 1996 to 2008, the country's major payors conspired to fix the prices of out-of-network goods and services through the use of a common pricing methodology, called Ingenix, owned and operated by one of their own: UnitedHealthcare.

5.     In 2008, the payors got caught. After major investigations, the payors entered into settlements with the New York Attorney General and private plaintiffs. As part of those settlements, the payors had to abandon the Ingenix conspiracy and use an independent database, known as FAIR Health, and their own business judgment to set prices for out-of-network goods and services for a period of five years.

6.     But the payors' motivations to fix and suppress prices for out-of-network services did not evaporate merely because they got caught. As the settlement of their Ingenix scheme was sunsetting, the payors sought out a new means to fix the prices of out-of-network services.

7.     Enter MultiPlan. MultiPlan is a payor for out-of-network goods and services. MultiPlan told other payors that it had come up with a better way to conspire—an "alternative" to Ingenix—in which MultiPlan offered to serve as a "liability shield." Thus, as each payor's settlement concerning the Ingenix conspiracy expired, that payor joined a cartel with its competitors to set the prices for out-of-network services via MultiPlan. MultiPlan formed that cartel using a series of written contracts, plus regular meetings and communications designed to ensure all the payors were using a common pricing method—MultiPlan's—to set prices for out-of-network goods and services and to coordinate a series of downward-trending pricing caps among the cartel members (the "MultiPlan Cartel").

8.     The operation of the MultiPlan Cartel is straightforward. MultiPlan and competing payors have agreed to stop competing on the prices that they pay to providers for providers' out-of-network goods and services. Instead of exercising their independent pricing discretion, as they

did prior to the cartel, MultiPlan and its competitors agreed to use MultiPlan's common pricing methodology to set the prices they pay for out-of-network goods and services. This common pricing methodology has three key parts: (1) payors send providers' bills for out-of-network healthcare to MultiPlan, (2) MultiPlan applies an agreed-upon pricing formula to those bills to set prices for those out-of-network goods and services, and (3) MultiPlan applies maximum price caps to the prices generated by its formulas. Because payors agreed to use a common pricing methodology, competitive forces no longer prevented the members of the MultiPlan Cartel from setting out-of-network prices well below the prices that would have existed for those goods and services absent the cartel.

9.      The cartel did not stop there. The cartel members also agreed to share petabytes of granular, real-time, and competitively sensitive healthcare claims data with MultiPlan. MultiPlan commingled that data into a massive dataset that it used to price out-of-network goods and services.

10.     MultiPlan and the other payors agree on the maximum amount they will pay for certain out-of-network goods and services. MultiPlan implements these out-of-network price caps (called "overrides") to ensure all cartel members are aligned on the prices they set for out-of-network goods and services. These overrides are just price-fixing. MultiPlan and a competing payor agree on the price that a payor will charge for a particular out-of-network good or service often with the understanding that the override price will be the price charged for that good or service nearly all of the time. MultiPlan uses the same overrides when setting out-of-network prices for its health plans.

11.     The MultiPlan Cartel has put healthcare providers in a chokehold. MultiPlan imposes the cartel's prices on healthcare providers, giving providers only hours to respond to MultiPlan's offers. "Offer" is a misnomer. While a provider is not technically required to accept

the prices that MultiPlan sets for out-of-network goods and services, providers have no choice but to do so.

12.     That is the case because the cartel members agree that MultiPlan will police the payors' cartel agreement by acting as the sole enforcer of out-of-network prices if a provider pushes back on the cartel's low-ball prices. MultiPlan likes to refer to these tactics as a "negotiation." They are anything but a negotiation. Because it has the pool of commingled confidential pricing data from all the cartel members and because MultiPlan is handling the pricing for all members, none of the normal pressures or dynamics of a negotiation in a market without collusion exist. Using its massive and commingled pricing database, MultiPlan forces providers to accept the cartel's low-ball pricing. MultiPlan can do this because the cartel holds a predominant market share in the market for out-of-network goods and services sold to payors ("Out-of-Network Goods and Services Market"). *See infra* ¶¶ 514-573. Thus, when a provider attempts to push back against one of the cartel's underpayments, the provider is not just negotiating with a single payor, they are negotiating against the entire industry. MultiPlan wields the cartel's collective market power to force providers to knuckle under and accept the cartel's rigged pricing. MultiPlan bombards providers with thousands of pricing communications. It uses high-pressure tactics and deception to force providers to respond to pricing communications in a matter of hours and it deceives providers into accepting below-market prices for their out-of-network care by attempting to hide the fact that prices were set by the cartel. If that does not work, MultiPlan threatens to push the price even lower if the provider does not capitulate and accept the cartel's prices. In other words, MultiPlan tells providers that it is the only game in town, that it is making an offer that they cannot refuse, and that if the providers do not play ball with the cartel, business will get worse for them.

13.     MultiPlan knows it can get away with acting, in the words of an analyst, "like a mafia enforcer for insurers," because virtually every payor has agreed to use its pricing methodology for out-of-network goods and services. MultiPlan can use these strong-arm tactics because, by virtue of the cartel, it knows the payor will not be competitively disadvantaged by pushing the pricing lower and the provider cannot effectively push back with other competitive pricing from other payors. As a result, healthcare providers cannot push back as they would in a market without collusion by telling the payor its pricing is far below what other payors pay. Providers are left with no practical option but to accept the pricing that the MultiPlan Cartel imposes. And that collusive pricing is recursive: every time MultiPlan forces a provider to accept the cartel's below-market pricing, that data goes into the pool of information MultiPlan draws on to price out-of-network services for other cartel members, ensuring that every price set for a cartel member is based on cartel pricing that allows the cartel to push pricing lower and lower.

14.     In addition to acting as the cartel's enforcer, MultiPlan facilitates the cartel by holding frequent private and off-record meetings with the other cartel members where MultiPlan presents non-public and competitively sensitive pricing data to reach agreements among the payors about ways that the cartel can pay even less for out-of-network goods and services. MultiPlan held, and continues to hold, events designed to facilitate industry-wide agreement to use MultiPlan's pricing methodology, including "client advisory board" meetings at luxury resorts and "road shows," where MultiPlan executives meet with the executives of competing payors to discuss how well the MultiPlan Cartel is suppressing out-of-network pricing competition.

15.     MultiPlan and the payor split the spoils generated by the cartel. MultiPlan charges the payor a bounty for each underpayment the cartel generates. The payors charge the employer groups that subscribe to their health plans a percentage fee—in effect a tax—on all out-of-network

bills that are routed through the buyers' cartel.

16.     MultiPlan also serves as the go-between to communicate with individual cartel members—often in one-to-one meetings among executives—on downward pricing moves and maximum pricing caps to keep cartel members in alignment as they collectively suppress pricing for out-of-network goods and services to lower and lower levels. The purpose of these meetings is to provide assurances that cartel members could use a common pricing methodology and pursue a common pricing goal without fear that doing so would put them at a competitive disadvantage if other cartel members abandoned the common pricing scheme and used independent discretion to set prices for out-of-network goods and services at a higher level.

17.     MultiPlan further solidifies the cartel by issuing secret "whitepapers" to its competitors explaining how MultiPlan's pricing methodology suppresses out-of-network pricing competition.

18.     MultiPlan also perpetuates and strengthens the cartel by recruiting more payors to join the cartel. MultiPlan directly communicates with competing payors to solicit those payors to join the conspiracy. In these communications, MultiPlan tells its competitors the prices that other payors are paying for out-of-network goods and services relative to Medicare prices for those services (in the industry, these percentages of Medicare prices are known as a percentage "of CMS"). MultiPlan tells its competitors how much money they could make by setting those lower prices. MultiPlan assures its competitors that if they set these lower prices, they will be in alignment with the prices that other payors are setting for the same out-of-network goods and services. Thus, MultiPlan gives each of its competitors the blueprint for conspiring—(a) the prices they need to set, (b) the financial motivation for setting those lower prices, and (c) the assurance that competitors would be setting the same prices, not undermining the cartel.

19.     MultiPlan's efforts to enlist its competitors in this scheme have been spectacularly successful. In a tight three-and-a-half year window when the Ingenix settlement obligations that several major payors had to set out-of-network prices in a fair and transparent manner expired, they signed written contracts to begin using MultiPlan's pricing methodology to set prices for out-of-network goods and services. By 2018, MultiPlan had reached agreements with nearly every other significant payor in the U.S. to use MultiPlan's pricing methodology to collectively suppress pricing competition and underpay providers for out-of-network goods and services.

20.     The ease of recruitment makes sense. The cartel has a massive financial motive to suppress pricing competition with respect to out-of-network goods and services. By underpaying doctors and hospitals, cartel members not only save money on costs but also takes home billions of dollars in profits annually through fees that they charge to health plan subscribers each time they underpay a doctor or hospital. Under this structure, MultiPlan and the payors charge massive fees to health plan subscribers based on a percentage of the underpayments generated by the cartel. As a result of this structure, MultiPlan and other cartel members make billions of dollars in profits while harming everyone else in the U.S. healthcare system. The cartel underpays doctors and hospitals. Subscribers are forced to pay massive fees. Patients find themselves in the middle—dealing with healthcare providers who are cutting back services due to shrinking margins and health plans that are constantly getting more expensive as payors pass through the massive fees associated with the MultiPlan Cartel.

21.     The MultiPlan Cartel is so successful because the cartel members have been successful at covering their tracks, at least until now. MultiPlan executives and their co-conspirators know that what they are doing is illegal, or at the very least legally dubious. They take steps to hide their meetings, including limiting the number of participants at meetings, not

taking notes of what is discussed in meetings, and switching from email discussions to telephone discussions and text messages that occur outside of corporate email servers.

22.     The agreements that MultiPlan and its competitors have reached are horizontal agreements that restrained pricing competition for out-of-network goods and services. Each of the cartel members, including MultiPlan itself, are payors for out-of-network goods and services. They compete with one another through setting prices for out-of-network goods and services.

23.     MultiPlan's executives have stated on multiple occasions that MultiPlan competes against other companies that set prices for out-of-network goods and services. Although MultiPlan refers to those competitors as "clients," that is a distinction that makes no difference. As MultiPlan's then-CEO Dale White[2] put it at a November 2023 investor conference: "***Our clients are our competitors; our competitors are our clients.***" One of the most significant ways that MultiPlan competed against other payors prior to the cartel was in using its independent business judgment to set prices for out-of-network healthcare.

24.     While direct evidence of an agreement to restrain trade is extremely rare in antitrust cases even after extensive discovery, it is present here in spades. MultiPlan and the other payors have admitted that: (1) MultiPlan and the other payors that price out-of-network goods and services are competitors, (2) the agreements between MultiPlan and other payors exist, and (3) these agreements have bilked healthcare providers out of billions of dollars of payments for out-of-network goods and services.

25.     MultiPlan and its competitors admit that they have entered into agreements with one another to stop using their independent discretion to price out-of-network goods and services. They have filed copies of those agreements with state insurance commissioners. They have

_____
[2] White is currently the Executive Chairman of MultiPlan's board of directors.

admitted that they enter into these agreements in filings with the Securities and Exchange Commission ("SEC"). They have admitted that these agreements exist in testimony offered under penalty of perjury in other litigation. They have admitted that these agreements exist in disclosures to health plan subscribers, explanations of benefits sent to patients, and communications sent to healthcare providers.

26. As recently as September 16, 2024, MultiPlan has been transparent about its goal to fix industry-wide pricing. During an interview on the DataFramed podcast, MultiPlan CEO Travis Dalton stated, "So part of what we're trying to do *collectively*, . . . with machine learning and other capabilities . . . is to determine [] an appropriate cost for [out-of-network goods and services.]." (emphasis added). The problem for Dalton is that what he describes is illegal—competing payors cannot collectively decide what the appropriate cost paid for a good or service is. That's a buyers' cartel.

27. The MultiPlan Cartel has decimated competition and harmed healthcare providers, patients, and health plan subscribers. The agreements between MultiPlan and its competitors to stop competing on out-of-network pricing harm competition and each of the Direct Action Plaintiffs ("DAPs"). Prior to the cartel, payors could, and did, pay providers competitive rates for their out-of-network goods and services. When there was a disagreement over the proper value of out-of-network goods and services, providers could negotiate the price for those goods and services in a market where payors independently set prices for out-of-network goods and services based on the competitive conditions in the market—including each payor's need to compete with the other payors with respect to access to out-of-network goods and services for patients.

28. The cartel's efforts to end pricing competition among payors were so pervasive that by 2020 MultiPlan was setting the prices for over 370,000 out-of-network claims *per day* on behalf

of payors that represented over 80% of all payments for out-of-network goods and services, resulting in a total underpayment of approximately $19 billion in 2020 alone. The cartel's anticompetitive effects have only metastasized since 2020. In a November 5, 2024, investor conference, MultiPlan's current CEO, Travis Dalton, reported that the company had a "record quarterly achievement" by generating up to $6.4 billion in underpayments in the third quarter of 2024 alone.

29.     Since the DAPs filed the first complaint in this litigation, major news outlets have raised the alarm about the MultiPlan Cartel. An exhaustive investigation by *The New York Times* that included interviewing 100 witnesses and evaluating tens of thousands of pages of confidential internal records recently concluded that MultiPlan runs a "lucrative, little-known alliance" of healthcare payors that underpays healthcare providers and undermines the value of commercial insurance. On May 1, 2024, *The New York Times* published an article specifically focused on MultiPlan's price-fixing. Entitled "Collusion in Health Care Pricing? Regulators Are Asked to Investigate," the article noted that "[a] data analytics firm [MultiPlan] has helped big health insurers cut payments to doctors, raising concerns about possible price fixing." The article quotes Barak Orbach, a law professor at the University of Arizona, as saying "[t]his should trigger an investigation by the agencies. There seems to be a really strong case."

30.     The MultiPlan Cartel has sparked calls for a federal investigation as well. On April 29, 2024, U.S. Senator Amy Klobuchar sent a letter to Assistant Attorney General Jonathan Kanter and Federal Trade Commission ("FTC") Chair Lina Khan asking them to investigate whether MultiPlan facilitates collusion between payors. She expressed concern that MultiPlan's "algorithmic tools are processing data gathered across numerous competitors to subvert competition among insurance companies."

31.     On April 9, 2024, the American Hospital Association called for a federal government investigation into MultiPlan's conduct.

32.     On May 9, 2024, the Department of Justice ("DOJ") announced the formation of the Task Force on Health Care Monopolies and Collusion. One of the Task Force's stated goals is investigating "dominant intermediaries" that "gobble[] up" healthcare spending in the U.S. It will explicitly consider "competition concerns shared by . . . health care professionals," including issues related to "medical billing." The Task Force was formed just over a week after Senator Klobuchar called on the DOJ and FTC to open an investigation into MultiPlan.

33.     On May 22, 2024, Senators Ron Wyden, Chairman of the Senate Finance Committee, and Bernie Sanders, Chairman of the Senate Health, Education, Labor, and Pensions ("HELP") Committee, sent a letter to MultiPlan's CEO Travis Dalton. In it, the Senators warned that their committees "are engaged in ongoing legislative work to put a stop to practices by plan service providers that drive up health care costs for consumers while padding their own profits." The Senators went on to say: "In the early 2000s, it appears your company negotiated with health care providers to reach these rates, but now through the Data iSight product, appears to use an opaque process to set recommended payments for out-of-network services. Because your company is paid more when it reaches lower payment amounts, the payments to health care providers are often far lower than the billed amount, with some describing these amounts as 'crazy low.' When the plan is only willing to pay this low amount, patients are on the hook for the remaining bill, which in extreme cases can total hundreds of thousands of dollars."

34.     MultiPlan's out-of-network pricing scheme is the subject of multiple investigations by the U.S. Department of Labor and U.S. Congress. MultiPlan's senior executives, counsel, and lobbyists have met with investigators multiple times and produced documents in connection with

these investigations.

35. Recognizing that the MultiPlan Cartel is illegal, multiple payors are either exiting the cartel or considering doing so. In October 2024, after Cigna was sued for its part in the MultiPlan Cartel, Cigna ceased using MultiPlan's common pricing methodology for out-of-network goods and services.

36. It is little wonder why MultiPlan's conduct is the subject of multiple federal investigations and its co-conspirators are looking for the exit. The MultiPlan Cartel is blatantly illegal. It is *per se* illegal for competitors to fix the prices that they will pay for goods and services by agreeing to use a common pricing methodology. It is *per se* illegal to fix the maximum price that competitors will pay for a particular good or service. It is *per se* illegal for competitors to fix the starting point for supposed pricing negotiations. And even if MultiPlan's pricing enforcement activities can be thought of as a "negotiation," it is *per se* illegal for competitors to agree that one company will handle pricing negotiations on their behalf. Each of those agreements is independently illegal and the agreements in totality are also illegal.

37. And, even if this conduct were somehow not illegal *per se*, it is certainly illegal under the rule of reason. The cartel dominates the Out-of-Network Goods and Services Market. It harms competition and injures providers by systematically underpaying them for out-of-network care in comparison to the prices that would have been paid absent the cartel. There are no redeeming procompetitive virtues to underpaying doctors and hospitals for life-saving out-of-network care. Even if there were somehow a procompetitive benefit to underpaying America's front-line healthcare workers (there is not), that benefit could easily have been achieved by less restrictive means, such as using existing unilateral pricing methods to set out-of-network prices.

38. DAPs have suffered damages due to the MultiPlan Cartel in an amount totaling

billions of dollars. The DAPs suffered damages each time that they were underpaid for out-of-network goods or services relative to what they would have been paid for those same goods and services in a market without the cartel because of the MultiPlan Cartel. MultiPlan and each of the members of its buyers' cartel are jointly and severally liable for all of the damages caused by those agreements to underpay healthcare providers for their out-of-network goods and services.

39.     As set forth below, DAPs challenge the MultiPlan Cartel under five alternative theories of liability pursuant to Section 1 of the Sherman Act.[3]

40.     ***Horizontal agreements in restraint of trade.*** *First*, because MultiPlan is a horizontal competitor with the other payors of out-of-network goods and services that participate in the MultiPlan Cartel, MultiPlan's agreements with other payors to use a common pricing methodology to set prices, fix maximum prices, and use a single pricing enforcer for out-of-network goods and services are horizontal restraints of trade and a *per se* violation of Section 1 of the Sherman Act. Even if MultiPlan is not a payor, it has still facilitated a horizontal cartel agreement among rival payors to underpay providers for out-of-network goods and services.

41.     ***Hub-and-spoke agreement in restraint of trade.*** *Second*, even if MultiPlan did not compete against the other payors participating in the cartel, the agreements among MultiPlan and the other cartel members would still be a *per se* violation of Section 1 of the Sherman Act because MultiPlan serves as the "hub" of a hub-and-spoke cartel. The "spokes" of that cartel are the agreements that MultiPlan has entered into with payors to use MultiPlan's pricing methodology, pool their pricing data and decisions through MultiPlan, and use MultiPlan to price out-of-network goods and services. The "rim" of the conspiracy is an agreement between the payors to use

---

[3] DAPs assert parallel theories of liability under applicable state antitrust laws for recovery of damages solely in the alternative only if and to the extent those DAPs are deemed not to be directly injured parties for purposes of seeking damages under the Clayton Act.

MultiPlan's pricing methodology and data rather than compete against each other and make independent decisions regarding pricing for of out-of-network claims. Each payor agrees to use MultiPlan for its out-of-network pricing knowing its competitors are doing the same and with the intent that they will all work collectively through MultiPlan to lower prices for out-of-network goods and services for all of the cartel members.

42. ***Agency liability.*** *Third*, even if MultiPlan were not a competitor of the other payors participating in the MultiPlan Cartel, its agreements with its co-conspirators would still violate Section 1 of the Sherman Act because MultiPlan acted as an agent, facilitator, and conduit of the other members of the MultiPlan Cartel and materially aided their anticompetitive goals. The members of the MultiPlan Cartel delegated virtually every aspect of the out-of-network pricing process to MultiPlan, including the authority to set prices, communicate them to providers, and dispose of any attempt by a provider to push back on those prices. In addition, MultiPlan served as a crucial messenger and conduit between the other members of the MultiPlan Cartel, helping them share confidential information with each other that made it easier for them to artificially suppress out-of-network pricing competition through coordinated action.

43. ***Vertical agreements in restraint of trade.*** *Fourth*, even if MultiPlan was not the hub of a hub-and-spoke conspiracy or an agent of its co-conspirators, its pricing agreements with payors would still be an unreasonable restraint of trade under Section 1 of the Sherman Act because those agreements have had, and continue to have, anticompetitive effects throughout the Out-of-Network Goods and Services Market, as well as with respect to out-of-network goods and services sold to particular payors. Those vertical agreements have no redeeming procompetitive benefits. They do not generate any savings for patients or subscribers. They only serve to harm providers, patients, and subscribers by increasing the cost of care, reducing access to care, and, in some cases,

reducing the quality of care. The cost of health insurance keeps going up, while the payors, their investors, and their executives line their pockets with money that should have been paid to doctors and nurses providing life-saving care. As a result, each of those agreements violates Section 1 of the Sherman Act as a vertical agreement in restraint of out-of-network pricing competition.

44. ***Agreements to engage in anticompetitive information exchange.*** *Fifth*, even if MultiPlan and the other payors did not come to an agreement to fix, decrease, peg, or stabilize prices for out-of-network goods and services, MultiPlan and the other payors agreed to exchange extensive, current, granular, confidential, and competitively sensitive information with one another with the purpose of decreasing the prices they each set for out-of-network goods and services. That agreement to exchange information had no procompetitive effects. It only served to suppress pricing competition for out-of-network goods and services. Even if that agreement had some procompetitive effects (it did not), those effects could have been achieved by less restrictive means, such as using publicly-available data to make independent pricing decisions.

45. With respect to the DAPs' antitrust claims under Section 1 of the Sherman Act, regardless of how you conceptualize this case, the result is the same. MultiPlan and other payors entered into agreements. Those agreements unreasonably restrained trade by ending pricing competition for out-of-network goods and services. As a result of those agreements, MultiPlan and the other payors cheated doctors and hospitals out of billions of dollars each year.

46. ***Non-Sherman Act claims.*** Finally, the DAPs seek to hold each Defendant liable under applicable state unfair business practices laws and for unjust enrichment based on their collusive, deceptive, and strongarm scheme to drive pricing for out-of-network goods and services to levels far below the prices that would have prevailed absent the cartel. Even if it were not in violation of the antitrust laws, Defendants' scheme is immoral, unethical, oppressive, and

unscrupulous, and the severe harm it inflicts on the DAPs is not outweighed by any supposed benefits. The severe, sub-market rates Defendants force on the DAPs put the availability of a robust choice of healthcare providers at risk for millions of patients, as some DAPs will no longer be able to provide services on an out-of-network basis given the financial constraints—and some, especially in already underserved rural areas, may go out of business altogether.

## II. Purpose and Nature of this Master Complaint

47. The DAPs file this Consolidated Master Complaint ("Master Complaint") as an administrative device to set forth the potential claims and facts that individual DAPs may assert in this multidistrict proceeding against Defendants.

48. The Master Complaint does not necessarily include all claims or allegations that have been or will be asserted in each DAP action filed. Individual DAPs may adopt the allegations and claims in this Master Complaint through a separate Short Form Complaint. Individual plaintiffs may supplement or add allegations, claims, or defendants to their respective Short Form Complaints. A copy of a draft Short Form Complaint is attached as Exhibit A.

## III. The Parties

### A. Plaintiffs

49. This Master Complaint is filed on behalf of DAPs that file a Short Form Complaint, each of which is a provider of out-of-network goods and services for which they have been underpaid (and, thereby, suffered injury, including antitrust injury) as a direct and proximate result of the unlawful conduct of the Defendants and their co-conspirators or as an association whose members include such providers. By operation of an anticipated Court order, all allegations pled in this Master Complaint are deemed pled in any Short Form Complaint as to the Defendants and claims identified therein.

## B.    Defendants and Co-Conspirators[4]

50.    ***MultiPlan.*** MultiPlan, Inc. is a New York corporation. Its principal place of business is located at 115 Fifth Avenue, 7th Floor, New York, NY 10003. MultiPlan, Inc. is wholly owned by MultiPlan Holding Corporation. The ultimate parent company of MultiPlan Holding Corporation is MultiPlan Corporation. MultiPlan Corporation is a publicly traded entity.

51.    In 2010, MultiPlan acquired Viant, Inc. ("Viant"), a healthcare cost management company incorporated in Delaware and headquartered in Illinois.

52.    In 2011, MultiPlan acquired National Care Network, LP and its affiliate National Care Network, LLC, healthcare cost management companies incorporated in Delaware and headquartered in Texas.

53.    In October 2020, Churchill Capital Corp. III and its related entities acquired MultiPlan, Inc. and its related entities. Churchill Capital Corp. III is a special-purpose acquisition company created to raise funds to take a private company public. It is incorporated in Delaware and headquartered in New York. After completing the acquisition of MultiPlan, Inc. and its related companies, Churchill Capital Corp. III changed its name to MultiPlan Corporation. Unless otherwise specified, this Complaint refers to MultiPlan, Inc., MultiPlan Holding Corporation, MultiPlan Corporation, MultiPlan, Inc., Churchill Capital III, Viant, Inc., Viant Payment Systems, Inc., National Care Network, LP, and National Care Network, LLC collectively as "MultiPlan."

---

[4] In their short-form complaints, each DAP will specify which entities it is naming as Defendants and the causes of action that it is asserting against those defendants. Each DAP will also list the names and corporate identities of the DAPs that bring their claims against Defendants in their Short Form Complaints. Each defendant and co-conspirator named in this complaint acted directly or through each of that entity's executives, employees, directors, and majority-owned subsidiaries. For example, UnitedHealth Group Inc. acted directly or through, among others, the following majority-owned subsidiaries: United Healthcare Insurance Company, and its affiliates; United Healthcare Services Inc.; United Healthcare Service LLC; Oxford Benefit Management, Inc.; UMR, Inc.; Sierra Health and Life Insurance Company, Inc.; Sierra Health-Care Options, Inc.; Health Plan of Nevada, Inc.; and United Healthcare of Florida, Inc.

54.     According to MultiPlan's website, MultiPlan has an office located in Naperville, Illinois with over 300 employees. MultiPlan's Naperville, Illinois office is its largest office by employee count. In filings with Secretaries of State, MultiPlan lists its mailing address as 535 E. Diehle Road, Naperville, Illinois 60563. MultiPlan operates as a single integrated business with a single board and executive team, a single set of financial statements, and a single corporate entity overseeing its Preferred Provider Organization ("PPO") networks and its claims-suppression business.

55.     **Aetna.** Aetna, Inc. ("Aetna") is a subsidiary of CVS Health Corporation. It is a Pennsylvania corporation that is headquartered in Hartford, Connecticut. Aetna is one of the largest payors in the U.S. It has a commercial insurance network that pays in-network and out-of-network claims from healthcare providers in all 50 states and the District of Columbia. Aetna is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the U.S. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and/or (5) Medicaid plans.

56.     **Blue Shield of California.** Blue Shield of California Life & Health Insurance Company ("BSCA") is a California corporation with its principal place of business in Oakland, California. BSCA is a licensee of the Blue Cross Blue Shield Association, a joint venture of insurance companies that work together to offer their members access to a nationwide network of healthcare providers. BSCA licensed to market health insurance plans using Blue Cross Blue Shield trademarks in California. BSCA issues insurance or provides administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans,

(2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and/or (5) Medicaid plans.

57. ***Blue Cross Blue Shield of Massachusetts.*** Blue Cross and Blue Shield of Massachusetts, Inc. ("BCBSMA") is a Massachusetts corporation with its principal place of business in Boston, Massachusetts. BCBSMA is a licensee of the Blue Cross Blue Shield Association. BCBSMA is licensed to market health insurance plans using Blue Cross Blue Shield trademarks in Massachusetts. BCBSMA issues insurance or provides administrative services concerning healthcare claims that include: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, and/or (3) hybrid-funded health plans.

58. ***Blue Cross Blue Shield of Michigan.*** Blue Cross Blue Shield of Michigan Mutual Insurance Company ("BCBSMI") is a Michigan mutual insurance company with its principal place of business in Michigan. BCBSMI is a licensee of the Blue Cross Blue Shield Association. BCBSMI is licensed to market health insurance plans using Blue Cross Blue Shield trademarks in Michigan. BCBSMI issues insurance or provides administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and/or (5) Medicaid plans.

59. ***Blue Cross Blue Shield of Minnesota.*** Aware Integrated, Inc. and BCBSM, Inc. d/b/a Blue Cross Blue Shield of Minnesota (collectively, "Blue Cross Blue Shield of Minnesota") are Minnesota corporations. Their principal place of business is in Minneapolis, Minnesota. Blue Cross Blue Shield of Minnesota is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the U.S. The plans issue insurance or provide administrative services concerning healthcare claims in the

form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and/or (5) Medicaid plans.

60. ***Cambia.*** Cambia Health Solutions, Inc. ("Cambia") f/k/a The Regence Group is an Oregon non-profit corporation with its principal place of business in Oregon. Cambia is the parent company of several wholly owned subsidiaries including Regence Blue Shield of Oregon, Regence Blue Shield of Utah, Regence Blue Shield of Washington, Asuris Northwest Health, and BridgeSpan Health. Cambia is a licensee of the Blue Cross Blue Shield Association. Cambia is licensed to market health insurance plans using Blue Cross Blue Shield trademarks in Oregon, Idaho, Utah, and Washington. Cambia, through its wholly-owned subsidiaries, issues insurance or provides administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and/or (5) Medicaid plans.

61. ***CareFirst, Inc.*** CareFirst, Inc. ("CareFirst") is a Maryland corporation with its principal place of business in Owings Mill, Maryland. CareFirst, through its wholly-owned subsidiaries and affiliates, Group Hospitalization and Medical Services, Inc.; CareFirst of Maryland, Inc.; and CareFirst Blue Choice, Inc., collectively do business as CareFirst Blue Cross Blue Shield. CareFirst is a licensee of the Blue Cross Blue Shield Association. CareFirst is licensed to market health insurance plans using Blue Cross Blue Shield trademarks in the District of Columbia and the counties in Northern Virginia and Maryland that makeup the Washington, D.C. suburbs. CareFirst's insurance plans issue insurance or provide administrative services concerning healthcare claims that include: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, and/or (3) hybrid-funded health plans.

62.     *Centene.* Centene Corporation ("Centene") is a Delaware corporation with its principal place of business in St. Louis, Missouri. Centene is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the U.S. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and/or (5) Medicaid plans.

63.     *Cigna.* The Cigna Group ("Cigna") is a Delaware corporation with its principal place of business in Broomfield, Connecticut. Cigna is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the U.S. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and/or (5) Medicaid plans.

64.     *Elevance.* Elevance Health, Inc. (formerly known as Anthem, Inc.) ("Elevance") is an Indiana corporation with a principal place of business in Indianapolis, Indiana. Elevance is a member of the Blue Cross Blue Shield Association. Elevance licenses certain trademarks and service marks from the Blue Cross Blue Shield Association in 14 states: California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, most of Missouri, Nevada, New Hampshire, parts of New York, Ohio, Virginia (except the Washington, D.C. Suburbs), and Wisconsin. Elevance does business under several names, including: Anthem Blue Cross Life and Health Insurance Company, Blue Cross of California, Blue Cross of Southern California, Blue Cross of Northern California, Blue Cross Blue Shield of Georgia, Anthem Health Plans, Inc. d/b/a Anthem

Blue Cross Blue Shield of Connecticut, Rocky Mountain Hospital & Medical Service, Inc. d/b/a Anthem Blue Cross Blue Shield of Colorado, Anthem Blue Cross Blues Shield of Nevada, Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross Blue Shield of Indiana, Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross Blue Shield of Kentucky, Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross Blue Shield of Maine, Anthem Blue Cross Blue Shield of Missouri, RightCHOICE Managed Care, Inc., Healthy Alliance Life Insurance Company and HMO Missouri Inc., Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross Blue Shield of New Hampshire, Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross Blue Shield, Community Insurance Company d/b/a Anthem Blue Cross Blue Shield of Ohio, Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia, Anthem Blue Cross Blue Shield of Wisconsin, and Compcare Health Services Insurance Corporation. Elevance is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the U.S. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and/or (5) Medicaid plans.

65.     ***HCSC.*** Health Care Service Corporation ("HCSC") is organized as a mutual reserve company under the laws of the state of Illinois, with a principal place of business in Chicago, Illinois. HCSC is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the U.S., including in Illinois, Montana, New Mexico, Oklahoma, and Texas. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3)

hybrid-funded health plans, (4) Medicare Advantage plans, and/or (5) Medicaid plans.

66.     ***Highmark.*** Highmark Health ("Highmark") is a Pennsylvania non-profit company with its principal place of business in Pennsylvania. Highmark is the ultimate parent company of several entities including Highmark, Inc.; Highmark BCBSD Inc.; Highmark West Virginia Inc.; and Highmark Western and Northwestern New York. Highmark is a licensee of the Blue Cross Blue Shield Association. Highmark is licensed to market health insurance plans using Blue Cross Blue Shield trademarks in Pennsylvania, West Virginia, Delaware, and certain counties in Ohio. Highmark, through its wholly owned subsidiaries, issues insurance or provides administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and/or (5) Medicaid plans.

67.     ***Horizon Blue Cross Blue Shield of New Jersey.*** Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey ("Horizon") is a New Jersey corporation with its principal place of business in Newark, New Jersey. Horizon is a licensee of the Blue Cross Blue Shield Association. Horizon is licensed to market health insurance plans using Blue Cross Blue Shield trademarks in New Jersey. Horizon, through its wholly owned subsidiaries, issues insurance or provides administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and/or (5) Medicaid plans.

68.     ***Humana.*** Humana Inc. ("Humana") is a Delaware corporation with its principal place of business in Louisville, Kentucky. Humana is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the U.S. The plans issue insurance or provide administrative services concerning

healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and/or (5) Medicaid plans.

69. **Kaiser.** Kaiser Foundation Health Plan, Inc. ("Kaiser") is a California non-profit public benefit corporation with a principal place of business in Oakland, California. Kaiser is the ultimate parent company of several entities including Kaiser Foundation Health Plan of Colorado; Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.; Kaiser Foundation Health Plan of Washington; and Kaiser Foundation Health Plan of the Northwest. Kaiser, through its wholly owned subsidiaries, issues insurance or provides administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and/or (5) Medicaid plans.

70. **Molina.** Molina Healthcare, Inc. ("Molina") is a Delaware corporation with a principal place of business in Long Beach, California. Molina is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the U.S. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and/or (5) Medicaid plans.

71. **Sanford Health Plan.** Sanford Health Plan ("Sanford") is a corporation organized under the laws of South Dakota with a principal place of business in Sioux Falls, South Dakota. It is one of the largest rural health plans in the country serving 200,000 members. Its network includes 25,000 regional providers, 700,000 national providers, and 349

hospitals. Sanford Health Plan's insurance plans issue insurance or provide administrative services concerning healthcare claims that include: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, and/or (3) hybrid-funded health plans.

72. **_United._** UnitedHealth Group Inc. ("United") is a Delaware corporation with a principal place of business in Minnetonka, Minnesota. United has two divisions: UnitedHealthcare, which provides health benefits plans and is the largest payor in the U.S., and Optum, which provides health services, including pharmacy benefit manager services. United is a vertically integrated healthcare enterprise with a portfolio of wholly owned subsidiaries comprising a massive healthcare ecosystem. United has a commercial insurance network that pays in-network and out-of-network claims from healthcare providers in all 50 states and the District of Columbia. United's insurance plans issue insurance or provide administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and/or (5) Medicaid plans.

73. **_Allied National._** Allied National, LLC ("Allied National") is a Missouri limited liability company with its principal place of business in Kansas. Allied National is one of the oldest and largest third-party administrators ("TPAs") in the U.S. As a TPA, Allied National performs administrative tasks for health insurance plans, including claims processing and pricing, billing, enrollment, and customer service.

74. **_Benefit Plans Administrators._** Benefit Plans Administrators of Eau Claire, LLC ("Benefit Plans Administrators") is a Wisconsin limited liability company with a principal place of business in Wisconsin. Benefit Plans Administrators is a TPA. As a TPA, Benefit Plans Administrators performs administrative tasks for health insurance plans, including claims

processing and pricing, billing, enrollment, and customer service.

75. **_Central States._** Central States Southeast and Southwest Areas Health and Welfare Fund ("Central States")[5] is a non-profit labor health fund and is administered from its principal and exclusive offices located in Chicago, Illinois. Central States provides third-party medical coverage under the trade name "Team Care." Central States performs administrative tasks for a health plan for current and former union members, including claims processing and pricing, billing, enrollment, and customer service.

76. **_Consociate._** Consociate, Inc. d/b/a Consociate Health ("Consociate Health") is an Illinois corporation that has a principal place of business in Illinois. Consociate Health is a TPA. As a TPA, Consociate Health performs administrative tasks for health plans, including claims processing and pricing, billing, enrollment, and customer service. Consociate Health also offers its own PPO network that other payors may use as a complementary network and that Consociate Health offers directly to subscriber groups as a primary network.

77. **_Healthcare Highways._** Healthcare Highways Health Plan (ASO), LLC ("Healthcare Highways") is a Texas limited liability company with its principal place of business in Texas. Healthcare Highways is a TPA. As a TPA, Healthcare Highways performs administrative tasks for health insurance plans, including claims processing and pricing, billing, enrollment, and customer service. Healthcare Highways also offers its own PPO network that other payors may use as a complementary network and that Healthcare Highways offers directly to subscriber groups as a primary network.

78. **_Secure Health._** Secure Health Plans of Georgia, L.L.C. d/b/a Secure Health

---

[5] In prior constituent Direct Action Plaintiff complaints Central States was incorrectly named as "Central States, Southeast and Southwest Areas Pension Fund."

("Secure Health") is a Georgia limited liability company with its principal place of business in Georgia. Secure Health is one of the largest TPAs in the U.S. As a TPA, Secure Health performs administrative tasks for health insurance plans, including claims processing and pricing, billing, enrollment, and customer service. Secure Health also offers its own PPO network that other payors may use as a complementary network and that Secure Health offers directly to subscriber groups as a primary network.

79.     Aetna, BSCA, BCBSMA, BCBSMI, Blue Cross Blue Shield of Minnesota, Cambia, CareFirst, Centene, Cigna, Elevance, HCSC, Highmark, Horizon, Humana, Kaiser, Molina, Sanford, United, Allied National, Benefit Plans Administrators, Central States, Consociate Health, Healthcare Highways, Secure Health, and each payor that has executed an out-of-network pricing agreement with MultiPlan (the "competing payors" or "Co-Conspirators"), have all abdicated out-of-network pricing authority to MultiPlan, and have performed other acts and made other statements in furtherance of the conspiracy. Each member of the MultiPlan Cartel is jointly and severally liable for all of the acts and omissions of its Co-Conspirators whether named or not in this complaint.

## IV.     Jurisdiction, Venue, and Interstate Commerce

80.     This Court has subject matter jurisdiction over various constituent cases in this multidistrict litigation pursuant to 28 U.S.C. §§ 1331 and 1337, as those actions raise federal questions under Section 1 of the Sherman Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

81.     This Court also has subject matter jurisdiction over constituent cases in this multidistrict litigation pursuant to 28 U.S.C. § 1332(a) because Plaintiffs and Defendants in such cases are residents of different states, and the amount in controversy exceeds $75,000.

82.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over DAPs'

state law claims in constituent cases in this multidistrict litigation because all claims alleged in this complaint form the same case or controversy.

83. Venue is proper in this District Court pursuant to the Order of the Judicial Panel on Multidistrict Litigation transferring related actions to this District ("Related Actions"). *See In re MultiPlan Health Insurance Provider Litigation*, MDL No. 3121, Dkt. 98 (J.P.M.L. Aug. 1, 2024).

84. This Court has personal jurisdiction over each Defendant to the same extent that the transferor court had personal jurisdiction in each Related Action, prior to transfer to the MDL court.

85. For Related Actions originally filed in the U.S. District Court for the Southern District of New York, the transferor court has personal jurisdiction over Defendants. MultiPlan's principal place of business is in New York. The U.S. District Court for the Southern District of New York has personal jurisdiction over Defendants under Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, and New York's long-arm statute, N.Y. C.P.L.R. § 302(a)(1). Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, may be found in and transact business in New York, including by offering health plans in the state; sending confidential, proprietary claims data concerning claims for out-of-network goods and services provided in New York to MultiPlan for pricing using MultiPlan's pricing methodology; using MultiPlan's common pricing methodology to set prices and pay claims for out-of-network goods and services provided in New York; entering into agreements with counterparties located in New York to set prices for out-of-network goods and services using a common pricing methodology; holding meetings in furtherance of the MultiPlan Cartel with counterparties in New York; and engaging in an antitrust conspiracy, which has a direct, foreseeable, and intended effect of causing injury to the business and property of persons and entities residing in, located in, or doing business

throughout the U.S., including in the state of New York.

86.     This Court has personal jurisdiction and venue over direct action cases that were originally filed in the U.S. District Court for the Northern District of Illinois. A substantial portion of MultiPlan's operations are located in Naperville, Illinois—including employees who are involved in operating MultiPlan's common pricing methodology for out-of-network goods and services. The acts and omissions alleged herein occurred substantially at MultiPlan's offices in Naperville, Illinois. Venue is proper in this court under Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, because one or more of Defendants maintain business facilities, have agents, transact business, and are otherwise found within the Northern District of Illinois. The Court has personal jurisdiction over Defendants under Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, and Illinois' long-arm statute, 735 Ill. Comp. Stat. 5/2-209(a). Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, may be found in and transact business in Illinois, including by offering health plans in the state; sending confidential, proprietary claims data concerning claims for out-of-network goods and services provided in Illinois to MultiPlan for pricing using MultiPlan's pricing methodology; using MultiPlan's common pricing methodology to set prices and pay claims for out-of-network goods and services provided in Illinois; entering into agreements with counterparties located in Illinois to set prices for out-of-network goods and services using a common pricing methodology; holding meetings in furtherance of the MultiPlan Cartel with counterparties in Illinois; and engaging in an antitrust conspiracy, which has a direct, foreseeable, and intended effect of causing injury to the business and property of persons and entities residing in, located in, or doing business throughout the U.S., including in the state of Illinois.

87.     Defendants' wrongful activities have substantially affected and are within the flow

of interstate commerce. Healthcare providers that are paid by MultiPlan and its Co-Conspirators provide goods and services to persons who reside in other states. In addition, Defendants and their Co-Conspirators operate PPO networks throughout the U.S. that set prices for out-of-network goods and services. The activities of MultiPlan and the members of the MultiPlan Cartel were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the U.S.

## V.     The MultiPlan Cartel is a Horizontal Price-Fixing Conspiracy

### A.     MultiPlan Competes Against Other Payors

#### i.     There are Several Types of Competing Payors in the United States

88.     Each of the Defendants and/or Co-Conspirators in this litigation are payors. Payors set the prices for healthcare goods and services utilized by patients covered by the payors' health plans, and then cause payments to be made for those healthcare goods and services. There are several types of payors for healthcare in the U.S., including large national insurance companies, Blue Cross and Blue Shield health plans, independent health plans, third-party administrators, bill review companies, Taft-Hartley health plans, and other entities that pay medical bills. MultiPlan has identified each of those types of entities as payors in its 2021, 2022, 2023, and 2024 annual reports filed with the SEC.[6]

89.     As of 2020, approximately 298 million individuals out of a total U.S. population of approximately 326 million (91.4%) had some form of third-party payment coverage for healthcare costs. Of those with coverage, 66.5% had private coverage from a commercial third-party payor and 33.5% had coverage from a government payor, such as Medicare or Medicaid.

90.     Commercial health insurance is one common type of a payor. Commercial health

---

[6] MultiPlan uses the same definition of "payor" in its registration statement and quarterly reports filed with the SEC.

insurance is a contract in which a third-party payor agrees to pay certain future healthcare costs for a subscriber. Health insurance is one of the most common, but not the only form of commercial third-party payment arrangement utilized by payors.

91.     Preferred Provider Organization health plans, or PPOs, are the most common type of commercial third-party payment plans offered in the U.S. A PPO is a third-party payment plan that contracts with doctors and medical facilities, such as hospitals, to create a network of participating providers. PPOs generally do not require the selection of a primary care physician or a referral to see a specialist. PPO plans are generally more expensive for subscribers, but they offer greater choice of in-network and out-of-network doctors and hospitals.[7]

92.     There are two types of funding models for commercial health insurance plans: risk-based (also called "fully insured") and administrative services only ("ASO," also called "self-funded").

93.     Under a risk-based model, the insurance company collects premiums and pays bills for healthcare goods and services submitted by providers (known as "claims"). If the premiums exceed the claims, the insurance company profits, but if the claims exceed the premiums, the insurance company carries the risk of loss.

94.     Under an ASO model, an employer group carries the risk instead—and is responsible for paying providers for its employees' claims. But employers do not have the time or in-house capabilities to develop and manage their own bespoke PPO networks. So, employers pay the payors a fixed administrative services fee per member, per month (a "PMPM" fee) to an outside

---

[7] There are additional types of plans, such as Health Maintenance Organizations, Exclusive Provider Organizations, Point of Service Plans, High Deductible Health Plans, and conventional or indemnity plans. These types of plans are not particularly relevant to the claims at issue in this case, so they are not discussed further herein.

organization to administer an ASO plan.[8]

95.    Under these ASO contracts, the employers take on claims-associated risks. In addition, the employers and payors enter into "shared savings agreements" that permit the payors to send out-of-network claims for ASO employers to MultiPlan to set out-of-network prices. Large employers, which make up a substantial portion of the market for commercial insurance, are almost all on ASO contracts. As a result, up to 90% of some payors' business is attributable to ASO contracts.

96.    Payors can use multiple models to build networks of healthcare providers, review bills from providers, set prices for services, and pay providers for their services. Payors often do this work directly by assembling their own networks and—absent the conspiracy alleged in this case—exercising their own discretion to review bills, set prices, and pay providers.

97.    In many cases, employers with ASO plans turn to third-party administrators, or TPAs, to perform those services on their behalf. TPAs are another form of payor. They are companies that manage the administrative and operational work of health plans. They allow payors to outsource several aspects of running a healthcare payor business. Significantly, TPAs receive claims from providers for out-of-network goods and services and adjudicate and price those claims.

98.    Payors compete with one another in different ways. Some compete to build networks of healthcare providers. Some compete to sign agreements with subscribers to access those networks. One form of competition among payors is relevant to this case. In a market without collusion, each payor should exercise its own independent discretion to set prices for healthcare

---

[8] The employer groups, unions, governmental entities, and individuals who purchase health plans either on an ASO or fully-insured basis are referred to as "subscribers."

goods and services. This is known in the industry as claims adjudication and pricing.

99.    There are two forms of claims adjudication and pricing—in-network and out-of-network. When a provider agrees to be "in-network," they contract with a payor to accept pre-agreed prices for medical goods and services that are less than the providers' customary charges for those goods and services, and to not bill in-network patients for the difference between those in-network rates and the providers' customary rates. In-network claims adjudication and pricing is not at issue in this case, and DAPs are not seeking any damages, declaratory relief, or injunctive relief of any sort with respect to in-network claims adjudication or pricing.

100.    This case focuses solely on out-of-network claims adjudication and pricing. Out-of-network claims adjudication and pricing is distinct from in-network adjudication and pricing.

101.    The differences between in-network and out-of-network pricing vary based on whether the healthcare services were emergency healthcare services provided in a hospital emergency room or non-emergency services.

102.    With respect to emergency services, out-of-network pricing is entirely distinct from in-network pricing. Emergency services are performed by hospitals and hospital-based physicians/clinicians in hospital emergency rooms. Patients cannot shop for a doctor who provides them with emergency services. Typically, a patient is experiencing some form of medical distress and goes to the nearest emergency room for treatment. For emergency services performed on an out-of-network basis, there is no up-front pricing negotiation between the provider and the payor prior to a patient receiving healthcare. Instead, out-of-network adjudication and pricing occurs *after* healthcare goods and services have been provided to the patient. For emergency services, healthcare providers have no option but to accept the prices that payors set for out-of-network goods and services. Providers cannot switch between in-network and out-of-network patients with

respect to emergency services. They are required by law to treat all incoming patients in need of emergency services regardless of whether those patients are in-network or out-of-network. Nor can providers seek payment from a source other than a third-party payor when emergency services are provided on an out-of-network basis. They are prohibited by law from seeking payment from any source other than the payor for emergency services. Therefore, out-of-network adjudication and pricing is a separate market from in-network claims adjudication and pricing with respect to emergency services. Although emergency medicine providers are required to provide services to out-of-network patients, they are nevertheless harmed by the cartel. They are paid less for their out-of-network goods and services than they otherwise would have been paid absent the cartel.

103. For non-emergency services, the MultiPlan Cartel's market dominance leaves providers with no option but to accept the prices imposed upon providers for out-of-network goods and services. Theoretically, healthcare providers can refuse to provide services to out-of-network patients for non-emergency care. However, because the MultiPlan Cartel sets the prices for an overwhelming percentage of out-of-network goods and services, the cartel effectively offers healthcare providers a Hobson's choice with respect to non-emergency services—the healthcare providers can either provide the out-of-network services and be severely underpaid for them (but at least make some revenue) or provide no out-of-network services at all (and forgo all revenue associated with those services). Because of the high fixed costs associated with operating a medical practice (including capital equipment, support staff, licensure, malpractice insurance, and office space), providers are effectively forced to provide out-of-network goods and services despite knowing that they will be severely underpaid for them, just so that they can continue to receive the reduced revenues associated with providing those out-of-network services in order to defray those fixed costs. Consequently, healthcare providers who provide non-emergency services are forced

to accept artificially suppressed prices set by the MultiPlan Cartel.

### ii. MultiPlan is a Payor and Directly Competes with the Other Members of the MultiPlan Cartel

104.    MultiPlan is a payor. It operates multiple PPO networks that adjudicate, price, and pay claims for in-network and out-of-network goods and services. With respect to out-of-network services, MultiPlan used to compete the same way that all payors used to compete with respect to out-of-network services. Prior to the cartel, MultiPlan exercised its independent discretion to set prices for out-of-network goods and services. But, after the cartel began, MultiPlan stopped exercising its independent discretion. Instead, it conspired with its competitors to pool pricing data and decision-making in its own common pricing methodology.

105.    MultiPlan owns and operates several PPO networks. According to MultiPlan, it has the "oldest and largest independent" PPO network in the U.S. The reach of MultiPlan's PPO networks is enormous. MultiPlan estimates that its PPO networks have over 1.4 million providers under contract, encompassing approximately "920,000 practitioners, 4,800 acute care hospitals and 87,000 ancillary facilities."

106.    MultiPlan markets its PPO networks to subscribers in two ways—(1) as a complementary or wrapped network, and (2) as a primary network.

107.    MultiPlan provides competing payors access to a "complementary" PPO network in exchange for a fee. This expands the number of healthcare providers who are effectively "in-network" for the payors contracting with MultiPlan. Payors who purchase access to MultiPlan's PPO networks gain the ability to call the healthcare providers within MultiPlan's network "in-network" in their own PPOs, and the ability to outsource adjudication of claims from those providers to MultiPlan. Payors can then tout the nationwide reach of their networks (comprising their own PPO networks and MultiPlan's) to subscribers and regulators, and command high

premiums for the privilege of accessing those networks.[9]

108.    MultiPlan also offers "primary" PPO networks, which contract directly with subscribers to give them access to MultiPlan's in-network providers and to pay bills for out-of-network healthcare.

109.    A wide variety of entities subscribe to MultiPlan's "primary" PPO networks, including private- and public-sector employers, tribal entities, and union benefit plans. For example, as of January 2021, the University of New Haven, the Mashantucket Pequot Tribal Nation, and UFCW Local 711 & Retail Food Employers Benefit Fund subscribed to MultiPlan's primary PPO networks.

110.    When a patient is covered by MultiPlan's primary PPO network, but elects to see a healthcare provider who is out-of-network, the provider submits a bill to MultiPlan for those out-of-network services. MultiPlan reviews the bill and sets a price for the out-of-network services. Then, MultiPlan pays the healthcare provider for those out-of-network goods and services.

111.    MultiPlan's PPO networks accept claims for out-of-network services from healthcare providers using pre-approved forms. Healthcare providers submit claims directly to MultiPlan's PPO network. For example, below is a claim submitted to MultiPlan for a $927 charge for an emergency room visit.

---

[9] For the avoidance of doubt, claims paid at the contract rates set forth in MultiPlan's wrap network agreements are not at issue in this case. This case concerns only claims priced at out-of-network rates.

**1500**

**HEALTH INSURANCE CLAIM FORM**

UNOFFICIAL/NOT YET APPROVED BY N.U.C.C. 02/12

Claim TPA ID :
Claim Total : $927.00

Patient's Acct# :
Batch Number :
CCN# :
HIC Number : n/a

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PICA | | | | | | | PICA |
| 1. MEDICARE | MEDICAID | TRICARE | CHAMPVA | GROUP HEALTH PLAN | FECA BLK LUNG | X OTHER | |

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)
a. OTHER INSURED'S POLICY OR GROUP NUMBER
b. RESERVED FOR NUCC USE
c. RESERVED FOR NUCC USE
d. INSURANCE PLAN NAME OR PROGRAM NAME

10. IS PATIENT'S CONDITION RELATED TO:
a. EMPLOYMENT? (Current or Previous) YES NO
b. AUTO ACCIDENT? YES NO PLACE (State)
c. OTHER ACCIDENT? YES NO
10d. CLAIM CODES (Designated by NUCC)

c. INSURANCE PLAN NAME OR PROGRAM NAME
d. IS THERE ANOTHER HEALTH BENEFIT PLAN? YES NO If yes, complete items 9, 9a, and 9d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING FORM.
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED AUTHORIZED SIGNATURE ON FILE DATE 01/08/18

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED AUTHORIZED SIGNATURE ON FILE

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY(LMP) QUAL.
15. OTHER DATE QUAL.
16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION FROM TO
17. NAME OF REFERRING PROVIDER OR OTHER SOURCE 17a. 17b.
18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES FROM TO
19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)
20. OUTSIDE LAB? YES NO $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY Relate A-L to service line below(24E) ICD Ind. 0
A. K625 B. K8590 C. I10 D.
22. RESUBMISSION CODE 1 ORIGINAL REF. NO.
23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATES OF SERVICE From / To | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES CPT/HCPCS MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL | J. RENDERING PROVIDER I.D. # |
|---|---|---|---|---|---|---|---|---|---|
| 1 01 08 18 01 08 18 | 23 | | 99284 | A,B,C | 927 00 | 1 | | | 1073933057 |
| 2 | | | | | | | | | |

112.     MultiPlan adjudicates and prices those claims for goods and services. For example, a patient was admitted to Laredo Regional Medical Center on January 6, 2019, with a gastrointestinal obstruction. Doctors at Laredo Regional Medical Center treated the patient and discharged her two days later. The patient was insured by The Health Plan of West Virginia, Inc., which contracts with MultiPlan to serve as its primary PPO network. According to medical claims data, Laredo Regional Medical Center submitted $37,224.53 in charges for the services provided to the patient. "MultiPlan PPO" paid $5,341.99 for the claim, or 14.35% of the bill that Laredo Regional Medical Center submitted.

113.     DAP Adventist Health System Sunbelt Healthcare Corporation ("AHS") has

identified hundreds of payment records in which MultiPlan is listed as the payor for healthcare goods and services both on an in-network and out-of-network basis. Below is a sample of statement dates, billed amounts, payment amounts allowed by MultiPlan (*i.e.*, what MultiPlan paid), and underpayments that MultiPlan generated using its pricing methodology for out-of-network services provided by AHS relative to billed charges. MultiPlan's underpayments for these services also amounted to an underpayment relative to the prices that would have been set for these services absent the cartel.

| Date | Billed Amount | MultiPlan Allowed Amount | Underpayment Based on Billed Charges |
|---|---|---|---|
| November 7, 2018 | $120,662.14 | $90,496.63 | $30,165.51 |
| November 18, 2018 | $31,900.66 | $27,753.59 | $4,147.07 |
| December 16, 2018 | $5,160.74 | $3,870.58 | $1,290.16 |
| March 29, 2019 | $77,450.86 | $66,607.75 | $10,843.11 |
| April 19, 2019 | $15,384.38 | $11,538.30 | $3,846.08 |
| April 21, 2019 | $38,093.99 | $33,147.77 | $4,952.22 |
| April 25, 2019 | $134,001.58 | $115,241.36 | $18,760.22 |
| April 25, 2019 | $95,162.86 | $82,791.68 | $12,371.18 |
| June 12, 2019 | $22,479.66 | $19,332.51 | $3,147.15 |
| July 29, 2019 | $27,936.18 | $24,052.11 | $3,911.07 |
| September 1, 2019 | $47,408.05 | $40,770.92 | $6,637.12 |
| September 4, 2019 | $40,267 | $33,018.94 | $7,248.06 |
| September 26, 2019 | $20,072.14 | $16,459.17 | $3,612.97 |

114.    Other payors, including members of the MultiPlan Cartel, also operate their own PPO networks that, prior to the cartel, independently set prices for out-of-network goods and services. For instance, Aetna offers Aetna Open Choice PPO plans, Elevance and other Blue Cross Blue Shield entities offer Blue Choice PPO plans, United offers UnitedHealthcare Options PPO plans, and Cigna offers Cigna Healthcare PPO plans.

115.    It is widely recognized that MultiPlan competes against other payors. Numerous hospital groups list MultiPlan, Aetna, Elevance, Cigna, Kaiser, United, and other Defendants or Co-Conspirators as having PPO plans that they accept either for in-network or out-of-network

care.

116.    MultiPlan's networks explicitly compete against TPAs. MultiPlan's PPO networks have filed applications for a certificate of authority with the Texas Department of Insurance to do business as a TPA.

117.    MultiPlan admits that its PPO networks compete against other payors' PPO networks. For example, in an Annual Report filed with the SEC on March 1, 2023, MultiPlan states: "*We also compete with PPO networks owned by our large Payor customers*[.]" MultiPlan's 2021 and 2022 Annual Reports contain similar admissions. After DAPs sued MultiPlan for entering into agreements with its competitors in violation of federal antitrust law, these admissions suddenly vanished from MultiPlan's SEC filings.

118.    In an August 2020 presentation, MultiPlan's then-Chief Revenue Officer, Dale White, explained that MultiPlan "*compete[s] with regional PPOs* . . . and network aggregators[.]" In a slide deck accompanying the presentation, MultiPlan listed First Health, a PPO network owned by Aetna, as a selected competitor. Again, after this antitrust litigation began, MultiPlan removed these admissions from its SEC filings.

119.    MultiPlan's former CEO, Dale White, openly admitted that MultiPlan competes with other payors at the November 29, 2023, Piper Sandler Healthcare Conference. At that conference, he stated, "*Our clients are our competitors; our competitors are our clients.*"

120.    Prior to the MultiPlan Cartel, MultiPlan's PPO networks competed against other payors with respect to out-of-network claims adjudication and pricing. MultiPlan and the other members of the MultiPlan Cartel exercised their independent judgment to set and negotiate the prices they paid for out-of-network goods and services. Absent the MultiPlan Cartel, payors competed with one another to adequately compensate providers for out-of-network goods and

services because they understood that it was in their unilateral economic self-interest to ensure that providers would accept the payors' patients on an out-of-network basis. In a market without collusion, providers had the ability to leverage payors against one another when negotiating the prices of out-of-network claims. If Aetna and Cigna were paying $900 for an out-of-network procedure, a provider could point to that fact if United attempted to pay $700 for the same out-of-network procedure. This ability to compare prices from competing buyers is key to all sellers ensuring that their goods and services are sold in a marketplace free from collusion.

121. MultiPlan admits that it specifically competes against other payors on the basis of out-of-network claims adjudication and pricing. In MultiPlan's 2022 10-K, MultiPlan explains that its services address "claims adjudication and pricing."

122. Other payors recognize that MultiPlan is a competing payor. In a prepared statement before the U.S. House of Representatives Judiciary Committee Subcommittee on Regulatory Reform, Commercial and Antitrust Law on September 29, 2015, Elevance's then-CEO Joseph Swedish explained that "traditional insurance providers" and "companies offering rental networks (*e.g.*, MultiPlan . . .)" are engaged in "robust competition."

123. Hospital systems refer to MultiPlan as a "payor" of in-network and out-of-network claims in public filings. For example, Mountain States Health Alliance and Wellmont Health System, two hospital systems operating in the Appalachia Highlands, listed MultiPlan as a "Payor" in their Application for a Letter Authorizing a Cooperative Agreement to the Commonwealth of Virginia.

124. The FTC has stated that MultiPlan is a payor on multiple occasions. In a 2010 administrative complaint against the Minnesota Rural Health Cooperative, the FTC listed payors operating in certain areas of Minnesota, including MultiPlan. In a March 23, 2006, administrative

complaint against Healthcare Alliance of Laredo, L.C., the FTC listed MultiPlan as a "payor" that does business in the Laredo, Texas area. Similarly, a 1998 Consent Order between the FTC and North Tahoe Medical Group, Inc. lists MultiPlan as a "payer."

125.   The DOJ also considers MultiPlan to be a payor. In a February 2011 complaint filed against United Regional Healthcare System, the DOJ and the State of Texas alleged that "[c]ommercial health insurers include managed-care organizations (such as Blue Cross Blue Shield, Aetna, United Healthcare, CIGNA, Accountable, or other HMOs or PPOs), rental networks (such as Beech Street, Texas True Choice, Multiplan, and PHCS), and self-funded plans . . . . Although not all of these are risk-bearing entities, they can be referred to collectively as 'commercial health insurers.'"

126.   Other entities have represented to federal antitrust agencies that MultiPlan is a payor. In a June 19, 2009, letter to the Antitrust Division of the DOJ, the Pacific Business Group on Health, the California Public Employees' Retirement System, and the California Health Care Coalition represented to the Antitrust Division of the DOJ that "there are dozens of entities offering health care coverage . . . in California today, . . . including Aetna, Blue Cross of California, United, CIGNA, . . . and MultiPlan."

127.   MultiPlan even complies with government regulations that apply to payors. In October 2020, the Centers for Medicare and Medicaid Services finalized a rule known as the Transparency in Coverage Rule, which, among other things, requires group health plans and health insurance issuers to make information available on their websites in a machine readable format concerning their negotiated rates with in-network providers and historical billed charges and allowed amounts. In April 2022, in accordance with the rule, MultiPlan produced network rate files for its PPO networks. MultiPlan also produced out-of-network allowed amounts and billed

charges to its PPO networks. MultiPlan made similar machine-readable files available again in December 2023.

128.    Any claim that MultiPlan is not a health insurance company is irrelevant. The competition that matters in this case is claims adjudication and pricing. Several different types of payors engage in claims adjudication and pricing, not just health insurance companies. For example, TPAs engage in claims adjudication and pricing even though they are not health insurance companies. ASO health plans also adjudicate and price claims even though they do not take in premiums and set a risk-based capital reserve to pay out future healthcare claims. That pricing competition for out-of-network goods and services is the relevant area of competition in this case.

129.    In public statements, MultiPlan attempts to characterize itself as a TPA. But, as Sean Crandell, MultiPlan's Senior Vice President of Healthcare Economics testified under oath, "third-party administrators . . . do the same thing as the large national health plans." Moreover, even if MultiPlan is a TPA, it enters into horizontal pricing agreements with other TPAs, such as Secure Health, Allied National, and Healthcare Highways.

130.    Even if MultiPlan does not compete against other payors on the basis of claims adjudication and pricing, it is certainly a potential competitor. MultiPlan operates multiple PPO networks, recruits providers, and has existing relationships with subscriber groups. MultiPlan could easily begin competing against other payors on the basis of claims adjudication and pricing with little difficulty.

**B.      MultiPlan Enters into Agreements with Its Competitors to Use a Common Pricing Methodology to Set the Prices Paid for Out-of-Network Goods and Services**

**i.      Overview of MultiPlan's Agreements with Competing Payors**

131.    MultiPlan was not content to just run PPOs and use its own independent discretion

to set prices for out-of-network goods and services for those PPOs. It embarked on a plan to build a pricing methodology for out-of-network goods and services that it then marketed to competing payors as a way to decrease prices for out-of-network goods and services in the wake of the Ingenix debacle. MultiPlan referred to this strategy internally as "MultiPlan 2.0."

132.     The first step in that plan was acquiring a pricing formula that MultiPlan could market as part of a broader pricing methodology that was an alternative to Ingenix.

133.     In 2009, MultiPlan acquired Viant from Welsh, Carson, Anderson & Stowe. The Viant pricing formula sets prices for out-of-network goods and services pursuant to pricing parameters that MultiPlan and the competing payor agree on in advance. It also uses hospital-specific cost data obtained from Medicare Cost Reports to calculate individual hospitals' operating expenses, plus an additional margin allowance based on geographic comparators. Thus, prices that MultiPlan sets on behalf of competing payors using its Viant pricing methodology are based, in part, on commingled, granular, real-time, and confidential data concerning providers' margins and billed charges.

134.     In 2011, MultiPlan acquired National Care Network LLC ("NCN") for $50 million, effectively purchasing NCN's Data iSight pricing methodology. According to MultiPlan's former CEO, Data iSight soon "became the foundation of [MultiPlan's] analytics business."

135.     In 2014, MultiPlan acquired Medical Audit & Review Solutions ("MARS"), once again purchasing an out-of-network pricing methodology provider. MARS is a provider of medical necessity auditing and case review services. It's PROBE Audit Risk System ("PARS") platform combines actuarial analytics and clinical reviews to identify opportunities to pay lower prices for out-of-network goods and services. MARS is yet another tool for MultiPlan to identify claims where it can underpay providers. By using MARS, MultiPlan and a competing payor agree that

they will apply a common pricing formula for setting lower prices for out-of-network goods and services. MARS operates by using an agreed-upon set of pricing rules to systematically underpay providers' out-of-network bills by associating the providers' work with billing codes that typically have lower out-of-network prices.

136.     After making these acquisitions, MultiPlan marketed its Data iSight, Viant, and MARS pricing formulas to other payors as a part of a broader common pricing methodology designed to decrease the amount of money that payors paid to providers for out-of-network goods and services.

137.     MultiPlan positioned these pricing formulas as targeting different types of out-of-network goods and services. In its marketing materials, MultiPlan pitched Data iSight as targeting claims from hospitals for physician services and facility claims. Viant targeted claims for outpatient services. MARS was positioned as a pricing formula for TPAs to lower out-of-network prices.

138.     Even after orchestrating the conspiracy, MultiPlan continued acquiring new companies to add additional formulas for setting prices for out-of-network goods and services on behalf of its competitors as a part of this pricing methodology.

139.     In November 2020, MultiPlan acquired HST, a pricing formula for out-of-network goods and services. At the time of acquisition, MultiPlan announced that it would "incorporate HST tools into MultiPlan's Data iSight service."

140.     MultiPlan has also developed proprietary pricing formulas internally. Around June 2023, MultiPlan introduced a new "AI-enabled" out-of-network claim pricing algorithm known as "Pro Pricer." MultiPlan claims that this pricing algorithm will set prices for out-of-network goods and services using a commingled dataset of over 40 years of pricing data, including current and

competitively sensitive pricing data.

141.    Regardless of the precise formula or algorithm that MultiPlan uses to set prices on behalf of its competitors, MultiPlan's broader common pricing methodology remains the same. Rather than using their own discretion to set prices, competing payors send MultiPlan their out-of-network bills from healthcare providers. MultiPlan prices those out-of-network goods and services on behalf of its competitors, generating massive underpayments for those out-of-network goods and services. The brand names that MultiPlan associates with its common pricing methodology are just window dressing. At the end of the day, all payors are agreeing to not exercise their independent pricing discretion, route out-of-network bills to MultiPlan, and use MultiPlan to set prices for those out-of-network goods and services in concert with nearly every other payor.

142.    MultiPlan's agreements with its competitors to use MultiPlan's common pricing methodology are memorialized in written contracts. In these written agreements, MultiPlan's competitors agree to send their out-of-network claims to MultiPlan via an electronic data interface; allow MultiPlan to set the prices for those claims using MultiPlan's pricing methodology; appoint MultiPlan to be the sole enforcer of the prices for those out-of-network goods and services if a provider attempts to push back on the cartel's prices; and agree on the maximum price that MultiPlan will set for particular types of out-of-network goods and services, regardless of the outcome of the application of its pricing methodology (which they refer to as "override" agreements).

143.    In a simplified example of how MultiPlan's pricing methodology works, an individual insured by a payor receives emergency services at a hospital. The hospital does not have a pre-existing contract governing the cost of those services with the patient's payor. However, the

payor is still required by its agreement with the subscriber to pay for the services rendered to the insured patient. So, the hospital treats the patient and submits a bill to the payor. Instead of paying the hospital's bill or using its own discretion to negotiate the hospital's bill, the payor turns the bill over to MultiPlan. MultiPlan uses a formula, which it has previously agreed with its competitor to use, to set the price paid for those goods and services pursuant to MultiPlan's agreement with the payor. MultiPlan then submits its price for the goods and services to the hospital on what is effectively a take-it-or-leave-it basis. And even if the hospital dares not to accept MultiPlan's price, the best it can hope to receive from any one-sided "negotiations" with MultiPlan (not the payor) is still a substantial underpayment.

144.    Outside the emergency room context, a similar dynamic is at play. A patient who has a PPO plan may prefer to be treated by a specific physician or surgeon, even though that doctor is out-of-network under that patient's health plan. In a non-emergency room setting, these out-of-network providers have no legal obligation to provide treatment to that patient. Nevertheless, they are effectively forced to provide treatment because medical practices have high fixed costs and treating an out-of-network patient generates some revenue for a provider, even if it is substantially lower than what should have been paid but for the cartel.

145.    MultiPlan uses the same pricing methodology in its PPO networks to adjudicate and price out-of-network claims.

146.    MultiPlan has disclosed to competing payors, including United, Aetna, and Cigna, that MultiPlan uses its pricing methodology to set prices for out-of-network goods and services on MultiPlan's PPO networks.

147.    As MultiPlan explains on its website, it uses the same payment pricing methodology that it markets to competing payors "on [its] network claims."

148. When MultiPlan uses the same pricing methodology as other payors to reduce payments to providers, MultiPlan benefits by continuing to take in the same amount in fees from subscribers who access its PPO networks and paying less to providers for their out-of-network goods and services.

149. MultiPlan also shares in the MultiPlan Cartel's ill-gotten gains. MultiPlan is paid a fee by the other cartel members based on the difference between a provider's billed charges and the price MultiPlan sets for those goods and services. This fee is usually equal to 5–7% of the "savings," but has been as high as 15%. The common purpose of the cartel is clear—the less money that is paid to healthcare providers, the more money the cartel, and MultiPlan, make. The bounty that payors pay to MultiPlan for running the cartel is known internally at MultiPlan as "percentage of savings" or "PSAV."

150. These bounty payments can be significant for even smaller health plans. For example, in 2022 Central States paid MultiPlan $7,145,083 in exchange for, among other things, using MultiPlan's common pricing methodology to set lower prices for out-of-network goods and services that were paid by Central States. That $7.14 million payment was just a drop in the bucket. Below is a chart showing Central States' payments to MultiPlan for, among other things, running the cartel.

| Tax Year | Central States' Payment to MultiPlan |
|----------|--------------------------------------|
| 2022 | $7,145,083 |
| 2021 | $22,327,702 |
| 2020 | $19,703,827 |
| 2019 | $21,131,365 |
| 2018 | $19,609,762 |
| 2017 | $17,852,242 |
| 2016 | $14,442,316 |
| 2015 | $9,292,307 |
| **Total** | **$131,504,604** |

151. Central States would not have paid $131.5 million to MultiPlan over 8 years if it

was not getting something of equal or greater value in return. In this case, Central States was obtaining the ability to generate hundreds of millions of dollars in additional revenue by underpaying doctors and hospitals relative to what Central States would have earned were it not colluding with other payors to reduce the prices set for out-of-network goods and services.

152.    The bounties that payors pay to MultiPlan for running the cartel are the lifeblood of MultiPlan. According to a May 10, 2023, Quarterly Report that MultiPlan filed with the SEC, 90.9% of MultiPlan's revenues were generated through this PSAV model in the first three months of 2023.

153.    MultiPlan did not just build an "alternative" to Ingenix. It hired alumni of the Ingenix conspiracy to help run MultiPlan's cartel. For instance, Christopher Dorn, a recently retired Senior Vice President and General Manager of Multiplan's Payment Integrity and Audit Division, joined Multiplan after twenty years at Ingenix, where he served as the Vice President of Payer Solutions.

154.    MultiPlan's common pricing methodology is not generating mere pricing recommendations. MultiPlan's competitors do not deviate from the prices that MultiPlan sets for out-of-network goods and services. They pay the prices that MultiPlan sets for out-of-network goods and services without alteration.

155.    For example, MultiPlan's contract with United states that "United shall adjudicate the claim" for out-of-network goods and services "using the recommended [MultiPlan] amount" generated either by the "Data iSight price" or the price that MultiPlan imposes upon the provider after the provider attempts to push back on MultiPlan's out-of-network pricing. In either case,

United has abdicated all pricing responsibility for out-of-network claims to MultiPlan.[10]

156.   Indeed, MultiPlan's 30(b)(6) witness testified during a deposition in *LD, et al. v. United Behavioral Health, et al.*, No. 4:20-cv-02254-YGR (N.D. Cal.), that she was unaware of a time when United ever altered or rejected a price for out-of-network goods and services set by MultiPlan.

157.   In fact, competing payors authorize MultiPlan to set and negotiate their out-of-network prices—completely abdicating all pricing authority to their competitor. In many cases, MultiPlan will price and adjudicate an out-of-network bill for its competitor, negotiate that bill for its competitor, and then pay the bill on behalf of its competitor. Accordingly, prices set using MultiPlan's common pricing methodology are not merely the beginning of a negotiation.

158.   Further underscoring that this is not a pricing negotiation, MultiPlan forces healthcare providers to accept the prices it sets for out-of-network services on behalf of its competitors. On its website, MultiPlan notes that Data iSight pricing is the price paid 96% of the time. A 2018 MultiPlan study cited even higher numbers: MultiPlan claimed that 99.4% of all out-of-network claims for inpatient treatment that are priced by Data iSight are paid at that price. Those figures were similar for outpatient (98.7%) and professional (94.5%) care. In 2023, MultiPlan's new CEO, Travis Dalton, told the news outlet Axios that, in 98% of its claims, the price MultiPlan sets is the price eventually paid for out-of-network goods and services.

159.   These statistics, contracts, and sworn testimony all tell the same story. MultiPlan is not making recommendations. It is setting prices on behalf of the entire industry. Healthcare providers accept MultiPlan's pricing because they are forced to do so, not because the out-of-

---

[10] United's statement that MultiPlan merely "recommends" a price is a fabrication. As explained in ¶ 154, the prices that MultiPlan generates for out-of-network goods and services are not recommendations.

network prices that MultiPlan sets are somehow fair, but because MultiPlan is the only game in town. Since the vast majority of payors have agreed to use MultiPlan's pricing methodology for out-of-network goods and services, providers have no ability to push back on the collusive pricing.

160. Nor are MultiPlan's PPO networks somehow separate from its common pricing methodology. MultiPlan operates its network and analytics businesses as one integrated business. As MultiPlan explained in its 2023 10-K, MultiPlan said: "The breadth of our service offerings allows our customers the flexibility to tailor solutions for a wide range of plan sponsors with varying plan sizes and benefit needs. At the same time, our service offerings are delivered from our common platform and are often bundled together to provide a comprehensive cost management solution for each individual customer. As such, we manage our service offerings as integrated components of a holistic value proposition, rather than as distinct service lines."

161. In the same 10-K, MultiPlan further stated, "[o]ur Analytics-Based Services reduce the per-unit cost of claims using data-driven negotiation and/or reference-based pricing methodologies. These services can be used standalone but often are used in a solution hierarchy after MultiPlan's network services to reduce claims with no available network contract."

        **ii.**     **There is Direct Evidence of MultiPlan's Agreements with Competing Payors to Use a Common Pricing Methodology to Set Prices for Out-of-Network Goods and Services**

162. There is overwhelming direct evidence that MultiPlan and competing payors agreed to use a common pricing methodology to set prices for out-of-network goods and services. This evidence includes: (1) contracts between MultiPlan and competing commercial healthcare payors, (2) public statements and communications by MultiPlan and other members of the cartel admitting to the existence of these contracts, and (3) internal communications between MultiPlan and other members of the cartel that have been revealed in other litigation.

163. ***Contracts.*** MultiPlan enters into written contracts with competing payors in which

the competing payor agrees to use MultiPlan's pricing methodology instead of exercising its own discretion to set out-of-network prices. MultiPlan and the competing payor also agree to split the revenue generated by underpaying for those goods and services.

164.    Each of these agreements to use a common pricing methodology instead of exercising independent pricing discretion is illegal *per se*. In addition, the agreements with the competing payors, representing the vast majority of all payors, to use MultiPlan's pricing methodology are collectively illegal *per se*.

165.    Despite MultiPlan's efforts to keep many of these agreements out of the public eye, facts concerning several of those agreements are publicly known.

166.    The publicly available versions of MultiPlan's out-of-network pricing contracts with its competitors follow the same form.

167.    Initially, MultiPlan and its competitors had agreements allowing MultiPlan's competitors to access MultiPlan's PPO network as a complementary network.

168.    Not content merely to share access to MultiPlan's PPO network, MultiPlan and its competitors entered into amendments to those existing agreements. Those amendments contain the agreements between MultiPlan and its competitors to use MultiPlan's pricing methodology to fix the price of out-of-network goods and services and to delegate the authority to negotiate with providers to MultiPlan.

169.    For example, on January 1, 2010, United and MultiPlan entered into a Network Access Agreement. In that contract, United agreed to use MultiPlan's PPO network as a complementary PPO network to extend the reach of United's PPO networks.

**Network Access Agreement**

This Agreement is entered into by and between UnitedHealthcare Insurance Company contracting on behalf of itself and the other entities that are United's Affiliates (collectively referred to as "United") and MultiPlan, Inc. ("Network Manager" or "MPI").

This Agreement is effective on January 1, 2010 (the "Effective Date").

170.    On October 1, 2017, United and MultiPlan executed an Amendment to that Network Access Agreement. In that amendment, United agreed to begin use MultiPlan's pricing methodology instead of exercising its own discretion to set out-of-network prices. Specifically, United agreed to use MultiPlan's Data iSight formula to set prices for out-of-network goods and services. In addition to agreeing to use the out-of-network prices set by MultiPlan, United also agreed that MultiPlan would negotiate the price of out-of-network goods and services for United if a provider pushed back on the prices set by MultiPlan. Under this agreement, MultiPlan charged United a fee equivalent to a percentage of the underpayment generated by using MultiPlan's pricing methodology. The existence of this agreement was not publicly disclosed until May 2024, when the agreement was entered into evidence in open court at a trial in *Emergency Services of Okla. PC, et al. v. United Healthcare Ins. Co.*, No. CJ-2019-482 (Okla. Dist., Cleveland County).

**AMENDMENT TO**
**NETWORK ACCESS AGREEMENT**

**THIS AMENDMENT**, effective October 1, 2017(the "Amendment Effective Date") or as otherwise provided herein, is entered into by and among **United Healthcare Insurance Company**, contracting on behalf of itself and the other entities that are United's Affiliates (collectively referred to as "United") and **MultiPlan, Inc.** on behalf of itself and its subsidiaries ("Network Manager or MPI") and amends a certain network access agreement between United and Network Manager dated January 1, 2010, as previously amended (collectively the "Agreement").    All terms contained in this Amendment shall have the meaning defined in the Agreement unless otherwise defined herein.

171.     MultiPlan's agreement with Aetna to stop competing on claims adjudication and pricing for out-of-network goods and services followed a similar pattern. On January 1, 2011, Aetna and MultiPlan entered into a Network Rental Agreement. In that contract, Aetna agreed to use MultiPlan's PPO network as a complementary PPO network to extend the reach of Aetna's PPO networks.

**NETWORK RENTAL AGREEMENT**

This Network Rental Agreement ("Agreement") is made and entered into by and between Aetna Health Management, LLC., on behalf of itself and its Affiliates (as defined below) (hereinafter "Company"), and MultiPlan, Inc. on behalf of itself and its Affiliates (hereinafter "Entity"), to become effective on January 1, 2011 ("Effective Date"). All defined terms in this Agreement and its Attachments shall have the meanings set forth herein and in Section 11 below or otherwise provided in the Attachments.

172.     On November 19, 2018, MultiPlan and Aetna entered into an amendment to the Network Rental Agreement. In that amendment, Aetna agreed to use MultiPlan's pricing methodology instead of exercising its own independent pricing discretion to set the prices for those goods and services. Specifically, Aetna agreed to begin using MultiPlan's Data iSight formula to set prices for out-of-network goods and services. Aetna also agreed that MultiPlan would negotiate the price of out-of-network goods and services for Aetna if a provider pushed back on the prices set by MultiPlan. Under this agreement, MultiPlan charged Aetna a fee equivalent to a percentage of the underpayment generated by using MultiPlan's pricing methodology. Initially, this fee was set at 12% of the underpayment generated by MultiPlan's pricing methodology. The existence of these agreements was not made public until it was filed with the Washington State Insurance Commissioner on December 22, 2021.

5. The following table is hereby added to Attachment 7, Compensation Schedule, Section 2.0, Fees and Savings, of the Agreement:

MEDICAL REIMBURSEMENT ANALYSIS SERVICES

| Medical Reimbursement Analysis Services | |
|---|---|
| Data iSight | 12% of Savings |

173.    MultiPlan's agreement with Cigna to stop competing on claims adjudication and pricing for out-of-network goods and services followed a similar pattern. In 2014, Cigna and MultiPlan entered into a Master Services Agreement, which has been amended several times to include statements of work and addenda. Initially, that Master Services Agreement allowed Cigna to use MultiPlan's PPO network as a complementary network.

174.    On April 1, 2015, Cigna and MultiPlan entered into Statement of Work No. 4 to the Master Service Agreement. In that amendment, Cigna agreed to use MultiPlan's pricing methodology instead of exercising its own independent pricing discretion to set the prices for those goods and services. Specifically, Cigna agreed to begin using MultiPlan's Data iSight formula to set prices for out-of-network goods and services. Cigna also agreed that MultiPlan would negotiate the price of out-of-network goods and services for Cigna if a provider pushed back on the prices set by MultiPlan. Under this agreement, MultiPlan charged Cigna a fee equivalent to a percentage of the underpayment generated by using MultiPlan's pricing methodology. The exact percentage that MultiPlan charged Cigna has been redacted in publicly available versions of the statement of work.

**STATEMENT OF WORK NO. 4**
**Medical Review Analysis Services**

This Statement of Work No. 4 (this "Statement of Work") is dated April 1, 2015 (the "SOW Effective Date") and is entered into between Company and Supplier pursuant to the Master Services Agreement between Cigna Corporate Services, LLC ("Company") and MultiPlan, Inc. on behalf of itself and its operating subsidiaries ("Supplier") dated April 1, 2015 (the "Agreement"). Supplier's principal place of business is located at 115 5th Avenue, New York, NY 10003. Capitalized terms used in this Statement of Work but not defined herein shall have the respective meanings set forth in the Agreement, including any Exhibit thereto.

175.    In 2018, Kaiser Foundation Health Plan of the Northwest ("Kaiser") and MultiPlan entered into a Medical Reimbursement Analysis Services agreement. In that contract, Kaiser agreed to begin using MultiPlan's out-of-network claims pricing methodology to set prices for out-of-network goods and services instead of using its own independent pricing discretion to set the prices for those goods and services. Specifically, Kaiser agreed to begin using MultiPlan's Data iSight formula to set prices for out-of-network goods and services. Kaiser also agreed that MultiPlan would negotiate the price of out-of-network goods and services for Kaiser if a provider pushed back on the prices set by MultiPlan. MultiPlan charged Kaiser a fee equivalent to a percentage of the underpayment generated by using MultiPlan's pricing methodology. Information about the agreement was not made public until it was filed with the Washington State Insurance Commissioner on January 20, 2022.

176.    In 2016, several subsidiaries of Cambia, including Asuris Northwest Health, Regence Blue Shield, Bridgespan Health Company, Regence Blue Cross Blue Shield of Oregon, and Regence Blue Cross Blue Shield of Idaho, entered into written contracts with MultiPlan. In those agreements, Cambia and its subsidiaries agreed to use MultiPlan's pricing methodology instead of exercising their own independent pricing discretion to set the prices for those goods and services. Specifically, Cambia and its subsidiaries agreed to begin using MultiPlan's Data iSight formula to set prices for out-of-network goods and services. Cambia and its subsidiaries also

agreed that MultiPlan would negotiate the price of out-of-network goods and services for Cambia if a provider pushed back on the prices set by MultiPlan. Under this agreement, MultiPlan charged Cambia and its subsidiaries a fee equivalent to a percentage of the underpayment generated by using MultiPlan's pricing methodology. Information about these agreements was not made public until it was filed with the Washington State Insurance Commissioner in 2022 and 2023.

177. According to *Griffin v. TeamCare*, 909 F.3d 842, 844-45 (7th Cir. 2018), Central States has agreed to use MultiPlan's Data iSight methodology to set the prices paid to providers for out-of-network goods and services. *Id.* at 844-45. Under this contract, Central States agreed to use MultiPlan's pricing methodology instead of exercising its own independent pricing discretion to set the prices for those goods and services. Specifically, Central States agreed to begin using MultiPlan's Data iSight formula to set prices for out-of-network goods and services. Central States also agreed that MultiPlan would negotiate the price of out-of-network goods and services for Central States if a provider pushed back on the prices set by MultiPlan. Under this agreement, MultiPlan charged Central States a fee equivalent to a percentage of the underpayment generated by using MultiPlan's pricing methodology.

178. On January 1, 2017, MultiPlan and Healthcare Highways entered into an Amendment to their Master Services Agreement. Healthcare Highways agreed to use MultiPlan's pricing methodology instead of exercising its own independent pricing discretion to set the prices for those goods and services. Specifically, Healthcare Highways agreed to begin using MultiPlan's Data iSight formulas to set prices for out-of-network goods and services. Healthcare Highways also agreed that MultiPlan would negotiate the price of out-of-network goods and services for Healthcare Highways if a provider pushed back on the prices set by MultiPlan. Under this agreement, MultiPlan charged Healthcare Highways a fee equivalent to a percentage of the

underpayment generated by using MultiPlan's pricing methodology.

179. Upon information and belief, MultiPlan has entered into written contracts with other competing payors, including Allied National, Benefit Plans Administrators, Blue Shield of California, Blue Cross Blue Shield of Massachusetts, Blue Cross Blue Shield of Michigan, Blue Cross Blue Shield of Minnesota, CareFirst, Centene, Elevance, HCSC, Highmark, Horizon, Humana, Kaiser, Molina, Sanford, and, Secure Health, that require those payors to use MultiPlan's pricing methodology to set prices for out-of-network goods and services instead of using their own independent pricing discretion to set the prices for those goods and services. Those agreements obligate MultiPlan to negotiate the price of out-of-network goods and services for those payors if a provider pushes back on the prices set by MultiPlan. Under these agreements, MultiPlan charged those payors a fee equivalent to a percentage of the underpayment generated by using MultiPlan's pricing methodology. The exact terms of those agreements have not been made public because they have not been filed with state insurance commissioners or on the public docket in litigation.

180. MultiPlan has taken steps to keep the terms of its agreements with competing payors a secret by inserting confidentiality clauses into its contract with competing payors and then bringing litigation to keep the terms of those contracts a secret. For example, MultiPlan has a Service Agreement with Allied National under which Allied National uses MultiPlan's out-of-network pricing methodology instead of using its own pricing discretion. The Service Agreement between MultiPlan and Allied National states that it is "Confidential Not For Distribution." The Service Agreement also contains a Confidentiality and Proprietary Rights clause, which defines "Confidential Information" to include information relating to MultiPlan's pricing methodology. The Service Agreement prohibits Allied National from using that Confidential Information for any reason other than using MultiPlan's pricing methodology. When Allied National filed a third-party

complaint in *Butler v. Unified Life Insurance Company, et al.*, No. 17-cv-50 (D. Mont. Nov. 18, 2021) that contained three paragraphs describing MultiPlan's pricing methodology, MultiPlan sued Allied National for disclosing that information. Ultimately, Allied National removed the unredacted filing from the public docket and redacted the three paragraphs describing MultiPlan's pricing methodology.

181.    MultiPlan's agreements with competing payors are also evident in preference sheets that MultiPlan and its Co-Conspirators fill out memorializing the details of their pricing agreements. Competing payors fill out preference sheets in which MultiPlan and the payors specifically agree on the formulas that they will use to price specific types of out-of-network goods and services and the maximum price that MultiPlan will set for those goods and services. Upon information and belief, MultiPlan enters into these preference sheet agreements with every payor that uses MultiPlan's pricing methodology for out-of-network goods and services, including each of the Defendants and Co-Conspirators.

182.    ***Plan disclosures.*** In disclosure documents and explanations of benefits, competing payors admit that they have entered into agreements with MultiPlan to use MultiPlan's common pricing methodology to set prices for out-of-network goods and services.

183.    Blue Cross Blue Shield of Michigan has disclosed that it uses MultiPlan's Data iSight service in a public contract with a Michigan government employer group.

184.    A June 1, 2017 Administrative Services Agreement between Owens & Minor Medical, Inc. and a subsidiary of Elevance states that Elevance had begun using MultiPlan to set prices for out-of-network goods and services. Specifically, Elevance began using MultiPlan's Data iSight pricing formula.

185.    In a health plan disclosure from 2018, Centene's subsidiary, Health Net, explained

that it had started utilizing MultiPlan's Data iSight formula to determine the maximum amount that it would pay on out-of-network claims submitted by providers.

186.    In a May 12, 2023 summary plan description for the Ashland County Employee Benefit Plan, Benefit Plans Administrators explained that the plan had agreed to use MultiPlan's Data iSight formula to set the prices paid to providers for out-of-network goods and services.

187.    A May 2017 draft agreement between Healthcare Highways and Oklahoma County notes that Healthcare Highways had begun to use MultiPlan's Data iSight formula to set the prices paid to providers for out-of-network goods and services.

188.    In Aetna's 2021 National Accounts Self-Funded Medical Underwriting Disclosures, Aetna noted that it uses MultiPlan's Data iSight pricing formula for out-of-network goods and services. Aetna's May 2022 disclosures similarly state that Aetna uses MultiPlan's Data iSight formula to price out-of-network claims and that MultiPlan negotiates out-of-network pricing on Aetna's behalf.

189.    A December 1, 2023 plan document and summary plan description that Consociate Health drafted for Tazewell County, Illinois' self-funded health benefit plan discloses the fact that Consociate Health has agreed to use MultiPlan's Data iSight pricing formula to set prices for out-of-network goods and services.

190.    According to a September 13, 2023 summary prepared for the City of Marshall, Blue Cross Blue Shield of Minnesota contracts with MultiPlan to use its pricing methodology for its payments to providers for out-of-network goods and services.

191.    ***Public communications.*** In public statements, MultiPlan and other payors concede the existence of their agreements to suppress out-of-network pricing competition.

192.    On August 18, 2020, MultiPlan's then-CEO, Mark Tabak, explained to investors

that MultiPlan has entered into "multi-year contracts with the leading payors" to use MultiPlan's pricing methodology to adjudicate and price out-of-network claims. He explained that MultiPlan underpays doctors and hospitals by "captur[ing] [out-of-network] claims" from competing payors that contract to use MultiPlan's pricing methodology.

193.    MultiPlan acknowledges that it has entered into similar agreements with each of the largest payors in the U.S., who would otherwise be competing with one another by exercising their own independent pricing discretion when setting prices for out-of-network goods and services. In 2021, Sean Crandell, the Senior Vice President of Healthcare Economics at MultiPlan, testified under oath that "all of the top 10 insurers in the U.S." have agreements with MultiPlan.

194.    MultiPlan told investors the same thing in a 2020 presentation, specifically stating that it has entered into agreements with United, Aetna, Cigna, Anthem, Humana, HCSC, Centene, Kaiser, WellCare, and Molina:



195.    At the 2021 Bank of America Leveraged Finance Conference, MultiPlan's then-Chief Financial Officer David L. Redmond stated that MultiPlan was typically "the sole source or the primary source of all out of network claims [pricing] with the major payers." Redmond explained that Anthem (the predecessor to Elevance), Aetna, United, and Cigna were the four largest users of MultiPlan's out-of-network claims pricing methodology.

196.    As of June 2023, MultiPlan touted that all of the top 15 payors in the U.S. have agreed to use MultiPlan as their pricer for out-of-network goods and services. Each of those payors

previously competed with MultiPlan's PPO networks on the basis of claims adjudication and pricing using their own pricing discretion prior to entering these agreements.

197.    The competing payors also acknowledge that they have entered into agreements with MultiPlan in communications with their subscribers. For instance, Secure Health sent a letter to its members in April 2017 with both MultiPlan's and Secure Health's logos at the top of the first page. The letter explained that Secure Health has "partnered with [MultiPlan's] Data iSight to review charges on out-of-network medical claims and bills to [] determine an appropriate fee that the provider should be paid."

198.    According to a letter to the United Steelworkers Union dated October 26, 2017, effective January 1, 2017, Highmark began using MultiPlan's Data iSight formula to set prices for out-of-network goods and services.

199.    According to a May 2022 presentation to the New Mexico Public Schools Insurance Authority, Blue Cross Blue Shield of New Mexico, a subsidiary of HCSC, disclosed that it was using MultiPlan's Data iSight formula to set prices for out-of-network goods and services.

200.    In presentations to New Jersey public employee benefits plan administrators, Horizon Blue Cross Blue Shield of New Jersey touted the amount of underpayments that Horizon was generating using MultiPlan's Data iSight formula. During these presentations, Horizon officials conceded that in several cases Horizon and MultiPlan made more from the fees associated with underpaying for out-of-network goods and services than the doctors and hospitals made from providing the out-of-network care.

201.    Similarly, in presentations to California municipalities, Blue Shield of California has acknowledged that it uses MultiPlan's pricing methodology to set prices for out-of-network goods and services.

202.  ***Communications with providers.*** In addition, providers routinely receive communications from MultiPlan in which MultiPlan concedes that it has "contracted with" various payors—*i.e.*, its competitors—and that the result of MultiPlan's agreements with its competitors is that the provider will be radically underpaid for its out-of-network goods and services. DAPs have thousands of such notices in which MultiPlan admits to "contracting with" its competitors.

203.  For example, in a July 2023 communication, MultiPlan informed a provider that it has an agreement with Cigna to set the price of the provider's out-of-network goods and services. In it, MultiPlan informed the provider that it had "contracted with" Cigna and that, as a result of that agreement, MultiPlan set a price of only $1,131.63 for a $15,041.36 bill for out-of-network medical services—a 92.5% underpayment.[11]



204.  In April of 2019, on behalf of Cigna, MultiPlan set a price for out-of-network goods and services at $324 on a bill of $5,750.

---

[11] Pursuant to federal law, DAPs have redacted personally identifying healthcare information from this and other examples. DAPs will provide Defendants with unredacted copies of these records when an appropriate protective order is entered by the Court.

Additional Comments:

*******************BEST OFFER FOR SETTLEMENT*******************
This is the best offer I can extend on this claim. If the offered adjusted amount is declined or changed, I will need to close with no settlement. Please, don't hesitate to contact me with any questions. If we do not resolve this case no additional payment will be made, if applicable follow ERISA guidelines or contact the payer.

Thanks!

Provider agrees to accept the adjusted price shown below as payment in full for the following products/services that have been provided to the above referenced patient.

| DATE OF SERVICE | PROVIDER'S LIST PRICE | ADJUSTED PRICE |
|---|---|---|
| 11/08/2018 to 11/09/2018 | $5,750.00 | $324.00 |

Provider agrees not to balance bill patient or patient's family (except for deductible, coinsurance, and non-covered items, if applicable).
Provider agrees to accept the above, provided that the Payor waives their right to conduct an on-site audit of the billed charges.
Provider agrees to waive all late charges.

205.    Similarly, in November 2021, another medical provider submitted $4,500 in charges incurred on November 13, 2021, to Anthem (a subsidiary of Elevance). MultiPlan responded with a letter stating: "Anthem, Inc. has contracted with MultiPlan to facilitate resolution of the above referenced services due to the Provider being out-of-network for this claim." MultiPlan set the price for those out-of-network goods and services at $673.65.



206.    Likewise, in 2021, a provider submitted a charge of $3,700 to United. MultiPlan

- 63 -

responded by setting a price of $323.58 "as payment in full." MultiPlan also warned that the provider could not "balance bill patient or patient's family (except for deductible, coinsurance, and non-covered items, if applicable)."

207.    In 2019, a provider in Arizona submitted a bill for $1,190 to United. The claim was paid at only $295.28. The Provider Remittance Advice form referred the member to Data iSight, saying Data iSight would "work with the provider" on the member's behalf. The form also advised the provider that the bill had been paid using Data iSight and demanded that the provider not balance bill the patient.



208.    The same thing happened two months later to a provider in Pennsylvania. The provider submitted a claim for $1,094 and was paid only $236.22.

| PATIENT: ███████████████ | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| SUBSCRIBER ID: ██████ 03/20/19-03/20/19 | | | SUBSCRIBER NAME: ██████ | | | CLAIM NUMBER: ███████ | | | | |
| CLAIM DATE: | | | DATE RECEIVED: 04/10/19 | | | PRODUCT: CHOYC+ | | | | |
| REND PROV ID: 1346291143 | | | REND PROV: ██████ | | | | | | | |

| PATIENT CONTROL NUMBER | PATIENT ID | AUTH/REF NUMBER | DRG | DRG WEIGHT | CLAIM CHARGE AMOUNT | CLM ADJ AMT | GRP CJ | CLAIM ADJ RSN CD | CLAIM PAYMENT AMOUNT | PATIENT RESPONSIBILITY |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | $1,094.00 | | | | $236.22 | $69.00 |

SERVICE LINE DETAIL(S)

| LINE CTRL# | DATES OF SERVICE | SUB PROD/ SVC/ MOD | ADJ PROD/ SVC | MOD | REV | UNITS | ADJ QTY | CHARGE | AMOUNT ALLOWED | ADJ AMOUNT | GRP CD | CLM ADJ RSN CD | PAYMENT AMOUNT | REMARK/ NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 333226777-0Z1 | 03/20/19 - 03/20/19 | | 99284 | | | | | $1,094.00 | $295.28 | -$781.72 -$61.06 | PI PR | 242 2 | $236.22 | IS |
| CLAIM# ██████ | | | | | | | SUBTOTAL | $1,094.00 | $295.28 | $857.78 | | | $236.22 | |

PAYMENT OF BENEFITS HAS BEEN MADE IN ACCORDANCE WITH THE TERMS OF THE MANAGED CARE SYSTEM.

NOTES

PI242    PAYER INITIATED REDUCTIONS - SERVICES NOT PROVIDED BY NETWORK/PRIMARY CARE PROVIDERS .

PR2      PATIENT RESPONSIBILITY - COINSURANCE AMOUNT

IS       MEMBER: THIS SERVICE WAS RENDERED BY AN OUT-OF-NETWORK PROVIDER AND PROCESSED USING YOUR NETWORK BENEFITS. IF YOU'RE ASKED TO PAY MORE THAN THE DEDUCTIBLE, COPAY AND COINSURANCE AMOUNTS SHOWN, PLEASE CALL DATA ISIGHT AT 866-835-4022 OR VISIT DATAISIGHT.COM . THEY WILL WORK WITH THE PROVIDER ON YOUR BEHALF. PROVIDER: THIS SERVICE HAS BEEN REIMBURSED USING DATA ISIGHT, WHICH UTILIZES COST DATA IF AVAILABLE (FACILITIES) OR PAID DATA (PROFESSIONALS). PLEASE DO NOT BILL THE PATIENT ABOVE THE AMOUNT OF DEDUCTIBLE, COPAY AND COINSURANCE APPLIED TO THIS SERVICE. IF YOU HAVE QUESTIONS ABOUT THE REIMBURSEMENT CONTACT DATA ISIGHT.

209.    In March of 2019, a provider submitted a bill for $1,190 and was paid only $413.39 by "UNITED HEALTHCARE DIS." "DIS" is a reference to MultiPlan's Data iSight formula.



| Payer Name | UNITED HEALTHCARE DIS |
|---|---|
| Provider Name | |
| Patient's Name | ███████ |
| Patient's Date of Birth | ███████ |
| Patient Control Number | ███████ |
| Date Bill Submitted | 3/4/2019 |
| Admission/Service Date | 1/1/2019 |
| Principal Diagnosis Code | J0300 |
| Total Submitted Charge | $1,190.00 |
| Data iSight Reimbursement Amount | $413.39 |

210.    In January 2024, a provider submitted a bill to a TPA for $41,452.62. HST, a MultiPlan company, responded by setting a price of $3,566.66 as "payment in full."

Plan Sponsor has contracted with **HSTechnology Solutions Inc.**, ("HST") to conduct an independent comparative analysis of charges billed. Provider agrees to accept as payment in full the Negotiated Amount for covered services rendered to Patient on the Date(s) of Service specified, less any co-payments, deductibles, and co-insurance, if any, and subject to the terms of the Patient's plan.

| Billed Charges: | Negotiated Amount |
|---|---|
| $41,452.62 | $3,566.66 |

By signing below, Provider agrees not to bill the Plan Sponsor, the Patient or any financially responsible party for the difference between the Billed Charges and the Negotiated Amount for the covered services rendered to Patient on the Date(s) of Service specified, and agrees to accept this amount as final and to waive any late charges. Provider retains the right to bill the Patient (or financially responsible party) for services not covered under the Patient's plan, and for any applicable co-payments, deductibles, or co-insurance.

211.     Jeffrey Farkas, MD, LLC submitted an out-of-network bill for $332,300 to Great-West Healthcare d/b/a Cigna after performing a surgery on February 17, 2016, that saved a patient's life after she suffered a stroke and multiple brain aneurysms. MultiPlan responded with a fax sent to Dr. Farkas's office on June 13, 2018. The fax revealed that Cigna had sent the claim to MultiPlan to take over negotiations: "Great-West Healthcare, now part of CIGNA has contracted with MultiPlan to facilitate resolution of the above referenced services due to the Provider being out-of-network for this claim. This agreement may expedite payment and decrease the Patient's responsibility." MultiPlan set the price for Dr. Farkas' life-saving brain surgery and related services at $12,407, a difference of $319,893. MultiPlan also stated that if Dr. Farkas agreed to that massive underpayment, Dr. Farkas could not bill the patient for the difference between Dr. Farkas' billed charges and the meager price that MultiPlan set for the life-saving brain surgery. MultiPlan gave Dr. Farkas two days to decide whether to accept the take-it-or-leave-it offer.

Great-West Healthcare, now part of CIGNA has contracted with MultiPlan to facilitate resolution of the above referenced services due to the Provider being out of network for this claim. This agreement may expedite payment and decrease the Patient's responsibility.

**Jeffrey Farkas MD LLC** agrees to accept the Proposed Amount listed below as payment-in-full (less any applicable deductible, co-insurance, or co-payment amounts in addition to non-covered items) for services rendered to this Patient on the following date(s):

| Date(s) of Service | Billed Charges | Proposed Amount |
|---|---|---|
| 02/17/2018 | $332,300.00 | $12,407.00 |

By signing this agreement, Provider accepts this Proposed Amount and agrees to reduce the liability of the Patient and Payor. Provider agrees not to bill the Patient, or financially responsible party, for the difference between the Billed Charges and the Proposed Amount. Provider retains the right to bill the Patient (or financially responsible party) for items not covered under the Patient's benefit plan and for any applicable deductibles, co-insurance, or co-payments. Provider shall not waive any such patient responsibility amounts due directly from the patient (or other financially responsible party).

When Dr. Farkas pushed back on MultiPlan's price, MultiPlan set an even lower price $7,499.77. Following multiple rounds of MultiPlan pricing and negotiation, Cigna ultimately sent the provider a $6,893.20 check. Dr. Farkas provided an invaluable service—saving a patient's life. When Dr. Farkas sent a bill for his services to Cigna, Cigna forwarded the bill to MultiPlan, and MultiPlan set a price that was significantly below billed charges and significantly below the prices that would have been paid for those services absent the cartel. MultiPlan exclusively negotiated with Dr. Farkas, and each time Dr. Farkas pushed back on MultiPlan's pricing, MultiPlan set a lower price. That is how the MultiPlan Cartel works—once MultiPlan takes over pricing and negotiation for its competitors, the provider cannot win; the only question is how much they will lose.

212. ***Explanations of Benefits.*** Members of the MultiPlan Cartel sent explanation of benefits documents to patients admitting that the cartel members used MultiPlan's pricing methodology to set the prices paid for out-of-network goods and services.

213. For example, in a March 15, 2017 explanation of benefits, when Mercy Hospital and Medical Center (now known as Insight Hospital and Medical Center) in Chicago, Illinois billed $12,471.10 in charges for an emergency surgery and recovery, Allied National sent the claim to MultiPlan to set a price for those out-of-network goods and services using MultiPlan's Data iSight

formula. Working on behalf of its competing TPA, Allied National, MultiPlan set the price for those out-of-network goods and services at $5,847.13—a $6,623.97 underpayment. The explanation of benefits listed the code "NAT011" next to the prices in Allied National's explanation of benefits. An explanation of codes section on the back of the explanation of benefits notes that "NAT011" means "[f]ee determination made by Data iSight."

214. Similarly, according to a March 16, 2017 explanation of benefits, the same hospital provided $8,023.78 worth of out-of-network goods and services to a patient, and MultiPlan used its Data iSight pricing formula to set the price for those services at $6,712.77—a $1,311.01 underpayment. That explanation of benefits also listed the code "NAT011" next to the prices set by Allied National.

215. ***Emails, Meetings, and Other Direct Communications.*** DAPs also have evidence concerning MultiPlan's communications with members of the MultiPlan Cartel that shows how this buyers' cartel works in practice.

216. On July 1, 2017, United and MultiPlan entered into an explicit agreement to suppress prices for out-of-network goods and services. United and MultiPlan implemented this agreement on or around July 1, 2017, by means of an Amendment to the companies' existing Network Access Agreement.

217. Prior to 2017, it was not possible for United to utilize MultiPlan's pricing methodology. On January 14, 2009, United and several of its subsidiaries entered into a settlement agreement to resolve claims made against the company in *American Medical Association, et al. v. United Healthcare Corporation, et al.*, No. 00-2800 (S.D.N.Y.), *Orborski v. United Healthcare Corporation, et al.*, No. 00-7246 (S.D.N.Y.), and *Malchow, et al. v. Oxford Health Plans, Inc., et al.*, No. 08-935 (D.N.J.). According to that settlement agreement, United was required to fund and

facilitate the creation of FAIR Health, an independent database of out-of-network claims data. Among other things, the settlement agreement required United to provide its out-of-network claims data to FAIR Health for a period of five years after FAIR Health first released its database. During that same five-year period, United was required to use FAIR Health to generate prices for out-of-network claims and United was prohibited from owning, operating, or funding "any other database product that provides data pooled from more than one insurer to the other health insurers for determining [out-of-network] reimbursement rates."[12] Because the FAIR Health database became operational in 2011, United was required to use FAIR Health until at least 2016 and could not use MultiPlan's pricing methodology.

218.    Knowing that United could begin using MultiPlan's pricing methodology around late 2016 or early 2017, MultiPlan began recruiting United into the conspiracy in late 2015. On or around October 1, 2015, MultiPlan sent United a presentation entitled "Data iSight: Maximize Savings Using a Patented Methodology." This presentation promised that United could substantially increase its revenues if it stopped independently pricing out-of-network payments to healthcare providers and used MultiPlan's common pricing methodology instead.

219.    MultiPlan induced United to join the MultiPlan Cartel by explaining that United's competitors had already entered into similar agreements with MultiPlan and by disclosing the pricing levels adopted by those competitors. In 2016, MultiPlan's former Chief Revenue Officer, Dale White, wrote an email to United executives, explaining that 7 of United's top 10 competitors were using MultiPlan's out-of-network pricing methodology. White encouraged United to do the

---

[12] As a technical matter, FAIR Health provides estimates of prices for healthcare goods and services based on a distribution of billed charges for those goods and services. Prior to the MultiPlan Cartel, providers used the FAIR Health database to make their own decisions about how much they would pay for out-of-network goods and services. In most cases, the prevailing market rate for out-of-network goods and services prior to the MultiPlan Cartel was between the 70% and 80% interval in the FAIR Health database.

same, writing: "Implementation of these initiatives in 2016 will go a long way to bring United back into alignment with its primary competitor group [*i.e.*, Blues, Cigna, Aetna] on managing out-of-network costs."

220.    One of the recipients of White's email, Rebecca Paradise, United's Vice President of Out-Of-Network Payment Strategy, explained that a key factor in United's decision to agree to use MultiPlan's out-of-network pricing methodology was that the methodology "was widely used by our competitors."

221.    White, MultiPlan's Chief Revenue Officer at the time, relayed to another United executive, John Haben (then the Vice President of Networks at United), that, by agreeing to use MultiPlan's Data iSight formula, United would be in alignment with other competitors. Haben subsequently wrote in an internal United email that, if United implemented Data iSight, United would be in alignment "with a major competitor."

222.    White also held telephone calls and off-the-record meetings with officials at United to convince them to join the MultiPlan Cartel. During these meetings, White explained that MultiPlan could generate substantial streams of revenue by underpaying doctors and hospitals using MultiPlan's pricing methodology, that other payors were already using MultiPlan's pricing methodology successfully, and that United could set its prices for out-of-network goods and services in alignment with its competitors using MultiPlan's pricing methodology. White was careful to cover his tracks. He shared the most competitively sensitive information with United over the phone to avoid creating a written record.

223.    In anticipation of beginning to use MultiPlan's pricing methodology, in 2016 United and MultiPlan employees began working together to iron out the technical details of their data connections and out-of-network pricing formulas. On April 21, 2016, Emma Johnson, the

Director of Sales and Account Management for National Accounts at MultiPlan, sent an email to Sarah Peterson (Director of Network Programs, United), Marie Rickmyer (Program Manager for United Out-of-Network Affordability), and Amy Barker (Associate Director of Claims at United). In that email, Johnson sought agreements from United on the maximum price that MultiPlan's Data iSight pricing formula would set for certain emergency room claims provided to MultiPlan via United's UNET claims processing system and claims underwritten by United's Golden Rule Insurance Co. ("GRI") affiliate. In the email, Johnson wrote: "Please confirm your agreement" that the maximum price that MultiPlan could set for emergency room claims "would be 350% of [Medicare]" or the Data iSight price. In reality, because the Data iSight price is almost always lower than 350% of Medicare (by design Data iSight generates prices that are around 200% of Medicare), MultiPlan was seeking an agreement to fix the prices that United paid for out-of-network goods and services at 350% of Medicare prices for those services. United subsequently agreed with MultiPlan to set its pricing for those emergency medical services claims at 350% of Medicare rates. MultiPlan's PPO networks also began setting prices for the same services at 350% of Medicare rates.

From:       Johnson, Emma [emma.johnson@MultiPlan.com]
Sent:       4/21/2016 11:13:27 AM
To:         Sarah R Peterson (sarah_r_peterson@uhc.com) [sarah_r_peterson@uhc.com]; Rickmyer, Marie A
            (marie_rickmyer@uhc.com) [marie_rickmyer@uhc.com]; Barker, Amy (ambarker@unitedhealthone.com)
            [ambarker@unitedhealthone.com]
CC:         Ginther, Bill [bill.ginther@MultiPlan.com]; Petrozzelli, Patricia [patricia.petrozzelli@MultiPlan.com]; Carolyn S Larson
            (carolyn_s_larson@uhc.com) [carolyn_s_larson@uhc.com]
Subject:    Data iSigt HCFA nd UB ER (GRI and UNET) and other questions

Hi –

As a follow up to our GRIC (UHONE) DiS call, I wanted to send out the definition of HCFA ER claims we currently use to identify the claim as ER:

POS 23 and/or CPT Code 99281-99290

Please confirm your agreement with this definition for both UNET and GRI. Using this definition Data iSight would then apply the rule of 350% of CMS override to never allow less than 350% CMS on the ER HCFA claims. Pricing would be 350% of CMS or the DiS rate whichever is greater.

Specifically for GRI (already in place on UNET) the definition for UB claims we currently use to identify the claim as ER:
Rev Code 450-459, not including 456

Please confirm your agreement with this definition for GRI implementation. Using this definition Data iSight would then apply the rule of 350% of CMS override to never allow less than 350% CMS on the ER UB claims. Pricing would be 350% of CMS or the DiS rate whichever is greater.

Also, for GRI specifically we would like to verify if there will be any U&C/R&C values or liability values that will need to be considered when applying the DiS rate or will DiS be calculating the DiS rate irrespective of any U&C/R&C or liability values?

The ER rules are pretty critical for us to approve so we can get started and complete the required system work to accommodate.

Let me know.
Thanks,
Emma

Emma Johnson
Director, Sales and Account Management
National Accounts
emma.johnson@multiplan.com

224. MultiPlan provided confidential and competitively sensitive information concerning the prices that United's competitors were paying for out-of-network goods and services to convince United to begin using MultiPlan's common pricing methodology. In a September 8, 2016 email, John Haben, a United executive, indicated specific knowledge of competitors' pricing formulas adopted through Data iSight. He wrote that "MultiPlan said seven of our top ten competitors use the tool today." He continued: "BCBS [Blue Cross Blue Shield] is even more aggressive and is accessing the option of moving DIS [Data iSight] up even higher to have

IPR/OPR (R&C repricing) which is option 3 . . . ." In this email, Haben demonstrated specific knowledge of the pricing "option" adopted by United's competitive rival, Blue Cross Blue Shield, in MultiPlan's Data iSight formula. Testifying under oath, Haben conceded that this knowledge of Blue Cross Blue Shield's pricing formula came from MultiPlan. Haben testified that he provided this information concerning Blue Cross Blue Shield pricing to other executives at United so that they would be comfortable moving forward with using MultiPlan's pricing methodology.

225.    MultiPlan continued providing assurances to United that United could use MultiPlan's pricing methodology to be in alignment with the prices set by its competitors. In a non-public presentation that MultiPlan made to United in early 2017, MultiPlan explained that its proprietary pricing methodology would generate significant underpayments to providers on out-of-network goods and services. In the same presentation, MultiPlan noted that its pricing methodology would set out-of-network prices that were lower than the usual, customary, and reasonable, or UCR,[13] prices for out-of-network goods and services that had previously prevailed in the market that existed prior to the MultiPlan Cartel.

226.    Haben summarized MultiPlan's proposal in a 2017 email and presentation he sent to senior management at United entitled "OCM [Outlier Cost Management]-MultiPlan Benchmark Pricing Overview." In the email, Haben wrote: "Today, our major competitors have some sort of outlier cost management; they use Data iSight. United will be implementing [Data iSight on] July 1, 2017." In the same email, Haben explained that the agreement between United and MultiPlan could cut United's out-of-network claim payments "by $900 million" per year.

---

[13] As further described below, *see* ¶¶ 297-301, prior to the MultiPlan Cartel, out-of-network rates were commonly determined by reference to a benchmark referred to as the "Usual, Customary, and Reasonable," or UCR, rate. "Usual and customary" is a term of art, regularly used and commonly understood within the healthcare industry. "Reasonable and customary," "usual and customary," "U&C," and like phrases denote the same meaning and are used interchangeably in the industry.

227.    Haben wrote in a 2017 United internal presentation about implementing MultiPlan that, "[b]y implementing Outlier Cost Management as currently planned, United catches up to the pack[.]" In other words, based on its communications with MultiPlan, United knew that it would be acting in parallel with its competitors by agreeing to use MultiPlan's pricing methodology for out-of-network goods and services.

228.    United confirmed that it agreed to use MultiPlan's pricing methodology to set prices for out-of-network goods and services because it knew that its competitors were using the same methodology. United wrote in a Customer Impact Advisory Brief that it was "utilizing Data iSight, owned by MultiPlan, to administer [an outlier cost management program]. 90 other payors nationwide use [Data iSight] in a similar manner."

229.    United has also admitted that it knows that each of its competitors use Data iSight. During its opening statement to a jury in another case, United explained "[w]hat is undisputed is that . . . every single one of United's major competitors . . . all use MultiPlan and Data iSight, every one."

230.    United tracked the amount of money that it underpaid healthcare providers using MultiPlan's out-of-network pricing methodology, which was a key component in "OCM," United's acronym for "Outlier Cost Management." United employees prepared a table with a column entitled "No OCM," meaning the additional amount that United would have paid on out-of-network claims had United not agreed to use MultiPlan's pricing methodology to set the prices of out-of-network goods and services. That internal analysis shows that United's agreement with MultiPlan resulted in United underpaying doctors and hospitals hundreds of millions of dollars each year.

231.    After instructing competing commercial payors on how to be in "alignment,"

MultiPlan pushed the MultiPlan Cartel to cut the prices for out-of-network goods and services even further.

232.    On March 13, 2018, MultiPlan officials met with United. During this meeting, MultiPlan provided a presentation entitled "MultiPlan Update for UnitedHealthcare: 2017 in Review." During this presentation, MultiPlan noted that the agreement between MultiPlan and United had successfully suppressed out-of-network prices and suggested ways to pay providers even less.

233.    Similarly, in a September 29, 2019 presentation to United entitled "Competitive Landscape for Cost Management," MultiPlan urged United to cut its out-of-network pricing even further for particular out-of-network procedures. This meeting was attended by Haben, who took contemporaneous notes of the meeting, which he sent to Rebecca Paradise, the Vice President of Out-of-Network Payment Strategy for United. Thus, while MultiPlan, United, and their competitors had already agreed to cut the prices set for out-of-network goods and services, they were attempting to agree on ways to make the cartel even more effective by setting even lower prices.

234.    The same pattern that transpired with United also occurred with Cigna. MultiPlan had a long-standing Network Access Agreement with Cigna that allowed Cigna to use MultiPlan's PPO network as a complementary network that would extend Cigna's existing PPO network. However, MultiPlan knew that Cigna was required to use the FAIR Health database to set out-of-network prices as a result of Cigna's settlement agreements with class action plaintiffs and the New York Attorney General to resolve claims related to Cigna's use of Ingenix. The earliest that Cigna could begin using MultiPlan's pricing methodology to set out-of-network prices was in 2015 or 2016.

235.     In advance of that 2015/2016 window of opportunity, MultiPlan began meeting with Cigna to pitch Cigna on using MultiPlan's common pricing methodology instead of competing to set out-of-network prices independently.

236.     Helpfully for MultiPlan, Cigna was also seeking a replacement for Ingenix. In 2015, a Cigna employee sent an internal email regarding out-of-network pricing in which the employee expressed concern with developing "[M]edicare equivalent" prices internally. The Cigna employee said, "We cannot develop these [prices] internally (think of when Ingenix was sued for creating out of network reimbursements)[.] We need someone (external to Cigna) to develop acceptable Medicaid or otherwise acceptable [prices.]" Thus, Cigna still wanted to cut out-of-network prices, it just needed someone else to be the ringleader of the scheme.

237.     MultiPlan jumped at the opportunity to do so. Starting in 2014, MultiPlan began meeting with Cigna to discuss MultiPlan's pricing methodology for out-of-network goods and services. The MultiPlan employees who attended the meetings included Dale White, MultiPlan's then-Chief Revenue Officer. The Cigna employees who attended these meetings included Terri Cothron, Cigna's Manager of National Ancillary & Non-Par Management.

238.     During these meetings and presentations, MultiPlan explained to Cigna that many other payors were already using its pricing methodology and that Cigna could increase its revenue substantially by bringing itself into alignment with those competitors' pricing methodology and the prices that those competitors set for out-of-network prices via MultiPlan. MultiPlan's presentations to Cigna explicitly compared Cigna's out-of-network pricing for particular types of out-of-network goods and services to pricing of Cigna's competitors and claimed that Cigna would increase its revenue by hundreds of millions of dollars each year by using MultiPlan's common pricing methodology.

239.    Based on the understanding that Cigna would pay lower prices for out-of-network goods and services by simultaneously using the same pricing methodology as its competitors, Cigna agreed to let MultiPlan set and negotiate the prices for out-of-network goods and services billed to Cigna beginning in April 2015.

240.    After reaching an agreement with Cigna, MultiPlan continued to meet and communicate with Cigna regularly to report on the underpayments generated by using MultiPlan's pricing methodology and to reach further agreements on how Cigna could pay healthcare providers even less.

241.    For example, in March 2016, officials from MultiPlan and Cigna met to discuss ways that they could work together to reduce out-of-network payments. During this "Non-Par Strategy Summit," Cigna displayed a slide deck that outlined how the company planned to work with MultiPlan to slash its out-of-network payments. Among others, this meeting was attended by Terri Cothron, who was responsible for overseeing Cigna's contractual relationship with MultiPlan.

242.    In advance of that meeting, MultiPlan sent Cigna an email with an attached presentation entitled "2016 Network Development Meeting: A Client's Perspective on Out-of-Network Costs." The presentation outlined how Cigna could redirect billions of dollars in out-of-network payments away from providers and to itself and MultiPlan. During the March 2016 "summit," a MultiPlan representative explained how MultiPlan's out-of-network pricing methodology worked and how it could significantly cut payments for out-of-network goods and services.

243.    After attending MultiPlan's presentation at the March 2016 summit meeting, Cothron confided to a co-worker that MultiPlan's pricing methodology "scares me."

244. Nevertheless, Cigna continued to use MultiPlan's pricing methodology for Cigna's out-of-network claims.

245. Cigna kept internal "Whitebook Reports" tracking how much money it earned by underpaying providers using MultiPlan's pricing methodology. Those reports contain line items for each out-of-network claim and the corresponding underpayment generated by using MultiPlan's pricing methodology.

246. During private meetings with Cigna, MultiPlan crowed about how successful its agreement with Cigna was in cutting payments to providers for out-of-network claims. In a slide deck entitled "Cigna & MultiPlan Governance Meeting, June 21, 2021," MultiPlan outlined that it had worked together with Cigna to cut the prices set for out-of-network goods and services. The message to Cigna was simple—the cartel was working.

247. Aetna and MultiPlan engaged in the exact same course of action as MultiPlan engaged in with United and Cigna. Around the same time that MultiPlan was pitching United and Cigna on the benefits of using MultiPlan's pricing methodology, it was making the same pitch to Aetna. MultiPlan explained that by using its common pricing methodology, Aetna would be in alignment with its competitors on out-of-network pricing strategy and would be setting similar prices for the same out-of-network goods and services. MultiPlan made its pitch to Aetna to use the same pricing methodology for out-of-network goods and services as its competitors via in-person meetings, presentations, and telephone calls.

248. Based on those assurances, Aetna and MultiPlan entered into a contract that, among other things, required Aetna and MultiPlan to stop exercising independent discretion in setting prices paid to out-of-network providers and to abdicate pricing discretion to MultiPlan. Then MultiPlan and Aetna split the increased margins generated by underpaying out-of-network

providers among themselves. Aetna paid MultiPlan a percentage of the underpayment generated by MultiPlan's claim suppression methodology ranging from approximately 10% to 15%. As a result, for many out-of-network claims, MultiPlan and Aetna made more on the claim than the provider did.

249.    MultiPlan's agreement with Aetna has led to massive underpayments to providers for their out-of-network goods and services. For example, on September 18, 2020, a surgeon in New Jersey performed a complex and invasive surgical procedure to alleviate a patient's long-standing lower-back pain. Prior to performing the surgery, the surgeon believed that Meritain Health, an Aetna subsidiary, had pre-authorized an out-of-network charge of $348,900 for the surgery and related care. Instead, on November 25, 2020, Meritain sent the surgeon an explanation of benefits along with an electronic payment for $7,750.59—a $341,149.41 underpayment when compared to the pre-authorization amount. Prior to performing the surgery, the surgeon was not made aware that Meritain Health had an agreement with MultiPlan or that his services would be subject to MultiPlan's pricing methodology for out-of-network goods and services. So, even where healthcare providers attempt to use prior authorizations to ensure that they will be paid adequately for out-of-network care, the MultiPlan Cartel still underpays them using deceptive bait-and-switch tactics.

250.    To substantiate its effectiveness in suppressing out-of-network payments, MultiPlan provided Aetna with regular reports showing the underpayments that MultiPlan's pricing methodology generated when it set the prices for out-of-network goods and services.

251.    MultiPlan pushed Aetna to use MultiPlan's common pricing methodology to pay less and less to providers (and to pay MultiPlan more and more for doing so). Aetna did so based on the understanding that its competitors were also using MultiPlan to cut out-of-network prices

in a similar manner.

252. MultiPlan's communications with United, Cigna, and Aetna are typical of how MultiPlan markets its pricing methodology to competing payors. Upon information and belief, MultiPlan has used similar communications, meetings, and presentations to convince BSCA, BCBSMI, Blue Cross Blue Shield of Minnesota, Cambia, Centene, Elevance, HCSC, Highmark, Horizon, Humana, Kaiser, Molina, Sanford, Allied National, Benefit Plans Administrators, Central States, Consociate Health, Healthcare Highways, and Secure Health to join the cartel by using MultiPlan's common pricing methodology. In those meetings, communications, and presentations, MultiPlan invited its competitors to use MultiPlan's pricing methodology instead of exercising their own discretion to set prices for out-of-network goods and services. Significantly, MultiPlan told each payor that other payors were using the same methodology and that, by simultaneously using the same pricing methodology, the payor could decrease the amount it pays for out-of-network goods and services.

253. Once a payor accepts MultiPlan's invitation to use the same pricing methodology as its competitors, MultiPlan and the payor memorialize that agreement in a written contract.

254. After signing a contract, MultiPlan provides the payor with a constant flow of competitively sensitive information via meetings, presentations, telephone calls, and video conferences. This information includes comparisons between the prices that the payor is paying for particular out-of-network goods and services and the prices that the payor's competitors are paying for the same out-of-network goods and services. The message from those presentations is clear. Payors who are paying too much for out-of-network goods and services need to get in line and set the same prices as their competitors. If the payors do so, they stand to benefit tremendously by cutting payments to providers and increasing their revenues.

255. Reporting from *The New York Times* confirmed that MultiPlan and competing payors frequently exchange confidential and competitively sensitive pricing information in order to effectuate the MultiPlan Cartel. *The New York Times* explained, "[a]s MultiPlan became deeply embedded with major insurers, it pitched new tools and techniques that yielded even higher fees [for MultiPlan]," by setting lower prices, "and in some instances told insurers what unnamed competitors were doing, documents and interviews show."

256. The fact that MultiPlan did not mention the names of some competitors is no saving grace. MultiPlan provided payors with the information to identify who those unnamed competitors were. *The New York Times* quoted Lisa McDonnel, a United executive, as writing in an internal email that "Dale [White, the Chief Revenue Officer of MultiPlan,] did not specifically name competitors but from what he did say we were able to glean who was who."

257. MultiPlan holds several types of meetings and sends several types of communications to its Co-Conspirators to reinforce the message that the competing payors should be acting together to use MultiPlan's pricing methodology to set low prices for out-of-network goods and services.

258. MultiPlan engages in "road shows" in which it travels to competing payors and provides updates on the claims pricing methodologies adopted by other competing payors.

259. MultiPlan executives Dale White and Susan Mohler are involved in these "road show" presentations, wherein MultiPlan produces detailed descriptions of MultiPlan's pricing methodology, reviews the underpayments generated by those pricing methodologies, and offers ways to further suppress payments for out-of-network goods and services.

260. MultiPlan prepares whitepapers for competing payors, which explain in detail how MultiPlan's pricing methodology lowers the prices set for out-of-network goods and services.

MultiPlan routinely shares those whitepapers with other members of the MultiPlan Cartel.

261.    These whitepapers are designed both to exchange information between competing payors and to ensure that all payors agree to the underlying pricing logic embodied in MultiPlan's pricing methodologies.

262.    MultiPlan maintains a Client Advisory Board that hosts annual multi-day retreats for executives from MultiPlan and competing payors to discuss out-of-network pricing.

263.    According to MultiPlan, the purpose of these meetings is to bring payors together so that they "can talk amongst their peers" about several topics, including out-of-network pricing.

264.    Similarly, Rebecca Paradise, Vice President of Out-of-Network Strategy for United, testified at trial in *Emergency Services of Okla. PC, et al. v. United Healthcare Ins. Co.*, No. CJ-2019-482 (Okla. Dist., Cleveland County) that United and competing payors attend multiday "customer meeting[s]" hosted by MultiPlan where they discussed out-of-network pricing.

265.    Employees from MultiPlan and several competing payors attended meetings of the Client Advisory Board. MultiPlan executives routinely attend meetings of the Client Advisory Board, including Susan Mohler, MultiPlan's Vice President of Marketing; Dale White, the former CEO of MultiPlan; Bruce Singleton, MultiPlan's former Senior Vice President of Network Strategy; Michael McEttrick, MultiPlan's former Vice President of Healthcare Economics; and Sean Crandell, MultiPlan's Senior Vice President of Healthcare Economics.

266.    During Client Advisory Board meetings, MultiPlan executives presented slides showing how little payors were paying providers as a result of using MultiPlan's out-of-network pricing methodology. These presentations also discussed how MultiPlan and the competing payors could make more money if they all agreed to use MultiPlan's pricing methodology even more

aggressively to set even lower prices for out-of-network goods and services.

267.    MultiPlan reassured the attendees of the Client Advisory Board meetings that their industry-wide plan to underpay providers for out-of-network goods and services was safe. In presentations at the Client Advisory Board meetings, MultiPlan referred to its common methodology for underpaying claims as a "liability shield" for its Co-Conspirators.

268.    Other presentations at the Client Advisory Board meetings took a whimsical approach, asking attendees, "Is it magic or is it MultiPlan?" In reality, it was a cartel.

269.    MultiPlan and its competing payors have attempted to keep these Client Advisory Board meetings a secret by holding them off-site at luxury resorts, not recording the presentations, and assuring the participants at the meetings that they are off-the-record. In deposition and trial testimony concerning these Client Advisory Board meetings in other litigation, attendees at the meetings incredibly state that they remember almost nothing about the meetings other than the fact that they attended them. However, some information concerning the Client Advisory Board meetings is publicly available.

270.    In 2019, MultiPlan hosted a Client Advisory Board meeting at the luxury spa resort Montage Laguna Beach in Orange County, California. Executives from MultiPlan, United, Aetna, several Blue Cross Blue Shield plans, Cigna, Humana, Kaiser, Consociate Health, and several other payors attended the event.

271.    John Haben, the former Vice President of Networks for United, and Rebecca Paradise, Vice President of Out-of-Network Payment Strategy for United, attended the 2019 MultiPlan Client Advisory Board meeting. Under oath, Paradise testified that "a lot of people in the insurance industry" were also at the meeting. At the meeting, MultiPlan's then-Vice President of Sales and Account Management, Dale White, presented ways that commercial payors could

"overcom[e] obstacles" with respect to cutting out-of-network pricing. Paradise also testified that the participants in this Client Advisory Board meeting, "talk[ed] about things they've implemented, other things they're looking at" with respect to setting prices for out-of-network goods and services.

272.    MultiPlan also uses the Client Advisory Board meetings to invite payors to join the MultiPlan Cartel. According to a 2017 MultiPlan document, the 2015 Client Advisory Board meeting featured prospective clients seated next to existing clients at dinner for this purpose. MultiPlan expected its Co-Conspirators to endorse MultiPlan's pricing methodology and the effectiveness of the cartel during this dinner.

273.    From September 26–28, 2021, MultiPlan's Client Advisory Board returned to the Montage Laguna Beach resort for another retreat.

274.    The Client Advisory Board Meetings have social functions such as dinners, cocktail hours, and golf outings where MultiPlan and competing payors discuss their experience using MultiPlan's pricing methodology to cut prices for out-of-network goods and services in a less formal setting. The photograph below shows Anthony Gonzalez, a MultiPlan sales executive, Ziad Rubaie, the former Chief Business Development Officer at Consociate Health, and Darren Reynolds, the CEO and President of Consociate Health, at a cocktail party during the 2021 Client Advisory Board Meeting.



275. MultiPlan has hosted Client Advisory Board meetings on a regular basis. The Client Advisory Board met in person each year from 2015 to 2023, with the exception of the meeting in 2020 (which occurred remotely due to the COVID-19 pandemic).

276. MultiPlan's Client Advisory Board meetings continue to this day, despite the extensive government and media scrutiny into MultiPlan's anticompetitive conduct. In November 2024, the MultiPlan Client Advisory Board met at the Montage Laguna Beach resort in Laguna Beach, California.

277. In addition to the secret whitepapers and off-the-record conclaves at luxury resorts,

MultiPlan facilitates regular agreement between payors concerning underpaying providers for their out-of-network goods and services in ad hoc sales meetings.

278. MultiPlan holds regular internal meetings of its sales and national account teams. These meetings occur at least quarterly and at times occurred as often as monthly. MultiPlan employees who attended these meetings included, at least, Dale White, Monica Armstrong, Jacqueline Kienzle, Emma Johnson, Susan Dominy, Anthony Gonzalez, and Matthew Butler.

279. During these meetings, MultiPlan employees discuss the current out-of-network underpayments that members of the MultiPlan Cartel are making for particular types of out-of-network goods and services. If MultiPlan identifies an instance where a payor is, in MultiPlan's judgment, paying too much for an out-of-network good or service, the sales and national account team identifies this as an "opportunity" for the payor to pay providers less for that service. MultiPlan's national accounts team and sales team are incentivized to do this because MultiPlan makes more revenue every time that a payor pays less for an out-of-network good or service. MultiPlan's sales employees are specifically incentivized to push these payors to set lower prices for out-of-network goods and services via MultiPlan's pricing methodology because their bonuses and performance evaluations are tied to the amount of underpayments generated by payors using MultiPlan's pricing methodology.

280. MultiPlan's national accounts team and sales team created a list of these opportunities to make more money by advising other payors to underpay providers.

281. Then, MultiPlan's sales and national accounts teams, with the assistance of MultiPlan's Senior Vice President of Healthcare Economics, Sean Crandell, and Senior Vice President of Marketing and Product Management, Susan Mohler, created presentations to payors that contained charts comparing that payor's payments to providers for particular out-of-network

goods and services to the payments made by competing payors.

282.     The presentations also contained specific recommendations about how the payor (and MultiPlan) could make more money by underpaying providers for those out-of-network goods and services at rates similar to their competitors.

283.     MultiPlan's sales and national accounts employees presented these recommendations and pricing comparisons to other payors on a regular basis.

284.     The message of these presentations was clear. Payors could make more money by underpaying providers. They could do so safe in the knowledge that they would not be undermined by other payors deciding to pay more for the same service, which would have allowed providers to point to those higher payments as a justification for requesting competitive payments for their services in pricing negotiations.

285.     Every member of the MultiPlan Cartel would benefit from that payor cutting its payments for particular out-of-network goods and services. MultiPlan would make more money, the payors would make more money, and the other payors would know that their fellow cartel members were holding the line on underpaying for out-of-network goods and services.

286.     These regular presentations allowed the MultiPlan Cartel to monitor and enforce their cartel agreement to stop competing on out-of-network pricing, use a common pricing methodology, and profit from underpaying providers.

287.     These meetings provided a forum in which members of the MultiPlan Cartel reaffirmed their participation in the buyers' cartel. MultiPlan and the payors met one-on-one, discussed ways to underpay providers, and agreed on a recommended course of action based on what competing payors were paying for the same out-of-network goods and services. MultiPlan communicated that other payors were underpaying for out-of-network goods and services, the

payors knew that their competitors would be underpaying for the same services as well, and the payors agreed to make similar underpayments.

###### iii. MultiPlan and its Competitors Engaged in Parallel Pricing Conduct

288.    MultiPlan and its competitors engaged in multiple forms of parallel pricing conduct. That parallel conduct cannot be explained as merely payors having similar reactions to similar competitive pressures within an interdependent market. Instead, MultiPlan and its competing payors engaged in parallel pricing conduct that is consistent with each member of the MultiPlan Cartel abiding by a preceding agreement to use a common pricing methodology to set the prices that they paid for out-of-network goods and services.

289.    Fundamentally, each Co-Conspirator engaged in the same pricing strategy. They adopted MultiPlan's pricing methodology and stopped using their own pricing discretion. They did so in a tight time period. While the exact dates that some payors agreed to start using MultiPlan's pricing methodology to set prices for out-of-network goods and services are presently unknown, the facts that are available demonstrate that payors began to use MultiPlan's pricing methodology in the roughly three-and-a-half year period between April 2015 and November 2018.

| Date | Agreement |
|---|---|
| April 2015 | Cigna signs Amendment to MultiPlan's Network Access Agreement concerning use of Data iSight pricing methodology |
| 2016 | Cambia enters into agreement with MultiPlan to use Data iSight |
| January 1, 2017 | Highmark begins using MultiPlan's Data iSight pricing methodology |
| January 1, 2017 | Healthcare Highways signs Amendment to Master Services Agreement with MultiPlan |
| April 2017 | Secure Health begins using MultiPlan's Data iSight pricing methodology |

| | |
|---|---|
| May 2017 | Elevance discloses that it has started using MultiPlan's Data iSight pricing methodology |
| October 2017 | United signs Amendment to MultiPlan's Network Access Agreement concerning use of Data iSight pricing methodology |
| 2018 | Centene discloses that it has started using MultiPlan's Data iSight pricing methodology |
| 2018 | MultiPlan enters into agreement with Kaiser regarding use of Data iSight |
| November 2018 | Aetna signs Amendment to MultiPlan's Network Access Agreement concerning use of Data iSight pricing methodology |

290.    Payors likely would have agreed to use MultiPlan's pricing methodology in closer proximity to one another had several major payors, including United and Aetna, not been prohibited from doing so by their settlements in the Ingenix investigation.

291.    Not only did members of the MultiPlan Cartel enter into agreements to outsource their pricing authority for out-of-network goods and services to MultiPlan, their use of MultiPlan's common pricing methodology also generated parallel prices for the same out-of-network goods and services.

292.    MultiPlan generates parallel out-of-network prices even when the FAIR Health or UCR rates for those services differ substantially. As the table below shows, the FAIR Health database indicates that the out-of-network price for the same CPT code should differ substantially by geography, but MultiPlan generated the same price for all the claims regardless of location.

| CPT Code | Location | Date | Submitted Claim | 70% of FAIR Health | MultiPlan Pricing/Payment |
|---|---|---|---|---|---|
| 99284 | Wyoming | 1/21/19 | $799 | $654.36 | $413.39 |
| 99284 | Arizona | 1/25/19 | $1,212 | $1,062.60 | $413.39 |
| 99284 | New Hampshire | 1/25/19 | $1,047 | $632.52 | $413.39 |
| 99284 | Oklahoma | 2/8/19 | $990 | $903.84 | $413.39 |
| 99284 | Kansas | 2/10/19 | $778 | $837.48 | $413.39 |
| 99284 | New Mexico | 2/19/19 | $895 | $1,136.52 | $413.39 |
| 99284 | California | 3/25/19 | $937 | $667.80 | $413.39 |
| 99284 | Nevada | 3/30/19 | $763 | $778.68 | $413.39 |
| 99284 | Pennsylvania | 5/20/19 | $1,094 | $760 | $413.39 |

Had the competing payors been using market-based UCR rates to set prices, they would have calculated different prices for out-of-network services performed in different locations. Instead, because the competing payors used MultiPlan's common pricing methodology, they generated parallel prices for those out-of-network procedures.

293. This parallel pricing makes no economic sense absent the existence of a conspiracy. Because the cost of care in Manhattan, New York, is higher than in Manhattan, Kansas, all legitimate methods of paying out-of-network claims account for the geographic difference between where care is administered. The only plausible explanation for this uniform pricing is that MultiPlan and its competitors agreed on pricing caps that have the effect of setting the same price for a particular out-of-network service regardless of where it is performed.

294. MultiPlan executives admit under oath that MultiPlan's out-of-network pricing methodology leads to parallel pricing. Significantly, Sean Crandell, MultiPlan's Senior Vice President of Healthcare Economics, admitted that MultiPlan's pricing methodology ended out-of-network pricing competition by pricing the claims of all payors the same. Under oath, he testified:

> Q. During the same time period, 2017 to 2020, was the out-of-network pricing recommended by Data iSight to United the same or different as that recommended to [United's] competitors?

A.     It was the same.

295.    In the same testimony, Crandell was asked: "[I]f the Data iSight tool is used among various different companies in the industry, do the recommended payment rates generated by Data iSight tool vary depending on which client you're running that calculation for?" Crandell answered: "No." When asked whether the tool could even factor in who the client is, he answered: "No, it can't. The system that generates the methodology cannot even factor in [who] the client [is]."

296.    In addition, MultiPlan facilitated a parallel transition away from a marketplace in which payors used their own discretion to set prices for out-of-network goods and services at prevailing market rates to a coordinated regime in which payors cut payments to providers. This transition was a radical structural break from how payors had behaved previously that cannot be explained by normal competitive factors.

297.    Prior to the MultiPlan Cartel, MultiPlan and its rival payors competed against each other by independently setting the prices at which they would pay out-of-network goods and services provided to patients enrolled in their respective networks.

298.    For decades, out-of-network rates were commonly determined by reference to the UCR rate. A UCR rate represents a percentile value—usually the 75th to 85th percentile—calculated from the billed charges of providers in the same geographic area. A percentile value indicates a specific point within a dataset expressed as a percentage. For example, a median is the 50th percentile—50 percent of the values in the data fall below it, 50 percent above it.

299.    UCR rates helped control healthcare costs for out-of-network goods and services while preserving each payor's ability to set its own out-of-network prices. As William Marino, the former President and CEO of Horizon, explained to the U.S. Senate Committee on Commerce,

Science, and Technology in 2009, UCR was "designed to permit payment amounts that would be predictable, change with market-based changes in prevailing payments, and keep insurance costs in check by eliminating excessive charges from the insurance pool." UCR was, and is, a less-restrictive alternative to the MultiPlan Cartel. It provided payors with a means of combatting what some payors believed were high prices for out-of-network goods and services while still setting prices independently based on market conditions.

300. Each of the members of the MultiPlan Cartel used FAIR Health or similar UCR rates to set prices for out-of-network goods and services prior to joining the cartel. Under the terms of a class action settlement in 2010, United and other payors were required to use FAIR Health for five years. However, after these obligations ended, various payors made parallel decisions to abandon FAIR Health/UCR and join the MultiPlan Cartel.

301. By joining the cartel, they jettisoned their prior approach to setting prices for out-of-network goods and services using their independent discretion.

302. As federal antitrust regulators have explained, "replac[ing] once-independent pricing decisions with a shared algorithm" like the MultiPlan Cartel has done constitutes illegal price-fixing. In other words, when "competitor's jointly delegat[e] key aspects of their decisionmaking to a common algorithm," they "deprive the marketplace of independent centers of decisionmaking" and violate Section 1 of the Sherman Act.

303. The same is true here. The MultiPlan Cartel extinguished horizontal competition by delegating industry-wide pricing authority for out-of-network goods and services to MultiPlan. For healthcare providers, this makes independent, individualized out-of-network pricing negotiations impossible. It also allows MultiPlan and its Co-Conspirators to dramatically suppress out-of-network prices far below what they would have been but for the MultiPlan Cartel.

304.     As a result of this industry-wide pricing transition engineered by MultiPlan, UCR

prices for out-of-network goods and services, once the industry standard, has gone by the wayside.

Debra Nussbaum, an employee of Optum, which is a subsidiary of United, testified at a deposition

in *In re: Out of Network Substance Use Disorder Claims Against UnitedHealthcare*, No. 19-cv-

02075 (C.D. Cal.), that "when [she] first started with Optum/United Behavioral Health, many plans

were utilizing reasonable and customary or UCR," and that "over time, [she has] seen a major shift

to other out-of-network reimbursement methodologies."

305.     Members of the MultiPlan Cartel also engaged in parallel conduct by charging

exorbitant fees to subscribers in exchange for using MultiPlan's common pricing methodology to

lower payments for out-of-network goods and services.

306.     In order to profit even more from using MultiPlan's pricing methodology to set low

prices for out-of-network goods and services, the cartel members added new terms to their ASO

contracts at or around the time that they began using MultiPlan's pricing methodology. In addition

to the PMPM fees (*see supra* ¶ 94), those ASO contracts also required self-insured groups to pay

a percentage (as high as 35%) of the difference between a billed out-of-network charge and the

amount paid for those out-of-network goods and services, known as the "shared savings fee."

Often, that fee was higher than the amount paid to the doctor or hospital performing the out-of-

network goods and services.

307.     United disclosed that its "shared savings program" was directly linked to its use of

MultiPlan's pricing methodology. A notification concerning Nokia Corporation's ASO plan notes

that Nokia participates in a "shared savings program" administered by United. That notice states

that the shared savings fees associated with that program are based on the underpayments

generated by MultiPlan's Data iSight formula.

308.     In addition, Aetna created the "National Advantage Program," or NAP. Under the

NAP, ASO subscribers to Aetna's PPO plans paid Aetna a substantial portion of the underpayment

generated by Aetna's agreement to use MultiPlan's pricing methodology.

309.     These shared savings agreements generate tremendous profits for competing payors

at the expense of providers. United made approximately $1.3 billion from its shared savings

program in 2020 alone. Moreover, in an internal presentation, United stated that it intended to cut

its out-of-network payments by $3 billion by 2023 in order to generate even higher shared savings

payments from ASO subscribers.

**C.     MultiPlan Receives, Pools, and Commingles Proprietary and Confidential Pricing Data to Set and Negotiate Prices for its Competitors' Out-of-Network Goods and Services**

310.     The precise nature of how MultiPlan suppresses prices for out-of-network goods

and services is non-public and proprietary. However, some details are available in the public

record. Those details show that MultiPlan receives petabytes of competitively sensitive and

proprietary pricing data from its competitors and that it commingles and pools that data into a

dataset that it uses to set and negotiate prices for out-of-network goods and services.

311.     MultiPlan's pricing methodologies work by virtue of deep technological

connections between MultiPlan and its competitors. Pursuant to their agreements with MultiPlan,

competing payors send their out-of-network claims to MultiPlan via an electronic data connection.

These claims come to MultiPlan with detailed information, such as the procedure code, dates of

service, the billed amount, and an alphanumeric code indicating whether the claim is subject to a

payor's previously disclosed UCR out-of-network rates.

312.     During an interview on the September 16, 2024 DataFramed podcast, MultiPlan's

Vice President of Data & Decision Science, Jocelyn Jiang, affirmed that MultiPlan receives its

data directly from its competitors: "Typically those claims data come directly from the insurance

companies and then we have a series of ingestion data processing steps to normalize and standardize those data coming from the insurance company."

313. The granular and real-time healthcare pricing and claims data that MultiPlan and its competitors share every day on a massive scale is confidential and competitively sensitive.

314. MultiPlan and its competitors have long recognized that the prices they pay for out-of-network goods and services are confidential and competitively sensitive. In the January 1, 2010 Network Access Agreement between MultiPlan and United, United and MultiPlan agreed that United could not use MultiPlan's price for in-network or out-of-network care to develop United's own PPO networks. The parties agreed that if United used MultiPlan's pricing information, that conduct "would cause irrevocable harm to [MultiPlan] and that [MultiPlan] shall be entitled to injunctive relief" to prevent United from using MultiPlan's pricing data.

315. In addition, MultiPlan's Network Rental Agreements with its competitors routinely define the term "proprietary and confidential information" to include "all internal business practices and business records, including, but not limited to, information concerning products, pricing, contracts or business methods in any form whatsoever, not including information otherwise in the public domain." This includes the rates paid to providers for in-network and out-of-network care, which MultiPlan and its Co-Conspirators regularly agree to hold "in strict confidentiality."

316. Furthermore, in an April 1, 2016 declaration submitted under penalty of perjury in *Federal Trade Comm'n v. Advocate Health Care Network, et al.*, 15-cv-11473 (N.D. Ill.), Randall Fortuna, who was at that time the Regional Director for MultiPlan's PPO networks in Illinois, Minnesota, Wisconsin, North Dakota, and South Dakota, testified that data concerning out-of-network claims pricing was "highly confidential and sensitive commercial business information"

that MultiPlan did not want to expose publicly.

317.     Fortuna explained that MultiPlan stores claims pricing information for its own PPO networks and its competitors' PPO networks on a proprietary, commingled database known as the EnterPrice System. A small number of MultiPlan employees working in MultiPlan's Healthcare Economics department have direct access to that system, and those employees receive regular confidentiality training and sign attestations that they will, and have, kept claims data on the EnterPrice System confidential.

318.     However, that confidentiality guidance means little in practice. MultiPlan's Healthcare Economics team routinely provides confidential pricing information drawn from the EnterPrice System to MultiPlan's sales and national accounts teams. Those sales executives routinely funnel highly confidential information to MultiPlan's competitors in order to convince them to set lower prices using MultiPlan's common pricing methodology.

319.     Nonetheless, MultiPlan's competitors continue to share their competitively sensitive claims pricing data with MultiPlan. MultiPlan then pools and commingles this data to set prices for out-of-network claims both for its own payments to healthcare providers and for its competitors' out-of-network payments to healthcare providers.

320.     Once MultiPlan receives confidential and competitively sensitive pricing information from its competitors via a data link, that data is loaded into MultiPlan's "Claims Savings Engine," known internally as FRED. FRED is a massive repository of incoming claims data from nearly all of the payors in the U.S. Pursuant to the contracts between MultiPlan and its competitors, FRED routes the data to one of several proprietary pricing formulas owned by MultiPlan. Those formulas set the price for the out-of-network goods and services at issue by determining how little the MultiPlan Cartel can pay the healthcare provider for that good or service.

321.     These pricing formulas are based on commingled and pooled sets of competitor's pricing and claims data. Data iSight provides a good example of how commingling and pooling plays into the process of setting out-of-network prices using MultiPlan's pricing formulas.

322.     In a secret whitepaper dated June 2019, entitled "Data iSight Product and Methodology Inpatient Module," MultiPlan explains the methodology Data iSight uses to generate prices for inpatient claims. Data iSight begins by compiling "a national benchmarking group that contains claim and cost data for cases of like severity in hospitals with characteristics that match those of the hospital on the claim being analyzed." This same benchmarking process is employed by every single payor that uses Data iSight to set prices for out-of-network goods and services. When providers generate a claim, all payors using Data iSight use the same benchmark group to generate pricing offers for claims from that hospital. Thus, MultiPlan pools and commingles all of the competitor pricing data that it has in its system into a single benchmarking dataset that it uses to set prices for out-of-network goods and services.

323.     The next step, according to the whitepaper, is to "adjust costs of all comparison cases based on hospital's wage index." Once again, in this step, all payors using Data iSight are using the same methodology—an adjustment based upon the claim-generating hospital's wage index—to determine the price set for those out-of-network goods and services.

324.     The third step is to "calculate the median benchmark cost of the service," according to the whitepaper. MultiPlan pulls the data in this step from the Hospital Provider Cost Report Information System which is maintained by CMS. Again, this methodology is common to all payors who use Data iSight to set prices for out-of-network goods and services.

325.     In the final step, Data iSight applies "standard overrides" which set upper and lower bounds on the prices its system would otherwise generate. These overrides "are always in place"

and "establish the upper and lower limits for the Data iSight price" for all payors who use Data iSight to set prices. These "overrides" set the maximum price that MultiPlan will set for a particular out-of-network good or service. When a payor agrees to use MultiPlan's pricing methodology, they agree to use a "default override" set to a certain percentage of Medicare pricing for the same good or service. In fact, Sean Crandell, MultiPlan's Senior Vice President of Healthcare Economics, has testified under oath that Data iSight applies "operational overrides" on top of overrides accepted by individual payors. These operational overrides help keep payors' prices in alignment.

326.    In another secret whitepaper, entitled "Data iSight Facility Methodology," MultiPlan explains the Data iSight formula it uses to set prices for outpatient goods and services. It describes a process similar to the one for inpatient claims. The whitepaper also explains that MultiPlan pools and commingles payors' data to generate benchmarks and conversion ratios used to set the price for outpatient goods and services. As with the inpatient pricing methodology, MultiPlan and its competitors agree on overrides, including default overrides, that set the maximum price that will be paid for a particular good or service.

327.    A U.S. patent (U.S. Patent No. 8,103,522) filed by MultiPlan's subsidiary National Care Network, LLC, also describes MultiPlan pooling and commingling payors' data to set prices for out-of-network goods and services using the Data iSight pricing formula.

328.    The first step in this process is pooling and commingling the data. The patent explains that when MultiPlan receives an out-of-network claim, it groups that claim into a refined diagnosis related group ("rDRG")—a standardized method of grouping insurance claims used by Medicare and some commercial health insurance networks that categorizes medical services on the basis of severity and complexity.

329. Then, MultiPlan identifies all claims at similar hospitals for the same rDRG code. In other words, MultiPlan pools and commingles all claims for the same out-of-network goods and services from the same provider to have a basis from which it can set prices for that provider.

330. Next, MultiPlan attempts to estimate the hospital's cost of providing that rDRG-coded service based on: (1) that group of hospitals' cost report submissions to CMS, and (2) the wage index of the hospital submitting the out-of-network claim.

331. Next, MultiPlan calculates the markup and margin for each submitted rDRG-coded out-of-network claim using a standard equation that applies to all payors' out-of-network claims.

332. MultiPlan's promotional materials refer to this as a "cost-up" methodology for setting prices for out-of-network facility claims, since it involves calculating an estimate of the healthcare provider's costs for furnishing out-of-network care and setting an out-of-network price based on that assumed marginal cost of providing care. So, MultiPlan and its Co-Conspirators agree upon a profit margin that the MultiPlan Cartel will allow healthcare providers to realize on their out-of-network facility claims.

333. Once MultiPlan calculates the estimated margin for a given out-of-network claim, it applies a conversion factor based on the median price that the provider accepts for the same good or service using the commingled and pooled data that MultiPlan receives from competing payors.

334. MultiPlan's Pro Pricer pricing algorithm also uses a massive commingled data set to generate prices for out-of-network goods and services. According to MultiPlan's marketing materials, Pro Pricer "leverages 40+ years of data" by using that commingled and pooled out-of-network pricing data to train the Pro Pricer algorithm on the "optimized" price to set for a particular out-of-network good or service.

335. Once MultiPlan has set the price for a provider's out-of-network goods and

services, it communicates that price to the provider via email, an online portal, a letter, or a fax. In these communications, MultiPlan notes that it is working with the payor—*i.e.*, its own competitor—to set the price for the out-of-network goods and services at issue.

336.     In nearly all cases, the provider is forced to accept the price that MultiPlan sets despite that price being significantly below the UCR/FAIR Health rate for the out-of-network goods and services in question. In the rare cases where a provider can push back on MultiPlan's pricing, the prices that the provider is paid are still below the UCR/FAIR Health rate.

337.     Moreover, providers cannot collect the balance of their charges from patients or any other source.

338.     For example, for emergency services, federal and state laws prohibit healthcare providers from balance billing patients for the difference between the payments received from a payor for out-of-network goods and services and the provider's billed charges.

339.     Likewise, MultiPlan's communications with the providers specify that, when a provider accepts MultiPlan's price, they are prohibited from balance billing the patient for the portion of the provider's fees that was not paid by the MultiPlan Cartel.

340.     That is why providers do not balance bill patients for the difference between the payments received from a payor for out-of-network goods and services and the provider's billed charges. They are prohibited by law and/or the Cartel itself from doing so. Thus, as Leif Murphy, the President and CEO of TeamHealth, explained in an April 19, 2019 email: "We don't balance bill[.]"

341.     As a result, DAPs cannot make up the underpayment caused by the MultiPlan Cartel by seeking payment from another source. Nor are the DAPs' damages contingent upon them not receiving payments from patients on balance bills. The proximate cause of the DAPs' damages

is the MultiPlan Cartel.

342. In fact, in some instances after MultiPlan sets the price for an out-of-network good or service, MultiPlan's competitor simply pays the provider that amount and discloses the fact that MultiPlan set the price for the out-of-network good or service in the fine print of an explanation of benefits or remittance advice form.

343. For example, United sends provider remittance advice forms to healthcare providers telling them how much they will be paid for out-of-network goods and services. Buried in the notes section of those forms, United explains that the remark code "IS" indicates that the price for an out-of-network service was actually set by MultiPlan, not the payor.



| LINE CTRL# | DATES OF SERVICE | SUB PROD/ SVC/ MOD | ADJ PROD/ SVC | MOD | REV | UNITS | ADJ QTY | CHARGE | AMOUNT ALLOWED | ADJ AMOUNT | GRP CD | CLM ADJ RSN CD | PAYMENT AMOUNT | REMARK/ NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 324304116 4Z1 | 01/05/19 - 01/05/19 | | 99285 | | | | 1 | $1,360.00 | $435.20 | $924.80 | PI | 242 | $0.00 | IS |
| | | | | | | | | | | $435.20 | PR | 1 | | |

| CLAIM# | | | | | SUBTOTAL | | | |
|---|---|---|---|---|---|---|---|---|

PAYMENT OF BENEFITS HAS BEEN MADE IN ACCORDANCE WITH THE TERMS OF THE MANAGED CARE SYSTEM.

NOTES

PI242    PAYER INITIATED REDUCTIONS - SERVICES NOT PROVIDED BY NETWORK/PRIMARY CARE PROVIDERS .

PR1    PATIENT RESPONSIBILITY - DEDUCTIBLE AMOUNT

PR234    PATIENT RESPONSIBILITY - THIS PROCEDURE IS NOT PAID SEPARATELY.

I4    THIS SERVICE OR SUPPLY IS DENIED. IT IS CONSIDERED PART OF ANOTHER SERVICE PERFORMED ON THE SAME DAY, OR IT IS NOT ALLOWED AS A SEPARATE CHARGE.

IS    MEMBER: THIS SERVICE WAS RENDERED BY AN OUT-OF-NETWORK PROVIDER AND PROCESSED USING YOUR NETWORK BENEFITS. IF YOU'RE ASKED TO PAY MORE THAN THE DEDUCTIBLE, COPAY AND COINSURANCE AMOUNTS SHOWN, PLEASE CALL DATA ISIGHT AT 866-835-4022 OR VISIT DATAISIGHT.COM . THEY WILL WORK WITH THE PROVIDER ON YOUR BEHALF. PROVIDER: THIS SERVICE HAS BEEN REIMBURSED USING DATA ISIGHT, WHICH UTILIZES COST DATA IF AVAILABLE (FACILITIES) OR PAID DATA (PROFESSIONALS). PLEASE DO NOT BILL THE PATIENT ABOVE THE AMOUNT OF DEDUCTIBLE, COPAY AND COINSURANCE APPLIED TO THIS SERVICE. IF YOU HAVE QUESTIONS ABOUT THE REIMBURSEMENT CONTACT DATA ISIGHT.

344. Similarly, so many Blue Cross Blue Shield health plans use MultiPlan's pricing methodology that several Blue Cross Blue Shield plans have adopted the remark code "ZCN" in remittance advice to refer to instances where out-of-network prices were set using MultiPlan's Data iSight pricing formula.

345. If a provider attempts to push back on the prices that MultiPlan sets for out-of-

network goods and services, MultiPlan uses commingled and pooled pricing data to enforce the cartel. MultiPlan's fee negotiation, or FNX, team accesses this data to determine how little they can agree to pay a provider for out-of-network goods and services. A member of MultiPlan's FNX team can see in granular detail the out-of-network prices that a provider has accepted for particular goods and services. This detailed pricing data allows MultiPlan to pinpoint exactly the point at which a provider will "break" and accept the cartel's out-of-network pricing.

346. The sharing of competitively sensitive information is not a one-way street. MultiPlan provides competitively sensitive information concerning competing payors' claims pricing to its competitors in order to perpetuate the MultiPlan Cartel.

347. MultiPlan's Healthcare Economics team works with MultiPlan's sales and national accounts teams to prepare presentations that explicitly compare payors' pricing for out-of-network goods and services. MultiPlan's pricing methodology accesses this competitive data to generate underpayments to providers for out-of-network goods and services. The purpose of those presentations is to garner further agreements among the payors that they will set even lower prices for out-of-network goods and services.

348. The pricing data exchanged through MultiPlan is detailed and enables identification of particular claims and particular payors. The pricing information is also current. It is competitively sensitive and not publicly available. Exchanges of current pricing data tied to particular companies—standing alone—can have pernicious effects on competition and violate Section 1 of the Sherman Act.

349. The purpose of this information exchange was to depress prices paid to providers for out-of-network goods and services and keep those prices artificially low. Exchanging this pricing information makes economic sense only as a means to suppress prices for out-of-network

claims. Payors furnished this information to MultiPlan with the understanding and desire that their competitors would use it to suppress prices for out-of-network goods and services. Competitors would otherwise not exchange large volumes of competitively sensitive pricing information.

350.    The routine exchange of information among MultiPlan and its competitors occurred simultaneously with an industry-wide shift away from market pricing toward prices for out-of-network goods and services set by MultiPlan. Without access to competitors' sensitive competitive information, members of the MultiPlan Cartel would have no choice but to compete against one another to provide adequate compensation to providers for out-of-network care.

351.    As described below in ¶¶ 629-660, the information exchange that MultiPlan facilitates is not reasonably necessary to further any procompetitive purpose. Even if it had some procompetitive purpose (which it does not), the information exchange could have been achieved by far less restrictive means, such as through independently run data sources like FAIR Health.

352.    The Antitrust Division of the DOJ has signaled increased scrutiny of competitors sharing data with one another through intermediaries such as MultiPlan.

353.    Information exchanges used to be tolerated in the healthcare sector under so-called "safety zones" discussed in various policy guidance from the Antitrust Division.

354.    In February 2023, however, the Antitrust Division withdrew that policy guidance. As Doha Mekki, the Principal Deputy Assistant Attorney General for the Antitrust Division, explained: "[T]here may be markets and industries where long-held sensibilities about when information exchanges are more benign than harmful are insufficiently sensitive to market developments and thus fail to capture the broader range of harm in the modern economy. . . . A softening of competition through tacit coordination, facilitated by information sharing, distorts free market competition in the process."

355. In addition, the Antitrust Division has provided "examples of conduct that can harm competition in healthcare." With respect to anticompetitive uses of healthcare data, the DOJ provides the example of an "insurer shar[ing] detailed utilization or claims data among competitors."

356. That is exactly what happened here. At every point that matters, MultiPlan is using commingled and pooled confidential pricing data to effectuate the cartel. MultiPlan ingests confidential claims data into a single repository each time that a payor uses MultiPlan's common pricing methodology. Publicly available information shows that the pricing formulas/algorithms used in MultiPlan's common pricing methodology use commingled confidential pricing data. MultiPlan enforces the cartel using a team of MultiPlan employees armed with access to a data set containing granular, current, and commingled confidential pricing data. And MultiPlan generates further agreements to ratchet down the prices set for out-of-network goods and services by funneling current confidential pricing data to competing payors.

**D.      MultiPlan Enters into Agreements with its Competitors to Set the Maximum Price for Out-of-Network Goods and Services**

357. In addition to entering into agreements to use the same pricing methodology to set the prices for out-of-network goods and services, MultiPlan and its Co-Conspirators enter into agreements to fix the maximum prices they will pay for particular out-of-network goods and services. MultiPlan and its Co-Conspirators referred to these maximum pricing agreements as overrides.

358. These maximum pricing agreements were entered into around the same time that MultiPlan and its competitors entered into agreements to use MultiPlan's common pricing methodology. Over time, MultiPlan and its competitors entered into agreements to lower the maximum prices they would pay for out-of-network goods and services, further slashing the

amounts they paid to doctors and hospitals for out-of-network goods and services.

359.     MultiPlan and each of the competing payors that use its pricing methodology agree on an override price that will be the maximum price that MultiPlan sets for a particular type of claim. These agreements can be found in both written contracts and documents called preference forms.

360.     For example, in 2019, United agreed to further suppress out-of-network pricing for emergency room claims using overrides. Starting in March 2019, MultiPlan and United agreed to cut payments for emergency room services from 350% of Medicare pricing to 250% of Medicare pricing. That price cut was rolled out to providers throughout 2019.

361.     Scott Ziemer, Vice President of Customer Solutions – Network at UMR (a United subsidiary), testified under oath that MultiPlan recommended that United use a pricing formula that capped out-of-network payments at 250% of Medicare rates. Ziemer further admitted that "we [United] don't give . . . instruction" to MultiPlan regarding what prices to set, and instead simply "rely" on MultiPlan's algorithm to determine the payment amount.

362.    On February 11, 2021, United and MultiPlan agreed to set the maximum price for out-of-network emergency room services even lower—at 150% of Medicare. This agreement was memorialized in a change request form.



**.:MultiPlan.**

## UnitedHealthcare Project / Change Request Form

*Please email this form to medwards@multiplan.com or [ HYPERLINK "mailto:kim.dugan@multiplan.com" ] when complete.*

| | |
|---|---|
| **Date Request Submitted:** | 2/11/2021 |
| **Client Name:** | UnitedHealthcare |
| **Requestor Name:** **Title:** **Phone:** **E-Mail:** | Antoinette Vaught-Williams Out of Network Programs (952) 202-6975 [ HYPERLINK "mailto:Antoinette_VaughtWilliams@uhc.com" ] |
| **Project Name:** | Emergency Room Reimbursement Reduction |
| **Expected Benefit:** | Gain medical cost savings |
| **Resource Availability Start Date:** | 3/1/2021 |
| **Funding Type:** | Fully Insured & ASO |
| **Packages Impacted, if applicable:** | |
| **Benefit Indicators:** | Benefit I & O |
| **Detailed Requirements of Project:** **\*\* Data iSight: State Rules/Appeal Mgmt Changes?** | • Change ER reimbursement from 250% of CMS to 150% of CMS • Both HCFA and UB • Remove DIS whichever is greater • All ASO |

363.    In an internal MultiPlan email dated February 18, 2021, MultiPlan employee Tina Smith explained: "UHC would like to change [Data iSight]pricing for ASO & FI [fully insured] ER that is currently at 250% of CMS or [Data iSight] whichever is greater to 150% of CMS (remove the greater of language), if no CMS value, use 40% of billed charges." In a March 12, 2021, email chain, United employees further discussed moving ER claims to the lesser of Data iSight and 150% of Medicare for ASO and fully insured clients.

364. Numerous other payors, including MultiPlan itself, utilize these price caps to set the maximum prices for out-of-network goods and services. MultiPlan's PPO network also states in plan disclosure documents that it sets maximum prices for goods and services at 150% of Medicare charges. Cigna, Aetna, Blue Cross and Blue Shield plans, Humana, Molina, Centene, and other payors have all agreed to use price caps for out-of-network services.

365. The fact that MultiPlan and its competitors agreed to use a percentage of Medicare pricing to set the maximum out-of-network prices is particularly significant.

366. In a secret August 2019 whitepaper titled "A Better Reference for Pricing: Avoiding the Pitfalls of Charge- and Medicare-Based Methodologies When Pricing Non-Contracted Claims," that was disseminated to United and others, MultiPlan confided that Medicare-referenced pricing was "inherently misleading" because most people "do [] not understand how low Medicare rates are." The whitepaper continued, "[t]he gap between [billed charges] and the barebones Medicare reimbursement can be significant."

367. In that same whitepaper, MultiPlan admits that "[t]he use of Medicare as the basis for calculating out-of-network reimbursement creates a flawed equation from inception," and that "there is no guarantee the resulting allowed amounts will cover a provider's costs." Thus, not only did MultiPlan and United agree to fix prices, they did so in a way that they knew was intentionally misleading and would generate significant underpayments for providers.

368. As the American Medical Association has explained, "there is no relationship between the Medicare fee schedule and usual, customary, and reasonable fees" for out-of-network goods and services. In fact, Medicare payments have not been related to UCR fees for twenty years.

369. What the MultiPlan Cartel is doing is sleight-of-hand. They are replacing the prior

independent pricing discretion that had resulted in UCR prices for out-of-network goods and services prior to the cartel with a collective pricing regime that may sound reasonable to outsiders, but that everyone involved in medical billing understands is a massive underpayment and a radical break with the prior pricing practices in this industry.

370. If a payor does not want to go along with the maximum prices set by MultiPlan, MultiPlan retains the contractual power to force the payor to implement MultiPlan's chosen maximum price for an out-of-network good or service. In its agreements with payors, MultiPlan reserves the right to set its own maximum price for an out-of-network good or service to ensure that the cartel remains cohesive.

371. The MultiPlan Cartel did not use these agreed-upon common pricing methodologies to generate fair or reasonable prices for out-of-network goods and services; it used those common pricing methodologies to ensure that the insurer Co-Conspirators could fix the exact amount they wanted to pay providers.

E. **MultiPlan Enters into Agreements with its Competitors to Act as the Sole Negotiator for Out-of-Network Prices**

372. MultiPlan enters into agreements with its Co-Conspirators under which MultiPlan negotiates the price for out-of-network goods and services with healthcare providers after MultiPlan sends a pricing notice to that healthcare provider. MultiPlan and its Co-Conspirators refer to this as "fee negotiation and benchmarking services" or "FNX."

373. By appointing a single negotiator of all their out-of-network prices, MultiPlan and competing payors deprive providers of the competition that would naturally flow from multiple payors making their own decisions about how to negotiate the prices of out-of-network goods and services with providers. If they had multiple negotiations against multiple payors, providers could use the competitive dynamics, and those multiple negotiations would eventually result in a more

competitive prevailing price for out-of-network goods and services relative to the cartel prices that MultiPlan imposes on healthcare providers.

374.     MultiPlan's FNX agreements end that competition. In the same way that it would be illegal for every company in a market to appoint a single executive to negotiate all employment contracts for all their employees, it is illegal for a broad swath of payors to agree that MultiPlan will negotiate the prices that they pay for out-of-network goods and services.

375.     In the instances where MultiPlan "negotiates" the prices it sets for out-of-network goods and services as a part of the FNX program, the negotiations are one-sided and are negotiations in name only. Because MultiPlan and its competing payors have agreed not to compete with one another, the question in these negotiations is not whether the healthcare provider will be harmed by the MultiPlan Cartel, but by how much.

376.     In addition, because competing payors have agreed to share their competitively sensitive claims data with MultiPlan, any "negotiations" start from a stacked deck. MultiPlan's negotiators have access to a database containing every payment that a provider has ever accepted for a particular out-of-network procedure from any payor that contracts with MultiPlan. Using this expansive and commingled dataset with dozens of payors' confidential pricing data, MultiPlan can pinpoint precisely the least amount that a provider will accept for a particular out-of-network good or service.

377.     MultiPlan's FNX agreements also serve to reinforce the cartel agreement to use the same pricing methodology. Because MultiPlan takes over the pricing negotiation between a payor and a provider, payors cannot deviate from the prices set by MultiPlan. Indeed, if MultiPlan negotiates on the insurer's behalf, the agreement between MultiPlan and the payor provides that the payor "shall pay the healthcare provider in accordance with the . . . negotiated reimbursement

amounts negotiated by" MultiPlan.

378.     Many payors have disclosed that they have agreed that MultiPlan will negotiate the amounts that they pay for out-of-network goods and services either through public disclosures or through their conduct. For example, a "Grievances and Appeals/Inquiry Directory" published by Humana directs providers who "disagree with the claim payment [they] received" to initiate a negotiation not through Humana, but "via the MultiPlan Provider Portal" or by calling a MultiPlan customer service phone number or sending a message to a MultiPlan email address. And, as noted above, Cigna, United, and Aetna all used MultiPlan to negotiate their out-of-network payments.

379.     MultiPlan incentivizes its FNX team to impose the lowest possible payments for out-of-network goods and services. In fact, MultiPlan employees describe an internal culture and incentive structure which discourages them from negotiating reasonable rates with providers. *The New York Times* reported that employee bonuses are tied to payment reductions, quoting former MultiPlan negotiator Kajuana Young, who said, "I knew they were not fair," in reference to the prices generated by MultiPlan.

380.     Medical practices interviewed by *The New York Times* confirmed their inability to negotiate over prices generated by MultiPlan. *The New York Times* interviewed a healthcare provider's office manager who said "[i]t's not a real negotiation" when MultiPlan transmits offers of payment on behalf of insurers. *The New York Times* further reported that "[i]nsurers can set negotiation parameters for MultiPlan, including not negotiating at all, records and interviews show. . . . Multiple providers and billing specialists said that in recent years they had increasingly been told their claims weren't eligible for negotiation."

**F.      There is Substantial Circumstantial Evidence that MultiPlan Enters Into Agreements with Competing Payors to Suppress Prices Paid for Out-of-Network Goods and Services**

381.     Because DAPs have cited extensive direct evidence of the MultiPlan Cartel

agreements, no circumstantial evidence is needed to infer the existence of the cartel. Nevertheless, reams of circumstantial evidence support the existence of the cartel.

382.    Here, multiple economic "plus factors" support the existence of MultiPlan's collusive agreements to suppress out-of-network pricing competition, including: (1) high market concentration in the relevant market, (2) high barriers to entry, (3) ample motive to participate in the MultiPlan Cartel, (4) a history of prior collusion, (5) numerous opportunities to collude, including those directly facilitated by MultiPlan, (6) actions against self-interest that make sense only as part of a cartel agreement, (7) evidence of cartel enforcement mechanisms, (8) pervasive and systematic information exchange between cartel members, and (9) customary patterns and courses of dealing that can be explained only by the existence of a cartel agreement. These "plus factors" equally support the existence of agreements between MultiPlan under a horizontal price-fixing conspiracy, a "hub-and-spoke" conspiracy, and a vertical price-fixing conspiracy resulting in an unreasonable restraint of trade.

### i.    High Collective Market Concentration

383.    Defendants and their Co-Conspirators have obtained a high degree of collective market share and market concentration on the buyer side of the Out-of-Network Goods and Services Market, *see* ¶¶ 514-573. MultiPlan claims that all of the top 15 payors (and many hundreds more as well) use its pricing methodology to set prices for out-of-network goods and services.

384.    MultiPlan itself acknowledges this high level of market concentration on the buyer side of the Out-of-Network Goods and Services Market. In an August 18, 2020 Analyst Day presentation, MultiPlan wrote that "[t]he health insurance sector has consolidated to four top insurers," all of whom use MultiPlan's pricing methodology to set prices for out-of-network goods and services.



385.    The high degree of concentration in the buyer side of the Out-of-Network Goods and Services Market is a plus factor indicating that it is susceptible to conspiratorial price-fixing by the MultiPlan Cartel. Where there are fewer buyers in a market, that makes collusion between those buyers relatively easier than in diffuse markets with many buyers.

### ii.    High Barriers to Entry

386.    There are high barriers to entry into the buyer side of the Out-of-Network Goods and Services Market. To even gain a foothold, new payors face formidable challenges. They need to be able to bear the extreme expenditures of time and money required to develop a network of healthcare providers large enough to compete as a payor. Even if a new entrant opted not to develop an insurance network, there would still be significant capital outlays required in order to rent a complementary network and operate as a payor. New payors would also face the formidable challenge of contending with the economies of scale enjoyed by the large incumbent payors.

Establishing name recognition in an industry occupied by long-entrenched and well-recognized major players presents an additional hurdle.

387.    If a new payor elected to operate as an insurance company, it would also face an actuarial risk. If a new insurance company cannot balance claims paid and revenue generated through premiums or network access fees (such as ASO fees), their capital surplus would be depleted.

388.    There are also steep regulatory hurdles to market entry for payors that elect to operate as insurance companies. The provision of health insurance is regulated at the federal level and each state has its own varying regulations for the industry, leading to a patchwork system that is difficult for new entrants to navigate. This patchwork is also ever-changing, as new legal and regulatory requirements are created on a regular basis.

389.    Even if a new entrant is initially successful, it must survive long enough to develop a broad base of business which allows it to effectively spread risk amongst its insureds.

390.    These barriers to entry further cement the dominance of the MultiPlan Cartel by ensuring that new entrants who reject the MultiPlan Cartel's price-fixing scheme cannot undermine the cartel's ability to impose artificially low rates on healthcare providers for out-of-network goods and services.

391.    These high barriers make it unlikely that a new entrant could disrupt the MultiPlan Cartel and support an inference of collusive agreements.

### iii.    Motive to Conspire

392.    MultiPlan and the members of the MultiPlan Cartel have a massive financial motive to underpay providers for their out-of-network goods and services. MultiPlan is paid a percentage of the underpayment that its pricing methodology generates. In other words, it makes money only if the cartel is successful in suppressing out-of-network pricing competition; and when the cartel

pays less money to providers for out-of-network goods and services, MultiPlan makes more money.

393.    The fees that MultiPlan's competitors pay it for suppressing out-of-network pricing competition are significant. At one point, Aetna paid MultiPlan 12% of "savings" as a fee for MultiPlan suppressing out-of-network pricing competition.

394.    The MultiPlan Cartel also generates fees from its ASO clients, known as "shared savings" fees. Under this structure, MultiPlan and the payors collect a percentage of the purported "savings"—calculated as the difference between a provider's billed charges and the drastically reduced amount the payor ultimately pays based on MultiPlan's methodologies. The ASO client pays this "shared savings" fee, which is often 35% or more, and that payment is divided between MultiPlan and the payor. Through this incentive structure, the MultiPlan Cartel's conspiracy not only results in underpayments to healthcare providers but also transforms these underpayments into bounty profits for cartel members. The cartel has a direct incentive to pay providers less because the less the cartel pays providers the larger their bounty profits. The gross payments to MultiPlan are also significant. In one year, United paid MultiPlan $300 million for generating underpayments for out-of-network goods and services. That $300 million payment accounted for up to 20% of MultiPlan's annual revenue that year.

395.    Likewise, payors are incentivized to pay less for out-of-network goods and services to increase their own profits. For example, in an internal email, United executives stated that by "driving all OON [out-of-network] claims to a more aggressive pricing," United could generate more profits than if it continued paying out-of-network claims at UCR rates.

396.    The motives of MultiPlan and its competitors are aligned because the less the MultiPlan Cartel pays to healthcare providers, the more revenue and profits they get to keep for

themselves. As MultiPlan stated in a presentation to investors, competing payors' "incentives are completely aligned" with MultiPlan's own incentives. Similarly, in MultiPlan's 2023 10-K, MultiPlan said: "our revenue model is aligned with the interests of our customers."

397.    While companies are disincentivized from entering into cartel agreements by antitrust law, MultiPlan strongly implies to its competitors that its out-of-network pricing scheme is entirely legal by offering to enter into formal contracts and pitching its pricing methodology as a "liability shield."

### iv.    Prior Industry Collusion

398.    It is easier for firms in a market to conspire with one another if they have done so before. Because payors could not collectively control out-of-network rates through legally enforceable contracts with providers (which is the way that they have traditionally controlled in-network rates), they attempted to enter into illegal cartel agreements to suppress out-of-network payment on multiple occasions.

399.    In 1996, United formed a wholly owned subsidiary called Ingenix. United then acquired both of the previously independent UCR databases, Medical Data Research (in 1997) and Prevailing Healthcare Charge System (in 1998). For the next decade, the UCR database was controlled by United.

400.    Other insurers quickly signed on to use Ingenix's new database and agreed to contribute to that database by sending their competitively sensitive claims and payment data to a subsidiary of their competitor (United).

401.    In 2008, the New York Attorney General began investigating Ingenix. The investigation was soon followed by a lawsuit filed by the American Medical Association and an investigation by the U.S. Senate's Committee on Commerce, Science, and Transportation.

402.    The investigations concluded that "the out-of-network system [was] broken." As

one of the lawyers leading the New York investigation later explained to the Senate Committee: "Reasonable and customary rates are supposed to fairly reflect market rates, but our investigation revealed that Ingenix [was] nothing more than a conduit for rigged information that [was] defrauding consumers of their right to fair reimbursement for their out-of-network healthcare costs." Although insurers promised plan members in their policy documents to pay based on UCR rates, they instead paid "based on schedules compiled by one of their own, the nation's [then] second largest health insurer, which has an interest in depressing reimbursement rates." The Ingenix schedules were "unreliable, inadequate and wrong."

403.    The investigations showed that Ingenix's database resulted in out-of-network claims being underpaid by 10% to 28% depending on the service involved.

404.    In early 2009, the New York Attorney General entered into a series of consent decrees with United and a total of 11 other insurers that participated in the Ingenix scheme, including Aetna, Cigna, and HealthNet.

405.    On January 13, 2009, United entered into a settlement with the New York Attorney General under which United agreed to shut down the Ingenix database and contribute $50 million toward the creation of a new, independent database that would house more aggregated information. That database became known as FAIR Health.

406.    On January 15, 2009, Aetna entered into a settlement with the New York Attorney General under which it agreed to end its relationship with Ingenix and to contribute $20 million toward the creation of FAIR Health. It further agreed to use the new database for a period of five years, and not to "own, operate, or fund any other database product that provides data pooled from more than one insurer to other health insurers for determining reimbursement rates."

407.    Similarly, on February 18, 2009, WellPoint, Inc. (the predecessor to Elevance)

agreed to end its relationship with Ingenix and pay $10 million toward the creation of FAIR Health. The WellPoint settlement included the same requirement to use the new database for five years and restriction on owning or operating any other database product.

408. The Ingenix scheme also led to massive civil settlements. For instance, United paid $350 million to settle a class action.

409. Following the settlements, FAIR Health was created as a non-profit company overseen by Syracuse University. FAIR Health was designed to collect, verify, and maintain insurers' claims data, and to calculate fair, transparent, and accurate UCR benchmarks for use by healthcare providers and insurers.

410. The database became operational in approximately January 2011. The insurers' five-year obligation to use FAIR Health ended in late 2015.

411. When insurers' obligations under their settlements with the New York Attorney General to use the FAIR Health database lapsed, insurers still had the same incentive to collude to depress out-of-network rates. But now, the prior vehicle for that collusion—Ingenix—was no longer available. MultiPlan filled the gap.

412. As a result of this prior collusion, the Co-Conspirators knew one another and knew that they could trust each other to collude on out-of-network pricing, they knew that using a common pricing methodology was a plausible way to reach an agreement to limit out-of-network pricing competition, and they knew that they could count on one another not to alert the government to the existence of a buyers' cartel. However, each of the largest payors knew that they alone could not develop another scheme to suppress out-of-network prices because the government would recognize its unlawfulness.

413. MultiPlan has been clear that its out-of-network pricing methodology serves

effectively the same purpose as the Ingenix scheme that resulted in the sprawling Attorney General investigation and multi-million dollar penalties. MultiPlan marketed its pricing methodology as an "alternative to Ingenix."

### v.    Opportunities to Conspire

414.    The MultiPlan Cartel has ample opportunities to conspire, which support an inference of agreements to conspire. As described above, *see* ¶¶ 215-287, MultiPlan itself facilitates extensive private communications between competing payors, which provide the setting and opportunity for them to conspire.

415.    Members of the MultiPlan Cartel have additional opportunities to conspire through other industry meetings. For example, many of them, including most of the largest commercial health insurance payors, are members of industry associations such as AHIP (formerly "America's Health Insurance Plans"). Co-Conspirators, including Aetna, Centene, Cigna, CVS Health, Elevance, HCSC, Humana, and many others, are members of AHIP.

416.    As AHIP states, it "plays an important role in bringing together member companies and facilitating dialogues to advocate on shared interests."

417.    AHIP's Board of Directors is a "who's who" of payor executives, including:

- Paul Markovich, President and CEO of Blue Shield of California;

- Daniel Loepp, President and CEO of Blue Cross Blue Shield of Michigan;

- Jared Short, President and CEO of Cambia;

- Sarah London, CEO of Centene;

- David Cordani, Chairman and CEO of Cigna;

- Karen S. Lynch, President and CEO of CVS Health (the parent company of Aetna);

- Gail K. Boudreaux, President and CEO of Elevance;

- Maurice Smith, President, CEO and Vice Chair of HCSC;

- David L. Holmberg, President and CEO of Highmark;

- Gary St. Hilaire, President and CEO of Horizon;

- Bruce D. Broussard, President and CEO of Humana;

- Greg A. Adams, Chair and CEO of Kaiser; and

- Joseph Zubretsky, President and CEO of Molina.

418.    AHIP hosts conferences, committee meetings, and board meetings multiple times a year where its members participate in private, closed-door meetings.

419.    In 2023, MultiPlan sponsored AHIP's Annual Conference. MultiPlan representatives attended AHIP's 2023 Annual Conference from June 13–15 in Portland, Oregon.

420.    The fact that members of the MultiPlan Cartel regularly gather together at closed-door retreats, ad hoc meetings, secret road shows, and at industry events such as AHIP's conferences, board meetings, and committee meetings is circumstantial evidence that their parallel conduct is part of a common scheme to suppress out-of-network pricing competition.

### vi.    Actions Against Self-Interest

421.    Payors that joined the MultiPlan Cartel have engaged in actions against self-interest in at least two ways.

422.    First, the agreements between MultiPlan and competing payors are economically irrational absent the existence of a cartel. If a single payor entered into an agreement with MultiPlan to shift away from UCR prices and to drastically underpay for out-of-network goods and services, providers would simply refuse to treat insureds affiliated with that payor (absent a scenario requiring treatment, such as emergency services). As a result, the payor would face

serious harm to the value and breadth of its insurance offering as healthcare providers refuse treatment, ultimately leading to a loss of subscribers.

423.    Such an agreement, standing alone, would also expose a payor to significant time and cost expenditures associated with pricing negotiations. While healthcare providers cannot effectively negotiate with the MultiPlan Cartel due to the volume of MultiPlan pricing offers, a single payor acting alone would face significant pushback from providers.

424.    Absent a cartel, the net effect of using MultiPlan's pricing methodology would be reduced profits—the lower reimbursement rates from MultiPlan's pricing algorithm would be insufficient to offset the lower patient volumes, increased negotiation costs, and MultiPlan's fee for the payor. The only way the agreement with MultiPlan is not economically self-defeating is if all or nearly all payors agree to join the MultiPlan Cartel.

425.    MultiPlan acknowledges that, without industry coordination, a payor cannot single-handedly slash the prices it sets for out-of-network goods and services. But, through MultiPlan, which "can talk to the entire industry," all payors can agree to join the MultiPlan Cartel and eliminate the risks associated with individual price cutting.

426.    Absent a conspiracy, payors would make independent decisions on how to pay out-of-network claims, with the freedom to consider the specific circumstances underlying each submitted claim, rather than automatically underpaying claims through MultiPlan's across-the-board methodology.

427.    Even if competing payors had a unilateral economic incentive to keep out-of-network claims effectively contained, they would not naturally agree to do so using the same pricing methodology from the same provider, which also happens to be a rival payor. Instead, these competitors should want to compete to find the optimal balance between keeping the costs of

claims down, while also minimizing the costs of claims disputes that arise when payment offers are too low.

428.    But if the competing payors agree to implement the exact same pricing methodologies, they can collectively maximize their profit while shielding themselves from the costs of disputes. Since all Co-Conspirators adopt the same pricing methodology, providers have no choice but to accept the prices set by that methodology.

429.    Second, the payors that have joined the MultiPlan Cartel have refrained from engaging in self-interested, unilateral conduct that would destabilize the cartel.

430.    For example, it was against the unilateral economic self-interest of many individual insurers to abandon using FAIR Health, which charges insurers a modest, flat annual fee. For comparison, MultiPlan assesses its clients a fee for each claim where it sets and negotiates the out-of-network price, which is based on a percentage of the difference between the billed amount and the sum ultimately paid. For many insurers, these contingent fees far exceed the flat annual fee to use FAIR Health benchmarks. Nevertheless, payors accounting for more than 80% of all out-of-network payments to providers in the U.S. have collectively delegated their out-of-network pricing decisions to MultiPlan, incurring significantly higher fees than FAIR Health. Payors would not have switched to a more expensive pricing methodology unless they understood that they would collectively benefit from using that agreed-upon methodology.

431.    Similarly, MultiPlan's competitors have abandoned efforts to in-source out-of-network pricing authority despite the vast savings that such efforts would generate and—in at least one case—despite spending considerable sums actually developing an alternative out-of-network pricing methodology.

432.    As the nation's single largest payor, United could easily analyze its own historical

claims database to ascertain the most efficient pricing levels for out-of-network payments. United could then set prices for out-of-network goods and services based upon that data. This would allow United to eliminate its reliance on MultiPlan's pricing methodology, saving them hundreds of millions of dollars per year in PSAV payments to MultiPlan.

433. In 2021, United created an out-of-network pricing methodology, known as Naviguard, to do just that. One analyst described Naviguard as "an in-house replacement for MultiPlan." In addition, Rebecca Paradise, United's Vice President of Out-of-Network Payment Strategy, testified that Naviguard was designed to effectively take MultiPlan's out-of-network pricing methodology in-house:

> Q.    Basically, you're going to replace MultiPlan, who's
>        charging a fee, take it inhouse so that you y'all can make
>        the money. Right?
>
> A.    Well, we weren't copying. Yes, we were looking for
>        solutions that we could support internally.

434. United planned to aggressively price the Naviguard product. Instead of taking a cut of the difference between the billed charge and the allowed amount for out-of-network goods and services, United planned to offer a fixed, per-member, per-month fee. As compared to "shared savings fees," this had the potential of dramatically lowering fees charged to its ASO clients. For example, public meeting minutes from Hays County, Texas reflect that the county paid $263,000 in "shared savings fees" for MultiPlan's services in 2019. Under the Naviguard pricing structure, the county would pay only $2.50 per member each month, or $30,000 per year.

435. United developed a "road map" to terminate its contract with MultiPlan by 2023 in anticipation of Naviguard coming online.

436. That plan was ultimately scrapped. After MultiPlan offered United a sweetheart deal to stay in the cartel, United renewed its contract with MultiPlan in January 2023 instead.

437.    United's expenditures on Naviguard and its subsequent decision not to bring out-of-network pricing in-house are actions against self-interest, which make sense only in the context of a horizontal conspiracy wherein MultiPlan is fixing prices amongst payors for out-of-network goods and services.

438.    Joining the MultiPlan Cartel makes very little sense for large payors, like United and Cigna, that can afford to create their own in-house pricing methodologies. It costs millions of dollars to build out the data links, associated information technology, and professional staff necessary to transmit securely a high volume of real-time claims information to MultiPlan for adjudication and pricing in less than 24 hours. It makes no economic sense for a payor to spend that money building a data link so that it can share raw competitively sensitive information with a competitor. The only rational explanation for taking on that sunk cost is that those payors believe that they can recoup those costs through the windfall profits generated by the MultiPlan Cartel.

### vii.    Pervasive Exchanges of Competitively Sensitive Information

439.    Competitors like the members of the MultiPlan Cartel would not exchange large volumes of competitively sensitive pricing information in the absence of a cartel agreement.

440.    However, MultiPlan and competing payors have agreed to exchange real-time, confidential, and competitively sensitive data regarding out-of-network pricing. The data exchanged is voluminous. In December 2021, MultiPlan had access to "over 3 petabytes of structured claims data from across 700 payer customers." By June 2023, MultiPlan touted that it had "10+ petabytes of [claims] data."

441.    Indeed, during a deposition, when asked whether there was "any information that MultiPlan would not provide for Cigna if Cigna asked," the Cigna witness responded: "from my experience, if I asked for information, they would provide it to me." A United witness similarly testified, "I have no reason for MultiPlan not to share or provide answers to any questions that we

have asked."

442.    MultiPlan also facilitates ad hoc exchanges of competitively sensitive information with other payors.

443.    United representatives have admitted under oath that MultiPlan shares sensitive information about competitors' out-of-network pricing. Paradise was asked at trial in *Emergency Services of Okla. PC, et al. v. United Healthcare Ins. Co.*, No. CJ-2019-482 (Okla. Dist., Cleveland County) whether she ever has "the opportunity to learn about what other insurers are allowing for similar [out-of-network claims] amounts." Paradise responded that "[f]rom time to time [United] may see that information." When asked for United's "sources" of information on its competitors' pricing, Paradise responded that MultiPlan was the source of that information.

444.    MultiPlan uses this competitively sensitive and confidential data to bring payors into alignment on underpaying healthcare providers for out-of-network goods and services. For instance, in a March 2017 presentation entitled, "Analysis and Recommended Actions for Enhancing Savings Results," MultiPlan provided United with a chart comparing United's payments for out-of-network goods and services for ambulatory surgical centers, dialysis treatment, hospital inpatient services, and hospital outpatient services. The chart compared United, shown in the chart as "UNH" to three of its competitors, shown as "Client B," "Client C," and "Client D." The purpose of this chart was clear—United was paying too much for those out-of-network services and it should lower its prices to match its competitors. Then, MultiPlan provided United with several solutions for how United could pay providers less for out-of-network goods and services. For example, MultiPlan recommended setting United's maximum out-of-network payment at 350% of the Medicare rate for particular out-of-network goods and services. According to the presentation, taking that single step would generate "annual incremental savings of $73

million for fully insured and $1.6 billion for ASO business." Subsequently, United agreed that MultiPlan should implement this 350% price cap on prices set for United's out-of-network goods and services when it implemented MultiPlan's pricing methodology starting on July 1, 2017.

445.    United subsequently used this information on its competitors' out-of-network payment strategies to inform how MultiPlan set prices for out-of-network goods and services on United's behalf. On May 8, 2017—just two months after MultiPlan delivered its "Analysis and Recommended Actions for Enhancing Savings Results" presentation to United—United's Executive Council met to make a final decision about adopting MultiPlan's out-of-network pricing methodology. At that meeting, a presentation was given to United's Executive Committee which explained that one added "value" in outsourcing out-of-network pricing to MultiPlan was that doing so "[l]evels [the] playing field with competitors."

446.    After United agreed to adopt MultiPlan's out-of-network pricing methodology, MultiPlan continued to funnel non-public information about competitors' out-of-network pricing to United in order convince United to set even lower prices for out-of-network goods and services via MultiPlan's common pricing methodology.

447.    On September 27, 2018, Rebecca Paradise, the Vice President of Out-of-Network Payment Strategy for United, sent an email to Jacqueline Kienzle, the Senior Vice President of Sales and Account Management at MultiPlan, copying Dale White, the then-Executive Vice President and Chief Revenue Officer at MultiPlan. In her email, Paradise made reference to a text message that John Haben, the Vice President of Networks at United, had sent to White the day before. Paradise requested that MultiPlan send United a chart comparing United's out-of-network payments to the out-of-network payments of three of its competitors. While this information was supposed to be blinded, prior to providing the information to United, White asked MultiPlan's

Senior Vice President of Healthcare Economics, Sean Crandell, who the competitors listed in the chart were so that he could provide that information to United.

448. The information exchanged by MultiPlan and the other members of the MultiPlan Cartel is exactly the type of information exchange that the courts have recognized is likely to have anticompetitive effects. First, the data exchanged is real-time pricing data, transmitted to MultiPlan automatically through electronic data links from competing payors. Second, the data exchanged is not blinded in any way. Third, the data exchanged is not publicly available—although hospitals do publish some pricing information online, it is not updated in real-time. Fourth, the data is granular—meaning that MultiPlan *knows exactly* what its competitors are charging for specific medical services and procedures.

449. MultiPlan funnels the competitively sensitive pricing information that it receives to its competitors in order to end pricing competition by adopting the same pricing methodology. For example, MultiPlan disclosed the specific out-of-network pricing strategy used by Blue Cross Blue Shield plans to United executives when recruiting United into the MultiPlan Cartel. United executive John Haben included this competitively sensitive information in a September 8, 2016 email to Lauren Paidosh (another United executive) and later conceded under oath that he received it from MultiPlan.

450. Payors enter the MultiPlan Cartel knowing that MultiPlan will share their commercially sensitive pricing information with other existing and prospective members of the MultiPlan Cartel.

451. While MultiPlan shares reams of information about its proprietary pricing methodology with competing payors, it keeps the same details hidden from providers. When a provider reached out to MultiPlan to learn more about its pricing methodology in July 2019,

MultiPlan's executives decided to withhold key information from the provider. In an email sent on July 10, 2019, Bruce Singleton, MultiPlan's Senior Vice President for Network Development Strategy, told Mike McEttrick, MultiPlan's Vice President of Healthcare Economics, that he wanted to keep the discussion with that provider at "eye level," meaning that he did not want to share the details of how MultiPlan's pricing methodology actually worked with the provider.

452. Competing companies would not risk sharing granular, real-time, and competitively sensitive pricing information with their rivals. The information exchange operated by MultiPlan is more consistent with an agreement to restrain trade than competition on the merits. Therefore, this type of information exchange is circumstantial evidence of a cartel agreement.

### viii.    Monitoring and Enforcement Structures

453. Because a cartel agreement is against public policy, members of the cartel cannot go to court to enforce their illicit agreement. As a result, they need to create extra-judicial structures to detect and prevent attempts to disrupt the cartel agreement.

454. United's plan to abandon the MultiPlan Cartel and to use its in-house Naviguard system to set prices for out-of-network goods and services was one such attempted disruption to the cartel agreement. Having the largest healthcare payor in the U.S. defect from the MultiPlan Cartel could destabilize the agreement and might cause other payors to reevaluate their participation in the cartel.

455. When news that United may be ending its relationship with MultiPlan came to light, MultiPlan's stock price tumbled. MultiPlan knew that it needed to take immediate action to stabilize the cartel and secure its own long-term viability.

456. So, MultiPlan bought off United with a sweetheart deal. Upon information and belief, in 2022, MultiPlan and United negotiated a new contract that went into effect in 2023. MultiPlan gave United extremely favorable commercial terms for continuing to allow MultiPlan

to set prices for out-of-network goods and services, allowing United to capture nearly all of the underpayments generated by MultiPlan's pricing methodology.

457.     Thus, beginning in 2023, United charged its ASO clients a fixed per-member, per-month fee for the underpayments that MultiPlan's pricing methodology generated for out-of-network goods and services, rather than a "shared savings fee." This agreement meant that MultiPlan would take a considerable hit to the fees it could collect from United: rather than receiving a variable spread price, it could get a consistent, low fee.

458.     This sweetheart deal was so good for United that it caused a temporary drop in MultiPlan's financial performance, which MultiPlan executives discussed during quarterly earnings calls with investors in Q4 2022 and Q1 2023. In MultiPlan's Q4 2022 earnings call, MultiPlan's then-CEO, Dale White, explained, "we have been anticipating that a multiyear contract renewal with one of our largest customers would mute our 2023 revenue growth" and that the contract renewal would be "a headwind against growth in 2023."

459.     However, MultiPlan was willing to sacrifice its own short-term revenues and profits in order to stabilize the cartel and keep the largest cartel members in the fold. As White explained during MultiPlan's earnings call for Q1 2023, renewing pricing agreements with the largest payors in the U.S. made MultiPlan's leadership "increasingly confident that our revenues are stabilizing and poised for growth over the next several years."

460.     MultiPlan's efforts to enforce the cartel agreement by buying the loyalty of one of the largest payors in the cartel appears to have worked. In an August 2, 2023, press release, the CEO of MultiPlan hailed Q2 2023 as an "inflection point" in which MultiPlan "deliver[ed] second quarter results at the high end of our expectations," leading MultiPlan to increase its revenue guidance for investors for 2023. Since August 2023, MultiPlan has generated increasing revenues

from its out-of-network claims pricing business despite other lines of its business faltering.

461.    MultiPlan's willingness to sacrifice short-term profits does not make economic sense absent its knowledge that perpetuating its conspiracy to underpay healthcare providers would pay off in the long run.

462.    In addition, one of the most efficient ways for members of a cartel to reach an agreement on collusive pricing, and to ensure that pricing sticks, is for every member of the cartel to allow one competitor to set prices and negotiate those prices. That is exactly what has happened here. Each of the competing payors, who should have been exercising their own discretion to set prices for out-of-network claims, entered into agreements that gave MultiPlan the right to set prices for each cartel member's out-of-network claims, and then made MultiPlan the sole entity responsible for negotiating payment of those collusively set prices.

463.    MultiPlan and its competitors were also brazen enough to write formal contracts that included dispute resolution provisions. For example, MultiPlan's contract with Aetna contains a clause enforcing their out-of-network pricing agreement through "mediation . . . administered by the American Arbitration Association under its Mediation Rules for Commercial Financial Disputes . . . in the city of New York." The contract contemplates the possibility that, if that mediation was unsuccessful, MultiPlan could sue Aetna to, among other things, enforce the terms of their out-of-network pricing agreement. This threat of litigation or mediation served as a check that ensured the compliance of cartel members.

464.    MultiPlan's PSAV payment model also enables MultiPlan's Co-Conspirators to ensure that MultiPlan is underpaying out-of-network claims. MultiPlan sends regular reports to competing payors about how little a healthcare provider is paid for out-of-network claims as a result of MultiPlan's proprietary pricing methodology. From these reports, MultiPlan's

competitors can monitor how well MultiPlan is adhering to its agreement to underpay healthcare providers for out-of-network goods and services.

465. In addition, MultiPlan recently increased its ability to exchange real-time pricing data. In June 2023, it announced a new product known as PlanOptix. MultiPlan said it created PlanOptix as a direct response to its competitors' demands. The product enables "access" to 400 billion "fully indexed" records. For example, a payor can "search a CPT code and understand the price of that particular service . . . at a provider under a certain network."

466. However, payors told MultiPlan that "[i]t's not enough to simply get to the data and information because the records are vast." They wanted direct competitor pricing information.

467. When MultiPlan first announced PlanOptix, it had already "ingested data on over 70 payers," including "all of the national major carriers as well as many of the regional ones." Per payors' requests, MultiPlan enhanced PlanOptix to show competitor pricing data—"not just at a global level, but even at a service level right, labs and X-rays versus inpatient, inpatient versus outpatient."

468. MultiPlan explained that, using PlanOptix, payors would be able to answer questions such as: "Where do I sit versus my competitor?" and "How do I ensure that I'm negotiating correctly when I measure myself against my competitors?" Indeed, in 2024 Travis Dalton, MultiPlan's current CEO, explained that PlanOptix "provides prescriptive analytics" to payors.

469. PlanOptix enables the members of the MultiPlan Cartel to monitor one another's adherence to their agreement to eliminate pricing competition on out-of-network goods and services. It does so by allowing payors to directly compare how much they pay to a particular provider for a particular type of out-of-network service, as shown below.



470.    In the example shown above, PlanOptix is comparing the prices that Blue Cross Blue Shield PPO plans pay for specific out-of-network services, such as coronary artery bypass grafts, lung transplants, colonoscopies, lumbar spinal fusion, and knee replacement surgeries at the Mayo Clinic Arizona to the prices that United and Aetna pay for the same out-of-network services. PlanOptix shows the average price that Blue Cross Blue Shield pays for those out-of-network services and the percentage difference between those prices and the prices that United and Aetna charge for the same out-of-network services. In fact, as shown above, payors using PlanOptix can directly compare their prices for out-of-network goods and services to the prices set by other payors for the same goods and services.

471.    At the November 28, 2023, Bank of America Leveraged Finance Conference, White openly stated that the purpose of PlanOptix is to "enable payers to benchmark themselves against their competitors." He explained that, using PlanOptix, a payor will know "whether they're

above or below or on par with their competition," including with regard to amounts paid to "a specific provider."

472.    PlanOptix is a cartelist's dream. It allows a member of the MultiPlan Cartel to monitor the effectiveness of the cartel in real-time and to detect whether any member of the cartel is "cheating" by paying providers more for out-of-network goods and services.

### ix.    Customary Patterns, Formulas, and Leadership

473.    The longer a cartel agreement endures, the more likely it is to remain effective. If every member of the cartel knows their role and that they can trust their fellow cartelists to adhere to their pricing agreement, a cartel can last for years.

474.    That is the case here. MultiPlan has a long history of facilitating and stabilizing the MultiPlan Cartel. MultiPlan emphasizes the long-term nature of its relationships with its competitors with respect to setting prices for out-of-network goods and services. In a June 28, 2023, investor presentation, it stated that its "Average Length of Large Customer Relationships" was over 25 years.

475.    MultiPlan has achieved "payer lock" due to MultiPlan's deep and long-standing integration into its clients' claims processing operations.

476.    In MultiPlan's Q3 2020 earnings call on November 12, 2020, then-CEO, Mark Tabak, described MultiPlan as having "created a competitive moat around our company that drives high recurring revenues."

477.    For over a decade, payors with collective dominance in the Out-of-Network Goods and Services Market have been locked into multi-year contracts to use MultiPlan's out-of-network pricing methodology.

478.    MultiPlan's consistent public statements trumpeting this high level of market participation and promoting the high provider acceptance rates of its pricing offers provide

reassurances regarding the stability of the cartel to its members.

479.     The MultiPlan Cartel has a long-standing and well-functioning ringleader in MultiPlan. MultiPlan takes the lead in recruiting new members into the cartel, shares information with them about the advantages of collusive pricing, threatens that they will suffer financial disadvantage by not joining or defecting from the cartel, and enforces price discipline by encouraging cartel members to match the out-of-network prices set by their competitors.

480.     These customary patterns, formulas, and leadership are circumstantial evidence of agreements and a conspiracy to suppress rates.

**G.     The MultiPlan Cartel Can be Evaluated as Either Traditional or Algorithmic Price Fixing**

481.     MultiPlan's agreements with competing payors have all of the hallmarks of traditional price fixing—horizontal agreement, information exchange, lack of deviation, collective market power, and enforcement structures.

482.     MultiPlan enters into written agreements with its competitors concerning: (1) the pricing methodology that they will use to pay providers for out-of-network goods and services instead of exercising independent pricing discretion, and (2) the maximum price that they will pay providers for particular out-of-network goods and services through override agreements.

483.     This is not a case in which competitors independently decide to license third-party pricing software through vertical agreements and then occasionally deviate from the prices recommended by that software.

484.     MultiPlan is not a third party at a different level of the distribution chain. MultiPlan is a payor. MultiPlan competes with the payors that use MultiPlan's pricing methodology. MultiPlan benefits from the cartel in the same way as the other payors, who are MultiPlan's horizontal competitors. Because the cartel protects MultiPlan from competitive pressures that

would exist absent collusions, MultiPlan underpays providers for out-of-network goods and services using a common pricing methodology rather than exercising independent pricing discretion, increasing its own revenues and profits at the expense of providers who should have been paid market rates for their goods and services.

485.    MultiPlan's pricing methodology is not merely recommending prices that payors can deviate from. Instead, payors delegate nearly every aspect of the out-of-network pricing process to MultiPlan. Payors agree to be bound by the prices set by MultiPlan's pricing methodology and to pay for out-of-network goods and services at the prices MultiPlan sets. Payors cannot, and do not, deviate from the prices set using MultiPlan's methodology. The cartel prevents a payor from doing so by requiring that MultiPlan handle any interactions with providers that deign to question the prices set by the cartel. Further, payors often agree to delegate payment of claims and the dispute resolution process to MultiPlan. Thus, the payors that entered into agreements with MultiPlan did not retain or exercise any meaningful pricing discretion.

486.    No analysis of "algorithmic price-fixing" is necessary for these agreements; they have been *per se* illegal for decades under black letter antitrust law. But even if the Court were to analyze these allegations under recent case law concerning algorithmic price-fixing, they are also illegal *per se* under that rubric as well.

487.    MultiPlan is a competing payor that should be using its own independent pricing discretion to pay providers for their services.

488.    Instead, MultiPlan and its competitors have agreed to use a common algorithm to set the prices that they will pay providers for out-of-network goods and services.

489.    A massive number of payors, representing more than 80% of all out-of-network payments by dollar volume in the U.S. have agreed to use MultiPlan's pricing methodology instead

of using their independent pricing discretion.

490.     In a tight three-and-a-half year window, numerous payors adopted parallel prices and parallel strategies by systematically switching from UCR or FAIR Health benchmarks to MultiPlan's pricing methodology.

491.     MultiPlan and its competitors do not deviate from the prices recommended by the algorithm. Those recommended prices are submitted to providers as proposed payments for out-of-network goods and services.

492.     Because they effectively have no other option, providers accept these underpayments more than 90% of the time.

493.     In the cases where a provider attempts to push back on MultiPlan's underpayments, they quickly find that they have no practical ability to do so. MultiPlan rigs that negotiation by setting a collusively low starting point for the negotiation and then acting as the sole negotiator of the claim using the petabytes of competitively-sensitive claims pricing information from its competitors to pinpoint the lowest price that the provider will accept for their out-of-network goods and services.

494.     MultiPlan facilitates and enforces this algorithmic price-fixing in multiple ways. It ingests, pools, and disseminates confidential and competitively sensitive information about competitors' payments for out-of-network goods and services to payors to coach them on how to underpay providers even more for particular services. MultiPlan also makes detailed and competitively sensitive payment information available to competing payors on-demand through its PlanOptix service. MultiPlan also takes over the negotiation of claims through its FNX service, guaranteeing that there will be no deviation from the cartel agreement.

495.     In addition, MultiPlan's agreements with competing payors are not "hybrid"

agreements that have vertical and horizontal aspects. MultiPlan's agreements are fundamentally agreements between companies that used to compete with one another to price and adjudicate claims for out-of-network goods and services, to refrain from setting prices independently and to abdicate pricing discretion for out-of-network goods and services to MultiPlan. MultiPlan and its competitors are not companies operating at different levels in a chain of distribution. MultiPlan and its competitors occupy the same level in the relevant market—they each receive bills from providers for out-of-network goods and services and set prices for those out-of-network goods and services.

496.     The agreement to restrain pricing competition did not operate in a downstream chain of distribution. Instead, all of the pricing decisions at issue were made at the same horizontal level of the relevant market. MultiPlan does not produce a product or service that is resold by payors. Nor do MultiPlan's competitors sell a product or service to MultiPlan that MultiPlan then resells.

### H.     Alternatively, the MultiPlan Cartel Is a Hub-and-Spoke Cartel

497.     Even if the MultiPlan Cartel were not a horizontal price-fixing agreement between competitors, it would be a hub-and-spoke agreement that is likewise *per se* illegal under the Sherman Act. MultiPlan is the hub of the cartel and the payors' agreements with MultiPlan to set prices for out-of-network goods and services are the spokes. The rim of the cartel is the agreement between the competing payors to use MultiPlan's out-of-network pricing methodology to suppress out-of-network pricing competition.

498.     Prior to joining the MultiPlan Cartel, payors made several attempts to underpay healthcare providers through unilateral action. They were unsuccessful in doing so, but the payors knew that they could not join a buyers' cartel because of their settlement agreements in the Ingenix investigation.

499.    For example, before it joined the MultiPlan Cartel in 2017, in May 2015, United paid $11.5 million to resolve claims that it used down-coding software algorithms, stalling tactics, and other unfair business practices to underpay healthcare providers in Connecticut, New York, North Carolina, and Tennessee.

500.    Likewise, in September 2015, United agreed to pay $9.5 million to settle claims that it systematically underpaid out-of-network claims in California. However, these unilateral efforts could be thwarted by providers, because providers could elect to not provide most forms of care to patients associated with a price-cutting payor.

501.    Payors realized the need for collective action. Initially, United attempted to solve that collective action problem using its subsidiary, Ingenix. However, when the New York State Attorney General shut down the Ingenix scheme, payors needed a new way to agree among themselves to set low prices for out-of-network goods and services.

502.    MultiPlan solved that collective action problem. It pitched itself to payors as a hub that could be used to collectively reduce out-of-network payments to healthcare providers. As MultiPlan told its investors, using MultiPlan is a "much better mechanism" for payors to collectively slash payments for out-of-network goods and services "versus doing it themselves." According to MultiPlan, this is because "if a pay[o]r decides to do everything on their own, their ability to go back to providers and push for savings is fundamentally different than ours. . . . [W]e can talk to the entire industry."

503.    MultiPlan persuaded the vast majority of competing payors to become spokes in the cartel by promising to cut the prices set for out-of-network goods and services while serving as a "liability shield" for the payors. MultiPlan has contracts with the top 15 payors in the nation and agreements with payors representing over 80% of the volume of out-of-network transactions

in the U.S. Each of these contracts between a payor and MultiPlan forms another spoke in the MultiPlan Cartel's hub-and-spoke conspiracy.

504.    MultiPlan uses similar tactics to facilitate collusion along the rim of the alleged hub-and-spoke conspiracy. MultiPlan informs each of the payors that a large number of other major payors are using MultiPlan's pricing methodology to set prices for out-of-network goods and services, that those payors are generating substantial revenues by setting low prices for out-of-network goods and services, and that the payor can bring itself into alignment with the rest of the industry on out-of-network pricing by working with MultiPlan.

505.    Thus, each of the payors knows that its competitors have considered or are considering the same terms offered by MultiPlan—*i.e.*, lowering out-of-network prices by using a common pricing methodology and splitting the revenues generated by doing so. Each competing payor has a strong motive to enter into the conspiracy because they know that without substantially unanimous action, agreeing to unilaterally cut out-of-network prices would be economically self-defeating. And, in the end, each payor agrees to the same course of conduct (cutting out-of-network prices via MultiPlan's pricing methodology), which constitutes an important departure from their prior practice of using UCR or FAIR Health benchmarks to compete against one another on out-of-network pricing.

506.    There is no valid business reason for each of the payors to have entered into agreements allowing MultiPlan to set and negotiate their out-of-network prices. Larger payors could have created their own in-house pricing methodologies (and some came close to doing so). Smaller payors could have used the FAIR Health benchmark to set out-of-network prices. The only plausible explanation for every payor of any consequence agreeing to use MultiPlan's out-of-network pricing methodology instead of their own pricing discretion is that MultiPlan provided

them with assurances that they could agree to do so with the common understanding that they would all benefit from ending out-of-network pricing competition.

507.     Each of the payors provides detailed and competitively sensitive pricing information to MultiPlan with the knowledge that MultiPlan will use the information to set prices for competing payors. MultiPlan pools and analyzes the petabytes of claims data it collects to benefit all payors by finding the lowest price that providers will accept for their out-of-network goods and services. Moreover, payors are aware that MultiPlan uses their competitively sensitive claims data to benefit all competitors because MultiPlan makes detailed payment information available on-demand through its PlanOptix service.

508.     There is extensive circumstantial evidence that payors have agreed with each other to use MultiPlan's pricing methodology to set prices for out-of-network goods and services, thus forming the rim of the hub-and-spoke conspiracy. This includes evidence that MultiPlan facilitated a parallel transition among payors from a more competitive pricing regime to a coordinated pricing regime, and a variety of plus factors, detailed above, that tend to exclude the possibility that the parallel conduct was the result of independent and non-conspiratorial action.

## I.     Alternatively, MultiPlan Acted As An Agent, Facilitator, or Conduit of Each of The Other Members of the MultiPlan Cartel

509.     Even if the MultiPlan Cartel was not a horizontal price-fixing agreement between competitors, or a hub-and-spoke agreement, the MultiPlan Cartel would still violate Section 1 of the Sherman Act because MultiPlan acted as an agent, facilitator, and conduit of the other members of the MultiPlan Cartel and materially aided their anticompetitive goals.

510.     MultiPlan had full knowledge that the other members of the MultiPlan Cartel were seeking to use its pricing methodology as a common means to end out-of-network pricing competition. MultiPlan intended to aid the other members of the MultiPlan Cartel in limiting out-

of-network pricing competition because it knew that the more it underpaid doctors and hospitals, the more money it would make.

511.     MultiPlan materially contributed to the success of the MultiPlan Cartel in multiple ways. In addition to setting each payor's out-of-network prices, MultiPlan communicates the price to the relevant provider, and disposes of any resulting "negotiation." MultiPlan also serves as a regular facilitator and conduit for passing information between the members of the MultiPlan Cartel to help them suppress out-of-network prices.

512.     MultiPlan also facilitates the success of the MultiPlan Cartel by informing payors about the out-of-network prices set by their competitors and encouraging them to adopt similarly low pricing. MultiPlan's goal in distributing this confidential information within the MultiPlan Cartel is to ensure that each payor's out-of-network pricing remains in line with its competitors' out-of-network pricing. MultiPlan also advances this goal by distributing whitepapers and marketing materials to all cartel members extolling the value of outsourcing out-of-network pricing responsibility to MultiPlan.

513.     Aware that its conduct on behalf of the other members of the MultiPlan Cartel could result in agency liability under the antitrust laws, MultiPlan has attempted to concoct contrary evidence. After the initial complaint in this litigation was filed, MultiPlan edited the pricing "offers" it sends to providers. In the most recent version of these pricing "offers," MultiPlan has inserted new language insisting that "MultiPlan is not a payor or an agent of any payor." This non sequitur has nothing to do with negotiating the payment of an out-of-network claim, and everything to do with MultiPlan's ongoing efforts to conceal its violations of the antitrust laws.

## VI. Even if this Case Were Evaluated Under the Rule of Reason, the MultiPlan Cartel Has Market Power, Harms Competition Throughout the Relevant Market, and Has No Procompetitive Effects

### A. The MultiPlan Cartel has Collective Market Power in the Relevant Market for Out-of-Network Goods and Services

514. As an initial matter, defining the relevant market is unnecessary in this case. First, because plaintiffs have pled a plausible claim under the *per se* rule of antitrust analysis, market definition is unnecessary because it must be presumed at this stage that the restraint harmed competition. Second, even if the Court analyzed plaintiffs' claims under the rule of reason, plaintiffs have offered abundant allegations of direct harm to competition including significant market-wide underpayments to providers directly caused by the MultiPlan Cartel, obviating the need to analyze a relevant market. Nonetheless, for the sake of completeness, DAPs plead the following facts concerning the scope of the relevant market.

515. The relevant market at issue in this litigation is the market for out-of-network goods and services sold to payors ("Out-of-Network Goods and Services Market").

516. In this market, providers sell out-of-network goods and services, patients consume the out-of-network goods and services, and payors like MultiPlan and its Co-Conspirators function as buyers of those goods and services.

517. Because this case is about a buyer-side cartel, the relevant inquiry when defining the relevant market for the providers' claims is, "from whom can providers reasonably seek payment for their out-of-network goods and services?" The inquiry focuses on which buyers of out-of-network healthcare services are reasonably substitutable from the perspective of sellers of those services.

518. The MultiPlan Cartel also expands and undergirds these commercial realities by specifically prohibiting hospital-based providers from seeking payment from any source other than

the relevant payor, as a condition of receiving any payment at all.

519.    It is not practicable for providers to avoid seeking payment from commercial payors by convincing patients to pay entirely out-of-pocket for out-of-network goods and services. In most cases, patients are unable or unwilling to pay out-of-pocket for the entirety of their care, which is why the vast majority of patients in the U.S. rely on a third-party payor.

520.    It is also not practicable for providers to use prior authorizations to ensure that they only provide care to in-network patients. In a prior authorization, a healthcare provider calls a health plan to get approval from the health plan prior to providing out-of-network care to a patient.

521.    With respect to emergency services, healthcare providers cannot use prior authorizations to check whether a patient is in-network or out-of-network. Hospital emergency departments must provide emergency healthcare to patients regardless of whether they are in-network or out-of-network.

522.    In theory, healthcare providers can refuse to provide services to out-of-network patients for non-emergency care. In practice, that is not possible. The MultiPlan Cartel leaves providers with effectively no option but to accept the prices imposed upon providers for out-of-network goods and services. Since the MultiPlan Cartel sets the prices for an overwhelming percentage of out-of-network goods and services, the cartel effectively offers healthcare providers no choice but to accept MultiPlan's prices for non-emergency out-of-network services. The healthcare providers can either provide the out-of-network services and be severely underpaid for them (but at least make some revenue) or provide no out-of-network services at all (and forgo all revenue associated with those services). Because of the high fixed costs associated with operating a medical practice (including capital equipment, support staff, licensure, insurance, and office space), many providers are effectively forced to provide out-of-network goods and services despite

knowing that they will be severely underpaid for them, just so that they can continue to receive the reduced revenues associated with providing those out-of-network services. As a consequence, healthcare providers who provide non-emergency services are forced to accept artificially suppressed prices set by the MultiPlan Cartel.

523.     In non-emergency contexts, MultiPlan and competing payors effectively dupe providers into providing up-front goods and services to out-of-network patients by providing no transparency into whether the price for those out-of-network goods and services will be set by MultiPlan. Providers often do not know that when they are providing services to an out-of-network patient that MultiPlan will set the price for those out-of-network goods and services. For instance, a prior authorization will not reveal whether the payor has an agreement with MultiPlan or whether MultiPlan will set the price for the out-of-network goods and services provided to that patient.

524.     Once a provider has provided services to an out-of-network patient, that provider cannot seek payment for its services from anyone other than the payor that has agreed to cover that patient's out-of-network goods and services. Indeed, as alleged above, when the MultiPlan Cartel underpays providers, providers are unable to turn to patients to be made whole for the collusive underpayment.

525.     For emergency services, federal and state laws prohibit healthcare providers from balance billing patients for the difference between the payments received from a payor for out-of-network goods and services and the provider's billed charges.

526.     For non-emergency services, healthcare providers cannot, and do not, balance bill patients for the difference between the payments received from a payor for out-of-network goods and services and the provider's billed charges. For example, as explained above, MultiPlan prohibits providers from balance billing patients as a condition of receiving payments for out-of-

network goods and services.

527.    As a result, the only seller to which a provider can turn to for an out-of-network claim is the payor associated with that claim.

528.    Government-paid forms of insurance do not participate in the relevant market at issue in this case. Providers do not seek payment for out-of-network goods and services from government payors, and government payors are not buyers of such services.

529.    Commercial payors recognize that government payors are not buyers of out-of-network goods and services. For instance, an internal United document concerning initiatives to suppress out-of-network payments explains that the initiatives do "not apply to Medicare or Medicaid members" because "[f]ederal and state programs, like Medicare Advantage and Medicaid plans, do not offer out-of-network coverage[.]"

530.    A common method to determine the scope of a relevant antitrust market is to assess whether a hypothetical monopolist could impose a small but significant non-transitory increase in price ("SSNIP") in the proposed market, typically 5%. In a case challenging a buyers' cartel, such as this one, the relevant test is whether a hypothetical monopsonist could impose a small but significant reduction in purchase price ("SSRIPP"). In this case, a hypothetical monopsonist— such as the MultiPlan Cartel—could impose a SSRIPP of 5% or more on out-of-network goods and services without causing healthcare providers to switch to providing other types of goods and services because hospitals are required by federal and state laws to provide emergency out-of-network goods and services. A payor can impose an SSRIPP on out-of-network goods and services because the negotiation of prices for those services occurs after the service is provided and the healthcare provider is locked into negotiating with a single payor.

531.    Moreover, MultiPlan's imposition of an industry-wide pricing scheme for out-of-

network goods and services provides a natural experiment to test the bounds of the relevant market. Despite MultiPlan and its Co-Conspirators decreasing rates for out-of-network goods and services substantially from the prior FAIR Health and UCR charges that existed in the pre-conspiracy period, healthcare providers continued to provide out-of-network goods and services. When MultiPlan imposed these lower prices for out-of-network goods and services, the amount of out-of-network goods and services sold by providers did not change appreciably. In fact, the total amount of out-of-network goods and services sold in the U.S. in 2023 was higher than before the MultiPlan Cartel began, in or around 2015. This suggests that a SSRIPP would not result in a sufficient number of healthcare providers switching to other forms of payment, such as services for government payors or in-network services, to make the SSRIP profitable for the payors.

532.    There are also special circumstances that make separate consideration of buyers of out-of-network goods and services appropriate. A change in the price of in-network or government-paid healthcare goods and services does not have an appreciable effect on the price of out-of-network goods and services because those prices are calculated and negotiated in fundamentally different ways. Put another way, the prices paid for in-network services and government-paid services do not constrain the prices charged for out-of-network goods and services because providers cannot switch between out-of-network payment and other forms of payment.

533.    A change in the price of in-network or government-paid healthcare goods and services also does not have an appreciable effect on the amount of out-of-network healthcare supplied by providers. Because patients and doctors make the decision about what goods and services to utilize, and those decisions are made on the basis of medical necessity, changes in in-network and government-paid prices for particular goods and services does not affect the supply

of out-of-network goods and services.

534. Practical indicia and commercial realities support the inference that in-network goods and services are distinct from the Out-of-Network Goods and Services Market at issue in this case.

535. One such reality is the design of third-party payors' coverage. Payors differentiate between providers who are in-network and providers who are out-of-network. By design, third-party payment plans offer different levels of coverage and financial incentives for in-network and out-of-network goods and services. For example, third-party payment plans have different co-insurance and out-of-pocket costs associated with in-network and out-of-network goods and services.

536. In addition, at the urging of several of the Defendants and Co-Conspirators in this case, courts have also found that statutes governing healthcare providers apply differently to in-network and out-of-network providers. *See, e.g.*, *Emerus Hosp. v. Healthcare Serv. Corp.*, 2020 WL 1675665, at *3-4 (N.D. Ill. 2020) (finding that Texas law concerning prompt payments to healthcare providers did not apply to out-of-network services); *Tex. Medicine Res., LLP v. Molina Healthcare of Tx., Inc.*, 620 S.W.3d 458, 469-70 (Tex. App. – Dallas 2021), *aff'd*, 659 S.W.3d 424 (Tex. 2023) (same).

537. Defendants recognize that prices for out-of-network goods and services are distinct from in-network prices based on how they organize their businesses. Defendants have separate employees in different departments that oversee issues related to payments to out-of-network providers. Defendants also create shared savings programs and cost management programs specific to out-of-network providers and track the cost of paying provider claims for out-of-network goods and services separately from in-network goods and services.

538. Similarly, MultiPlan views in-network and out-of-network prices as occupying separate markets. MultiPlan has created pricing methodologies that target only the prices of out-of-network goods and services. In fact, MultiPlan has chosen to focus a substantial portion of its business on out-of-network pricing. For example, during a recent presentation at the 42nd Annual J.P. Morgan Healthcare Conference, MultiPlan's then-CEO, Dale White, explained "MultiPlan's focus over the past 40 years has been on out-of-network claims."

539. Similarly, in a September 2024 interview on the DataFramed podcast, MultiPlan President & CEO Travis Dalton expressed that "[t]here's essentially two kinds of health insurance in the U.S., so it's government-funded, Medicare and Medicaid, and then there are commercial insurance products." He went on to say, "When someone . . . needs to see a provider . . ., they have the choice to go in-network,. . . . Or, there are some out-of-network options that exist . . . and that's a very different path with a very different cost structure around it."

540. MultiPlan's own website markets its services in distinct "Commercial" and "Government" "Markets." In the same September 2024 interview, Dalton explained that in-network, out-of-network, and government programs all offer different prices for the same services: "The price for the same service can be different. So, if you're going through a Medicare channel it's a price, if it's in-network negotiated it's a price, if it's out-of-network it can be a price."

541. Other competing payors also recognize that government payors are not buyers of out-of-network goods and services. For instance, an internal United document concerning initiatives to suppress out-of-network payments explains that the initiatives do "not apply to Medicare or Medicaid members" because "[f]ederal and state programs, like Medicare Advantage and Medicaid plans, do not offer out-of-network coverage[.]"

542. Persistent differences in claims volumes and claims pricing also demonstrate that

commercial out-of-network pricing and in-network pricing constitute separate markets. If in-network buyers and out-of-network buyers were a part of the same market for purchasing healthcare goods and services, then the prices and sales volumes for those goods and services would be similar because, if they were a part of the same market, buyers would see no difference between the same service provided to an in-network patient and an out-of-network patient. That is not the case. For decades, the prices paid for in-network and out-of-network goods and services have varied significantly for the same services provided in the same geographic region.

543.    Healthcare is not the only market in which goods and services can be sold in different ways and occupy distinct markets. One analogy is to recognized differences between futures markets and spot markets for the same goods or services. The market for out-of-network goods and services is comparable to a spot market. In a spot market, goods or services are exchanged for cash immediately, instead of at a future date. When a patient is treated by an out-of-network healthcare provider, no preexisting agreement on prices or terms exists between the provider and the payor. Instead, out-of-network adjudication and pricing occurs on individual claims after healthcare goods and services have been provided to the patient. By contrast, the market for in-network goods and services is comparable to a futures market. In a futures market, delivery of underlying goods or services occurs on a future date at contractually governed prices and terms. Likewise, when a provider agrees to be "in-network," the provider contracts with a third-party payor to accept pre-agreed network rates for medical goods and services that are less than the providers' customary charges for those goods and services, and to not bill in-network patients for the difference between those in-network rates and the providers' customary rates. Even when the price of a spot market may influence the price of a futures market, they can remain two different relevant product markets when their prices are not synonymous.

544.    While healthcare providers operate in other markets, besides the Out-of-Network Goods and Services Market, that represent different phases of their operations, those markets are not the market specifically targeted and restrained by the MultiPlan Cartel.

545.    For example, in one phase of competition, providers compete with each other to attract patients to their facilities based on numerous factors, such as reputation, expertise, proximity, and range of services.

546.    In another phase of competition, providers compete for inclusion in certain payors' provider networks. In this phase, providers may engage in *ex ante* negotiations with certain interested payors concerning how much they could expect to receive for in-network goods and services provided to patients enrolled in a particular payor's health insurance plan. For a multitude of reasons, however, a particular provider will typically remain out-of-network for a significant number of payors.

547.    These different phases of competition, which may constitute separate antitrust markets, are not at issue in this case. The relevant market in this case is limited to the payors that providers can turn to when they provide out-of-network goods and services.

548.    Even in these other phases of competition, government payors and commercial payors are not reasonably interchangeable. Government-paid forms of insurance, like Medicare, Medicaid, and Tricare, are not viable alternatives for commercial payments and do not compete against commercial health insurance. These forms of government-paid insurance address populations that are not typically served by commercial health insurance. For example, Medicare and Medicaid have statutory age, income, or disability requirements. Similarly, Tricare is available only to current and former members of the U.S. military. Patients in government payor programs do not switch between commercial payor networks and government payor systems in sufficient

numbers for government payors and commercial payors to compete against one another.

549. Moreover, government payors typically pay providers negotiated up-front rates that are significantly lower than the up-front in-network rates negotiated by commercial payors. That is because the government has significantly more purchasing power that it can use in these up-front rate negotiations.

550. While it is true that payors do not market out-of-network coverage separately to subscribers as a stand-alone product, that fact is immaterial to this litigation. This case is about the range of buyers for healthcare goods and services, not the range of buyers for health plans. In other words, this case concerns the choices that *providers* can make about to whom they will sell their goods and services; it is not about the choices that *subscribers* make about from whom they will purchase health coverage. At any rate, patients do consider out-of-network benefits when deciding the health plans in which they will enroll. They weigh the amount that they will pay for common and anticipated forms of in-network care, such as physicals and well-visits, against their exposure for unplanned and catastrophic out-of-network care, such as what a patient would be financially responsible for if they were involved in a serious car accident. Patients can, and often do, purchase a health plan specifically because of its out-of-network provisions—either because of the financial coverage offered for out-of-network care or because the out-of-network provisions of a health plan allow a patient to continue seeing a trusted doctor.

551. In summary, the discrete product or service that can be purchased is the healthcare goods and services offered by providers on an out-of-network basis. That discrete product or service can be subject to price-fixing because providers cannot turn to other payors to purchase their out-of-network goods or services. The goods and services have already been provided and the third-party payor will purchase them, but the question is the price that they will pay for those

out-of-network goods and services. Commercial payors formed the MultiPlan Cartel specifically to exploit these market realities by suppressing prices for out-of-network goods and services.

552. At a minimum, it is clear that healthcare providers cannot substitute between out-of-network goods and services and in-network goods and services with respect to emergency care.

553. Healthcare providers in hospital emergency rooms are *prohibited* from switching between these types of buyers by federal and state laws. Enacted nearly 40 years ago, the Emergency Medical Treatment and Labor Act ("EMTALA"), requires hospitals participating in Medicare and Medicaid—which is effectively all hospitals in the U.S.—to "scree[n]" and "stabilize" "any individual" who comes to a hospital emergency room with an "emergency medical condition" that jeopardizes the patient's "health." 42 U.S.C. §§ 1395dd(a), (b)(1)(A), (e)(1)(A). EMTALA bans hospitals from switching from providing healthcare goods and services to out-of-network patients to providing those services to in-network patients. Therefore, if a patient who is out-of-network comes to a hospital with an "emergency medical condition," "the hospital must act to stabilize the condition . . . before the patient can be transferred or released." *Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 894 (7th Cir. 2003).

554. For emergency care, state laws also require hospital emergency rooms to admit and treat patients regardless of whether they are in-network or out-of-network, effectively prohibiting hospitals from switching between in-network and out-of-network payors. *See, e.g.*, Cal. Health & Safety Code §§ 1317(a)-(b) (licensed hospitals must provide emergency services to all patients and may not discriminate between patients based on their insurance status); Fla. Stat. §§ 395.1041(3)(a), (f) (every hospital must provide emergency services to patients and may not discriminate between patients seeking emergency services based on "insurance status, economic status, or ability to pay for medical services"); La. Rev. Stat. § 2113.4(A) (any hospital that

receives benefits or funds from the state of Louisiana "shall make its emergency services available to all persons . . . regardless of whether the person is covered by private, federal Medicare or Medicaid, or other insurance."); N.Y. Pub. Health Stat. § 2805-b(1) ("Every hospital shall admit any person who is in need of immediate hospitalization with all convenient speed and shall not before admission question the patient or any member of his or her family concerning insurance, credit or payment of charges").

555.    EMTALA and equivalent state laws require hospital-based providers to comply with these admission and non-discrimination obligations at all times. Failure to comply with these statutory requirements can result in severe penalties, including: (1) state criminal liability, (2) substantial fines, (3) suspension of the hospital-based provider's participation in Medicare and Medicaid, and (4) civil lawsuits. No reasonable hospital-based provider would knowingly violate these federal and state laws in order to switch from out-of-network patients to in-network patients when providing emergency care. The severe financial penalties for doing so would cause a hospital-based provider to lose substantial patient volume and sources of funding, causing significant financial damages to the hospital as a whole. For that reason, hospital-based providers do not switch between providing emergency services to in-network and out-of-network patients.

556.    Outside of co-insurance and deductible obligations, a hospital-based provider cannot seek payment from an out-of-network patient for emergency services. In many cases, such as when providing emergency care, hospital-based providers are prohibited from seeking payment for those services from patients (*i.e.*, "balance billing") by the No Surprises Act, *see* 42 U.S.C. § 300gg-111. Violations of the No Surprises Act can result in large civil penalties of up to $10,000 per violation.

557.    In economic terms, EMTALA and the No Surprises Act are switching costs.

Because no hospital-based provider would want to violate the law and expose themselves to significant legal penalties in order to switch to other forms of out-of-network payment, such as balance billing, or to switch between out-of-network and in-network payors, these large switching costs lock a provider into seeking payment from only one payor for out-of-network goods and services. If the costs of switching from one buyer to another are so prohibitive that no rational seller would switch between them, then the relevant market is limited to only those buyers that a seller can practically turn to in order to sell their goods and services. In this case, the only party to whom a hospital-based provider can sell their out-of-network goods and services is the payor associated with the patient that consumed the out-of-network goods and services.

558.    The statutes and regulations that govern hospital-based providers also differentiate between in-network and out-of-network goods and services. *See, e.g.*, 28 U.S.C. § 9816 (No Surprises Act); N.J. Stat. § 26:2SS-9(c); Conn. Gen. Stat. § 19a-904a; Mo. Stat. § 376.690; Il. Stat. Comp. § 88/50; Tex. Ins. Code § 1305.006.

559.    Within the market for out-of-network goods and services, there are submarkets for out-of-network goods and services sold to each specific payor.

560.    Once a provider has provided out-of-network goods and services to a patient, the provider can turn to only one buyer to pay for those services—the patient's third-party payor. The provider cannot seek to sell those services to another buyer because no other payor has agreed to cover those out-of-network goods and services.

561.    This submarket is not defined according to any single method of payment, or the preferred payment method of a provider. Instead, this market is defined by the commercial reality that there are literally no other payment sources for a provider's medical goods and services when a provider has already provided those goods and services to an out-of-network patient.

562.     A payor can impose an SSRIPP on out-of-network goods and services because the negotiation of prices for those services occurs after the service is provided and the hospital is locked into negotiating with a single payor.[14]

563.     The relevant geographic market is the United States. Providers in the U.S. cannot practicably turn to payors in other countries, where private medical insurance is uncommon or non-existent and nearly all medical care is administered as a part of a comprehensive government program, for payment of out-of-network medical services. The U.S. healthcare industry, including the market for payment of out-of-network goods and services, is universally recognized by industry participants as distinct from healthcare industries in foreign countries, and is subject to a variety of unique federal and state laws and regulations that apply only in the U.S. The relevant geographic market is not smaller than the U.S. because healthcare providers can practicably turn to commercial insurers located in other parts of the country for payment of out-of-network goods and services.

564.     MultiPlan and its Co-Conspirators, through their conspiratorial agreements, collectively hold dominant power on the buyer side of the Out-of-Network Goods and Services Market. Nearly every payor that participates in the relevant market has agreed to use MultiPlan's pricing methodology to set the prices for out-of-network goods and services, to fix the maximum price for particular out-of-network goods and services, and to allow MultiPlan to negotiate the price of out-of-network goods and services on behalf of other payors. The members of the MultiPlan Cartel collectively control more than 90% of the relevant market as measured by number

_____

[14] This is not to say that payors are free from competitive pressures when negotiating prices for out-of-network healthcare services. As explained, in a competitive market, payors must avoid below-market pricing to maintain the out-of-network provider's willingness to provide out-of-network goods and services to the payor's enrollees in situations where the provider has discretion to refuse and avoid costly disputes. The MultiPlan Cartel was created specifically to eliminate the need for this price competition.

of covered patients.

565.     MultiPlan claims that the entire nationwide market for out-of-network goods and services is approximately $130 billion annually:



566.     Out of that $130 billion, MultiPlan claims that it processed $106 billion in charges in 2019:



**3. In 2019, we processed 360K+ claims daily, totaling $106B of health charges and identified $19B in potential savings for our customers**

$106B — Healthcare charges processed

$45B — Claims with savings opportunity identified

$19B — Identified savings for our customers

$0.98B — MultiPlan Revenues

567.    By claiming to process $106 billion in charges for out-of-network goods and services out of a potential $130 billion, MultiPlan acknowledges that it processes approximately 81.5% of the out-of-network claims submitted in the U.S.[15] Therefore, regardless of how the metes and bounds of the relevant market are defined, the MultiPlan Cartel has market power over commercial third-party payments for out-of-network goods and services. The cartel has a dominant market share of both covered members and healthcare claims. The cartel also has a demonstrated ability to collectively control the prices set for healthcare goods and services. In economic terms, the members of the MultiPlan Cartel collectively hold monopsony power.

568.    Since acquiring Data iSight in 2011, MultiPlan's analytics business has grown considerably. Revenues generated by Data iSight alone totaled $323.7 million in 2019. By 2020, analytics-based services such as Data iSight made up more than 59% of MultiPlan's annual

---

[15] As a technical matter, ASO subscribers can opt-out of using MultiPlan's pricing for out-of-network goods and services. While some do so, the 81.5% share of out-of-network claims processed by MultiPlan show that, in reality, nearly all ASO plans' out-of-network claims are priced by MultiPlan.

revenues. In 2021, MultiPlan's analytics-based services generated $709 million of its $1.1 billion in total revenues. MultiPlan explained in 2023 that its analytics business typically earns profit margins "in the mid to high 60% range."

569.    MultiPlan's market power has continued to grow since 2019 as its largest clients have gained market share and additional payors have begun using MultiPlan's pricing methodology to set prices for out-of-network goods and services.

570.    The Out-of-Network Goods and Services Market is protected by high barriers to entry. Payors operate in a highly concentrated industry, with a small number of large payors collectively dominating the market. Indeed, during a trial, Rebecca Paradise, the Vice President of Out-of-Network Payment Strategy at United Healthcare, agreed that MultiPlan's out-of-network pricing methodology "was widely used by our competitors." Moreover, most of MultiPlan's contracts with customers are three years or longer in length, with "high renewal rates." MultiPlan has even touted the "stickiness" of its "long-term customer relationships."

571.    This high collective market concentration of the members of the MultiPlan Cartel is probative circumstantial evidence of an agreement or agreements to conspire. This dominant collective market power has allowed the MultiPlan Cartel to impose anticompetitive effects on the entire relevant market.

572.    In addition to this collectively dominant market power, when a healthcare provider provides out-of-network goods and services to a patient, its only option for seeking payment for those services is to submit a claim to the particular payor that administers the insurance plan in which that patient is enrolled.

573.    As a result, each payor has complete buyer-side power over the adjudication and pricing of out-of-network goods and services provided to the patients to whom it provides

coverage.

**B.    The MultiPlan Cartel Harmed Providers, Patients, and Subscribers**

574.    ***Harm to Providers.*** MultiPlan's agreements with competing payors harm competition and each of the DAPs.

575.    In its investor presentations, MultiPlan openly touts the fact that it helps its competitors systematically underpay healthcare providers. During a fall 2021 investor road show presentation, MultiPlan explained to investors that, in an illustrative world "[w]ithout MultiPlan," a doctor could expect to make $800 on an out-of-network claim, but in an illustrative world with MultiPlan, a doctor would make only $600 on the same out-of-network claim—a 25% difference. In another presentation, MultiPlan claimed that its pricing methodology was even more effective, writing that it provided "savings of 61%–81% off billed charges."

576.    MultiPlan's provider remittance advice forms also provide direct evidence that the MultiPlan Cartel results in healthcare providers being paid far less on each claim than they would have under the more competitive regime that existed prior to the MultiPlan Cartel where out-of-network claims prices were determined by the UCR/FAIR Health rate.

577.    For one example of the MultiPlan Cartel's pricing suppression, the claim below shows that a patient was seen at the emergency department of Northeastern Nevada Regional Hospital in Elko, Nevada. That patient had a particularly difficult case, which was coded using CPT code 99285, which is reserved for the most severe and complex emergency medicine cases. The provider submitted a claim for $1,360, roughly 70% of the FAIR Health price for that CPT code in Elko, Nevada. Using MultiPlan's pricing, United paid only $435.20 for the claim—22.5% of the amount that FAIR Health determined was the appropriate out-of-network price for CPT code 99285. As the table below shows, that is significantly less than the 70-80% of FAIR Health pricing standard that applied to out-of-network claims prior to the MultiPlan Cartel.

| Submitted Amount | FAIR Health Out-of-Network Cost Estimate | 70% of FAIR Health | MultiPlan Pricing/Payment | Difference Between FAIR Health Benchmark and MultiPlan |
|---|---|---|---|---|
| $1,360 | $1,888 | $1,321.60 | $432.50 | $889.10 |

578.     That same pattern has played out with other claims. The table below shows the difference between FAIR Health out-of-network prices and the prices set using MultiPlan's pricing methodology for claims submitted to United in Elko, Nevada. In every case, the agreement between United and MultiPlan to not compete on claims pricing results in providers being paid far less than they would have under the prior more competitive out-of-network pricing regime.

| CPT Code | Submitted Amount | FAIR Health Out-of-Network Cost Estimate | 70% of FAIR Health | MultiPlan Pricing/Payment | Difference Between FAIR Health Benchmark and MultiPlan |
|---|---|---|---|---|---|
| 99283 | $463 | $689 | $482 | $217.77 | $264.23 |

579.     According to an internal United document, prior to implementation of Data iSight, United's ASO clients paid 100% of billed charges. After implementation, they often paid less than 60% of billed charges.



**Post Implementation reimbursement rates on claims paid. Pre-Implementation rates were 100% of billed charges.**

580.     MultiPlan sends regular closure reports and performance reports to its Co-Conspirators showing the amount that MultiPlan's methodology underpriced each out-of-network claim and the underpayment that the provider received as a result of MultiPlan's agreement to stop competing with its competitors on claims adjudication and pricing. In the case of United, MultiPlan sent closure and performance reports to the dedicated email address. Later, MultiPlan sent the performance reports and closure reports to United using a Secure File Transfer Protocol process.

581.     MultiPlan also provides quarterly, weekly, and daily reports to its Co-Conspirators concerning MultiPlan's ability to slash the prices of out-of-network claims. These reports are typically broken down into ASO and fully insured reports. For example, MultiPlan routinely sent competing payors reports on provider appeals from MultiPlan's out-of-network pricing, utilization reports, state reports, situs reports, and specialty reports.

582.     MultiPlan used the collective market power of the cartel to bully providers into accepting extremely low prices for their out-of-network goods and services. In some cases,

MultiPlan set the maximum price for out-of-network goods and services at 150% or 110% of Medicare rates. Those prices are known to be unprofitable for providers and, if sustained, can drive providers out of business.

583. *The New York Times* reporting confirmed the providers' inability to negotiate with MultiPlan. It wrote that "[d]ocuments and interviews revealed tactics meant to pressure medical practices to accept low payments. Some offers came with all-caps admonitions and deadlines just hours away. Accept and receive prompt payment; refuse and risk an even lower payout. Practices and billing specialists said this often wasn't an empty threat."

584. MultiPlan also threatens to drop their payments if healthcare providers do not accept their cut-rate offers. In a fax to a healthcare provider, MultiPlan gave the provider eight days to respond to a low-ball offer. But the fax warned, "Please note that if you do not wish to sign the attached proposal . . . this claim is subject to a payment as low as 110% of Medicare rates based on the guidelines and limits on the plan for this patient." In other words, if the provider disagrees with MultiPlan's offer, MultiPlan will lower the rate even further.

585. Similarly, in February of 2019, MultiPlan (through Viant) offered an "adjusted price" to a provider of $3,328 on a bill for $9,284. When the provider tried to counter, Viant replied that it could not accept the counter and that, if denied, the claim would be returned for processing as low as 110% of Medicare and the payor would not allow any appeals.

586. In a recent trial in Oklahoma, an economic expert testified on behalf of certain plaintiff entities that contract with TeamHealth. During his testimony, he was asked "[h]ave you seen, in all the thousands of pieces of paper you've looked at, any connection between what happens to the rates allowed to ER doctors once an insurance company starts to dance with that shared savings and iSight?" He responded, simply, "[t]he reimbursement goes down."

587.    As a result of these payment rate cuts, staffing agencies have been forced to cut physician salaries and benefits due to the low prices set for out-of-network goods and services set by the MultiPlan Cartel. This is not a case about providers seeking a windfall or to charge higher prices for out-of-network healthcare. DAPs and providers only want the same thing that any seller of goods and services want—to sell those goods and services in a market that is free from collusion.[16]

588.    ***Harm to Patients.*** In addition to suppressing payments to providers for out-of-network claims, the MultiPlan Cartel also harms patients because those underpayments limit the amount of revenue that healthcare providers can spend on improving care or offering charitable care. Many hospitals are committed to providing charity care and making a positive impact on the communities they serve. Because providers throughout the U.S. were systematically underpaid as a result of the MultiPlan Cartel, they have less funds to devote to those charitable efforts.

589.    Moreover, America's hospitals are facing an economic crisis, with many struggling to break even due to rising costs and insufficient payments. Over half of U.S. hospitals ended 2022 operating at a loss, a trend that continued into 2023. In addition, a 2023 survey from the American Medical Group Association that collected data from over 15,000 providers found that "median loss per physician for system-affiliated groups is now more than $249,000, as operating expense increases outpace revenue gains."

590.    The MultiPlan Cartel's underpayments have already caused some healthcare providers to fail, thereby limiting the supply of healthcare goods and services available to

---

[16] While payors like to point to the fact that out-of-network prices tend to be higher than in-network and Medicare prices, that is a misleading argument. Medicare and Medicaid prices tend to be unprofitable for providers. Moreover, in-network prices are only profitable if a PPO network can steer a sufficient amount of patient volume to a provider. Thus, providers rely on a payor mix in which out-of-network services cross-subsidize unprofitable or low-margin services. Without that mix, providers do not have sufficient revenue to invest in capital equipment, labor, and facilities in order to maintain their current lines of service.

consumers. For example, in a separate lawsuit filed in San Francisco County Superior Court, VHS Liquidating Trust alleged that Verity Health System went bankrupt as a result of the MultiPlan Cartel. On August 31, 2018, Verity Health System filed for Chapter 11 bankruptcy. As a part of that bankruptcy process, on January 6, 2020, Verity Health System announced the closure of the St. Vincent Medical Center in Los Angeles, California.

591.    Small and independent providers are especially susceptible to the price-fixing of the MultiPlan Cartel. In the recent *The New York Times* exposé on MultiPlan, the reporter interviewed healthcare providers about MultiPlan's effect on their businesses. Kelsey Toney is a behavioral therapist for children with autism in rural Virginia. She typically charges the rates that Virginia pays for people on Medicaid. As reported by *The New York Times*, "last year, she said, Meritain Health, an Aetna subsidiary, informed her that fair payment for her services was less than half what Medicaid paid, based on calculations by MultiPlan." She was then faced with the prospect of turning her patients away: "I don't want to say, 'I'm sorry I can no longer accept you,' especially when I'm the only provider within an hour," she said. Toney told *The New York Times* she "has not billed the parents of her two patients covered by Meritain, but going forward she will not accept patients with similar insurance."

592.    On May 1, 2024, *The New York Times* further reported that "[o]ne provider reported slashed payments from UnitedHealthcare, Cigna and an Aetna subsidiary after the insurers routed claims to MultiPlan's most aggressive pricing tool."

593.    This problem is particularly acute in the context of mental health and substance use disorder ("MHSD") treatment. MultiPlan's pricing scheme often results in payments for MHSD treatment claims that are less than 10–20% of the amount that would be expected for the same services based on traditional methods of calculating rates (*i.e.*, UCR). This massive underpayment

of MHSD treatment pressures existing providers to close or reduce services and causes patients to lose treatment access—a particularly problematic outcome given the lack of MHSD providers across the country.

594. In addition, the MultiPlan Cartel's effect of slashing out-of-network payments suppresses revenue for rural hospitals that are in serious danger of failing—cutting off a key source of healthcare goods and services for many communities. According to the Center for Healthcare Quality and Payment Reform, between 2005 and 2019, over 150 rural hospitals closed. Another 39 rural hospitals closed between 2020 and 2024, despite the COVID-19 pandemic driving record demand for hospital services. Many of the rural hospitals that are still operating are doing so on shoestring budgets. More than 700 rural hospitals, representing nearly 30% of all rural hospitals in the U.S., are at risk of closing. Over 350 rural hospitals are at immediate risk of closing because they are losing money on patient services and have more debts than assets.

595. Since rural hospitals treat fewer patients than urban and suburban hospitals, they have a higher cost of care per patient. As a result, many rural hospitals are at risk of closing because they receive inadequate payments for their services. Therefore, the MultiPlan Cartel's agreement to suppress payment rates to all healthcare providers, including rural hospitals, threatens to drastically cut the supply of healthcare services in several parts of the country. If rural hospitals fail because of the MultiPlan Cartel, the cost of healthcare will increase throughout the U.S. because patients in areas previously served by those hospitals will seek acute medical care only when they are experiencing very severe symptoms, raising the cost of care.

596. In its May 1, 2024 report, *The New York Times* quoted one anonymous rural healthcare provider as saying that MultiPlan "has decimated my life" and caused "the closing of my business," which "left patients having to travel 2.5 hrs for surgery."

597. Furthermore, the MultiPlan Cartel takes advantage of hospital emergency departments that cannot lawfully avoid the cartel's underpayment scheme. In essence, hospital emergency rooms are sitting ducks. There is nothing that they can do to avoid the effects of the MultiPlan Cartel, short of filing this lawsuit.

598. Emergency department utilization is extremely high throughout the U.S. According to the U.S. Centers for Disease Control and Prevention, there were 131.2 million emergency department visits in 2020, equating to 40.5 visits per 100 people. A total of 39.8 million emergency department visits were covered by some form of commercial health insurance.

599. As of 2018, there were approximately 4,500 emergency departments at hospitals throughout the U.S. staffed by approximately 45,000 physicians.

600. Demand for emergency department medical services is highly inelastic. Patients often have little choice regarding to which hospital they are taken and are rarely able to avoid or defer emergency medical treatment.

601. Emergency departments also play an increasing role in the provision of healthcare services. From 1993 to the present, emergency department visits have grown faster than population growth, and emergency departments have become the primary way that patients are admitted to hospitals.

602. Although emergency departments face increasing and inelastic demand, hospitals must serve all patients who come to the emergency department. As discussed above, under EMTALA and analogous state laws, hospitals and physicians who staff emergency medical departments must treat and stabilize all patients, without regard to their method of payment, and hospitals are subject to civil liability for violating these laws.

603. Moreover, although commercial insurance networks typically require medical

providers to seek preauthorization before providing certain medical services, hospitals do not need to seek insurance preauthorization prior to providing emergency medical services. *See* 26 U.S.C. § 9816(a)(1)(A) (requiring that emergency services be covered "without the need for any prior authorization determination").

604.     Because hospital emergency departments are required to treat all persons seeking emergency medical treatment, they rely on commercial insurance networks like the MultiPlan Cartel members to fairly compensate them for out-of-network charges at UCR rates.

605.     Courts recognize that this statutory requirement to treat all persons seeking emergency treatment is ripe for abuse by commercial health insurance networks. *See, e.g.*, *N.Y. City Health & Hosps. Corp. v. Wellcare of N.Y., Inc.*, 937 N.Y.S. 2d 540, 545 (N.Y. Sup. Ct. 2011) ("An insurance company is unjustly enriched if it fails to pay the hospital in full for the costs incurred in rendering the necessary treatment of the insurer's enrollees.").

606.     By colluding to underpay providers, and paying the minimum possible amount to still maintain relationships with hospitals and emergency healthcare providers, the MultiPlan Cartel has been systematically bleeding emergency rooms dry.

607.     Providers certainly cannot turn to Medicare and Medicaid to make up for the losses caused by the MultiPlan Cartel. Payments by Medicare and Medicaid have long failed to keep pace with inflation. Although total hospital expenses increased by 17.5% between 2019 and 2022, Medicare payments for inpatient care increased only 7.5% over the same period. As a result, hospitals' margin on care provided to Medicare patients sank to a historic low of -12%—meaning that for every $100 a hospital spends to treat a recipient of Medicare, Medicare pays only $89.

608.     This dynamic is only exacerbated in times of national public health crisis like the COVID-19 pandemic. While hospital emergency departments generate a massive amount of out-

of-network claims from saving patient lives, the MultiPlan Cartel generates massive profits for MultiPlan and other cartel members by systematically underpaying those out-of-network claims.

609.    As a result of the MultiPlan Cartel, payors typically pay 50% or less of the value of emergency department out-of-network claims. According to an analysis of a sample of 10% of Florida emergency department visits between 2014 and 2015, the average emergency physician charge was $679. That charge is not exorbitant. FAIR Health, a database that contains publicly available data based on billions of out-of-network claims, calculates the 80th percentile charge for a high acuity emergency department visit in Florida to be $950. Despite that fact, payors' average out-of-network payment on those claims was $307. As a result, an emergency physician in Florida provides an average of $138,000 in uncompensated care each year.

610.    Private medical groups are also struggling to stay above water. On average, their expenses are outpacing the payments that they receive for providing care. While revenue per physician has increased by 9.1% since 2020, the median expense per physician has increased by 26.5%. Just like other providers, these medical groups cannot afford to be underpaid by the MultiPlan Cartel. The MultiPlan Cartel puts wide swaths of providers at the edge of bankruptcy.

611.    The MultiPlan Cartel leaves patients worse off. They have less access to care. They have less choice. They too are harmed by the cartel.

612.    ***Harm to Subscribers.*** The MultiPlan Cartel also harms subscribers. After entering into agreements with MultiPlan to limit out-of-network pricing competition, competing payors turn around and charge exorbitant fees to ASO subscribers in exchange for setting low out-of-network prices. Those charges to subscribers can often dwarf the actual amount paid to the provider. Theoretically, competing payors could pass along the "savings" generated by underpaying out-of-network providers in the form of lower per member per month fees for

providing administrative services. That is not happening. As explained below (*see* ¶¶ 629-660), the sole beneficiaries of the MultiPlan Cartel are the cartel members—they reap the benefits of massive profits, surpluses, executive compensation, and stock buy-backs, while the rest of the healthcare system in the U.S. attempts to survive on the miniscule amounts that the cartel deigns to pay for out-of-network goods and services. Therefore, as a result of the MultiPlan Cartel, providing health insurance gets *more* expensive for employers and other health plan subscribers.

613. Many subscribers' contracts with third-party payors are private and not disclosed publicly. However, state and local government entities routinely make information about their healthcare benefits available to the public.

614. An October 28, 2024 *New York Times* investigation concluded that the MultiPlan Cartel is overcharging subscribers for the underpayments that the cartel makes to healthcare providers.

615. The *New York Times* investigation concluded that members of the MultiPlan Cartel, including Elevance, United, Aetna, and Cigna, force state and local government employers to subscribe to health plans that include "shared savings" plans that allow the payors to charge subscribers exorbitant sums for the underpayments that they make to providers.

616. These "shared savings" payments are calculated using a percentage of savings, or PSAV, model. Under this PSAV model, the payor charges the subscriber a percentage of the difference between an out-of-network healthcare provider's billed charges and the amount that the MultiPlan Cartel pays for those out-of-network goods and services.

617. In many cases, these "shared savings" payments are actually higher than the amount of money that the MultiPlan Cartel pays the healthcare provider who actually did the work.

618. Subscribers know that these "shared savings" charges are a sham. There are no

savings and there is nothing that they can do about it.

619.     Referring to Elevance's shaved savings program, a human resources officer for a California county told *The New York Times*, "We don't like it, but there's not much we can do."

620.     A human resources officer for a local government told the *New York Times* that the basic proposition of these "shared savings" programs is a lie. She explained, "What they're trying to say is, 'Look how much it saved you,' but that's really not savings."

621.     A benefits manager for a small Midwestern town said of these "shared savings" programs, "I don't like it morally, conceptually."

622.     Subscribers are told that these "shared savings" programs are "not something you can opt out of."

623.     Competing payors also tell subscribers that if they attempt to opt out of these "shared savings" programs, the payors will raise other administrative fees associated with their health plan, effectively punishing subscribers for attempting to forgo these massive charges.

624.     Many competing payors also make it difficult to track the true cost of these "shared savings" programs by burying the cost of the savings program in a flat monthly charge and not providing a claim-specific breakdown of their "shared savings" charges. As one insurance broker put it, "I'm sure many employers are out there paying this and not even aware that they're paying it."

625.     Members of the MultiPlan Cartel have long worried about the "optics" associated with these shared savings programs while continuing to pocket massive profits from them. In a 2018 presentation, United acknowledged that it had generated "significant revenue" from its out-of-network "savings" program, which totaled $1.1 billion in a single year.

626.     The revenue generated from these massive shared savings payments incentivized

competing payors to use the MultiPlan Cartel to pay providers even less for their out-of-network goods and services. In a 2020 presentation, UMR, a subsidiary of United, wrote: "Strategy for 2021 is force clients to move to more aggressive [shared savings] programs."

627.     Thus, the MultiPlan Cartel creates a negative feedback loop that harms subscribers and providers. Because competing payors benefit from colluding to pay healthcare providers even less and charging subscribers even more for that "service," payors are constantly working with MultiPlan to find ways to pay healthcare providers even less for their out-of-network goods and services.

628.     The MultiPlan Cartel harms competition by systematically underpaying healthcare providers, limiting the amount of revenue that healthcare providers can spend on improving and expanding care, and putting at-risk healthcare providers closer to bankruptcy. The cartel harms patients by leaving them with less access to care and less choice. The cartel harms subscribers by charging them exorbitant fees as a result of the conspiracy.

### C.     There is No Procompetitive Justification for the MultiPlan Cartel

629.     MultiPlan attempts to justify its behavior as intended to keep prices down for healthcare consumers. MultiPlan likes to say that it is bending the curve on healthcare costs. That is a lie. As an August 5, 2020 analysis explained: "Theoretically, MultiPlan's harsh negotiation tactics should be good for rising American health care costs; insurers are supposed to lower costs by negotiating lower prices on behalf of the patient. But instead, MultiPlan acts like a mafia enforcer for insurers, forcing doctors to accept low payments while insurance premiums for patients . . . somehow continue to rise."

630.     Although MultiPlan claims that its out-of-network pricing methodology helped decrease healthcare costs, the data shows otherwise. According to the Centers for Medicare & Medicaid Services, in 2016, a year before several payors joined the MultiPlan Cartel, private health

insurance expenditures in the U.S. were $1.03 trillion. By 2021, private health insurance expenditures in the U.S. were $1.21 trillion. By 2025, private health insurance expenditures in the U.S. are projected to be $1.53 trillion, a 48% increase over 2016.

631.     MultiPlan's argument that it generates savings also ignores who those purported "savings" benefit—MultiPlan and the other members of the MultiPlan Cartel. As explained above, through its PSAV payment model, MultiPlan makes more money when doctors, nurses, and hospitals make less money. Moreover, MultiPlan's Co-Conspirators have designed third-party payment plans that include "shared savings programs" that entitle the Co-Conspirators to a percentage of the "savings"—as high as 35%—generated by underpaying doctors and hospitals for out-of-network goods and services. This often results in MultiPlan and its Co-Conspirators being paid *more* than the provider when a provider provides out-of-network goods and services to a patient. Consider, for example, an instance in which a provider bills $1,500 for an out-of-network service and the MultiPlan Cartel pays only $150 for that service. If MultiPlan has a 15% PSAV for that charge, it will make $202.50 on that claim ($50 more than the provider and 15% of the $1,350 "savings"). If MultiPlan's Co-Conspirator has a 35% shared saving program, it will make $540 on the claim (40% of the $1,350 "savings"). In that scenario, MultiPlan and its Co-Conspirator make nearly six times as much as the provider on that claim.

632.     The remaining underpayment does not benefit subscribers or patients. Competing payors use these underpayments to enrich themselves and funnel cash into eye-watering executive compensation, stock buybacks, and massive surpluses.

633.     In fact, while average Americans have seen their deductibles and premiums increase every year, the members of the MultiPlan Cartel have been getting rich.

634.     Between 2012 and 2022, a period in which the size and effectiveness of the

MultiPlan Cartel increased substantially, the revenues of the seven largest payors (United, Elevance, Aetna, Cigna, Centene, Humana, and Molina) increased by 300% growing from $412.9 billion in 2012 to $1.25 trillion in 2022, far faster than their revenues increased prior to the cartel.

635.    During the same ten-year period, the profits of those seven companies increased by 287%, from $24 billion in 2012 to $69.3 billion in 2022.

636.    For example, in 2009, the first year before it began doing business with MultiPlan, United earned $7.35 billion in profits. In 2022, United made $31.85 billion in profits.

637.    And, compared to FAIR Health, using Data iSight was incredibly lucrative: as a United executive admitted under oath, the MultiPlan Cartel enabled the insurer to raise its margins from $5 per member, per month when it was forced to use FAIR Health as a benchmark, to $30 per member, per month when it joined the MultiPlan Cartel—a 600% increase.

638.    MultiPlan's executives also continue to be compensated at astronomical levels. For example, in MultiPlan's 2024 Proxy Statement, MultiPlan's then-CEO was reported to have made $10.7 million in total compensation in 2022 and $7.6 million in 2023. Additional executives also made over $1 million in 2023, such as Jim Head, MultiPlan's former CFO, who made over $3 million in total compensation in 2023 before being replaced in 2024.

639.    In 2023, the CEOs of the six largest payors (United, Elevance, Aetna, Cigna, Centene, and Humana) earned a combined $122 million in total compensation.

640.    Andrew Witty, the CEO of United, made $23.5 million in compensation in 2023—352 times the median salary at United.

641.    Gail Boudreaux, the CEO of Elevance Health, made $21.8 million in compensation in 2023—389 times the median salary at Elevance.

642.    Karen Lynch, the CEO of Aetna's parent company, CVS Health, made $21.6

million in compensation in 2023—392 times the median salary at CVS Health.

643. David Cordani, the CEO of Cigna, made $21.04 million in compensation in 2023—279.9 times the median salary at Cigna.

644. Sarah London, the CEO of Centene, made $18.5 million in total compensation in 2023—234 times the median salary at Centene.

645. Bruce Broussard, the CEO of Humana, made $16.3 million in compensation in 2023—192 times the median salary at Humana.

646. The compensation paid to the CEOs of MultiPlan Cartel members are even more stark when examined over time. The following chart shows the total compensation paid to the seven largest payor's CEOs between 2012 and 2022. The compensation paid to these CEOs increased faster during the MultiPlan Cartel than it did prior to the cartel.

| Payor | Total CEO Compensation (2012-2022) |
|---|---|
| Cigna | $366.9 million |
| United | $349.4 million |
| Centene | $322.6 million |
| Aetna | $265.7 million |
| Elevance | $166.5 million |
| Molina | $122.1 million |

647. Rather than passing the purported savings generated by the MultiPlan Cartel on to patients, the members of the MultiPlan Cartel also spent billions of dollars on stock buybacks that had no benefit for patients, but did serve to line the pockets of executives and strategic investors.

648. In less than a two-year period, between March 31, 2020 and December 31, 2022, United, Elevance, Cigna, Aetna, Humana, Centene, and Molina collectively spent $47.4 billion on

share buybacks. Between January 1, 2024 and July 31, 2024 alone, Cigna spent $5 billion buying back its own shares. Similarly, in 2022 Aetna's corporate parent, CVS Health, announced that it would spend $10 billion on stock buy-backs.

649.    If that were not enough, while the MultiPlan Cartel has paid doctors and hospitals less and less, the members of the MultiPlan Cartel have engaged in increasingly extravagant internal spending. In 2022, a few days after posting earnings that beat Wall Street expectations, Aetna executives flew to Walt Disney World—with some executives using private jets—for a private concert with John Legend.

650.    In addition to funneling cartel-generated profits to their C-suites, members of the MultiPlan Cartel also stashed those profits in their capital reserves. Members of the MultiPlan Cartel also have capital and statutory surpluses that are far more than is necessary to satisfy requirements of state insurance commissioners and independent ratings agencies. For instance, as of December 31, 2023, United had to keep a capital surplus of $18.3 billion to meet regulatory requirements. However, the company had a capital surplus of $38.5 billion—over $20 billion more than it needed to keep in order to satisfy state regulators. Similarly, as of December 31, 2023, Cigna had to keep a capital surplus of $4.3 billion to meet regulatory requirements. However, the company had a capital surplus of $14.9 billion—$10 billion more than it needed in order satisfy state regulators.

651.    While some members of the MultiPlan Cartel are purportedly non-profit entities, they have funneled the gains from their participation in the cartel into excessive executive compensation, extravagant executive fringe benefits, and surpluses far in excess of requirements of state regulators and ratings agencies. For example, although Highmark is purportedly a non-profit entity, in its Form 990 filing with the Internal Revenue Service, it reported $708 million in

assets and $227 million in liabilities, leaving the purportedly non-profit company with $480 million in net assets. Highmark's executives made out like bandits too. David Holmberg, the CEO and President of Highmark, made $8.5 million in total compensation in 2021. According to the same 2021 Form 990 tax return, Holmberg received significant fringe benefits including private jet flights for himself and a companion, first class air travel, and a country club membership. Although members of the MultiPlan Cartel that are purportedly non-profits typically retain independent executive compensation consultants to advise them on the proper amount of compensation and benefits to pay to their executives, these consultants compare compensation between members of the MultiPlan Cartel. This makes the overpayment of executives in the MultiPlan Cartel a self-fulfilling prophecy.

652. Similarly, while Central States claims to be a non-profit, it made over $5.1 billion in revenue in 2022 according to IRS records. After deducting claims expenses and overhead, Central States made a net income of $1.1 billion in 2022—a significant increase from the $933 million in net income that Central States made in 2021. Central States also has a surplus that is far larger than what is necessary to pay its anticipated annual claims. In 2022, Central States had plan assets of $7.7 billion. Central States paid over $203 million to administrative costs, including employee compensation, in 2022.

653. In theory, medical loss ratios, or MLRs, prescribed by federal regulations should prevent insurers from spending less and less of subscribers' premiums on paying healthcare claims. But, in practice, competing payors manipulate MLRs through conduct that one former payor executive has called a "magician's trick" that involves "figur[ing] out clever ways to shuffle costs around, reclassify expenses, and game the system, so they can rake in massive profits while technically staying within the MLR limits[.]" As that former executive explained, "[i]n a fair

world[,] . . . if insurers spent less on your care, you'd get some money back or pay lower premiums. But in *this* world, they keep finding ways to keep those extra dollars and you're wondering why your premiums keep rising even though you barely go to the doctor."

654. To put all of this in plain English, the members of the MultiPlan Cartel like to justify their conduct as generating "savings" or "bending the cost curve." That is not happening. Each year regular Americans pay more out-of-pocket before their health insurance even kicks in and pay more for having insurance coverage even if they do not use it. At the same time, unknown to patients, MultiPlan and its competing payors are often making more money than their doctor when they see an out-of-network physician. While the MultiPlan Cartel makes billions of dollars from underpaying doctors and hospitals, patients do not see that money.

655. While MultiPlan and its Co-Conspirators attempt to justify the MultiPlan Cartel as tackling exorbitant fees charged by hospitals, they tell a different story when they are testifying under oath. During a trial, John Haben, the former Vice President of Networks at United, testified that despite United's public position that emergency department charges are "egregious," emergency department bills are actually "not a lot of money" when "you put it in the perspective of saving somebody's life." When Haben was informed that an emergency department had charged $1,428 for a patient's medical care and that United, using MultiPlan, had offered to pay only $254 for that claim, Haben testified that "$1,400 is not a lot of money," the emergency department bill was "reasonable," and United's MultiPlan-induced offer to pay $254 for that out-of-network service was "low."

656. Haben is right: emergency care is highly valuable and can lower total medical spending for acutely ill patients. As Dr. Laura Burke, an emergency physician at Beth Israel Deaconess Medical Center, explained: "Too often discussion of the cost of emergency care fail[s]

to consider the bigger picture—that spending on emergency care can save lives, alleviate suffering and in some instances avoid the need for more expensive hospitalization. . . . Emergency physicians treat anyone, anytime and serve as the safety net for the nation's acute care system."

657.    In *Adventist Health System Sunbelt Healthcare Corporation v. MultiPlan, Inc.*, No. 1:23-cv-07031 (S.D.N.Y.), MultiPlan attempted to suggest that its pricing methodology is procompetitive because of "the patient's own interest in having their portion of the ultimate payment to AHS for OON services reduced." But that has not happened. Patients' cost of care has not been reduced by MultiPlan. Co-insurance, deductible, and other out-of-pocket costs for health plans have continued to increase each year under the MultiPlan Cartel.

658.    The MultiPlan Cartel also charges exorbitant "shared savings" fees to employer groups, increasing the cost of self-insured employers offering healthcare coverage. The benefits of the MultiPlan Cartel flow one way—to the cartelists, their executives, and their investors.

659.    Therefore, MultiPlan cannot justify its conduct. MultiPlan does not contain costs. Its cartel has taken advantage of a rapidly growing healthcare sector to enrich itself at the expense of doctors, nurses, and patients. And the life-saving care provided by healthcare providers is not "exorbitant" as the cartel likes to claim (until they are sworn to tell the truth).

660.    Even if there were some real savings associated with the MultiPlan Cartel, that savings could be achieved by less restrictive means that do not harm providers and patients, such as each payor using FAIR Health and its independent business judgment as the basis for pricing and negotiating claims for out-of-network goods and services.

## VII.    DAPs Have Suffered Antitrust Injury and Have Antitrust Standing

661.    Regardless of whether the MultiPlan Cartel agreement is characterized as an agreement between horizontal competitors, a hub-and-spoke agreement, or a vertical agreement, the DAPs have antitrust standing to bring claims against MultiPlan and have suffered a classic

antitrust injury.[17]

662.     DAPs have suffered direct damages to their business and property as a result of the MultiPlan Cartel agreement. The MultiPlan Cartel has caused massive damages to each healthcare provider by collectively setting prices for out-of-network goods and services far below what they would have been but for the cartel. Each member of the MultiPlan Cartel uses MultiPlan's common pricing methodology to massively underpay doctors and hospitals for out-of-network goods and services.

663.     For example, between May 2019 and December 2021, four DAPs—Emergency Physicians of Mid-America, P.C.; Emergency Services of Oklahoma, P.C.; Oklahoma Emergency Services, P.C.; and South Central Emergency Services, P.C.—submitted 22,623 bills for out-of-network services to United. In those bills, the four DAPs sought payments of $23,848,730. The average bill they submitted was for $1,054. However, using MultiPlan's common pricing methodology, United paid only $6,093,373 on those bills—an underpayment of 74.4%. The prices that United set for those out-of-network goods and services using MultiPlan's common pricing methodology were well below the prices that would have been set for those goods and services absent the cartel. The prices were substantially lower than both UCR and FAIR Health prices for those goods and services.

664.     Thus, DAPs have sustained, and continue to sustain, significant economic losses from underpayments made by members of the MultiPlan Cartel and directly caused by the MultiPlan Cartel agreement. DAPs will calculate the full amount of such underpayment damages after discovery and upon proof at trial. Unless the conduct of MultiPlan and other members of the

---

[17] In the case of the associational DAPs that have sued with respect to the interests of their healthcare provider members, the healthcare provider members have suffered the injuries to their business and property alleged in this section.

MultiPlan Cartel is stopped, DAPs will incur future damages via those underpayments.[18]

665.     As noted above (*see, e.g.*, ¶¶ 14, 19-20, 22, 28, 45, 128, 382, 392-393, 412, 449, 497, 506, 510), the MultiPlan Cartel eliminates pricing competition. Prior to the formation of the MultiPlan Cartel, third-party payors competed with one another to set prices for out-of-network goods and services. If a third-party payor did not compensate a provider fairly for out-of-network goods and services, the provider had the ability to bargain fairly for a proper payment for their services by pointing to the prices that other payors were willing to pay for the same service. The MultiPlan Cartel destroyed that pricing competition.

666.     There is direct evidence that the MultiPlan Cartel caused anticompetitive harm to the DAPs. MultiPlan provides monthly "savings reports" that calculate the exact amount of money that MultiPlan has caused specific members of the MultiPlan Cartel to underpay healthcare providers. These savings reports show the amount of charges billed by providers, the prices set by the MultiPlan's pricing methodology, and the portion of the underpayment that MultiPlan attributes to its claims suppression methodology. Each of these savings reports is direct evidence of the anticompetitive harm caused by MultiPlan's agreements with its Co-Conspirators.

667.     MultiPlan's own filings with the SEC illustrate the harm that the MultiPlan Cartel has caused to providers. According to the May 10, 2023 Quarterly Report that MultiPlan filed with the SEC, MultiPlan processed $18.4 billion in charges from commercial health plans in the first three months of 2023. MultiPlan estimates that its agreed-upon pricing methodology resulted in a 61–81% underpayment to providers. These underpayment percentages and the billions of dollars in underpayments generated by the MultiPlan Cartel each year indicate that the MultiPlan Cartel

---

[18] DAPs are not seeking damages for claims that they submitted to MultiPlan's PPO primary or wrap networks and that MultiPlan set prices for as in-network claims.

has caused massive harm to providers, competition, and the DAPs.

668.	Because of the revenues that they lost due to the MultiPlan Cartel, DAPs and other healthcare providers had to cut back on other expenses, including physician compensation and benefits, capital equipment purchases and leases, and hiring additional staff. For example, in a March 13, 2020 email, the TeamHealth DAPs[19] noted that due to massive underpayments that the TeamHealth DAPs were receiving from United for out-of-network goods and services, TeamHealth had made cuts to compensation and benefits for physicians and advanced practice clinicians.

669.	Even if DAPs were able to negotiate with MultiPlan over these out-of-network prices, the best they can hope for is being forced to accept a massive underpayment. The underpayments that MultiPlan negotiates on behalf of its competitors do not differ materially from the initial price set by MultiPlan. For example, David Steinfeld, the Vice President of Clinical and Consumerism Solutions at United, explained in a July 30, 2018 email that even when a provider appealed a price set by MultiPlan, United assumed that the provider would still accept 97.4% of that underpayment.

670.	What makes this even more galling is that United executives privately admitted that they could and would pay providers 100% of their billed charges for out-of-network goods and services, if necessary. In a separate July 30, 2018 email, Steinfeld stated, "If it came down to it UHC would pay billed charges[.]" Sarah R. Peterson, the Director of Network Programs at United, responded to Steinfeld's email on July 31, 2018, explaining that United was secretly willing to pay 100% of billed charges because, "UHC is not taking on legal risk" for using MultiPlan.

---

[19] The "TeamHealth DAPs" are the plaintiffs in *Hill Country Emergency Medical Associates, et al. v. MultiPlan, Inc., et al.*, No. 1:24-cv-11234 (N.D. Ill.).

671. In other words, although United realized that there was a legal risk in using MultiPlan and that the company was secretly willing to pay 100% of billed charges to avoid taking on legal risks associated with using MultiPlan, United continued to use MultiPlan's out-of-network pricing suppression methodology to underpay providers billions of dollars and force providers to accept those underpayments.

672. Rather than competing with other payors to offer reasonable payments for out-of-network goods and services, the members of the MultiPlan Cartel cut their payments to providers with impunity, knowing that they could do so because other payors had agreed to underpay providers as a part of the MultiPlan Cartel. For example, Dan Schumacher, the President and Chief Operating Officer of United, told one provider that United would cut payments to that provider for out-of-network goods and services by as much as 50%. When the provider asked Schumacher why United was cutting the payments to that provider for out-of-network goods and services so drastically, Schumacher replied, "because we can."

673. MultiPlan's pricing methodology generates significant underpayments when compared to non-collusive methods of setting prices for out-of-network goods and services.

674. DAPs' injuries are of the type that the antitrust statutes were intended to forestall. Namely, DAPs were harmed because they were underpaid by members of the MultiPlan Cartel because MultiPlan and other members of the cartel agreed to suppress payments to healthcare providers for out-of-network claims.

675. There are no more direct victims of the MultiPlan Cartel than DAPs. DAPs provided medical goods and services to patients at DAPs' facilities. DAPs submitted bills directly to members of the MultiPlan Cartel. Acting on direction from MultiPlan and pursuant to their anticompetitive agreement, members of the MultiPlan Cartel systematically underpaid DAPs for

those claims. Were it not for the MultiPlan Cartel agreement, DAPs would have been compensated fairly and at a more competitive level for those claims.

676.    There is no potential for speculative damages, duplicative recovery, or complex apportionment of damages. Each claim that DAPs submitted to members of the MultiPlan Cartel for out-of-network goods and services was underpaid compared to the amount that DAPs would have been paid but for the cartel agreement.

677.    Nor is there any other proximate or intervening cause of the DAPs' losses due to MultiPlan's underpayments. For the reasons stated above, when the MultiPlan Cartel systematically underpays DAPs for their out-of-network goods and services, DAPs did not have the ability to obtain the balance of those charges from the patient or any other payor.

678.    While the No Surprises Act ("NSA") contains an independent dispute resolution mechanism for disputed out-of-network claims subject to the No Suprises Act, DAPs cannot avoid the effects of the MultiPlan Cartel using that process. By artificially depressing prices for out-of-network claims across such a wide range of payors, and then categorically refusing to negotiate in most instances, MultiPlan makes the cost of disputing its cartel's underpayments too high to be worthwhile.

679.    MultiPlan admits that: (1) a small fraction of claims go into arbitration, and (2) once there, the independent dispute resolution process is "clunky" and "inefficient." During the 42nd Annual J.P. Morgan Healthcare Conference, former MultiPlan CEO Dale White said about the NSA: "The process itself is relatively efficient and smooth, except for when it gets to the IDR stage. When it gets to the IDR stage, which is the smallest percentage of claims, of our no-surprises claims, the ones that end up in arbitration is a fraction of their overall NSA claim volume. Once it gets there, it's very clunky, very inefficient, and we've had to invest in it. We had to dedicate some

expenses in '22 and '23, in support of just that IDR component. We'll continue to do so. We think there's opportunity for us. It's a complex process. As I said earlier, we've invested in it."

680.     MultiPlan counts on the sheer breadth of its cartel and the crushing volume of pricing notices that it sends to payors to overwhelm the No Suprises Act's independent dispute resolution process. MultiPlan sends some providers multiple pricing notices each day, leading to a queue of underpayments on out-of-network claims that the provider has no effective means to push back on. The MultiPlan Cartel underpays providers for their out-of-network goods and services tens of thousands of times each day. Providers must challenge *each* of those underpayments *individually* in the independent dispute resolution process. In many cases, the cost of pursing independent dispute resolution quickly outstrips the loss caused by the underpayment on a particular claim. Thus, there is no way for a provider to effectively use the independent dispute resolution process to reverse the effects of the MultiPlan Cartel's underpayments.

681.     Government data confirms the futility of pursuing independent dispute resolution. According to a joint report from the U.S. Department of Health and Human Services, U.S. Department of Labor, and U.S. Department of Treasury, during the fourth quarter of 2022, only 11,443 disputes concerning MultiPlan's payments for out-of-network goods and services were contested in the independent dispute resolution process during that period. Those 11,443 dispute claims represent less than 0.1% of all underpayments from the MultiPlan Cartel during that period.

682.     For all out-of-network goods and services, MultiPlan "erect[s] a bureaucratic layer so thick and complicated that few can navigate it" when pushing back on MultiPlan's pricing. MultiPlan relies on the fact that providers overseeing a massive flow of out-of-network claims will not have the time to fight back on individual claims. MultiPlan prices nearly every out-of-network claim, giving medical billers less than 10 days to respond to those prices. When a provider asks

the competing payor how MultiPlan set the prices for its out-of-network claims, the payor claims that it is not responsible for MultiPlan's pricing. When the provider tries to negotiate with MultiPlan, MultiPlan often redirects the provider to the competing payor in order to play a days-long game of telephone instead of actually negotiating the out-of-network price set by MultiPlan.

683.    In short, while there are procedures for providers to dispute payment amounts through arbitration, the sheer volume of claims that are underpaid by the MultiPlan Cartel make arbitrating each individual claim practically and financially impossible.

684.    DAPs suffered antitrust injury as a result of the MultiPlan Cartel. As explained above, the actions of MultiPlan and the MultiPlan Cartel have directly harmed DAPs. For decades, federal courts have recognized that agreements between competitors to underpay providers for goods and services are illegal *per se* because buyers' cartels are so pernicious that they will almost always harm competition.

685.    DAPs are the most efficient enforcer of the antitrust laws with respect to the MultiPlan Cartel. DAPs were directly injured when they were underpaid for submitted out-of-network claims due to the cartel agreement. The damages that DAPs suffered are not contingent, speculative, or complex. Due to the MultiPlan Cartel's conduct, and as a practical and legal matter, DAPs cannot seek payment for these charges from any other source.

## VIII. DAPs' Claims are Not Arbitrable

686.     DAPs' claims are not subject to an arbitration clause in any contract that they may have with MultiPlan or any other payor concerning in-network rates.[20]

687.     DAPs' claims for damages, injunctive relief, and declaratory relief relate solely to the prices MultiPlan and Co-Conspirators set for claims that were entirely out-of-network and were not subject to any prior contractual agreement between DAPs and a payor. DAPs are not seeking relief for any in-network claims pricing or prices set for claims on MultiPlan's complementary network. DAPs' claims against Defendants do not pertain to, arise out of, or relate in any way to the contractual in-network rates set in their contracts (if any) with Defendants.

688.     Defendants all recognize that out-of-network claims are not governed by contracts and have publicly stated as much. For example:

- "Our Analytics-Based Services reduce the per-unit cost of claims using data-driven negotiation and/or reference-based pricing methodologies. These services can be used standalone but often are used in a solution hierarchy after MultiPlan's network services to reduce claims with no available network contract." – MultiPlan

- "[W]e do not have contracts with all providers that render services to our members and, as a result, may not have a pre-established agreement about the amount of compensation those out-of-network providers will accept for the services they render." – Elevance

- "If a provider isn't under contract with your plan, they are known as an 'out-of-network provider.'" – United

---

[20] Each DAP shall make a good faith effort in their Short Form Complaint to identify and assert claims only against those Defendants from which they have been paid solely on an out-of-network basis or otherwise have no agreement to arbitrate disputes concerning the prices of out-of-network goods and services.

- "Out-of-network providers do not have contracts with Humana." – Humana

- "If a doctor or facility has no contract with your health plan, they're considered out-of-network[.]" – Cigna

- An out-of-network doctor "has not agreed to a contract price for the covered service." – Aetna

- "An out-of-network provider is a physician, hospital or other health care provider who has not signed an agreement to provide services through our PPO network." – Blue Cross Blue Shield of Michigan

- "Providers and facilities that do not have a contract with a health insurer are considered out-of-network." – Highmark Health

- "Out-of-network [] [t]ypically refers to physicians, hospitals or other health care providers who do not contract with an insurance plan to provide services to its members." – Consociate Health

- "Out-of-network describes providers and facilities that haven't signed a contract with your health plan." – Healthcare Highways

- "Out-of-network describes providers and facilities that haven't signed a contract with your health plan." – Team Care

689. Defendants' agreements with MultiPlan also explicitly contemplate that MultiPlan's proprietary pricing methodologies will be used to set prices only for healthcare claims that are not subject to any form of written contract. In its contract with Cigna, MultiPlan agreed to apply its proprietary pricing methodologies to "claims of providers [that] do not participate in [Cigna's] network." Likewise, in its contract with MultiPlan, Aetna agreed to send MultiPlan "only out-of-network, non-contracted claims" to be priced according to MultiPlan's proprietary pricing

methodology. Finally, in its contract with MultiPlan, United agrees to route only out-of-network and non-contracted claims to MultiPlan in order to set prices for those claims.

690. For the entire time period relevant to this complaint, no DAP had an in-network agreement or any other form of contract with any Defendant named in its short form complaint that requires any DAP to arbitrate disputes concerning out-of-network pricing.

691. For example, in 2019, United terminated its in-network agreements with the TeamHealth DAPs. As a result, each of those DAPs are currently out-of-network with United and have not reached any agreement to arbitrate their claims against United. Those DAPs have not reached an agreement or meeting of the minds with United concerning the arbitration of any disputes between them and United concerning out-of-network claims adjudication and pricing. And, for purposes of clarity, this dispute does not arise under any of those DAPs' now-terminated out-of-network agreements with United. For purposes of clarity, the TeamHealth DAPs seek damages, injunctive relief, and declaratory relief only for the period after United terminated its agreement with those DAPs.

692. Even if there were, somehow, an enforceable arbitration clause that applied to the DAPs' claims against Defendants (and there is no such clause), many Defendants have waived the right to enforce those clauses. For example, MultiPlan has litigated motions to dismiss against DAP Adventist Health System in the U.S. District Court for the Southern District of New York and did not file a motion to compel arbitration in those proceedings. Moreover, MultiPlan's counsel has told this Court that it will not be filing a motion to compel arbitration in this action.

693. The contracts that MultiPlan and its Co-Conspirators entered into with DAPs regarding in-network goods and services confer no benefits on non-contracting parties and cannot serve as the basis to compel arbitration between the DAPs and a third-party. Many of those

contracts contain clauses that expressly state that the contract confers no benefits on any third-party and that no entity is a third-party beneficiary of the contract.

## IX. The Defendants Also Use Deceptive and Unfair Tactics to Further Their Unlawful Scheme

694. Defendants also have created a web of deceit, and use strongarm tactics to carry out their common purpose of paying DAPs and other providers at rates far below the rates paid in a more competitive market absent collusion. In doing so, Defendants enriched themselves through fees and the benefit of underpaying for DAPs' out-of-network goods and services. Among other things, the Defendants routinely misrepresent to providers in "verification of benefits" communications before services are provided that the payor pays for such services at competitive market rates—and fails to tell providers that, in fact, prices will be determined using MultiPlan's common pricing methodology. And none of the cartel members tell providers that the pricing is being determined through collusion and the use of commingled data, as opposed to each payor independently determining what price it will pay. Defendants couple their bait-and-switch pricing with strong-arm tactics, obfuscation, and a bureaucratic maze designed to leave providers with no practical choice but to take the Defendants' low-ball payments.

695. One of the main reasons PPO plans generally cost more is because plan members can choose to receive out-of-network goods and services. The willingness of providers (including DAPs) to provide services to a PPO plan's members on an out-of-network basis is thus material to the value and appeal of a PPO plan. In turn, when employers select a PPO plan to offer to their employees—and when employees opt to enroll in a PPO plan from among the different types of plans an employer may offer—accessibility to providers on an out-of-network basis is a material consideration.

696. In furtherance of their common plan, Defendants routinely and falsely represent

that they allegedly provide reasonable, competitive, and negotiated rates to out-of-network providers. For example, United represents that it "reimburses at competitive rates" when a patient exercises their choice to use an out-of-network provider and engages in "negotiation" with providers over such rates. Aetna similarly represents that it uses MultiPlan to set prices "based on typical competitive charges and/or payments for a service." Cigna represents that it offers out-of-network providers "an amount based on a market-based rate," or UCR amounts. There is no disclosure that MultiPlan is using the cartel's commingled data, that the other payors have substituted MultiPlan Cartel pricing of out-of-network goods and services for their own independent decisions on pricing, or that pricing is suppressed through a series of caps ("overrides") that MutiPlan coordinates so that the cartel members remain in alignment in pushing out-of-network prices lower and lower.

697.    Except in the case of emergency services that are covered by EMTALA or similar state laws, before providing out-of-network goods and services, a DAP typically contacts the patient's insurer (or agent of the insurer) for a verification of benefits and, if needed, pre-authorization for the services. This allows the DAP to confirm that the treatment will be paid for even though the provider is not in-network for that patient's plan. Such confirmation is a standard practice in the healthcare industry that induces DAPs to provide services and facilities to patients on an out-of-network basis.

698.    Defendants are aware that DAPs and other out-of-network providers seek out and routinely rely on such pre-treatment verifications. Defendants take advantage of this dynamic to victimize the DAPs. Throughout the relevant period, agents and representatives of each Defendant regularly and routinely represented to DAPs that the competing payors would pay for out-of-network goods and services and facilities, for example, a UCR rate or a specified multiple of

Medicare rates—only to have MultiPlan come back after the goods and services are provided with cartel pricing that is far below what was indicated in the pre-service communications. MultiPlan presents its low-ball, non-market rates on a take-it-or-leave-it basis—often with deadlines of 24 hours or less and with threats that any push back from the provider will just result in a lower payment rate.

699.    The MultiPlan employees making these communications are instructed and incentivized to pay DAPs low rates—which rates are then communicated to other MultiPlan employees in a race to the bottom. Moreover, the rates paid to DAPs often are tied to pre-determined price "caps" set in a coordinated manner as part of Defendants' scheme.

700.    Defendants know these tactics work because DAPs are under the misimpression (deliberately generated through Defendants' misrepresentations and half-truths) that the rates MultiPlan is communicating to them are market based and determined independently by each payor. DAPs do not have the data, resources, or time to understand that the rates being paid are the product of collusion.

## X.    The Statute of Limitations Should be Tolled Under the Fraudulent Concealment and Continuing Violation Doctrines

### A.    Fraudulent Concealment

701.    From at least January 1, 2015 through the present, MultiPlan and members of the MultiPlan Cartel have affirmatively and fraudulently concealed the existence of the MultiPlan Cartel from DAPs by various means and methods.

702.    MultiPlan colludes with competing payors by entering into horizontal agreements to end pricing competition for out-of-network goods and services. The DAPs are not a party to those agreements. Due to non-disclosure and confidentiality clauses in the contracts, DAPs did not access, and could not have reasonably accessed, the underlying terms that would have alerted

DAPs of a potential antitrust claim.

703.    MultiPlan has also taken steps to maintain the secrecy of its agreements with competing payors. For instance, its Network Rental Agreement with United requires United to take steps "to preserve the confidential and proprietary nature of [MultiPlan's] repricing information."

704.    The same Network Rental Agreement between MultiPlan and United requires United and MultiPlan to conceal their agreement from the public. The agreement states, "neither party will make any public announcement of this Agreement," and that United and MultiPlan will "restrict knowledge of the terms and conditions of this Agreement to those who need to know."

705.    Moreover, MultiPlan publicly disseminates misleading and false information to cover up the fact that it is a payor, thereby hiding the fact that it was colluding with its competitors (other payors) to suppress payments to providers.

706.    The landing page of MultiPlan's website currently states prominently at the top of the page: "**We are not an insurance company**" (original emphasis). MultiPlan's website also states: "MultiPlan is not a health insurance company and does not sell insurance directly or indirectly through agents or brokers."

707.    In the "About MultiPlan" section of its press releases, MultiPlan also (mis)characterizes itself as merely a "partner" to health insurance companies and describes those companies only as MultiPlan's "clients[]." MultiPlan does not mention that it is actually a payor.

708.    MultiPlan submits to providers through its Negotiation Services Portal pricing offers which state falsely that "MultiPlan is not a payor or an agent of any payor." In fact, MultiPlan is both a payor *and* an agent of competing payors, who enter into agreements authorizing MultiPlan to make pricing offers and negotiate out-of-network claims on their behalf.

709. These statements are highly misleading at best, if not entirely inaccurate. MultiPlan is a payor. MultiPlan has one of the oldest and largest PPO networks in the U.S. MultiPlan prices and pays out-of-network claims in its primary PPO networks. MultiPlan's claims that it is "not a health insurance company" are irrelevant and incorrect. Like many payors, MultiPlan is not an insurer. But MultiPlan still competes against other payors by adjudicating and pricing claims.

710. MultiPlan's statements made to DAPs and the public that MultiPlan is "not an insurance company" were misleading, and MultiPlan intended for DAPs, other healthcare providers, and the public to rely upon them.

711. Likewise, MultiPlan's Co-Conspirators made statements to the public that were designed to obscure the difference between the out-of-network price set by the MultiPlan Cartel and the UCR rates for out-of-network goods and services that existed prior to the MultiPlan Cartel. For example, in a certificate of coverage for United's Student Injury and Sickness Insurance Plan for enrolled students at the University of Mississippi, United claimed that it "uses data from . . . Data iSight to determine Usual and Customary Charges." United failed to explain that there is a vast difference between prices set by MultiPlan's pricing methodology and UCR rates.

712. On information and belief, MultiPlan's Co-Conspirators have also submitted false payment communications intended to trick providers into accepting MultiPlan's artificially low payments for out-of-network services. Federal regulation requires that when a payor pays a medical claim at a different rate than the billed amount, the payor must explain the reason for the discrepancy to the provider. When these communications, which are commonly referred to as explanations of benefits (or "EOBs"), are submitted electronically, they are subject to federal regulations governing the form and content of electronic healthcare transactions. These regulations require that EOBs use a standardized set of claim adjustment reason codes ("X12 Codes") to

explain why a claim was paid differently than the billed amount.

713. Payors use the X12 Code "CO" (short for "Contractual Obligation") to indicate that a claim was paid pursuant to a contractual agreement between the payor and the provider, or a government-sponsored plan like Medicare, which has pre-set rates. For instance, a payor is supposed to submit an EOB using the code CO when the payor has paid a claim pursuant to a network contract with the healthcare provider, under which the payor and provider have agreed to a lower rate than the charged amount. The X12 Code "PR" (short for "Patient Responsibility") means that the patient is responsible for a portion of the submitted charge. When a payor pays an out-of-network claim—which is not subject to a preexisting agreement with the provider—below the billed amount, the payor is supposed to send the provider an EOB using the "PR" reason code.

714. MultiPlan's Co-Conspirators sometimes submit electronic EOBs using the code "CO" for out-of-network claims priced by MultiPlan, even though the rates determined by MultiPlan are not subject to any contract between the provider and payor, and the EOBs should therefore use the code "PR." MultiPlan's Co-Conspirators do this because they believe that healthcare providers and their billing service providers are less likely to carefully review and appeal claims paid below the charged amount when the payment rate is set by a preexisting contract. It is common practice for medical billing service contractors to automatically accept payments accompanied by the code CO, because they assume that the payment amount has already been negotiated and agreed to by the provider and payor (or set by the government). Conversely, MultiPlan's Co-Conspirators believe that healthcare providers and their medical billing service contractors will be more likely to scrutinize and potentially appeal payments using the code PR, which are not set by contract.

715. The competing payors' statements to DAPs and other healthcare providers that out-

of-network claims priced by MultiPlan were paid pursuant to a "contractual obligation" were false, and the Co-Conspirators intended for DAPs and other healthcare providers to rely upon them. The Co-Conspirators' false and misleading billing practices caused DAPs and other healthcare providers to accept unreasonably low prices for out-of-network claims set by MultiPlan, which they may have appealed if the payors had submitted EOBs using accurate X12 Codes.

716.    While MultiPlan was attempting to hide its role in the cartel by claiming that it did not compete against other payors, the members of the MultiPlan Cartel were busy trying to deflect attention from the cartel by blaming physicians for allegedly charging too much for out-of-network goods and services. They did that using false comparisons, invented numbers, and laundered academic research.

717.    In a December 4, 2018 email exchange between Lambert van der Wade, Dan Schumacher, Jon Wander, and Jeff Lucht of United, they discussed a draft United research paper entitled, "Inflated Charge by Out-of-Network Emergency Physicians Total $8 Billion Each Year." However, they acknowledged that this headline number was built on a false comparison. Lucht pushed for the article to compare billed out-of-network charges to Medicare payment amounts, stating: "It seems we could tell a similar story by just showing non-par billed amounts as a percentage of Medicare – they look ludicrously high and should make our point." Wade responded that while that comparison was "a viable option," "to be clear, using invented Medicare rate benchmarks, rather than real numbers, will adversely affect the deliverable." Wade went on to explain that the figures in the report were "invented" and not "real," because "100% Medicare is too low. Policy makers know and appreciate the fact that commercial rates are higher than public program rates, and believe this should remain the case, in part to cross subsidize (and lower the direct cost to government of) public programs." In the end, Wade agreed to use "Medicare rates"

because "the OON charges . . . will indeed look high, allowing us to make our intended point[.]"

718.    United secretly laundered its viewpoint through seemingly neutral academic writing from Professor Zack Cooper, an Associate Professor of Public Health and Associate Professor of Economics at Yale University's School of Public Health. United executives reviewed Professor Cooper's academic writing on out-of-network pricing prior to its publication and edited the writing to better fit with United's chosen narrative concerning out-of-network pricing. Professor Cooper published his academic work on out-of-network pricing without fully disclosing the degree to which United executives had been involved in reviewing and editing his work.

719.    Professor Cooper's research was not just slanted. It was wrong. In reality, emergency medicine was not generating the surprise out-of-network bills that Professor Cooper claimed. In 2019, on average, the TeamHealth DAPs billed $150 per patient encounter in hospital emergency departments.

720.    MultiPlan also took steps designed to make it more difficult for the cartel to be detected. MultiPlan and other competing payors kept their meetings off-the-record. They exchanged their most sensitive information via telephone conversations and text messages and not on corporate email servers. They also took steps to prevent providers from balance billing when MultiPlan set out-of-network prices, making it less likely that patients would begin complaining about "surprise" medical bills.

721.    Given the MultiPlan Cartel's massive effort at misdirection and blame-shifting, DAPs exercised reasonable diligence at all times since January 1, 2015, but had no reason to suspect the existence of the MultiPlan Cartel until recently. The concerted nature of the Defendants' wrongdoing only began to come to light at all—and even then, incompletely—in (1) a September 8, 2021 California-law antitrust claim filed against MultiPlan by the VHS Liquidating

Trust filed in San Francisco County Superior Court, and (2) a March 7, 2022 article raised questions regarding MultiPlan's antitrust compliance. *See MultiPlan: Company's Information Sharing, Meetings Practices Could Raise Antitrust Concerns, Experts Say*, Cap. F. (March 7, 2022), https://thecapitolforum.com/multiplan-companys-information-sharing-meetings-practices-could-raise-antitrust-concerns-experts-say. DAPs could not have discovered the MultiPlan Cartel at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques described above, including MultiPlan's multiple misleading statements that it is not a health insurance company, to conceal the existence of the cartel.

722. Other lawsuits against MultiPlan did not alert DAPs to any federal antitrust claims, as none revealed the true nature of MultiPlan's relationship with other payors. For example, *Plastic Surgery Center, P.A. v. Cigna, et al.*, No. 3:17-cv-2055 (FLW) (DEA) (D.N.J.), made claims related to in-network claims—not out-of-network claims—and did not allege antitrust violations. *Hott v. MultiPlan, Inc.*, No. 21 Civ. 02421 (LLS) (S.D.N.Y.), and *LD v. United Behavioral Health*, No. 4:20-cv-02254-YGR (N.D. Cal.), both raised grievances concerning MultiPlan's out-of-network rates to healthcare providers, but did not allege that the reason for the low rates was that MultiPlan had entered into agreements with its competitors to suppress payments. *Pacific Recovery Solutions v. United Behavioral Health*, No. 4:20-cv-02249 (YGR) (N.D. Cal.), alleged antitrust violations related to out-of-network payments, but based on an inability to collect unpaid balances from patients rather than collusion between competitors to tamp down payments to providers.

### B. Continuing Violation

723. MultiPlan's conduct has also resulted in a continuing violation against DAPs.

724. Following its initial combination with its Co-Conspirators, MultiPlan has committed overt acts, each of which constitutes part of the ongoing violation.

725.    Members of the MultiPlan Cartel met frequently to refine their cartel agreement and to ensure that the agreement was effective in suppressing out-of-network payments to healthcare providers. Members of the MultiPlan Cartel met during Client Advisory Board meetings to discuss the effectiveness of MultiPlan's products in cutting out-of-network payments to healthcare providers. MultiPlan representatives also met weekly or daily with executives at United concerning out-of-network payments.

726.    Members of the MultiPlan Cartel took steps to maintain and adjust their anticompetitive agreement by renewing contracts with MultiPlan for out-of-network claim suppression and changing the agreed-upon methodology that MultiPlan would use to suppress out-of-network payments. Indeed, MultiPlan told investors in May 2023 that, in the short period between Q3 2022 and Q1 2023 alone, MultiPlan "renewed multiyear contracts with 3 of our larger customers." According to MultiPlan, "those 3 contracts accounted for more than 50% of [MultiPlan's] revenue." These new agreements solidify and perpetuate the MultiPlan Cartel and are continuing violations of the antitrust laws.

727.    MultiPlan Cartel members also imposed shared savings agreements on employee benefit plans to ensure that the cartelists would generate profits by cutting out-of-network payments.

728.    MultiPlan's overt actions and the overt actions of its fellow cartelists were new acts beyond the initial cartel agreement that were necessary to perpetuate the conspiracy. Those overt acts continued from at least January 1, 2015 through the present. By constantly renewing and refining their agreement to suppress out-of-network reimbursement payments, the members of the MultiPlan Cartel inflicted new and accumulating injury on the DAPs.

## XI. Causes of Action

### FIRST CLAIM FOR RELIEF

### HORIZONTAL AGREEMENTS IN RESTRAINT OF TRADE

### (Section 1 of the Sherman Act, 15 U.S.C. § 1)

729. DAPs reincorporate and reallege by reference the preceding paragraphs as though fully set forth herein.

730. Beginning at least as early as January 1, 2015, and through the present, MultiPlan engaged in a continuing contract, combination, or conspiracy with the other members of the MultiPlan Cartel to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

731. MultiPlan is a horizontal competitor with other payors in the Out-of-Network Goods and Services Market.

732. MultiPlan's PPO networks compete against other payors to set prices for out-of-network goods and services. By entering into the MultiPlan Cartel agreement, MultiPlan and its Co-Conspirators removed this form of rivalry amongst themselves by illegally coordinating the prices that they set for out-of-network goods and services. But for the MultiPlan Cartel agreement, payors would have exercised their independent business judgment when setting and negotiating prices for out-of-network goods and services.

733. MultiPlan and its horizontal competitors in the MultiPlan Cartel reached agreements to stop competing against one another by setting their own prices for out-of-network goods and services. Instead, they agreed to: (1) use MultiPlan's pricing methodology to set prices for out-of-network goods and services, (2) fix maximum prices that they would pay for particular out-of-network goods and services, and (3) use MultiPlan as the sole negotiator of out-of-network prices.

734.    In this manner, the MultiPlan Cartel had a conscious commitment to this common scheme concerning fixing prices among competitors in the Out-of-Network Goods and Services Market.

735.    Providers, including DAPs, were directly and proximately harmed by the horizontal price-fixing of the MultiPlan Cartel. DAPs submitted billed charges for out-of-network goods and services to members of the MultiPlan Cartel, and MultiPlan and its Co-Conspirators conspired to systematically underpay DAPs for their out-of-network goods and services. These conspiratorial underpayments caused a direct, foreseeable, concrete, and redressable injury to the DAPs.

736.    The injuries suffered by DAPs as a result of the MultiPlan Cartel are of a type that the antitrust laws are intended to prevent. Economic losses caused by an agreement among competitors to restrain trade are a classic example of injuries that the antitrust laws are intended to prevent.

737.    DAPs' injuries flow from MultiPlan's illegal agreements with the members of the MultiPlan Cartel. Were it not for those agreements, DAPs would have received higher payments for out-of-network medical services.

738.    DAPs suffered compensable damages as a result of the MultiPlan Cartel. The exact calculation and amount of those damages will be disclosed in DAPs' expert reports and expert testimony at trial.

739.    DAPs continue to be harmed by the MultiPlan Cartel's ongoing horizontal price-fixing conspiracy.

740.    DAPs exercised reasonable diligence in attempting to ascertain the existence of the MultiPlan Cartel's illegal horizontal price-fixing.

741.    The MultiPlan Cartel fraudulently concealed its horizontal price-fixing from DAPs

and the public such that the illegal nature of the scheme only became ascertainable after certain lawsuits and regulatory filings made relevant information accessible to the public.

742. The MultiPlan Cartel's horizontal price-fixing is a *per se* violation of Section 1 of the Sherman Act.

743. In the alternative, the MultiPlan Cartel's horizontal price-fixing violates the rule of reason under either a quick look or more fulsome analysis because MultiPlan and its competitors entered into agreements that restrained trade in a properly defined relevant market and there is no procompetitive justification for the MultiPlan Cartel.

744. Even if MultiPlan is not a payor, it is still liable for a *per se* violation of Section 1 of the Sherman Act because it was a potential competitor of the cartel members.

**SECOND CLAIM FOR RELIEF**

**HUB-AND-SPOKE AGREEMENT IN RESTRAINT OF TRADE**

**(Section 1 of the Sherman Act, 15 U.S.C. § 1)**

**(Plead in the Alternative to Claims 1, 3, and 4)**

745. DAPs reincorporate and reallege by reference the preceding paragraphs as though fully set forth herein.

746. In the alternative to the DAPs' first cause of action, from at least as early as January 1, 2015 through the present, MultiPlan entered into an illegal "hub-and-spoke" agreement with the other members of the MultiPlan Cartel to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

747. MultiPlan is the "hub" of the hub-and-spoke conspiracy. It initiated the conspiracy, induced the Co-Conspirators to join, facilitates the price-fixing undertaken by the conspiracy, and profits from that facilitation.

748.     MultiPlan's agreements with competing payors to participate in the MultiPlan Cartel constitute the various "spokes" of the conspiracy. As stated above, MultiPlan and the competing payors reached agreements to stop competing against one another by setting their own prices for out-of-network goods and services. Instead, they agreed to (1) use MultiPlan's pricing methodology to set prices for out-of-network goods and services, (2) fix maximum prices that they would pay for particular out-of-network goods and services, and (3) use MultiPlan as the sole negotiator of out-of-network prices.

749.     The "rim" of the hub-and-spoke conspiracy is formed by the agreements between and among payors to adopt MultiPlan's pricing methodology for out-of-network goods and services. Voluminous circumstantial evidence supports the existence of these "rim" agreements, including parallel conduct among members of the MultiPlan Cartel and "plus factors" indicating that this conduct was the result of an anticompetitive agreement (*i.e.*, high market concentration, barriers to market entry, ample motive, opportunities to conspire, previous collusion, actions against self-interest, exchange of competitively sensitive information, monitoring and enforcement structures, customary patterns and leadership, and sweetheart deals to retain cartel members).

750.     The injuries suffered by the DAPs as a result of the MultiPlan Cartel are of a type that the antitrust laws are intended to prevent. Economic losses caused by an agreement among competitors to restrain trade are a classic example of injuries that the antitrust laws are intended to prevent.

751.     DAPs suffered compensable damages as a result of the hub-and-spoke conspiracy formed by the MultiPlan Cartel. The exact calculation and amount of those damages will be disclosed in DAPs' expert reports and expert testimony at trial.

752.     DAPs' injuries flow from the MultiPlan Cartel's illegal hub-and-spoke conspiracy.

Were it not for the conspiracy, DAPs would have received higher payments for out-of-network goods and services.

753. DAPs continue to be harmed by the MultiPlan Cartel's ongoing hub-and-spoke conspiracy.

754. DAPs exercised reasonable diligence in attempting to ascertain the existence of the MultiPlan Cartel's illegal hub-and-spoke conspiracy. The MultiPlan Cartel fraudulently concealed its hub-and-spoke conspiracy from DAPs and the public such that the illegal nature of the scheme only became ascertainable after certain lawsuits and regulatory filings made relevant information accessible to the public.

755. The MultiPlan Cartel's hub-and-spoke conspiracy constitutes a *per se* violation of Section 1 of the Sherman Act.

756. In the alternative, even if no "rim" agreement is present, the MultiPlan Cartel is still a hub-and-spoke agreement that violates the rule of reason because MultiPlan and the competing payors have agreed to unreasonably restrain trade in the Out-of-Network Goods and Services Market and there is no procompetitive justification for their conduct. Even if such a procompetitive justification did exist (and it were not a pretext), the alleged procompetitive benefits of the MultiPlan Cartel could still be obtained by less restrictive means, such as using FAIR Health to determine out-of-network prices.

# THIRD CLAIM FOR RELIEF

## PRINCIPAL-AGENT COMBINATIONS IN RESTRAINT OF TRADE

### (Section 1 of the Sherman Act, 15 U.S.C. § 1)

### (Plead in the Alternative to Claims 1, 2, and 4)

757.    DAPs reincorporate and reallege by reference the preceding paragraphs as though fully set forth herein.

758.    In the alternative to DAPs' first, second, and fourth causes of action, from at least as early as January 1, 2015 through the present, MultiPlan acted as an agent, facilitator, or conduit of each of the other members of the MultiPlan Cartel to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act.

759.    MultiPlan operated as the agent of competing payors that were engaged in a *per se* illegal conspiracy to restrain trade by suppressing competition for out-of-network payments to healthcare providers. MultiPlan was aware of the competing payors' intent to suppress competition by using a common methodology for setting prices out-of-network goods and services and using a common agent for negotiating those prices. MultiPlan facilitated the payors' efforts to suppress competition among themselves concerning payments for out-of-network goods and services. MultiPlan intended to facilitate this *per se* violation of Section 1 of the Sherman Act because it had a financial stake in doing so—MultiPlan was paid more if it assisted the competing payors in paying less to healthcare providers for out-of-network goods and services. MultiPlan also contributed materially to the competing payors' restraint of trade. It provided each of the payors with access to its common pricing methodology, which the competing payors could not have recreated on their own, and served as a conduit for the members of the MultiPlan Cartel to indirectly communicate with each other about their pricing of out-of-network payments.

760. The MultiPlan Cartel has dominant collective market power in the Out-of-Network Goods and Services Market. It also has complete power in each relevant submarket, where healthcare providers have no choice but to submit their billed charges to the specific payor operating the health plan in which the patient is enrolled and cannot turn to another buyer for payment of those out-of-network charges.

761. MultiPlan and each of the other payors entered into anticompetitive agreements that harmed competition in the Out-of-Network Goods and Services Market and its submarkets by intentionally suppressing the prices paid to out-of-network healthcare providers, including DAPs.

762. The MultiPlan Cartel's price-fixing agreements are each an unreasonable restraint on trade in violation of Section 1 of the Sherman Act. MultiPlan and its Co-Conspirators entered into agreements that used their combined market power to restrain trade in the relevant market and relevant submarkets without any procompetitive justification. Even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

763. DAPs' injuries flow from MultiPlan's illegal agreements with each member of the MultiPlan Cartel. Were it not for those agreements, DAPs would have received higher payments for out-of-network medical services.

764. DAPs suffered compensable damages as a result of the MultiPlan Cartel. The exact calculation and amount of those damages will be disclosed in DAPs' expert reports and expert testimony at trial. DAPs continue to be harmed by the MultiPlan Cartel's ongoing combination or conspiracy.

**FOURTH CLAIM FOR RELIEF**

**AGREEMENTS TO UNREASONABLY RESTRAIN TRADE**

**(Section 1 of the Sherman Act, 15 U.S.C. § 1)**

**(Plead in the Alternative to Claims 1, 2, and 3)**

765. DAPs reincorporate and reallege by reference the preceding paragraphs as though fully set forth herein.

766. In the alternative to DAPs' first, second, and third causes of action, from at least as early as January 1, 2015 through the present, MultiPlan engaged in a continuing agreement with each of the other members of the MultiPlan Cartel to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

767. The MultiPlan Cartel has dominant collective market power in the Out-of-Network Goods and Services Market. It also has complete power in each relevant submarket, where healthcare providers have no choice but to submit their billed charges for out-of-network goods and services to the specific payor operating the health plan in which the patient is enrolled and cannot turn to another buyer for payment of those out-of-network charges.

768. MultiPlan and each of the other payors entered into anticompetitive agreements that harmed competition in the Out-of-Network Goods and Services Market and its submarkets by agreeing to: (1) use MultiPlan's pricing methodology to set prices for out-of-network goods and services, (2) fix maximum prices that they would pay for particular out-of-network goods and services, and (3) use MultiPlan as the sole negotiator of out-of-network prices.

769. The MultiPlan Cartel's price-fixing agreements are each an unreasonable restraint on trade in violation of Section 1 of the Sherman Act. MultiPlan and its Co-Conspirators entered into agreements that used their combined market power to restrain trade in the relevant market and

relevant submarkets without any procompetitive justification. Even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

770. DAPs' injuries flow from MultiPlan's illegal agreements with each member of the MultiPlan Cartel. Were it not for those agreements, Defendants would have competed with one another to independently set and negotiate prices for out-of-network goods and services, resulting in higher payments for out-of-network goods and services.

771. DAPs suffered compensable damages as a result of the MultiPlan Cartel. The exact calculation and amount of those damages will be disclosed in DAPs' expert reports and expert testimony at trial. DAPs continue to be harmed by the MultiPlan Cartel's ongoing vertical price-fixing conspiracy.

## FIFTH CLAIM FOR RELIEF

## ANTICOMPETITIVE INFORMATION EXCHANGE

### (Section 1 of the Sherman Act, 15 U.S.C. § 1)

772. DAPs reincorporate and reallege by reference the preceding paragraphs as though fully set forth herein.

773. From at least as early as January 1, 2015 through the present, MultiPlan engaged in a continuing arrangement with each of the other members of the MultiPlan Cartel to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, through an anticompetitive information exchange.

774. Because DAPs rely on evidence of information sharing (*see supra* Section V.C.), the elements of a Section 1 violation can be satisfied by showing either an anticompetitive agreement to fix prices, where information sharing supports the inference of such an agreement,

or an anticompetitive agreement to share information. The First and Second Causes of Action relate to the former. This Cause of Action relates to the latter.

775.    MultiPlan and the other members of the MultiPlan Cartel engaged in concerted action by entering into an anticompetitive arrangement to regularly exchange detailed, current, competitively sensitive, and non-public information about the prices that they set and negotiated for out-of-network goods and services.

776.    The information being exchanged among the MultiPlan Cartel consists primarily of critical and sensitive pricing information.

777.    The information being exchanged among the MultiPlan Cartel is increasingly granular. The information consists of detailed, non-aggregated, and intimate details about the cartel member's competitive affairs.

778.    The information being exchanged among the MultiPlan Cartel is not publicly available, and is not disseminated to healthcare providers, healthcare consumers, or other market participants. Instead, it is shared only with members of the MultiPlan Cartel.

779.    The information being exchanged among the MultiPlan Cartel reflects recent, present, and planned future conditions. Advancements in MultiPlan's technology allows cartel members' current and future prices and plans to be shared quickly and frequently.

780.    The purpose and effect of this arrangement to exchange information is to stifle pricing competition for out-of-network goods and services and to depress payments to healthcare providers, including DAPs, for out-of-network goods and services.

781.    The MultiPlan Cartel has dominant collective market power in the Out-of-Network Goods and Services Market. It also has complete power in each relevant submarket, where healthcare providers have no choice but to submit their billed charges to the specific payor

operating the health plan in which the patient is enrolled and cannot turn to another buyer for payment of those out-of-network charges.

782.     This information exchange harms competition in the Out-of-Network Goods and Services Market and its submarkets because the suppressed payments to healthcare providers are lower than they would have been had those companies competed with one another to set prices independently without exchanging vast amount of information of current pricing information in order to bring their out-of-network pricing into alignment. The information exchange also harms consumers of healthcare services because the underpayments limit healthcare providers' investments on improving care.

783.     There is no procompetitive justification for the anticompetitive information exchange among the MultiPlan Cartel. Even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition, such as utilizing FAIR Health pricing information.

## SIXTH CLAIM FOR RELIEF

## VIOLATION OF STATE AND D.C. ANTITRUST STATUTES

### (Plead in the Alternative to Claims 1-5)

784.     DAPs reincorporate and reallege by reference the preceding paragraphs as though fully set forth herein.

785.     Defendants are engaged in a continuing contract, combination, or conspiracy and/or exchange of information that has operated from at least as early as January 1, 2015 through the present with respect to the prices paid for out-of-network goods and services in unreasonable restraint of trade in commerce, in violation of the various state antitrust and consumer protection statutes set forth below.

786. Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for Out-of-Network Goods and Services Market and relevant submarkets.

787. DAPs' injuries flow from Defendants' illegal agreements and conduct in furtherance of the MultiPlan Cartel. Were it not for those agreements and conduct, Defendants would have competed with one another to independently set and negotiate prices for out-of-network goods and services, resulting in higher payments for out-of-network goods and services.

788. As a result of Defendants' unlawful conduct, each DAP has been injured by being paid for their Out-of-Network Goods and Services at prices lower than they would have been paid if Defendants competed with one another to independently price out-of-network goods and services.

789. DAPs suffered compensable damages as a result of Defendants' unlawful agreements and conduct. The exact calculation and amount of those damages will be disclosed in DAPs' expert reports and expert testimony at trial.

790. By engaging in the foregoing conduct, Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the following state antitrust laws pleaded below.

791. **Arizona:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Ariz. Rev. Stat. § 44-1402,** *et seq.*, with respect to pricing of out-of-network goods and services provided in Arizona by one or more DAPs.

    a. Defendants' combination or conspiracy had the following effects:

        1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Arizona;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Arizona;

3. DAPs were deprived of free and open competition; and

4. DAPs were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct substantially affected Arizona commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, DAPs have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **Ariz. Rev. Stat. § 44-1401,** *et seq.*

e. Accordingly, DAPs seek all forms of relief available under **Ariz. Rev. Stat. § 44-1402,** *et seq.*

792. **California:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Cal. Bus. Prof. Code § 16720,** *et seq.*, with respect to pricing of out-of-network goods and services provided in California by one or more DAPs.

a. Defendants entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Cal. Bus. Prof. Code § 16720. Defendants, each of them, have acted in violation of Cal. Bus. Prof. Code § 16720 to fix, suppress, and maintain prices of out-of-network goods and services at sub-competitive levels and to unlawfully exchange pricing information.

b. The aforesaid violations of Cal. Bus. Prof. Code § 16720, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants, the substantial terms of which were to fix, suppress, and maintain prices of out-of-network goods and services at

sub-competitive levels and unlawfully exchange pricing information.

c.   For the purpose of forming and effectuating the unlawful trust, Defendants have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above and the following: fixing, suppressing, and maintaining prices of out-of-network goods and services at sub-competitive levels and unlawfully exchanging pricing information for out-of-network goods and services.

d.   Defendants' combination or conspiracy had the following effects:

1.   Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout California;

2.   Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout California;

3.   DAPs were deprived of free and open competition; and

4.   DAPs were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

f.   Defendants' illegal conduct substantially affected California commerce.

g.   As a direct and proximate result of Defendants' unlawful conduct, DAPs have been injured in their business and property and are threatened with further injury.

h.   Defendants entered into agreements in restraint of trade in violation of **Cal. Bus. Prof. Code § 16720,** *et seq.*

i.   As a result of Defendants' violation of Cal. Bus. Prof. Code § 16720, DAPs seek all forms of relief available under Cal. Bus. Prof. Code § 16750(a), including treble damages and their cost of suit, including a reasonable attorney's fee.

793.   **Connecticut:** Defendants have entered into an unlawful agreement in restraint of

trade in violation of **Conn. Gen. Stat. Ann. § 35-26,** *et seq.,* with respect to pricing of out-of-network goods and services provided in Connecticut by one or more DAPs.

    a.   Defendants' combination or conspiracy had the following effects:

    1.   Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Connecticut;

    2.   Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Connecticut;

    3.   DAPs were deprived of free and open competition; and

    4.   DAPs were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

    b.   Defendants' illegal conduct substantially affected Connecticut commerce.

    c.   As a direct and proximate result of Defendants' unlawful conduct, DAPs have been injured in their business and property and are threatened with further injury.

    d.   Defendants entered into agreements in restraint of trade in violation of **Conn. Gen. Stat. Ann. § 35-26,** *et seq.*

    e.   Accordingly, DAPs seek all forms of relief available under **Conn. Gen. Stat. Ann. § 35-26,** *et seq.*

794.   **District of Columbia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **D.C. Code Ann. § 28-4502,** *et seq.*, with respect to pricing of out-of-network goods and services provided in the District of Columbia by one or more DAPs.

    a.   Defendants' combination or conspiracy had the following effects:

    1.   Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout the District of Columbia;

2.     Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout the District of Columbia;

3.     DAPs were deprived of free and open competition; and

4.     DAPs were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b.   Defendants' illegal conduct substantially affected District of Columbia commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, DAPs have been injured in their business and property and are threatened with further injury.

d.   Defendants entered into agreements in restraint of trade in violation of **D.C. Code Ann. § 28-4502,** *et seq.*

e.   Accordingly, DAPs seek all forms of relief available under **D.C. Code Ann. § 28-4502,** *et seq.*

795.   **Hawaii:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Haw. Rev. Stat. § 480-1,** *et seq.*, with respect to pricing of out-of-network goods and services provided in Hawaii by one or more DAPs.

a.   Defendants' combination or conspiracy had the following effects:

1.     Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Hawaii;

2.     Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Hawaii;

3.     DAPs were deprived of free and open competition; and

4.     DAPs were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b.   Defendants' illegal conduct substantially affected Hawaii commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, DAPs have been injured in their business and property and are threatened with further injury.

d.   Defendants entered into agreements in restraint of trade in violation of **Haw. Rev. Stat. § 480-1,** *et seq.*

e.   Accordingly, DAPs seek all forms of relief available under **Haw. Rev. Stat. § 480-1,** *et seq.*

796.   **Illinois:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **740 Ill. Comp. Stat. Ann. § 10/1,** *et seq.*, with respect to pricing of out-of-network goods and services provided in Illinois by one or more DAPs.

a.   Defendants' combination or conspiracy had the following effects:

1.     Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Illinois;

2.     Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Illinois;

3.     DAPs were deprived of free and open competition; and

4.     DAPs were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b.   Defendants' illegal conduct substantially affected Illinois commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, DAPs have been injured in their business and property and are threatened with further injury.

d.   Defendants entered into agreements in restraint of trade in violation of **740 Ill. Comp. Stat. Ann. § 10/1,** *et seq.*

e. Accordingly, DAPs seek all forms of relief available under **740 Ill. Comp. Stat. Ann. § 10/1**, *et seq.*

797. **Iowa:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Iowa Code § 553.4**, *et seq.*, with respect to pricing of out-of-network goods and services provided in Iowa by one or more DAPs.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Iowa;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Iowa;

3. DAPs were deprived of free and open competition; and

4. DAPs were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct substantially affected Iowa commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, DAPs have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **Iowa Code § 553.4**, *et seq.*

e. Accordingly, DAPs seek all forms of relief available under **Iowa Code § 553.4**, *et seq.*

798. **Kansas:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Kansas Stat. Ann. § 50-101**, *et seq.*, with respect to pricing of out-of-network goods and services provided in Kansas by one or more DAPs.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Kansas;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Kansas;

3. DAPs were deprived of free and open competition; and

4. DAPs were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct substantially affected Kansas commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, DAPs have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **Kansas Stat. Ann. § 50-101,** *et seq.*

e. Accordingly, DAPs seek all forms of relief available under **Kansas Stat. Ann. § 50-101,** *et seq.*

799. **Maine:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Me. Rev. Stat. Ann. tit. 10 § 1101,** *et seq.*, with respect to pricing of out-of-network goods and services provided in Maine by one or more DAPs.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Maine;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Maine;

3. DAPs were deprived of free and open competition; and

4. DAPs were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct substantially affected Maine commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, DAPs have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **Me. Rev. Stat. Ann. tit. 10 § 1101, *et seq.***

e. Accordingly, DAPs seek all forms of relief available under **Me. Rev. Stat. Ann. tit. 10 § 1101, *et seq.***

800. **Michigan:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Mich. Comp. Laws Ann. § 445.772, *et seq.***, with respect to pricing of out-of-network goods and services provided in Michigan by one or more DAPs.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Michigan;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Michigan;

3. DAPs were deprived of free and open competition; and

4. DAPs were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct substantially affected Michigan commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, DAPs have been

injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **Mich. Comp. Laws Ann. § 445.772, *et seq.***

e. Accordingly, DAPs seek all forms of relief available under **Mich. Comp. Laws Ann. § 445.772, *et seq.***

801. **Minnesota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Minn. Stat. § 325D.51, *et seq.***, with respect to pricing of out-of-network goods and services provided in Minnesota by one or more DAPs.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Minnesota;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Minnesota;

3. DAPs were deprived of free and open competition; and

4. DAPs were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct substantially affected Minnesota commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, DAPs have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **Minn. Stat. § 325D.51, *et seq.***

e. Accordingly, DAPs seek all forms of relief available under **Minn. Stat. § 325D.51, *et seq.***

802. **Mississippi:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Miss. Code Ann. § 75-21-3, *et seq.***, with respect to pricing of out-of-network goods and services provided in Mississippi by one or more DAPs.

　　a. Defendants' combination or conspiracy had the following effects:

　　　　1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Mississippi;

　　　　2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Mississippi;

　　　　3. DAPs were deprived of free and open competition; and

　　　　4. DAPs were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

　　b. Defendants' illegal conduct substantially affected Mississippi commerce.

　　c. As a direct and proximate result of Defendants' unlawful conduct, DAPs have been injured in their business and property and are threatened with further injury.

　　d. Defendants entered into agreements in restraint of trade in violation of **Miss. Code Ann. § 75-21-3, *et seq.***

　　e. Accordingly, DAPs seek all forms of relief available under **Miss. Code Ann. § 75-21-3, *et seq.***

803. **Nebraska:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Neb. Rev. Stat. § 59-801, *et seq.***, with respect to pricing of out-of-network goods and services provided in Nebraska by one or more DAPs.

　　a. Defendants' combination or conspiracy had the following effects:

　　　　1. Price competition for out-of-network goods and services was restrained,

suppressed, and eliminated throughout Nebraska;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Nebraska;

3. DAPs were deprived of free and open competition; and

4. DAPs were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct substantially affected Nebraska commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, DAPs have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **Neb. Rev. Stat. § 59-801,** *et seq.*

e. Accordingly, DAPs seek all forms of relief available under **Neb. Rev. Stat. § 59-801,** *et seq.*

804. **Nevada:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Nev. Rev. Stat. Ann. § 598A.060,** *et seq.*, with respect to pricing of out-of-network goods and services provided in Nevada by one or more DAPs.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Nevada;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Nevada;

3. DAPs were deprived of free and open competition; and

4. DAPs were paid prices for out-of-network goods and services that were

artificially suppressed below competitive levels.

b.  Defendants' illegal conduct substantially affected Nevada commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, DAPs have been injured in their business and property and are threatened with further injury.

d.  Defendants entered into agreements in restraint of trade in violation of **Nev. Rev. Stat. Ann. § 598A.060,** *et seq.*

e.  Accordingly, DAPs seek all forms of relief available under **Nev. Rev. Stat. Ann. § 598A.060,** *et seq.*

805.    **New Hampshire:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.H. Rev. Stat. Ann. § 356.2,** *et seq.*, with respect to pricing of out-of-network goods and services provided in New Hampshire by one or more DAPs.

a.  Defendants' combination or conspiracy had the following effects:

1.      Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout New Hampshire;

2.      Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout New Hampshire;

3.      DAPs were deprived of free and open competition; and

4.      DAPs were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b.  Defendants' illegal conduct substantially affected New Hampshire commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, DAPs have been injured in their business and property and are threatened with further injury.

d.  Defendants entered into agreements in restraint of trade in violation of **N.H. Rev.**

Stat. Ann. § 356.2, *et seq.*

e. Accordingly, DAPs seek all forms of relief available under **N.H. Rev. Stat. Ann. § 356.2, *et seq.***

806.    **New Mexico:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.M. Stat. Ann. § 57-1-1, *et seq.*,** with respect to pricing of out-of-network goods and services provided in New Mexico by one or more DAPs.

a. Defendants' combination or conspiracy had the following effects:

1.    Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout New Mexico;

2.    Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout New Mexico;

3.    DAPs were deprived of free and open competition; and

4.    DAPs were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct substantially affected New Mexico commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, DAPs have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **N.M. Stat. Ann. § 57-1-1, *et seq.***

e. Accordingly, DAPs seek all forms of relief available under **N.M. Stat. Ann. § 57-1-1, *et seq.***

807.    **New York:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.Y. Gen. Bus. L. § 340, *et seq.*,** with respect to pricing of out-of-network

goods and services provided in New York by one or more DAPs.

    a.  Defendants' combination or conspiracy had the following effects:

    1.  Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout New York;

    2.  Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout New York;

    3.  DAPs were deprived of free and open competition; and

    4.  DAPs were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

    b.  Defendants' illegal conduct substantially affected New York commerce.

    c.  As a direct and proximate result of Defendants' unlawful conduct, DAPs have been injured in their business and property and are threatened with further injury.

    d.  Defendants entered into agreements in restraint of trade in violation of **N.Y. Gen. Bus. L. § 340,** *et seq.*, including a *per se* violation.

    e.  Accordingly, DAPs seek all forms of relief available under **N.Y. Gen. Bus. L. § 340,** *et seq.*

    808.  **North Carolina:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.C. Gen. Stat. § 75-1,** *et seq.*, with respect to pricing of out-of-network goods and services provided in North Carolina by one or more DAPs.

    a.  Defendants' combination or conspiracy had the following effects:

    1.  Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout North Carolina;

    2.  Out-of-network goods and services prices were suppressed, fixed,

maintained and stabilized at artificially low levels throughout North Carolina;

      3.     DAPs were deprived of free and open competition; and

      4.     DAPs were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

      b.  Defendants' illegal conduct substantially affected North Carolina commerce.

      c.  As a direct and proximate result of Defendants' unlawful conduct, DAPs have been injured in their business and property and are threatened with further injury.

      d.  Defendants entered into agreements in restraint of trade in violation of **N.C. Gen. Stat. § 75-1,** *et seq.*

      e.  Accordingly, DAPs seek all forms of relief available under **N.C. Gen. Stat. § 75-1,** *et seq.*

      809.    **North Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.D. Cent. Code § 51-08.1-01,** *et seq.*, with respect to pricing of out-of-network goods and services provided in North Dakota by one or more DAPs.

      a.  Defendants' combination or conspiracy had the following effects:

      1.     Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout North Dakota;

      2.     Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout North Dakota;

      3.     DAPs were deprived of free and open competition; and

      4.     DAPs were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

      b.  Defendants' illegal conduct substantially affected North Dakota commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, DAPs have been injured in their business and property and are threatened with further injury.

d.   Defendants entered into agreements in restraint of trade in violation of **N.D. Cent. Code § 51-08.1-01,** *et seq.*

e.   Accordingly, DAPs seek all forms of relief available under **N.D. Cent. Code § 51-08.1-01,** *et seq.*

810.   **Rhode Island:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **R.I. Gen. Laws § 6- 36-4,** *et seq.*, with respect to pricing of out-of-network goods and services provided in Rhode Island by one or more DAPs.

a.   Defendants' combination or conspiracy had the following effects:

1.   Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Rhode Island;

2.   Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Rhode Island;

3.   DAPs were deprived of free and open competition; and

4.   DAPs were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b.   Defendants' illegal conduct substantially affected Rhode Island commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, DAPs have been injured in their business and property and are threatened with further injury.

d.   Defendants entered into agreements in restraint of trade in violation of **R.I. Gen. Laws § 6- 36-4,** *et seq.*

e.   Accordingly, DAPs seek all forms of relief available under **R.I. Gen. Laws § 6-**

**36-4,** *et seq.*

811. **South Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **S.D. Codified Laws § 37-1,** *et seq.*, with respect to pricing of out-of-network goods and services provided in South Dakota by one or more DAPs.

    a. Defendants' combination or conspiracy had the following effects:

        1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout South Dakota;

        2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout South Dakota;

        3. DAPs were deprived of free and open competition; and

        4. DAPs were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

    b. Defendants' illegal conduct substantially affected South Dakota commerce.

    c. As a direct and proximate result of Defendants' unlawful conduct, DAPs have been injured in their business and property and are threatened with further injury.

    d. Defendants entered into agreements in restraint of trade in violation of **S.D. Codified Laws § 37-1,** *et seq.*

    e. Accordingly, DAPs seek all forms of relief available under **S.D. Codified Laws § 37-1,** *et seq.*

812. **Tennessee:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Tenn. Code Ann. § 47-25-101,** *et seq.*, with respect to pricing of out-of-network goods and services provided in Tennessee by one or more DAPs.

    a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Tennessee;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Tennessee;

3. DAPs were deprived of free and open competition; and

4. DAPs were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct substantially affected Tennessee commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, DAPs have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **Tenn. Code Ann. § 47-25-101,** *et seq.*

e. Accordingly, DAPs seek all forms of relief available under **Tenn. Code Ann. § 47-25-101,** *et seq.*

813. **Utah:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Utah Code Ann. § 76-10-3101,** *et seq.*, with respect to pricing of out-of-network goods and services provided in Utah by one or more DAPs.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Utah;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Utah;

3. DAPs were deprived of free and open competition; and

4.     DAPs were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b.   Defendants' illegal conduct substantially affected Utah commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, DAPs have been injured in their business and property and are threatened with further injury.

d.   Defendants entered into agreements in restraint of trade in violation of **Utah Code Ann. § 76-10-3101,** *et seq.*

e.   Accordingly, DAPs seek all forms of relief available under **Utah Code Ann. § 76-10-3101,** *et seq.*

814.   **Vermont:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Vt. Stat. Ann. tit. 9 § 2453,** *et seq.*, with respect to pricing of out-of-network goods and services provided in Vermont by one or more DAPs.

a.   Defendants' combination or conspiracy had the following effects:

1.     Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Vermont;

2.     Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Vermont;

3.     DAPs were deprived of free and open competition; and

4.     DAPs were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b.   Defendants' illegal conduct substantially affected Vermont commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, DAPs have been injured in their business and property and are threatened with further injury.

d.  Defendants entered into agreements in restraint of trade in violation of **Vt. Stat. Ann. tit. 9 § 2453,** *et seq.*

e.  Accordingly, DAPs seek all forms of relief available under **Vt. Stat. Ann. tit. 9 § 2453,** *et seq.*

815.  **West Virginia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **W. Va. Code § 47-18-4,** *et seq.*, with respect to pricing of out-of-network goods and services provided in West Virginia by one or more DAPs.

a.  Defendants' combination or conspiracy had the following effects:

1.  Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout West Virginia;

2.  Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout West Virginia;

3.  DAPs were deprived of free and open competition; and

4.  DAPs were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b.  Defendants' illegal conduct substantially affected West Virginia commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, DAPs have been injured in their business and property and are threatened with further injury.

d.  Defendants entered into agreements in restraint of trade in violation of **W. Va. Code § 47-18-4,** *et seq.*

e.  Accordingly, DAPs seek all forms of relief available under **W. Va. Code § 47-18-4,** *et seq.*

816.  **Wisconsin:** Defendants have entered into an unlawful agreement in restraint of

trade in violation of **Wis. Stat. § 133.01,** *et seq.*, with respect to pricing of out-of-network goods and services provided in Wisconsin by one or more DAPs.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Wisconsin;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Wisconsin;

3. DAPs were deprived of free and open competition; and

4. DAPs were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct substantially affected Wisconsin commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, DAPs have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **Wis. Stat. § 133.01,** *et seq.*

e. Accordingly, DAPs seek all forms of relief available under **Wis. Stat. § 133.01,** *et seq.*

## SEVENTH CLAIM FOR RELIEF

## VIOLATION OF STATE CONSUMER PROTECTION LAWS

817. DAPs reincorporate and reallege by reference the preceding paragraphs as though fully set forth herein.

818. To the extent required, this claim is pleaded in the alternative to the other claims in this Master Complaint.

819.     Defendants have engaged in unfair or deceptive acts or practices from at least as early as January 1, 2015 through the present with respect to the prices paid for out-of-network goods and services in violation of the state deceptive trade practices and consumer protection laws set forth below.

820.     Defendants worked together to fix, suppress, and maintain prices of out-of-network goods and services at sub-competitive levels, and to unlawfully exchange pricing information.

821.     To the extent such proof may be required under the law of any individual state:

     a.     Defendants' conduct causes widespread and substantial harm to consumers of out-of-network goods and services, including because Defendants' widespread scheme to suppress and pay sub-market and/or sub-UCR rates for out-of-network goods and services: (1) exposes consumers to potential liability for the difference between the suppressed rates Defendants pay and the UCR rates and (2) results in eventual denial of services by and/or closure of certain providers (particularly in rural areas), thereby suppressing consumer choice of out-of-network goods and services; and

     b.     Defendants' scheme is immoral, unethical, oppressive, and unscrupulous and the severe harm it inflicts on the DAPs is not outweighed by any supposed utility to the healthcare system. The severe, sub-market rates Defendants force on the DAPs put the availability of a robust choice of healthcare providers at risk for millions of patients as some DAPs will no longer be able to provide services on an out-of-network basis given the financial constraints—and some (especially in already underserved rural areas) may go out of business altogether.

822.     Defendants also used deceptive and high-pressure communications and tactics to carry out their scheme, on which DAPs and others reasonably relied and/or had no practical choice but to rely.

823. Were it not for Defendants' unfair or deceptive acts or practices, Defendants would have made higher payments to each DAP for their respective out-of-network goods and services.

824. Each DAP has been injured by Defendants' unfair or deceptive acts or practices in that DAP's business or profession.

825. Each DAP's injuries flow from Defendants' unfair or deceptive acts or practices.

826. Each DAP has suffered an ascertainable, pecuniary loss or money loss as a result of Defendants' unfair or deceptive acts or practices.

827. Each DAP has suffered compensable damages as a result of Defendants' unlawful agreements and conduct. The exact calculation and amount of those damages will be disclosed in DAPs' expert reports and expert testimony at trial.

828. The conduct of each Defendant, as described above, individually and/or collectively was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of plan members, and warrants an award of punitive damages in an amount sufficient to punish each Defendant and deter others from like conduct.

829. **Arizona:** Defendants have engaged in unfair or deceptive acts or practices in violation of **Ariz. Rev. Stat. §§ 44.1521, *et seq.*,** with respect to pricing of out-of-network goods and services provided in Arizona by DAPs and/or to Arizona residents.

    a) Defendants' illegal conduct had a substantial effect on Arizona commerce.

    b) As a direct and proximate cause of Defendants' unlawful conduct, one or more DAP has been injured in their business and property and are threatened with further injury.

    c) By reason of the foregoing, Defendants have engaged in unfair or deceptive

acts of practices in violation of **Ariz. Rev. Stat. §§ 44.1521, *et seq.***

d)      Accordingly, one or more DAP is entitled to all relief available under **Ariz. Rev. Stat. §§ 44.1521, *et seq.***

830.    **California:** Defendants have engaged in unfair or deceptive acts or practices in violation of **Cal. Bus. & Prof. Code § 17200, *et seq.*** with respect to pricing of out-of-network goods and services provided in California by DAPs and/or to California residents.

a)      Defendants' illegal conduct had a substantial effect on California commerce.

b)      As a direct and proximate cause of Defendants' unlawful conduct, one or more DAP has been injured in their business and property and are threatened with further injury.

c)      By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of **Cal. Bus. & Prof. Code § 17200, *et seq.***

d)      Accordingly, one or more DAP is entitled to all relief available under **Cal. Bus. & Prof. Code § 17200, *et seq.***

831.    **Colorado:** Defendants have engaged in unfair or deceptive acts or practices in violation of **Colo. Rev. Stat. §§ 6-1-101, *et seq.*** with respect to pricing of out-of-network goods and services provided in Colorado by DAPs and/or to Colorado residents.

a)      Defendants' illegal conduct had a substantial effect on Colorado commerce.

b)      As a direct and proximate cause of Defendants' unlawful conduct, one or more DAP has been injured in their business and property and are threatened with further injury.

c)      By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of **Colo. Rev. Stat. §§ 6-1-101, *et seq.***

d)      Accordingly, one or more DAP is entitled to all relief available under **Colo. Rev. Stat. §§ 6-1-101, *et seq.***

832.     **Connecticut:** Defendants have engaged in unfair or deceptive acts or practices in violation of **Conn. Gen. Stat. §§ 41-110a,** *et seq.* with respect to pricing of out-of-network goods and services provided in Connecticut by DAPs and/or to Connecticut residents.

     a)     Defendants' illegal conduct had a substantial effect on Connecticut commerce.

     b)     As a direct and proximate cause of Defendants' unlawful conduct, one or more DAP has been injured in their business and property and are threatened with further injury.

     c)     By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of **Conn. Gen. Stat. §§ 41-110a,** *et seq.*

     d)     Accordingly, one or more DAP is entitled to all relief available under **Conn. Gen. Stat. §§ 41-110a,** *et seq.*

833.     **Minnesota:** Defendants have engaged in unfair or deceptive acts or practices in violation of **Minn. Stat. § 325F.68,** *et seq.* with respect to pricing of out-of-network goods and services provided in Minnesota by DAPs and/or to Minnesota residents.

     a)     Defendants' illegal conduct had a substantial effect on Minnesota commerce.

     b)     As a direct and proximate cause of Defendants' unlawful conduct, one or more DAP has been injured in their business and property and are threatened with further injury.

     c)     By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of **Minn. Stat. § 325F.68,** *et seq.*

     d)     Accordingly, one or more DAP is entitled to all relief available under **Minn. Stat. § 325F.68,** *et seq.*

834.     **New Mexico:** Defendants have engaged in unfair or deceptive acts or practices in violation of **N.M. Stat. Ann. § 57-12-3,** *et seq.* with respect to pricing of out-of-network goods and services provided in New Mexico by DAPs and/or to New Mexico residents.

a) Defendants' illegal conduct had a substantial effect on New Mexico commerce.

b) As a direct and proximate cause of Defendants' unlawful conduct, one or more DAP has been injured in their business and property and are threatened with further injury.

c) By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of **N.M. Stat. Ann. § 57-12-3,** *et seq.*

d) Accordingly, one or more DAP is entitled to all relief available under **N.M. Stat. Ann. § 57-12-3,** *et seq.*

835. **North Carolina:** Defendants have engaged in unfair or deceptive acts or practices in violation of **N.C. Gen. Stat. § 75-1.1,** *et seq.* with respect to pricing of out-of-network goods and services provided in North Carolina by DAPs and/or to North Carolina residents.

a) Defendants' illegal conduct had a substantial effect on North Carolina commerce.

b) As a direct and proximate cause of Defendants' unlawful conduct, one or more DAP has been injured in their business and property and are threatened with further injury.

c) By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of **N.C. Gen. Stat. § 75-1.1,** *et seq.*

d) Accordingly, one or more DAP is entitled to all relief available under **N.C. Gen. Stat. § 75-1.1,** *et seq.*

836. **South Carolina:** Defendants have engaged in unfair or deceptive acts or practices in violation of **S.C. Code Ann. § 39-5-10,** *et seq.* with respect to pricing of out-of-network goods and services provided in South Carolina by DAPs and/or to South Carolina residents.

a) Defendants' illegal conduct had a substantial effect on South Carolina

commerce.

b) As a direct and proximate cause of Defendants' unlawful conduct, one or more DAP has been injured in their business and property and are threatened with further injury.

c) By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of **S.C. Code Ann. § 39-5-10,** *et seq.*

d) Accordingly, one or more DAP is entitled to all relief available under **S.C. Code Ann. § 39-5-10,** *et seq.*

837. **Tennessee:** Defendants have engaged in unfair or deceptive acts or practices in violation of **Tenn. Code Ann. §§ 47-18-191,** *et seq.* with respect to pricing of out-of-network goods and services provided in Tennessee by DAPs and/or to Tennessee residents.

a) Defendants' illegal conduct had a substantial effect on Tennessee commerce.

b) As a direct and proximate cause of Defendants' unlawful conduct, one or more DAP has been injured in their business and property and are threatened with further injury.

c) By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of **Tenn. Code Ann. §§ 47-18-191,** *et seq.*

d) Accordingly, one or more DAP is entitled to all relief available under **Tenn. Code Ann. §§ 47-18-191,** *et seq.*

## EIGHTH CLAIM FOR RELIEF

## UNJUST ENRICHMENT

### (Plead in the Alternative to All Other Causes of Action)

838. DAPs incorporate and reallege by reference all of the preceding paragraphs, as though fully set forth herein.

839. To the extent required, this claim is pleaded in the alternative to the other claims in

this Master Complaint.

840. This claim for relief is alleged under the laws of the following States and territory: Arkansas, Arizona, California, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

841. As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched by, at a minimum:

     a)    The receipt of fees tied to payments to DAPs for out-of-network goods and services at rates that were suppressed by the Defendants' unlawful, deceptive, and unfair conduct;

     b)    The value of the out-of-network goods and services provided by DAPs to members of Defendants' plans for which Defendants have not paid a UCR price; and/or

     c)    Higher premiums paid by patients for access to out-of-network goods and services.

842. By underpaying the DAPs for the out-of-network goods and services they provided to members of Defendants' plans, Defendants have redirected payment that should have been paid, in whole or in part, to the DAPs to instead pay themselves. Defendants have thus received and retained the benefit of the DAPs providing out-of-network goods and services to Defendants' plan members for which the DAPs remain grossly underpaid.

843. Defendants have been unjustly enriched by the receipt and use of funds that earned interest or otherwise contributed to their businesses when such funds should have been used to pay the DAPs in a timely and appropriate manner.

844. Defendants have benefitted from their unlawful acts and it would be inequitable for

Defendants to be permitted to retain any of the ill-gotten gains resulting from the suppression of the rates of payments to DAPs for out-of-network goods and services.

845.     Each DAP is entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct.

846.     The DAPs are further entitled to the establishment of a constructive trust consisting of all Defendants' ill-gotten gains from which each DAP may make claims on a pro rata basis.

847.     Pursuit of any remedies against the plan sponsors or members with respect to payments for out-of-network goods and services subject to Defendants' scheme would have been futile, given that those firms did not take part in Defendants' scheme or conspiracy.

## XII.    Prayer for Relief

WHEREFORE, DAPs demand that judgment be entered in their favor and against Defendants, including for the treble damages, injunctive relief, and declaratory judgment outlined below. Specifically, DAPs seek an order and judgment from the Court that:

a)     Defendants pay damages to DAPs for underpayments made to DAPs, lost profits and revenues of DAPs, and other economic harm to DAPs as a result of the MultiPlan Cartel in an amount to be determined at trial and that may be trebled by operation of law;

b)     Defendants pay punitive damages as required by state law and common law;

c)     Defendants pay pre-judgment and post-judgment interest on such monetary relief;

d)     Defendants disgorge all proceeds that any of them unlawfully or inequitably received;

e)     Defendants pay DAPs' costs of bringing this lawsuit, including DAPs' reasonable attorneys' fees;

f)     Defendants are permanently enjoined from continuing to operate and participate in the MultiPlan Cartel;

g)      A declaratory judgment that Defendants have violated Section 1 of the Sherman Act and have violated state unfair competition and antitrust laws; and

h)      All other relief to which DAPs may be entitled at law or equity.

## XIII. Jury Demand

DAPs respectfully request a jury trial on all causes of action so triable.

Dated: December 2, 2024

/s/ Stephen M. Medlock
Stephen M. Medlock
**VINSON & ELKINS LLP**
2200 Pennsylvania Ave., N.W., Suite 500 W
Washington, D.C. 20037
Tel: (202) 639-6500
Fax: (202) 639-6604
smedlock@velaw.com

/s/ Matthew M. Lavin
Matthew M. Lavin
**Arnall Golden Gregory LLP**
2100 Pennsylvania Ave., N.W., Suite 350S
Washington, D.C. 20037
Tel: (202) 677-4030
Fax: (202) 677-4031
Matt.Lavin@agg.com

/s/ Hunter Shkolnik
Hunter Shkolnik
**NS PR Law Services, LLC**
1302 Avenida Ponce de León
Santurce, Puerto Rico 00907
Tel: (787) 493-5088
Fax: (646) 843-7603
Hunter@NSPRLaw.com

/s/ Jennifer R. Scullion
Jennifer R. Scullion
**Seeger Weiss LLP**
55 Challenger Road 6th Fl.
Ridgefield Park, NJ 07660
Tel: (973) 639-9100
Fax: (973) 679-8656
jscullion@seegerweiss.com

*Direct Action Plaintiffs' Executive Committee*

<u>*/s/ Christopher Seeger*</u>
Christopher Seeger
**Seeger Weiss LLP**
55 Challenger Road 6th Fl.
Ridgefield Park, NJ 07660
Tel: (973) 639-9100
Fax: (973) 679-8656
cseeger@seegerweiss.com

*Plaintiffs' Coordinating Counsel*