**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE: MULTIPLAN HEALTH INSURANCE PROVIDER LITIGATION | Case No. 1:24-cv-6795 MDL No. 3121 |
| This Document Relates To: | Hon. Matthew F. Kennelly |
| 1:24-cv-7177 1:24-cv-6802 | |

<u>**MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND—RELEVANT CCAC FACTUAL ALLEGATIONS ........................................4

    A.    Healthcare Dynamics: Patients, Providers, and MCOs ........................................4

    B.    Plaintiffs Seek to Require That All MCOs Use Only Legacy Benchmarking Systems That Increase Patient Fees and Provider Profits ......................................7

    C.    MultiPlan's Competitive Option: Customizable, Cost-Based Pricing Recommendations From Public Data, for Use by MCOs as They See Fit .............9

    D.    The CCAC Makes No Non-Conclusory Factual Allegations Regarding Individual MCOs' Use of MultiPlan Or Any Alleged Unlawful Agreement ........13

ARGUMENT ....................................................................................................................14

I.    PLAINTIFFS FAIL TO PLEAD ANTITRUST STANDING OR INJURY ....................15

    A.    Plaintiffs Lack Antitrust Standing to Pursue These Claims Because Their Purported Injuries Are Indirect and Derivative ....................................................15

    B.    Plaintiffs Lack Standing Because They Fail to Allege Any Injury Derived From Any Defendant's Use of MultiPlan ...............................................................19

    C.    Plaintiffs Fail to Plead Antitrust Injury Because They Do Not and Cannot Allege Actual Harm to Competition ....................................................................20

II.    PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE A CONSPIRACY ..............................21

    A.    Plaintiffs Do Not Plead Any Direct Evidence Of A Conspiracy ...........................23

    B.    Plaintiffs Do Not Allege Any Circumstantial Evidence Of A Conspiracy ............24

        1.    Plaintiffs Do Not Allege That Defendants Engaged In Parallel Conduct ....................................................................................................25

        2.    The CCAC Alleges Conduct In Each Defendant's Self-Interest ...............28

        3.    Plaintiffs' "Information Sharing" Allegations Do Not Support Their Conspiracy Claim ...................................................................................32

        4.    Plaintiffs' Additional "Plus Factors" Do Not Suggest A Conspiracy ........34

III.    PLAINTIFFS FAIL TO PLEAD A COGNIZABLE "PRICE" CAPABLE OF BEING "FIXED" AND A COGNIZABLE ANTITRUST MARKET .............................35

    A.    Courts Reject Antitrust Claims Predicated On MCO Reimbursements to Providers Because They Are Not Standalone Products and Services...................35

    B.    Plaintiffs' Newly-Alleged Nationwide Market For "Out-of-Network Health Services for Purchase by [MCOs]" Is Infirm ........................................................38

CONCLUSION .................................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*AD/SAT, Div. of Skylight, Inc. v. Associated Press*,
181 F.3d 216 (2d Cir. 1999)..................................................................................29

*Agnew v. Nat'l Collegiate Athletic Ass'n*,
683 F.3d 328 (7th Cir. 2012) .................................................................15, 20, 38

*Am. Floral Servs., Inc. v. Florists' Transworld Delivery Ass'n*,
633 F. Supp. 201 (N.D. Ill. 1986) .........................................................................29

*Arnett Physician Grp., P.C. v. Greater LaFayette Health Servs., Inc.*,
382 F. Supp. 2d 1092 (N.D. Ind. 2005) ................................................................39

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...............................................................................................14

*Assoc. of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*,
15 F.4th 831 (7th Cir. 2021) .................................................................................15

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990)..........................................................................................20, 21

*Bank of Am., N.A. v. Knight*,
725 F.3d 815 (7th Cir. 2013) .............................................................................30, 31

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).......................................................................................*passim*

*Black Bear Sports Grp., Inc. v. Amateur Hockey Ass'n of Ill., Inc.*,
2019 WL 2060934 (N.D. Ill. May 9, 2019)............................................................8

*Blue Cross & Blue Shield United v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995) ...............................................................................40

*Bogan v. Hodgkins*,
166 F.3d 509 (2d Cir. 1999).................................................................................38

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962).............................................................................................20

*Brunswick Corp. v. Pueblo Bowl-O-Mat*,
429 U.S. 477 (1977).........................................................................................20, 21

*Chamberlain Grp. Inc. v. Techtronic Indus. N. Am.*,
  2017 WL 4269005 (N.D. Ill. 2017) ...............................................31

*Chi. Studio Rental, Inc. v. Ill. Dep't of Com.*,
  940 F.3d 971 (7th Cir. 2019) .......................................................21

*City of New York v. Grp. Health Inc.*,
  649 F.3d 151 (2d Cir. 2011)........................................................40

*Cornish-Adebiyi v. Caesars Ent., Inc.*,
  2024 WL 4356188 (D.N.J. Sept. 30, 2024) ..............................27, 33

*Franco v. Conn. Gen. Life Ins. Co.*,
  818 F. Supp. 2d 792 (D.N.J. 2011) ..........................3, 32, 35, 36

*FTC v. Advocate Health Care Network*,
  841 F.3d 460 (7th Cir. 2016) .......................................................39

*FTC v. Staples, Inc.*,
  190 F. Supp. 3d 100 (D.D.C. 2016) ...........................................39

*Gamm v. Sanderson Farms*,
  944 F.3d 455 (2d Cir. 2019)........................................................34

*Garry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*,
  937 F.3d 1056 (7th Cir. 2019) .....................................................15

*Gibson v. MGM Resorts International*,
  2023 WL 7025996 (D. Nev. Oct. 24, 2023) ..............................27, 33

*GPS of N.J. M.D., P.C. v. Horizon Blue Cross & Blue Shield*,
  2023 WL 5815821 (D.N.J. Sept. 8, 2023) ..................................17

*In re Aetna UCR Litig.*,
  2015 WL 3970168 (D.N.J. June 30, 2015) .................4, 32, 35, 36

*In re Baby Food Antitrust Litig.*,
  166 F.3d 112 (3d Cir. 1999).........................................................23

*In re BCBS Antitrust Litig.*,
  308 F. Supp. 3d 1241 (N.D. Ala. 2018).....................................30

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
  2013 WL 4506000 (N.D. Ill. Aug. 23, 2013) ............................16

*In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*,
  60 F. Supp. 3d 914 (N.D. Ill. 2014) ...........................................23

*In re Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ...................................................................27

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002) .................................................................................23

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010)..............................................................................22, 23

*In re Late Fee & Over-Limit Fee Litig.*,
    528 F. Supp. 2d 953 (N.D. Cal. 2007) ...................................................................26

*In re Loc. TV Advert. Antitrust Litig.*,
    2022 WL 3716202 (N.D. Ill. Aug. 29, 2022) .........................................................33

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ....................................................................26, 28, 31

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010) ............................................................................23, 25

*In re Wellpoint, Inc. Out-of-Network "UCR" Rates Litig.*,
    903 F. Supp. 2d 880 (C.D. Cal. 2012) ........................................................... *passim*

*In re: Amazon.com, Inc. eBook Antitrust Litig.*,
    2022 WL 4581903 (S.D.N.Y. Aug. 3, 2022) ..........................................................24

*Ind. Grocery, Inc. v. Super Valu Stores, Inc.*,
    864 F.2d 1409 (7th Cir. 1989) ...............................................................................20

*Kleen Prods. LLC v. Ga-Pac. LLC*,
    910 F.3d 927 (7th Cir. 2018) .................................................................................35

*LD v. United Behav. Health*,
    508 F. Supp. 3d 583 (N.D. Cal. 2020) ...................................................................19

*Little Rock Cardiology Clinic PA v. Baptist Health*,
    591 F.3d 591 (8th Cir. 2009) .................................................................................40

*Loeb Indus., Inc. v. Sumitomo Corp.*,
    306 F.3d 469 (7th Cir. 2002) .................................................................................16

*Long Island Anesthesiologists PLLC v. United Healthcare Ins. Co. of N.Y. Inc.*,
    2023 WL 8096909 (E.D.N.Y. Nov. 21, 2023)......................................................4, 20

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*,
    29 F.4th 337 (7th Cir. 2022) ............................................................................19, 35

iv

*Marion Healthcare LLC v. S. Ill. Healthcare*,
    2013 WL 4510168 (S.D. Ill. Aug. 26, 2013) .........................................................................40

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
    952 F.3d 832 (7th Cir. 2020) ....................................................................................22, 23

*Mayor & City Council of Baltimore v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013)......................................................................................25, 30

*Meridian Treatment Servs. v. United Behav. Health*,
    2022 WL 1105071 (N.D. Cal. Apr. 13, 2022) ...................................................................18

*Orthopedic Specialists of S. Cal. v CALPERS*,
    228 Cal. App. 4th 644 (2014) ..........................................................................................18

*Pac. Recovery Sols. v. United Behav. Health*,
    481 F. Supp. 3d 1011 (N.D. Cal. 2020) .................................................................4, 16, 18

*Pac. Recovery Sols.v. Cigna Behav. Health, Inc.*,
    2021 WL 1176677 (N.D. Cal. Mar. 29, 2021) ............................................................. *passim*

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
    911 F.3d 505 (8th Cir. 2018) ...........................................................................................26

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997)..............................................................................................38

*Reapers Hockey Assoc., Inc. v. Amateur Hockey Assoc. Ill., Inc.*,
    412 F. Supp. 3d 941 (N.D. Ill. 2019) ...............................................................................38

*RJ v. Cigna Health & Life Ins. Co.*,
    625 F. Supp. 3d 951 (N.D. Cal. 2022) .............................................................................19

*Run it First, LLC v. CVS Pharm.*,
    2022 WL 484862 (S.D. Fla. Feb. 15, 2022) ....................................................................27

*United States v. E. I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956)..........................................................................................................38

*VHS Liq. Trust v. MultiPlan Corp.*,
    No. CGC-21-594966 (Cal. Super. Ct. Aug. 9, 2024).....................................................4, 37

*Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
    328 F. Supp. 3d 824 (N.D. Ill. 2018) ..........................................................................26, 34

**RULES**

Fed. R. Civ. P. 12(b)(6).........................................................................................................14

v

## INTRODUCTION

This is the latest in a long line of suits claiming that managed care organizations ("MCOs") violate antitrust law by using the same data sources to lower reimbursement rates for medical services provided to patients by out-of-network providers ("OON services"). Specifically, Plaintiffs here—two healthcare providers—seek to deploy antitrust law to increase the fees they and other providers can obtain from patients and their MCOs by eliminating the MCOs' ability to use the cost-management products and services offered by MultiPlan, Inc. Courts have repeatedly dismissed such claims at the pleading stage. That is because the foundation on which they rest is fundamentally implausible, precluding plaintiffs from making factual allegations that could support a cognizable claim for relief.

The suit here is no different. The MCOs' use of MultiPlan—especially its Data iSight solution, which uses publicly available data (such as data on provider costs) to recommend reimbursement amounts that MCOs may use and that providers may accept or reject—does not establish an unlawful "cartel" or state an antitrust claim. The suit fails for the following reasons.

***First***, the Consolidated Class Action Complaint ("Complaint" or "CCAC"), ECF No. 172, itself demonstrates that Plaintiffs cannot establish antitrust standing or antitrust injury. As to antitrust standing, Plaintiffs' claims rest on the premise that MCOs unilaterally decide how much Plaintiffs are paid for providing OON services. But that premise is contradicted by the CCAC's allegations, which make clear that OON providers (a) are free to charge whatever they want, often many multiples of typical in-network rates or of the rates that Medicare pays for the same service, and (b) can balance-bill their patient for the difference between what they are reimbursed by the MCO and what they believe is appropriate compensation. And while the health plans administered by MCOs vary in their coverage for OON services and methodologies for determining OON coverage amounts, Plaintiffs acknowledge that MCOs neither limit the rates that providers may

charge for their OON services nor promise to cover OON providers' rack rates. Instead, an MCO reimburses the provider for whatever amount the MCO is obligated to pay under the patient's health plan—an amount often set by the plan sponsor, such as an employer, not the MCO—and the patient is typically then liable for the difference between the amount reimbursed by the MCO and the amount billed by the OON provider. Thus, unless the provider agrees to accept as full payment the amount paid by the MCO, it can "balance bill" patients for the difference between what it *unilaterally* decides to charge for its services and what any particular health plan covers. As to antitrust injury, antitrust laws protect competition—not the excessive profits Plaintiffs want to reinstate by eliminating competitive products for helping MCOs determine appropriate reimbursements. Plaintiffs admit they have no issue with MCOs using the same "benchmarking" system to make "fair" OON reimbursements; they just want this Court to override the plan designs of thousands of health plan sponsors, and instead order MCOs to use a benchmarking system favorable to them. That desire does not give rise to an antitrust injury.

***Second****,* Plaintiffs do not and cannot plausibly allege a conspiracy among MCOs to suppress OON reimbursements. Plaintiffs' theory rests on the premise that, absent a conspiracy, MCOs would be competing against one another to pay *higher* OON reimbursements to providers. That makes no sense. And Plaintiffs fail to plead facts plausibly alleging that: (1) any MCOs ever directly communicated with each other, let alone agreed, concerning the adoption of MultiPlan's solutions; (2) hundreds of MCOs agreed to form a "cartel" via their use of MultiPlan's products and services; or (3) MCOs use MultiPlan in the same way to determine individual reimbursements.

Indeed, as courts have recognized in dismissing similar conspiracy claims, MCOs compete *against* each other to offer plans most attractive to each plan sponsor, which may include competing to control healthcare costs, particularly those paid to high-charging OON providers. To

this end, MCOs have an incentive to seek tools and services available to control those costs. This competition to control OON costs is reflected in the CCAC's factual allegations. If, as Plaintiffs allege, MultiPlan's tools allow for substantially greater controls over OON costs, then one would naturally expect—absent any conspiracy—to see exactly what Plaintiffs allege here: many MCOs adopting and using those tools over the course of several years. That is not a reduction of competition—it *is* competition in an industry in which one key dimension is the ability to control healthcare costs for plan sponsors and members. Thus, Plaintiffs do not and cannot allege the circumstantial evidence of parallel conduct or "plus factors" necessary to plausibly state a conspiracy claim; rather, the fact that MCOs know that other MCOs have adopted the ability to use cost-management solutions and seek to avoid falling behind their competitors is exactly the sort of natural competitive response that forecloses an inference of conspiracy.

***Third,*** courts have repeatedly dismissed similar antitrust cases because OON reimbursements from MCOs do not constitute a "price" capable of being "fixed" in a cognizable antitrust market. Plaintiffs try to circumvent this fatal deficiency by switching their labeling from a "reimbursements" market—as alleged in nearly all the initial cases filed in this MDL—to a "market for out-of-network healthcare services for purchase by third-party commercial payers," CCAC ¶ 250. That gambit fails. Plaintiffs' claims remain targeted on MCO reimbursements, and the commercial reality is that there is no sale of any healthcare services by Plaintiffs to MCOs, much less "competition" among MCOs to reimburse providers after the fact for services rendered on an OON basis. Patients—not MCOs—purchase health services from their OON providers and are obligated to pay the providers for such services.

Courts in a long line of cases have dismissed similar claims by OON providers. *See, e.g.*, *Franco v. Conn. Gen. Life Ins. Co.*, 818 F. Supp. 2d 792, 832 (D.N.J. 2011), *aff'd in relevant part*,

647 F. App'x 76 (3d Cir. 2016) (dismissing antitrust claim based on MCOs' common use of Ingenix to reimburse OON claims); *In re Aetna UCR Litig.*, 2015 WL 3970168, at *24 (D.N.J. June 30, 2015) (same); *In re Wellpoint, Inc. Out-of-Network "UCR" Rates Litig.*, 903 F. Supp. 2d 880, 902 (C.D. Cal. 2012) (same); *Pac. Recovery Sols v. United Behav. Health*, 481 F. Supp. 3d 1011, 1022–23 (N.D. Cal. 2020) (dismissing antitrust claims based on MCOs' common use of MultiPlan to reimburse OON claims); *Pac. Recovery Sols. v. Cigna Behav. Health, Inc.*, 2021 WL 1176677, at *14 (N.D. Cal. Mar. 29, 2021) (same); *Long Island Anesthesiologists PLLC v. United Healthcare Ins. Co. of N.Y. Inc.*, 2023 WL 8096909 (E.D.N.Y. Nov. 21, 2023) (same); Or. Sustaining Demurrer at 15, *VHS Liq. Trust v. MultiPlan Corp.*, No. CGC-21-594966 (Cal. Super. Ct. Aug. 9, 2024) (attached as Ex. A to the Decl. of Sadik Huseny Supp. Defs.' MTD CACC ("Huseny Decl.")) (same). Plaintiffs offer no facts that support a different outcome here. Defendants respectfully request that the CCAC be dismissed with prejudice.

## BACKGROUND—RELEVANT CCAC FACTUAL ALLEGATIONS

### A. Healthcare Dynamics: Patients, Providers, and MCOs[1]

*Patients select and are the buyers of healthcare services.* Under our healthcare system, patients select their healthcare providers and each patient buys, consumes, and is responsible for paying for medical treatment. *See* CCAC ¶¶ 3, 72, 75 (acknowledging that patients are the consumers of medical care and choose providers for various reasons). Patients can pay providers directly or, more commonly, patients assign to their provider the right to submit a claim to the

---

[1] The CCAC defines the non-MultiPlan defendants as "Insurer Defendants" and refers to such entities as "insurers." *E.g.*, CCAC ¶¶ 2, 6–8. This definition is misleading, as the CCAC own allegations make clear that many of the "Insurer Defendants" are managed care organizations that in some instances insure/cover patients, but that in many other instances provide only administrative services to thousands of other "self-funded administrative service only health plans," usually those run by employers for their employees, which provide employees with "insurance coverage." *Id.* ¶¶ 25, 26, 28, 30–36, 50. Accordingly, this motion refers to the non-MultiPlan Defendants as the "MCO Defendants."

patient's insurer or claim administrator on the patient's behalf, and the plan will usually "reimburse" the provider directly some or all of the cost, depending on the terms of the patient's plan. *Id.* ¶ 51. As the purchasers of healthcare services, patients (especially those receiving services from an out-of-network provider, as described below) have the ultimate obligation to pay for the cost of treatment, regardless of coverage. *Id.* ¶¶ 72, 84, 87.

*Providers sell healthcare services to patients and seek reimbursement from patients and their MCOs and/or health plans.* Providers sell healthcare services to patients. A provider that is "in-network" with an MCO typically has contractually agreed on the terms and reimbursement rates that will govern the provider's medical treatment of patients (members) of that plan. *Id.* ¶¶ 2, 55–57. Seeing an "in-network" provider means that patients can obtain treatment at a previously agreed-upon rate, that the MCO or health plan will reimburse the provider at the agreed-upon rate, and that the patient will not be responsible for paying anything other than the coinsurance or deductible required by the patient's plan. *Id.* ¶ 62.

By contrast, when the provider's fees have not been determined in advance of treatment (e.g., through a network agreement with an MCO), the provider will treat the patient and then seek fees (usually much higher) for the services rendered, at a rate set "unilaterally" by the provider. *Id.* ¶ 270. The provider can submit a bill for the charges to the patient's MCO, after the services have been rendered, requesting reimbursement for whatever coverage is available under the plan. *Id.* ¶¶ 65–66.

*MCOs provide insurance coverage or administrative services for self-funded health plans and may negotiate with providers as to the appropriate reimbursement for services provided to OON patients.* MCOs do not buy or sell healthcare services. Instead, MCOs either (1) offer insurance to individuals (either directly or through a plan sponsored by the individual's employer)

and collect premiums to pay for individuals' healthcare claims pursuant to a contract, or (2) provide administrative services to "self-funded administrative service only health plans." *Id.* ¶¶ 25–26, 28, 30–36. For "self-funded administrative service only" plans, MCOs do not pay claims out of their own funds—they provide only "administrative services" to the entity (typically an employer) that pays directly for health benefits for its members (typically employees).

Regardless of the type of coverage, the agreement between the individual subscriber and plan sponsor or MCO determines what services the plan sponsor or MCO will cover and how much it will reimburse, and there is wide variation in these benefit designs. Some plans only cover in-network providers for voluntary healthcare services, *id.* ¶¶ 72, 87, so a member who sees an OON provider is responsible for the entire cost of care. Other plans offer OON benefits, but with a limit on how much the MCO will cover for different types of services. There is also wide variation in how these limits are set. Some plans set the limit based on a percentile from a publicly available benchmark of providers' billed charges, which is often what Plaintiffs refer to as how "usual, customary and reasonable" ("UCR") rates are calculated. *Id.* ¶¶ 14, 140. Other plans set the limit based on a percentage of Medicare reimbursement, *id.* ¶ 129, and still others set the limit based on the average cost of the service provided, again based on publicly available data. Plaintiffs acknowledge that even when plans choose the same type of methodology for OON benefits, they can set different caps, for example, by setting a different percentile for "UCR rate[s]" or a different percentage of Medicare reimbursement. *Id.* ¶¶ 83–86, 129.

Because OON providers have no agreement with MCOs to accept reimbursement at a negotiated rate for patients on an OON basis, *id.* ¶¶ 65, 68, the amount the MCO covers does not limit how much the provider may bill the patient for an OON service. In many circumstances, the provider can bill the member for whatever portion the plan does not cover, a practice called

"balance billing." *Id*. ¶ 87. To protect their members, however, in many cases MCOs try to negotiate with OON providers *post*-service to accept an amount in exchange for an agreement not to balance bill the members of the plan.[2] Plan sponsors may authorize their MCOs to use a vendor like MultiPlan to negotiate on the plan's behalf. *Id.* ¶ 144. OON providers may accept or reject these vendors' offers. *Id*. ¶¶ 87, 144. OON providers have the option to pursue patients for the balance of their full-billed charges if they are unhappy with what the plan offers through negotiation or sets as the OON benefit limit. That is the point of a provider being OON: it is not bound to accept the MCO's reimbursement.

### B. Plaintiffs Seek to Require That All MCOs Use Only Legacy Benchmarking Systems That Increase Patient Fees and Provider Profits

MCOs have historically insured or administered plans that use benchmarks to determine OON reimbursements. Plaintiffs even endorse benchmarks, describing those that MCOs previously used, such as UCR benchmarks, to arrive at reimbursement rates "comparable" to each other. *Id.* ¶¶ 14, 73, 80–86; *see also id.* ¶ 84 (noting that "insurers typically cap compensation . . . at 80–90% of the UCR rate"). And they acknowledge that MCOs and providers looked to these benchmarking databases for many years prior to MultiPlan's entry. *Id.*

Plaintiffs admit that those benchmarks led to drastic increases in OON bills, driven by providers' ability to unilaterally increase their own charges (which in turn inflated the benchmarks). A New York State Comptroller study cited throughout the CCAC illustrates this by analyzing the differences in reimbursements using UCR benchmarks and those using one of MultiPlan's solutions, comparing those rates to Medicare and in-network rates. *See An Analysis*

---

[2] Plaintiffs do not dispute that a patient's responsibility to pay a portion of the OON provider's charges is an important part of many healthcare plan designs, because it makes members aware of and responsible for the higher charges they may incur by seeking OON care, rather than using in-network providers which tends to reduce costs for the population covered by the plan.

*of Reasonable and Customary OON Reimbursement Rates*, Office of the N.Y. State Comptroller (April 2020) (attached as Ex. B to Huseny Decl.; cited at CCAC ¶¶ 17, 247, 272).[3]  Plaintiffs allege in conclusory fashion that UCR is "widely accepted" and "fair and reasonable," CCAC ¶ 89, but the study they cite finds otherwise: (1) UCR "costs have risen significantly" and significantly outpaced overall increases in the cost of medical care; and (2) UCR reimbursement rates were *1.5– 100 times higher* than in-network reimbursement rates and *1.5-49 times higher* than reimbursement rates using a MultiPlan solution because UCR rates are based on "provider-driven charges."  Ex. B at 6, 10, 19–22 (emphasis added); *see also* CCAC ¶¶ 17, 272.  In real-world terms, that means Patient X is treated in-network for an infection and the provider seeks $1,000, while Patient Y is treated by the exact same hospital for the exact same problem but, if OON, the provider seeks up to $100,000 under the UCR methodology described.

The study also notes that (1) providers "may bill higher than necessary for a service" to *purposefully* drive up the UCR rate used to calculate reimbursements, Ex. B; (2) OON charges are "increasing at a higher rate than those of in-network providers," *id.* at 6; and (3) OON providers "are becoming more aggressive in their pricing," *id.*  Importantly, "large disparities" in UCR-based rates were not attributable to "a predictable source" such as "an increase in claims or medical care cost-of-living."  *Id.* at 2.

In light of this assessment, Plaintiffs unsurprisingly do not allege any facts that these legacy databases ever generated "competitive" rates that were the product of competition between MCOs for Plaintiffs' services.  Plaintiffs do not allege any facts that they ever used UCR rates to play one plan or MCO off another (*i.e.*, using the threat of non-treatment to those plan's members) to obtain

---

[3] Where "significant documents are referenced in the complaint and attached by the defendant to its motion to dismiss, those documents are considered to be incorporated into the pleadings and a court may consider them."  *Black Bear Sports Grp., Inc. v. Amateur Hockey Ass'n of Ill., Inc.*, 2019 WL 2060934, at *3 (N.D. Ill. May 9, 2019) (Kennelly, J.) (collecting cases).

a higher reimbursement amount than they otherwise could have. Similarly, Plaintiffs do not allege any facts indicating that MCOs ever agreed to reimburse them at higher OON rates in order to obtain some advantage for separate "in-network" claims.

Instead, Plaintiffs allege that they were allowed to "unilaterally" collect ever-increasing rates for OON patients based on benchmarking databases tilted in favor of ever higher payments, which they expected every plan to use. CCAC ¶¶ 270, 272. As the study they cite found, that led to soaring patient costs. *See* Ex. B at 6–8, 22.[4] Plaintiffs seek to require the healthcare industry to pay these excessive costs at the expense of plan sponsors, including employers, and patients.

### C. MultiPlan's Competitive Option: Customizable, Cost-Based Pricing Recommendations From Public Data, for Use by MCOs as They See Fit

MultiPlan built its cost and reference-based pricing business against this backdrop. MultiPlan is not an insurer or MCO and does not provide insurance, offer plans, or cover healthcare claims. CCAC ¶¶ 121–22, 139. Instead, MultiPlan offers, separately and independently to various clients: (1) customizable products for calculating OON reimbursements, primarily its Data iSight solution, and (2) a service that allows MCOs to outsource negotiations with providers to MultiPlan, with all reimbursement decisions resting solely with the MCOs. *Id.* ¶¶ 142–44.

*1. Overview—Data iSight pricing recommendations are based on public data and cost-based referencing*. MultiPlan's primary OON pricing recommendation methodology, and the focus of the CCAC, is called Data iSight. Plaintiffs allege that through Data iSight, MultiPlan exchanges MCOs' confidential information with other MCOs and that Data iSight uses this confidential information to recommend an OON price. *Id.* ¶ 338. But there are no factual allegations supporting these conclusory assertions, because they are not true.

---

[4] Because patients covered by a plan typically pay a larger percentage of a provider's bill when that provider is "out of network" instead of "in-network," patients can end up paying a substantially higher amount when OON bills increase. CCAC ¶¶ 73–74.

Rather, Plaintiffs' own factual allegations demonstrate the contrary—that Data iSight is a fully individualized and customized provider-cost-based solution. Its reference points are based on healthcare providers' publicly available cost data, or a combination of historical claims data and information that providers (not MCOs) have submitted to government agencies like the U.S. Centers for Medicare and Medicaid Services. *Id.* ¶¶ 149–51. Providers' publicly-reported costs and other publicly reported data are not "confidential" information of the providers, the MCOs, or anyone. But the cost-based nature of Data iSight, of course, is why provider Plaintiffs dislike it. It allows MCOs to evaluate providers' billed charges against the actual cost of providing healthcare services, rather than the historical charge-based benchmark of billed charges that providers prefer, given that providers can effectively unilaterally increase their own reimbursements. The New York State Comptroller study on which Plaintiffs rely makes this clear. *See* Ex. B at 2, 6, 22–23.

*2. Data iSight pricing recommendations are highly individualized, customized, and ultimately for the MCO to determine how or whether to use.* When an MCO contracts with MultiPlan, it obtains access to the recommendations provided by Data iSight and/or MultiPlan's products and services, which the MCO and/or plan sponsors (in the case of administrated services only plans) ultimately decides whether and how to use. CCAC ¶¶ 143–44, 158–59, 184. Because the services that MultiPlan provides are not one-size-fits-all, Plaintiffs do not and cannot allege that each MCO's use of Multiplan resulted in the same reimbursements for the same treatment from each MCO. Instead, the CCAC admits each MCO client can and does customize the services to fit its individualized plan terms. *See, e.g.*, *id.* ¶¶ 158–59, 163, 193, 199. This can include "data-driven negotiation and/or reference-based pricing methodologies" that "can be used standalone" or "used in a solution hierarchy" depending on the specific services chosen. *Id.* ¶ 270.

Plaintiffs allege, for example, that MultiPlan provides seven distinct "methods" through

which an MCO can set reimbursement rates, including based on (1) hospital profitability; (2) percentage of Medicare; (3) average mark-up; (4) percentage of cost; (5) percentage of charges; (6) percentile of billed charges; and (7) average billed charges.  *Id.* ¶ 159.  Customers can also select customized reimbursement floors and ceilings for Data iSight, to ensure that proposed reimbursements stay within certain thresholds set by each MCO or plan sponsor.  *Id.* ¶ 163; *A Better Reference for Pricing*, MultiPlan (Aug. 2019) at 6 (attached as Ex. C to Huseny Decl.).[5]  As part of this process, each MCO uses Data iSight differently based on the specific priorities of the plans they are managing by submitting their "pricing preferences and strategies" to MultiPlan using a "Preferences Form."  CCAC ¶ 184.  Importantly, the methodology is selected at the level of "a particular [medical] service," *id.* ¶ 158, so MCOs may use Data iSight only for particular services.  The final recommendation and savings "reflect[s] a variety of configuration options selected by the [MCOs] to reflect their preferred balance of savings and member satisfaction."  Ex. C at 6.  And MCOs or plan sponsors can use Data iSight's large "number of options, such as guardrails that ensure a reimbursement never strays below or above a benchmark such as Medicare or *the [MCO's] benefit limit*, if different than the reference point."  *Id.* (emphasis added).

Plaintiffs do not allege that MultiPlan mandates that all of its 700+ clients agree to any sort of exclusivity provision, or that MultiPlan's contracts preclude or restrict MCOs from using another OON cost methodology.  Nor do Plaintiffs allege that MultiPlan's clients always use MultiPlan's solutions to decide a final OON reimbursement (*i.e.*, that they always accept the recommendation)—or that its use is required or mandated at all.  *E.g.*, CCAC ¶ 202 (discussing UnitedHealth's analysis of whether to adopt MultiPlan recommendation).  Rather, at bottom, the

---

[5] The CCAC incorporates this white paper by reference.  *See* CCAC ¶ 165; *supra* n.3.  Plaintiffs state such "white papers" "describe in detail the processes that [MultiPlan] uses to reprice out-of-network claims." CCAC ¶ 146.

CCAC's allegations show that Data iSight provides customized pricing recommendations: (1) for each individual MCO, health plan, and transaction at issue, (2) that are based on the specific transaction and cost-based referencing and public data, (3) that are not mandatory in any sense, and (4) that each MCO in any instance ultimately elects to use or alter in any way they may want (if they even elect to use MultiPlan at all). *Id.* ¶¶ 158–59, 184, 193, 199.

     *3. Negotiations with providers to reach resolution*. Plaintiffs do not allege, for MCO clients using only Data iSight, that MultiPlan transmits reimbursement offers directly to providers (or interacts with providers at all). That is because MultiPlan's MCO clients that use only Data iSight will receive a pricing recommendation from MultiPlan, but it is ultimately the MCO or plan sponsor that decides whether to use that recommendation and typically communicates directly with the provider regarding reimbursement. The MCO may negotiate with the OON provider, with the provider ultimately deciding whether to balance bill the patient.

     MultiPlan does offer an additional service that some MCO clients may elect to use in certain circumstances: negotiation services, where MultiPlan negotiates the MCO's offer directly with the provider. *Id.* ¶ 144. MultiPlan's negotiation services include a significant patient protection component: a prohibition on balance billing should the provider accept the MCO's reimbursement offer. *Id.* ¶ 227. This is critical for consumer protection because providers often can (and do) pursue payment from the patient directly. *Id.* ¶ 87. When such negotiation services are used, providers are not required to accept any particular pricing offer made as a result of an MCO using MultiPlan. *Id.* ¶ 170 (acknowledging that providers may "choose not to accept" the offer, in which case the claim could be subject to "the guidelines and limits on the plan" for the patient). Plaintiffs do not dispute that an OON provider is under no obligation to accept as payment in full any reimbursement amount from any MCO, and can choose to balance bill the patient. If,

and only if, negotiations are successful, with the provider agreeing to a resolution where it does not balance bill patients, does MultiPlan earn a percentage of the savings. *Id.* ¶¶ 175–76. Therefore, MultiPlan is incentivized to both protect the patient from balance billing and to calculate and recommend amounts acceptable to the provider. *Id.*

Plaintiffs allege that, where MultiPlan's negotiation services are used, providers choose to accept the MCO's offer over 95% of the time, including expressly agreeing not to balance bill the patient—demonstrating both (1) that providers determine whether to accept the MCO's offer or instead pursue balance billing of their customer, the patient, and (2) that MultiPlan is often able to recommend amounts acceptable to the provider. *Id.* ¶ 173. As the white paper cited in the CCAC explains, "Even health plans with an aggressive stance on out-of-network utilization find that the reference point must be defensible and fair to providers in order to be effective for members." Ex. C at 8.

### D. The CCAC Makes No Non-Conclusory Factual Allegations Regarding Individual MCOs' Use of MultiPlan Or Any Alleged Unlawful Agreement

Plaintiffs claim through numerous conclusory allegations that hundreds of MCOs across the country—including the ten MCOs named in the CCAC—have conspired to fix OON reimbursements. But despite the wide variation among MCOs and their uses of MultiPlan, the CCAC lumps together all MCOs (and others) and omits key factual allegations about how any MCO specifically uses or has used MultiPlan's services. Plaintiffs instead allege generically that each MCO Defendant "us[es] MultiPlan's out of-network claims repricing services." CCAC ¶¶ 25–36; *see also, e.g.*, *id.* ¶ 156 ("MultiPlan instructs many of its large insurer clients (including the Insurer Defendants) to enter manual overrides, like caps and floors on payment"); *id.* ¶ 191 (MCOs use MultiPlan "because they know their competitors have also agreed to do so").

Plaintiffs do not include factual allegations regarding even their own treatment of patients

receiving services on an out-of-network basis and reimbursements for such treatment. Plaintiffs do not allege that any MCO using MultiPlan reimbursed any particular Plaintiff for OON services, much less that any MCO did so at a below-cost or below-market rate. Relatedly, Plaintiffs do not allege that OON reimbursements using MultiPlan's methodologies were unprofitable to them (or anyone), nor do they allege what portion of OON bills, for each provider, are paid in full or close to full with no pushback—whether MultiPlan is used or not. These are not facts Plaintiffs can claim not to know. Plaintiffs are healthcare providers with their own detailed records of their reimbursement histories, including when MultiPlan's products and services are used and when not.

The CCAC also alleges no facts showing any horizontal agreement between any MCO Defendants to use MultiPlan. Plaintiffs note that MultiPlan has been offering repricing services since "the late 2000s," *id.* ¶ 132, and allege that the MCO Defendants joined at different points in time, *see, e.g.*, *id.* ¶¶ 25–26, 28, 112. Yet Plaintiffs do not allege, among other things, that any MCO Defendant ever communicated directly or indirectly with another MCO Defendant about using MultiPlan, let alone for the purpose of reaching an agreement to artificially reduce OON reimbursements. Nor does the CCAC allege any facts showing that any MCO Defendant shared confidential information with another, or vis-à-vis MultiPlan, or in any other manner. In short, there are no factual allegations showing that MCO Defendants' use of MultiPlan's services is the result of an agreement among them, rather than the product of independent decision making.

## ARGUMENT

Under Federal Rule of Civil Procedure 12(b)(6), Plaintiffs must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint must be more than mere "labels and conclusions" and include more than "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. While factual

14

allegations are generally accepted as true at the pleading stage, neither unwarranted factual deductions, nor legal conclusions couched as factual allegations, are afforded such deference. *Id.* at 557. "Repetition cannot substitute for factual allegations." *Assoc. of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 15 F.4th 831, 834 (7th Cir. 2021); *see id.* (taking a "careful look" at the complaint and affirming dismissal because "conclusory allegations—that [defendant] agreed, conspired, colluded, or induced agreement, conspiracy, or collusion" are insufficient to plead a Section 1 claim).

To state a claim under Section 1 of the Sherman Act, Plaintiffs must plead with sufficient facts "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in [a] relevant market; and (3) an accompanying injury" to themselves that flows directly from anticompetitive effects of the alleged conduct on the market—*i.e.*, antitrust standing and injury. *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012).

Plaintiffs' Section 1 claim fails for three independent reasons: (1) Plaintiffs fail to plead antitrust standing or antitrust injury, (2) Plaintiffs fail to plausibly allege any agreement in restraint of trade, and (3) Plaintiffs' "price-fixing" claim fails because OON reimbursements are not a "price" that is capable of being "fixed" in any cognizable antitrust market.

## I. PLAINTIFFS FAIL TO PLEAD ANTITRUST STANDING OR INJURY

### A. Plaintiffs Lack Antitrust Standing to Pursue These Claims Because Their Purported Injuries Are Indirect and Derivative

Plaintiffs lack antitrust standing to pursue their claims because, in many circumstances, they remain free to seek any unpaid portion of their billed charges from their customers, the patients. Thus, any "injury" from MCOs not reimbursing them as much as they want is indirect and derivative. *See Garry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*, 937 F.3d 1056, 1066 (7th Cir. 2019). Courts have thus repeatedly dismissed, on standing grounds, providers' antitrust claims

alleging industrywide conspiracies to suppress OON payments through use of common data sources. *See, e.g.*, *In re WellPoint*, 903 F. Supp. 2d 880, 901–03 (C.D. Cal. 2012) (dismissing Sherman Act claim that insurer conspired to underpay OON claims through coordinated use of Ingenix data); *Pac. Recovery Sols. v. United Behav. Health* ("*Pac. Recovery I*"), 481 F. Supp. 3d 1011, 1022–23 (N.D. Cal. 2020) (dismissing Sherman Act claim that insurer conspired to underpay certain OON claims through use of MultiPlan pricing); *Pac. Recovery Sols. v. Cigna Behav. Health, Inc.* ("*Pac. Recovery II*"), 2021 WL 1176677, at *12 (N.D. Cal. Mar. 29, 2021) (same).

Antitrust standing "examines the connection between the asserted wrongdoing and the claimed injury to limit the class of potential plaintiffs to those who are in the best position to vindicate the antitrust infraction." *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2013 WL 4506000, at *9 (N.D. Ill. Aug. 23, 2013); *see also McGarry*, 937 F.3d at 1066 (affirming dismissal for lack of antitrust standing). In determining whether a plaintiff has antitrust standing, courts examine these factors: "(1) the causal connection between the violation and the harm; (2) the presence of improper motive; (3) the type of injury and whether it was one Congress sought to redress; (4) the directness of the injury; (5) the speculative nature of the damages; and (6) the risk of duplicate recovery or complex damage apportionment." *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 484 (7th Cir. 2002). Plaintiffs fail to satisfy these factors.

As Plaintiffs allege, they (as OON providers) have no contractual relationship with an MCO. CCAC ¶ 65. An MCO likewise has no obligation to pay anything to an OON provider. *Id.* The customer-supplier relationship is between the patient and provider. An MCO's obligations with regard to OON services, in contrast, are to its members, by virtue of the terms of the member's healthcare plan. *E.g., id.* ¶ 3 ("many insurance plans offer out-of-network coverage to plan members"), ¶ 84 (providing example of "an insurer that promised plan members it would

compensate out-of-network providers for services at 90% of the UCR rate"). As Plaintiffs concede, the member may often be subject to balance billing for the difference between the provider's charge and the reimbursement allowed by the health plan. *E.g., id.* ¶ 70 (claims paid to OON providers should include a code that "indicates that the patient is responsible for a portion of the bill (i.e., the shortfall that has not been covered by the patient's plan)"), ¶ 72 ("patients that opt to use their out-of-network plan benefits will typically have to pay higher out-of-pocket costs"), ¶ 84 (where plan provides that MCO pays only 90% of the UCR rate, "the patient would then contribute the remaining 10% of the UCR rate (or allowed amount) as co-insurance").

Plaintiffs also acknowledge that at least some MCOs use MultiPlan's products to make "offers of payment to providers," *id.* ¶ 170, notwithstanding the lack of any contractual relationship between the MCO and the OON provider. While OON providers who accept these offers "relinquish their right to balance bill[]," *id.* ¶ 12, Plaintiffs can reject an MCO's offer and pursue from the patient or MCO the additional payment. *Id.* ¶ 173 (acknowledging that providers do not always accept). And except for certain involuntary claims like emergency services (which neither Plaintiff claims to provide), to the extent a payor uses MultiPlan to set a plan benefit limit, the provider is free to balance bill if dissatisfied with the reimbursement.[6] *See In re WellPoint*, 903 F. Supp. 2d at 901–02 (noting ability of providers to balance bill if objecting to how the MCO calculated OON benefits reimbursement through Ingenix).

Accordingly, Plaintiffs can seek full compensation for whatever they believe they are due and owed from the patient that obtained services from them. If an OON provider chooses not to

---

[6] Even for emergency services, Plaintiffs cannot claim injury because federal law requires that an insurer generally must make an initial payment to the provider, and to the extent that the provider is unsatisfied provides a mandatory independent dispute resolution process to determine whether an additional amount is owed. *See GPS of N.J. M.D., P.C. v. Horizon Blue Cross & Blue Shield*, 2023 WL 5815821, at *3, 9 (D.N.J. Sept. 8, 2023).

balance bill the patient, the provider's own conduct is the cause of its alleged injury of lack of payment. Or, if a patient's chosen OON provider pursues a balance bill from the patient but the patient refuses to pay, the injury arises from the patient's failure to comply with his or her payment obligation to that provider, not from the MCO's conduct. Plaintiffs lack antitrust standing in these circumstances. *See id.* at 902 (no antitrust standing where no "'direct link' between the harm the Provider Plaintiffs suffered and Defendants' alleged misconduct"); *Pac. Recovery I*, 481 F. Supp. 3d at 1022 (no antitrust standing because OON providers' alleged injury arose "only to the extent that their patients fail to pay them that difference," an injury that "would arise directly from the patients' failure to comply with their financial obligations to plaintiffs, not from defendants' conduct"); *see also Meridian Treatment Servs. v. United Behav. Health*, 2022 WL 1105071, at *3– 4 (N.D. Cal. Apr. 13, 2022) (using same test as antitrust standing to find no RICO standing because "the allegations from the original complaint gave rise to the inference that [provider plaintiffs] had a right to [balance bill]," even if they chose not to do so).[7]

Even if there had been some cognizable injury to Plaintiffs, their claims would create the significant risk of duplicative recovery and likely impossible damage apportionment, a factor courts have also found precludes provider antitrust standing for OON antitrust claims like Plaintiffs'. *See WellPoint*, 903 F. Supp. 2d at 903 (holding that "the potential for duplicative recovery [by members] weighs against standing"). As courts have recognized, patients can and do sue their MCOs when they believe OON claims have been allegedly underpaid under the terms of the patients' insurance agreements, including with respect to MCOs' use of MultiPlan pricing. *See id.* But even if patients have not filed suits, the risk of duplicative recovery remains because

---

[7] Both plaintiffs are from California, whose law similarly holds that noncontracted providers have no standing to sue the patient's health plan for allegedly deficient payments because the noncontracted provider's legal recourse for payment is from its patient. *See Orthopedic Specialists of S. Cal. v CALPERS*, 228 Cal. App. 4th 644, 648 (2014).

18

providers can (and do) balance bill for OON claims, and a provider that collects on those balance bills would receive a windfall if allowed to recover again on an antitrust theory like the one both Plaintiffs lay out here. *See LD v. United Behav. Health*, 508 F. Supp. 3d 583, 590 (N.D. Cal. 2020) (acknowledging allegations that members received balance bills in connection with claims priced using a MultiPlan product); *RJ v. Cigna Health & Life Ins. Co.*, 625 F. Supp. 3d 951, 959 (N.D. Cal. 2022) (same).

Ultimately, if MultiPlan's amounts are found to be too low, as Plaintiffs allege, *patients* would be the only direct victims, and Plaintiffs' injury would be derivative of the alleged underpayment to the members.[8]  *See Pac. Recovery II*, 2021 WL 1176677, at *12 (finding OON providers lacked antitrust standing to bring Sherman Act claims challenging MultiPlan pricing because "Plaintiffs' injuries arise, if at all, only to the extent that their patients do not pay the amounts that Cigna does not reimburse"); *see also WellPoint*, 903 F. Supp. 2d at 901–02.

### B. Plaintiffs Lack Standing Because They Fail to Allege Any Injury Derived From Any Defendant's Use of MultiPlan

To allege injury necessary for both Article III and antitrust standing, Plaintiffs must allege that they received "below-market" OON reimbursements as a result of MultiPlan's solutions.  *See Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 345 (7th Cir. 2022) (holding plaintiffs lacked both Article III standing and antitrust standing because they had not been injured by alleged conspiracy).  But the CCAC is devoid of any factual allegations that any MCO Defendant paid either Plaintiff a "below-market" repriced OON claim using MultiPlan's recommendations—or any other specific facts regarding injury to Plaintiffs.  The CCAC does not even allege that any specific defendant has ever reimbursed either Plaintiff for OON services.  And

---

[8] While a provider who chooses to accept an MCO's offer negotiated by MultiPlan may agree not to balance bill the patient, providers are not harmed even in that scenario because they have agreed to give up their right to seek their full billed charge from their patient, which is entirely their choice.

it does not allege that the Plaintiffs did not or could not bill their patients for the balance of their charges not paid by the MCO. The entirety of Plaintiffs' allegations as to their own specific "injuries" is found in but two paragraphs—where each Plaintiff alleges only that it "typically" submits out of network claims "to insurers," that these insurers "use MultiPlan's out-of-network claims repricing services and are thus members of the MultiPlan Cartel," and that each Plaintiff "has received unreasonably low compensation amounts." CCAC ¶¶ 20–21. Plaintiffs allege no actual facts (as opposed to conclusory assertions) showing that they actually received a below-market OON reimbursement as a result of a MultiPlan solution.

### C. Plaintiffs Fail to Plead Antitrust Injury Because They Do Not and Cannot Allege Actual Harm to Competition

Plaintiffs cannot establish antitrust injury because they have failed to properly allege harm to competition. An antitrust plaintiff must allege not only that it personally suffered an actual injury from defendants' conduct but also that its injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 489 (1977); *Agnew*, 683 F.3d at 335. Because antitrust laws were enacted for "the protection of competition, not competitors," *Brown Shoe Co. v. United States*, 370 U.S. 294, 319 (1962), a plaintiff must allege an antitrust injury that results from a "competition-*reducing* aspect or effect of the defendant's behavior," *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990).

Plaintiffs seek the ability to obtain an excessive or supracompetitive price for services billed on an OON basis—one that dwarfs (by a factor of up to 100 times) the recovery they obtain for the same services when billed on an in-network basis or through Medicare. *See* CCAC ¶ 272. This is not the type of injury antitrust laws were meant to prevent. *See Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1418 (7th Cir. 1989). Indeed, in *Long Island*

*Anesthesiologists PLLC v. United Healthcare Insurance Co. of New York Inc.*, the court dismissed antitrust claims against United and MultiPlan predicated on decreased OON reimbursement rates, finding that the plaintiffs suffered no antitrust injury because "lowering reimbursement rates paid to a physician practice is generally insufficient to establish antitrust injury."  2023 WL 8096909, at *5-6 (E.D.N.Y. Nov. 21, 2023).

Although Plaintiffs assert "that competition decreased, the thrust of its complaint points the opposite way."  *Chi. Studio Rental, Inc. v. Ill. Dep't of Com.*, 940 F.3d 971, 978 (7th Cir. 2019). Plaintiffs' allegations show, at most, that MultiPlan's individualized agreements with various MCOs result in *more* cost-management options and *lowered* costs and benefits to MCOs and their members (patients).  *See* CCAC ¶¶ 74, 84, 227.  MCOs' contracts with MultiPlan give those MCOs and/or their plan sponsors a new competitive option—the option of using MultiPlan's solutions, as customized and decided solely by the MCOs, to decide on an OON reimbursement.

The only "injury" Plaintiffs complain of is injury to *themselves*—namely, their inability to obtain a windfall by forcing MCOs to reimburse a higher portion of their fees (rather than justify those fees to patients).  Plaintiffs want a return to the world where MCOs must use providers' preferred UCR legacy databases, and not have the option of using MultiPlan's alternative.  Their own cited study shows why: between 2012 and 2016 "reasonable and customary" rates *rose 26%* each year, far above even the 13% overall increase in medical care.  Ex. B at 7.  But the antitrust laws protect "competition, not individual competitors" and Plaintiffs "must assert an injury not only to [themselves], but to the relevant market."  *Chi. Studio Rental*, 940 F.3d at 978.   Plaintiffs' claimed injury does not result from any competition-reducing effect of anything done by any Defendant.  *Atl. Richfield Co.,* 495 U.S. at 344; *Brunswick,* 429 U.S. at 489.

## II.  PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE A CONSPIRACY

Section 1 applies only to conduct that "stems from . . . agreement," rather than from

"independent decision" by the Defendants. *Twombly*, 550 U.S. at 553 (alteration and citation omitted). An allegation of mere parallel conduct "falls short" of pleading an unlawful agreement because such conduct is "in line with a wide swath of rational and procompetitive business strategy unilaterally prompted by common perceptions of the market." *Id.* at 553–54. Accordingly, to state a Section 1 claim based on allegations of parallel conduct, a complaint must plausibly "raise[] a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557. Moreover, where, as here, "the complaint itself gives reasons to believe" that the defendants have a natural, independent incentive to engage in the alleged conduct, dismissal is warranted because "there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway." *Id.* at 566, 568.

Plaintiffs allege a conspiracy between a service provider, MultiPlan, and "any person or entity" that has used those services. *See* CCAC ¶ 40. Courts refer to a conspiracy where an entity at one level in the market allegedly conspires with a group of competitors at a different level of the market as a "hub and spoke conspiracy." *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 842 (7th Cir. 2020). To plausibly allege such a conspiracy, it is not sufficient to allege a series of bilateral agreements, no matter how numerous, between the vendor and its customers.[9] Rather, Plaintiffs must plausibly allege a horizontal agreement among the customers at the "rim" of the alleged conspiracy. *Id.* at 842; *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 327 (3d Cir. 2010) ("[T]he critical issue for establishing a *per se* violation with the hub-and-spoke system is how the spokes are connected to each other."). Thus, Plaintiffs must show not only that MultiPlan entered into bilateral vertical agreements with its customers—as every vendor does—but also that the MCOs *actually agreed with each other* ("the rim") to form

---

[9] As detailed in the DAP motion to dismiss, bilateral agreements between a vendor and its customers may not be "aggregated" to plead a conspiracy. *See* DAP MTD at 22 (collecting cases).

an unlawful "cartel."  Plaintiffs have not done so.

### A.      Plaintiffs Do Not Plead Any Direct Evidence Of A Conspiracy

Plaintiffs fail to plead direct evidence of a conspiracy among MCOs to buy or use MultiPlan's products and services, much less one to fix OON reimbursement rates.  Direct evidence of a conspiracy must be "explicit and requires no inferences to establish" a conspiracy from it.  *In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*, 60 F. Supp. 3d 914, 950 (N.D. Ill. 2014) (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999)).  Pleading direct evidence of a conspiracy is a steep burden that is rarely met because it requires evidence "tantamount to an acknowledgement of guilt."  *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002); *see also In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (direct evidence "would usually take the form of an admission by an employee of one of the conspirators[] that officials of the defendants had met and agreed explicitly on the terms of a conspiracy to raise price").

The CCAC (at page 72) has a heading proclaiming that "Direct and Indirect Evidence of the Multiplan Cartel Exists," but the factual allegations following that heading (and elsewhere in the CCAC) contain no direct factual allegations of the alleged conspiracy.  Instead, they focus on bilateral agreements between MultiPlan and each of its customers.  *E.g.*, CCAC ¶¶ 219, 222, 231–33.  Plaintiffs allege that these agreements are "substantially similar," (*id.* ¶¶ 219, 231–33), but alleging that a vendor entered into "substantially similar" bilateral agreements with each of its customers comes nowhere close to showing that the customers entered into an agreement *with one another* to violate the law.  *See Marion Healthcare,* 952 F.3d at 842 (vertical agreements with distributors insufficient to establish a horizontal agreement); *In re Ins. Brokerage Antitrust Litig.,* 618 F.3d at 327 ("[O]ne cannot plausibly infer a horizontal agreement among a broker's insurer-partners from the mere fact that each insurer entered into a similar contingent commission

agreement with the broker."); *see also In re: Amazon.com, Inc. eBook Antitrust Litig.*, 2022 WL 4581903, at *11-12 (S.D.N.Y. Aug. 3, 2022) (no direct evidence where plaintiffs "rely solely on the vertical agency agreements between each Publisher and Amazon").

Nor do any of the various statements Plaintiffs highlight represent evidence of a conspiracy, let alone *direct* evidence. *See* CCAC ¶¶ 235–39. For example, Plaintiffs point to a statement by MultiPlan CEO Travis Dalton—where they use ellipses *twice*—to suggest that he made a public admission that MultiPlan and MCOs are secretly setting prices "collectively." *Id.* ¶¶ 234–35. He said no such thing. Here is Plaintiffs' allegation:

- "MultiPlan CEO Travis Dalton admitted to coordinating industry wide compensation amounts, stating 'part of what we're trying to do collectively, . . . with machine learning and other capabilities . . . is to determine [] an appropriate cost for [out-of-network services.].'"

The full statement below, with the removed text in blue in place of Plaintiffs' ellipses, makes clear Mr. Dalton was talking *not* about "MCOs" collectively *at all*, but rather about the collective mechanisms that MultiPlan is using to bring transparency to the industry:

- "So if you're going through a Medicare channel, it's a price. If it's in network negotiated, it's a price. If it's out of network, it can be a price. So part of what we're trying to do collectively with all the transparency data and with machine learning and other capabilities is to essentially, bring transparency to the table, but also evaluate those prices. Against some fair and reasonable basis and determine what an appropriate cost for something might be and bring that to the industry in a way that helps contain costs over time."[10]

This is Plaintiffs' supposed express, "public" admission of a cartel. It is frivolous.

**B. Plaintiffs Do Not Allege Any Circumstantial Evidence Of A Conspiracy**

Plaintiffs also fail to adequately allege an agreement between MCOs via circumstantial evidence. To allege a Section 1 conspiracy based on circumstantial evidence, Plaintiffs must plead

---

[10] *Using Data to Optimize Costs in Healthcare*, Datacamp, (Sept. 16, 2024), https://www.datacamp.com/podcast/using-data-to-optimize-costs-in-healthcare (cited at CCAC ¶ 235 and incorporated by reference); *see supra* n.3.

facts demonstrating *both* (1) parallel conduct *and* (2) a factual "context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557; *see also In re Text Messaging Antitrust Litig.*, 630 F.3d at 628; *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013). They do neither.

### 1. Plaintiffs Do Not Allege That Defendants Engaged In Parallel Conduct

Plaintiffs' attempt to plead a conspiracy through circumstantial evidence fails at the threshold because the conduct they allege is not parallel. The CCAC asserts that there was a "dramatic, abrupt shift in pricing practices," CCAC ¶ 248, in an apparent attempt to invoke the Seventh Circuit's *Text Messaging* decision. *See* 630 F.3d at 628 (emphasizing allegation that "all at once the defendants changed their pricing structures, which were heterogeneous and complex, to a uniform pricing structure, and then simultaneously jacked up their prices by a third"). But the factual allegations of the CCAC show otherwise.

The CCAC contains no allegations of parallel reimbursement reductions among the MCO defendants, and therefore offers no facts to support an inference of a price-fixing conspiracy. Nor does the CCAC even show that the MCO defendants engaged MultiPlan's services in parallel. The CCAC alleges that Cigna contracted with MultiPlan "[o]n April 1, 2015," shortly after it completed its obligation to use the FAIR Health database. CCAC ¶ 111. UnitedHealth, by contrast, only "began using Data iSight . . . in 2016," and "expanded the use of Data iSight in October of 2017," more than two years after Cigna began using MultiPlan's services. *Id.* ¶ 113. For its part, Aetna "contracted with MultiPlan to use its OON claims repricing and negotiation services" on "November 19, 2018"—more than three-and-a-half years after Cigna switched. *Id.* ¶ 114. Other Defendants are likewise scattered across this multi-year period: Highmark "entered into a contract with Multiplan" on January 1, 2017, *id.* ¶ 115; Elevance in May 2017, *id.* ¶ 116; and Kaiser "[i]n 2018," *id.* ¶ 117. Plaintiffs then allege that "hundreds of other co-conspirators also began

MultiPlan to reprice their out-of-network claims between 2015 and 2018." *Id.* ¶ 118.

That is not an "abrupt shift" or the "all at once" conduct described in *Text Messaging*. It is the opposite. These facts do not support—and in fact undermine—any plausible inference that Cigna, when it began using MultiPlan's services in April 2015, had any "preceding agreement" with other Defendants, who did not begin using MultiPlan's services until years later. *See Twombly*, 550 U.S. at 557. There is likewise nothing to suggest that any of the decisions by "hundreds" of alleged co-conspirators over the course of this multi-year period were so suspiciously synchronized as to suggest a conspiracy. *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015) (competitors adopting similar pricing policies "over a period of several years" insufficient to plead parallel conduct because the "slow adoption of similar policies does not raise the specter of collusion"). Nor is it alleged that these "hundreds" of co-conspirators subscribed to the same MultiPlan product, customized them in the same way, or set the same reimbursement rates for OON providers. *See Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 836–37 (N.D. Ill. 2018) (conduct that "do[es] not occur in a predictable pattern or scale, much less move in lockstep," fails to "support a plausible inference of collusion"). Rather, Plaintiffs admit a variety of reimbursement options and methods are made available by plan sponsors to each MCO. CCAC ¶¶ 158–60, 162.

In case after case, courts reject efforts to claim that shifts in business practices spread over even just a few months constitute parallel conduct supporting an inference of conspiracy. *See, e.g., Wash. Cnty Health Care Auth.*, 328 F. Supp. 3d at 836-37 (staggered actions by alleged conspirators "tends to undermine, rather than support, the notion that the defendants engaged in parallel conduct"); *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 516-17 (8th Cir. 2018) (no parallel conduct where alleged actions took place six months apart); *In re Late*

26

*Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 962 (N.D. Cal. 2007) ("[T]ime lags of three to six months between pricing moves 'refute rather than support' allegations of conspiracy[.]") (citation omitted)); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1022–23 (N.D. Cal. 2007) (rejecting claim of parallelism where defendants took similar actions within three months of one another as such conduct "fall[s] short of unusual, lockstep pricing behavior"); *Run it First, LLC v. CVS Pharm.*, 2022 WL 484862, *5 (S.D. Fla. Feb. 15, 2022) (rejecting claim of parallelism where similar actions were taken "within a four-month period").

A recent decision addressing price-recommendation software underscores why Plaintiffs' allegations fail as a matter of law. The plaintiffs in *Gibson v. MGM Resorts International* alleged that casino hotel operators began using price-recommendation software over a multi-year period, ultimately resulting in "higher prices for hotel rooms than the market could otherwise support." 2023 WL 7025996, at *1 (D. Nev. Oct. 24, 2023). The court dismissed, noting that the plaintiffs failed to allege facts that would allow the court to "plausibly infer that all [defendants] began using particular pricing software at or around the same time," *id.* at *4, and that it was "unclear…whether all [defendants] use the same pricing algorithm even though Plaintiffs allege that [defendants] have colluded to adopt a shared set of pricing algorithms," *id.* at *3. It explained that "[b]etween not alleging what software [defendants] all agreed to use, who entered into any purported agreement, and when they entered into any agreement, the Court cannot infer parallel conduct from the Complaint." *Id.* at *4; *see also Cornish-Adebiyi v. Caesars Ent., Inc.*, 2024 WL 4356188, at *5 (D.N.J. Sept. 30, 2024) (dismissing antitrust claims regarding the same software, and questioning how "mere use of the specific software [could be] suggestive of culpable conspiracy").

That multiple companies in the same industry use industry-leading software services and started doing so over the course of several years is simply not evidence of conspiracy. And even

if it were true that Defendant MCOs administered plans that in some instances used a common methodology or similar reimbursement rates, such behavior would not be probative of a conspiracy based on Plaintiffs' own allegations. They allege that many MCOs previously used common benchmarks like billed charges databases, and administered plans that adopted similar reimbursement methodologies, before *any* MCO had a plan that used MultiPlan's services at issue here. *See* CCAC ¶¶ 14, 73, 80–89, 105, 107. Tellingly, Plaintiffs characterize common use of these benchmarks as *competitive*. *Id.* ¶ 73. In light of these concessions, Plaintiffs cannot plausibly assert that the mere use of *another* common benchmark suggests a conspiracy.

### 2. The CCAC Alleges Conduct In Each Defendant's Self-Interest

The CCAC also fails because its factual allegations show that the alleged conduct was consistent with each Defendant's individual economic self-interest. *See Twombly*, 550 U.S. at 566 ("[T]here is no reason to infer that the companies had agreed among themselves to do what was only natural anyway . . . .").

As in *Twombly*, the CCAC itself reveals a rational, non-conspiratorial reason why MCOs contract with MultiPlan: "[i]nsurers seek to predict and, if possible, limit the prices they will pay for [healthcare] services." CCAC ¶ 55. Thus, Plaintiffs admit that it is rational for MCOs—like any business—to seek to control their costs and those for their members and plan sponsors. This natural incentive to engage in the challenged conduct forecloses an inference of conspiracy and requires dismissal. *See Twombly*, 550 U.S. at 566; *see also, e.g.*, *Musical Instruments*, 798 F.3d at 1195 (affirming dismissal where "the complaint itself…provides ample independent business reasons why each of the manufacturers" engaged in the challenged conduct).

Lacking any facts showing an agreement among the Defendant MCOs or the "hundreds" of supposed co-conspirators, Plaintiffs attempt to appeal to the counter-intuitive theory that MCOs somehow "compete against each other" to pay *higher* rates to OON providers. CCAC ¶ 78. They

posit that because high-charging OON providers would try to punish an MCO that "refused to pay a reasonable compensation rate on out-of-network claims," "it would be against the unilateral economic self-interest of any one insurer to pay below-market compensation for out-of-network services, absent awareness that competitors had agreed to the same." *Id.* ¶ 181.

There are no factual allegations offered to support this conclusory assertion—and here, too, Plaintiffs' own allegations undermine their claim. For example, Plaintiffs allege that Cigna entered into a contract with MultiPlan on April 1, 2015 (CCAC ¶ 232), which was 2.5 years before United entered its contract with MultiPlan in October 2017 (¶ 231), more than 3.5 years before Aetna entered its contract with MultiPlan in November 2018 (¶ 222), and more than two years before Elevance "began using MultiPlan's Data iSight pricing formula" in June 2017 (¶ 233). There are no factual allegations suggesting that Cigna had any "awareness that competitors had agreed to the same," *id.* ¶ 181, when it entered into a contract with MultiPlan *years* before. Nor are there any allegations that Cigna experienced any punishment or "abrasion" that would have made it irrational to continue using MultiPlan's services that, according to the CCAC, resulted in "billions of dollars" in savings for Cigna's plan sponsors and members (*e.g.*, *id.* ¶¶ 181, 210).

Rather, the CCAC alleges facts showing that it was independently rational for MCOs to use MultiPlan's services. *See Am. Floral Servs., Inc. v. Florists' Transworld Delivery Ass'n*, 633 F. Supp. 201, 211 (N.D. Ill. 1986) (rejecting Section 1 claim because "[t]wo competitors may adhere to a "common formula" to establish prices absent a conspiracy because each unilaterally finds the formula to be in its best interests); *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 235 (2d Cir. 1999) (per curiam) (no conspiracy where conduct was consistent with unilateral legitimate business interests). For example, Plaintiffs allege that UnitedHealth switched to MultiPlan not because of any communications with its competitors, but in response to sales

pitches from MultiPlan explaining that UnitedHealth could dramatically reduce its costs. CCAC ¶¶ 190–92. Plaintiffs allege that MultiPlan informed UnitedHealth that (i) seven of its top ten competitors "were already using MultiPlan's repricing services" (*id.* ¶ 190), (ii) UnitedHealth could reduce its out-of-network costs by $900 million per year (*id.* ¶ 192), and (iii) it could "catch[] up to the pack" of competitors who were already experiencing savings through MultiPlan's services (*id.*). The CCAC further alleges that UnitedHealth believed using MultiPlan's services could allow it to "level the playing field" with its competitors. *Id.* ¶ 203. Instead of any conspiracy among competing MCOs, these allegations demonstrate unilateral decisions that had the effect of enhancing competition, as UnitedHealth was allegedly seeking to "catch up to" competitors experiencing hundreds of millions of dollars in savings that it and its customers were missing. *See Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 139 (2d Cir. 2013) (no conspiracy plausibly alleged when allegations amount only to "actions taken by market actors who are aware of and anticipate similar actions taken by competitors").

As for most of the "hundreds" of alleged co-conspirators—including many of the Defendants—the CCAC is utterly silent about the circumstances under which they chose to use MultiPlan's services. That alone is sufficient reason to dismiss the claims against those Defendants. For example, the allegations against the so-called "BCBS Defendants," as with the allegations against the other MCO Defendants, fall well short of Plaintiffs' "essential" obligation to show "that [each] defendant joined the conspiracy and knew of its scope."[11] *Bank of Am., N.A.*

---

[11] The "BCBS Defendants" are Elevance Health, Inc., Health Care Service Corporation, Blue Shield of California Life & Health Insurance Company, Horizon Health Services, Inc., d/b/a Horizon Blue Cross Blue Shield of New Jersey, Blue Cross Blue Shield of Michigan Mutual Insurance Company, and Highmark Inc. These are independent and autonomous MCOs that each have a license to use the Blue Cross or Blue Shield trademark from the Blue Cross Blue Shield Association, which "does not write any insurance policies." *In re BCBS Antitrust Litig.*, 308 F. Supp. 3d 1241, 1250 (N.D. Ala. 2018). Although also named, Blue Cross Blue Shield of Florida, Inc. has been voluntarily dismissed. ECF No. 256.

*v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013). Plaintiffs' references to the BCBS Defendants are limited to a handful of paragraphs that provide nothing more than identifying information, such as the location of their headquarters and operations, the services each provides, and that each "uses MultiPlan's [OON] claims repricing services." CCAC ¶¶ 29–36. But none of these facts even bear upon whether any BCBS Defendant knowingly joined or participated in the purported conspiracy. Indeed, for nearly all the BCBS Defendants, there are no allegations about when a contract with MultiPlan was entered, for what duration, for what service(s), or for which plans. *See id.* There is also no recognition that each BCBS Defendant is a separate entity, with each making its own decisions and policies regarding OON claims, and they cannot be lumped together pretending they act collectively. This approach strains "group pleading" well beyond its limits. *See Chamberlain Grp. Inc. v. Techtronic Indus. N. Am.*, 2017 WL 4269005, at *3 (N.D. Ill. 2017) (dismissing antitrust claims for failure to allege "individual actions of, or the relationships between" group of defendants).

Plaintiffs' allegations fatally undermine any inference of conspiracy in other ways, too. For instance, Plaintiffs describe MultiPlan's marketing efforts to "countless other insurers" touting the savings available to them. *Id.* ¶ 212; *see also, e.g.*, *id.* ¶¶ 202, 210. These allegations contradict the conclusory assertion of a secret conspiracy among MCOs, because a common response to a vertical trading partner's common (and persuasive) marketing pitch is another perfectly rational, non-conspiratorial reason for MCOs to decide to use MultiPlan's services. *See Musical Instruments*, 798 F.3d at 1195 ("Manufacturers' decisions to heed similar demands made by a common, important customer do not suggest conspiracy or collusion. They support a different conclusion: self-interested interdependent parallel conduct in an interdependent market."). Armed with the knowledge that others were saving money for their members using MultiPlan's products,

it would be a rational independent decision for any MCO or plan sponsor to use those products.

Finally, the CCAC contains no allegations plausibly suggesting that, absent the availability of MultiPlan's products, MCOs would suddenly compete to pay more for OON services—or would find members and sponsors clamoring to pay more for healthcare through MCOs that pay higher OON rates. That same flawed premise was at the heart of the Ingenix-related cases that Plaintiffs refer to repeatedly, as those cases (like this one) claimed that there must have been a conspiracy at work when most MCOs used products offered by Ingenix that allegedly suppressed reimbursements to out-of-network providers. *Id.* ¶¶ 97–98. Yet while Plaintiffs point to the suits *filed* against the industry arising out of the widespread use of Ingenix's cost-reducing products, they fail to mention the *outcome*—in particular the rulings *rejecting* the theory that industry-wide usage of Ingenix supported an inference of conspiracy because the defendants' conduct was "just as easily explained by reference to their own self-interest" in not wanting to pay inflated reimbursement rates to out-of-network providers. *In re Aetna UCR Litig.*, 2015 WL 3970168 at *20-21 (D.N.J. June 30, 2015); *see also Franco v. Conn. Gen. Life Ins. Co.*, 818 F. Supp. 2d 792, 839 (D.N.J. 2011) (holding that health plans' "efforts to keep [out-of-network] costs down" fulfilled an "obvious objective" for any health plan, not a conspiracy).

### 3. Plaintiffs' "Information Sharing" Allegations Do Not Support Their Conspiracy Claim

Plaintiffs further attempt to salvage their complaint by asserting that "it would be against the unilateral economic interest of each [MCO] Defendant to share its CSI [competitively sensitive information] with other [MCOs] through a common third party," CCAC ¶ 245. Yet again, Plaintiffs' factual allegations undermine their own conclusory assertions. The CCAC does not actually allege that any of the MCOs shared competitively sensitive information *with each other*. Instead, Plaintiffs allege that MCOs submit their claims information to *MultiPlan*, and then assert

without support that this confidential data is used to set OON compensation rates. *E.g.*, *id.* ¶¶ 184, 200, 213, 283, 338. But the CCAC does not—because Plaintiffs cannot—allege any actual facts showing that MultiPlan provides any of its clients' confidential information to any other client, or that any client can use the result of MultiPlan's provider cost-based pricing tools to ascertain the confidential claims information of any other client. The MultiPlan document that Plaintiffs offer as describing "the claims repricing strategies adopted by [the] insurers," *id.* ¶ 263, explains that Data iSight's methodologies are based on "[c]omprehensive facility cost data [that] is publicly available" and "publicly-available database of paid claims," used in conjunction with "widely-recognized" AMA and CMS data. Ex. C at 5.

Courts have found similar allegations of "information sharing" via algorithmic technologies insufficient to raise any inference of conspiracy. *See Gibson*, 2023 WL 7025996, at *6 (dismissing Section 1 claim where plaintiffs merely alleged that confidential information was fed in—but not out—of the pricing algorithm at issue, and where plaintiffs failed to allege that "one [alleged co-conspirator] ever receive[d] confidential information belonging to another" as opposed to merely getting "their own confidential information back mixed with public information from other sources"). Because "specific sources quoted by the [complaint] seem to confirm that the pricing recommendations at issue were never based on the confidential, proprietary data of their competitors," Plaintiffs' allegations of information sharing fall flat. *Cornish-Adebiyi*, 2024 WL 4356188, at *5; *see also* DAP MTD at 33–34. Moreover, courts have also rejected claims based on anonymized information, which is the most that is alleged here. *In re Loc. TV Advert. Antitrust Litig.*, 2022 WL 3716202, at *2-3, 6-8 (N.D. Ill. Aug. 29, 2022) (rejecting claim that a data-aggregator "facilitated the reciprocal exchange of competitively sensitive market information

among" defendants absent allegations that anonymity of CSI was compromised).[12]

### 4. Plaintiffs' Additional "Plus Factors" Do Not Suggest A Conspiracy

Having failed to plausibly allege a conspiracy based on Defendants' conduct, Plaintiffs fall back on allegations about basic market structure that supposedly "render the market susceptible to collusion," including that the alleged market is characterized by (1) "high barriers to entry," (2) "high exit barriers;" (3) "high concentration"; (4) common billing codes; and (5) "opportunities to meet and collude." CCAC ¶¶ 250–55. These allegations are plainly insufficient to imply a conspiracy. *See Gamm v. Sanderson Farms*, 944 F.3d 455, 466 (2d Cir. 2019) (allegations "that the general structure of the poultry market made it 'susceptible to price fixing'" were not themselves sufficient to support the inference that an illegal combination actually occurred); *Wash. Cnty. Health Care*, 328 F. Supp. 3d at 841 ("it cannot be the case that allegations that a market is oligopolistic and a product is homogeneous are sufficient to survive a motion to dismiss").

The dearth of allegations regarding the alleged opportunities to collude is particularly striking in light of Plaintiffs' broader failure to allege any facts regarding the circumstances of the alleged agreement among the 700+ alleged co-conspirators. Plaintiffs allege that representatives from MultiPlan and the MCOs attended some of the same meetings and conferences, including some sponsored and held by MultiPlan. *See* CCAC ¶¶ 255–57, 259–62. But the CCAC is bereft of any facts about the content of those meetings and the statements arising therefrom that would suggest the presence of an agreement, beyond garden-variety averments that MultiPlan touted the financial benefits to MCOs of using its products. Indeed, there are no allegations regarding any such meetings during the 2015-2018 period during which the conspiracy was allegedly

---

[12] Unlike the DAPs, Plaintiffs here have not brought a standalone information exchange claim under Section 1. *See* CCAC ¶ 332. Defendants address allegations regarding the exchange of competitively sensitive in greater detail in the DAP motion to dismiss, *see* DAP MTD at 32–35, and incorporate those arguments by reference here. *See* JSR (Nov. 21, 2024) at 6, ECF No. 178.

implemented beyond the statement that "retreats occurred in 2015." *Id.* ¶ 256. This does not suggest any improper agreement at any such meeting. *See Kleen Prods. LLC v. Ga-Pac. LLC*, 910 F.3d 927, 938 (7th Cir. 2018) ("[H]aving the opportunity to conspire does not necessarily imply that wrongdoing occurred. Especially when companies have legitimate business reasons for their contacts, plaintiffs must offer some evidence that moves beyond speculation about the content of what was conveyed."); *In re Aetna UCR Litig.*, 2015 WL 3970168, at *20 ("[W]hile plaintiffs alleged that defendants had opportunities to confer, this alone does not plausibly create the inference that defendants took that opportunity").[13]

### III. PLAINTIFFS FAIL TO PLEAD A COGNIZABLE "PRICE" CAPABLE OF BEING "FIXED" AND A COGNIZABLE ANTITRUST MARKET

#### A. Courts Reject Antitrust Claims Predicated On MCO Reimbursements to Providers Because They Are Not Standalone Products and Services

Plaintiffs' price-fixing claim also fails for the fundamental reason that Plaintiffs do not and cannot plausibly "allege that the price of any product or service has been fixed or restrained." *In re Aetna UCR Litig.*, 2015 WL 3970168, at *24. Courts have consistently rejected price-fixing claims that, like this one, are predicated on MCOs' reimbursements for OON services obtained by their members (*i.e.*, the patients). The problem with such claims is that "reimbursement for OON services" is not "a standalone product and service," and thus, the amount of such a reimbursement does not constitute a "price" in any relevant product or services market for purposes of antitrust law. Ex. A, *VHS* Or. at 15; *see also Franco*, 818 F. Supp. 2d at 832.

Consider *Franco v. Connecticut General Life Insurance Co.*, where the plaintiff providers

---

[13] In short, Plaintiffs attempt to allege a "rimless wheel" conspiracy predicated on independent agreements between a service provider and each of its individual clients. This fails for the reasons described *supra* and further defeats Plaintiffs' claim of antitrust injury. Plaintiffs must allege an injury traceable to each Defendant, rather than one that merely has some connection to various bilateral agreements with MultiPlan. *See, e.g., Marion Diagnostic Ctr.*, 29 F.4th at 345 (plaintiffs lack standing to sue alleged "spoke" in a rimless price-fixing conspiracy where they have not been injured by it). Plaintiffs fail to make that showing.

asserted that MCOs had conspired to fix prices for OON service reimbursements by using a "flawed centralized database" to "decrease reimbursements," 818 F. Supp 2d. at 832—specifically, the "Ingenix database" that Plaintiffs allege was the "predecessor" to MultiPlan's set of products. CCAC ¶¶ 94, 153. The *Franco* court explained that this supposed "price-fixing" was not an antitrust violation because "the purported agreement … to cap [OON] reimbursements does not pertain to the pricing of anything"; there was "no indication in the complaints that coverage of [OON] services […] is a discrete product available for purchase and sale apart from the rest of a subscriber's insurance policy, at its own price." 818 F. Supp. 2d at 832–33.

In *In re Aetna UCR Litigation*, another court reached the same conclusion. There, the plaintiffs alleged that MCOs had "agreed to fix and depress [OON] reimbursements through use of the Ingenix database." 2015 WL 3970168, at *24. But, as the court explained, while plaintiffs had "label[led] such conduct as an agreement to fix *price*, plaintiffs actually fail[ed] to allege that the price of any product or service has been fixed or restrained" because OON reimbursements are not a discrete product or service. *Id.* (stressing that, when it comes to "health insurance," the relevant "price" is "the premium," as "many courts have noted") (collecting cases). The plaintiffs' failure to "allege a *price*-fixing agreement" doomed their claims. *Id.* at *25 (emphasis added).

Plaintiffs asserting antitrust claims based on the use of *Multiplan's* products have fared likewise. In *Pacific Recovery II*, the plaintiff providers "allege[d] that Cigna and Viant conspired to fix the price of coverage for OON providers'…services." 2021 WL 1176677, at *13. The *Pacific Recovery II* court stressed that the "problem" with such a claim is that "insurance benefits for OON servicers are not a discrete product available for purchase and sale" by insurers at "their own price." *Id.* at *14. Because the plaintiffs failed to "plausibly allege[] a product or service capable of being price-fixed," the court dismissed the price-fixing claim. *Id.* at *13.

36

More recently, in *VHS Liquidating Trust v. MultiPlan Corp.*, the plaintiffs alleged an agreement among MultiPlan and MCOs (many of the same MCO Defendants here) to reduce OON reimbursements paid to providers. Ex. A, VHS Or. at 15. As in *Franco*, *Aetna*, and *Pacific Recovery II*, the *VHS* court held that "reimbursement for OON service" is not "a standalone product and service" and thus the amount of such a reimbursement does not constitute a "price" for purposes of antitrust law. *Id.* at 15; *see also id.* at 17 (dismissing the plaintiffs' price-fixing claims on this basis). The claims dismissed by the court in *VHS* are virtually indistinguishable from those brought here.

Plaintiffs attempt to plead around this long line of cases by claiming that "Plaintiffs are sellers of out-of-network healthcare services" and that MCOs are "buyers of those services." CCAC ¶ 265.[14] But Plaintiffs' own allegations reveal that their claims are predicated entirely on MCOs' reimbursement for services already provided or sold. This is because the commercial reality is that *patients*—not MCOs—are the purchasers of health services from their OON providers and have the obligation to pay for them. *Id.* ¶ 87 (explaining patients' payment obligations for OON services). By the time an OON provider submits a claim to an MCO, the service underlying that claim has been rendered (or "sold"). *Id.* There is no "sale" of any healthcare services by Plaintiffs to MCOs, much less any "competition" between MCOs to reimburse providers after the fact for services rendered on an OON basis. Calling MCOs "purchasers" does not supplant this dispositive fact; neither does substituting the word "purchase" for "reimbursement," when Plaintiffs' claims here are not about what patients purchase but about what portion of the provider's charge for that service an MCO, in each given instance, will reimburse or cover after the fact. Even at the motion to dismiss stage, a court "is not required to

---

[14]Specifically, Plaintiffs now claim an alleged market for "out-of-network health services for purchase by third-party commercial payers" rather than a "reimbursements" market. *Id.* ¶ 265.

don blinders and to ignore commercial reality." *42nd Parallel N. v. E St. Denim Co.*, 286 F.3d 401, 406 (7th Cir. 2002).

### B. Plaintiffs' Newly-Alleged Nationwide Market For "Out-of-Network Health Services for Purchase by [MCOs]" Is Infirm

Regardless of whether the "per se" or "rule of reason" analysis applies, "the failure to allege the existence of a relevant commercial market is fatal" to a claim under Section 1, *Reapers Hockey Assoc., Inc. v. Amateur Hockey Assoc. Ill., Inc.*, 412 F. Supp. 3d 941, 952–53 (N.D. Ill. 2019), because "[i]t is the existence of a commercial market that implicates the Sherman Act in the first instance," *Agnew*, 683 F.3d at 337. "If a plaintiff can show that a defendant has engaged in naked restrictions on price or output, he can dispense with any showing *of market power* until a procompetitive justification is shown—but the existence of a relevant market cannot be dispensed with altogether." *Id.* (emphasis added). Accordingly, "it is an element of a per se case to describe the relevant market in which we may presume the anticompetitive effect *would* occur." *Bogan v. Hodgkins*, 166 F.3d 509, 515 (2d Cir. 1999) (emphasis added).

A properly alleged antitrust market must encompass all products and/or services that are "reasonably interchangeable" for the purposes for which they are produced. *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). If a plaintiff "alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997). Plaintiffs' alleged "nationwide" market for "out-of-network healthcare services for purchase by third-party commercial payors" fails this standard for three reasons.

*First*, the supposed "market" groups innumerable different healthcare services offered by vastly different kinds of providers into a single alleged market. A routine primary care checkup is

not "reasonably interchangeable" with a heart transplant. While it is true that "cluster markets" can group together services that are not reasonably interchangeable, CCAC ¶ 266, this is permissible only where competitive dynamics are the same across the relevant products, *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 117 (D.D.C. 2016), and "the cluster is itself an object of consumer demand." *FTC v. Advocate Health Care Network*, 841 F.3d 460, 467 (7th Cir. 2016). For example, courts may group together "inpatient general acute care services" performed at hospitals. *Id*. Here, the competitive dynamics across literally *all* healthcare services are obviously vastly different, and Plaintiffs' failure to allege facts showing that the competitive dynamics for the entire universe of healthcare services are identical is fatal to their claim.

*Second*, Plaintiffs' alleged geographic market also fails because it includes healthcare services offered thousands of miles apart in the same alleged "market." CCAC ¶ 275. A routine primary care checkup in California is simply not "reasonably interchangeable" with one in Illinois from the perspective of patients or MCOs. This Court need not (and should not) "don blinders and [] ignore commercial reality" that renders the CCAC's proposed geographic market implausible. *42nd Parallel N.*, 286 F.3d at 406 (dismissing complaint for implausible geographic market). The CCAC's failure to plead any facts supporting the proposed "nationwide" market for OON healthcare services likewise warrants dismissal. *See, e.g.*, *Arnett Physician Grp., P.C. v. Greater LaFayette Health Servs., Inc.*, 382 F. Supp. 2d 1092, 1095 (N.D. Ind. 2005) (dismissing antitrust claims, in part, for failure to plead facts about relevant geographic market).

*Third*, in addition to including all healthcare services provided anywhere in their nationwide market, Plaintiffs arbitrarily define the market around the rate they want to be paid— rather than the actual substitutability of those services, as the law requires. In particular, Plaintiffs define the market as services reimbursed at "more expensive" OON rates "*set unilaterally by*

*providers*"—which are charges that "are typically 1.5 to 100 times higher" than actual negotiated rates or rates determined by government programs. CCAC ¶¶ 270, 272. This makes no sense because, from the perspective of providers and patients alike, the nature of the actual healthcare services does not change based on whether Plaintiffs dictate an excessive price or not. *See Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 598 (8th Cir. 2009) ("[A]s a matter of law, in an antitrust claim brought by a seller, a product market cannot be limited to a single method of payment when there are other methods of payment that are acceptable to the seller."); *Marion Healthcare LLC v. S. Ill. Healthcare*, 2013 WL 4510168, at *10 (S.D. Ill. Aug. 26, 2013) ("When there are numerous sources of interchangeable demand, the plaintiff cannot circumscribe the market to a few buyers [] to manipulate the buyers' market share.").

Plaintiffs allege that providers sell their services at both in-network and OON rates. CCAC ¶¶ 55–64. In fact, Plaintiffs concede that providers may choose to be in-network with some MCOs and out-of-network with others, and that they use the threat of going out-of-network as "leverage" when negotiating with MCOs for in-network rates. *Id*. ¶¶ 60–61. The fact that providers "can easily shift from one type of service to another if a change in relative prices makes one type more lucrative than others" defeats their contrived market definition. *Blue Cross & Blue Shield United v. Marshfield Clinic*, 65 F.3d 1406, 1411 (7th Cir. 1995). Plaintiffs' *preference* to be reimbursed at "100 times" a competitive rate "unilaterally" does not create a relevant market. *See City of New York v. Grp. Health Inc.,* 649 F.3d 151, 154-56 (2d Cir. 2011) (alleged market "legally insufficient because it is defined by the City's preferences, not according to the rule of reasonably interchangeability and cross-elasticity of demand").

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court dismiss the CCAC with prejudice.

Dated:  January 16, 2025

Respectfully submitted,

/s/  Sadik Huseny
Sadik Huseny (*pro hac vice*)
**LATHAM & WATKINS LLP**
300 Colorado Street, Suite 2400
Austin, TX 78701
Telephone: (737) 910-7300
sadik.huseny@lw.com

Gary Feinerman (IL Bar No. 6206906)
**LATHAM & WATKINS LLP**
330 N Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
gary.feinerman@lw.com

Lawrence E. Buterman (*pro hac vice*)
Katherine A. Rocco (*pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
lawrence.buterman@lw.com
katherine.rocco@lw.com

Anna M. Rathbun (*pro hac vice*)
Graham B. Haviland (*pro hac vice*)
**LATHAM & WATKINS LLP** 555 Eleventh
Street, NW
Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
anna.rathbun@lw.com
graham.haviland@lw.com

Craig Lewis Caesar (IL Bar. No 3121593)
**PHELPS DUNBAR LLP**
365 Canal Street, Suite 2000
New Orleans, LA 70130
Telephone: (504) 584-9272
craig.caesar@phelps.com

/s/  E. Desmond Hogan (w/ consent)
E. Desmond Hogan
Justin W. Bernick
W. David Maxwell (*pro hac vice*)
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5600
desmond.hogan@hoanlovells.com
justin.bernick@hoganlovells.com
david.maxwell@hoganlovells.com

Jordan D. Teti
**HOGAN LOVELLS US LLP**
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 785-4600
jordan.teti@hoganlovells.com

*Attorneys for Defendants Elevance Health, Inc.,*
*Horizon Health Services, Inc. (Horizon Blue*
*Cross and Blue Shield of New Jersey)*

/s/  Daniel R. Campbell (w/ consent)
Daniel R. Campbell
Emilie E. O'Toole
**MCDERMOTT, WILL & EMERY LLP**
444 West Lake Street, Suite 4000
Chicago, IL 60606
Telephone: (312) 984-7782
dcampbell@mwe.com
eotoole@mwe.com

Joshua B. Simon (*pro hac vice*)
Warren Haskel (*pro hac vice*)
Dmitriy G. Tishyevich (*pro hac vice*)
Caroline Incledon (*pro hac vice*)
Chelsea Edith Rae Cosillos (*pro hac vice*)
**MCDERMOTT, WILL & EMERY LLP**
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 547-5444
jsimon@mwe.com

Errol J. King (*pro hac vice*)
Katherine Mannino (*pro hac vice*)
**PHELPS DUNBAR LLP**
II City Plaza
400 Convention Street, Suite 1100
Baton Rouge, LA 70802
Telephone: (225) 376-0279
errol.king@phelps.com
katie.manino@phelps.com

*Attorneys for Defendants MultiPlan, Inc.;*
*MultiPlan Corporation; National Care*
*Network, LLC; Viant Payment Systems, Inc.;*
*and Viant, Inc.*


/s/  Katherine A. Trefz (w/ consent)
Jonathan B. Pitt
Katherine A. Trefz
Feyilana Lawoyin
**WILLIAMS & CONNOLLY LLP**
680 Maine Avenue, S.W.
Washington, DC 20024
Telephone: (202) 434-5000
jpitt@wc.com
ktrefz@wc.com
flawoyin@wc.com

*Attorneys for Defendant Aetna Inc.*

/s/  Scott Jared Fisher (w/ consent)
Scott Jared Fisher
Eric Y. Choi
**NEAL, GERBER & EISENBERG**
Two North LaSalle Street, Suite 1700
Chicago, IL 60602
Telephone: (312) 269-8035
sfisher@nge.com
echoi@nge.com

whaskel@mwe.com
dtishyevich@mwe.com
cincledon@mwe.com
ccosillos@mwe.com

*Attorneys for Defendant The Cigna Group*

/s/  Brian P. Kavanaugh (w/ consent)
Brian P. Kavanaugh
Scott D. Stein
**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
bkavanaugh@sidley.com
sstein@sidley.com

*Attorneys for Defendant Health Care Service*
*Corporation*


/s/ Todd M. Stenerson (w/ consent)
Todd M. Stenerson
**ALLEN OVERY SHEARMAN STERLING**
**US LLP**
1101 New York Avenue NW
Washington, DC 20005
Telephone:  (202) 508-8093
todd.stenerson@aoshearman.com
Richard Franklin Schwed (*pro hac vice*)
**ALLEN OVERY SHEARMAN STERLING**
**US LLP**
599 Lexington Avenue
New York, NY 10022
Telephone:  (212) 848-5445
rschwed@aoshearman.com

Samuel W. Cooper (*pro hac vice*)
**ALLEN OVERY SHEARMAN STERLING**
**US LLP**
800 Capitol Street, Suite 2200
Houston, TX 77002
Telephone:  (713) 354-4838
samuel.cooper@aoshearman.com


*Attorneys for Defendant Blue Cross Blue Shield*
*of Michigan Mutual Insurance Company*

Rachel S. Brass (*pro hac vice*)
Henry H. Cornillie
**GIBSON, DUNN & CRUTCHER LLP**
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: (415) 393-8293
rbrass@gibsondunn.com
hcornillie@gibsondunn.com


Joshua Lipton (*pro hac vice*)
Kristen C. Limarzi (*pro hac vice*)
**GIBSON, DUNN & CRUTCHER LLP**
1700 N Street, N.W.
Washington, DC 20036
Telephone: (202) 955-8500
jlipton@gibsondunn.com
klimarzi@gibsondunn.com


Heather L. Richardson (pro hac vice)
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
hrichardson@gibsondunn.com

*Attorneys for Defendant United Health Group, Inc.*

/s/  *Stephen D. Libowsky (w/ consent)*
Stephen D. Libowsky (IL Bar No. 6187081)
Rebecca A. Finkel (IL Bar No. 6317199)
**MANATT, PHELPS & PHILLIPS, LLP**
151 North Franklin Street
Chicago, Illinois 60606
Telephone: (312) 529-6300
slibowsky@manatt.com
rfinkel@manatt.com


Gregory N. Pimstone (*pro hac vice*)
**MANATT, PHELPS & PHILLIPS, LLP**
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 312-4000
gpimstone@manatt.com

*Attorneys for Defendant Blue Shield of California Life & Health Insurance Company*

/s/  *William J. Sheridan (w/ consent)*
William J. Sheridan (pro hac vice)
Courtney Bedell Averbach (pro hac vice)
Leah E. Hungerman (pro hac vice)
**REED SMITH LLP**
225 Fifth Avenue
Pittsburgh, PA 15222
Telephone: (412) 288-3131
Facsimile:  (412) 288-3063

*Attorneys for Defendant Highmark Inc.*