**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: MULTIPLAN HEALTH INSURANCE PROVIDER LITIGATION | Case No. 1:24-cv-6795 MDL No. 3121 |
| This Document Relates To: | Hon. Matthew F. Kennelly |
| ALL DIRECT ACTIONS | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS THE CONSOLIDATED MASTER DIRECT ACTION PLAINTIFF COMPLAINT AND DIRECT ACTION PLAINTIFFS' SHORT-FORM COMPLAINTS**

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

BACKGROUND—RELEVANT DAPC FACTUAL ALLEGATIONS ........................................3

    A.    Healthcare Dynamics: Patients, Providers, MCOs, and TPAs ...............................3

    B.    Providers Charge Admittedly Higher Amounts to OON Patients and Then Seek Reimbursement from Patients and MCOs.......................................................6

    C.    Plaintiffs Seek to Require All MCOs/TPAs to Use Only Legacy Benchmarking Systems That Increase Patient Fees and Provider Profits ..............7

    D.    MultiPlan's Competitive Option: Customizable, Cost-Based OON Pricing Recommendations from Public Data, for Use by MCOs as They See Fit..............8

    E.    The DAPC Makes No Non-Conclusory Factual Allegations Regarding Individual MCOs'/TPAs' Use of MultiPlan Or Any Alleged Unlawful Agreement......................................................................................................12

    F.    Plaintiffs' Allegations Closely Track Those in the CCAC ...................................14

ARGUMENT ......................................................................................................................14

I.      PLAINTIFFS FAIL TO PLEAD ANTITRUST STANDING AND INJURY.................15

    A.    Plaintiffs Lack Antitrust Standing Because Their Purported Injuries Are Indirect and Derivative ........................................................................................15

    B.    Plaintiffs Lack Standing Because They Fail to Allege Any Injury Derived From Any Defendant's Use of MultiPlan.............................................................16

    C.    Plaintiffs Fail to Plead Antitrust Injury Because They Do Not and Cannot Allege Actual Harm to Competition .....................................................................19

II.    PLAINTIFFS FAIL TO PLEAD A COGNIZABLE "PRICE" CAPABLE OF BEING "FIXED" OR A COGNIZABLE ANTITRUST MARKET ...............................21

III.   PLAINTIFFS DO NOT PLAUSIBLY ALLEGE A CONSPIRACY (COUNT 2) ..........22

IV.   PLAINTIFFS' ADDITIONAL FEDERAL ANTITRUST CLAIMS FAIL .....................25

    A.    MultiPlan's Service Contracts Are Not *Per Se* Illegal Under a "Horizontal Competitor" Theory (Count 1)..............................................................................25

B.      MultiPlan's Vertical Service Contracts Do Not Harm Competition (Count 4) ..................................................................................................................27

C.      Plaintiffs' "Principal-Agent" Theory Has No Legal Basis (Count 3) ....................31

D.      Plaintiffs Fail to State an Information Exchange Claim (Count 5) ........................32

V.      PLAINTIFFS' STATE LAW CLAIMS FAIL ................................................................35

A.      State Law Antitrust Claim (Count 6) ....................................................................36

B.      "Consumer Protection" Claim (Count 7) ..............................................................36

C.      Unjust Enrichment Claim (Count 8) .....................................................................38

VI.     THERE ARE NO FACTUAL ALLEGATIONS AS TO MANY DEFENDANTS .........40

CONCLUSION .............................................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Addyston Pipe & Steel Co. v. United States*,
    175 U.S. 211 (1899)............................................................................................32

*Adventist Health Sys., Inc. v. MultiPlan, Inc.*,
    No. 24-cv-6803 (N.D. Ill.), ECF No. 1 .............................................................21

*Agnew v. NCAA*,
    683 F.3d 328 (7th Cir. 2012) ............................................................................22

*Always Towing & Recovery, Inc. v. Milwaukee*,
    2 F.4th 695 (7th Cir. 2021) ...................................................................25, 26, 27

*Appalachian Coals v. United States*,
    288 U.S. 344 (1933)..........................................................................................31

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...........................................................................14, 23, 37

*Ass'n. of Am. Physicians & Surgeons, Inc. v. Am. Bd. Of Med. Specialties*,
    15 F.4th 831 (7th Cir. 2021) .............................................................................15

*Atl. Richfield Co. v. USA Petrol Co.*,
    495 U.S. 328 (1990)..........................................................................................20

*Bank of Am., N.A. v. Knight*,
    725 F.3d 815 (7th Cir. 2013) ............................................................................40

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...........................................................................14, 15, 23

*Black Bear Sports Grp., Inc. v. Amateur Hockey Ass'n of Ill., Inc.*,
    2019 WL 2060934 (N.D. Ill. May 9, 2019) (Kennelly, J.) ...............................10, 22

*Brantley v. NBC Universal, Inc.*,
    2008 WL 11338585 (C.D. Cal. Mar. 10, 2008)................................................28

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)..........................................................................................20

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
    485 U.S. 717 (1988)..........................................................................................26

*Chicago Studio Rental, Inc. v. Illinois Dep't of Com.*,
    940 F.3d 971 (7th Cir. 2019) ........................................................30

*Clark v. Experian Info. Sols., Inc.*,
    2005 WL 1027125 (N.D. Ill. Apr. 26, 2005) ...................................37, 38

*Cleary v. Philip Morris Inc.*,
    656 F.3d 511 (7th Cir. 2011) ........................................................38, 39

*Cornish-Adebiyi v. Caesars Entertainment, Inc.*,
    2024 WL 4356188 (D.N.J. Sept. 30, 2024) ...................................34

*Day v. Taylor*,
    400 F.3d 1272 (11th Cir. 2005) ...................................................31

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) ......................................................28

*Dimidowich v. Bell & Howell*,
    803 F.2d 1473 (9th Cir. 1986) ....................................................27

*Gibson v. MGM Resorts International*,
    2023 WL 7025996 (D. Nev. Oct. 24, 2023) ...................................34

*GPS of N.J. M.D., P.C. v. Horizon Blue Cross & Blue Shield*,
    2023 WL 5815821 (D.N.J. Sept. 8, 2023) .....................................16

*Ill. Corp. Travel. Inc. v. Am. Airlines, Inc.*,
    889 F.2d 751 (7th Cir. 1989) ......................................................31

*In re Actos End Payor Antitrust Litig.*,
    2015 WL 5610752 (S.D.N.Y. Sept. 22, 2015)................................39

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
    2023 WL 6006525 (S.D.N.Y. July 31, 2023) .................................32

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
    2024 WL 918030 (S.D.N.Y. Mar. 2, 2024) ...................................28

*In re Bystolic Antitrust Litig.*,
    583 F. Supp. 3d 455 (S.D.N.Y. 2022)..........................................36

*In re Humira (Adalimumab) Antitrust Litig.*,
    465 F. Supp. 3d 811 (N.D. Ill. 2020)............................................36, 37

*In re Local TV Advertising Antitrust Litig.*,
    2022 WL 3716202 (N.D. Ill. Aug. 29, 2022) .....................32, 33, 34, 35

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ......................................................................31

*In re Opana ER Antitrust Litig.*,
    162 F. Supp. 3d 704 (N.D. Ill. 2016) ..........................................................37

*In re Se. Milk Antitrust Litig.*,
    739 F.3d 262 (6th Cir. 2014) ........................................................................27

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010) ........................................................................23

*In re Text Messaging Antitrust Litig.*,
    46 F. Supp. 3d 788 (N.D. Ill. 2014) ............................................................24

*Indiana Grocery, Inc. v. Super Valu Stores, Inc.*,
    864 F.2d 1409 (7th Cir. 1989) ......................................................................19

*Jeffrey Farkas, M.D., LLC v. Cigna Health & Life Ins. Co.*,
    386 F. Supp. 3d 238 (E.D.N.Y. 2019) ......................................................7, 20

*Kartell v. Blue Cross Blue Shield of Mass., Inc.*,
    749 F.2d 922 (1st Cir. 1984) ........................................................................30

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ......................................................................................25

*Levine v. Cent. Fla. Med. Affiliates, Inc.*,
    72 F.3d 1538 (11th Cir. 1996) ......................................................................31

*Loeb Indus., Inc. v. Sumitomo Corp.*,
    306 F.3d 469 (7th Cir. 2002) ........................................................................36

*Long Island Anesthesiologists PLLC v. United Healthcare Ins. Co. of N.Y. Inc.*,
    2023 WL 8096909 (E.D.N.Y. Nov. 21, 2023) ..............................19, 26, 29, 30

*Marion Diagnostic Ctr., LLC v. Becton Dickson & Co.*,
    29 F.4th 337 (7th Cir. 2022) ...................................................................16, 28

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
    952 F.3d 832 (7th Cir. 2020) .............................................................22, 23, 31

*McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*,
    937 F.3d 1056 (7th Cir. 2019) ......................................................................15

*Mich Int'l Monetary Inc. v. Vega Cap. London, Ltd.*,
    596 F. Supp. 3d 1076 (N.D. Ill. 2022) ........................................................38

*N. Jackson Pharm., Inc. v. Caremark RX, Inc.*,
  385 F. Supp. 2d 740 (N.D. Ill. 2005) ............................................................32

*Ohio v. Am. Express*,
  585 U.S. 529 (2018)....................................................................................28

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
  629 F.3d 697 (7th Cir. 2011) ......................................................................38

*Paddock Pubs., Inc. v. Chicago Tribune Co.*,
  1995 WL 632031 (N.D. Ill. Oct. 25, 1995)....................................................28

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
  614 F.3d 57 (3d Cir. 2010)...........................................................................29

*Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.*,
  412 F. Supp. 3d 941, 952–53 (N.D. Ill. 2019) ..............................................22

*Spinelli v. NFL*,
  96 F. Supp. 3d 81 (S.D.N.Y. 2015)...............................................................29

*Supreme Auto Transp., LLC. v. Arcelor Mittal USA, Inc.*,
  902 F.3d 735 (7th Cir. 2018) ......................................................................36

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001).........................................................................35

*United States v. U.S. Gypsum Co.*,
  438 U.S. 422 (1978).....................................................................................32

*Va. Excelsior Mills, Inc. v. FTC*,
  256 F.2d 538 (4th Cir. 1958) ......................................................................31

*Virgin Atl. Airways Ltd v. Brit. Airways PC*,
  257 F.3d 256 (2d Cir. 2001).........................................................................30

*Vital Pharms., Inc. v. Berlin Packaging LLC*,
  632 F. Supp. 3d 780 (N.D. Ill. 2022) ...........................................................27

## RULES

Federal Rule of Civil Procedure 12(b)(6) .........................................................14

Federal Rule of Civil Procedure 8 .............................................................37, 39

## INTRODUCTION

The Consolidated Master Direct Action Plaintiff Complaint ("Complaint" or "DAPC") in this MDL proceeding suffers from the same fatal deficiencies identified in Defendants' Motion to Dismiss the Consolidated Class Action Complaint ("Class MTD"). Its allegations largely track those in the Consolidated Class Action Complaint ("Class Complaint" or "CCAC"), and similarly fail because Plaintiffs do not plausibly allege: (1) antitrust standing and antitrust injury, (2) a standalone product or "price" that can be fixed in any relevant antitrust market, or (3) an antitrust conspiracy. Numerous courts have dismissed similar cases—including near-identical ones brought against MultiPlan and many of the MCO Defendants named in this case—based on these threshold deficiencies. Managed care organizations ("MCOs") and third-party administrators ("TPAs")[1] do not dictate how much providers are paid for medical services provided to patients by out-of-network providers ("OON services"). There is no separate reimbursement product, price, or market for OON services. And MCOs/TPAs did not agree to fix prices in Plaintiffs' imaginary OON reimbursement market merely by using common data sources.

Defendants briefly address these threshold issues in this motion, as framed by the DAPC's specific allegations, but to avoid duplication refer largely to the detailed discussion of these topics in the Class MTD. Defendants also briefly discuss the lack of essentially any allegations as to the new TPA Defendants named only in the direct action cases.[2]

The DAPC also raises numerous additional federal antitrust and state law claims and theories, in an apparent effort to circumvent the fundamental failings with their case. Each suffers

---

[1] The DAPC attempts to define each defendant as a "Payor" of healthcare goods and services. This is an improper attempt to define into being a "horizontal conspiracy" that does not exist, and there are large and fundamental differences among the many defendants named in the DAPC (which include MultiPlan, large MCOs, and TPAs not in the CCAC).

[2] The TPA Defendants named in these direct actions and to which this argument applies include: Benefit Plan Administrators of Eau Claire, LLC, Consociate Inc., and Secure Health Plans of Georgia, LLC.

from its own fatal infirmities, which Defendants address in full herein:

*MultiPlan as a "Horizontal Competitor" to MCOs/TPAs in OON Reimbursements.* In addition to an antitrust theory tracking the one in the CCAC, Plaintiffs here allege an alternative theory whereby MultiPlan and MCOs/TPAs are "horizontal competitors" in the distinct business of assembling in-network PPO plans. This contrivance fails, because Plaintiffs seek relief as to OON services, *not* healthcare services provided on an in-network basis, and Plaintiffs do not allege MultiPlan is an MCO or TPA or any form of insurer providing OON coverage.

*MultiPlan's Individual Agreements With Clients As Allegedly Unlawful Under a Vertical Theory.* Plaintiffs assert a fallback theory that the service agreements between MultiPlan and its clients are unlawful vertical agreements in restraint of trade. But Plaintiffs' own allegations show that the agreements are reasonable and competitive, providing for access to MultiPlan's products and services to lower healthcare costs.

*MultiPlan and MCOs/TPAs Violating Some Form of "Principal-Agent" Theory of Antitrust.* Plaintiffs purport to bring a "principal-agent" antitrust claim that is nothing more than a "rimless" hub-and-spoke conspiracy. This is routinely rejected by courts and lacks merit here.

*MultiPlan as Operating an Unlawful "Information Exchange" Across its Hundreds of Clients and Thousands of Plans They Administer.* Plaintiffs contend that MultiPlan's OON reimbursement-recommendation product (Data iSight) serves to exchange competitively sensitive information among MCOs/TPAs. But Plaintiffs' own allegations and the materials they incorporate by reference show that Data iSight uses *publicly available* data sets in generating recommendations and *does not* use competitor data. Plaintiffs' claim that MultiPlan itself directly exchanges competitively sensitive information between its clients lacks factual allegations sufficient to make it plausible.

*State Law Claims.* Finally, Plaintiffs toss in a handful of state antitrust, consumer protection, and unjust enrichment claims. The state law antitrust claims are predicated on the same conduct as their federal antitrust claims, and similarly fail. And Plaintiffs do not adequately allege state consumer protection and unjust enrichment claims. Far from seeking to *protect* consumers, Plaintiffs ask the Court to find unlawful the very products providing a cost-based benchmark for OON reimbursements which, when coupled with the balance billing protections they similarly attack, dramatically lower financial exposure for consumers. Plaintiffs instead want the Court to require the use of *their* preferred benchmarks, which they concede lead to higher prices that they can recover from patients and health plans. It is Plaintiffs—not Defendants—who are harming consumers.

Defendants respectfully request that the DAPC and Short Form Complaints be dismissed with prejudice.

### BACKGROUND—RELEVANT DAPC FACTUAL ALLEGATIONS

### A. Healthcare Dynamics: Patients, Providers, MCOs, and TPAs

*Patients select and are the buyers of healthcare services.* Under our healthcare system, patients select their healthcare providers and each patient buys, consumes, and is responsible for paying for medical treatment. *See* DAPC ¶¶ 33, 143–44, 550–51. Patients can pay providers directly or, more commonly, patients assign to their provider the right to submit a claim to the patient's insurer or claim administrator on the patient's behalf, and the plan will usually reimburse the provider directly some or all of the cost, depending on the terms of the patient's plan. *Id.* ¶¶ 89–97, 99, 101–02, 143. As the purchasers of healthcare services, patients (especially those receiving services from an out-of-network provider, as described below) have the ultimate obligation to pay for the cost of treatment, regardless of coverage. *Id.* ¶¶ 143–44, 550, 557.

*Providers sell healthcare services to patients and seek reimbursement amounts from*

*patients and their MCOs and/or health plans.* Providers sell healthcare services to patients. *Id.* ¶¶ 143–44. A provider that is "in-network" with an MCO typically has contracted with that plan about the terms and reimbursement rates that will govern the provider's medical treatment of patients (members) of that plan. *Id.* ¶¶ 90–97, 99. Seeing an "in-network" provider means that patients can obtain treatment at a previously agreed-upon rate, that the MCO or health plan will reimburse the provider at the agreed-upon rate, and that the patient will not be responsible for paying anything other than the coinsurance or deductible required by the patient's plan. *Id.* ¶ 99.

By contrast, when the provider's fees have not been determined in advance of treatment (*e.g.*, through a network agreement with an MCO), the provider will treat the patient and then charge a (usually much higher) rate set unilaterally by the provider. *Id.* ¶¶ 143–44. The provider can submit a bill for the charges to the patient's MCO/TPA, after the services have been rendered, requesting reimbursement available under the particular terms of the patient's health plan. *Id.* ¶¶ 101–03, 143–44, 524.

*MCOs encompass a variety of organizations, including health plans, companies that provide healthcare coverage or administrative services for self-funded health plans and each may negotiate with providers as to the appropriate reimbursement for services provided to OON patients.* MCOs do not buy or sell healthcare services. Instead, MCOs either (1) offer healthcare coverage to individuals (either directly or through a plan sponsored by the individual's employer or union) and collect premiums or plan contributions to pay for individuals' healthcare claims pursuant to a contract, or (2) provide administrative services to "self-funded administrative service only ['ASO'] health plans." *Id.* ¶¶ 92–94, 97. For ASO plans, the MCOs do not pay claims out of their own funds—they provide only "administrative services" to the entity (typically an employer) that pays directly for health benefits for its members (typically employees). *Id.* ¶¶ 93–

95.  This is how most individuals receive health coverage:  Plaintiffs admit that "[l]arge employers, which make up a substantial portion of the market for commercial insurance, are almost all on ASO contracts.  As a result, up to 90% of some payors' business is attributable to ASO contracts." *Id.* ¶ 95.  Employers with ASO plans may also utilize TPAs to manage the administrative and operational work of health plans.  *Id.* ¶ 97.  TPAs do not offer insurance, but receive claims from providers for OON services and adjudicate them consistent with plan terms.  *Id.*

Regardless of the type of coverage, the plan agreement between the individual subscriber and plan sponsor or MCO determines what services the plan sponsor or MCO will cover and how much it will reimburse, and there is wide variation in these benefit designs.  *Id.* ¶ 535.  Some plans only cover in-network providers for voluntary medical services, *id.* ¶¶ 99, 519, 522–24, so a member who sees an OON provider is responsible for the entire cost of care.  Other plans offer OON benefits, but with a limit on how much the MCO will cover for different types of services.  Plans differ in how they set these limits as well.  For example, some plans set the limit based on a percentile from a publicly available benchmark of providers' billed charges, which Plaintiffs refer to as "usual, customary and reasonable" ("UCR") rates.  *E.g.*, *id.* ¶¶ 298–300.  Other plans set the limit based on a percentage of Medicare reimbursement, *id.* ¶ 360, and still others set the limit based on the average cost of the service provided, again based on publicly available data, *id.* ¶ 324.  Plaintiffs acknowledge that even when plans choose the same type of methodology for OON benefits, they can set different caps, for example, by setting a different percentile for "UCR rate[s]" or a different percentage of Medicare reimbursement.  *Id.* ¶¶ 298, 360.

Because MCOs have no agreement to reimburse OON providers at an agreed-upon rate, *id.* ¶ 99, the amount that the MCO covers does not limit how much the provider may bill the patient for an OON service.  In many circumstances, the provider may bill the member for whatever

portion the plan does not cover, a practice called "balance billing." *Id*. ¶ 338. This possibility leads some MCOs/TPAs to try to negotiate with OON providers *post*-service to accept an amount in exchange for an agreement not to balance bill the members. Plan sponsors may authorize their MCOs to use a vendor like MultiPlan to negotiate on the plan's behalf. *Id.* ¶¶ 95, 157. OON providers may accept or reject these vendors' offers. *Id*. ¶¶ 103, 339. OON providers have the option to pursue patients for their full-billed charges if they are unhappy with what the plan offers through negotiation or sets as the OON benefit limit. That is the point of a provider being OON: it is not bound to accept the MCO's reimbursement.

## B. Providers Charge Admittedly Higher Amounts to OON Patients and Then Seek Reimbursement from Patients and MCOs

Because no pre-negotiated contract governs what OON providers can receive from patients, providers can unilaterally dictate their billed charges. *See id.* ¶ 113. These not only "tend to be higher than in-network and Medicare prices," *id.* ¶ 587 n.16, but are often many times greater.

Patients feel the impact of rising OON prices. Because patients covered by a plan typically pay a larger percentage of a provider's bill when that provider is "out of network" instead of "in-network," patients can end up paying a substantially higher amount when OON bills increase. *Id.* ¶¶ 535, 550. A patient responsible for, say, 50% of an OON bill will pay a vastly different amount if the reimbursement for an OON claim is $100,000 versus $10,000. Accordingly, patients demand, and MCOs compete to provide: (1) decreases in the cost of OON services in general, and (2) protection against balance billing.

The DAPC provides one striking illustration of the impact of such payment negotiations on patients. *Id.* ¶ 211. Plaintiffs allege that Jeffrey Farkas, MD, LLC charged $332,300 for a single surgery—a charge for which the patient, who was in a life-or-death situation, potentially would have been billed. Following the procedure, Dr. Farkas submitted a claim to an MCO, Cigna,

which contracted with MultiPlan to engage in negotiations on its behalf. *Id.* MultiPlan relayed Cigna's offer to reimburse Dr. Farkas $12,407 for that work, but Dr. Farkas rejected Cigna's offer and the plan ultimately sent him a check for $6,893.20 as the "covered amount" under the applicable plan. *Jeffrey Farkas, M.D., LLC v. Cigna Health & Life Ins. Co.*, 386 F. Supp. 3d 238, 242 (E.D.N.Y. 2019). When Dr. Farkas sued Cigna, the court granted summary judgment for Cigna, highlighting that the reimbursement offer Cigna made using MultiPlan's products was *three times more* than for an individual on Medicare. *Id.* at 241–42, 244–47. In other words, not only would the member have been spared being billed potentially $320,000 more of the provider's charges had the provider accepted MultiPlan's initial offer, but Cigna would have paid the provider 80% more than the reimbursement ultimately determined, and upheld by the court, based on the member's plan terms.

### C. Plaintiffs Seek to Require All MCOs/TPAs to Use Only Legacy Benchmarking Systems That Increase Patient Fees and Provider Profits

MCOs/TPAs often use benchmarks to determine OON reimbursements, as dictated by patients' insurance policies or health plans. Plaintiffs even endorse benchmarks, describing those that MCOs previously used, such as UCR benchmarks, as arriving at "predictable" reimbursement rates to each other. DAPC ¶ 299; *see also id.* ¶ 298 (noting that MCOs "usually" use a UCR rate from "the 75th to 85th percentile"). And Plaintiffs acknowledge that MCOs and providers looked to these benchmarking databases for many years prior to MultiPlan's entry. *Id.* ¶¶ 298–300.

Plaintiffs do not allege any facts that these legacy databases ever generated "competitive" rates that were the product of competition between MCOs for Plaintiffs' services. Plaintiffs do not allege that they ever used UCR rates to play one plan or MCO off another (i.e., using the threat of non-treatment to those plan's subscribers) to obtain a higher reimbursement amount than they otherwise could have. Plaintiffs simply allege that they were allowed to unilaterally collect ever-

7

increasing rates for OON patients based on a database tilted in favor of ever higher payments, which they expected every plan to use. And Plaintiffs seek to require the healthcare industry to pay these excessive costs, at the expense of plan sponsors (including employers) and patients.

**D.     MultiPlan's Competitive Option: Customizable, Cost-Based OON Pricing Recommendations from Public Data, for Use by MCOs as They See Fit**

MultiPlan built its cost and reference-based pricing business against this backdrop. MultiPlan is not an insurer, payor, MCO, or TPA. It does not offer any plan to any subscriber, collect premium payments, have any insured or member patients, assume risk, or provide benefit coverage to, adjudicate, or pay healthcare claims from patients. *Id.* ¶¶ 104–08. As part of its legacy business, MultiPlan assembles preferred provider organization ("PPO") networks for use by its health-plan clients in providing *in-network* care to their members. *Id.* ¶ 105. But Plaintiffs have made clear that "[i]n-network claims adjudication and pricing is not at issue in this case," and their claims concern exclusively "out-of-network claims adjudication and pricing." *Id.* ¶¶ 99–100.

In its core business, MultiPlan offers, separately and independently to various clients, (1) customizable products for calculating OON reimbursement, primarily its Data iSight solution, and (2) a service that allows MCOs to outsource OON reimbursement negotiations with providers to MultiPlan, with all reimbursement decisions resting solely with the MCOs/TPAs. *Id.* ¶¶ 161, 325–26; 373.

*1. Overview—Data iSight pricing recommendations are based on public data and cost-based referencing*. MultiPlan's primary OON pricing recommendation methodology, and the focus of Plaintiffs' claims, is called Data iSight. Plaintiffs allege that, through Data iSight, MultiPlan exchanges each clients' confidential information with others, and that Data iSight uses this confidential information to recommend an OON price. *Id.* ¶¶ 325–26. But the DAPC has no *factual* allegations supporting these conclusory assertions.

8

In fact, the actual factual allegations show that Data iSight is a fully individualized and customized provider-cost-based solution. Its reference points are based on healthcare providers' publicly-available cost data, or a combination of historical claims data and information that providers have submitted to government agencies like the U.S. Centers for Medicare and Medicaid Services. *Id.* ¶¶ 322–31. Publicly reported data are not "confidential" information of the providers, the MCOs, or anyone. *Id.* ¶ 324. But the cost-based nature of Data iSight, *id.* ¶ 322, is exactly why Plaintiffs dislike it. It allows MCOs to evaluate providers' unilaterally-set prices against the actual cost of providing healthcare services, rather than the historical charge-based benchmark of billed charges that providers prefer, given that providers can effectively unilaterally increase their own reimbursements. *Id.* ¶¶ 298–301.

*2.  Data iSight pricing recommendations are highly individualized, customized, and ultimately for the MCO/TPA to determine how or whether to use*. When an MCO/TPA contracts with MultiPlan, it obtains access to the recommendations provided by Data iSight and/or MultiPlan's other products and services, which the client or plan sponsor ultimately decides whether and how to use. *Id.* ¶¶ 170, 172, 174–76, 184–90. Because the services that MultiPlan provides to each client are not one-size-fits-all, Plaintiffs do not and cannot allege that each client's use of Multiplan's solutions resulted in the same reimbursements for the same treatment from each MCO/TPA. The DAPC admits that each client and/or plan sponsor can and does customize the services to fit its individualized preferences and plan terms. *Id.* ¶¶ 10, 142, 322–33. This can include "data-driven negotiation and/or reference-based pricing methodologies" that "can be used standalone" or "used in a solution hierarchy" depending on the services chosen. *Id.* ¶ 688.

The DAPC incorporates materials that demonstrate this. Plaintiffs, for example, cite to MultiPlan white papers that detail the Data iSight functionality, and make clear that it uses client-

selected methodologies and overrides as well as publicly available data. *See A Better Reference for Pricing*, MultiPlan (Aug. 2019) (attached as Ex. A to the Decl. of Sadik Huseny Supp. Defs.' MTD DAPC ("Huseny Decl."); cited at DAPC ¶ 366); *Data iSight Product and Methodology Inpatient Module*, MultiPlan (June 2019) (attached as Ex. B to Huseny Decl.; cited at DAPC ¶¶ 322–25); *Data iSight Facility Methodology*, MultiPlan (July 2018) (attached as Ex. C to Huseny Decl.; cited at DAPC ¶ 326).[3]   One white paper explains that *clients* have the choice of implementing customized reimbursement floors and ceilings as part of the Data iSight methodology, for example requiring that the reimbursement amount be *above* a client-chosen percentage of "Medicare reimbursement," a "claim's cost," or a "claim's charge." Ex. B at 6.[4]

As part of this process, each client or plan sponsor uses Data iSight and MultiPlan's other cost-management solutions differently based on the specific priorities of the plans they are managing by submitting their pricing preferences and strategies to MultiPlan using a "preference sheet." DAPC ¶¶ 181, 359. Importantly, the methodology is selected at the level of "particular services," *id.* ¶ 494, so MCOs/TPAs may use Data iSight only for particular services and different methodologies for other services. The final recommendation and resulting potential savings "reflect[s] a variety of configuration options selected by the plans to reflect their preferred balance of savings and member satisfaction." Ex. A at 6. And MCOs/TPAs and plan sponsors can use Data iSight's large "number of options, such as guardrails that ensure a reimbursement never strays

---

[3] Where "significant documents are referenced in the complaint and attached by the defendant to its motion to dismiss, those documents are considered to be incorporated into the pleadings and a court may consider them." *Black Bear Sports Grp., Inc. v. Amateur Hockey Ass'n of Ill., Inc.*, 2019 WL 2060934, at *3 (N.D. Ill. May 9, 2019) (Kennelly, J.) (collecting cases). Plaintiffs allege and acknowledge that these "white papers" "explain in detail how MultiPlan's pricing methodology lowers the prices set for out-of-network goods and services." DAPC ¶ 260.

[4] The white paper further explains that MultiPlan provides six "alternative pricing methodologies"—distinct from the Data iSight methodology—through which a MCO/TPA can set reimbursement rates, including based on (1) percentage of cost; (2) percentage of Medicare; (3) percentage of charge; (4) percentile of billed charges; (5) average billed charges; and (6) hospital profitability. Ex. B at 7.

below or above a benchmark such as Medicare or *the [MCO's] benefit limit*, if different than the reference point." *Id.* (emphasis added).

Plaintiffs do not allege that MultiPlan mandates that all of its 700+ clients agree to any sort of exclusivity provision, or that MultiPlan's contracts preclude or restrict clients from using another cost management methodology. Nor do Plaintiffs allege that MultiPlan's clients always use MultiPlan's solutions in deciding a final OON reimbursement (i.e., that they always accept the recommendation)—or that its use is required or mandated at all, even if licensed. DAPC ¶ 158.

At bottom, the DAPC confirms that MultiPlan provides reimbursement recommendations that: (1) are customized pricing recommendations for each individual MCO/TPA, health plan, and transaction at issue, (2) are based on the specific transaction and cost-based referencing and public data, (3) are not mandatory in any sense, and (4) leave it open for each plan to use or alter in any way it wants (if it even uses MultiPlan's services at all). *Id.* ¶¶ 158, 181, 325–26, 360, 465, 696.

*3. Negotiations with providers to reach resolution*. Plaintiffs do not allege that MultiPlan transmits reimbursement offers directly to providers (or interacts with providers at all) for clients using only Data iSight's repricing products. In these instances, the MCO/TPA negotiates with the provider, with the OON provider ultimately deciding what reimbursement it will accept and whether to balance bill the patient.

MultiPlan does offer an additional service to those clients that may elect it: negotiation and patient advocacy services to negotiate settlements such that the patient is ultimately protected from any balance billing. *Id.* ¶¶ 339–40. When such negotiation services are used, the DAPC also makes clear that providers are not required to accept any particular pricing offer made as a result of a client using MultiPlan. *See id.* ¶¶ 143–44, 523–24.

11

MultiPlan's negotiation services include by design a significant patient protection component: a prohibition on balance billing should the provider accept the reimbursement offer. This is critical for consumer protection because providers often can (and do) pursue payment from the patient directly. Plaintiffs do not dispute that an OON provider is under no obligation to accept as payment in full any reimbursement amount from any MCO and can choose to balance bill. If, and only if, negotiations are successful and the provider agrees to resolution where it does not balance bill patients does MultiPlan get paid a percentage of the savings. *Id.* ¶ 149. Therefore, MultiPlan is incentivized to both protect the patient from balance billing and to calculate and recommend payment acceptable to the provider. *Id.* ¶¶ 148–49, 206–08. The DAPC concedes that MultiPlan's reference-based products and services recommend above-cost allowed amounts that enable providers both to recover their costs and turn a profit for their OON services, while protecting patients. *Id.* ¶ 322; *see also* Ex. B at 6 (noting client selects appropriate Data iSight margin factor). As another white paper cited in the DAPC explains, "Even health plans with an aggressive stance on out-of-network utilization find that the reference point must be defensible and fair to providers in order to be effective for members." Ex. A at 8.

### E. The DAPC Makes No Non-Conclusory Factual Allegations Regarding Individual MCOs'/TPAs' Use of MultiPlan Or Any Alleged Unlawful Agreement

Plaintiffs claim through numerous conclusory allegations that hundreds of MCOs/TPAs across the country—including the Defendants named here—have conspired to fix OON reimbursements. But despite the wide variation among clients and their uses of MultiPlan, the DAPC lumps together all MCOs/TPAs and omits key factual allegations about how any particular MCO/TPA specifically uses or has used MultiPlan's services. Plaintiffs instead make only generic assertions that each MCO/TPA Defendant "executed an out-of-network pricing agreement with MultiPlan," or mere "example[s]" of "communications with providers" involving MultiPlan and

certain MCOs."  DAPC ¶¶ 50–79, 202–11; *see also, e.g.*, *id.* ¶ 157 ("competing payors authorize MultiPlan to set and negotiate their out-of-network prices"); *id.* ¶ 488 ("MultiPlan and its competitors have agreed to use a common algorithm to set the prices that they will pay providers for out-of-network goods and services.").

Plaintiffs do not allege any facts about how *any* MCO or TPA specifically uses or has used MultiPlan's services: when they do, when they do not, how they use those services, and what those MCOs/TPAs do for the vast majority of the time when they reimburse OON charges on their own or via mechanisms other than MultiPlan's services.  Plaintiffs do not allege that any Defendant (other than United, in one paragraph referencing four DAPs) reimbursed any particular Plaintiff for OON services, much less that any did so at below-cost or below-market rate using MultiPlan or that reimbursements set by the MCOs/TPAs were parallel or aligned in any way.  There are also no factual allegations regarding any use of MultiPlan relative to other products and services or in-house negotiations.

The DAPC likewise alleges no facts showing any horizontal agreement between any MCO/TPA Defendants to use MultiPlan.  Plaintiffs do not allege that any MCO/TPA Defendant ever communicated, directly or indirectly, with another MCO/TPA Defendant about using MultiPlan, let alone for the purported purpose of artificially reducing OON reimbursements.  Nor do Plaintiffs allege any other facts showing that MCO/TPA Defendants' use of MultiPlan's services is the result of an agreement among them, rather than the product of independent decision making.  For instance, the DAPC does not allege any facts showing that any one MCO/TPA Defendant shared confidential information with another, vis-à-vis MultiPlan or in any other manner.  Plaintiffs' own allegations outright undermine any inference of information sharing because MultiPlan's products use only public cost data to generate "comparator[]" sets for

13

reimbursement recommendations. DAPC ¶¶ 133, 330. Plaintiffs' attempt to allege parallel action on the part of MCO/TPA Defendants (and their alleged co-conspirators) is belied by Plaintiffs' own allegation that MultiPlan has been offering repricing services since 2009, *id.* ¶ 133, and Plaintiffs' failure to allege when the vast majority of MCO/TPA Defendants (or any of the 700+ "co-conspirators") began using MultiPlan's services in the long period since they became available.

F.     **Plaintiffs' Allegations Closely Track Those in the CCAC**

As relevant to this motion, the DAPC's factual allegations largely mirror those in the CCAC, and it relies on fundamentally the same alleged conduct to support its claims. The DAPC's several hundred paragraphs of additional allegations add little of relevant substance, mostly covering (1) general descriptions of MultiPlan's service agreements with its clients and processing of claims to non-plaintiff providers, and (2) conclusory and unsupported assertions about the features of MultiPlan's products and services. Those descriptions and assertions are contradicted by the DAPC itself and the sources upon which Plaintiffs rely upon—for example the oft-repeated assertion that MultiPlan's Data iSight solution (which in fact relies on publicly available data) makes pricing recommendations based on confidential competitor data. *E.g.*, DAPC ¶¶ 162–214, 319–56; *see also infra* at 33–34.

## ARGUMENT

Under Federal Rule of Civil Procedure 12(b)(6), Plaintiffs must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint must be more than mere "labels and conclusions" and include more than "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. While factual allegations are generally accepted as true at this stage of the litigation, neither unwarranted factual

14

deductions, nor legal conclusions couched as factual allegations, are afforded such deference. *Id.* at 557. "Repetition cannot substitute for factual allegations." *Ass'n. of Am. Physicians & Surgeons, Inc. v. Am. Bd. Of Med. Specialties*, 15 F.4th 831, 834 (7th Cir. 2021). Plaintiffs do not meet this standard as to any of their claims.

## I. PLAINTIFFS FAIL TO PLEAD ANTITRUST STANDING AND INJURY

### A. Plaintiffs Lack Antitrust Standing Because Their Purported Injuries Are Indirect and Derivative

As described in more detail in Defendants' Class MTD, Plaintiffs lack antitrust standing to pursue their claims here because they remain free to collect all or any unpaid portion of their billed charges from their customers, the patients. Thus, any "injury" from MCOs/TPAs not reimbursing them as much as they want is indirect and derivative. *See McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*, 937 F.3d 1056, 1066 (7th Cir. 2019). Courts have repeatedly dismissed providers' antitrust claims alleging industrywide conspiracies to suppress OON reimbursements because the providers lack standing. *See* Class MTD at 16 (collecting cases).

In addition to the discussion in the Class MTD, Defendants note one issue particular to the DAPC. Plaintiffs make the remarkable assertion that "providers cannot collect the balance of their charges from patients or any other source." DAPC ¶ 337. But the DAPC does not support that conclusory and misleading assertion. Specifically, Plaintiffs do not make any factual allegations showing that they cannot simply pursue their full billed charges from the patient who elected to see them on an OON basis and who is responsible for the bill the provider issues afterward. In the paragraphs that follow, Plaintiffs make clear what they really mean: (1) for emergency services, a provider is limited by law (the No Surprises Act) in what it can balance bill patients, and (2) in all other cases, when the providers *choose to accept* the suggested price in those instances when it is offered through MultiPlan's negotiation services, the provider itself *has agreed to not balance bill*

15

*the patient. See id.* ¶¶ 338–39; *supra* at 5–6.

In the case of emergency and other involuntary services covered by the No Surprises Act, Plaintiffs cannot claim that they were injured if a plan used MultiPlan to make the initial payment. The reason in plain: federal law requires that, absent agreement with the provider, a plan must make an initial payment to the provider, and the law sets out a mandatory independent dispute resolution process if a provider disagrees that this amount is sufficient. *See, GPS of N.J. M.D., P.C. v. Horizon Blue Cross & Blue Shield*, 2023 WL 5815821, at *3, 9 (D.N.J. Sept. 8, 2023).

Otherwise, Plaintiffs' assertion that they "cannot collect the balance of their charges from patients" is true only to the extent they themselves have agreed to not do so, as part of reimbursement negotiations. DAPC ¶ 339 ("when a provider accepts MultiPlan's price, they are prohibited from balance billing the patient"); *id.* ¶ 524 ("when the MultiPlan Cartel underpays providers, providers are unable to turn to patients to be made whole"). There is not a single factual allegation that a provider in these circumstances is ever prohibited from simply rejecting the MCO/TPA offer (made through MultiPlan's negotiation services) and deciding to balance bill its patient. And even though Plaintiffs number in the hundreds, there is not a single allegation about how even one of them was so prohibited.

## B. Plaintiffs Lack Standing Because They Fail to Allege Any Injury Derived From Any Defendant's Use of MultiPlan

Plaintiffs also lack antitrust standing to pursue these claims because they do not adequately allege that that they received "below-market" OON reimbursements as a result of MultiPlan's solutions. *See Marion Diagnostic Ctr., LLC v. Becton Dickson & Co.*, 29 F.4th 337, 345 (7th Cir. 2022) (holding plaintiffs lacked both Article III standing and antitrust standing to sue because they had not been injured by the alleged conspiracy); *see* Class MTD at 19–20.

Although it has hundreds more paragraphs than the CCAC, the DAPC is almost entirely

devoid of any factual allegations that any Defendant paid any Plaintiff a "below-market" repriced OON claim using MultiPlan's recommendations—or any other specific facts regarding injury to Plaintiffs. Likewise, Plaintiffs' many "Short Form Complaints"—which specifically provided each Plaintiff with a section to describe in detail their purported injuries and grounds for standing to bring its claims against any particular Defendant—fail to allege anything specific of this sort. Instead, they all merely contain generalized statements about being injured by the purported cartel. Many follow this cut-and-paste formula: "Plaintiff was directly injured by Defendants' illegal conduct because it was underpaid for out-of-network goods and services as a result of the alleged antitrust violations set forth in the Master Complaint." *See, e.g.*, *CHS/Community Health Sys., Inc. v. MultiPlan, Inc.*, No. 24-cv-6804 (N.D. Ill.), ECF No. 37 (CHS Short Form Complaint). These are conclusory assertions, not factual allegations showing that any Plaintiff was actually injured by receiving an improperly low OON reimbursement from any Defendant as a result of the Defendant using a MultiPlan solution. They are insufficient to demonstrate standing.

Plaintiffs provide a handful of examples showing reimbursements as a percentage of the billed charges that they unilaterally dictate. But those examples say nothing about *market* reimbursement rates. In one of them—the only example of a claimed specific injury that Plaintiffs call out in the "Injury and Standing" section of the DAPC—Plaintiffs allege that, between May 2019 and December 2021, four Plaintiffs submitted OON bills to Defendant United and received payments reflecting a 74.4% reduction from billed charges. DAPC ¶ 663. But apart from declaring that this was an "underpayment," the DAPC contains no factual allegations about how these four Plaintiffs' various aggregated bills were calculated, whether United's payments were consistent with the terms of health plans that dictated United's payment obligations, whether the payments made by United (allegedly using MultiPlan's "pricing methodology") were in fact below-market

17

rather than simply below the bills initially sent by these Plaintiffs, how the amounts paid compared to what United should have paid for OON benefits for the governing plans (or what those plans even were), whether these Plaintiffs balance-billed any portion of the remainder or otherwise received payment for any portion of the remainder, or anything else. *Id.*

Plaintiffs' focus on the percentage reduction from their original charges does not suggest any harm because it says nothing about whether those original charges were competitive. Plaintiffs do say that the prices offered by United "were substantially lower than both UCR and FAIR Health prices for those goods and services," DAPC ¶ 663, but (as discussed) they fail to plausibly allege that the relevant health plans required United to use those other benchmarks, or that those benchmarks reflect reimbursements that would prevail in the but-for world absent Defendants' alleged conduct. Those are simply Plaintiffs' preferred, self-ratcheting benchmarks. Two more examples presented by Plaintiffs are similar, and have this same deficiency. *Id.* ¶¶ 292, 577–78.[5]

Plaintiffs' final example is similarly deficient. It provides only a handful of "billed amounts" that Adventist Health System was allegedly paid at lower rates as a result of MultiPlan:

| Date | Billed Amount | MultiPlan Allowed Amount | Underpayment Based on Billed Charges |
|---|---|---|---|
| November 7, 2018 | $120,662.14 | $90,496.63 | $30,165.51 |
| November 18, 2018 | $31,900.66 | $27,753.59 | $4,147.07 |
| December 16, 2018 | $5,160.74 | $3,870.58 | $1,290.16 |
| March 29, 2019 | $77,450.86 | $66,607.75 | $10,843.11 |
| April 19, 2019 | $15,384.38 | $11,538.30 | $3,846.08 |
| April 21, 2019 | $38,093.99 | $33,147.77 | $4,952.22 |
| April 25, 2019 | $134,001.58 | $115,241.36 | $18,760.22 |
| April 25, 2019 | $95,162.86 | $82,791.68 | $12,371.18 |
| June 12, 2019 | $22,479.66 | $19,332.51 | $3,147.15 |
| July 29, 2019 | $27,936.18 | $24,052.11 | $3,911.07 |
| September 1, 2019 | $47,408.05 | $40,770.92 | $6,637.12 |
| September 4, 2019 | $40,267 | $33,018.94 | $7,248.06 |
| September 26, 2019 | $20,072.14 | $16,459.17 | $3,612.97 |

---

[5] In the Dr. Farkas example highlighted by the DAPC, the court approved an ultimate payment of $6,893.20 on the initial exorbitant bill of over $332,300 for a single surgery. DAPC ¶ 211; *supra* at 6–7. This was a court-approved reduction of *well over 90%*. The percentage amount of a reduction is of course based on how high the provider decides to bill for OON services.

DAPC ¶ 113.  But Plaintiffs again fail to plausibly allege that these "billed amounts" reflect the reimbursements that would prevail in the but-for world absent Defendants' alleged conduct, and thus fail to plausibly allege that the difference between the "billed amounts" and the "MultiPlan allowed amounts" are "underpayments."  Presumably, these are the best examples Plaintiffs could find from a massive provider system.  Yet they show that Adventist Health System was receiving about 85% of its billed amount, with no factual allegations indicating that why it was entitled to receive its full billed charges, or any reason why it was injured in comparison to a but-for world given that it received 85% of its unilaterally-set OON charges.

Plaintiffs' own example shows that there is nothing uniform or extreme about the reimbursements recommended via MultiPlan.  In this circumstance they are in fact *consistent* (or even higher) than UCR rates, which Plaintiffs allege are "usually in the 75th to 85th percentile. DAPC ¶ 298.  This handful of examples also underscore the complete lack of any factual allegations showing injury to any of the *other* DAPs who are purportedly bringing claims.

### C. Plaintiffs Fail to Plead Antitrust Injury Because They Do Not and Cannot Allege Actual Harm to Competition

As described in more detail in Defendants' Class MTD, Plaintiffs cannot establish antitrust injury because they are seeking the ability to obtain an excessive price for services billed on an OON basis—one that dwarfs the recovery they obtain for the same services when billed on an in-network basis or through Medicare.  This is not the type of injury that antitrust law is meant to prevent.  *See Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1418 (7th Cir. 1989); *Long Island Anesthesiologists PLLC v. United Healthcare Ins. Co. of N.Y. Inc.*, 2023 WL 8096909, *3–6 (E.D.N.Y. Nov. 21, 2023); Class MTD at 20–21.

Moreover, the DAPC's numerous allegations make clear that, to the extent Plaintiffs' profits have decreased, that is a result of *more* competition from MultiPlan's entry—not less.

MCOs' contracts with MultiPlan give those MCOs (or, in the case of self-funded plans, the plan sponsors) a new competitive option—the possibility, as customized and decided by them and plan sponsors, to offer an OON reimbursement informed by their use of MultiPlan's cost-management products. This may have thrown a wrench into Plaintiffs' desire to have all MCOs/TPAs use their own preferred UCR legacy databases (with their ever-ratcheting charge-based criteria), but that is not a harm to competition, as required for antitrust injury—just the opposite. *Atl. Richfield Co. v. USA Petrol Co.,* 495 U.S. 328, 344 (1990); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); Class MTD at 20–21.

Plaintiffs make clear that in their view, the "competitive regime" prior to MultiPlan's entry was a world where OON rates "were determined" by Plaintiffs' preferred benchmarking systems, the ever-increasing "UCR/Fair Health rate." DAPC ¶ 576. But that is not competition—that is a single system Plaintiffs demand MCOs still use to "determine" the rates *they* prefer. The DAPC's example of Dr. Farkas makes clear why Plaintiffs want this. As described, *supra*, Dr. Farkas charged $332,300 for a single surgery and rejected Cigna's offer (using MultiPlan) for reimbursement of $12,407 for that work. *Id.* ¶ 211. And in the subsequent litigation, the court granted summary judgment for Cigna, ruling that the check it issued for $6,893.20 was not inappropriate, and expressly noting that the reimbursement offer made using MultiPlan's products was three times more than for an individual on Medicare. *See Farkas*, 386 F. Supp. 3d at 241–42, 246–47; *supra* at 6–7. The "competitive regime" prior to MultiPlan, in Plaintiffs' view, would invariably lead to reimbursement at higher and inflated amounts. There is and can be no "antitrust injury" under Plaintiffs' own allegations.

## II. PLAINTIFFS FAIL TO PLEAD A COGNIZABLE "PRICE" CAPABLE OF BEING "FIXED" OR A COGNIZABLE ANTITRUST MARKET

Plaintiffs' antitrust claims also fail for the fundamental reason that they do not and cannot plausibly allege that the price of any product or service has been fixed or restrained. As set forth in detail in the Class MTD, Plaintiffs bring the same claims advanced and rejected in numerous cases predicated on MCOs' reimbursements for out-of-network services obtained by their subscribers (*i.e.*, the patients). *See* Class MTD at 35–40 (addressing allegation that Defendants have agreed to use the same MultiPlan OON reimbursement methodology to "suppress out-of-network reimbursement payments").

As with the Class, Plaintiffs try to work around this fatal deficiency by switching their allegations from a "reimbursements" market—set forth in *Adventist*, the first case filed in this MDL, and nearly every one of the copycat cases filed thereafter—to a market for out-of-network healthcare services for purchase by third-party commercial payers. The sleight-of-hand fails. Plaintiffs' new alleged product market "for out-of-network goods and services sold to payors," DAPC ¶ 515, is just the reimbursement market that they previously alleged in their long-form complaints (and abandoned due to its previous failures in court) with a new name slapped on. *See* Class MTD at 37–38; Compl. ¶ 138, *Adventist Health Sys., Inc. v. MultiPlan, Inc.*, No. 24-cv-6803 (N.D. Ill.), ECF No. 1. Plaintiffs concede as much, stating that their alleged market consists of the specific MCO/TPA a provider looks to for payment *after* the patient has purchased the OON service and taken on the obligation to pay for it. *See* DAPC ¶¶ 530 ("A payor can impose a [small but significant reduction in purchase price] on out-of-network goods and services because the negotiation of prices for those services occurs *after* the service is provided and the healthcare provider is locked into negotiating with a single payor." (emphasis added)); *see also id.* ¶ 760.

Moreover, as set forth in the Class MTD, even if the new alleged market is credited, it is fatally overbroad in multiple respects. *See* Class MTD at 37–38.

Plaintiffs also fail to plausibly allege a relevant market for other reasons set forth in the Class MTD —defects fatal to Plaintiffs' claims as well because "it is the existence of a commercial market that implicates the Sherman Act in the first instance." *Agnew v. NCAA*, 683 F.3d 328, 337 (7th Cir. 2012); *see also Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.*, 412 F. Supp. 3d 941, 952–53 (N.D. Ill. 2019); *see* Class MTD at 38–40. There simply is no market in which MCOs/TPAs compete for more opportunities to pay higher amounts for OON claims. All of Plaintiffs' antitrust claims should be dismissed on this ground alone.

## III.    PLAINTIFFS DO NOT PLAUSIBLY ALLEGE A CONSPIRACY (COUNT 2)

For all the reasons set forth in Defendants' Class MTD, Plaintiffs fail to plead factual allegations plausibly showing a conspiracy. *See* Class MTD at 21–35. Defendants incorporate that discussion herein, and briefly reiterate some of the salient points here.

The DAPC's allegations on this key issue—whether there was an agreement among hundreds of industry participants to form a purported "cartel"—are no different in any substantive respect from those in the CCAC. To allege their "hub-and-spoke" conspiracy, Plaintiffs must plausibly allege a horizontal agreement among the MCOs that form the "rim" of the alleged conspiracy. *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 842 (7th Cir. 2020). Thus, Plaintiffs must show not only that MultiPlan entered into bilateral vertical agreements with its customers—as every vendor does in every market—but also that the MCOs/TPAs agreed with each other ("the rim") to form an illegal "cartel." They fail to do so.

First, like Class Plaintiffs, Plaintiffs fail to allege direct evidence of a conspiracy. Their purported "direct evidence" consists merely of bilateral agreements between MultiPlan and its MCO clients. *E.g.*, DAPC ¶¶ 142, 163–81, 216, 234, 247; Class MTD at 22–23. But these *vertical*

agreements are insufficient to establish a *horizontal* conspiracy among the MCOs. *See, e.g.*, *Marion Healthcare,* 952 F.3d at 842 (vertical agreements with distributors insufficient to establish a horizontal agreement); Class MTD at 22–24 (collecting cases). Plaintiffs make a handful of conclusory references to "the agreement between the competing payors," DAPC ¶¶ 41, 347, 497, but simply stating an agreement exists is clearly insufficient to state a claim. *See Iqbal*, 556 U.S. at 678.

Second, Plaintiffs also fail to allege circumstantial evidence of a conspiracy, which requires Plaintiffs to plead facts demonstrating *both* (1) parallel conduct *and* (2) a factual "context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. They do neither.

Plaintiffs' allegations make clear that the MCOs/TPAs did not act in parallel—in fact they began using MultiPlan's services over the course of at least a "three-and-a-half year period." DAPC ¶ 289. This is not the "abrupt shift" in the market that supports a plausible inference of a conspiracy. *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 728 (7th Cir. 2010); Class MTD at 25. And Plaintiffs' own allegations and the sources they cite show that different MCOs use different MultiPlan services in different ways and can customize their use of Data iSight with different overrides. *See* DAPC ¶¶ 161, 688; Ex. B at 6–7. Plaintiffs do not plausibly allege parallel conduct, because their complaint is silent on *how* these services are used beyond conclusory and implausible allegations that all clients use them in the same way.

Plaintiffs' "plus factors" fare no better. Plaintiffs' attempts to sensationalize the factual context surrounding MultiPlan's products and services do not take the place of well-pleaded factual allegations supporting an inference of conspiracy. As discussed in detail in the Class MTD: (1) the DAPC's own allegations make clear that MCO/TPA Defendants' conduct was in each

Defendant's independent interest and lacks any factual allegations supporting the notion that, absent a "MultiPlan Cartel," the MCOs/TPAs would suddenly compete to pay *more* to OON providers; (2) Plaintiffs' "information exchange" allegations are utterly lacking (*see also infra* Section IV.D); and (3) the hodge-podge of additional allegations regarding industry susceptibility to collusion (and alleged history of collusion), along with generalized "meetings," are inadequate.

For example, Plaintiffs allege that representatives from the MCOs attended some conferences hosted by MultiPlan. *E.g.*, DAPC ¶¶ 262–76. But their allegations offer no detail, not even a single fact suggesting any agreements were made between MCOs at any meeting. *E.g.*, *In re Text Messaging Antitrust Litig.*, 46 F. Supp. 3d 788, 806 (N.D. Ill. 2014) ("The decision by a group of industry players to have a meeting or to talk at a dinner or cocktail reception does not constitute a conspiracy." (citation omitted)); Class MTD at 33–35. Indeed, the DAPC contains no allegations whatsoever about conferences *before* the conspiracy allegedly began, beyond the mere mention that an event was hosted in 2015. DAPC ¶ 272.

The independent decisions of industry participants over the course of several years to use an industry-leading product to achieve a result in their own self-interest does not raise the inference of a conspiracy. MCOs compete against one another to establish effective and cost-efficient networks, develop plan structures and tools to incentivize members to use those networks, and control healthcare costs for their plan sponsors and members, particularly amounts paid to high-charging OON providers, and thus they have an obvious incentive to seek tools and services available to further those competitive goals. And if, as Plaintiffs allege, MultiPlan's solutions allow for greater ability to manage OON reimbursements, then one would expect—absent any conspiracy—to see exactly what Plaintiffs allege here: a broad range of industry participants over time adopting and using those services. That is not a reduction of competition—it *is* competition

in an industry in which one key dimension of competition is the ability to reduce the burden of healthcare costs for members and plans. There is no plausible basis to infer a conspiracy when hundreds of industry participants have taken the actions alleged. Class MTD at 28–32.

## IV.    PLAINTIFFS' ADDITIONAL FEDERAL ANTITRUST CLAIMS FAIL

### A.    MultiPlan's Service Contracts Are Not *Per Se* Illegal Under a "Horizontal Competitor" Theory (Count 1)

Count 1 of the DAPC alleges that every single one of MultiPlan's hundreds of service contracts with its MCO/TPA clients is not a vendor-customer agreement, but instead a horizontal, *per se* illegal price-fixing conspiracy, and that every entity that entered into one of these bilateral agreements is part of an illegal cartel as a result. DAPC ¶¶ 729–44. This claim should be dismissed because the alleged conduct—MultiPlan's sale of its reference-based pricing products and services to 700+ clients via hundreds of service agreements—consists of *vertical* agreements that must be analyzed instead under the rule of reason. *Id.* ¶¶ 142–44, 155, 163, 170, 172, 174–79; *see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886–87, 899, 907 (2007) (vertical price restraints evaluated under the rule of reason); *Always Towing & Recovery, Inc. v. Milwaukee*, 2 F.4th 695, 705–06 (7th Cir. 2021) (same).

Plaintiffs cannot seriously dispute that MultiPlan's OON service agreements with MCOs/TPAs are nothing more than vertical agreements. Plaintiffs nonetheless urge the Court to label these agreements as "horizontal" because MultiPlan's *separate* PPO network business competes with some (though not all) MCOs in contracting with providers. DAPC ¶¶ 116–19. Plaintiffs' argument makes no sense. The alleged relevant market is for *out-of-network* services performed by non-contracted providers—not competition for *in-network* services performed by contracted providers.

25

MultiPlan's PPO business involves contracting with providers to join its PPO networks, which MultiPlan then rents to plans or other payors. *Id.* ¶¶ 104–11. MultiPlan competes against other PPO networks (including those created by a small subset of vertically-integrated MCOs) to contract with these providers and provide in-network services at in-network, contracted prices. *Id.* None of the allegations regarding MultiPlan's OON reference-based pricing contracts with MCOs—which form the basis of Plaintiffs' claim—relate to this PPO network business in which MultiPlan and MCOs allegedly compete. *See Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730–31 (1988) (whether agreement is horizontal or vertical depends on whether defendants entered the agreement as "competitors" or as "firms at different levels of distribution"). Plaintiffs concede that this case is not about MultiPlan's PPO business, stating that "[i]n network claims adjudication and pricing is not at issue in this case." DAPC ¶ 99. Plaintiffs' allegations instead relate to MultiPlan's upstream role as a seller of reference-based pricing products and services to its MCO/TPA clients, who operate downstream as buyers. *Id.* ¶¶ 131, 136–37, 142–44, 157, 396 (acknowledging that alleged co-conspirators are in a customer-vendor relationship with MultiPlan). There is no basis under the law to apply the *per se* rule to a "vertical" agreement between companies in one market simply because the companies may be "horizontal" competitors in a different market.

For example, while Plaintiffs focus on MultiPlan's contracts with MCOs, including UnitedHealth, as one court recently concluded, "United and MultiPlan . . . are not horizontal competitors" and any services contract between them relating to OON network reimbursements does not constitute "a conspiracy let alone a horizontal conspiracy." *Long Island Anesthesiologists PLLC*, 2023 WL 8096909, at *17–18. So too here. The DAPC itself makes clear that MultiPlan

operates at different levels of the supply chain from MCOs/TPAs with respect to its OON services, *e.g.*, DAPC ¶¶ 99, 100–04, 142–44, 147, and therefore the *per se* rule does not apply.

Moreover, the vertical agreements between MultiPlan and MCOs/TPAs have many potential competitive benefits for clients, including more precise estimates of OON reimbursement amounts that allow plans and subscribers to save costs, and increased efficiencies for plans that can outsource negotiations to MultiPlan. DAPC ¶¶ 211, 535; *infra* at 29–30. Courts analyze such agreements under the rule of reason regardless of whether the parties otherwise compete in different aspects of their relationship. *See Vital Pharms., Inc. v. Berlin Packaging LLC*, 632 F. Supp. 3d 780, 785 (N.D. Ill. 2022) (citations omitted) (holding that vertical agreements between a distributor and manufacturer must be analyzed under the rule of reason even though the manufacturer also engages in distribution); *Always Towing & Recovery, Inc.*, 2 F.4th at 705–06 (characterizing agreement as vertical and applying the rule of reason based on the nature of the relationship reflected in the relevant contract); *accord In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 272–74 (6th Cir. 2014) (alleged conspiracy between dairy cooperative and milk processor that consisted of supply agreements was not *per se* illegal, even though defendants also allegedly competed, because agreements offered many potential efficiencies and the "substantial vertical elements" of the parties' relationship were "too significant . . . to agree [] that the essence of the conspiracy was horizontal") (quotation omitted); *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1480–81 (9th Cir. 1986) (agreements between dual-distributor that operated at multiple levels of the supply chain and distributor were not *per se* illegal under the Sherman Act), *modified on denial of rehr'g*, 810 F.2d 1517 (9th Cir. 1987).

### B.     MultiPlan's Vertical Service Contracts Do Not Harm Competition (Count 4)

Plaintiffs also argue that each individual agreement between MultiPlan and an MCO client violates antitrust law even if characterized as a vertical restraint. DAPC ¶¶ 765–71.

27

The rule of reason standard, rather than the *per se* standard, presumptively applies to Section 1 claims based on vertical restraints. *Ohio v. Am. Express*, 585 U.S. 529, 541 (2018). To plead a the rule of reason claim, plaintiffs must plausibly allege an adverse effect on competition in a relevant market. *Id.* at 542. This analysis must be carried out for *each* individual alleged vertical agreement. Plaintiffs' claims do not withstand this scrutiny.

First, Plaintiffs do not and cannot plausibly allege that each of MultiPlan's vertical services agreements had an adverse effect on competition. Instead, Plaintiffs attempt to aggregate each independent agreement to demonstrate anticompetitive harm, asserting that the *combined* market power and *collection* of agreements caused harm. DAPC ¶¶ 768–70 (alleging that MultiPlan, MCO/TPA Defendants, and unnamed co-conspirators "used their combined market power to restrain trade in the relevant market"). However, absent allegations of a conspiracy or horizontal agreement among the MCOs/TPAs—which Plaintiffs fail to allege, *see supra* Section III—Plaintiffs cannot aggregate the service agreements to plausibly allege a rule of reason claim. *See Paddock Pubs., Inc. v. Chicago Tribune Co.*, 1995 WL 632031, at *5–11 (N.D. Ill. Oct. 25, 1995) (explaining that it is inappropriate to aggregate contracts "in the absence of a conspiracy to support a violation of section 1"); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 210 (4th Cir. 2002) (instructing that courts may "not consider the cumulative harm" of discrete vertical agreements and collecting cases); *In re Amazon.com, Inc. eBook Antitrust Litig.*, 2024 WL 918030, at *7 (S.D.N.Y. Mar. 2, 2024) (declining to permit aggregation in "the absence of controlling law and a coordinated horizontal effort among" the defendants); *Brantley v. NBC Universal, Inc.*, 2008 WL 11338585, at *3 n.3 (C.D. Cal. Mar. 10, 2008) (rejecting "claim that [plaintiffs] can aggregate the effects of defendants' actions even though they are alleged to have acted independently and not collectively"). Plaintiffs in essence try to plead a "rimless wheel" conspiracy—but "a wheel

without a rim is not a single conspiracy." *Dickson*, 309 F.3d at 203–04. Because Plaintiffs' claim is based on the purported aggregated effects of the vertical agreements and aggregated market power of MCOs/TPAs, their vertical agreement claim fails.

Second, the fact that MultiPlan gave its clients the option to use its reference-based pricing solutions to calculate OON reimbursements instead of the legacy databases that Plaintiffs prefer is not enough to establish harm to competition. Plan sponsors and insurance plans are free to decide which cost-management products, if any, they want to use. *See Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83 (3d Cir. 2010) (it is "well established" that businesses should be encouraged to compete to serve as their customers' supplier and the customer is free to contract with whomever they choose). The plans' independent choices to move their businesses away from legacy databases and to MultiPlan was a lawful exercise of their "freedom to switch suppliers" that "lies close to the heart of the competitive process that the antitrust laws seek to encourage." *Spinelli v. NFL*, 96 F. Supp. 3d 81, 116 n.16 (S.D.N.Y. 2015). This is particularly true given there are no allegations that MultiPlan has 700+ agreements with clients all containing any sort of potentially anticompetitive restraint, or that any plan was mandated by Multiplan to pay any final amount to any provider. Each payor-client "remains free to pick the supplier [or product] that it believes will provide the best deal," *Race Tires*, 614 F.3d at 79, and each is free to decide what they will ultimately reimburse as a result. That is decidedly not anticompetitive conduct.

Third, Plaintiffs make no allegation whatsoever that "the competitive structure of the market . . . has been affected by the decision of a single health insurance plan to reimburse out-of-network providers at lower rates" such as is required to show harm to competition. *Long Island Anesthesiologists PLLC*, 2023 WL 8096909, at *5. For example, Plaintiffs do not allege that *each* of MultiPlan's 700+ bilateral contracts increased the market share of any plan or impacted

29

competition between plans. And there are no non-conclusory factual allegations that MultiPlan's bilateral agreements reduced demand by patient-subscribers for provider services or resulted in anticompetitive prices in any market—much less that *each* agreement between MultiPlan and its clients reduced competition between buyers of Plaintiffs' services and yielded anticompetitive effects. *See Virgin Atl. Airways Ltd v. Brit. Airways PC*, 257 F.3d 256, 264 (2d Cir. 2001).

Finally, Plaintiffs' allegations show the procompetitive effects of MultiPlan's agreements in the form of more cost-management options and lowered costs to patients, who shoulder some portion of OON reimbursements and will benefit from lower fees when providers agree to accept MultiPlan's offers as payment in full. DAPC ¶¶ 12, 257, 349, 493, 550; *see also Long Island Anesthesiologists PLLC*, 2023 WL 8096909, at *5 (allegations that a plan *lowered* reimbursement rates to a provider by using MultiPlan's services was itself insufficient to establish a harm to competition or anticompetitive effects); *Kartell v. Blue Cross Blue Shield of Mass., Inc.*, 749 F.2d 922, 925, 929 (1st Cir. 1984) (buyers can attempt to keep prices down).

Given this, to survive dismissal, Plaintiffs at minimum had to allege that MultiPlan could achieve the same procompetitive benefits for its clients and their subscribers through less restrictive means in order to survive dismissal. *Virgin Atl. Airways Ltd.*, 257 F.3d at 264–65. They have failed to do so. Plaintiffs' entire theory of harm is predicated on the assertion that the prices that they unilaterally decide to charge to patients are "competitive" prices, so reimbursing at lower rates somehow constitutes competitive harm. DAPC ¶¶ 575–76. But as discussed, the only "injury" Plaintiffs complain of is injury to themselves (albeit undetailed and inchoate). They fail to "assert an injury not only to [themselves], but to the relevant market." *Chicago Studio Rental, Inc. v. Illinois Dep't of Com.*, 940 F.3d 971, 978 (7th Cir. 2019); *see also see supra* Section I.

### C.     Plaintiffs' "Principal-Agent" Theory Has No Legal Basis (Count 3)

Plaintiffs' Count 3 asserts a purported "principal-agent combination in restraint of trade," DAPC ¶¶ 757–64, but that is nothing more than the kind of "rimless" hub-and-spoke conspiracy that courts have repeatedly rejected.

As discussed above and in the Class MTD, a hub-and-spoke conspiracy requires agreements between MultiPlan (the "hub") and each MCO/TPA (the "spokes"), as well as a horizontal agreement among the MCOs/TPAs (the "rim").  *See Marion Healthcare, LLC*, 952 F.3d at 842 ("[A] hub-and-spokes conspiracy requires a rim connecting the various horizontal agreements.") (quotation omitted); *see also supra* Section III; Class MTD at 22–23.  Indeed, "a rimless hub-and-spoke conspiracy is not a hub-and-spoke conspiracy at all . . . it is a collection of purely vertical agreements."  *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 n.3 (9th Cir. 2015).

Characterizing MultiPlan as the "agent" of each MCO/TPA does not support Plaintiffs' claims—it defeats them.  It is axiomatic that vertical agreements between principal and agent are "lawful per se" because principals and agents are incapable of conspiring as a matter of law.  *Ill. Corp. Travel. Inc. v. Am. Airlines, Inc.*, 889 F.2d 751, 753–54 (7th Cir. 1989); *Day v. Taylor,* 400 F.3d 1272, 1278 (11th Cir. 2005) (same).  Moreover, there is "nothing unlawful" about the fact that MCOs/TPAs might use the services of a common consultant.  *Va. Excelsior Mills, Inc. v. FTC,* 256 F.2d 538, 541 (4th Cir. 1958); *see also Appalachian Coals v. United States,* 288 U.S. 344, 367 (1933) (rejecting use of a common sales agent as violation of Sherman Act).  A good example is court and agency approval of the "messenger model" in which a common consultant conveys information from healthcare providers to MCOs regarding the prices the providers might accept. *See Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1549 (11th Cir. 1996) (finding that

messenger model "method of negotiating with payors the fees it pays providers does not violate the Sherman Act as a matter of law") (citation omitted).

Instead, a horizontal agreement among defendants regarding the use of the common consultant has long been a necessary prerequisite to sustain a claim. *Cf. Addyston Pipe & Steel Co. v. United States*, 175 U.S. 211, 237 (1899) (finding horizontal agreement to use common sales agent to sell at fixed prices unlawful). Count 3 should be dismissed because it does not plead such a horizontal agreement. *In re Amazon.com, Inc. eBook Antitrust Litig.*, 2023 WL 6006525, at *21 (S.D.N.Y. July 31, 2023) (dismissing conspiracy claim because "the mere fact that the Publishers entered into agency agreements with Amazon was not direct evidence of a conspiracy"). Moreover, there is no legal basis to apply the *per se* rule to such vertical "agency" relationships, and therefore Count 3—which alleges a *per se* violation, DAPC ¶ 759—should be dismissed for this reason as well. *N. Jackson Pharm., Inc. v. Caremark RX, Inc.*, 385 F. Supp. 2d 740, 746 (N.D. Ill. 2005) (finding that claims challenging use of Caremark as "common agent" must be evaluated under the rule of reason).

### D. Plaintiffs Fail to State an Information Exchange Claim (Count 5)

Plaintiffs' information exchange claim fares no better than their various price-fixing claims. The dissemination of information "does not invariably have anticompetitive effects; indeed, such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978). For this reason, allegedly unlawful information exchanges are analyzed under the rule of reason, with courts considering factors such as "the nature of the information exchanged" and "the structure of the industry" in evaluating the potential for competitive harm. *Id.*; *see also In re Local TV Advertising Antitrust Litig.*, 2022 WL 3716202, at *3 (N.D. Ill. Aug.

29, 2022). The concern is that the exchange of certain information could be used to "police a secret or tacit conspiracy to stabilize price." *In re Local TV Advertising*, 2022 WL 3716202, at *3. Thus, the "nature of the information" factor has "certain well-established criteria," including the time frame covered by the information, the specificity of the information (*e.g.*, was it aggregated or transaction-specific), and whether the information was publicly available. *Id.*

Plaintiffs do not allege that any MCOs/TPAs exchanged competitively sensitive information *with each other*. *See* DAPC ¶¶ 2, 8, 310–12, 350, 776–79. Instead, Plaintiffs allege that: (1) MCOs/TPAs submit their claims information to *MultiPlan* and that this confidential data is used to generate OON reimbursement recommendations, *id.* ¶¶ 319–28, and (2) that MultiPlan has acted as a go-between in conveying competitively sensitive pricing information among its 700+ clients, *id* ¶¶ 254–61, 282–87, 346, 776–79. Their allegations fall well short of alleging that MultiPlan's products and services permit MCOs/TPAs to "police a secret or tacit conspiracy."

Plaintiffs' first theory is contradicted by their own complaint. The DAPC is replete with conclusory assertions that information was "comingled and pooled" in the process of providing reimbursement recommendations via Data iSight but alleges no actual facts showing that MultiPlan does any such thing. *Id.* ¶¶ 310–12, 321, 333, 334, 356. Rather, Plaintiffs' allegations show that each client submits certain specific claim information to MultiPlan (necessary to provide a recommendation as to each such claim) and Data iSight uses a vast array of *publicly* available data—including data that providers themselves submit to the federal government—to individually generate a reimbursement recommendation for each submitted claim based on a client's chosen customizations. *Id.*

Indeed, the MultiPlan document that Plaintiffs describe as "explaining how MultiPlan's pricing methodology" operates, *id.* ¶ 17, explains that Data iSight's methodologies are based on

"[c]omprehensive facility cost data [that] is *publicly available*" and "publicly-available databases of paid claims," used in conjunction with "widely-recognized" AMA and CMS data.  Ex. A at 5 (emphasis added).  And the document which Plaintiffs say shows that "MultiPlan pools and comingles all of the competitor pricing data that it has in its system," DAPC ¶ 322, indicates nothing of the sort.  Rather, it states that Data iSight uses "publicly-available" data.  Ex. C at 2.

Similar allegations of "information sharing" via algorithmic software and technologies have been found insufficient to state antitrust claims.  In *Cornish-Adebiyi v. Caesars Entertainment, Inc.*, the plaintiffs alleged that the defendants—who were hotel companies— conspired to fix prices of hotel rooms by using a pricing software sold by a third-party software company.  2024 WL 4356188, at *1 (D.N.J. Sept. 30, 2024).  The plaintiffs there claimed that the defendants gave the software company "non-public proprietary data related to pricing and occupancy" and that its algorithm then "processes and analyzes" that data, together with "other supply and demand data" to recommend an "optimal" price accepted by the users "around 90% of the time."  *Id.* at *2.  Like here, that's as far as the allegations went.  Even crediting these allegations for purposes of the motion, the court held their "antitrust theory is factually and legally incomplete" because it failed to allege "how this data is used once it is handed over" to the software provider.  *Id.* at *5.  And in *Gibson v. MGM Resorts International*, the court dismissed a Section 1 claim where the plaintiffs alleged that confidential information was fed into—but not out of— the pricing algorithm at issue.  2023 WL 7025996, at *6 (D. Nev. Oct. 24, 2023).  The court found dispositive that the plaintiffs failed to allege that "one [alleged co-conspirator] ever receive[d] confidential information belonging to another" as opposed to merely getting "their own confidential information back mixed with public information from other sources."  *Id.* at *5. Plaintiffs' allegations here suffer from the same shortcomings.

Plaintiffs' second theory—that MultiPlan expressly conveyed and exchanged pricing strategy between its hundreds of clients—suffers from the same shortcomings as those a court in this District recently addressed in *In re Local TV Advertising*. There, plaintiffs alleged defendants conspired to raise the prices of broadcast television spot advertisements through information exchange with third parties, including the exchange of non-public price data and other competitively sensitive information. 2022 WL 3716202 at *1–2. The court observed that to state a claim, the plaintiffs must make "concrete allegations" that any conduit "compromised the ostensible anonymity" of the competitively sensitive information and show that the information exchanged "enabled co-conspirators to tacitly communicate with one another." *Id.* at *6. The court concluded that the complaint was "devoid of sufficiently concrete allegations" that the defendant's market reports and recommendations (developed from data they received) enabled the readers of the reports to "tacitly communicate with one another." *Id.* at *8. Additionally, the plaintiffs "fail[ed] to allege that . . . analytics were presented with so much specificity that [defendants] could use them to 'police a secret or tacit conspiracy to [fix] prices.'" *Id.* at *6 (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 212 (2d Cir. 2001)).

So too here. Plaintiffs acknowledge that MultiPlan has over 700+ clients. DAPC ¶ 440. Yet Plaintiffs allege only a handful of instances of high-level, anonymized comparisons of reimbursements involving a single one of these alleged co-conspirators. *See id.* ¶¶ 444–47. There are no factual allegations of MultiPlan exchanging confidential information of one client with another—because it is not true.

## V.    PLAINTIFFS' STATE LAW CLAIMS FAIL

In addition to their various federal antitrust claims, Plaintiffs pile on a variety of related state law claims predicated on the same conduct. DAPC ¶¶ 784–816 (antitrust), 817–37 (consumer protection), 838–47 (unjust enrichment). A subset of Plaintiffs filed short form complaints

bringing claims under the antitrust laws of nine jurisdictions, the consumer protection laws of four jurisdictions, and the unjust enrichment laws of eleven jurisdictions.  These claims are addressed below, and Defendants submit, for the Court's ease of reference, a State Authority Appendix laying out the relevant authority for each of the individual state law claims Plaintiffs bring.[6]

## A.    State Law Antitrust Claim (Count 6)

All of the state-law antitrust claims are based on the same factual allegations as their federal claims, and so fail for the same reasons their federal claims fail.  *See In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 843 (N.D. Ill. 2020) (dismissing all state law antitrust claims for the same reasons as the federal antitrust claims), *aff'd sub nom. Mayor of Baltimore v. Abbvie Inc.*, 42 F.4th 709 (7th Cir. 2022); *accord In re Bystolic Antitrust Litig.*, 583 F. Supp. 3d 455, 497 (S.D.N.Y. 2022) ("Because the Court dismisses the federal antitrust claims . . . claims under the antitrust laws of various states—based on the same allegations—fail too." (citation omitted)), *aff'd sub nom. Watson Lab'ys, Inc. v. Forest Lab'ys Inc.*, 101 F.4th 223 (2d Cir. 2024).  *See* App. A.[7]

## B.    "Consumer Protection" Claim (Count 7)

Plaintiffs do not plausibly allege that Defendants have engaged in conduct that harms consumers.  Nor do they plausibly allege any conduct distinct from that underlying their antitrust

---

[6] Two DAP member cases raising a range of additional claims were filed after the Complaint was filed and the parameters for motion to dismiss briefing were set.  *See Heritage General*, No. 24-cv-12517 (N.D. Ill.); *Adv. Spinal Care & Assoc. LLC v. MultiPlan Corp.* No. 25-cv-80 (N.D. Ill.).  Because these claims were not contemplated as part of this motion to dismiss briefing, Defendants do not address these claims in this memorandum, but reserve the right to seek dismissal of these claims at a subsequent time.

[7] Plaintiffs also appear to concede that their various state antitrust claims are brought only as a potential work-around of the *Illinois Brick* doctrine, which bars claims by indirect purchasers.  DAPC ¶ 39 n.3.  Plaintiffs' view, apparently, is that to the extent their injuries are deemed too attenuated because they have no contracts requiring clients to pay anything as to OON services (thereby barring their claims under *Illinois Brick),* they should be able to bring state antitrust claims by relying on the laws of so-called "*Illinois Brick* repealer states" that allow suits by "indirect purchasers."  *See* DAPC ¶ 39 n.3.  But even those state laws have not "thrown . . . proximate causation out the window."  *Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 743–44 (7th Cir. 2018).  These states still generally apply the same antitrust standing principles applied under federal law.  *See Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 484 (7th Cir. 2002); App. A.

claims. Instead, at the end of a Complaint focused entirely on antitrust claims, they simply list each jurisdiction, re-incorporate their allegations of antitrust violations, and state that Defendants violated the state's consumer protection statute. DAPC ¶¶ 817–37. But as courts in this District have recognized, that conclusory pleading cannot support a consumer protection claim. Where plaintiffs have "pleaded antitrust claims" and then "merely alleged those claims are also actionable under state consumer protection laws," the consumer protection claims should be dismissed. *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 726 (N.D. Ill. 2016); *see In re Humira*, 465 F. Supp. 3d at 848. The DAPC simply "offers labels and conclusions" and "a formulaic recitation of the elements," and therefore fails to meet the requirements of Rule 8. *Iqbal*, 556 U.S. at 678.

Moreover, consumer protection statutes are meant "to protect consumers from fraudulent sales." *Clark v. Experian Info. Sols., Inc.*, 2005 WL 1027125, at *4 (N.D. Ill. Apr. 26, 2005). There is nothing "unlawful" about Defendants' conduct, since Plaintiffs rely solely on their antitrust claims, which fail for the reasons described above. Nor is there anything "unfair" or "fraudulent" about holding Plaintiffs accountable and helping to control runaway healthcare costs. Plaintiffs' brief attempts to assert the contrary are baseless. First, they allege that patients are "exposed . . . to potential liability for the difference between the suppressed rates Defendants pay and the UCR rates," DAPC ¶ 821, while simultaneously complaining that they *are not* allowed to "balance bill" those same patients under the terms of reimbursement agreements negotiated with MultiPlan. *Id.* ¶¶ 338–41 (admitting providers do not balance bill because MultiPlan's contracts with payors prohibit it). In other words, they concede that patients receive the benefit of lower cost-of-care (in the form of lower co-insurance and premiums, for example) to the extent that they receive lower OON reimbursements, but complain that they are unable to charge patients *more* money—hundreds of thousands of dollars for some bills mentioned in the DAPC—because of

MultiPlan. *Id.* ¶ 33. Such charges, even if paid by MCOs and plans, will still harm patients in the form of increased premiums. Plaintiffs are not aggrieved consumers that need the protection of state consumer protection laws, and their interest in collecting greater reimbursements from MCOs and plan sponsors by billing exorbitant amounts is not what consumer protection statues were designed to protect. *See Clark*, 2005 WL 1027125, at *4.

Second, Plaintiffs allege the "eventual denial of services by and/or closure of certain providers (particularly in rural areas), thereby suppressing consumer choice of out-of-network goods and services." DAPC ¶ 821. But Plaintiffs do not connect the alleged risk of provider closures to MultiPlan's services or reimbursement rates for OON care. Indeed, they assert that some rural hospitals are at "risk of closing because they are losing money on patient services," *id.* ¶ 594, but have not alleged and cannot allege that the OON reimbursement rates at issue are below cost. And the assertion that patients may "eventually" be denied services is speculative and contradicted by their own allegation that providers *are not* turning away patients. *Id.* ¶ 522.

Finally, Plaintiffs' consumer protection claims should be dismissed because they fail to allege (1) any specific deceptive misrepresentation as required under Arizona, California, and Minnesota law; (2) reliance on any alleged statement as required by Arizona and Minnesota law; or (3) any category of conduct cognizable under Colorado law. *See* App. B.

### C.     Unjust Enrichment Claim (Count 8)

Plaintiffs' unjust enrichment claim fails for similar reasons. As a threshold matter, the unjust enrichment claims fail along with the antitrust claims because it is based on the same alleged conduct. *See, e.g.*, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 723 (7th Cir. 2011); *Mich Int'l Monetary Inc. v. Vega Cap. London, Ltd.*, 596 F. Supp. 3d 1076, 1099 (N.D. Ill. 2022) (citing *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011)).

In any event, Plaintiffs' unjust enrichment claim is threadbare and insufficient. To state such a claim, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Cleary*, 656 F.3d at 516 (citation omitted). In raising this claim Plaintiffs summarily incorporate and reallege "all of the preceding [837] paragraphs," assert that it is unjust for Defendants to retain any benefits (including fees and premiums) obtained in connection with allegedly suppressed payments for OON goods and services, and recite the state laws under which Plaintiffs pursue unjust enrichment claims. DAPC ¶¶ 838–42. Unjust enrichment is an equitable claim against a defendant who "unjustly retained a benefit to the plaintiff's detriment," and whose "retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Cleary*, 656 F.3d at 516 (citation omitted).

Despite the nuanced differences in the common law elements of unjust enrichment in each state, *see* App. C, Plaintiffs have simply "*listed* claims under various state laws" rather than "truly *pleaded* claims under those laws sufficient to show their entitlement to recovery" as required by Rule 8. *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d at 725–26; *see* DAPC ¶ 840. "[U]njust enrichment is not a catch-all claim existing within the narrow scope of federal common law," but instead a state-specific remedy that requires state-specific allegations. *In re Actos End Payor Antitrust Litig.*, 2015 WL 5610752, at *28 (S.D.N.Y. Sept. 22, 2015) (citation omitted), *aff'd in part*, 848 F.3d 89 (2d Cir. 2017).

What little Plaintiffs have pleaded does not state an unjust enrichment claim. DAPC ¶ 841. Defendants' retention of payments is not unjust. The retention of fees by MultiPlan and premiums by the MCO/TPA Defendants does not violate the antitrust laws. And there is nothing fundamentally wrong with receiving those payments in exchange for services. MultiPlan and its

39

clients are only alleged to have applied various customized methodologies to determine fair compensation for OON services, at rates generally greater than those offered by Medicare or in-network. *See supra* at 9–11. Plaintiffs do not plausibly plead that their preferred reimbursement amount—the "UCR price"—was the competitive, market rate. DAPC ¶ 841.

This claim should also be dismissed because the laws of the states under which it is brought (Illinois, South Dakota, Hawaii, Utah, Arizona, Minnesota, California, Florida, New Jersey, New Hampshire, and New York) provide Plaintiffs an adequate remedy at law and/or Plaintiffs' claims are duplicative. *See* App. C. The fact that Plaintiffs are pursuing claims under antitrust and consumer protection laws belies any argument that no adequate remedy is available.

## VI. THERE ARE NO FACTUAL ALLEGATIONS AS TO MANY DEFENDANTS

Finally, the DAPC alleges essentially zero facts about the new TPA Defendants—named only in the direct action cases—and these Defendants (listed *supra* at footnote 2) should be dismissed on this ground as well. A complaint must give notice to each defendant as to what it allegedly did wrong and, as noted, cannot improperly lump defendants together. *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013). "A complaint based on a theory of collective responsibility must be dismissed" and "it remains essential to show that a particular defendant joined the conspiracy and knew of its scope." *Id.* The TPA Defendants are named and then subject only to passing references, including allegations made on "information and belief" basis. This is improper, and the TPA Defendants should be dismissed for this reason as well.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court dismiss the Master Consolidated DAP Complaint and Short Form Complaints with prejudice.

Dated: January 16, 2025

Respectfully Submitted,

| | |
|---|---|
| /s/ Sadik Huseny | /s/ E. Desmond Hogan (w/ consent) |
| Sadik Huseny (*pro hac vice*) | E. Desmond Hogan |
| **LATHAM AND WATKINS LLP** | Justin W. Bernick |
| 300 Colorado Street, Suite 2400 | W. David Maxwell (*pro hac vice*) |
| Austin, TX 78701 | **HOGAN LOVELLS US LLP** |
| Telephone: (737) 910-7300 | 555 Thirteenth Street, N.W. |
| sadik.huseny@lw.com | Washington, D.C. 20004 |
| | Telephone: (202) 637-5600 |
| Gary Feinerman (IL Bar No. 6206906) | desmond.hogan@hoanlovells.com |
| **LATHAM AND WATKINS LLP** | justin.bernick@hoganlovells.com |
| 330 N Wabash Avenue, Suite 2800 | david.maxwell@hoganlovells.com |
| Chicago, IL 60611 | |
| Telephone: (312) 876-7700 | Jordan D. Teti |
| gary.feinerman@lw.com | **HOGAN LOVELLS US LLP** |
| | 1999 Avenue of the Stars, Suite 1400 |
| Lawrence E. Buterman (*pro hac vice*) | Los Angeles, CA 90067 |
| Katherine A. Rocco (*pro hac vice*) | Telephone: (310) 785-4600 |
| **LATHAM AND WATKINS LLP** | jordan.teti@hoganlovells.com |
| 1271 Avenue of the Americas | |
| New York, NY 10020 | *Attorneys for Defendants Elevance Health, Inc.;* |
| Telephone: (212) 906-1200 | *Horizon Healthcare Services, Inc. (Horizon* |
| lawrence.buterman@lw.com | *Blue Cross and Blue Shield of New Jersey);* |
| katherine.rocco@lw.com | *BCBSM, Inc. (Blue Cross and Blue* |
| | *Shield of Minnesota); Aware Integrated, Inc.;* |
| Anna M. Rathbun (*pro hac vice*) | *Blue Cross and Blue Shield of Massachusetts,* |
| Graham B. Haviland (*pro hac vice*) | *Inc.; and CareFirst, Inc.* |
| **LATHAM AND WATKINS LLP** | |
| 555 Eleventh Street, NW | /s/ Katherine A. Trefz (w/ consent) |
| Suite 1000 | Jonathan B. Pitt |
| Washington, DC 20004 | Katherine A. Trefz |
| Telephone: (202) 637-2200 | Feyilana Lawoyin |
| anna.rathbun@lw.com | **WILLIAMS & CONNOLLY LLP** |
| graham.haviland@lw.com | 680 Maine Avenue, S.W. |
| | Washington, DC 20024 |
| Craig Lewis Caesar (IL Bar. No 3121593) | Telephone: (202) 434-5000 |
| **PHELPS DUNBAR LLP** | jpitt@wc.com |
| 365 Canal Street, Suite 2000 | ktrefz@wc.com |
| New Orleans, LA 70130 | flawoyin@wc.com |
| Telephone: (504) 584-9272 | |
| craig.caesar@phelps.com | *Attorneys for Defendant Aetna Inc.* |

Errol J. King (*pro hac vice*)
Katherine Mannino (*pro hac vice*)
**PHELPS DUNBAR LLP**
II City Plaza
400 Convention Street, Suite 1100
Baton Rouge, LA 70802
Telephone: (225) 376-0279
errol.king@phelps.com
katie.manino@phelps.com

*Attorneys for Defendants MultiPlan, Inc.;*
*MultiPlan Corporation; National Care*
*Network, LLC; Viant Payment Systems, Inc.;*
*Viant, Inc.; and Medical Audit & Review*
*Solutions, Inc.*

/s/ *Scott Jared Fisher (w/ consent)*
Scott Jared Fisher
Eric Y. Choi
**NEAL, GERBER & EISENBERG**
Two North LaSalle Street, Suite 1700
Chicago, IL 60602
Telephone: (312) 269-8035
sfisher@nge.com
echoi@nge.com

Rachel S. Brass (*pro hac vice*)
Henry H. Cornillie
**GIBSON, DUNN & CRUTCHER LLP**
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: (415) 393-8293
rbrass@gibsondunn.com
hcornillie@gibsondunn.com

Joshua Lipton (*pro hac vice*)
Kristen C. Limarzi (*pro hac vice*)
**GIBSON, DUNN & CRUTCHER LLP**
1700 M Street, N.W.
Washington, DC 20036
Telephone: (202) 955-8500
jlipton@gibsondunn.com
klimarzi@gibsondunn.com

/s/ *Daniel R. Campbell (w/ consent)*
Daniel R. Campbell
Emilie E. O'Toole
**MCDERMOTT, WILL & EMERY LLP**
444 West Lake Street, Suite 4000
Chicago, IL 60606
Telephone: (312) 984-7782
dcampbell@mwe.com
eotoole@mwe.com

Joshua B. Simon (*pro hac vice*)
Warren Haskel (*pro hac vice*)
Dmitriy G. Tishyevich (*pro hac vice*)
Caroline Incledon (*pro hac vice*)
Chelsea Edith Rae Cosillos (*pro hac vice*)
**MCDERMOTT, WILL & EMERY LLP**
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 547-5444
jsimon@mwe.com
whaskel@mwe.com
dtishyevich@mwe.com
cincledon@mwe.com
ccosillos@mwe.com

*Attorneys for Defendant The Cigna Group*

/s/ *Brian P. Kavanaugh (w/ consent)*
Brian P. Kavanaugh
Scott D. Stein
**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
bkavanaugh@sidley.com
sstein@sidley.com

*Attorneys for Defendant Health Care*
*Service Corporation and the Central States*
*Southeast and Southwest Health and*
*Welfare Fund*

Heather L. Richardson (*pro hac vice*)
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
hrichardson@gibsondunn.com

*Attorneys for Defendant UnitedHealth Group, Inc*

/s/  Christopher S. Moore(w/ consent)
Christopher S. Moore (IL Bar. No. 6256418)
**CHRIS MOORE LAW LLC**
220 North Green Street
Suite 4031
Chicago, Illinois 60607
Telephone: (312) 704-4444
*chris@chrismoorelaw.com*

Richard G. Douglass (IL Bar. No. 6282777)
**DOUGLASS P.C.**
77 W. Wacker Drive
Suite 4500
Chicago, IL 60601
Telephone: (312) 216-5145
*rich@douglasspc.com*

*Attorneys for Defendant Allied National, LLC*

/s/  Jason C. Murray (w/ consent)
Jason C. Murray (*pro hac vice*)
Jordan L. Ludwig (*pro hac vice*)
**CROWELL & MORING LLP**
515 South Flower Street, 40th Floor
Los Angeles, CA 90071
Telephone: (213) 662-4750
jmurray@crowell.com
jludwig@crowell.com

Jason P. Stiehl
**CROWELL & MORING LLP**
455 North Cityfront Plaza Drive Suite 3600
Chicago, IL 60611
Telephone: (312) 321-4200
jstiehl@crowell.com

/s/  Stephen D. Libowsky (w/ consent)
Stephen D. Libowsky (IL Bar No. 6187081)
Rebecca A. Finkel (IL Bar No. 6317199)
**MANATT, PHELPS & PHILLIPS, LLP**
151 North Franklin Street
Chicago, Illinois 60606
Telephone: (312) 529-6300
slibowsky@manatt.com
rfinkel@manatt.com

Gregory N. Pimstone (*pro hac vice*)
**MANATT, PHELPS & PHILLIPS, LLP**
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 312-4000
gpimstone@manatt.com

*Attorneys for Defendant Blue Shield of California Life & Health Insurance Company*

/s/ James W. Davidson
James W. Davidson
Riley B. Olson
**O'HAGAN MEYER LLC**
One East Wacker Drive, Suite 3400
Chicago, Illinois 60601
Telephone: (312) 422-6100
jdavidson@ohaganmeyer.com
rolson@ohaganmeyer.com

*Attorneys for Defendant Secure Health Plans of Georgia, L.L.C.*

/s/  William J. Sheridan (w/ consent)
William J. Sheridan (*pro hac vice*)
Courtney Bedell Averbach (*pro hac vice*)
Leah E. Hungerman (*pro hac vice*)
**REED SMITH LLP**
225 Fifth Avenue
Pittsburgh, PA 15222
(412) 288-3131
wsheridan@reedsmith.com
caverbach@reedsmith.com
lhungerman@reedsmith.com

*Counsel for Defendant Highmark Health*

Ashley L. McMahon (*pro hac vice*)
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 624-2500
amcmahon@crowell.com

*Attorneys for Defendant Kaiser Foundation Health Plan, Inc.*

/s/ *John J. Hamill (w/ consent)*
John J. Hamill
john.hamill@us.dlapiper.com
Michael S. Pullos
michael.pullos@us.dlapiper.com
**DLA PIPER LLP (US)**
444 West Lake Street, Suite 900
Chicago, Illinois 60606
Tel: 312.368.3423
Fax: 312.251.5728

*Attorneys for Defendants Benefit Plan Administrators of Eau Claire, LLC and Consociate, Inc. (Consociate Health)*

/s/ *Lynn H. Murray (w/ consent)*
Lynn H. Murray
Riley C. Mendoza
Samuel G. Bernstein
**SHOOK, HARDY & BACON LLP**
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Telephone: (312) 704-7700
lhmurray@shb.com
rmendoza@shb.com
sbernstein@shb.com

Ryan Sandrock
**SHOOK, HARDY & BACON LLP**
555 Mission St,
San Francisco, CA 94105
Telephone: (415)544.1900
rsandrock@shb.com

*Attorneys for Defendant Molina Healthcare, Inc.*

/s/ *Stephen D. Libowsky (w/ consent)*
Stephen D. Libowsky (IL Bar No. 6187081)
Rebecca A. Finkel (IL Bar No. 6317199)
**MANATT, PHELPS & PHILLIPS, LLP**
151 North Franklin Street
Chicago, Illinois 60606
Telephone: (312) 529-6300
slibowsky@manatt.com
rfinkel@manatt.com

Ileana Hernandez (*pro hac vice forthcoming*)
**MANATT, PHELPS & PHILLIPS, LLP**
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 312-4000
ihernandez@manatt.com

*Attorneys for Defendant Sanford Health Plan*