**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| In re MULTIPLAN HEALTH INSURANCE PROVIDER LITIGATION<br><br><br>*This Document Relates To:*<br>ALL DIRECT ACTION PLAINTIFF ACTIONS | Case No. 1:24-cv-06795<br><br>MDL No. 3121<br><br>Hon. Matthew F. Kennelly |

**DIRECT ACTION PLAINTIFFS'**
**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND .................................................................................................. 1

I.  Defendants are Competitors.......................................................................................... 1

II.  Defendants Agreed to Stop Competing on OON Pricing .............................................. 2

III.  Defendants' Agreements Harm Market-Wide Competition ........................................... 4

ARGUMENT ........................................................................................................................... 4

I.  Defendants Cannot Use a Motion to Dismiss to Rewrite DAPs' Complaint ................... 4

II.  Defendants' Pricing Agreements Are *Per Se* Illegal ...................................................... 6

    A.  DAPs Plead a Horizontal Agreement in Restraint of Trade (Count 1)................... 7

        1.  Defendants Cannot Recast Their Horizontal Agreement as a Vertical One ........................................................................................ 9

        2.  Defendants Cannot Recast the Nature of their Horizontal Competition ................................................................................... 12

        3.  Defendants Cannot Argue That Their Price-Fixing Is "Reasonable." .......................................................................... 12

        4.  The Hotel Algorithm Cases Highlight the Strength of DAPs' Claims ........................................................................................ 13

    B.  DAPs Allege a *Per Se* Unlawful "Hub-And-Spoke" Cartel (Count 2)................ 15

        1.  DAPs Plead Parallel Pricing Strategy and Parallel Pricing ..................... 16

        2.  DAPs Plead Plus Factors That Holistically Show the Existence of a Cartel ...................................................................................... 19

    C.  MultiPlan Facilitated a *Per Se* Unlawful Cartel (Count 3)................................. 21

III.  Defendants' Agreements also Violate the Rule of Reason (Counts 4 and 5) ................. 22

    A.  DAPs Allege an Information Exchange Agreement............................................. 23

    B.  DAPs Allege a Relevant Market for OON Services in the United States ........... 24

    C.  DAPs Allege Harm to Competition in the Market for OON Services................. 28

    D.  There Are No Procompetitive Justifications for Defendants' Cartel.................... 30

IV.  DAPs Allege Antitrust Injury and Standing ................................................................ 31

    A.  DAPs Plead Antitrust Injury ............................................................................. 31

    B.  DAPs Plead Antitrust Standing......................................................................... 32

V.  DAPs Plead Facts Showing that Each Defendant Participated in the Cartel ................. 35

VI.  DAPs Allege State Law and Unjust Enrichment Claims (Counts 6-8) ........................ 36

    A.  DAPs Allege State Antitrust Statute Claims (Count 6) ...................................... 36

    B.  DAPs Allege State Consumer Protection Statute Claims (Count 7).................... 36

    C.  DAPs Allege Unjust Enrichment Claims (Count 8) ........................................... 38

VII.  Alternatively, Leave to Amend Should be Granted...................................................... 39

CONCLUSION...................................................................................................................... 39

## <u>TABLE OF ABBREVIATIONS</u>

| | |
|---|---|
| DAPs | Direct Action Plaintiffs |
| Defendants | The Defendants and Co-Conspirators listed in the DAPs' Master Complaint |
| DC | DAPs' Master Complaint, Dkt. 182 |
| DB | Defendants' Opening Brief in Support of their Motion to Dismiss the Direct Action Plaintiffs' Master Complaints and Short-Form Complaints, Dkt. 286 |
| DB Ex. | Exhibit to the Declaration of Sadik Huseny in Support of Defendants' Motion to Dismiss the Direct Action Plaintiffs' Master Complaints and Short-Form Complaints, Dkt. 287 |
| CB | Defendants' Opening Brief in Support of their Motion to Dismiss the Class Action Plaintiffs' Amended Consolidated Complaint, Dkt. 283 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aetna UCR Litig.*,
2015 WL 3970168 (D.N.J. 2015) ....................................................................21, 26

*Albrecht v. Herald Co.*,
390 U.S. 145 (1968) ..................................................................................................21

*Always Towing & Recovery, Inc. v. City of Milwaukee*,
2 F. 4th 695 (7th Cir. 2021) ..................................................................................7, 10

*Am. Needle, Inc. v. NFL*,
560 U.S. 183 (2010) ................................................................................................9, 13

*Apple Inc. v. Pepper*,
587 U.S. 273 (2019) ..................................................................................................34

*Arizona v. Maricopa Cnty. Med. Soc'y*,
457 U.S. 332 (1982) ..................................................................................................15

*Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*,
2020 WL 5642941 (N.D. Ill. 2020), *aff'd*, 15 F. 4th 831 (7th Cir. 2021)..............15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................................... *passim*

*Biden v. Texas*,
597 U.S. 785 (2022) ..................................................................................................35

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995), *as amended* (Oct. 13, 1995) ........................26, 27, 33

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
881 F. Supp. 1309 (W.D. Wis. 1994) ......................................................26, 27, 33

*Blue Shield of Va. v. McCready*,
457 U.S. 465 (1982) ..................................................................................................34

*Broad. Music, Inc. v. CBS, Inc.*,
441 U.S. 1 (1979) ......................................................................................................11

*In re Broiler Chicken Antitrust Litig.*,
2025 WL 461407 (N.D. Ill. 2025) ...........................................................................31

*In re Broiler Chicken Antitrust Litig.*,
  290 F. Supp. 3d 772 (N.D. Ill. 2017) .......................................................................... *passim*

*Brooks v. Ross*,
  578 F.3d 574 (7th Cir. 2009) ....................................................................................6

*Bus. Elecs. Corp. v. Sharp Elec. Corp.*,
  485 U.S. 717 (1988)...................................................................................................11

*Carbone v. Brown Univ.*,
  621 F. Supp. 3d 878 (N.D. Ill. 2022) .......................................................................... *passim*

*Catalano, Inc. v. Target Sales, Inc.*,
  446 U.S. 643 (1980)............................................................................................15, 32

*Citizen Publ'g Co. v. United States*,
  394 U.S. 131 (1969)...................................................................................................15

*City of New York v. Grp. Health Inc.*,
  649 F.3d 151 (2d Cir. 2011)......................................................................................28

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962)...................................................................................................19

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
  906 F.2d 432 (9th Cir. 1990) ....................................................................................24

*Copperweld v. Indep. Tube Corp.*,
  467 U.S. 752 (1984)...................................................................................................12

*Cornish-Adebiyi v. Caesars Ent., Inc.*,
  2024 WL 4356188 (D.N.J. 2024). .......................................................................13, 14

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
  801 F.3d 758 (7th Cir. 2015) ...................................................................................7, 23

*Davitashvili v. Grubhub Inc.*,
  2022 WL 958051 (S.D.N.Y. 2022)............................................................................30

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
  903 F. Supp. 2d 198 (S.D.N.Y. 2012) .......................................................................37

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  2018 WL 6629250 (N.D. Ill. 2018) ............................................................................8

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  313 F. Supp. 3d 931 (N.D. Ill. 2018) .........................................................................5

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  362 F. Supp. 3d 477 (N.D. Ill. 2019) ..............................................................23, 31

*In re Deere & Co. Repair Serv. Antitrust Litig.*,
  703 F. Supp. 3d 862 (N.D. Ill. 2023) ............................................................. *passim*

*In re Delta Dental Antitrust Litig.*,
  484 F. Supp. 3d 627 (N.D. Ill. 2020) ............................................................. *passim*

*Denny's Marina, Inc. v. Renfro Prods., Inc.*,
  8 F.3d 1217 (7th Cir. 1993) ........................................................................11

*Deslandes v. McDonald's USA, LLC*,
  81 F.4th 669 (7th Cir. 2023) .......................................................................30

*Duffy v. Yardi Systems, Inc.*,
  2024 WL 4980771 (W.D. Wash. 2024)..............................................8, 10, 15, 16

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992)...................................................................................28

*In re Effexor Antitrust Litig.*,
  357 F. Supp. 3d 363 (D.N.J. 2018) ...............................................................37

*Elward v. Electrolux Home Prods., Inc.*,
  264 F. Supp. 3d 877 (N.D. Ill. 2017) .............................................................18

*In re Flat Glass Antitrust Litig.*,
  385 F.3d 350 (3d Cir. 2004).....................................................................15, 18

*Franco v. Conn. Gen. Life Ins. Co.*,
  818 F. Supp. 2d 792 (D.N.J. 2011) ............................................................21, 26

*FTC v. Super. Ct. Trial Laws. Ass'n*,
  493 U.S. 411 (1990)...................................................................................13

*Gelboim v. Bank of Am. Corp.*,
  823 F.3d 759 (2d Cir. 2016).........................................................................35

*Gibson v. Cendyn Group, LLC*,
  2024 WL 2060260 (D. Nev. 2024) ................................................................14

*Gibson v. MGM Resorts Int'l*,
  2023 WL 7025996 (D. Nev. 2023) .............................................................13, 14

*Goldfarb v. Va. State Bar*,
  421 U.S. 773 (1975)...................................................................................14

*GPS of N.J. M.D., P.C. v. Horizon Blue Cross & Blue Shield*,
  2023 WL 5815821 (D.N.J. 2023) ...................................................................35

*In re Graphics Processing Units Antitrust Litig.*,
  527 F. Supp. 2d 1011 (N.D. Cal. 2007) .......................................................17

*Hawaii v. Standard Oil Co. of Cal.*,
  405 U.S. 251 (1972).......................................................................................33

*Hytera Commc'ns Corp. v. Motorola Sols., Inc.*,
  623 F. Supp. 3d 857 (N.D. Ill. 2022) ...........................................................37

*Ill. Brick Co. v. Illinois*,
  431 U.S. 720 (1977).......................................................................................34

*In re Int. Rate Swaps Antitrust Litig.*,
  261 F. Supp. 3d 430 (S.D.N.Y. 2017)...........................................................19

*Int'l Outsourcing Servs., LLC v. Blistex, Inc.*,
  420 F. Supp. 2d 860 (N.D. Ill. 2006) ...........................................................15

*Int'l Travel Arrangers, Inc. v. W. Airlines, Inc.*,
  623 F.2d 1255 (8th Cir. 1980) ......................................................................21

*Interstate Cir. v. United States*,
  306 U.S. 208 (1939).......................................................................................17

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
  383 F. Supp. 3d 187 (S.D.N.Y. 2019)...........................................................11

*Kleen Prods., LLC v. Packaging Corp. of Am.*,
  775 F. Supp. 2d 1071 (N.D. Ill. 2011) .........................................................17

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
  232 F.3d 979 (9th Cir. 2000) ........................................................................32

*Kraft Foods Glob., Inc. v. United Egg Producers, Inc.*,
  2023 WL 6065308 (N.D. Ill. 2023) ...............................................................16

*In re Late Fee & Over-Limit Fee Litig.*,
  528 F. Supp. 2d 953 (N.D. Cal. 2007) .........................................................17

*Little Rock Cardiology Clinic PA v. Baptist Health*,
  591 F.3d 591 (8th Cir. 2009) ........................................................................27

*In re Loc. TV Advert. Antitrust Litig*,
  2020 WL 6557665 (N.D. Ill. 2020) .........................................................20, 29

*In re Loc. TV Advert. Antitrust Litig*,
   2022 WL 3716202 (N.D. Ill. 2020) ...................................................................22

*Long Island Anesthesiologists PLLC v. United Healthcare Insurance Company of New York, Inc.*,
   2023 WL 8096909 (E.D.N.Y. 2023)................................................................9, 10

*Marion Diagnostic Center, LLC v. Becton Dickinson & Co.*,
   29 F.4th 337 (7th Cir. 2022) .......................................................................32, 33

*Marion Healthcare LLC v. S. Ill. Healthcare*,
   2013 WL 4510168 (S.D. Ill. 2013)...................................................................27

*Moehrl v. Nat'l Ass'n of Realtors*,
   492 F. Supp. 3d 768 (N.D. Ill. 2020) ...............................................................17

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984).........................................................................................16

*In re Musical Instr. & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) .........................................................................17

*Nat'l Soc. of Prof'l Eng'rs v. United States*,
   435 U.S. 679 (1978).........................................................................................12

*N. Jackson Pharm., Inc. v. Caremark RX, Inc.*,
   385 F. Supp. 2d 740 (N.D. Ill. 2005) ...............................................................22

*Norfolk Monument Co. v. Woodlawn Mem'l Gardens, Inc.*,
   394 U.S. 700 (1969).........................................................................................14

*Ohio v. Am. Express Co.*,
   585 U.S. 529 (2018).........................................................................................23

*Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*,
   2020 WL 6134982 (N.D. Ill. 2020) ........................................................23, 24, 36

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
   524 F. Supp. 2d 1031 (N.D. Ill. 2007) ..................................................6, 31, 33, 34

*Osterhaus Pharm., Inc. v. Express Scripts, Inc.*,
   2025 WL 486195 (W.D. Wash. 2025)...............................................................12

*In re Outpatient Med. Ctr. Emp. Antitrust Litig.*,
   630 F. Supp. 3d 968 (N.D. Ill. 2022) ...............................................................35

*Pac. Recovery Sols. v. Cigna Behav. Health, Inc.*,
   2021 WL 1176677 (N.D. Cal. 2021) ...........................................................26, 34

*Pac. Recovery Sols. v. United Behav. Health*,
   481 F. Supp. 3d 1011 (N.D. Cal. 2020) ......................................................................34, 35

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
   911 F.3d 505 (8th Cir. 2018) ..........................................................................................17

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
   764 F. Supp. 2d 991 (N.D. Ill. 2011) ..............................................................................17

*In re Processed Egg Prods. Antitrust Litig.*,
   851 F. Supp. 2d 867 (E.D. Pa. 2012) ..............................................................................38

*In re RealPage, Inc., Rental Software Antitrust Litig.*,
   709 F. Supp. 3d 478 (M.D. Tenn. 2023) .....................................................................18, 19

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
   792 F.2d 210 (D.C. Cir. 1986) ........................................................................................10

*Run it First v. CVS Pharm.*,
   2022 WL 484862 (S.D. Fla. 2022) ..................................................................................17

*Sanner v. Bd. of Trade of City of Chicago*,
   62 F.3d 918 (7th Cir. 1995) ........................................................................................32, 33

*In re Se. Milk Antitrust Litig.*,
   739 F.3d 262 (6th Cir. 2014) ..........................................................................................10

*Sere v. Br. of Trustees of Univ. of Ill.*,
   852 F.2d 285 (7th Cir. 1988) ..........................................................................................15

*Sloan v. Anker Innovations Ltd.*,
   711 F. Supp. 3d 946 (N.D. Ill. 2024) ..............................................................................35

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig*,
   2024 WL 4532937 (N.D. Cal. 2024) ...............................................................................37

*N.Y. ex rel. Spitzer v. St. Francis Hosp.*,
   94 F. Supp. 2d 399 (S.D.N.Y. 2000).................................................................................15

*In re Sulfuric Acid Antitrust Litig.*,
   743 F. Supp. 2d 827 (N.D. Ill. 2010) ..........................................................................11, 12

*Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*,
   902 F.3d 735 (7th Cir. 2018) ..........................................................................................36

*Tera Grp., Inc. v. Citigroup, Inc.*,
   2019 WL 3457242 (S.D.N.Y. 2019).................................................................................20

*In re Terazosin Hydrochloride Antitrust Litig.*,
220 F.R.D. 672 (S.D. Fla. 2004) .........................................................................38

*In re Text Messaging Antitrust Litig.*,
2010 WL 1782006 (N.D. Ill. 2010) ..............................................................30, 39

*In re Text Messaging Antitrust Litig.*,
630 F.3d 622 (7th Cir. 2010) ...........................................................................8, 20

*Tiz, Inc. v. S. Glazer's Wine & Spirits*,
2024 WL 2785142 (N.D. Ill. 2024) .....................................................................16

*Toys "R" Us, Inc. v. FTC*,
221 F.3d 928 (7th Cir. 2000) ...............................................................................11

*In re Turkey Antitrust Litig.*,
642 F. Supp. 3d 711 (N.D. Ill. 2022) ...................................................................20

*United States v. Apple, Inc.*,
791 F.3d 290 (2d Cir. 2015).................................................................................11

*United States v. Beaver*,
515 F.3d 730 (7th Cir. 2008) ...............................................................................18

*United States v. Socony-Vacuum Oil Co.*,
310 U.S. 150 (1940)...................................................................12, 13, 18, 33

*USFL v. NFL*,
842 F.2d 1335 (2d Cir. 1988)...............................................................................20

*VHS Liquidating Trust v. Multiplan Corp.*,
No. CGC-21-594966 (Cal. Super. Ct. 2024) .......................................................26

*Vital Pharms., Inc. v. Berlin Packaging LLC*,
632 F. Supp. 3d 780 (N.D. Ill. 2022) ...................................................................11

*Vogel v. Am. Soc. of Appraisers*,
744 F.2d 598 (7th Cir. 1984) ..........................................................................13, 32

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
627 F.3d 85 (3d Cir. 2010)............................................................................13, 31

*Wash. Cnty. Health Care Auth. v. Baxter Int'l*,
328 F. Supp. 3d 824 (N.D. Ill. 2018) ...................................................................17

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
903 F. Supp. 2d 880 (C.D. Cal. 2012) ..................................................................35

*In re Wheat Rail Freight Rate Antitrust Litig.*,
    579 F. Supp. 517 (N.D. Ill. 1984), *aff'd* 759 F.2d 1305 (7th Cir. 1985) ...............................13

*Wiegand v. Walser Auto. Groups, Inc.*,
    683 N.W.2d 807 (Minn. 2004)...............................................................................................37

**Statutes**

42 U.S.C. § 300gg-111 ...............................................................................................................34, 35

Colo. Rev. Stat. Ann. § 6-1-105...............................................................................................37, 38

Minn. Stat. § 325F.68 subd. 8 ........................................................................................................37

**Rules**

Fed. R. Civ. P. 8(d)(2)....................................................................................................................38

## INTRODUCTION

DAPs have caught Defendants red-handed. Unlike most antitrust cases where pleadings are built on supposition and inference, DAPs already have reams of *direct evidence*, including details of the contracts, meetings, and presentations that make up the cartel. DAPs cite business documents, admissions, and sworn testimony showing that (1) Defendants previously competed on out-of-network ("OON") pricing; (2) Defendants agreed to stop competing on OON pricing; and (3) that agreement directly harmed healthcare providers by paying them billions of dollars less than they would have been paid but-for the cartel. Thus, DAPs' 244-page, 847-paragraph Complaint does far more than plead plausible antitrust and state law claims.

Defendants raise no pleading-stage arguments to the contrary. The fact-bound arguments they do raise should be rejected. ***First***, Defendants ignore the DAPs' actual allegations and improperly rest their motion on their own alternative factual narrative. ***Second***, Defendants ignore the wealth of direct and circumstantial evidence showing the existence of a *per se* violation of the antitrust laws. ***Third***, Defendants ignore the extensive facts establishing market definition, market power, and market harm in support of DAPs' rule of reason claims. ***Fourth***, DAPs are directly harmed by the cartel, and Defendants' arguments to the contrary merely dispute the factual allegations in DAPs' pleadings. DAPs have antitrust standing and suffered antitrust injury. ***Finally***, Defendants' state law arguments fail for substantially the same reasons.

## FACTUAL BACKGROUND

### I.    Defendants are Competitors

Healthcare providers ("providers"), such as doctors, provide care to patients. DC ¶ 516. However, patients do not purchase the vast majority of healthcare. *Id* ¶ 89. Instead, third-party payors ("payors") purchase those services. *Id.* ¶ 551. Payors include health insurance companies, such as Aetna; Blue Cross/Blue Shield plans; and third-party administrators ("TPAs"). *Id.* ¶ 88.

Providers sell two distinct types of services to payors: in-network services and OON services. DC ¶ 99. For in-network services, providers and payors negotiate the prices for those services in advance and enter into a contract specifying those prices. *Id.* OON services are entirely different. *Id.* ¶ 100. Providers care for a patient that needs OON services and then submit a bill to a payor. *Id.* ¶¶ 102-03, 143-44. The payor reviews the bill, sets a price for those OON services, and then pays the provider directly. *Id.* ¶¶ 110, 143, 154, 342.

Defendants are payors. DC ¶ 88. Prior to the cartel, they competed with one another by independently setting prices for OON services. *Id.* ¶¶ 98, 297. This pricing competition incentivized each payor to set reasonable OON prices to ensure providers would provide OON services to their subscribers. *Id.* ¶¶ 27, 120.

Defendants are competitors. DC ¶ 23. They compete against one another with respect to OON pricing. *Id.* ¶¶ 97, 116, 129. MultiPlan[1] competes directly against payors. It has repeatedly told its shareholders that it competes against other payors on the basis of OON pricing. *Id.* ¶¶ 117-19, 121. Other payors, providers, and regulators recognize that MultiPlan is a payor. *Id.* ¶¶ 115, 122-27. And indisputable data shows that MultiPlan is a payor. *Id.* ¶¶ 110-13. As MultiPlan's then-CEO put it, "***Our clients are our competitors; our competitors are our clients***." *Id.* ¶¶ 23, 119.

## II.     Defendants Agreed to Stop Competing on OON Pricing

From 1996 to 2008, major payors used a pricing methodology developed by UnitedHealthcare, known as Ingenix, to conspire with one another on OON pricing. DC ¶ 4. But in 2009, the New York Attorney General ("NYAG") discovered the conspiracy and forced the cartelists to enter into settlements requiring them to independently price OON services. *Id.* ¶ 5.

---

[1] Since this litigation began, MultiPlan has conceded that it is subject to government investigations; replaced its CEO, COO, CFO, and general counsel; and changed its name to "Claritev." DAPs continue to use "MultiPlan" here for consistency with their pleadings.

When the Ingenix conspiracy ended, MultiPlan saw a business opportunity. It acquired an OON pricing methodology that it marketed as an "alternative" to Ingenix. DC ¶ 7. As each payor's settlement with NYAG was expiring, MultiPlan pitched them on using MultiPlan's pricing methodology instead of competing on OON pricing. *Id.* MultiPlan told them that their competitors were using its OON pricing methodology, and by joining, they could align with their competitors, producing billions of dollars in revenue by underpaying doctors. *Id.* ¶¶ 219, 221, 238, 247, 444.

Between 2015 and 2018, as their NYAG settlement obligations expired, payors entered into written contracts to use MultiPlan's OON pricing methodology. DC ¶¶ 169-79, 289. In these contracts, payors agree to send their OON bills to MultiPlan. *Id.* ¶ 142. MultiPlan ingests those bills into a massive, commingled pricing database. *Id.* ¶ 310. Then, MultiPlan uses various calculations to determine exactly how low it can set the price for an OON service. *Id.* ¶ 345. If the price generated by the methodology is still too generous, a pre-agreed maximum price cap lowers the price further. *Id.* ¶ 142. Using MultiPlan's OON pricing methodology, Defendants set parallel prices for OON services. *Id.* ¶¶ 291-92. The OON prices dictated by MultiPlan are not mere "recommendations"—payors do not deviate from them because MultiPlan prohibits them from doing so. *Id.* ¶¶ 154-56. If a provider tries to push back on the cartel's OON pricing, MultiPlan acts as the enforcer of the cartel. *Id.* ¶¶ 12, 345. It handles inquiries from providers and, armed with reams of competitors' pricing data, undermines any attempt by providers to negotiate appropriate prices for their OON services. *Id.* ¶ 345.[2]

MultiPlan provides a constant stream of non-public information about other payors' OON pricing to competing payors. *Id.* ¶ 9. These prices are competitively-sensitive and provided in real-time, granular form. *Id.* ¶¶ 9, 256, 314-19. MultiPlan communicates this confidential data to other

---

[2] In the rare instance when a provider tries to reject MultiPlan's OON pricing, the cartel sets an even lower price to punish the provider and demand obedience to the cartel's pricing. DC ¶¶ 12, 583-85.

payors through meetings, text messages, telephone calls, its PlanOptix service, and boozy off-the-record meetings at exclusive resorts. *Id.* ¶¶ 21, 222, 261-76, 277-83, 465. Through these frequent communications, payors get MultiPlan's message—by abdicating OON pricing authority to MultiPlan the cartelists can make billions. *Id.* ¶¶ 268, 303.

## III. Defendants' Agreements Harm Market-Wide Competition

Providers are sitting ducks for the cartel. When a provider delivers OON services to a patient, they can only turn to a single payor for payment for those services. DC ¶¶ 524-27, 560. For emergency services, providers are required by law to treat and stabilize patients in need of those services. *Id.* ¶¶ 102, 553-55. Providers can only seek payment from the payor for emergency services. *Id.* ¶¶ 102, 556. For non-emergency services, providers have no practical ability to deny treatment to patients seeking OON services or to collect payment for OON services from anyone other than the payor associated with that patient. *Id.* ¶¶ 103, 520, 526. Since providers can only seek payment from a single payor for OON services, the cartel can rip off providers on a massive scale. *Id.* ¶¶ 28, 292, 577-78, 663. In 2020, MultiPlan set prices for over 370,000 OON claims per day for over 80% of the market, resulting in a total underpayment of approximately $19 billion. *Id.* ¶ 28. These underpayments are gargantuan when compared to the prices that would have existed but-for the cartel. *Id.* ¶¶ 575-78, 587, 663. The cartel also harms patients by leaving providers with less money to invest in the availability and quality of care. *Id.* ¶¶ 588-96. The cartel harms health plan subscribers by charging them massive and bogus fees each time the cartel underpays a doctor. *Id.* ¶¶ 612-27. The cartel enriches Defendants, while hundreds of providers are operating on the brink of insolvency. *Id.* ¶¶ 594-96, 629-60.

## ARGUMENT

## I. Defendants Cannot Use a Motion to Dismiss to Rewrite DAPs' Complaint

Defendants improperly attempt to transform this motion to dismiss into a factual contest.

"There is no heightened pleading standard for antitrust claims." *In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d 627, 639 (N.D. Ill. 2020). Plaintiffs need only plead facts necessary to "nudge[] their claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Courts "view the complaint in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from the allegations in the plaintiff's favor." *Carbone v. Brown Univ.*, 621 F. Supp. 3d 878, 883 (N.D. Ill. 2022). Courts may not "dismiss a complaint that states a plausible version of events merely because the court finds a different version more plausible." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 952 (N.D. Ill. 2018). Nor do they credit a defendant's "series of 'yeah, buts' [that] conflict with [] the prohibition against crediting alternative . . . interpretations of allegations at the motion to dismiss stage." *In re Deere & Co. Repair Serv. Antitrust Litig.*, 703 F. Supp. 3d 862, 905 (N.D. Ill. 2023) (cleaned up). Defendants' brief is just such a litany of irrelevant "yeah buts":

| Defendants' Counter-Narrative | What DAPs' Complaint Actually Says |
|---|---|
| Defendants assert that DAPs' claims are premised on them being competitors in "the distinct business of assembling in-network PPO plans." DB 2. | MultiPlan competes with Defendants on OON claims pricing. *E.g.*, DC ¶¶ 22-23, 120-21. |
| Defendants claim that they are not purchasers of OON services. DB 3. | Defendants purchase OON services. DC ¶ 88, 110, 516, 665-66. |
| Defendants assert that healthcare providers do not have to accept the prices they set for OON services. DB 6, 16. | Providers have no ability to push back on the cartel's pricing or seek payment from anyone else once they have been underpaid by the cartel. *See, e.g.*, DC ¶¶ 13, 375, 524. |
| Defendants claim that DAPs' claims are limited to Data iSight. DB 8-11. | Data iSight is one component of the cartel, but the cartel also includes MultiPlan's Viant, MARS, HST, and Pro Pricer pricing formulas. *See, e.g.*, DC ¶¶ 135-41. |
| Defendants claim that they are creating savings for patients and health plan sponsors. DB 7, 27. | DAPs specifically deny that the cartel generates any savings and explains that no savings are passed on to patients or health plan subscribers. DC ¶¶ 43, 632; *see id.* ¶ 620 (health plan sponsor explaining, "'that's really not savings'"). |

| | |
|---|---|
| Defendants assert they commingle only "public data." DB 8-9, 33-34. | Defendants share their confidential data, and all data is pooled on an ongoing basis through a recursive feedback loop. DC ¶¶ 13, 310, 320. |
| Defendants assert that DAPs allege no coordinated communication or transmission of information on pricing strategy. DB 13, 32-34. | Defendants meet and discuss OON pricing, MultiPlan serves as a go-between to ensure alignment, and MultiPlan has automated the dissemination of pricing strategy communications between payors through its PlanOptix service. DC ¶¶ 16, 215-87, 465-72. |
| Defendants assert that DAPs allege no specific allegations of parallel conduct. DB 23. | MultiPlan generates parallel pricing and eliminates competition by generating identical OON prices across different payors, even where market rates vary significantly geographically. *See* DC ¶ 291-93. Additionally, MultiPlan's own executives testified under oath that its OON pricing methodology leads to parallel pricing. DC ¶ 294-95. |
| Defendants claim the DAPs allege no direct agreement among payors. DB 22-23. | DAPs cite evidence of direct agreements among payors, including contracts between MultiPlan and other payors, as well as internal communications showing price coordination. *See, e.g.*, DC ¶¶ 131-42, 161, 172-76, 218-25. |

At most, these factual disputes show there are ample grounds for discovery.

Defendants misconstrue Rule 12(b)(6) by repeatedly urging the Court to ignore DAPs' factual allegations as "conclusory." *See* DB 8, 12, 14, 15. "Conclusory" allegations are those that merely "parrot the statutory language of the claims that they are pleading." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 524 F. Supp. 2d 1031, 1036-37 (N.D. Ill. 2007) (if a plaintiff pleads facts and not legal conclusions, *Twombly* imposes an "easy-to-clear" hurdle). Here, DAPs do not rely on legal conclusions; DAPs' Complaint is bristling with facts, including contractual language from the cartel agreements, admissions in business documents, photos from cartel meetings, and testimony offered under oath. *See* DC ¶¶ 162-287. Those allegations are not "conclusory" simply because Defendants disagree with them.

## II. Defendants' Pricing Agreements Are *Per Se* Illegal

To plead a claim under Section 1 of the Sherman Act, DAPs must allege "(1) [D]efendants

had a contract, combination, or conspiracy ('an agreement'); (2) as a result, trade in the relevant market was unreasonably restrained; and (3) [the plaintiff was] injured." *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 801 F.3d 758, 762 (7th Cir. 2015). Where the alleged restraint "falls into a certain subset of agreements, known as '*per se*' violations," however, courts "dispense with" the second element and presume that the agreement unreasonably restrained trade. *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F. 4th 695, 704 (7th Cir. 2021).

DAPs plead three alternative forms of an agreement that are *per se* unlawful: (1) a horizontal agreement between MultiPlan and its competitors, (2) a "hub-and-spoke" agreement in which MultiPlan is the "hub" and the other conspirators are the "spokes," and (3) an agreement between competing payors that was facilitated by MultiPlan. These three types of agreements require different factual allegations. For a horizontal agreement, DAPs must plead facts showing that MultiPlan and other payors are competitors and that they entered into agreements. *Infra* § II.A. By contrast, a hub-and-spoke agreement does not require evidence that MultiPlan competes against payors. Rather, DAPs must show that MultiPlan (the hub) entered into agreements with payors (the spokes) and that the payors had an understanding that they would use MultiPlan's pricing methodology to underpay healthcare providers (the rim). *Infra* § II.B. Likewise, a facilitation-based agreement does not require proof that MultiPlan competes against payors, but does require DAPs to show that MultiPlan facilitated an agreement between competing payors to use MultiPlan's pricing methodology to underpay providers. *Infra* § II.C. Since MultiPlan competes with payors and entered into pricing agreements with them, this Court need not reach the alternative theories of agreement, but even if this Court is not convinced that MultiPlan is a payor, Defendants still entered into an agreement that is a *per se* violation of the Sherman Act.

A.      **DAPs Plead a Horizontal Agreement in Restraint of Trade (Count 1)**

To plead a horizontal agreement, a complaint must allege only "enough factual matter

(taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556; *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2018 WL 6629250, at \*11 (N.D. Ill. 2018) ("specific allegations" of "who, what, where, and when" are not required when pleading an agreement). Direct evidence of an agreement—such as a contract or an admission that such an agreement exists—is the "smoking gun" of antitrust law. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010).

*Duffy v. Yardi Systems, Inc.*, 2024 WL 4980771 (W.D. Wash. 2024) is instructive. In *Duffy*, landlords had set rents independently, but then agreed to use a common methodology to set their rents going forward. *Id.* at \*3-4. One of the defendants, Yardi, pitched the landlords on using its methodology and each of the defendants entered into written contracts agreeing to use Yardi to set their rents. *Id.* \*4. Then, the defendants pooled their pricing data and pricing decision-making in Yardi and charged the prices set by Yardi's formula. *Id.* The district court found such allegations sufficient to make out an agreement under Section 1 of the Sherman Act because the plaintiff alleged each defendant was invited to enter into an agreement and accepted that invitation. *Id.*

The allegations here are even stronger. DAPs allege direct evidence that MultiPlan invited each Defendant to join an agreement to use MultiPlan's pricing methodology and each Defendant agreed to do so. DC ¶ 252. Under that agreement, MultiPlan did not merely recommend prices as in *Duffy*; it literally set and enforced those prices on behalf of itself and its co-conspirators. DC ¶¶ 12, 142. DAPs allege the exact dates and contents of agreements between MultiPlan, United, Cigna, Aetna, and Kaiser. *Id.* ¶¶ 169-76, 178. DAPs also cite court records, plan disclosures, and communications with providers in which Elevance, Blue Cross Blue Shield of Michigan, Benefit Plan Administrators, Consociate, Blue Cross Blue Shield of Minnesota, Secure Health, Highmark, HCSC, Horizon, and Allied National all admit they too entered into agreements with MultiPlan. *Id.* ¶¶ 177, 179-92, 197-214. DAPs cite MultiPlan's investor presentations confirming it has

similar agreements with the remaining Defendants. *Id.* ¶¶ 193-96. DAPs also cite meetings, presentations, emails, and internal business documents from MultiPlan that discuss these agreements. *Id.* ¶¶ 216-48.

Defendants do not dispute that these agreements exist. Instead, they improperly raise three factual disputes: (1) that their agreements with MultiPlan are vertical agreements since MultiPlan is not a payor, (2) that MultiPlan's OON pricing methodology is a separate business operating in a separate market, and (3) that the agreements are pro-competitive. Those arguments fail.

### 1.      Defendants Cannot Recast Their Horizontal Agreement as a Vertical One

Defendants' argument that their agreement is vertical fails because it is contrary to the Complaint. DB 25. Defendants are all payors. DC ¶¶ 88, 104, 110. Prior to the cartel, they competed against one another directly as horizontal competitors. *Id.* ¶¶ 23, 104, 120, 731. They did so by independently setting prices, negotiating with providers, and paying for OON services. *Id.* ¶¶ 12, 23, 27, 104, 114, 120, 297, 373, 665. The cartel extinguished this competition. *Id.* ¶¶ 2, 8, 25, 27, 104, 286. *See Am. Needle, Inc. v. NFL*, 560 U.S. 183, 190 (2010) (cartels "deprive[] the marketplace of independent centers of decisionmaking that competition assumes and demands"). Now, rather than set OON prices independently, subject to competitive pressures, MultiPlan and its competitors agree to use the same pricing methodology to price OON services, set maximum price caps for those services, and appoint MultiPlan as their OON pricing enforcer. DC ¶ 40. Defendants' factual dispute is no basis for a motion to dismiss. *Deere*, 703 F. Supp. 3d at 905-06.

Defendants double down on this factual error by relying on inapposite cases. Defendants' citation to *Long Island Anesthesiologists PLLC v. United Healthcare Insurance Company of New York, Inc.*, 2023 WL 8096909 (E.D.N.Y. 2023) ("*LIA*") only highlights the allegations here that were missing in *LIA*. In *LIA*, the plaintiff alleged a conspiracy between MultiPlan and United based entirely on "a bare assertion that MultiPlan is working with United to force lower reimbursement

rates." *Id.* at *7. But the plaintiff in *LIA* failed to allege that "MultiPlan had any role in helping United . . . determine appropriate reimbursement rates," that "MultiPlan knew the reimbursement rates it sought were lower than the rates that United had previously offered," or that "MultiPlan believed the rates were below competitive levels." *Id.*

This case is nothing like *LIA*. Unlike *LIA*, DAPs allege MultiPlan is the ringleader of the cartel. DC ¶¶ 236-37, 479. It sets its co-conspirators' OON prices. DC ¶¶ 154-55. And, in contrast to *LIA*, DAPs here (1) explain how, prior to the conspiracy, MultiPlan competed against its co-conspirators as independent decisionmakers on prices for OON services, *id.* ¶¶ 8, 104, 120, 301, 302; (2) catalogue a series of admissions by MultiPlan that it competes against its co-conspirators with respect to OON pricing, *id.* ¶¶ 117-21; and (3) detail how the cartel's scheme to underpay healthcare providers works. *See id.* ¶¶ 310-80. This case has all of the facts missing in *LIA*.

Similarly, Defendants rely on inapposite cases in which the alleged conspirators were undisputedly *not competitors* with respect to the subject matter of their contract. *See, e.g., Always Towing*, 2 F. 4th at 706 ("Defendants are not competitors for scrapped vehicles . . . the City sells the vehicles, and Miller Compressing and others purchase them."); *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 272–74 (6th Cir. 2014) (assessing an agreement "between Dean in its role as a processor of bottled milk and [Dairy Farmers of America] in its role as a supplier of raw milk"). Here, by contrast, the DC explains in detail how MultiPlan and its co-conspirators *previously competed* as independent pricing decision-makers for OON services, and then entered into contracts *extinguishing that pricing competition*. DC ¶¶ 120, 303.[3]

---

[3] Even if MultiPlan and its co-conspirators were not current competitors, they are still potential competitors. DC ¶¶ 130, 744. Pricing agreements between potential competitors are *per se* unlawful. *See, e.g., Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 229 (D.C. Cir. 1986) (horizontal restraints "eliminate some degree of rivalry" among "actual or potential competitors."). And Defendants' counter-factual claim that MultiPlan is not a supplier of OON insurance coverage is immaterial. *Duffy*, 2024 WL 4980771, at *6 n.2 (applying *per se* rule because the court was "not convinced that the 'vertical' label

Defendants' effort to analogize Multiplan to a "dual distributor" also fails. DB 27. "Dual distribution" exists when a manufacturer sells products both directly to consumers, and has a vertical relationship with retailers. *Vital Pharms., Inc. v. Berlin Packaging LLC*, 632 F. Supp. 3d 780, 785 (N.D. Ill. 2022) (manufacturer sold its products directly and through distributors). Here, Defendants are horizontal competitors that all purchase OON services and have stopped competing on OON pricing. DC ¶¶ 22, 50-79, 88, 289, 303; *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 244 (S.D.N.Y. 2019) (rejecting application of dual distribution cases where "anticompetitive agreements are directly related to the competitive landscape"). As one court explained, "[h]omespun metaphors of complex economic activities go only so far," and the "actual label placed on a conspiracy is a pedantic distinction." *Deere*, 703 F. Supp. 3d at 903. What matters is whether DAPs have alleged that horizontal competitors entered into an agreement. *Id.* They have done so in spades.[4]

The reality for MultiPlan, as its then-CEO recently explained, is that "[o]ur clients are our competitors; our competitors are our clients." DC ¶¶ 23, 119. MultiPlan is a payor, DC ¶ 110, and its effort to walk back its admissions raises, at best, a factual dispute. *See, e.g.*, *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 867-68 (N.D. Ill. 2010) (denying summary judgment where two defendants claimed they were mere "suppliers," but discovery showed they competed against

---

properly characterizes Yardi's relationship with the landlord defendants given that Yardi is not a supplier or distributor of housing units.").

[4] Even if some aspect of Defendants' agreements are vertical, that does not doom DAPs' horizontal conspiracy claim. In antitrust law, "easy labels," like vertical, "do not supply ready answers." *Broad. Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 8 (1979). "[A] facially vertical restraint" may be the result of "'a horizontal cartel agreement'" and is evidence of "a horizontal restraint." *Bus. Elecs. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 730 n.4 (1988). The mere presence of a "vertical organizer of a horizontal price-fixing conspiracy" does not allow the conspiracy to "escape application of the *per se rule*." *United States v. Apple, Inc.*, 791 F.3d 290, 297 (2d Cir. 2015); *see also Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220-21 (7th Cir. 1993) ("[t]hat the conspiracy was joined" by an intermediary "does not transform it into a vertical agreement."); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 932, 935-36 (7th Cir. 2000) (retailer's coordination of horizontal agreement among manufactures did not turn the restraint into "nothing more than a series of separate, similar agreements").

11

other cartel members); *Osterhaus Pharm., Inc. v. Express Scripts, Inc.*, 2025 WL 486195, at *5-6 (W.D. Wash. 2025) (because plaintiff adequately alleged that defendants were competitors and their agreements lowered reimbursement prices, the court could not consider arguments that defendants were not competitors and their agreements were pro-competitive on a motion to dismiss). MultiPlan admitted that it competes against other payors. It cannot exit this case at the pleading stage by insisting it misspoke.

### 2. Defendants Cannot Recast the Nature of their Horizontal Competition

Defendants claim that MultiPlan competes against other payors only in "contracting with providers" to join their respective PPO networks, and that MultiPlan's OON pricing methodology is a "separate" business that operates in a separate market. DB 25. Again, this is a factual dispute, not a motion to dismiss argument. DAPs explain that MultiPlan itself is a payor of OON services and has no separately incorporated business, no separate board of directors, no separate financial statements, and no separate executive team for its purportedly "separate" OON pricing "business." DC ¶¶ 54, 110. Even if MultiPlan *had* attempted to cabin its pricing conduct to a particular "division" of its company, such corporate formalities would have no impact on the antitrust analysis. *See Copperweld v. Indep. Tube Corp.*, 467 U.S. 752, 770 (1984) ("the operations of a corporate enterprise organized into divisions must be judged as the conduct of a single actor").

### 3. Defendants Cannot Argue That Their Price-Fixing Is "Reasonable."

Defendants argue their agreements have "potential competitive benefits" because they lower Defendants' costs, generate "savings," and create unspecified "efficiencies." DB 10, 27. That argument is contrary to decades of antitrust law. "[A]n agreement that interfere[s] with the setting of price by free market forces" among horizontal competitors is illegal *per se*. *Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978). This includes agreements over how competitors set prices, not just agreements over the prices themselves. *See United States v. Socony-*

*Vacuum Oil Co.*, 310 U.S. 150, 223, 224 n.59 (1940) (price-fixing includes any "combination formed for the purpose and with the effect of . . . depressing, fixing, pegging, or stabilizing" prices, including an agreement on "the formula underlying price policies"); *id.* at 222 ("prices are fixed . . . if prices paid or charged are . . . by various formulae . . . related to market prices."); *In re Wheat Rail Freight Rate Antitrust Litig.*, 579 F. Supp. 517, 538 (N.D. Ill. 1984) ("an agreement on how rates are to be calculated effectively fixes prices"), *aff'd* 759 F.2d 1305 (7th Cir. 1985). When Defendants agreed to use MultiPlan's OON pricing rather than their own discretion, they "join[ed] together separate decisionmakers" and "deprive[d] the market of independent centers of decisionmaking" in violation of Section 1 of the Sherman Act. *Am. Needle,* 560 U.S. at 195.

It does not matter that Defendants' cartel operates on the buying side of the market. "[A] buyers' cartel . . . is illegal per se." *Delta Dental*, 484 F. Supp. 3d at 633 (plaintiff pled plausible Section 1 claim where insurers conspired to decrease payments to dental providers); *Vogel v. Am. Soc. of Appraisers*, 744 F.2d 598, 601 (7th Cir. 1984) ("buyer cartels . . . are illegal per se."). Nor does it matter that Defendants believe that there is some economic justification for their cartel. *FTC v. Super. Ct. Trial Laws. Ass'n*, 493 U.S. 411, 435 (1990) ("the law does not permit an inquiry into [the] reasonableness" of price-fixing); *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 105 (3d Cir. 2010) (attempt to justify conspiracy to "artificially depress[] reimbursement rates" as beneficial to consumers "reflects a basic misunderstanding of the antitrust laws").

### 4. The Hotel Algorithm Cases Highlight the Strength of DAPs' Claims

Defendants attempt to analogize this case to recent decisions in *Gibson v. MGM Resorts Int'l*, 2023 WL 7025996 (D. Nev. 2023), and *Cornish-Adebiyi v. Caesars Ent., Inc.,* 2024 WL 4356188 (D.N.J. 2024). CB 27. But those cases are distinguishable. In both cases, hotel operators licensed pricing software from a third party that did not operate hotels and had no stake in conspiring with the hotel operators because it was simply paid a flat fee for licensing its software.

*Gibson v. Cendyn Group, LLC*, 2024 WL 2060260, at \*4, \*7 (D. Nev. 2024); *Cornish*, 2024 WL 4356188, at \*2, \*5. Here, MultiPlan operates a PPO network that directly competes with the networks of its co-conspirators and benefits from the Cartel in the same ways as other payors, including by eliminating competitive pressure on its own OON prices and recouping a substantial bounty on each underpaid OON claim. DC ¶¶ 104, 148. Moreover, in the hotel cases there was no allegation that the software pooled confidential information to generate pricing recommendations. *Gibson*, 2024 WL 2060260, at \*7; *Cornish*, 2024 WL 4356188, at \*2. The hotel operators retained substantial pricing discretion and often *ignored* the software's recommendations. *Gibson*, 2024 WL 2060260, at \*7; *Cornish*, 2024 WL 4356188, at \*2. Indeed, the plaintiffs conceded that the software company had difficulty ensuring hotel operators actually implemented the recommended prices. *Gibson*, 2024 WL 2060260, at \*7; *Cornish*, 2024 WL 4356188, at \*2.

This case has all the facts missing in *Gibson* and *Cornish*. Defendants agreed with a direct competitor to use their competitor's pricing methodology. DC ¶¶ 104, 131, 141-42, 145-48, 297, 303. They did so in a tight 3.5-year window and would have done so with more simultaneity but for ongoing commitments to the NYAG. *Id.* ¶¶ 19, 289-90. Defendants explicitly shared and commingled confidential pricing information to calculate OON prices. *Id.* ¶¶ 310-56. And, unlike in *Cornish* and *Gibson*, Defendants are *required by contract* to use the prices generated by MultiPlan's pricing methodology and MultiPlan acts as the sole pricing enforcer, ensuring that its prices stick. *Id.* ¶¶ 12, 142, 154-56, 372-80, 485, 491.[5] And MultiPlan has a direct financial stake in the cartel—it makes more money every time the cartel pays a doctor less. *Id.* ¶¶ 392-94.

Indeed, every aspect of Defendants' agreements are illegal *per se*. It is illegal *per se* for

---

[5] Even if MultiPlan couches its pricing as a "recommendation," that is immaterial. *See, e.g.*, *Goldfarb v. Va. State Bar*, 421 U.S. 773, 781-82 (1975) (condemning "suggested" minimum fee schedule); *Norfolk Monument Co. v. Woodlawn Mem'l Gardens, Inc.*, 394 U.S. 700, 703 (1969) ("self-serving disclaimer" that restraint was merely "suggested" did not negate contention that there was an agreement).

Defendants to abdicate their pricing decisions to an industry-wide pricing methodology. *See, e.g.*, *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647-48 (1980) (agreement on pricing formula *per se* unlawful); *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 363-64 (3d Cir. 2004) (*per se* unlawful for Defendants to employ a common mechanism for calculating price); *Duffy*, 2024 WL 4980771, at *6-8 (use of common pricing algorithm illegal *per se*). It is *per se* illegal for Defendants to agree on price caps for OON services. *See, e.g.*, *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 348-52 (1982) (agreements capping maximum prices are *per se* illegal); *Int'l Outsourcing Servs., LLC v. Blistex, Inc.*, 420 F. Supp. 2d 860, 864 (N.D. Ill. 2006) (a *per se* unlawful "buyers' cartel" occurs "when a group of buyers band together in order to fix a maximum price (below competitive levels) that they will pay for an item."). It is *per se* illegal for Defendants to use MultiPlan as the sole pricing enforcer for their OON pricing. *See, e.g.*, *Citizen Publ'g Co. v. United States*, 394 U.S. 131, 134-36 (1969) (common negotiator *per se* unlawful); *N.Y. ex rel. Spitzer v. St. Francis Hosp.*, 94 F. Supp. 2d 399, 412-14 (S.D.N.Y. 2000) (hospitals appointing a single negotiator illegal *per se*). Defendants raise no argument about the price-cap and price-enforcement agreements anywhere in their opening brief, effectively conceding that DAPs have alleged plausible claims based on that conduct. *See Sere v. Br. of Trustees of Univ. of Ill.*, 852 F.2d 285, 287-88 (7th Cir. 1988) (failure to raise an argument in the opening brief constitutes forfeiture of that argument). Thus, DAPs have alleged a plausible horizontal agreement that is illegal *per se*.

**B.     DAPs Allege a *Per Se* Unlawful "Hub-And-Spoke" Cartel (Count 2)**

If the Court reaches DAPs' alternative theories of agreement,[6] DAPs also allege a plausible

---

[6] Since DAPs allege a plausible claim for a horizontal agreement, this Court need not address the scope of the relevant market or DAPs' alternative claims under Section 1 of the Sherman Act (Counts 2-4) or state law (Counts 6-8). *See, e.g.*, *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 2020 WL 5642941, at *5 (N.D. Ill. 2020) ("Under the *per se* rule, certain restraints may be deemed unreasonable without any inquiry into the relevant market context."), *aff'd*, 15 F. 4th 831 (7th Cir. 2021); *Carbone*, 621 F. Supp. 3d at 890 (not addressing alternate antitrust theories where Section 1 claim was adequately pled).

*per se* hub-and-spoke agreement. DC ¶¶ 41, 497-508. In a hub-and-spoke agreement, "a core conspirator" (the "hub") directs "the functions of the conspiracy" with each spoke, while an "agreement to further a single purpose or design" (the "rim") connects the spokes. *Kraft Foods Glob., Inc. v. United Egg Producers, Inc*., 2023 WL 6065308, at *11-12 (N.D. Ill. 2023). Here, MultiPlan is the hub; its agreements with payors are the spokes; and the conscious commitment among payors to participate in the collective scheme is the rim. DC ¶¶ 41, 502-04.

The agreements between MultiPlan (the hub) and the payors (the spokes) are not in dispute. DB 22-25; DC ¶¶ 41, 162-287. Instead, Defendants argue that DAPs fail to allege evidence of an agreement between payors to use MultiPlan's pricing methodology to set prices for OON services. DB 22-23. That argument fails. A rim agreement "need not be formal or written," *Duffy*, 2024 WL 4980771, at *3. All that is required is "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). A plaintiff can plead the existence of such a commitment solely through circumstantial evidence. *Tiz, Inc. v. S. Glazer's Wine & Spirits*, 2024 WL 2785142, at *16-20 (N.D. Ill. 2024). To do this, a plaintiff need only plead facts plausibly demonstrating that Defendants engaged in parallel conduct and "plus factors" that suggest the parallel conduct is due to an agreement. *Id.* at *16. Here, DAPs plead ample circumstantial evidence, including parallel conduct and nine plus factors, from which the Court may infer a rim agreement.

### 1.    DAPs Plead Parallel Pricing Strategy and Parallel Pricing

Defendants claim that DAPs cannot show parallel conduct because (1) different Defendants started using MultiPlan's methodology at different points over a three-and-a-half year period, (2) Defendants use MultiPlan services that are marketed under different names, and (3) Defendants supposedly set different rates for their OON services. DB 23; CB 25-26. Each argument fails.

*First*, "[i]t is elementary that an unlawful conspiracy may be and often is formed without

16

simultaneous action or agreement on the part of the conspirators." *Interstate Cir. v. United States*, 306 U.S. 208, 227 (1939); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1000 (N.D. Ill. 2011) (inferring a cartel from conduct that was "sequential rather than simultaneous"). A cartel may also begin with fewer members and expand over time. *See, e.g.*, *Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp. 3d 768, 780 (N.D. Ill. 2020) (denying motion to dismiss where plaintiff alleged that conspirators agreed over time to a common pricing rule).

Here, DAPs explain that "payors began to use MultiPlan's pricing methodology . . . between April 2015 and November 2018," DC ¶ 289, with some payors' entry delayed by settlement agreements in the Ingenix investigation. *Id.* ¶ 290. This Court has repeatedly "found allegations of Defendants joining or effectuating a conspiracy" over several years to "sufficiently allege parallel conduct." *See, e.g*, *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 791 (N.D. Ill. 2017) (denying motions to dismiss even where plaintiffs allege conduct occurring over multiple years); *Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1077-78 (N.D. Ill. 2011) ("variation in the . . . timing" of price increases over a 5-year period was "not substantial enough to overcome the otherwise strong suggestion of conscious parallelism").[7]

*Second*, even if Defendants used different MultiPlan-branded pricing services, DAPs claim every Defendant adopted the same pricing strategy by abdicating their independent pricing discretion for OON services to MultiPlan and worked through MultiPlan to ensure their OON pricing remained in alignment. DC ¶¶ 42, 141, 425, 508. That is more than sufficient to

---

[7] Defendants' cases either lacked plus factors, *e.g.*, *Twombly*, 550 U.S. 556-57; *In re Musical Instr. & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193-97 (9th Cir. 2015); *Run it First v. CVS Pharm.*, 2022 WL 484862, at *5 (S.D. Fla. 2022) involved divergent (not parallel) conduct, *e.g.*, *Wash. Cnty. Health Care Auth. v. Baxter Int'l*, 328 F. Supp. 3d 824, 835-37 (N.D. Ill. 2018); *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 516-17 (8th Cir. 2018); *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 961-63 (N.D. Cal. 2007), or both, *see In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1020-23 (N.D. Cal. 2007).

demonstrate parallel conduct. *See In re RealPage, Inc., Rental Software Antitrust Litig.*, 709 F. Supp. 3d 478, 495, 507-09 (M.D. Tenn. 2023) (even though defendants adopted three different pricing formulas over a multi-year period, plaintiffs adequately alleged that defendants adopted a singular pricing strategy by abandoning their independent pricing discretion).

*Third*, DAPs allege that Defendants used MultiPlan's pricing methodology to set parallel prices for the same OON services, regardless of actual market conditions. DC ¶¶ 291-93. MultiPlan's own Senior VP of Healthcare Economics **testified under oath** that MultiPlan's pricing methodology generates parallel prices. *Id.* ¶ 294. Defendants attempt to dispute his testimony by parsing three whitepapers detailing MultiPlan's pricing methodology. DB Exs. A-C. Defendants argue that because these whitepapers mention the possibility that MultiPlan's pricing methodology can be customized, that must mean that there is no possibility of parallel pricing conduct. DB 23. That argument misunderstands DAPs' allegations. The mere fact that MultiPlan marketed its pricing methodology as customizable does not mean that it was actually customized. Pricing data shows that for the same OON service, MultiPlan's pricing methodology set the same price, regardless of market realities. DC ¶¶ 292-93; *Elward v. Electrolux Home Prods., Inc.*, 264 F. Supp. 3d 877, 886 (N.D. Ill. 2017) ("[E]ven if the attached exhibits were included in the consideration of this motion [to dismiss]," disputed issues of fact regarding the interpretation of exhibits "cannot be decided on a motion to dismiss."). Moreover, regardless of whether Defendants could customize certain details, "price-fixing [outlaws] more than mere establishment of uniform prices." *Socony-Vacuum*, 310 U.S. at 223; *United States v. Beaver*, 515 F.3d 730, 739 (7th Cir. 2008) (Section 1 "does not outlaw only perfect conspiracies."); *Flat Glass*, 385 F.3d at 362 (agreement to set starting point for pricing negotiations was illegal even when many prices were negotiated). What matters for Section 1 is that competitors have agreed to adopt a common, coordinated pricing strategy,

even if the final prices are not identical. *See, e.g.*, *RealPage*, 709 F. Supp. 3d at 507-09 (plaintiffs sufficiently alleged parallel conduct by pleading that defendants adopted the same pricing strategy, even though data showed that they set different prices); *In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 479 (S.D.N.Y. 2017) ("Conspirators may aid the common venture via techniques and stratagems that are consistent and reinforcing but not entirely overlapping."). DAPs do just that. They allege that Defendants engaged in parallel conduct by agreeing to abdicate independent pricing discretion to MultiPlan, providing MultiPlan with reams of confidential pricing data, and abiding by the prices set by MultiPlan. DC ¶¶ 141, 155-57.

## 2. DAPs Plead Plus Factors That Holistically Show the Existence of a Cartel

Defendants' plus factor arguments fare not better. They analyze each plus factor individually, but "courts must look at the course of conduct of the alleged conspiracy as a whole" because "the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts." *Deere*, 703 F. Supp. 3d at 903; *Broiler Chicken*, 290 F. Supp. 3d at 797 (rejecting attempt to "isolat[e] each factor"); *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components").

DAPs' plus factors plausibly allege an agreement along the rim of MultiPlan's hub-and-spoke cartel. DC ¶¶ 382-480. Defendants have a stranglehold on the market for OON services. *Id.* ¶¶ 383-85. Collectively, they purchase over 80% of all U.S. OON services. *Id.* ¶¶ 28, 430. Their collective market power is protected by massive barriers to entry. *Id.* ¶¶ 386-91. Defendants previously realized that their collective market power gave them the ability to conspire with one another to underpay healthcare providers, and they attempted to do so before they were caught by the NYAG. *Id.* ¶¶ 398-413. But that collusive drive did not go away just because they got caught— they all realized that they had the ability to make billions by collectively underpaying doctors and

passing along massive fees to health plan subscribers. *Id.* ¶¶ 306-09, 631. Defendants also had multiple means through which they could communicate and conspire on OON pricing, including in-person meetings facilitated by MultiPlan; MultiPlan funneling confidential pricing information between payors through in-person meetings, calls, texts, and its automated PlanOptix system; and frequent trade association meetings. *Id.* ¶¶ 219, 221, 227, 260-68, 271, 310-50, 439-52. Through each of these means, Defendants shared massive amounts of real-time, unblinded, and granular pricing data with one another. *Id.* ¶¶ 439-52. At the same time they were meeting frequently and sharing reams of data on a daily basis, Defendants did something that made no economic sense absent the existence of a conspiracy—they broke with their past conduct and adopted the same pricing strategy of massively underpaying providers for OON services. *Id.* ¶¶ 421-28.

Courts routinely recognize that these facts are plus factors and plausibly point toward the existence of a cartel. *See, e.g.*, *Text Messaging*, 630 F.3d at 628 (collective market power); *In re Turkey Antitrust Litig.*, 642 F. Supp. 3d 711, 727 (N.D. Ill. 2022) (high barriers to entry); *USFL v. NFL*, 842 F.2d 1335, 1371 (2d Cir. 1988) (prior antitrust violation); *Tera Grp., Inc. v. Citigroup, Inc.,* 2019 WL 3457242, at *20 (S.D.N.Y. 2019) (motive beyond "generic interest in generating increased profit"); *Broiler Chicken*, 290 F. Supp. 3d at 803 ("opportunities to collude at industry conferences and trade associations meetings" may "serve as a plausible factual basis to infer the existence" of a conspiracy)[8]; *In re Loc. TV Advert. Antitrust Litig*, 2020 WL 6557665, at *9 (N.D. Ill. 2020) ("information exchange . . . is a plus factor").

Defendants urge the Court to adopt an alternate explanation for all of this. They claim that, absent MultiPlan's pricing methodology, they still would not compete on OON pricing. DB 23-24. But that argument runs headlong into the facts. Prior to the cartel, Defendants did, in fact,

---

[8] Defendants' cases stand merely for the proposition that "opportunity to collude" is *by itself* insufficient to allege a conspiracy. DB 24. But this is an improper attempt to disaggregate DAPs' plus factors.

compete on OON pricing. DC ¶¶ 27-28, 575, 665, 711.[9] And Defendants' alternate narrative cannot be credited on a motion to dismiss. *Broiler Chicken,* 290 F. Supp. 3d at 788 ("it is improper at this stage of the proceedings to weigh alternatives and which is more plausible."). Thus, DAPs plausibly allege a rim agreement and a *per se* illegal hub-and-spoke cartel.[10]

### C. MultiPlan Facilitated a *Per Se* Unlawful Cartel (Count 3)

Alternatively, MultiPlan committed a *per se* violation of the Sherman Act by facilitating an agreement among payors to suppress OON pricing. DC ¶¶ 509-13, 757-64. A defendant is liable for a *per se* violation when it knowingly facilitates a cartel by "materially aid[ing]" in the formation of the cartel "with[] knowledge of the purpose of such [cartel]." *Int'l Travel Arrangers, Inc. v. W. Airlines, Inc.*, 623 F.2d 1255, 1265-66 (8th Cir. 1980). If the facilitator of a cartel provides material aid to the cartel and knows of its purpose, it does not matter that the facilitator is just trying "to earn its fee," it is liable for a *per se* violation of antitrust law. *Albrecht v. Herald Co.*, 390 U.S. 145, 149-50 (1968), *overruled on other grounds by State Oil Co. v. Khan*, 522 U.S. 3 (1997).

For example, in *In re Broiler Chicken Antitrust Litigation*, plaintiffs adequately alleged that a consultant facilitated a conspiracy among chicken companies to cut chicken supply. 2019 WL 1003111, at *2 (N.D. Ill. 2019). The consultant allegedly did so by facilitating the regular exchange of highly-sensitive pricing and supply data between the defendants and holding regular meetings with the defendants. *Id.* at *1. Nevertheless, the consultant argued that it did not know

---

[9] Defendants' case law on this point is similarly inapposite. *Franco v. Conn. Gen. Life Ins. Co.,* 818 F. Supp. 2d 792, 839-40 (D.N.J. 2011) ("efforts to keep [OON] costs down" involved incentivizing subscribers to use in-network providers, *not* eliminating independent pricing competition); *In re Aetna UCR Litig.,* 2015 WL 3970168 at *20-22 (D.N.J. 2015) (plaintiffs did not allege how payors' conduct violated "their economic self-interest," a cartel enforcement mechanism, or a "sensible timeline of the conspiracy").

[10] Courts occasionally credit an "obvious alternate explanation" for defendants' conduct. *Twombly*, 550 U.S. at 567. There is nothing obvious about Defendants' explanation for their conduct here. They claim that the amounts they pay in exchange for OON services are not prices, they are not buyers, and there is no market for those services. DB 2-3. Respectfully, it requires considerable chutzpah to argue that this is the one sector of the U.S. economy with no prices, buyers, or market.

of the alleged cartel and was an "unwitting" facilitator of the alleged conspiracy. *Id*. But the district court found that it could not make that inference in the consultant's favor at the motion to dismiss stage because "[i]t is at least plausible (if not likely) that a person who facilitates a conspiracy knows about the conspiracy and engages in facilitation knowing of its consequences." *Id.* at *2.

The same is true here. MultiPlan contributed materially to the formation of the cartel by holding frequent meetings with payors, facilitating a massive flow of competitively-sensitive information between them, and automating that exchange of information through PlanOptix. *See* DC ¶¶ 494, 511-12. MultiPlan intended to facilitate the conspiracy because it materially benefited from payors paying less for OON services. *Id.* ¶¶ 279, 392-94. And MultiPlan even attempted to cover up its role as the facilitator of the cartel. *Id*. ¶ 513.

Defendants raise no availing arguments to the contrary. They claim that MultiPlan cannot be liable for facilitating the cartel if no genuine principal-agent relationship exists. DB 31. But MultiPlan's liability is predicated on its role in facilitating the cartel agreement, not a formal principal-agent relationship. *In re Loc. TV Advert. Antitrust Litig.*, 2022 WL 3716202, at *6 (N.D. Ill. 2022). Next, they contend that there is "nothing unlawful" about Defendants using a common consultant. DB 31. But DAPs allege far more than the mere common retention of a consultant.[11] DC ¶¶ 14, 277-87, 296, 509-13. Thus, MultiPlan is liable for facilitating a *per se* illegal cartel.

## III. Defendants' Agreements also Violate the Rule of Reason (Counts 4 and 5)

In the alternative to its *per se* claims, DAPs allege that Defendants entered into two types of agreements that restrained trade under the rule of reason: (1) vertical agreements in restraint of trade and (2) an agreement to exchange information that had the effect of restraining trade. DC ¶¶

---

[11] The court's rule of reason analysis in *N. Jackson Pharm., Inc. v. Caremark RX, Inc.*, 385 F. Supp. 2d 740 (N.D. Ill. 2005) is inapplicable. That case involved a "cooperative purchasing agreement" analogous to a joint venture. *Id*. at 747-48. Here, the cartel "seek[s] only to combine otherwise independent buyers in order to suppress their otherwise competitive instinct to bid up price." *Id*. at 748 (citation omitted).

43-44, 765-783. The rule of reason is "a fact-specific assessment" of a restraint's "actual effect on competition," *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) (internal quotations omitted), and the "balance" of effects "is a factual issue for trial." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 477, 495 (N.D. Ill. 2019). To plead a rule of reason violation of Section 1 of the Sherman Act, DAPs must allege that Defendants entered into an agreement, the agreement unreasonably restrained trade in a relevant market, and the agreement harmed DAPs and competition itself. *Dairy Farmers of Am.*, 801 F.3d at 762.

Defendants do not challenge the existence of vertical agreements between MultiPlan and other payors. DB 2, 25-30. Instead, they raise three arguments: (1) they claim there is no evidence of an agreement to exchange information, (2) they claim there is no plausible relevant market for OON services, and (3) they argue that the alleged agreements did not harm competition because their conduct was pro-competitive. *Id.* 21-22, 27-30, 32-35. Each argument is wrong.

### A.    DAPs Allege an Information Exchange Agreement

Defendants argue that DAPs have not alleged that they entered into an agreement to exchange information because (1) MultiPlan's Data iSight formula allegedly uses public information, and (2) supposedly, there are no allegations that MultiPlan exchanged information between two or more payors. DB 32-35. Neither argument holds water.

*Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*, 2020 WL 6134982 (N.D. Ill. 2020) is illustrative. There, plaintiffs alleged that the defendants agreed to "regularly exchange detailed, timely, competitively-sensitive and non-public information about their operations" via an intermediary. *Id.* at *6. That intermediary published reports that included data on turkey production that was regularly collected by the USDA. *Id.* However, the data published in the reports was "anonymized." *Id.* Nevertheless, the court found plaintiffs alleged enough to plead information exchange agreements because the defendants "could decipher the data pertaining to" each other

23

and "because executives . . . allegedly had regular opportunities to meet and discuss production targets at various trade association meetings." *Id.*

The facts here are far stronger than in *Olean*. Unlike in *Olean*, DAPs allege that Defendants exchanged real-time and unblinded confidential pricing data for the specific purpose of facilitating a cartel that underpaid healthcare providers. DC ¶¶ 348-351, 439-52. Contrary to Defendants' supposition, that information includes each of the brand names that MultiPlan uses to market its OON pricing methodology, not just Data iSight. *Id.* ¶¶ 133-41, 465-72. DAPs allege that each of these branded products do the same thing—they exchange massive amounts of current, granular, confidential, and competitively-sensitive information with the purpose of decreasing the prices they each set for OON goods and services. *Id.* ¶¶ 44, 320, 772-83. For example, DAPs allege that MultiPlan commingles Defendants' current OON pricing data—data that Defendants have told the federal government they consider to be confidential and competitively-sensitive—into a massive database that calculates common OON prices for all payors. *Id.* ¶¶ 317-20, 334.[12] DAPs cite specific instances when MultiPlan has communicated one payor's confidential OON pricing to another payor in order to facilitate an industry-wide understanding that providers should be paid less for OON services. *Id.* ¶¶ 224, 226, 255, 256-59, 279, 346-48, 441, 443-44, 447. And MultiPlan's PlanOptix service allows payors to view one another's real-time prices for OON services. *Id.* ¶¶ 465-72. Thus, DAPs have alleged an information exchange agreement.

### B. DAPs Allege a Relevant Market for OON Services in the United States

Defendants argue that (1) "[t]here simply is no market" in which they compete to

---

[12] MultiPlan cites three brochures that concern only Data iSight and pre-date PlanOptix. DB Exs. A-C. Those materials do not discuss how MultiPlan uses competitor data, and any interpretation of the materials is obviously a factual dispute. Even if *some* of the data MultiPlan comingled to set prices was public, that would not negate the inference of a conspiracy to depress purchase prices. *See, e.g.*, *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 447 (9th Cir. 1990) (rejecting argument that exchanging public information "cannot support an inference of conspiracy").

priceOON services, (2) payments to providers are not a product or service, and (3) the amount of any such payment is not a price. DB 22. Each of these arguments simply disputes DAPs' factual allegations and is improper on a motion to dismiss. DC ¶¶ 27, 120, 121, 514-73.

Courts routinely deny "motions to dismiss for failure to plead a relevant product market" because "market definition is a deeply fact-intensive inquiry." *Delta Dental*, 484 F. Supp. 3d at 640. At this stage, the question is not whether Defendants merely raise "fair criticisms" of Plaintiffs' proposed relevant market, but whether Defendants have established "there is *no* plausible relevant market." *Carbone*, 621 F. Supp. 3d at 889. For example, in *Delta Dental* (a case Defendants ignore), the plaintiffs asserted a relevant market consisting of "the dental goods and services sold by plaintiffs to insurers." 484 F. Supp. 3d at 640. The court found that this market definition was "consistent with [plaintiffs'] theory that defendants have combined to form a buyers' cartel with monopsony power that makes it difficult for alternative buyers to compete, thereby depressing the market price for the sale of dental goods and services." *Id.* at 641. Because the market for purchasing dental goods and services had several buyers, the court found that the "plaintiffs' market definition avoids the under-inclusiveness of [] product markets" limited to a single type of payment or reimbursement. *Id.*

DAPs plead a similar market here. DAPs allege that doctors and hospitals are providing OON services to patients and that payors are paying for those services. DC ¶¶ 515-16. In that sense, OON services are like any other professional service, such as legal services, where services are provided before a payment is made. *Id.* ¶¶ 524-27, 551. DAPs' market definition is not based on a single type of payment or reimbursement. *Id.* ¶ 551. Instead, it focuses on a type of healthcare service that, in a competitive market, has many buyers (payors) who compete on the prices that they offer for those services. *Id.* ¶¶ 98-100, 104, 561.

25

Ignoring the facts, Defendants argue that "reimbursement for OON services" is not "a standalone product [or] service." CB 35. That raises a factual dispute; but even if it were true, it would be irrelevant. DC ¶ 550. The "reality of the health services financing market" is that, "for antitrust purposes," a payor is "treated as a buyer where it pays the bill and seeks to set the amount charged." *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 881 F. Supp. 1309, 1317 (W.D. Wis. 1994) (citing cases). "[A]ny distinction between reimbursement by third party insurers such as Blue Shield and purchasing are irrelevant for antitrust purposes." *Id.*; *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1411, 1416 (7th Cir. 1995), *as amended* (Oct. 13, 1995) (affirming finding that a payor is a "purchaser" in the "market for physician services"). Here, as in *Marshfield Clinic*, 881 F. Supp. at 1312, DAPs' market is based on the OON services that doctors and hospitals provide to patients, but are paid for by payors. DC ¶¶ 514-16. As DAPs explain, OON services are a unique form of services that are sold separately from in-network services. *Id.* ¶¶ 99-103. That easily distinguishes this case from the very different markets in the cases Defendants cite. *See, e.g.*, *Franco v. Conn. Gen. Life Ins. Co.*, 818 F. Supp. 2d 792, 832 (D.N.J. 2011) (subscriber-plaintiffs alleged a relevant "market for data used to calculate . . . reimbursement of claims by health insurance beneficiaries for [OON], non-negotiated medical services"); *In re Aetna UCR Litig.*, 2015 WL 3970168, at *24 (D.N.J. 2015) (in claim brought by health plan subscribers, the price of health insurance is the premium); *Pac. Recovery Sols. v. Cigna Behav. Health, Inc.*, 2021 WL 1176677, at *14 (N.D. Cal. 2021) (providers alleged a conspiracy to fix the price of "insurance benefits" for health plan subscribers). Defendants cannot credibly argue that this is the one sector of the U.S. economy with no market, buyers, or prices.

Defendants' reliance on an unpublished ruling from a state trial court, *VHS Liquidating Trust v. Multiplan Corp.*, No. CGC-21-594966 (Cal. Super. Ct. 2024), is misplaced. *VHS* cannot

be squared with the Seventh Circuit's holding that payors are purchasers of doctors' services and collusion in the market for such services violates the antitrust laws. *Marshfield Clinic*, 881 F. Supp. at 1317-18; *Marshfield Clinic*, 65 F.3d at 1414-16.[13] *VHS* is also factually distinct from this action. In *VHS*, the plaintiff alleged a "Repricing Market" in which the relevant price was "not the 'price' for the delivery of medical services by providers to patients," and providers did not "participate in the 'Repricing Market[].'" Dkt. 284-1 at 9. Unlike in *VHS*, DAPs allege that the relevant price is the price for the delivery of medical services to patients, DC ¶¶ 2, 8, 297, and that Defendants are buyers of those services, *id.* ¶ 516. Defendants' reliance on a single, unpublished opinion from a state court cannot rewrite this Circuit's case law or the facts in DAPs' complaint.

Defendants also argue that the market for OON services is too broad because patients need specific types of OON services—such as physicals and heart transplants. They insist that the relevant market must be a series of narrow geographic markets for particular healthcare services. CB 38-40. But DAPs' market is not based on the services demanded by patients; it is based on the OON services sold to payors. DC ¶¶ 12, 515-17. While a patient may be in need of a particular service and may only turn to a few providers near their home for those services, payors purchase all OON services nationwide. *Id.* ¶¶ 87, 563. And the cartel adopted the same pricing strategy for all OON services nationwide. *Id.* ¶¶ 288-95. Each of Defendants' cases addresses the market for services demanded by patients, not the market in which providers sell services to payors. *See, e.g.*, *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 597 (8th Cir. 2009) (cardiologists could attract patients that used both private and government insurance); *Marion Healthcare LLC v. S. Ill. Healthcare*, 2013 WL 4510168, at *10 (S.D. Ill. 2013) (similar).

Defendants claim that in-network services should be included in the relevant market. *See*

---

[13] *VHS* also relied heavily on the inapposite cases discussed above. Dkt. 284-1 at 13-15.

CB 39-40. But this is precisely the sort of disputed factual criticism that is improper to adjudicate on a motion to dismiss. *See Carbone*, 621 F. Supp. 3d at 889. And Defendants ignore the commercial reality of the relevant market. When a patient receives OON care from a provider, that provider can only turn to one payor to purchase those services. DC ¶¶ 524, 530. As a legal and practical matter, providers cannot bill patients for the unpaid balance of OON claims or seek payment from another source. *Id.* ¶¶ 524-27, 551. Providers cannot deny OON services to patients or substitute between selling OON services and in-network services. *Id.* ¶¶ 99-103, 522, 552. When a provider can only sell its goods and services to a single buyer or a set of buyers, those buyers comprise the relevant market. *See, e.g.*, *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461-79 (1992) (relevant market existed for a single brand of aftermarket parts where owners of Kodak brand copiers could only use Kodak-brand parts and aftermarket repair services); *Deere*, 703 F. Supp. 3d at 896 (only one provider of tractor repair services was in relevant market).[14]

In sum, Defendants' factual criticisms concerning DAPs' relevant market are inappropriate for the motion to dismiss stage. All that a plaintiff "is required" to do is "plead sufficient factual allegations that, when taken as true, make plausible the existence of *a* relevant market." *Carbone*, 621 F. Supp. 3d at 889. DAPs have done so. The factual criticisms Defendants raise are exactly the sort of factual disputes that should be resolved at summary judgment or trial "on a case-by-case basis, focusing on the particular facts disclosed by the record." *Kodak*, 504 U.S. at 467.

## C. DAPs Allege Harm to Competition in the Market for OON Services

Defendants claim that: (1) DAPs have only alleged harm to themselves, not harm to competition; and (2) the effects of Defendants' supposedly vertical agreements cannot be

---

[14] This reality also distinguishes *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 154-55 (2d Cir. 2011) (employer could not define market consisting solely of its current insurance provider where the insurer faced competition from other plans). DAPs do not define a market based solely on their preference. CB 40.

aggregated. DB 28-30. Both arguments are mistaken. To allege harm to competition, a plaintiff can allege either (1) "direct evidence" of harm, *i.e.*, "actual detrimental effects on competition such as reduced output, increased prices, or decreased quality in the relevant market," or (2) "indirect evidence" showing Defendants had "market power" and "that the challenged restraint harms competition." *Loc. TV Advert.*, 2020 WL 6557665, at *13.

DAPs allege both direct and indirect evidence of harm to competition. DC ¶¶ 564-628. DAPs demonstrate that they were underpaid billions of dollars each year when compared to the prices for OON services that would have been paid but-for the cartel. *Id.* ¶¶ 28, 38, 663-67. The cartel's competitive harm is not limited to DAPs. *Id.* ¶¶ 574-628. The cartel harms patients by reducing their access to care and the amount of revenue that providers can spend on improving the quality of care. *Id.* ¶¶ 588-611. Health plan subscribers are harmed because the cartel charges them extravagant fees every time it suppresses the price of an OON service. *Id.* ¶¶ 612-28. Defendants cannot credibly argue that their cartel did not cause market-wide harm. As one provider put it, the cartel has "decimated my life" and caused "the closing of my business," which "left patients having to travel 2.5 [hours] for surgery." *Id.* ¶ 596. This harm does not rely on the aggregation of vertical restraints. Instead, DAPs allege *each* agreement between MultiPlan and another payor harms competition because it results in providers being underpaid for their OON services and without another source of payment to turn to for those services. *Id.* ¶¶ 767, 796. Were it not for each agreement, each Defendant "would have competed . . . to independently set and negotiate prices for [OON] services, resulting in higher payments for [OON] services." *Id.* ¶ 770.

Defendants criticize the DAPs for not alleging how each of MultiPlan's agreements with other payors "increased the market share of any plan or impacted competition between plans," "reduced demand by patient-subscribers for provider services," or "resulted in anticompetitive

prices in any market." DB 29-30. That is incorrect. DAPs explain how MultiPlan's agreements result in providers being paid less for OON services than they would have been paid but-for the cartel. DC ¶¶ 36, 142-43, 357-380. Those agreements affected competition between payors by *destroying* OON pricing competition. *Id.* ¶¶ 19, 25-27, 163, 291. And this case is a buyers' cartel case about purchases of OON services, not patients' demand for OON services. *Supra* § III.B. Further, "[n]either *Twombly* nor *Iqbal* requires a plaintiff to prove [its] case in the complaint, nor do they impose a summary judgment-like standard to be applied at the pleading stage." *In re Text Messaging Antitrust Litig.*, 2010 WL 1782006, at *4 (N.D. Ill. 2010).[15]

### D. There Are No Procompetitive Justifications for Defendants' Cartel

Defendants argue that DAPs' rule of reason claims fail because this Court can find—based solely on the pleadings—that Defendants' conduct was "procompetitive." DB 30. This argument bites off more than it can chew. "[C]onsideration of alleged procompetitive effects of Defendants' actions and the ultimate judgment of whether any procompetitive effects 'outweigh' any anticompetitive effect is inappropriate" on a motion to dismiss. *Davitashvili v. Grubhub Inc.*, 2022 WL 958051, at *6 (S.D.N.Y. 2022). Such justifications are "a defense, and complaints need not anticipate and plead around defenses." *Deslandes v. McDonald's USA, LLC*, 81 F.4th 669, 705 (7th Cir. 2023). Thus, arguments that "lower reimbursement rates necessarily mean lower" costs are "not susceptible to resolution" on a motion to dismiss. *Delta Dental*, 484 F. Supp. 3d at 642. And DAPs allege that the cartel's underpayments to providers did not result in lower costs. Instead, while the payors got rich from the cartel, they consistently short-changed providers, patients, and health plan subscribers. DC ¶¶ 594-96, 612-54. As one subscriber put it: "What they're trying to

---

[15] Defendants argue that their agreements were not anticompetitive because "[i]nsurance plans are free to decide which cost-management products, if any, they want to use." DB 29. That is a non-sequitur. Companies are free to switch suppliers, but they are not free to join a cartel.

say is 'Look how much [we] saved you,' but that's really not savings." *Id.* ¶ 620.

Furthermore, Defendants argue that DAPs must "allege that MultiPlan could achieve the same procompetitive benefits . . . through less restrictive means." DB 30. But DAPs do allege that the any supposed procompetitive benefits from MultiPlan's pricing methodology (and, in reality, there are none) could be achieved using the pricing benchmarks that were common prior to the cartel. *See* DC ¶¶ 37, 44, 298-303, 660. And "whether challenged conduct has a procompetitive effect on balance so as to survive scrutiny under a rule-of-reason analysis is a factual issue for trial," not a motion to dismiss. *Dealer Mgmt. Sys.*, 362 F. Supp. 3d at 495.

## IV.   DAPs Allege Antitrust Injury and Standing

### A.   DAPs Plead Antitrust Injury

Defendants claim DAPs cannot allege antitrust injury because DAPs allegedly seek "excessive" prices and their harms allegedly flow from "*more* competition from MultiPlan's entry—not less." DB 19. Both contentions flip the law and DAPs' allegations on their heads. "[A] seller sufficiently alleges antitrust injury by pleading that it has received excessively low prices from members of the buyers' cartel." *Omnicare*, 524 F. Supp. 2d at 1040; *Delta Dental*, 484 F. Supp. 3d at 642 (same); *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 105 (3d Cir. 2010) ("artificially depressed reimbursement rates" imposed by "alleged conspiracy" "constitute an antitrust injury."). DAPs allege the cartel paid them less than they would have received absent Defendants' collusion. DC ¶¶ 49, 113, 158-59, 662, 664, 674-76, 757. Defendants claim that DAPs must calculate the underpayments made to each "particular plaintiff." DB 13, 17. DAPs are not required to attach a damages expert report to their Complaint. A common scheme coupled with examples of fixed prices "permit[s] the reasonable inference that Defendants were . . . fixing prices for *all*." *In re Broiler Chicken Antitrust Litig.*, 2025 WL 461407, at *6 (N.D. Ill. 2025).

Defendants' claim that DAPs are seeking "excessive" payments. DB 19-20. But

Defendants tell a different story under oath. DC ¶ 655. Regardless, "[i]t is no excuse that the prices fixed" are supposedly "reasonable." *Catalano*, 446 U.S. at 647; *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988-89 (9th Cir. 2000) ("Clearly mistaken is the occasional court that considers low buying prices pro-competitive or that thinks sellers receiving illegally low prices do not suffer antitrust injury."). Defendants simply ignore this Circuit's cases finding that depression of prices by a buyers' cartel causes market-wide harm. *See Vogel*, 744 F.2d at 601 ("Just as a sellers' cartel enables the charging of monopoly prices, a buyers' cartel enables the charging of monopsony prices; and monopoly and monopsony are symmetrical distortions of competition from an economic standpoint."); *Carbone*, 621 F. Supp. 3d at 890 (complaint adequately alleged antitrust injury from a conspiracy to use a common pricing methodology). Moreover, Defendants' argument is answered by the well-pled facts—the cartel did not "increase" competition, DB 19; it destroyed it. Defendants agreed "to stop competing against each other" and to "stop using their independent judgment" to set prices for OON services. DC ¶ 2; *see also id.* ¶¶ 8, 25-28, 120, 286.

## B.      DAPs Plead Antitrust Standing

Defendants' antitrust standing argument is equally baseless. Antitrust standing "is the equivalent of the common-law tort limitation of proximate cause." *Sanner v. Bd. of Trade of City of Chicago*, 62 F.3d 918, 926-29 (7th Cir. 1995). It is readily found where, as here, the plaintiffs allege they are the ***direct, intended victims*** of a buyers' cartel. *Id.* That is precisely what the complaint shows. DAPs submit bills to Defendants and receive payments directly from Defendants for their OON services. DC ¶ 143. The cartel artificially depressed the prices paid to DAPs for OON services, and Defendants designed their conspiracy to make it effectively impossible for DAPs to reject or challenge those prices. *Id.* ¶¶ 12-13, 157-59.[16] It is difficult to imagine a clearer

---

[16] This case is nothing like *Marion Diagnostic Center, LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 347 (7th Cir. 2022), where the court found that "indirect purchasers further down the supply chain," who did

case of antitrust standing. *Sanner*, 62 F.3d at 927 (antitrust standing pled where defendants intentionally "depressed prices" paid to sellers); *Omnicare*, 524 F. Supp. 2d at 1042 ("In a buyers' cartel case . . . the most direct seller [] is the proper plaintiff.").

Nevertheless, Defendants argue that DAPs' injuries are "indirect and derivative" because there is no preexisting "contractual relationship" between a provider and payor for OON services. DB 15. But that argument ignores decades of binding authority. *See, e.g.*, *Socony-Vacuum*, 310 U.S. at 216-18 (defendants' fixed and maintained "spot market prices" for gasoline sold to distributors and consumers); *Sanner*, 62 F.3d at 928-29 (plaintiffs had no contractual relationships with defendants, but had antitrust standing where they alleged "direct harm" from an "artificial drop in cash market prices."); *Marshfield Clinic*, 65 F.3d at 1414-15 (while "the two entities were not linked by any overarching contract," plaintiff "ought to be allowed to sue to recover" for damages arising from defendant's violation of the antitrust laws).[17]

Defendants' claim that DAPs' injuries are nonetheless "indirect" and "derivative" of injuries to DAPs' patients, DB 15-16, ignores the applicable law in this Circuit that, "for antitrust purposes," a payor is "treated as a buyer where it pays the bill and seeks to set the amount charged." *Marshfield Clinic*, 881 F. Supp. at 1317. Defendants' argument that DAPs lack standing because they purportedly can "balance bill" patients for the amounts unpaid by Defendants is equally meritless. Whether "the victim of" cartel pricing can "partially recoup[] its loss in some other way" is legally irrelevant because federal antitrust law prohibits any such "pass through" defense. *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262 n.14 (1972). A direct seller is "injured in its business" by undercharges from *direct buyers* even if a direct seller "passed on" some or all of

---

not purchase products from the Defendants, lacked standing to challenge an upstream conspiracy. *See* DB 16. Here, DAPs receive collusive payments at below-market rates *directly* from Defendants. DC ¶ 675.

[17] The Seventh Circuit rejected this "contractual relationship" argument, because "each payment and acceptance [is] a separate completed contract." *Marshfield Clinic*, 65 F.3d at 1414.

the undercharge. *See Ill. Brick Co. v. Illinois*, 431 U.S. 720, 724-75 (1977); *Omnicare*, 524 F. Supp. 2d at 1043 (plaintiff that "was paid lower-than-competitive reimbursement rates" which "might, but might not, be passed on" to others had antitrust standing). The Supreme Court has rejected arguments to deviate from the "bright line" rule that the party directly transacting with the antitrust violator is entitled to seek relief. *Apple Inc. v. Pepper*, 587 U.S. 273, 282 (2019).

Even if balance billing were relevant, DAPs explain why it is not possible here. For emergency services, DAPs are prohibited by the No Surprises Act and similar state laws from balance billing patients. DC ¶¶ 338, 556; 42 U.S.C. § 300gg-111.[18] And for non-emergency services, providers cannot "simply reject[]" the cartel's underpayments as Defendants argue. DB 16. Providers have no practical ability to refuse the Defendants' underpayments—or the requirement that, to be paid at all, DAPs must agree not to balance bill. *Id.* ¶¶ 12-13,103, 339-41, 685, 694-700. The cartel sets prices for OON services on a take-it-or-leave-it basis and tells providers that if they do not accept the cartel's pricing, life will get worse for them. *Id.* ¶ 158, 373-76, 698. The cartel also specifically prohibits balance-billing when it pays a provider for OON services. *Id.* ¶¶ 206, 339, 526. So, it is not practically possible for providers to collect balances from patients. *Id.* ¶¶ 340, 677. "[T]he offer of a Hobson's choice" does not deprive DAPs of antitrust standing. *See Blue Shield of Va. v. McCready*, 457 U.S. 465, 483 (1982).

Defendants rely on *Pac. Recovery Sols. v. United Behav. Health*, 481 F. Supp. 3d 1011, 1022 (N.D. Cal. 2020), but in that case the plaintiff healthcare providers expressly alleged that *their patients* were "the direct victims of the alleged conspiracy." *Id.*; *see also Pac. Recovery Sols. v. Cigna Behav. Health, Inc.*, 2021 WL 1176677, at *8 (N.D. Cal. 2021) ("By Plaintiffs' own allegations, Plaintiffs' patients are the direct victims."). The *Pacific Recovery* plaintiffs also failed

---

[18] The statutory prohibition on balance billing for emergency services distinguishes this case from actions cited by Defendants that were decided before the No Surprises Act took effect. *See* CB 18.

to allege, as DAPs do here, that they were prohibited, both legally and by the Defendants themselves, from balance billing their patients for OON services.[19]

Finally, Defendants insinuate that emergency medicine providers might be able to be made whole through the independent dispute resolution ("IDR") process provided by the No Suprises Act, 42 U.S.C. § 300gg-111(c)(1)(B). DB 16. While Defendants say this process is mandatory, "the statute does not say anything like that." *Biden v. Texas*, 597 U.S. 785, 802 (2022). The statute says that a provider "may" institute the IDR process, 42 U.S.C. § 300gg-111(c)(1)(B), confirming that it is a discretionary process. *Biden*, 597 U.S. at 802. Tellingly, Defendants fail to cite a single authority to the contrary. As Defendants' only case on this point explains, "where . . . the parties are unable to resolve the dispute through negotiations, the parties **may** then proceed to IDR arbitration." *GPS of N.J. M.D., P.C. v. Horizon Blue Cross & Blue Shield*, 2023 WL 5815821, at *2 (D.N.J. 2023) (emphasis added). Moreover, the IDR process is too slow and cumbersome to possibly protect DAPs from Defendants' OON pricing scheme. DC ¶¶ 678-83. And even if it could, the existence of an alternative, voluntary means of resolving a pricing dispute does not deprive a plaintiff of antitrust standing. *See Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 773 (2d Cir. 2016) (plaintiffs had antitrust standing though they "remained free to negotiate" interest rates).

## V.    DAPs Plead Facts Showing that Each Defendant Participated in the Cartel

There "is no 'group pleading' doctrine . . . that either permits or forbids allegations against Defendants collectively." *Sloan v. Anker Innovations Ltd.*, 711 F. Supp. 3d 946, 955 (N.D. Ill. 2024); *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d 968, 984 (N.D. Ill. 2022) (complaints "need not contain detailed 'defendant by defendant' allegations"); *Carbone*, 621 F.

---

[19] Defendants' reliance on *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 903 F. Supp. 2d 880 (C.D. Cal. 2012) is misplaced. There, patients alleged that, due to the under-reimbursement of providers, patients incurred "more out-of-pocket expense[s]," and the patients claimed that they were the "more direct victims" of the alleged antitrust violation. *Id.* at 893, 902.

Supp. 3d at 887 ("plaintiffs are not required to cite evidence specific to each defendant in their complaint"). A complaint need only "give the defendant fair notice of what the claim is and the grounds upon which it rests," *Agri Stats*, 2020 WL 6134982, at *5 (citation omitted).

Here, DAPs allege facts specific to Benefit Plan Administrators, Consociate, and Secure Health, showing that they participated in the cartel by using MultiPlan's common pricing methodology and attending cartel meetings. DC ¶ 186 (BPA); *id.* ¶¶ 189, 270, 274 (Consociate); *id.* ¶¶ 197, 289 (Secure Health). In the case of Consociate, DAPs included a picture of Consociate executives drinking at a cartel meeting. *Id.* ¶ 274. In addition, DAPs allege that each of those Defendants adjudicate and price claims for OON services, *id.* ¶ 97, and that MultiPlan has "horizontal pricing agreements" with each of them, *id.* ¶¶ 79, 129. This is not group pleading.

## VI. DAPs Allege State Law and Unjust Enrichment Claims (Counts 6-8)

### A. DAPs Allege State Antitrust Statute Claims (Count 6)

Defendants mistakenly assert that the DAPs' state law antitrust claims should be dismissed on the same grounds as the federal claims. DB 36. Because the federal claims are adequately pled, including as to proximate cause, this argument fails. In any event, DAPs' state antitrust claims are brought, in the alternative to the federal antitrust claims, in so-called "*Illinois-Brick*-repealer" jurisdictions that allow indirectly injured parties to sue and take a broader approach to proximate cause. *E.g.*, *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 816 (N.D. Ill. 2017) ("any state with an *Illinois Brick* repealer would reject application of *AGC* to this case").[20]

### B. DAPs Allege State Consumer Protection Statute Claims (Count 7)

Defendants wrongly argue that DAPs' claims under four states' consumer protection laws

---

[20] *Supreme Auto Transp. v. Arcelor Mittal USA,* cited by Defendants, confirmed that many suits that "would be barred under federal law" satisfy "ordinary principles of proximate causation" in *Illinois-Brick*-repealer states. 902 F.3d 735, 744 (7th Cir. 2018). And Defendants miscite *Loeb Indus.v. Sumitomo Corp.*, which declined to analyze the state law claims for lack of federal jurisdiction. 306 F.3d 469, 496 (7th Cir. 2002).

are conclusory. But DAPs explain how Defendants unfairly, unlawfully, and deceptively fix the prices for OON services while claiming otherwise. *See* DC ¶¶ 694-722, 817-29, 817-31, 833.[21]

Defendants incorrectly claim that DAPs do not allege specific deceptive misrepresentations required by Arizona, California, and Minnesota law; or reliance for the Minnesota and Arizona claims. But DAPs specifically allege that they relied on Defendants' false claims that they provide reasonable and competitive rates to OON providers, and Multiplan's false claims that it is not a payor. *See, e.g.*, DC ¶¶ 225, 249, 694-722, 817-29. These allegations are more than sufficient. *See, e.g.*, *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 222 (S.D.N.Y. 2012) (Arizona law); *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig*, 2024 WL 4532937, at *51 (N.D. Cal. 2024) (Minnesota law); *Hytera Commc'ns Corp. v. Motorola Sols., Inc.*, 623 F. Supp. 3d 857, 884 (N.D. Ill. 2022) (California law).

Moreover, California's Unfair Competition Law ("UCL") provides relief for three forms of unfair competition: (1) unlawful, (2) unfair, or (3) fraudulent. *See In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 395 (D.N.J. 2018). Accordingly, by alleging business practices forbidden by law, (*e.g.*, a conspiracy to fix prices), DAPs have stated a claim under the UCL's unfair and unlawful prongs. *See id.* at 395; *Hytera*, 623 F. Supp. 3d at 884.

Defendants also misstate Minnesota law. DB at 38. Minnesota "eliminated the requirement of pleading and proving 'traditional common law reliance' as an element." *Wiegand v. Walser Auto. Groups, Inc.*, 683 N.W.2d 807, 811 (Minn. 2004) (citation omitted); *see In re Soc. Media*, 2024 WL 4532937, at *51; *see also* Minn. Stat. § 325F.68 subd. 8.

Defendants claim DAPs fail to enumerate a deceptive practice under Colorado law, Colo. Rev. Stat. Ann. § 6-1-105. This argument fails. DAPs allege Defendants make false or misleading

---

[21] *Clark v. Experian Info. Sols., Inc.*, is inapposite, as that case only concerns a dispute regarding choice-of-law and says nothing about adequate pleading. 2005 WL 1027125, at *4 (N.D. Ill. 2005).

statements concerning the price of OON services, DC ¶¶ 694-700; fail to disclose material information, *id.* ¶¶ 701-22; and knowingly or recklessly engage in unfair, unconscionable, and deceptive practices, *id.* ¶¶ 7-46, 551. *See* Colo. Rev. Stat. Ann. § 6-1-105 (l), (u), and (rrr).

### C. DAPs Allege Unjust Enrichment Claims (Count 8)

Defendants argue that DAPs' complaint fails to state a claim for unjust enrichment pursuant to the law in eleven jurisdictions. DB 38. Not so. Unjust enrichment is indeed a state common law claim, but DAPs properly state such a claim under the law of each relevant state. *See* Restatement (First) of Restitution §1 (1937) (elements); *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 697 n.40 (S.D. Fla. 2004) (unjust enrichment is a universally recognized cause of action with elements that are materially the same throughout the states); *In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 916 & n.50 (E.D. Pa. 2012). As Defendants acknowledge, to state an unjust enrichment claim, a plaintiff must allege (1) the unjust retention of (2) a benefit received (3) at the expense of the plaintiff. DB 39. Contrary to Defendants' false assertion that DAPs merely list claims under various state laws, DAPs allege facts for each required element, specifically alleging at length how Defendants conspire to underpay doctors, and unjustly retain as profits fees that should have been paid to DAPs. *See* DC ¶¶ 12-29, 37, 40, 49, 286, 309, 394-96, 424, 438, 841 (unjust retention of fees through payment of unfairly low rates), 842-43 (unjust retention of fees that should have been paid to DAPs).

Defendants argue that the unjust enrichment claim should be dismissed because DAPs have an adequate remedy at law and duplicative claims. DB 40. However, DAPs plead unjust enrichment in the alternative to all other causes of action. DC ¶ 839; Fed. R. Civ. P. 8(d)(2). Alternative pleading is no reason to dismiss these claims.

## VII. Alternatively, Leave to Amend Should be Granted

If there are any pleading deficiencies, leave to amend should be granted. *Text Messaging*, 2010 WL 1782006, at *1. Defendants raise no argument to the contrary.

## CONCLUSION

Defendants contest nearly every material fact alleged in DAPs' Complaint. This is a motion to dismiss. They should save those arguments for the jury. The motion should be denied.

Dated: March 3, 2025

*/s/ Stephen M. Medlock*
Stephen M. Medlock
Stephen Cohen
Michael McCambridge
**VINSON & ELKINS LLP**
2200 Pennsylvania Ave., N.W., Suite 500 W
Washington, D.C. 20037
Tel: (202) 639-6500
smedlock@velaw.com
scohen@velaw.com
mmccambridge@velaw.com

Mackenzie Newman
1114 Avenue of the Americas
New York, NY 10036
Tel: (212) 237-0000
mnewman@velaw.com

Michael Scarborough
Dylan Ballard
555 Mission Street
Suite 2000
San Francisco, CA 94105
Tel: (415) 979-6900
mscarborough@velaw.com
dballard@velaw.com

*/s/ Matthew M. Lavin*
Matthew M. Lavin
Gabriel H. Scannapieco
**ARNALL GOLDEN GREGORY LLP**
2100 Pennsylvania Ave., N.W., Suite 350S
Washington, D.C. 20037
Tel: (202) 677-4030

39

Matt.Lavin@agg.com
Gabe.Scannapieco@agg.com

*/s/ Hunter J. Shkolnik*
Hunter J. Shkolnik
Paul J. Napoli
Nestor D. Galarza
**NS PR LAW SERVICES LLC**
1302 Avenida Ponce de León
Santurce, Puerto Rico 00907
Tel: (787) 493-5088
Hunter@NSPRLaw.com
PNapoli@NSPRLaw.com
NGalarza@NSPRLaw.com

Shayna E. Sacks
**NAPOLI SHKOLNIK PLLC**
360 Lexington Avenue, 11th Floor
New York, NY 10017
Tel: (212) 397-1000
SSacks@napolilaw.com

*/s/ Jennifer R. Scullion*
Jennifer R. Scullion
Caleb Seeley
**SEEGER WEISS LLP**
55 Challenger Road 6th Fl.
Ridgefield Park, NJ 07660
Tel: (973) 639-9100
jscullion@seegerweiss.com

*Direct Action Plaintiffs' Executive Committee*

*/s/ Christopher Seeger*
Christopher Seeger
**SEEGER WEISS LLP**
55 Challenger Road 6th Fl.
Ridgefield Park, NJ 07660
Tel: (973) 639-9100
cseeger@seegerweiss.com

*Plaintiffs' Coordinating Counsel*