**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: MULTIPLAN HEALTH INSURANCE PROVIDER LITIGATION | Case No. 1:24-cv-06795 MDL No. 3121 |
| This Document Relates To: | Hon. Matthew F. Kennelly |
| 1:24-cv-7177 1:24-cv-6802 | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS**
**THE CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 1

II.  BACKGROUND ................................................................................................. 4

    A.  Competitive Dynamics in the U.S. Healthcare System ................................ 4

    B.  The MultiPlan Cartel ................................................................................... 5

    C.  Prior Industry Collusion: The Ingenix Cartel (1997-2009) ..................................... 8

    D.  The MultiPlan Cartel Takes Shape ................................................................. 8

III.  THE PLEADING STANDARD IN SECTION 1 CASES ................................................ 9

IV.  ARGUMENT .................................................................................................... 9

    A.  Defendants Cannot Use a Motion to Dismiss to Rewrite the Complaint ............... 9

    B.  Plaintiffs Adequately Allege Antitrust Standing and Injury................................ 10

        1.  Plaintiffs Adequately Allege Antitrust Standing.......................................... 11

        2.  Plaintiffs Adequately Allege Antitrust Injury ............................................. 15

    C.  Plaintiffs Adequately Allege a Horizontal Conspiracy ..................................... 18

        1.  The Complaint Alleges Direct Evidence of an Agreement ......................... 19

        2.  The Complaint Adequately Alleges an Agreement Under the "Invitation-and-Acceptance" Analysis ...................................................................... 21

            a.  MultiPlan invited insurers to engage in concerted action ............ 21

            b.  The Insurer Defendants accepted MultiPlan's invitation to act in concert .................................................................. 22

        3.  The Complaint Alleges an Agreement Circumstantially via Parallel Conduct and "Plus Factors" ...................................................................... 24

            a.  Plaintiffs allege parallel conduct ................................................ 24

            b.  Plaintiffs allege numerous plus factors ....................................... 27

    D.  If the Court Applies a Mode of Analysis at This Stage, It Should be the *Per Se* Rule ............................................................................................................. 31

    E.  Out-of-Network Services Have Fixable Prices ................................................ 33

    F.  Plaintiffs Allege a Cognizable Antitrust Market ............................................. 35

    G.  There is No "Group Pleading" Issue ............................................................. 39

V.  CONCLUSION..................................................................................................... 40

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Am. Needle, Inc. v. NFL*,
 560 U.S. 183 (2010) ................................................................................................ 18

*Apple, Inc. v. Pepper*,
 587 U.S. 273 (2019) ................................................................................................ 15

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
 459 U.S. 519 (1983) ......................................................................................... 11, 14

*Atl. Richfield Co. v. USA Petroleum Co.*,
 495 U.S. 328 (1990) ................................................................................................ 17

*Atl. Seaboard Corp. v. Fed. Power Comm'n*,
 404 F.2d 1268 (D.C. Cir. 1968) ............................................................................. 14

*Arizona v. Maricopa Cnty. Med. Soc.*,
 457 U.S. 332 (1982) ................................................................................. 16, 33, 35

*Bank of Am. v. Knight*,
 725 F.3d 815 (7th Cir. 2013) .................................................................................. 40

*Beatrice Foods Co. v. F.T.C.*,
 540 F.2d 303 (7th Cir. 1976) .................................................................................. 38

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ............................................................................................ 9, 24

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
 65 F.3d 1406 (7th Cir. 1995) ........................................................................... Passim

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
 881 F. Supp. 1309 (W.D. Wis. 1994) ..................................................................... 12

*Blue Shield of Virginia v. McCready*,
 457 U.S. 465 (1982) ................................................................................................ 13

*Bodie-Rickett & Assocs. v. Mars, Inc.*,
 957 F.2d 287 (6th Cir. 1992) .................................................................................. 11

*Brown Shoe Co. v. United States*,
 370 U.S. 294 (1962) ................................................................................................ 38

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
 429 U.S. 477 (1977) ................................................................................................ 17

*Carbone v. Brown Univ.*,
 621 F. Supp. 3d 878 (N.D. Ill. 2022) .................................................................. Passim

*Catalano, Inc. v. Target Sales, Inc.*,
 446 U.S. 643 (1980) ......................................................................................... 33, 35

*Chamberlain Grp., Inc. v. Techtronic Indus. N.A., Inc.*,
2017 WL 4269005 (N.D. Ill. 2017) ................................................................. 40

*Chicago Studio Rental v. Ill. Dep't of*,
940 F.3d 971 (7th Cir. 2019) ........................................................................... 17

*Citizen Publ'g Co. v. United States*,
394 U.S. 131 (1969) ......................................................................................... 32

*City of Rockford v. Mallinckrodt ARD, Inc.*,
360 F. Supp. 3d 730 (N.D. Ill. 2019) ................................................................ 9

*Conrad v. Jimmy John's Franchise, LLC*,
2021 WL 718320 (S.D. Ill. Feb. 24, 2021) ..................................................... 35

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) ................................................................................... 3, 31

*Cornish-Adebiyi v. Caesars Ent., Inc.*,
2024 WL 4356188 (D.N.J. Sept. 30, 2024) ......................................... 25, 29, 30

*Deslandes v. McDonald's USA, LLC*,
81 F.4th 699 (7th Cir. 2023) .................................................................. 2, 16, 28

*Duffy v. Yardi Sys., Inc.*,
2024 WL 4980771 (W.D. Wash. Dec. 4, 2024) ..................................... Passim

*Elward v. Electrolux Home Prods., Inc.*,
264 F. Supp. 3d 877 (N.D. Ill. 2017) ............................................................... 26

*Emergency Physician Servs. of N.Y. v. UnitedHealth Grp., Inc.*,
2024 WL 4229902 (S.D.N.Y. Sept. 17, 2024) ................................................. 18

*Franco v. Conn. Gen. Life Ins. Co.*,
818 F. Supp. 2d 792 (D.N.J. 2011) .................................................................. 34

*FTC v. Advocate Health Care Network*,
841 F.3d 460 (7th Cir. 2016) ........................................................................... 36

*Gibson v. Cendyn Grp., LLC*,
2024 WL 2060260 (D. Nev. May 8, 2024) ........................................... 25, 29, 30

*Gibson v. MGM Resorts Int'l*,
2023 WL 7025996 (D. Nev. Oct. 24, 2023) ........................................... 29, 30

*Gomez v. Illinois State Bd. of Ed.*,
811 F.2d 1030 (7th Cir. 1987) ......................................................................... 10

*Great Atl. & Pac. Tea Co. v. FTC*,
440 U.S. 69 (1979) ........................................................................................... 22

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
392 U.S. 481 (1968) .................................................................................... 2, 13

*In re Aetna UCR Litig.*,
2015 WL 3970168 (D.N.J. 2015) ..................................................................... 34

iv

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
2022 WL 4581903 (S.D.N.Y. Aug. 3, 2022)................................................. 20, 21

*In re Blue Cross Blue Shield Antitrust Litig.*,
2017 WL 2797267 (N.D. Ala. June 28, 2017)............................................. 37, 39

*In re Broiler Chicken Antitrust Litig.*,
290 F. Supp. 3d 772 (N.D. Ill. 2017) ................................................... 9, 25, 27

*In re Broiler Chicken Antitrust Litig.*,
2025 WL 461407 (N.D. Ill. Feb. 11, 2025) ............................................ 28, 29, 40

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
2015 WL 3988488 (N.D. Ill. June 29, 2015).............................................. 38, 39

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
362 F. Supp. 3d 510 (N.D. Ill. 2019) .............................................................. 31

*In re Deere & Co. Repair Serv. Antitrust Litig.*,
703 F. Supp. 3d 862 (N.D. Ill. 2023) ..................................... 17, 18, 27, 32

*In re Delta Dental Antitrust Litig.*,
484 F. Supp. 3d 627 (N.D. Ill. 2020) ..................................................Passim

*In re High Fructose Corn Syrup Litig.*,
295 F.3d 651 (7th Cir. 2002)............................................ 19, 22, 26, 32

*In re Local TV Advertising Antitrust Litig.*,
2022 WL 3716202 (N.D. Ill. Aug. 29, 2022)................................................. 29

*In re Loestrin 24 Fe Antitrust Litig.*,
814 F.3d 538 (1st Cir. 2016) .......................................................................... 35

*In re RealPage, Inc. Rental Software Antitrust Litig.*,
709 F. Supp. 3d 478 (M.D. Tenn. 2023) .................................... 22, 28, 29, 30

*In re Text Messaging Antitrust Litig.*,
630 F.3d 622 (7th Cir. 2010)............................................................. 25, 31

*In re Turkey Antitrust Litig.*,
642 F. Supp. 3d 711 (N.D. Ill. 2022) .............................................................. 24

*In re Turkey Antitrust Litig.*,
2025 WL 264021 (N.D. Ill. Jan. 22, 2025) .................................................... 14

*In re Wellpoint, Inc. Out-of-Network UCR Rates Litig.*,
903 F. Supp. 2d 880 (C.D. Cal. 2012) ............................................................ 13

*Ind. Grocery, Inc. v. Super Valu Stores, Inc.*,
864 F.2d 1409 (7th Cir. 1989)........................................................................ 17

*Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010)........................................................................... 20

*Interstate Cir., Inc. v. United States*,
306 U.S. 208 (1939) ...............................................................................Passim

*Int'l Outsourcing Servs., LLC v. Blistex, Inc.*,
    420 F. Supp. 2d 860 (N.D. Ill. 2006) ................................................................. 28, 33

*Killingsworth v. HSBC Bank Nev., N.A.*,
    507 F.3d 614 (7th Cir. 2007) ...................................................................................... 9

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000) .............................................................................. 16, 17

*Laumann v. Nat'l Hockey League*,
    907 F. Supp. 2d 465 (S.D.N.Y. 2012) ...................................................................... 23

*Law v. NCAA*,
    134 F.3d 1010 (10th Cir. 1998) ........................................................................... 3, 17

*LD v. United Behav. Health*,
    508 F. Supp. 3d 583 (N.D. Cal. 2020) ...................................................................... 14

*Little Rock Cardiology Clinic PA v. Baptist Health*,
    591 F.3d 591 (8th Cir. 2009) ..................................................................................... 39

*Loeb Indus. v. Sumitomo Corp.*,
    306 F.3d 469 (7th Cir. 2002) ....................................................................... 11, 15, 38

*Long Island Anesthesiologists PLLC v. United Healthcare Ins. Co. of N.Y. Inc.*,
    2023 WL 8096909 (E.D.N.Y. Nov. 21, 2023) .......................................................... 17

*Mandeville Island Farms v. American Crystal Sugar Co.*,
    334 U.S. 219 (1948) ................................................................................................... 15

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*,
    29 F.4th 337 (7th Cir. 2022) ..................................................................................... 23

*Marion Healthcare LLC v. S. Ill. Healthcare*,
    2013 WL 4510168 (S.D. Ill. Aug. 26, 2013) ............................................................ 39

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
    952 F.3d 832 (7th Cir. 2020) .................................................................................... 20

*Methodist Health Serv. Corp. v. OSF Healthcare Sys.*,
    2015 WL 1399229 (C.D. Ill. Mar. 25, 2015) ........................................................... 39

*Meyer v. Kalanick*,
    174 F. Supp. 3d 817 (S.D.N.Y. 2016) ........................................................... 23, 26, 32

*Midwest Gas Servs. v. Ind. Gas Co., Inc.*,
    317 F.3d 703 (7th Cir. 2003) .................................................................................... 11

*Moehrl v. Nat'l Ass'n of Realtors*,
    492 F. Supp. 3d 768 (N.D. Ill. 2020) .................................................................. 25, 39

*NCAA v. Alston*,
    594 U.S. 69 (2021) ..................................................................................................... 17

*N.Y. ex rel. Spitzer v. St. Francis Hosp.*,
    94 F. Supp. 2d 399 (S.D.N.Y. 2000) ......................................................................... 33

*Newcal Indus. v. Ikon Off. Sol.*,
   513 F.3d 1038 (9th Cir. 2008) .................................................................. 35

*Norfolk Monument Co. v. Woodlawn Mem. Gardens*,
   394 U.S. 700 (1969) ................................................................................. 27

*Omnicare, Inc. v. Unitedhealth Group, Inc.*,
   524 F. Supp. 2d 1031 (N.D. Ill. 2007) ............................................... 16, 35

*Pac. Recovery Sols. v. Cigna Behav. Health, Inc.*
   2021 WL 1176677 (N.D. Cal. Mar. 29, 2021) ................................... 13, 34

*Pac. Recovery Sols. v. United Behav. Health*,
   481 F. Supp. 3d 1011 (N.D. Cal. 2020) .................................................... 13

*Pit Row, Inc. v. Costco Wholesale Corp.*,
   101 F.4th 493 (7th Cir. 2024) .................................................................. 36

*Ploss v. Kraft Foods Group, Inc.*,
   197 F. Supp. 3d 1037 (N.D. Ill. 2016) ..................................................... 35

*Quantum Foods, LLC v. Progressive Foods, Inc.*,
   2012 WL 5520411 (N.D. Ill. Nov. 14, 2012) ........................................... 10

*RJ v. Cigna Health and Life Ins. Co.*,
   625 F. Supp. 3d 951 (N.D. Cal. 2022) ..................................................... 14

*Sharif Pharm. Inc. v. Prime Therapeutics, LLC*,
   950 F.3d 911 (7th Cir. 2020) ................................................................... 37

*Sloan v. Anker Innovations Ltd.*,
   711 F. Supp. 3d 946 (N.D. Ill. 2024) ....................................................... 39

*Swanson v. Citibank, N.A.*,
   614 F.3d 400 (7th Cir. 2010) ..................................................................... 9

*Tex. Med. Ass'n v. U.S. HHS*,
   120 F.4th 494 (5th Cir. 2024) .................................................................. 18

*Texas Hill Country Landscaping, Inc. v. Caterpillar, Inc.*,
   522 F. Supp. 3d 402 (N.D. Ill. 2021) ....................................................... 31

*Tichy v. Hyatt Hotels Corp.*,
   376 F. Supp. 3d 821 (N.D. Ill. 2019) ....................................................... 27

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001) .......................................................... 29, 37, 38

*Toys "R" Us, Inc. v. FTC*,
   221 F.3d 928 (7th Cir. 2000) ............................................................. 19, 23

*United States v. Apple Inc.*,
   952 F. Supp. 2d 638 (S.D.N.Y. 2013) ...................................................... 21

*United States v. Apple, Inc.*,
   791 F.3d 290 (2d Cir. 2015) ......................................................... 21, 23, 32

*United States v. Beaver*,
    515 F.3d 730 (7th Cir. 2008) .................................................................. 26

*United States v. Bertelsmann SE & Co. KGaA*,
    646 F. Supp. 3d 1 (D.D.C. 2022) ........................................................... 38

*United States v. Giraudo*,
    2018 WL 2197703 (N.D. Cal. May 14, 2018) ...................................... 13

*United States v. Paramount Pictures*,
    334 U.S. 131 (1948) ................................................................................ 24

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940) ................................................................... 25, 26, 38

*Vasquez v. Indiana Univ. Health, Inc.*,
    40 F.4th 582 (7th Cir. 2022) .................................................................. 12

*VHS Liquidating Trust v. MultiPlan Corp.*,
    2024 WL 5378341 (Cal. Super. Ct. Aug. 9, 2024) ............................... 34

*Vogel v. Am. Soc. of Appraisers*,
    744 F.2d 598 (7th Cir. 1984) .................................................................. 32

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010) ........................................................... 3, 15, 16

## Other Authorities

*The Firm as Cartel Manager*,
    64 Vand. L. Rev. 813 (2011) .................................................................. 32

## I.    <u>INTRODUCTION</u>

The Consolidated Class Action Complaint, ECF No. 172 (the "Complaint"), plausibly alleges that the Insurer Defendants[1] executed a conspiracy to fix and suppress out-of-network ("OON") payments to a proposed class of healthcare providers. Plaintiffs allege that the Insurer Defendants implemented this unlawful agreement by turning over non-public pricing data to a mutual third party, MultiPlan, and jointly delegating to MultiPlan their previously independent decision-making over OON compensation amounts (the "MultiPlan Cartel"). Compl. ¶¶184-88, 195-212. Each Insurer Defendant adopted MultiPlan's algorithmically-informed pricing determinations knowing they were derived from rival insurers' competitively sensitive information ("CSI"). *Id*. ¶¶147, 184-85, 213-17. And they did so with the purpose of suppressing prices for OON services, in part demonstrated by the fact that many Insurer Defendants are repeat players from the Ingenix Cartel. *Id*. ¶¶90-98, 250, 277. By eliminating competition among themselves for OON services, the Insurer Defendants suppressed prices in violation of the Sherman Act. *Id*. ¶¶279-80, 306-07, 313.

Rather than grapple with these straightforward allegations, Defendants alternate between mischaracterizing the Complaint and misstating the law. ECF No. 283 ("MTD"). Defendants make three principal arguments, all of which fail:

***First***, Defendants argue the Complaint fails to plead antitrust standing. Specifically, they argue that Plaintiffs' injury (artificially low OON payments) is not "direct" because healthcare providers can seek unpaid portions of their billed charges from patients ("balance billing"). MTD at 15-19. This argument both ignores a central allegation in the Complaint—that providers are

---

[1] The "Insurer Defendants" are Defendants Aetna, Inc., Cigna Group, UnitedHealth Group Inc., Elevance Health Inc., Health Care Service Corp., Horizon Health Services, Inc., Blue Cross Blue Shield of Michigan Mutual Insurance Company, and Highmark Inc.

*prohibited* from balance billing by the Cartel (¶¶172-74, 198)—and is legally incorrect. Under *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), and its progeny, a plaintiff's ability to pass on its injury to another party (patients, according to Defendants) neither negates the plaintiff's injury nor renders it "indirect." To the contrary, courts consistently hold that providers, like Plaintiffs, sell services directly to insurers. *See, e.g.*, *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic ("BCBS Wisconsin")*, 65 F.3d 1406, 1414 (7th Cir. 1995) (paying clinic directly for OON services gave insurer standing to sue clinic). This establishes antitrust standing.

Defendants further argue that Plaintiffs fail to allege antitrust injury because the Cartel (supposedly) "lowered costs" for the Insurer Defendants and their subscribers (patients). MTD at 20-21. That the Insurer Defendants reduced their *own* costs just proves the Cartel worked. But whether patient costs were also reduced—and Plaintiffs allege they were not (Compl. ¶17)—is legally irrelevant. Defendants' conduct was designed to and did harm competition among insurers in the market for OON healthcare services. *Id*. ¶¶277, 305-13. This is a cognizable antitrust injury. *See, e.g.*, *Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 703 (7th Cir. 2023) (explaining purported "benefits to consumers" do not justify monopsony pricing).

**Second**, Defendants argue that Plaintiffs fail to plausibly allege a conspiracy using either direct or circumstantial evidence. This argument relies mostly on misrepresenting the allegations, with Defendants asserting, contrary to the Complaint, that MultiPlan relies only on "publicly available data" to "recommend," rather than determine, OON prices. *Compare* MTD at 9-12, *with* Compl. ¶¶199-218. Defendants also suggest that allegations of an express agreement between competitors to act in the same way at the same time is required. MTD at 25-27. But Section 1 is not so limited. *See Interstate Cir., Inc. v. United States*, 306 U.S. 208, 227 (1939) ("It is elementary

2

that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators."). Additionally, Defendants attempt to disaggregate the alleged evidence, parsing individual allegations and claiming each is insufficient by itself. But allegations of a conspiracy must be viewed "as a whole," not "by dismembering it and viewing its separate parts." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (citation omitted). In any event, Defendants' assertions regarding the specific allegations also fail. For example, Defendants argue the Insurer Defendants behaved rationally and self-interestedly when they delegated their decision-making to MultiPlan because it lowered their input costs. MTD at 28-30. But increasing profits does not justify horizontal price fixing. *See Law v. NCAA*, 134 F.3d 1010, 1022 (10th Cir. 1998) ("[M]ere profitability or cost savings have not qualified as a defense under the antitrust laws.").

*Third*, Defendants argue that Plaintiffs fail to plead a "standalone product [or] service" with a "price" capable of being "fixed." MTD at 35-38. These arguments are nonsensical. Plaintiffs allege insurers buy OON services from providers for particular sums—*i.e.*, "prices"— and collude to suppress those payment amounts. Compl. ¶¶51, 60, 265. There is ample caselaw holding that collusion to suppress such provider payment amounts violates the antitrust laws. *See, e.g.*, *In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d 627, 638 (N.D. Ill. 2020); *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 104-05 (3d Cir. 2010). Nor does Plaintiffs' market definition—to the extent one is even necessary—suffer any "infirm[ity]," MTD at 38-40, much less one warranting dismissal. *Carbone v. Brown Univ.*, 621 F. Supp. 3d 878, 889 (N.D. Ill. 2022) (Kennelly, J.) ("All that is required . . . is for the plaintiffs to plead sufficient factual allegations that, when taken as true, make plausible the existence of a relevant market.").

Defendants' Motion to dismiss the Complaint should be denied in its entirety.

## II.     BACKGROUND

### A.      Competitive Dynamics in the U.S. Healthcare System

In the United States, commercial insurance companies and other third-party payers ("insurers") account for around 90% of all healthcare expenditures. Compl. ¶¶50-51, 252. Patients consume healthcare services and choose providers, but that is different from purchasing those services. *Cf.* MTD at 4 (conflating "buy[ing]," "consum[ing]," and "paying for medical treatment"). Healthcare providers depend on compensation from insurers to stay in business. Compl. ¶51. Typically, providers collect only nominal amounts from patients at the point of service (as "copays" or "co-insurance"). *Id*. Providers then submit a bill (or "claim") to the patient's insurer, which pays the provider directly for services. *Id*. Thus, from the perspective of providers like Plaintiffs, patients and insurers are not reasonably substitutable purchasers. *Id*. ¶252.

Insurers purchase the healthcare services consumed by their patient members subject to any coverage limitations. *Id*. ¶¶52, 73, 265. Healthcare services are thus necessary "inputs" for health plans. *Id*. ¶¶76, 265. In an unrestrained market, insurers compete against each other for these services, which results in increased compensation. *Id*. ¶¶5, 77-78, 181, 247, 279. Insurers can reduce costs by operating networks of providers who agree to perform services for their members at pre-negotiated rates. *Id*. ¶55. These rates reflect volume discounts, with providers agreeing to accept lower prices in exchange for access to an insurer's plan members. *Id*. Network rates result from closed-door negotiations between an insurer and a provider and can vary depending on the market power of each. *Id*. ¶¶58-59. Agreed-upon compensation rate schedules are confidential and competitively sensitive. *Id*. ¶58. Insurers treat them as "trade secrets," as knowledge of these rates can be used by rivals to outbid them (and lure away providers), or by providers to demand increased compensation. *Id*.

Providers decide which (if any) insurance networks to join based on the rates offered. *Id*.

4

¶¶59-60. Those that decline to participate in networks are not subject to network agreements and can charge retail prices. *Id*. ¶60. Insurers can choose to only purchase services performed by in-network providers. *Id*. ¶72. HMOs, for example, do not generally purchase OON services. *Id*. That is insufficient for many Americans, who view insurance networks as overly restrictive or inadequate and seek OON services. *Id*. ¶¶75, 77. To capture this demand, insurers sell plans, like PPOs, that allow members to seek covered treatment from OON providers. *Id*. ¶¶72, 75-76. Though PPOs generally cost more than HMOs, they are the most popular plans. *Id*. ¶¶74, 76.

Insurers may independently set their "allowed amounts" as they see fit. *Id*. ¶¶84-85. Historically, insurers used "usual, customary, and reasonable" ("UCR") benchmarks to determine their payment allowances for OON services. *Id*. ¶¶80-81. UCR benchmarks were pegged to publicly available retail charge data for like services performed within a particular geographic area. *Id*. ¶¶81, 120. Adopting a methodology that resulted in lower compensation rates posed significant competitive risks for Insurers. *Id*. ¶¶77-78. An insurer that paid below-market compensation would shift costs onto patients and providers. *Id*. Providers might elect to balance bill patients or refuse to sell OON services to that insurer (by declining to treat that insurer's patient members). *Id*. ¶¶77-78, 181. In turn, patients might move to an insurance plan with better OON coverage. *Id*. The industry term for the competitive consequences of under-paying OON providers is "abrasion." *Id*. In an unrestrained market, each insurer seeks to avoid abrasion by paying competitive compensation rates to providers, which can push OON prices up. *Id*. ¶¶77-78. Insurers' unilateral interest in competing for OON services (and subscribers), however, conflicts with their *collective* interest in reducing overall OON costs, presenting a collective action problem. *Id*. ¶6.

## B. The MultiPlan Cartel

MultiPlan offered insurers a way (albeit illegal) to overcome this collective action problem: by acting as the ringleader of a Cartel to suppress OON prices. *Id*. ¶¶7-12. Since at least 2015,

MultiPlan has sold OON claims "repricing" services and software. *Id*. ¶¶132, 179, 183. "Repricing" is industry jargon for paying providers less than what they billed the insurer for services rendered. *Id*. ¶132.

Insurers that sign up for MultiPlan's repricing services agree to delegate their decision-making over how to compensate OON providers to MultiPlan. *Id*. ¶195. According to MultiPlan, by doing so, "[c]ommercial plans of any size" can obtain significant "discounts on out-of-network charges" while ensuring "low provider abrasion" and "minimizing the balance billing of their members." *Id*. ¶182. MultiPlan requires its clients (the Insurer Defendants and their co-conspirators) to submit real-time, non-public claims and payment data—data typically considered competitively sensitive. *Id*. ¶¶8, 199-201. MultiPlan also requires insurers to disclose their non-public pricing preferences and strategies. *Id*. ¶¶157-59, 184, 199. MultiPlan aggregates the data and preferences harvested from its "700-plus payer customers" into a single dataset and feeds it into its "Data iSight" algorithm, which sets target compensation levels for each OON claim. *Id*. ¶¶8, 128, 148, 186-87. The algorithm is simplistic; as MultiPlan admits, it merely calculates "median" payment amounts for like procedures. *Id*. ¶149. MultiPlan keeps these median calculations artificially low by including, among other things, discounted, confidential in-network payments in its dataset. *Id*. ¶¶153-54. Beyond using the Insurer Defendants' CSI in setting prices through Data iSight, MultiPlan also shares that information within the Cartel to further promote its efforts to depress provider payments. *Id.* ¶¶200-12, 240.

MultiPlan also maintains the ability to override its basic formula by instructing insurers to impose specific caps, like 250% of the Medicare rate. *Id.* ¶¶10, 159, 165. These caps allow MultiPlan to suppress payment amounts *en masse*, driving down median payment amounts even faster. *Id.* ¶10. Once the market resets based on these new, suppressed compensation levels,

MultiPlan instructs insurers to enter even lower rate caps, while assuring them that they will remain, in the words of one MultiPlan executive, in the "middle of the pack," avoiding the competitive harms (*i.e.*, "abrasion") that would be expected in an unrestrained market. *Id.*

To ensure that its low, fixed payment rates hold, MultiPlan enforces them with providers on behalf of the Insurer Defendants and other co-conspirators, who contractually agree to honor MultiPlan's "negotiated rates." *Id.* ¶11. These negotiations are coercive, with MultiPlan threatening to withhold most or all payment if providers do not quickly accept the initial offer. *Id.* ¶¶11, 170-71. Handling these "negotiations" is central to MultiPlan's ability to "minimize abrasion," which it accomplishes, in part, by conditioning compensation offers on the provider's agreement not to balance bill the patient. *Id.* ¶¶11, 173, 220. This condition—which no individual insurer could impose while simultaneously cutting their rates—ensures providers, not patients, are the ones injured by the Cartel. *Id.* ¶¶181, 198. Insurers cannot and do not second-guess MultiPlan's rate determinations. *Id.* ¶¶11, 215, 220. In 98% of cases, MultiPlan's rate determination is imposed on the provider and becomes the final price paid by the insurer. *Id.* ¶173. MultiPlan points to these high provider acceptance rates as proof its payments are reasonable. *Id.* ¶12. But what they actually prove is the existence of a Cartel with collective monopsony power. *Id.* ¶12.

The Cartel suppresses the compensation paid to providers by insurers for OON healthcare services. According to one study, compensation amounts paid to OON providers based on MultiPlan's methodology are 1.5 to 49 times lower than rates paid for the same services based on UCR benchmarks. *Id.* ¶306. For each claim it reprices, MultiPlan receives a fee based on a percentage of the difference between the initial claim amount and what the insurer ultimately pays. *Id.* ¶13. In other words, MultiPlan gets paid more as providers get paid less, thus sharing in the spoils of the Cartel. *Id.* The revenues MultiPlan generates from its repricing services have

7

skyrocketed from $23 million in 2012 to $564 million in 2020 and $709 million in 2021. *Id.*

    **C.    Prior Industry Collusion: The Ingenix Cartel (1997-2009)**

The Cartel dates to roughly 2015, but it is not the first scheme by insurers to suppress OON compensation rates. *Id.* ¶90. From the late 1990s to around 2009, insurers suppressed these payments through a UnitedHealthcare subsidiary, Ingenix, Inc. *Id.* ¶¶18, 91, 98. During that time, Ingenix operated the sole repository of data that insurers used to calculate UCR benchmarks. *Id.* ¶91. But, as a 2008 New York Attorney General ("NYAG") investigation revealed, Ingenix was polluting its claims database with discounted in-network payment amounts (just as MultiPlan does), which skewed UCR values (and, in turn, provider compensation) downward. *Id.* ¶¶93, 97, 99. Providers tried to cover their losses by balance billing patients, leading to subscriber complaints and lawsuits, which sparked the NYAG investigation. *Id.* ¶97-99.

In 2009, twelve insurers (including UnitedHealth, Cigna, and Aetna) settled with NYAG. *Id.* ¶¶18, 100-01. They agreed to invest hundreds of millions of dollars to create FAIR Health, Inc., an independent UCR database, and to not develop or use any alternative for at least five years. *Id.* ¶¶18, 100-01. The five-year terms of those settlements ended in 2015 and 2016. *Id.* ¶102. Insurers then fled FAIR Health (and UCR benchmarking) to MultiPlan. *Id.* ¶109.

    **D.    The MultiPlan Cartel Takes Shape**

Between 2015 and 2018, the Insurer Defendants (and hundreds of others) adopted MultiPlan's OON claims repricing services as a new means to coordinate pricing. *Id.* ¶¶110-18. This time around, insurers sought to avoid the central pitfall of the Ingenix Cartel—subscriber abrasion—by preventing providers from balance billing. Compl. ¶¶97-98, 180-83. With this difference, all the "savings" generated by the MultiPlan Cartel would come out of providers' pockets. *Id.* ¶¶12, 198. FAIR Health still exists and can be used to generate UCR benchmarks. *Id.* ¶243. It charges a flat annual fee for access to its database, making it less expensive than Multiplan.

*Id*. But insurers nevertheless choose to pay MultiPlan's high fees because MultiPlan can do what FAIR Health does not: facilitate their price-fixing scheme. *Id*.

## III.  THE PLEADING STANDARD IN SECTION 1 CASES

A complaint need not plead "detailed factual allegations," but rather "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). On a motion to dismiss, the Court takes as true well-pleaded allegations and draws all inferences in Plaintiffs' favor. *See Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). For a Section 1 Sherman Act claim, a plaintiff must plead facts plausibly suggesting (1) a contract, combination, or conspiracy (*i.e.*, an agreement); (2) a resulting unreasonable restraint of trade in a relevant market; and (3) an accompanying antitrust injury. *See City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 753 (N.D. Ill. 2019). Although a plaintiff must plead more than facts that are merely consistent with an agreement, *Twombly* does not "impose a probability requirement at the pleading stage." 550 U.S. at 556. "[I]t is not necessary to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010); *see In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 801 (N.D. Ill. 2017) (existence of "alternative explanation" does not "destroy the plausibility of Plaintiffs' conspiracy claims").

## IV.  ARGUMENT

### A.  Defendants Cannot Use a Motion to Dismiss to Rewrite the Complaint

Defendants repeatedly ask the Court to adopt their self-serving counter-narratives over the Complaint's allegations. Directly contradicting facts alleged by Plaintiffs, Defendants characterize patients, rather than insurers, as the primary "buyers of healthcare services" and assert that insurers "do not buy . . . healthcare services." *Compare* MTD at 4-5, *with* Compl. ¶¶50-51, 265. Defendants

similarly rewrite the Complaint by referring to insurers' payments to OON providers as "reimbursements," even though, as they admit, this phrase is not in the Complaint. MTD at 3. And, again contradicting the pleadings, Defendants characterize MultiPlan's price determinations as mere "recommendations" which are based solely on "publicly available data." *Compare* MTD at 9-10 *with* Compl. ¶¶169, 173, 213-18 ("[I]nsurers cannot set pricing preferences unilaterally as they see fit; rather, pricing preferences can only be entered by 'mutual agreement' with MultiPlan, whose determinations are informed by its access to the CSI of other insurers.").

Defendants' mischaracterizations of the allegations to create a strawman should be rejected. *See Quantum Foods, LLC v. Progressive Foods, Inc.*, 2012 WL 5520411, at *4 (N.D. Ill. Nov. 14, 2012) ("[T]he defendant cannot . . . attempt to refute the complaint or to present a different set of allegations. The attack is on the sufficiency of the complaint, and the defendant cannot set or alter the terms of the dispute . . . .'") (quoting *Gomez v. Illinois State Bd. of Ed.*, 811 F.2d 1030, 1039 (7th Cir. 1987)). Instead, the Court must review the Complaint "in the light most favorable to the plaintiff[s]." *Carbone*, 621 F. Supp. 3d at 883 (citation omitted).

### B. Plaintiffs Adequately Allege Antitrust Standing and Injury

To establish antitrust standing, Plaintiffs must show they "can most efficiently vindicate the purposes of the antitrust laws," *Carbone*, 621 F. Supp. 3d at 890 (citation omitted). To establish antitrust injury, they must show "their injuries are of the type the antitrust laws were intended to prevent." *Id*. (citation omitted). The Complaint is adequate on both fronts: Plaintiffs allege they sell OON services directly to Cartel members, suffer injury when they receive artificially low payment amounts from them, and are the primary victims of the Cartel. Compl. ¶¶20-21, 51, 67, 144, 265, 305-08, 321. Plaintiffs further allege that their injuries flow from the elimination of competition among insurers in the input market for OON services, *id*. ¶¶305-17, a type of harm the antitrust laws are intended to prevent.

10

### 1. Plaintiffs Adequately Allege Antitrust Standing

Courts consider several factors in analyzing antitrust standing, including: "(1) the causal connection between the alleged anti-trust violation and the harm to the plaintiff; (2) improper motive; (3) whether the injury was of a type that Congress sought to redress with the antitrust laws; (4) the directness between the injury and the market restraint; (5) the speculative nature of the damages; [and] (6) the risk of duplicate recoveries or complex damages appointment." *Midwest Gas Servs. v. Ind. Gas Co.*, 317 F.3d 703, 710 (7th Cir. 2003) (alterations and citation omitted) (reciting factors from *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters ("AGC")*, 459 U.S. 519, 537-45 (1983)). Though Defendants assert "Plaintiffs fail to satisfy these factors," MTD at 16, their motion challenges only two: the "directness" between Plaintiffs' injury and the Cartel, and the risk of duplicative recovery, *id.* at 15-19. Both challenges fail.[2]

Defendants contend that Plaintiffs' alleged injury is not sufficiently "direct" for several reasons. First, they assert Plaintiffs "have no contractual relationship" with members of the Cartel. MTD at 16. But contractual privity is not a requirement for antitrust standing. *See, e.g.*, *Loeb Indus. v. Sumitomo Corp.*, 306 F.3d 469, 481-82 (7th Cir. 2002) (collecting cases); *BCBS Wisconsin*, 65 F.3d at 1414 (finding "overarching contract" between insurer and provider unnecessary and observing "the money went directly from Blue Cross to the Clinic" so no "more [was] required to establish [a] right to sue to collect . . . overcharges").

Next, Defendants declare that insurers "do not buy or sell healthcare services" from providers. MTD at 5; *see also id.* at 16 ("The customer-supplier relationship [here] is between the

---

[2] By failing to challenge other *AGC* factors, Defendants (correctly) concede that Plaintiffs satisfy them, which further weighs in favor of Plaintiffs' antitrust standing. *See Bodie-Rickett & Assocs. v. Mars, Inc.*, 957 F.2d 287, 290 (6th Cir. 1992) (noting that the *AGC* "factors are to be balanced; no single factor is conclusive").

patient and provider."). But the pleadings allege the *opposite*—that insurers purchase healthcare services directly from providers.[3] Defendants concede as much, stating that they pay "the provider *directly* some or all of the cost" of OON services. MTD at 5 (emphasis added). And courts routinely recognize that insurers are direct purchasers of healthcare services from providers—and thus that they have standing to sue each other for Sherman Act violations. *See BCBS Wisconsin,* 65 F.3d at 1414-15 (because Blue Cross "paid Marshfield Clinic directly, in accordance with Blue Cross's contractual obligations to its insureds," Blue Cross had antitrust standing to sue to recover overcharges paid to the Clinic).[4]

Defendants also contend that Plaintiffs' injuries are "indirect" because, "in many circumstances," providers can balance bill patients. MTD at 15. But that argument ignores a core allegation of Plaintiffs' suit: the Cartel eliminates balance billing by conditioning payment on providers agreeing *not to seek* additional compensation from patients. Compl. ¶¶11, 144, 172, 174. Defendants counter that since providers may reject offers of payment from the Cartel members, their injuries are "entirely their choice." MTD at 19 n.8. That the Cartel left providers the illusory "choice" to turn down compensation from their only realistic source of payment (insurers)—and instead go after individual patients for all or nearly all of their billed charges—has no bearing on Plaintiffs' standing. As Plaintiffs allege, providers have "no practical option but to accept the 'repriced' compensation amounts that MultiPlan imposes" because "virtually every major" insurer

---

[3] *See, e.g.,* Compl. ¶51 (providers submit bill for services to insurers who pay providers directly); *id.* ¶67 (insurers send explanation of benefits to providers explaining compensation paid to them); *id.* ¶265 ("healthcare providers like Plaintiffs are sellers of out-of-network healthcare services, while third-party payers like the Insurer Defendants are buyers of those services").

[4] *See also Vasquez v. Indiana Univ. Health, Inc.*, 40 F.4th 582, 585 & n.1 (7th Cir. 2022) (characterizing "insurers" as the "most directly affected buyers" of hospital's supra-competitive prices, situating them firmly "within the scope of" those empowered to sue under the antitrust laws); *BCBS Wisconsin v. Marshfield Clinic*, 881 F. Supp. 1309, 1317-18 (W.D. Wis. 1994) ("Blue Cross is a purchaser of physician services and may have suffered antitrust injury, an injury which the antitrust laws intend to protect and which flows directly from the antitrust violation."), *aff'd in relevant part*, 65 F.3d 1406 (7th Cir. 1995).

is a member of the Cartel that imposes the same conditions on payment. Compl. ¶¶173-74. The antitrust laws do not force sellers (or buyers) into a Hobson's choice of participating in a price-fixed market or leaving the market altogether. *Cf. Blue Shield of Virginia v. McCready*, 457 U.S. 465, 482 (1982) (plaintiffs may "prove antitrust injury before they actually are driven from the market"); *United States v. Giraudo*, 2018 WL 2197703, at *5 (N.D. Cal. May 14, 2018) (any rule "that a consumer is not harmed by a price-fixing scheme so long as he is not forced to buy a product at a price above what he is willing to pay" would render the "antitrust laws … a dead letter"). Plaintiffs' allegations concerning the Cartel's prohibition on balance billing distinguish this case from the cases Defendants cite where *plaintiffs alleged* that balance billing was permitted and that patients were therefore the "direct victims" of the alleged conspiracies.[5]

Even if Plaintiffs here could, in theory, balance bill, it would not undermine the "directness" of their injuries. An antitrust plaintiff is entitled to recover the full extent of its damages, irrespective of any ability to mitigate or "pass[] on" their injuries to another party. *Hanover Shoe*, 392 U.S. at 489-94. In other words, passing on injury to another party does not

---

[5] *See In re Wellpoint, Inc., Out-of-Network UCR Rates Litig.t*, 903 F. Supp. 2d 880, 902 (C.D. Cal. 2012) (providers alleged they were injured only to the extent they "encountered friction in collecting the balance of their billed-charges"); *Pac. Recovery Sols. v. United Behav. Health*, 481 F. Supp. 3d 1011, 1022 (N.D. Cal. 2020) (*"Pacific Recovery I"*) ("[P]laintiffs allege that the direct victims of the alleged conspiracy were 'United's members" (i.e., plaintiffs' patients) . . . . [and] that their own injury arises only to the extent that their patients do not pay the amounts that United does not reimburse."); *Pac. Recovery Sols. v. Cigna Behav. Health, Inc.* ("*Pacific Recovery II*"), 2021 WL 1176677, at *8 (N.D. Cal. Mar. 29, 2021) ("By Plaintiffs' own allegations, . . . patients are the direct victims."). Notably, in *Wellpoint*, the provider plaintiffs premised their antitrust standing arguments on contractual "assignments of [health] benefits" pursuant to which patients assigned providers "the right to collect [OON] reimbursements directly from the assignor's insurer." 903 F. Supp. 2d at 895, 898. This spurred the *Wellpoint* court to characterize providers' alleged injuries as "derivative" of those suffered by their patients. *Id.* at 899 ("[T]o the extent [providers] sue via assignment, they seek to recover *derivatively* for the injuries inflicted upon their subscriber-patients, and not their own injuries.") (emphasis added). But the court ultimately ruled these general benefits assignments did not convey antitrust standing on the providers because "assignments to pursue" antitrust claims must be "express." *Id.* at 898. Plaintiffs here are not suing via assignment; they base their standing on the direct injuries they suffered at the hands of the cartel. In this context, Defendants' repeated characterization of Plaintiffs' alleged injuries as "derivative," Class MTD at 15, 19, makes little sense.

negate standing or even reduce the damages a plaintiff is entitled to recoup from Cartel members. *See In re Turkey Antitrust Litig.*, 2025 WL 264021, at *4 (N.D. Ill. Jan. 22, 2025) ("[T]he Supreme Court has held that antitrust injury is considered complete when the direct purchaser pays an illegal overcharge and whether he was able to pass through the overcharge to indirect purchasers is irrelevant to the inquiry.") (citation omitted). To the extent the cases cited by Defendants could be read to hold otherwise, they were wrongly decided.[6]

The ability to balance bill patients also does not "create the significant risk of duplicative recovery," as Defendants claim. MTD at 18-19. The "duplicative recovery" analysis asks whether the same party (here, Defendants) may have to pay twice for the same harm. *See AGC*, 459 U.S. at 549-50 (noting *Illinois Brick* rule, which barred indirect-purchaser standing, was based on concern defendants "would have faced the prospect of two treble damages actions based on the same overcharges"). The concern Defendants raise here is a different one: that Plaintiffs may be able to recoup their losses from two sources—Defendants and patients—thus reaping a "windfall."[7] MTD at 19. But there is no bar on an antitrust plaintiff's ability to recover its losses from different sources—even if it means recovery exceeding the damages suffered. *Hanover Shoe* explicitly allows for that outcome. *See Atl. Seaboard Corp. v. Fed. Power Comm'n*, 404 F.2d 1268,

---

[6] Defendants also claim that California law bars standing here because Plaintiffs' proper "legal recourse for payment is from [their] patient." MTD at 18, n.7. Such rule is irrelevant where, as here, Plaintiffs allege they are specifically prohibited from balance billing by the Cartel.

[7] Defendants also claim that "patients can and do sue" insurers for underpayments. *See* MTD at 18-19. But Defendants' own framing acknowledges that any such patient suits would be for the insurers underpaying "under the terms of [their] insurance agreements," rather than under the Sherman Act. The patient cases they cite do not raise antitrust claims. *LD v. United Behav. Health,* 508 F. Supp. 3d 583 (N.D. Cal. 2020) (RICO and ERISA claims); *RJ v. Cigna Health and Life Ins. Co.*, 625 F. Supp. 3d 951 (N.D. Cal. 2022) (same)).

1273 n.17 (D.C. Cir. 1968) (noting *Hanover Shoe* rule parallels the "collateral source doctrine"
from tort law); *Loeb*, 306 F.3d at 483 (*Hanover Shoe* "at times favors plaintiffs").[8]

## 2. Plaintiffs Adequately Allege Antitrust Injury

To constitute antitrust injury, a plaintiff's injuries must be "of the type the antitrust laws
were intended to prevent and reflect the anticompetitive effect of either the violation or of
anticompetitive acts made possible by the violation." *Carbone*, 621 F. Supp. 3d at 890 (citation
omitted). Defendants argue that Plaintiffs cannot meet this requirement because the Cartel
supposedly "lowered costs" for patients. MTD at 21. But Plaintiffs allege the opposite. *See* Compl.
¶17 ("Rather than inure to the benefit of customers and insureds, these 'savings' advantage
MultiPlan as well as insurance company executives and shareholders."); *see also W. Penn*
*Allegheny Health Sys.*, 627 F.3d at 104 (rejecting similar argument, noting "the complaint alleges
that Highmark did *not* pass the savings on to consumers").

Even if the Court were to take as true Defendants' unsupported claim that patients benefit
from their scheme, it would not undermine Plaintiffs' alleged antitrust injury. The antitrust laws
protect competition at all levels of commerce, not just the consumer level. *See Mandeville Island
Farms v. American Crystal Sugar Co.*, 334 U.S. 219, 235 (1948) ("It is clear that the agreement is
the sort of combination condemned by the Act, even though the price-fixing was by purchasers,
and the persons specially injured … are sellers, not customers or consumers."). And it is black
letter law that buyers' cartels resulting in payment of artificially low prices to suppliers violate

---

[8] Even if patients are also harmed, it would not prove their injuries are duplicative of providers', much
less bar providers from recovering their distinct damages. *See Apple, Inc. v. Pepper*, 587 U.S. 273, 287
(2019) ("Basic antitrust law tells us that the 'mere fact that an antitrust violation produces two different
classes of victims hardly entails that their injuries are duplicative of one another.'" (quoting Areeda &
Hovenkamp, Antitrust Law ¶339d)). It would mean only that the Cartel's effects are felt in "two separate
markets": the input market for OON services and the market for health insurance. *See Loeb*, 306 F.3d at
483 (harms incurred in two different markets were both "compensable").

Section 1. *See Arizona v. Maricopa Cnty. Med. Soc..*, 457 U.S. 332, 348 (1982) (caselaw places agreements that "are horizontal and fix maximum prices" "on the same legal—even if not economic—footing as agreements to fix minimum or uniform prices"). Accordingly, Plaintiffs' alleged antitrust injury—depressed compensation rates—is of the "type the antitrust laws were intended to prevent." *Omnicare, Inc. v. Unitedhealth Group, Inc.*, 524 F. Supp. 2d 1031, 1040 (N.D. Ill. 2007) ("In a buyers' conspiracy case, a seller sufficiently alleges antitrust injury by pleading that it has received excessively low prices from members of the buyers' cartel."); *Delta Dental*, 484 F. Supp. 3d at 642 (same).

Where, as here, supplier plaintiffs (*i.e.*, healthcare providers) have suffered antitrust injury, they need not also allege harm to consumers in a separate market (*i.e.*, the health insurance market). The Third Circuit addressed this "basic misunderstanding of the antitrust laws" in *W. Penn Allegheny Health Sys.*, 627 F.3d at 105, where an insurer and rival hospital allegedly conspired to depress rates paid to the plaintiff, *id.* at 94. There, as here, the defendants argued that "low reimbursement rates translate into low premiums for subscribers, and [] it would therefore be contrary to a key purpose of the antitrust laws—promoting consumer welfare—to allow [plaintiff] to recover the amount of the underpayments." *Id.* at 103. Rejecting this argument, the Third Circuit explained that any consumer savings would have resulted from "action that tends to diminish the quality and availability of hospital services." *Id.* at 104. The court recognized that "[every precedent in the field makes clear that the interaction of competitive forces, not price-rigging, is what will benefit consumers." *Id.* at 105 (quoting *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000)).

The Seventh, Ninth, and Tenth Circuits have reached similar conclusions. *See Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 703 (7th Cir. 2023) (rejecting argument that "treats benefits

16

to consumers . . . as justifying detriments to workers" as "not right; it is equivalent to saying that antitrust law is unconcerned with competition in the markets for inputs, and [*NCAA v. Alston*, 594 U.S. 69 (2021)] establishes otherwise."); *Knevelbaard Dairies*, 232 F.3d at 987-88 (9th Cir. 2000) (finding suit alleging cheese makers' conspiracy to depress prices they paid milk producers "plainly alleges" antitrust injury to producers, and rejecting notion that "conspiracy to depress prices would … benefit" consumers); *Law v. NCAA*, 134 F.3d at 1022 ("[C]ost-cutting by itself is not a valid procompetitive justification" because "[i]f it were, any group of competing buyers could agree on maximum prices" and "rob[] the suppliers of the normal fruits of their enterprises.").[9]

Defendants next argue that Plaintiffs do not allege individual payments from specific Defendants, and the Complaint has only "two paragraphs" with "conclusory" allegations about Plaintiffs' injuries. MTD at 19-20. But Plaintiffs' well-pleaded allegations that they have suffered injuries traceable to the Cartel are more than sufficient. *See* Compl. ¶¶20-21 (Plaintiffs treat out-of-network patients, submit claims to insurers who use MultiPlan, and have received unreasonably low payments for out-of-network claims because of the Cartel).[10] *See In re Deere & Co. Repair*

---

[9] Defendants' reliance on *Long Island Anesthesiologists PLLC v. United Healthcare Ins. Co. of N.Y. Inc.*, 2023 WL 8096909 (E.D.N.Y. Nov. 21, 2023), is misplaced. MTD at 20. There the court found no antitrust injury because plaintiffs failed to allege any unlawful agreement among competitors. *Id.* at *6. The Complaint here suffers no such infirmity. Defendants' other cited cases are similarly inapposite because they involved no alleged horizontal restraints (which, by definition, harm competition). Rather, they dealt with competitor suits in which plaintiffs alleged their rivals had engaged in monopolization schemes and vertical restraints, all of which were dismissed because the plaintiffs failed to show they suffered injury flowing from harm to the competitive process. *See, e.g.*, *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338-40 (1990) ("vertical, maximum-price-fixing agreement . . . does not cause a competitor antitrust injury unless it results in predatory pricing"); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488-89 (1977) (rival's acquisition of once-failing bowling alleys did not harm competition); *Chicago Studio Rental v. Ill. Dep't of Com.*, 940 F.3d 971, 978 (7th Cir. 2019) (rival's entry into Chicago film-studio market did not harm competition); *Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1418-20 (7th Cir. 1989) (affirming summary judgment against plaintiff who asserted vertical price fixing claim but no "agreement," and finding no injury).

[10] *See also, e.g.*, Compl. ¶305 (Cartel directly damages Plaintiffs' business and property, causing them to "sustain economic losses from artificial suppression of OON compensation rates"); ¶308 (but for conspiracy, Plaintiffs would have received higher compensation for OON services); ¶313 (MultiPlan Cartel

*Serv. Antitrust Litig.*, 703 F. Supp. 3d 862, 874-75, 911 (N.D. Ill. 2023) (rejecting argument that plaintiffs failed to "explicitly allege" they bought repair services from specific dealers because plaintiffs alleged they bought from "at least one" dealer and that the "co-conspirators include *all* the [d]ealerships").[11]

### C. Plaintiffs Adequately Allege a Horizontal Conspiracy

Plaintiffs plausibly allege a conspiracy among rival insurers, facilitated by MultiPlan, to suppress payments for OON services below competitive levels. Plaintiffs point to direct evidence as well as circumstantial evidence from which the horizontal conspiracy can be inferred. *Id*. ¶¶219-63. Yet again, Defendants' arguments rest on mischaracterizations of the allegations and the law.

*First*, Defendants seek to reduce the scope of Section 1 to conspiracies where competitors enter into an express agreement to engage in the same conduct at the same time. *See* MTD at 24-28. That is not the law. Rather, competitors act in concert where, as here, their conduct "joins together separate decisionmakers," thereby "depriv[ing] the marketplace of independent centers of decisionmaking." *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 195 (2010) (citation omitted). This can occur through joint delegation to a common entity or tacit agreement; it need not involve simultaneous or uniform conduct. *See Interstate Cir.*, 306 U.S. at 227; *infra* Section IV.C.3.a.

*Second*, Defendants focus narrowly on one type of circumstantial evidence: parallel conduct and "plus factors." MTD at 24-28, 34-35. Plaintiffs plead parallel conduct and a host of plus factors. *See infra* Section IV.3. But that is not the only way to show concerted action

---

suppressed compensation rates paid to Plaintiffs for OON claims below competitive levels); ¶321 (Plaintiffs injured by Cartel's conduct which resulted in them receiving lower rates of compensation for OON claims than they otherwise would have).

[11] Defendants also assert, in a footnote, that Plaintiffs cannot claim injury related to emergency services because the federal "No Surprises Act" provides a mandatory dispute resolution process. MTD at 17 n.6. *See Tex. Med. Ass'n v. U.S. HHS*, 120 F.4th 494, 501-03 (5th Cir. 2024). Defendants neglect to mention that this Act took effect in 2022, seven years after the alleged class period began. *Emergency Physician Servs. of N.Y. v. UnitedHealth Grp., Inc.*, 2024 WL 4229902, at *15 (S.D.N.Y. Sept. 17, 2024); Compl. ¶318.

circumstantially. It is "enough" to allege Defendants, "knowing that concerted action was contemplated and invited," adhered "to the scheme and participated in it." *Interstate Cir.*, 306 U.S. at 215-19, 226, 232 (finding "conclusion" of conspiracy "unavoidable" where film exhibitor sent identical letters to eight competing distributors, asking each of them to increase minimum movie ticket prices, and distributors followed suit). The invitation-and-acceptance analysis is particularly apt for conspiracies facilitated by an intermediary, like this one. *See, e.g.*, *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 935 (7th Cir. 2000) (summarizing *Interstate Circuit* as inferring agreement between distributors "from the nature of the proposals [made by an intermediary], from the manner in which they were made, from the substantial unanimity of action taken, and from the lack of evidence of a benign motive"); *Duffy v. Yardi Sys.*, 2024 WL 4980771, at *4 (W.D. Wash. Dec. 4, 2024) (horizontal conspiracy among landlords, facilitated by software firm, was adequately alleged "under the invitation and acceptance analysis").

*Third*, Defendants characterize the alleged conspiracy as a "hub and spoke conspiracy" with MultiPlan and insurers operating at different levels of the same market. MTD at 22. But whether MultiPlan is "vertically" oriented vis-à-vis insurers is irrelevant. The challenged restraint suppresses price competition between horizontal competitors and is thus *per se* unlawful. *See Yardi*, 2024 WL 4980771, at *6-8; *Toys "R" Us*, 221 F.3d at 935-36.

## 1. The Complaint Alleges Direct Evidence of an Agreement

While sufficiently detailed allegations of direct evidence of antitrust conspiracy survive the plausibility requirement of *Twombly* even without any "plus factors," the Seventh Circuit has explained that the distinction between direct and circumstantial evidence is "largely if not entirely superfluous." *In re High Fructose Corn Syrup Litig.*, 295 F.3d 651, 661-62 (7th Cir. 2002). Plaintiffs can adequately allege an antitrust conspiracy with only direct evidence, only circumstantial evidence, or a combination of the two. *See id.* Defendants' insistence that Plaintiffs

19

"do not plead any direct evidence of a conspiracy," MTD at 23, is thus as irrelevant as it is wrong.

Plaintiffs allege several pieces of direct evidence of conspiracy. In particular, they allege that the Insurer Defendants entered into agreements with MultiPlan providing that:

> (1) the insurer will use MultiPlan's pricing methodology (Data iSight) instead of exercising its own, independent decision-making to set compensation amounts for out-of-network providers, (2) in the event of a dispute with a provider over compensation, the insurer will delegate to MultiPlan the task of 'negotiating' with the provider, and that MultiPlan will condition payment on the provider's agreement not to balance bill the patient, (3) the insurer will adhere to MultiPlan's pricing determinations, (4) the insurer will share CSI with their rivals through MultiPlan (including its pricing preferences and strategies) and have access to MultiPlan's claims database, which contains CSI from rivals, and (5) the insurer will split with MultiPlan the revenues generated by underpaying OON providers.

Compl. ¶220. Plaintiffs provide support by pointing to several executed contracts between MultiPlan and the Insurer Defendants. *Id.* ¶¶222-33. Plaintiffs also cite MultiPlan's public statements claiming that its coordinated price setting and pooled database of competitors' CSI is what gives MultiPlan value, not its proprietary "algorithm." *Id.* ¶¶9, 235-37. These allegations constitute direct evidence. Contrary to Defendants' assertions, the agreements Plaintiffs describe are not merely bilateral agreements between Insurer Defendants and MultiPlan, MTD at 23; they expressly facilitate insurers' delegation of decision-making to a common pricing agent (MultiPlan) and provide for their sharing of CSI through MultiPlan. *See* Compl. ¶¶167, 184-85 200-01, 220, 237. Defendants' reliance on cases involving purely vertical agreements that do not facilitate horizontal coordination in this way is misplaced.[12]

---

[12] *See Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 842-43 (7th Cir. 2020) ("All the Providers have alleged is that the distributors buy and sell the devices in accordance with the terms of the contracts that the GPOs have negotiated. They have made no argument that [under those contracts] the distributors played any role in setting the anticompetitive pricing or that there was any *quid pro quo* according to which Becton compensated them for participating in the alleged antitrust conspiracy."); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 329-30, 336 (3d Cir. 2010) ("contingent commission agreements" between brokers and insurers, which gave brokers higher commissions for steering clients to preferred insurers, did not directly show horizontal conspiracy); *In re Amazon.com, Inc. eBook Antitrust*

### 2. The Complaint Adequately Alleges an Agreement Under the "Invitation-and-Acceptance" Analysis

"Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which . . . is restraint of interstate commerce, is sufficient to establish unlawful conspiracy under the Sherman Act." *Interstate Cir.*, 306 U.S. at 227.

#### a. MultiPlan invited insurers to engage in concerted action

Plaintiffs allege that MultiPlan—through its marketing and other public and private communications—contemplated and invited concerted action among insurers with "respect to their compensation decisions and provider interactions." Compl. ¶182. To begin, Multiplan "market[ed] its platform as a way for insurers to 'outsource the repricing' and negotiation of 'out-of-network claims'" and eliminate the "guesswork" associated with independently setting compensation levels. *Id.* ¶¶8, 182. MultiPlan further claimed it could increase "discounts on out-of-network charges," saving insurers millions, while also ensuring "low provider abrasion" and "minimizing" balance billing for "[c]ommercial plans of any size." *Id.* ¶¶182, 236.

MultiPlan was "fully aware" that the benefits it touted—rate cuts and the elimination of balance billing—"would entice a critical mass of [insurers] only if [they] perceived an opportunity" to act "collectively." *United States v. Apple, Inc.*, 791 F.3d 290, 317 (2d Cir. 2015); Compl. ¶¶180-82. Absent collective action, any insurer that unilaterally cut rates would face provider abrasion and risk subscriber loss. *Id.* ¶¶78, 181. Nor could any insurer "have succeeded in unilaterally imposing" on providers the condition that they waive the right to balance bill while simultaneously cutting their compensation. *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 693 (S.D.N.Y. 2013), *aff'd*, 791 F.3d 290. Rather, an individual insurer would have to pay providers

---

*Litig.*, 2022 WL 4581903, at *11-12 (S.D.N.Y. Aug. 3, 2022) (plaintiffs "rel[ied] solely on vertical agency agreements between each Publisher and Amazon," which did not provide for horizontal coordination or information sharing).

*more* for an agreement not to seek payment from other sources. *See High Fructose Corn Syrup*, 295 F.3d at 659 (sellers' switch from annual to quarterly contracts, coupled with price increases, suggested market was not competitive because in an unrestrained market, sellers would have to "compensate the customers for assuming additional risk").

Even MultiPlan's promise to remove the "guesswork" from pricing was "code for unlawful coordination on prices through the collection of rival insurers' otherwise private" information. Compl. ¶8. Guesswork is a feature, not a bug, of competition. "Uncertainty" about competitors' pricing strategies, and the competitive landscape generally, fuels price competition. *See Great Atl. & Pac. Tea Co. v. FTC*, 440 U.S. 69, 80 (1979). MultiPlan eliminated this uncertainty.

Plaintiffs allege that MultiPlan invited insurers to contribute real-time, non-public pricing information to its database, including in-network claims data and internal pricing preferences. Compl. ¶¶120, 184. MultiPlan was aware that insurers would share this information "if and only if" they knew they would "receiv[e] in return the benefit of their competitors' data in pricing their own [claims]." *In re RealPage, Inc. Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 510 (M.D. Tenn. 2023). And MultiPlan marketed this benefit to prospective customers, claiming that it "talk[ed] to the entire industry" and made price determinations for insurers based on data pooled from over "700 payors," which enabled it to "generate bigger savings" for clients, all while nearly eliminating "abrasion" and balance billing. Compl. ¶¶182, 188. MultiPlan also guaranteed to insurers that they would not be alone in cutting prices and sharing their CSI by making public and private representations about which insurers had already joined the Cartel. *Id*. ¶¶113, 189-92.

### b. The Insurer Defendants accepted MultiPlan's invitation to act in concert

Plaintiffs further allege the Insurer Defendants accepted MultiPlan's invitation to act in concert: between 2015 and 2018, the Insurer Defendants (and hundreds of others) signed up for

MultiPlan's OON claims repricing services. *Id.* ¶¶109-18. This was a dramatic shift from the prior industry practice of setting rates unilaterally based on UCR benchmarks, Compl. ¶¶80, 246, which itself suggests conspiracy. *See Toys "R" Us*, 221 F.3d at 935 (manufacturers' "abrupt shift" was part of "compelling case for inferring horizontal agreement").

Plaintiffs allege that to effectuate this shift, each Insurer Defendant signed MultiPlan's standard repricing services contract, with the knowledge that their competitors were doing the same. Compl. ¶¶113, 189-92, 248. These contracts required the insurer to delegate its decision-making over OON compensation amounts to MultiPlan, turn over CSI to MultiPlan, and abide by MultiPlan's pricing determinations. Compl. ¶¶196, 220. Each insurer further committed to "forward[ing]" its "out-of-network, non-contracted claims" to MultiPlan to "determine payment allowance[s] for those claims" through Data iSight. *Id.* ¶223. "By the very act of signing" these uniform contracts—which required insurers to cede their decision-making over OON rates to the same third party and adhere to its proprietary process for determining prices—each insurer "signaled a clear commitment" to the scheme. *Apple*, 791 F.3d at 317; *see also Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 343 (7th Cir. 2022) ("knowingly engag[ing] in parallel conduct can constitute[] circumstantial evidence of an agreement"); *Meyer v. Kalanick*, 174 F. Supp. 3d 817, 824 (S.D.N.Y. 2016) (plaintiffs plausibly alleged a conspiracy in which drivers "sign[ed] up for Uber precisely 'on the understanding that the other [drivers] were agreeing to the same' pricing algorithm"); *Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 486-87 (S.D.N.Y. 2012) (where firms have "knowledge that [its competitors] are bound by identical agreements, and their participation is contingent upon that knowledge, they may be considered participants in a horizontal agreement in restraint of trade").

After signing these contracts, the Insurer Defendants shared their CSI with MultiPlan

knowing it would be pooled and used to determine prices. Compl. ¶¶186-88. In so doing, they "accepted [MultiPlan's] advertised invitation to trade their commercially sensitive information for the ability to" reduce the prices they paid OON providers "without fear of being undercut by their competitors." *Yardi*, 2024 WL 4980771, at *4. The insurers also received CSI about their competitors directly from MultiPlan, along with instructions for bringing their OON costs into alignment with the competition. Compl. ¶¶201-12. For example, MultiPlan's former CEO told UnitedHealth executives that capping OON payments at "350 percent" of Medicare rates would situate UnitedHealth "in line with [one] competitor" and "leading the pack along with another." *Id*. ¶202. While MultiPlan did not always "specifically name competitors" while sharing prices and strategies, their identities could be "glean[ed]." *Id*. ¶208. The Insurer Defendants heeded MultiPlan's pricing instructions and paid OON claims in accordance with MultiPlan's rate determinations, which they knew were being set "collectively" based on competitors' non-public CSI. *Id*. ¶¶7, 79; *see also id*. ¶235 (MultiPlan CEO stating company aimed to set prices "collectively"). They thus reaped supra-competitive profits and "acquiesce[d] in [MultiPlan's] illegal scheme." *United States v. Paramount Pictures*, 334 U.S. 131, 161 (1948).

### 3. The Complaint Alleges an Agreement Circumstantially via Parallel Conduct and "Plus Factors"

The Complaint contains "factual enhancement" in the form of "parallel conduct" and plus factors sufficient to state a plausible Section 1 claim. *See Twombly*, 550 U.S. at 557; *In re Turkey Antitrust Litig.*, 642 F. Supp. 3d 711, 722 (N.D. Ill. 2022).

#### a. Plaintiffs allege parallel conduct

Plaintiffs allege that starting in 2015, the Insurer Defendants and other cartel members (accounting for some 81% of the market) engaged in numerous parallel acts, including: (a) abandoning UCR benchmarking, which the industry used for decades to determine OON

24

compensation amounts, (b) jointly delegating their authority to reprice and negotiate OON claims to a common entity, (c) adopting MultiPlan's formula for setting OON compensation amounts (which used other competitors' private pricing data), (d) contributing their own non-public pricing data to MultiPlan's database, and (e) reducing the compensation they paid to OON providers below previous, competitive levels. Compl. ¶¶8, 80, 108-09, 195, 242, 245, 246, 253.

Defendants contend that these allegations are insufficient to show parallel conduct because Plaintiffs do not allege they adopted MultiPlan's services at the exact same time or paid providers the exact same rates. MTD at 25-28. However, antitrust plaintiffs need not prove simultaneous or uniform action. *Interstate Cir.*, 306 U.S. at 227 ("It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators."); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940) ("[P]rice-fixing includes more than the mere establishment of uniform prices . . . ."); *Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp. 3d 768, 780 (N.D. Ill. 2020) (finding it "unnecessary for Plaintiffs to plead the Corporate Defendants' involvement in the initial issuance of" allegedly anticompetitive rule in 1996). Courts have also upheld claims involving significant variations in defendants' pricing behaviors. *See Broiler Chicken*, 290 F. Supp. 3d at 791-92 (collecting cases and observing that "[p]ermitting flexibility" among cartel members may increase the cartel's efficacy and reach).[13]

---

[13] In *In re Text Messaging Antitrust Litig.*, the Seventh Circuit did not hold that "all at once" behavior was necessary to allege parallel conduct; the court treated simultaneity as a "plus" factor that would support an inference of conspiracy. 630 F.3d 622, 628 (7th Cir. 2010); *see also In re Broiler Chicken*, 290 F. Supp. 3d 772 at 790-91 (discussing *Text Messaging* and holding "all at once" conduct not required to allege parallelism). In Defendants' other cited cases, the co-conspirators' adoption of a common scheme was alleged to have occurred over a far longer span of time than the roughly three-year period alleged here. *See Gibson v. Cendyn Grp., LLC*, 2024 WL 2060260, at *4 (D. Nev. May 8, 2024) (adoption of pricing algorithm occurred over "10-year period"); *Cornish-Adebiyi v. Caesars Ent., Inc.*, 2024 WL 4356188, at *2 (D.N.J. Sept. 30, 2024) (14-year period).

Defendants further contend that parallel conduct cannot be shown because the Insurer Defendants did not always follow MultiPlan's price "recommendations." MTD at 9-11. This argument directly contradicts the Complaint, which alleges MultiPlan's rate determinations are not "mere 'recommendation[s]'" and that insurers cannot and do not second-guess them. Compl. ¶¶11, 179, 213-18. Plaintiffs also allege MultiPlan's price is the final amount paid unless the provider refuses to accept it, which occurs, according to MultiPlan, only 2% of the time. Compl. ¶¶173-74. And they allege MultiPlan's methodology *does* produce parallel prices. Compl. ¶169 (examples of parallel pricing), *id*. ¶217 (citing testimony that from 2017-2020, "pricing recommended by Data iSight to United [was] the same . . . as that recommended to [United's] competitors").[14]

Even if the Insurer Defendants did occasionally deviate from MultiPlan's rate determinations (again, a fact not alleged), it would not undermine Plaintiffs' conspiracy allegations. *See Yardi*, 2024 WL 4980771, at *5 (finding conspiracy claim plausible because "defendants [allegedly] intended to and, for the most part, did adhere to Yardi's pricing recommendations"). "[T]he Sherman Antitrust Act does not outlaw only perfect conspiracies . . . ." *United States v. Beaver*, 515 F.3d 730, 739 (7th Cir. 2008); *Socony-Vacuum*, 310 U.S. at 224 n.59 ("Price fixing agreements may or may not be aimed at complete elimination of price competition."). Even agreements to fix non-mandatory or "recommended" prices are *per se* illegal. *See High Fructose Corn Syrup*, 295 F.3d at 656 ("An agreement to fix list prices is . . . a per se violation of the Sherman Act even if most or for that matter all transactions occur at lower prices.");

---

[14] Defendants attempt to create a dispute of fact regarding this testimony by arguing that certain whitepapers cited in the Complaint mention the possibility that MultiPlan's pricing methodology can be customized. MTD at 10-11. But the mere fact that MultiPlan marketed its pricing methodology as customizable does not mean that it was. *See Meyer*, 174 F. Supp. 3d at 826 ("The fact that Uber goes to such lengths to portray itself . . . as the mere purveyor of an 'app' cannot shield it from the consequences of its operating as much more."). Disputes regarding the proper interpretation of exhibits "cannot be decided on a motion to dismiss." *Elward v. Electrolux Home Prods., Inc.*, 264 F. Supp. 3d 877, 886 (N.D. Ill. 2017).

26

*Norfolk Monument Co. v. Woodlawn Mem. Gardens*, 394 U.S. 700, 702-03 (1969) (pamphlet's self-serving disclaimer that it was providing "suggested standards of fair and reasonable regulations which the [other conspirators] would be advised to adopt" did not rebut contention pamphlet evidenced price-fixing agreement).

### b. Plaintiffs allege numerous plus factors

*Actions against self-interest*. An inference of an agreement among rivals can be "supported by the fact that going it alone [would be] against their individual self-interest." *Deere & Co. Repair Serv. Antitrust Litig.*, 703 F. Supp. 3d at 908. Plaintiffs allege the Insurer Defendants engaged in acts that would be economically irrational absent coordination, including (a) paying below-market compensation rates to providers, (b) sharing CSI with rivals through a conduit, and (c) paying for MultiPlan's services when cheaper pricing tools existed such as FAIR Health or, in the case of UnitedHealthcare, its in-house product "Naviguard." Compl. ¶¶241-45.

Defendants counter that using MultiPlan's services was in each insurer's independent self-interest because it allowed them to limit OON costs, and their "natural incentive" to "control their costs" "forecloses an inference of conspiracy." MTD at 28. That makes no sense. The economic self-interest inquiry does not ask whether the challenged conduct benefited the defendants—after all, price-fixing is generally beneficial for cartel members. Instead, it asks whether their conduct would have been economically rational *absent collective action*. *Tichy v. Hyatt Hotels Corp.*, 376 F. Supp. 3d 821, 838 (N.D. Ill. 2019) (looking to whether alleged parallel conduct, "absent the conspiracy, [would] damage Defendants' economic interests"). As Plaintiffs allege, under-paying providers and exchanging CSI would not be rational absent coordination because it would lead to competitive injury. Compl. ¶¶242, 245. This explanation is plausible and should not be "weigh[ed] . . . against the plausibility of the defendants' alternative explanation for their conduct" on a motion to dismiss. *Broiler Chicken*, 290 F. Supp. 3d at 801.

27

In any event, Defendants' competing explanation—that the desire to control OON costs independently motivated each insurer to use MultiPlan—is implausible on its face. Insurers can control OON costs themselves by simply changing the way they set their allowed amounts or dialing down their UCR benchmarks to a lower percentile. The only reason insurers would pay a third party enormous fees to determine their OON payment amounts is to coordinate with rivals and thereby avoid the competitive injuries described in the Complaint. *Cf. Yardi*, 2024 WL 4980771, at *5 (rejecting argument that court should "assume that the . . . defendants, having turned over their commercially-sensitive data and paid for the services [intermediary] offered, did not intend to use the information generated"). Defendants scoff at the notion that, absent coordination, insurers would "compete against each other" for OON services by "pay[ing] *higher* rates." MTD at 28-29, 32. But that is basic economics. In an unrestrained market, buyers must compete against each other for key inputs like labor and supplies. *See Deslandes*, 81 F.4th at 702-03; Compl. ¶105 (alleging post-Ingenix compensation rates rose because scheme to suppress prices ended). And if they agree not to compete to control costs, that is *per se* illegal. *See Int'l Outsourcing Servs., LLC v. Blistex, Inc.*, 420 F. Supp. 2d 860, 865 (N.D. Ill. 2006) (finding "the complaint sets forth a horizontal price fixing scheme among buyers to fix the prices of an input" and "sufficiently alleges conduct prohibited per se by the Sherman Act").

***Information Exchange***. "It is well-settled that the exchange of pricing information among competitors is indicative of anticompetitive agreement." *In re Broiler Chicken Antitrust Litig.*, 2025 WL 461407, at *4 (N.D. Ill. Feb. 11, 2025). This includes exchanges of information through a conduit. *See Yardi*, 2024 WL 4980771, at *4; *RealPage*, 709 F. Supp. 3d at 510. Here, Plaintiffs allege MultiPlan collected rival insurers' confidential pricing data and made price determinations based on this pooled data. Compl. ¶¶184-88, 199-212. They also allege MultiPlan "act[ed] as a go-

between between its clients, explicitly telling them who else [was] part of the Cartel, what their rivals [were] paying for particular kinds of OON [services], and which pricing strategies they [were] employing." *Id.* ¶240.

Defendants argue that Plaintiffs fail to allege MultiPlan gave "any of its clients' confidential information to any other client." MTD at 33. This argument ignores Plaintiffs' allegations that MultiPlan gave clients' CSI (like their pricing strategies) to rival insurers as part of its efforts to bring their practices into "alignment." Compl. ¶240. At times, MultiPlan gave insurers enough information to reveal the identities of its others clients, *id.* ¶208, meaning the information it passed along was not "anonymized," as Defendants suggest.[15] MTD at 33.

The fact that MultiPlan did not simply hide behind its algorithm—and instead played an active role as a go-between for the Cartel—sets this case apart from two decisions cited by Defendants involving purely "algorithmic" price-fixing schemes, *Gibson v. MGM Resorts Int'l*, 2023 WL 7025996 (D. Nev. Oct. 24, 2023) ("*Gibson I*"), and *Cornish-Adebiyi v. Caesars Ent., Inc.*, 2024 WL 4356188 (D.N.J. Sept. 30, 2024) (conspiracy allegations premised on "mere use of . . . software"). Unlike in those cases (both pending on appeal),[16] Plaintiffs here allege that prices

---

[15] Plaintiffs allege that the data shared between members of the Cartel is not "public." Compl. ¶8. Regardless, the need for data being exchanged to be "confidential" applies only to standalone information exchange claims. *See Todd v. Exxon Corp.*, 275 F.3d 191, 198-99 (2d Cir. 2001) (stand-alone information-exchange claims subject to rule of reason, and reasonableness depends on "nature of the information exchanged") (internal quotations omitted). Here, the exchange of information pled by Plaintiffs is simply additional evidence of a price fixing conspiracy. *See Broiler Chicken*, 2025 WL 461407, at *4 (exchange of pricing information "indicative of anticompetitive agreement"). This readily distinguishes this case from *In re Local TV Advertising Antitrust Litig.*, 2022 WL 3716202, *6 (N.D. Ill. Aug. 29, 2022), where the court found plaintiffs failed to adequately allege the defendant was a "conduit" for an anticompetitive information exchange because the pricing data shared was not specific enough. Here, by contrast, "Plaintiffs allege that the Defendants use [MultiPlan as] far more than a simple conduit of information—they delegate their . . . pricing to [that intermediary] with the knowledge that [the intermediary] makes" pricing determinations "by relying upon their competitors' private data." *RealPage*, 709 F. Supp. 3d at 550.

[16] In *Gibson*, the decision on appeal is a more recent dismissal not cited by Defendants. *See Gibson v. Cendyn Grp., LLC*, 2024 WL 2060260 (D. Nev. May 8, 2024) ("*Gibson II*"). In both *Gibson* and *Cornish-*

---

were determined not just by algorithm, but by high-level MultiPlan personnel, who played active roles in determining and coordinating Cartel insurer pricing. Compl. ¶¶190-93; *id*. ¶9 (alleging MultiPlan's simplistic algorithm operates mostly as a "smokescreen" for traditional price-fixing).

*Gibson* and *Cornish-Adebiyi* are also distinguishable for other reasons. Both cases involve allegations by hotel guests that casino-hotels adopted pricing software from the Rainmaker company over a decade-plus-long period to fix room rates. *See supra* n.13. And both were dismissed for similar reasons: the complaints did not allege the hotel defendants "directly benefit[ed] from the non-public pricing . . . data" contributed by its competitors to Rainmaker or that hotels' proprietary data was "pooled or otherwise commingled into a common dataset against which the algorithm runs." *Cornish-Adebiyi*, 2024 WL 4356188, at *5-6 (relying on *Gibson I* and *II*); *see also Gibson*, 2023 WL 7025996, at *4-6 (finding plaintiffs did not allege hotel operators received non-public information). Here, by contrast, Plaintiffs allege the Insurer Defendants submit CSI to MultiPlan, and that their CSI is pooled into a common dataset from which MultiPlan makes price determinations for all Cartel members. Compl. ¶¶9-10, 120, 147-51, 220. This case thus bears more similarity to two other recent price-fixing cases where plaintiffs' conspiracy claims were found plausible because they alleged the intermediary's software "inputs a melting pot of confidential competitor information through [their] algorithm[s] and spit[] out price recommendations based on that private competitor data." *RealPage*, 709 F. Supp. 3d at 512; *see also Yardi*, 2024 WL 4980771, at *5.

**Other plus factors**. Plaintiffs allege several additional plus factors, including a highly concentrated market, Compl. ¶253, a history of cartelization, ¶250, and opportunities to collude,

---

*Adebiyi*, the Government has supported the claims. *See* Brief for the United States as Amicus Curiae in Support of Plaintiffs-Appellants, *Gibson v. Cendyn Group, LLC*, 24-03576, ECF No. 28 (9th Cir. Oct. 24, 2024); Statement of Interest of the United States, *Cornish-Adebiyi v. Caesars Ent., Inc.*, 1:23-cv-02536, ECF No. 96 (D.N.J. Mar. 28, 2024).

¶¶255-63. These allegations also give rise to a "plausible inference of conspiracy." *Cf. Text Messaging*, 630 F.3d at 627-29 (discussing allegations about industry structure and opportunities to collude). Defendants attack these allegations in isolation. MTD at 34-35. But Plaintiffs are entitled to "the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Cont'l Ore*, 370 U.S. at 699 ("[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts . . ."). Defendants also criticize Plaintiffs' allegations that MultiPlan and the Insurer Defendants attended various industry events as too general to show they had "opportunities to collude." MTD at 34-35. These are criticisms of "the weight of the plaintiffs' evidence" and are "not a basis to find plaintiffs' allegations implausible." *Carbone*, 621 F. Supp. 3d at 885-86. They are also unfounded: Plaintiffs allege many specific opportunities for collusion, including meetings, summits, and retreats. *See* Compl. ¶¶255-62.

### D.    If the Court Applies a Mode of Analysis at this Stage, It Should be the *Per Se* Rule

If the Court were to apply a mode of analysis to the Section 1 claim at this juncture, it should be the *per se* rule. Compl. ¶340. Defendants do not explicitly argue, and thus waive, any contention that the rule of reason governs. *See Texas Hill Country Landscaping, Inc. v. Caterpillar, Inc.*, 522 F. Supp. 3d 402, 413 (N.D. Ill. 2021) ("[F]ailure to develop a legal argument in an opening brief results in the argument's waiver.").[17] When determining whether the *per se* rule applies, courts "evaluat[e] the nature of the restraint, rather than the identity of each party who joins in to

---

[17] Even if the Court decided to evaluate the Complaint under the rule of reason as opposed to the *per se* rule at this stage (and it should not), there would still be no basis for dismissal. Plaintiffs allege a viable relevant market. *Supra* at Section IV.F. And Defendants did not (and could not) contend that evaluating "whether challenged conduct has a procompetitive effect on balance so as to survive scrutiny under a rule-of-reason analysis" is allowable on a motion to dismiss. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 538-39 (N.D. Ill. 2019).

impose it." *Apple*, 791 F.3d at 297. Horizontal restraints, which impede competition between firms at the same level of distribution, are "unreasonable *per se*." *See Delta Dental*, 484 F. Supp. 3d at 635 ("[P]rice-fixing among competitors generally remain[s] subject to per se analysis."). As are "hub-and-spoke" conspiracies, with an agreement between the spokes forming the rim of the wheel. *See Deere & Co. Repair Serv. Antitrust Litig.*, 703 F. Supp. 3d at 902.

Here, Plaintiffs allege the Insurer Defendants operate at the same level of the market and compete against each other for OON healthcare services. Compl. ¶¶5, 7, 125, 241. The alleged restraint also operates horizontally, coordinating the Insurer Defendants' pricing decisions, eliminating competition, and disadvantaging providers. *Id*. ¶7. Plaintiffs therefore allege horizontal price fixing and the *per se* rule applies. *See, e.g.*, *Vogel v. Am. Soc. of Appraisers*, 744 F.2d 598, 601 (7th Cir. 1984) ("buyer cartels . . . are illegal per se.").

Courts regularly hold that horizontal competitors commit *per se* violations of Section 1 where, as here, they appoint a joint agent or entity to price their products or services. *See, e.g.*, *Citizen Publ'g Co. v. United States*, 394 U.S. 131, 133-36 (1969) (creation of joint venture to manage pricing and circulation); *Yardi*, 2024 WL 4980771, at *6-8; *Meyer*, 174 F. Supp. 3d at 826.[18] *Yardi* is instructive. There, the plaintiffs (tenants) alleged that the landlords conspired to fix rents through their joint adoption of Yardi's "revenue management" software and their contribution of non-public pricing data to Yardi's database. 2024 WL 4980771, at *6-8. After finding an agreement between the landlords was plausibly alleged, the court held that the *per se* rule applied. *Id.* at *8. The court explained: "horizontal agreements among competitors with regards to pricing

---

[18] *See also* Hovenkamp & Leslie, *The Firm as Cartel Manager*, 64 VAND. L. REV. 813, 850 (2011) ("From an antitrust standpoint, there is no difference between agreeing to abide by [the decisions of a cartel ringleader] and agreeing to cede decision making authority to a separate entity."); *High Fructose Corn Syrup*, 295 F.3d at 655 ("[A]lmost any market can be cartelized if the law permits sellers to establish formal, overt mechanisms for colluding, such as exclusive sales agencies.").

structures have predictable and pernicious anticompetitive effects and are therefore a classic example of a *per se* antitrust violation." *Id.* at *7. That the alleged restraint involved "a computerized algorithm" run by an intermediary and a "novel way of doing business" did not alter the analysis. *Id.* at *7-8. The same logic applies here.[19]

Defendants argue only that MultiPlan and the Insurer Defendants operate at "different levels of the market" (making the alleged restraint, in their view, a "hub-and-spoke conspiracy") and that MultiPlan's contracts with insurers are "vertical." MTD at 22. Defendants' attempt to conjure up vertical characteristics to evade application of the *per se* rule should be rejected. The Cartel lacks any true vertical character: it does not operate downstream in a chain of distribution, and all the pricing decisions at issue occur at the same level of the market. Nor can MultiPlan be characterized as "vertically" oriented to the Insurers, as it does not stand between insurers and providers in a vertical chain of distribution and does not produce any product or service that is passed on to providers. *See Yardi*, 2024 WL 4980771, at *6, n.2 ("The Court . . . is not convinced that the 'vertical' label properly characterizes Yardi's relationship with the landlord defendants given that Yardi is not a supplier or distributor of housing units."). Even if the Court conceived of the alleged conspiracy as a "hub-and-spoke" arrangement, the *per se* rule would apply, because Plaintiffs plausibly allege an agreement between the insurer "spokes." *Supra* at Section IV.C.

### E. Out-of-Network Services Have Fixable Prices

Defendants next argue that prices for medical services cannot be "fixed" because healthcare providers do not provide "standalone products and services." MTD at 35-38. In support,

---

[19] *See also Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647-48 (1980) ("a horizontal agreement among competitors to use a specific method of quoting prices may be unlawful"). It is also illegal *per se* for the Insurer Defendants to agree on price caps for OON services, *Maricopa Cnty.*, 457 U.S. at 348-52; *Blistex*, 420 F. Supp. 2d at 864 (N.D. Ill. 2006), and appoint a common negotiator for their OON claims, *N.Y. ex rel. Spitzer v. St. Francis Hosp.*, 94 F. Supp. 2d 399, 412-14 (S.D.N.Y. 2000).

Defendants cobble together statements from a series of flawed and inapposite out-of-district decisions dismissing complaints that alleged different facts and legal theories.[20] Under applicable case law, Plaintiffs plausibly plead a conspiracy among buyers to fix the prices they pay for OON services. As alleged in the Complaint, first, healthcare providers offer their services. Compl. ¶¶20-21, 265. After the providers do their job, they seek payment from insurers. *Id.* ¶¶50-51. If the insurer and provider do not have an applicable pre-existing network agreement (in which they negotiated lower rates for increased exposure), the provider seeks payment from the insurer at their standard rate (which is necessarily market determined). *Id.* ¶¶55, 60, 65-66. If the insurer is participating in the MultiPlan Cartel, the insurer, via MultiPlan, gives the provider a below-market payment set through collusion, conditioned on the provider seeking payment from no other source (eliminating balance-billing). *Id.* ¶¶39, 142-45, 169-74, 305-06. This is price fixing, plain and

---

[20] Defendants' claim that OON services somehow do not have "fixable" prices finds its origins in *Franco v. Conn. Gen. Life Ins. Co.*, 818 F. Supp. 2d 792, 833 (D.N.J. 2011), a decision involving the Ingenix Cartel. After dismissing the provider plaintiffs' antitrust claims for lack of standing due to an assignment issue not present here, the *Franco* court considered the merits of the subscriber plaintiffs' price-fixing allegations. *Id.* at 812. Per the court, the subscriber plaintiffs did not plausibly allege price fixing because the only "products" they purchased from the insurer defendants were health insurance policies, and there was no allegation of collusion by the insurers to fix "the price[s] at which [insurance] polic[ies] [were] made available for purchase by the Subscriber Plaintiffs." *Id.* at 832 ("[T]here is no indication in the complaints that . . . services by [OON] providers . . . is a discrete product available for purchase [by the Subscriber Plaintiffs] apart from the rest of a subscriber's insurance policy, at its own price."). *Franco's* ruling as to the subscriber plaintiffs was later adopted in *In re Aetna UCR Litig.*, 2015 WL 3970168, at *24 (D.N.J. June 30, 2015) (involving allegation "Aetna paid less than it was contractually obligated to" for OON benefits) and *Pacific Recovery II*, 2021 WL 1176677, at *13-14 (involving allegation Cigna and Viant fixed "the price of coverage for OON providers' [out-patient] services"), where the courts similarly focused on the product or service at issue being the insurance policy itself based on the specific allegations of the complaints in those actions. *Franco* was again cited in *VHS Liquidating Trust v. MultiPlan Corp.*, 2024 WL 5378341, at *7-8 (Cal. Super. Ct. Aug. 9, 2024), an unpublished ruling from a California trial court that misapplied this reasoning—not least because the plaintiff in *VHS* was a *provider* that sold healthcare services directly to the insurer defendants and was plainly entitled to sue them for colluding to suppress the prices they pay for services. *Cf. BCBS Wisconsin*, 65 F.3d at 1414; *supra* at Section IV.B.1. *VHS* simply ignored this reality, as Defendants do, and deemed the prices non-party subscribers pay for insurance policies to be the relevant prices. *See* 2024 WL 5378341, at *9 ("Reimbursement for OON services are part and parcel of a [subscriber's] health insurance policy rather than a standalone product or service."). These decisions should carry no weight here.

simple. *See, e.g.*, *Maricopa Cnty.*, 457 U.S. at 348-51, 356-57 (horizontal agreement among providers to fix maximum price that can be claimed from insurers was *per se* violation); *Delta Dental*, 484 F. Supp. 3d at 638 (allegation of defendants' collective determination of below-market rates imposed on dental providers was "price fixing"); *Omnicare*, 524 F. Supp. 2d at 1039-40 (allegations that insurers acted in concert to pay noncompetitive rates stated price-fixing claim).

Defendants make much of the Complaint's use of the term "purchase" instead of "reimbursement," MTD at 37, but even if the payments received from insurers are "reimbursements," that does not render them prices incapable of being fixed. The concept of "price fixing" is much broader than Defendants suggest. *Cf. Catalano, Inc.*, 446 U.S. at 648-50 (agreeing on credit terms is a form of price fixing); *Carbone*, 621 F. Supp. 3d at 889-90 (price fixing in financial aid packages). That makes sense, because antitrust law "has consistently prioritized substance over form" in the name of policing broad ranges of anticompetitive conduct. *In re Loestrin 24 Fe Antitrust Litig.*, 814 F.3d 538, 550 (1st Cir. 2016).

## F.      Plaintiffs Allege a Cognizable Antitrust Market

Defendants argue that Plaintiffs fail to provide an adequate market definition. MTD at 38-40. But this case concerns a horizontal price-fixing arrangement that is *per se* illegal, so a market definition is not even needed. *Omnicare*, 524 F. Supp. 2d at 1042 ("[A] buyers' conspiracy to fix prices, which is alleged here, is per se unlawful, so that no proof of market control need be offered."); *Conrad v. Jimmy John's Franchise, LLC*, 2021 WL 718320, at *22 (S.D. Ill. Feb. 24, 2021) ("[N]ot every antitrust case requires market definition."); Compl. ¶264. In any event, dismissal "based on a market argument" should be granted only when a court is "*certain*" that the market is insufficient. *Ploss v. Kraft Foods Group, Inc.*, 197 F. Supp. 3d 1037, 1070-71 (N.D. Ill. 2016) (emphasis added); *see also Newcal Indus. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) (there is no requirement that the relevant market "be pled with specificity" and dismissal is

only required where the market is "facially unsustainable"). That is not the case here. Plaintiffs'
market definition—"the market for out-of-network healthcare services for purchase by third-party
commercial payers (i.e., insurers)"—is supported by plausible allegations and more than adequate
at this stage. Compl. ¶¶264-74 (describing "practical indicia" of alleged market, including its
recognition by industry participants and distinct OON prices); *id*. at ¶252 ("Individual patients are
not reasonable substitutes for commercial third-party payers from the perspective of providers.").
*See, e.g.*, *Pit Row, Inc. v. Costco Wholesale Corp.*, 101 F.4th 493, 505 (7th Cir. 2024) (explaining
"practical indicia" are "[h]elpful evidence" of market boundaries); *Delta Dental*, 484 F. Supp. 3d
at 641 (relevant market in buyers' cartel case "comprised of [those] buyers who are seen by sellers
as being reasonably good substitutes") (citation omitted).

Defendants argue that the alleged market is deficient for three reasons. MTD at 38-40. All
fail. *First*, they argue that the alleged market includes "vastly different" kinds of healthcare
services that are not "reasonably interchangeable." MTD at 38-39. Defendants concede "cluster
markets" are permissible where "the cluster is itself an object of consumer demand," *id*. (quoting
*FTC v. Advocate Health Care Network*, 841 F.3d 460, 467 (7th Cir. 2016)), but assert that the
"competitive dynamics" across different types of OON services "are obviously vastly different,"
MTD at 39. But the Complaint alleges that the competitive dynamics across OON healthcare
services are affected "equally" by Defendants' scheme. Compl. ¶266 (alleging "cluster market").
Plaintiffs also allege that insurers purchase all types of healthcare services on an OON basis in a
similar manner, and that pricing practices have been applied uniformly across OON healthcare
services since long before the conspiracy. *See id*. ¶¶80-89 (discussing use of UCR); ¶¶65-68
(process for submitting compensation claims), ¶266 (Cartel members purchase services "together
to sell health plans with" OON benefits). Courts have repeatedly held that "[h]ealth care services

36

can be suitable subjects for such 'cluster' product markets" given the commercial reality that insurers must purchase all kinds of healthcare services. *Sharif Pharm. Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 918 (7th Cir. 2020); *Delta Dental*, 484 F. Supp. 3d at 640-41 (accepting market "for the purchase of dental goods and services"); *BCBS Antitrust Litig.*, 2017 WL 2797267, at *10-11 (N.D. Ala. June 28, 2017) (rejecting argument that proposed market improperly lumped together "tens of thousands of 'radically' different providers" because complaint alleged "all providers face the same basic set of options for selling their goods and services").

*Second*, Defendants argue that the nationwide scope of the alleged market "fails" because healthcare services across states are not "reasonably interchangeable" "from the perspective of patients or [insurers]." MTD at 39. But "[i]n the case of a buyers' cartel" what matters is the perspective of *sellers*, as the relevant market "is comprised of [those] buyers who are seen by sellers as being reasonably good substitutes." *Delta Dental*, 484 F. Supp. 3d at 641 (quoting *Todd*, 275 F.3d at 202). Viewed correctly, Plaintiffs' allegations of a nationwide market are plausible: They allege many insureds select plans offering OON coverage (like PPOs) because they travel frequently or live in areas that have limited in-network options; that PPO members can and do obtain OON services from any provider in the nation; and that their insurers purchase OON services nationwide. Compl. ¶¶75, 275. It makes no difference to providers whether the buyer— or even the patient—is from Chicago or Carlsbad. *See Delta Dental*, 484 F. Supp. 3d at 641 (given plaintiffs "seek to represent a nationwide class and claim that defendants insure patients across the country, their identification of the [U.S.] and the respective territories in which defendants participate in the market as buyers of dental goods and services is sufficient at this stage").

*Third*, Defendants contend that Plaintiffs "arbitrarily" define the market as one for OON services only, rather than also including in-network services. MTD at 39-40. But the Complaint

alleges numerous facts supporting a distinct OON services market. Specifically, Plaintiffs allege that Defendants (and the insurance industry as a whole) recognize OON services as a distinct market. Compl. ¶¶81, 265-72. *See Todd*, 275 F.3d at 205 ("[i]ndustry recognition is well established as a factor that courts consider in defining a market"). They further allege that OON prices are distinct from in-network prices (even for the same services). *Id.* ¶272. *See, e.g.*, *United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 25 (D.D.C. 2022) ("practical indicia" of market "boundaries" include "'distinct prices'") (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). These distinct prices persist because in-network prices are based on contracts between providers and insurers (and reflect volume discounts) for services to be rendered in future, whereas OON prices are based on non-discounted retail charges for services rendered. Compl. ¶¶9, 59-65. *See Beatrice Foods Co. v. F.T.C.*, 540 F.2d 303, 309 (7th Cir. 1976) ("[P]rice[] distinctions in products may play a role in market definitions where articles are sold in clearly separate price groupings that have little or no price sensitivity between them."). If in-network and OON services were part of the same market, buyers would not see persistent price differences for the same services based on whether they were provided on an in-network and OON basis. *See id.* And courts have long recognized that markets can be defined by the contractual structure under which goods and services are sold rather than the nature of the goods or services themselves. For example, "futures" markets (exchanges at future dates based on contractually pre-determined terms) are commonly recognized as distinct from spot markets (exchanges immediately for cash), even though they involve the same goods or services. *See Socony-Vacuum*, 310 U.S. at 166 (involving conspiracy to fix "tank car prices of gasoline" in certain "spot markets"); *Loeb Indus., Inc.*, 306 F.3d at 482 (recognizing in some circumstances "the futures market and physical market must be evaluated separately") (citation omitted); *In re Dairy Farmers of Am., Inc. Cheese*

*Antitrust Litig.*, 2015 WL 3988488, at *34 (N.D. Ill. June 29, 2015) (finding "Cheese Spot market" plausibly alleged even though it accounted for only 2% of annual cheddar cheese supply).

Defendants' factual disagreement with Plaintiffs' market allegations does not render them implausible. In any event, Defendants "do not suggest that there is *no* plausible relevant market," but instead that the market "may differ from what [Plaintiffs] propose" and should be more broadly defined to include in-network services. *Carbone*, 621 F. Supp. 3d at 889. This is not a basis for dismissal on the pleadings. *Id.* at 889-90.[21]

### G.    There is No "Group Pleading" Issue

Finally, Defendants argue that the Complaint "strains" the "group pleading" doctrine. MTD at 31. Not so. Allegations concerning groups of defendants are permissible so long as they "provide[] sufficient detail to put the defendants on notice of the claims" and do not require defendants "to speculate about which claims or allegations pertain to them" because "they must defend against all of them." *Sloan v. Anker Innovations Ltd.*, 711 F. Supp. 3d 946, 955 (N.D. Ill. 2024) (citations omitted). In a Section 1 case, plaintiffs need only "allege that each individual defendant joined the conspiracy and played some role in it"; "detailed defendant by defendant allegations" are not required. *Moehrl v. Nat'l Assoc. of Realtors*, 492 F. Supp. 3d 768, 777 (N.D. Ill. 2020) (citation omitted). Allegations of a common scheme supported by examples of fixed

---

[21] Defendants' cited cases do not compel a different conclusion. In *BCBS Wisconsin*, 65 F.3d at 1411, the court found, *after trial* based on "the record compiled in the district court," that HMO and PPO services were not distinct markets in analyzing whether certain providers had monopolies. The discussion in *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 598 (8th Cir. 2009) (and *Marion Healthcare LLC v. S. Ill. Healthcare*, 2013 WL 4510168, at *11 (S.D. Ill. Aug. 26, 2013), which adopts its reasoning), that a market cannot be based on how patients pay is also unpersuasive. MTD at 40. As other courts have noted, the *Little Rock* court did not analyze any allegations regarding how different sources of revenue may, in fact, not be interchangeable, including because, as alleged here, buyers pay comparatively different prices, *see* Compl. ¶¶267, 272; *BCBS Antitrust Litig.*, 2017 WL 2797267, at *9 n.4 (declining to follow *Little Rock*); *Methodist Health Serv. Corp. v. OSF Healthcare Sys.*, 2015 WL 1399229, at *6-7 (C.D. Ill. Mar. 25, 2015) (explaining sub-group of buyers may be appropriate).

prices "permit the reasonable inference that Defendants were . . . fixing prices for *all*" plaintiffs. *In re Broiler Chicken Antitrust Litig.*, 2025 WL 461407, at *6 (N.D. Ill. 2025); *accord Carbone*, 621 F. Supp. 3d at 887 ("plaintiffs are not required to cite evidence specific to each defendant in their complaint" if they "cite[] evidence specific to certain [defendants] as examples").

Plaintiffs' allegations satisfy this standard. The Complaint includes allegations as to many individual Insurer Defendants. *E.g.*, Compl. ¶¶110-16, 202-11, 222-33. And it alleges that all Insurer Defendants engaged in the same anticompetitive conduct—jointly delegating decision-making over OON prices to a common agent, turning over their CSI to that agent, and adhering to its price determinations with knowledge they were based on rivals' CSI. *E.g.*, Compl. ¶¶10, 38, 126, 219-20, 246, 248-49, 254, 275, 338. No more is required. *See Yardi*, 2024 WL 4980771, at *2 ("[d]efendant-specific allegations" not required where plaintiffs alleged all defendants "engaged in the same anti-competitive scheme, namely entering into express agreements with Yardi with the understanding that their collective actions would allow them to restrain trade"). Defendants' cited cases are inapposite. *See Bank of Am. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) (plaintiff only vaguely alleged "the defendants looted the corporation"); *Chamberlain Grp. v. Techtronic Indus.*, 2017 WL 4269005, at *3 (N.D. Ill. 2017) (finding impossible plaintiff's "purposely vague" allegations that defendants engaged in identical behavior).

## V.    CONCLUSION

For all of these reasons, Defendants' motion to dismiss the Complaint should be denied.

Dated: March 3, 2025

Respectfully Submitted,

*/s/ Natasha J. Fernández-Silber*

**EDELSON PC**
Natasha J. Fernández-Silber* (*pro hac vice*)
Abby Lemert
350 N. LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: (312) 589-6370
Fax: (312) 589-6378
nfernandezsilber@edelson.com
alemert@edelson.com
*Admitted in New York and Michigan

**SUSMAN GODFREY LLP**
Shawn J. Rabin (*pro hac vice*)
William Christopher Carmody (*pro hac vice*)
Thomas K. Boardman (*pro hac vice*)
Stephanie N. Spies (*pro hac vice*)
One Manhattan West, 50th Floor
New York, New York 10001
Tel.: (212) 336-8330
srabin@susmangodfrey.com
bcarmody@susmangodfrey.com
tboardman@susmangodfrey.com
sspies@susmangodfrey.com

Halley W. Josephs (*pro hac vice*)
Tyler D. Downing (*pro hac vice*)
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Tel: (310) 789-3100
hjosephs@susmangodfrey.com
tdowning@susmangodfrey.com

**BERGER MONTAGUE PC**
Eric L. Cramer (*pro hac vice*)
David F. Sorensen (*pro hac vice*)
Zachary D. Caplan (*pro hac vice*)
Patrick F. Madden (*pro hac vice*)
Hope Brinn (*pro hac vice*)
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
ecramer@bm.net

dsorensen@bm.net
zcaplan@bm.net
pmadden@bm.net
hbrinn@bm.net

Daniel J. Walker (*pro hac vice*)
1001 G Street, NW, Suite 400 East
Washington, DC 20001
Tel: (202) 559-9740
dwalker@bm.net

*Interim Co-Lead Class Counsel*