UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE MULTIPLAN HEALTH INSURANCE PROVIDER LITIGATION<br><br>*This Document Relates To:*<br>ALL ACTIONS | Case No. 1:24-cv-06795<br><br>MDL No. 3121<br><br>Hon. Matthew F. Kennelly |

**STATEMENT OF INTEREST OF THE UNITED STATES**

ABIGAIL A. SLATER
*Assistant Attorney General*

ROGER P. ALFORD
*Principal Deputy Assistant Attorney General*

MARK H. HAMER
WILLIAM RINNER
*Deputy Assistant Attorneys General*

DAVID B. LAWRENCE
*Policy Director*

ALICE A. WANG
*Counsel to the Assistant Attorney General*

KARINA LUBELL
*Competition Policy and Advocacy Section Chief*

HENRY J. HAUSER
ESTHER PYON
GRACE LEE
*Attorney Advisors*

U.S. Department of Justice, Antitrust Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: 202-975-8352
E-mail: henry.hauser@usdoj.gov

*Attorneys for the United States of America*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii
INTRODUCTION ................................................................................................................................. 1
LEGAL BACKGROUND .................................................................................................................... 2
ARGUMENT ......................................................................................................................................... 4
    I.    Competitors' Joint Use of a Common Pricing Algorithm to Set Starting-Point or Maximum Prices Can Be Concerted Action Under Section 1 ....................................... 4
    II.    Information Exchange Through a Common Pricing Algorithm Can Violate Section 1 .............................................................................................................................. 7
CONCLUSION ..................................................................................................................................... 8

**TABLE OF AUTHORITIES**

**Cases:**

*American Needle v. NFL*,
   560 U.S. 183 (2010) ................................................................................................ 2

*American Tobacco Co. v. United States*,
   328 U.S. 781 (1946) ............................................................................................ 2, 3

*Arizona v. Maricopa County Medical Society*,
   457 U.S. 332 (1982) ................................................................................................ 6

*Blue Cross and Blue Shield United of Wisconsin v. Marshfield Clinic*,
   65 F.3d 1406 (7th Cir. 1995) .................................................................................. 4

*Catalano, Inc. v. Target Sales, Inc.*,
   446 U.S. 643 (1980) ................................................................................................ 5

*Duffy v. Yardi Systems, Inc.*,
   2024 WL 4980771 (W.D. Wash. Dec. 4, 2024) .................................................... 7

*FTC v. Advocate Health Care Network*,
   841 F.3d 460 (7th Cir. 2016) .................................................................................. 4

*FTC v. Superior Court Trial Lawyers Ass'n*,
   493 U.S. 411 (1990) ................................................................................................ 4

*Gelboim v. Bank of America Corp.*,
   823 F.3d 759 (2d Cir. 2016) ................................................................................... 6

*In re High Fructose Corn Syrup Antitrust Litigation*,
   295 F.3d 651 (7th Cir. 2002) .................................................................................. 6

*In re RealPage, Inc., Rental Software Antitrust Litigation (No. II)*,
   709 F. Supp. 3d 544 (M.D. Tenn. 2023) ............................................................... 7

*In re Wheat Rail Freight Rate Antitrust Litigation*,
   579 F. Supp. 517 (N.D. Ill. 1984) .......................................................................... 5

*Interstate Circuit v. United States*,
   306 U.S. 208 (1939) ................................................................................................ 3

*Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*,
   334 U.S. 219 (1948) ................................................................................................ 4

*Matter of Wheat Rail Freight Rate Antitrust Litigation*,
   759 F.2d 1305 (7th Cir. 1985) ................................................................................ 5

*McLain v. Real Estate Board of New Orleans, Inc.*,
  444 U.S. 232 (1980) .......................................................................................................... 2

*National Society of Professional Engineers v. United States*,
  435 U.S. 679 (1978) .......................................................................................................... 4

*Ohio v. American Express*,
  585 U.S. 529 (2018) ...................................................................................................... 3, 4

*Plymouth Dealers' Ass'n of Northern California. v. United States*,
  279 F.2d 128 (9th Cir. 1960) ........................................................................................ 5, 6

*Standard Oil Co. of New Jersey v. United States*,
  221 U.S. 1 (1911) .............................................................................................................. 2

*Toys "R" Us, Inc. v. FTC*,
  221 F.3d 928 (7th Cir. 2000) ........................................................................................... 3

*United States v. Agri Stats, Inc.*,
  No. 0:23-cv-3009-JRT-JFD (D. Minn. Sept. 28, 2023) ................................................... 1

*United States v. Masonite Corp.*,
  316 U.S. 265 (1942) .......................................................................................................... 6

*United States v. Paramount Pictures, Inc.*,
  334 U.S. 131 (1948) .......................................................................................................... 3

*United States v. RealPage, Inc.*,
  No. 1:24-cv-00710 (M.D.N.C. Aug. 23, 2024) ............................................................... 1

*United States v. Socony-Vacuum Oil Co.*,
  310 U.S. 150 (1940) ............................................................................................. 2, 3, 4, 5

*United States v. Topkins*,
  No. 3:15-cr-00201 (N.D. Cal. Apr. 30, 2015) ................................................................. 3

*United States v. Trans-Missouri Freight Ass'n*,
  166 U.S. 290 (1897) .......................................................................................................... 2

*United States v. Union Pacific Railroad Co.*,
  226 U.S. 61 (1912) ............................................................................................................ 2

**Statutes:**

15 U.S.C. § 1 ............................................................................................................................ 2, 4

28 U.S.C. § 517 ........................................................................................................................... 1

## INTRODUCTION

The United States respectfully submits this statement under 28 U.S.C. § 517, which permits the Attorney General to direct any officer of the Department of Justice "to attend to the interests of the United States in a suit pending in a court of the United States."[1] *Id*. Competitors' use of algorithmic technologies to coordinate their decision-making poses a growing threat to the free market competition on which our economic system is premised. The United States therefore has a strong interest in the correct application of the antitrust laws to claims alleging algorithmic collusion and information exchange under Section 1 of the Sherman Act, 15 U.S.C. § 1.

The United States has filed multiple statements of interest and amicus briefs addressing the proper legal framework for analyzing claims involving the joint use of algorithms. *See, e.g.*, [Brief for the United States as Amicus Curiae in Support of Plaintiffs-Appellants](#), *Gibson v. Cendyn Group, LLC*, No. 24-3576 (9th Cir. Oct. 24, 2024), ECF No. 28. The United States also remains committed to enforcing the antitrust laws against unlawful exchanges of competitively sensitive information that take place through and alongside new technologies and is currently litigating two civil cases challenging information-sharing agreements: *United States v. Agri Stats, Inc.*, No. 0:23-cv-3009-JRT-JFD (D. Minn. Sept. 28, 2023), and *United States v. RealPage, Inc.*, No. 1:24-cv-00710 (M.D.N.C. Aug. 23, 2024).

---

[1] The United States files this statement of interest in response to Defendants' Joint Motion to Dismiss the Consolidated Class Action Complaint, ECF No. 282 ("Class MTD"); Memorandum in Support, ECF No. 283 ("Class MTD Mem."); Joint Motion to Dismiss the Consolidated Master Direct Action Plaintiff Complaint and Direct Action Plaintiffs' Short-Form Complaints, ECF No. 285 ("DAP MTD"); and Memorandum in Support, ECF No. 286 ("DAP MTD Mem.").

**LEGAL BACKGROUND**

Section 1 of the Sherman Act forbids "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade." 15 U.S.C. § 1. This language comprises two primary elements: (1) "a contract, combination, or conspiracy"—i.e., "concerted action"— (2) that "unreasonably restrains trade."[2] *Am. Needle v. NFL*, 560 U.S. 183, 186 (2010).

Concerted action is conduct that "joins together separate decisionmakers" and thus "deprives the marketplace of independent centers of decisionmaking." *Id.* at 195 (internal quotation marks omitted). Such joint action can take a variety of forms, from a written contract, to a trust agreement, to a secret conspiracy, to the joint delegation of decisionmaking power to a common agent. *See United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290, 292–97, 341 (1897); *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 70–76 (1911); *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809–10 (1946); *Am. Needle*, 560 U.S. at 201. The existing antitrust laws address threats to competition without regard to which technology rivals use to coordinate previously independent decisions. *See United States v. Union Pac. R.R. Co.*, 226 U.S. 61, 85–86 (1912) (The Sherman Act "embraces all forms of combination, *old and new*." (emphasis added)); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940) ("[T]he machinery employed by a combination for price-fixing is immaterial.").

Just as concerted action can take a variety of forms, its existence can be demonstrated in several ways. Among others, concerted action may be inferred from evidence of an

---

[2] Plaintiffs also must show that the alleged restraint of trade substantially affected, or occurred in the flow of, interstate or foreign commerce. *McLain v. Real Est. Bd. of New Orleans, Inc.*, 444 U.S. 232, 241 (1980). We do not address this element in this Statement of Interest. Nor do we address the requirement in private suits for plaintiffs to establish antitrust standing and injury.

invitation for collective action followed by conduct showing acceptance.[3] *See Interstate Cir. v. United States*, 306 U.S. 208, 226–27 (1939); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 935 (7th Cir. 2000). In *Interstate Circuit*, for example, the Supreme Court held: "[i]t was enough that, knowing that concerted action was contemplated and invited, the [defendant] distributors gave their adherence to the scheme and participated in it. Each [defendant] distributor was advised that the others were asked to participate; each knew that cooperation was essential to successful operation of the plan. They knew that the plan, if carried out, would result in a restraint of commerce, . . . and knowing it, all participated in the plan." 306 U.S. at 226-27; *see also United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 142 (1948) ("It is not necessary to find an express agreement in order to find a conspiracy. It is enough that a concert of action is contemplated and that the defendants conformed to the arrangement."); *Am. Tobacco*, 328 U.S. at 810 (circumstances showing "a unity of purpose or a common design and understanding" among competitors).

Once concerted action is shown, the question becomes whether it unreasonably restrains trade. *Ohio v. Am. Express*, 585 U.S. 529, 540 (2018) ("*Amex*"). A restraint of trade may be unreasonable in one of two ways. *Id.* at 540-41. First, it may be unreasonable *per se*, without inquiry into its competitive effects. The paradigmatic per se unreasonable restraint is an agreement between competitors to fix prices.[4] *Socony-Vacuum*, 310 U.S. at 218. Second, a

---

[3] These various methods of showing concerted action apply to the joint use of pricing algorithms. To start, there could be evidence of an express agreement, either among competitors—e.g., Plea Agreement at ¶ 4(b), *United States v. Topkins*, No. 3:15-cr-00201 (N.D. Cal. Apr. 30, 2015), ECF No. 7 (agreement between competitors "to adopt specific pricing algorithms")—or between an algorithm provider and a user. Alternatively, an algorithm provider's "pitch" could constitute an invitation for collective action among competitors—by indicating to users that the same pitch was made to their competitors and insinuating that using the algorithm could help them avoid competition—and subsequent joint use of the algorithm could demonstrate acceptance of that invitation. *See, e.g., Interstate Cir.*, 306 U.S. at 226–27.

[4] Market definition—which aids in assessing whether a restraint has the potential for actual adverse effects on competition—is not required for per se-illegal restraints. *See FTC v. Superior Ct. Trial Laws. Ass'n*, 493 U.S. 411, 430-31 (1990).

3

restraint may be unreasonable under the "rule of reason," a "fact-specific assessment" of the challenged conduct's "effect on competition." *Amex*, 585 U.S. at 541 (internal quotation marks omitted).

## ARGUMENT

The United States files this Statement to make two points addressing errors of law in Defendants' arguments. First, using a common pricing algorithm can indeed qualify as concerted action under Section 1 of the Sherman Act, 15 U.S.C. § 1, even if the competitors do not always use the algorithm in the same way. Second, competitors' exchange of competitively sensitive information can violate Section 1 even if those exchanges occur through an intermediary. The United States takes no position on the disposition of any other issues in this case, including the facts alleged by Plaintiffs.

### I. Competitors' Joint Use of a Common Pricing Algorithm to Set Starting-Point or Maximum Prices Can Be Concerted Action Under Section 1

Defendants argue that Plaintiffs fail to plausibly allege a conspiracy to suppress out-of-network reimbursement rates in part because Plaintiffs do not plead that payors "use MultiPlan in the same way to determine individual reimbursements."[5] Class MTD Mem. at 2. This argument

---

[5] Citing several non-binding district-court decisions, Defendants also argue that Plaintiffs' price-fixing claim must be dismissed because, as a matter of law, the rate at which an out-of-network healthcare provider is reimbursed for its services is not a "cognizable 'price' capable of being 'fixed.'" Class MTD Mem. at 35-38. Specifically, Defendants assert that a reimbursement rate is not a "price" because reimbursements to out-of-network providers are not a product or service available for sale; the relevant product, according to Defendants, is health insurance, and the price is the premium paid by patients. *Id*. But where, as here, insurers pay providers directly for healthcare services, *see* Consolidated Class Action Complaint ¶¶ 11, 51, 87, 265, ECF No. 172, insurers are, in fact, purchasers of those services. *Blue Cross and Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1414 (7th Cir. 1995) (Posner, J.) (holding that Blue Cross was a "direct purchaser" of healthcare services from Marshfield Clinic because "the money went directly from Blue Cross to the Clinic, and although the two entities were not linked by any overarching contract, each payment and acceptance was a separate completed contract"); *cf. FTC v. Advoc. Health Care Network*, 841 F.3d 460, 468 (7th Cir. 2016) (in hospital merger case, describing the product market as "those services sold to commercial health plans and their members"). And a price-fixing conspiracy among purchasers is per se illegal. *See, e.g.*, *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219, 235-36 (1948); *Socony-Vacuum*, 310 U.S. at 223-27 & n.59. Indeed, Defendants' argument to the contrary essentially seeks an antitrust exemption for these purchases—a request that is "properly addressed to Congress," not this Court. *Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679, 689-90 (1978).

is based on an incorrect understanding of the law and of the types of concerted action the Sherman Act covers. Under well-established precedent, there can be concerted action subject to Section 1 in setting the starting points of prices even if the conspirators have some discretion in choosing how often to follow them.

The Sherman Act defines concerted action broadly because of its anticompetitive risk. *See supra* pp. 2-3. Concerted action encompasses many types of joint conduct and is not limited to agreements among competitors to charge the same price. *See, e.g.*, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223, 226 n.59 (1940) (unlawful concerted action can include any "combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity," including agreement on "the formula underlying price policies"). For example, this Court has condemned "an agreement on how rates are to be calculated." *In re Wheat Rail Freight Rate Antitrust Litig.*, 579 F. Supp. 517, 538 (N.D. Ill. 1984), *aff'd sub nom. Matter of Wheat Rail Freight Rate Antitrust Litig.*, 759 F.2d 1305 (7th Cir. 1985). Accordingly, concerted action is not a singular concept but a robust legal category that encompasses a range of conduct designed to interfere with independent competition.

In particular—and especially important here—the Sherman Act can cover concerted action by competitors on any "formula underlying price policies." *Socony-Vacuum*, 310 U.S. at 222, 226 n.59; *see also id.* at 223 ("an artificial stimulus applied to (or at times a brake on) market prices, a force which distorts those prices, a factor which prevents the determination of those prices by free competition alone"). That includes any formula used to fix benchmark, component, recommended, or "starting point" prices—even if end prices ultimately vary. *Plymouth Dealers' Ass'n of N. Cal. v. United States*, 279 F.2d 128, 132 (9th Cir. 1960) (list prices); *see also, e.g.*, *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 648 (1980) (discounts);

*Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 339 (1982) (maximum fee schedules); *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 765, 771 (2d Cir. 2016) ("benchmark" or "component" used in contracts setting interest rates).

Defendants are thus incorrect in arguing that "Plaintiffs' attempt to plead a conspiracy through circumstantial evidence fails at the threshold because the conduct they allege is not parallel." Class MTD Mem. at 25. Courts assessing the presence of concerted action should look not just to parallel final prices—reflecting one form of conspiracy—but parallel behavior in determining prices—reflecting coordination in the approaches to determining prices. For example, this Circuit has previously rejected attempts to impose minimum rates of adherence when assessing agreements to fix the starting point of pricing. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002). Rather than look to rates of adherence, it has reasoned that the fixed prices necessarily had some influence on the market—thus disrupting the competitive process—from the very fact that defendants bothered to fix such prices at all. *See United States v. Masonite Corp.*, 316 U.S. 265, 268-69, 275 (1942). This Circuit rejected the argument that there could be no horizontal price-fixing conspiracy if "many of the actual sales" occurred below fixed list prices. *High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d at 656. Because the defendants agreed to fix "the starting point for the bargaining," their agreement was covered "even if *most or for that matter all* transactions occur at lower prices." *Id.* (emphasis added); *see also Gelboim*, 823 F.3d at 771, 776 (well-established antitrust precedent "allows an antitrust claim based on the influence that a conspiracy exerts on the starting point for prices"); *Plymouth*, 279 F.2d at 132 ("the fact that the dealers used the fixed uniform list price in most instances only as a starting point[] is of no consequence.").

6

Moreover, proof of parallel conduct and "plus factors" is not the only way of showing concerted action through circumstantial evidence. *See supra* pp. 2-3. In light of the foregoing principles, Defendants are incorrect to suggest that differences in the application of a pricing algorithm necessarily foreclose the possibility of a common scheme involving that algorithm.

## II. Information Exchange Through a Common Pricing Algorithm Can Violate Section 1

Defendants argue that Direct Action Plaintiffs' information exchange claim fails in part because they do not allege that payor Defendants "exchanged competitively sensitive information with each other." DAP MTD Mem. at 33. To the extent Defendants suggest that competitors' exchange of information through an intermediary cannot violate Section 1, this argument is contrary to law.

Courts have recognized that sharing information through an algorithm provider can create the same anticompetitive effects as a direct exchange between competitors because the algorithm provider "has confidential price strategy information from multiple competitors, [and] it can program its algorithm to maximize industry-wide pricing" even if "the firms themselves don't directly share their pricing strategies." *Duffy v. Yardi Sys., Inc.*, 2024 WL 4980771, at *5 (W.D. Wash. Dec. 4, 2024) (internal quotations omitted). "The fact that [] defendants did not meet as a group but rather used an intermediary . . . does not preclude the existence of an agreement or change its unlawful nature." *Id.* at *5; *cf. In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 544, 549–50 (M.D. Tenn. 2023) (plaintiffs adequately pleaded a Section 1 claim where centralized algorithm recommended prices to competitors based on "granularly-focused data").

7

## CONCLUSION

For the foregoing reasons, the Court should decide Defendants' Motions to Dismiss, ECF. Nos. 282 & 285, consistent with the legal principles above regarding (1) concerted action involving pricing algorithms, and (2) information exchange through a common pricing algorithm.

                                            Respectfully submitted,

Dated: March 26, 2025

ABIGAIL A. SLATER
*Assistant Attorney General*

ROGER P. ALFORD
*Principal Deputy Assistant Attorney General*

MARK H. HAMER
WILLIAM RINNER
*Deputy Assistant Attorneys General*

DAVID B. LAWRENCE
*Policy Director*

ALICE A. WANG
*Counsel to the Assistant Attorney General*

KARINA LUBELL
*Competition Policy and Advocacy Section Chief*

HENRY J. HAUSER
ESTHER PYON
GRACE LEE
*Attorney Advisors*

/s/ *Henry J. Hauser*
HENRY J. HAUSER

*Attorneys for the United States of America*

**CERTIFICATE OF SERVICE**

      I hereby certify that on March 27, 2025, I electronically filed the foregoing brief by using the CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

                                                  /s/ *Henry J. Hauser*
                                                  HENRY J. HAUSER