**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: MULTIPLAN HEALTH INSURANCE PROVIDER LITIGATION | Case No. 1:24-cv-6795 MDL No. 3121 |
| This Document Relates To: | Hon. Matthew F. Kennelly |
| 1:24-cv-7177 1:24-cv-6802 | |

## REPLY IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

ARGUMENT .........................................................................................................................3

I.     PLAINTIFFS FAIL TO PLEAD ANTITRUST STANDING OR INJURY .....................3

     A.     Plaintiffs Lack Antitrust Standing Because They Have Not Plausibly Alleged That They Are "Prohibited" from Balance-Billing Patients. ....................3

     B.     Plaintiffs Fail to Plead Antitrust Injury....................................................................6

II.     THE COMPLAINT'S FACTUAL ALLEGATIONS DO NOT PLAUSIBLY ESTABLISH AN UNLAWFUL AGREEMENT ................................................................7

     A.     Plaintiffs Do Not Plead Any Direct Evidence of a Conspiracy. ............................8

     B.     Plaintiffs Do Not Allege Any Circumstantial Inference of a Conspiracy. ............10

          1.     Plaintiffs Fail To Allege Parallel Conduct.................................................10

          2.     Even if There Were Parallel Conduct, Plaintiffs' Allegations Undermine an Inference of Conspiracy. ...................................................13

III.     PLAINTIFFS FAIL TO PLEAD EITHER A COGNIZABLE "PRICE" CAPABLE OF BEING "FIXED" OR A COGNIZABLE ANTITRUST MARKET ..........................17

     A.     MCO Reimbursements Are Not Standalone Products and Services. ...................17

     B.     Plaintiffs' Newly-Alleged Nationwide Market for "Out-of-Network Health Services for Purchase by [MCOs]" Is Infirm........................................................18

CONCLUSION....................................................................................................................20

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*In re Aetna UCR Litig.*,
2015 WL 3970168 (D.N.J. June 30, 2015) ..............................................2, 8, 14. 15

*Agnew v. NCAA*,
683 F.3d 328 (7th Cir. 2012) ...............................................................18

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990)................................................................................6

*Austin v. Blue Cross & Blue Shield of Ala.*,
903 F.2d 1385 (11th Cir. 1990) ............................................................6

*In re BCBS Antitrust Litig.*,
No. 13-20000 (N.D. Ala. Apr. 18, 2017), ECF No. 1083.....................20

*Beatrice Foods Co. v. F.T.C.*,
540 F.2d 303 (7th Cir. 1976) ...............................................................19

*Bell Atl. v. Twombly*,
550 U.S. 544 (2007)...........................................................................10, 13

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
881 F. Supp. 1309 (W.D. Wis. 1994) ....................................................5

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)...........................................................................6, 18

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977)................................................................................7

*In re Citric Acid Litig.*,
191 F.3d 1090 (9th Cir. 1999) ...............................................................8

*Conrad v. Jimmy John's Franchise, LLC*,
2021 WL 718320 (S.D. Ill. Feb. 24, 2021).........................................19

*Cornish-Adebiyi v. Caesars Ent., Inc.*,
2024 WL 4356188 (D.N.J. Sept. 30, 2024) ......................................12, 13

*In re Delta Dental Antitrust Litig.*,
484 F. Supp. 3d 627 (N.D. Ill. 2020) .................................................19, 20

*Duffy v. Yardi Systems, Inc.*,
  2024 WL 4980771 (W.D. Wash. Dec. 4, 2024) ...................................................15

*Franco v. Conn. Gen. Life Ins. Co.*,
  818 F. Supp. 2d 792 (D.N.J. 2011), *aff'd in relevant part*, 647 F. App'x 76 (3d
  Cir. 2016) .............................................................................................................3, 18

*F.T.C. v. Staples, Inc.*,
  190 F. Supp. 3d 100 (D.D.C. 2016) .......................................................................20

*Gibson v. Cendyn Grp., LLC*,
  2024 WL 2060260 (D. Nev. May 8, 2024) .....................................................12, 13

*Hanover Shoe, Inc. v. United Shoe Machinery Corp*,
  392 U.S. 481 (1968) .................................................................................................5

*In re High Fructose Corn Syrup Antitrust Litig.*,
  295 F.3d 651 (7th Cir. 2002) ...............................................................................8, 9

*Little Rock Cardiology Clinic PA v. Baptist Health*,
  591 F.3d 591 (8th Cir. 2009) .................................................................................19

*In re Mexican Gov't Bonds Antitrust Litig.*,
  412 F. Supp. 3d 380 (S.D.N.Y. 2019) ...................................................................12

*Oakland Police & Fire Ret. Sys. v. Mayer Brown LLP*,
  861 F.3d 644 (7th Cir. 2017) .................................................................................11

*Omnicare, Inc. v. UnitedHealth Group, Inc.*,
  524 F. Supp. 2d 1031 (N.D. Ill. 2007) ..................................................................19

*Pac. Recovery Sols. v. United Behav. Health*,
  481 F. Supp. 3d 1011 (N.D. Cal. 2020) ...........................................................1, 3, 5

*Pac. Recovery Sols. v. Cigna Behav. Health, Inc.*,
  2021 WL 1176677 (N.D. Cal. Mar. 29, 2021) .................................................1, 3, 18

*In re RealPage*,
  709 F. Supp. 3d 478 (M.D. Tenn. 2023) ................................................................15

*In Re RealPage, Inc., Rental Software Antitrust Litigation (No. II)*,
  No. 23-md-3071 (M.D. Tenn. Nov. 15, 2023), ECF No. 628 ................................12

*Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.*,
  412 F. Supp. 3d 941 (N.D. Ill. 2019) ..............................................................18, 19

*Robinson v. Tex. Auto. Dealers Ass'n*,
  387 F.3d 416 (5th Cir. 2004) ...................................................................................6

*Ryan Segal v. Amadeus IT Grp., S.A*,
   2025 WL 963751 (N.D. Ill. Mar. 31, 2025)................................................................12

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
   950 F.3d 911 (7th Cir. 2020) ...................................................................................20

*In re Text Messaging Antitrust Litig.*,
   630 F.3d 622 (7th Cir. 2010) ................................................................................8, 10

*Toys "R" Us, Inc. v. F.T.C.*,
   221 F.3d 928 (7th Cir. 2000) ..............................................................................16, 17

*In re Treasury Sec. Auction Antitrust Litig.*,
   595 F. Supp. 3d 22 (S.D.N.Y. 2022), *aff'd sub nom. City of Pontiac Police &*
   *Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381 (2d Cir. 2024) ..................12

*United States v. Apple*,
   952 F. Supp. 2d 638 (S.D.N.Y. 2013), *aff'd*, 791 F.3d 290 (2d Cir. 2015) .............16

*United States v. E. I. du Pont de Nemours & Co.*,
   351 U.S. 377 (1956).................................................................................................20

*Vasquez v. Ind. Univ. Health, Inc.*,
   40 F.4th 582 (7th Cir. 2022) .....................................................................................5

*In re WellPoint, Inc. Out-Of-Network "UCR" Rates Litig.*,
   903 F. Supp. 2d 880 (C.D. Cal. 2012) ..............................................................1, 3, 4

## STATUTES

Sherman Act § 1.................................................................................................8, 14, 15

## INTRODUCTION

Class Plaintiffs' ("Plaintiffs") Opposition is an exercise in deflection and confirms this case should be dismissed. Rather than answering Defendants' arguments and pointing to well-pleaded factual allegations that establish their single antitrust claim, Plaintiffs instead ignore or contort their own allegations, their missing allegations, and the applicable caselaw. Most strikingly, Plaintiffs concede that there is more than a decade's worth of caselaw dismissing similar antitrust claims against MCOs based on allegations that they have used the same third-party data sources to allegedly suppress reimbursements to out-of-network ("OON") providers. Nothing has changed since these cases were decided. Indeed, Plaintiffs hold out the cases relating to Ingenix as the model for their claims here—but *those cases were dismissed at the pleading stage*, just like so many others. The Opposition confirms that Plaintiffs do not and can never successfully distinguish their Complaint ("CCAC") from the many others that came before it and failed.

*First*, Plaintiffs cannot establish antitrust standing because they do not and cannot allege that they are incapable of collecting payment from patients. Plaintiffs cannot deny that courts have repeatedly dismissed OON providers' "suppressed reimbursements" claims against MCOs for lack of antitrust standing because OON providers are entitled to seek their full billed charges from their patients. *See Pac. Recovery Sols. v. United Behav. Health*, 481 F. Supp. 3d 1011, 1022-23 (N.D. Cal. 2020) ("*Pac. Recovery I*"); *Pac. Recovery Sols. v. Cigna Behav. Health, Inc.*, 2021 WL 1176677, at *12 (N.D. Cal. Mar. 29, 2021) ("*Pac. Recovery II*"); *In re WellPoint, Inc. Out-Of-Network "UCR" Rates Litig.*, 903 F. Supp. 2d 880, 901-03 (C.D. Cal. 2012). Nor can Plaintiffs distinguish these cases by alleging Plaintiffs are prohibited from "balance billing," because the Complaint does not and cannot allege that. Instead, the Complaint alleges that Plaintiffs agree not to balance bill *only if* they accept MultiPlan's repricing offers, while acknowledging that, if they reject those offers, their patients remain responsible for any portion of the provider's billed charge

that the plan, pursuant to its contract with the patient, does not cover.

Plaintiffs' Opposition also confirms that they do not and cannot allege antitrust injury—that their lowered OON reimbursements flowed from a reduction in competition. Plaintiffs try to argue that MCOs' use of MultiPlan's services deprives providers of receiving competitively set reimbursements. But the Complaint tells a different story—the UCR-based reimbursements that Plaintiffs seek to return to, through perversely using antitrust law to eliminate a new competitive option, were *not* competitively set but instead resulted from providers' efforts to drive up rates.

*Second*, Plaintiffs fail to point to anything in their Complaint plausibly alleging a conspiracy or "cartel." Plaintiffs do not dispute that nearly-identical antitrust claims have also been dismissed because pleading that MCOs engaged in parallel conduct in choosing to use the same data source for OON reimbursements is not sufficient to allege a conspiracy. *See In re Aetna UCR Litig.*, 2015 WL 3970168, at *20–21 (D.N.J. June 30, 2015). And while Plaintiffs try to distinguish these cases, their own factual allegations *foreclose* any inference of conspiracy. As the Complaint admits, MCOs have a natural incentive to keep payments to OON providers low for the benefit of plan members and sponsors, so it is rational for each of MultiPlan's 700+ clients to unilaterally decide to use MultiPlan's services. In the face of that admitted reality, Plaintiffs' theory that, absent an industry-wide agreement, an MCO would face so much "abrasion" of its members after switching to MultiPlan that it would have to turn back to other service providers is implausible. In fact, Plaintiffs do not allege that early adopters of Multiplan's services lost members or plans—they allege, to the contrary, that these early adopters achieved significant savings for the benefit of their members and plan sponsors.

*Third*, Plaintiffs fail to explain how the reimbursement paid by MCOs after a patient has already purchased and consumed services from a provider can possibly be understood as the object

of an alleged price-fixing conspiracy. Plaintiffs cannot dispute that courts have also repeatedly dismissed nearly-identical antitrust claims because MCOs' OON reimbursements are not prices that can be fixed. *See, e.g.*, *Franco v. Conn. Gen. Life Ins. Co.*, 818 F. Supp. 2d 792, 832 (D.N.J. 2011), *aff'd in relevant part*, 647 F. App'x 76 (3d Cir. 2016). Plaintiffs' attempt to wave off this authority in a footnote (Class Opp'n 34 n.20, ECF No. 352 ("Opp'n")) does not offer any meaningful distinction between this case and that line of authority, and their notion that identical services from the same providers somehow constitute different product markets—based on those providers' billing preferences—is wrong.

## ARGUMENT

### I.   PLAINTIFFS FAIL TO PLEAD ANTITRUST STANDING OR INJURY

#### A.   Plaintiffs Lack Antitrust Standing Because They Have Not Plausibly Alleged That They Are "Prohibited" from Balance-Billing Patients.

Plaintiffs have no response to the series of cases noted in Defendants' opening brief dismissing similar claims brought by OON providers against MCOs and software companies like MultiPlan for lack of antitrust standing.[1] As those cases establish, OON providers like Plaintiffs are not injured by allegedly suppressed OON reimbursements where, as here, they can bill their patients for unpaid amounts. Providers are "'injured' only to the extent that their patients fail to pay them that [balance-bill] difference." *Pac. Recovery I*, 481 F. Supp. 3d at 1022. And even then, the alleged conspiracy is not the direct cause of providers' injury—instead, their injury flows "from the patients' failure to comply with their financial obligations to [providers], and not from [the payors'] conduct." *Id.*; *accord Pac. Recovery II*, 2021 WL 1176677, at *12 (finding OON providers' injuries "derivative of their patients' injury" because the providers' "injuries arise, if at all, only to the extent that their patients do not pay" balance-bill amounts).

---

[1] *See* ECF No. 283 at 15-16 ("Class MTD") (citing *Pac. Recovery I*, 481 F. Supp. 3d at 1022-23; *Pac. Recovery II*, 2021 WL 1176677, at *12; *In re WellPoint*, 903 F. Supp. 2d at 901-03).

Plaintiffs contend that they are "prohibited" from balance-billing patients. Opp'n 1-2 (citing CCAC ¶¶ 172-74, 198). Their Complaint says otherwise. It alleges that, in cases where a negotiation occurs, OON providers agree not to balance-bill their patients *only if* they accept the MultiPlan-offered amount. CCAC ¶ 172 ("MultiPlan conditions all offers of payment on the provider's promise not to [balance bill].").  In other words, Plaintiffs *can* balance bill patients if either (1) there is no negotiation with MultiPlan *or* (2) they decide not to accept an offered amount.

As in similar cases where courts have dismissed claims on standing grounds, Plaintiffs here allege that the *patient* is responsible for the difference between the plan-reimbursed amount and the provider's billed charge for the OON service, and that OON providers can balance bill the patient for that difference. *See id.* ¶ 87 (acknowledging that after receiving the plan-allowed amount, OON providers can "seek additional compensation from the patient for the portion of the charged amount above the [plan] 'allowed amount,'" "known as 'balance billing'"). Plaintiffs even rely, as a primary basis for their claim, upon a contract for reimbursement (Opp'n 20) that expressly contemplates that providers may "balance bill[] the patient" for any amount in excess of the MCO's unaccepted offer of payment. Decl. of Graham Haviland Supp. Defs.' Class MTD ("Haviland Decl."), Ex. A at 4.[2] As this contract shows, providers are only prohibited from "balance billing" if they voluntarily accept the amount negotiated as payment in full. Opp'n 20.[3]

Thus, this case is just like *Pacific Recovery* and *WellPoint*. OON providers can always balance bill if they choose to, the patient then decides whether to pay, and the proximate cause of any injury to the provider arises from the patient's decision not to pay, not any alleged conspiracy.

---

[2] Because this contract was incorporated by reference in the Complaint (CCAC ¶¶ 222-30), the Court can consider it as part of the pleadings. *See* Class MTD 8 n.3.

[3] The Complaint does not allege anything like the "Hobson's Choice" Plaintiffs conjure in the Opposition. It does not allege any facts, for example, that patients are not a "realistic source of payment" for any unreimbursed amounts of OON claims, much less that the choice between accepting MCOs' offers or retaining the ability to balance bill means agreeing to MCOs' terms "or leaving the market." Opp'n 12-13.

*See In re WellPoint*, 903 F. Supp. 2d at 901-02 (finding no antitrust standing without "'direct link' between the harm the Provider Plaintiffs suffered and Defendants' alleged misconduct").

Plaintiffs' remaining arguments are irrelevant—but also fall flat. Plaintiffs argue that "contractual privity is not a requirement for antitrust standing." Opp'n 11. But Defendants never argued otherwise. *See* Class MTD 15-16. Plaintiffs then cite a series of authorities, but none of those cases found an OON *provider* has antitrust standing based on alleged under-reimbursements by an MCO. Opp'n 12 & n.4 (citing *Vasquez v. Ind. Univ. Health, Inc.*, 40 F.4th 582, 585 & n.1 (7th Cir. 2022) (did not address antitrust standing and only referred to payor as a "buyer" of healthcare services in dicta); *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 881 F. Supp. 1309, 1318 (W.D. Wis. 1994) (BCBSW sought to recover amounts it overpaid as a result of monopolist-provider's "supra competitive prices")). An insurer may have standing based on *provider overcharges* where it is contractually obligated to pay a portion of the patient's bill. *Marshfield*, 881 F. Supp. at 1318. But that does not mean an OON *provider* will have standing given that they can balance bill their patients; Plaintiffs cannot cite to a single case that so holds.

Finally, *Hanover Shoe, Inc. v. United Shoe Machinery Corp*, 392 U.S. 481, 489-94 (1968), does not counsel a different result. Plaintiffs' antitrust standing problem stems from the fact that non-party patients—not Defendants—are responsible for payment of the *entire* OON amounts that Plaintiffs seek to recover. That is nothing like a "pass-through" scenario where an injured party may simply pass on a defendant's price increases to indirect purchasers located downstream. Patients are plainly not "indirect purchasers," nor do Plaintiffs allege that any product is being sold from MCOs to providers to patients.[4]

---

[4] Nor can Plaintiffs dispute that their claim creates a risk of duplicative recovery, another factor that precludes standing. Class MTD 18-19. As in *Pacific Recovery I*, "plaintiffs' allegations do not foreclose the possibility that their patients . . . could also sue defendants to recover damages," which raises the "risk of duplicative recoveries" and "fact-intensive inquiries and calculations." 481 F. Supp. 3d at 1022-23.

### B.  Plaintiffs Fail to Plead Antitrust Injury.

Plaintiffs' Opposition also confirms that they did not (and cannot) properly allege antitrust injury.  As Plaintiffs concede, because antitrust laws were enacted for "the protection of competition, not competitors," *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962), Plaintiffs are required to allege that their own injury—lower OON reimbursements—"coincide[d] with the public detriment tending to result from the alleged violation."  *Austin v. Blue Cross & Blue Shield of Ala.*, 903 F.2d 1385, 1389-90 (11th Cir. 1990) (citation omitted).

Plaintiffs fail to do that.  Instead, they argue only that MCOs' use of MultiPlan's Data iSight allegedly caused some providers to receive less in OON reimbursements from MCOs than they previously did.  But under well-settled law, for providers to show antitrust injury they also must allege that their lowered reimbursements flowed from a reduction in competition, causing them to be paid a price lower than a competitive rate that they would have received absent an MCO's use of Data iSight.  *See, e.g.*, *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990); *cf. Robinson v. Tex. Auto. Dealers Ass'n*, 387 F.3d 416, 422 (5th Cir. 2004).

Plaintiffs do not come close to making this showing.  The Complaint never once alleges facts that show Plaintiffs' preferred reimbursement benchmarks constitute competitively-set rates. To the contrary, the Complaint (and the materials it incorporates) alleges that UCR-based OON reimbursements were *not* competitively set, but rather flowed directly from providers' efforts to "bill higher than necessary for a service" to purposefully drive up the UCR rate used to calculate reimbursements.  *See* Decl. of Sadik Huseny Supp. Class MTD, Ex. B 21-22, ECF No. 284-2.

Compounding Plaintiffs' problem, the Complaint has no factual allegations suggesting that UCR rates were set by competition between MCOs, or that providers have ever used UCR rates to play one plan or MCO off another (i.e., using the threat of non-treatment to those plan's members) to obtain a higher reimbursement.  *See* Class MTD 8-9.  Conclusory assertions do not suffice:

without such actual factual allegations, Plaintiffs cannot show that they suffered an "injury of the type the antitrust laws were intended to prevent"—i.e., one that flows from an unlawful impairment to the competition. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

With no way to address these pleading gaps, Plaintiffs double-down on misdirection: they argue that, because MCOs allegedly reduced reimbursements to OON providers (while supposedly discouraging balance billing), the Court may rely upon *Plaintiffs' own alleged harm* as indicative of broader harm to competition. But that is not the law. Even in a classic buyer-side antitrust case (which this is not), lower prices do not, without more, give rise to antitrust injury. None of the cases that Plaintiffs cite holds otherwise. Opp'n 15-16 (citing cases).

Plaintiffs also argue that they were injured by MCOs' efforts to limit how much providers balance billed the MCO's subscribers. But this reformulation of their antitrust injury theory only makes their case weaker, because any harm Plaintiffs suffered from MCO's efforts to limit patient billing for OON reimbursements does not flow from a *reduction* in competition—under Plaintiffs' theory, *it flows directly from active, robust competition* between MCOs for subscribers (which in the past was done through increasing OON reimbursements to keep balance-billed amounts low, benefitting providers). *Id.* at 5 (citing CCAC ¶¶ 77-78). Plaintiffs do not plead antitrust injury by alleging that MCOs' compete for subscribers today by incentivizing providers to take somewhat less money in return for the speedy payments from MCOs instead of billing patients. CCAC ¶ 489. Any alleged harm to providers is a *result* of this competition, not from an *elimination* of competition. Plaintiffs cannot cite to a single case holding antitrust injury exists where plaintiffs—as here—do not plead that their alleged harm results from any competition-reducing conduct.

## II.  THE COMPLAINT'S FACTUAL ALLEGATIONS DO NOT PLAUSIBLY ESTABLISH AN UNLAWFUL AGREEMENT

Plaintiffs' efforts to remedy the other flaws in their Complaint fare no better.

Fundamentally, the conduct they allege—that hundreds of MCOs turned to MultiPlan's cost-cutting services at different times over a span of several years in order to save money for their members and plan sponsors—is completely consistent with unilateral self-interest, and does not support their proposed inference of a "cartel." *See In re Aetna UCR Litig.*, 2015 WL 3970168, at *20-21 (dismissing Sherman Act Section 1 claim based on a failure to allege a conspiracy where the complaint's central allegation, like here, was that each MCO had economic incentives to reduce reimbursements to out-of-network providers). There are two pathways to establish an agreement for purposes of Section 1—direct evidence ("smoking gun" evidence that requires no inferences) and circumstantial evidence from which an agreement may be inferred. *See, e.g.*, *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010). Plaintiffs fail to establish either.

## A. Plaintiffs Do Not Plead Any Direct Evidence of a Conspiracy.

Plaintiffs fail to identify any direct evidence of a "conspiracy among rival insurers, facilitated by MultiPlan." Opp'n 18; *see also* CCAC ¶ 1. Indeed, they continue to betray a fundamental misunderstanding of what constitutes "direct evidence" of a conspiracy under black-letter Seventh Circuit law. Direct evidence of a conspiracy is "tantamount to an acknowledgement of guilt." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002). It must be "explicit and require no inferences to establish" a conspiracy. *In re Citric Acid Litig.*, 191 F.3d 1090, 1093-94 (9th Cir. 1999) (citation omitted).

There is nothing like that here. Plaintiffs walk back their assertion that MultiPlan's CEO made public comments that were "direct evidence" of a price-fixing agreement—after Defendants pointed out that the Complaint misrepresented the comment via careful use of ellipses. Opp'n 20 (citing CCAC ¶¶ 9, 235-37). Instead, Plaintiffs double down on another misrepresentation—one concerning the bilateral contracts between individual MCOs and MultiPlan. *See id.* (quoting CCAC ¶ 220). Specifically, Plaintiffs point to allegations in their Complaint referencing bilateral

agreements between MultiPlan and a few MCOs, which they state contain certain terms that, according to their Complaint, "directly evidence the conspiracy alleged herein." CCAC ¶ 219; *see also* Opp'n 20; CCAC ¶¶ 220-33. According to Plaintiffs these contracts show that each MCO:

> [E]ntered into agreements with MultiPlan providing that: "(1) the insurer will use MultiPlan's pricing methodology (Data iSight) instead of exercising its own, independent decision-making to set compensation amounts for out-of-network providers, (2) in the event of a dispute with a provider over compensation, the insurer will delegate to MultiPlan the task of 'negotiating' with the provider, and that MultiPlan will condition payment on the provider's agreement not to balance bill the patient, (3) the insurer will adhere to MultiPlan's pricing determinations, (4) the insurer will share CSI with their rivals through MultiPlan (including its pricing preferences and strategies) and have access to MultiPlan's claims database, which contains CSI from rivals, and (5) the insurer will split with MultiPlan the revenues generated by underpaying OON providers."

Opp'n 20 (quoting CCAC ¶ 220 (asserting the contracts "expressly contemplate" the above)).

Far from supporting Plaintiffs' claim, these allegations fatally undermine it. None of these supposed "terms" in bilateral contracts between an MCO and MultiPlan constitutes an "explicit," smoking gun agreement among MCOs on any subject. *In re High Fructose Corn Syrup*, 295 F.3d at 662. Alleging that these MCOs each entered into separate bilateral contracts with MultiPlan is not direct evidence that those MCOs entered into an agreement *with each other* about any subject, much less that there is a grand "cartel among insurance companies" (CCAC ¶ 1) that includes the hundreds of MCOs that allegedly use MultiPlan's services. Tellingly, Plaintiffs do not identify a single case in which any court (much less one in this Circuit) has treated allegations of this sort as "direct evidence" of a horizontal conspiracy.

Moreover, and significantly, Plaintiffs *misrepresent to the Court what the terms actually say.* The Complaint refers to one bilateral contract in particular that was made public in a filing over three years ago. CCAC ¶¶ 222-30 (discussing Haviland Decl., Ex. A). The actual terms, which the Court may view for itself, bear no resemblance to Plaintiffs' characterizations to the Court. For example, far from providing that "the insurer will use MultiPlan's pricing

9

methodology," Opp'n 20 (quoting CCAC ¶ 220), the contract simply grants a license to "access on-line results from Data iSight," with no obligation whatsoever to adopt *any* methodology or recommendation. Haviland Decl., Ex. A 3 § D. Nor does the contract contain any terms whatsoever supporting the assertion that "the insurer will share CSI with their rivals" or "have access to MultiPlan's claim database." *Compare* Opp'n 20 *with* Haviland Decl., Ex. A. Rather than categorically requiring the provider not to balance bill the patient, the contract contemplates that the provider may "contest[] the amount paid and balance bill[] the patient." Haviland Decl., Ex. A 4 § E. And the contract explicitly states that any negotiation with a provider will be according to "pre-designated Company [i.e., MCO] parameters." *Id.*

Plaintiffs' two pieces of "direct evidence"—a CEO quote misrepresented through ellipses, and bilateral contract terms that contradict their assertions—fatally undermine their claim.

## B. Plaintiffs Do Not Allege Any Circumstantial Inference of a Conspiracy.

Plaintiffs' "circumstantial evidence" fares no better. To plead a conspiracy through circumstantial evidence, Plaintiffs cannot simply allege that all payors used MultiPlan's services or took some other common course of conduct. Plaintiffs must allege facts that "enable[] parallel conduct to be interpreted as collusive," such as "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *In re Text Messaging Antitrust Litig.*, 630 F.3d at 628 (quoting in part *Bell Atl. v. Twombly*, 550 U.S. 544, 557 n.4 (2007)). Plaintiffs fail to adequately allege parallel conduct, much less "plus factors" sufficient to infer an agreement.

### 1. Plaintiffs Fail To Allege Parallel Conduct.

Plaintiffs' claim fails for the simple reason that they do not plead facts showing parallel reimbursement reductions among Defendants. While Plaintiffs insist that MCOs have acted in parallel by delegating their reimbursement authority to MultiPlan by "adopt[ing] MultiPlan's

formula" for OON reimbursements, Opp'n 25, their own Complaint alleges no such thing. First, the Complaint does not even allege that a shared "formula" exists. The Complaint only describes individual "preference forms" that each MCO separately provides MultiPlan to guide the functionality of Data iSight for that individual MCO. CCAC ¶ 157. And the white papers that Plaintiffs assert "instruct clients on how to implement the scheme," *id.* ¶ 263, in fact describe the "variety of configuration options selected by [] plans to reflect their preferred balance of savings and member satisfaction." Huseny Decl., Ex. C 6, ECF No. 284-3. In short, the documents incorporated by reference in the Complaint demonstrate the individualized choices made by each MCO, which is inconsistent with an inference of conspiracy.

Nor does the Complaint actually allege that any MCO "delegated" its own reimbursement authority to MultiPlan at any time. To the contrary, the Complaint itself shows that Data iSight is customizable, that it touted its customizability as leading to variable savings (i.e., differences in reimbursements), and that MultiPlan, in fact, elicits each client's input in order to implement their individual preferences. *See* CCAC ¶¶ 157, 263. Far from "relinquishing" reimbursement authority to MultiPlan, these allegations show that each MCO dictates how its reimbursements are calculated. And the Complaint does not allege that any MCO ever discussed their preferences with any other MCO, much less agreed on what settings to implement or what results to accept. This is not a "fact dispute" over whether any MCO ever delegated anything to MultiPlan, as Plaintiffs now assert. Opp'n 26 n.14. Instead, it is a failure to allege facts supporting Plaintiffs' claim, which cannot be cured in the Opposition by misdirection and prose. *See id.* at 15; *Oakland Police & Fire Ret. Sys. v. Mayer Brown LLP*, 861 F.3d 644, 654 (7th Cir. 2017) (dismissing claim where "[t]he factual allegations contained in the complaint contradict[ed] [the] conclusory allegation" about the contractual relationship). Without alleged facts showing that any MCO

delegated anything to MultiPlan, much less that they did so at the same time, Plaintiffs cannot plausibly allege that the MCOs did so in parallel.[5] Use of a common service provider, without any well-pled allegations as to price or methodology is not parallel behavior of a sort anomalous in a competitive market, much less conduct sufficient to state an antitrust claim. *Gibson v. Cendyn Grp.*, *LLC*, 2024 WL 2060260, at *8 (D. Nev. May 8, 2024); *Cornish-Adebiyi v. Caesars Ent., Inc.*, 2024 WL 4356188, at *7 (D.N.J. Sept. 30, 2024). Indeed, in an opinion issued just two days ago, a court in this district dismissed a hub-and-spoke conspiracy claim because competitors' common use of a software platform was insufficient to allege a "rim." *Ryan Segal v. Amadeus IT Grp., S.A*, 2025 WL 963751, at *5 (N.D. Ill. Mar. 31, 2025).

The Department of Justice's ("DOJ") carefully-worded Statement of Interest, ECF No. 283 ("DOJ SOI"), filed one week ago, highlights these deficiencies. Unlike in other SOIs (*see, e.g., In Re RealPage, Inc., Rental Software Antitrust Litigation (No. II)*, No. 23-md-3071 (M.D. Tenn. Nov. 15, 2023), ECF No. 628), DOJ does not ask the Court to deny Defendants' motions to dismiss, nor does it even suggest that Plaintiffs' claims have any merit. Instead, it opines on narrow legal arguments *that Defendants did not make*. DOJ's principal argument is that "Defendants are incorrect to suggest that differences in the application of a pricing algorithm necessarily foreclose the possibility of a common scheme involving that algorithm." DOJ SOI 7. But Defendants make no such "foreclosure" argument, and don't need to. Instead, Defendants show that the absence of

---

[5] Plaintiffs argue that no "group pleading" issues exist because the Complaint alleges that all Defendants used MultiPlan for OON pricing, and "[n]o more is required" at the pleading stage. Opp'n 39-40. But this is not the law. "Post-*Twombly* authorities overwhelmingly hold that a complaint that provides no basis to infer the culpability of the *specific* defendants named in the complaint fails to state a claim." *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 388 (S.D.N.Y. 2019) (collecting cases). Plaintiffs' failures are exemplified by their treatment of the seven "BCBS Defendants," which, although separately owned and operated, are effectively treated as a single entity. *See, e.g.*, CCAC ¶ 112; *In re Treasury Sec. Auction Antitrust Litig.*, 595 F. Supp. 3d 22, 43 (S.D.N.Y. 2022) ("Because these allegations refer to the nine Auction Defendants as a group, they will be discounted accordingly." (citation omitted)), *aff'd sub nom. City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381 (2d Cir. 2024).

any plausible allegations that "MCOs use MultiPlan in the same way to determine individual reimbursements" undercuts any notion of Plaintiffs' conjured "conspiracy." Class MTD 2. The DOJ SOI never disputes that Plaintiffs' failure to put forth such allegations is highly relevant to whether a plausible conspiracy exists. Courts have rejected claims similarly predicated on the alleged "joint delegation" of pricing authority when customers can reject recommendations as they see fit. *Gibson*, 2024 WL 2060260, at *8 (nonbinding nature of recommendations rendered it "implausible" to infer "a tacit agreement to accept . . . pricing recommendations"); *Cornish-Adebiyi*, 2024 WL 4356188, at *7 (refusing to "infer a plausible price-fixing agreement . . . from the mere fact that [certain defendants] all use the same pricing software"). This reasoning applies with even greater force where, as here, customers dictate parameters through which MultiPlan provides reimbursement recommendations. *See* Class MTD 10-12, 26.

### 2. Even if There Were Parallel Conduct, Plaintiffs' Allegations Undermine an Inference of Conspiracy.

Plaintiffs also attempt to allege various "plus factors" which, as Defendants set forth in detail in their motion to dismiss, do not support the claimed conspiracy. Class MTD 34-35. Plaintiffs' Opposition has no meaningful response, and their own allegations only undermine any inference of a conspiracy.

*MCOs Have a Unilateral Incentive to Minimize OON Payments:* Plaintiffs' own Complaint alleges—consistent with common sense—that each MCO possesses an economic self-interest in minimizing out-of-network payments. Class MTD 28-32; CCAC ¶ 55 ("Insurers seek to predict and, if possible, limit the prices they will pay for [healthcare] services."). This conceded self-interest undercuts Plaintiffs' argument that signing on to MultiPlan's services suggests the existence of a conspiracy. *See Twombly*, 550 U.S. at 566 ("[T]here is no reason to infer that the companies had agreed among themselves to do what was only natural anyway . . . .").

13

Notwithstanding their own allegations to the contrary, Plaintiffs theorize that MCOs acted against their self-interest by contracting with MultiPlan. Plaintiffs' conjecture is that any MCO establishing "below-market" OON reimbursement rates (in the absence of a conspiracy) would experience so much "abrasion" that it would be forced to restore reimbursement rates to a "superior" level. CCAC ¶ 78. But apart from the allegations undercutting this theory, the Complaint also contains no factual allegations supporting it. Class MTD 28-31. To the contrary, the Complaint alleges that Cigna switched to MultiPlan *years* before other MCOs, CCAC ¶ 111, yet there are no allegations that it faced the "provider abrasion" and "subscriber loss" that Plaintiffs claim would happen to "any insurer" that lowered reimbursement rates "[a]bsent collective action." Opp'n 21. Instead, the Complaint alleges that Cigna experienced "billions of dollars" in savings from its shift to MultiPlan. CCAC ¶¶ 210-11. Indeed, the Complaint and Opposition explain that it was entirely in any MCO's independent self-interest to pursue cost-savings for OON reimbursements, regardless of whether others were doing the same. *Id*. This has nothing to do with "abrasion" or a conjured "cartel." *Id*. ¶¶ 242, 250.

Other courts have applied *Twombly* in similar circumstances to dismiss complaints—including in the Ingenix litigation upon which Plaintiffs rely. Opp'n 8. The courts in those cases repeatedly rejected the plaintiffs' claims as a matter of law, including granting motions to dismiss antitrust conspiracy claims for reasons that apply with equal force here. For example, in *In re Aetna UCR Litigation*, 2015 WL 3970168, at *21 (D.N.J. June 30, 2015), the court dismissed the plaintiffs' Sherman Act Section 1 claim, explaining that "[a] claim of antitrust conspiracy predicated on parallel conduct must be dismissed 'if "common economic experience," or the facts alleged in the complaint itself, show that independent self-interest is an "obvious alternative explanation" for defendants' common behavior.'" *Id.* (citations omitted). Nor did the allegation

14

that the defendants "conspired" to use a common data source (there, Ingenix) to allegedly suppress OON reimbursements suffice, where defendants' "individual economic motivation to engage in the activity alleged is glaring and unavoidable." *Id.* So too here.

*Plaintiffs' Opposition Cannot Paper Over the Holes in Their Allegations That MCOs Used Data iSight to Exchange CSI:* As set forth in Defendants' DAP Reply, Plaintiffs do not meaningfully contest that their conclusory assertions of information "pooling" and "commingling" are contradicted by the materials relied upon in their Complaint and incorporated by reference. Reply Supp. Mot. to Dismiss Consolidated DAP Compl. 16-18 ("DAP Reply"). Indeed, the Data iSight white paper that they contend reveals the alleged "information exchange" makes clear that reimbursement recommendations *are not* based on competitors' CSI. *Cf.* CCAC ¶ 263. This is fatal to Plaintiffs' ability to plead a plausible "algorithmic" price-fixing conspiracy of this sort, as recent law confirms. *See* Class MTD 33-34; DAP Reply 16-17. As in *Gibson* and *Cornish-Adebiyi*, there are no plausible allegations (nor can there be, consistent with Rule 11) that Data iSight uses confidential competitor data to generate reimbursement recommendations. And Plaintiffs' reliance on *In re RealPage*, 709 F. Supp. 3d 478, 528 (M.D. Tenn. 2023), and *Duffy v. Yardi Systems, Inc.*, 2024 WL 4980771 (W.D. Wash. Dec. 4, 2024), is misplaced because Data iSight simply does not work the way the software was alleged to have worked in those other cases, and Plaintiffs have not plausibly alleged that it does.

*The Complaint's Allegations Regarding MultiPlan's Marketing of its Services Do Not Provide A Basis to Infer a Conspiracy*: Having failed to plausibly allege a conspiracy through any other means, Plaintiffs are left to argue that they have plausibly alleged a conspiracy *among the MCOs* merely because MultiPlan "marketed its platform" as a way for insurers to save on out-of-network costs and "invited" insurers to sign up for its services. Opp'n 21. Based on these

"invitations" from a service provider to save on costs through the services it was offering, Plaintiffs argue that any MCO that "signed up for MultiPlan's claims repricing services" is part of an alleged cartel. *Id.* at 22-23. But Plaintiffs can cite to nothing in support of this made-up theory, and Defendants are aware of no case to ever conclude that a vendor which "markets" the ability of its services to reduce costs creates *per se* liability simply by entering into a bilateral agreement with customers. To the contrary, courts have rejected this argument. *See supra* 12; Class MTD 26.

The cases Plaintiffs cite only reinforce the need to show an agreement at the rim of the alleged conspiracy among the horizontal competitors. For example, Plaintiffs' lead case in discussing MultiPlan's "marketing" of its services is *United States v. Apple*, in which the court expressly cautioned that it was not finding vertical agreements or even Apple's "simultaneous negotiations with suppliers" to be unlawful. 952 F. Supp. 2d 638, 708 (S.D.N.Y. 2013), *aff'd*, 791 F.3d 290 (2d Cir. 2015). Rather, the court based liability on its finding that the publishers (horizontal competitors at the "rim") "*conspired with each other* to eliminate retail price competition to raise e-book prices, and that Apple played a central role in facilitating and executing that conspiracy." *Id.* at 647 (emphasis added). The facts that supported an agreement among the publishers at the rim included many facts critically missing here, such as Apple's requirement that all agreements be in place all at once, an agreement among all actors "to work together to eliminate retail price competition," the simultaneous entry of contracts among all participants, and a "[v]irtually overnight" and dramatic upward shift in industry pricing. *Id.* at 647-48.

Similarly, in *Toys "R" Us, Inc. v. F.T.C.*, a dominant retailer was "coercing suppliers" to engage in a group boycott of other retailers, depriving them "of a profitable sales outlet" but offering assurances that it "could protect them against cheaters." 221 F.3d 928, 935-36 (7th Cir. 2000). The retailer passed messages between the suppliers, indicating that each would adhere to

the group boycott. *Id.* at 932-33. Suppliers stated that their participation was contingent on their competitors doing the same. *Id.* And the group boycott resulted from a policy implemented simultaneously with respect to all manufacturers and "took hold" the year after the retailer started organizing it. *Id.* at 931-33. There is no plausible allegation whatsoever here of such horizontal agreements, nor simultaneous implementation of the alleged conduct.

## III. PLAINTIFFS FAIL TO PLEAD EITHER A COGNIZABLE "PRICE" CAPABLE OF BEING "FIXED" OR A COGNIZABLE ANTITRUST MARKET

### A. MCO Reimbursements Are Not Standalone Products and Services.

Even if Plaintiffs could allege the existence of a plausible "conspiracy" here (and they cannot), their Complaint fails for the independent reason that they fail to plead either a "price" that could be fixed or a cognizable antitrust market. Plaintiffs suggest Defendants are arguing "that prices for medical services cannot be 'fixed.'" Opp'n 33. But Defendants simply explain—consistent with a long line of cases that Plaintiffs have no answer to—that an OON reimbursement is not fairly characterized as the "price" of any product from the perspective of antitrust law, given the commercial realities of how the market works. Class MTD 37. Because providers can and do collect from patients—the only parties with whom Plaintiffs have any contractual relationship governing payment—a partial reimbursement received from a patient's MCO is not the "price" of the service rendered. Yet a partial reimbursement amount is all that Plaintiffs argue that the Defendants' conduct has affected. This is not an antitrust "exemption" to anything—as the DOJ asserts without support in a passing footnote, DOJ SOI 4 n.5—it is a threshold failure to plead the *basics* of any "price-fixing" claim, as court after court has found.

Moreover, Plaintiffs completely ignore the fatal defect with their reimbursement market: OON reimbursements are not cognizable products for antitrust purposes because MCOs do not compete to offer reimbursement to providers with whom they have no contractual

relationship *after* a patient has received care and taken on the obligation for the bill. OON reimbursements are not an "area of effective competition in the relevant line of commerce," *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 & n.35 (1962), because the medical services are rendered on the basis of an agreement between provider and patient, and providers can only collect *from a single MCO* (the one the patient contracted with) on the back end. Plaintiffs do not even try to explain how competition for OON reimbursements is possible under these conditions. Nor do they cite a single case identifying "OON services" as the subject of a price-fixing claim.

Plaintiffs try to distinguish *Franco v. Connecticut General Life Insurance Co.* and the cases that followed it on the ground that they considered claims by patients rather than providers. Opp'n 34 n.20. That distinction is immaterial. As *Franco* explained, lowering reimbursements at most "diminish[es] [OON] coverage" and "the quality of the product sold" to insureds by leaving them on the hook for more of the bill. 818 F. Supp. 2d 792, 833-34 (D.N.J. 2011). Diminishing the scope of coverage—i.e., the *portion* of an OON bill paid by the patient's insurer—does not fix the "price" of any OON services. And just as OON reimbursements are not a distinct product for patients (because they come as part of a broader package of insurance), OON reimbursements are not a distinct product for providers because they are part of a broader package including payments from patients. *Pac. Recovery II*, 2021 WL 1176677, at *14 (N.D. Cal. Mar. 29, 2021).

**B.  Plaintiffs' Newly-Alleged Nationwide Market for "Out-of-Network Health Services for Purchase by [MCOs]" Is Infirm.**

As a threshold matter, Plaintiffs are simply wrong that they can just ignore the entire concept of market definition because they attempt to allege *per se* (as well as rule of reason) claims. "The failure to allege the existence of a relevant commercial market is fatal . . . regardless of whether per se, quick-look, or rule-of-reason analysis is applied." *Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.*, 412 F. Supp. 3d 941, 952 (N.D. Ill. 2019); *see also Agnew v.*

*NCAA*, 683 F.3d 328, 335 (7th Cir. 2012).[6]  And courts can in fact dismiss claims when the market alleged is not plausible.  *Reapers Hockey Ass'n*, 412 F. Supp 3d at 952 ("The complaint fails as a matter of law because it defines the relevant market in terms . . . too narrow.").

*First*, Plaintiffs' alleged market is too narrow because it is defined by the excessive unilateral OON "list" prices they seek to foist on Defendants, rather than defining it based on "buyers who are seen by sellers as being reasonably good substitutes."  *In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d 627, 641 (N.D. Ill. 2020) (citation omitted) (acknowledging "infirmities" of "market 'limited to a single method of payment'").  That Plaintiffs want to be paid "more expensive" OON rates that are "1.5 to 100 times higher" than in-network rates does not mean there is a separate market for rates "set unilaterally by providers."  CCAC ¶¶ 270, 272.  Markets "limited to a single method of payment" are legally infirm where, as here, "there are other methods of payment that are acceptable to the seller," namely, contracting with MCOs directly to sell the same exact healthcare services to the same patients.  *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 598 (8th Cir. 2009).  And Plaintiffs concede that providers may choose to go in-network or out-of-network with MCOs, and may choose to be in-network for some MCOs while remaining OON for others.  CCAC ¶¶ 55-64.[7]

*Second*, Plaintiffs' alleged market improperly lumps together *all* healthcare provider

---

[6] Plaintiffs' cases do not support the contrary.  *Omnicare, Inc. v. UnitedHealth Group, Inc.*, makes the distinct (and here, irrelevant) point that some cases do not require proof of market *power*, not that they do not require a plausible market.  524 F. Supp. 2d 1031, 1042 (N.D. Ill. 2007).  And the quote from *Conrad v. Jimmy John's Franchise, LLC*, is dicta.  2021 WL 718320, at *22 (S.D. Ill. Feb. 24, 2021).

[7] None of the cases Plaintiffs cite endorsed a relevant market based on price differences "unilaterally" set by the plaintiffs themselves *for the same exact services*.  *Cf.* Opp'n 38 (citing *Beatrice Foods Co. v. F.T.C.*, 540 F.2d 303, 309 (7th Cir. 1976) (*upholding* relevant market that combined high price/quality and low price/quality paint brushes)).  Plaintiffs attempt to analogize their proposed market (defined around the *means* of paying for identical services) to the "spot" and "futures" markets for commodities that differ with regard to the timing of delivery.  But healthcare services are not commodities bought and sold at fluctuating prices in separate spot and futures markets.  Providers are easily able to choose (and switch) between being in and out of a network, depending on their own economic rationale.

19

services across the country into their alleged market, even though, for example, primary care visits in Chicago are not "reasonably interchangeable" with a heart transplant in Miami. *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). For purposes of evaluating such a "cluster" market, the question is not whether the "'competitive dynamics' across different types of OON services . . . are affected 'equally' by Defendants' scheme," Opp'n 36, but instead whether competition for primary care visits looks the same as competition for heart transplants. *F.T.C. v. Staples, Inc*., 190 F. Supp. 3d 100, 117 (D.D.C. 2016). The Complaint alleges no facts showing that they are.[8]

*Third,* Plaintiffs' Opposition—and their citation to yet additional inapposite cases— confirms they cannot plead a relevant geographic market, as they must. In *BCBS Antitrust Litigation,* the provider plaintiffs alleged geographic markets limited to states, Core-Based Statistical Areas, or counties within states—not nationwide—because "[h]ealthcare professionals and healthcare facilities usually provide services to patients living or working in relatively close proximity to their offices or other facilities." *In re BCBS* Fourth Am. Compl. ¶ 352. And in contrast to *Delta Dental*, the majority of Defendants do *not* "insure patients across the country," and thus are not "seen by sellers as being reasonably good substitutes." 484 F. Supp. 3d at 641.

## CONCLUSION

Defendants respectfully request that the Court dismiss the Complaint with prejudice.

---

[8] Plaintiffs' cited cases in opposition are, again, inapposite. The court in *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC* affirmed *dismissal* for failure to allege a plausible market. 950 F.3d 911, 919 (7th Cir. 2020). In *Delta Dental*, the court never addressed whether the market was overbroad by including services provided by vastly different providers, and only accepted the alleged market because it included not only goods and services sold to insurers, but also to "uninsured individuals." *Delta Dental*, 484 F. Supp. 3d at 640-41. And it is surprising that Plaintiffs cite *In re Blue Cross Blue Shield ("BCBS") Antitrust Litigation*, where the plaintiff provider class alleged a product market for the "purchase of goods and services from healthcare providers by commercial buyers," *regardless* of whether such services were in-network or out-of-network. Fourth Am. Compl. ¶¶ 348, 351-52, *In re BCBS Antitrust Litig.*, No. 13-20000 (N.D. Ala. Apr. 18, 2017), ECF No. 1083 ("*In re BCBS* Fourth Am. Compl.").

Dated: April 2, 2025

Respectfully Submitted,

/s/ Sadik Huseny

Sadik Huseny (*pro hac vice*)
**LATHAM & WATKINS LLP**
300 Colorado Street, Suite 2400
Austin, TX 78701
Telephone: (737) 910-7300
sadik.huseny@lw.com

Gary Feinerman (IL Bar No. 6206906)
**LATHAM & WATKINS LLP**
330 N Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
gary.feinerman@lw.com

Lawrence E. Buterman (*pro hac vice*)
Katherine A. Rocco (*pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
lawrence.buterman@lw.com
katherine.rocco@lw.com

Anna M. Rathbun (*pro hac vice*)
Molly M. Barron (*pro hac vice*)
Graham B. Haviland (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
anna.rathbun@lw.com
molly.barron@lw.com
graham.haviland@lw.com

Craig Lewis Caesar (IL Bar. No 3121593)
**PHELPS DUNBAR LLP**
365 Canal Street, Suite 2000
New Orleans, LA 70130
Telephone: (504) 584-9272
craig.caesar@phelps.com

/s/ E. Desmond Hogan (w/ consent)

E. Desmond Hogan
Justin W. Bernick
W. David Maxwell (*pro hac vice*)
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5600
desmond.hogan@hoanlovells.com
justin.bernick@hoganlovells.com
david.maxwell@hoganlovells.com

Jordan D. Teti
**HOGAN LOVELLS US LLP**
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 785-4600
jordan.teti@hoganlovells.com

*Attorneys for Defendants Elevance Health, Inc.;*
*Horizon Healthcare Services, Inc. (Horizon*
*Blue Cross and Blue Shield of New Jersey)*

/s/ Katherine A. Trefz (w/ consent)

Jonathan B. Pitt
Katherine A. Trefz
Feyilana Lawoyin
**WILLIAMS & CONNOLLY LLP**
680 Maine Avenue, S.W.
Washington, DC 20024
Telephone: (202) 434-5000
jpitt@wc.com
ktrefz@wc.com
flawoyin@wc.com

*Attorneys for Defendant Aetna Inc.*

Errol J. King (*pro hac vice*)
Katherine Mannino (*pro hac vice*)
**PHELPS DUNBAR LLP**
II City Plaza
400 Convention Street, Suite 1100
Baton Rouge, LA 70802
Telephone: (225) 376-0279
errol.king@phelps.com
katie.manino@phelps.com

*Attorneys for Defendants MultiPlan, Inc.;
Claritev Corporation; National Care Network,
LLC; Viant Payment Systems, Inc.; and Viant,
Inc.*

/s/ William J. Sheridan (w/ consent)
William J. Sheridan (*pro hac vice*)
Courtney Bedell Averbach (*pro hac vice*)
Leah E. Hungerman (*pro hac vice*)
**REED SMITH LLP**
225 Fifth Avenue
Pittsburgh, PA 15222
Telephone: (412) 288-3131
Facsimile: (412) 288-3063

*Attorneys for Defendant Highmark Inc.*

/s/ Daniel R. Campbell (w/ consent)
Daniel R. Campbell
Emilie E. O'Toole
**MCDERMOTT, WILL & EMERY LLP**
444 West Lake Street, Suite 4000
Chicago, IL 60606
Telephone: (312) 984-7782
dcampbell@mwe.com
eotoole@mwe.com

Joshua B. Simon (*pro hac vice*)
Warren Haskel (*pro hac vice*)
Dmitriy G. Tishyevich (*pro hac vice*)
Caroline Incledon (*pro hac vice*)
Chelsea Edith Rae Cosillos (*pro hac vice*)
**MCDERMOTT, WILL & EMERY LLP**
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 547-5444
jsimon@mwe.com
whaskel@mwe.com
dtishyevich@mwe.com
cincledon@mwe.com
ccosillos@mwe.com

*Attorneys for Defendant The Cigna Group*

/s/ Brian P. Kavanaugh (w/ consent)
Brian P. Kavanaugh
Scott D. Stein
**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
bkavanaugh@sidley.com
sstein@sidley.com

*Attorneys for Defendant Health Care Service
Corporation*

/s/ Scott Jared Fisher (w/ consent)
Scott Jared Fisher
Eric Y. Choi
**NEAL, GERBER & EISENBERG**
Two North LaSalle Street, Suite 1700
Chicago, IL 60602
Telephone: (312) 269-8035
sfisher@nge.com
echoi@nge.com
Rachel S. Brass (*pro hac vice*)
Henry H. Cornillie
**GIBSON, DUNN & CRUTCHER LLP**
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: (415) 393-8293
rbrass@gibsondunn.com
hcornillie@gibsondunn.com

Joshua Lipton (*pro hac vice*)
Kristen C. Limarzi (*pro hac vice*)
**GIBSON, DUNN & CRUTCHER LLP**
1700 M Street, N.W.
Washington, DC 20036
Telephone: (202) 955-8500
jlipton@gibsondunn.com
klimarzi@gibsondunn.com

Heather L. Richardson (pro hac vice)
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
hrichardson@gibsondunn.com

*Attorneys for Defendant UnitedHealth Group, Inc.*

/s/ Todd M. Stenerson (w/ consent)
Todd M. Stenerson
**ALLEN OVERY SHEARMAN STERLING US LLP**
1101 New York Avenue NW
Washington, DC 20005
Telephone: (202) 508-8093
todd.stenerson@aoshearman.com
Richard Franklin Schwed (*pro hac vice*)
**ALLEN OVERY SHEARMAN STERLING US LLP**
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-5445
rschwed@aoshearman.com

Samuel W. Cooper (*pro hac vice*)
**ALLEN OVERY SHEARMAN STERLING US LLP**
800 Capitol Street, Suite 2200
Houston, TX 77002
Telephone: (713) 354-4838
samuel.cooper@aoshearman.com
Rachel Mossman Zieminski (*pro hac vice*)
**ALLEN OVERY SHEARMAN STERLING US LLP**
2601 Olive Street, Suite 1700
Dallas, TX 75201
Telephone: (214) 271-5385
rachel.zieminski@aoshearman.com

*Attorneys for Defendant Blue Cross Blue Shield of Michigan Mutual Insurance Company*

## <u>CERTIFICATE OF SERVICE</u>

I, Sadik Huseny, hereby certify that on this 2nd day of April, 2025, I caused the foregoing

to be electronically filed with the Clerk of the Court of the United States District Court for the

Northern District of Illinois, Eastern Division, using the CM/ECF system, which sent notification

of such filing to all filing users.


*/s/  Sadik Huseny*
Sadik Huseny