# EXHIBIT A

### Network Rental Agreement Amendment 3

This Amendment 3 (the "Amendment") to the Network Rental Agreement (the "Agreement") between Aetna Health Management, LLC, on behalf of itself and its Affiliates (hereinafter referred to as "Company") and MultiPlan, Inc., on behalf of itself and its Affiliates (hereinafter referred to as "Entity") is effective December 9, 2018 (the "Third Amendment Effective Date").

**WHEREAS**, the Parties entered into the Agreement effective January 1, 2011, as amended, to arrange for the access of health care services for Company members from health care providers contracted with Entity.

**WHEREAS**, the Parties wish to amend the Agreement as provided herein;

**NOW, THEREFORE**, in consideration of the mutual promises and undertakings contained herein, the Parties agree as follows:

1. Section 1.2, Provision of Other Services, of the Agreement is hereby replaced in its entirety with the following:

   Provision of Other Services. In addition to permitting Company access to the Negotiated Rates offered by the Participating Entity Providers, Entity shall provide Negotiation Services, when requested by Company in writing, as set forth in Attachment 1, Schedule 1.3, and Attachment 1, Schedule 1.5, Medical Reimbursement Analysis Services.

2. Section 10.8, Notices; Attachment 5, Health Insurance Portability and Accountability Act, Section 7, Notices; and Attachment 6, Gramm-Leach-Bliley Act, Section 5, Notices shall be modified as follows:

   MultiPlan, Inc.
   16 Crosby Drive
   Bedford, MA 01730-1402
   Attention: Legal Department

   Aetna, Inc.
   1425 Union Meeting Road, MS U2GN
   Blue Bell, PA 19422
   Attention: Mary Foote, Senior Director – National Contracting

3. Section 11.31, Medical Reimbursement Analysis Services, Entity's proprietary processes to review certain claims as further described on Attachment 1, Schedule 1.5, is hereby added to the Agreement.

4. Attachment 1, Schedule 1.5, attached hereto, is hereby added to the Agreement.

5. The following table is hereby added to Attachment 7, Compensation Schedule, Section 2.0, Fees and Savings, of the Agreement:

MEDICAL REIMBURSEMENT ANALYSIS SERVICES

| Medical Reimbursement Analysis Services | |
|---|---|
| Data iSight | 12% of Savings |

6. The cite referenced in Attachment 10, Article II, Section H to "50 Illinois Administrative Code §2051.310 (6) (H)" is hereby replaced with "50 Illinois Administrative Code §2051.310 (6) (H)-(J)".

7. All other terms of the Agreement not amended herein remain in full force and effect. If any term of this Amendment conflicts with the terms of the Agreement, the terms of this Amendment shall prevail. The terms capitalized but not defined in this Amendment shall have the meanings ascribed to them in the Agreement.

IN WITNESS WHEREOF, the Parties have caused this Amendment to be executed below.

ENTITY

By: _____
                 Signature

Printed Name: MARK TABAK

Title: CEO

Date: 11/15/18

COMPANY

By: _____
                 Signature

Printed Name: Mary Foote

Title: Senior Director, National Contracting

Date: 11/19/18

**Attachment 1**

**Schedule 1.5**

**MEDICAL REIMBURSEMENT ANALYSIS SERVICES**

A. **DESCRIPTION OF SERVICES.**

1. **Data iSight:** means Entity's proprietary process that reviews claims compared to the cost of services rendered (for facility claims) and/or typical reimbursement levels (for professional claims) as benchmarked against similar service providers and determines a reasonable payment allowance that is transparent to the payer, the provider, and the patient.

B. **REFERRAL CRITERIA.** Company will use commercially reasonable efforts to forward to Entity only out-of-network, non-contracted claims that have been reviewed by Company to verify eligibility and coverage under the terms of the applicable benefit program, that meet the mutually agreed upon threshold for referral and Entity's other criteria for referral as specified in the administrative guide for Service implementations. Company acknowledges that Entity makes no representation or warranty that any Company benefit program is consistent with the Services.

C. **PAYMENT OF CLAIMS.**

1. Company agrees to pay providers, for which the Services are provided, in accordance with Company's standard policies and procedures. Unless otherwise required by law, except in the event of fraud, willful misconduct or illegal activity, Company agrees not to reduce the applicable provider's rate for claims for which Entity has negotiated a rate that is other than the out of network rate set forth in the applicable health benefits plan; provided that the negotiated rate is consistent with the business criteria mutually agreed upon between Company and Entity (Data iSight Client Preferences form).

D. **DATA ISIGHT LICENSE AGREEMENT.** Entity hereby grants Company a non-exclusive, non-transferable limited license to access on-line results from Data iSight via the internet (the "License").

1. Entity will make the Data iSight application results available for use by Company, its employees, applicable vendors, contractors and any participant under Company's benefit programs ("Authorized Users"). Authorized Users are granted the non-exclusive right to access, view, and print information on Data iSight ("Licensed Content"). Company may offer access to Data iSight only to Authorized Users whose identity can be confirmed using mutually agreed upon authentication methods.

2. Company shall not copy, reproduce, distribute, re-market, re-sell, sublicense, or otherwise use, enable or permit the use of Data iSight for any purpose other than the legitimate purposes of the this Agreement. Company shall use Data iSight and the information contained therein only in compliance with all applicable laws and regulations. Entity represents and warrants that (i) the data used to populate the claims database underlying the Data iSight application has been lawfully obtained; and (ii) Entity possesses all licenses and permissions legally required to use Data iSight to provide the Services to its customers.

3. The Parties acknowledge that Data iSight and associated materials (unless in the public domain) are the property of Entity, and are protected by copyright laws. Company acknowledges that no rights of ownership or other intellectual property rights with respect to the Licensed Content are transferred by the grant of this License or by the payment of Fee. Entity represents and warrants that it has the right to deliver this License to Company. Entity retains its right to enforce its trademarks, copyrights, patents, trade secrets and other rights against Company and Authorized Users.

4. Entity represents and warrants, to the best of its knowledge, information, and belief, that the claims database underlying the Data iSight application contains accurate, reliable data sufficient to provide the Services in a manner consistent with industry standards.

5. This License shall terminate when Entity and Company terminate the Data iSight Services outlined herein ("DiS Termination"). Company and Entity agree that for a period of twelve (12) months following DiS Termination, Entity shall use reasonable efforts to assist Company in resolving any issues related to claims to which Data iSight Services have been applied, provided, however, such claims for services were rendered to patients prior to DiS Termination, but forwarded to Entity after the effective date of DiS Termination.

E. **DISPUTES.** If, after receipt of payment, the provider contests the amount paid and balance bills the patient, Entity will:

1. Assist the Company in alleviating the patient's concerns about the balance billing through education.

2. Contact the provider to attempt to negotiate a revised billed amount in accordance with pre-designated Company parameters not to exceed the original billed charge.

3. Where the negotiated amount is less than the original billed charge, (i) obtain the provider's signed agreement to the revised amount or secure proper documentation stating no "balance bill" to the patient except for deductible, co-insurance and non-covered services based on the provider's adjusted price and (ii) provide Company with such documentation if requested. If the negotiated amount falls within the pre-designated parameters agreed to by Company, Company will pay the provider the negotiated amount.

4. Entity will only be obligated to process disputes received within six (6) months of the date Entity originally processed the bill. There will be no Fee Credit adjustment to Company for disputes received beyond this six (6) month timeframe.

5. This dispute handling process is separate from any benefit program mandated appeals process. Company shall have sole right and discretion over any benefit program mandated appeals process.

Page **4** of **4**