**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE: MULTIPLAN HEALTH INSURANCE PROVIDER LITIGATION | Case No. 1:24-cv-6795 MDL No. 3121 |
| This Document Relates To: | Hon. Matthew F. Kennelly |
| ALL DIRECT ACTIONS | |

**REPLY IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS
THE CONSOLIDATED MASTER DIRECT ACTION PLAINTIFF COMPLAINT AND
DIRECT ACTION PLAINTIFFS' SHORT-FORM COMPLAINTS**

## TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................1

ARGUMENT ......................................................................................................................2

I.      PLAINTIFFS FAIL TO PLEAD ANTITRUST STANDING OR INJURY ......................2

     A.    Plaintiffs' Own Allegations Show That They Lack Antitrust Standing Because They Choose Whether to Bill Their Patients ...............................................2

     B.    Plaintiffs Fail to Plead Antitrust Injury ...................................................................5

II.    SETTLED LAW PRECLUDES PLAINTIFFS' ATTEMPT TO TREAT BILATERAL SERVICES AGREEMENTS AS *PER SE* ILLEGAL UNDER A "HORIZONTAL COMPETITOR" PRICE-FIXING THEORY (COUNT 1) .....................6

III.   PLAINTIFFS' OPPOSITION CONFIRMS THEY DO NOT PLAUSIBLY ALLEGE A HUB-AND-SPOKE CONSPIRACY (COUNT 2) ........................................10

IV.   PLAINTIFFS' "PRINCIPAL-AGENT" THEORY IS INFIRM (COUNT 3) ..................13

V.    PLAINTIFFS CANNOT ALLEGE A COGNIZABLE "PRICE" CAPABLE OF BEING "FIXED" OR A COGNIZABLE ANTITRUST MARKET ................................13

VI.   COUNT 4 FAILS BECAUSE PLAINTIFFS CONCEDE THAT THEY CANNOT ALLEGE THAT ANY INDIVIDUAL SALES OR SERVICE CONTRACT BETWEEN MULTIPLAN AND AN MCO/TPA HARMED COMPETITION ..............15

VII.  PLAINTIFFS' COMPLAINT FORECLOSES THEIR INFORMATION EXCHANGE CLAIM (COUNT 5) .....................................................................................16

VIII. PLAINTIFFS' STATE LAW CLAIMS FAIL ...............................................................18

     A.    State Law Antitrust Claims (Count 6) ...................................................................18

     B.    "Consumer Protection" Claims (Count 7) .............................................................18

     C.    Unjust Enrichment Claims (Count 8) ....................................................................19

IX.   THERE ARE INADEQUATE ALLEGATIONS AS TO MANY DEFENDANTS ........20

CONCLUSION ..................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*42nd Parallel N. v. E St. Denim Co.*,
286 F.3d 401 (7th Cir. 2002) ...............................................15

*In re Aetna UCR Litigation*,
2015 WL 3970168 (D.N.J. June 30, 2015) ..................................9, 11

*Agnew v. NCAA*,
683 F.3d 8 (7th Cir. 2012) ...............................................13

*Always Towing & Recovery, Inc. v. City of Milwaukee*,
2 F.4th 695 (7th Cir. 2021) ...............................................7, 8

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
2024 WL 918030 (S.D.N.Y. Mar. 2, 2024) ..................................16

*Atkins v. City of Chicago*,
631 F.3d 823 (7th Cir. 2011) ...............................................17

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).......................................................10, 12

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995) ...............................................3, 15

*In re Broiler Chicken Antitrust Litigation*,
290 F. Supp. 3d 772 (N.D. Ill. 2017) ......................................13

*In re Broiler Chicken Antitrust Litig.*,
702 F. Supp. 3d 635 (N.D. Ill. 2023) ......................................13

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977).......................................................5

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
485 U.S. 717 (1988).......................................................7

*Cleary v. Philip Morris Inc.*,
656 F.3d 511 (7th Cir. 2011) ...............................................19

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
362 F. Supp. 3d 510 (N.D. Ill. 2019) ......................................18

*In re Deere & Co. Repair Serv. Antitrust Litig.*,
  703 F. Supp. 3d 862 (N.D. Ill. 2023) ....................................................14

*In re Delta Dental Antitrust Litig.*,
  484 F. Supp. 3d 627 (N.D. Ill. 2020) ....................................................14

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
  504 U.S. 451 (1992)..............................................................................14

*Franco v. Connecticut General Life Insurance Co.*,
  818 F. Supp. 2d 792 (D.N.J. 2011), *aff'd in relevant part*, 647 F. App'x 76 (3d
  Cir. 2016) .............................................................................................8, 9

*Generac Corp. v. Caterpillar Inc.*,
  172 F.3d 971 (7th Cir. 1999) ..................................................................8

*Gustafson v. BAC Home Loans Servicing, LP*,
  294 F.R.D. 529 (C.D. Cal. 2013) ...........................................................20

*Illinois Corporate Travel v. American Airlines*,
  889 F.2d 751 (7th Cir. 1989) ..................................................................8

*Kleen Prods. LLC v. Georgia-Pacific LLC*,
  910 F.3d 927 (7th Cir. 2018) ................................................................20

*Kunzelmann v. Wells Fargo Bank, N.A.*,
  2013 WL 139913 (S.D. Fla. Jan. 10, 2013) ...........................................20

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007)................................................................................7

*In re Loc. TV Advert. Antitrust Litig.*,
  2022 WL 3716202 (N.D. Ill. Aug. 29, 2022) .........................................17

*Manitowoc Co., Inc. v. Kachmer*,
  2015 WL 1746552 (N.D. Ill. Apr. 14, 2015) ...........................................7

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
  952 F.3d 832 (7th Cir. 2020) ................................................................10

*McCauley v. City of Chicago*,
  671 F.3d 611 (7th Cir. 2011) ..................................................................4

*McGarry & McGarry, LLC v. Bankr. Mgmt. Sols.*,
  937 F.3d 1056 (7th Cir. 2019) ..............................................................18

*Mish Int'l Monetary Inc. v. Vega Cap. London, Ltd.*,
  596 F. Supp. 3d 1076 (N.D. Ill. 2022) ..................................................19

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ................................................................12

*In re Opana ER Antitrust Litig.*,
   162 F. Supp. 3d 704 (N.D. Ill. 2016) ...............................................18, 19

*In re Out of Network Substance Use Disorder Claims*,
   2022 WL 17080378 (C.D. Cal. Oct. 14, 2022)..........................................7

*Pac. Recovery Sols. v. Cigna Behav. Health, Inc.*,
   2021 WL 1176677 (N.D. Cal. Mar. 29, 2021)...........................................3

*Pac. Recovery Sols. v. United Behav. Health*,
   481 F. Supp. 3d 1011 (N.D. Cal. 2020) ................................................3, 5

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997)....................................................................14

*Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.*,
   412 F. Supp. 3d 941 (N.D. Ill. 2019) ......................................................13

*Robinson v. Tex. Auto. Dealers Ass'n*,
   387 F.3d 416 (5th Cir. 2004) ....................................................................5

*In re Se. Milk Antitrust Litig.*,
   739 F.3d 262 (6th Cir. 2014) ....................................................................8

*In re Text Messaging Antitrust Litig.*,
   630 F.3d 622 (7th Cir. 2010) ..................................................................12

*In re Text Messaging Antitrust Litig.*,
   46 F. Supp. 3d 788 (N.D. Ill. 2014), *aff'd*, 782 F.3d 867 (7th Cir. 2015) ..............................20

*Thompson v. Jiffy Lube Int'l, Inc.*,
   250 F.R.D. 607 (D. Kan. 2008)................................................................20

*TML Recovery, LLC v. Cigna Corp.*,
   2024 WL 1699512 (C.D. Cal. Mar. 18, 2024)...........................................7

*United States v. E. I. du Pont de Nemours & Co.*,
   351 U.S. 377 (1956)................................................................................15

*United States v. U.S. Gypsum Co.*,
   438 U.S. 422 (1978)................................................................................16

*In re Wellbutrin XL Antitrust Litig.*,
   260 F.R.D. 143 (E.D. Pa. 2009)..............................................................19

*In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*,
   903 F. Supp. 2d 880 (C.D. Cal. 2012) ..........................................................................3

**STATUTES**

42 U.S.C.§ 300gg-111 ...........................................................................................................4

Sherman Act § 1.....................................................................................................9, 11, 13, 16

## INTRODUCTION

Direct Action Plaintiffs' ("Plaintiffs" or "DAPs") Opposition confirms that their Complaint suffers from the same fundamental deficiencies as the Class Plaintiffs' Complaint. Like the Class Plaintiffs, DAP Plaintiffs ignore or contort their own allegations and the applicable caselaw. And like the Class Plaintiffs, DAP Plaintiffs have no answer to the decade's worth of caselaw dismissing similar antitrust claims based on out-of-network ("OON") reimbursements and fail to rebut Defendants' dispositive arguments regarding antitrust standing, antitrust injury, hub-and-spoke conspiracy, and market definition. These failures are described in detail both below and in the Class Reply. And DAP Plaintiffs' attempts to circumvent this long line of authority and their own failed allegations—via a grab-bag of additional theories and claims—are makeweight.

*"Horizontal Competitor" Theory:*  Plaintiffs point to nothing in their Complaint to support their leading claim that each service contract between MultiPlan and its managed care organization ("MCO") or third-party administrator ("TPA") clients is a horizontal restraint subject to *per se* treatment. Plaintiffs do not meaningfully dispute that these contracts are vertical agreements between a service provider and its customers. They fail to confront Supreme Court and Seventh Circuit precedent that forecloses the application of the *per se* rule to such vertical agreements. And they offer no support for their *ipse dixit* that MultiPlan is a "payor"—rather, they concede that MultiPlan does not collect premiums, insure patients, or bear the responsibility for paying claims.

*Principal-Agent Theory:*  Plaintiffs fail to identify a single case adopting their "principal-agent" theory, which is not a cognizable theory of antitrust liability. Instead, they rely upon simple horizontal agreement cases that provide no support for their novel claim.

*Vertical Agreement Theory:*  Plaintiffs concede that an antitrust claim based on vertical agreements must show that *each* vertical agreement has anticompetitive effects in its own right. But Plaintiffs' entire case (including the vertical agreement claim) is predicated on a "cartel" that

includes all of MultiPlan's MCO/TPA clients, and Plaintiffs accordingly rely upon the alleged *collective* effects of MultiPlan's service contracts. Plaintiffs do not allege that each vertical agreement has anticompetitive effects, nor can they.

*Information Exchange Theory:* Plaintiffs' information exchange claim rebuts itself. The documents they rely upon in their Complaint to allege a "pooling" and "commingling" of customer data via MultiPlan's Data iSight product suggest no such thing *and, in fact, show the contrary*. Caught flatfooted, Plaintiffs have no answer—but can only claim in a footnote, without elaboration or support, a "factual dispute." Not so. Plaintiffs' only source for claiming improper information sharing shows otherwise—and allegations need not be credited when contradicted or rendered implausible by the complaint or documents it incorporates. This is a fundamental and fatal pleading failure—not a factual dispute.

*State Law Claims:* Finally, Plaintiffs' state law claims are all derivative of their antitrust claims, and fail for the same reasons. Plaintiffs' cited cases provide no support for the assertion that the antitrust standing analysis is different under the state antitrust laws they rely upon. Moreover, Plaintiffs impermissibly rely on their antitrust allegations for their consumer protection claim, and all but concede that their unjust enrichment claim is bound up with their antitrust claims.

## ARGUMENT

### I. PLAINTIFFS FAIL TO PLEAD ANTITRUST STANDING OR INJURY

#### A. Plaintiffs' Own Allegations Show That They Lack Antitrust Standing Because They Choose Whether to Bill Their Patients

Courts routinely dismiss similar claims brought by OON providers for lack of antitrust standing. If the alleged "conspiracy" to suppress OON reimbursements existed, the patients—not OON providers like Plaintiffs—would be the direct victims. That means Plaintiffs do not have

antitrust standing to bring these claims.[1]

Plaintiffs respond that they do not need a "contractual relationship" with payors to have antitrust standing.  DAP Opp'n 33-34, ECF No. 351 ("Opp'n").  But that is a strawman, as Defendants did not argue that a contractual relationship is required.  *See* DAP MTD 15.  Instead, cases like *Pacific Recovery* and *WellPoint* show that OON providers are not injured by an alleged conspiracy to suppress OON reimbursements because they can bill patients for unpaid amounts. Patients incur the obligation to pay the provider; OON providers are "injured only to the extent that their patients fail to pay them that [balance bill] difference."  *Pac. Recovery Sols. v. United Behav. Health*, 481 F. Supp. 3d 1011, 1022 (N.D. Cal. 2020) (*"Pac. Recovery I"*).  Any injury thus flows "from the patients' failure to comply with their financial obligations to [providers], and not from [the payors'] conduct."  *Id*.

None of Plaintiffs' cases addresses the situation here.  Opp'n 32-33.  *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic* held that an *insurer* had standing to bring claims *against providers* (who allegedly increased the cost of medical services through illegal market allocation), which is not at issue in this case.  In *Marshfield*, the insurer was injured by the alleged price inflation because, "in accordance with [its] contractual obligations to its insureds," it would have to pay a portion of the overcharge.  65 F.3d 1406, 1414-15 (7th Cir. 1995)*.*  The critical fact here—that providers can balance bill patients—had no bearing on the question in *Marshfield* of whether the insurer was directly harmed by a provider's billing of supracompetitive charges.  *Id*.

In an attempt to avoid the numerous cases directly on point that have dismissed similar claims, Plaintiffs assert a claimed factual distinction:  that they supposedly "cannot collect the

---

[1] *See* ECF No. 286 at 15 ("DAP MTD"); *Pac. Recovery Sols. v. Cigna Behav. Health, Inc.*, 2021 WL 1176677, at *12 (N.D. Cal. Mar. 29, 2021) ("*Pac. Recovery II*"); *In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*, 903 F. Supp. 2d 880, 901-03 (C.D. Cal. 2012)); *see also* Mem. Supp. Defs.' Joint Mot. to Dismiss Consol. Class Action Compl. 16, ECF No. 283 ("Class MTD")).

balance of their charges" from patients.  Consol. Master DAP Compl. ¶ 337, ECF No. 182 ("DAPC"); *see also* Opp'n 34.  But there are no well-pled allegations supporting this assertion, and the Complaint's allegations show the contrary.  For non-emergency claims, Plaintiffs allege that a provider only gives up the right to balance bill if it accepts an amount based on MultiPlan's recommended reimbursement; they specifically allege that "MultiPlan prohibits providers from balance billing patients *as a condition* of receiving payments."  DAPC ¶ 526 (emphasis added). Plaintiffs never allege that they are precluded from balance billing if they decline MultiPlan's negotiation attempts, let alone with "specific facts," as *Twombly* requires.  *See McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011).

For emergency claims, Plaintiffs argue that the No Surprises Act ("NSA") bars them from balance billing patients.  Opp'n 34.  But the NSA only came into effect on January 1, 2022, so this argument has no bearing on the vast majority of Plaintiffs' claims.  *See* DAPC ¶ 728 (alleging conspiracy "from at least January 1, 2015").  Plaintiffs also do not specifically allege that they even provide OON emergency services, whether pre- or post-NSA.  *See id.* ¶ 49 (describing DAPs only as "provider[s] of out-of-network goods and services for which they have been underpaid"). And even with respect to post-NSA claims, the statute specifically allows an OON provider to challenge any payment amount received by a payor through baseball-style arbitration, with each side submitting its best offer and the arbitrator choosing between the two.  *See* 42 U.S.C. § 300gg-111(c)(1)(B).  Moreover, NSA pricing for OON providers is indexed to payers' median contract rates for those services for in-network providers, so such OON reimbursement rates are not affected by Data iSight.  *Id.* § 300gg-111(a)(3)(E)(i)(I).  In these circumstances, the reimbursement resulting from MultiPlan's process cannot possibly be the source of antitrust standing.

Finally, Plaintiffs argue that balance billing is merely a way of "passing-through" to

patients Plaintiffs' supposed direct injuries. But as Plaintiffs concede, "[h]ealthcare providers . . . provide care to patients," Opp'n 1, and "patients are on the hook" for their own healthcare bills. DAPC ¶ 33. The issue is not that Plaintiffs can "pass-through" to subscribers an injury arising from MCOs; the issue is that Plaintiffs *have no injury at all* unless they balance bill and their patients refuse to pay—and even then, the injury is "from the patients' failure to comply" with their payment obligations, not from the alleged conspiracy. *Pac. Recovery I*, 481 F. Supp. 3d at 1022. This is not a "pass through" defense, it is a threshold standing issue regarding the nature of Plaintiffs' claimed injury. *See also* Reply Supp. Mot. to Dismiss Consolidated Class Action Compl. 5 ("Class Reply").

### B.      Plaintiffs Fail to Plead Antitrust Injury

To survive dismissal, Plaintiffs needed to allege that they were reimbursed at a rate lower than the competitive rate they would have received absent a Defendant's use of MultiPlan's services because of a reduction in competition. *See, e.g.*, *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *cf. Robinson v. Tex. Auto. Dealers Ass'n*, 387 F.3d 416, 422 (5th Cir. 2004). The Complaint alleges no facts showing that the past reimbursement levels to which providers want to return, based on the common UCR benchmarks they prefer (such as FAIR Health), ever constituted competitively-set rates. The Complaint is also devoid of factual allegations that providers used UCR rates to play one plan or Defendant off another (i.e., using the threat of non-treatment to those plan's members) to obtain higher reimbursements—or that these "old" rates were otherwise competitively set. DAP MTD 18-19.

Without any factual allegations of this nature, Plaintiffs cannot show that they suffered an injury that flows from impaired competition in the market. *Brunswick Corp.*, 429 U.S. at 489. Plaintiffs' Opposition has no real response. Plaintiffs do not and cannot dispute that OON reimbursements based on providers' unilaterally-set billed charges were not competitively set. Nor

can they dispute that they are seeking to eliminate MultiPlan's offering and return to a world where they can require all MCO and TPA Defendants to use the same benchmarking system that yielded ever-ratcheting increases in OON charges. To the extent that Plaintiffs cite cases where sellers who were paid anticompetitively low prices due to an alleged buyers' cartel could, in some situations, establish antitrust injury, Opp'n 31-32, that is not this case here. *See* Class Reply 7. Plaintiffs allege only that the use of Data iSight allegedly caused some providers to receive less in OON reimbursements than they previously did. Even in buyer-side antitrust cases, these allegations, without more, do not give rise to antitrust injury.

## II. SETTLED LAW PRECLUDES PLAINTIFFS' ATTEMPT TO TREAT BILATERAL SERVICES AGREEMENTS AS *PER SE* ILLEGAL UNDER A "HORIZONTAL COMPETITOR" PRICE-FIXING THEORY (COUNT 1)

Plaintiffs' main theory of liability fails as a matter of law. Plaintiffs' primary argument is that MultiPlan is a "payor" who competes against MCOs for OON reimbursements. Based solely on that representation, Plaintiffs argue that the Court can treat MultiPlan's separate, bilateral sales contracts with its MCO-customers as 700+ horizontal price-fixing agreements that are *per se* unlawful. Opp'n 7-12. That is wrong on two fundamental levels.

*First*, Plaintiffs do not (and cannot) allege that MultiPlan is a "payor" of OON reimbursements, and they do not allege that MultiPlan "competes" against any MCO or TPA in reimbursing the "OON services" at issue in this case. The Complaint does not allege MultiPlan is in the insurance business, that it sponsors or administers health plans, or that it pays providers anything from its own pockets for any medical services rendered to a patient.[2] Likewise, there are no allegations that MultiPlan collects premiums from any patient or patient's employer, or that MultiPlan insures or covers a *single patient ever seen by any Plaintiff in this case* (or any provider

---

[2] In a footnote, Plaintiffs assert that MultiPlan is a "supplier of OON insurance." Opp'n 10 n.3. But their Complaint concedes that this is false, acknowledging that "MultiPlan is not an insurer." DAPC ¶ 709.

anywhere). Thus, there is no "reimbursement" at issue that MultiPlan pays, let alone competes against any other Defendant to pay. Instead, the Complaint alleges that MultiPlan's "PPO networks compete against other payors' PPO networks." DAPC ¶ 117 (citing MultiPlan, Annual Report (Form 10-K) (Mar. 1, 2023)). But MultiPlan's PPO networks do not pay claims, they are offerings that are available to *actual* claim payors. DAP MTD 26; DAPC ¶¶ 104-11. Multiple courts have therefore expressly rejected the argument that MultiPlan is a "payor[]." *TML Recovery, LLC v. Cigna Corp.*, 2024 WL 1699512, at *2 (C.D. Cal. Mar. 18, 2024); *In re Out of Network Substance Use Disorder Claims*, 2022 WL 17080378, at *2 (C.D. Cal. Oct. 14, 2022).[3]

*Second*, even if the Court accepted Plaintiffs' "MultiPlan-as-payor" theory at this stage, well-settled controlling law still dooms their claim. Both the Supreme Court and the Seventh Circuit have made it clear that courts determine whether a restraint is horizontal or vertical—and thus whether the *per se* standard is available to plaintiffs—by examining the parties' relationship *in the agreement at issue*. *See, e.g.*, *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730-31 (1988); *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 705-06 (7th Cir. 2021) (contract was vertical because, in the context of that agreement, the parties were acting as seller/buyer, not as a horizontal competitors).

As a result, outside of properly-alleged hub-and-spoke claims and other circumstances not applicable here, agreements with a vertical component—in which one party is selling a product or service to the other—are evaluated under the rule of reason. *See, e.g.*, *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886-87, 899, 907 (2007); *Always Towing*, 2 F.4th at 705-06. This is true even for agreements between defendants with mixed vertical and horizontal

---

[3] Nor can Plaintiffs prevail on their "undeveloped" fallback position, made "only in a footnote," that MultiPlan is a potential competitor-payor. Opp'n 10 n.3; *Manitowoc Co., Inc. v. Kachmer*, 2015 WL 1746552, at *4 n.2 (N.D. Ill. Apr. 14, 2015). Plaintiffs present no factual allegations to support the notion that MultiPlan will (or even might) shift its business to become a payor.

relationships, such that the defendants compete in one or more markets.

For example, in *Illinois Corporate Travel v. American Airlines*, 889 F.2d 751 (7th Cir. 1989), the plaintiff alleged that American Airlines entered into an agreement with its travel agents to limit discounts on American's tickets. Although American competed with its travel agents in certain aspects of its business, the court rejected the plaintiff's argument that the agreement was *per se* unlawful, holding that "[d]ual distribution . . . does not subject to the *per se* ban a practice that would be lawful if the manufacturer were not selling direct to customers" in competition with its agents. *Id.* at 753; *see also In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 273 (6th Cir. 2014) (rejecting application of *per se* rule due to nature of the agreement at issue); *Generac Corp. v. Caterpillar Inc.*, 172 F.3d 971, 977 (7th Cir. 1999) (dismissing horizontal conspiracy claims "[e]ven though in some ways the companies may have operated in similar lines of business, [because] this particular agreement was a vertical one").[4]

The Complaint here is clear that the agreements in this case are *sales or service* agreements in which MultiPlan *licenses* the use of its software, for a fee, to customers. DAPC ¶¶ 142-44, 155, 163, 170, 172, 174-79. These vertical cost-management services cannot be deemed horizontal merely because MultiPlan operates a PPO in another branch of its business that is not "separately incorporated." Opp'n 12. Indeed, MultiPlan's vertical relationship with MCOs is the same as the vertical relationship between FAIR Health and those same MCOs. DAPC ¶ 756 (suggesting that payors should "us[e] FAIR Health to determine [OON] prices").

This conclusion is buttressed by the Ingenix-related cases that Plaintiffs hold out as analogs to their claims here. In *Franco v. Connecticut General Life Insurance Co.*, for example, the court

---

[4] Plaintiffs are also wrong that the caselaw treating mixed horizontal and vertical agreements as presumptively lawful (and therefore evaluated under the rule of reason) is limited to dual-distributorships. What matters is the relationship of the parties within the context of the restraint at issue, not whether one or more of the parties is a dual distributor. *Always Towing*, 2 F.4th at 705-06.

found that even though Ingenix was a "wholly-owned subsidiary of UnitedHealth," a direct competitor of defendant CIGNA, the plaintiffs' effort to label Ingenix's repricing services for OON claims *per se* unlawful was misplaced. 818 F. Supp. 2d 792, 802, 804, 830-33 (D.N.J. 2011), *aff'd in relevant part*, 647 F. App'x 76 (3d Cir. 2016). The court explained that the plaintiffs had alleged, at most, that CIGNA and other MCOs "entered into separate contracts with UnitedHealth and Ingenix agreeing to supply data to Ingenix," but that they had not plausibly alleged that those agreements concerned any "competing products or services." *Id.* at 832.

Similarly, the court in *In re Aetna UCR Litigation* rejected the plaintiffs' argument that the services agreement between Aetna and Ingenix was *per se* unlawful. 2015 WL 3970168, at *23 (D.N.J. June 30, 2015). The court held that allegations that "Ingenix had an incentive" to "support[] its parent company by assisting UHG to perpetuate low reimbursement rates" not only failed to establish any horizontal agreement, but in fact suggested that "Ingenix had a . . . motive to engage in this conduct separate and apart from the alleged conspiracy." *Id.* at *21. Accordingly, the court dismissed the antitrust claims against Aetna, Ingenix, and UnitedHealth.

The same result should follow here. By sidestepping the vertical nature of the actual services agreement underlying their Section 1 claim, Plaintiffs ignore the teachings of in *Business Electronics*, *Leegin*, *Always Towing*, and the cases that flow from them, which foreclose this claim.[5] The Court should dismiss Count 1.[6]

---

[5] Indeed, no court has held that a software sales agreement, on its own, is a horizontal *per se* price fixing agreement. Plaintiffs' cases involved hub-and-spoke claims or claims where the alleged restraint was not vertical at all or involved naked price-fixing or output restrictions. Opp'n 11-12& n4.

[6] Plaintiffs revert to arguing that the Court should treat these bilateral sales agreements, without more, as dispositive evidence of an array of illegal agreements *between* those customers to price fix. Opp'n 13-15. But every court that has considered this precise argument has rejected it. *See* Class MTD 26; Class Reply 12-13.

III.   **PLAINTIFFS' OPPOSITION CONFIRMS THEY DO NOT PLAUSIBLY ALLEGE A HUB-AND-SPOKE CONSPIRACY (COUNT 2)**

Plaintiffs' alternative "hub and spoke" theory of conspiracy (Count 2) fails as a matter of law because the Complaint's factual allegations of bilateral vertical agreements between MultiPlan and each of its customers are not enough to support a plausible inference of an agreement *among* those customers.  *See, e.g.*, *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 842-43 (7th Cir. 2020) (hub-and-spoke conspiracy requires an agreement at the rim "connecting the various horizontal agreements"); *see also* Class MTD 22-24 (collecting cases).

Plaintiffs' effort to establish a conspiracy claim fails for the same reasons the Class's conspiracy claim fails.  *See* Class Reply 10-17.  *First*, Plaintiffs appear to acknowledge that they offer no direct evidence of any agreement among MCOs/TPAs at the horizontal "rim" of any alleged conspiracy.  *See* Opp'n 16.

*Second*, Plaintiffs' fail to allege a horizontal agreement through circumstantial evidence because they do not allege any parallel pricing conduct by MCOs/TPAs, much less the required "plus factors" suggesting that their conduct is the result of conspiracy, rather than independent action.  *See* Class Reply 13-17.  Defendants do not repeat each of their arguments regarding circumstantial evidence from the Class Reply here, but do note that Plaintiffs' own factual allegations provide a natural, non-conspiratorial incentive to use MultiPlan's services that forecloses an inference of conspiracy.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 566 (2007).  For example, Plaintiffs allege that "payors are incentivized to pay less for out-of-network goods and services to increase their own profits."  DAPC ¶ 395.  And Plaintiffs allege that, "[f]or decades," Defendants used outside vendors (such as FAIR Health and Ingenix) and UCR rates to "help[] control healthcare costs for out-of-network goods and services" as "a means of combatting what some payors believed were high prices for out-of-network goods and services."  *Id.* ¶¶ 298-

99.    Moreover, the Complaint provides a rational, non-conspiratorial explanation for why MCOs/TPAs decided to use MultiPlan's services, as Plaintiffs allege that MultiPlan's marketing message appealed to each client's alleged unilateral economic self-interest.  *Id.* ¶ 284.

The court in *In re Aetna* reached the same conclusion in dismissing the plaintiffs' Sherman Act Section 1 claim.  In that case, the plaintiffs alleged (as Plaintiffs do here) that each of the MCOs had natural economic incentives to reduce reimbursements to out-of-network providers. 2015 WL 3970168, at *21 (dismissing conspiracy claims because defendants' "individual economic motivation to engage in the activity alleged is glaring and unavoidable"); *see* Class Reply 14-15 (discussing *In re Aetna*).  Plaintiffs have no response to *In re Aetna*, so they dismiss it in a footnote as "inapposite."  *See* Opp'n 21 n.9.  That is remarkable, given that Plaintiffs repeatedly hold out the Ingenix cases as being analogous to their claims here.  Plaintiffs allege that the MCOs "still had the same incentive to collude to depress out-of-network rates" through MultiPlan that they had with Ingenix.  DAPC ¶ 411; *see also id.* ¶¶ 132, 236 (alleging MultiPlan was formed as "an alternative to Ingenix" and "a replacement for Ingenix"); *id.* ¶ 411 (MultiPlan "filled the gap" when Ingenix's services were discontinued"); *id.* ¶ 413 (MultiPlan "serves effectively the same purpose as the Ingenix scheme").  According to Plaintiffs' own allegations, "the payors' motivations" to keep out-of-network rates low when they contracted with Ingenix— a central basis for the court's dismissal of the conspiracy in *In re Aetna*—"did not evaporate" when those same payors contracted with MultiPlan.  *Id.* ¶ 6.

Plaintiffs' conclusory allegation that it is against an MCO's self-interest to contract with MultiPlan (absent an industry-wide conspiracy because an MCO acting unilaterally faces "abrasion," or "serious harm to the value and breadth of its insurance offering") does not change the result.  *Id.* ¶ 422.  Plaintiffs' own factual allegations contradict this argument.  They allege that

some MCOs/TPAs adopted MultiPlan's services *years* before their competitors (*see, e.g.*, *id.* ¶ 289), and yet apparently suffered no abrasion at all. *See, e.g.*, *id.* ¶ 238 (alleging that an early adopter like Cigna stood to "increase its revenue by hundreds of millions of dollars each year by using MultiPlan[]"). Moreover, Plaintiffs' allegation that MCOs adopted MultiPlan over a "tight three-and-a-half year window," (*id.* ¶ 19), is hardly an "all at once" change in pricing that courts have found suggest the presence of a conspiracy in other cases. *See, e.g.*, *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015) (competitors adopting similar pricing policies "over a period of several years" insufficient to plead parallel conduct because the "slow adoption of similar policies does not raise the specter of collusion"); *cf. In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) ("all at once the defendants changed their pricing structures, which were heterogeneous and complex, to a uniform pricing structure, and then simultaneously jacked up their prices by a third").

Plaintiffs' final argument is that their "narrative"—however implausible and contradicted by their own allegations—can survive dismissal because an "alternative narrative cannot be credited on a motion to dismiss." Opp'n 21. That is squarely rejected by *Twombly*. In *Twombly*, the plaintiffs alleged that the defendants shared a "compelling common motivation" to conspire. 550 U.S. at 551. But instead of taking the plaintiffs' allegation at face value and passing the case through to discovery, as Plaintiffs suggest here, the Court explained that the complaint's "sufficiency turns on the suggestions raised by [the alleged] conduct *when viewed in light of common economic experience*." *Id.* at 565 (emphasis added). Because that analysis in *Twombly* revealed the alleged conduct was consistent with "the natural, unilateral reaction" of the defendants to market conditions, that complaint failed to allege a plausible conspiracy. *Id.* at 546. The same analysis requires dismissal here because "common economic experience" and Plaintiffs' own

allegations show that the MCOs/TPAs acted consistently with their own rational self-interest. DAPC ¶ 411; *see also* Class Reply 13-15.

## IV.    PLAINTIFFS' "PRINCIPAL-AGENT" THEORY IS INFIRM (COUNT 3)

Defendants are aware of no court that has imposed antitrust liability based on a "principal-agent" conspiracy theory, and Plaintiffs identify none. Instead, the cases Plaintiffs cite fall under their horizontal agreement theory (Count 1). For example, in *In re Broiler Chicken Antitrust Litigation*, the plaintiffs alleged a horizontal agreement among chicken producers, in which the court found sufficient "plus factors" to support an inference of the horizontal conspiracy. 290 F. Supp. 3d 772, 800-01 (N.D. Ill. 2017) (evaluating "plus factors"). Nowhere did the plaintiffs allege—or the court endorse—a novel "principal-agent" conspiracy theory. *In re Broiler Chicken Antitrust Litig.*, 702 F. Supp. 3d 635, 674 (N.D. Ill. 2023) ("But not even Plaintiffs argue that participating in Agri Stats alone is sufficient to establish an intent to conspire."). In fact, the court ultimately *rejected* plaintiffs' conspiracy claims against Agri Stats outright, finding that, just like MultiPlan, Agri Stats did not facilitate the exchange of competitor pricing information. *Id.* at 675. The case law—that Plaintiffs ignore—is clear that principal-agent agreements are "lawful per se." *See* DAP MTD 31-32 (collecting cases). Courts have soundly rejected Plaintiffs' "principal-agent" theory. Count 3 should therefore be dismissed.

## V.    PLAINTIFFS CANNOT ALLEGE A COGNIZABLE "PRICE" CAPABLE OF BEING "FIXED" OR A COGNIZABLE ANTITRUST MARKET

Plaintiffs' attempt to fix the problems with their alleged OON reimbursement market fails, requiring dismissal under a *per se* or rule of reason standard.[7] As numerous courts have found,

---

[7] Seventh Circuit cases have indicated plaintiffs must allege a relevant market in order to survive dismissal on *any* antitrust theories, even Section 1 agreements evaluated *per se*. DAP MTD 22 (citing *Agnew v. NCAA*, 683 F.3d 8, 337 (7th Cir. 2012)); *see also Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.*, 412 F. Supp. 3d 941, 952 (N.D. Ill. 2019) (dismissing for failure to allege plausible relevant market);

"reimbursement for OON services" is not "a standalone product and service," and thus, the amount of such a reimbursement does not constitute a "price" in any relevant product or services market for purposes of antitrust law. *See* Class MTD 35-37 (discussing cases). There are no meaningful distinctions between those cases and this one. Plaintiffs try to avoid these cases by asking the Court—without any principled reason or basis in factual allegations—to pronounce Defendants as the "buyers" of OON services who are capable of setting and paying a price for those services. But there is no factual basis whatsoever for the notion that OON services are provided to *MCOs/TPAs* instead of the *patients that receive treatments*, and Plaintiffs cannot point to a single case adopting this fiction. Their attempts to distinguish *Franco*, and like cases fail. *See* Class Reply 18.

Plaintiffs' additional argument that the market should be limited to OON services because providers cannot switch between selling services in-network and out-of-network, Opp'n 28, is contradicted by their Complaint, which explains that providers may choose to go in-network or out-of-network with MCOs.[8] DAPC ¶ 99. And the cases Plaintiffs rely upon show why their claims must be dismissed. Plaintiffs misstate the holding in *Delta Dental*, which found that the market was not "under-inclusive" specifically because it included *all* goods and services sold to "uninsured individuals paying out-of-pocket, or to government programs on behalf of their participants," and was *not* limited to only those goods and services sold to insurers. *In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d 627, 640-41 (N.D. Ill. 2020); *see also id.* (product markets

---

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) (affirming dismissal where alleged relevant market "does not encompass all interchangeable substitute products"); Class MTD 38-40.

[8] Plaintiffs seem to argue that *each individual patient* is a separate product "aftermarket" under the Supreme Court's decision in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992), because, once the provider treats the patient on an OON basis, the provider has few reimbursement options. Opp'n 28. There is no support for Plaintiffs' proposition. Such aftermarkets only exist if a plaintiff satisfies a three-part test evaluating customer "lock-in," interchangeability, and ability to predict "life-cycle" costs. *In re Deere & Co. Repair Serv. Antitrust Litig.*, 703 F. Supp. 3d 862, 891 (N.D. Ill. 2023).

should not be "limited to a single method of payment" or reimbursement (citation omitted)). Likewise, in *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, the Seventh Circuit *rejected* the plaintiffs "HMO Services" market because "[t]he services offered by HMOs and by various fee-for-service plans are both provided by the same physicians, who can easily shift from one type of service to another if a change in relative prices makes one type more lucrative than others." 65 F.3d 1406, 1411 (7th Cir. 1995). Plaintiffs' proposed relevant market is likewise improperly defined around the "contractual forms" through which "physicians sell their services," and ignores the fact (conceded by Plaintiffs) that Plaintiffs are free to shift between offering services on an in- and out-of-network basis. *Id.* at 1410.[9]

Finally, Plaintiffs improperly lump together *all* healthcare provider services in the country into their alleged market, even though, for example, primary care visits are not "reasonably interchangeable" with a heart transplant. *See United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). And Plaintiffs fail to rebut Defendants' argument that a nationwide geographic market is implausible and is, on its own, grounds for dismissal. *42nd Parallel N. v. E St. Denim Co.*, 286 F.3d 401, 406 (7th Cir. 2002).

## VI. COUNT 4 FAILS BECAUSE PLAINTIFFS CONCEDE THAT THEY CANNOT ALLEGE THAT ANY INDIVIDUAL SALES OR SERVICE CONTRACT BETWEEN MULTIPLAN AND AN MCO/TPA HARMED COMPETITION

Because Plaintiffs still cannot allege a cognizable antitrust product market, they cannot demonstrate that any of MultiPlan's bilateral services agreements harmed competition in any

---

[9] As also described in the Class Reply, the Department of Justice's ("DOJ") Statement of Interest, ECF No. 382 ("DOJ SOI"), takes aim at arguments Defendants do not advance—and thus undermines Plaintiffs' claims. Relevant here, DOJ asserts, in a footnote, that Defendants have argued that "health insurance" is the relevant product here. DOJ SOI 4 n.5. This is incorrect. Defendants have argued that MCOs' reimbursements of OON services are not the "price" of such services, which providers dictate and may collect from patients according to terms entered into prior to treatment (regardless of what MCOs may choose to reimburse). Class MTD 35-38. And DOJ's reliance on *Marshfield Clinic*, 65 F.3d 1406, is misplaced for the reasons detailed above.

relevant market, as is required for their rule of reason claim. Count 4 also fails because it alleges at most that MultiPlan's service contracts have affected competition only in the aggregate. DAP MTD 28-29. That is not enough. Even Plaintiffs concede that they must allege that *each* agreement was anticompetitive to state a viable claim for relief. Opp'n 29; *see also In re Amazon.com, Inc. eBook Antitrust Litig.*, 2024 WL 918030, at *7 (S.D.N.Y. Mar. 2, 2024). They have not alleged any facts that suggest that *each* agreement, on its own, had any impact at all on any market-wide OON reimbursement rate. Instead, their theory of market-wide harm hinges on the existence of a "cartel," i.e., an agreement among horizontal competitors in the relevant market. *See* Opp'n 29; DAPC ¶ 770. Because Plaintiffs cannot plausibly plead a horizontal agreement, they cannot show that any standalone sales agreement violated Section 1.

## VII. PLAINTIFFS' COMPLAINT FORECLOSES THEIR INFORMATION EXCHANGE CLAIM (COUNT 5)

To the extent anything remains of Plaintiffs' standalone claim that defendants allegedly shared confidential information in violation of Section 1 (Count 5), the Court should dismiss it. As Plaintiffs concede (Opp'n 23), because the dissemination of information "does not invariably have anticompetitive effects," *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978), information exchanges are analyzed under the rule of reason, with courts considering factors such as "the nature of the information exchanged" and "the structure of the industry" in evaluating the potential for competitive harm. *Id*. Plaintiffs' claim fails under this standard.[10]

*First*, Plaintiffs do not seriously contest that their conclusory allegations of information

---

[10] Here, too, the DOJ SOI fundamentally undermines Plaintiffs' case. With respect to Plaintiffs' information exchange claim, DOJ argues only that "[t]o the extent Defendants suggest that competitors' exchange of information through an intermediary cannot violate Section 1, this argument is contrary to law." DOJ SOI 7. But Defendants do not argue that categorical position—and do not need to. Plaintiffs' claims fail because they have not adequately alleged that confidential information has been exchanged *either* directly among MCOs or indirectly through MultiPlan. DAP MTD 33.

"pooling" and "commingling" are contradicted by the *very source* of those allegations in their Complaint—the white papers they concede are incorporated by reference. Instead, they state in a footnote that the white papers "do not discuss how MultiPlan uses competitor data." Opp'n 24 n.12. But that's the point: the documents that they relied upon as authoritative and from which they based their "information sharing" allegations *do not include* the feature that Plaintiffs falsely claim they do, and falsely insist is integral to Data iSight's operation. DAPC ¶ 260. Plaintiffs provide no alternative interpretation of the white papers to raise a plausible "factual dispute" over whether MultiPlan uses clients' pooled confidential data (it does not). Opp'n 24 n.12. Factual allegations "contradicted in the complaint itself or in documents attached to it" should not be credited. *Atkins v. City of Chicago*, 631 F.3d 823, 831-32 (7th Cir. 2011). And to the extent Plaintiffs allege that each MCO sent its own confidential data MultiPlan, which stored ("pooled") that data in a single database, the Complaint never alleges that any MCO/TPA ever had access to another MCO/TPA's data in Data iSight, or that MultiPlan ever made such unaggregated or unblinded data available to any MCO/TPA. In short, the Complaint does not allege that Data iSight ever "enabled co-conspirators to tacitly communicate with one another, *In re Loc. TV Advert. Antitrust Litig.*, 2022 WL 3716202, at *6 (N.D. Ill. Aug. 29, 2022).

*Second*, in lieu of allegations showing the sort of systematic, algorithmic information-sharing that they claim (without support) in their Opposition, Plaintiffs rely on a handful of alleged anecdotal episodes in which MultiPlan allegedly suggested as part of its marketing efforts to a prospective customer that some customers use Data iSight in roughly the same way as others. Opp'n 24. This sleight of hand fails, as Plaintiffs never plausibly allege that any of these supposed marketing communications impacted any reimbursement that any provider received. *See In re Loc. TV Advert. Antitrust Litig.,* 2020 WL 3716202, at *8.

*Finally*, Plaintiffs' reliance on PlanOptix is misplaced. Far from facilitating the "dissemination of pricing strategy communications between payors," Opp'n 6, PlanOptix makes available *public* pricing data that the federal government *requires* health plans and hospitals to publish to promote price transparency.[11] Moreover, Plaintiffs have not alleged that *any* MCO or TPA Defendants in this litigation have subscribed to PlanOptix since it was launched in June 2023—eight years after the alleged conspiracy began. DAPC ¶ 465.

## VIII. PLAINTIFFS' STATE LAW CLAIMS FAIL

### A. State Law Antitrust Claims (Count 6)

Plaintiffs assert that their state law antitrust claims are only brought "in the alternative" to the extent Plaintiffs' injuries are too attenuated to provide antitrust standing under federal law. *See* Opp'n 36. Plaintiffs' purported workaround is premised on the notion that "any state with an *Illinois Brick* repealer would reject application of *AGC*" and the antitrust standing principles it spells out. *Id.* (citation omitted). But courts cannot simply "assume" that "states that have enacted *Illinois Brick* repealers also have abandoned *AGC*'s antitrust standing requirement." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 541 (N.D. Ill. 2019). Indeed, these states "generally apply the same antitrust standing principles applied under federal law." DAP MTD 36 n.7; *see, e.g.*, *McGarry & McGarry, LLC v. Bankr. Mgmt. Sols.*, 937 F.3d 1056, 1064-65 (7th Cir. 2019) (relying on the *AGC* factors to assess standing under the Illinois Antitrust Act).

### B. "Consumer Protection" Claims (Count 7)

Plaintiffs' consumer protection claims also fail, as the Complaint "merely allege[s]" that Plaintiffs' "antitrust claims" are "also actionable under state consumer protection laws." *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 726 (N.D. Ill. 2016); *see* DAP MTD 36–37.

---

[11] *See PlanOptix*, www.claritev.us/data-decision-science-services/planoptix/ (last visited Mar. 31, 2025).

Plaintiffs deny that this is what they are doing, but rely on allegations for their consumer protection claims that prove the point. *See* Opp'n 37 (relying on allegations that Defendants "fix the prices for OON services"). This Court should reject Plaintiffs' attempt to "assert what are essentially antitrust claims in the guise of a claim under . . . consumer protection statute[s]." *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 162 (E.D. Pa. 2009); *see In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d at 725-26. In any event, these claims fail too. Plaintiffs assert that Defendants' "business practices [are] forbidden by law," Opp'n 37, but point only to their antitrust claims, which are deficient for the reasons articulated. And Plaintiffs' Complaint does not adequately allege that there is anything "unfair" or "fraudulent" about providing services that MCOs use to control runaway healthcare costs. *See* DAP MTD 37.

### C.    Unjust Enrichment Claims (Count 8)

Plaintiffs' unjust enrichment claims should be dismissed because they are duplicative, and Plaintiffs have an adequate remedy at law. *See id.* at 38-40. Plaintiffs do not meaningfully dispute either point but argue the claims should survive because they are pled "in the alternative to all other causes of action." Opp'n 38. Not so. Because Plaintiffs' "unjust enrichment claim[s] rest[] on the same [alleged] conduct" as the antitrust claims, they "stand or fall" together. *Mish Int'l Monetary Inc. v. Vega Cap. London, Ltd.*, 596 F. Supp. 3d 1076, 1099 (N.D. Ill. 2022) (citing *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011)).

Plaintiffs' unjust enrichment claims also fail because Plaintiffs have simply "listed claims under various state laws" rather than "truly pleaded claims under those laws sufficient to show their entitlement to recovery." *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d at 725-26. Plaintiffs attempt to excuse their failure to include any state-specific allegations on the ground that the common law elements of unjust enrichment are "materially the same throughout the states." Opp'n 38. But, as courts have recognized, "there are a number of material differences among the

states' laws on unjust enrichment." *See, e.g.*, *Gustafson v. BAC Home Loans Servicing, LP*, 294 F.R.D. 529, 548-49 (C.D. Cal. 2013) (collecting cases).[12]

## IX. THERE ARE INADEQUATE ALLEGATIONS AS TO MANY DEFENDANTS

Finally, Defendants' opening brief demonstrates that several TPA Defendants are only mentioned in generic and conclusory passing references that do not satisfy pleading standards. Plaintiffs offer no serious rejoinder, simply assertions that "MultiPlan has 'horizontal pricing agreements' with each of [the TPAs]." Opp'n 36. But the conclusory allegation that these TPA Defendants merely contracted with MultiPlan as a service provider to use Data iSight at some point in time—2023 for both BPA and Consociate—cannot support claims against those Defendants. DAPC ¶¶ 186, 189. Indeed, Plaintiffs provide an illustration of the Complaint's endemic shortcomings by suggesting that one defendant (Consociate) can be hauled into an MDL antitrust action based on a photograph of representatives having a cocktail with a MultiPlan representative in 2021—several years after the purported formation of the conspiracy. But the "decision by a group of industry players to have a meeting or to talk at a dinner or cocktail reception does not constitute a conspiracy." *In re Text Messaging Antitrust Litig.*, 46 F. Supp. 3d 788, 806 (N.D. Ill. 2014), *aff'd*, 782 F.3d 867 (7th Cir. 2015); DAP MTD 24. The Complaint fails to "offer some evidence that moves beyond speculation about the content of what was conveyed" and the alleged meeting. *Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 938 (7th Cir. 2018).

## CONCLUSION

Defendants respectfully request that the Court dismiss the Complaint with prejudice.

---

[12] For example, some states, including New York, "permit plaintiffs to recover where the benefit was indirectly conferred" while others, including Florida, have established a "direct benefit requirement." *Kunzelmann v. Wells Fargo Bank, N.A.*, 2013 WL 139913, at *10 (S.D. Fla. Jan. 10, 2013). Plaintiffs purport to bring unjust enrichment claims "under the laws" of both jurisdictions, *see* DAPC ¶ 840, but make no attempt to grapple with the nuances of what these states—and others—require plaintiffs to allege for unjust enrichment, *see also, e.g.*, *Thompson v. Jiffy Lube Int'l, Inc.*, 250 F.R.D. 607, 626 (D. Kan. 2008) (taking note of other "variances in the state common laws of unjust enrichment").

Dated: April 2, 2025

Respectfully Submitted,

/s/ Sadik Huseny
Sadik Huseny (*pro hac vice*)
**LATHAM AND WATKINS LLP**
300 Colorado Street, Suite 2400
Austin, TX 78701
Telephone: (737) 910-7300
sadik.huseny@lw.com

Gary Feinerman (IL Bar No. 6206906)
**LATHAM AND WATKINS LLP**
330 N Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
gary.feinerman@lw.com

Lawrence E. Buterman (*pro hac vice*)
Katherine A. Rocco (*pro hac vice*)
**LATHAM AND WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
lawrence.buterman@lw.com
katherine.rocco@lw.com

Anna M. Rathbun (*pro hac vice*)
Molly Barron (*pro hac vice*)
Graham B. Haviland (*pro hac vice*)
**LATHAM AND WATKINS LLP**
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
anna.rathbun@lw.com
molly.barron@lw.com
graham.haviland@lw.com

Craig Lewis Caesar (IL Bar. No 3121593)
**PHELPS DUNBAR LLP**
365 Canal Street, Suite 2000
New Orleans, LA 70130
Telephone: (504) 584-9272
craig.caesar@phelps.com

/s/ E. Desmond Hogan (w/ consent)
E. Desmond Hogan
Justin W. Bernick
W. David Maxwell (*pro hac vice*)
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5600
desmond.hogan@hoanlovells.com
justin.bernick@hoganlovells.com
david.maxwell@hoganlovells.com

Jordan D. Teti
**HOGAN LOVELLS US LLP**
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 785-4600
jordan.teti@hoganlovells.com

*Attorneys for Defendants Elevance Health, Inc.;
Horizon Healthcare Services, Inc. (Horizon
Blue Cross and Blue Shield of New Jersey);
BCBSM, Inc. (Blue Cross and Blue
Shield of Minnesota); Aware Integrated, Inc.;
Blue Cross and Blue Shield of Massachusetts,
Inc.; and CareFirst, Inc.*

/s/ Katherine A. Trefz (w/ consent)
Jonathan B. Pitt
Katherine A. Trefz
Feyilana Lawoyin
**WILLIAMS & CONNOLLY LLP**
680 Maine Avenue, S.W.
Washington, DC 20024
Telephone: (202) 434-5000
jpitt@wc.com
ktrefz@wc.com
flawoyin@wc.com

*Attorneys for Defendant Aetna Inc.*

Errol J. King (*pro hac vice*)
Katherine Mannino (*pro hac vice*)
**PHELPS DUNBAR LLP**
II City Plaza
400 Convention Street, Suite 1100
Baton Rouge, LA 70802
Telephone: (225) 376-0279
errol.king@phelps.com
katie.manino@phelps.com

*Attorneys for Defendants MultiPlan, Inc.;*
*Claritev Corporation; National Care Network,*
*LLC; Viant Payment Systems, Inc.; Viant,*
*Inc.; and Medical Audit & Review Solutions,*
*Inc.*

/s/ *William J. Sheridan (w/ consent)*
William J. Sheridan (*pro hac vice*)
Courtney Bedell Averbach (*pro hac vice*)
Leah E. Hungerman (*pro hac vice*)
**REED SMITH LLP**
225 Fifth Avenue
Pittsburgh, PA 15222
(412) 288-3131
wsheridan@reedsmith.com
caverbach@reedsmith.com
lhungerman@reedsmith.com

*Counsel for Defendant Highmark Health*

/s/ *James W. Davidson (w/ consent)*
James W. Davidson
Riley B. Olson
**O'HAGAN MEYER LLC**
One East Wacker Drive, Suite 3400
Chicago, Illinois 60601
Telephone: (312) 422-6100
jdavidson@ohaganmeyer.com
rolson@ohaganmeyer.com

*Attorneys for Defendant Secure Health Plans*
*of Georgia, L.L.C.*

/s/ *Daniel R. Campbell (w/ consent)*
Daniel R. Campbell
Emilie E. O'Toole
**MCDERMOTT, WILL & EMERY LLP**
444 West Lake Street, Suite 4000
Chicago, IL 60606
Telephone: (312) 984-7782
dcampbell@mwe.com
eotoole@mwe.com

Joshua B. Simon (*pro hac vice*)
Warren Haskel (*pro hac vice*)
Dmitriy G. Tishyevich (*pro hac vice*)
Caroline Incledon (*pro hac vice*)
Chelsea Edith Rae Cosillos (*pro hac vice*)
**MCDERMOTT, WILL & EMERY LLP**
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 547-5444
jsimon@mwe.com
whaskel@mwe.com
dtishyevich@mwe.com
cincledon@mwe.com
ccosillos@mwe.com

*Attorneys for Defendant The Cigna Group*

/s/ *Brian P. Kavanaugh (w/ consent)*
Brian P. Kavanaugh
Scott D. Stein
**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
bkavanaugh@sidley.com
sstein@sidley.com

*Attorneys for Defendant Health Care*
*Service Corporation and the Central States*
*Southeast and Southwest Health and*
*Welfare Fund*

/s/ Scott Jared Fisher (w/ consent)
Scott Jared Fisher
Eric Y. Choi
**NEAL, GERBER & EISENBERG**
Two North LaSalle Street, Suite 1700
Chicago, IL 60602
Telephone: (312) 269-8035
sfisher@nge.com
echoi@nge.com

Rachel S. Brass (*pro hac vice*)
Henry H. Cornillie
**GIBSON, DUNN & CRUTCHER LLP**
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: (415) 393-8293
rbrass@gibsondunn.com
hcornillie@gibsondunn.com

Joshua Lipton (*pro hac vice*)
Kristen C. Limarzi (*pro hac vice*)
**GIBSON, DUNN & CRUTCHER LLP**
1700 M Street, N.W.
Washington, DC 20036
Telephone: (202) 955-8500
jlipton@gibsondunn.com
klimarzi@gibsondunn.com

Heather L. Richardson (*pro hac vice*)
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
hrichardson@gibsondunn.com

*Attorneys for Defendant UnitedHealth
Group, Inc*

/s/ Stephen D. Libowsky (w/ consent)
Stephen D. Libowsky (IL Bar No. 6187081)
Rebecca A. Finkel (IL Bar No. 6317199)
**MANATT, PHELPS & PHILLIPS, LLP**
151 North Franklin Street
Chicago, Illinois 60606
Telephone: (312) 529-6300
slibowsky@manatt.com
rfinkel@manatt.com

Ileana Hernandez (*pro hac vice*)
**HERNANDEZ LASKA LLP**
3415 South Sepulveda Blvd., Suite 1100
Los Angeles, CA 90034
Telephone: (310) 742-5816
ihernandez@hernandezlaska.com

*Attorneys for Defendant Sanford Health Plan*

s/ John J. Hamill (w/ consent)
John J. Hamill
john.hamill@us.dlapiper.com
Michael S. Pullos
michael.pullos@us.dlapiper.com
**DLA PIPER LLP (US)**
444 West Lake Street, Suite 900
Chicago, Illinois 60606
Tel: 312.368.3423
Fax: 312.251.5728

*Attorneys for Defendants Benefit Plan
Administrators of Eau Claire, LLC and
Consociate, Inc. (Consociate Health)*

*/s/ Christopher S. Moore(w/ consent)*
Christopher S. Moore (IL Bar. No. 6256418)
**CHRIS MOORE LAW LLC**
220 North Green Street
Suite 4031
Chicago, Illinois 60607
Telephone: (312) 704-4444
*chris@chrismoorelaw.com*

Richard G. Douglass (IL Bar. No. 6282777)
**DOUGLASS P.C.**
77 W. Wacker Drive
Suite 4500
Chicago, IL 60601
Telephone: (312) 216-5145
*rich@douglasspc.com*

*Attorneys for Defendant Allied National, LLC*

*/s/ Jason C. Murray (w/ consent)*
Jason C. Murray (*pro hac vice*)
Jordan L. Ludwig (*pro hac vice*)
**CROWELL & MORING LLP**
515 South Flower Street, 40th Floor
Los Angeles, CA 90071
Telephone: (213) 662-4750
jmurray@crowell.com
jludwig@crowell.com

Jason P. Stiehl
**CROWELL & MORING LLP**
455 North Cityfront Plaza Drive Suite 3600
Chicago, IL 60611
Telephone: (312) 321-4200
jstiehl@crowell.com

Ashley L. McMahon (*pro hac vice*)
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 624-2500
amcmahon@crowell.com

*Attorneys for Defendant Kaiser Foundation Health Plan, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Sadik Huseny, hereby certify that on this 2nd day of April, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court of the United States District Court for the Northern District of Illinois, Eastern Division, using the CM/ECF system, which sent notification of such filing to all filing users.

<u>*/s/  Sadik Huseny*</u>
Sadik Huseny