**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **In re MULTIPLAN HEALTH** | ) | |
| **INSURANCE PROVIDER** | ) | **Case No. 24 C 6795** |
| **LITIGATION** | ) | |

<u>**CASE MANAGEMENT ORDER NO. 14 –**</u>
<u>**Memorandum Opinion and Order on motions to dismiss**</u>

MATTHEW F. KENNELLY, District Judge:

This opinion concerns two complaints—a consolidated class action complaint and a consolidated direct action complaint—brought by healthcare providers against MultiPlan, Inc. and several organizations that contract with MultiPlan to facilitate the purchase of out-of-network healthcare services. The class action plaintiffs have sued the defendants for antitrust violations under section 1 of the Sherman Act. The direct action plaintiffs also assert a section 1 Sherman Act claim as well as state-law antitrust, consumer protection, and unjust enrichment claims. The class action plaintiffs name MultiPlan and the following contracting parties as defendants: Aetna, Inc., The Cigna Group, UnitedHealth Group, Inc., and members of the Blue Cross Blue Shield Association. The direct action plaintiffs make their claims against those defendants, as well as: Cambia Health Solutions, Inc., CareFirst, Inc., Centene Corp., Health Care Service Corp., Highmark Health, Humana Inc., Kaiser Foundation Health Plan, Inc., Molina Healthcare, Inc., Sanford Health Plan, Allied National, LLC, Benefit Plans Administrators of Eau Claire, LLC, Central States Southeast and Southwest Areas Health and Welfare Fund, Consociate, Inc., Healthcare Highways Health Plan, LLC, and Secure Health Plans of Georgia, LLC.

The defendants have filed motions to dismiss both complaints.  For the reasons below, the Court denies the defendants' motions to dismiss the federal and state antitrust claims and the state consumer protection claims, but grants the motion to dismiss the unjust enrichment claims.

## Background

At the motion to dismiss stage, the Court accepts all well-pled factual allegations as true.  *Ashcroft v. al-Kidd*, 563 U.S. 731, 734 (2011).  The plaintiffs are healthcare providers, such as doctors.  They provide healthcare services to patients in exchange for a fee.  Patients, however, often do not fully pay for a provider's services.  In the United States, the vast majority of healthcare services are instead paid by a commercial third-party payor.

Third-party payors come in many forms and labels.  If they directly pay for a subscriber's / patient's healthcare services, the best label would be "insurer."  But a so-called "insurer" might instead offer a self-funded administrative-service-only health plan, in which case the "insurer" does not provide insurance, but just administrative services for a fully-paying entity—typically an employer on behalf of its employees.  In this scenario, the "insurer" is better labelled a "managed care organization" (MCO), as it provides administrative services to the employer but does not directly pay for healthcare services (i.e., does not "insure" any patient / employee).  Employers may further complicate the picture by using a "third-party administrator" (TPA) to handle the administrative services detailed in their health plans, as opposed to using the MCO itself.

No matter the label, these third-party payors all engage in one activity relevant to

this dispute:  they negotiate payments for healthcare services.  To ensure predictable costs, third-party payors will often pre-negotiate the rate for certain healthcare providers' services through contracts between themselves and providers.  These providers thus become a part of a payor's "network."  A payor's subscribers who use providers within the payor's network receive "in-network" services for which a payor and provider have already agreed on the price.  These pre-negotiated agreements are mutually beneficial, as payors incentivize their subscribers to use in-network providers' services, while providers offer payors discounted rates to be a part of such networks.

Not all providers, however, agree to pre-negotiate their rates with third-party payors.  Providers may feel that the pre-negotiated compensation rates are too low or that the in-network boost in patients does not justify discounting their rates.  Absent in-network discounts, healthcare services provided "out of network" end up being more expensive than comparable in-network services.  In this circumstance, some third-party payors choose not to cover any non-negotiated, out-of-network services.  Yet many payors, hoping to maximize their subscriber base, will cover out-of-network services to a certain extent.

**A.    UCR benchmarks**

The lack of a pre-negotiated contract makes payment for out-of-network services more complex than for in-network services.  Historically, third-party payors used "usual, customary, and reasonable" (UCR) benchmarks as a starting point for negotiations.  UCR benchmarks are pegged to public retail medical charge data for similar healthcare services performed in the same geographic area.

Once a third-party payor calculated a UCR rate for a healthcare service, it would

offer some downward variation of that rate to the provider as payment, usually 80% to 90% of the suggested UCR rate. If a provider determined the rate offered was fair, it could accept that rate as full payment.  But providers could also accept the third-party payor's rate as partial payment and seek additional compensation from a patient—a process called "balance billing."

Prior to 1997, payors used retail charge data from two independent databases to calculate UCR benchmarks:  the Prevailing Healthcare Charges System and Medical Data Resource.  Third-party payor UnitedHealth Group, however, purchased these databases in 1998.  United then consolidated these databases into its subsidiary, Ingenix.

For roughly a decade, Ingenix was the primary data set payors used to calculate out-of-network rates.  Yet the UCR rates produced by Ingenix were lower than healthcare providers expected.  This, in turn, led to patients receiving larger bills from providers via balance billing.

The increased costs for patients sparked an investigation into Ingenix by the New York Attorney General.  The investigation ultimately culminated in a settlement between the New York Attorney General and United in 2009.  Under the settlement, United agreed to shut down Ingenix and contribute $50 million to the formation of an independent organization, FAIR Health, which took ownership of Ingenix's consolidated UCR database.  United was further required to use FAIR Health's database for calculating UCR benchmarks for at least five years.  The New York Attorney General reached similar settlements with other third-party payors that had used Ingenix, including Aetna, Cigna Group, and Elevance, a Blue Cross Blue Shield Association

4

member.  These settlements also required the third-party payors to use FAIR Health's database for at least five years.

**B.    MultiPlan**

MultiPlan offers an alternative method for calculating a third-party payor's out-of-network rate through its Data iSight algorithm.  Data iSight calculates rates by referencing both the cost of the service to the provider and the median payment for similar services rendered.  Using these metrics, the Data iSight algorithm tends to produce lower payment rates than UCR benchmarks like FAIR Health.

Third-party payors can tweak the Data iSight algorithm by using overrides. These overrides can set a floor or ceiling on the calculated rate (e.g., "Don't Pay More / Less Than X% of Claim's Cost").  Payors can also select rate calculations that differ from Data iSight's default calculation, such as by instead pegging the rate calculated to "X% of Medicare Reimbursement."  Class Action Compl. ¶¶ 155–164; Direct Action Compl. ¶¶ 323–325.

If a third-party payor agrees to use a Data iSight calculated rate, MultiPlan also offers to negotiate the rate with providers on behalf of the payor.  When negotiating with providers, MultiPlan will condition all payments on a provider's agreement not to balance bill the patient, meaning the provider will accept a MultiPlan negotiated rate as full payment.  The plaintiffs allege that MultiPlan's rates are given on a take-it-or-leave it basis; providers have not been successful in convincing MultiPlan to deviate from a Data iSight calculated rate.  Still, a provider can decline MultiPlan's offer and seek payment directly from the patient and his or her insurer in accordance with the patient's health plan.

As third-party payors' five-year obligation to use FAIR Health's UCR benchmark expired, they shifted over to MultiPlan's rate calculation and negotiation services. Cigna, for example, completed its obligation to use FAIR Health in early 2015. On April 1 of that year, Cigna contracted with MultiPlan to use its Data iSight algorithm and negotiation services. By 2018, hundreds of third-party payors, including United, Aetna, and Blue Cross Blue Shield Association members, had contracts with MultiPlan. MultiPlan grew to having contracts with over 700 third-party payors, including the top 15 payors. In 2019, it processed over 80% of out-of-network healthcare service payments.

## C.    The present suits

Healthcare providers filed multiple lawsuits against MultiPlan and several third-party payors that use MultiPlan's rate calculation and negotiation services. In August 2024, the Judicial Panel on Multidistrict Litigation centralized these lawsuits before the undersigned judge.

At issue in this opinion are two complaints: a consolidated class action complaint and a consolidated master direct action complaint. The class action plaintiffs allege on behalf of themselves and similarly situated healthcare providers that MultiPlan and third-party payors violated federal antitrust law by agreeing to fix the prices paid for out-of-network healthcare services. The direct action plaintiffs allege that MultiPlan and third-party payors violated federal antitrust law, state antitrust laws, state consumer protection laws, and state unjust enrichment laws. The class action plaintiffs make allegations only against MultiPlan, insurers, and MCOs, while the direct action plaintiffs make allegations against TPAs as well.

The defendants have moved to dismiss both complaints.

6

## Discussion

To survive a motion to dismiss, the complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). For a claim to have "facial plausibility," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *McCauley v. City of Chicago*, 671 F.3d 611, 615 (7th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678). The Court views the complaint in "the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from the allegations in the plaintiff's favor." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

### A. Federal antitrust claims

The bulk of both complaints and the motions to dismiss briefing are spent on the plaintiffs' federal antitrust claims. To plead a federal antitrust claim under section 1 of the Sherman Act, the plaintiffs must plausibly allege "(1) that defendants had a contract, combination, or conspiracy ('an agreement'); (2) that as a result, trade in the relevant market was unreasonably restrained; and (3) that they were injured." *See Omnicare, Inc. v. UnitedHealth Grp.*, 629 F.3d 697, 705 (7th Cir. 2011). The defendants contend the plaintiffs have not asserted a viable federal antitrust claim because they have not plausibly alleged: (1) antitrust standing and injury, (2) a relevant market, and (3) an agreement that violates federal antitrust law.

#### 1. Antitrust standing and injury

Antitrust violations can create wide-reaching injuries, as their effects "cause ripples of harm to flow through the Nation's economy." *McGarry & McGarry, LLC v.*

*Bankr. Mgmt. Sols., Inc.*, 937 F.3d 1056, 1064 (7th Cir. 2019) (quoting *Blue Shield of Va. v. McCready*, 457 U.S. 465, 477 (1982)). Despite this, "Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action" under federal antitrust law. *Id.* (quoting *McCready*, 457 U.S. at 477). The Supreme Court has thus established "additional rules" for determining "whether the plaintiff is the proper party to bring a private antitrust action" in the form of antitrust standing and injury. *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481 (7th Cir. 2002) (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983) ("*AGC*")).

### a.    Antitrust standing

Antitrust standing "examines the connection between the asserted wrongdoing and the claimed injury to limit the class of potential plaintiffs to those who are in the best position to vindicate the antitrust infraction." *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 395 (7th Cir. 1993). Courts consider several factors in analyzing a plaintiff's antitrust standing, including: "(1) the causal connection between the violation and the harm; (2) the presence of improper motive; (3) the type of injury and whether it was one Congress sought to redress; (4) the directness of the injury; (5) the speculative nature of the damages; and (6) the risk of duplicate recovery or complex damage apportionment." *Loeb Indus.*, 306 F.3d at 484 (citing *AGC*, 459 U.S. at 537–45). The defendants focus their attacks on two of these factors: the directness of the injury and the risk of duplicate recovery.

### i.    Direct injury

The defendants argue that providers are not directly injured by the alleged third-

party payor agreement to fix prices because they can always seek full payment from the patient. The defendants cite three out-of-circuit cases to support this contention.

In *In re WellPoint, Inc. Out-of-Network UCR Rates Litigation*, 903 F. Supp. 2d 880 (C.D. Cal. 2012), a judge in the Central District of California found that providers lacked antitrust standing to bring a price-fixing claim against third-party payors, partly due to the lack of direct injury. *Id.* at 902. The district court determined that patients who subscribed to third-party payors were the more direct victims, as they would be responsible for the remaining payment if payors artificially depressed rates. *Id.* The court also found these patients were motivated to sue third-party payors due to the higher costs for services they faced, suggesting that provider lawsuits were unnecessary for antitrust enforcement. *Id.*

A judge in the Northern District of California came to a similar conclusion in *Pacific Recovery Solutions v. United Behavioral Health*, 481 F. Supp. 3d 1011 (N.D. Cal. 2020). The court emphasized that the providers had alleged "the direct victims of the alleged [antitrust violation] were '[the third-party payor]'s members' (i.e., plaintiffs' patients)." *Id.* at 1022. Based on this allegation, the court concluded that providers' injuries were derivative of the injuries of patients, as the providers were underpaid only if the patients failed to pay the remaining amount after a third-party payor's alleged underpayment. *Id.*

Finally, another court in the Northern District of California reached the same conclusion in *Pacific Recovery Solutions v. Cigna Behavioral Health, Inc.*, No. 5:20 C 2251 EJD, 2021 WL 1176677 (N.D. Cal. Mar. 29, 2021). Relying on *In re WellPoint*, the court concluded that the patients were the more direct victims of an alleged third-party

9

payor price-fixing agreement and that the providers' injuries arose "only to the extent that their patients do not pay the amounts . . . not reimburse[d]." *Id.* at *12.

These cases are all distinguishable, as the providers in this case allege they cannot accept the third-party payor's proposed payment and then bill the patient for any amount remaining due. Specifically, the providers allege that when MultiPlan negotiates on behalf of payors, it conditions payment on a provider's agreement to not "balance bill patients for the unpaid portions of their claims." Class Action Compl. ¶ 11; *see also* Direct Action Compl. ¶ 339. This is a critical difference from the cases the defendants cite—the providers in this case allege they *cannot* seek the remaining balance from patients if they accept a third-party payor's payment through MultiPlan.

The defendants maintain that this is a distinction without a difference. They contend the providers can still reject a third-party payor's payment and seek full compensation from the patient, meaning that a provider would be injured only if the patient fails to pay.

This argument, however, ignores the practical effect of MultiPlan's balance billing prohibition. A provider given the option between guaranteed partial payment from a third-party payor and the mere possibility of full payment from a patient will likely choose the guaranteed payment even if it is below the market rate for the provider's services. The fact that providers allegedly accept MultiPlan's initial payment offer over 95% of the time indicates as much—a provider would not accept an allegedly unduly low amount conditioned on an agreement not to balance bill the patient if the provider believed it could procure the full amount from the patient.

The defendants attempt to rebut this reasoning by noting there are no specific

allegations that third-party payors are more capable of paying for healthcare services than patients. Yet there is little doubt that commercial third-party payors have greater resources than the average patient. A court need not ignore this reality when ruling on a motion to dismiss. *See 42nd Parallel N. v. E St. Denim Co.*, 286 F.3d 401, 406 (7th Cir. 2002) (noting a court is "not required to don blinders and to ignore commercial reality" when considering a motion to dismiss); *Iqbal*, 556 U.S. at 679 (noting that a court should "draw on its judicial experience and common sense" when determining whether a plaintiff alleges a plausible claim for relief).

MultiPlan's balance billing prohibition indicates that providers are the directly injured parties for another reason: it prevents patients from feeling the effect of the alleged price-fixing agreement. Because providers believe that their only real option for payment is from third-party payors who condition payment on not charging the patient, patients are likely to be oblivious to the fact that third-party payors are allegedly underpaying for provided healthcare services. Unlike the cases the defendants cite, patients in this case have no real incentive to sue third-party payors for alleged underpayment, as the balance billing prohibition prevents them from being stuck with the bill. Providers are thus the only private parties under this scenario that have an incentive to enforce antitrust law.

Because the alleged balance billing prohibition prevents providers from seeking the remaining payment from patients and shields patients from the consequences of the alleged third-party payor price-fixing agreement, the providers have alleged a direct injury.

11

###### ii.     Duplicate recovery

The defendants also contend that providers would receive duplicative recovery because they could sue third-party payors for antitrust violations while also collecting payment from patients, creating a windfall.  The duplicate recovery factor, however, is not concerned with plaintiffs recovering damages beyond compensating their injuries— the fact that antitrust law "provides a treble-damages remedy" indicates as much.  *See McGarry & McGarry*, 937 F.3d at 1063; 15 U.S.C. § 15 ("[A]ny person who shall be injured . . . by reason of anything forbidden in the antitrust laws . . . shall recover threefold the damages . . . .").  Instead, the duplicate recovery factor considers whether a *defendant* would be subject to multiple suits by different plaintiffs for the same antitrust injury.  *See AGC*, 459 U.S. at 543–44 (discussing the prohibition on "indirect purchasers" suing for antitrust violations when explaining the need to avoid "duplicate recoveries," as allowing indirect purchasers to sue "create[s] the danger of multiple liability . . . and prejudice to absent plaintiffs").

The defendants argue in a footnote that there is a risk of multiple suits, as both a provider and patient could sue for underpayment.  But as discussed above, patients lack an incentive to sue the defendants because the balance billing prohibition prevents them from shouldering the costs of the alleged price-fixing agreement.  Because patients do not feel the effects of the alleged third-party payor price-fixing agreement, the risk that other parties will sue the defendants is low.

\*     \*     \*

The Court finds that the providers have plausibly alleged a direct injury and that there is little risk of duplicate recovery.  There are no other antitrust standing factors in

dispute. The Court therefore finds the plaintiffs have plausibly alleged they have antitrust standing.

### b. Antitrust injury

Antitrust injury requires a plaintiff allege injuries that are "of the type the antitrust laws were intended to prevent and reflect the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 481 (7th Cir. 2020) (citation omitted). Because antitrust law "protect[s] . . . competition, not competitors," *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962), "mere economic loss does not amount to an antitrust injury." *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 345 n.7 (7th Cir. 2022). Instead, a plaintiff must allege an injury that "stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Chi. Studio Rental, Inc. v. Ill. Dep't of Com.*, 940 F.3d 971, 978 (7th Cir. 2019) (quoting *Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 344 (1990)).

The defendants first argue that the providers do not allege they received below-market payments because of the alleged price-fixing agreement. The plaintiffs squarely allege they received "unreasonably low compensation amounts" from third-party payors who utilize MultiPlan's services. Class Action Compl. ¶¶ 20–21; *see also* Direct Action Compl. ¶¶ 662–664 (alleging "massive[] underpay[ment]" from third-party payors who use MultiPlan). The plaintiffs need not allege more at this stage of review. "[A] seller sufficiently alleges antitrust injury by pleading that it has received excessively low prices from members of the buyers' cartel." *Omnicare, Inc. v. UnitedHealth Grp.*, 524 F. Supp. 2d 1031, 1040 (N.D. Ill. 2007) (collecting cases); *In re Delta Dental Antitrust Litig.*,

484 F. Supp. 3d 627, 642 (N.D. Ill. 2020) (same).

The defendants disagree, contending that what the plaintiffs want is not market rates, but supposedly inflated UCR benchmark rates. Yet nowhere in the complaints do the plaintiffs request that the Court reinstate these prior benchmarks. The providers instead ask that third-party payors refrain from participating in an alleged price-fixing agreement by discontinuing their use of MultiPlan's services. What method or process the third-party payors elect instead would be up to each individual payor.

Moreover, the fact that a system used prior to MultiPlan's entry onto the scene was supposedly also not competitive cannot justify an alleged price-fixing scheme. "It has long been settled that an agreement to fix prices is unlawful *per se*." *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980). Price-fixing agreements between competitors cannot be justified *at all*, let alone by the argument that currently-fixed prices are more "reasonable." *Id.*; *see also United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940) (noting that price fixing is illegal *per se* even if justified by the need to "stabilize" the market, as "stabilization is but one form of manipulation").

Finally, the defendants argue that even if providers are getting below-market payments, the plaintiffs fail to allege the lesser payments are due to a harm to competition. Rather, the defendants contend, MultiPlan's services actually increase competition by providing another rate-calculation option. They further emphasize that using MultiPlan is beneficial, as it lowers costs to third-party payors and their subscribers / patients.

The plaintiffs, whose factual allegations must be taken as true at the motion to dismiss stage, plausibly allege the opposite. Rather than just another payment option,

the plaintiffs allege MultiPlan is the dominant force in the market, having agreements with over 700 third-party payors and processing over 80% of out-of-network service payments. Class Action Compl. ¶ 273; Direct Action Compl. ¶ 567. By using MultiPlan, these third-party payors allegedly "stop competing against each other on pricing for out-of-network . . . services" by delegating their "independent judgment on how much to pay" to MultiPlan. Direct Action Compl. ¶ 2; *see also* Class Action Compl. ¶ 195 (alleging third-party payors "delegate to MultiPlan the authority to determine out-of-network compensation rates and negotiate those rates with providers," "facilitating their collective action"). Whether MultiPlan facilitates a third-party payor price-fixing agreement or is simply another pricing option for payors is thus a factual dispute that cannot be resolved on a motion to dismiss.

Nor can the defendants justify an alleged price-fixing agreement by touting lower prices for its members and patients. "Every precedent in the field makes clear that the interaction of competitive forces, not price-rigging, is what will benefit consumers." *W. Penn. Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 105 (3d Cir. 2010) (quoting *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000)); *see also Knevelbaard Dairies*, 232 F.3d at 989 ("Clearly mistaken is the occasional court that considers low buying prices pro-competitive or that thinks sellers receiving illegally low prices do not suffer antitrust injury.") (citation omitted). And again, a competitor price-fixing agreement cannot be justified, period—price fixing is illegal *per se*. *Catalano*, 446 U.S. at 647.

For these reasons, the Court finds the plaintiffs have plausibly alleged an antitrust injury.

15

2.      **Relevant market**

a.      **Need for a market**

The defendants next contend that the plaintiffs fail to plausibly allege a relevant market.  The plaintiffs first attempt to sidestep this argument entirely by contending that no market definition is required for an alleged price-fixing agreement among competitors.  This is incorrect.

The "entire point" of antitrust law is "to protect competition in the commercial arena."  *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 337 (7th Cir. 2012).  "[W]ithout a commercial market, the goals of [antitrust law] have no place."  *Id.*

The plaintiffs' cited cases do not contradict this.  Instead, they stand for the proposition that a plaintiff need not allege market *power* when alleging a price-fixing agreement among competitors.  *See Omnicare*, 524 F. Supp. 2d at 1042 ("[A] buyers' conspiracy to fix prices, which is alleged here, is per se unlawful, so that no proof of market *control* need be offered.") (emphasis added); *Conrad v. Jimmy John's Franchise, LLC*, No. 18 C 133 NJR, 2021 WL 718320, at *22 (S.D. Ill. Feb. 24, 2021) ("Antitrust law may condemn some conduct, such as naked price-fixing . . . among competitors, with little or no inquiry into market *power* of the participant . . . .") (citation omitted) (emphasis added).

Allegations concerning the market power of the alleged conspirators are unnecessary for competitor price-fixing claims because the simple agreement to fix prices satisfies the "conspiracy" element of the antitrust violation, whether or not the conspiring parties actually had the power to fix prices.  *Socony-Vacuum*, 310 U.S. at 224 n.59 ("It is the 'contract, combination . . . or conspiracy, in restraint of trade or

16

commerce' which [section] 1 of the [Sherman] Act strikes down, whether the concerted activity be wholly nascent or abortive on the one hand, or successful on the other."). And although market power is usually required to establish "the relevant market was unreasonably restrained," competitor "price-fixing [agreements] . . . are considered *per se* unreasonable." *Omnicare*, 629 F.3d at 705–06.

But even if plaintiffs do not have to allege market power for a price-fixing agreement among competitors, they must allege a relevant market *in general*. An agreement to fix prices cannot violate antitrust law if there is no market for the good or service to which the price is attached. "It is the existence of a commercial market that implicates [antitrust law] in the first instance." *Agnew*, 683 F.3d at 337.

With the need for a relevant market established, the Court next considers the plaintiffs' alleged market.

### b.    Alleged market

"A 'relevant market' under [antitrust law] is comprised of the 'commodities reasonably interchangeable by consumers for the same purposes.'" *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916–17 (7th Cir. 2020) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)). At the motion to dismiss stage, the burden to allege a relevant market is low. "All that is required, on a motion to dismiss, is for the plaintiffs to plead sufficient allegations that, when taken as true, make plausible the existence of a relevant market." *Carbone v. Brown Univ.*, 621 F. Supp. 3d 878, 899 (N.D. Ill. 2022) (Kennelly, J.); *see also Vasquez v. Ind. Univ. Health, Inc.*, 40 F.4th 582, 584 (7th Cir 2022) (noting the plaintiff "needed to allege only one plausible geographic market to survive a motion to dismiss").

17

The plaintiffs define the relevant market as "the market for out-of-network healthcare services for purchase by third-party commercial payers." Class Action Compl. ¶ 265; *see also* Direct Action Compl. ¶ 515 ("The relevant market . . . is the market for out-of-network goods and services sold to payors."). The defendants argue the plaintiffs do not allege a relevant market because: (1) they fail to allege a "price" capable of being fixed and (2) the market as defined is implausible.

i.    **Fixable "price"**

The defendants first argue that no market exists for out-of-network healthcare services, as out-of-network services are not a standalone product that has a "price" that can be fixed. Instead, the defendants contend that the product at issue is a patient's insurance policy, which includes coverage for both in-network and out-of-network services. Because patients cannot purchase coverage solely for out-of-network services, the defendants argue, there is no way to fix prices for out-of-network services.

The defendants' argument amounts to sleight of hand. Rather than address the market the plaintiffs allege—the market for out-of-network services sold to third-party payors—the defendants analyze the separate market for insurance policies sold to patients. This is the wrong analysis. It may be true that out-of-network service *coverage* is not a discrete product sold to *patients* because it is sold within insurance policies that package both in- and out-of-network services together. But the market alleged in this case is between third-party payors and providers, not third-party payors and their subscribers / patients.

Courts in this circuit and elsewhere have "noted the role of insurers as purchasers of health services." *Blue Cross & Blue Shield United of Wis. v. Marshfield*

18

*Clinic*, 881 F. Supp. 1309, 1317 (W.D. Wis. 1994) (collecting cases); *see also Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) (recognizing that third-party payor Blue Cross is a "buyer of medical services"). The "reality of the health services financing market" is that the "price set for treatment is often negotiated not between patient and physician, but between patient's insurer and physician." *Marshfield Clinic*, 881 F. Supp. at 1317 (quoting *Nelson v. Monroe Reg'l Med. Ctr.*, 925 F.2d 1555, 1564 n.5 (7th Cir. 1991)). And although the defendants try to shift the analysis from third-party payors "paying" for healthcare services to payors "reimbursing" patients, "any distinction between reimbursement by third party insurers . . . and purchasing [is] irrelevant for antitrust purposes." *Id.* (citing *Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 926 (1st Cir. 1984)). In sum, although it is the patient who benefits from healthcare services provided, the third-party payor participates in the market by buying the services.

The defendants attempt to resist being labelled "purchasers" of healthcare services by insisting that "there is no factual basis whatsoever for the notion that [out-of-network] services are provided to [third-party payors] instead of the *patients that receive treatments*." Reply in Supp. of Defs.' Mot. to Dismiss Direct Action Compl. at 14. The defendants seemingly argue that a purchaser must use the product being purchased to be in the market for that product. By that logic, parents who buy a chocolate bar for a child would not be in the market for chocolate bars, as only the child consumes the chocolate. This absurdity simply highlights the recognized "reality of the health services financing market" that third-party payors are the purchasers for out-of-network healthcare services, whether or not the payor is considered a recipient of those

services.  *See Marshfield Clinic*, 881 F. Supp. at 1317.

Next, the defendants contend that even if third-party payors do purchase

healthcare services, there can be no competitive market for out-of-network healthcare

services rendered, as providers can only negotiate with the treated patient's third-party

payor.  Yet the fact that competition does not happen at the point of sale does not mean

there is no market.  As the plaintiffs allege, if providers realize that a third-party payor

pays too-low, noncompetitive rates for out-of-network services, providers will stop

accepting patients who utilize that payor.  Class Action Compl. ¶ 242; Direct Action

Compl. ¶ 422.  As a result, payors would lose subscribers to other third-party payors

that can provide greater access to out-of-network services.  Class Action Compl. ¶ 242;

Direct Action Compl. ¶ 422.  Third-party payors thus must keep their out-of-network rate

payments at a competitively high level to avoid losing subscribers who wish to utilize a

wide breadth of providers.  Class Action Compl. ¶ 242; Direct Action Compl. ¶ 422.  In

other words, third-party payors compete with other third-party payors for out-of-network

services to ensure they do not lose subscribers, even if providers cannot choose

between payors once a patient / subscriber receives treatment.  This is a competitive

market.

Finally, the defendants ask the Court to adopt the reasoning of three out-of-circuit

cases and one state court case, which all hold that there is no fixable "price" for out-of-

network healthcare services.  Two of the cases—*Franco v. Connecticut General Life

Insurance Co.*, 818 F. Supp. 2d 792 (D.N.J. 2011) and *In re Aetna UCR Litigation*, Civ.

No. 07-3541, 2015 WL 3970168 (D.N.J. June 30, 2015)—are inapposite.  Both cases

involved lawsuits brought by patients against their third-party payors, not providers

against payors.  As discussed above, it may be correct to conclude that out-of-network services cannot have their prices fixed when sold to patients, as it is only "one aspect" of the total insurance policy a patient purchases.  *See Franco*, 818 F. Supp. 2d at 834; *In re Aetna*, 2015 WL 3970168, at *24.  But the plaintiffs in this case are providers who do allegedly sell out-of-network services as a separate product to third-party payors.

Admittedly, the other two cases cited—*Pacific Recovery Solutions v. Cigna Behavioral Health, Inc.*, *supra*, and *VHS Liquidating Trust v. Multiplan Corp.*, No. CGC-21-594966, 2024 WL 5378341 (Cal. Super. Aug. 9, 2024)—were brought by providers. But both relied heavily on *Franco* and *In re Aetna* to reach the conclusion that there was no fixable price, despite the provider-plaintiffs alleging a market distinct from what the patient-plaintiffs had alleged in past cases.  *See Cigna*, 2021 WL 1176677, at *13; *VHS Liquidating Tr.*, 2024 WL 5378341, at *7–9.  The Court respectfully disagrees with these courts holdings and finds the plaintiffs have alleged a discrete product—out-of-network healthcare services sold to third-party payors—that can have its price fixed.

### ii.    Cognizable market

The defendants also argue that the alleged market itself is implausible.  First, they contend the alleged market is too broad, as it groups different healthcare services offered by different types of providers.  Because an out-of-network routine check-up is not reasonably interchangeable with out-of-network heart surgery, the defendants argue, a market including all out-of-network services is implausible.

But defendants concede that products, even if not separately interchangeable, can be "clustered" together in a "cluster market" if the "'cluster' is itself an object of consumer demand."  *FTC v. Advoc. Health Care Network*, 841 F.3d 460, 467–68 (7th

Cir. 2016) (quoting *Green Country Food Mkt., Inc. v. Bottling Grp.*, 371 F.3d 1275, 1284–85 (10th Cir. 2004)). The Seventh Circuit has recognized that "[h]ealth care services can be suitable subjects for such 'cluster' product markets." *Sharif Pharmacy*, 950 F.3d at 918; *see, e.g.*, *In re Delta Dental*, 484 F. Supp. 3d at 640 (finding the plaintiffs plausibly alleged a market for "dental goods and services sold by plaintiffs to insurers"). Different types of healthcare services may be grouped in a cluster market because healthcare services are often "sold to commercial health plans and their members" in a package. *Advoc. Health Care Network*, 841 F.3d at 467–68.

Although the defendants maintain that competition for purchasing out-of-network services differs based on the type of service, the plaintiffs plausibly allege otherwise. They allege that payment for out-of-network services is calculated in a similar manner—through the use of some benchmark or algorithm—across all healthcare services purchased, and that third-party payors purchase different types of out-of-network healthcare services "together to sell health plans with out-of-network benefits." Class Action Compl. ¶¶ 80–89, 266; Direct Action Compl. ¶¶ 295–300, 538. Taking these factual allegations as true, the Court finds the plaintiffs have plausibly alleged a market for all types of out-of-network services.

The defendants next argue that the providers' alleged nationwide market for-out-of-network healthcare services is geographically implausible. There is nothing facially invalid about alleging a nationwide market—a market "can be as large as the globe" as long as a plaintiff plausibly alleges facts to support such breadth. *See Advoc. Health Care Network*, 841 F.3d at 468–69. The providers allege several facts that support a nationwide market, including that patients often utilize out-of-network services because

of frequent travel, patients from anywhere in the United States can and do obtain out-of-network services across the nation, and third-party payors purchase out-of-network services from healthcare providers nationwide.  Class Action Compl. ¶¶ 75, 275–276; Direct Action Compl. ¶¶ 87, 563; *see also In re Delta Dental*, 484 F. Supp. 3d at 641 (denying a motion to dismiss in a case involving an alleged nationwide market when the plaintiffs "claim[ed] that defendants insure patients across the country").

The defendants attempt to rebut these allegations by arguing that "[a] routine primary care checkup in California is simply not 'reasonably interchangeable' with one in Illinois."  Mem. in Supp. of Defs' Mot. to Dismiss Class Action Compl. at 39.  This conclusory argument is unconvincing.  Whether or not a healthcare provider renders a service in California or Illinois, the third-party payor purchasing the service receives the bill, and the plaintiffs' allegations suggest that the process of negotiating payment is the same no matter the location.  The Court finds the plaintiffs have plausibly alleged a nationwide market for out-of-network services.

Finally, the defendants argue that the alleged market is underinclusive, as it only includes out-of-network healthcare services rather than both in-network and out-of-network services.  When determining whether two products should be included in the same market, courts commonly look toward "practical indicia" as "[h]elpful evidence" of the relevant market.  *See Pit Row, Inc. v. Costco Wholesale Corp.*, 101 F.4th 493, 505 (7th Cir. 2024).  Relevant practical indicia includes:  "(i) industry or public recognition of the submarket as a separate economic entity, (ii) the product's peculiar characteristics and uses, (iii) unique . . . facilities, (iv) distinct customers, (v) distinct prices, (vi) sensitivity to price changes, and (vii) specialized vendors."  *Methodist Health Servs.*

*Corp. v. OSF Healthcare Sys.*, No. 1:13 C 1054 SLD JEH, 2015 WL 1399229, at *6 (C.D. Ill. Mar. 25, 2015) (citing *Brown Shoe*, 370 U.S. at 325).

The plaintiffs' allegations implicate at least three practical indicia that support treating out-of-network services as a distinct market from in-network services.  First, both the third-party payor industry and the public recognize out-of-network services are a distinct market, as indicated by third-party payors differentiating between them in their health plans and statements made by industry leaders.  Class Action Compl. ¶¶ 268–269 (noting that MultiPlan "describes 'out-of-network cost containment' as an 'addressable market' that is separate from . . . the 'provider network' market"); Direct Action Compl. ¶¶ 538–540.  Second, out-of-network services have characteristics different from in-network services based on how they are negotiated, with the price for in-network services being negotiated before treatment and the price for out-of-network services being negotiated after treatment.  Class Action Compl. ¶ 270; Direct Action Compl. ¶ 543.  Third, out-of-network services have distinct prices from in-network services; they are "far more expensive than comparable in-network services."  Class Action Compl. ¶ 272; Direct Action Compl. ¶ 537.

The defendants counter that these practical indicia distract from the key inquiry of whether products are reasonably interchangeable.  According to the defendants, these indicia cannot overcome the fact that in-network and out-of-network services cover identical treatments.  Although the defendants recognize the prices differ substantially between in-network and out-of-network services, they rely on *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591 (8th Cir. 2009), to argue that markets cannot be defined by differing prices when the service rendered is the same.

24

In *Little Rock Cardiology Clinic*, a provider alleged the relevant market was "the market for cardiology procedures obtained in hospitals by patients covered by private insurance." *Id.* at 596. The Eighth Circuit concluded the alleged market was invalid because it did not include government insurance. *Id.* at 597. The court determined that payment through private insurance and government insurance was "reasonably interchangeable from the cardiologist's perspective," as the cardiologist-provider alleged it "accepted payment from sources other than private insurers." *Id.* The Eighth Circuit then drew on this reasoning to hold that "as a matter of law, in an antitrust claim brought by a seller, a product market cannot be limited to a single method of payment when there are other methods of payment that are acceptable to the seller." *Id.* at 598.

The defendants overread *Little Rock Cardiology Clinic*. The Eighth Circuit only considered different *sources* of payment, not differing payment amounts. Implicit in the court's reasoning is that there was no difference in payment between government insurance as opposed to private insurance, making them "reasonably interchangeable from the [provider]'s perspective." *Id.* at 597. In this case, the plaintiffs allege out-of-network services are not reasonably interchangeable with in-network services due to their substantially different rates. Other courts have distinguished *Little Rock Cardiology Clinic* on this basis as well, including a court in this circuit. *See, e.g.*, *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, No. 1:13 C 1054 SLD JEH, 2016 WL 5817176, at *9 (C.D. Ill. Sept. 30, 2016) (finding *Little Rock Cardiology Clinic* "easily distinguishable" as it "nowhere mentions allegations that government payers reimburse at substantially different rates than commercial payers" and "the Eighth Circuit explicitly treated the two sources of revenue as fungible"); *In re Blue Cross Blue*

*Shield Antitrust Litig.*, No. 2:13 C 20000 RDP, 2017 WL 2797267, at *9 & n.4 (N.D. Ala. June 28, 2017) (collecting cases).  The Court thus finds the plaintiffs have plausibly alleged a distinct market for out-of-network services.

To be clear, the Court is not finding that the defendants' critiques of the relevant market are baseless.  The defendants raise fair concerns regarding the scope and type of services covered by the plaintiffs' alleged nationwide market for out-of-network healthcare services.  But the bulk of these criticisms amount to factually disputing the plaintiffs' allegations, which are disputes the Court may not resolve at this stage of review.  *See also In re Delta Dental*, 484 F. Supp. 3d at 640 (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d. Cir. 2001) (Sotomayor, J.)) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market.").  For all of these reasons, the Court finds the plaintiffs have plausibly alleged a relevant market.

### 3.    Antitrust violations

The plaintiffs assert all of their federal antitrust claims under section 1 of the Sherman Act.  *See* 15 U.S.C. § 1. As discussed earlier, a section 1 claim requires the plaintiffs to plausibly allege "(1) that defendants had a contract, combination, or conspiracy ('an agreement'); (2) that as a result, trade in the relevant market was unreasonably restrained; and (3) that they were injured."  *See Omnicare*, 629 F.3d at 705.  Collectively, the plaintiffs plead five theories for how the defendants agreed to unreasonably restrain trade in violation of federal antitrust law.  Because these theories were all raised in the alternative, the Court only addresses the first two:  (1) a horizontal agreement between MultiPlan and third-party payors and (2) a hub-and-spokes

26

agreement involving third-party payors facilitated by separate agreements with MultiPlan.

### a. Horizontal agreement

The direct action plaintiffs allege that the third-party payors' contracts with MultiPlan amount to horizontal price-fixing agreements. To reiterate, price-fixing agreements among competitors are *per se* unlawful—they are "conclusively presumed" an unreasonable restraint of trade. *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 704 (7th Cir. 2021) (citation omitted). This conclusive presumption, however, only applies to "agreement[s] between competitors"—i.e., "horizontal" agreements. *Id.* at 705 (quoting *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988)). "[A]greements between firms at different levels of distribution," on the other hand, are "vertical" agreements. *Id.* at 705 (quoting *Bus. Elecs. Corp.*, 485 U.S. at 730). Vertical price agreements are not *per se* illegal. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 881 (2007).

The direct action plaintiffs contend that the agreements between MultiPlan and third-party payors to determine out-of-network service payment rates and negotiate those rates should be treated as horizontal agreements. In doing so, these plaintiffs argue that MultiPlan is also a third-party payor that competed with the other payors in the past for out-of-network services. They support this claim with factual allegations that MultiPlan competes and has admitted to competing with third-party payors regarding MultiPlan's "preferred provider organization" (PPO) network.

The issue with these arguments is that they are only substantiated by factual allegations regarding MultiPlan's *in-network* service payments, whereas the alleged

horizontal price-fixing agreement in this case concerns *out-of-network* service payments. The allegations suggest that MultiPlan has its own curated network of providers that it sells to other third-party payors so they can expand their own networks. Direct Action Compl. ¶¶ 104–111. There are no allegations, however, that MultiPlan purchases out-of-network services through its PPO network. Yet the agreements between MultiPlan and third-party payors at issue in this case solely involve MultiPlan's rate calculation and negotiation services pertaining to out-of-network service payments.

It is not enough for the direct action plaintiffs to allege that MultiPlan and third-party payors compete in *some* market. The plaintiffs must provide factual allegations supporting an agreement between competitors in the relevant market. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 3–5 (2006) (finding that two competitors in the "national and international oil and gasoline markets" did not enter a horizontal price-fixing agreement when they participated in a joint venture to sell gasoline in the western United States, as they "did not compete with one another in the relevant market"). By only alleging facts relating to MultiPlan's PPO network services to show competition with other third-party payors, the plaintiffs have not plausibly alleged MultiPlan competes with third-party payors in the market for out-of-network healthcare services. *See also Long Island Anesthesiologists PLLC v. United Healthcare Ins. Co. of N.Y.*, No. 22 C 4040 (HG), 2023 WL 8096909, at *6 (E.D.N.Y. Nov. 21, 2023) (finding that the plaintiffs' complaint "support[ed] a conclusion that" MultiPlan and third-party payor United were "not horizontal competitors").

Nor can the direct action plaintiffs remedy this insufficiency by arguing, in a footnote, that MultiPlan and third-party payors are "potential competitors." *See* Direct

Action Pls.' Opp'n to Mot. to Dismiss at 10 n.3.  There are no factual allegations that suggest MultiPlan was planning, is planning, or even will be planning to compete in the market for out-of-network services.  This argument is thus equally implausible, if not waived.  *See Harmon v. Gordon*, 712 F.3d 1044, 1054 (7th Cir. 2013) ("[A] party can waive an argument by presenting it only in an undeveloped footnote.").

### b.    Hub-and-spokes agreement

Both sets of plaintiffs allege that MultiPlan facilitated an agreement among third-party payors through the shared use of MultiPlan's rate calculation and negotiation services.  As discussed above, MultiPlan does not compete directly with third-party payors for out-of-network services.  Still, courts have recognized that a noncompetitor can facilitate an agreement among competitors, creating a horizontal agreement between those competitors.

"Where the plaintiffs allege that participants in a market at different levels of the distribution chain entered into a conspiracy, the plaintiffs must show that similarly situated members of the conspiracy coordinated not only with [the entity at the different distribution level], but also with each other."  *Marion Diagnostic Ctr.*, 29 F.4th at 345.  One way of doing so is to allege a "hub-and-spokes conspiracy," in which the competitors use "a central coordinating party (the 'hub')" to facilitate an agreement among the competitors (the "spokes").  *Id.*

To plead an agreement, the plaintiffs must allege "enough factual matter (taken as true) to suggest an agreement was made."  *Twombly*, 550 U.S. at 556.  Two types of evidence can be used to indicate an agreement:  direct and circumstantial.  Direct evidence is the "smoking gun in a price-fixing case," in which an alleged conspirator

essentially admits to the agreement. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002) (describing direct evidence as "tantamount to an acknowledgement of guilt").

The plaintiffs contend they have alleged direct evidence of an agreement through contracts between MultiPlan and the third-party payors. But these contracts are only evidence of vertical agreements. As such, they are not "smoking gun" evidence of a horizontal agreement among the third-party payors themselves.

Still, circumstantial evidence may also be used to plausibly allege an agreement. *In re Text Messaging*, 630 F.3d at 629. For circumstantial evidence to indicate an agreement, the plaintiffs must allege (1) "parallel conduct" by the defendants and (2) "context that raises a suggestion of a preceding agreement"—often called "plus factors." *Twombly*, 550 U.S. at 557; *In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1058–59 (N.D. Ill. 2022) (collecting cases).

### i. Parallel conduct

The plaintiffs allege that the defendants all switched from using traditional UCR benchmarks when calculating out-of-network service rates to MultiPlan's rate calculation and negotiation services. Class Action Compl. ¶¶ 246–249; Direct Action Compl. ¶¶ 288–209. This is enough to plausibly allege parallel conduct. *See In re RealPage Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 506–08 (M.D. Tenn. 2023) (finding the plaintiffs plausibly alleged parallel conduct when the defendant-property owners and managers switched from the traditional method of prioritizing occupancy when determining rental rates to using a third-party algorithm).

30

The defendants' arguments otherwise are unavailing. First, the defendants contend the third-party payors' use of MultiPlan's services cannot be considered parallel conduct because the plaintiffs do not allege third-party payors started using MultiPlan at the same time. But concurrent adoption of a price-fixing scheme is not required to prove parallel conduct. "It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators." *Interstate Cir., Inc. v. United States*, 306 U.S. 208, 228 (1939). Of course, changing price structures "all at once" can be a strong indicator that parallel conduct is in fact an agreement to fix prices. *See In re Text Messaging*, 630 F.3d at 628. But "all at once behavior" is not "necessary to allege parallel conduct in the first place." *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 791 (N.D. Ill. 2017) (cleaned up). The plaintiffs thus did not have to allege the third-party payors all contracted with MultiPlan at the same time for their use of MultiPlan's services to be considered parallel conduct.

Next, the defendants argue that the fact that MultiPlan's Data iSight algorithm is customizable means the plaintiffs have not plausibly alleged parallel conduct through its use, as the third-party payors may use the Data iSight algorithm in any number of ways. The plaintiffs, however, dispute how much third-party payors customize MultiPlan's algorithm in practice. Even one of MultiPlan's own white papers detailing how Data iSight is used, which was referenced in the direct action complaint and attached by the defendants to their motion to dismiss,[1] indicates that third-party payors utilize certain

---

[1] "[W]here . . . significant documents are referenced in the complaint and attached by the defendant to its motion to dismiss, those documents are considered to be incorporated into the pleadings and a court may consider them." *Black Bear Sports Grp. v. Amateur Hockey Ass'n of Ill., Inc.*, No. 18 C 8364, 2019 WL 2060934, at *3 (N.D. Ill. May 9, 2019) (Kennelly, J.) (collecting cases).

"customizable" overrides in similar ways.  *See* Direct Action Compl. ¶ 260; Huseny Decl. Regarding Mot. to Dismiss Direct Action Compl., Ex. C at 2, 4.  For example, the white paper notes that third-party payors "[t]ypically . . . apply an override to never pay more than 250% of Medicare" for inpatient claims and that "the typical . . . elected override is to never pay more than 400% of Medicare" for outpatient claims.  Huseny Decl. Regarding Mot. to Dismiss Direct Action Compl., Ex. C at 2, 4.  Further, the direct action plaintiffs provide a chart indicating some parallel pricing for out-of-network services as a result of MultiPlan's algorithm.  Direct Action Compl. ¶¶ 292–293.

But more to the point, the defendants do not have to use MultiPlan in identical ways for their use to be considered parallel conduct.  Price-fixing agreements need "not be aimed at complete elimination of price competition" for them to violate antitrust law. *Socony-Vacuum*, 310 U.S. at 224 n.59; *see also United States v. Beaver*, 515 F.3d 730, 739 (7th Cir. 2008) ("[T]he Sherman Antitrust Act does not outlaw only perfect conspiracies to restrain trade.").  If competitors agree to abide by a third-party algorithm that guarantees a below market price, it would not matter if every price the algorithm recommended differed for each competitor based on each of the competitor's preferred settings.  An agreement to fix prices within a below-market *range* through use of an algorithm is no different for antitrust purposes than an agreement to fix prices to a single point.  *See Socony-Vacuum*, 310 U.S. at 224 n.59 ("[P]rice-fixing includes more than the mere establishment of uniform prices . . . .").  Therefore, the plaintiffs did not have to allege third-party payors used MultiPlan's algorithm in exactly the same way for their use to be parallel conduct.

Lastly, the defendants emphasize that use of MultiPlan's calculated rate is

discretionary. Because third-party payors can deviate from MultiPlan-calculated rates, the defendants argue, use of MultiPlan's algorithm cannot be considered parallel conduct.

Yet third-party payors' theoretical ability to deviate from a MultiPlan-calculated rate does not mean payors actually reject MultiPlan's recommendations in practice. The plaintiffs allege that MultiPlan rates are often directly sent to providers, indicating third-party payors often adopt MultiPlan-calculated rates with little to no changes. Class Action Compl. ¶ 215; Direct Action Compl. ¶ 154. Moreover, an exemplar contract between MultiPlan and third-party payor Aetna, attached and incorporated into the class action complaint, reflects that a third-party payor has a contractual obligation "not to reduce" any MultiPlan-calculated rate that MultiPlan negotiates on behalf of the third-party payor. Class Action Compl. ¶ 214; *id.* Ex. A at 3. Whether or not MultiPlan's calculated rates are labelled as "recommendations," the plaintiffs plausibly allege that they are more akin to mandates. *Cf. Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.*, 394 U.S. 700, 703 (1969) (per curiam) (noting that a "self-serving disclaimer" that a defendant only "suggested standards of fair and reasonable regulations which [its clients] would be advised to adopt" did not "conclusively rebut" the claimed price-fixing agreement).

The Court concludes that the plaintiffs have plausibly alleged parallel conduct among the third-party-payor defendants through use of MultiPlan's rate calculation and negotiation services.

ii.    **Plus factors**

As discussed above, allegations of parallel conduct alone are insufficient to plead

an antitrust violation.  This is because "section 1 of the Sherman Act . . . does not require [competitors] to compete; it just forbids their agreeing or conspiring not to compete."  *In re Text Messaging*, 630 F.3d at 627.  "[A] complaint that merely alleges parallel behavior alleges facts that are equally consistent with an inference that the defendants are conspiring and an inference that the conditions of their market have enabled them to avoid competing without having to agree not to compete."  *Id.*  "Absent additional 'factual enhancement' or a 'circumstance pointing toward a meeting of the minds,' an allegation of parallel conduct 'stops short of the line between possibility and plausibility.'"  *In re Broiler Chicken*, 290 F. Supp. 3d at 790 (quoting *Twombly*, 550 U.S. at 557).  When considering factual allegations that indicate an agreement, a court views the circumstances as a whole to determine if a plaintiff has plausibly alleged an agreement.  *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698–99 (1962) (cleaned up) ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.").

The plaintiffs first contend that the third-party payors' use of MultiPlan's services are acts against their self-interest.  Actions that would not be in the self-interest of competitors absent an agreement indicate an agreement, as it is irrational for a competitor to work against its own interests without assurances that others will do the same.  *See In re Deere & Co. Repair Serv. Antitrust Litig.*, 703 F. Supp. 3d 862, 908 (N.D. Ill. 2023); *see also Twombly*, 550 U.S. at 557 n.4 (noting that "parallel behavior that would probably not result from . . . mere interdependence unaided by an advance understanding among the parties" indicates an agreement).  The plaintiffs cite three acts that were allegedly against the third-party payors' self-interest:  (1) paying below-market

compensation rates to providers, (2) sharing competitively sensitive information with competitors through MultiPlan, and (3) paying for MultiPlan's services despite cheaper pricing tools existing. Class Action Compl. ¶¶ 241–245; Direct Action Compl. ¶¶ 421–438.

The Court begins with the third argument—paying for MultiPlan's services is against self-interest due to the existence of cheaper options—as it is both the least argued and least convincing. The plaintiffs do not allege facts that indicate it would be more advantageous for third-party payors to calculate rates themselves or use other methods rather than outsource that aspect of their business to a specialist like MultiPlan. It is true that third-party payors could utilize pre-existing UCR benchmarks like FAIR Health. But there are no allegations that FAIR Health offers the same quality of rate calculation service as MultiPlan. Nor do the plaintiffs allege that FAIR Health has a negotiation service similar to MultiPlan. And although it is peculiar that United was allegedly developing an in-house calculation method before deciding to scrap it in favor of MultiPlan's services, there is no indication that United's prototype was as effective as MultiPlan or that other third-party payors have the resources to develop an in-house rate calculator as sophisticated as MultiPlan's Data iSight algorithm. The possibility that third-party payors could use a different rate calculation service, therefore, does not make third-party payors' use of MultiPlan's services against their self-interest.

The plaintiffs' other two arguments have greater merit. First, the plaintiffs plausibly allege that using MultiPlan without an agreement among third-party payors would not be in their self-interest due to the risk of subscriber loss. As discussed above, third-party payors risk losing subscribers when paying healthcare providers rates

that are below the rates their competitors pay, as providers will stop providing their services to patients who use third-party payors known for underpayments. Class Action Compl. ¶ 242; Direct Action Compl. ¶ 422. The plaintiffs' allegations indicate that MultiPlan's calculated rates are well below the UCR benchmark rates third-party payors used in the past. *See* Class Action Compl. ¶¶ 20–21; Direct Action Compl. ¶¶ 8, 13, 211, 336. Taking these factual allegations as true, the risk of losing subscribers would have made any individual third-party payor's utilization of MultiPlan's rate calculation services against its self-interest absent an agreement that others would do the same.

The defendants protest that the plaintiffs have provided little evidence of subscriber loss occurring despite third-party payors like Cigna using MultiPlan before others decided to do so. Yet at this stage of review, the plaintiffs need not provide evidence that subscriber loss actually occurred. It is plausible that third-party payors would be concerned about subscriber loss absent an agreement that all of them use MultiPlan. The fear of losing subscribers due to a loss in provider-coverage is so prevalent in the healthcare industry that the industry has coined a term for it— "abrasion." Class Action Compl. ¶ 78.

Further, it is not as though early MultiPlan adopters like Cigna were left out in the cold for too long. Although Cigna joined in early 2015, other third-party payors— including large commercial payors such as Blue Cross Blue Shield Association members and United—allegedly had contracts with MultiPlan by around 2016, and hundreds more joined them by 2018. Class Action Compl. ¶ 112–118; *see also* Direct Action Compl. ¶ 289. Perhaps in a different market this gap in adoption would be conclusive. But in the market for out-of-network services, a provider would have to first

receive unduly low payment rates for out-of-network services before deciding to stop accepting patients who utilize those commercial third-party payors. *See* Direct Action Compl. ¶ 591 (detailing a provider's alleged decision to stop accepting a third-party payor's low rates only after already treating two patients using that third-party payor). The subscriber loss that third-party payors face by paying noncompetitive rates, then, is somewhat delayed; healthcare providers have to realize a particular third-party payor consistently underpays for services before they start rejecting the payor's patients, and these patients will not feel an incentive to switch to alternative third-party payors until the lack of coverage becomes apparent. It is thus plausible that by the time Cigna was set to face significant abrasion, many third-party payors in the industry had already switched over to MultiPlan, making rejecting patients with third-party payors who use MultiPlan no longer an option. The Court concludes that the plaintiffs have plausibly alleged that the risk of subscriber loss due to MultiPlan's allegedly noncompetitive calculations indicates use of MultiPlan would be against the self-interest of each individual third-party payor absent an agreement.

Second, the plaintiffs allege that third-party payors act against their self-interest by transferring competitively sensitive pricing information to MultiPlan, which relays this information to other competitors, despite the fact that this price information can be used to undercut the payors' own prices. "It is well-settled that the exchange of price information among competitors is indicative of anticompetitive agreement." *In re Broiler Chicken Antitrust Litig.*, No. 16 8637, 2025 WL 461407, at *4 (N.D. Ill. Feb. 11, 2025); *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 457 (1978) ("[T]he exchange of price information among competitors carries with it the added potential for the development of

concerted price-fixing arrangements which lie at the core of the Sherman Act's prohibitions.").  The plaintiffs allege that MultiPlan facilitates the exchange of competitively sensitive pricing information in two ways:  (1) through the Data iSight algorithm itself by "pooling" third-party payors' data and (2) through MultiPlan's discussions with other third-party payors.

The Court is not persuaded at this point that the plaintiffs have plausibly alleged that MultiPlan's Data iSight algorithm compiles competitively sensitive data for use in its rate calculations.  To support this contention, the plaintiffs rely on white papers produced by MultiPlan that detail how Data iSight calculates rates.  Class Action Compl. ¶ 165; Direct Action Compl. ¶ 322–326.  Yet these white papers, which defendants attached to their motions to dismiss, state that the Data iSight algorithm utilizes only "publicly-available" data.  Huseny Decl. Regarding Mot. to Dismiss Class Action Compl., Ex. C at 5; Huseny Decl. Regarding Mot. to Dismiss Direct Action Compl., Ex. C at 2. The lack of an indication that Data iSight compiles *competitively sensitive* pricing data is critical.  It is natural—if not expected—that to compete better, competitors will monitor the publicly-available pricing practices of others.  *See U.S. Gypsum Co.*, 438 U.S. at 441 n.16 (noting "[t]he exchange of price data . . . among competitors does not invariably have anticompetitive effects" as it can "increase economic efficiency and render markets more . . . competitive."); *see also In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 875 (7th Cir. 2015) ("Competitors in concentrated markets watch each other like hawks.").

It is possible, of course, that these cited white papers are not completely transparent regarding what information MultiPlan's algorithm compiles.  But factual

allegations must be plausible, not just possible.  At this point, the plaintiffs have not alleged sufficient facts to "nudge[] their claim[]" that MultiPlan's Data iSight algorithm compiles competitively sensitive data "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 547.

But the crux of the plaintiffs' information-sharing allegations goes beyond MultiPlan's algorithm.  As the class action plaintiffs put it, MultiPlan is alleged not just to have "hid[den] behind its algorithm," but also to have "played an active role as a go-between" for third-party-payors.  Class Action Pls.' Opp'n to Mot. to Dismiss at 29.

A prominent example, highlighted in both complaints, was communication between MultiPlan and UnitedHealth, in which MultiPlan divulged enough pricing information to United that it could glean how its competitors were calculating their out-of-network rates.  Class Action Compl. ¶¶ 200–208; Direct Action Compl. ¶¶ 254–257; *cf. In re Text Messaging*, 630 F.3d at 628 (noting that meetings where "price information" was "exchanged" "facilitates price fixing").  The plaintiffs further allege that MultiPlan promotes the amount of information it gets from third-party payors by claiming that it can "align" payor rates for out-of-network services.  In support of this, the plaintiffs cite an email from a MultiPlan executive to United in which MultiPlan promoted its ability to "bring United[] back into alignment with its primary competitor group . . . on managing out-of-network costs."  Class Action Compl. ¶¶ 190–193; Direct Action Compl. ¶¶ 219. And as discussed above, the white papers that MultiPlan produces—which are allegedly distributed to competitors—detail what overrides competitors "typically" apply, further communicating competitively sensitive pricing information to each third-party payor. Class Action Compl. ¶ 263; Direct Action Compl. ¶ 260; Huseny Decl. Regarding Mot. to

Dismiss Direct Action Compl., Ex. C at 2, 4. These allegations indicate that third-party payors know and effectuate MultiPlan's communication of competitively sensitive pricing information from one third-party payor to another despite a third-party payor's self-interest in keeping potentially detrimental price information private

Finally, the plaintiffs allege several other market-related circumstances that facilitate an agreement among third-party payors, including: (a) high barriers of entry, (b) high exit barriers, (c) high market concentration, and (d) past collusive conduct, as illustrated by the Ingenix settlements. Class Action Compl. ¶¶ 250–263; Direct Action Compl. ¶¶ 381–480. The defendants are correct that general allegations concerning the structure of a market are insufficient alone to plausibly allege a price-fixing agreement. *See Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 466 (2d Cir. 2019) (noting allegations that "the general structure of the poultry market made it 'susceptible to price-fixing'" were insufficient by themselves to support an agreement). But market circumstances that make an agreement possible are relevant when considering whether the plaintiffs otherwise plausibly allege an agreement. *See In re Text Messaging*, 630 F.3d at 627–28 ("[I]ndustry structure that facilitates collusion constitutes supporting evidence of collusion."); *see, e.g.*, *In re Turkey Antitrust Litig.*, 642 F. Supp. 3d 711, 727 (N.D. Ill 2022) (noting high market concentration and high barriers of entry "support[] claims of a conspiracy to fix prices"); *In re Broiler Chicken*, 290 F. Supp. 3d at 803 (noting "opportunities to collude" support the "existence of a conspiratorial agreement").

When considering the plaintiffs' allegations as a whole, a plausible allegation of an agreement to fix prices comes into view. Third-party payors, many exiting settlement-mandated contracts with FAIR Health's UCR benchmark, each switched to

contracting with MultiPlan for its rate calculation and negotiation services. In doing so, they agreed not only to give MultiPlan competitively sensitive pricing information but also to abide by MultiPlan's rate calculations in order to utilize its negotiation service. MultiPlan thus gained reams of private pricing information about each third-party payor with which it has a contract, including the competitively sensitive information of how a specific third-party payor calculates offered rates for out-of-network services. MultiPlan then communicated this information to other third-party payors through meetings and by circulating white papers that indicated the "typical" calculation settings third-party payors used. Using this information, third-party payors utilizing MultiPlan calculated their rates in a similar way, knowing others agreed to do the same, "aligning" their prices with one another while collectively avoiding risk of subscriber loss.

On this point, the Court finds illustrative the Supreme Court's decision in *United States v. Masonite Corp.*, 316 U.S. 265 (1942). In *Masonite*, the hardboard manufacturer Masonite executed several identical "agency" agreements with hardboard distributors from 1933 to 1941, in which Masonite would decide "minimum prices" for hardboard sales. *Id.* at 268–73, 282–83. Although each agreement was negotiated separately between Masonite and a distributor, each distributor was aware of who else had signed an agency agreement. *Id.* at 270. The Supreme Court found that the distributors had entered into a horizontal agreement to fix prices facilitated by their separate vertical agreements with Masonite. *Id.* at 274–75. The Court recognized that each distributor "negotiated only with Masonite," "did not require as a condition of its acceptance that Masonite make such an agreement with any others, and had no discussion with any of the others." *Id.* Nor was it important that the Court could not

41

pinpoint "at what precise point of time each [distributor] became aware of the fact that its contract was not an isolated transaction but part of a larger arrangement." *Id.* at 275. What mattered was that "as the arrangement continued," each distributor "became familiar with its purpose and scope." *Id.* The distributors had agreed to fix prices through their "express delegation" to Masonite, which was "just as illegal as the fixing of prices by direct, joint action." *Id.* at 276.

The plaintiffs plausibly allege a horizontal hub-and-spokes agreement similar to the one in *Masonite*.[2] Although the defendants scoff at the idea that there can be a plausible allegation of an agreement among MultiPlan's 700+ third-party-payor clients, MultiPlan has allegedly made each of the third-party payors aware of a broader horizontal agreement through its statements that it can "align" a third-party payor's rates with other MultiPlan clients by using disclosed competitively sensitive information. Each third-party payor that contracts with MultiPlan thus knows that MultiPlan is capable of aligning rates without the risk of subscriber loss *because* other third-party payors have

---

[2] The Court is aware of the First Circuit's conclusion that *Masonite* only concerned "the individual vertical contracts between Masonite and each competitor" and made "no holding on horizontal conspiracy." *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 57 (1st Cir. 2016). According to the First Circuit, *Masonite* cannot be read as finding "an overarching horizontal conspiracy," as it was missing the "essential conspiracy element" of "a motive for joint action or interdependence." *Id.* (citation omitted). The Court respectfully disagrees with this interpretation. In concluding that the defendants violated section 1 of the Sherman Act, the Supreme Court emphasized that the distributors became aware that they were not just engaged in "isolated transaction[s]," but were "a part of a larger arrangement." *Masonite Corp.*, 316 U.S. at 275. The Supreme Court would have no reason to highlight this larger arrangement if it was not identifying a horizontal agreement. *See also Sun Oil Co. v. FTC*, 350 F.2d 624, 633–34 (7th Cir. 1965) (interpreting the Supreme Court as "striking down [a] horizontal conspiracy" in *Masonite*). To the extent that *Nexium* is correct that *Masonite*'s analysis is faulty due to the lack of a motive for joint action, the Court reiterates that there is a motive for third-party payors to jointly act in this case—to avoid risk of subscriber loss caused by lowering their out-of-network payment rates to noncompetitive levels.

agreed to disclose pricing information and delegate rate calculations to MultiPlan's algorithm as well. The plaintiffs have thus plausibly alleged that third-party payors who utilize MultiPlan's rate calculation and negotiation services are familiar with the scope of the alleged price-fixing scheme and have therefore collectively agreed to fix prices for out-of-network service payments.

The defendants offer an alternative explanation. They contend that using MultiPlan is in their self-interest, as doing so leads to lower costs on their end. Using MultiPlan to reduce prices, according to the defendants, was thus an independently rational decision that undermines allegations of conspiracy.

Although an "obvious alternative explanation" can indicate that an alleged agreement is not plausible, *Twombly*, 550 U.S. at 567, it cannot override a plausibly alleged agreement. *See in re Broiler Chicken*, 290 F. Supp. 3d at 788 (noting "it is improper at [the motion to dismiss stage] to weigh alternatives and which is more plausible"). As discussed above, the Court has found that the plaintiffs have plausibly alleged that using MultiPlan was not obvious due to the risk of subscriber loss and the need to disclose competitively sensitive pricing information to a third-party that discloses that information with other competitors. The defendants' alternative explanation does not, at this stage of the case, undermine the Court's conclusion that the plaintiffs have alleged a plausible horizontal agreement to fix prices for out-of-network service payments through the use of MultiPlan's rate calculation and negotiation services.

*       *       *

As discussed above, horizontal price-fixing agreements are *per se* illegal. In finding that the plaintiffs have plausibly alleged a horizontal hub-and-spokes price-fixing

43

agreement, the Court has thereby found that the plaintiffs' have plausibly alleged an agreement to fix prices for out-of-network healthcare services in violation of federal antitrust law. The Court therefore denies the defendants' motion to dismiss the plaintiffs' federal antitrust claims.

## B.    State antitrust claims

The direct action plaintiffs also claim the defendants' actions violate the antitrust laws of several states. The defendants' only response is that these state violations are based on the plaintiffs' federal antitrust claims and therefore "fail for the same reasons their federal claims fail." Mem. in Supp. of Defs' Mot. to Direct Action Compl. at 36. Because the Court has found a plausibly alleged federal antitrust violation, the Court also finds the direct action plaintiffs have plausibly alleged state antitrust violations. The Court therefore denies the defendants' motion to dismiss the direct action plaintiffs' state antitrust claims.

## C.    Consumer protection claims

Next, the direct action plaintiffs allege the defendants' actions violate the state consumer protection laws of Arizona, California, Colorado, Connecticut, Minnesota, New Mexico, North Carolina, South Carolina, and Tennessee. The defendants first contend that all of the plaintiffs' state consumer protection claims should be dismissed, arguing these claims are just repackaged antitrust claims. In support of this, the defendants cite cases from this district that have dismissed state consumer protection law claims when the plaintiffs "pleaded antitrust claims" and "merely alleged those claims are also actionable under state consumer protection laws." *See In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 726 (N.D. Ill. 2016).

The Court does not agree with this characterization of the direct action plaintiffs' complaint. Although their complaint focuses primarily on the antitrust claims, the direct action plaintiffs do allege harm to patients—the consumers—and explain how the defendants' actions rise to violations of these consumer protection laws. *See* Direct Action Compl. ¶¶ 588–628, 817–837. Specifically, these plaintiffs allege that the defendants' "scheme to suppress and pay sub-market" rates for out-of-network services harms consumers by: "(1) expos[ing] consumers to potential liability for the difference between the suppressed rates [the defendants] pay and the UCR rates and (2) results in eventual denial of services by and/or closure of certain providers (particularly in rural areas), thereby suppressing consumer choice of out-of-network goods and services." *Id*. ¶ 821.

The defendants contend that the plaintiffs have not plausibly alleged these harms because they are contradicted by other factual allegations in the complaint, which indicate providers cannot charge or deny services to patients due to the defendants wide-spread agreement to fix out-of-network healthcare service prices. Yet the Federal Rules of Civil Procedure allow a plaintiff to plead in the alternative and raise "as many separate claims or defenses as it has, *regardless of consistency*." Fed R. Civ. P. 8(d)(3) (emphasis added). And the plaintiffs make clear in their complaint that these state consumer protection claims are "pleaded in the alternative to the other claims." Direct Action Compl. ¶ 818.

Of course, a plaintiff's ability to plead in the alternative "does not license disregard of the requisite pleading standards." *Weddle v. Smith & Nephew, Inc.*, No. 14 C 9549, 2016 WL 1407634, at *4 (N.D. Ill. Apr. 11, 2016). Every claim, even if pleaded

in the alternative, must be plausibly alleged to survive a motion to dismiss. *Id.* (collecting cases). But the plaintiffs do plausibly allege specific facts that indicate a harm to consumers. They allege that at least one healthcare provider has stated it will no longer provide services to patients who utilize third-party payors that use MultiPlan due to past underpayments by those third-party payors. Direct Action Compl. ¶ 591. They also allege that several healthcare providers have closed or are on the brink of closure due to third-party payors' underpayments for out-of-network services and that two healthcare providers have expressly blamed MultiPlan for their closures—all of which leads to patients having less access to healthcare. *Id.* ¶¶ 590–596. Whether or not these allegations contradict others in the complaint, they provide an alternative plausible basis for the direct action plaintiffs' consumer protection claims.

Lastly, the defendants contend that the plaintiffs have not alleged the facts required to satisfy specific elements in Arizona's, California's, Minnesota's, and Colorado's consumer protection laws. These arguments are made in a conclusory manner and lack cited supporting authority, so they are likely waived or forfeited. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived . . . ."). Still, the Court briefly considers the issues raised.

First, the defendants argue that there are no alleged facts of a "deceptive misrepresentation as required under Arizona, California, and Minnesota law." Mem. in Supp. of Defs.' Mot. to Dismiss Direct Action Compl. at 38. Yet the direct action plaintiffs do allege that the defendants "routinely and falsely represent that they allegedly provide reasonable, competitive, and negotiated rates to out-of-network

providers." Direct Action Compl. ¶ 696. They support this allegation with quotes from United, Aetna, and Cigna in which they claimed to provide a "competitive" or "market-based rate" while using MultiPlan. *Id.* But as discussed above, the plaintiffs have plausibly alleged that third-party payors using MultiPlan were achieving agreed-upon, noncompetitive rates. These statements thus plausibly support the direct action plaintiffs' allegation that third-party payors made deceptive misrepresentations, to the extent that is required by Arizona, California, and Minnesota consumer protection law.

Second, the defendants contend that the direct action plaintiffs fail to allege "reliance on any alleged statement as required by Arizona and Minnesota law." Mem. in Supp. of Defs.' Mot. to Dismiss Direct Action Compl. at 38. As an initial note, it does not appear that Minnesota consumer protection law requires allegations of reliance: "[a]llegations of reliance are not necessary to state a claim because the [Minnesota] legislature had eliminated the requirement of pleading and providing traditional common law reliance as an element." *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Litig.*, 753 F. Supp. 3d 849, 919 (N.D. Cal. 2024) (quoting *Wiegand v. Walser Auto. Grps.*, 683 N.W.2d 807, 811 (Minn. 2004)) (cleaned up). It is undisputed, however. that Arizona consumer protection law requires allegations of reliance to state a claim. *See also id.* (citing *Schellenbach v. GoDaddy.com, LLC*, 321 F.R.D. 613, 624 (D. Ariz. 2017).

Either way, the direct action plaintiffs do allege reliance. These plaintiffs allege that they initially accepted out-of-network prices calculated by MultiPlan because they were "under the misimpression . . . that the rates MultiPlan [was] communicating to them [were] market based and determined independently by each payor" and they did

"not have the data, resources, or time to understand" how the rates were calculated. Direct Action Compl. ¶ 700.  This is a plausible allegation of reliance on the defendants' allegedly false statements that they provided competitive, market-based out-of-network service price calculations.

Finally, the defendants argue that the plaintiffs do not allege "any category of conduct cognizable under Colorado law."  Mem. in Supp. of Defs.' Mot. to Dismiss Direct Action Compl. at 38.  Yet the alleged misrepresentations discussed above squarely implicate at least one "deceptive trade practice" as defined by Colorado's consumer protection law:  "[m]ak[ing] false or misleading statements concerning the price of goods [or] services . . . or the reasons for, existence of, or amounts of price reductions."  *See* Color. Rev. Stat. § 6-1-105(1)(*l*).  By allegedly misrepresenting the competitive nature of MultiPlan's out-of-network service price calculations, the defendants are alleged to have made "false or misleading statements" concerning both the price of services and "the reasons for" "price reductions."  The direct action plaintiffs thus have plausibly alleged a deceptive trade practice under Colorado consumer protection law.

Because no other consumer protection law claims are in dispute, the Court finds the direct action plaintiffs have plausibly alleged their state consumer protection claims and denies the defendants' motion to dismiss these claims.

### D.    Unjust enrichment

Finally, the direct action plaintiffs claim unjust enrichment.  Despite bringing this claim under the laws of thirty-one states and the District of Columbia, the plaintiffs devote only ten paragraphs in their complaint to describing these claims.  *See* Direct

Action Compl. ¶¶ 838–847.  In doing so, the plaintiffs merely "*list[]* claims under various state laws" as opposed to "truly *plead[ing]* claims under those laws sufficient to show their entitlement to recovery under them."  *In re Opana ER*, 162 F. Supp. 3d at 726; *see also Iqbal*, 556 U.S. at 678 ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.") (cleaned up).

The direct action plaintiffs contend that their pleading was sufficient, as unjust enrichment has "materially the same" elements "throughout the states."  Direct Action Pls.' Opp'n to Mot. to Dismiss at 38.  Yet "[u]njust enrichment is not a catch-all claim existing within the narrow scope of federal common law."  *In re Wellbutrin XL*, 260 F.R.D. at 167 (citing *Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc.*, 164 F.3d 123, 129–30 (2d Cir. 1999)).  As the defendants point out, "variances exist in state common laws of unjust enrichment," including whether misconduct must "include dishonesty or fraud" or whether "no adequate legal remedy" must exist.  *See Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 501 (S.D. Ill. 1999) (collecting cases).  These differences have caused courts to repeatedly reject the assertion that "unjust enrichment laws are essentially the same across the 50 states."  *See Vulcan Golf, LLC v. Google Inc.*, 254 F.R.D. 521, 532–33 (N.D. Ill. 2008) (collecting cases finding class certification unwarranted for unjust enrichment claims due to state law variances).

By failing to differentiate between the unjust enrichment laws of the states the direct action plaintiffs bring these claims under, the plaintiffs have not plausibly alleged an unjust enrichment claim under any state law.  The Court therefore grants the defendants' motion to dismiss the direct action plaintiffs' unjust enrichment claims.

E.    **Group pleading**

Finally, the Court addresses the defendants' argument that the direct action plaintiffs have failed to adequately plead facts specifically connecting three TPAs— Benefit Plans Administrators, Consociate Health, and Secure Health—to their claims. Under Rule 8 of the Federal Rules of Civil Procedure, a plaintiff need only provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).  "There is no 'group pleading' doctrine, *per se*, that either permits or forbids allegations against defendants collectively."  *Sloan v. Anker Innovations Ltd.*, 711 F. Supp. 3d 946, 955 (N.D. Ill. 2024) (quoting *Robles v. City of Chicago*, 354 F. Supp. 3d 873, 875 (N.D. Ill. 2019)) (cleaned up).  Rule 8 only requires that a complaint provide "sufficient detail to put defendants on notice of the claims." *Id.* (citation omitted); *see also Bank of Am. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) ("Each defendant is entitled to know what he or she did that is asserted to be wrongful.").

The direct action plaintiffs have alleged enough facts to put these TPA defendants on notice of the direct action plaintiffs' antitrust claims.  These plaintiffs allege that Benefit Plans Administrators, Consociate Health, and Secure Health all contracted with MultiPlan to use its Data iSight algorithm.  Direct Action Compl. ¶¶ 186, 189, 197.  The defendants do not deny that these agreements exist.  And as discussed above, it is these agreements to use MultiPlan's pricing services that implicate the TPAs as co-conspirators in a horizontal hub-and-spokes agreement to fix prices.  The TPAs thus know what actions they took that are "asserted to be wrongful," as required by Rule 8.  *Knight*, 725 F.3d at 818.  No more specificity is required at this stage of review. *Carbone*, 621 F. Supp. 3d at 887 ("The plaintiffs are not required to cite evidence

50

specific to each defendant in their complaint.").

## Conclusion

For the reasons stated above, the Court grants the defendants' motions to dismiss in part and denies them in part [dkt. nos. 282, 285]. The Court denies the defendants' motions to dismiss the class action and direct action plaintiffs' federal and state antitrust claims and the direct action plaintiffs' state consumer protection claims. The Court dismisses the direct action plaintiffs' unjust enrichment claims. Counsel are directed to meet and confer regarding a discovery and pretrial schedule and are to file a joint status report with an agreed proposed schedule, or alternative proposals if they cannot agree, by June 10, 2025. A video case management conference on June 17, 2025 at 10:00 a.m. Judge Kennelly's courtroom deputy clerk will send out a video invitation in advance of the conference.

Date: June 3, 2025

_____

MATTHEW F. KENNELLY
United States District Judge

51