UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: MULTIPLAN HEALTH INSURANCE PROVIDER LITIGATION | Case No. 1:24-cv-06795 MDL No. 3121 |
| This Document Relates To: | Hon. Matthew F. Kennelly |
| ALL ACTIONS | |

## JOINT STATUS REPORT

The parties submit the following joint status report pursuant to the Court's Case Management Order No. 15, dated June 3, 2025 (ECF No. 428).

The parties have exchanged positions and met and conferred in good faith several times prior to and after the May 2, 2025 oral argument on Defendants' motions to dismiss, most recently on May 28, 2025 and June 6, 2025, regarding a discovery and pretrial schedule for this action. While the parties reached agreement on a number of deadlines, they were unable to resolve several disputes, which are addressed below as follows:

    A.  Overall Length of Fact Discovery and Schedule in General

    B.  Whether to Set A Trial Date Now

    C.  DAPs' Deadlines for Briefing Whether to Have Tracks/Bellwethers for Discovery and Trial

    D.  Deadlines Relating to the Production of Structured Data

    E.  Other Interim Fact Discovery Deadlines

    F.  Deadlines for Submission of Expert Reports

    G.  Sequencing/Briefing for Class Certification, Summary Judgment, and *Daubert*

    H.  Proposed Limits on Written Discovery

    I.  Timing of Privilege Logs

Accompanying this report as **Exhibit A** is a chart comparing the parties' proposed scheduling positions. For ease of reference, the event numbers herein correspond to those included in this chart. For the Court's convenience, the parties also submit herewith their individual scheduling proposals standing alone: Defendants' proposal (**Exhibit B**), the Class proposal (**Exhibit C**), and the DAP proposal (**Exhibit D**).

## I.     Summaries of the Parties' Positions Regarding the Case Schedule

<u>**Class Summary:**</u> The Class Plaintiffs have proposed a case schedule that largely tracks the one entered by this Court in *Henry v. Brown University et al.*, No. 22-cv-00125 (N.D. Ill. Sep. 8, 2022), ECF No. 195, another cartel case involving a proposed class and multiple defendants.

Under the Class Plaintiffs' proposal, the parties would engage in roughly 14 months of fact discovery, with the close of fact discovery set for August 17, 2026. During this time, all structured data would be produced within 4 months of the upcoming status conference (by October 16, 2025) and most documents would be produced within 6 months (by December 12, 2025). These proposed interim data and document production deadlines are necessary to the rest of the schedule. They will ensure the parties have sufficient time to review the productions, analyze the data, take depositions, and submit a single round of expert reports encompassing both class and merits issues (which, under the Class's proposal, are due October 1, 2026), thus avoiding the need to later extend the schedule to the maximum extent possible.

These interim fact discovery deadlines are also fair and reasonable in light of the parties' discovery efforts to date and compared to schedules in other antitrust cases like *Henry v. Brown*. Because the Court allowed the parties here to engage in limited discovery pending resolution of the motions to dismiss (something which did not happen in *Henry v. Brown*), Defendants have been on notice about the general nature of Plaintiffs' structured data and document requests since

at least January 2025, when the first sets of RFPs were served, and Plaintiffs also provided Defendants with a draft of their full set of RFPs as a courtesy. Defendants have thus had months to investigate data sources and prepare for production. They have no excuse for delaying the case schedule on the basis that discovery is just now starting.

Under the Class Plaintiffs' proposal, 14 months of fact discovery would be followed by 5 months of expert discovery, encompassing both class and merits issues, which would close February 26, 2027. Thereafter, the parties would brief all *Daubert* motions (regardless of whether they concern class or merits issues) at the same time as the motion for class certification, which would be due April 12, 2027. Briefing on these motions would conclude with the Class submitting its class certification reply on July 26, 2027, 14 days after the deadline for *Daubert* replies (July 12, 2027).

Under the Class proposal, any motions for summary judgment would be due on August 25, 2027 (which is 30 days following the submission of class certification replies) with briefing on summary judgment motions to conclude October 25, 2027. The Class Plaintiffs propose briefing motions for summary judgement after briefing on class certification and *Daubert* motions has concluded to avoid logistical difficulties, as well as potential one-way intervention concerns.

The Class Plaintiffs believe there are substantial reasons that the Class trial should be the first trial in this multidistrict litigation. The Class Plaintiffs request a firm trial date in late 2027 or one of the Court's choosing. The Class Plaintiffs also believe that DAPs' proposed deadline as to tracks/bellwethers it not necessary or appropriate; DAPs can simply file their motions regarding such proposals in the ordinary course. Nor is there any need for a bellwether process here, as this is an antitrust MDL in which the Class case will functionally serve as the bellwether.

The Class Plaintiffs' scheduling and trial proposals are the most efficient path forward. The Class's proposed schedule is not "protracted" as DAPs claim. Under the Class Plaintiffs' plan, the time to trial would be just 30 months (as compared to 27 months under DAPs plan), an accelerated but realistic timeline for a complex antitrust action like this one, and only a few months longer than DAPs' proposal. Nor would the Class Plaintiffs' scheduling proposal cause the DAP cases to "grind to a halt." Under the Class proposal, the DAPs would proceed with *Daubert* briefing at the same time that class certification is being briefed, thus resulting in no idle time for DAPs. The only DAP cases that would "grind to a halt" would be those that the DAPs elect not to proceed in discovery under their tracks/bellwether proposal if approved by the Court.

The Class Plaintiffs respectfully request that the Court order the entry of their proposed scheduling order (Exhibit C).

**DAPs' Summary:** The case schedules proposed by Defendants and Class Plaintiffs are both needlessly protracted. The Court has held that Plaintiffs plausibly allege a *per se* antitrust violation. Mot. to Dismiss, ECF No. 428 at 43-44. The very purpose of the *per se* rule is to streamline the fact and expert discovery relevant to proving or disproving the alleged violation. Any schedule in this case should reflect this streamlining by featuring an efficient and orderly discovery process.

Accordingly, under DAPs' proposal, the parties would engage in roughly 13 months of fact discovery, with fact discovery closing on July 3, 2026. During this 13-month period, DAPs propose interim deadlines to ensure the case stays on schedule and avoid the need to seek extensions. DAPs propose that: (1) defendants produce materials previously produced in relevant government investigations and related litigation by August 4, 2025, (2) structured data be produced

by October 16, 2025, (3) documents from 5 priority custodians be produced by November 11, 2025, and (4) all document productions be complete by December 1, 2025.

These interim deadlines are important to avoid the compounding delays that often beset MDLs. For example, the documents produced in previous investigations or litigations will be critical in helping determine appropriate search terms and custodians for the custodial discovery. Those documents can be produced by August 4, 2025 because they have already been collected, reviewed for privilege, stored on a document review platform, and actually produced to one or more government agencies. The parties can then make use of those materials in the search term and custodian negotiations that, under all parties' proposals, are set to begin at the end of August.

DAPs also propose front-loading the production of the structured claims data, which is necessary to generate the econometric analyses necessary to class certification and merits expert testimony. Because it will take time for experts to "clean" the data (i.e., put the data into a unified database that can be queried for purposes of econometric modeling), the parties should start working now to produce this data as expediently as possible. And producing documents from priority custodians on an expedited basis will ensure the parties are prepared to begin taking key depositions as early in the fact discovery period as possible.

Judicial economy will be also served by the use of a tracking/bellwether process. With over two-hundred DAPs (and more likely to join the suit), it is a far better use of the Court's and parties' resources to identify select pools of DAPs for full discovery, pre-trial motions, and trial. DAPs propose a July 3, 2025 deadline for the parties to submit a joint proposal or briefing on the use of a tracking/bellwether process, so that this issue may be efficiently resolved comparatively early in the litigation process.

Similarly, the DAPs' cases should not be delayed by any class certification process. After fact discovery, the DAP cases should not grind to a halt—let alone for a period of more than six months—while the Class Plaintiffs and Defendants engage in class certification briefing. The issues between class certification and the merits often overlap, such that the parties can efficiently address class and summary judgment motions at the same time. Alternatively, if the Court would prefer to have Class Plaintiffs brief class certification separately from summary judgment, the DAPs propose having the DAPs brief summary judgment on a separate track from the Class Plaintiffs to avoid the extended delays that would obtain under the Class Plaintiffs' and Defendants' proposals.

Finally, this Court should set a trial date. Having a trial date will focus the parties and their counsel from the outset of the discovery process, and ensure that clients have certainty about the anticipated time to a decision on the merits. DAPs propose a trial date of September 21, 2027. DAPs do not agree that the Class trial should be the first trial in the MDL, as reflected in the DAPs' position regarding bellwethers described above.

**Defendants' Summary:** Defendants propose an aggressive but manageable schedule for this enormous litigation, which involves hundreds of plaintiffs, over a dozen defendants, and a putative nationwide class including all healthcare providers that have offered services on an out-of-network basis over the past ten years. Defendants proposal is commensurate with the scope of this case.[1] Defendants propose that (1) fact discovery take 18 months, which is on the lower side

---

[1] DAPs insist that their condensed discovery schedule reflects the fact that they have moved past the motion to dismiss stage on a potential *per se* antitrust claim. Unless all Plaintiffs are abandoning any claim that does not fall under the *per se* standard, the fact that a potential *per se* antitrust claim is at issue has no bearing on the scope of discovery, particularly in light of the Court's statements, in its order on the motions to dismiss, regarding the importance of market issues in this case.

for antitrust MDLs in this District; (2) all DAPs be subject to discovery and on the same schedule as Defendants; (3) structured data and other interim discovery deadlines reflect the scale of this case and build in enough time to resolve any disputes that may arise in both directions; and (4) class certification and summary judgment be bifurcated to allow for the efficient resolution of issues at the class certification stage that may affect the structure of the case going forward. These proposals are broadly consistent with the treatment of complex antitrust cases in this District, including in the financial aid litigation pending before this Court—and because Defendants remain committed to a swift and efficient timetable for this case, the overall schedule proposed is indeed shorter as a general matter than those ordered in such cases. Defendants' overall schedule will allow the parties and the Court to appropriately, but relatively swiftly, address the complicated issues in this case. *See, e.g.*, *Henry v. Brown Univ.*, No. 22-cv-125 (N.D. Ill. Sept. 8, 2022), ECF No. 195.

Plaintiffs' proposals, by contrast, are simply not realistic or feasible for a litigation of this scope. Plaintiffs propose a fact discovery schedule dramatically shorter than that in comparable litigation. They propose structured data production deadlines that are grossly unrealistic, particularly given that the scope of structured data at issue has not yet been resolved but Plaintiffs have made clear they will be asking for enormous tranches of sensitive healthcare data—likely hundreds of millions or even billions of lines of data, over a very long period of time. They propose interim deadlines that are arbitrary and unnecessarily short. And DAPs have gone even further in (1) proposing a potential discovery bellwether process that—as DAPs have described to Defendants—would seek to shield a large portion of DAPs from discovery, as well as delay discovery, notwithstanding this Court's repeated admonition to plaintiffs that discovery in this case

will be a two-way street,[2] and (2) proposing inefficient simultaneous briefing of class certification and the summary judgment.

Defendants respectfully request that the Court order the entry of their proposed scheduling order (Exhibit B).

**A.** **Overall Length of Fact Discovery (No. 17) and Schedule in General**

| | EVENT | DEFENDANT PROPOSAL | CLASS PROPOSAL | DAP PROPOSAL |
|---|---|---|---|---|
| 17 | Close of Fact Discovery | December 8, 2026<br><br>18 months after scheduling conference/order | August 17, 2026 (Mon)<br><br>14 months after June 17, 2025 status conference | July 3, 2026 (Fri)<br><br>13 months after denial of motion to dismiss |

**DAPs' Position:**[3] DAPs propose approximately 13 months for fact discovery, ending July 3, 2026 (No. 18). Under DAPs' schedule, document production would be complete in

---

[2] Indeed, this echoes Plaintiffs' continued approach to the limited, go-get discovery requests the Court has ordered to date in this case. Both the Class and the DAP Plaintiffs—despite this Court's express admonition that discovery was to proceed in both directions—strenuously objected to every single one of Defendants' limited requests in RFP 2, primarily on the ground that basic issues such as "balance billing" and Plaintiffs' billing practices were simply not relevant in any respect to any part of this case. Moreover, on the basis of these objections, neither set of Plaintiffs stated in their responses that they would be producing anything at all. Defendants expect that this threshold issue regarding plaintiffs' attempts to eliminate where possible discovery against themselves—particularly as to the DAP plaintiffs, who have stated they are only available to meet and confer as a group on their responses until after this JSR is due—will likely need to be raised with the Court shortly after response and objections to the third set of RFPs are submitted. And they are part and parcel of the DAP EC now seeking to *structurally* limit discovery as against most of their plaintiffs via a "track" proposal.

[3] Defendants' footnote 2 is inaccurate. The Class Plaintiffs have never stated that they were refusing to produce documents in response to Defendants' RFPs Set 3. Rather, in their formal responses, they lodged certain relevance and other objections to preserve them, and then offered to meet and confer with Defendants, which they did on June, 5, 2025. Notwithstanding their objections, the Class Plaintiffs produced documents responsive to RFP Set 2 by the parties-agreed upon deadline for the start of rolling productions, May 30—a deadline to which multiple defendants failed to adhere. Moreover, DAPs have produced thousands of pages of contracts in response to Defendants' requests for production. DAPs have not refused to produce documents in

approximately 6.5 months on December 1, 2025.  Production of materials that (a) were produced to government regulators and (b) are in the possession of a handful of priority custodians can be front-loaded. Front-loading production of these materials would allow depositions to begin more quickly and avoid unnecessarily delaying the litigation awaiting production of materials that are already known to be relevant to the case.[4]

Fact discovery does not need to be as protracted as Defendants and the Class propose. DAPs spent months investigating their claims against MultiPlan prior to filing the initial complaint in this MDL. Extensive trial exhibits, depositions, and trial testimony are available concerning MultiPlan's repricing scheme in state court actions filed against MultiPlan and United.  Moreover, DAPs understand that MultiPlan, United, Cigna, and other defendants have made extensive document productions to the United States Department of Labor in connection with a civil investigation.  As a result, the parties are not starting discovery from a blank slate.  Thus, as several other courts have found, a 13-month fact discovery schedule is appropriate. *See, e.g.*, Order Modifying Scheduling Order, ECF No. 489, *In re HIV Antitrust Litig.*, 3:19-cv-02573 (N.D. Cal. Dec. 17, 2020) (scheduling close of discovery 14 months from the court's Rule 12(b)(6) motion to

---

response to Defendants' second set of document requests. Defendants' most recent requests asked for documents concerning unspecified "meetings . . . regarding pricing and payment for OON Healthcare Goods and Services" and "revenue cycle management reports." DAPs do not understand what documents those requests seek and asked for a meet-and-confer to understand what documents they should be collecting and producing. Several DAPs offered to meet with Defendants on those issues prior to the submission of this joint status report, but the parties were not able to schedule a meet-and-confer until later this week.

[4] Indeed, Defendants have already signaled during the meet and confer process that they may seek to delay document discovery, including by requiring Plaintiffs to re-serve the "go-get" requests from their Second Set of Requests for Production as identical custodial requests pursuant to the ESI Protocol (ECF No. 241). Similarly, Secure Health Plans of Georgia ("SHPG") only served its Responses and Objections to Plaintiffs' Second Set of Requests for Production on June 10, 2025, more than three weeks after the May 19 deadline, on the ground that unidentified employees at SHPG had experienced technical issues with email and a medical incident.

dismiss ruling); Revised Scheduling Order, ECF No. 122, *In re Northshore Univ. HealthSystem Antitrust Litig.*, 1:07-cv-04446 (N.D. Ill. Jun. 27, 2008) (scheduling close of discovery 12 months from the court's Rule 12(b)(6) motion to dismiss ruling).

**Class Position:** The Class Plaintiffs propose 14 months of additional fact discovery, ending August 17, 2026 (No. 17), as compared to just under 13 months in the DAPs' schedule and 18 months under Defendants' schedule. The Class Plaintiffs' proposed deadlines will facilitate the just and speedy determination of this action, without imposing unreasonable obligations on the parties, and are comparable to the timetables adopted in other complex antitrust actions. *See, e.g., Henry v. Brown*, No. 22-cv-00125 (N.D. Ill. Sep. 8, 2022), ECF No. 195 at 13 (adopting substantial completion deadline of 165 days following service of RFPs and 18 months for fact discovery in case where no discovery was permitted pending resolutions of motions to dismiss). Defendants' proposal of 18 additional months for fact discovery fails to account for the months of discovery that have already occurred in this litigation.

**Defendants' Position:** Defendants propose the close of fact discovery be set for December 8, 2026, just under 18 months after this scheduling conference. This proposal is appropriately tailored to the size and scope of the litigation and consistent with other large antitrust litigations in this District.

This is a massive case by any measure. It involves hundreds of named plaintiffs, with more represented by the putative nationwide class of "[a]ll healthcare providers and practices in the United States and its territories that were paid for out-of-network healthcare services by any commercial third-party payer . . . pursuant to MultiPlan's claims repricing services from January 1, 2015 through the present[.]" CCAC ¶ 318. There are over a dozen named defendants, and Plaintiffs allege that there are approximately 700 potential co-conspirators. *Id.* ¶ 7. This case also

involves complex allegations related to how payments for medical services are charged and paid, spanning vastly different areas of medicine and encompassing the entire country. Plaintiffs' putative class reaches back over a decade, and they have indicated that they will seek documents going back even further. Defendants anticipate that, in addition to voluminous document production, this case will involve the production of a substantial volume of data, which (as discussed below) will be complex and time-consuming to understand and produce.

The fact discovery deadline should build in sufficient time to account for the size and complexity of the case and leave room for the parties—acting without delay—to make requests, issue and negotiate third party subpoenas, produce documents, take depositions, and respond to learnings from fact discovery with additional discovery. Even acting efficiently and without delay, these processes simply take time in a case of this size, complexity, and importance.

Eighteen months is consistent with other large antitrust cases in this District, including other MDLs. The *Broiler Chicken* schedule set about 18 months from the court's decision on the motion to dismiss to the close of fact discovery. *See In re Broiler Chicken Antitrust Litig.*, No. 16-cv-8537 (N.D. Ill. Apr. 27, 2017), ECF No. 388. The *Delta Dental* and *Deere & Company* litigations provided for substantially longer schedules. *See In re Delta Dental Antitrust Litig.*, No. 19-cv-6734 (N.D. Ill. Sept. 11, 2020), ECF No. 306 (setting fact discovery deadline at over 21 months from date of the Scheduling Order); *In re: Deere & Co. Repair Servs. Antitrust Litig.*, No. 22-cv-50188 (N.D. Ill. Mar. 18, 2025), ECF No. 234 (setting fact discovery deadline at 28 months from initial disclosures). Defendants note that in the financial aid antitrust litigation before this Court, which is complex but involves fewer parties, the fact discovery deadline was set for 16 months after the date of the post-Rule 12 scheduling order. *Henry v. Brown Univ.*, No. 22-cv-125 (Sept. 8, 2022), ECF No. 195. Defendants' proposal reasonably anticipates the difficulty of

managing fact discovery in a large case like this one while leaving no room for any party to act with delay.

**B.      Whether to Set Trial Dates Now (No. 32)**

|   | **EVENT** | **DEFENDANT PROPOSAL** | **CLASS PROPOSAL** | **DAP PROPOSAL** |
|---|---|---|---|---|
| 32 | First Trial Begins | Court's discretion | **Class Plaintiffs request that the Court set a firm trial date for the Class in late 2027.** | **Approximately October 5, 2027 (Tue.), depending on the Court's availability**<br><br>14 days after pre-trial conference |

**DAPs' Position:** DAPs request that this Court set a trial date now for the parties to work toward. Having a trial date will focus the parties and ensure that this case does not fall down counsel's list of priorities. It will ensure that clients have certainty about the anticipated time to a decision on the merits. The DAPs propose a pretrial conference date of approximately September 21, 2027, depending on the Court's availability. This is 120 days after the conclusion of summary judgment briefing. They propose a trial beginning 14 days later, on or about October 5, 2027. This proposal is well-within the time range for trial commonly set in other federal antitrust litigations. *See, e.g.*, Revised Scheduling Order, ECF No. 122, *In re Northshore Univ. HealthSystem Antitrust Litig.*, 1:07-cv-04446 (N.D. Ill. Jun. 27, 2008) (scheduling trial date for 28 months after the court's Rule 12(b)(6) motion to dismiss ruling); Order Modifying Scheduling Order, ECF No. 489, *In re HIV Antitrust Litig.*, 3:19-cv-02573 (N.D. Cal. Dec. 17, 2020) (scheduling trial date for 25 months after the court's Rule 12(b)(6) motion to dismiss ruling); Revised Scheduling Order, ECF No. 244, *In Re: Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 1:18-md-02819 (E.D.N.Y. Feb. 8, 2019) (scheduling trial date for 18 months after the court's Rule 12(b)(6) motion to dismiss ruling).

**Class Position:** The Class Plaintiffs request a firm trial date in late 2027 or one of the Court's choosing. This schedule is accelerated but realistic. The Class Plaintiffs also believe there are substantial reasons that the Class trial should be the first trial in this multidistrict litigation, which is the normal practice in cases involving both a class and early opt-outs. *See, e.g., In re Polyurethane Foam Antitrust Litig.*, No. 10-MD-2196 (N.D. Ohio, July 3, 2014), ECF No. 1272 at 2 (ordering trials for direct purchaser class claims to precede individual direct purchaser actions); *In re Processed Egg Products Antitrust Litig.*, No. 08-md-02002 (E.D. Pa. Sep. 20, 2017), ECF 1543 at 2 (same).

**Defendants' Position:** Setting a definite trial date—well over two years in the future even under Plaintiffs' proposals—is premature and unwarranted at this stage of the litigation. It is also inconsistent with the initial case schedules in the financial aid antitrust litigation before this Court and other complex antitrust litigation in this District, which have not included trial dates. *See Henry v. Brown Univ.*, No. 22-cv-125 (N.D. Ill. Sept. 8, 2022), ECF No. 195; *In re Delta Dental Antitrust Litig.*, No. 19-cv-6734 (N.D. Ill. Sept. 11, 2020), ECF No. 306; *In re: Deere & Co. Repair Servs Antitrust Litig.*, No. 22-cv-50188 (N.D. Ill. Mar. 18, 2025), ECF No. 234.

Setting a date certain is not possible under any of the parties' broader case schedules. If the Court agrees with Defendants that summary judgment briefing should wait until after a ruling on class certification, then the date by which summary judgment motions will be briefed will not be known until later in the litigation. And even if the summary judgment schedule is firmly set under Plaintiffs' proposals, it is unreasonable to set a firm trial schedule without knowing first when summary judgment, class certification, and *Daubert* motions will be resolved. Moreover, Plaintiffs' schedules do not build in nearly enough time for the trial dates they request. Class Plaintiffs, for example, contemplate a trial date within about two months of completion of

summary judgment briefing. And the entire structure of the DAP proceeding will not be clear, under DAPs' proposal, until any bellwether process is set. Trial dates can be set after class certification and summary judgment are decided, when the contours of any remaining issues in the case are clearer.

**C.  DAPs' Deadline for Briefing Whether to Have Tracks/Bellwethers for Discovery and Trials (No. 2)**

|  | EVENT | DEFENDANT PROPOSAL | CLASS PROPOSAL | DAP PROPOSAL |
|---|---|---|---|---|
| 2 | Deadline for proposals to the Court regarding whether or not to have tracks/bellwethers for discovery and trials, and other matters concerning composition and timing of trial(s).<br><br>*If disagreement, letter briefs of no more than 5 pages per proposal (i.e., if Class, DAPs, and Defendants disagree with each other, three letter briefs total)* | **This deadline is not necessary or appropriate for the case schedule at this time.** | **This deadline is not necessary or appropriate for the case schedule at this time.** | **July 3, 2025 (Thurs)** |

**DAPs' Position:** More than 225 DAPs have asserted claims in this MDL. The DAPs vary in size, the nature of their practices, geographic location, and the payors they name as Defendants. The DAP EC anticipates more DAPs (represented by the DAP EC and others) will file short-form complaints in the near future. Thus, this raises scheduling and management issues that should be decided now. It is not feasible for the parties or the Court to simultaneously prepare hundreds of cases for trial—*i.e.*, full-blown discovery, pre-trial motions, and trial preparation with respect to

hundreds of DAPs in one group. As is typical in MDLs with many individual cases,[5] a tracking/bellwether process will allow the parties and the Court to focus on a subset of cases to be readied for trial expeditiously and inform DAPs and Defendants of the strength and value of the DAP claims more generally, thereby facilitating settlements.

After initially suggesting discussion of a bellwether process in October 2025, the DAP EC tried to re-open discussions this April and again in the most recent round of meet and confers on scheduling in May and June. Specifically, the DAP EC has proposed two tracks: Track 1 for DAPs to proceed through full discovery, pre-trial motions, and trial preparation without bellwether selection and Track 2 for DAPs that will be subject to a bellwether selection process to identify a representative subset of Track 2 DAPs to proceed through full discovery, pre-trial motions, and trial preparation.[6]

The DAP EC believes its proposal is sensible, but remains open to other approaches. Defendants, however, have made no counter-proposal and discussions never progressed to the specifics of a bellwether selection process.[7] Indeed, Defendants refuse even to agree to a schedule

---

[5] *See, e.g.,* Case Mgmt. Order, ECF No. 467, *In re Testosterone Replacement Therapy Prods. Liab. Litig.*, 1:14-cv-01748 (N.D. Ill. Nov. 6, 2014), (ordering process for identification of "bellwether discovery plaintiffs"); *In re Hair Relaxer Mktg. Sales Pracs. & Prods. Liab. Litig.*, No. 23-cv-0818, 2025 WL 354410, at *1 (N.D. Ill. Jan. 31, 2025) (ordering process to identify 20 cases for bellwether discovery); Case Mgmt. Order, ECF No. 604, *In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*, 4:22-md-3047 (N.D Cal. Feb. 8, 2024) (ordering schedule for identification of "bellwether discovery" pools); Case Mgmt. Order, ECF No. 232, *In re Nat'l Prescription Opiate Litig.*, 17-cv-2804 (N.D. Ohio Apr. 11, 2018) (ordering schedule for discovery and trial of selected "Track One" cases and for identification of additional tracks).

[6] The DAP EC anticipates that Track 1 would include most of the DAP claims currently filed by members of the DAP EC, including all claims filed on behalf of hospitals and physician groups represented by Vinson & Elkins and the various Sound Physician entities represented by the Arnall Golden Gregory/Napoli Shkolnik/Seeger Weiss groups.

[7] Respectfully, this dispute does not implicate the class plaintiffs. Their case will proceed to class certification, summary judgment, and trial on the schedule laid out by the court. Any suggestion that a class case could stand in for a DAP bellwether ignores that, by definition, DAPs already

for proposals/positions to be submitted to the Court. The DAP EC respectfully submits that a deadline is needed to make progress on this issue—including discussion of the some of the issues Defendants now raise in this JSR (i.e., whether plaintiff fact sheets or other limited disclosures are needed before bellwether selection, how many bellwether discovery cases to identify, etc.). An early deadline along the lines the DAP EC has proposed also makes sense so that the Court can determine now, at the outset of the parties' negotiations over full-blown discovery, how to structure discovery and the pre-trial process for the DAPs.

Contrary to what Defendants now assert, there is no reason that discussions or briefing on a tracking/bellwether process needs to be protracted. Indeed, the whole point of the DAPs' scheduling proposal is to tee up the DAP and Defendants' respective positions early—within 30 days of the ruling on the motion to dismiss. Likewise, any actual bellwether selection process—using Plaintiff Fact Sheets—can be conducted in a matter of weeks, as this Court ordered in another matter. Corrected Case Mgmt. Order, ECF No. 302, *Adams v. BRG Sports, Inc.*, 17-cv-08972 (N.D. Ill. May 6, 2019) (eight weeks from fact sheets to bellwether selection by court).

Defendants' position that full discovery from all DAPs is needed to identify bellwether candidates also is not well-taken. Most of the cases they cite, for example, appear not to have considered the use of early "Plaintiff Fact Sheets" to guide bellwether selection. Another case Defendants cite rejected formal "bellwethers," but still limited pre-trial discovery and proceedings to a targeted subset of plaintiffs to avoid overwhelming the Court and the parties. *See*, *e.g.*, *In re*

---

have determined that they do not favor a class approach to their claims. It also ignores that the putative class still has to carry its burden to certify a class (including overcoming arguments concerning the "customized" pricing approaches for MultiPlan's conspirators) and that, even if a class is certified, it remains subject to decertification, including after trial. DAPs do not face these uniquely class issues and evidentiary/expert burdens. In addition, the DAPs have not sought to "leapfrog" over the Class, but have only said the DAPs should not be delayed by the Class.

*Kia Hyundai Vehicle Theft Litig.*, 2024 WL 4415204, at *12 (C.D. Cal. 2024) (denying request for bellwethers but staying litigation with respect to "all but the first-named Plaintiff").

Accordingly, the DAPs propose a deadline of July 3, 2025 for the DAP EC and Defendants to submit a joint proposal or short briefing on a tracking/bellwether process.

**Class Position:** The Class Plaintiffs agree with the Defendants that no bellwether/track deadlines are needed in the case schedule. If counsel for DAPs wish to file protective orders to shield certain DAPs from discovery or to file a motion seeking approval of a bellwether selection process, they may do so in the ordinary course, with an opportunity for other parties, including the Class Plaintiffs, to respond to any such motion to the extent they implicate trial sequencing or other issues pertinent to the class.

Contrary to the DAPs' position, this dispute implicates the Class Plaintiffs. Indeed, DAP counsel has repeatedly indicated that they intend to leapfrog the Class trial with DAP "bellwethers" and that they may seek to tax any eventual class recovery under the common benefit doctrine. *See* ECF No. 153 at 1-2 (arguing DAP EC should be permitted to seek common benefit fees from "any eventual class recovery"). Moreover, the proposed tracking/bellwether process here is duplicative of the efficiencies rendered by Rule 23 (without the same due process protections) and nearly unprecedented in an antitrust action.[8] All provider plaintiffs here—regardless of their size or specialty—allege the exact same cartel, so the primary question for any jury will be the same: whether that cartel has been proven by a preponderance of the evidence. Plainly, that question

---

[8] The only antitrust case known to Class counsel where any sort of bellwether-like process was adopted was *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.), but that case involves hundreds of separate conspiracies involving different drugs, and the bellwether process was designed to test the plaintiffs' theories as to certain of those drugs—not to leapfrog direct action plaintiffs over a class. Indeed, some of those so-called bellwethers (including the ones that will go to trial first) are class cases. By contrast, here, all plaintiffs allege the same cartel.

should be adjudicated in the context of the most representative trial, which will bind the largest number of parties, and tried by duly-appointed Class counsel—the Class trial. And this sensible approach will result in no significant delay for the DAP proceedings, as the Class and DAP schedules are only a few months apart.

**Defendants' Position:** DAPs' deadline for submitting "proposals to the Court regarding whether or not to have tracks/bellwethers for discovery and trials" is unnecessary at this stage of the litigation.

First, DAPs' proposal contemplates that they intend to have "tracks" for different cases that may withhold large numbers of DAP cases from discovery.[9] Defendants disagree that it makes sense in the context of this case to limit their ability to take discovery from the vast majority of Plaintiffs bringing claims against them. *See In re 2004 DuPont Litig.*, 2006 WL 5097316, at *2 (E.D. Ky. Mar. 8, 2006) (in a case with 340 plaintiffs, concluding a bellwether discovery approach was premature until discovery was taken). Courts regularly find that "sufficient discovery should be conducted prior to selecting bellwethers" to ensure the chosen bellwethers are representative of the plaintiffs as a whole. *In Re Kia Hyundai Vehicle Theft Litig.*, 2024 WL 4415204, at *11 (C.D.

---

[9] DAPs also have not made a firm proposal regarding which of their cases will move in discovery and the specific proposal in their footnote 6 was not previously raised with Defendants; instead, prior to this JSR, DAPs had stated the Vinson & Elkins clients would be "Track 1" and they would determine later which other DAPs would seek to be excluded from party discovery. DAPs assert that Defendants have refused to make a counter-proposal or agreed to a schedule for proposals, but that is not true, even leaving aside the specific proposal Defendants just received via this JSR. Instead, after DAPs first raised the brand new idea *two weeks ago* that some DAPs represented by the DAP EC would not move forward with any party-discovery in this case (but apparently have to be compelled to produce discovery via "third-party" subpoenas), Defendants stated that was contrary to how the parties ad Court have proceeded to date, and that the Court would have to decide whether this was an appropriate way to proceed after it had approved of the DAP EC leadership structure and proposals. Moreover, given the parties' agreement to move into full discovery on June 24, their proposal will simply not work in the broader context of the parties' proposed discovery schedule.

Cal. July 2, 2024); *see Adams v. Deva Concepts, LLC*, 2023 WL 6518771, at *7 (S.D.N.Y. Oct. 4, 2023) ("[T]he Court cannot choose 'representative plaintiffs for bellwether discovery . . . in a vacuum'" and choosing too early "would produce only inefficiencies and delay."); *Zito v. Leasecomm Corp.*, 233 F.R.D. 395, 399–400 (S.D.N.Y. 2006) (in a case with over 200 individual plaintiffs, rejecting plaintiffs' proposal for bellwether discovery and trial and concluding that "[w]hether there is some rational basis for deciding how to group the cases for trial is a matter best deferred until the close of discovery").

All cases with short form complaints filed shortly after the DAP Consolidated Master Complaint (i.e., all DAP EC cases) should proceed to discovery so that all parties are equipped with the information necessary to engage in productive bellwether selection if discovery shows the use of bellwether trials is warranted. This will ensure that any chosen bellwethers will be representative of different plaintiff groups. *See In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019–20 (5th Cir. 1997) (holding that a "core element" of bellwether plaintiffs is "representativeness" so that a bellwether may best "achieve its value ascertainment function" or provide answers to common issues).

But even if some bellwether discovery process might be appropriate, the timing of DAPs' proposal makes no sense. The agreed-upon date for the start of full discovery is *before* DAPs' proposed date to submit proposals regarding *whether* to have a bellwether discovery process at all. It would likely take months to resolve disputes regarding the proposals, develop and provide fact sheets to the 200+ DAPs, identify potential bellwether cases, and finally resolve any disputes over the cases. Under DAPs' proposal, Defendants would likely not even know which DAPs are subject to discovery until months after discovery had begun, and after many of their proposed discovery deadlines (e.g., producing samples of structured data and disclosing custodians/search

19

methodology proposals) had already passed.  This would put Defendants at a disadvantage and is inconsistent with the need for discovery to be a two-way street.  To the extent the Court is inclined to accept DAPs' proposal, Defendants' proposed timeline for discovery becomes all the more necessary to help ensure that Defendants are not prejudiced by any delay in obtaining discovery from DAPs.

Second, DAPs' proposal is premature as to bellwether trials.  There is no reason to establish a bellwether trial process before discovery has begun in full and the close of fact discovery is more than year away under any of the parties' proposals.  If the DAP EC or Defendants believe that bellwether trials are appropriate, they can and will discuss that process as the case progresses.  And when fact discovery is complete and all parties have a full understanding of the issues, the parties can submit proposals to the Court as appropriate.  *See,* *e.g.*, *Adams*, 2023 WL 6518771, at *7.

**D.    Deadlines Relating to the Production of Structured Data (Nos. 3, 9 & 11)**

The parties disagree about the scope of data samples, the date by which complete structured data should be produced, and an interim deadline related to the submission of disputes on structured data to the Court, as illustrated below.

|  | **EVENT** | **DEFENDANT PROPOSAL** | **CLASS PROPOSAL** | **DAP PROPOSAL** |
|---|---|---|---|---|
| 3 | Production of structured data samples (at least 50 lines) | **July 24, 2025 (Thurs)**<br><br>Limited to structured data field names previously provided pursuant to RFP 3 | **July 24, 2025 (Thurs)** | **July 24, 2025 (Thurs)** |
| 9 | Joint status report and a proposed order concerning agreements on the scope and format of production of structured data or, if disagreement | **September 18, 2025 (Thu)**<br><br>57 days after submission of data samples | **August 18, 2025 (Mon)**<br><br>25 days after submission of data samples | **August 18, 2025 (Mon)**<br><br>25 days after submission of data samples |

|   |   |   |   |   |
|---|---|---|---|---|
|   | on the proposed order, Plaintiffs collectively may file a letter brief of up to 10 pages and Defendants collectively may file a letter brief of up to 10 pages. | This joint status report and proposed order should also address the timing for production of structured data. |   |   |
| 11 | Deadline to complete production of structured data requested in Plaintiffs' and Defendants' Third Set of RFPs | **Deadline to be determined as per Row 9 (by the parties' agreement after meet and confer, or the Court's resolution of any disputes, regarding the production of structured data).** | **October 16, 2025 (Thurs)**<br><br>This deadline is necessary as many subsequent dates are contingent upon completion of data production. | **October 16, 2025 (Weds)**<br><br>This deadline is necessary as many subsequent dates are contingent upon completion of data production. |

**Plaintiffs' Joint Position:** Plaintiffs seek the timely, organized, and complete production of Defendants' structured data, which is a necessary prerequisite for Plaintiffs' experts to begin importing, cleaning, and analyzing that data to calculate damages and conduct other analyses, including so that the parties can meaningfully discuss settlement. The structured data that Plaintiffs seek will show, among other things, the prices that each Insurer Defendant paid for out-of-network claims that were "repriced" by MultiPlan, as well as original "billed amounts" and each Insurer Defendant's "allowed amounts" for those claims.

Under Plaintiffs' proposals, all structured data must be produced by October 16, 2025 (No. 11), approximately four months from the June 17, 2025 status conference. There would also be interim deadlines for (a) the production of *complete* data samples (July 24, 2025) (No. 3) and (b) the submission of a joint status report and proposed order on the scope, timing, and format for the production of structured data (Aug. 18, 2025) (No. 9). These deadlines will ensure that Plaintiffs'

experts have sufficient time to ingest, clean, and analyze the data, which will take months following **completion** of Defendants' data productions.

Plaintiffs' proposal for the production of structured data—which sets the completion deadline at 261 days following Plaintiffs' service of RFP No. 3—is less accelerated than the schedules entered in several other complex, multi-defendant antitrust actions. For example, in *Henry v. Brown University*, this Court ordered a deadline for structured data production that was 147 days after service of the first set of RFPs.[10] No. 22-cv-00125 (N.D. Ill. Sep. 8, 2022), ECF No. 195 at 13. *See also Deere & Co. Repair Servs. Antitrust Litig.*, No. 22-cv-50188 (N.D. Ill Mar. 18, 2025), ECF No. 234 at 1 (deadline for structured data set for 165 days after service of RFPs); *In re Realpage, Inc., Rental Software Antitrust Litig. (No. II)*, No. 23-md-03071 (M.D. Tenn. Feb. 16, 2024), ECF No. 818 at 2 (requiring parties to produce structured data within 243 days after serving RFPs).

Plaintiffs' proposed deadlines are eminently reasonable, particularly in light of the discovery that has already occurred in this case. Defendants have been on notice as to Plaintiffs' requests for months: Plaintiffs identified the *specific data fields* they were requesting in RFP No. 3, which was served January 28, 2025. Thereafter, each Defendant investigated their data sources and produced a list of data fields on May 1, which the parties have begun to confer about. Defendants profess that they don't know what fields Plaintiffs want because RFP No. 3 sought only samples—but Plaintiffs have explained that their data request will be identical to RFP No. 3, except that it won't be limited to "samples." Because of these early efforts, Defendants have had months to investigate their data sources and prepare for production. Accordingly, there is no reason

---

[10] This deadline was extended just once, by 21 days. *See Henry v. Brown*, No. 22-cv-00125 (N.D. Ill. Feb. 8, 2023), ECF No. 315.

that Defendants—sophisticated corporations that have been involved in many suits where they were required to produce the same structured data that Plaintiffs seek here—cannot complete their productions of structured data by October 2025.

Defendants' competing proposal to have **no set interim deadline** at this time for completion of structured data production is entirely unworkable and outside the norm for complex antitrust actions. Under Defendants' proposal, no interim deadline for the production of structured data would be proposed or considered by the Court until the parties submit a joint status report due September 26, over three months from now. This would leave in doubt a key deadline, upon which the rest of the case schedule is built. Under Defendants' current proposal, the parties would not be required to substantially produce their structured data until the close of fact discovery, giving Plaintiffs' experts mere weeks to produce complex econometric modeling and reports. Defendants' proposal would thus result in future scheduling disputes and extensions and, ultimately, significant delay.

Two other points on the Defendants' proposed dates bear noting: First, "rolling" productions of structured data with no completion deadline, which Defendants propose, are unworkable. Plaintiffs' experts need a complete set of data to begin their work and rolling productions do not allow for that. The only relevant date for structured data is the date such productions are completed, which should be earlier in the fact discovery period, as Plaintiffs propose.[11] Second, the schedule should include a reasonably early date to raise disputes about structured data with the Court. Plaintiffs propose August 18, 2025 (No. 9), 25 days after samples

---

[11] Plaintiffs do not object to the concept of rolling productions in principle—but what matters is the date Defendants complete their productions, because only then can Plaintiffs' experts substantially begin their work.

are provided. This provides enough time for the parties to negotiate without further delaying productions of data.[12]

Defendants also argue, in a footnote, that their sample data productions should be limited to those data fields Defendants provided to Plaintiffs on May 1, 2025. *See* Defendants' Position, Footnote No. 13 (samples should be "limited to structured data field names previously provided pursuant to RFP 3"). The Court should not limit Defendants' structured data production to the field names already provided by Defendants—fields which they unilaterally identified and which have not been tested. As an initial matter, to the extent there is a dispute about the appropriate scope of structured data productions, the Parties should raise that for the court in the ordinary fashion: after meeting and conferring, narrowing their dispute, and engaging in motion practice where each side has an opportunity to fully present their arguments—not in the context of the case schedule. But on the substance, Plaintiffs believe that the data field lists provided by many, if not all of the Defendants are incomplete, and Plaintiffs are working with their experts and meeting and conferring with Defendants to make sure Plaintiffs receive the data the need. For example, while Plaintiffs understand that Multiplan routinely prepares reports for payors which include the usual and customary amount (*i.e.* a standard out-of-network rates identified by insurers for medical services) as a field, Defendants are resisting production of these reports and data. These rates have obvious importance to Plaintiffs' econometrics, Plaintiffs know Defendants keep them, and yet

---

[12] Defendants contend that the sequencing of briefing any structured data disputes and the production deadline is too short, but Defendants themselves propose a later date for submitting data disputes to the Court (September 18 vs. Plaintiffs' August 18). And if one or more Defendants has issues producing data by October 16—such as delays in computer processing times—the parties can meet and confer about limited and reasonable extensions to that deadline on a defendant-by-defendant basis grounded in real facts about their hurdles rather than hypothetical objections.

nearly 5 months after Plaintiffs' initial request, no Defendant has produced this data. Other omissions may be less obvious given the information asymmetry between the Parties.

Data samples provide an important window for Plaintiffs' experts to analyze a small selection of data (fifty lines) and determine if there are key pieces of information missing that they may need to conduct their analysis. Samples create efficiencies and reduce burdens because Defendants can pull the samples rather seamlessly—unlike the substantial computer processing time Defendants say they will need to pull the complete data sets. If there are errors or omissions in the samples, they can be remedied *before* time consuming full-scale data pulls occur. But if the samples are unduly limited—so too will be the economists' work. Plaintiffs are much more likely to need Defendants to conduct additional data pulls if they produce incomplete samples.

Defendants' structured proposal is at best a delay tactic, and at worst a pretext for depriving Plaintiffs for the data they are likely to rely on to prove damages in this case. The Court should ensure comprehensive structured data productions are provided in a timely manner and reject Defendants' attempt to litigate a substantive issue—the scope of data productions—through the case schedule.

**Defendants' Position:** Structured data, such as healthcare claims data, will be key discovery that goes to the heart of this complex antitrust action. Between the parties' productions, this data will show what insurers, managed care organizations ("MCOs"), and benefit plans offered and paid providers, what providers billed and collected from patients, which reimbursement methodologies were used, the specific medical services at issue, and the geographic area where those services were provided, among other details. This is vital information in a case in which Plaintiffs' allegations center on the amount and method of their claims' reimbursement and which markets may be relevant. Based on recent experience, Defendants expect that collection and

production of their claims data—which will potentially be billions of lines of data—will also be one of (if not the most) time- and resource-intensive undertakings in the case.

Defendants thus propose a reasonable and efficient approach to the deadlines for producing structured data that accounts for both the substantial time demands and necessary sequencing associated with these types of complicated productions. After service of document and data requests, Defendants expect that the parties' negotiations over the scope of the data production—implicating issues such as the appropriate time period, types of claims or services included, types of reimbursement methodologies included, or network status of claims pulled, among others—will take considerable time to resolve. Especially given that each Defendant will have different types of claims data storage and unique claims data, which may have changed over time, Defendants anticipate that these negotiations will involve many rounds of meet-and-confers to ensure that each Defendant will pull and produce its structured data only once because, as described below, the labor and time necessary to actually pull and produce structured data is substantial. Thus, it is imperative that the case schedule provides enough time to allow the parties to fully hash out the scope of the data productions and avoid the risk of having to make multiple or revised data pulls, which would result in material delays to the case and likely significant increases in costs.

Once the parties agree on scope (or if they cannot, once the Court resolves their disputes), the actual data collection is a time-consuming process that takes many months to complete for many reasons. Indeed, while Defendants each have different systems and processes for claims data, collecting data for every Defendant is far more complicated than simply pushing a button. Factors impacting collection include the potential for numerous manual components requiring human intervention at various points in the process; fields in the resulting claims report may need to be pulled from sources outside the structured database at issue; the data may need to be filtered

via a multistep, iterative process; and high-volume data requests (*i.e.* those involving hundreds of millions or billions of lines of data) often drive up processing times. This process also will need to be repeated for each claim system used, as many Defendants use multiple claim systems to process claims—so different queries need to be written and run across the systems by the relevant subject-matter experts. Moreover, some of the data Plaintiffs seek may be archived and, if the parties agree to produce this data, this data may require additional customized queries and processing time to restore. All of this needs to be done before Defendants' counsel, and their experts, are even able to view any claims data reports before production, at which point it is common that certain data may be missing or incomplete and thus require resolution or supplementation. Since Plaintiffs have suggested they intend to seek data from an extensive time period and scope, these are likely to be particularly relevant issues.

To ensure an orderly and efficient process, Defendants therefore propose the following deadline windows regarding discovery on structured data. First, on June 24, 2025, the parties will exchange service of their third set of requests for production, which will include their respective requests for structured data. Second, on July 24, 2025, the parties will produce sample structured data.[13] Third, on September 18, 2025, the parties will submit to the Court either a proposed order on agreed-upon parameters for the data pulls if an agreement is reached, or, if an agreement is not reached, the parties will submit disputed issues. Finally, the parties will begin producing structured

---

[13] Defendants also propose that production of samples of structured data be limited to the data fields previously provided to in response to Request for Production No. 3. Plaintiffs disagree that production should be limited to these fields. However, Plaintiffs have been in possession of these fields for months and have only recently raised issues with them. To ensure that the parties have sufficient time to collect and produce their data samples by the July 24, 2025 deadline, Defendants propose limiting those samples to the fields that the parties have been on notice of for many months; to the extent there are questions or concerns regarding additional fields, the parties can meet and confer on them.

data at a time agreed to by the parties or, to the extent there are disputes, by the Court. Given this rolling production, Defendants' proposed deadlines will allow the parties and their experts ample time to analyze the structured data before fact discovery closes, which Defendants propose should be set on December 8, 2026, 18 months after the scheduling conference.

Plaintiffs' alternative proposals, on the other hand, are simply not feasible, as they incorrectly assume that this process can be fast-tracked and fail to consider the required order of operations. In addition to proposing shorter interim deadlines, Plaintiffs' proposal would require substantial completion of structured data in a little more than approximately three-and-a-half months after Defendants receive Plaintiffs' discovery requests pertaining to structured data and less than two months after the parties either reach an agreement on parameters or submit their disputes to the Court (and therefore Plaintiffs assume less than two months is enough time to not only resolve submitted disputes but also thereafter to pull data). As discussed above, neither of these proposals is possible.

Plaintiffs' proposed deadlines are also premature because the scope of the request is likely to determine the timeline required for the pull. This is because the larger the data pull, the longer the process will take due to the additional technical time necessary to run the pulls, as well as the additional human oversight required to ensure they are pulling correctly. Indeed, in Defendants' recent experience, pulling and producing what Defendants anticipate were much smaller subsets of data than what Plaintiffs will seek here still took many months of computer processing time. Defendants' proposal recognizes that the parties will be in a better position to discuss the timing of structured data production when they file the joint status report and proposed order concerning agreements on the scope and format of production of structured data, at which time they will have

a better sense of the scope and format of any productions, and an understanding of the key disputed areas.

Plaintiffs argue that Defendants should be able to complete productions by Plaintiffs' proposed deadlines because Defendants were supposedly on notice regarding the structured data Plaintiffs intended to request when Plaintiffs served their first set of requests for production. That is inaccurate: Plaintiffs only requested sample data in those requests—which will be produced by July 24, 2025.[14] And Plaintiffs only informed Defendants on June 10, 2025 (the date this joint status report was due) that they expect their eventual data request to request similar data as what they sought in their RFP No. 3. Moreover, the fact remains Plaintiffs have not actually issued any structured data requests, and Defendants cannot begin the long process of collecting data until they have received a request and the parties have negotiated the scope and parameters of the pulls (beyond which fields may be included). To the extent Plaintiffs intend to request all paid in-network and out-of-network claims data from each Defendant for the last 15 years – in other words, the entirety of Defendants' paid claims data over more than a decade – this only further underscores how expansive Plaintiffs' requests will be, and how much time is needed for the parties to negotiate a reasonable scope for structured data collection. And while Plaintiffs argue that the parties "have begun to confer" about data fields, Defendants produced their claims data fields months ago, and only just received emails from Plaintiffs offering to meet and confer on these fields on June 9 and June 10, right before this joint status report was due to be filed, which additionally highlights the long negotiation process expected to take place.

---

[14] Specifically, Plaintiffs' first set of requests for production included a request for "Samples of Structured Data showing Payor Data Fields and MultiPlan Payor Data Utilization Fields for each paid claim for Out-of-Network Services and In-Network Services, as applicable, with dates of service from January 1, 2010 to the present at the most granular level that such Structured Data is kept, including at the claim or line level."

Finally, Defendants address two additional points that Plaintiffs raise in their portion of the submission. First, it is simply not true that "under Defendants' current proposal, they would not be required substantially produce their structured data until the close of fact discovery, giving Plaintiffs' experts mere weeks to produce complex econometric modeling and reports." Under Defendants' proposal, the parties will agree on that deadline—or the Court will decide it, based on the parties submissions—just three months from now: after the RFPs for the data are issued (deadline agreed), the production of data samples (deadline agreed), and the parties meet and confer on the production parameters and present issues, if any, to the Court. Defendants simply oppose Plaintiffs' unjustified desire to put in place a senseless deadline now. Second, Plaintiffs claim that "'rolling' productions of structured data with no completion deadline . . . are unworkable," but this does not accurately describe Defendants' proposal, which, as set forth above, is to have the parties agree on the deadline (or the Court set one, based on the parties' submissions) when they file a joint status report on data scope and format in just a few months. That said, rolling productions may be required in this matter; while the parties generally appear to agree that it is best to pull a complete set of data at once if feasible, supplemental data may need to be pulled and produced in certain instances. Moreover, many of the Defendants have multiple claims systems, and it may make sense to produce a completed report from one system while still working on a report from another. Plaintiffs do not articulate why this proposal would not be workable for them; to the contrary, it would allow them to get data sooner.

At bottom, Plaintiffs urge the Court to accept their extraordinary 4-month deadline for production of literally *hundreds of millions or billions* of line of data—a potentially unprecedented volume of structured data even for an antitrust case, potentially involving a substantial portion of

all of the commercial healthcare claims data in this country over the past decade—by relying on false assertions.

Defendants are committed to engaging in efficient and expeditious structured data discovery. We have thus respectfully submitted scheduling proposals that we believe will effectively facilitate this discovery—very early in the fact discovery period, just not unduly so.

**E. Other Interim Fact Discovery Deadlines (Nos. 4, 10, 12, and 14 to 16)**

The parties also disagree about certain specific interim deadlines, including whether some of these deadlines are appropriate to be included in this general case schedule.

| | EVENT | DEFENDANT PROPOSAL | CLASS PROPOSAL | DAP PROPOSAL |
|---|---|---|---|---|
| 4 | Deadline for defendants to produce materials produced in government investigations and/or other litigation, if permitted by Court | **This deadline is not necessary or appropriate for the case schedule at this time.** | **Class Plaintiffs agree that these materials should be prioritized, but believe this should be worked out through the meet and confer process.** | **August 4, 2025 (Mon)** |
| 10 | Deadline to complete search methodology negotiations and submit any remaining search term disputes relating to third set of RFPs. ESI Protocol Section V.E.3.e-f (page 27-28). | **October 22, 2025 (Wed)**<br><br>120 days after service of third set of RFPs | **September 12, 2025 (Fri)** | **September 12, 2025 (Fri)** |
| 12 | Deadline to complete production of documents from up to 5 priority custodians per party | **N/A** | **N/A** | **November 11, 2025 (Tues)** |
| 14 | Deadline regarding document productions in response to Third Set of RFPs | **April 9, 2026 (substantial completion) (Thu)**<br><br>290 days after service of third set of RFPs | **Dec. 12, 2025 (completion) (Fri)**<br><br>~6 months from service of third set of RFPs | **December 12, 2025 (Fri) (completion)**<br><br>~6 months from service of third set of RFPs |

| | EVENT | DEFENDANT PROPOSAL | CLASS PROPOSAL | DAP PROPOSAL |
|---|---|---|---|---|
| | | | | |
| 15 | Last day on which parties may serve requests for production, with the exception of witness-specific requests for production directly related to scheduled depositions | **September 24, 2026 (Thu)**<br><br>~75 days before close of fact discovery | **June 3, 2026 (Weds)**<br><br>~75 days before close of fact discovery | **April 17, 2026 (Fri)**<br><br>~75 days before close of fact discovery |
| 16 | Last day on which parties may serve interrogatories | **October 23, 2026 (Fri)**<br><br>~45 days before close of fact discovery | **July 3, 2026 (Fri)**<br><br>~45 days before close of fact discovery | **May 19, 2026 (Tue)**<br><br>~45 days before close of fact discovery |

**DAPs' Position:** The DAPs' schedule proposal includes interim deadlines for certain discovery items. First, DAPs propose that defendants produce materials produced in government investigations and/or other litigation by Aug. 4, 2025. Second, DAPs propose the parties complete production of documents from up to 5 priority custodians per party by Nov. 11, 2025.

The Court should order these interim deadlines to keep the case from lagging and streamline the parties' efforts. For example, the documents produced in previous investigations or litigations will be critical in helping determine appropriate search terms and custodians for the custodial discovery. If those documents are produced by August 4, 2025, which is eminently reasonable considering they have undoubtedly already been collected, reviewed for privilege, produced, and stored on a document review platform, the parties can incorporate learnings from those materials into the search term and custodian negotiations that are set to begin at the end of August under all parties' proposals pursuant to the ESI protocol. *See, e.g.*, Scheduling Order No. 2, ECF No. 574, *In re Broiler Chicken Antitrust Litigation*, No. 1:16-cv-08637 (N.D. Ill.) (setting deadline to produce documents previously produced to the Florida Attorney General in advance of

the close of fact discovery); Amended Case Management Order, ECF No. 36, *In re: Qualcomm Antitrust Litigation*, No. 17-md-02773 (N.D. Cal.) (setting deadline for Qualcomm to produce documents previously submitted to government investigatory agencies more than 9 months in advance of the close of fact discovery). Further, Defendants' concerns about "cloned discovery" are unwarranted. Setting an interim deadline for Defendants to produce these materials does not impact Defendants' ability to raise any future relevance objections, and indeed, the Court has already signaled that requests for production of documents previously produced to government enforcers "are likely going to be more or less okay." Apr. 11, 2025 Hrg. Tr. at 18.

Courts have similarly recognized that setting interim deadlines for the production of documents from limited priority custodians may achieve discovery efficiencies. *See, e.g.*, Pretrial Scheduling Order, ECF No. 571, *In re Cattle and Beef Antitrust Litigation*, No. 20-cv-1319 (D. Minn.) (setting deadline to complete production of documents for "5 Priority Custodians per Defendant Family" more than one year in advance of the close of fact discovery). Here, producing documents from priority custodians on an expedited basis will allow the parties to begin taking depositions earlier such that the parties can be working on more discovery tasks at the same time and keep the case moving forward.

**Class Position**: The Class Plaintiffs do not believe that the additional interim deadlines proposed by DAPs (dealing with priority documents and custodians) are necessary at this point (Nos. 4 and 12). The Class Plaintiffs agree with DAPs that these materials should be prioritized but believe that this prioritization can be worked out during the meet-and-confer process, after which any disputes can be raised with the Court. That said, the Class Plaintiffs do not oppose interim deadlines if the Court believes it would be prudent to impose such deadlines in its discretion.

The Class Plaintiffs support the earlier interim dates for the other items concerning a deadline to complete search methodology negotiations, deadline for complete production of documents, and deadlines for written discovery (Nos. 10, 14-16). Search methodology negotiations should be complete by September 12, 2025 (No. 10), complete production of documents responsive to the third set of RFPs should occur by December 12, 2025 (No. 14), and the deadline for serving written discovery set forth by Class Plaintiffs should be adopted (No. 15 & 16).

**Defendants' Position:** Defendants propose that the parties be required to complete search methodology negotiations and submit to the Court any remaining search term disputes related to the third set of RFPs by October 22, 2025. Plaintiffs propose September 12, 2025. The parties have agreed that the deadline to meet and confer regarding potential use and identification of search terms is August 25, 2025. Defendants do not believe that two weeks is enough time for the parties to meet and confer sufficiently before submitting disputes to the Court. As the Court knows, this matter involves complex issues spanning nearly 20 different defendants as well as two different sets of Plaintiffs, and search term negotiations often require multiple rounds of meet and confers between parties and subsequent internal evaluation of any proposed search terms to determine whether responsive documents are being appropriately identified. Given that each defendant likely will need defendant-specific (and many plaintiffs will likely also need plaintiff-specific) search terms it would be more economical, and better conserve judicial resources, to allow the parties the eight weeks Defendants seek in order to allow multiple rounds of meeting and conferring before raising disputes to the Court.

Defendants do not believe that a priority discovery deadline for defendants to produce materials produced in government investigations (if any) and/or other litigation is necessary or appropriate. There is a presumption against this type of "cloned discovery" in this District and

34

courts have consistently found these types of requests "facially overbroad." *See, e.g.*, *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 2023 WL 4181198, at *6 (N.D. Ill. June 26, 2023) (collecting cases denying requests for production of generalized documents produced to government agencies). To be clear, Defendants are not objecting to *reviewing* documents that were previously produced in government investigations and then producing documents responsive to proper requests, they are only objecting to the request that such productions be re-produced in their entirety and on an accelerated timeline. Defendants propose that any documents produced in government investigations/other litigation be subject to the same review process as all other documents in this case. This is in accord with *In re Outpatient* and other cases in this District that note that parties seeking discovery of documents produced in government investigations/other litigation "must do their own work and request the information they seek directly" and "must make proper requests describing the information in which they are interested." *Id.*

Defendants propose that the deadline for the parties to substantially complete production in response to the Third Set of RFPs be set for April 9, 2026, which is 290 days (or approximately 9 months) after service. Plaintiffs propose the parties' fully complete production by December 12, 2025, approximately six months after service of the Third Set of RFPs. Plaintiffs' proposal does not provide the parties, or the Court, enough time to resolve the potential disputes identified in the parties' proposed scheduling order (TAR/AI protocol, production of structured data, search term negotiations) and also collect, review, and produce documents in the remaining time period. Plaintiffs' proposed calendar would set the deadline to submit disputes regarding search terms for the Third Set of RFPs to the Court on September 12, 2025 and the deadline to produce documents by December 12, 2025. This would require the Court to hear and resolve any disputes, the parties to conduct any meet and confers following the Court's resolution of any disputes, apply any

resulting search terms, review and produce documents all within two and a half months. This would be an extraordinarily compressed timeline that would inevitably result in multiple extensions. Defendants propose a realistic timeline that should provide all parties with enough time to resolve any disputes and produce documents, while lessening the likelihood that the parties will return to the Court and seek an extension of a foreseeably insufficient deadline.

F.  **Submission of Expert Reports (Nos. 18 to 20)**

All parties propose a consolidated expert report schedule, with one set of expert reports addressing both merits and class issues. The parties also agree that opening reports should be filed 45 days following their proposed dates for the close of fact discovery. The parties disagree as to the actual start date of the expert report period, given their different proposed fact discovery end dates, and disagree about the length of time between reports.

|  | **EVENT** | **DEFENDANT PROPOSAL** | **CLASS PROPOSAL** | **DAP PROPOSAL** |
|---|---|---|---|---|
| 18 | Class and DAP Plaintiffs' Opening Merits and Class Certification Expert Reports | **January 29, 2027**<br><br>45 days following close of fact discovery | **October 1, 2026 (Thurs)**<br><br>45 days following close of fact discovery | **August 17, 2026 (Mon)**<br><br>45 days following close of fact discovery |
| 19 | Defendants' Merits and Class Certification Opposition Expert Reports | **April 29, 2027**<br><br>90 days following opening reports) | **November 16, 2026 (Mon)**<br><br>45 days following opening reports | **October 1, 2026 (Thurs)**<br><br>45 days following opening reports |
| 20 | Class and DAP Plaintiffs' Rebuttal Expert Reports | **July 28, 2027**<br><br>90 days following opposition reports | **January 12, 2027 (Tues)**<br><br>45 days following opposition reports + 12 days for holidays | **November 16, 2026 (Mon)**<br><br>46 days following opposition reports |
| 21 | Close of Expert Discovery | **September 10, 2027** | **February 26, 2027 (Fri)** | **January 6, 2027 (Wed)** |

| EVENT | DEFENDANT PROPOSAL | CLASS PROPOSAL | DAP PROPOSAL |
|---|---|---|---|
| | 44 days following rebuttal reports | 45 days following submission of rebuttal reports | 45 days following rebuttal reports (plus one week to account for holidays) |

**Plaintiffs' Joint Position:** Plaintiffs request the Court adopt an earlier closing of fact discovery (which follows from the Plaintiffs' other proposed deadlines) as well as a quicker timeline for the submission of responsive expert reports and the close of expert discovery, which is reasonable even in a complex case like this one. *See Henry v. Brown*, ECF No. 195 at 14 (226 days for expert discovery). Defendants' proposal is unnecessarily extended, and overall, longer than the periods ordered in comparable litigation for the submission of expert reports. *See id.*

**Defendants' Position:** Plaintiffs' proposed time for the submission of expert reports is insufficient. As described above, this is a massive and complex case that will likely involve very large amounts of structured data. Plaintiffs' proposal provides for far shorter periods of time between reports than case schedules entered in recent large antitrust cases in this district, including in the financial aid antitrust litigation before this court. *In re: Deere & Co. Repair Servs. Antitrust Litigation*, No. 22-cv-50188 (N.D. Ill. Mar. 18, 2025), ECF No. 234, (100 days between opening and rebuttal expert reports); *Henry v. Brown Univ.*, No. 22-cv-125 (Sept. 8, 2022), ECF No. 195 (78 days between opening and rebuttal expert reports); *In re Delta Dental Antitrust Litig.*, No. 19-cv-6734 (N.D. Ill. Sept. 11, 2020), ECF No. 306 (98 days between opening and rebuttal class certification expert reports). Defendants' proposal—providing 90 days for rebuttal and reply reports—will provide the experts with the necessary time to respond to disclosures from opposing experts and to provide the analysis required to address the complex issues in this case.

G. **Sequencing and Briefing Schedule for Class Certification, Summary Judgment, and Related *Daubert* Motions (Nos. 22 to 29)**

All Parties agree that the first stage of briefing should begin 45 days after the close of expert discovery, but otherwise disagree as to sequencing and timing for briefing.

DAPs propose consolidating the briefing schedule for class certification, summary judgment, and related *Daubert* motions into a single stage of briefing. Under the DAPs' proposed schedule, there are 45 days between opening, opposition, and reply briefs, with all briefing concluded by May 2027. Should the Court prefer to sequence summary judgment in the Class case to follow class certification, the DAPs request that summary judgment concerning the DAPs' claims proceed on the proposed schedule – i.e., the DAPs' cases should not be held up by the Class case schedule.

Class Plaintiffs propose bifurcating the briefing schedule for class certification and summary judgment, but believe only one round of *Daubert* motions is necessary, and that the *Daubert* motions (both as to class certification experts and merits experts) should be briefed concurrently with Class Certification (Nos. 22, 23, 24 & 29).

Defendants agree with the Class Plaintiffs as to bifurcating the briefing schedule for class certification and summary judgment, but also propose having the *Daubert* motions bifurcated in like fashion, so that *Daubert* motions related to class certification experts are heard during the class certification briefing, and *Daubert* motions related to merits experts are heard during the summary judgment briefing.

The parties' proposals on these issues—along with differences in timing as between the briefs in questions—are highlighted in the chart below:

| | EVENT | DEFENDANT PROPOSAL | CLASS PROPOSAL | DAP PROPOSAL |
|---|---|---|---|---|
| 22 | Class Certification Motions | **October 25, 2027**<br><br>45 days following close of expert discovery | **April 12, 2027 (Mon) [one round of *Daubert* for class/merits]**<br><br>45 days following close of expert discovery | N/A |
| 23 | Class Certification Opposition Briefs | **December 9, 2027**<br><br>45 days following class cert motion | **May 27, 2027 (Thurs)**<br><br>45 days following submission of class cert motions | N/A |
| 24 | Class Certification Reply Briefs | **January 23, 2028 (class certification only)**<br><br>45 days following oppositions | Class Plaintiffs propose that *Daubert* reply briefs be due on July 26, 2027 with their class certification reply brief due 14 days later. *See* Row 29. | N/A |
| 25 | Class Certification Hearing | Court's discretion | Court's discretion | Court's discretion |
| 26 | Summary Judgment Motions | 90 days following class cert decision. Defendants also propose a second round of *Daubert* for merits experts. | **August 25, 2027 (Weds)**<br><br>30 days after class cert reply | **February 22, 2027 (Mon)** – (can be simultaneous with class certification motions or DAPs and Class proceed on separate schedules) |
| 27 | Summary Judgment Opposition Briefs | 60 days following SJ/*Daubert* motions | **September 24, 2027 (Fri)**<br><br>30 days after motions filed | **April 8, 2027 (Mon)** – (can be simultaneous with class certification motions or DAPs and Class proceed on separate schedules) |

| | EVENT | DEFENDANT PROPOSAL | CLASS PROPOSAL | DAP PROPOSAL |
|---|---|---|---|---|
| 28 | Summary Judgment Replies | 30 days following SJ/*Daubert* oppositions | **October 25, 2027 (Mon)**<br><br>30 days after oppositions | **May 24, 2027 (Mon)** – (can be simultaneous with class certification motions or DAPs and Class proceed on separate schedules) |
| 29 | Daubert motions | Defendants propose that *Daubert* motions as to class certification experts follow the exact same timeline as briefing on the class certification motion, set forth above.<br><br>Defendants propose that *Daubert* motions as to merits experts follow the exact same timeline as briefing on the summary judgment motions. | Class Plaintiffs propose that there should be one period for briefing all *Daubert* motions (class and merits) as well as class certification followed by a separate period for briefing on summary judgment only. | DAPs propose that there can be one period for briefing on all *Daubert*, class certification, and summary judgment motions or DAPs and Class proceed on separate schedules. |

**DAPs' Position:** DAPs propose consolidating the briefing schedule for class certification, summary judgment, and related *Daubert* motions into a single stage of briefing. Under the DAPs' proposed schedule, there are 45 days between opening, opposition, and reply briefs, with all briefing complete by May 24, 2027. DAPs do not believe that this case should stop moving forward while the class plaintiffs and defendants focus on class certification briefing. The issues between class certification and the merits often overlap. For example, the class will likely argue that there is common economic evidence of a conspiracy and that there are econometric models that can demonstrate antitrust injury and damages. This is precisely the same evidence that will be offered at summary judgment. While class certification and summary judgment address different legal

questions, if the same key evidence will be offered in support of both motions, there is no reason to present that evidence to the court twice over a period of 6 months, as the class proposes. The parties can concurrently address class and summary judgment. *See* ECF Nos. 371, 394, *In Re: Google Digital Advertising Antitrust Litigation*, 1:21-md-03010 (S.D.N.Y.) (setting deadline for parties to file motions for class certification and pre-motion letters requesting leave to file summary judgment motions on the same day); *see also* Order, ECF No. 47 at 3, *In Re: Da Vinci Surgical Robot Antitrust Litigation*, 3:21-cv-03825 (N.D. Cal. Aug. 23, 2021) (setting summary judgment briefing before class certification); Scheduling Order, ECF No. 3413 at 6, *In Re Libor-Based Financial Instruments Antitrust Litigation*, 1:11-md-02262 (S.D.N.Y. June 16, 2022) (setting simultaneous deadlines for briefing in support of summary judgment motions on "Upstream Issues," motion to certify proposed class, and *Daubert* motions).

This approach will also not raise any concerns regarding one-way intervention. The one-way intervention rule does not apply in this context. As the Seventh Circuit has explained, the rule against one-way intervention prevents the same plaintiff from acquiring a favorable summary judgment ruling and then asking a district court to certify a class after obtaining that favorable merits ruling. *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1057-58 (7th Cir. 2016). The rule does not prevent parties from briefing class certification and summary judgment simultaneously. *Id.* And since the DAPs by definition are not seeking class certification and will opt out of any certified class in this litigation, the Seventh Circuit's concerns regarding one-way intervention do not apply. *See Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 547 (1974) (explaining that the one-way intervention rule is designed to prevent members of a class from using class certification as a sword and shield). As the court noted at the October 25, 2024 status conference, one-way intervention is

41

not implicated "by the denial of a summary judgment motion" and the court "[did not] see that one-way intervention is a real issue here." Tr. 10/25/24 48:9-49:23.

**Class Position:** Both Class Plaintiffs and Defendants propose bifurcating the briefing schedule for class certification and summary judgment; but Class Plaintiffs believe only one round of *Daubert* motions is necessary, and that the *Daubert* motions should be briefed concurrently with Class Certification (Nos. 22, 23, 24 & 29). Defendants propose two rounds of *Daubert* motions (one on class issues, the next on merits issues), which is inefficient.

Under the Class proposal, summary judgment briefing would occur shortly after the *Daubert*/Class Certification briefing concludes (Nos. 26, 27 & 28), with all briefing concluding by October 2027—whereas Defendants propose to wait 90 days after class certification is *decided* before submitting initial summary judgement briefs—providing no specific deadline.

Defendants' proposal is too long, and DAPs' proposal is too short. Defendants' summary judgement deadline would unnecessarily place the case effectively on hold for three months in addition to the time it takes the Court to decide *Daubert* and Class Certification motions, when the parties could otherwise be using that time to brief summary judgment. The Court should not key any summary judgment deadlines off the class certification *decision*, consistent with its order in *Henry v. Brown*, in which the Court scheduled summary judgment briefing based on when Class Certification was fully *briefed*.

Whether or not all the motions (class, *Daubert*, summary judgment) should be briefed concurrently as DAPs suggest, Plaintiffs agree that a single round of *Daubert* briefing is appropriate—and routine in recent antitrust cases—and doing otherwise would unfairly provide Defendants with two bites at the apple for challenging experts. Holding two rounds of *Daubert* briefing is especially unwarranted where, as here, all parties agree that there should be a single

42

period of expert discovery for (i) the submission of expert reports addressing both class and merits issues, and (ii) expert depositions addressing all issues. Even in cases where there are two sets of reports (one for merits, one for class), *Daubert* motions are often briefed concurrently because both types of expert reports involve overlapping (and even duplicative issues) and briefing these issues concurrently allows the Court to consider all relevant expert evidence simultaneously and efficiently. *See, e.g.*, *In re RealPage Inc. Rental Software Antitrust Litig. (No. II)*, No. 3:23-cv-03071 (M.D. Tenn. Feb. 16, 2024), ECF No. 818 at 5 (scheduling concurrent class certification and *Daubert* motions for reports addressing both class and merits issues). The qualification of each party's experts need only be challenged once (if at all), and matters regarding the suitability of data, experts' assumptions and methodologies, and similar issues are likely to be raised twice if two rounds of *Daubert* motions are presented to the Court. A single round of briefing avoids this duplication, ensures consistent rulings, and preserves judicial resources. *See, e.g.*, *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 158 (S.D. Ind. 2009) (noting the parties amended the schedule to brief class certification and *Daubert* concurrently, because doing otherwise would be "cumbersome, potentially duplicative, and protracted" possibly resulting in "never-ending or ever-changing expert opinions"). For these reasons, courts routinely schedule briefing on both class and merits experts concurrently. *See, e.g.*, *Henry v. Brown Univ.*, No. 22-cv-00125 (N.D. Ill, Sept. 8. 2022), ECF No. 195 at 14 (scheduling single set of *Daubert* motions addressing class certification and merits concurrent with the motion for class certification); *In re Geisinger Health & Evangelical Community Hosp. Healthcare Workers Antitrust Litig.*, No. 21-cv-00196 (M.D. Pa. Feb. 7, 2022), ECF No. 80, 152 at 1 (same); *Greystone Mortg., Inc, v. Equifax Workforce Solutions LLC,* No. 24-2260 (E.D. Pa. Mar. 25, 2025), ECF No. 66 at 2 (scheduling concurrent expert reports, class certification, *Daubert,* and summary judgment briefing); *In re Copaxone Antitrust Litig.,*

2024 WL 5203037, at *3 (D.N.J. Nov. 25, 2024) (scheduling *Daubert* motions on class and merits concurrent with summary judgment).

DAPs propose all three types of briefing (class, *Daubert*, and summary judgment) occur concurrently—with briefing concluding by May 2027. DAP's proposal, while technically possible, raises two issues. The first is practical: filing three (or more) sets of exhibit-heavy briefing concurrently is a cumbersome task; and the Court may not desire to review and rule on that amount of material at the same time anyway. If simultaneous briefing of class, *Daubert*, and summary judgment is the Court's preference, however, Class Plaintiffs do not oppose compressing all briefing for these motions into a consolidated schedule, as the DAPs propose. The second issue is that reaching any decision on the merits of summary judgment—for either DAPs or Class Plaintiffs' claims—before the class opt-out period has run may create a one-way intervention issue that could, in theory at least, preclude certification of the proposed class. As the Seventh Circuit has explained, "the rule against one-way intervention may . . . preclude[] [class] certification" when the trial court rules on "summary judgment prior to deciding class certification." *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1058 (7th Cir. 2016) (noting that the "rule against one-way intervention prevents plaintiffs from moving for class certification after acquiring a favorable ruling on the merits of a claim" and that plaintiffs, "by moving for class certification and partial summary judgment at the same time, came dangerously close to precluding review of the class certification decision"). As Defendants do not waive their one-way intervention objections here, the Class Plaintiffs request a case schedule that does not create a risk that class certification might be precluded. Such concerns explain why courts typically sequence briefing on class certification motions before summary judgment motions. Indeed, the DAPs do not identify a single class action in which the court ordered a single briefing period for class certification,

44

*Daubert*, and a complete summary judgment motion, absent consent of the defendants. The Class Plaintiffs believe addressing the issues through efficient sequential briefing is preferable to a consolidated briefing period with the Court then potentially overwhelmed with material and left to stagger its decisions, such that it waits to issue any summary judgment ruling until after ruling on class certification—and if granted, the notice and opt-out period has run—to avoid any one-way intervention issues. *See Costello*, 810 F.3d at 1058 (holding the one-way intervention rule did not preclude class certification because the court chose to deny Plaintiffs' motion for class certification before addressing their concurrent motion for summary judgment).

One final nuance in the proposals is that the Class Plaintiffs seek an extra fourteen days after *Daubert* reply briefs are due on July 12, 2027 to file their class certification reply brief, which would be due July 26, 2027 (No. 24). This timing allows the Class plaintiffs to address any issues that arise in the *Daubert* replies and have the final say on their class certification motion, consistent with the schedule this Court ordered in *Henry v. Brown*.

**<u>Defendants' Position</u>:** Defendants propose that summary judgment motions and *Daubert* motions for merits experts be filed after the Court's decision on class certification, as set forth in the table above. This staged approach to management of this highly complex case is preferable for at least three reasons.

First, the Court's decision on class certification will inform the scope of summary judgment briefing and evidence, resulting in more efficiency and focus for such dispositive motions. For example, if the Court denies certification of a nationwide class of "[a]ll healthcare providers and practices in the United States and its territories that were paid for out-of-network healthcare services," CCAC ¶ 318, then summary judgment motions on the merits likely would focus on the narrower subset of geographic areas and services implicated by the named Plaintiffs. Likewise, if

a subclass is certified that is specific to certain types of MultiPlan services and the manner in which they are used, then that would narrow the scope of summary judgment briefing and evidence on issues of antitrust standing and injury. It is inefficient for the parties and the Court to incur the substantial burdens related to briefing summary judgment assuming that the maximum scope of class certification will be granted. It is simply more efficient for the Court and the parties to know whether and what class can be certified—and how the Court has analyzed those issues, which may overlap with the merits—before briefing summary judgment. That efficiency and analysis of key issues in the case more broadly would accrue to summary judgment involving the DAPs, as well, given similarities in all plaintiffs' allegations.

Second, for the reasons noted above, Defendants' proposal is consistent with the approaches in scheduling orders from other large antitrust cases in this District in which class certification was sequenced prior to summary judgment. *See, e.g.*, *In re Delta Dental Antitrust Litig*, No. 19-cv-6734 (N.D. Ill. Sept. 11, 2020), ECF No. 306 (ordering that proposed schedule for summary judgment and *Daubert* motions for merits experts would be determined after the ruling on class certification); *In re Turkey Antitrust Litig.*, No. 19-cv-8318 (N.D. Ill. Jan. 11, 2021), ECF No. 210 (same); *In re Broiler Chicken Antitrust Litig.*, No. 16-cv-8637 (N.D. Ill. Apr. 27, 2017), ECF No. 388 (ordering summary judgment motions and *Daubert* motions for merits experts to be filed 240 days after ruling on class certification, with 60 days for responses and 45 days for replies). In fact, Defendants here propose a relatively faster timetable in comparison to the other scheduling orders mentioned above. Defendants' schedule is proposed now, far in advance of a class certification decision, and Defendants request a filing date of 90 days (not 240) after that decision.

Third, the proposals of Class Plaintiffs (starting summary judgment briefing one month after class certification ***briefing*** closes) and DAPs (simultaneous class certification and summary judgment briefing) do not account for the rationale behind the one-way intervention rule, which is to separate merits issues from the decision of putative class members to opt-out of any certified class. *See, e.g.*, *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1057–58 (7th Cir. 2016) ("Plaintiffs, by moving for class certification and partial summary judgment at the same time, came dangerously close to precluding review of the class certification decision. Had the district court chosen to decide Plaintiffs' motion for partial summary judgment prior to deciding class certification, the rule against one-way intervention may have precluded certification."). The DAPs' argument that one-way intervention concerns do not apply, because the DAPs will opt-out of any class regardless, is wrong. Given the substantial overlap between the Class Plaintiffs' and DAPs' allegations, summary judgment in the DAP cases would clearly inform putative class members' opt-out decisions.

Finally, Defendants sensibly propose that Daubert motions for class certification and merits analyses should occur separately, as courts in this District have ordered in other cases. *See, e.g.*, *In re Delta Dental Antitrust Litig.*, No. 19-cv-6734, ECF No. 306 (ordering that Daubert motions for class certification experts and Daubert motions for merits experts would be briefed separately); *In re Turkey Antitrust Litig.*, No. 19-cv-8318, ECF No. 210 (same); *In re Broiler Chicken Antitrust Litig.*, No. 16-cv-8637, ECF No. 388 (same). It would be more efficient to focus on distinct class-related expert analyses first, rather than packing additional merits-related expert analyses into the same Daubert motions.

In summary, Defendants' reasonable proposal for sequencing summary judgment after class certification promotes efficient and orderly resolution of this large and complex case.

### H.    Proposed Limits on Written Discovery

The parties agree that, as part of the case scheduling, it would be useful to have guidance from the Court now as to any limits on written discovery.

#### a.   *Requests for Production*

**<u>Plaintiffs' Joint Proposal</u>:** Plaintiffs do not agree that a formal limit on requests for production is appropriate, or that this issue need be addressed at this juncture when there has been no showing of any discovery overreach on the part of any party. Plaintiffs are unaware of any complex antitrust case where a court has preemptively set a limit on RFPs, and Defendants have pointed to none. Indeed, attempting to resolve this issue now, before fact discovery has fully opened, sets up the parties and the Court for unnecessary disputes about what constitutes a "single" request and ignores the fact that sometimes compound requests are clearer and more narrow than non-compound requests.

If the Court wishes to set a limit on requests for production at the outset of the fact discovery period, Plaintiffs propose 125 requests for production as a limit, not counting the parties' first two sets of requests for production and including all discrete subparts. They further propose that the parties be permitted to seek additional limited RFPs from the Court for good cause shown.

**<u>Defendants' Proposal</u>:** Defendants propose that the parties be limited to 75 additional document requests (beyond those already included in the parties' First and Second Sets of RFPs), including discrete subparts; and that any party can seek leave of court to issue additional document requests for good cause.  Plaintiffs oppose any limit on RFPs, but in the alternative suggest that the limit should be 125.  The Manual for Complex Litigation (Fourth) notes that the Court has broad discretion to impose limits on the "scope and quantity" of discovery requests, including "on the volume of requests for production."  § 11.422.  It further notes that "[p]resumptive limits should be set early in the litigation, before discovery has begun," and should "balance efficiency and

economy against the parties' need to develop an adequate record for summary judgment or trial." *Id.*; *see, e.g.*, *Henry v. Brown Univ.*, No. 22-cv-125, ECF No. 315 (limiting plaintiffs to 100 requests for production). Particularly given the aggressive discovery schedule being contemplated, it is important that the parties have certainty up front about the limits of document discovery, and Defendants propose that 75 (in addition to the existing document requests) is sufficient.

### b. *Interrogatories*

**Plaintiffs' Joint Proposal:** Plaintiffs may collectively propound no more than 50 written interrogatories, including all discrete subparts, on Defendants. Defendants may collectively propound no more than 50 written interrogatories, including all discrete subparts, on Plaintiffs.

**Defendants' Proposal:** With regard to interrogatories, plaintiffs have proposed expanding the number of interrogatories to 50, double the presumptive limit in Fed. R. Civ. P. 33. Defendants do not believe there is good cause at this point to modify the 25-interrogatory limit, particularly at the outset of discovery.

## I. Timing of Privilege Logs

**Plaintiffs' Joint Position:** Plaintiffs propose that the parties submit rolling privilege logs 30 days after each production. Courts have recognized that a 30-day time limit is the "default guideline" for producing privilege logs under Fed. R. Civ. P. 34. *See, e.g.*, *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, 244 F.R.D. 412, 425-26 (N.D. Ill. 2006) ("using the 30–day period [under Fed. R. Civ. P. 34] as a default guideline" for producing a privilege log) (quoting *Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Ct. for Dist. of Mont.*, 408 F.3d 1142, 1149 (9th Cir. 2005)). The production of rolling privilege logs ensures the parties can timely and efficiently resolve privilege disputes amongst themselves, or with the Court's guidance where necessary. That is why numerous courts managing antitrust MDLs have ordered the production of rolling privilege logs. *In re Granulated Sugar Antitrust Litig.*, No. 24-md-03110 (D. Minn. Mar. 17, 2025), ECF

No. 345 at 29-30 ("Unless otherwise agreed by the Parties, privilege logs will be produced on a rolling basis within thirty (30) days of the production from which documents were withheld[.]"); *FTC v. Amazon.com, Inc.*, No. 2:23-cv-01495 (W.D. Wash. June 11, 2024), ECF No. 256 at 9 (requiring defendant to make rolling privilege log disclosures); *In re Generic Pharms. Pricing Antitrust Litig.*, No. 2:16-md-02724 (E.D. Pa. Apr. 6, 2021), ECF No. 1736 at 2 (ordering defendants to produce privilege logs on a rolling basis); *In re Liquid Aluminum Sulfate Antitrust Litig.*, No. 2:16-md-02687 (D.N.J. Oct. 8, 2018), ECF No. 1094 at 3 (requiring defendant to disclose privilege logs on a rolling basis).

The belated production of privilege logs—particularly when they are produced towards the close of fact discovery—can result in unexpected disputes and significant case delays. *See, e.g.*, Status Report, *In re RealPage, Inc. Rental Software Antitrust Litigation (No. II)*, No. 3:23-md-03071 (M.D. Tenn. June 6, 2025), ECF No. 1158 at 68 (MDL plaintiffs arguing that defendants did not disclose that they withheld more than 50,000 documents based on claims of privilege and suggesting that case management order deadlines should be extended to accommodate ongoing disputes concerning privileged documents and structured data). By requiring prompt, rolling productions, Plaintiffs' proposal ensures the parties can work out any disputes concerning the designation of documents as privileged in a timely manner without disrupting further deadlines.

**<u>Defendants' Position</u>:** Defendants propose that all privilege logs be served within 30 days after substantial completion deadline for those productions made on or before the substantial completion deadline, or within 30 days after a production for those productions made after the substantial completion deadline. This is consistent with the approach taken in other antitrust MDLs in this District. *See, e.g.*, *In re Turkey Antitrust Litig.*, No. 19-cv-8318 (N.D. Ill. Jun. 9, 2025), ECF No. 201 (adopting this approach to privilege log timing). Plaintiffs do not cite any antitrust

cases in this District adopting the 30-day rolling production deadline they propose. And the eight months in Defendants' schedule between the substantial completion and close of fact discovery deadlines provides ample time to resolve any privilege log disputes.

Dated: June 10, 2025

/s/ Christopher A. Seeger
Christopher A. Seeger
**SEEGER WEISS LLP**
55 Challenger Road 6th Fl.
Ridgefield Park, NJ 07660
Tel.: (973) 639-9100
Fax: (973) 679-8656
cseeger@seegerweiss.com

*Plaintiffs' Coordinating Counsel*

/s/ Sadik Huseny
Sadik Huseny (*pro hac vice*)
**LATHAM & WATKINS LLP**
300 Colorado Street, Suite 2400
Austin, TX 78701
Tel.: (737) 910-7300
sadik.huseny@lw.com

*Defendants' Coordinating Counsel*

/s/ Shawn J. Rabin
Shawn J. Rabin (*pro hac vice*)
**SUSMAN GODFREY LLP**
One Manhattan West, 50th Floor
New York, NY 10001-8602
Tel.: (212) 336-8330
srabin@susmangodfrey.com

*Interim Class Liaison Counsel*