**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

IN RE: MULTIPLAN HEALTH
INSURANCE PROVIDER LITIGATION

This Document Relates To:

ALL ACTIONS

Case No. 1:24-cv-6795
MDL No. 3121

Hon. Matthew F. Kennelly

## MULTIPLAN INC.'S OPPOSITION TO PLAINTIFFS' MOTIONS TO COMPEL REGARDING PLAINTIFFS' PROPOSED TIME PERIODS, CUSTODIANS, AND SEARCH TERMS

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 5

    A.    Plaintiffs' Cases Allege a Hub-and-Spoke Conspiracy Beginning in 2015 ............5

    B.    Plaintiffs' Expansive Discovery Requests Seek Virtually All Documents
           Relating to Broad Swaths of MultiPlan's Business .................................................6

    C.    The Parties' Negotiations Over Custodians, Search Terms, and Relevant
           Time Period ..........................................................................................................7

    D.    MultiPlan Has Produced Many Thousands of Non-Custodial Documents
           and Will Produce Thousands More, Along With Vast Data and Other
           Materials, Including Source Code ..........................................................................9

    E.    Plaintiffs' Requested Custodians, Search Terms, and Time Period
           Exponentially Increase the Burden and Scope of Discovery ................................10

LEGAL STANDARD.................................................................................................... 12

ARGUMENT ................................................................................................................ 12

    A.    Plaintiffs' 12 Additional Requested Custodians Are Duplicative of
           MultiPlan's 18 Proposed Custodians and Are Unlikely to Possess
           Material, Unique Information ...............................................................................12

          1.    MultiPlan's Custodians Have Information That, Together, Will
                Cover Every Issue on Which Plaintiffs Seek Discovery............................13

          2.    Plaintiffs' 12 Additional Custodians Cover the Same Ground as
                MultiPlan's Set of 18................................................................................18

    B.    Plaintiffs' Search Terms Produce an Unreasonable Number of False Hits,
           the Review of Which Will Divert Time and Resources ........................................22

    C.    Plaintiffs' Demand for Several Additional Years Is Not Proportional to the
           Needs of the Case..................................................................................................26

    D.    The Parties Should Proceed with MultiPlan's Parameters and Revisit
           Potential Supplementation Later, or Plaintiffs Should Bear the Cost of
           Their Demands for Early, Overbroad Document Production ................................29

CONCLUSION.............................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Chicago Regional Council of Carpenters Pension Fund v. Celtic Floor Covering*
  *Inc.*, 316 F. Supp. 3d 1044 (N.D. Ill. 2018) ..............................................................11

*FTC v. Deere & Co.*,
  2025 WL 1866817 (N.D. Ill. July 7, 2025)................................................................12

*In re Broiler Chicken Antitrust Litig.*,
  2018 WL 3398141 (N.D. Ill. July 12, 2018).............................................................21

*In re Broiler Chicken Antitrust Litig.*,
  No. 6 C 8637, 2020 WL 1046784 (N.D. Ill. Mar. 4, 2020) .....................................4

*In re Exactech Polyethylene Orthopedic Prods. Liab. Litig.*,
  347 F.R.D. 572 (E.D.N.Y. 2024) ............................................................................22

*In re Fine Paper Antitrust Litig.*,
  685 F.2d 810 (3d Cir. 1982).....................................................................................4

*In re Hair Relaxer Mktg. Sales Pracs. and Prods. Liab. Litig.*,
  2023 WL 8935006 (N.D. Ill. Dec. 27, 2023)............................................................12

*In re Linerboard Antitrust Litig.*,
  296 F. Supp. 2d 568 (E.D. Pa. 2003) .......................................................................3

*In re Outpatient Medical Center Employee Antitrust Litigation*,
  2023 WL 4181198 (N.D. Ill. June 26, 2023)............................................................27

*In re Sulfuric Acid Antitrust Litig.*,
  231 F.R.D. 351 (N.D. Ill. 2005)...............................................................................3

*Kleen Prods. LLC v. Packaging Corp. of Am.*,
  2013 WL 120240 (N.D. Ill. 2013) ...........................................................................27

*Miller v. Trans Union, LLC*,
  2007 WL 2351199 (N.D. Ill. Aug. 14, 2007) ..........................................................12

*Motorola Sols., Inc. v. Hytera Commc'ns Corp.*,
  365 F. Supp. 3d 916 (N.D. Ill. 2019) ...................................................................3, 12

*United States v. IBM Corp.*,
  83 F.R.D. 97 (S.D.N.Y. 1979) .................................................................................3

*Wiginton v. C.B. Richard Ellis, Inc.*,
   229 F.R.D. 568 (N.D. Ill. 2004).............................................................................................29

**RULES**

Fed. R. Civ. P. 26...............................................................................................................3, 12, 29

## INTRODUCTION

Plaintiffs bring two separate motions to compel against MultiPlan related to the document production parameters (custodians, time period, and search terms) for MultiPlan's forthcoming custodial productions. ECF Nos. 573, 574. MultiPlan has sought for months to negotiate these parameters with Plaintiffs. Yet, unlike their negotiations with every other Defendant in this case, Plaintiffs refused to engage in any meaningful discussion with MultiPlan about the perceived shortcomings in MultiPlan's discovery plans or the implications of expanding discovery as Plaintiffs request. *First*, Plaintiffs rejected MultiPlan's proposal of 18 document custodians, instead demanding 30—where none of the additional 12 custodians have unique, non-duplicative information beyond what MultiPlan's 18 custodians will provide as to the key issues in this proceeding. *Second*, Plaintiffs demand facially overbroad search terms that demonstrably generate voluminous false hits and will yield a review set of approximately 9.5 million documents under Plaintiffs' proposal—well beyond anything proportionate to the needs of the case. And *third*, Plaintiffs insist on a 13-year "general" discovery period for MultiPlan despite conceding that 12 years is appropriate for every other defendant, and despite MultiPlan's agreement to an even longer time period for certain go-get document categories.

Critically, in complex cases of this sort, these discovery demands must be assessed together, because each brings multiplicative effects to substantially inflate the total number of documents at issue. One cannot fairly determine the burden and proportionality of Plaintiffs' requests by examining them individually. Yet Plaintiffs prefer to isolate each discovery parameter from the others, masking their collective effects—even refusing MultiPlan's request that this dispute be presented to the Court in a single motion to compel. MultiPlan files this consolidated opposition—as approved by the Court in ECF No. 572—in order to appropriately address these issues. Both of Plaintiffs' motions are meritless, as discussed below. Together they, along with

Plaintiffs' prior motions to compel against MultiPlan, reflect a strategy to bury MultiPlan in unwarranted discovery disputes, regardless of relevance, burden, or proportionality:

1.     ***MultiPlan offered unquestionably robust document production parameters.*** MultiPlan offered custodians and search terms that, in MultiPlan's estimations, would likely lead to a review set of over 3 million documents, over a twelve year discovery period.  This production will respond to roughly 50 RFPs seeking information on virtually every corner of this case:  from MultiPlan's acquisitions of various analytic tools over the years; to MultiPlan clients' use of out-of-network services; to communications with MultiPlan's co-defendants; to MultiPlan's development pipeline and competitive analyses.  This massive custodial production will accompany many thousands of non-custodial documents (nearly 40,000 of which MultiPlan has already produced), many millions of lines of structured claims data, and certain source code, all of which MultiPlan has agreed to provide.

2.     ***Plaintiffs do not identify any meaningful deficiency in MultiPlan's discovery plan.*** Plaintiffs focus entirely on getting "more," and do not identify any deficiency or any important subject areas *not* covered by MultiPlan's proposed parameters.  They do not, because they cannot: MultiPlan's robust discovery plan is proportionate to the needs of the case.

3.     ***Plaintiffs ignore burden and proportionality, the key factors in complex case discovery disputes.***  As explained in detail herein, each of Plaintiffs' three parameter demands are disproportionate to the needs of the case.  In combination, Plaintiffs' demands will exponentially increase the scope of discovery well beyond any colorable utility and doom any hope of staying even close to the current case schedule.  MultiPlan estimates (based on conservative extrapolations from its initial custodial pulls) that Plaintiffs' proposal, altogether, would yield a review set of over *10 million documents.*  At a standard rate of two minutes per document reviewed, this would

2

require approximately 316,000 hours in first-level attorney review that would take a team of 200 attorneys approximately *40 weeks* to complete, without TAR. Even under Defendants' proposed TAR protocol, only a portion of this burden would be alleviated: assuming that TAR allows MultiPlan to avoid reviewing one-third of the review set, MultiPlan estimates it would take approximately 211,000 hours in first-level attorney review that take a team of 200 attorneys over *26 weeks* to complete.

Plaintiffs' motions ignore the proportionality concerns fundamental to the scope of discovery permitted under Rule 26. Fed. R. Civ. P. 26(b)(1) (the scope of discovery includes relevant matters "proportional to the needs of the case, considering" various factors including "whether the burden or expense of the proposed discovery outweighs its likely benefit"). Instead, Plaintiffs invoke for this Court—as their lead case—a *46-year-old decision*, decided before proportionality became part of the Federal Rules, to suggest that the burden of reviewing many millions of documents may be reasonable because IBM (one of the largest companies in the world in 1979) was ordered to do so. ECF 574 at 5 (citing *United States v. IBM Corp.*, 83 F.R.D. 97 (S.D.N.Y. 1979)). This is telling. Today, "relevance alone does not translate into automatic discoverability" and "assessment of proportionality is essential." *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 365 F. Supp. 3d 916, 924 (N.D. Ill. 2019). Plaintiffs therefore cannot rely on "the *ipse dixit* that the information is relevant, as though that alone were outcome-determinative." *Id.* at 925. Indeed, even though all of the cases Plaintiffs cite are old, many of them involve substantially *less* document discovery than will occur here (either on a per-defendant basis, or in the case as a whole).[1] And Plaintiffs' requests here go far beyond what other recent cases have

---

[1] *See, e.g.*, *In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 351, 354 (N.D. Ill. 2005) (noting production of between 840,000 and 1,000,000 documents across three defendants); *In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003) (millions of **pages** of documents produced in case involving twelve

deemed reasonable. *See, e.g., In re Broiler Chicken Antitrust Litig.*, 2020 WL 1046784, at *1 (N.D. Ill. Mar. 4, 2020) (noting in that "it is difficult to see how Plaintiffs could make [a showing of particularized need for additional discovery] considering they have already received eight million documents" across many defendants).

**4. Plaintiffs ignore the enormous volume of documents they will obtain from all of the defendants in the case.**   In addition to ignoring burden and proportionality concerns as to MultiPlan alone, Plaintiffs fail to acknowledge the enormous volume of documents that will be reviewed and produced by the other 16 defendants in this litigation—*including the relevant communications the payor defendants had with MultiPlan.*[2]   These defendants will review many millions of documents, with millions of documents in total likely to be produced.   It is against this backdrop that Plaintiffs seek the review of many million *more* documents from MultiPlan.   Where the core issue in this case is Plaintiffs' allegation of a supposed "cartel" agreement, there is no colorable argument that MultiPlan's discovery plan is deficient, particularly when considered in the context of the abundant discovery materials from defendants overall.

**5. Plaintiffs' demands are fundamentally at odds with the normal and appropriate rolling approach to complex litigation discovery.**   There is a normal, iterative course to discovery in complex antitrust cases:   negotiate reasonably tailored custodians, search terms, and time periods to begin with so as not to delay productions, proceed with review and production of such

---

different defendant manufacturers); *In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 816 (3d Cir. 1982) (nearly two million documents produced in case involving 15 defendants).

[2] Plaintiffs do not tell the Court anything about what the other defendants have agreed to review. MultiPlan understands that, collectively the set of documents agreed to be reviewed by the other defendants totals many millions of documents (likely close to ten million), that the other defendants have agreed to run search terms intended to capture such communications with MultiPlan, and they have selected as custodians those who would have had substantial communications with MultiPlan during the relevant time period.

materials (here, millions of documents), and then, as the productions may warrant, discuss whether additional custodians, search terms, or document requests should be added to the agreed-parameters. This is the appropriate way to ensure discovery is proportional.

Plaintiffs' counsel know this, having been involved in numerous other complex antitrust cases. And indeed, Plaintiffs appear to have taken that very approach with the *other* defendants in the case. There is no basis for proceeding differently—and in unprecedented fashion—as to MultiPlan alone, especially in light of the robust parameters MultiPlan intends to use.

*       *       *

MultiPlan respectfully requests that the Court deny Plaintiffs' motions and allow MultiPlan to proceed with its proposed document discovery parameters. If the Court is inclined to go broader, MultiPlan respectfully requests that the Court consider ordering Plaintiffs to bear the cost of the additional volume of documents that must be reviewed. MultiPlan's objections to Plaintiffs' inappropriate parameters are based solely on marginal relevance, undue burden, and proportionality. If Plaintiffs do not want to proceed with the ordinary course of receiving document productions and then engaging in good faith discussions about appropriate expansions (if any), and instead front-load a massive burden on MultiPlan, they should shoulder that cost.

## BACKGROUND

### A.    Plaintiffs' Cases Allege a Hub-and-Spoke Conspiracy Beginning in 2015

As the Court is aware, Plaintiffs' claims in this proceeding center around the allegation that, starting around 2015, payors supposedly began conspiring with each other, through MultiPlan, to set prices for OON healthcare services. Consolidated Class Action Complaint ("CCAC") ¶ 109, ECF No. 172 (alleging that "[o]nce their NYAG settlement agreements began to expire in 2015 and 2016, the major insurers all began using MultiPlan's claims repricing services instead"); DAP Master Complaint ("DAPC") ¶ 289, ECF No. 182 (alleging that "payors began to

use MultiPlan's pricing methodology in the roughly three-and-a-half year period between April 2015 and November 2018). This theory is based on payors switching from "FAIR Health's UCR benchmark"—the use of which had been mandatory until 2015 for some defendants bound by a settlement agreement—to MultiPlan's services. Motion to Dismiss Order ("MTD Order") at 6, ECF No. 428.[3] That is, Plaintiffs alleged an agreement *among payors* to "stop[] using their own pricing discretion" in "a tight time period." DAPC ¶ 289; *see also* CCAC ¶ 173.

Plaintiffs' claims thus are predicated not on the MultiPlan services themselves, standing alone, but on an agreement among Defendants to adopt them starting around 2015. Indeed, Plaintiffs never dispute that the MultiPlan services on which Plaintiffs' claims are based—Data iSight, Viant, and negotiation services—had all been part of the competitive landscape for at least six years prior to the alleged conspiracy and, in some cases, for well over a decade.

**B.      Plaintiffs' Expansive Discovery Requests Seek Virtually All Documents Relating to Broad Swaths of MultiPlan's Business**

Despite the narrow theory that survived dismissal, Plaintiffs' requests for production are expansive, touching on nearly every corner of MultiPlan's OON business. By way of example:

- RFP No. 17: All Documents and Communications related to MultiPlan's OON Repricing Services or OON pricing generally between or among any two or more Defendants or their agents or Representatives.

---

[3] In its motion to dismiss order, the Court rejected Plaintiffs' argument that "agreements between MultiPlan and third-party payors to determine out-of-network service payment rates and negotiate those rates should be treated as horizontal agreements." *Id.* at 27. The Court also found that "contracts between MultiPlan and the third-party payors" are not "direct evidence" of an unlawful agreement among payors. *Id.* at 30. Further, the Court found that Plaintiffs had not "plausibly alleged that MultiPlan's Data iSight algorithm compiles competitively sensitive data for use in its rate calculations." *Id.* at 38. Instead, in allowing Plaintiffs' claims to proceed, the Court found that Plaintiffs had plausibly alleged through circumstantial evidence an agreement among payors, facilitated by MultiPlan, to fix prices for healthcare services offered on an OON basis. *Id.* at 29-44. The parallel conduct Plaintiffs alleged was that the payors "all switched from using traditional UCR benchmarks when calculating out-of-network service rates to MultiPlan's rate calculation and negotiation services." *Id.* at 30.

- RFP No. 23:  For the time period from January 1, 2010 to the present, all Documents and Communications concerning any acquisition, development, use, or deployment of OON Repricing Services (or any entity related thereto) [...] .

- RFP No. 41:  For the time period from January 1, 2010 to the present, for each of Your, MultiPlan's, or any other OON Repricing Services, all Documents and Communications related to the actual or considered development, modification, implementation, or acquisition of that Repricing Service.

- RFP No. MP57:  For the time period January 1, 2010 to the present, all Documents and Communications relating to internal MultiPlan meetings, including, but not limited to, [...] any meeting of MultiPlan Employees or staff responsible for OON Pricing, non-par/OON cost containment, or OON bill negotiation services.

*See generally* Ex. A (Plaintiffs' Third Set RFPs) at 13, 14, 19, 22.  Just these RFPs seek virtually all documents relating in any way to MultiPlan's "OON Repricing Services," all internal MultiPlan meetings, and all communications with MultiPlan's clients regarding OON pricing.

Despite their overbreadth, MultiPlan generally agreed, subject to its objections, to search for and produce documents responsive to over 50 of Plaintiffs' requests and proposed search terms intended to broadly capture responsive documents.

### C. The Parties' Negotiations Over Custodians, Search Terms, and Relevant Time Period

To identify documents responsive to Plaintiffs' requests—despite their overbreadth—MultiPlan proposed custodians and search terms, and then repeatedly expanded those proposals through negotiations with Plaintiffs.

MultiPlan initially proposed a list of 10 custodians, together covering the major issues in this litigation.  Plaintiffs agreed that those 10 were the appropriate custodians—but then demanded an *additional 67 custodians*—without any basis or justification.  MultiPlan requested a more targeted list, and Plaintiffs then proposed a list of 43 additional custodians on top of the initial 10. MultiPlan closely considered each of the additional requested custodians and agreed that 4 of the individuals on Plaintiffs' list were appropriate.  Plaintiffs insisted on 19 more.  MultiPlan sought

7

to resolve the dispute by offering an additional 4 duplicative or otherwise unnecessary custodians, reserving the right to stand on its 14 previously disclosed custodians if Plaintiffs refused that compromise. Plaintiffs did not accept that offer and have moved to compel MultiPlan to use 30 custodians (the 14 MultiPlan proposed, the 4 MultiPlan proposed to add in its compromise proposal, and 12 more).

The parties similarly engaged in extensive search term negotiations. Since MultiPlan proposed its initial set of search terms, the parties have gone back and forth with six sets of revisions. MultiPlan ran hit reports, reviewed samples of documents pulled in by those search terms, and met-and-conferred with Plaintiffs twice to discuss the parties' positions. In the course of those negotiations, MultiPlan compromised on the use of 16 specific search strings, and the parties narrowed other disputes, but disagree on the remainder.

With regard to time period, Plaintiffs' requests called for a general relevant time period going back to January 1, 2012, with many of their broadest requests extending back to January 1, 2010. MultiPlan proposed a general relevant time period going back to January 1, 2015—the year Plaintiffs have presented as the beginning of the conspiracy—but eventually offered a compromise start date of January 1, 2013, to provide two years of additional discovery before Plaintiffs even allege the conspiracy began. Plaintiffs refused to compromise, despite doing so with every other defendant in this case. The parties also discussed the time period for certain specific requests where Plaintiffs sought information from before the general relevant time period. The parties reached agreement on RFPs 15, 16, and 34 to the extent such requests are amenable to collection on a go-get basis. The parties were not able to reach compromise on RFPs 23, 24, and 41. Plaintiffs requested 9 custodians (including many not on MultiPlan's list) going back to January 1, 2010, for those requests. MultiPlan does not agree that any discovery preceding 2013 is

appropriate for these RFPs, but offered two custodians going back to 2010 to resolve the dispute. Plaintiffs refused this too, and move to compel discovery from 9 custodians on these requests, dating back to 2010.

### D. MultiPlan Has Produced Many Thousands of Non-Custodial Documents and Will Produce Thousands More, Along With Vast Data and Other Materials, Including Source Code

MultiPlan has already produced over 150,000 pages of documents (across nearly 40,000 documents) in response to Plaintiffs' go-get discovery requests. Among these productions, MultiPlan has provided:

- Hundreds of contracts with payor defendants for a variety of services, including some dating back decades.
- Tens of thousands of granular reports breaking down clients' varied use of MultiPlan's services.
- Hundreds of documents relating to "project priority" meetings.
- Nearly 100 documents related to MultiPlan's CAB meetings, including presentations describing the functionality of MultiPlan's products.

MultiPlan is also investigating, reviewing, and producing vast quantities of data and additional documents drawn from non-custodial sources. This includes robust and key sources of information, including (1) structured data expected to reflect hundreds of millions of lines of healthcare claims; (2) technical documents reflecting changes made to the functionality of the services at issue; and (3) board of directors documents. Indeed, Plaintiffs have even demanded some of the most sensitive information companies possess—source code—related to essentially all of MultiPlan's services. MultiPlan has agreed to provide some source code (notwithstanding the Court's motion to dismiss order finding that Plaintiffs had not "plausibly alleged that MultiPlan's Data iSight algorithm compiles competitively sensitive data for use in its rate calculations," MTD Order at 38), and the parties are currently in negotiations about source code productions and protections.

### E. Plaintiffs' Requested Custodians, Search Terms, and Time Period Exponentially Increase the Burden and Scope of Discovery

In response to Plaintiffs' proposals to expand the custodians, search terms, and time period, MultiPlan has investigated whether—and to what extent—it could reasonably accommodate Plaintiffs' demands. MultiPlan tested the parties' proposed search terms on collections so far from 11 of MultiPlan's custodians going back to 2014. Even on that limited subset of custodians and shorter timeframe, Plaintiffs' search terms hit on approximately 2.3 million documents and, including family documents, capture approximately 3.6 million documents out of a searchable set of 7 million. Attached as Exhibit B is a chart showing the hits on the disputed terms, including family documents. This provides a more helpful guide to the parties' disputes than Plaintiffs' Exhibit 1 which (1) does not contain any information about family documents (which determines the true scope of MultiPlan's burden) and (2) does not contain hit information for Plaintiffs' final proposed search terms, which were only provided to MultiPlan the evening before Plaintiffs filed their motions to compel.

Extrapolating from these search term hits, MultiPlan's best estimate is that Plaintiffs' *full* demand—which involves expansive search terms as to *30* custodians, a general start date of January 1, 2012, and several additional years of materials for 9 of those 30 custodians—will present a review set of approximately 9.5 million custodial documents. This would be on top of the many thousands of non-custodial documents (and other materials) MultiPlan intends to produce.

MultiPlan anticipates that attorney review of 9.5 million documents would require approximately 316,000 hours of first-level review, assuming that reviewers would spend two

minutes reviewing each document.[4]  With a team of 200 contract attorneys, that would take approximately 40 weeks.  Even if TAR eliminates the need to review one-third of the documents in the review set, MultiPlan would still need over 26 weeks with 200 contract attorneys (at a total of approximately 211,000 reviewer-hours) for the first-level review.

MultiPlan's proposed search terms, by contrast—while still pulling millions of documents for review—are within the realm of reason and proportionality.  Based on its pull to date of 11 custodians going back to 2014, MultiPlan's search terms hit on over 980,000 documents—1.8 million including families.  Extrapolated to the full 18 custodians, and going back to 2013, as Multiplan set forth in its rejected compromise proposal to Plaintiffs, MultiPlan conservatively estimates that MultiPlan's proposed search terms will bring approximately *3 million* documents into the review set.  The full impact of Plaintiffs' proposal is set forth in the following chart:

| Scope | MultiPlan: Estimated Documents and Review Time | Plaintiffs: Estimated Documents and Review Time |
|---|---|---|
| 14 custodians going back to Jan. 1, 2013 | Documents: **2,400,000**  Hours to Review: **80,000** | Documents: **4,700,000**  Hours to Review: **156,000** |
| 18 custodians going back to Jan. 1, 2013 | Documents: **3,000,000**  Hours to Review: **100,000** | Documents: **5,900,000**  Hours to Review: **197,000** |
| 30 custodians going back to Jan. 1, 2012, with 9 additional custodians going back to Jan. 1, 2010 for particular search terms | Documents: **5,200,000**  Hours to Review: **173,000** | Documents: **9,500,000**  Hours to Review: **316,000** |

---

[4] Plaintiffs are wrong that deduplication will eliminate the burden of adding new custodians.  ECF No. 374 at 14.  Deduplication eliminates only completely *identical* documents.  It will do nothing to address slightly different versions of the same document or distinct documents that address the identical subject matter.

## LEGAL STANDARD

While the resolution of discovery disputes is "committed to the court's extremely broad discretion," *Chi. Reg'l Council of Carpenters Pension Fund v. Celtic Floor Covering Inc.*, 316 F. Supp. 3d 1044, 1046 (N.D. Ill. 2018), the permissible scope of discovery is not boundless. A court must limit the extent of discovery when "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C)(i).

Importantly, where the marginal relevance of the material sought is outweighed by the burden of production, a moving party's motion to compel discovery is regularly denied. *See FTC v. Deere & Co.*, 2025 WL 1866817, at *2 (N.D. Ill. July 7, 2025) ("even minimal burdens are undue if the sought-after material adds little value to the litigation"); *Motorola Sols., Inc. v. Hytera Commc'n Corp.*, 365 F. Supp. 3d 916, 924 (N.D. Ill. 2019) (acknowledging that "district courts, which have extensive discretion in granting and denying discovery, have long held that it is permissible to refuse to grant discovery of matters of 'marginal relevance'"); *Miller v. Trans Union, LLC*, 2007 WL 2351199, at *4 (N.D. Ill. Aug. 14, 2007) (denying motion to compel where marginal relevance of an additional 32,000 documents would be outweighed by the burden of production); *In re Hair Relaxer Mktg. Sales Pracs. and Prods. Liab. Litig.*, 2023 WL 8935006, at *4 (N.D. Ill. Dec. 27, 2023) (denying a motion to compel where the materials were relevant but not proportional to the needs of the case).

## ARGUMENT

### A. Plaintiffs' 12 Additional Requested Custodians Are Duplicative of MultiPlan's 18 Proposed Custodians and Are Unlikely to Possess Material, Unique Information

MultiPlan offered Plaintiffs 18 custodians (all accepted by Plaintiffs) who, between them, are the most likely sources of information in MultiPlan's possession for every relevant issue in this

litigation.[5]  At every point in the negotiation process, MultiPlan sought to meaningfully confer with Plaintiffs on the substance of each custodian, to explain why they were appropriate and what substantive areas their custodial files would cover.

### 1. MultiPlan's Custodians Have Information That, Together, Will Cover Every Issue on Which Plaintiffs Seek Discovery

MultiPlan's 18 custodians include numerous senior executives, individuals intimately familiar with MultiPlan's OON products and services, and individuals that oversee key relationships with MultiPlan's clients (including all of its largest clients).  Half of MultiPlan's proposed custodians hold (or have held) executive or senior roles (Dale White, Michael Kim, Susan Mohler, Monica Armstrong, Melbalynn Madarang, Jacqueline Kienzle, Andrew Cone, Sean Crandell, Derek Reis-Larson, and Bruce Singleton).  For custodians that oversee client relationships and accounts, MultiPlan included a custodian sufficient to cover the payor-defendants named in this litigation, and multiple custodians covering MultiPlan's largest clients (Monica Armstrong, Melbalynn Madarang, Jacqueline Kienzle, Kurt Fullmer, Michael Battistoni, Mark Edwards, and Emma Johnson).  MultiPlan also included three employees with key roles in its HealthCare Economics division (which oversees its analytics based services, including Data iSight and Viant), with broad supervisory oversight and technical product development experience related to the services at issue (Sean Crandell, Michael McEttrick, and Michael Schill).  On negotiation services, MultiPlan offered two employees with senior leadership and supervisory roles, including one who is responsible for training MultiPlan's negotiations team (Kathleen Praxmarer and Melissa Dotson).  Importantly, 14 of the custodians on MultiPlan's list were

---

[5] After proposing 14 custodians, MultiPlan offered an additional 4 custodians in an effort to reach resolution. Although duplicative of MultiPlan's initial custodians (or involving in-network services not at issue in this litigation), and thus unnecessary, MultiPlan was willing to add these custodians as a good-faith effort to resolve the disagreement.  As noted, Plaintiffs rejected the offer.

employed in roles relevant to this litigation for *at least a decade* of MultiPlan's proposed relevant time period. The scope of documents in the custodial files of these custodians is, accordingly, substantial.

The chart below illustrates the comprehensiveness of MultiPlan's custodian proposal, as offered to and rejected by Plaintiffs.[6] The list covers all relevant subject areas in Plaintiffs' 50+ RFPs, over the entire time period at issue, covering the CEO & President, IT, marketing, sales and client accounts, analytics-based services, negotiation services, healthcare economics, and operations. These individuals are most likely to hold relevant information relating to Plaintiffs' claimed "cartel" in this case—and, critically, how MultiPlan actually operates in truth, making healthcare more affordable, transparent and fair for all:

| Custodian | Title(s) | Description |
|---|---|---|
| Dale White | CEO & President *2022-2024*<br><br>President, Payor Markets *2021*<br><br>EVP, Sales & Account Management *2004-2020* | Dale White is the former CEO & President of MultiPlan, responsible for strategic decision-making for the company. Prior to CEO & President, Mr. White was an executive for over a decade with a focus on client relationships, working directly with Mark Tabak (Former CEO & President) to guide MultiPlan's short- and long-term strategy. Mr. White is quoted or referred to extensively in Plaintiffs' complaints. His documents are expected to relate to company strategy, acquisitions, communications and relationships with clients, OON services, and product development. |
| Michael Kim | SVP, IT, CIO *2013-2025* | Mr. Kim is the executive responsible for MultiPlan's technology, artificial intelligence/data science and information security. His documents are expected to relate to MultiPlan's technology, OON services, and data practices. |
| Susan Mohler | Advisor, Strategic, Administrative Operations | Ms. Mohler was responsible for creating marketing and sales materials for MultiPlan's |

---

[6] The four custodians with an asterisk (*) were the four custodians that MultiPlan offered to Plaintiffs, in addition to the 14 custodians previously offered in an attempt to resolve the custodian dispute.

| | | |
|---|---|---|
| | *2025-present*<br><br>SVP, Marketing & Product Development<br>*2021-2024*<br><br>VP, Marketing & Communications<br>*2012-2020* | OON services for the entirety of the relevant time period,. Her documents are expected to relate to MultiPlan's communications with clients and marketing of its OON services. |
| Monica Armstrong | SVP, Client Success<br>*2025-present*<br><br>CSO, National Accounts<br>*2024-present*<br><br>SVP, VP, Director, Manager, Sales & Account Management<br>*2003-2023* | Ms. Armstrong currently oversees all client relationships at MultiPlan, including each of the defendants named in this litigation. Ms. Armstrong's experience with clients goes beyond a supervisory role. In her former roles at MultiPlan, Ms. Armstrong worked directly with Cigna, Aetna, Kaiser, and regional TPAs. Her documents are expected to relate to MultiPlan's OON services, account management, and communications/relationships with its clients. |
| Melbalynn Madarang | SVP, VP, Director, Sales & Account Management<br>*2011-present* | Ms. Madarang has overseen MultiPlan's relationship with Blue Cross Blue Shield clients since 2011. Her documents are expected to relate to MultiPlan's OON services, account management, and communications/relationships with its clients. |
| Kurt Fullmer | VP, Sales and Account Management<br>*2013-2022* | Mr. Fullmer worked directly with hundreds of self-funded employers and TPAs. His documents are expected to relate to MultiPlan's OON services, account management, and communications/relationships with its clients. |
| Jacqueline Kienzle | SVP, VP, Manager, Sales & Account Management<br>*2003-present*<br><br>VP, Client Success<br>*2022-present* | Ms. Kienzle directly oversaw MultiPlan's relationship with UnitedHealthcare and its affiliates for over a decade during the relevant time period. In her current role, Ms. Kienzle engages in strategic planning with clients. Her documents are expected to relate to MultiPlan's OON services, account management, and communications/relationships with its clients. |
| Andrew Cone | SVP, CRO, Payor Markets<br>*2021-2023* | Mr. Cone, as the Chief Revenue Officer, oversaw revenue growth and strategies at MultiPlan, particularly with respect to MultiPlan's TPA and regional clients. His |

| | | |
|---|---|---|
| | | documents are expected to relate to MultiPlan's OON services, account management, and communications/relationships with its clients. |
| Mark Edwards | Director, Manager, Sales Account Management *1998-present* | Mr. Edwards helped manage UnitedHealthcare's accounts for over two decades,. His documents are expected to relate to MultiPlan's OON services, account management, and communications/relationships with its clients. |
| Michael Battistoni* | VP, Sales & Account Management *2022-present* | Mr. Battistoni manages MultiPlan's relationship with certain TPA accounts. His documents are expected to relate to MultiPlan's OON services, account management, and communications/relationships with its clients.<br><br>Although this custodian is duplicative of Mr. Fullmer and Mr. Cone, who both oversee TPA clients, MultiPlan proposed him as an additional custodian in an effort to further provide comfort to Plaintiffs that MultiPlan's custodian list was fulsome. |
| Emma Johnson* | Director, Sales & Account Management *1999-2018* | Ms. Johnson helped manage UnitedHealthcare's accounts and its affiliates, prior to retiring. Her documents are expected to relate to MultiPlan's OON services, account management, and communications/relationships with its clients.<br><br>Although this custodian is duplicative of Mr. Ms. Kienzle and Mr. Edwards, who both worked with UnitedHealthcare, MultiPlan proposed her as an additional custodian in an effort to further provide comfort to Plaintiffs that MultiPlan's custodian list was fulsome. |
| Sean Crandell | SVP, VP, AVP, Director, Healthcare Economics *2010-present* | Mr. Crandell holds the senior-most position with respect to MultiPlan's data analytics and reporting, including Data iSight and Viant, and he worked at Viant prior to joining MultiPlan. His documents are expected to relate to MultiPlan's OON services, reporting, technology, data practices, and product development. |
| Michael Schill | Senior Director, Director, Manager, Software | Mr. Schill is a Senior Director of MultiPlan's data analytics products and services. He previously worked as a software developer at |

| | Developer, HCE Analytics *2012-present* | MultiPlan. His documents are expected to relate to MultiPlan's OON services, technology, and data practices. |
|---|---|---|
| Michael McEttrick* | VP, Healthcare Economics *2010-2020* | Mr. McEttrick, as the Vice President of Healthcare Economics, oversaw initiatives relating to MultiPlan's OON services and reporting. His documents are expected to relate to MultiPlan's OON services, technology, and reporting.<br><br>Although this custodian is duplicative of Mr. Crandell and Mr. Schill, MultiPlan proposed him as an additional custodian in an effort to further provide comfort to Plaintiffs that MultiPlan's custodian list was fulsome. |
| Kathleen Praxmarer | VP, OON Solutions *2020-present*<br><br>VP, Negotiation Services *2018-2019*<br><br>VP, National PNS Ops *2010-2017* | Ms. Praxmarer is currently responsible for all of MultiPlan's OON Solutions. Ms. Praxmarer previously held the senior-most position with respect to negotiation services, overseeing thousands of negotiations with providers and training individual negotiators at MultiPlan. Before joining MultiPlan, Ms. Praxmarer was a Vice President at Viant, overseeing national operations. Her documents are expected to relate to MultiPlan's OON negotiation services, negotiators' training, negotiation guidelines, and communications with providers. |
| Melissa Dotson | AVP, Director, Negotiation Services *2004-present* | Ms. Dotson holds a supervisory role with respect to MultiPlan's negotiation services and is directly involved in training negotiators and overseeing support teams. Her documents are expected to relate to MultiPlan's OON negotiation services, negotiators' training, negotiation guidelines, and communications with providers. |
| Derek Reis-Larson | SVP, Claims Pricing Services *2020-2025*<br><br>SVP, Operations *2018-2019*<br><br>VP, CS *2005-2017* | Mr. Reis-Larson holds the senior-most operations role with respect to MultiPlan's claims pricing products, including negotiation services, Data iSight, and Viant, among others. He has been involved with product design and system integration throughout his time at MultiPlan. His documents are expected to relate to MultiPlan's OON services, reporting, technology, data practices, and product development. |

| Bruce Singleton* | SVP, Network Development Strategy *2015-present* | Mr. Singleton is MultiPlan's senior-most employee responsible for its network development. MultiPlan's network services are not at issue in this litigation, but Plaintiffs expressed interest in the existence of any relationship between MultiPlan's networks and its OON repricing services. MultiPlan thus proposed him as an additional custodian in an effort to provide comfort to Plaintiffs that MultiPlan's custodian list was fulsome. |

### 2. Plaintiffs' 12 Additional Custodians Cover the Same Ground as MultiPlan's Set of 18

Plaintiffs' proposed 12 additional custodians work in the exact same departments, hold similar roles, have worked closely with individuals are already included on MultiPlan's proposed list (and will have been involved in the same discussions, with documents touching on similar topics), and/or have been supervised by the individuals on MultiPlan's list:

| Custodian | Title(s) | Reasons Why This Individual Is Duplicative of MultiPlan's List & Has No Unique, Relevant Information: |
|---|---|---|
| Mark Tabak | Chair & CEO *2002-2022* | Plaintiffs fail to explain how Mark Tabak is a "unique source" of information. MultiPlan's list already includes another former CEO, Dale White, who was not only Mr. Tabak's predecessor but worked directly with him for the preceding decade in the same department, referred to as the "Office of CEO."<br><br>Mr. White was one of three individuals that worked alongside Mr. Tabak during this time, played an integral role in MultiPlan's strategic decision-making, and was the executive most involved in client account relationships.<br><br>Mr. White's custodial files will demonstrate the strategic decision-making at MultiPlan for the entirety of the relevant time period and makes Mr. Tabak an unnecessary custodian. |
| Travis Dalton | President & CEO *2024-present* | MultiPlan's proposed list already includes *nine* members of MultiPlan's senior leadership, those actually at the company and involved with |

18

| | | |
|---|---|---|
| | | decision-making during the relevant time period. By contrast, Mr. Dalton only joined MultiPlan in 2024, and had no role in the company prior to that.<br><br>Plaintiffs are clear that they seek Mr. Dalton for his correspondence related to "MultiPlan's response to [this] litigation," ECF No. 573 at 10. That is inappropriate—seeking materials that in large or entire part will be covered by privilege—and demonstrates that Mr. Dalton's information will not be relevant to Plaintiffs' claims. It cannot justify the burden of adding Mr. Dalton as a full separate custodian. |
| Kevin Williams | VP, Manager, Sales & Account Management *1997-present* | MultiPlan has already proposed *eight* individuals in MultiPlan's Sales & Account Management department, including at least one employee for each of MultiPlan's largest clients.<br><br>Plaintiffs suggest that Mr. Williams possesses unique information on Cigna. But prior to her recent promotion to a more senior role a year ago, Ms. Armstrong directly oversaw Cigna's accounts for over a decade over the relevant time period.<br><br>Plaintiffs fail to specify how Mr. Williams would provide any new, relevant information beyond that provided by Ms. Armstrong. |
| Paul Nappi | Director, Sales & Account Management *2015-2019* | MultiPlan's proposed list already includes three individuals "familiar with payors not covered by the 'National Accounts' team." ECF No. 573 at 10. Kurt Fullmer, Andrew Cone, and Michael Battistoni oversee MultiPlan's relationship with regional TPAs and self-funded employers (i.e., not "National Accounts") within MultiPlan's Sales & Account Management.<br><br>MultiPlan's list also includes two of Mr. Nappi's direct supervisors: Kurt Fullmer and Dale White. Plaintiffs fail to explain how adding a *fourth* custodian familiar with TPAs and self-funded employers provides any marginal benefit, especially since TPAs and self-funded employers are only tangentially related to the alleged conspiracy at issue. |

| Liz Lord | Director, Product Planning *2003-present* | Ms. Lord is unlikely to possess unique relevant documents as a supervisor in MultiPlan's IT department. Her role as a "facilitator" of project prioritization meetings is largely administrative and supervisory. MultiPlan has already produced hundreds of documents with the "agendas, issues, and attendance at these meetings." ECF No. 573 at 11.<br><br>Moreover, many of MultiPlan's custodians—including Monica Armstrong, Jacqueline Kienzle, Melbalynn Madarang, Kathy Praxmaraer, and Michael Schill— have been involved in project priority meetings, and have documents related to those meetings (including agendas and the like) in their custodial files. |
|---|---|---|
| Linda Gordon-Cohen | Director, Technical Product Planning *2009-present* | Plaintiffs purportedly seek technical information regarding the software, engineering, and development of MultiPlan's OON repricing products and services from Ms. Gordon-Cohen. ECF No. 573 at 11.<br><br>However, MultiPlan's proposed list already includes Michael Schill, Michael McEttrick, and Sean Crandell, the individuals with technical expertise most involved with the information Plaintiffs seek from Ms. Gordon-Cohen. To the extent Plaintiffs include Ms. Gordon-Cohen for her knowledge of product development strategies, Ms. Gordon-Cohen is duplicative of Derek Reis-Larson, who holds the senior most role with respect to MultiPlan's Claim Pricing Services and is, thus, the most familiar with relevant, strategic product development at MultiPlan. |
| Michael Ferrante | SVP, Network Development; EVP, Operations *1995-2023* | Michael Ferrante is duplicative of Bruce Singleton, who has been the SVP of Network Development Strategy at MultiPlan for the vast majority of the relevant time period.<br><br>To the extent Plaintiffs seek information regarding Mr. Ferrante's prior role in operations, MultiPlan has already provided multiple employees from its operations department. |
| Christopher Dorn | SVP, Payment Integrity *2016-2024* | Mr. Dorn's work in Payment Integrity, a service that identifies errors in clinical coding, is irrelevant |

| | | to Plaintiffs' allegations concerning MultiPlan's OON repricing services. |
|---|---|---|
| Mike Bandomer | Director, OON Solutions *2015-present* | Plaintiffs' demands for (i) Mike Bandomer, (ii) JR Moss, (iii) an FNX Negotiator, and (iv) a Viant Negotiator are unreasonable and duplicative. MultiPlan's proposed list already includes two individuals that hold supervisory roles with respect to FNX and Viant: Kathleen Praxmarer and Melissa Dotson. Ms. Praxmarer and Ms. Dotson oversee negotiator training, manage the negotiations division, and are the individuals most likely to have information relevant to Plaintiffs' claims including information about "the inner workings of these negotiation services." ECF No. 573 at 11. Moreover, Mr. Bandomer and Mr. Moss both previously reported to Ms. Praxmarer, so many relevant documents and communications are likely within Ms. Praxmarer's custody.

Plaintiffs' demand to add *four* additional custodians on the same subject matter already directly covered by two agreed-upon custodians is unwarranted—particularly because they cannot articulate what additional, unique information these individuals possess. |
| JR Moss | Manager, Negotiation Services; Director, Operations *1997-2023* | |
| Fee Negotiator | | |
| Viant Negotiator | | |

If it becomes apparent as discovery proceeds that additional custodians are necessary, Plaintiffs will be free to request them and the parties will discuss, as standard. But the 12 extra custodians demanded by Plaintiffs now do not bring anything unique to the table that would justify the massive burden to MultiPlan of collecting and reviewing their documents. The fact that Plaintiffs appear to want 30 custodians for the sake of having 30 custodians is not a reason to grant their motion to compel, when the actual individuals at issue do not have unique, relevant knowledge of the allegations or issues in the case. *In re Broiler Chicken Antitrust Litig.*, 2018 WL 3398141, at *3 (N.D. Ill. July 12, 2018) (noting the court's preference to "wait until it is clear or at least clearer that discovery is necessary" rather than "open up discovery . . . into areas that may or may not be relevant, with the attendant burden and delay even if incremental").

Plaintiffs insist that it doesn't matter whether their additional custodians are duplicative, *see* ECF No. 573 at 14, arguing that MultiPlan can solve that problem by just "deduplicating" the documents collected from the various custodians at a later stage in the production. That is wrong and misleading: Plaintiffs know that "de-duplication" is a *document* concept, not a custodian concept, and in any event only works when there is an *exact* match in documents. As a practical matter, it is not used to remove substantively duplicative documents where there is not also exact, technical duplication. *See* ESI Protocol at 17-18, ECF No. 241 (removal of "near-duplicate documents" not permitted without agreement of requesting party). It is not an answer to the problem of duplicative custodians. By Plaintiffs' logic, *every employee* with potentially responsive information should be included as a custodian. But that is not how discovery works. If a proposed custodian covers the same subject matter as someone else, and does not have unique, responsive information that is proportional to the needs of the case (as is the situation here), the law is clear that they should not be added as custodians in the first place. *In re Exactech Polyethylene Orthopedic Prods. Liab. Litig.*, 347 F.R.D. 572, 587 (E.D.N.Y. 2024).

## B. Plaintiffs' Search Terms Produce an Unreasonable Number of False Hits, the Review of Which Will Divert Time and Resources

Compounding the burden of Plaintiffs' overbroad list of custodians, Plaintiffs' proposed search terms are neither tailored to relevant issues nor proportional to the issues in this case. Plaintiffs' search terms suffer from two key defects. *First*, they hit on a large number of false hits and voluminous irrelevant documents. *Second*, the terms capture an enormous quantity of documents simply because those documents mention Data iSight and other reimbursement methodologies—the core of MultiPlan's everyday business. Plaintiffs' refusal to pair its Data iSight search terms with reasonable connectors that would target references to Data iSight's actual methodology and application is inappropriate.

*False Hits*. Plaintiffs' proposed terms pull in large numbers of false hits and irrelevant documents because they overly rely on common words and large proximity connectors. Among the most egregious examples:

- Plaintiffs insist on a search string containing "share" w/25 "MultiPlan", which Plaintiffs say is designed to capture documents about MultiPlan's market share. In reality, that search hits on 412,425 documents—905,029 when counting hits with full families—and pulls in a plethora of false hits,[7] including junk marketing emails seeking to have the recipient—an individual with a MultiPlan email domain—"share" their feedback, or internal MultiPlan emails that "share" an update about a new MultiPlan team member.

- Plaintiffs also move to compel a string that includes "training" w/25 "setup" w/50 "approved," that hits on 130,107 documents and 383,230 when counting hits with full families. Instead of capturing mostly emails related to Data iSight trainings, for example, this search draws in numerous irrelevant emails concerning trainings about employee benefits offered by MultiPlan, approved time-off requests, and administrative communications, which include "New Hire *setup*," "Schedul[ing] [a] *training* room," and making "updates to the PTO calendar with *approved* requests."[8]

- The same string also includes other terms that pull in false hits. "Policy" w/25 "reimbursement" w/50 "recommendation" hits on emails that are irrelevant to this case,

---

[7] This String is (compete OR competes OR competing OR competit* OR altern* OR substit* OR share OR shares OR (market NOT w/1 (street OR st)) OR markets OR marketplace OR marketplaces OR interchang* OR switch*) w/25 (MultiPlan* OR Claritev* OR "Multi Plan" OR "MP" OR "MPI").

[8] This string is ((polic* OR guid* OR train* OR templ*) w/25 (pric* OR set* OR reimbur* OR fix* OR control* OR limit* OR curtail* OR suppress* OR align* OR similar* OR same)) w/50 (negotiat* OR review* OR approv* OR measur* OR recommend* OR strateg* OR formula* OR method* OR "out of network" OR "out-of-network" OR OON OR noncontract* OR non-contract* OR non-par* or nonpar* OR ONET).

including, for example, emails about MultiPlan's employee benefits, such as a tuition "*reimbursement policy*" and a Scholarship program for employee children that require a "*recommendation*" to participate.

By contrast, MultiPlan's searches generally have smaller proximity connectors that effectively avoid these problems while still capturing the relevant information that Plaintiffs need. Plaintiffs argue that MultiPlan's terms are overly restrictive when they include proximity connectors of less than ten, but such connectors are designed to ensure that the concepts on either side are connected. And the results of broader connectors (as illustrated above), show why the tighter connectors are necessary in many instances. In any event, MultiPlan's searches do not omit critical information. Contrary to Plaintiffs' representations, *see* ECF No. 574 at 8, MultiPlan has not refused to exclude terms that hit on documents discussing MultiPlan's competitors or competition for OON repricing services; rather, MultiPlan has not agreed to include specific company names—Zelis and ELAP—in its terms, given Plaintiffs' failure to articulate any rationale for those specific terms with respect to the claims in this case. Moreover, those company names are unnecessary because other terms will provide Plaintiffs many thousands of documents concerning competition and competitors for OON repricing services. And using these names as search terms will capture many irrelevant documents. For example, Plaintiffs' proposed search term capturing any documents with "share" w/25 "Zelis" or "ELAP" pulls in various emails from LinkedIn.

***Overbreadth Relating to Data-iSight and Other Methodologies.*** Plaintiffs' search terms suffer from another defect: they are structured to pull in basically all documents mentioning Data iSight and other claim reimbursement methodologies. As a threshold matter, Data iSight and MultiPlan's other reference-based pricing and negotiation services comprise a massive portion of

24

its business—and there are potentially millions of documents in MultiPlan's custodial files that reference Data iSight in passing without any substantive, relevant information responsive to the issues in this case.[9] Plaintiffs are not entitled to discovery on this irrelevant information, nor is the inclusion of large quantities of *marginally* responsive documents proportionate to the needs of the case given the massive volume of documents MultiPlan (and others) will be producing regardless. *Motorola Sols.*, 365 F. Supp. 3d at 924. Yet Plaintiffs' searches would impose on MultiPlan an obligation to review these documents, a wasteful and time-intensive exercise. The implications of such a search are very different for a payor Defendant, which may interact with MultiPlan in a limited capacity. It's another thing entirely for MultiPlan because the term refers to a significant portion of MultiPlan's business. Feeding an enormous volume of (at best) marginally responsive documents into the TAR model will (1) make it difficult to train the TAR model effectively, and (2) limit the utility of the TAR model, by flooding the review set with marginally relevant, redundant documents. And again, even if TAR excludes one-third of the documents, MultiPlan would likely still be left with *over 6.3 million documents* to review in this scenario.

In contrast, MultiPlan has crafted searches that tie references to Data iSight to discussion of its methodology, composition, or use by payors. In doing so, MultiPlan's search terms will capture the documents that are actually relevant (e.g., communications regarding how the services at issue were actually being used by customers).[10]

---

[9] Specifically, Plaintiffs' terms hit on documents that are at most marginally relevant, such as "report" w/40 "DIS" (or variations of Data iSight). This string pulls in emails from automated MultiPlan email domains. Meanwhile, "negotiation services" w/50 "leaving," pulls in email notices of people at the company going out of office or leaving the company, but whose current job title involves negotiation services which is part of their signature block.

[10] Other strings, beyond the overly broad Data iSight string, also pull in large swaths of documents that are far broader than appropriate or reasonable. For example, a string including "retention" or "meets" or "meet" w/50 "customer" or "client" or "service," hits on emails and resumes from job applicants that

Taken together, Plaintiffs' searches will bloat the overall review pool unnecessarily, imposing undue burden on MultiPlan. Plaintiffs do not deny this; instead, they argue that MultiPlan's use of TAR can be used to clean out the waste that Plaintiffs' searches swept in. But this is wrong, too. The TAR model is only as good as what it is fed. While it can make a review team's review of documents that hit on reasonably tailored search terms more efficient, it cannot fix the problems caused by the use of extremely broad terms that pull in troves of irrelevant documents containing false hits, but also massive quantities of marginally relevant and redundant information. TAR is not the "easy button" Plaintiffs suggest it is.

### C. Plaintiffs' Demand for Several Additional Years Is Not Proportional to the Needs of the Case

Combined with their demands that MultiPlan add duplicative custodians and run vastly overbroad search terms, Plaintiffs demand that MultiPlan produce *an entire year of extra discovery for every custodian*—beyond what plaintiffs agreed to for every other defendant. This request is unjustified by the needs of the case.

***MultiPlan's Discovery Period Should Begin in 2013, the Same as All Other Defendants***. Plaintiffs do not articulate any legitimate reason for demanding discovery to 2012 instead of 2013. Nor could they. Plaintiffs allege a conspiracy between MultiPlan and its clients that allegedly began *in 2015*, when a settlement requirement that many payors use a FAIR Heath benchmark for out of network reimbursements expired. CCAC ¶ 109. According to Plaintiffs, the expiration of the Fair Heath settlement allegedly provided the impetus for (and made possible) the conspiracy that followed from 2015. This so-called conspiracy never happened, but MultiPlan is nevertheless

---

discuss customer retention and customer service. This string is ((retain* OR retention OR pitch* OR propos* OR meet*) w/50 (contract* OR agree* OR client* OR customer* OR payor* OR insurer* OR TPA* OR MCO* OR MSA OR CSA OR service* OR MOU* OR MOA* OR LOI* OR LOA*)) AND ("FNX" OR (financial w/5 negotiat*) OR (claim* w/5 negotiat*) OR "HST" OR "ProPricer" OR "Pro Pricer").

prepared to accommodate Plaintiffs' request for years of pre-alleged-conspiracy discovery—indeed, MultiPlan agreed to search custodial documents going back to 2013. Plaintiffs concede that this is all they need *because they have agreed to a 2013 start date for every other Defendant.*

Despite this, Plaintiffs insist on a 2012 start date just for MultiPlan—yet provide no concrete reason, only conjecture, for why an extra year for MultiPlan would yield relevant and proportional information. *First,* Plaintiffs insists that MultiPlan's "wrongful conduct was already under way" in 2012. ECF No. 573 at 7. But that is inconsistent with their Complaints, which allege that the alleged conspiracy began in 2015. *Second,* Plaintiffs argue that an additional year of discovery is needed "to obtain adequate discovery into MultiPlan's ongoing efforts to market its OON repricing services and to sign up payor customers." *Id.* at 5-6. But MultiPlan and others have marketed "OON repricing services" (and payors had been using those services) for *well over a decade* prior to when the Plaintiffs allege the conspiracy began. Plaintiffs provide no reason to believe that MultiPlan's business practices in 2012 have any relevance to an alleged conspiracy that Plaintiffs say began at least three years later.

Finally, the burden of an additional year is real. One of MultiPlan's proposed custodians had over 70,000 documents collected from 2012 alone. MultiPlan thus estimates that adding a year to the relevant time period will require the review of hundreds of thousands of additional documents, with corresponding costs, reviewer resources, and delay. *See supra* at 10-11.

The District of Illinois cases that Plaintiffs cite do not support their request, but undercut it. In *In re Outpatient Medical Center Employee Antitrust Litigation*, for example, the court expressly *rejected* the plaintiffs' request for three years of document discovery prior to the start of the alleged conspiracy, in favor of two years. 2023 WL 4181198, at *4-5 (N.D. Ill. June 26, 2023) (cited at ECF No. 573 at 4) (collecting cases and finding that "two years prior to the earliest specific

27

start date [of the conspiracy] alleged in the Complaint" was "in line with the temporal scope of discovery in other antitrust litigation"); *see also Kleen Prods. LLC v. Packaging Corp. of Am.*, 2013 WL 120240, at *8-9 (N.D. Ill. 2013) (cited at ECF No. 573 at 4) (ordering production of conduct documents dating back to January 1, 2003, for a conspiracy alleged to have begun in 2005). A similar outcome is appropriate here.

*Plaintiffs' demand for discovery from nine custodians prior to 2012 is even more unreasonable.* Plaintiffs' time period demand is even worse than it seems, because, in addition to seeking *21 custodial productions* back to 2012, they also want MultiPlan to produce a staggering *9* custodians *back several years earlier.* What is the basis of this request? According to Plaintiffs, they want custodial documents relating to MultiPlan's acquisitions of various companies and products—and its marketing of its services years before the alleged conspiracy. But this information is only marginally relevant at best—Plaintiffs do not (and cannot) argue that MultiPlan's acquisitions of Viant and NCN were somehow unlawful.[11]

Despite this, MultiPlan nevertheless offered to search and produce documents for two custodians (Dale White and Sean Crandell) back to 2010 for certain requests in an attempt to resolve the parties' dispute. Plaintiffs refused that offer. If granted, their demand for *nine* custodians on extraordinarily broad RFPs would have the effect of extending almost the entire discovery period to 2010—something even Plaintiffs concede is not appropriate. The Court should deny Plaintiffs' request to extend the relevant time period for custodial discovery or accept MultiPlan's compromise offer to produce documents for Dale White and Sean Crandell going back to 2010 for certain RFPs..

---

[11] The discovery Plaintiffs are seeking in RFPs Nos. 23, 24, and 41 are (as Plaintiffs' "relevance" descriptions indicate) an attempt to improperly extend the standard 2-year period for exploring the origins of alleged conspiracies to a full 5 years. ECF No. 573 at 12-14.

### D. The Parties Should Proceed with MultiPlan's Parameters and Revisit Potential Supplementation Later, or Plaintiffs Should Bear the Cost of Their Demands for Early, Overbroad Document Production

As noted, with every other Defendant, Plaintiffs followed the ordinary approach to document production parameters in complex antitrust cases: compromise on reasonable parameters and reserve the right to revisit the appropriate scope of custodians, search terms, and particular document pulls should discovery indicate it is warranted. This allows document review and productions to begin promptly in cases involving tight discovery schedules, but to evolve as the needs of the case may develop. Plaintiffs' opposite approach with MultiPlan—expansive and uncompromising—is unwarranted. The problem centers on the marginal relevance (if any) of the millions of additional documents that would have to be pulled and reviewed under Plaintiffs' approach, and the corresponding burden and lack of proportionality to the issues in this case given the enormous discovery MultiPlan has agreed to produce, and has already started producing.

These burden and proportionality concerns—which translate into time and substantial cost—have been recognized time and again by the courts. Accordingly, if the Court is inclined to grant some or all of Plaintiffs' broad document production parameters now—rather than wait until after productions have begun, and Plaintiffs potentially have a legitimate reason to ask for broader parameters (which the parties would of course discuss)—MultiPlan thus respectfully asks that the Court require Plaintiffs to shoulder the extra cost of doing so.

The Federal Rules of Civil Procedure specifically contemplate that courts may condition discovery on the requesting party's payment of associated costs, and such cost-shifting is appropriate where the responding party would bear an undue burden or expense from complying with requested discovery. Fed. R. Civ. P. 26(c)(1) ("The court may, for good cause, issue an order to protect a party or person from . . . undue burden or expense, including . . . specifying terms, including time and place or the allocation of expenses, for the disclosure or discovery . . . ."). In

determining whether cost-shifting is warranted, courts in the Seventh Circuit generally rely on the following factors: "(1) the extent to which the request is specifically tailored to discover relevant information; (2) the availability of such information from other sources; (3) the total cost of production, compared to the amount in controversy; (4) the total cost of production, compared to the resources available to each party; (5) the relative ability of each party to control costs and its incentive to do so; (6) the importance of the issues at stake in the litigation; and (7) the relative benefits to the parties of obtaining the information." *Wiginton v. C.B. Richard Ellis, Inc.*, 229 F.R.D. 568, 572 n.8 (N.D. Ill. 2004).

These factors weigh in favor of cost-shifting here, should the Court accept some or all of Plaintiffs' expansive document production parameters. Plaintiffs' requests are not narrowly tailored and will result in discovery that is largely duplicative of the discovery Plaintiffs will receive from other defendants and from MultiPlan's own proposal. The cost will be massive and disproportionate to any limited benefits Plaintiffs might receive. Plaintiffs' rejection of the ordinary-course approach to discovery, and disregard of burden and proportionality concerns, comes with a massive cost—and they should be the ones to bear it; not Multiplan.

## CONCLUSION

MultiPlan respectfully requests that this Court deny Plaintiffs' Motions to Compel.


Dated: November 10, 2025                           Respectfully submitted,

                                                   /s/ *Sadik Huseny*
Craig Lewis Caesar (IL Bar. No 3121593)            Sadik Huseny (*pro hac vice*)
PHELPS DUNBAR LLP                                  LATHAM & WATKINS LLP
365 Canal Street, Suite 2000                       300 Colorado Street, Suite 2400
New Orleans, LA 70130                              Austin, TX 78701
Telephone: (504) 584-9272                          Telephone: 737-910-7300
craig.caesar@phelps.com                            sadik.huseny@lw.com

Errol J. King (*pro hac vice*)
Katherine Mannino (*pro hac vice*)
PHELPS DUNBAR LLP
II City Plaza
400 Convention Street, Suite 1100
Baton Rouge, LA 70802
Telephone: (225) 376-0279
errol.king@phelps.com
katie.manino@phelps.com

Gary Feinerman (IL Bar No. 6206906)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: 312-876-7700
gary.feinerman@lw.com

Lawrence E. Buterman (*pro hac vice*)
Katherine A. Rocco (*pro hac vice*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: 212-906-1200
lawrence.buterman@lw.com
katherine.rocco@lw.com

Anna M. Rathbun (*pro hac vice*)
Graham B. Haviland (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
anna.rathbun@lw.com
graham.haviland@lw.com

*Attorneys for Defendant MultiPlan, Inc.*

## CERTIFICATE OF SERVICE

Pursuant to Local Rule 5.9, I hereby certify that on this 10th day of November 2025, the foregoing

was electronically filed using the Court's CM/ECF system.

/s/ Sadik Huseny
Sadik Huseny (*pro hac vice*)