UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **IN RE: MULTIPLAN HEALTH INSURANCE PROVIDER LITIGATION** | Case No. 1:24-cv-06795 MDL No. 3121 |
| This Document Relates To: | Hon. Matthew F. Kennelly |
| ALL ACTIONS | |

## JOINT STATUS REPORT

The Parties submit the following joint status report pursuant to the Court's Minute Order dated January 23, 2026. ECF No. 640.

### I.  Pending Proposed Orders

**A. Joint Scheduling Order.** On February 3, the parties submitted a draft Case Management Order No. 20 to the Court's proposed order email address. The draft CMO reflects amendments to the case schedule as adopted by the Court following the January 21 status hearing, at ECF No. 640.

**B. Replacement Discovery Bellwether DAP Selections.** On January 14, the parties submitted a draft Case Management Order to the Court's proposed order email address. The draft CMO reflects Defendants' replacements for two Discovery Bellwether DAP selections that dismissed their actions, *see* ECF Nos. 610, 618.

### II.  Pending Motions Before the Court

**A. DAPs' Motion for Common Benefit Order**. The parties' submissions are at ECF Nos. 408, 425, and 426. The Court previously held argument and took the matter under submission. ECF No. 507.

1

**B. Plaintiffs' Motion to Compel Defendants to Conduct a Reasonable Search for Text Messages and Centralized Travel and Expense Records.** Motion filed at ECF No. 647. Defendants' opposition is due on February 23, per the Court's Minute Order at ECF No. 640.

**C. Defendants' Motion to Compel Production of Documents.** Motion filed at ECF No. 648. As to Direct Action Plaintiffs only, Defendants move to compel production of discovery regarding (i) all Defendants and health plan entities, (ii) patient billing, and (iii) substitutes to OON services including in-network services and self-pay, and to compel discovery for (iv) the period January 1, 2013 to January 1, 2015. As to Direct Action Plaintiffs and Class Plaintiffs, Defendants move to compel production of discovery regarding (v) financial performance, (vi) process for setting billed charges, and (vii) employer-sponsored health plans. Plaintiffs' opposition is due on February 23, per the Court's Minute Order at ECF No. 640.

**D. Plaintiffs' Motion to Strike Defendants' Unclean Hands Affirmative Defense.** Motion filed at ECF No. 646. Defendants' opposition is due on February 23, per the Court's Minute Order at ECF No. 640.

III. <u>**Update on Matters Before E-Discovery Special Master Grossman**</u>

On November 21, as re-entered on December 12, 2025, the Court appointed Dr. Maura R. Grossman to serve as E-Discovery Special Master. ECF Nos. 595, 628. The below matters are currently assigned to Dr. Grossman.

**A. Dispute Concerning Technology Assisted Review ("TAR") Protocol.** On October 20, pursuant to the Court's October 14 Minute Order, ECF No. 564, the Parties emailed to the Court their respective positions on the TAR protocol and a proposed

2

order reflecting the disputed provision. The Parties' submissions are at ECF Nos. 509 and 510.  The parties attended two working sessions with Dr. Grossman on December 29, 2025 and January 5, 2026, after which the parties were able to reach agreement on their disputes.  The parties are preparing a proposed TAR protocol to submit to the Court and will provide an update to the Court at the February 27 status hearing.

**B. Plaintiffs' Motion to Compel MultiPlan to Produce Documents Using Plaintiffs' Proposed Time Periods and From Additional Custodians; Plaintiffs' Motion to Compel MultiPlan to Apply Plaintiffs' Search Terms.**  Motions filed at ECF Nos. 573-74. MultiPlan's consolidated opposition to both motions to compel was filed on November 10. ECF No. 579. Plaintiffs' consolidated reply was filed on November 12. ECF No. 583.  The parties attended a working session with Dr. Grossman on February 12 and will attend a follow-up session on February 24.  The parties will provide an update to the Court at the February 27 status hearing.

## IV.     Additional Joint Status Conference Topics

### A.     Status of Document Productions

Rolling productions of custodial documents are ongoing.

### B.     Status of DAP Discovery Parameter Negotiations

Defendants and DAPs have been engaging in meet-and-confers regarding DAPs' custodians, non-custodial sources, and search terms. A chart showing the present status of discovery parameter negotiations is attached as **Exhibit A.**

*Defendants' Position:* Defendants are concerned with the timing of this process, as the chart in Exhibit A illustrates, especially in light of DAPs' representations during the recent discussions and schedule extension request to the Court.  Defendants will continue to meet and confer with DAPs on these issues up to the time of the status hearing to reach closure on these

issues, and barring agreement, on how to present any disputes to the Court for the next status hearing.

*DAPs' Position:* Defendants' concerns are unfounded. This Court named the majority of the 36 Bellwether DAPs on November 19, 2025. ECF No. 590. The parties selected two replacement Bellwether DAPs (Wayne Lee MD Plastic Surgery and Douglas M. Monasebian) on December 30. Since then, DAPs have held multiple meet-and-confers and exchanged significant amounts of correspondence in an effort to come to agreement on custodians, non-custodial sources, and search terms. DAPs have also begun producing custodial documents.

C.     **Status of Third Party Discovery**

Plaintiffs have served document subpoenas on non-parties under Federal Rule of Civil Procedure 45, and meet-and-confers are ongoing. As of February 20, 2026, Plaintiffs have served document subpoenas on the following:

- Acrisure (Insurance Broker)
- AHIP (National Trade Association)
- Allegeant (Third Party Administrator)
- Alliant (Insurance Broker)
- Aon (Insurance Broker)
- Arthur J. Gallagher (Insurance Broker)
- AssuredPartners (Insurance Broker)
- Auxiant (Third Party Administrator)
- AvMed (Third Party Administrator)
- Barclays Capital (Investment Bank)
- Bernard R. Siskin (Ph.D Statistician)
- BofA Securities (Investment Bank)
- Brown & Brown (Insurance Broker)
- Christopher Dorn (Former MultiPlan SVP)
- Dale White (Former MultiPlan CEO)
- Delta Health Systems (Third Party Administrator)
- Emma Johnson (Former MultiPlan employee)
- Group Resources Inc. (Third Party Administrator)

- Health Plans Inc. (Third Party Administrator)
- HUB Intl. (Insurance Broker)
- JP Morgan Chase (Banking Institution)
- John Haben (Former United Employee)
- Key Benefit Administrator (Third Party Administrator)
- Mark Tabak (Former MultiPlan CEO)
- Marsh & McLennan (Insurance Broker)
- Mercer (Insurance Broker)
- Michael McEttrick (Former MultiPlan VP)
- Milliman (Insurance Broker)
- Montage Intl. (Hospitality Company)
- Paul Galant (Former MultiPlan President)
- Piper Sandler (Investment Bank)
- USI Insurance (Insurance Broker)
- Vault Admin Services (Third Party Administrator)
- Willis Towers Watson (Insurance Broker)

Defendants have served one non-party document subpoena on the following:

- Work Comp Revenue Solutions (billing agent of proposed class representative Advanced Orthopedic Center).

Defendants anticipate serving subpoenas for documents on many of the same non-parties that Plaintiffs served in the near term. No party has served a deposition subpoena.

**Defendants' Position:** Mindful that non-party discovery may implicate the overall discovery schedule, Defendants have asked, but received no answer from Plaintiffs, on whether there are additional, imminent third party subpoenas Plaintiffs intend to serve (*i.e.*, shortly after this upcoming status conference). The parties will continue to discuss these issues and will be prepared to address them at the conference.

**Plaintiffs' Position:** Plaintiffs are continuing to consider third-party discovery but have no concrete plans to issue additional specific subpoenas at this time. Defendants first noticed their

intent to serve subpoenas "on many of the same non-parties" as Plaintiffs in this JSR and have not articulated what non-duplicative purpose this discovery would serve.

### D. DAP/Class Discovery Coordination

***Defendants' Position:*** Defendants believe that the Court has made clear, time and time again, that the Putative Class and DAPs must coordinate as much as possible to allow this case to proceed efficiently.  June 17, 2025 Hr'g Tr. at 30:10-30:12 ("[T]his is an obvious point, but I'm going to say it anyway.  The discovery needs to be coordinated as much as is humanly possible"); Oct. 25, 2024 Hr'g Tr. at 53:2-3 (asking Putative Class counsel "what's happening to coordinate all this stuff?").  And such close coordination, and DAPs' representations as to the same, were a key factor in the Court initially allowing both sets of Plaintiffs' cases to proceed simultaneously.

Defendants are concerned that, now that discovery is starting in earnest, Plaintiffs are beginning to approach things differently and are not engaging in coordination sufficient to meet this standard.  Rather than working together to coordinate on a single joint position regarding generalized discovery issues to present to Defendants and to the Court, the Putative Class and DAPs have started to routinely adopt different positions on issues such as:

- The rules for cell phone discovery, ECF No. 647 at 1-6 (Putative Class and DAPs taking different positions on motion to compel);

- The timing of privilege logs, *infra* at 9-13;

- The need for a structured data 30(b)(6) deposition of MultiPlan, ECF No. 606 at 3-4 (DAPs taking no position on the Putative Class's request for such a deposition, but preserving their optionality, and only later joining the notice for such a deposition after the Court issued its direction);

- Search terms proposed for MultiPlan.

As a result, the Court and Defendants have frequently been faced with multiple Plaintiffs' proposals, needlessly complicating discussions over the relevant issues and leading to disputes that are more complicated and difficult to resolve.  It also results in the Court being given a single

6

position from Defendants but Plaintiffs presenting two options—each Plaintiff-friendly, but in different ways—for the Court's consideration. There is no reason that Plaintiffs cannot work together to present a single position on these issues given that Defendants (who are differently situated in many relevant respects, and are coordinating among a far larger group of counsel), have been able to work together to present a single, uniform position on global issues.

Creating even further confusion, Plaintiffs' failure to coordinate has led them to repeatedly present positions to Defendants on behalf of "Plaintiffs," that turn out to be proposals by one set of Plaintiffs' counsel and do not, in fact, represent the joint position of all Plaintiffs and their counsel. At times, other Plaintiffs' groups have then provided new positions when Defendants responded to what they reasonably believed to the joint position of all Plaintiffs. This approach to discovery is both unfair to Defendants—because Plaintiffs' various positions present a moving target—and risks delay by sowing confusion.

Plaintiffs cannot deny that these issues exist and are growing, and that Plaintiffs are taking greater and greater liberties in simply presenting two "Plaintiffs' positions" wherever they see fit on global, generalized discovery issues where they had promised to coordinate. The Court has seen this in previous status reports and hearings, and this status report is a case in point, laying out several such differences. There is no legitimate reason for this. The Court is presented with a single Defendants' position on global/general issues because Defendants' counsel coordinate and work hard to reach such a position, notwithstanding a large group of Defendants with their own individual interests. There is simply no reason, absent extraordinary circumstances Plaintiffs cannot, as a general matter, do the same.

Defendants raise this issue now before it becomes an intractable problem—and a given that the Court will be presented with two Plaintiffs' positions, yet a single Defendants' position,

whenever it benefits Plaintiffs.  Defendants request that the Court instruct Plaintiffs to coordinate more effectively, specifically by adopting, absent extraordinary circumstances, a single position on generalized/global case management and discovery issues (e.g., the rules for privilege logs, cell phone discovery parameters, etc.) and purely offensive discovery issues directed at Defendants (e.g., search terms for a particular Defendant to use).

*Plaintiffs' Position:* Class and DAP Counsel have taken extraordinary measures to coordinate in all aspects of this litigation. Plaintiffs have served nearly all discovery requests jointly, engaged in coordinated meet-and-confers, and have—at most points in this litigation—reached agreement among themselves on disputed issues. But Class and DAPs have different and sometimes conflicting interests, which may may result in, and in fact require, counsel to take different positions from time to time. Defendants' demand that Plaintiffs present a single unified position on all matters is inappropriate and runs counter to the Rules of Professional Conduct and Rule 23: counsel's obligation runs to their clients, and in the case of Class Counsel, to members of the proposed class as well.

Plaintiffs continue to make great efforts to coordinate their positions when merited and in their respective clients' best interests, and hope that Defendants will do the same.

### E.    Deposition Protocol – Limit of Depositions of Defendants

The parties have agreed to a lower overall limit on fact depositions of Defendants.  At the September 22, 2025 status hearing, the Court indicated an overall limit of 170 fact depositions of all Defendants. ECF Nos. 511, 538.  At that time, there were 28 Defendants in the case.  Since then, the DAP bellwether selection process has reduced the number of Defendants in discovery from 28 to 17.  At the January 21, 2026 status hearing, the Court declined to order per-Defendant sub-limits, instead relying on an overall limit for all Defendants, but acknowledged that the reduction in the number of Defendants in discovery may warrant a lower overall limit than the 170

originally ordered.  *See* Jan. 21, 2026 Status Hr'g Tr. at 12:4-6.  The Court also set an overall limit of 145 fact depositions of Plaintiffs.

The parties have since met and conferred about lowering the overall limit on Defendant depositions based on Defendants' arguments that the factual underpinnings underlying the total deposition number had changed, given the number of Defendants in the case has decreased since September 22.  As a compromise, the parties have agreed to an overall limit of 145 fact depositions of Defendants.[1]  The parties plan to submit an updated deposition protocol reflecting this limit to the Court's proposed order email address.

### F.      Privilege Logging

The parties met and conferred on February 5 regarding the timing and scope of production of privilege logs. The Putative Class Plaintiffs and Defendants have reached an impasse on the Class Plaintiffs' proposal. The DAPs and Defendants have reached a compromise. The parties' positions are laid out below.

***Defendants' Position:***  The DAPs and Defendants have reached a compromise and agree to the following deadlines:

- **May 4, 2026**:  Initial log of 500 entries (or all privileged documents identified to date, if fewer than 500).

- **July 23, 2026**:  Log covering the remaining privileged documents.

Although the DAPs and Defendants have met and conferred with the Putative Class in good faith, the Putative Class has been unwilling to compromise and insists on rolling productions within 30 days of each production.  Because Rule 26 sets no deadline for serving a privilege log,

---

[1] Defendants reserve their rights to seek a protective order if Plaintiffs seek an inappropriate, inefficient or unduly burdensome number of depositions of any particular Defendant.  *See* Jan. 21, 2026 Status Hr'g Tr. 12:10-19 (acknowledging that Defendants may seek relief from inefficient or unduly burdensome depositions).

timing is governed by Rule 26's proportionality standard. In a large, complex ESI case, Putative Class Plaintiffs' proposal is not proportional and will slow production, reduce log quality, and increase discovery disputes without meaningfully facilitating efficient depositions or reducing the likelihood of targeted privilege disputes. It is also inconsistent with the way many Defendants (and likely some Plaintiffs) are conducting their document review, in which there are no definitive privilege determinations until later in the review process.[2]

*First*, in high-volume reviews, privilege analysis, quality control, and log drafting often draw on the same limited senior resources responsible for moving document production forward. Requiring logs "at or near the same time as corresponding document productions" diverts those resources and predictably diminishes log accuracy and completeness. *Commentary on Privilege*

---

[2] Defendants also note that the Putative Class's arguments are yet another attempt—after the parties have made many productions of custodial documents—to re-raise an issue that was previously before the Court at an appropriately early time, but resolved. ***First***, as part of the parties' ESI Protocol discussions and negotiations over a year ago, counsel for Class Plaintiffs specifically sought to include a term mandating privilege log productions within 30 days of any corresponding production. Defendants rejected that request as unreasonable and inefficient, inevitably causing delays in production—and the Putative Class abandoned it as part of the parties' trade-offs in limiting the disputed issues for the Court's ruling. This was reflected in the submissions to the Court and the eventual ESI Protocol entered by the Court, which addresses privilege logs as being produced pursuant to the FRCP but does *not* include the Putative Class's proposed language on rolling/mandated privilege log productions. ECF 241 at 29. ***Second***, notwithstanding this resolution, the Putative Class yet again tried to bring up this issue, this time in conjunction with the case schedule discussions, and presented it to the Court as part of their proposed case schedule in June of last year. *See* ECF No. 432 at 49-50 (30-day rolling privilege logs advocated by the Putative Class in connection with the scheduling order). The Court did not affirm the proposal and the final case schedule submitted by the parties to the Court, and entered by the Court, did not include it either. *See* ECF No. 450 (Discovery and Case Scheduling Management Order submitted by the Parties to the Court did not present the 30-day rolling production deadline or flag it an unresolved or open issue).

This is now Class Plaintiffs' ***third*** attempt—after the issue was resolved twice between the parties—to have the Court consider yet again an unwarranted 30-day rolling privilege log rule.

*Logs*, 25 Sedona Conf. J. 271–72 (2024). As Sedona explains, the "foremost" downside of rolling logs is that production-driven deadlines yield "inferior quality" logs. *Id*.

*Second*, privilege determinations often mature as reviewers gain broader context from email threads, related documents, and a clearer understanding of counsel's roles. Sedona cautions that rolling logs can force complex privilege decisions "across an entire universe of documents early in the process, before the full scope of potentially privileged documents has been assessed," leading to inconsistent privilege assertions and increased risk of inadvertent production of privileged documents as privilege determinations evolve. *Id.* at 272.

*Finally*, rolling logs impose ongoing administrative burdens—version control, tranche tracking, serial supplementation, and repeated meet-and-confers—while productions are still underway. Managing "numerous iterations of a rolling log requires detailed organization to track and resolve disputes," increasing rather than streamlining motion practice. *Id.* at 271.

Putative Class Plaintiffs contend that privilege logs must be produced sufficiently in advance of depositions to ensure that privilege issues do not result in reopening depositions or extending the discovery schedule. The DAPs' and Defendants' proposal accounts for this issue and ensures initial privilege logs will be produced a month before the substantial completion deadline. Moreover, Rule 26 does not mandate that all privilege disputes be resolved before depositions begin. Indeed, courts routinely permit depositions to proceed while the parties finalize privilege logs, and any discrete disputes can be addressed through targeted meet-and-confers or prompt motion practice if necessary.

For these reasons, the DAPs and Defendants oppose rolling logs and have worked together to agree to a realistic schedule that accounts for the likely volume of privileged material. The DAPs' and Defendants' staged approach provides an early opportunity to identify and address any

systemic privilege issues while allowing the parties to complete document review through the June 4 substantial completion deadline before preparing comprehensive logs.

**DAPs' Position:** As a compromise, DAPs sign on to the proposal outlined above in the Defendants' position section.

**Class Plaintiffs' Position:** Class Plaintiffs propose that each party serve an updated privilege log 30 days after each rolling production that provides the details required under the Federal Rules of Civil Procedure and the ESI Protocol in this case for documents that have been withheld up to that point. For documents that have already been withheld before the date of this JSR, privilege logs would be due 30 days after the Court enters an Order on this issue. This will allow any issues with privilege logging to be raised with the Court before the parties begin depositions in earnest, which will ensure that privilege issues do not result in either reopening depositions or further extending the discovery schedule.[3]

Defendants' and DAPs' proposals to provide their first logs of 500 entries in two-and-a-half months would not allow the parties to timely raise privilege disputes. Nothing in that proposal would stop Defendants from concealing more controversial privilege calls until later in the schedule—after the parties will have conducted dozens of depositions—which would create a risk that depositions would need to be reopened or that the schedule would need to be extended for Plaintiffs to seek further discovery.

The Sedona Conference Commentary that Defendants cite supports the Class's position, not Defendants. Defendants ignore Sedona's recognition that "putting off the logging process risks delaying depositions, summary judgment, and trial . . . [because] issues related to privilege

---

[3] Defendants recognize that the Court has not ruled on how the parties should address privilege logging. *See supra* n.2.

logs often take significant time and effort to identify, work through, and present to the court." *Commentary on Privilege Logs*, 25 Sedona Conf. J. 270 (2024). Likely for that reason, courts routinely require that parties produce privilege logs simultaneously with productions, which is more than what the Class requests here. *See, e.g.*, *Brown v. Barnes & Noble, Inc.*, 474 F. Supp. 3d 637, 647 (S.D.N.Y. 2019) ("Producing parties should provide a log with each production tranche and/or on a rolling basis."). Sedona ultimately recommends setting deadlines for when privilege logs will be produced "that take[] into account the practical reality of preparing the logs (including the burdens) and the requesting party's need to review and potentially challenge the logs in time to obtain documents and use them in depositions, in dispositive motions, with an expert, or at trial, or to raise challenges with the court before the close of discovery." *Commentary on Privilege Logs* at 300**.** Class Plaintiffs' proposal does so.

### G. Source Code Protective Order

MultiPlan has agreed to produce certain source code underlying its out-of-network services, Data-iSight and Viant. The parties have exchanged draft protective orders regarding this production and intend to continue negotiations. The parties will submit a proposed order if they are able to come to an agreement; if not, the parties will crystallize any disputes in advance of the March status conference and provide their respective proposals concerning the process and timing for resolving those disputes.

### H. MultiPlan Structured Data 30(b)(6) Deposition

On December 16, the Putative Class and DAP Plaintiffs jointly served a 30(b)(6) deposition notice on MultiPlan related to structured data and systems. On December 31, MultiPlan served its responses and objections. The deposition is currently scheduled for March 5.

On January 12, the parties met and conferred about the deposition topics and deposition date, and have had numerous exchanges since then. Plaintiffs believe that there is a dispute ripe

for the Court's pre-deposition determination, as set forth below. MultiPlan disagrees, but responds to Plaintiffs' position.

*Plaintiffs' Position:* As communicated in Plaintiffs' December 16 deposition notice and during the Parties' subsequent discussions, Plaintiffs intend to address the below topics during the deposition:

- Topic 1: Information about MultiPlan's databases and data systems, including their names, the general types of data they contain, and how they relate to one another.

- Topic 2: Information previously addressed in Plaintiffs' written correspondence regarding MultiPlan's data sample and reasonable follow up questions, as well as information about the documents or materials MultiPlan maintains about its structured data.

- Topic 3: Information about the categories of data that are fed into MultiPlan's repricing algorithms. As Plaintiffs represented to MultiPlan's counsel, this is not meant to be a "pop quiz" into all 5,000 structured date fields MultiPlan maintains, and Plaintiffs agreed to limit granular questions about specific structured data fields to questions already outlined in correspondence to MultiPlan, and reasonable follow ups.

- Topic 4: General, high-level information about what data MultiPlan receives from its clients and what is reported back to them. Plaintiffs agreed to limit any more granular questions on this topic to the eight Payor Defendants named in the Consolidated Class Action Complaint.

Based on meet-and-confer discussions in mid-January, Plaintiffs understood that the Parties had an agreement as to the scope of the deposition. However, as of February 11, MultiPlan appears to have adopted the position that Topic 4 must be limited to questions about "*specific* reports" that Plaintiffs identify 10-14 days in advance of the deposition. *See* Feb. 11, 2026 Email from Counsel for MultiPlan to Plfs. ("We ask again for Plaintiffs to identify—10-14 days before the deposition—specific reports (Topic 4) as to which they intend to ask structured-data questions, as a means to appropriately describe that topic with reasonable particularity."). Although it disputes this characterization, MultiPlan again insists below that it cannot prepare a witness to answer questions

on "granular details" regarding client reports "unless Plaintiffs identify, sufficiently in advance of the deposition, a reasonable subset of reports on which they wish to focus." Plaintiffs have no problem identifying for MultiPlan categories of documents that they intend to ask about during the deposition and have agreed to do so. And Plaintiffs have explained before and reiterate again below, Plaintiffs have no interest in turning the deposition into a pop quiz, or asking about obscure one-off reports. However, Plaintiffs are concerned that MultiPlan will not prepare its witness to talk about data reported to clients or used in its repricing algorithm that does not appear in reports that have been produced to Plaintiffs and identified to MultiPlan in advance on the basis of this objection.

The primary purpose of this 30(b)(6) deposition is to ascertain general information about MultiPlan's data and data systems that may not have been included in its prior disclosures or document productions.[4] Accordingly, Plaintiffs may have questions about data reported to MultiPlan clients that has not been produced to Plaintiffs. The goal of the deposition is to streamline and expedite structured data discovery, rather than require Multiplan to identify all 8,000 odd data fields it has indicated it possesses. Moreover, this deposition is necessary precisely because MultiPlan has refused to answer formal discovery requests and informal questions about such pivotal topics as the "'categories of data' specifically inputted into MultiPlan's algorithm(s) in order to reprice claims." Dec. 5, 2025 Jt. Status Rep., ECF No. 606 at 3. MultiPlan has also refused to produce certain types of payor reports that Plaintiffs are aware of and have been seeking

---

[4] Plaintiffs have never agreed to limit the scope of the 30(b)(6) deposition to what MultiPlan's already-identified structured data fields mean. As Plaintiffs communicated to MultiPlan and the Court (and as the Court understood), the purpose of this deposition is to "get a handle on what the categories [of data] are," and "what the categories mean." Dec. 12, 2025 Hr'g Tr. 23:9-10, 15.

15

for nearly a year.[5] Accordingly, MultiPlan's attempt to limit the scope of the deposition to specific client reports they have produced—when their production makes clear they have not yet produced all the relevant reports yet—appears to be yet another attempt to frustrate Plaintiffs' efforts to identify the relevant data MultiPlan maintains.[6]

MultiPlan's continued objections ignore Plaintiffs' extensive efforts—in the form of numerous emails and meet-and-confers—to explain the scope of their deposition topics, narrow them as appropriate, and clear up any possible ambiguity. As Plaintiffs represented to MultiPlan's counsel in writing, Topic 3 is intended to capture the data inputs that are fed into and relied upon by the MultiPlan repricing algorithms—not all of the thousands of fields that are in some way related to their repricing services. Topic 4 is limited to high-level, general information about what data MultiPlan receives from its clients and what is reported back to them—it is not intended to be a "gotcha" where Plaintiffs ask detailed questions about miscellaneous reports.

To prevent any disputes over scope from impacting the upcoming deposition, Plaintiffs request that the Court direct MultiPlan to prepare its 30(b)(6) witness to answer questions concerning the full scope of topics as described above. MultiPlan should not be permitted to object to deposition questions on the basis they concern specific reports or other documents that were not identified in advance of the deposition. Plaintiffs' Topics "describe with reasonable particularity

---

[5] To ensure MultiPlan's structured data production is complete, Plaintiffs have asked MultiPlan to produce on an expedited basis the "utilization reports" that were produced and described in other litigation involving MultiPlan and reflect "claims sent to MultiPlan by the payors," "charges billed through MultiPlan," and purported savings on repriced claims. *See Fed. Trade Comm'n v. Advocate Health Care Network*, No. 1:15-cv-11473 (N.D. Ill. Apr. 1, 2016), ECF No. 268, Ex. A at 2; *North Shore-Long Island Jewish Health Sys., Inc. v. Multiplan, Inc.*, No. 2:12-cv-01633 (E.D.N.Y. Oct. 17, 2016), ECF No. 162, Ex. 1 at 71:4–73:18. MultiPlan has declined.

[6] Although MultiPlan asserts that Topic 4 implicates "tens of thousands of detailed MultiPlan 'reports,'" MultiPlan has to date produced essentially 6 types of reports, each of which follows the same template and includes the same list of fields, which number only in the dozens.

the matters for examination" and are within the proper scope of discovery. If MultiPlan contends that the noticed Topics are overly broad or improper, MultiPlan should have sought a timely protective order. MultiPlan did not do so, and it has been over two months since Plaintiffs served the deposition notice and the deposition is scheduled for March 5, 2026.

*MultiPlan's Position:* MultiPlan does not believe there is a ripe dispute and is frankly confused regarding the pre-deposition relief sought by Plaintiffs in response to MultiPlan's good faith efforts to gain the clarity needed to prepare its Rule 30(b)(6) witness(es) for an efficient March 5 deposition. Because Plaintiffs insisted on including this JSR topic—and two days before the JSR was due, suddenly articulated that they want actual rulings from the Court restricting "objections" in a deposition that has not yet occurred, and based on characterization of MultiPlan's position that are just not true—MultiPlan provides the full context for the Court.

*1. Background regarding the scope of this deposition.* During the December 12, 2025 status conference, the Court rejected the notion of an "extra" 30(b)(6) deposition of MultiPlan but otherwise approved Plaintiffs' plan to take a Rule 30(b)(6) deposition regarding MultiPlan's structured data, which Plaintiffs informed the Court was to be focused on "what [MultiPlan's] structured data [fields] mean." *See* Dec. 12, 2025 Hr'g Tr. At 21:18-20 ("What you want to ask about now is what's – what do the categories mean, essentially"; "Correct"); *id.* at 21:21-24 ("What you want to ask about later is what's this data that you produced to us mean."; "Sure. And how does the algorithm work"); *see also id.* at 23:8-11 ("[I[f you do a deposition now and **you're trying to get a handle on what the categories mean**, you're not going to be able to do that again later…") (emphasis added); *id.* at 23:14-18 ("**[B]ut if we're talking about a deposition now just to get a handle on what the categories are** and depositions later once the actual records get [produced], those do not strike me as duplicative.") (emphasis added). As noted for the Court at

17

that hearing and related filings, MultiPlan had no issue or objection to such a deposition, but simply wanted to make sure it was not an "extra" deposition and that Plaintiffs could not re-depose MultiPlan employees on the same issues later in the discovery period.

Four days later, however, on December 16, 2025, Plaintiffs served a deposition notice with Rule 30(b)(6) topics that were far broader than what they had represented to the Court:

> **Topic 1**: The identity, architecture, types of data maintained in, and relationships among any Data Systems You use or rely on for repricing out-of-network claims.

> **Topic 2**. The Structured Data sample and the explanatory materials You have produced in this litigation regarding Your Structured Data; the identity of the Data System(s) from which any disclosed Structured Data field is derived; and any other materials You maintain that define or describe the data in Your Data Systems, such as look-up tables, glossaries, data crosswalks, data keys, and data dictionaries.

> **Topic 3**. The Data Systems, categories of data, and corresponding Structured Data fields used by Your OON Repricing Services to reprice claims (including used by any algorithms to reprice claims).

> **Topic 4.** The categories of data and corresponding Structured Data fields You report to or receive from Your OON Repricing Services clients, including:
> (a) submitted or billed amounts;
> (b) usual and customary amounts ("UNC");
> (c) target amounts or override parameters;
> (d) amounts allowed and/or paid to providers;
> (e) savings amounts (e.g., net or gross savings, shared savings amounts); and
> (f) fees You charge clients for use of Your OON Repricing Services.

Plaintiffs' Topic 2 is what they represented to the Court at the hearing that they wanted to ask about. The additional three topics went far beyond, and cover all MultiPlan data systems, all structured data fields "used by [MultiPlan's] OON Repricing Services," and all structured data fields that "[MultiPlan] report[s] to or receive[s] from [MultiPlan's] OON Repricing Services clients." As written, these topics implicate thousands of structured data fields, hundreds of thousands of pages of produced client reports, and myriad client-specifications.

18

"Structured data," as the Court knows, is an immensely broad area, particularly so in this case (healthcare claims across the country for over a decade). It is essentially another category of information, like documents and emails. If a deposition topic stated "all documents at MultiPlan regarding your OON systems," it would be facially absurd—and of course objectionable. But that is exactly what the majority of Plaintiffs' topics do, as to structured data. Accordingly, MultiPlan timely objected to the topics as, among other things, improperly broad and lacking "reasonable particularity." *See* Fed. R. Civ. P. 30(b)(6). To the extent that Plaintiffs are suggesting that MultiPlan delayed in raising these concerns about the topics, that is incorrect.[7]

***2. MultiPlan's efforts to avoid yet another Plaintiff-manufactured dispute and prepare its witness(es) to facilitate an efficient deposition.*** Although Plaintiffs' topics went far beyond the "meaning" of MultiPlan's structured data fields, MultiPlan did not raise Plaintiffs' bait and switch with the Court, or otherwise refuse to proceed with the additional, extremely broad topics at all. Instead, and in an ongoing effort to move the structured data issues forward, MultiPlan agreed to proceed with the deposition and simply sought clarification and some particularity as to the extremely broad topics, to ensure efficient witness preparation and to facilitate a productive deposition.[8] Through a meet-and-confer and additional correspondence, Plaintiffs articulated

---

[7] Plaintiffs are also incorrect about what MultiPlan has, or has not, agreed to produce. MultiPlan has not refused to provide information regarding its "categories of data", and it has produced many thousands of its client and various metrics reports—which Plaintiffs know, and which is the subject of MultiPlan's clarification, but which Plaintiffs neglect to mention to the Court. Regardless, MultiPlan's other discovery responses have nothing to do with whether Plaintiffs have articulated their Rule 30(b)(6) topics with "reasonable particularity", or the practical consequences of that failure for MultiPlan's preparation of its witness(es).

[8] The Parties also agreed that, although MultiPlan's investigation into its structured data is ongoing, MultiPlan would notify Plaintiffs, prior to the deposition, of some additional potentially relevant structured data fields that MultiPlan has identified, precisely for efficiency's sake. After the Court denied Plaintiffs' earlier motion to compel for "all" MultiPlan structured data fields, Plaintiffs thereafter were able to articulate for MultiPlan several more specific categories of fields

some of the information that they were most interested in asking (such as the types of structured data "fed into" DataiSight), but remained adamant, in writing, that they would "not agree to narrow Topics 1 through 3".[9] As to Topic 4, Plaintiffs explained that, in addition to "a general, high-level understanding of what data MultiPlan receives from its clients and what is reported back to them", Plaintiffs intended to pursue "granular" questions about information that MultiPlan has received from or reported to the Payor Defendants.

In response, MultiPlan explained that its witness(es) would be prepared to provide general, high-level testimony on these topics,[10] but asked that, *to the extent that Plaintiffs intend to seek granular information regarding particular client reports or documents during the deposition, for which the witness might not have personal knowledge, Plaintiffs identify those documents (or particular fields) to help ensure an efficient deposition*. *See Banks v. Office of Senate Sergeant-at-Arms*, 222 F.R.D. 7, 18-19 (D.D.C. 2004) (rejecting as "absurdly overbroad" wide-ranging Rule 30(b)(6) deposition notice that "reads like an interrogatory or a section of a request for production of documents").

This is a standard request in these sorts of technical depositions. Plaintiffs' additional deposition topics, and in particular Topic 4, read precisely like a request for production of documents (*i.e.*, all structured data underlying the tens of thousands of detailed MultiPlan

---

they were particularly interested in (ie, anything related to "net savings" and "client-specific" fields). Although the structured data production date is months away, MultiPlan is gathering such information that it has identified thus far and will provide it. This is how the process should work.

[9] It is telling that, despite Plaintiffs' protestations that their topics are not "really" as broad as they appear on the page, they request that the Court order MultiPlan to "answer questions concerning the full scope of [their] topics".

[10] Plaintiffs' assertion otherwise, inserted into this JSR the day before filing, is not true—and MultiPlan has made the point expressly to Plaintiffs that the witness(es) will be prepared to answer questions regarding Topics 1, 3, and 4 at a high level.

"reports," spanning hundreds of thousands of pages, over a 16-year period). MultiPlan has made clear that, without further specificity as to the client reports that Plaintiffs are interested in, MultiPlan can only guess at the specific structured data underlying those reports on which Plaintiffs might seek testimony. That is because MultiPlan has produced thousands of client reports to date, and the substance of these reports and the way they are generated can vary significantly depending on the client and scenario—regardless of whether Plaintiffs believe that the formatting and set-up of some reports look similar to others. Given this volume and potential variability, it is impossible for MultiPlan to prepare a witness on granular details regarding the structured data fields underlying every report unless Plaintiffs identify, sufficiently in advance of the deposition, a reasonable subset of reports on which they wish to focus. Indeed, courts have found that, where, as here, the noticing party fails to describe the noticed topics with sufficient particularity and fails to meaningfully engage in reasonably narrowing the topics despite the noticed entity's repeated attempts, a deponent can only answer to the best of their ability. *See Banks v. Office of the Senate Sergeant-At-Arms*, 241 F.R.D. 370, 375 (D.D.C. 2007) ("Designation as a Rule 30(b)(6) deponent does not require [the deponent] to conduct detailed independent investigations beyond what is reasonably known to the company. That, in essence, would be to investigate Plaintiff's case for him.").

*3. Plaintiffs' requested relief for pre-deposition rulings—raised for the first time in this JSR—is unwarranted.* MultiPlan asked that Plaintiffs identify such reports 10-14 days prior to the deposition—similar to the timeframe in which MultiPlan is endeavoring to provide Plaintiffs with additional structured data field names, as described in footnote 3 above. This was not, of course, a demand that Plaintiffs narrow their Topic 4 to only a few documents or to identify every deposition exhibit ahead of time. It was, however, an attempt to ensure that if Plaintiffs wish to

question the witness(es) on the particularities of one of thousands of variable clients reports, the witness(es) will be prepared to provide the answers that Plaintiffs seek. To date, Plaintiffs have refused, saying simply that they might provide such reports or similar documents (or might not).

That is Plaintiffs' choice, and the deposition will proceed with the questions they choose to ask. But there is no real dispute for the Court's determination at this time. In this JSR, Plaintiffs suddenly request that the Court prospectively bar MultiPlan from objecting to certain documents or lines of questioning during the deposition, apparently on the basis of Plaintiffs' brand-new assertion in this JSR that they don't *really* intend to ask detailed or granular or "pop-quiz" questions on any reports. Plaintiffs can offer no support for such a request—which is unripe and improper on its face. MultiPlan intends to move forward with the March 5 deposition (a date proposed by Plaintiffs) and prepare its witnesses to the best of its ability, including as to how MultiPlan may generate client reports using structured data.

## I.     Submission Regarding Optional Mediator

In its January 23 minute order, the Court directed that this joint status report "should include a submission regarding proposed mediator(s)." Defendants' Coordinating Counsel, Interim Class Liaison Counsel, and Plaintiffs' Coordinating Counsel have conferred regarding a proposed optional mediator, who would be available to any parties to use, as they may or may not see fit, while still allowing parties to instead choose to privately mediate with another neutral or on their own as they may determine.

Class Plaintiffs propose Hon. Layn R. Phillips of Phillips ADR Enterprises as the optional mediator for the Class case. A biography/CV is attached as **Exhibit B** and available at: https://phillipsadr.com/our-team/layn-phillips.

DAPs and Defendants propose Hon. Diane M. Welsh (Ret.). A biography is attached as

**Exhibit C** and available at: https://www.jamsadr.com/neutrals/welsh.

Dated: February 20, 2026

/s/ Sadik Huseny
Sadik Huseny (*pro hac vice*)
**LATHAM & WATKINS LLP**
300 Colorado Street, Suite 2400
Austin, TX 78701
Tel.: (737) 910-7300
sadik.huseny@lw.com

*Defendants' Coordinating Counsel*

/s/ Shawn J. Rabin
Shawn J. Rabin (*pro hac vice*)
**SUSMAN GODFREY LLP**
One Manhattan West, 50th Floor
New York, NY 10001-8602
Tel.: (212) 336-8330
srabin@susmangodfrey.com

*Interim Class Liaison Counsel*

/s/ Christopher A. Seeger
Christopher A. Seeger
**SEEGER WEISS LLP**
55 Challenger Road 6th Fl.
Ridgefield Park, NJ 07660
Tel.: (973) 639-9100
cseeger@seegerweiss.com

*Plaintiffs' Coordinating Counsel*