# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: MULTIPLAN HEALTH INSURANCE PROVIDER LITIGATION | Case No. 1:24-cv-06795<br>MDL No. 3121<br><br>Hon. Matthew F. Kennelly<br><br>FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMAND |

**TABLE OF CONTENTS**

I.      INTRODUCTION ....................................................................................................1

II.    PARTIES ...............................................................................................................8

      A.     Plaintiffs.......................................................................................................8

      B.     Defendants ..................................................................................................10

              i.         MultiPlan.........................................................................................10

              ii.        Aetna ...............................................................................................11

              iii.      Cigna ...............................................................................................11

              iv.      UnitedHealth ..................................................................................12

              v.         Centene ..........................................................................................12

              vi.      Blue Cross Blue Shield Defendants ..............................................13

III.   CO-CONSPIRATORS.........................................................................................18

IV.   JURISDICTION AND VENUE ..........................................................................19

V.    FACTUAL BACKGROUND...............................................................................21

      A.     The Out-Of-Network Healthcare Services Industry ..............................21

              i.         Third-Party Payers of Healthcare Services ....................................21

              ii.        In-Network Care .............................................................................23

              iii.      Out-of-Network Care ......................................................................25

              iv.      In-Network Compensation Process..................................................25

              v.         Out-of-Network Compensation Process ..........................................26

              vi.      Insurance Plans that Offer Out-of-Network Coverage ....................28

              vii.    Competition Among PPOs for Out-of-Network Providers..................30

      B.     Historical Pricing of Compensation for Out-of-Network Provider Services ........31

              i.         Benchmarking to UCR Rates (up to 1997).......................................31

i

ii. Prior Industry Collusion: The Ingenix Cartel (1997-2009) ................34

iii. FAIR Health, Inc. (2010 to 2015)........................................................37

iv. Insurers Abandon UCR-Based Compensation and Join the MultiPlan Cartel (2016 to the present)..................................................................39

C. The Evolution of MultiPlan's Business ................................................................42

i. MultiPlan 1.0.......................................................................................42

ii. MultiPlan 2.0.......................................................................................46

D. MultiPlan's OON Claims Repricing Services .....................................................48

i. The Data iSight Methodology..............................................................49

a) MultiPlan Pollutes its Database ..................................................51

b) MultiPlan Applies Algorithmic Overrides.................................52

ii. MultiPlan's "Negotiation" Services.....................................................57

iii. MultiPlan's Contingent Fee Structure .................................................59

VI. DEFENDANTS' ANTICOMPETITIVE SCHEME..........................................................60

A. MultiPlan Invites Insurers to Participate in Collective Action .............................60

B. Insurers Accept MultiPlan's Invitation to Collude ..............................................66

i. Joint Delegation ...................................................................................66

ii. Anticompetitive Information Exchange.................................................67

iii. Adherence to MultiPlan's Pricing Determinations ..............................72

C. Direct and Indirect Evidence of the MultiPlan Cartel Exists...............................74

i. MultiPlan's Contracts with Insurers ....................................................74

a) The Aetna-MultiPlan Contract ....................................................74

b) Contracts between MultiPlan and the Other Insurers..................76

ii.     Public Statements by MultiPlan ............................................................77

iii.    Private Communications Between MultiPlan and Other Members of the Cartel ................................................................................................79

iv.    Indirect Evidence of a Horizontal Agreement .....................................79

    a)   Insurers Engage in Actions Which, Absent Concerted Action, Would Be Against Their Individual Economic Self-Interest.........79

    b)   Defendants' Parallel Conduct and Abrupt Change in Behavior ....82

    c)   The Market for OON Healthcare Services Is Susceptible to the Formation, Maintenance, and Efficacy of a Cartel ........................83

VII.    THE RELEVANT MARKET...................................................................................87

    A.    The Relevant Services Market: The Market for Out-of-Network Provider Services for Purchase by Commercial Insurers..................................................................87

    B.    The Relevant Geographic Market: Nationwide .....................................................91

VIII.   DEFENDANTS' MONOPSONY POWER IN THE MARKET FOR OUT-OF-NETWORK PROVIDER SERVICES..............................................................................92

IX.    FRAUDULENT CONCEALMENT, CONTINUING VIOLATION, AND TOLLING THE STATUTE OF LIMITATIONS ..........................................................................93

X.    ANTICOMPETITIVE EFFECTS AND IMPACT ON INTERSTATE COMMERCE....98

XI.    CLASS ACTION ALLEGATIONS ............................................................................102

XII.   CAUSES OF ACTION...............................................................................................104

XIII.  PETITION FOR RELIEF .........................................................................................107

XIV.  JURY DEMAND.......................................................................................................107

## I.       INTRODUCTION

1.       Plaintiffs Advanced Orthopedic Center, Inc. ("Advanced Orthopedic"), Curtis F. Robinson, MD, Inc., d/b/a Panoramic Medicine ("Panoramic Medicine"), Douglas Psychotherapy Services LCSW PC, d/b/a Humantold Psychotherapy PC ("Humantold"), and Carnegie Hill Psychiatry PC ("Carnegie Hill," and together with Advanced Orthopedic, Panoramic Medicine, and Humantold, "Plaintiffs") bring this action on behalf of a proposed Class of healthcare providers to challenge a cartel among insurance companies—with and through Defendant MultiPlan, Inc. ("MultiPlan")—to artificially reduce the compensation paid to providers for out-of-network ("OON") healthcare services (the "MultiPlan Cartel" or "Cartel").

2.       The difference between "out-of-network" and "in-network" healthcare services stems from the nature of the provider's relationship with the patient's insurance company. Some healthcare providers agree to accept heavily discounted contractual rates for their services from one or more insurers in exchange for access to those insurer's members (i.e., "patient steerage"). When the provider has agreed to be part of a particular patient's insurance network, it will submit an "in-network claim" to the insurer for payment based on the pre-negotiated rate following the provision of care. Conversely, some providers decline to enter network agreements with some or all insurers, often because they deem the in-network compensation rates offered unreasonably low. When a provider has not agreed to be part of a particular patient's insurance network—but the patient's plan covers "out-of-network" care—the provider often submits an "out-of-network claim" to the insurer following the provision of care. These out-of-network claims are not based on any pre-negotiated, discounted rate, but rather on the provider's retail charge for the service performed.

3.       Patients may prefer, and in some cases require, treatment from out-of-network providers, including in situations where an established patient-doctor relationship exists, where

1

in-network options are lacking, where highly specialized care is needed, or in cases of emergency. Given the persistent consumer demand for out-of-network care options, many insurance plans offer out-of-network coverage to plan members (or "subscribers"). In fact, out-of-network benefits are the defining feature of the nation's most popular insurance plan type: the preferred provider organization ("PPO").

4. Relative to other plan types, like health maintenance organizations ("HMOs"), PPOs command higher premiums in part because they afford their subscribers the option to see any provider of their choosing (assuming they are willing to incur increased out-of-pocket costs for out-of-network care). HMOs, by contrast, typically cover only services performed by "in-network" providers.

5. Normal, competitive market conditions incentivize insurers to provide PPO subscribers—who are paying a premium relative to HMO subscribers to obtain, among other things, out-of-network benefits—with access to quality out-of-network care options, including by paying providers competitive rates of compensation for out-of-network services. Insurers understand that in a normal, competitive market, paying providers below-market compensation for out-of-network services might result in providers either (a) refusing to treat their subscribers on an out-of-network basis, or (b) billing those subscribers for the portions of their claims not covered by insurance, a process known as "balance billing." This, in turn, harms insurers' "bottom lines," as subscribers who value their out-of-network coverage may look to change plans. To avoid losing these subscribers, insurers normally would have a strong unilateral economic interest to pay providers competitive compensation for out-of-network care and to compete on that basis to satisfy providers and retain subscribers.

6. However, each insurer's unilateral interest in competing for out-of-network

2

healthcare services (to avoid subscriber and provider loss) conflicts with insurers' collective interest in reducing overall out-of-network payments to providers. This presents what is known as a collective action problem. To achieve the collective goal of reducing industry-wide out-of-network costs, insurers must work together to set rates. Setting aside its legality under the antitrust laws, such coordination is both (a) logistically complex, given the number of claims, services, and insurers involved; and (b) difficult to enforce, given each insurer's individual incentive to undermine the competition by offering better out-of-network coverage to their subscribers through the payment of fair, competitive compensation to providers.

7.      The MultiPlan Cartel allows insurers to overcome this collective action problem, albeit in violation of the antitrust laws. Rather than setting their out-of-network compensation rates independently, most of the nation's insurers—roughly 700 out of about 1,100 total (including all fifteen of the largest insurers)—now outsource this rate-setting function to a common entity, MultiPlan. By acting collectively through MultiPlan, insurers (including the Insurer Defendants, as defined below) effectively eliminate competition between themselves for out-of-network provider services and artificially suppress the prices they pay for those services.

8.      As part of this scheme, insurers are required and agree to provide MultiPlan with proprietary, granular, real-time, and competitively sensitive information ("CSI"), including data concerning the amount they pay providers for in- and out-of-network services, and their internal pricing strategies and preferences. This CSI enables MultiPlan to coordinate on behalf of Cartel members to suppress industry-wide out-of-network compensation rates paid to providers. As MultiPlan boasts on its website, in order to set rates for the industry, it "leverages reimbursement [i.e., payment] data from millions of claims[,]" thus helping individual insurers "reprice" out-of-network claims without "the guesswork." This is code for unlawful coordination on prices

3

through the collection of rival insurers' otherwise private CSI, including provider payment data.

9.      MultiPlan purports to determine out-of-network compensation rates "algorithmically" through a proprietary program called "Data iSight." But Data iSight is little more than a technological smokescreen for traditional price-fixing. As MultiPlan admits, the program merely calculates "median" provider compensation levels. MultiPlan ensures that these median calculations are artificially low by feeding the algorithm junk data, including, for example, data reflecting what insurers pay providers on an in-network basis. As noted above, in-network rates reflect the steep discounts that some providers agree to offer insurers in exchange for the benefits of network participation (most notably, increased patient volume). They do not represent reasonable compensation rates for out-of-network services—i.e., services performed by a provider who has chosen not to enter into any agreement with the insurer and thus does not stand to gain the benefits of network participation.

10.      To further suppress and coordinate compensation levels for out-of-network healthcare services, MultiPlan instructs many of its insurer co-conspirators, including the Insurer Defendants, to enter specific algorithmic "overrides" such as "Don't pay more than X% of the Medicare rate." The imposition of such rate caps by even a few of the largest insurers (which, given their market share, are responsible for paying a huge proportion of out-of-network claims) results in rapid downward shifts in industry-wide provider compensation levels. Compensation amounts paid to providers based on these artificial caps become the very data points MultiPlan then feeds its algorithm to calculate median compensation levels in the future. Once the market resets based upon these new, suppressed compensation levels, MultiPlan can instruct insurers to enter even lower rate caps—all while assuring them that they will remain, in the words of one MultiPlan executive, in the "middle of the pack" as compared to competitors, thus avoiding the

4

competitive harms that would result in a normal, unrestrained market.

11.     MultiPlan does not stop there. To ensure its low, fixed compensation rates hold, MultiPlan also "negotiates" with providers on behalf of its insurer clients, who agree to honor MultiPlan's negotiated rates. However, these are not true negotiations because, in over 95% of cases, providers are compelled to accept the initial offer made by MultiPlan and agree as a condition of payment not to balance bill patients for the unpaid portions of their claims. As a result, in virtually all cases, the MultiPlan rate determination is the final compensation amount paid to providers, not a mere "recommendation" to the insurer.

12.     MultiPlan points to such high provider acceptance rates as proof that its compensation amounts for out-of-network services are reasonable. But what they actually signal is the existence of a cartel with collective buying power over providers. Out-of-network providers are forced to accept artificially low compensation amounts (and relinquish their right to balance bills) because virtually all patients are now covered by insurers participating in the MultiPlan Cartel. The bargaining power that out-of-network providers once had—which was premised on the ability to discipline individual insurers through balance billing and service refusal—is gone. The fact that providers have no alternatives confirms that the MultiPlan Cartel has significant market (buying) power over providers; the threat of competition is virtually non-existent and thus incapable of disciplining the behavior of cartel members. As a result, the MultiPlan Cartel has dramatically suppressed the rates of compensation paid by insurers to providers for out-of-network healthcare services.

13.     MultiPlan has a direct economic stake in this race to the bottom. For each out-of-network claim it "reprices"—which is industry jargon for paying providers less than the amount for which they have billed—MultiPlan receives a fee from the insurer based on a percentage of

5

the difference between the initial claim amount and what the insurer ultimately pays the provider. In other words, MultiPlan gets paid more as providers get paid less, thus sharing in the spoils generated by the Cartel. The revenues generated by MultiPlan from its repricing services have gone from $23 million in 2012 to $564 million in 2020 and $709 million in 2021. Insurers choose to pay MultiPlan's high fees to facilitate their rate-fixing scheme.

14.     Historically, insurers described their process for calculating compensation rates for out-of-network services as being based on what they deemed the "usual, customary, and reasonable" charge for a particular service, i.e., the "UCR" rate. To determine the UCR rate for a particular service, insurers would survey the amounts providers in a particular geographic market charged on a retail basis for the same or similar medical services. Each insurer would then individually set its own UCR rate based on this observed retail charge data. Often, insurers would set their UCR rates based on the "80th percentile rule." This would mean that the insurer's UCR rate for a particular service would be equal to or less than what 80% of the medical providers in a given area charged for the same or similar medical services.

15.     Today, UCR rates (to the extent they are still used by insurers to set compensation amounts for out-of-network services) are typically calculated using charge data compiled by the independent non-profit organization, FAIR Health, Inc. ("FAIR"). Unlike MultiPlan, FAIR charges a flat annual fee to insurers for access to its data repository. In other words, FAIR's compensation is not tied to how insurers set UCR rates or what they ultimately pay for out-of-network services.

16.     However, UCR is no longer the dominant methodology insurers use to calculate the payments they will make on out-of-network claims. MultiPlan has changed the rules of the game, replacing the UCR method, which focused on what providers charge for out-of-network

services on a retail basis, with its own price-coordination scheme, which focuses on the lower amounts participants in the MultiPlan Cartel pay providers for like services (including on a heavily discounted, in-network basis).

17. That strategy has paid off for Cartel members. According to an April 2020 study published by the Office of the New York State Comptroller, depending on the service provided, compensation amounts paid to out-of-network providers based on MultiPlan's repricing services were 1.5 to 49 times lower than compensation paid to out-of-network providers for the same services based on the UCR benchmarks. And whereas prior to 2016 , compensation rates typically increased over time, since then they have decreased each year because of MultiPlan's price-coordination scheme. Rather than inure to the benefit of customers and insureds, these "savings" advantage MultiPlan as well as insurance company executives and shareholders. Meanwhile, providers are forced to accept increasingly low compensation amounts for out-of-network services.

18. The MultiPlan Cartel dates to roughly 2015, but it is not the first scheme by insurers to suppress out-of-network compensation rates. From the late 1990s to around 2009, insurers fixed these rates through a UnitedHealthcare subsidiary, Ingenix, Inc. ("Ingenix"). During that time, Ingenix operated the sole repository of data that insurers used to calculate UCR rates. But as a New York Attorney General's Office ("NYAG") investigation revealed, Ingenix was systematically understating UCR, including by polluting its claims database with discounted in-network payment amounts, just as MultiPlan does today. The Ingenix scheme artificially suppressed compensation rates for out-of-network services by 10 to 28%, leading to massive insurer liability. In 2009, twelve insurers (including the "big four"—Blue Cross/Blue Shield, United, Cigna, and Aetna) settled with NYAG. They agreed to invest hundreds of millions of

dollars in the creation of a new, independent UCR database to replace Ingenix—which would become FAIR—and to refrain from developing or using any alternative to FAIR for at least five years. The five-year terms of those settlements ended in 2015 and 2016. When those bans lapsed, insurers shifted away from FAIR (and from the UCR method entirely) and began to fix rates again via MultiPlan.

19. The conspiracy challenged herein is unlawful under Section 1 of the Sherman Act. Plaintiffs bring this action to recover damages, trebled, as well as injunctive and other appropriate relief, detailed infra, on behalf of themselves and all others similarly situated.

## II. PARTIES

### A. Plaintiffs

20. Plaintiff Advanced Orthopedic is a California corporation located in Poway, California that operates throughout Southern California. Advanced Orthopedic is an independently owned and operated orthopedic practice founded and run by Jonathan Nissanoff, MD. Advanced Orthopedic provides specialized orthopedic care to patients suffering orthopedic and sports medicine injuries, including foot, ankle, knee, hip, wrist, hand, elbow, shoulder, and spine injuries. Advanced Orthopedic does not participate in any insurance networks; it only treats patients on an out-of-network basis. Advanced Orthopedic typically bills for its services by submitting bills to insurers. Many of these insurers use MultiPlan's out-of-network claims repricing services and are thus members of the MultiPlan Cartel. Advanced Orthopedic has received unreasonably low compensation amounts (i.e., below competitive levels) for out-of-network claims as a result of the unlawful price-fixing conspiracy alleged herein.

21. Plaintiff Curtis F. Robinson, MD, Inc., d/b/a Panoramic Medicine is a California corporation located in Mill Valley, California. Panoramic Medicine is an independently owned and operated primary care practice founded and run by Mill Valley-native Curtis Robinson, MD.

8

Panoramic Medicine supports individual and community health, wellness, and longevity through the provision of cutting-edge primary medical care. While Panoramic Medicine participates in several insurance networks, it sometimes treats patients on an out-of-network basis. For these patients, Panoramic Medicine typically submits out-of-network claims to their insurers, which, in turn, will often use MultiPlan's out-of-network claims repricing services and are members of the MultiPlan Cartel. Panoramic Medicine has received unreasonably low compensation (i.e., below competitive levels) for those out-of-network claims as a result of the unlawful price-fixing conspiracy alleged herein.

22. Plaintiff Douglas Psychotherapy Services LCSW PC, d/b/a Humantold Psychotherapy PC, is a New York Professional Corporation located in New York, New York that operates in New York City. Humantold offers compassionate, evidence-based psychotherapy services for individuals, couples, families, and groups to address a diverse range of mental wellness needs, issues, and communities. Humantold primarily treats patients on an out-of-network basis. For these patients, Humantold submits out-of-network claims to their insurers, many of which use MultiPlan's out-of-network claims repricing services and are thus members of the MultiPlan Cartel. Humantold has received unreasonably low compensation (i.e., below competitive levels) for those out-of-network claims as a result of the unlawful price-fixing conspiracy alleged herein.

23. Plaintiff Carnegie Hill Psychiatry PC is a New York Professional Corporation located and operating in New York, New York. Carnegie Hill partners with Humantold to provide psychiatry services and deliver holistic treatment for their patients, tailored to their specific needs and concerns. Carnegie Hill exclusively treats patients on an out-of-network basis. For these patients, Carnegie Hill submits out-of-network claims to their insurers, many of which

9

use MultiPlan's out-of-network claims repricing services and are thus members of the MultiPlan Cartel. Carnegie Hill has received unreasonably low compensation (i.e., below competitive levels) for those out-of-network claims as a result of the unlawful price-fixing conspiracy alleged herein.

### B. Defendants

#### i. MultiPlan

24. Defendant MultiPlan, Inc. ("MultiPlan") is a New York corporation. Its principal place of business is located at 115 Fifth Avenue, 7th Floor, New York, NY 10003. MultiPlan is wholly owned by MultiPlan Holding Corporation. The ultimate parent company of MultiPlan Holding Corporation is MultiPlan Corporation. MultiPlan Corporation is a publicly traded entity. MultiPlan, which purports to operate a third-party out-of-network claims repricing service, serves as the conduit by which Cartel members share, inter alia, detailed, competitively sensitive, non-public information.

25. MultiPlan has a number of subsidiaries, including Viant, Inc. ("Viant"), a healthcare cost management company incorporated in Nevada and headquartered in Illinois, which MultiPlan acquired in 2010, and the healthcare cost management company National Care Network, LP (incorporated and headquartered in Texas) along with its affiliate, National Care Network, LLC (incorporated in Delaware and headquartered in Texas), both of which MultiPlan acquired in 2011.

26. Until October 2020, MultiPlan was a privately held corporation. In October 2020, Churchill Capital Corp. III and its related entities acquired MultiPlan, Inc. and its related entities. Churchill Capital Corp. III is a special-purpose acquisition company created to raise funds to take a private company public. It is incorporated in Delaware and headquartered in New York. After completing the acquisition of MultiPlan, Inc. and its related companies, Churchill Capital

10

Corp. III changed its name to MultiPlan Corporation.

### ii.  Aetna

27.  Defendant Aetna, Inc. ("Aetna"), a subsidiary of CVS Health Corporation, is one of the largest commercial health insurance payers in the United States. Aetna is a Delaware corporation headquartered in Hartford, Connecticut. Aetna is the parent company of, or an otherwise affiliated or related company to, various commercial health insurance plans and prescription drug plans that operate in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. Aetna is a member of the MultiPlan Cartel and began using MultiPlan's out-of-network claims repricing services in November 2018. On information and belief, Aetna pays for out-of-network services performed by healthcare providers in all fifty states and the District of Columbia.

### iii.  Cigna

28.  Defendant The Cigna Group ("Cigna") is one of the largest health insurance companies in the United States. It is a corporation organized under the laws of the State of Delaware, with its principal place of business in Broomfield, Connecticut. Cigna is the parent company of, or an otherwise affiliated or related company to, various commercial health insurance plans and prescription drug plans that operate in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. Cigna is a member of the MultiPlan Cartel and began using MultiPlan's out-of-network claims repricing services in 2015. On information and belief, Cigna pays for out-of-network services

11

performed by healthcare providers in all fifty states and the District of Columbia.

### iv. UnitedHealth

29. Defendants UnitedHealth Group Incorporated and its subsidiary, UnitedHealthcare Insurance Company (collectively, "UnitedHealth" or "United") are among the largest health insurance companies in the United States. UnitedHealth Group is a Delaware corporation with a principal place of business in Minnetonka, Minnesota. UnitedHealthcare Insurance Company is a Connecticut corporation with a principal place of business in Hartford, Connecticut. UnitedHealth Group Incorporated has two divisions: UnitedHealthcare, which provides health benefits plans, and Optum, which provides health services, including pharmacy benefit manager services. UnitedHealth is a vertically integrated healthcare enterprise with a portfolio of wholly owned subsidiaries comprising a massive healthcare ecosystem. UnitedHealthcare is the largest commercial health insurance company in the United States.

30. UnitedHealth's insurance plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service-only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. UnitedHealth is a member of the MultiPlan Cartel and began using MultiPlan's out-of-network claims repricing services in 2016. On information and belief, UnitedHealth pays for out-of-network services performed by healthcare providers in all fifty states and the District of Columbia.

### v. Centene

31. Defendants Centene Corporation and its subsidiary, Health Net of California, Inc. (collectively, "Centene") are among the largest health insurance organizations in the United States. Centene Corporation is a Delaware corporation with its principal place of business in St. Louis, Missouri. Health Net of California, Inc. is a California corporation with its principal place

12

of business in Woodland Hills, California. Centene is the parent company of, or is otherwise affiliated or related to, various commercial health insurance plans and prescription drug plans operating in the United States, including Health Net of California, Inc. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. Centene uses MultiPlan's out-of-network claims repricing services, is a member of the MultiPlan Cartel, and pays for out-of-network healthcare services performed by healthcare providers in all fifty states and the District of Columbia.

### vi.        Blue Cross Blue Shield Defendants

32.     The Blue Cross Blue Shield Association ("BCBSA"), sometimes called "The Blues," is a joint venture of insurance companies throughout the United States that work together to offer their members access to a nationwide network of healthcare providers.

33.     Defendant Elevance Health, Inc. (formerly known as Anthem, Inc.) ("Elevance") is one of the largest health insurance companies in the United States. Elevance is a member of BCBSA. It is an Indiana corporation with a principal place of business in Indianapolis, Indiana. Elevance licenses certain trademarks and service marks from BCBSA in fourteen states: California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, most of Missouri, Nevada, New Hampshire, parts of New York, Ohio, Virginia (except the Washington, D.C. suburbs), and Wisconsin. Elevance is the parent company of, or an otherwise affiliated or related company to, various commercial health insurance plans and prescription drug plans that operate in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare

13

Advantage plans, and (5) Medicaid plans. On information and belief, Elevance uses MultiPlan's out-of-network claims repricing services, is a member of the MultiPlan Cartel, and pays for out-of-network services performed by healthcare providers in all fifty states and the District of Columbia.

34.     Defendant Health Care Service Corporation, a Mutual Legal Reserve Company ("HCSC"), is one of the largest health insurance companies in the United States. It is organized as a mutual reserve company under the laws of the state of Illinois with a principal place of business in Chicago, Illinois. HCSC maintains certificates of authority to conduct insurance operations in thirty-two states and the District of Columbia. HCSC licenses certain trademarks and service marks of BCBSA and does business in Illinois as Blue Cross and Blue Shield of Illinois. HCSC also does business as Blue Cross and Blue Shield of Montana, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Texas. HCSC offers plans to provide insurance and/or administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. On information and belief, HCSC uses MultiPlan's out-of-network claims repricing services, is a member of the MultiPlan Cartel, and pays for out-of-network services performed by healthcare providers in all fifty states and the District of Columbia.

35.     Defendant Horizon Health Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey ("Horizon") is a health insurance company. It is a New Jersey corporation with a principal place of business in Newark, New Jersey. Horizon is a licensee of BCBSA and is licensed to offer Blue Cross and Blue Shield-branded health insurance plans in New Jersey.

14

Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. On information and belief, Horizon uses MultiPlan's out-of-network claims repricing services, is a member of the MultiPlan Cartel, and pays for out-of-network services performed by healthcare providers in all fifty states and the District of Columbia.

36.     Defendant Blue Cross Blue Shield of Michigan Mutual Insurance Company ("BCBSMI") is a Detroit, Michigan mutual insurance company. Its principal place of business is in Michigan. BCBSMI is a licensee of the Blue Cross and Blue Shield Association and is licensed to offer Blue Cross and Blue Shield-branded health insurance plans in Michigan. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. On information and belief, BCBSMI uses MultiPlan's out-of-network claims repricing services, is a member of the MultiPlan Cartel, and pays for out-of-network services performed by healthcare providers in all fifty states and the District of Columbia.

37.     Defendant Highmark Inc. is one of the largest health insurance organizations in the United States. It is incorporated and has its principal place of business in Pittsburgh, Pennsylvania. Highmark is a licensee of BCBSA, and its Blue-branded affiliates are collectively the fourth-largest Blue Cross and Blue Shield-affiliated organization in the country. Highmark is licensed to offer Blue Cross and Blue Shield-branded health insurance plans in Pennsylvania, Delaware, West Virginia, and parts of New York. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial

15

health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. On information and belief, Highmark uses MultiPlan's out-of-network claims repricing services, is a member of the MultiPlan Cartel, and pays for out-of-network services performed by healthcare providers in all fifty states and the District of Columbia.

38.     Defendant Blue Cross and Blue Shield of Massachusetts, Inc. ("BCBSMA") is a Massachusetts corporation with its principal place of business in Boston, Massachusetts. BCBSMA is a licensee of the Blue Cross Blue Shield Association. BCBSMA is licensed to market health insurance plans using Blue Cross Blue Shield trademarks in Massachusetts. BCBSMA issues insurance or provides administrative services concerning healthcare claims that include: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, and/or (3) hybrid-funded health plans. BCBSMA uses MultiPlan's out-of-network claims repricing services, is a member of the MultiPlan Cartel, and pays for out-of-network services performed by healthcare providers in all fifty states and the District of Columbia.

39.     Defendants Aware Integrated, Inc. and BCBSM, Inc. d/b/a Blue Cross Blue Shield of Minnesota (collectively, "Blue Cross Blue Shield of Minnesota") are Minnesota corporations. Their principal place of business is in Eagan, Minnesota. Blue Cross Blue Shield of Minnesota is the parent company, or otherwise affiliated with or related to, various commercial health insurance plans and prescription drug plans that operate in the U.S. The plans issue insurance or provide administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and/or (5) Medicaid

16

plans. Blue Cross Blue Shield of Minnesota uses MultiPlan's out-of-network claims repricing services, is a member of the MultiPlan Cartel, and pays for out-of-network services performed by healthcare providers in all fifty states and the District of Columbia.

40. CareFirst, Inc. ("CareFirst") is a Maryland corporation with its principal place of business in Baltimore, Maryland. CareFirst, through its wholly-owned subsidiaries and affiliates, Group Hospitalization and Medical Services, Inc.; CareFirst of Maryland, Inc.; and CareFirst BlueChoice, Inc., collectively do business as CareFirst BlueCross BlueShield. CareFirst is a licensee of the Blue Cross Blue Shield Association. CareFirst is licensed to market health insurance plans using Blue Cross Blue Shield trademarks in the District of Columbia and the counties in Northern Virginia and Maryland that make up the Washington, D.C. suburbs. CareFirst's insurance plans issue insurance or provide administrative services concerning healthcare claims that include: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, and/or (3) hybrid-funded health plans. CareFirst uses MultiPlan's out-of-network claims repricing services, is a member of the MultiPlan Cartel, and pays for out-of-network services performed by healthcare providers in all fifty states and the District of Columbia.

41. Collectively, the aforementioned entities are referred to as "the BCBS Defendants" throughout.

42. Defendants Aetna, Cigna, UnitedHealth, Centene, and the BCBS Defendants are collectively referred to in this complaint as the "Insurer Defendants." They have each executed one or more out-of-network claims repricing services agreements with MultiPlan and have participated in the MultiPlan Cartel. Each has performed acts and made statements in furtherance of the conspiracy. Accordingly, along with MultiPlan, the Insurer Defendants are jointly and

17

severally liable for all the acts and omissions of their co-conspirators, whether named or not named in this Complaint.

### III.    CO-CONSPIRATORS

43.    The named Defendants are not the only participants in the MultiPlan Cartel. MultiPlan sets out-of-network compensation rates for nearly all major health insurers in the United States, and many of the smaller ones as well. It has bragged that it contracts with some 700 health insurance companies and payers—including the 15 largest health insurers in the United States—to provide out-of-network claims repricing services. Collectively, the Insurer Defendants account for over 60 percent of the commercial insurance market share by enrollment, and account for an even greater percentage of the commercial PPO market by enrollment.

44.    The conspiracy alleged herein includes any person or entity that has entered into an out-of-network claims repricing services agreement with MultiPlan, used MultiPlan's out-of-network claims repricing tools, or otherwise participated with the Defendants in the alleged conspiracy and performed and made statements in furtherance of thereof.

45.    Defendants are jointly and severally liable for the acts of these co-conspirators, whether or not they are named as defendants in this Complaint, including but not limited to:

46.    Humana Inc. ("Humana") is one of the largest health insurance companies in the United States. It is a Delaware corporation with its principal place of business in Louisville, Kentucky. Humana is the parent company to, or an otherwise affiliated or related company of, various commercial health insurance plans and prescription drug plans that operate in the United States. The plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. On information and belief, Humana uses MultiPlan's out-of-network claims

18

repricing services, is a member of the MultiPlan Cartel, and pays for out-of-network healthcare services performed by providers in all fifty states and the District of Columbia.

47.     Kaiser Foundation Health Plan, Inc. ("Kaiser") is a California non-profit public benefit corporation with a principal place of business in Oakland, California. Kaiser is the ultimate parent company of several entities including Kaiser Foundation Health Plan of Colorado; Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.; Kaiser Foundation Health Plan of Washington; and Kaiser Foundation Health Plan of the Northwest. Kaiser, through its wholly owned subsidiaries, issues insurance or provides administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and/or (5) Medicaid plans. On information and belief, Kaiser uses MultiPlan's out-of-network claims repricing services, is a member of the MultiPlan Cartel, and pays for out-of-network healthcare services performed by providers in all fifty states and the District of Columbia.

## IV.     JURISDICTION AND VENUE

48.     This case arises under Section 1 of the Sherman Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 & 26). Plaintiffs seek treble damages for their injuries, and those suffered by members of the proposed Class, resulting from Defendants' anticompetitive conduct; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the laws of the United States.

49.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 (federal question) and § 1337(a) (antitrust), and 15 U.S.C. § 15 (antitrust). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs,

19

and at least one member of the proposed Class is a citizen of a state different from that of each Defendant.

50.     This Court has personal jurisdiction over MultiPlan because Multiplan operates nationally, transacting business throughout the United States, including in this District (including repricing claims for out-of-network healthcare services performed in this District), and is engaging in the alleged antitrust conspiracy, which has a direct, foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. MultiPlan has substantial operations in Naperville, Illinois, including employees there who are involved in operating MultiPlan's common pricing methodology for out-of-network services. Acts and omissions alleged herein occurred at MultiPlan's office in Naperville, Illinois.

51.     This Court has personal jurisdiction over all the Insurer Defendants (Aetna, Cigna, UnitedHealth, Centene, and the BCBS Defendants) because each of them paid compensation to members of the proposed Class for providing medical services on an out-of-network basis in this District and engaged in the alleged antitrust conspiracy, which has a direct, foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. The Insurer Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, may be found in and transact business in Illinois, including by offering health plans in the state; sending confidential, proprietary claims data concerning claims for out-of-network services performed in Illinois to Defendant MultiPlan; using MultiPlan's common pricing methodology to set prices and pay claims for out-of-network services provided in Illinois; holding meetings in furtherance of the MultiPlan Cartel with parties in Illinois; and

20

engaging in an antitrust conspiracy, which has a direct, foreseeable, and intended effect of causing injury to the business and property of persons and entities residing in, located in, or doing business throughout the United States including in the state of Illinois.

52.    Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and under the federal venue statute, 28 U.S.C. § 1391, because certain unlawful acts by the Defendants were performed in this District as described above, and those and other unlawful acts caused harm to interstate commerce in this District. No other forum would be more convenient for the parties and witnesses to litigate this case. Venue is also proper given the Judicial Panel on Multidistrict Litigation's order transferring this case to this Court.

## V.    FACTUAL BACKGROUND

### A.    The Out-of-Network Healthcare Services Industry

#### i.    Third-Party Payers of Healthcare Services

53.    An assortment of public and private third-party payers ("TPPs") pays roughly ninety percent of U.S. healthcare expenses, including those related to out-of-network care. These payers include government-funded insurance programs (like Medicare and Medicaid); self-insured employers (whose plans are typically administered by commercial insurance companies); and commercial insurance companies themselves (such as UnitedHealthcare, Anthem, Aetna, Kaiser, Cigna, and the various Blue Cross/Blue Shield companies).

21



54.    Most healthcare providers depend upon compensation from insurance companies to stay in business. Typically, providers collect only nominal amounts from patients at the point of service (usually in the form of "copays" or "co-insurance"). The providers then submit the bill (or "claim") for services rendered to the patient's insurer for that insurer to pay the provider directly for the services.

55.    All medical claims submitted by providers to insurers for compensation use the same set of uniform billing codes. Procedure code sets like CPT ("Current Procedure Terminology") and ICD-10-PCS ("International Classification of Diseases, 10th Revision, Procedure Coding System") tell the insurer which service the provider performed. Diagnosis code sets like the ICD-10-CM ("International Classification of Diseases, 10th Revision, Clinical Modification") tell the insurer why the patient received the service. Most claims contain numerous codes, reflecting each diagnosis and treatment administered during a medical visit. Typically, providers receive compensation for each code billed (so long as it is covered by the

22

patient's healthcare plan).

56.     Healthcare providers often work with administrative professionals called "billers" and "coders" to extract billing information from patients' medical charts, generate the claims that are submitted to insurance, and ensure the providers receive proper compensation. Many providers also work with administrative professionals to pre-screen claims, correct errors, and securely transmit claims to insurers (and patients).

57.     This administrative work is both time-consuming and expensive. As a result, providers often choose to outsource their medical billing to third parties (some of which are located offshore) so that they can devote more internal resources to serving patients.

### ii. In-Network Care

58.     Insurers seek to predict and, if possible, limit the prices they will pay for medical services. To that end, most insurers maintain "networks" of healthcare providers that have agreed to offer them discounted rates for services in exchange for (a) patient steerage and (b) the avoidance of certain administrative burdens associated with negotiating the cost of services with insurers on an ad hoc basis. To create these networks, insurers enter into contracts (often called "network agreements") with providers. Insurers then offer access to their provider networks to (a) their own plan subscribers and (b) the self-insured plans they administer.

59.     When a provider seeks to be paid by an insurer for providing healthcare services covered by a network agreement, such compensation claims are called "in-network" or "contracted" claims. By contrast, claims for services not covered by a network agreement are called "out-of-network," "non-contracted," or "retail" claims.

60.     Network agreements between providers and insurers typically detail the kinds of services to be covered by the insurer on an in-network basis including the amount the provider will be paid for each covered service and the process by which claims for compensation are

23

adjudicated.

61.     Network contracts contain proprietary, competitively sensitive terms, including agreed-upon rates (i.e., compensation amounts) that result from closed-door negotiations between insurers and providers.1 Insurers seek to protect the rate schedules and other information in their network agreements from disclosure. They know that competing insurance companies may use the information to lure providers to their networks by offering superior terms (in turn driving up in-network rates for the industry). They also know that healthcare providers may leverage the information to demand more favorable rates during future negotiations. Moreover, public disclosure of negotiated rates can lead to subscriber backlash if negotiated discounts do not result in lower plan premiums or align with subscriber expectations. Given these sensitivities, the industry has taken the position that agreed-upon rates in network agreements are trade secrets.

62.     Insurers' in-network rates for providers vary widely, even for the same services across different providers. Hospitals, with their extensive service offerings and substantial market presence, typically command higher compensation from insurance companies, whereas independent practices, due to their smaller size and limited bargaining power, typically secure far less favorable in-network rates. In some cases, the in-network compensation rates paid by insurers fall below the operational costs incurred by independent providers. A provider in this situation faces a difficult decision: They can accept inadequate in-network rates, knowing that doing so may leave them in financial distress, or they can decline to join some or all insurance

---

[1] Prior to 2022, in-network compensation rates were virtually always treated as confidential and proprietary. In 2022, federal legislation went into effect requiring insurers to disclose the terms of certain network agreements with hospitals. Transparency in Coverage, 85 Fed. Reg. 72158 (Nov. 12, 2020) (to be codified at 26 C.F.R pt. 54; 29 C.F.R. pt. 2590; 45 C.F.R. pt. 147; and 45 C.F.R. pt. 158).

24

networks, knowing it will result in the loss of patient volume.

### iii. Out-of-Network Care

63.     Many providers refrain from participating in network arrangements for one, some, or all insurers. Some providers determine that the in-network compensation paid by insurers is too low (which is often the case for independent practices), or that the network will not provide the providers with adequate patient volume to justify the low compensation rates. Refraining from participating in a particular insurer's network allows the provider to bill that insurer at the retail rate for services (assuming the patient's plan includes out-of-network benefits).

64.     The ability of providers to be compensated for out-of-network services by insurers based on prevailing market rates—and thereby to profitably practice medicine outside of insurance networks—represents a powerful form of leverage on the side of providers when they seek to negotiate compensation for in-network care. Such ability functions, essentially, as a check on insurers' ability to drive in-network compensation too low. However, as described herein, the MultiPlan Cartel drastically reduces providers' leverage in this regard by suppressing out-of-network compensation far below competitive levels, such that the threat of any provider leaving an insurer's network to instead offer services only on an out-of-network basis becomes increasingly hollow.

### iv. In-Network Compensation Process

65.     When a provider seeks compensation from an insurer for services rendered to one of its members, the process is different depending upon whether the provider (a) has signed a network agreement governing compensation for the service (such that the provider's claim for payment will be considered "in-network") and (b) has no network agreement with the insurer (such that the claim will be considered "out-of-network").

66.     The process for providers to obtain compensation for in-network services

rendered is relatively straightforward. Once the insurer receives a claim for a service from an in-network provider, the claim enters the adjudication process, during which the claim for compensation will either be "accepted" (meaning paid), "denied" (not paid), or "rejected" (returned due to error). If some but not all of the services reflected in the bill are covered by the insurer's plan, the insurer may approve compensation for the covered services while rejecting compensation for the non-covered services.

67. Following adjudication, the insurer submits a report to the provider detailing which codes it is willing to compensate the provider for and at what rate (according to parties' network agreement). The provider then checks the report for accuracy and may begin an appeals process (the procedure for which is governed by the network agreement) should a dispute arise.

### v. Out-of-Network Compensation Process

68. In contrast, when a provider is out-of-network, there is no contract between the insurer and the provider to govern the parties' obligations to one another, how compensation claims are adjudicated or at what rates, or the means for resolving any disputes over such compensation. Nor is there an obligation on the part of the provider to render out-of-network services to an insurer's members, with certain limited exceptions (like emergency care). In the absence of such an agreement, the insurer and provider are left to negotiate what services will be paid for, and in what amount, based on what the market will bear.

69. When out-of-network providers submit compensation claims to insurers, they (or, more commonly, their medical billers) generally do so through an electronic standard form required by the Health Insurance Portability and Accountability Act ("HIPAA"), 5 U.S.C. § 164. Insurers either deny these claims and pay nothing to the provider or accept them for processing, in which case they must determine a compensation amount for each accepted service code billed. As explained further below, insurers that are part of the MultiPlan Cartel set their compensation

26

rates for out-of-network claims using MultiPlan's repricing services.

70. After an insurer accepts for processing an out-of-network claim for compensation from a provider, the insurer sets the compensation rate it will pay and must inform the provider why a claim or service line was paid at a rate different from what was billed. These communications are commonly referred to as explanations of benefits (or "EOBs").

71. Such EOBs explicitly state that compensation for out-of-network claims is not governed by any network agreement. For example, EOBs sent by Defendant Aetna to out-of-network providers explain, "You are an out-of-network provider and do not have a contracted rate from Aetna. The member's plan provides benefits for covered out-of-network services at what we find to be a recognized charge."

72. EOBs submitted electronically (as is now the norm) are subject to federal regulations that govern electronic healthcare transactions. These regulations mandate the use of standard claim adjustment codes (known as the "X12 Codes"). The X12 code "CO" (which is short for "Contractual Obligation") indicates a compensation claim was paid pursuant to a contract (like a network agreement), which provides for a rate lower than the billed amount. The code CO is also used when the patient is covered by a government-sponsored plan like Medicare, which has pre-set compensation rates for medical services.

73. By contrast, the X12 code "PR" (which is short for "Patient Responsibility") indicates that the patient is responsible for a portion of the bill (i.e., the shortfall that has not been covered by the patient's plan). When an insurer pays an OON claim for compensation below the amount billed by the provider, the claims should be designated by the code PR, as they are non-contract claims.

74. On information and belief, insurers that use MultiPlan to reprice out-of-network

27

claims often improperly use the code "CO" on their electronic EOBs to providers—even though these compensation amounts are not determined by any contractual obligation—in an effort to fraudulently conceal the conspiracy alleged herein. On information and belief, it is common practice for medical billers to automatically accept compensation that deviates from the billed amount based on the code CO, as they assume these compensation amounts have been pre-negotiated and agreed to by the provider (or set by the government). By contrast, medical billers are far more likely to manually audit compensation payments accompanied by the code PR to ensure they are reasonable, leading to more appeals of unreasonably low payments. Because Cartel members improperly use the X12 code "CO" on their electronic EOBs, providers and their medical billers may be less likely to appeal and scrutinize under-compensation resulting from the MultiPlan Cartel.

### vi.   Insurance Plans that Offer Out-of-Network Coverage

75.    The two most common forms of health insurance in the United States are HMOs and PPOs. Both forms of insurance utilize provider networks to manage their compensation obligations to providers. HMOs require patients to obtain healthcare services, however, only from providers that (1) participate in the plan network and (2) agree to provide services to plan members at steeply discounted compensation rates.2 PPOs, by contrast, give patients a choice: Patients can either obtain care from an in-network provider who has agreed to receive discounted compensation for providing in-network services, or patients can get care from an out-of-network provider of their choosing who has no contractual agreement with the insurer, and regardless of where that provider is located geographically. However, patients that opt to use their out-of-

---

2 An HMO plan may, at times, provide partial payment for services performed by a healthcare provider not within network, but only in extraordinary circumstances. Such coverage typically requires prior authorization by the insurer, which will pre-negotiate the terms of compensation with the provider.

network plan benefits will typically have to pay higher out-of-pocket costs.

76.     Historically, under most PPO plans, insurers paid providers compensation for out-of-network care based on a large, fixed percentage (typically 80-90 percent) of the UCR rate, less the patient's cost-share contribution (e.g., coinsurance, co-pay, or other sharing the patient agrees to as part of participating in the insurance plan). The UCR rate, as described further below, is supposed to be a fair reflection of the prevailing market rate for a given service in a particular geographic area.

77.     The option to see out-of-network health insurance providers comes at a cost to subscribers. Premiums (and deductibles) are significantly higher on average for PPOs than for HMOs. For example, for a 30-year-old, the average PPO plan established under the Affordable Care Act costs about $800 more per year than the average HMO plan. Nevertheless, PPOs are the most common plan type in the United States, with nearly half of all insured U.S. employees covered by a PPO, reflecting consumers' preference for increased provider choice.

78.     There are many reasons consumers choose to pay higher premiums and deductibles for the option of seeing out-of-network providers. After changing employers, a patient may wish to continue working with certain providers, like a long-standing primary care physician, even if those providers no longer participate in the patient's new healthcare plan network. Other patients know that they have a medical condition that requires specialized treatment that may only be available from out-of-network providers. Geography is also a factor, as convenient in-network options are often limited for those who travel frequently or who live in rural areas. And many consumers wish to protect themselves financially in the event of a new diagnosis or emergency, when obtaining in-network care may be impossible or inferior to other options.

79.     Insurers understand why out-of-network coverage appeals to consumers. That is why insurers market PPOs with labels like "freedom" and "choice." Yet, behind the scenes, they do everything possible to under-pay the out-of-network providers who provide the necessary input that makes PPO plans desirable in the first place.

### vii.    Competition Among PPOs for Out-of-Network Providers

80.     Because consumers prefer PPO plans over HMOs in large part because they cover out-of-network services, in a competitive market, insurers marketing PPO plans (or other plans with out-of-network benefits) are incentivized to ensure that those plan subscribers can obtain services from out-of-network providers. To do so in a normal, competitive market, insurers must maintain satisfactory relationships with out-of-network providers, and, at a minimum, pay them competitive compensation rates. As Defendant UnitedHealth has explained, "[f]ailure to maintain satisfactory relationships with out-of-network health care providers could adversely affect our business and results of operations."

81.     Indeed, insurers like Defendant UnitedHealth know that if they pay below-market compensation amounts to out-of-network providers, those providers may, in the future, refuse to serve their plan members. The insurance industry refers to this as provider "abrasion." Given the risk of provider "abrasion," under normal market conditions (i.e., absent a market restraint), it would be economically irrational for an individual insurer to lowball out-of-network providers with below-market compensation; insurers would instead compete against each other for out-of-network provider services, including by paying superior rates of compensation.

82.     But, as set forth in further detail below, such competition has been largely eliminated by the MultiPlan Cartel. Insurers acting collectively, with and through MultiPlan, have slashed out-of-network compensation rates to providers. Absent an assurance that their competitors are doing the same thing, an individual insurer would not suppress its compensation

30

to out-of-network providers in this way for fear of providers balance billing or refusing to work with its plan members altogether. The MultiPlan Cartel provides insurers with that assurance.

### B. Historical Pricing of Compensation for Out-of-Network Provider Services

#### i. Benchmarking to UCR Rates (up to 1997)

83.     For decades, health insurers independently determined the compensation they paid to out-of-network providers based on prevailing market rates (i.e., the retail prices typically charged by doctors) in particular geographic areas. Rates of compensation based on what healthcare providers typically charge for specific services in a particular geographic area are collectively referred to as "usual, customary, and reasonable" or "UCR" rates, or sometimes just "reasonable and customary" ("R&C") rates.

84.     Insurers and providers have always understood that UCR rates (which are used to compensate out-of-network providers) should be based on "the prevailing rate[s] the doctors charge when they have not negotiated a lower rate with the insurer on an in-network basis." (emphasis added).3 That's because out-of-network providers do not receive the promise of increased patient volume or other benefits (like prompt and predictable payment) that come with contracting to participate in an insurer's network. In the absence of these benefits and contractual inducements, providers would not offer discounts to insurers, and insurers would not expect to pay substantially less than the retail charge amount for services rendered to their members. Therefore, pre-negotiated, discounted, in-network compensation rates do not and have never represented reasonable compensation for out-of-network medical services, and have never been relevant to the proper calculation of UCR compensation rates.

---

[3] *Deceptive Health Insurance Industry Practice: Are Consumers Getting What They Paid For?* (Part I): S. Hr'g 111-37 Before the S. Comm. on Commerce, Science, & Transportation, 111th Cong. 5 (2009).

85.     To properly calculate UCR rates, insurers historically used aggregated, retail medical charge data (as opposed to payment data) for like healthcare services performed in the same geographic market. Based on aggregated charge data, each insurer exercised its own independent judgment to determine the applicable UCR rate schedule to use to compensate OON providers for medical services (often referred to as the "allowed amount" by insurers). Each insurer then exercised its own independent judgement to determine what proportion of the allowed amount to cover for out-of-network services.

86.     Historically, many insurers employed the 80th percentile rule to calculate UCR compensation rates. This method is based on the distribution of billed charges for similar medical services within a specific geographic area; and it pegs the UCR rate to the billed amount below which 80% of all submitted bills for like services fall. For example, if, after analysis, the 80th percentile charge for a colonoscopy in a particular geographic area is identified as $1,200, this figure becomes the UCR compensation rate for that service in that market. This approach aims to ensure that UCR compensation rates reflect prevailing market rates (covering the majority of charges up to the 80th percentile), while eliminating higher outlier charges. Other insurers might peg UCR to a different percentile charge, typically between the 70th and 90th percentiles.

87.     However, insurers generally do not compensate out-of-network providers based on the full UCR rate for services rendered. Instead, insurers typically cap compensation to out-of-network providers at 80-90% of the UCR rate. For example, an insurer that promised plan members it would compensate out-of-network providers for services at 90% of the UCR rate would pay the lower of the actual billed charge or 90% of the UCR rate for similar procedures in the same geographic area; the patient would then contribute the remaining 10% of the UCR rate

32

(or allowed amount) as co-insurance. The obligations of both insurers and patients were thus pegged to the UCR rate that the insurer calculated.

88. A hypothetical example of how compensation would be calculated under the UCR method is as follows: A physician submits a $1,350 bill for a colonoscopy for a patient who has a PPO insurance plan with out-of-network benefits that (a) follows the 80th percentile rule to set UCR rates and (b) covers 90% of the determined UCR rate (or "allowed amount"). The insurer accesses data from a UCR database for other colonoscopies performed in the same geographic location. The data shows there were 10 other colonoscopies performed in that region, which were billed at $500, $600, $700, $800, $900, $1,000, $1,100, $1,200, $1,300, and $1,400. These charges are then organized from lowest to highest to determine percentiles:

| Procedure | Percentile | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 20th | 30th | 40th | 50th | 60th | 70th | 80th | 90th |
| Colonoscopy | $600 | $700 | $800 | $900 | $1,000 | $1,100 | $1,200 | $1,300 |

89. At the 50th percentile, half of the charges recorded in the database are equal to or lower than $900, and half are higher. At the 70th percentile, 70% of recorded charges are equal to or lower than $1,100, and 30% are higher. In this hypothetical, because the insurer uses the 80th percentile rule to calculate UCR rates, the UCR rate for colonoscopies in this geographical area is $1,200. As such, the plan would reduce the physician's billed charge from $1,350 to $1,200 (the allowed amount). Then, the insurer would pay 90% of that amount, or $1,080. The patient would then be obligated to pay the remaining 10% of that $1,200 allowed amount, or $120, as co-insurance.

90. Once a healthcare provider receives notice from an insurer of what it deems to be the allowed amount for a particular out-of-network claim, one option that provider traditionally

33

has had is to seek additional compensation from the patient for the portion of the charged amount above the "allowed amount." This is known as "balance billing." Using the above hypothetical again as an example, the doctor could bill the patient for the $150 difference between its charge amount ($1,350) and the allowed amount it has already received as compensation ($1,200).

91. The UCR methodology represented a means of normalizing OON healthcare costs for insurers. As William Marino, former President and CEO of Horizon Blue Cross Blue Shield of New Jersey, explained to the U.S. Senate Committee on Commerce, Science and Technology in 2009, UCR rates are "designed to permit payment amounts that would be predictable, change with market-based changes in prevailing payments, and keep insurance costs in check by eliminating excessive charges from the insurance pool."

92. In other words, UCR gave the insurance industry a means of combatting what some insurers claimed were excessive retail charges for medical care, while still adequately compensating providers. Despite having a widely accepted and readily accessible means to pay providers in a fair and reasonable way, insurers have, at various points, instead chosen to use anticompetitive tactics to further reduce out-of-network costs.

### ii. Prior Industry Collusion: The Ingenix Cartel (1997-2009)

93. In many ways, the MultiPlan Cartel is the modern-day incarnation of a prior collusive effort by insurers to suppress out-of-network provider compensation: the Ingenix Cartel.

94. Prior to 1997, insurers calculated UCR rates using retail charge data from two independent databases: the Prevailing Healthcare Charges System ("PHCS") and Medical Data Resource ("MDR"). PHCS was created in 1973 and MDR was created in 1987. Between 1997 and 1998, a UnitedHealth subsidiary called Ingenix purchased MDR and PHCS. It then consolidated those databases in 2001 into Ingenix. With UnitedHealth's acquisition of the

34

nation's only UCR claims databases, one of the largest insurance companies in the country gained significant influence over how the entire industry would set UCR rates, thereby affecting nationwide compensation levels for out-of-network healthcare providers.

95.     As Ingenix and UnitedHealth would eventually be forced to admit, Ingenix's close ties with insurers—and its status as a UnitedHealth subsidiary—created "inherent" conflicts of interest. Because it was vertically integrated with an insurer, Ingenix was incentivized to skew the data (and UCR rates that flowed from that data) downwards. And that is precisely what it did.

96.     First, Ingenix polluted its database with claims submitted under network agreements (which reflected discounted in-network rates). As noted above, in-network rates do not represent reasonable rates of compensation to out-of-network providers because, when a provider performs services on an out-of-network basis, it does not receive any of the contractual benefits associated with network participation (e.g., increased patient volume). By improperly including heavily discounted in-network charges in its claims database, Ingenix systematically and artificially depressed the apparent prevailing market rates for services, and, in turn, the calculation of UCR rates.

97.     Second, Ingenix applied formulaic edits that removed higher charge amounts from its databases. And the insurance companies that contributed data to the Ingenix database did the same. For example, Aetna, which was Ingenix's single largest data contributor, "pre-scrubbed" its data before submitting it, eliminating the highest 20% of valid medical charges before sending claims data to Ingenix. Such data manipulation made the distribution of compensation payments in Ingenix's databases appear lower than they were in the actual marketplace. Ingenix also manipulated its data in other ways, including, for example, deleting

35

charges with modifiers to indicate complications; failing to collect information affecting the value of the service performed; pooling data from dissimilar providers for use in the database; maintaining outdated information; and using a deficient methodology to derive artificially low charges.

98. UCR rate calculations performed using Ingenix's manipulated data skewed roughly 10-28% lower than what they would otherwise be, resulting in underpayments to providers and exposing patients to the risk of balance billing. But every dollar saved on out-of-network provider compensation based on Ingenix's data represented increased profits for UnitedHealth, as well as for the rest of the insurance industry.

99. Whenever an insurer or Ingenix received an inquiry from a doctor or patient regarding how UCR rates were calculated, they responded, "it's proprietary." Meanwhile, Ingenix did not even attempt to maintain that its UCR data was accurate. As an Ingenix employee testified under oath: "Ingenix has never tested its results to determine if its statistical conclusions bear any relationship to the actual high, low, median or 80th percentile . . . rates charged by health care providers in any given area."

100. The health insurance industry overwhelmingly used Ingenix data to set compensation rates for out-of-network providers for about a decade. But in the late 2000s, providers and consumers began to complain about unreasonably low out-of-network compensation to providers, which resulted in patients being balance billed for large sums. These complaints spurred several investigations and lawsuits over Ingenix's practices, which eventually revealed that Ingenix was systematically manipulating its data with the purpose and effect of reducing compensation to OON providers.

101. Physicians filed lawsuits against the insurers participating in the Ingenix Cartel

36

alleging suppressed compensation. Patients likewise sued when providers billed them for compensation amounts not paid by the insurers. In 2000, the American Medical Association ("AMA") and several state-specific medical associations filed a class action against UnitedHealth alleging that Ingenix improperly reduced out-of-network compensation to healthcare providers in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and the antitrust laws. The suit settled in 2009, with UnitedHealth agreeing to pay $350 million to class members.

### iii. FAIR Health, Inc. (2010 to 2015)

102.    In February 2008, then-New York Attorney General Andrew Cuomo announced an investigation "into a scheme by health insurers to defraud consumers by manipulating [OON compensation] rates" to providers. Linda Lacewell, the Assistant Attorney General in charge of that investigation, described Ingenix as "essentially a closed-loop system of the health insurance industry collecting the information among itself, pooling the information together, all relying on the same information, a system that is impenetrable to the consumer." The investigation found, for example, that "[o]ne national insurer filled an entire page with a list of alternative ways in which it purported to calculate out-of-network rates, in language that can best be described as gobbledygook" when, in reality, it simply "pa[id] the same rates for in-network and out-of-network care."

103.    The NYAG investigation culminated in the demise of Ingenix. In January 2009, a settlement was announced between NYAG and UnitedHealth. As part of the deal, UnitedHealth agreed to shut down Ingenix and contribute $50 million to the formation of a new, independent non-profit organization, FAIR Health, Inc. ("FAIR"), to take ownership of the Ingenix UCR database. UnitedHealth further agreed to use FAIR for determining out-of-network compensation rates for at least five years, and to refrain from using, owning, operating, or funding any other

37

database for such purpose during that time. The settlement explained that the purpose of creating FAIR was to enable transparency regarding rates, rather than non-transparent, insurer-run pricing.

104.    Similar settlements with NYAG quickly followed for the other major insurers. Aetna agreed to pay $20 million for the creation of FAIR, to contribute untainted data to the new database, and to use FAIR for five years. Cigna and WellPoint, Inc. (later known as Anthem, and then Elevance) agreed to pay $10 million and to use FAIR for five years. Other smaller insurers reached settlement agreements that required them to contribute between $200,000 and $1.6 million and to use FAIR for five years.

105.    FAIR was incorporated in October 2009, and became available for use in mid-2010. Under the terms of its NYAG settlement, UnitedHealth was required to shut down Ingenix within sixty days of the date on which FAIR became available for use. Moreover, UnitedHealth and all other settling insurers were required to begin using FAIR within sixty days of the date on which it became operational, and to use it exclusively for the setting of out-of-network compensation rates for a period of at least five years. Because FAIR became operational sometime in 2010, the obligation of the settling insurers (including the Insurer Defendants) to use FAIR expired sometime in 2015 or early 2016.

106.    Once UnitedHealth shut down Ingenix, all insurers that had previously used Ingenix (not just those that had settled with NYAG) had to switch to a different UCR database. Because UnitedHealth had purchased and consolidated the only two databases available a decade earlier (leaving no privately controlled alternatives in the marketplace), FAIR was the obvious and near-universal choice.

107.    FAIR began the gradual process of correcting the skewed UCR database it

38

inherited from UnitedHealth. As FAIR collected more non-manipulated data from insurers (who were required by their settlement agreements to submit accurate, un-scrubbed charge data), the effects of the decades' long scheme to deflate out-of-network provider compensation rates began to subside.

108.    Over the following years, UCR compensation rates and payments rose some 26%. Half of that increase was attributable to cost-of-living increases during that time, but the remainder reflected the normalization of the UCR database and a return to a dataset that accurately reflected prevailing market rates free from manipulation. As a result, patients and physicians received more accurate and fair compensation from insurers for the medical care they received or provided. But this resolution did not last.

### iv.    Insurers Abandon UCR-Based Compensation and Join the MultiPlan Cartel (2015 to the present)

109.    Unsurprisingly, insurers loathed the free market dynamics of the UCR benchmarking system under FAIR when they could no longer manipulate UCR rates downward through the Ingenix Cartel.

110.    Describing the post-Ingenix world, one MultiPlan executive has explained, "there was a need in the marketplace back in early 2010 . . . to really address what was a feasible allowable . . . payment [for OON providers]," i.e., a benchmark that was lower than the UCR rate. Around this time, many insurance executives expressed a desire to use Medicare rates—which are very low due to the federal government's outsized bargaining power over providers and other factors—as the new benchmark for setting out-of-network provider compensation levels. However, they recognized that, absent an industrywide shift, using Medicare rates as benchmarks was untenable for any individual insurer, as it would lead to provider "abrasion" and balance billing.

39

111. MultiPlan emerged on the scene at precisely this time to offer insurers a vehicle for a concerted shift away from UCR benchmarking and towards an opaque new "proprietary" pricing methodology called Data iSight, which would dramatically suppress out-of-network compensation rates. MultiPlan marketed its new repricing services as an "alternative to Ingenix," which could serve as a "liability shield" for insurers given MultiPlan's veneer of "independe[nce]" from the industry.

112. Insurers quickly accepted MultiPlan's invitation to participate in this common scheme. Once their NYAG settlement agreements began to expire in 2015 and 2016, the major insurers all began using MultiPlan's claims repricing services instead. By 2018, MultiPlan had reached agreements with nearly every significant insurer in the United States to use MultiPlan's repricing services to collectively suppress out-of-network compensation amounts.

113. A partial timeline of the industry-wide shift from UCR-benchmarking (and the use of FAIR) to MultiPlan's OON claims repricing and negotiation services, including Data iSight, is below:

114. Defendant Cigna began using FAIR in 2010. In 2015, it completed its five-year obligation under its NYAG consent decree to use FAIR. On April 1, 2015, Cigna contracted with MultiPlan to use its OON claims repricing and negotiation services, including Data iSight. Under the agreement, Cigna would pay a fee (which is redacted in the publicly available version of the document) equivalent to a percentage of the underpayment generated by using MultiPlan's pricing methodology.

115. The BCBS Defendants (or their predecessors in interest) began using FAIR in 2010. In 2015, several of the BCBS Defendants (or their predecessors in interest)—including New York's largest insurer at the time, Empire BlueCross BlueShield, a former subsidiary of

40

WellPoint, Inc., which is now owned by Defendant Elevance—completed their five-year obligations under their NYAG consent decrees to use FAIR. According to testimony and internal documents from Defendant UnitedHealth, BCBS entities began using MultiPlan's OON claims repricing and negotiation services, including Data iSight, between 2015 and 2016 (if not sooner).

116. Defendant UnitedHealth shut down its Ingenix database and began using FAIR in 2011. In 2016, UnitedHealth completed its five-year obligation to use FAIR. UnitedHealth executives have testified that the company began using Data iSight for parts of its business in 2016, and further expanded the use of Data iSight in October of 2017. Internal company documents confirm the decision to adopt MultiPlan's OON claims repricing and negotiation services (including Data iSight) was based on representations that MultiPlan made throughout 2015 and 2016 that "seven of [UnitedHealth's] top ten competitors" were already "us[ing] the tool," including "BCBS [Blue Cross Blue Shield]," which was being particularly "aggressive" about using "DiS [Data iSight]" to set low out-of-network compensation amounts.

117. Defendant Aetna began using FAIR in 2010. It entered into a network rental agreement with Multiplan effective January 1, 2011. In 2015, it completed its five-year obligation to use FAIR and modified its network rental agreement with Multiplan on May 1, 2015. On November 19, 2018, Aetna contracted with MultiPlan to use its OON claims repricing and negotiation services, including Data iSight.

118. Defendant Highmark, one of the BCBS Defendants, entered into a contract with MultiPlan concerning the use of MultiPlan's OON claims repricing and negotiation services on January 1, 2017.

119. Defendant Elevance, one of the BCBS Defendants, entered into a contract with MultiPlan concerning the use of MultiPlan's OON claims repricing and negotiation services in

May 2017.

120.    In 2018, co-conspirator Kaiser contracted with MultiPlan to begin using its claims repricing services.

121.    On information and belief, hundreds of other co-conspiring insurers also began MultiPlan to reprice their out-of-network claims between 2015 and 2018.

122.    The industry's adoption of MultiPlan's OON claims repricing and negotiation services (including Data iSight) was abrupt and coincided with the end of the major insurers' five-year legal commitments to NYAG to use FAIR (and not other data source or platform) to set out-of-network provider compensation rates.

123.    As described further below, MultiPlan did not set provider compensation amounts based on publicly available provider charge data (or the resulting UCR benchmarks); instead, its Data iSight tool based compensation amounts on what members of the MultiPlan Cartel were actually paying providers (including on an in-network basis) and other non-public, CSI, like individual insurer's pricing strategies. This represented a complex and important change in insurers' out-of-network claims pricing structure, which had previously been based on UCR benchmarking under FAIR. This concerted industry-wide change in pricing practices could only have been the result of an understanding among all the major insurers that they all had to undertake the shift to MultiPlan together to ensure its success.

### C.    The Evolution of MultiPlan's Business

#### i.    MultiPlan 1.0

124.    MultiPlan was not always in the claims-repricing business. In fact, the company was founded in 1980 as a New York-based purveyor of provider networks to insurers. Over time, MultiPlan expanded its provider and facility network footprint. Today, it maintains a nationwide PPO network of over 1.3 million providers, which insurers can "rent." MultiPlan refers to its

complementary PPO network business as "MultiPlan 1.0."

125. MultiPlan's nationwide complementary network is among the largest, if not the largest, in the United States. To build and maintain this massive PPO network, MultiPlan negotiates with providers and facilities across the country to "establish discounts" for insurers "in exchange for patient steerage [to participating providers]." MultiPlan then rents out its network to insurers, who, for a fee, get the benefit of the network discounts MultiPlan has negotiated. Insurers can use the MultiPlan PPO as either their primary provider network, or, in the case of larger insurers, to supplement or geographically extend their own preexisting networks. The terms of MultiPlan's rental arrangements with insurers are set forth in its standard "Network Rental Agreement."

126. The value of MultiPlan's network—and the amount of rent MultiPlan can extract from insurers—is directly tied to the number of providers MultiPlan can convince to participate. The more providers MultiPlan signs up around the country, the more attractive its rental network becomes to potential insurer clients, and, in turn, the more MultiPlan can charge for access. For this reason, MultiPlan touts the participation of over 1.3 million providers in its network as its major "competitive advantage."

127. In a normal, competitive market, to attract providers to its network, MultiPlan must offer providers competitive compensation rates (and other inducements, such as patient steerage). If MultiPlan offers compensation rates (or other terms) that are inferior to what competitor networks offer, it will lose the battle for providers, and providers will not join the MultiPlan network.

128. In this race for providers, MultiPlan's network competes against insurers that offer PPO plans and operate their own networks. As MultiPlan's former CEO Dale White said in

43

a November 2023 investor conference: "Our clients are our competitors; our competitors are our clients." And, as MultiPlan has admitted in its Virtual Analyst Day presentation on August 18, 2020, MultiPlan "compete[s] with regional PPOs targeting primary network business." In its Form 10-K for 2022, Multiplan admitted that it also competes "with PPO networks owned by [its] large Payor customers." In other words, MultiPlan and the insurers are horizontal competitors when it comes to PPO provider coverage.

129. Many if not most of these insurers—including all the Insurer Defendants—also hire MultiPlan to perform out-of-network claims repricing services (as detailed further below) to determine the compensation insurers will pay to out-of-network providers. MultiPlan induces healthcare providers to join its PPO network—and to obligate themselves to provide services to patients insured by MultiPlan's insurer clients—with the promise of attractive contractual compensation rates. MultiPlan's standard "Participating Provider Agreement" outlines certain "Contract Rates" which are "equal to eighty (80%) percent" of the provider's "[b]illed [i.e., retail] charges." The rates specified in most standard network agreements are, by contrast, pegged to Medicare rates (e.g., 200% of Medicare rates), meaning they are far lower.

130. But MultiPlan's promise is illusory. Unlike bona fide network agreements, which contractually obligate insurers to pay specific amounts to doctors for performing covered services, MultiPlan's Provider Participation Agreement includes no payment obligation whatsoever on the part of any insurer. Instead, it provides that MultiPlan may, "in its sole discretion," rent out its network to insurer clients who may choose not to pay the "Contract Rates" specified in the MultiPlan agreement, and instead may opt to pay the provider based on the "out-of-Network benefit level" specified in the patient's PPO plan. Specifically, these agreements state:

> [MultiPlan] may, in its sole discretion, include Group and each Participating Professional as a Network Provider in any or all [of MultiPlan's rental] Network(s). Group and each Participating Professional acknowledge that certain Programs offered by [MultiPlan's insurer] Clients accessing the Network (i) may not include a network option; or (ii) **may cover Covered Services under the Participant's Program at . . . out-of-Network benefit level.**

131. MultiPlan knows (but does not disclose to providers) that many if not most of the claims submitted by participating providers will be compensated at rates that are far lower than the purported "Contract Rates." In fact, these claims will be treated by insurers as out-of-network claims and compensated at levels that MultiPlan itself sets via its "Data iSight" claims repricing methodology (which is at the heart of the conspiracy alleged herein).

132. In fact, MultiPlan guarantees as much to its insurer clients. Its standard Network Rental Agreement with insurers essentially allows insurers to compensate MultiPlan network providers however they see fit. It provides that the insurer may "pay claims from [providers who participate in MultiPlan's PPO network] in accordance with a Member's [i.e., the patient's] plan of benefits (e.g., benefit plans providing benefit levels at Reasonable and Customary, percentage of Medicare, or otherwise) in lieu of" the Contract Rates MultiPlan dangles in front of providers to induce their participation in the MultiPlan PPO network.

133. Given this reality, MultiPlan's participation agreements with providers may be void for lack of consideration, with providers agreeing to perform services for various insurance plan subscribers with no guarantee of payment. Regardless, though, a claim submitted by a MultiPlan participating provider that is treated as an out-of-network claim (otherwise known as a "non-contract" or "retail" claim) is not subject to any contract, much less the MultiPlan Provider Participation Agreement.

134. Through its network rental business, MultiPlan has aggregated more than 10

petabytes of claim and compensation data. Such data reflects not only what healthcare providers charge for in-network and non-contracted services, but also what those physicians are willing to accept as payment for those services. MultiPlan refers to this non-public data—which is central to the conspiracy alleged herein—as the "crown jewels" of its company.

### ii. MultiPlan 2.0

135. Just as Ingenix was being investigated for antitrust violations and fraud in the late 2000s, MultiPlan began offering a new service to its insurance company clients: "re-pricing" their out-of-network (or "non-contracted") claims. This is a euphemism for operating as a price coordinator telling insurers how much to pay providers who perform out-of-network services for their subscribers. Because of MultiPlan's vast rental network, MultiPlan was already involved in processing claims for insurers, had access to a trove of industrywide claims data, and was well-positioned to reprice OON claims for the industry.

136. In August of 2009, mere months after the rash of NYAG settlements that would shutter Ingenix, MultiPlan announced that it had reached an agreement to acquire the data analytics firm, Viant, Inc.

137. Viant, like MultiPlan, operated a rental PPO network, but it also offered "non-network cost management services" and a post-payment audit service. The acquisition of Viant thus "added analytics-based services" and "re-pricing solutions" to MultiPlan's business portfolio. The Viant acquisition was completed in 2010.

138. In June 2011, MultiPlan acquired another company, National Care Network, LLC ("NCN") for $50 million. Around this time, NCN described itself as a national leader in cost management, boasting powerful data-driven tools and technology solutions. At the time of MultiPlan's acquisition, NCN had a patent application pending for a software program that would become central to the MultiPlan Cartel. That program would eventually be known as

46

"Data iSight."

139.    In December 2014, adding to its so-called analytics-based services portfolio, MultiPlan acquired yet another company called Medical Audit and Review Solutions ("MARS").

140.    Through these acquisitions, MultiPlan became the "leader in out-of-network cost containment," with its revenues exploding, including, in particular, revenues from its Data Analytics segment, as seen below:



141.    By 2019, MultiPlan claimed to process over 135 million OON healthcare claims annually, totaling $106 billion in billed charges, and to generate over $19 billion in "savings" for its customers. In 2022, MultiPlan claimed to process 546 million claims (totaling over $155 billion in billed charges), and to identify $22.3 billion in "savings" for insurer clients. On November 5, 2024, MultiPlan's current CEO, Travis Dalton, reported to investors that Multiplan had hit a "record quarterly achievement" by generating $6.4 billion in underpayments in the third quarter of 2024 alone.

47

142.     Over time, MultiPlan's analytics-based repricing services have contributed an increasing share of the company's annual revenues, now accounting for roughly 70% of total revenues. MultiPlan reported $561 million in 2019 revenues from its analytics-based repricing services, leaping to $713 million by 2022. Meanwhile, MultiPlan's revenues from services related to its rental network dropped from $314 million in 2019 to $245 million in 2022.

143.     As reflected by this explosive growth, MultiPlan quickly became the dominant repricing service, processing hundreds of millions of claims annually. By contrast, its next closest competitor, Zelis (a company that reprices out-of-network claims based on a UCR benchmark) processes only about 2 million out-of-network claims a year.

144.     For a time, MultiPlan purported to employ several different algorithmic repricing programs for the claims it receives, including Viant and Data iSight. However, in its 2022 10-K, MultiPlan references Viant only once (in the "corporate history" section) and describes the company's claims re-pricing business as utilizing only one repricing algorithm: the "Data iSight program." Whatever MultiPlan calls its "algorithms" and "solution sets," they all pull data from the same database, operate in the same way, and serve the same function: price-fixing in the market for out-of-network provider services for purchase by insurers.

### D.     MultiPlan's OON Claims Repricing Services

145.     MultiPlan's out-of-network claims repricing services (i.e., MultiPlan's service of fixing out-of-network provider compensation for participating insurers) have two primary components.

146.     First, MultiPlan makes compensation determinations (which deviate downward from what the provider has billed for OON services) using its Data iSight program. These determinations involve both an algorithmic component as well as direct input from MultiPlan personnel, who work with insurers to choose pricing strategies that function as algorithmic

48

overrides—typically hard rate caps—to fix and standardize rates and manipulate the market.

147. Second, MultiPlan negotiates the terms of payment with providers on behalf of participating insurers, ensuring that all compensation payments are conditioned on the promise that the provider will not balance bill the patient.

148. As described below, both of these services—claims repricing and negotiation—are important to the MultiPlan Cartel's ability to fix prices for the industry, while protecting Cartel members from competitive harms.

### i. The Data iSight Methodology

149. The precise method by which MultiPlan sets compensation rates is non-public and proprietary. On information and belief, MultiPlan maintains internal white papers that describe in detail the processes that it uses to reprice out-of-network claims. Public statements by MultiPlan employees, promotional materials, and U.S. Patent No. 8,103,522 (the "'522 patent," submitted by MultiPlan subsidiary National Care Network, LLC) describe MultiPlan's repricing methodology to some extent.

150. Insurers who contract with MultiPlan for repricing services automatically send their out-of-network claims to MultiPlan for repricing. Once Multiplan receives a claim from one its hundreds of payor clients via a data link, that data is loaded into Multiplan's "Claims Savings Engine," known internally as "FRED," which then routes the claim to Data iSight.

151. MultiPlan purports to calculate out-of-network provider compensation rates based not on what doctors are charging for services in particular geographic markets (as UCR rates are), but on "what people are actually paying within the marketplace," "amounts generally accepted by providers as payment in full for [like] services," or "typical" compensation rates. MultiPlan calls this methodology "Data iSight."

152. While MultiPlan dresses up its repricing methodology in technological jargon, it

has been forced to admit in legal proceedings that once the algorithm establishes a comparator set, in most cases it simply calculates the "median" payment amount for like services.

153.    According to the '522 patent, the process of establishing a comparator set depends in part on what kind of claim is being repriced. For an inpatient hospital care claim, Data iSight uses refined Diagnosis Related Groups ("rDRG") values as benchmarks. rDRG is a system created by the Centers for Medicare and Medicaid Services ("CMS"); it classifies claims according to type of care, severity, and complexity. When repricing an inpatient claim, Data iSight searches the MultiPlan claims database for other claims for the same rDRG value at other "like" hospitals, then makes a cost adjustment based on the treating hospital's wage index, as shown in Figure 2A of the '522 patent, below:

**Data iSight Process 200**



**FIG. 2A**

154.    For outpatient treatment claims, Data iSight uses the Healthcare Common Procedure Coding System ("HCPCS"), another CMS-developed system. HCPCS is a collection of standardized codes that represent medical procedures, supplies, products, and services used to

50

facilitate the processing of health insurance claims. Data iSight searches the MultiPlan claims

databases for other bills for the same services, on a code-by-code basis, and then makes an

adjustment based on the wage index where the treatment was rendered, as shown in Figure 2B of

the '522 patent below:



**FIG. 2B**

155.    MultiPlan claims that Data iSight is a highly accurate, fair, and transparent way to

calculate compensation rates based on certain reasonable benchmarks. But, in reality, MultiPlan

ensures that Data iSight always generates artificially low compensation rates.

### a)    MultiPlan Pollutes its Database

156.    MultiPlan (like its predecessor Ingenix) includes in its dataset payments made

pursuant to in-network agreements. These in-network payments are then fed to Data iSight as

comparators for out-of-network provider services, resulting in a "garbage in, garbage out"

dynamic.

157.    As discussed above, in-network compensation rates, which are heavily

discounted, do not represent reasonable benchmarks for compensating out-of-network providers'

51

services because those providers would not offer insurers in-network discounts absent the promise of increased patient volume that comes with network participation. By intentionally corrupting its database with heavily discounted in-network payments, MultiPlan suppresses compensation levels for out-of-network providers.

### b) MultiPlan Applies Algorithmic Overrides

158. MultiPlan's supposedly sophisticated algorithm merely identifies the median compensation amount for "like" services based on junk data that MultiPlan feeds its database to suppress those median amounts. However, MultiPlan does not stop there in its efforts to coordinate and suppress OON provider compensation.

159. MultiPlan instructs many of its large insurer clients (including the Insurer Defendants) to enter manual overrides, like caps and floors on payment. These overrides provide MultiPlan with additional means to control and coordinate insurer behavior, thereby reducing member and provider "abrasion" and accelerating the Cartel's goal of suppressing industry-wide out-of-network provider compensation rates.

160. MultiPlan implements these overrides through agreements with insurers that use its claims repricing services. Under these agreements, each insurer must complete a "Data iSight Client Preferences form." Yet the insurer is not free to independently select these preferences. Instead, the insurer and MultiPlan must "mutually agree[] upon" certain "business criteria" by which to set such preferences. In other words, MultiPlan maintains control over these selections, enabling and driving coordination via MultiPlan across the Insurer Defendants and co-conspirators.

161. The available "business criteria" on these preference forms are seven "methods" for setting rates, which are devised by MultiPlan. Most of these "methods" cap the amount the insurer is willing to pay for a particular service (regardless of what a reasonable payment would

be or what the algorithm would otherwise output). For example, one available Data iSight "method" is "[r]eimbursement at which X% of Hospitals are profitable" (with "reimbursement" here referring to "compensation"). Under this method, insurers and MultiPlan might decide to compensate providers at a level at which 50% of hospitals lose money for the service provided—which is the opposite of fair and reasonable, as any compensation below cost is punitive.

162. Another method is "[r]eimbursement at X% of Medicare," meaning MultiPlan and the insurer agree to pay no more than a certain percentage of what Medicare pays as compensation for a service (with "reimbursement" again referring to "compensation"). The remaining five methods are: "[r]eimbursement at which the average mark-up is X%"; "[r]eimbursement at X% of Cost"; "[r]eimbursement at X% of Charges"; "[r]eimbursement at X Percentile of Billed Charges" (i.e., UCR); and "[r]eimbursement at Average Billed Charges," as shown below in Table 1 of the '522 patent:

| | Available Methods |
|---|---|
| F1 | Reimbursement at which X % of Hospitals are profitable |
| F2 | Reimbursement at which the average mark-up is X % |
| F3 | Reimbursement at X % of Cost |
| F4 | Reimbursement at X % of Medicare Reimbursement |
| F5 | Reimbursement at X % of Charges |
| F6 | Reimbursement at X Percentile of Billed Charges |
| F7 | Reimbursement at Average Billed Charges |

163. Data iSight uses these "methods" to formulate an "initial target" compensation amount. The initial target amount largely determines how providers who participate in the MultiPlan PPO network will be compensated for claims they submit to MultiPlan's insurer clients. If the provider who submitted the claim participates in MultiPlan's rental PPO network, MultiPlan compares (a) the illusory "Contract Rates" set forth in the provider's network "Participation Agreement" with MultiPlan, with (b) the "initial target" computed by Data iSight

53

for the insurer responsible for paying the bill.4 If the Multiplan "Contract Rate" amount is greater than the insurer's "initial target," the Contract Rate will not be applied; instead, the claim is shunted back to Data iSight to be "re-priced" like any other out-of-network claim—i.e., based on median compensation amounts.

164.     However, as noted above, Data iSight-computed median compensation amounts are artificially low because they are based on polluted data that includes discounted rates of payment made to providers for in-network services.

165.     Data iSight, moreover, often yields final compensation amounts that are even lower than these artificially low median calculations. That's because MultiPlan instructs many insurers, including the Insurer Defendants, to also apply additional overrides to determine the final provider compensation amount. These overrides are shown in Table 1 of the '522 patent:

| | Available Overrides |
|---|---|
| O1 | Don't Pay Less Than X % of Claim's Cost |
| O2 | Don't Pay Less Than X % of Claim's Charge |
| O3 | Don't Pay Less Than X % of Claim's Reimbursement |
| O4 | Don't Pay More Than X % of Claim's Cost |
| O5 | Don't Pay More Than X % of Claim's Charge |
| O6 | Don't Pay More Than X % of Claim's Reimbursement |
| O7 | Don't Pay More Than Billed Charges |

166.     While some of MultiPlan's available "overrides" appear to be floors on payment (e.g., "Don't pay less than"), in reality, these apparent "floors" are almost always paired with "ceilings" ("Don't pay more than"). By applying both a floor and a ceiling on payment,

---

4 As described above, under MultiPlan's nebulous Provider Participation Agreement, doctors are not guaranteed to receive the enticing Contract Rates outlined by MultiPlan. Instead, their claims may be compensated in whatever way the insurer and MultiPlan ultimately see fit. In practice, and as contemplated in MultiPlan's network rental agreements with insurers, this means that the purported Contract Rates will be paid only if such rates are below the insurer's "initial target reimbursement amount," which, on information and belief, rarely occurs.

MultiPlan and the insurer functionally decide the exact level at which to set compensation rates.

167. In addition, as MultiPlan's Senior Vice President of Healthcare Economics, Sean Crandell, has testified, Data iSight applies certain "operational overrides" in addition to those overrides agreed upon by individual insurers. These operational overrides—which are based on a percentage of Medicare pricing for the same service—"are always in place" and "establish the upper and lower limits for the Data iSight price" to help keep insurers' prices in "alignment."

168. Because of these overrides, Data iSight payment levels are usually pegged to "barebones" Medicare rates—the long-held goal of the insurance industry. As reported by the New York Times, Data iSight often recommends compensating providers at between 160 to 260 percent of Medicare rates. While such rates may "sound[] fair, maybe even generous" to members of the public, healthcare providers know that in many cases, Medicare rates do not even cover their costs and are not sustainable.[5] As MultiPlan has admitted internally (including in a 2019 white paper), pricing OON claims at some percentage above 100% of the Medicare rate is "inherently misleading" because "the average consumer does not understand just how low Medicare rates are." In reality, and as former MultiPlan employees described to the New York Times, the rates generated by Data iSight are "ridiculously low" and "crazy low."

169. According to an internal document from Defendant UnitedHealth, after the insurer adopted Data iSight, its average compensation for OON services fell by around 60%, shorting OON providers almost $100 million per month.

170. MultiPlan actively policies its insurer clients' pricing strategies to ensure they are aligned with the pricing moves of the Cartel as a whole. For example, during the process of

---

[5] Between 2019 and 2022, Medicare compensation to providers only increased by 7.5% while hospital expenses increased 17.5% over the same period. Overall, for every $100 a hospital spends to treat a Medicare recipient, Medicare pays only $84.

reaching "mutual agreement" as to the business criteria and overrides to be used to set UnitedHealth's out-of-network provider compensation in 2017, MultiPlan explained that with an "override" of 350% of Medicare rates, UnitedHealth would be "leading the pack," alongside one other competitor, in terms of how low it could drive out-of-network provider compensation. This information about competitor-pricing practices and preferences exploited CSI that would not have been shared among insurers but for operation of the MultiPlan Cartel. And, consistent with the Cartel's goal of reducing industry-wide OON compensation rates over time, UnitedHealth reduced its payment ceiling from 500% of Medicare rates in 2016, to 350% in 2018, and 250% thereafter.

171. The rate determinations generated by these overrides often do not factor geographical differences in the cost of key inputs like labor. Numerous providers have observed that MultiPlan reprices claims with no geographical adjustment. For example, Freemont Emergency Services (an emergency room physician group that successfully sued UnitedHealth for suppressing out-of-network compensation) documented that between January and May of 2019, it submitted identical claims to UnitedHealth for the same service performed in nine different states. While these bills varied in amount, each bill was equal to exactly UCR (based on the 80th percentile rule) in the geographical region where the service was performed. Had these bills been submitted to UnitedHealth during the time in which FAIR Health was used to set compensation rates, each bill would have been paid at exactly the amount charged (based on the 80th percentile charge in the same geographic area). But, after having those claims repriced by MultiPlan, UnitedHealth paid these healthcare providers far less. For each of the nine treatments in nine different states stretching from one coast to another, MultiPlan calculated, and UnitedHealth paid, compensation of exactly $413.39. Depending on geographic location, this

56

resulted in an underpayment to healthcare providers of between $381.61 and $939.61 (or 45% and 70% off of the relevant UCR benchmark).

### ii. MultiPlan's "Negotiation" Services

172.     After determining a payment amount via the Data iSight methodology, MultiPlan "negotiates" payment with providers. This negotiation function is critical to ensuring that all insurers adhere to MultiPlan's payment determinations, and to MultiPlan's ability to orchestrate the conspiracy. Cartel members thus agree that MultiPlan will police the Cartel by acting as the sole negotiator of out-of-network prices if a provider pushes back.

173.     MultiPlan makes offers of payment to providers on a take-it-or-leave-it basis. These offers are often sent to third-party medical billers, many of which are located offshore, rather than to providers themselves. Typically, MultiPlan gives medical billers less than ten days (and often much less) to respond to its offers and threatens to drop said compensation offers should providers choose not to accept. In one fax to a healthcare provider, MultiPlan gave the provider eight days to respond to a low-ball offer, warning: "if you do not wish to sign the attached proposal . . . this claim is subject to a payment as low as 110% of Medicare rates based on the guidelines and limits on the plan for this patient."

174.     If the provider or its medical biller tries to negotiate for higher compensation with MultiPlan, MultiPlan says it is not the insurer and does not have authorization to increase the payment offer. If the provider or biller asks the insurer how MultiPlan reprices its claims, the insurance company explains that it is not responsible for MultiPlan's pricing. As one healthcare provider's office manager reported to the New York Times, "[i]t's not a real negotiation" when MultiPlan transmits offers of payment on behalf of insurers. Indeed, as the Times reported, "[d]ocuments and interviews revealed tactics meant to pressure medical practices to accept low payments. Some offers came with all-caps admonitions and deadlines just hours away. Accept

57

and receive prompt payment; refuse and risk an even lower payout. Practices and billing specialists said this often wasn't an empty threat." Moreover, "[i]nsurers can set negotiation parameters for MultiPlan, including not negotiating at all, records and interviews show. And "Multiple providers and billing specialists [have] said that in recent years they had increasingly been told their claims weren't eligible for negotiation."

175. But it is not enough to simply force providers to accept the extremely low payment amounts calculated by Data iSight. To avoid patient backlash and subscriber loss for its insurer clients, MultiPlan must also ensure that providers will not hold patients liable for the remainder of the bill, as this would harm insurer's ability to compete for subscribers in the health insurance markets. So, MultiPlan conditions all offers of payment on the provider's promise not to "bill the Patient, or financial responsible party, for the difference between the Billed Charges and the Proposed Amount [i.e., the payment offer]."

176. MultiPlan knows it can get away with acting like a mafia enforcer for insurers because virtually every major commercial healthcare insurer has agreed to use its repricing methodology, leaving healthcare providers with no practical option but to accept the "repriced" compensation amount that MultiPlan imposes. Across all claim types, in over 95% of cases, providers accept the initial compensation offer made by MultiPlan, and do so, as required, on the condition that they will refrain from balance billing the patient. A 2018 MultiPlan study cited even higher numbers, reporting that 99.4% of all out-of-network claims for in-patient treatment are ultimately paid at the Data iSight-generated price. The study cited similar rates for outpatient claims (98.7%) and professional claims (94.5%). And in 2023, MultiPlan's CEO, Travis Dalton, confirmed these statistics, telling the news outlet Axios that the price MultiPlan sets is the price eventually paid for 98% of out-of-network claims.

177. MultiPlan "eliminate[s] balance billing" among the miniscule percent of providers who appeal the initial compensation offer by providing "post-payment negotiation" services to insurers. As part of this service, MultiPlan again tells providers that that if they do not accept the offer, they may receive no compensation at all. The vast majority of these appeals result in providers accepting MultiPlan's offer, again on the condition they will not balance bill the patient.

### iii.   MultiPlan's Contingent Fee Structure

178. For each claim MultiPlan reprices, it typically collects a fee from the insurer based on the difference between the provider's original claim and the amount the provider accepts. This fee is typically equal to 5-7% of the "savings" obtained by MultiPlan but has been as high as 12% in some cases. Internally, MultiPlan refers to these fees as a "percentage of savings" or "PSAV."

179. MultiPlan is thus highly motivated to calculate the lowest compensation rates possible—whether or not they are "reasonable" or "fair" to the provider. Indeed, these contingent fees represent the lion's share of the MultiPlan's annual revenues. In 2021 alone, MultiPlan raked in roughly $709 million in fees for repricing OON claims, which account for roughly 63.5 percent of its total revenues.

180. This structure further incentivizes MultiPlan to ensure that as many insurers as possible join, participate, and stay in the MultiPlan Cartel. If insurers began to defect from the Cartel, competition between insurers would resume for out-of-network provider services. Providers would cease accepting patients from insurers that use MultiPlan's repricing services, and more insurers would leave the MultiPlan Cartel as their subscribers with out-of-network benefits would not be able to obtain the care desired from out-of-network providers, leading to an expanding cycle of abrasion. But by keeping most insurers nationwide in the MultiPlan

Cartel, MultiPlan enhances and maintains its ability to control compensation to out-of-network providers on behalf of all the insurers, industry-wide, participating in the MultiPlan Cartel.

## VI.    DEFENDANTS' ANTICOMPETITIVE SCHEME

181.    A cartel is a group of rivals that conspire to fix prices, allocate markets, or otherwise illegally limit competition. Cartels can be organized by competing sellers of goods or services (who seek to raise prices to increase their revenues) or by buyers (who seek to suppress prices to reduce their costs). Either way, the goal of cartel members is the same: to act (collectively) like a monopolist, or in the case of a buyers' cartel (such as the Cartel alleged herein), like a monopsonist. Whether the cartel is one of buyers or one of sellers, the relevant market is harmed.

182.    The MultiPlan Cartel is a buyers' cartel dating back to around 2015 (and perhaps earlier), and is designed to reduce out-of-network claims compensation rates. To achieve this outcome, cartel members agree (among themselves and with MultiPlan, which orchestrates their scheme) to: (1) outsource their compensation decisions with respect to out-of-network compensation rates to a common decisionmaker, MultiPlan, and abide by its price determinations; (2) exchange among themselves and MultiPlan CSI regarding their compensation rates and pricing strategies; and (3) have MultiPlan coordinate compensation strategies and compensation amounts amongst the co-conspirators. This joint delegation and anticompetitive information exchange allows MultiPlan to coordinate insurer behavior and minimize industry-wide out-of-network compensation rates.

### A.    MultiPlan Invites Insurers to Participate in Collective Action

183.    As a sophisticated market participant, MultiPlan is aware that its out-of-network claims repricing services are attractive to insurers only if insurers perceive an opportunity to collectively adopt the same pricing methodology and negotiation strategy.

60

184. It is well understood that a single insurer, acting alone, will face massive provider "abrasion" if it compensates out-of-network claims at below-market rates (including those pegged to unreasonably low percentages of Medicare rates or those driven by in-network compensation rates). Historically, when a particular insurer refused to pay a reasonable compensation rate on out-of-network claims, providers would balance bill plan its members or refuse to treat them on an out-of-network basis in the future, leading to subscriber complaints, appeals, and departures. Insurers thus understand that to successfully lowball providers (without risking serious economic harm), they must not only force providers to accept low compensation for services, but to do so on terms that preclude balance billing, something no individual insurer would have sufficient leverage to do on its own. Indeed, it would be against the unilateral economic self-interest of any one insurer to pay below-market compensation for out-of-network services, absent awareness that competitors had agreed to do the same.

185. MultiPlan offers a solution to this dilemma, inviting insurers to act collectively with respect to their compensation decisions and provider interactions. To that end, it markets its platform as a way for insurers to "outsource the repricing" and negotiation of "out-of-network claims" to a single decision-maker, MultiPlan. According to MultiPlan, by delegating these functions to MultiPlan, "[c]ommercial plans of any size" can obtain significant "discounts on out-of-network charges" while ensuring "low provider abrasion" and "minimizing the balance billing of their members."

186. Such marketing contemplates and invites concerted action among insurers to suppress compensation to out-of-network providers. Indeed, the benefits touted by MultiPlan's marketing—the elimination of provider abrasion, balance billing of subscribers, and their associated competitive harms for insurers—are benefits that MultiPlan and all insurers know can

61

only be delivered if there is a collective shift among insurers to the MultiPlan Cartel. Insurers sacrifice their independent decision-making to a common decisionmaker (MultiPlan) only because they know (1) their competitors are doing the same, and (2) it is only through coordination with their competitors that insurers could successfully suppress OON compensation rates without suffering competitive harms—the explicit goal and result of the MultiPlan Cartel.

187. MultiPlan also invites and requires insurers to participate in the anticompetitive sharing of CSI. MultiPlan requires each insurer client to submit real-time, non-public pricing information to its database, including: (1) claims (both in- and out-of-network) received from providers; (2) compensation paid to those providers, whether in-network or out-of-network; and (3) proprietary pricing preferences and strategies, which MultiPlan solicits (among other ways) through its mandatory "Data iSight Client Preferences form."

188. This pricing information (including the caps and overrides applied by insurers, via mutual agreements with MultiPlan) constitute CSI that would not be shared in a competitive market. An insurer equipped with knowledge of a competitor's pricing data and strategies could gain a competitive advantage and seize market share by paying out-of-network providers at higher rates than a lowballing competitor. It would be against the unilateral economic interest of any independent insurer to share that CSI with MultiPlan for use with its competitors (whether directly or indirectly) unless it knew that its competitors were doing the same. Absent such an assurance, an insurer would be undermining its competitive standing vis-à-vis other insurers.

189. MultiPlan is transparent that the value of its services stems from its ability to harvest competitively sensitive payment data from hundreds of insurance companies, and to use that data to fix OON compensation rates for the entire industry. MultiPlan touts its "incomparable database"—populated with some 135 million claims a year, or "360,000 claims a

day," from "700-plus payer customers"—as the single most "impressive" fact about the company, and the real reason insurers stand to benefit from the decision to "outsource the pricing of [their] out-of-network claims" to MultiPlan.

190. As one former MultiPlan executive, Paul Galant, signaled to the market on a 2020 earnings call, MultiPlan's ability to collect "claims from 700 payers" made the company's repricing tools "very, very different" from those operated by a "single payer" (such as Naviguard, UnitedHealth's in-house repricing tool). According to Galant, MultiPlan's access to industry-wide data (i.e., data across hundreds of ostensibly rivalrous insurers), rather than its technology, was the reason "why [insurers] all come to MultiPlan" for claims repricing. And he boasted that MultiPlan's "data advantage" had created a "competitive moat around [the] company that drives recurring revenues."

191. Galant doubled down on these comments during a Virtual Analyst Day later in 2020. According to Galant, MultiPlan's value proposition had nothing to do with its proprietary technology, bluntly stating that anyone can "create their own algorithms." The MultiPlan "difference," he explained, was that "we see data across 700 payors," enabling the company to "generate bigger savings" for clients and to obtain better concessions from providers in negotiations. According to this executive, because MultiPlan can "talk to the entire industry"— rather than just one "specific payer"—it was better equipped to "push for savings" than an insurer, acting individually, "who decides to do everything on their own." In other words, MultiPlan could deliver results for insurers because it enabled their collective action.

192. To attract new cartel members (and ensure the ongoing participation of existing members), MultiPlan also regularly announces how many insurers are part of its price-fixing scheme. In 2020, Mark Tabak, then-CEO of MultiPlan, stated publicly that the company was

63

"the leader in out-of-network cost containment" and had entered into "multi-year contracts with the leading payers" to provide OON claims repricing service. Likewise, in 2023, MultiPlan executives bragged that "all of the top 15 insurers" in the country had agreed to use MultiPlan's out-of-network claims-repricing services. On information and belief, each of the Insurer Defendants is part of this group of "15 top insurers."

193.  MultiPlan makes the same kinds of representations in private to insurers to induce them to join the Cartel. For example, on February 27, 2016, MultiPlan's former CEO Dale White, emailed UnitedHealth executive John Haben stating that seven of the insurer's top ten competitors were already using MultiPlan's repricing services, including Data iSight. According to White, "[i]mplementation of these initiatives in 2016 [would] go a long way to bring UnitedHealth back into alignment with its primary competitor group [BCBS, Cigna, and Aetna] on managing out-of-network costs."

194.  White's email to Haben was nothing more than an invitation to collude. It assured UnitedHealth's executives that by joining MultiPlan's collusive scheme, UnitedHealth's OON compensation rates would be "aligned" with those of its competitors, thus enabling the insurer to lowball providers without suffering competitive harms. As another recipient of that email, UnitedHealthcare executive Rebecca Paradise, has testified, a key factor in UnitedHealth's decision to use MultiPlan was that it was "widely used by our competitors." Such statements confirm that concerted action is the point of the MultiPlan Cartel, and that the Insurer Defendants join it precisely because they know their competitors have also agreed to do so.

195.  MultiPlan also relays even more competitively sensitive and specific information about their competitors' pricing behaviors and strategies in private communications with insurers. On September 8, 2016, Haben informed several UnitedHealth colleagues that

"MultiPlan [had] said seven of our top ten competitors use the tool today." He went on to state that "BCBS [Blue Cross Blue Shield] is even more aggressive [in in suppressing OON compensation amounts] and is accessing the option of moving DIS [Data iSight] up even higher . . . [to] option 3." Haben later testified that this knowledge of competitors' pricing formulas came from MultiPlan and that had he passed on the specific information concerning BCBS pricing to other executives at UnitedHealth so they would be comfortable moving forward with using MultiPlan. This account is corroborated by contemporaneous emails, with Haben informing colleagues via email in 2017, "Today, our major competitors" use the "outlier cost management" tool "Data iSight" and "United will be implementing [Data iSight on] July 1, 2017." He projected in that same email that working with MultiPlan could cut UnitedHealth's out-of-network costs "by $900 million" per year. Internal documents also confirm that UnitedHealth's explicit purpose in adopting MultiPlan's OON claims repricing services was to coordinate their pricing behaviors with those of its competitors. According to a presentation Haben gave internally in 2017, "[b]y implementing Outlier Cost Management as currently planned, United catches up to the pack[.]" In other words, based on its communications with MultiPlan, Haben knew that by signing up for Data iSight, UnitedHealth would be acting in concert with its competitors with respect to the setting of OON compensation amounts.

196. Multiplan is open about its hands-on role in setting out-of-network compensation amounts for its major insurer clients in a coordinated—or "aligned"—fashion using the CSI that MultiPlan invites (and requires) them all to share, like their OON pricing strategies. As MultiPlan executive Dale White explained to investors on April 18, 2020:

> Our customers don't view us as a technology or a services vendor, but as an important partner. . . . We have an ongoing cadence of collaboration, where we perform a deep-dive on their claims mix and savings performance, present opportunities to enhance their cost

65

management programs, and then work with them on selection and implementation of those opportunities. We are also often invited to learn more about their own strategic initiatives, so that we can align our service roadmaps accordingly. From an operational standpoint, as a mission-critical component of our payers' day-to-day business, we are electronically connected and deeply embedded in their processes and their claims' processing platforms.... [O]ver the years, we have developed customized business logic for a number of our larger clients.

**B.      Insurers Accept MultiPlan's Invitation to Collude**

197.    As MultiPlan regularly boasts, over 700 insurers, including all of the nation's top fifteen healthcare insurers, have accepted MultiPlan's invitation to participate in concerted action with respect to the pricing of out-of-network claims. These insurers show their acceptance of MultiPlan's invitation to collude in at least three ways.

### i.  Joint Delegation

198.    Insurers enter into contracts with MultiPlan through which they delegate to MultiPlan the authority to determine out-of-network compensation rates and negotiate those rates with providers to ensure they are accepted. The very act of contracting with a common third party to determine rates and negotiate with providers signals insurers' conscious commitment to adhere to MultiPlan's price determinations, facilitating their collective action.

199.    Under MultiPlan's OON claims repricing services contracts, insurers agree to set payment preferences through "mutual[] agree[ment]" with MultiPlan, and abide by MultiPlan's "negotiated rates" so long as they are "consistent with the business criteria mutually agreed upon between [the insurer] and MultiPlan." Through these provisions, insurers delegate to MultiPlan control over key business decisions that directly impact compensation rates. That all of MultiPlan's insurer clients cede control to MultiPlan in this way enables MultiPlan to orchestrate uniform behavior by each of its insurer clients to achieve their common, illicit goal of suppressing compensation rates across the board—a goal from which MultiPlan profits

66

handsomely.

200. Members of the Multiplan Cartel are open about the existence of these agreements with Multiplan. They have filed copies of those agreements with state insurance commissioners and acknowledged them in filings with the Securities and Exchange Commission ("SEC") and while testifying in other litigation. They have also admitted that these agreements exist in disclosures to health plan subscribers, explanations of benefits sent to patients, and communications sent to healthcare providers. For example, EOBs sent by Defendant Aetna to out-of-network providers explain, "The recognized charge determination on the claim resulted in a reduction in payment and was calculated using the Data iSight database. In the event you choose to balance bill the member for the amount reflected in the 'not payable column' . . . . the member may be eligible for patient advocacy services through Data iSight to resolve the outstanding balance."

201. By outsourcing their independent decision-making and negotiation authority to a mutually agreed-upon third party, insurers know that they will not (and cannot) be disciplined by providers for setting ever-lower compensation rates. Providers are forced to accept these low compensation rates, without recourse to balance billing, because virtually all insurers now use MultiPlan's out-of-network claims-repricing services. In other words, healthcare providers have nowhere to turn for better terms, and must deal with MultiPlan or receive no compensation from insurers at all.

### ii. Anticompetitive Information Exchange

202. Insurers provide MultiPlan with copious amounts of CSI, such as their payment data and payment preferences (including the overrides they enter into Data iSight).

203. Insurers share this data with MultiPlan because they know that MultiPlan will use it to assist them and their co-conspirators (including through the setting of OON compensation

rates and the effectuation of pricing strategies). They also participate in sharing of CSI so that they can benefit from the proprietary data their competitors are likewise providing to MultiPlan.

204.    After signing a contract, MultiPlan provides the payor with a constant flow of CSI via meetings, presentations, telephone calls, and video conferences. This information includes comparisons between the prices that the insurer client and its competitors are paying for particular out-of-network services. According to the New York Times, "[a]s MultiPlan became deeply embedded with major insurers, it pitched new tools and techniques that yielded even higher fees [for MultiPlan]," by setting lower prices, "and in some instances told insurers what unnamed competitors were doing."

205.    MultiPlan's relationship with Defendant UnitedHealth illustrates how the company leverages insurers' proprietary payment data and pricing strategies to effectuate its scheme to suppress industry-wide OON prices. In 2017, MultiPlan instructed UnitedHealth to pursue a specific, aggressive override strategy, based on what MultiPlan's other insurer clients were doing, which would drive down industry-wide compensation rates to out-of-network providers. In March 2017, MultiPlan's former CEO, Dale White, provided UnitedHealth executives with a presentation—titled, "Analysis and Recommended Actions for Enhancing Savings Results"—which showed that payment amounts made by "UNH [UnitedHealth]" on certain OON claims were higher than those of three main competitors (referred to as MultiPlan clients A, B, and C). As part of the presentation, White provided several options for how UnitedHealth could reduce its OON costs, but recommended setting a maximum out-of-network payment at 350% of the Medicare rate. This strategy, White stated, would generate "annual incremental savings of $73 million for fully insured and $1.6 billion for ASO business." Summarizing this presentation for colleagues in an April 2017, UnitedHealth's Vice President of

68

Networks, John Haben, explained that by agreeing to use MultiPlan's "recommended benchmark pricing" of "350 percent CMS," UnitedHealth would "be in line with [one] competitor" and "leading the pack along with another competitor."

206. On May 8, 2017, UnitedHealth's Executive Council met to make a final decision about adopting MultiPlan's recommendation and expanding its use of Data iSight. At the meeting, executives explained that one key "value" associated with outsourcing UnitedHealth's pricing decisions for OON services (to MultiPlan) was that it "[l]evel[ed] [the] playing field with competitors." On July 1, 2017, UnitedHealth decided to adopt the recommended 350% price cap and to expand its use of Data iSight.

207. Thereafter, MultiPlan continued to funnel non-public information about competitors' out-of-network pricing to UnitedHealth in an effort to convince the company to set its rate caps even lower. On September 27, 2018, UnitedHealth's Rebecca Paradise (VP of OON Strategy) emailed MultiPlan's Jacqueline Kienzle (SVP Sales & Account Management), copying Dale White. Referring to a text exchange between Haben and White, Paradise requested that Kienzle send her the chart MultiPlan had comparing UnitedHealth's OON payments to those of three of its competitors. Before providing this information to United, White asked MultiPlan's Senior Vice President of Healthcare Economics, Sean Crandell, who the competitors listed in the chart were so that he could share their identities with UnitedHealth.

208. MultiPlan was aware of the pricing strategies of United's competitors because, as MultiPlan clients, they had set those benchmarks via "mutual agreement" with MultiPlan. MultiPlan then used that information to make a similar instruction to UnitedHealth. Thus, MultiPlan's role as a clearinghouse for each Insurer Defendant's and each co-conspirator's competitively sensitive and otherwise non-public pricing data is essential to its ability to

69

orchestrate the MultiPlan Cartel, and to bring each Insurer Defendant's and each co-conspirator's practices in alignment with the Cartel's overall pricing moves. On March 13, 2018, MultiPlan executives gave UnitedHealth personnel a presentation (titled, "MultiPlan Update for UnitedHealthcare: 2017 in Review"), which noted that UnitedHealth had successfully reduced its OON costs through the use of Data iSight and suggested ways further cut those costs (by paying OON providers even less).

209. In a September 29, 2019 presentation entitled "Competitive Landscape for Cost Management," MultiPlan urged UnitedHealth to cut OON compensation amounts even further for particular procedures. This meeting was attended by Haben, who took contemporaneous notes of the meeting, which he sent to Rebecca Paradise, the Vice President of Out-of-Network Strategy for United. Paradise would later be asked at trial in another litigation whether she has ever had "the opportunity to learn about what other insurers are allowing for similar [out-of-network claims] amounts." She testified that "[f]rom time to time [UnitedHealth] may see that information." When asked about the "sources" of that information, she responded, MultiPlan.

210. Against this backdrop, Defendant UnitedHealth's pricing became increasingly aggressive over time, backed by MultiPlan's assurances that its OON compensation rates were still consistent with industry practices as a whole (something MultiPlan could assure only because of its possession of industry-wide CSI). In 2018, based on MultiPlan's instruction, UnitedHealth agreed to cap rates for certain OON services at 250% of the Medicare rate. According to Scott Ziemer, a former VP of Customer Solutions at UnitedHealth who has testified about this proving move under oath, "[UnitedHealth] [did not] give . . . [the rate cap] instruction" to MultiPlan; rather, it instead simply "rel[ied]" on MultiPlan to determine payment amounts pursuant to this new cap.

70

211. This was not the last time MultiPlan would instruct UnitedHealth to make a downward pricing move. According to the New York Times, in 2019, MultiPlan's former CEO Dale White met with executives from UnitedHealth to instruct the insurer to impose aggressive out-of-network rate caps "more broadly" to "catch up" with certain competitors. The Times quoted Lisa McDonnel, a UnitedHealth executive who attended that meeting, as writing in an internal email, "Dale did not specifically name competitors [at the meeting] but from what he did say we were able to glean who was who."

212. Thereafter, on February 11, 2021, UnitedHealth agreed with MultiPlan's instruction that it lower its cap on payment for certain services to 150% of the Medicare rate, an agreement memorialized in a change request form. On February 18, 2021, a MultiPlan employee, Tina Smith, emailed colleagues to confirm that "UHC [UnitedHealth] would like to change [Data iSight] pricing for ASO & FI [Fully Insured] ER that is currently at 250% of CMS or [Data iSight] whichever is greater to 150% of CMS (remove the greater of language), if no CMS value, use 40% of billed charges." UnitedHealth employees further discussed moving ER claims to the lesser of Data iSight and 150% of Medicare for ASO and Fully Insured clients in an email exchange from March 12, 2021.

213. The experience of Defendant Cigna is like that of UnitedHealth. To induce Cigna to join the Cartel, MultiPlan held a "summit" for Cigna executives in March 2016. In advance of this meeting, MultiPlan sent Cigna an email with an attached presentation—entitled "2016 Network Development Meeting: A Client's Perspective on Out-of-Network Costs"—which outlined how Cigna could redirect billions of dollars in out-of-network payments away from providers and to itself and MultiPlan. At the summit, MultiPlan representatives explained how Data iSight worked and how it could significantly reduce Cigna's costs, i.e., by ensuring

71

providers were underpaid OON providers. After attending the event, the Cigna executive responsible for overseeing Cigna's contractual relationship with MultiPlan, Terri Cothron, told a colleague that MultiPlan's pricing methodology "scares me."

214. This did not stop Cigna from contracting with MultiPlan to use its OON claims repricing services, including Data iSight, in April 2015. Thereafter, MultiPlan made regular reports to Cigna about how much it was saving on OON claims due to Data iSight, and what strategies Cigna could employ to pay healthcare providers even less. As recently as June 21, 2021, in a slide deck entitled "Cigna & MultiPlan Governance Meeting, June 21, 2021," MultiPlan outlined that it had continued to work with Cigna to cut the prices set for out-of-network goods and services.

215. This same dynamic has played out with countless other insurers. MultiPlan has leveraged its access to insurers' proprietary data and preferences to orchestrate similar pricing moves with each of the largest health insurance companies in the United States—which would otherwise be competing amongst themselves for the services of OON providers by paying market rates—thereby suppressing the rates paid to providers for OON services.

### iii. Adherence to MultiPlan's Pricing Determinations

216. Insurers must abide by MultiPlan's price determinations as a condition of participation in the Cartel. MultiPlan ensures this outcome through its contracts with insurers. Pursuant to MultiPlan's standard OON claims repricing services contract, insurers cannot set pricing preferences unilaterally as they see fit; rather, pricing preferences can only be entered by "mutual agreement" with MultiPlan, whose determination are informed by its access to the CSI of other insurers.

217. Each insurer then agrees "not to reduce the . . . provider's rate for claims for which [MultiPlan] has negotiated a rate . . . provided that the negotiated rate is consistent with

72

the business criteria mutually agreed upon between [the insurer] and MultiPlan." This contractual prohibition against the insurer "reduc[ing]" the provider's rate below MultiPlan's "negotiated rate" constitutes a tacit, functional agreement by the insurer to pay the provider exactly what MultiPlan instructs it to pay.

218. This is borne out in practice. MultiPlan processes some 370,000 claims per day for its clients. Given this volume, insurers cannot (and do not) independently assess whether MultiPlan's algorithmically adjusted rates are fair or reasonable. Instead, virtually all MultiPlan-generated rates are sent to providers or their billers (usually by MultiPlan itself) with no modification whatsoever on the part of the insurer (or any other form of "human touch").

219. And, MultiPlan executives have admitted under oath that MultiPlan's out-of-network pricing methodology leads to coordinated pricing across insurers. For example, Sean Crandell, MultiPlan's Senior Vice President of Healthcare Economics, has been asked under oath in another litigation whether, "[d]uring the . . . period[] 2017 to 2020 . . . out-of-network pricing recommended by Data iSight to United [was] the same or different as that recommended to [United's] competitors." He testified, "It was the same." Crandell was also asked, given that "the Data iSight tool is used among various different companies in the industry," whether "the recommended payment rates generated by Data iSight tool vary depending on which client [MultiPlan is] running that calculation for. He answered, "No."

220. Because providers have no reasonable alternatives to whom to sell their services besides insurers—which are almost all part of the Cartel—in some 95-99% of cases, providers (either directly or through their billers) accept the MultiPlan-generated rates initially offered, on the condition that they will "not . . . bill the Patient, or financially responsible party [i.e., the patient], for the difference between the Billed Charges and the Proposed Amount [offered]." And

73

some insurers do not bother to engage in the façade of "negotiation" at all. For example, effective January 1, 2021, Aetna specifically instructed MultiPlan to only make one offer to out-of-network providers and not to engage in any further negotiations.

221.    For these reasons, the MultiPlan rate determination is the final payment amount in virtually all cases.

### C.    Direct and Indirect Evidence of the MultiPlan Cartel Exists

#### i.    MultiPlan's Contracts with Insurers

222.    MultiPlan has entered into similar repricing services agreements with some 700 ostensibly rivalrous commercial insurers (out of roughly 1,100 total in the United States), including each the Insurer Defendants, which directly evidence the conspiracy alleged herein.

223.    These agreements all expressly contemplate that: (1) the insurer will use MultiPlan's pricing methodology (Data iSight) instead of exercising its own, independent decision-making to set compensation amounts for out-of-network providers, (2) in the event of a dispute with the provider over compensation, the insurer will delegate to MultiPlan the task of "negotiating" with the provider, and that MultiPlan will condition payment on the provider's agreement not to balance bill the patient, (3) the insurer will adhere to MultiPlan's pricing determinations, (4) the insurer will share CSI with their rivals through MultiPlan (including its pricing preferences and strategies) and have access to MultiPlan's claims database, which contains CSI from rivals, and (5) the insurer will split with MultiPlan the revenues generated by underpaying OON providers.

224.    Several of these contracts (or parts thereof) are publicly available, and are described below:

#### a)    The Aetna-MultiPlan Contract

225.    Aetna entered an amended "Medical Reimbursement Analysis Services"

74

agreement with MultiPlan on November 19, 2018, which provides as follows:

226. Aetna will "forward . . . out-of-network, non-contracted claims" to MultiPlan, which will use its "Data iSight . . . proprietary process" to "determine payment allowance[s]" for those claims.

227. Aetna will have "access" to the "on-line results from Data iSight" and to the "data used to populate [MultiPlan's] claims database" and which "underl[ies] the Data iSight application."

228. Aetna will complete a "Data iSight Client Preferences form" indicating its pricing preferences for OON claims (a form of CSI). However, these preferences will be expressed based on certain "business criteria," which MultiPlan unilaterally defines, and which must be "mutually agreed upon" by MultiPlan and Aetna. In other words, MultiPlan maintains control over these selections, enabling and driving coordination via MultiPlan across the Insurer Defendants and co-conspirators.

229. MultiPlan will handle "disputes" with providers over the compensation amounts they receive from Aetna. As part of this delegated negotiation function, MultiPlan will "[c]ontact the provider to attempt to negotiate a revised billed amount in accordance with [the] pre-designated [mutually agreed upon] parameters not to exceed the original billed charge."

230. During these negotiations, MultiPlan will condition all payment to providers on their agreement not to balance bill the patient. Specifically, the contracts provide that "[w]here the negotiated amount is less than the original billed charge," MultiPlan must "obtain the provider's signed agreement to the revised amount or secure proper documentation stating no 'balance bill' to the patient except for deductible, co-insurance and non-covered services based on the provider's adjusted price[.]"

231. Aetna will "pay providers" no less than the rate determined and negotiated by MultiPlan (the "negotiated rate") so long as the "negotiated rate" is "consistent with the business criteria mutually agreed upon between [Aetna] and [MultiPlan]." As noted above, because both MultiPlan and the insurer know that once a provider has already **formally agreed** to accept the MultiPlan rate as part of its "negotiation" with MultiPlan, the insurer has no incentive to pay *more* than the MultiPlan "negotiated rate." As such, this contractual provision constitutes a functional agreement by the insurer to pay the provider exactly what MultiPlan instructs it to pay.

232. Aetna will pay a fee to MultiPlan equivalent to 12% of the "savings" (i.e., the underpayment) generated by using MultiPlan's pricing methodology compared to the provider's billed charges.

233. Although this contract between Aetna and MultiPlan was executed on November 19, 2018, its existence was not made public until it was filed with the Washington State Insurance Commissioner on December 22, 2021.

### b) Contracts between MultiPlan and the Other Insurers

234. Defendant UnitedHealth entered into a substantially similar agreement with MultiPlan on October 1, 2017. The existence of this agreement was not publicly disclosed until May 2024, when it was entered into evidence in Emergency Services of Oklahoma, PC v. United Healthcare Insurance. Co., No. CJ-2019-482 (May 7, 2024, Dist. Ct. Cleveland Cnty. Okla.).

235. Defendant Cigna entered into a substantially similar agreement with MultiPlan on April 1, 2015.

236. On information and belief, Defendant Centene or one or more of its subsidiaries affiliates has entered into a substantially similar agreement with MultiPlan.

237. On information and belief, the Blue Cross Blue Shield Defendants have also

76

entered into substantially similar agreements with MultiPlan. Defendant Blue Cross Blue Shield of Michigan has publicly disclosed that it uses MultiPlan's Data iSight service. And at least one subsidiary of Defendant Elevance began using MultiPlan's Data iSight pricing formula to set prices for out-of-network goods and services on June 1, 2017.

### ii. Public Statements by MultiPlan

238. MultiPlan has admitted publicly to the existence of—and its role in orchestrating—the alleged conspiracy among insurers to fix and suppress the rates they pay providers for OON services.

239. For example, during a September 16, 2024 interview on the DataFramed podcast, MultiPlan CEO Travis Dalton admitted to coordinating industry wide compensation amounts, stating "part of what we're trying to do collectively, . . . with machine learning and other capabilities . . . is to determine [] an appropriate cost for [out-of-network services.]." This is an express admission by MultiPlan that it facilitates collective action among horizontal rivals with respect to how they compensate providers for OON services.

240. MultiPlan also explicitly markets to insurers its ability to facilitate their collective action. For example, MultiPlan advertises its platform as a way for insurers to "outsource the repricing" and negotiation of "out-of-network claims" to a single decision-maker (MultiPlan), which enables "[c]ommercial plans of any size" to obtain significant "discounts on out-of-network charges" while ensuring "low provider abrasion" and "minimizing the balance billing of their members." Such statements confirm MultiPlan's role in facilitating concerted action among insurers, as all industry participants understand that the only way to profitably reduce payment amounts on OON claims (while avoiding competitive harms like balance billing) would be through a collective shift among insurers to the MultiPlan Cartel.

241. MultiPlan has also publicly admitted that its value to insurers stems not from its

77

technology, by its ability to leverage CSI from 700+ insurers, which enables MultiPlan to coordinate industrywide pricing on OON claims. For example, as noted above, in 2020, a MultiPlan executive told investors that anyone can "create their own algorithms"; the MultiPlan "difference"—and "why [insurers] all come to MultiPlan" for claims repricing—was that MultiPlan could "talk to the entire industry" and "see" competitively sensitive "data across 700 payors." MultiPlan's access to all these insurers' CSI enabled the company, he explained, to "generate bigger savings" for clients and obtain better concessions from providers in negotiations than an insurer, acting individually, "who decides to do everything on their own." He also boasted that MultiPlan's "data advantage" had created a "competitive moat around [the] company that drives recurring revenues."

242.    Insurers also acknowledge the existence of their agreements with MultiPlan in communications to their subscribers. For instance, in presentations to New Jersey public employee benefits plan administrators, executives from Defendant Horizon Blue Cross Blue Shield of New Jersey touted the amount of savings Horizon was generating by underpaying OON providers by using Data iSight. And, in some cases, they explained, the underpayment was so great that MultiPlan made more on the fees from processing the claim than providers did rendering care. Similarly, in presentations to California municipalities, Defendant BSCA acknowledged that it uses MultiPlan's pricing methodology to set prices for out-of-network goods and services.

243.    MultiPlan has also been public about its plans to harness technology to increase its ability to facilitate the rapid exchange of pricing data and other CSI between its insurer clients. In June of 2023, MultiPlan announced a new product, called as PlanOptix, designed to give its insurer clients "access" to 400 billion "fully indexed" payment records from across the

78

major U.S. third-party payers, and to enable searches based on CPT code to "understand the price of that particular service . . . at a provider under a certain network." MultiPlan has explained that PlanOptix allows its clients to get answers to questions such as, "Where do I sit versus my competitor?" and "How do I ensure that I'm negotiating correctly when I measure myself against my competitors?" Indeed, at a November 28, 2023, Bank of America Leveraged Finance Conference, former MultiPlan CEO Dale White openly stated that the purpose of PlanOptix is to "enable payers to benchmark themselves against their competitors." He explained that by using PlanOptix, a payor will know "whether they're above or below or on par with their competition," including with regard to amounts paid to "a specific provider."

### iii. Private Communications Between MultiPlan and Other Members of the Cartel

244.    MultiPlan's private statements to insurers also confirm that concerted action is the point of MultiPlan's business model. As described above, not only does MultiPlan collect CSI, like in-network payment data, from all its insurer clients, which it uses it to set uniform OON compensation amounts across all payers; it also acts as a go-between between its clients, explicitly telling them who else is part of the Cartel, what their rivals are paying for particular kinds of OON, and which pricing strategies they are employing—all so that MultiPlan can instruct each insurer to implement the same pricing strategies and moves.

### iv. Indirect Evidence of a Horizontal Agreement

#### a)    Insurers Engage in Actions Which, Absent Concerted Action, Would Be Against Their Individual Economic Self-Interest

245.    As part of the MultiPlan Cartel, each Insurer Defendant (horizontal competitors to one another) engages in numerous actions, which, in the absence of concerted action, would be against its individual economic self-interest, but which, in the context of the scheme, maximize profits for the collective. These "actions against self-interest" are strong circumstantial evidence

79

of a horizontal agreement among insurers to reduce competition for OON providers and suppress their compensation rates.

246. First, it is against the unilateral economic interest of any individual Insurer Defendant to lowball OON providers (the goal and consequence of using MultiPlan, including through agreements to implement aggressive rate caps) by paying below-market rates, because doing so is well known to cause provider "abrasion"—meaning providers refusing to treat an insurer's subscribers on an out-of-network basis, or balance billing them. In the absence of collusion, insurers would pay competitive rates to achieve greater provider satisfaction and avoid the economic harm in the output market for insurance products caused by provider abrasion, i.e., subscriber loss.

247. Second, it is against the economic self-interest of any individual Insurer Defendant to pay for MultiPlan's expensive claims repricing services when there are far cheaper products on the market that enable insurers to determine fair and reasonable compensation rates for out-of-network services. Such products include but are not limited to those offered by FAIR Health, Inc. FAIR compiles charge and allowed amount data from across the nation and can identify specific percentile charges that insurers can use to set their UCR rates, services for which it charges insurers a modest, flat annual fee. By contrast, MultiPlan assesses its clients a fee for each repriced claim, which is based on a percentage of the difference between the billed amount and the sum ultimately paid. For any individual insurer, these contingent fees far exceed the flat annual fee they would have to pay to use FAIR. But insurers are willing to pay MultiPlan's fees because MultiPlan enables insurers to engage in collective action—i.e., to act, collectively, as a monopsonist—which enables the suppression of industry wide out-of-network compensation rates. Absent collusion, insurers would not pay MultiPlan's fees and would use

FAIR or another cheaper product or vendor. Insurers only use MultiPlan's repricing services because, collectively, they do much better by dividing the monopsony profits (which MultiPlan enables them to obtain) than by using other services in a fair, functioning, and competitive market not mired by collusion.

248. Third, it would be against the economic self-interest of any individual Insurer Defendant (each of which is a sophisticated, well-resourced company) to use MultiPlan when it could simply develop its own internal algorithms to reprice OON claims and avoid paying fees to a third-party vendor altogether. As MultiPlan has itself admitted, anyone can "create their own algorithms." And, in fact, Defendant UnitedHealth did develop such an algorithm, known as Naviguard, to set OON compensation rates. However, UnitedHealth put Naviguard on ice in 2020 after MultiPlan made UnitedHealth a sweetheart deal—in the form of a contingent fee discount—to remain within the Cartel in January 2023.[6] Absent collusion, it would have been economically irrational for UnitedHealth not to use Naviguard—and instead pay for similar services from a third-party— after investing the resources necessary to develop it.

249. Fourth, it would be against the unilateral economic interest of each Insurer Defendant to share its CSI (e.g., competitively sensitive and proprietary pricing data and strategies) with other insurers through a common third party, unless each Defendant knew all other insurers had agreed to do the same. In the absence of concerted action, insurers would not share such information with rivals (through an intermediary or otherwise) because of the risk of competitive harm. After all, competitors could use the information to make superior bids to out-of-network providers and strengthen their PPO networks and plan offerings relative to the competition.

---

[6] On information and belief, under the deal, MultiPlan would charge UnitedHealth's ASO clients a fixed monthly fee per member, rather than a contingent "shared savings fee."

**b)** **Defendants' Parallel Conduct and Abrupt Change in Behavior**

250.    Almost immediately after insurers' obligations to use FAIR expired in 2015 under their agreements with NYAG, the industry began to abandon FAIR en masse—and the traditional UCR method for setting OON compensation amounts—and instead began using MultiPlan's claims repricing services. By 2018, all of the Insurer Defendants had adopted MultiPlan's Data iSight.

251.    This parallel change in pricing strategy—which followed the expiration of their five-year agreement to use FAIR Health under their Ingenix settlement agreements—had a dramatic impact on OON compensation amounts. According to an April 2020 study published by the Office of the New York State Comptroller, since 2016, OON compensation rates have fallen year-over-year, whereas prior to 2016, they typically rose over time.

252.    The Insurer Defendants' dramatic, abrupt shift in pricing practices was not a product of independent decision-making, but rather of their collusion, which was facilitated by MultiPlan. This can be inferred, in part, from Cartel members' collective knowledge that their rivals had entered into the same collusive agreements with MultiPlan—i.e., agreements to (1) delegate their rate-setting and negotiation authority to MultiPlan, (2) exchange CSI among each other using MultiPlan as a conduit, and (3) pay MultiPlan on a contingent basis based on how far it suppressed OON compensation rates. This collective knowledge was ensured by MultiPlan's regular public representations (including about how many of the nation's "top" insurers had entered "multi-year contracts" with MultiPlan), and its many private communications with insurers imparting competitors' pricing strategies (so that all of its clients could pay compensation amounts that were "aligned" with the behavior of the Cartel as a whole).

253.    The "formula" for MultiPlan's contingent fees also gives rise to collective knowledge among the Insurer Defendants that they are all being instructed to pay the bare

82

minimum for OON services. Indeed, MultiPlan, like its insurer clients, is financially motivated to slash compensation amounts for OON providers as much as possible. As the New York Times puts it, "the formula for MultiPlan and the insurance companies is simple: The smaller the reimbursement, the larger their fee."

c)       **The Market for OON Healthcare Services Is Susceptible to the Formation, Maintenance, and Efficacy of a Cartel**

254.    As the Ingenix Cartel episode demonstrates, the market for out-of-network healthcare services for purchase by commercial insurers is characterized by numerous features, sometimes called "plus factors," that render the market susceptible to collusion and bolster the plausibility of the cartel alleged herein. Indeed, many current and former Multiplan executives are alumni of Ingenix. For instance, Christopher Dorn, a recently retired Senior Vice President and General Manager of Multiplan's Payment Integrity and Audit Division, joined Multiplan after twenty years at Ingenix, where he served as the Vice President of Payer Solutions.

255.    First, on the buyer side, there are high barriers to entry that make it difficult for new insurers to enter the market for OON healthcare services. These barriers include state and federal regulatory requirements as well as the costs associated with developing physician and patient networks, developing bill processing and payment systems that integrate with providers' systems or are otherwise capable of large-scale processing, and developing and managing a sufficiently broad pool of subscribers to spread risk.

256.    Second, on the supplier side, out-of-network providers face high exit barriers when seeking compensation for services they provide. As noted previously, in the United States, some 90% of all healthcare costs are paid not by patients but by third-party payers. Given this reality—along with laws and regulations limiting the ability of providers to directly bill patients—out-of-network providers generally have no substitutes for commercial third-party

83

payers for their services (especially when balance billing is precluded by contract). The only way for out-of-network providers to "exit" this third-party payer system is to refuse to treat patients unless they pay cash, something very few patients can afford. Individual patients are not reasonable substitutes for commercial third-party payers from the perspective of providers.

257. Third, the relevant market for out-of-network provider services for purchase by commercial insurers is highly concentrated, making collusion more feasible. Cartel members are responsible for over 81% of all compensation paid by commercial insurers to OON providers, meaning they control over 81% of the buyer side of the relevant market. And on information and belief, the Insurer Defendants alone possess, collectively, well over 50% of that market. MultiPlan itself acknowledges this high level of market concentration. In an August 18, 2020 Analyst Day presentation, MultiPlan explained that the "[t]he health insurance sector ha[d] consolidated to four top insurers" which all used MultiPlan to set prices for out-of-network services.

258. Fourth, the claims for compensation submitted to insurers by out-of-network providers are submitted by providers with uniform billing codes. This allows MultiPlan to reprice claims consistently for like claims submitted by providers to different insurers and across different health plans, across the entire country. As a result, MultiPlan and the Insurer Defendants can execute their anticompetitive scheme.

259. Fifth, members of the MultiPlan Cartel have had ample opportunities to meet and collude, including at events organized and hosted by MultiPlan itself. For instance, MultiPlan maintains a Client Advisory Board ("CAB") that hosts lavish, multi-day retreats that bring together executives from competing health insurers (including, for example, Defendants UnitedHealth, Aetna, and Cigna) to discuss topics such as MultiPlan's ability to deliver cost

savings through its programs. Executives from MultiPlan routinely attend meetings of the Client Advisory Board, including Susan Mohler, MultiPlan's Vice President of Marketing; Dale White, the former CEO of MultiPlan; Bruce Singleton, MultiPlan's former Senior Vice President of Network Strategy; Michael McEttrick, MultiPlan's former Vice President of Healthcare Economics; and Sean Crandell, MultiPlan's Senior Vice President of Healthcare Economics.

260. These retreats occurred in 2015, as well as in 2019 and 2021, and possibly at other times. In 2019, MultiPlan hosted a CAB retreat at a luxury spa in Laguna Beach, California attended by executives from MultiPlan, UnitedHealth, Aetna, Cigna, Humana, several Blue Cross Blue Shield associations, Kaiser, and other insurance companies. It held a similar event in the same city in 2021. At these meetings, MultiPlan seats insurer invitees next to each other, which gives them an opportunity to discuss the benefits of joining the Cartel. According to sworn testimony by a UnitedHealth executive, at these events, insurance executives "[t]ypically . . . talk about things they've implemented" using MultiPlan's Data iSight scheme and "other things they're looking at" to reduce out-of-network costs, and they also share with each other "new information" about their efforts in this regard.

261. At Client Advisory Board meetings, MultiPlan also makes its own presentations concerning Cartel members' cost reduction efforts, facilitating the exchange of sensitive, proprietary payment information between rivals. In past meetings, MultiPlan executives presented slides showing how little insurers were paying providers by using Data iSight, and how MultiPlan and its insurer clients could make more money if they all agreed to use Data iSight more aggressively to set even lower prices for out-of-network services.

262. There is also a revolving door between MultiPlan and the insurers that are part of the MultiPlan Cartel. For example, Christopher Dorn's replacement at MultiPlan as Senior Vice

85

President and General Manager of Multiplan's Payment Integrity and Audit Division, Charles Jensen, joined the company after working for two years at Defendant Elevance Health as Senior Manager of Payment Integrity. Before that, Jensen worked for three years at Blue Cross and Blue Shield of Illinois, Montana, New Mexico, Oklahoma, and Texas. As another example, Melissa Phillips Holladay, Multiplan's Assistant Vice President of Payment Integrity Analytics, spent 21 years at Blue Cross and Blue Shield of Illinois, Montana, New Mexico, Oklahoma, and Texas as their Executive Director of Market Performance.

263. The cozy relationship between MultiPlan staffers and the company's insurer clients helps MultiPlan facilitate the Cartel. For example, on September 25, 2024, Jensen hosted a seminar for insurance industry employees and executives called "Navigating the Current Landscape of Payment Integrity with Partnership Peace of Mind," which discussed "trends and challenges" in the industry.

264. The Insurer Defendants and MultiPlan have had opportunities to collude through other channels as well. Aetna, Centene, Cigna, CVS Health, Elevance, HCSC, Humana, and other insurers are members of AHIP (formerly, "America's Health Insurance Plans"), a trade organization of insurers that regularly holds conferences and meetings, both public and private. MultiPlan sponsors and sends representatives to AHIP events. Numerous executives employed by the Insurer Defendants and their co-conspirators sit on AHIP's Board of Directors, including: Gail K. Bourdreaux, President and CEO of Elevance; Bruce D. Broussard, President and CEO of Humana; David Cordani, Chairman and CEO of Cigna; Sarah London, CEO of Centene; Karen S. Lynch, President and CEO of CVS Health (the parent company of Aetna); Paul Markovich, President and CEO of Blue Shield of California, Daniel Loepp; President and CEO of Blue Cross Blue Shield of Michigan; David L. Holmberg, President and CEO of Highmark; Gary St. Hilaire,

President and CEO of Horizon; and Maurice Smith, President, CEO, and Vice Chair of HCSC.

265.    AHIP hosts conferences, committee meetings, and board meetings multiple times a year where its members participate in private, closed-door meetings. In 2023, MultiPlan sponsored AHIP's Annual Conference. Upon information and belief, MultiPlan representatives attended AHIP's 2023 Annual Conference from June 13-15 in Portland, Oregon.

266.    MultiPlan also engages in "road shows," visiting various insurance companies, including the Insurer Defendants, to provide updates regarding its claims repricing services. At these road shows, MultiPlan executives (including Dale White and Susan Mohler) share with insurers detailed descriptions of Data iSight's repricing methodology, the "savings" achieved by various MultiPlan customers, and recommendations to further reduce out-of-network compensation. During roadshow in the fall of 2021, MultiPlan bragged that it was reducing payments for out-of-network services by 61-81%. Upon information and belief, MultiPlan meets with each of its clients every year at such road shows, which allows the Cartel to be regularly updated and renewed.

267.    MultiPlan also prepares white papers for its claims repricing clients, which include references to the claims repricing strategies adopted by other insurers and instruct clients on how to implement the scheme.

## VII.    THE RELEVANT MARKET

268.    This case concerns a horizontal price-fixing arrangement that is per se illegal. Thus, a market definition is not needed. Nevertheless, to the extent Plaintiffs must define a relevant market, Plaintiffs do so below.

### A.    The Relevant Services Market: The Market for Out-of-Network Provider Services for Purchase by Commercial Insurers

269.    If a relevant antitrust market is necessary, the relevant market is the market for

87

out-of-network healthcare services for purchase by third-party commercial payers (i.e., insurers). In this market, healthcare providers like Plaintiffs are sellers of out-of-network healthcare services, while third-party payers like the Insurer Defendants are buyers of those services. Absent this key input (OON services), insurers would not be able to offer plans with out-of-network benefits, such as PPOs, to consumers in the downstream market for health insurance.

270.    This market is a "cluster market," comprised of different services, which do not necessarily substitute for one another, but which members of the Cartel, including the Insurer Defendants, must purchase together to sell health plans with out-of-network benefits. This group of services is defined as a cluster market for convenience because the effects described herein apply equally to all these services.

271.    Healthcare providers selling services in this market have no reasonable economic substitutes to which they could turn in response to a small but significant non-transitory decrease in compensation paid by commercial insurers for OON healthcare services. The significantly lower compensation rates for providing in-network services, as compared to OON services, also means that providers would not substitute to in-network services in response to a small but significant non-transitory decrease in compensation for OON services.

272.    The relevant market for OON healthcare services for purchase by commercial insurers can be corroborated by practical indicia of the contours of competition. With regard to industry or public recognition of the market, there is widespread recognition in the insurance industry that OON healthcare services are distinct from in-network services. Despite their higher cost, many patients prefer or require OON healthcare services, including in cases of emergency, where an established relationship exists with an OON provider, where in-network options are lacking (such as in rural areas), or where highly specialized care is needed (and no suitable in-

88

network options exist). Indeed, insurers sell plans with OON benefits, such as PPOs, specifically to capitalize on this persistent consumer demand for district and more expensive out-of-network healthcare services.

273. Insurers, moreover, regularly refer to OON healthcare services as an economically distinct and necessary market. For example, UnitedHealth has explained in various securities filings that "[s]ome providers that render service to our members do not have contracts with us" and that "[f]ailure to maintain satisfactory relationship with [these] out-of-network health care providers could adversely affect our business and results of operations." The organizational structures of the major insurers reflect their recognition out-of-network services and economically from in-network services. Many insurers set up departments or employ personnel that focus specifically on out-of-network payments and OON cost management. MultiPlan likewise recognizes that OON healthcare services constitute a distinct "pain point" for insurers, as compared with in-network services. And, as a result, MultiPlan promotes itself as the leader in "out-of-network cost containment" for its insurer customers. In public filings, MultiPlan also describes "OON cost containment" as an "addressable market" that is separate from what it calls the "provider network" market. And, of course, MultiPlan has created pricing methodologies that apply only to claims for out-of-network services and has chosen to focus its business on out-of-network pricing. As MultiPlan's former CEO, Dale White, has stated, "MultiPlan's focus over the past 40 years has been on out-of-network claims."

274. With regard to the peculiar characteristics and uses of OON healthcare services, the market for OON healthcare services is unique because providers are compensated at market-determined rates (set unilaterally by providers) for providing a service without any promise for future work or patient flow. Indeed, all the Defendants and co-conspirators recognize that out-of-

network claims are not governed by contracts and have publicly stated as much, as shown below:

> Defendant MultiPlan: "Our Analytics-Based Services reduce the per-unit cost of claims using data-driven negotiation and/or reference-based pricing methodologies. These services can be used standalone but often are used in a solution hierarchy after MultiPlan's network services to reduce claims with no available network contract."

> Defendant Elevance: "[W]e do not have contracts with all providers that render services to our members and, as a result, may not have a pre-established agreement about the amount of compensation those out-of-network providers will accept for the services they render."

> Defendant UnitedHealth: "If a provider isn't under contract with your plan, they are known as an 'out-of-network provider.'"

> Defendant Cigna: "If a doctor or facility has no contract with your health plan, they're considered out-of-network[.]"

> Defendant Aetna: An out-of-network doctor "has not agreed to a contract price for the covered service."

> Defendant: Blue Cross Blue Shield of Michigan: "An out-of-network provider is a physician, hospital or other health care provider who has not signed an agreement to provide services through our PPO network."

> Defendant Highmark: "Providers and facilities that do not have a contract with a health insurer are considered out-of-network."

> Co-Conspirator Humana: "Out-of-network providers do not have contracts with Humana."

275. OON healthcare services are also often purchased by insurers because they fill gaps in insurers' networks, a purpose and use which is unique to OON services.

276. With regard to distinct prices, absent the Cartel, out-of-network services are far more expensive than comparable in-network services or services performed pursuant to government plans like Medicare. According to the Office of the New York State Comptroller report cited above, the UCR-based compensation rates for services provided in the relevant market for OON healthcare services are typically 1.5 to 25 times higher than those for

comparable services in Medicare markets, and 1.5 to 100 times higher than those for comparable service for in-network provision of healthcare services.

277. Once a relevant market has been defined, Defendants' collective market (buying) power can be inferred based on their combined market share plus evidence of barriers to entry. Every major commercial healthcare insurer has agreed to use MultiPlan's repricing methodology. MultiPlan has entered agreements with some 700 insurers, which account for the vast majority of all payments made by insurers on OON claims. MultiPlan also claims to process some $106 billion in claims for OON services out of the total $130 billion charged by providers for OON services. Members of the Cartel thus possess, collectively, 81.5% of the relevant market (i.e., the market for OON provider services for purchase by insurers). On information and belief, the Insurer Defendants—who are the largest payers in the Cartel—collectively control well over 50% of the relevant market themselves.7

278. The services provided by MultiPlan to Defendant Insurers are not the relevant antitrust market here. MultiPlan's claims-repricing services, and Data iSight in particular, is little more than a technological smokescreen for traditional price-fixing among insurers.

**B.      The Relevant Geographic Market: Nationwide**

279. The relevant geographic market is the United States. Insurers, including the Insurer Defendants, are the dominant purchasers of OON healthcare services and purchase such services nationally. Indeed, even to the extent an insurer's network operates only regionally or within a few sets of states, or its subscriber base's residences are similarly limited, the OON healthcare services covered and purchased by such insurers are performed nationwide. In fact, an

---

7 On information and belief, the Insurer Defendants share of the separate and distinct in-network services market is roughly the same as their collective share of the relevant OON services market.

important reason insurers offer plans that cover out-of-network services is that regional provider networks will often have gaps in the types of specialties offered. Insurers, including the Insurer Defendants, also compete with each other for business from employers, commercial purchasers of "administrative services only" ("ASO") plans, and individual subscribers, and such competition occurs on a national basis. Similarly, absent the anticompetitive scheme alleged herein, the Insurer Defendants would compete with each other nationally for OON healthcare services to facilitate their competition for business from employers, commercial purchasers of ASO plans, and individual subscribers. In short, the buyers of OON healthcare services make their purchases and compete with each other on a national basis.

280. As a result, the purchasers of OON healthcare services from providers operate nationally and a provider would not be constrained by regional or statewide geographic factors in selling services to these national purchasers.

## VIII. DEFENDANTS' MONOPSONY POWER IN THE MARKET FOR OUT-OF-NETWORK PROVIDER SERVICES

281. This case concerns a horizontal price-fixing arrangement which is per se illegal and thus alleging market power is unnecessary. The purpose of Defendants' arrangement (which MultiPlan orchestrates) is to facilitate coordination between horizontal competitors, including the Insurer Defendants, to fix and suppress the compensation amounts they pay providers for out-of-network services.

282. To the extent proof of market power is needed under a rule of reason analysis, the Cartel members' collective buying power can be established with direct evidence (like their collective ability to control prices and profitably push them below competitive levels), obviating the need for a market definition. To the extent necessary, the Cartel members' collective buying power can also be established with indirect evidence (such as their collective share of the

relevant market).

283. Members of the MultiPlan Cartel (including the Insurer Defendants) would not have been able profitably to impose massive reductions in out-of-network provider compensation rates such as (in some instances) 45% to 70% off the relevant UCR benchmark in 2019—well in excess of the small but significant non-transitory decrease in prices of a hypothetical monopsonist—unless they collectively possessed buying market power over providers. Absent the conspiracy, insurers would face competitive harms for under-paying providers—like provider abrasion leading to PPO subscriber loss—making such behavior unprofitable.

284. Additionally, the fact that about 700 of the roughly 1,100 commercial insurers in the United States (including all of the major insurers, which account for the vast majority of all OON healthcare spending) now use MultiPlan to set their OON provider compensation rates, such that providers have no real alternatives in terms of who they can sell their OON healthcare services to, is also direct evidence of Cartel members' collective buying market power over providers.

## IX.    FRAUDULENT CONCEALMENT, CONTINUING VIOLATION, AND TOLLING THE STATUTE OF LIMITATIONS

285. Defendants have affirmatively and fraudulently concealed the Cartel by various means and methods from its inception.

286. Defendants did so in at least two ways. First, they misled Plaintiffs and other providers about how Defendants set compensation rates. Second, they actively worked to conceal the Cartel and ensure its secrecy.

287. MultiPlan's explanation of its pricing methodology to providers was false and misleading. Moreover, MultiPlan and the other Defendants intentionally hid from the proposed Class, including Plaintiffs, that compensation rates were actually determined by use of a shared

93

pricing system that used Defendants' real-time, non-public CSI and combined it with their competitors' real-time, non-public CSI to set out-of-network compensation rates.

288. MultiPlan also made false and misleading statements to conceal that it colluded with and orchestrated insurers (i.e., competitors) to work in concert to artificially suppress payments to healthcare providers.

289. MultiPlan and the other Defendants also spent years claiming that they set compensation by a neutral, algorithmic process, when in fact they were fixed and influenced by the Cartel's members.

290. MultiPlan and Defendants also publicly misrepresented that they did not engage in anticompetitive conduct. For example, MultiPlan's published Code of Business Conduct and Ethics states that it is "committed to conducting our business with integrity at all times," and that "only legal and ethical means should be used to gather information about existing and potential competitors."

291. Similarly, Aetna's Code of Conduct provides that employees must "obey all laws and regulations that apply to Aetna's business," "be honest and act with integrity in all of your Aetna business dealings," "must not be part of any conduct . . . that is intended to mislead, manipulate, or take unfair advantage of anyone, or misrepresent Aetna products, services, contract terms or policies to a . . . provider," and "[d]o not agree with representatives of a competing company, or with others, to be part of these or any other practices that may illegally restrain competition: fixing prices[.]"

292. Cigna's Code of Ethics and Principles of Conduct contain similar misleading information. Cigna says it will "comply with applicable laws" and "will behave ethically." It claims to only "look[] for competitive advantages through legal and ethical business practices,"

94

that it "neither accept[s] nor tolerate[s] taking advantage of anyone through, for example, manipulating or misrepresenting information," that it "competes fairly around the world," that it "seek[s] to maintain and grow our business through superior products and services—and not through any improper or anticompetitive business practices," and that it "compl[ies] with competition and antitrust laws throughout the world."

293. UnitedHealth's Code of Conduct also instructs employees to "[a]void discussions with competitors that may appear to restrain competition unreasonably," including "[c]ommunications or agreements with competitors regarding . . . provider reimbursement [compensation] rates." The Code specifically cautions against sharing information about provider compensation rates by competitors. Specifically, it addresses a hypothetical of an Optum Health employee (subsidiary of UnitedHealth): "Q. I work in Optum Health and received a request from a colleague on my old team at UnitedHealthcare for some information related to [compensation] rates of other payers. May I provide the data since we are part of the same company? A. Not without consulting your business Legal Representative or Compliance Officer. Optum Health's provider businesses contract with competitors of UnitedHealthcare and may receive competitively sensitive information, which must be protected, and sharing the data requested without review and approval by legal counsel could be a form of unfair competition."

294. Similarly, Defendant Blue Cross Blue Shield of Michigan's Code of Business Conduct provides that the company "strives to conduct its business in a manner that helps maintain a free and competitive market," and that "[a]ctivities that would restrain a competitive market, even artificially, are contrary to that philosophy and to antitrust laws, including: Entering into any agreement or joint conduct with competitors that would harm competition; [. . . ]; Collaborating with a competitor to decide what to pay for services." It specifically provides that

the company should "[n]ever exchange price information or communicate with a competitor about prices, anything that may affect prices, or customers," yet that is exactly what the company does through MultiPlan. Upon information and belief, other Blue Cross affiliates have similar provisions in their codes of conduct and ethics.

295.    Defendants also took steps to conceal the true nature of their anticompetitive arrangement from Plaintiffs and the proposed Class.

296.    Defendants engaged in a secret and inherently self-concealing conspiracy that did not reveal facts sufficient to put Plaintiffs or the proposed Class on inquiry notice.

297.    Defendants often improperly used the code "CO" (which stands for "contractual obligation") on their electronic EOBs to providers, even though these compensation amounts were not determined by any contractual obligation. This is an effort to fraudulently conceal the conspiracy alleged herein. It is common practice for medical practices (often via the third-party administrative professionals they hire) to automatically accept compensation that deviates from the billed amount based on the code CO, as they assume these compensation amounts have been pre-negotiated and agreed to by the provider (or set by the government). By contrast, medical practices are far more likely to manually audit compensation payments accompanied by the code PR to ensure they are reasonable, leading to more appeals of unreasonably low payments. Because Cartel members improperly use the X12 code "CO" on their electronic EOBs, they ensure that providers and their administrative staff will be less likely to scrutinize (and appeal) their under-compensation resulting from the MultiPlan Cartel.

298.    Defendants other than MultiPlan privately submitted their own non-public claims data to MultiPlan, and MultiPlan in turn used its proprietary repricing tools, the details of which remain confidential, to propose compensation rates. The inner workings and true nature of this

process are secrets that are not shared with providers like Plaintiffs and the proposed Class.

299. Defendants regularly attended invitation-only industry events, including events held and sponsored by MultiPlan, where they discussed behind closed doors how MultiPlan's repricing tools allowed them to reduce costs by suppressing out-of-network compensation rates.

300. Defendants had private communications and meetings to discuss out-of-network claim repricing, MultiPlan's repricing tools, and use of those tools, including by each Defendant's competitors.

301. Plaintiffs and the proposed Class therefore had neither actual nor constructive knowledge of the facts giving rise to their claim for relief. Plaintiffs and the proposed Class did not discover, nor could they have discovered through the exercise of reasonable diligence, the existence of Defendants' Cartel until shortly before filing this Complaint.

302. Through Defendants' knowing and active concealment of their misconduct, Plaintiffs and the proposed Class did not receive information that should have put them, or any reasonable person or provider standing in their shoes, on sufficient notice of collusion worthy of further investigation.

303. Plaintiffs and the proposed Class could not have been on inquiry notice of MultiPlan's scheme and the extent and effect of the MultiPlan Cartel until the New York Times published concerns about MultiPlan's practices, based on recently unsealed confidential documents in other litigation, on April 7, 2024.

304. Even if notice had arisen earlier, an ordinary person acting reasonably diligently would not have had the time, resources, or specialized training to uncover the misconduct that Plaintiffs, through counsel highly experienced in antitrust class action litigation, alleges herein, earlier than May 2024.

97

305. Plaintiffs exercised reasonable diligence at all times and could not have discovered Defendants' alleged misconduct sooner because of Defendants' deceptive and secretive actions which concealed their misconduct.

306. Plaintiffs filed their case as soon as they became aware of the anticompetitive conduct alleged herein, in reliance on its counsel's investigation.

307. Defendants' fraudulent concealment of their wrongful misconduct has tolled and suspended the running of the statute of limitations concerning the claims and rights of action of Plaintiffs arising from the conspiracy, including all parts of the class period earlier in time than the four years immediately preceding the date this action was filed.

308. Defendants' misconduct also constitutes a continuing violation against Plaintiffs and the proposed Class. Defendants continue to engage in the anticompetitive conduct alleged herein and have taken no affirmative steps to withdraw from it or otherwise disavow it.

## X.     ANTICOMPETITIVE EFFECTS AND IMPACT ON INTERSTATE COMMERCE

309. The MultiPlan Cartel directly damages Plaintiffs' business and property and restrains competition in the relevant market. Plaintiffs have sustained and continue to sustain economic losses—the full amount of which Plaintiffs will calculate after discovery and prove at trial—due to Defendants' artificial suppression of compensation rates for OON healthcare services.

310. Studies show that depending on the service provided, compensation to out-of-network providers based on MultiPlan's repricing methodology are 1.5 to 49 times lower than compensation paid to out-of-network providers for the same services based on the UCR method of calculating compensation rates. And whereas prior to 2016, compensation rates typically increased over time, since then they have decreased each year because of MultiPlan's price-

coordination scheme.

311. Multiplan's own documents confirm how the Multiplan Cartel harms out-of-network providers. In a November 2020 presentation to investors, Multiplan offered a hypothetical example of plan members "Jack" and "Jane" who obtained pediatric orthopedic services on an out-of-network basis, and described how MultiPlan would impact the provider's compensation for those services. In the absence of Multiplan, the provider in the hypothetical, Dr. Smith, would receive $1,000. But after Multiplan repriced the claim, Dr. Smith would receive only $600 for the same services. Multiplan claims to have "save[d] the healthcare ecosystem $500, for which it earns $40." But Multiplan's "savings" come at the expense of independent healthcare providers, many of whom already operate on razor-thin margins. Indeed, in the New York Times exposé on Multiplan, one independent provider reported that Multiplan's tool "has decimated [his] life," caused "the closing of [his] business," forcing "patients . . . to travel 2.5 hrs for surgery."

312. But for Defendants' conspiracy, Plaintiffs and members of the proposed Class would have received higher compensation for OON healthcare services.

313. While the conspiracy continues, Plaintiffs and proposed Class members will continue to suffer losses.

314. The antitrust laws aim to prevent injuries such as those alleged herein that stem from a conspiracy among buyers to systematically suppress the price paid for a good or service, such as OON healthcare services. Agreements to reduce price competition or fix prices violate the antitrust laws.

315. The outsourcing of both insurers' rate-setting decisions and claims negotiation responsibilities, as well as Defendants' anticompetitive information exchange, has corrupted the

99

market for OON healthcare services, replacing independent centers of decision-making with a single effective decisionmaker, MultiPlan, and disrupting the competitive process. Insurers' collective use of MultiPlan's repricing services to set artificially low compensation rates subverts the competitive process by depriving the market of "independent centers of decisionmaking" and replacing them with decisionmaking on prices by one shared pricing "brain."

316.    Economic theory and antitrust jurisprudence show that such joint delegation schemes, particularly when accompanied by the sharing of CSI, reduce the intensity of price competition and artificially suppress compensation below competitive levels. In recent guidance to human resources professionals, the Department of Justice Antitrust Division ("DOJ") stated that "[s]haring information with competitors about terms and conditions of employment" can be anticompetitive in that it decreases competition below competitive levels by allowing firms to match each other's compensation rather than compete for services by offering additional compensation.

317.    That is precisely what has happened with respect to the prices insurers pay for out-of-network care consumed by their subscribers: The MultiPlan Cartel suppressed the compensation rates they paid to healthcare providers, including Plaintiffs, for out-of-network claims below competitive levels.

318.    It is thus no surprise that MultiPlan's out-of-network claims repricing scheme is the subject of multiple investigations by at least the U.S. Department of Labor and the U.S. Congress. On April 29, 2024, U.S. Senator Amy Klobuchar sent a letter to Assistant Attorney General Jonathan Kanter and Federal Trade Commission ("FTC") Chair Lina Khan asking them to investigate whether MultiPlan facilitates collusion between payers; in the letter, Senator Klobuchar expressed concern that MultiPlan's "algorithmic tools are processing data gathered

100

across numerous competitors to subvert competition among insurance companies." And on May 9, 2024, the Department of Justice ("DOJ") announced the formation of the Task Force on Health Care Monopolies and Collusion to investigate "dominant intermediaries" that "gobble[] up" healthcare spending in the United States, as well as "competition concerns shared by . . . health care professionals" including issues related to "medical billing."

319. The MultiPlan Cartel's suppression of out-of-network compensation rates also indirectly suppresses rates in the separate market for in-network services—in which the Insurer Defendants also exercise market power—by undermining the ability of providers to leave insurance networks if in-network compensation rates fall too low, a key form of leverage providers would have in the negotiation of those in-network rates in the absence of the MultiPlan Cartel. Because of the Cartel, even if providers attempt to leave insurance networks and bill subscribers on an out-of-network basis based on the prevailing market rate, MultiPlan ensures that the providers will receive compensation amounts that are roughly equal to in-network rates, and which are unreasonably low. By undermining the economic viability of providers performing services on an out-of-network basis, insurers strip providers of a key form of leverage—the ability to decline network participation if in-network rates are too low—thereby suppressing in-network compensation rates. For example, in 2021, Blue Cross and Blue Shield member companies sent letters to providers demanding large in-network discounts of 15% or more.

320. Other harms to competition also naturally flow from the MultiPlan Cartel's suppression of out-of-network compensation rates. For example, below-market payments drive providers out of business, ultimately leading to reduced patient choice. They also stifle innovation and advancements in patient care by reducing the funds available for providers to

101

invest and expand.

321. By reason of the unlawful activities alleged herein, Defendants' actions substantially affected interstate trade and commerce throughout the United States, and caused antitrust injury to Plaintiffs and members of the proposed Class.

## XI.    CLASS ACTION ALLEGATIONS

322. Plaintiffs bring this action on behalf of themselves, and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) as representatives of the proposed Class, which is defined as follows:

> All healthcare providers and practices in the United States and its territories that were paid for out-of-network healthcare services by any commercial third-party payer—including but not limited to the Defendants (or any division, subsidiary, predecessor, agent, or affiliate thereof)—pursuant to MultiPlan's claims repricing services from January 1, 2015 through the present and until the unlawful conduct alleged herein ceases.

Excluded from the proposed Class are the Defendants and any other third-party payers that used MultiPlan's repricing services (and their officers, directors, management, employees, affiliates, parent companies, and subsidiaries), as well as all governmental entities.

323. The proposed Class is so numerous that joinder of all members in this action is impracticable. There are tens of thousands if not hundreds of thousands of members in the proposed Class.

324. Plaintiffs' claims are typical of those of the proposed Class because Plaintiffs press the same legal theories, and seek to redress the same injury, for themselves as for all members of the proposed Class.

325. Plaintiffs and all members of the proposed Class were all injured by the same unlawful conduct, which resulted in all of them receiving lower rates of compensation on out-of-network claims than they otherwise would have in a competitive market.

326. Plaintiffs will fairly and adequately protect and represent the interests of the proposed Class. The interests of Plaintiffs are not antagonistic to the proposed Class.

327. Questions of law and fact common to the members of the proposed Class predominate over questions, if any, that may affect only individual members.

328. Defendants have acted and refused to act on grounds generally applicable to members of the proposed Class, such that injunctive relief are appropriate with respect to the proposed Class as a whole.

329. Questions of law and fact common to the proposed Class include but are not limited to:

- whether Defendants have entered into a contract, combination, conspiracy, or common understanding to artificially suppress compensation rates for out-of-network claims;

- whether, if Defendants entered into such a contract, combination, conspiracy, or common understanding, that conduct is a per se violation of Section 1 of the Sherman Act;

- whether Defendants' conduct has in fact artificially suppressed prices paid on out-of-network claims to members of the proposed Class;

- the proper measure of damages for the proposed Class; and

- the contours of appropriate injunctive relief to remediate the anticompetitive effects of the challenged conduct in the future.

330. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex antitrust and unfair competition class actions.

331. Class action treatment is the superior method for the fair and efficient

103

adjudication of this controversy in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent, varying, or repetitive adjudications.

## XII. CAUSES OF ACTION

### COUNT ONE

**Agreement in Restraint of Trade in Violation of
Section 1 of the Sherman Act, 15 U.S.C. §1**

332. Plaintiffs incorporate each allegation above as if fully set forth herein.

333. Plaintiffs seek monetary and injunctive relief on behalf of themselves and all other members of the proposed Class under Sections 4 and 16 of the Clayton Antitrust Act for Defendants' conduct in violation of Section 1 of the Sherman Act.

334. Defendants, directly and through their divisions, subsidiaries, agents, and affiliates, engage in interstate commerce in the purchase of OON healthcare services for subscribers from Plaintiffs and the Class, and in the sale of health insurance plans.

335. Beginning in or around 2015, Defendants and their co-conspirators entered into and engaged in an unlawful contract, combination, or agreement, in restraint of interstate trade and commerce in violation of the Sherman Act, 15 U.S.C. § 1.

336. Specifically, Defendants have combined to form a cartel to artificially suppress

out-of-network compensation rates paid to healthcare providers across the United States and exchanged non-public and competitively sensitive information with one another in order to accomplish that purpose.

337. Defendants' conduct was undertaken with the intent, purpose, and effect of artificially suppressing compensation to out-of-network providers below competitive levels.

338. Defendants perpetrated this scheme with the specific intent of decreasing the compensation paid to out-of-network providers for Defendants' own benefit.

339. Defendants' conduct in furtherance of the unlawful Scheme described herein was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' affairs.

340. Defendants' Cartel has caused Plaintiffs and the proposed Class to suffer damages in the form of artificially suppressed compensation.

341. The contract, combination, or conspiracy alleged herein has taken the form of a horizontal conspiracy between competitors in the market for healthcare provider services.

342. In furtherance of this contract, combination, or conspiracy, Defendants have committed various acts, including as follows:

- The Insurer Defendants provided real-time, private, confidential, competitively sensitive and detailed internal claims data to MultiPlan for use in MultiPlan's out-of-network claim repricing tools.

- MultiPlan sold and operated its out-of-network claim repricing tool that repriced the compensation to OON providers for healthcare services claims.

- Defendants knowingly used the same out-of-network claim repricing tool that incorporated other Defendants' real-time, private, confidential, competitively sensitive,

105

and detailed internal claims data to calculate compensation rates for OON healthcare services claims and suppress compensation to OON providers.

- The Insurer Defendants paid OON providers compensation for healthcare services claims at the rates recommended by MultiPlan's repricing tool.

- The Insurer Defendants outsourced out-of-network claims handling to MultiPlan knowing that MultiPlan would set the compensation for OON healthcare claims at the rates recommended by MultiPlan's repricing tool.

- Defendants exchanged sensitive, real-time, private, confidential, and detailed internal claims data with each other, including by using the MultiPlan OON claims repricing tool.

- Defendants used many forms and methods of bilateral and multilateral communication across various settings and venues concerning the compensation rates for OON healthcare services claims, including their use of MultiPlan's out-of-network claim repricing tool, which had the purpose and effect of maintaining and reinforcing their anticompetitive scheme.

343. There are no procompetitive justifications for Defendants' Cartel, and any proffered justifications, to the extent cognizable, could be achieved through less restrictive means.

344. Defendants' Cartel is unlawful under a per se mode of analysis. In the alternative, Defendants' Cartel is unlawful under either a quick look or rule of reason mode of analysis.

345. As a direct and proximate result of Defendants' unlawful scheme, Plaintiffs and members of the proposed Class have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition unless Defendants' conduct is enjoined.

346. Plaintiffs and the proposed Class are entitled to recover three times the damages sustained by them and interest on those damages, together with reasonable attorney's fees and costs under Section 4 of the Clayton Act, 15 U.S.C. § 15.

347. Plaintiffs and the proposed Class are entitled to a permanent injunction that terminates the unlawful conduct alleged herein, as well as any other equitable relief the Court deems proper.

## XIII. PETITION FOR RELIEF

348. Plaintiffs petition for the following relief:

a) A determination that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, that Plaintiffs be appointed as class representatives, and that Plaintiffs' counsel be appointed as class counsel;

b) A determination that the conduct set forth herein is unlawful under Section 1 of the Sherman Act;

c) A judgment and order requiring the Defendants to pay damages to Plaintiffs and members of the proposed Class, trebled;

d) An order enjoining the Defendants from engaging in further unlawful conduct;

e) An award of attorneys' fees and costs;

f) An award of pre- and post-judgment interest on all amounts awarded; and

g) Such other and further relief as the Court deems just and equitable.

## XIV. JURY DEMAND

349. Plaintiffs, on behalf of themselves and the proposed Class, demand a jury trial on all issues triable as of right before a jury.

107

Dated: May 1, 2026

Respectfully submitted,

*/s/ Natasha J. Fernández-Silber*
**EDELSON PC**
Natasha J. Fernández-Silber
200 South 1st Street
Ann Arbor, MI 48104
Tel: (312) 589-6370
Fax: (312) 589-6378
nfernandezsilber@edelson.com

Sarah R. LaFreniere (*pro hac vice*)
Brandon Baum-Zepeda*
1255 Union Street NE, Suite 850
Washington, DC 20002
Tel: (202) 270-4777
slafreniere@edelson.com
bbaum-zepeda@edelson.com

*not admitted to practice in DC; practice authorized
by D.C. Rule 49(c)(3).

*/s/ Shawn J. Rabin*
**SUSMAN GODFREY LLP**
William Christopher Carmody (*pro hac vice*)
Shawn J. Rabin (*pro hac vice*)
Stephanie N. Spies (*pro hac vice*)
Nicholas Carullo (*pro hac vice*)
Thomas K. Boardman (*pro hac vice*)
Ryan Sila (*pro hac vice*)
William J. Melsheimer (*pro hac vice*)
One Manhattan West, 50th Floor
New York, NY 10001-8602
Tel: (212) 336-8330
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
sspies@susmangodfrey.com
ncarullo@susmangodfrey.com
tboardman@susmangodfrey.com
rsila@susmangodfrey.com
jmelsheimer@susmangodfrey.com

Halley W. Josephs (*pro hac vice*)
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067

108

Tel: (310) 789-3100
hjosephs@susmangodfrey.com

*/s/ Zachary D. Caplan*
**BERGER MONTAGUE PC**
Eric L. Cramer (*pro hac vice*)
Zachary D. Caplan (*pro hac vice*)
Patrick F. Madden (*pro hac vice*)
Jordan T. Hollinger (*pro hac vice*)
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
ecramer@bergermontague.com
zcaplan@bergermontague.com
pmadden@bergermontague.com
thollinger@bergermontague.com

Zachary R. Shelley (*pro hac vice*)
1001 G St NW, Suite 400 East
Washington, DC 20001
Tel: (202) 559-9740
zshelley@bergermontague.com

*Interim Co-Lead Class Counsel*

109