**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: MULTIPLAN HEALTH INSURANCE PROVIDER LITIGATION | Case No. 1:24-cv-06795 MDL No. 3121 |
| *This Document Relates to ALL ACTIONS* | Hon. Matthew F. Kennelly |

**MULTIPLAN'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL**
**DEFENDANT MULTIPLAN TO PRODUCE ITS FULL SET OF DATA DICTIONARIES**

Plaintiffs' Motion to Compel (ECF No. 706) ("Motion" or "Mot.") is the latest installment in a recurring pattern. Rather than engage with MultiPlan on MultiPlan's actual, imminent structured data production—which is currently estimated to consist of 2-3 terabytes of data (roughly equivalent to 160-240 million pages), over six billion records, and roughly 350 data fields (which represents MultiPlan more than tripling the number of fields initially identified, per ongoing discussion with Plaintiffs)—Plaintiffs seize on language in a single produced document as a pretext for a motion to compel production of a broad new swath of documents as to which they never even issued a Request for Production ("RFP"). The motion is clearly aimed, once again, at obtaining every data field in every system MultiPlan operates—with disregard of relevance, burden, or proportionality concerns, and disregard of the fact that Plaintiffs never even issued a discovery request for such a wide range of irrelevant materials.

There is no basis for this Motion. MultiPlan and its employees have been working extensively for nine months to accommodate Plaintiffs' increasingly burdensome and disproportional demands for structured data—even preparing and producing a Rule 30(b)(6) witness for an early deposition on multiple topics in excess of what this Court expressly allowed.

MultiPlan has already produced scores of documents that are the closest thing to an ordinary course data dictionary that MultiPlan has found for its own data and that could even potentially relate to the claims data it has identified for production. And MultiPlan has repeatedly committed to produce similar ordinary course documents to the extent MultiPlan identifies them.

Plaintiffs, however, would rather harass MultiPlan for materials that do not exist or do not matter—in yet another motion filed out of the blue, one week before a status hearing. The Court should deny the Motion, for the following reasons.

*First*, MultiPlan has satisfied its obligations with respect to the only formal discovery request that Plaintiffs have ever properly served regarding the production of data dictionaries— RFP 13. Plaintiffs' RFP 13 seeks an array of documents, including data dictionaries, that are "sufficient to understand all ***produced*** Structured Data." *See* Pls.' Third Set of RFPs at RFP 13 (emphasis added).[1] This RFP made sense as a practical matter because Plaintiffs fairly need to understand the data that MultiPlan is producing. MultiPlan, meanwhile, has been crystal clear— to both Plaintiffs and this Court—that it plans to produce structured data overwhelmingly from its data warehouse, which is the company's centralized, long-term repository of claims data used for analytics and reporting. As a result, MultiPlan repeatedly searched for data dictionaries for the data warehouse to respond to RFP 13—but one does not exist. MultiPlan's Rule 30(b)(6) witness, Meenu Talwar, MultiPlan's Senior Vice President of Technology, confirmed that fact during her March deposition.[2] Plaintiffs have not identified a single piece of evidence to suggest otherwise.

---

[1] MultiPlan has not attached the discovery documents, correspondence, or deposition testimony it cites to in this brief in the interest of filing this brief publicly. MultiPlan would be happy to provide the Court with copies of any referenced documents upon request, to the extent helpful.

[2] Plaintiffs' suggestion that MultiPlan has somehow agreed that Ms. Talwar's prior testimony warrants allowing Plaintiffs to take "another Rule 30(b)(6) deposition," Mot. at 2 n.2, is categorically false. MultiPlan does not agree that Ms. Talwar's testimony was deficient in any way, and has told Plaintiffs that repeatedly. *See infra*.

*Second*, to nevertheless help Plaintiffs understand MultiPlan's data, MultiPlan engaged in nine months of extensive investigation, informal correspondence and an early Rule 30(b)(6) deposition—all designed to help Plaintiffs understand what MultiPlan's produced fields mean. Consistent with that effort, following MultiPlan's Rule 30(b)(6) deposition, MultiPlan investigated and produced dozens of "reference tables" for certain fields related to a separate data system, called MPI Core. MPI Core is an active claims system from which the data warehouse pulls claims information on a daily basis (among other sources). Although the data warehouse fields and MPI Core fields are not identical, and may differ in meaning, the MPI Core reference tables are the closest thing to data dictionaries for MultiPlan's own data, used in the ordinary course, that could potentially be helpful for understanding the fields in the data warehouse, and they are the materials referenced in the single document that Plaintiffs make the centerpiece of their Motion. Plaintiffs' suggestion that MultiPlan has refused to produce responsive data dictionaries is false.

MultiPlan has never agreed to perform a scorched earth search for any *other* snippets of partial data dictionaries that might relate to some portions of some data system unrelated to the issues in this case— nor, again, have Plaintiffs issued a discovery request for production as to any such thing. Doing so would be immensely burdensome—and pointless. MultiPlan's data systems are numerous, diffuse, and highly decentralized, and most hold vast amounts of data that have absolutely nothing to do with Plaintiffs' claims. MultiPlan does not have a comprehensive data dictionary covering all its data systems, despite internal discussions about eventually doing so. Nor is there any reason why Plaintiffs would need every document that resembles a data dictionary in any form, for every bit of data within MultiPlan's system. Indeed, such materials would not help them understand the structured data that MultiPlan is producing. For example, Plaintiffs' Motion presumably could sweep in data dictionaries created by third parties that MultiPlan has

acquired in order to understand certain datasets of purchased third-party or public data that MultiPlan's services use. Similarly, within the last year, MultiPlan has made efforts to create a data catalogue for its system relating to negotiation services, but to date has not created any product that MultiPlan employees use in the ordinary course. Neither of these types of documents is relevant to Plaintiffs' request to understand MultiPlan's *produced* data, yet Plaintiffs' Motion demands them (and a vast search of anything else that Plaintiffs might consider a "data dictionary") unnecessarily. Plaintiffs' demand that MultiPlan locate and produce *all* data dictionaries (regardless of relevance) does not make sense.

*Third*, Plaintiffs' Motion improperly seeks to achieve through the back door what this Court denied nine months ago—every structured data field within every system MultiPlan operates, regardless of relevance or burden. MultiPlan has engaged in extensive efforts for long months to provide Plaintiffs with all of the specific structured data that Plaintiffs have sought— and Plaintiffs' Motion does not identify any category of data that it believes will be missing from MultiPlan's upcoming productions. MultiPlan should be able to focus on imminently producing *terabytes* of structured data, not spending its time responding to baseless motions.

## BACKGROUND

1. **PLAINTIFFS REQUESTED DATA DICTIONARIES "SUFFICIENT TO UNDERSTAND ALL *PRODUCED* STRUCTURED DATA" BUT THERE IS NO DEDICATED DATA DICTIONARY FOR THE DATA WAREHOUSE**

When Plaintiffs initially served RFPs aimed at acquiring vast amounts of MultiPlan's structured data in discovery, Plaintiffs also served an accompanying RFP for "[d]ocumentation

sufficient to understand all produced Structured Data, including but not limited to . . . (e) data dictionaries."[3]  *See* Pls.' Third Set of RFPs at RFP 13.

As a healthcare technology, data, and insights company, MultiPlan receives and maintains an enormous volume of structured data regarding claims for healthcare services. *See, e.g.*, Aug. 18, 2025 Declaration of Meenu Talwar ¶ 4, ECF No. 493-8 ("Talwar Decl.").  MultiPlan's data warehouse pulls claims data from different MultiPlan active claims systems on a daily basis, and, in addition to providing long-term storage of claims data, is the source of MultiPlan's analytics and reporting to clients. *See id.* ¶ 7.  MultiPlan made clear to Plaintiffs and the Court that the majority of structured data MultiPlan intends to produce for the ***fifteen-year*** relevant time period is drawn from its data warehouse. *See id.*

MultiPlan diligently investigated Plaintiffs' request for data dictionaries "sufficient to understand produced structured data," but was unable to identify a data dictionary for the structured data fields in its data warehouse. *See, e.g.*, Sept. 10, 2025 Joint Status Report ("JSR") at 15, ECF No. 512 ("there is no comprehensive data dictionary—indeed, that is precisely why MultiPlan created the Explanatory Guide"); Nov. 13, 2025 Ltr. from G. Haviland to Plaintiffs ("Explanatory Guide Part 2") at 8 ("MultiPlan is not aware of any dedicated data dictionary for the structured data fields in its data warehouse"); March 17, 2026 Ltr. from G. Haviland to

---

[3] The full text of Plaintiffs' request is: "Documentation sufficient to understand all ***produced*** Structured Data, including but not limited to (a) code/lookup tables for any fields provided that may contain coded (character) data; (b) column/field descriptions for each field provided; (c) identification of the field or set of fields which uniquely identifies a claim; (d) links or references between documents; and (e) data dictionaries. If data fields are provided in different tables, provide ID Variables in each table to merge tables together. Data information and formatting should be consistent, including where data warehouses and standards have changed over time. If formatting or data field names have changed over the Relevant Time Period, responses should include information detailing how to map field names across data files."  *See* Pls.' Third Set of RFPs at RFP 13 (emphasis added).

Plaintiffs ("March 17 Letter") at 3 ("MultiPlan has investigated the Data Warehouse, and has not identified such materials specific to the Data Warehouse").

This situation is not unique to MultiPlan. Two of the largest Direct Action Plaintiffs ("DAPs") experienced the exact same issue and have represented that after a search, they did not have documents responsive to Defendants' request for data dictionaries for their produced data. Plaintiffs inexplicably do not tell the Court this, and that MultiPlan's circumstances are not unusual in the slightest.

**2. MULTIPLAN UNDERTOOK EXTRAORDINARY EFFORTS TO HELP PLAINTIFFS UNDERSTAND THE MEANING OF ITS STRUCTURED DATA**

Despite the lack of a specific data dictionary for the data warehouse, MultiPlan has provided voluminous help to Plaintiffs to understand MultiPlan's structured data fields for production.

On September 5, 2025, MultiPlan provided via correspondence a detailed explanation of its produced structured data to date ("Explanatory Guide Part 1"), which walked almost field-by-field through MultiPlan's July claims data sample, in order to respond to Plaintiffs' 43 questions (plus subparts) about MultiPlan's structured data. As MultiPlan explained in the September 10, 2025 Joint Status Report, MultiPlan created Explanatory Guide Part 1 for Plaintiffs "precisely" because "there is no comprehensive data dictionary" for the data warehouse. *See* Sept. 10, 2025 JSR at 15, ECF No. 512.

Despite MultiPlan's efforts to explain what its produced fields mean, Plaintiffs moved to compel a list of effectively every structured data field relating to MultiPlan's out of network services, complaining that without this list, Plaintiffs wouldn't "know what they don't know" with respect to potential additional structured data fields in MultiPlan's systems. MultiPlan opposed Plaintiffs' motion as massively overbroad and burdensome, but committed to "continue to work"

6

with Plaintiffs to "identify new, additional categories" of "structured data fields," and to continue to "help [Plaintiffs] understand MultiPlan's structured data fields and samples[.]" *See* Sept. 10, 2025 JSR at 9, ECF No. 512. The Court denied Plaintiffs' motion and noted that Plaintiffs' proposal did not appear "appropriate or workable." *See* Sep. 22, 2025 Status Hr'g Tr. at 66:12.

On November 13, 2025, in response to another informal letter from Plaintiffs, MultiPlan created its Explanatory Guide Part 2, which contained a field-by-field breakdown of information received from clients and information reported to clients, as well as information on fields relating to MultiPlan's fees. In this explanatory guide, MultiPlan reiterated:

> **MultiPlan is not aware of any dedicated data dictionary for** the structured data fields in **its data warehouse**, from which the historical claims structured data Plaintiffs have requested will be produced [.] MultiPlan is continuing to investigate whether there is any data dictionary for any segment of any other active systems that could have any relevance to the structured data fields in the data warehouse.

Explanatory Guide Part 2 at 8 (emphasis added).

Following the Explanatory Guide Part 2, Plaintiffs discontinued their informal correspondence with MultiPlan over structured data and requested an early Rule 30(b)(6) deposition in order to ask about the "meaning" of MultiPlan's structured data fields. *See* Dec. 12, 2025 Status Hr'g Tr. at 21:18-24 (THE COURT: What you want to ask about now is … what do the [structured data field] categories mean, essentially. MS. FERNANDEZ-SILBER: Correct). Despite these representations to the Court, Plaintiffs served MultiPlan with a deposition notice going well beyond that limited issue, covering four extremely broad topics, including (i) "the identity, architecture, types of data maintained in, and relationships among any Data Systems You use or rely on for repricing out-of-network claims," (ii) "the identity of the Data System(s) from which any disclosed Structured Data field is derived; and any other materials You maintain that define or describe the data in Your Data Systems, such as look-up tables, glossaries, data crosswalks, data keys, and data dictionaries," (iii) "the Data Systems, categories of data, and

corresponding Structured Data fields used by Your OON Repricing Services to reprice claims (including used by any algorithms to reprice claims)," and (iv) "the categories of data and corresponding Structured Data fields You report to or receive from Your OON Repricing Services clients, including (a) submitted or billed amounts; (b) usual and customary amounts ('UNC'); (c) target amounts or override parameters; (d) amounts allowed and/or paid to providers; (e) savings amounts (e.g., net or gross savings, shared savings amounts); and (f) fees You charge clients for use of Your OON Repricing Services." *See* Plaintiffs' Notice of Rule 30(b)(6) Deposition (the "Deposition Notice") at 6.

MultiPlan warned Plaintiffs that the deposition was premature as the actual production deadlines were months away, *see* Dec. 5, 2025 JSR at 5, ECF No. 606. MultiPlan also warned Plaintiffs that Topic No. 3 was functionally indistinguishable from Plaintiffs' August motion to compel "all [MultiPlan's] data fields that have to do with out-of-network claims pricing." *See* MultiPlan's Responses & Objections to Plaintiffs' Deposition Notice at 12. But Plaintiffs insisted, and MultiPlan did not object to the deposition or its broad topics—beyond what was requested of or allowed by the Court—in an effort to answer Plaintiffs' questions.

### 3. MULTIPLAN'S RULE 30(B)(6) WITNESS TESTIFIED AT LENGTH ABOUT MULTIPLAN'S STRUCTURED DATA

MultiPlan designated Ms. Talwar as its Rule 30(b)(6) deponent on structured data, and she was deposed on March 5, 2026. Rather than focusing on the "meaning" of the fields MultiPlan was preparing to produce from its data warehouse, Plaintiffs spent the majority of the deposition asking about MultiPlan's general discovery processes, custodial documents, and systems unrelated to the products and services at issue in this litigation. Despite Plaintiffs' broad questions, Ms. Talwar answered every question diligently and with as much detail as possible. Where asked, Ms. Talwar also provided detailed explanations regarding a number of specific structured data

fields that Plaintiffs emphasized in correspondence, their Deposition Notice, and this Motion. *See, e.g.*, Talwar Dep. Tr. at 107:10-108:8; *id.* at 152:14-20; *id.* at 183:18-25.

Out of the **hundreds** of field names that MultiPlan had identified for production at that point, Ms. Talwar testified that she was not particularly familiar with **three discrete fields.** Accordingly, MultiPlan promptly followed up with Plaintiffs following the deposition and provided supplemental, detailed explanations of those three fields in its March 17 Letter to Plaintiffs. Plaintiffs have never raised any questions or issues with that response.

During the deposition, Ms. Talwar also explained in detail how her team has worked to identify fields responsive to Plaintiffs' requests by examining schemas, table names, field names, and consulting with domain experts across multiple business units. *See* Talwar Dep. Tr. at 142:10-14 ("a lot of knowledge exists in people's minds… it is a lot of talking to the domain people to unravel and produce and stitch the story together"); *id.* at 115:8-13 ("a lot of due diligence [is required] to know what could be two or three fields that really have the same meaning across different tables, even though they might have a slightly different name").

To the extent the Court finds it helpful to review the deposition transcript of Ms. Talwar—which MultiPlan believes will illuminate both Plaintiffs' approach and MultiPlan's substantial efforts as to structured data—MultiPlan would be happy to provide it for the Court's reference.

**4. FOLLOWING MULTIPLAN'S RULE 30(B)(6) DEPOSITION, MULTIPLAN SEARCHED FOR AND PRODUCED MPI CORE REFERENCE TABLES**

Following Ms. Talwar's deposition, MultiPlan voluntarily provided even more information regarding MultiPlan's structured data. Between the March 5, 2026 Rule 30(b)(6) deposition and this filing, MultiPlan produced three additional structured data samples for fields disclosed to Plaintiffs on February 23, 2026, and continued to work to identify additional fields responsive to Plaintiffs' requests for MultiPlan's ultimate production.

During the course of this investigation, MultiPlan also identified a set of materials that MultiPlan employees refer to as reference tables and/or charts, related to MultiPlan's MPI Core data system. MPI Core is an ingestion platform for MultiPlan's clients' claim data. The MPI Core reference tables contain descriptions of some fields within MPI Core, which MultiPlan uses to train employees, and thus are the closest thing to a data dictionary used in the ordinary course that MultiPlan has located thus far, that could potentially be useful for understanding fields in the data warehouse (even though many of the field descriptions in the MPI Core reference tables may be incomplete or out of date). MultiPlan *sua sponte* notified Plaintiffs on March 17, 2026 it was seeking to pull such materials, and produced more than 40 charts and 300 pages of MPI Core reference tables to Plaintiffs on April 28, 2026. Plaintiffs have not asked a single substantive question about the specific materials or structured data that MultiPlan produced or identified after the Rule 30(b)(6) deposition.

**5.    PLAINTIFFS HAVE FOCUSED ON A QUOTE ABOUT "DATA DICTIONARIES" IN A SINGLE DOCUMENT THAT REFERS TO THE MPI CORE REFERENCE TABLES THAT MULTIPLAN PRODUCED**

Instead of engaging with MultiPlan on the MPI Core reference tables, data samples, or any targeted categories of structured data in MultiPlan's upcoming productions, Plaintiffs have fixated since mid-April on a stray comment in one custodial document, which contains the following quote:

> MultiPlan's platforms and systems are spread across various databases and set-ups. This has created challenges and gaps where undocumented knowledge can be required to address business issues, or lengthy lead times are required to make changes. For example, discussions suggest that ~50% of the current data inventory has data dictionaries. Rest is work in progress.

MPI_0000222843 at -848.

In a letter dated April 10, 2026, Plaintiffs questioned MultiPlan about this document and its specific reference to data dictionaries. To address Plaintiffs' questions about the existence of

10

additional undisclosed data dictionaries that might be relevant to this case, MultiPlan spoke with multiple individuals involved with the document, including the author, John Briggs, who had relatively recently begun working at MultiPlan. MultiPlan also learned that the reference to "data dictionaries" in MPI_0000222843, which MultiPlan initially understood to involve a list of tables and columns, referred only to MPI Core, and specifically to the MPI Core reference tables MultiPlan had previously identified for Plaintiffs in March, and which it produced in April.

On May 1, 2026, MultiPlan met and conferred with Plaintiffs regarding logistics for its forthcoming enormous structured data production. MultiPlan came to that meeting to detail the scope of its upcoming structured data production and to tell Plaintiffs that it had identified—and planned to produce—even *more* categories of data, in an attempt to be as comprehensive as possible. Specifically, MultiPlan explained that it planned to produce (on June 1, the current deadline for all parties' structured data productions) fields in excess of its prior samples, including numerous additional fields to assist Plaintiffs with mapping the data and fields related to capitated payments. MultiPlan further informed Plaintiffs of the estimated size of its production (up to three terabytes of data and over six billion records). MultiPlan also explained to Plaintiffs that it anticipated making supplemental productions after June 1, to account for the Parties' continued negotiations about certain substantive categories of data and particular technical complexities associated with certain data pulls. MultiPlan invited Plaintiffs to ask substantive questions about these points, in the hope of engaging in a productive discussion about MultiPlan's upcoming productions. Instead, Plaintiffs spent most of the May 1 meet and confer falsely accusing MultiPlan of discovery malfeasance based on MPI_0000222843—and demanding both the production of a huge swath of additional materials they had never requested, and another "free" deposition of a MultiPlan 30(b)(6) witness. Days later, Plaintiffs filed this Motion to Compel.

11

## ARGUMENT

**1.  MULTIPLAN SEARCHED FOR BUT HAS NOT LOCATED ANY DATA DICTIONARIES FOR THE DATA WAREHOUSE**

MultiPlan cannot produce documents Plaintiffs wish existed, but do not.

Plaintiffs do not contest that a data dictionary does not exist for MultiPlan's data warehouse.  Nor do they deny that RFP 13 only seeks documentation sufficient to understand MultiPlan's forthcoming structured data production, or that MultiPlan's production draws overwhelmingly from its data warehouse.  *See* Pls.' Third Set of RFPs at RFP 13 (requesting "[d]ocumentation sufficient to understand all produced Structured Data.")

As Ms. Talwar said in her deposition, MultiPlan "wish[es] [it] had a data dictionary" for its data warehouse.  Talwar Dep. Tr. at 221:23-24.  But because one does not exist, MultiPlan has gone to extraordinary lengths to respond to all of Plaintiffs' questions about the meaning of data fields and continues to explore its structured data systems for materials that might be responsive to Plaintiffs' RFP 13.  Plaintiffs' claim that MultiPlan "stymied discovery" into its systems by "withholding additional data dictionaries for no good reason" is an egregious misrepresentation. Mot. at 1-2.

**2.  MULTIPLAN PRODUCED THE CLOSEST THING TO RESPONSIVE, ORDINARY COURSE DATA DICTIONARIES FOR MULTIPLAN'S OWN DATA THAT MULTIPLAN  HAS FOUND TO DATE**

After Plaintiffs' Rule 30(b)(6) deposition in March, MultiPlan produced over three hundred pages of reference tables related to its MPI Core system, in an effort to produce information— even beyond the data warehouse and the confines of RFP 13—that MultiPlan believed could potentially be useful for understanding MultiPlan's data.  As noted, *supra*, these MPI Core reference tables are the "data dictionaries" referred to in MPI_0000222843 (which Plaintiffs call the "Briggs Report").  Mot. at 2.  The structured data fields in the MPI Core tables may not

12

fully map to the data warehouse, and certain fields may have meanings in MPI Core that differ from the meaning of fields in the data warehouse. That is because structured data fields in different data systems have their own "data lineage," i.e., the source where they pull information from to populate the field. Additionally, some of the descriptions in the MPI Core tables may be either incomplete, obsolete or otherwise inaccurate. Nonetheless, MultiPlan provided these tables as part of its continuing efforts to give Plaintiffs as much information about the fields included in its forthcoming structured data production as possible.[4] MultiPlan has also repeatedly expressed, including during the parties' May 1, 2026 meet and confer, that it will continue to search for and produce any data dictionary, used in the ordinary course, for the MultiPlan structured data that it is producing, to the extent it locates any such document.

Plaintiffs do not dispute any of this. Instead, they suggest that MultiPlan possesses but does not want to produce other actual data dictionaries. *See, e.g.*, Mot. at 1 ("Plaintiffs move to compel MultiPlan to produce its complete set of data dictionaries."); *id*. at 11 ("Plaintiffs are entitled to review all MultiPlan's data dictionaries."). This is false, and it makes no sense—why would MultiPlan go through the time and expense to create Explanatory Guides and prepare a witness for a 30(b)(6) deposition if there were data dictionaries for its produced fields readily available? MultiPlan has never refused to produce data dictionaries for its structured data production and has expended significant time and resources searching for such documentation.

---

[4] Plaintiffs complain that "MultiPlan produced some of the data dictionaries but insisted on referring to them as mere 'tables.'" Mot. at 2. MultiPlan has explained how the company understands these materials and uses the company's own verbiage to refer to them; Plaintiffs' fixation on semantics over substance is unproductive.

### 3.  PLAINTIFFS' COMPLAINTS ABOUT MULTIPLAN'S DISCOVERY EFFORTS ARE SPURIOUS

#### A.  Plaintiffs' complaints about the Rule 30(b)(6) deposition are unfounded

Without any actual basis for demanding data dictionaries for the data warehouse, which do not exist, Plaintiffs suggest they are entitled to some sort of relief because, they complain, Ms. Talwar's testimony was "materially inaccurate and incomplete." Mot. at 2 n. 3. That is false. It seems Plaintiffs wanted the deposition to be an exact memory test about all of MultiPlan's systems and fields, contrary to what it represented to this Court, contrary to what it *specifically* told MultiPlan, and contrary to the rules of civil procedure. Ms. Talwar provided detailed responses to hours of questions about structured data field meanings and MultiPlan's systems. And for the few questions on "meaning" that Ms. Talwar was unable to answer on the spot, MultiPlan provided answers shortly after the deposition in detailed correspondence.

Ms. Talwar's testimony about data dictionaries was also accurate because MultiPlan has not identified data dictionaries for its structured data production from the data warehouse. *See, e.g.*, Talwar Dep. Tr. 23:2-10 (testifying that no data dictionary exists for MultiPlan's data warehouse). This is not unusual; two of the largest DAPs likewise have been unable to identify data dictionaries for their structured data productions. *See supra* at 6.

#### B.  Plaintiffs' complaint about when MultiPlan produced MPI_0000222843 is unfounded and irrelevant

Plaintiffs also suggest that the production of MPI_0000222843 *after* Ms. Talwar's deposition was somehow intentional on the part of MultiPlan's outside counsel. Mot. at 8. That is both false and absurd. Plaintiffs demanded they be allowed to take an early deposition, in March 2026, at which point only a fraction of all parties' documents had been produced and months before the parties' deadline to produce structured data. Plaintiffs knew this very well; they were in the middle of search term negotiations with MultiPlan, and before the Special Master. MultiPlan is

14

reviewing millions of documents. It did not deliberately withhold MPI_0000222843 or any other document until after Ms. Talwar's deposition. And it will certainly keep producing documents. Plaintiffs knew that millions of pages of document discovery would be produced (from MultiPlan and other Defendants), after they demanded and insisted on proceeding with an early deposition but they chose not to proceed in an ordinary course fashion.

4.     **PLAINTIFFS' DEMAND FOR EVERY DOCUMENT RESEMBLING ANY DATA DICTIONARY IN ANY DATA SYSTEM IS NOT RELEVANT OR WORKABLE**

Plaintiffs' Motion does not seek appropriate relief. MultiPlan cannot produce data dictionaries that do not exist. And to the extent that Plaintiffs demand that MultiPlan scour hundreds of thousands of fields across a vast expanse of disconnected data systems in search of any snippets of partial data dictionaries related to portions of data systems on MultiPlan's platform that have nothing to do with this case—doing so would be unduly burdensome and not proportional. It also makes no sense—such information will not help Plaintiffs understand the data that MultiPlan is producing—which was the purpose of Plaintiffs' RFP 13. Plaintiffs' request is particularly senseless given that Plaintiffs' Motion does not identify any substantive category of information that they believe to be missing from MultiPlan's forthcoming productions. To the contrary, Plaintiffs are on the brink of receiving terabytes of data, encompassing hundreds of fields and billions of records.

**CONCLUSION**

MultiPlan respectfully requests that the Court deny Plaintiffs' Motion.

15

Dated: May 14, 2026

Errol J. King (*pro hac vice*)
Katherine Mannino (*pro hac vice*)
PHELPS DUNBAR LLP
II City Plaza
400 Convention Street, Suite 1100
Baton Rouge, LA 70802
Telephone: (225) 376-0279
errol.king@phelps.com
katie.mannino@phelps.com

Respectfully submitted,

/s/ *Sadik Huseny*

Sadik Huseny (*pro hac vice*)
LATHAM & WATKINS LLP
300 Colorado Street, Suite 2400
Austin, TX 78701
Telephone: 737-910-7300
sadik.huseny@lw.com

Gary Feinerman (IL Bar No. 6206906)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: 312-876-7700
gary.feinerman@lw.com

Lawrence E. Buterman (*pro hac vice*)
Katherine A. Rocco (*pro hac vice*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: 212-906-1200
lawrence.buterman@lw.com
katherine.rocco@lw.com

Anna M. Rathbun (*pro hac vice*)
Graham B. Haviland (*pro hac vice)*
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
anna.rathbun@lw.com
graham.haviland@lw.com

*Attorneys for Defendants Claritev
Corporation, Medical Audit & Review
Solutions, Inc., Multiplan, Inc., National
Care Network, LLC, Viant Inc., Viant
Payment Systems, Inc.*

16