**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re MULTIPLAN HEALTH | ) | |
| INSURANCE PROVIDER | ) | Case No. 24 C 6795 |
| LITIGATION | ) | |

**CASE MANAGEMENT ORDER NO. 33 –**
**Memorandum Opinion and Order on motion to amend answer**

MATTHEW F. KENNELLY, District Judge:

This multidistrict litigation involves consolidated lawsuits in which healthcare providers allege that MultiPlan, Inc. (now called Claritev) and third-party payors of healthcare services have conspired to suppress reimbursement rates for out-of-network healthcare services. The payors and MultiPlan (collectively, the payors) have moved to amend their answers to assert an unclean hands defense. For the reasons below, the Court denies the payors' motion.

The Court has discussed the claims in this MDL with some detail in prior opinions. *See In re MultiPlan Health Ins. Provider Litig.*, 789 F. Supp. 3d 614 (N.D. Ill. 2025). For purposes of the present motion, a high-level summary will do.

In the United States, patients often pay only a fraction of the cost for healthcare services they receive. That is because many people subscribe to a commercial third-party payor, such as an insurer, who reimburses the healthcare provider for the rest.[1] Reimbursement is negotiated between the third-party payor and the healthcare provider. Third-party payors often pre-negotiate discounted rates with healthcare

---

[1] Sometimes, the third-party payor merely facilitates the reimbursement, which ultimately comes from an employer.

providers, which become part of the payor's "network." In exchange for the discounted rate, the third-party payor encourages its subscribers to use the in-network providers' services.

This litigation focuses on pricing for out-of-network services, which are not pre-negotiated. An individual third-party payor's ability to offer lower reimbursement rates to healthcare providers is limited by competitive pressure from other third-party payors. If a third-party payor pays below competitive reimbursement rates, healthcare providers may refuse to offer out-of-network services to that payor's subscribers or bill the subscribers for the remaining amount—a practice called "balance billing." Both options can cause the lower-paying insurer to lose subscribers to competitors that maintain better out-of-network coverage by paying the providers higher reimbursement rates.

This competitive pressure may disappear if enough third-party payors coordinate with one another to suppress reimbursement rates across the industry, *i.e.*, agree to fix prices. According to the plaintiff healthcare providers, that is what has happened here. They allege that the defendant third-party payors have agreed to outsource their individual pricing decisions to MultiPlan, which, the provider plaintiffs say, collects competitively sensitive pricing data from each member and coordinates industry-wide, artificially low reimbursement rates. The providers claim that this conspiracy violates federal antitrust law and seek treble damages and injunctive relief. Some providers also claim that the conspiracy violates state antitrust and consumer-protection laws.

With the nature of the providers' claims in mind, the Court considers the payors' proposed unclean hands defense. The common-law doctrine of unclean hands bars equitable relief when the plaintiff has engaged in misconduct related to the matter at

issue. *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814–15 (1945). It reflects the idea that "in equity as in law the plaintiff's fault, like the defendant's, is relevant to the question of what if any remedy the plaintiff is entitled to." *Scheiber v. Dolby Lab'ys, Inc.*, 293 F.3d 1014, 1021 (7th Cir. 2002). The doctrine applies only when the plaintiff's misconduct has an "immediate and necessary relation" to the equity sought. *Henderson v. United States*, 575 U.S. 622, 625 n.1 (2015) (quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933)). Ordinarily, there must be a "direct nexus between the bad conduct and the activities sought to be enjoined." *Shondel v. McDermott*, 775 F.2d 859, 869 (7th Cir. 1985).

In *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134 (1968), the Supreme Court limited the applicability of common-law defenses in antitrust actions. There, the defendants imposed in their franchise agreements anticompetitive geographic- and price-restrictions that violated the antitrust laws. *Id.* at 137. The defendants argued that the plaintiffs were barred from recovering damages under the common-law doctrine of *in pari delicto*, an analog to unclean hands for damages claims, because the plaintiffs were themselves franchisees of the defendants and may have reaped some of the profits from the anticompetitive scheme.[2] *Id.* at 138–39.

The Court rejected the defense, warning against "invoking broad common-law barriers to relief where a private suit serves important public purposes." *Id.* at 138. It reasoned that barring the plaintiffs from recovering damages would undermine the

---

[2] The traditional concept of *in pari delicto* may have been narrower than unclean hands, but that difference is not relevant here because *Perma Life*'s analysis assumed a broadened version of *in pari delicto* more closely analogous to unclean hands. *Pinter v. Dahl*, 486 U.S. 622, 632 (1988); *see Perma Life*, 392 U.S. at 140; *id.* at 153 & n.1 (Harlan, J., concurring).

private-enforcement scheme central to the antitrust laws' "overriding public policy in favor of competition." *Id.* at 139. And, the Court continued, denying damages to the plaintiffs as a deterrent was unnecessary because they would remain liable for their own illegal conduct, and any benefit they gained from that conduct could be considered in calculating damages. *Id.* at 139–40.

Five Justices, in separate opinions, nonetheless endorsed a narrower defense that would bar plaintiffs from recovering damages when they were substantially equally responsible for the violations. *Id.* at 146–54 (separate opinions); *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 308–09 (1985). At least part of the rationale was that this limitation was necessary to avoid encouraging antitrust violations, for otherwise a party could actively create and participate in an anticompetitive conspiracy with the fallback option of turning on its co-conspirators and seeking treble damages if the scheme turned out to be unprofitable. *Blackburn v. Sweeney*, 53 F.3d 825, 829 (7th Cir. 1995) (citing *Perma Life*, 392 U.S. at 151 (Marshall, J., concurring)).

Turning to the present case, the third-party payors' proposed unclean hands defense is based on allegations that the healthcare providers have used improper billing practices to inflate the reimbursement amounts they bill to the payors. Specifically, the payors allege that the providers: (1) bill for a treatment priced higher than what was actually provided or justified; (2) bill for services that were never provided; (3) waive patient payment and improperly shift the costs to the payors; and (4) bill separately services that are meant to be bundled.

At the outset, there is a bit of a mismatch between this case and *Perma Life*, though not one that helps the payors. In *Perma Life*, the plaintiffs' alleged misconduct

4

was participating in the same conspiracy that they challenged. Here, the providers'

billing practices are separate from the alleged conspiracy to eliminate competition

between the payors for reimbursements. It is hard to see how the two have the

requisite "immediate and necessary relation" or "direct nexus" to warrant applying

unclean hands, though the payors have posited at least one ostensibly equitable

remedy, discussed below, that could have the requisite connection.

In any event, *Perma Life*'s rule against applying common-law defenses when

they conflict with antitrust policy applies whether the plaintiffs' alleged misconduct is

related to or separate from the conspiracy at issue. *See Perma Life*, 392 U.S. at 138–

39 (citing *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*, 340 U.S. 211 (1951)). And

*Perma Life* precludes many of the potential uses for unclean hands here. For example,

the payors may not use an unclean hands defense to avoid an injunction dissolving the

alleged conspiracy—the typical equitable relief awarded in antitrust cases. Refusing

that remedy and permitting an anticompetitive conspiracy to continue, like denying

damages, would be contrary to antitrust policy.

Seeking to cabin *Perma Life*'s scope, the payors point out that it dealt only with a

defense to damages, not equitable relief. But nothing in *Perma Life* suggests that it is

limited to damages. To the contrary, the argument for keeping injunctive relief available

even when a plaintiff has unclean hands is arguably even stronger, because dissolving

the conspiracy directly advances antitrust policy without granting the plaintiff a windfall

in the way that treble damages might.

Subsequent cases have also refuted the idea that *Perma Life* does not apply to

equitable defenses like unclean hands. The Supreme Court has cited *Perma Life* as

applying to unclean hands, though it ultimately held in that case that the plaintiff's wrongdoing—copying confidential documents from her employer before her allegedly discriminatory firing—made it inappropriate to order reinstatement. *See McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 360–63 (1995). The Seventh Circuit has more conclusively interpreted *Perma Life* to apply to equitable defenses such as unclean hands. *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 597 (7th Cir. 1984); *see also PharmacyChecker.com LLC v. LegitScript LLC*, 137 F.4th 1031, 1039 (9th Cir. 2025). That is the best reading of *Perma Life*, and in any event, it is binding on this Court.[3]

The third-party payors next argue that even if *Perma Life* once applied to equitable defenses, that aspect of the case is no longer good law. They cite the Supreme Court's recent decision in *Starbucks Corp. v. McKinney*, 602 U.S. 339 (2024), for the proposition that there is a "strong presumption" that Congress incorporates "traditional principles of equity" when it authorizes equitable relief, absent a "clear command" to the contrary. *Id.* at 345–46. With this principle in hand, the payors assert that section 16 of the Clayton Act, 15 U.S.C. § 26, the statutory provision authorizing injunctive relief in federal antitrust cases, does not contain a clear command displacing that presumption. Instead, they say, it seems to expressly incorporate traditional

---

[3] The third-party payors say that the portion of *General Leaseways* applying *Perma Life* to equitable defenses is dicta. The Court disagrees. *General Leaseways* first concluded that the balance of harms and likelihood of success favored granting a preliminary injunction and then considered whether the plaintiff was nonetheless barred from injunctive relief because it was a member of the alleged cartel—the situation in *Perma Life*, but with a preliminary injunction at issue instead of damages. The Seventh Circuit's conclusion that *Perma Life* precluded the application of unclean hands to deny the preliminary injunction was necessary to its holding.

equitable principles.  *See id.* (authorizing injunctive relief "when and under the same conditions as injunctive relief . . . is granted by courts of equity, under the rules governing such proceedings").  So, the payors conclude, the antitrust laws incorporate the equitable doctrine of unclean hands.

The payors' reliance on *Starbucks* is misplaced.  *Starbucks*' "strong presumption" requiring a "clear command" language pertains to the standard for determining whether Congress has departed from the traditional four-factor test for granting a preliminary injunction.  Neither *Starbucks* nor the cases it cites address the question of when Congress intends to preserve any particular common-law defense in creating a statutory cause of action, let alone the far more specific question of whether Congress preserved unclean hands as a defense in the antitrust laws.

It is true that courts "*generally* presume that Congress legislates against the backdrop of the common law."  *Comcast Corp. v. Nat'l Ass'n of Afr. American-Owned Media*, 589 U.S. 327, 335 (2020) (emphasis added).  But that general presumption yields "when a statutory purpose to the contrary is evident."  *United States v. Texas*, 507 U.S. 529, 534 (1993); *see, e.g.*, *Minerva Surgical, Inc. v. Hologic, Inc.*, 594 U.S. 559, 572 (2021); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 347 (2013).  *Perma Life* establishes that the antitrust laws' "overriding public policy in favor of competition" trumps applications of common-law defenses that would undermine that policy and its private-enforcement scheme.  *Perma Life*, 392 U.S. at 139; *see Gen. Leaseways*, 744 F.2d at 597.  That is a straightforward application of the relevant interpretive principle, and *Starbucks*, which addressed a different question under a different interpretive standard, did not impliedly overrule it.  *Cf. Shalala v. Ill. Council on*

7

*Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("[The] Court does not normally overturn, or . . . dramatically limit, earlier authority *sub silentio*."); *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 798 (2014) ("[The] Court does not overturn its precedents lightly.").

Perhaps recognizing all this, the payors avoid arguing that their unclean hands defense would bar an injunction dissolving the conspiracy. Instead, they seek to assert an unclean hands defense against "any injunction that would have the practical effect of compelling [the payors] to reimburse [1] services that were mischaracterized, medically unnecessary, or otherwise unsubstantiated, or [2] to base reimbursement for those services on [inflated] charges."[4] Defs.' Mot. to Amend at 3–4. That, however, involves how exactly an injunction, if given, should be worded; it is not an affirmative defense.

And under *Perma Life*, the payors cannot use the providers' allegedly improper billing practices to preclude recovery of damages caused by the alleged anticompetitive scheme. "Caused" is the key word. If what the payors mean is that the providers cannot recover as damages amounts that are not attributable to the anticompetitive effects of the alleged conspiracy but rather result from improper billing, that is a viable point: antitrust plaintiffs can recover only for injuries caused by the conspiracy, and more specifically for injuries caused by the conspiracy's anticompetitive effects. *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 123–24 (1969); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also MCI Commc'ns*

---

[4] It is possible that the system that existed before the claimed conspiracy might reward improper billing practices, but under the antitrust laws, horizontal price-fixing among the payors is not an appropriate solution. Providers who engage in improper billing practices are subject to liability for their own illegal conduct. *See Perma Life*, 392 U.S. at 139.

8

*Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161–63 (7th Cir. 1983). But that is a question of causation and the amount of damages; this does not make unclean hands an affirmative defense to liability.

That leaves the prospect of an unclean hands defense against the state law claims. Those claims, at least at this stage, are relabeled versions of the federal antitrust claims. It is possible that unclean hands could be a more viable defense against the state claims, for example, if specific states depart from the *Perma Life* rule in their antitrust or consumer-protection laws. *But see* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 2410 (5th ed. May 1, 2026) (observing that state antitrust laws generally track federal antitrust law); *Ticconi v. Blue Shield of Cal. Life & Health Ins. Co.*, 160 Cal. App. 4th 528, 543, 72 Cal. Rptr. 3d 888, 899 (2008) (stating that unclean hands cannot be used as an absolute defense under a California consumer-protection law). But for now, these state claims and the parties' briefing on them are not sufficiently developed for the Court to determine that an unclean hands defense against any particular state claim (or set of state claims) would be viable even though it is not regarding the federal antitrust claim.

## Conclusion

For the reasons stated above, the Court denies the defendants' motion to amend [dkt. 668].

Date: June 24, 2025

_____
MATTHEW F. KENNELLY
United States District Judge

9