UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: MULTIPLAN HEALTH INSURANCE PROVIDER LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Case No. 1:24-cv-06795<br>MDL No. 3121<br><br>Hon. Matthew F. Kennelly |

**JOINT STATUS REPORT**

The Parties submit the following joint status report pursuant to the Court's Minute Order dated August 14, 2026. ECF No. 811.

## I. Pending Motions Before the Court

**A. Motion to Authorize Targeted Document Preservation Discovery.** Plaintiffs filed their opening motion on September 14, 2026. ECF 826. MultiPlan filed its opposition brief on September 29, 2026. Plaintiffs' reply is due October 6, 2026. Argument will be heard, if necessary, at the October 9, 2026 status hearing.

**B. Motion to Compel Production of Discovery Related to DOJ's Parallel Antitrust Investigations.** Plaintiffs filed their opening motion on September 30, 2026. ECF 836. The Court has not yet set a deadline for any opposition or reply.

**C. Notice of Lodging of Proposed Stipulated Case Management Order Governing Use of Phone Numbers and Phone Carrier Records.** The notice was filed at ECF 837 and a Word version was emailed to the Court's proposed order email address.

## II. Additional Joint Status Conference Topics

### A. Depositions.

**1. Status Update.** CMO No. 36 (Amended Case Scheduling Order) set forth a deadline of September 22, 2026 for the parties to submit a preliminary list of at least 65 expected fact deposition notice recipients. Plaintiffs and Defendants have each done so. On September 9, Plaintiffs served specific deposition notices with proposed deposition dates for a portion of their list, and on September 28 served deposition notices for the remainder. On October 1, Defendants served specific deposition notices with proposed deposition dates for a portion of their list and expect to serve additional specific deposition notices with proposed dates shortly. The parties are currently engaged in good faith discussions regarding scheduling these depositions and will be prepared to provide an update to the Court at the status hearing.

**2. Deadline for Negotiating Plaintiffs' 30(b)(6) Notices and Presenting Disputes to the Court.** Pursuant to CMO No. 36, the last day to serve Rule 30(b)(6) deposition notices is November 24, 2026. On September 18, 2026, Plaintiffs served Defendants with Rule 30(b)(6) deposition notices. Defendants' responses and objections are due on October 16, 2026. Defendants expect to issue their Rule 30(b)(6) deposition notices shortly.

CMO 28 requires that the parties meet and confer in good faith to attempt to resolve any objections to the 30(b)(6) notices and proposed topics for examination, but does not set a timeline for resolution of such process. The parties agree that there should be a deadline for this process as to both Plaintiffs and Defendants, such that the parties should (1) crystallize any disputes within 30 days of the issuance of responses and objections to 30(b)(6) notices and proposed topics for examination; and (2) file any motions related to same within 35 days of the issuance of responses and objections to 30(b)(6) notices and proposed topics for examination.

**3. Good Faith Scheduling of Depositions; Deadline for Identifying 30(b)(6) Witnesses.**

The parties disagree as to the interaction of certain rules in the Deposition Protocol (CMO 28) governing 30(b)(6) deposition scheduling, and have not been able to resolve the difference. The parties' respective positions are below.

**Plaintiffs' Position:**

Plaintiffs request that the Court set a November 30, 2026 deadline for Defendants to identify their 30(b)(6) witnesses (45 days after Defendants' objections and responses to the 30(b)(6) notices are due).

To date, Plaintiffs have noticed 76 of their allotted 145 Rule 30(b)(1) depositions, pursuant to Defendants' request for an early deadline for identifying the first wave of deponents. Defendants, however, indicated that some of these witnesses were likely to serve as 30(b)(6) designees, and requested that Plaintiffs postpone those depositions until the parties resolve disputes over the 30(b)(6) topics to facilitate the ability of the parties to schedule a witness's 30(b)(1) and 30(b)(6) depositions on or near the same day (i.e., on consecutive or near-consecutive days). In the spirit of cooperation, Plaintiffs agreed, but the result has been that Plaintiffs have had to postpone dozens of depositions they noticed for October and November. Among the initial 48 depositions that Plaintiffs have attempted to schedule, Defendants have stated that 30 of those witnesses will potentially be designated as 30(b)(6) witnesses and thus could not be scheduled at this time. Plaintiffs therefore requested a date certain in late November by which Defendants will identify the witnesses who will serve as their 30(b)(6) designees, but Defendants refused.[1]

[1] Plaintiffs have not "backtracked" on their commitment to coordinating Rule 30(b)(6) and Rule 30(b)(1) depositions. Plaintiffs raised this issue with Defendants precisely so that the Parties could

The requested November 30 deadline is warranted to ensure deposition scheduling is efficient and predictable. It gives Defendants ample time to make those designations while ensuring that all Parties can predictably schedule their depositions. If the Court is not inclined to order this new deadline, then Defendants should be ordered to comply with the Deposition Protocol—which expressly permits 30(b)(6) designees to be deposed twice, once as an individual, and once as a corporate representative—and negotiate dates for all of the noticed 30(b)(1) depositions now.

**Defendants' Position:** Plaintiffs seek to change the Deposition Protocol (CMO 28) but do not lay out that CMO's key deposition scheduling provisions for the Court. They are as follows:

- For Rule 30(b)(1) witnesses, CMO 28 Section 4 ("Scheduling and Location of Deposition") starts with a key principle: "The Parties agree that they will work in good faith to coordinate the scheduling of depositions at a mutually convenient time." ECF 663 at 11.

- For Rule 30(b)(6) depositions, CMO 28 Section 3(b) states: "The Party noticed for a Rule 30(b)(6) deposition must identify the individual(s) designated to testify on its behalf and the topic(s) on which such individual(s) is designated to testify no later than fourteen (14) calendar days prior to the commencement of the Rule 30(b)(6) deposition." *Id.* at 9.

- Finally, as to witnesses to be questioned in both Rule 30(b)(6) and Rule 30(b)(1) capacities, CMO 28 Section 3(b) states: "The parties will use their best efforts to notice Rule 30(b)(6) depositions so as to allow the Parties to coordinate the timing of the depositions of a corporate representative designated under Rule 30(b)(6) and the deposition of that individual as a fact witness under Rule 30(b)(1)." *Id.* at 9.

On September 16, 2026, Defendants reached out to Plaintiffs to discuss a good faith scheduling issue resulting from Plaintiffs' issuance of initial deposition notices: the likelihood that some of the witnesses being served with Rule 30(b)(1) deposition notices would be Rule 30(b)(6) designees as well. When the parties met and conferred, Defendants flagged the relevant provisions

---

more effectively coordinate Rule 30(b)(6) and Rule 30(b)(1) depositions without resulting in significant scheduling delays.

of the Deposition Protocol, set forth above, and asked Plaintiffs to work with them in good faith on deferring these limited depositions until the Rule 30(b)(6) objection process was resolved and the Rule 30(b)(6) and Rule 30(b)(1) depositions could be coordinated for the same day. This is a straightforward and standard request in complex litigation, and in circumstances where the parties had also expressly agreed—and the Court had ordered—in CMO 28 that the parties would work in good faith on scheduling and use "best efforts" to coordinate Rule 30(b)(6) and Rule 30(b)(1) depositions, Defendants did not believe this would be an issue. Plaintiffs did not raise any objection or concern at the September 18, 2026 meet and confer.

But Plaintiffs backtracked as part of this JSR drafting process. Plaintiffs now demand either that the Court (1) change the agreed-upon provision in CMO 28 that allows parties to designate their Rule 30(b)(6) witnesses 14 days before such depositions, or (2) order Defendants to have these limited witnesses sit for Rule 30(b)(1) depositions early, regardless of whether they will be Rule 30(b)(6) deponents. Defendants ask that the Court deny Plaintiffs' request.

The parties engaged in extensive negotiations regarding depositions, resulting in the Deposition Protocol entered by the Court as CMO 28. That CMO sets out a clear timeline of 14 days prior to the deposition date for identifying Rule 30(b)(6) witnesses. *Id.* Para. 3(b). This, of course, is *more* than the Federal Rules provide, given parties can simply appear for a Rule 30(b)(6) deposition, day-of, with their designated witnesses—and often do. But the 14-day advance notice in CMO 28 was agreed to (and then entered by the Court) so that the parties taking any such depositions have some time to engage in and prepare for such depositions, knowing two weeks in advance who will be sitting in the seat as the designated witness. Changing that CMO rule to now require a definitive set of Rule 30(b)(6) designees across a huge range of topics, nine months before the close of the fact deposition discovery period, is nonsensical. And Plaintiffs' new "alternative"

proposal—ordering Defendants to simply have all of their witnesses sit for Rule 30(b)(1) depositions regardless of the customary (and CMO-mandated) practice of coordinating those depositions—is simply punitive, and without any basis.

Defendants' view is that there is no reason to now *change* these negotiated provisions of the CMO, and Plaintiffs' self-serving arguments to the contrary are contrived. Of the 76 Rule 30(b)(1) deposition notices Plaintiffs served, Defendants estimate less than a third need to be "deferred" (and that for a very brief period) until the Rule 30(b)(6) objections process works through, and these witnesses can then sit for both Rule 30(b)(6) and Rule 30(b)(1) depositions. By the time of the status hearing, the parties are expected to have noticed roughly 100 Rule (30)(b)(1) depositions across Defendants and Plaintiffs, which will require deposition double-tracking from the early days of the deposition period—so there is no delay whatsoever in overall depositions, and as noted the bulk of these will be scheduled as 30(b)(1) deponents. The fact that a limited portion may be 30(b)(6) designees, and will need to be scheduled in the later part of Q1 (the current schedule of noticed depositions already runs into March 2027) as part of the parties' good faith meet and confer discussions, does not require a change to CMO 28 and a blanket rule that the parties must identify and designate 30(b)(6) deponents now, 9 months before the fact deposition discovery period deadline.

Defendants also do not understand how that would be possible, even in theory, given the efforts and complexity required to identify a comprehensive and locked-in set of witnesses at a time shortly after 30(b)(6) notices were just issued. And for a case of this magnitude—especially given Plaintiffs' burn-the-ground down approach to every discovery issue—it is impossible. The best illustration of this is Plaintiffs' own Rule 30(b)(6) notices. Defendants attach, as just an exemplar, the notice issued to MultiPlan (the notices issued to the other defendants are similar).

*See* Exhibit A, filed herewith. As readily apparent from even a cursory review, the notice does not provide narrowly tailored topics with reasonable particularity as Rule 30 requires.[2] Plaintiffs ask about literally everything. It is not a credible starting position as to Rule 30(b)(6) topics and is particularly troubling here in light of the overall case schedule. And all of this is relevant to the instant issue here because there is no way, at a minimum, that any Defendant can identify their full list of Rule 30(b)(6) designees until well after these topics are discussed and the Court resolves any disputes.

### 4. Pre-Deposition Disclosures

**<u>Plaintiffs' Position</u>:** The Parties are working diligently to ensure that document and text message productions for each deponent are made sufficiently in advance of each deposition to provide the examining party a reasonable opportunity to prepare. However, Defendants have made a number of large document productions in the last few days (well after the substantial completion deadline) with materials relevant to upcoming depositions.[3] Plaintiffs are concerned these delayed productions will continue. Plaintiffs cannot adequately prepare for depositions—30(b)(1) or

---

[2] Rule 30(b)(6) topics must be described with reasonable particularity. Fed. R. Civ. P. 30(b)(6); see *Lang v. Colonial Penn Life Ins. Co.*, 2022 WL 4465719, at *7 (N.D. Ill. Sept. 26, 2022) (finding topics failed to satisfy the reasonable particularity standard of Rule 30(b)(6) and striking from the deposition notice); *Banks v. Office of Senate Sergeant-at-Arms*, 222 F.R.D. 7, 17, 318-19 (D.D.C. 2004) (rejecting as "absurdly overbroad" wide-ranging Rule 30(b)(6) deposition notice that "reads like an interrogatory or a section of a request for production of documents").

[3] At least two Defendants, Aetna and Cigna, recently produced substantial numbers of documents. Between September 18 and 21 alone, Aetna produced 152,726 documents (approximately 19% of its total productions to date), and Cigna produced 71,413 documents (approximately 15% of its total). These late productions are not the small post-deadline productions Plaintiffs anticipated. They are significant document dumps that make deposition preparation exceedingly difficult—particularly when those productions include documents relating to the very 30(b)(1) witnesses Plaintiffs intend to depose.

30(b)(6)—when they do not know what documents remain outstanding or which witnesses Defendants will designate.

In order to ensure the examining parties have adequate opportunity to prepare for upcoming depositions, Plaintiffs have requested that the Parties make the following disclosures by October 8, 2026:

1) Whether document productions are now complete; and
2) Whether a party anticipates making any additional document productions within the next 6-8 weeks, including general information about the size, contents, and custodians whose files will be included in expected productions.
3) Whether document productions are now complete; and
4) Whether a party anticipates making any additional document productions within the next 6-8 weeks, including general information about the size, contents, and custodians whose files will be included in expected productions.

**Defendants' Position:** Plaintiffs raised this as a brand-new proposal in a JSR draft sent Wednesday, two days prior to the filing, and the parties have not conferred about it. Defendants agree with the general proposition that the Parties are working diligently to make additional production—but the sudden imposition of additional and arbitrary deadlines that are not in the Case Schedule, based on misleading premises and false aspersions about Defendants, is improper.

As an initial matter, the Parties agreed that July 30, 2026 was a substantial completion deadline for productions of documents responsive to the parties' Third Sets of Requests for Production ("Third RFPs")—not a deadline by which all responsive documents to all requests would be produced. Defendants substantially completed their document productions in response to Plaintiffs' Third RFPs on July 30, 2026. Since then, Defendants and Plaintiffs both have been

making rolling productions consistent with their discovery obligations. Plaintiffs' characterization of certain Defendants' recent productions as untimely "document dumps" is inaccurate and misleading. These are not "document dumps," they are ordinary course productions in a large, complex litigation.[4] The volume of documents produced reflects the scope and complexity of the discovery requests and number of document custodians—not any lack of diligence or gamesmanship on Defendants' part. It is particularly hypocritical for Plaintiffs to point out additional recent document productions from Defendants as problematic when Plaintiffs are doing the exact same thing—only worse. For example, in response to Defendants' Third FRPs, DAP Community Health Systems (CHS) made a document production of 82,060 documents on September 18, and the Team Health DAPs made productions of 62,184 documents on September 18 and 84,870 on September 24. And the GNS DAPs, in a letter just sent on Wednesday, September 30, noted that they are still working to prepare and serve corrected and/or supplemental document productions for certain DAPs, and are still investigating the scope of collection for certain custodians from which DAPs have produced very little or nothing to date. To the extent they are related to the Third RFPs, the disclosures Plaintiffs seek are simply not necessary.

Plaintiffs' arbitrary deadline of October 8 is also unworkable as applied to subsequent Sets of Requests for Production. Plaintiffs have issued additional RFPs where they have demanded yet more documents and to which Defendants are working through their responses. However, Defendants cannot know in less than a week's time "the size, contents, and custodians" of productions that have not yet materialized. For example, Defendant MultiPlan is working through a huge volume of documents (requested in Plaintiffs' Fourth Set of RFPs) involving source code,

---

[4] Based on Defendants' calculations, of the millions of documents produced by Defendants as of today, Defendants produced approximately 90% of them by the substantial completion deadline; Plaintiffs' equivalent percentage is approximately 83%).

including various technical and client customization document regarding implementation and operation of MultiPlan's Data iSight and Viant source code (related to Plaintiffs' Fourth Set of RFPs). Applying an October 8 deadline to disclose information about work that is actively in progress is not only unreasonable, but impossible to meet.

Finally, Plaintiffs' suggestion that they "cannot adequately prepare for depositions" is also overstated. Plaintiffs have had access to millions of documents produced well in advance of the deposition schedule and have had ample time and opportunity to review those materials. To the extent Plaintiffs have concerns about specific deponents, Defendants have been and remain willing to meet and confer regarding the sequencing and timing of depositions. Defendants expect Plaintiffs to do the same—in fact, Defendants specifically noted for Plaintiffs, weeks ago, that the Parties should work together to ensure there are no outstanding document production issues related to deponents who are scheduled to testify. This is how it ordinarily works: Parties confer in good faith to ensure that the noticing Party cannot later argue the deponent needs to sit again for deposition due to later-produced documents. There is no need for additional arbitrary deadlines.

**5. Deposition of Dr. Bernard Siskin.** On September 9, 2026, Plaintiffs served Dr. Siskin, a statistical consultant who has previously worked with MultiPlan, with a subpoena for deposition. On September 18, Defendants cross-noticed Dr. Siskin. The deposition is currently noticed for October 13, 2026, but will be rescheduled due to unavailability. Pursuant to CMO 28 (Deposition Protocol Para. 7(c)), the parties are conferring regarding the allocation of questioning time for this witness, the scheduling of the deposition, and the appropriateness of certain questioning of Dr. Siskin. The parties will be prepared to address these issues in greater detail at the October 9 hearing to the extent that any still remain open.

## B. Additional Topics.

### 1. Update on Source Code Production.

**<u>Plaintiffs' Position</u>:** MultiPlan's source code is the set of instructions that tells its pricing tools, such as Data iSight, how to calculate the payment amount for a medical claim. On September 11, MultiPlan made portions of that code available to Class Plaintiffs for a "static," in-person review, subject to the stringent protective order MultiPlan requested.[5] That same day Class Plaintiffs' experts began reviewing the code at Latham & Watkins's Los Angeles office, where they are under constant surveillance and limited to pen and paper to document their analysis. The review is laborious, time-intensive, and costly. And DAPs' experts cannot begin their review until the Class's review is complete, as MultiPlan refuses to make the code available in two places at once for security reasons, despite its employees working with the "live" source code, remotely, from multiple locations across the United States.

However, it is now evident that Class Plaintiffs cannot complete their review because MultiPlan omitted essential components of the source code:

- As confirmed below, MultiPlan did not produce key pieces of its pricing code. For example, the Data iSight code refers to eight (8) different possible pricing methods used by Data iSight, but MultiPlan produced code for only one method.
- MultiPlan did not produce historical versions of the pricing code, which would reveal any changes to its pricing methodologies over the course of the alleged conspiracy.[6]

---

[5] Initially, Plaintiffs requested that MultiPlan produce the source code to Plaintiffs in a manner that would allow Plaintiffs to "run" MultiPlan's pricing algorithm with real data in an isolated clean room setting at the office of Plaintiffs' experts. The Court denied that request without prejudice, instead allowing MultiPlan to make its code available for inspection on a laptop at Latham's offices, with no ability to actually run the code. However, the Court invited Plaintiffs to renew their request for a dynamic review (if needed) after their static review was complete.

[6] Compounding the problem, the code produced to date does not have an accurate "last modified" date, so Plaintiffs cannot tell when any of it was last changed or when it took effect. MultiPlan now "expects" to produce historical code "in the next few weeks," but still does not provide a date certain.

- MultiPlan did not produce its client "override" codes, which are instructions (such as, "do not pay more than X") that alter the prices the code would otherwise produce. MultiPlan maintains these override codes in a look-up table.[7]
- MultiPlan did not produce any documentation showing the order the various pieces of pricing code run in. This likely exists in something as simple as a flow chart. The need is acute here: MultiPlan's pricing code was produced out of order with almost no comments or internal documentation—which is highly unusual.[8]

MultiPlan previously agreed to produce all of these items, and Class Plaintiffs expected they would be made available at Latham's office for the review. Class Plaintiffs alerted MultiPlan to gaps in its production on the first day of their review, September 11, and again on September 23. On September 15, MultiPlan indicated it was investigating the matter, but has yet to substantively respond or commit to a date certain by which it will produce the missing materials.

In this JSR, MultiPlan concedes that it has not produced all of the pricing methodologies used by Data iSight (its primary pricing tool), and for the first time admits it never intended to do so. Instead, it is now limiting its production to two "prevalent" pricing methods within Data iSight and Viant. Plaintiffs have no idea what this means, and have certainly never agreed to such a limitation. MultiPlan also touts that it has produced many lines of code. But of the more than 3.5 million lines of code MultiPlan produced, just over 20,000—a fraction of one percent—are the pricing logic, and most of this code is apparently missing.[9] Simply, MultiPlan's line counts are beside the point: it has not produced most of its **pricing logic**, which is the heart of an algorithmic price-fixing case.

---

[7] Again, MultiPlan now says it will produce additional look-up tables "to the extent" it identifies them, but will not commit to a date certain.

[8] MultiPlan says it is searching for flow charts but again commits to no date.

[9] In addition, Plaintiffs' experts estimate that over half of the code produced is publicly available code from the Centers for Medicare & Medicaid Services used to calculate standardized Medicare rates for claims.

MultiPlan also complains it has worked hard toward a September production to accommodate "Class Plaintiffs' preferred timing to begin inspection." But Plaintiffs requested this source code in June 2025, MultiPlan agreed to produce it more than a year ago, and in June, the Court entered the protective order MultiPlan itself proposed. It is now October, and MultiPlan still has not produced much of the code for its core pricing algorithm and now apparently suggests it never intended to. MultiPlan's strategy of delay is abundantly clear; Plaintiffs simply want to keep their review of the code on track.

Given the urgency of this issue, and in order to allow Class Plaintiffs' in-person source code review to be wrapped up expeditiously, Plaintiffs request that the Court order MultiPlan to make available the four categories of materials described above no later than October 19, 2026.

**Defendants' Position:**

Plaintiffs have mischaracterized MultiPlan's source code and source code production on numerous levels. MultiPlan remains willing to work with Plaintiffs on a prompt and reasonable basis, to supplement MultiPlan's existing source code production where relevant and proportionate—and to help Plaintiffs' experts understand the source code. But Plaintiffs' continued aspersions on the source code production process—along with an attempt to broaden its scope without any regard to proportionality are improper.

To level set, as the Court knows, Plaintiffs issued Requests for Production demanding source code for essentially all of MultiPlan's services. *See* Plaintiffs Fourth Set of RFPs at Request No. 80. There was no basis for the production of any source code, given the Court's ruling on Defendants' motions to dismiss together with the other discovery that Plaintiffs are already receiving, but given the centrality of MultiPlan's Data iSight and Viant OON so-called

"algorithmic" repricing methodologies to Plaintiffs' complaints, the parties resolved this by MultiPlan agreeing to produce Data iSight and Viant source code.

MultiPlan has produced that source code, and the production has been extensive. Pursuant to the parties' previous discussions with the Court and CMO 35 (Source Code Protective Order), on September 11, MultiPlan produced, and Plaintiffs' experts began reviewing, MultiPlan's Data iSight and Viant source code in a clean-room setting in Los Angeles. The source code produced encompasses over **3.55 million lines** of routing logic across 3,654 files, over 20,000 lines of Data iSight and Viant pricing logic across 138 files, and over 260,000 lines of Data iSight and Viant building logic across 1,061 files. Class Plaintiffs' experts have currently spent 12 days reviewing the source code; when they are finished, MultiPlan will then create a clean-room set-up in Austin, for DAPs' experts to review. This is the sequence according to Plaintiffs' preference. As Plaintiffs concede, it requires a substantial amount of MultiPlan's resources to sustain a secure clean room environment for such a long, sustained period of weeks, but Plaintiffs' experts are welcome to access the code as frequently and as extensively as they wish.[10]

As Plaintiffs know, MultiPlan offers numerous reference-based pricing methodologies that individual clients can and do select depending on that client's preferences. Within the source code, there are *three* categories of logic, that, when combined together and working in tandem, make up the processes that underscore MultiPlan's reference-based pricing: pricing logic, building logic, and routing logic. For each pricing methodology, MultiPlan must separately identify and compile method-specific pricing logic and building logic spread across thousands of individual files of

[10] Plaintiffs' counsel's aspersions about the clean room process and logistics are just not true. The review has been smooth, with Plaintiffs' experts raising no process or logistical issues, and is proceeding exactly as set forth in the Source Code Protective Order (CMO No. 35). There is no "constant surveillance"—the parties agreed to, and the Court ordered, a clean room process pursuant to CMO No. 35 that is straightforward and absolutely standard in source code review.

source code, which then works in combination with MultiPlan's routing logic. In lay terms, the building logic is the part of the code that, broadly speaking, pulls raw data inputs into tables that the pricing logic then calls upon to generate a recommendation. The routing logic is the part of the code that directs a particular claim to the pricing methodology selected for it by a given client. On top of this, MultiPlan has retained both current/recent and "historical" versions of its Data iSight and Viant source code going back several years, and Plaintiffs have demanded that MultiPlan produce all of those current and historical versions. That extensive demand for source code has required MultiPlan to collect millions of lines of source code logic, across years, for different versions of the code, for each of the three categories of underlying logic.

MultiPlan expended considerable resources and spent months to produce source code for Data iSight and Viant by early September, which was Class Plaintiffs' preferred timing to begin inspection. To accommodate Class Plaintiffs' timeline in this way, MultiPlan prioritized producing source code for the prevalent Data iSight and Viant methods, referred to by method codes known as "F2" and "V2", including pricing, building and routing logic. Plaintiffs have thus received a complete snapshot of that current core source code—with complete pricing, building and routing logic—as was operative in June 2026.

Plaintiffs' suggestion that they do not have source code for the core current pricing logic is thus not true. And their complete dismissal, in this JSR, of the various vital components of Data iSight source code they have received is not credible: if MultiPlan had *not* produced the millions of lines of code for its routing logic and building logic (including historically), the Court can surely imagine how loudly Plaintiffs surely would have complained about "not receiving millions of line of critical source code." Moreover, while MultiPlan's September 11 production included the full current version of the pricing, building and routing logic for its produced Data iSight and Viant

methods, as well as full historical versions of the building and routing codes for those methods, MultiPlan has informed Plaintiffs that it intends to supplement this existing source code even further by producing scripts related to historical versions of the pricing logic, which are maintained in a different format than the historical versions of its building and routing logic, and thus requires an even more time-intensive manual review process. Plaintiffs complain that MultiPlan "omitted" this code from its production (this is Plaintiffs' second bullet point), but MultiPlan has been transparent with Plaintiffs about the longer process MultiPlan needed to review and produce scripts related to historical pricing logic, and expects to supplement its existing production with these historical pricing scripts in the next few weeks.

Since their review began, Class Plaintiffs also have raised other questions regarding the source code and requested additional materials. This is ordinary course, and the parties are conferring and will continue to confer on these issues. But Class Plaintiffs' request that the Court set an arbitrary deadline for completion of this process is without merit, particularly given the magnitude of what Plaintiffs are asking for is potentially massive. Among other things, as set forth in their first bullet point, Plaintiffs have demanded that MultiPlan produce complete sets of its source code for at least five additional pricing methodologies within MultiPlan's FReD system. As a threshold matter, MultiPlan is willing to consider producing source code within its FReD system for certain additional methodologies to the extent Plaintiffs can articulate the relevance and proportionality of such requests. But it is clear that Class Plaintiffs have lost all sense of proportionality at this point. Class Plaintiffs do not even try to argue that the additional pricing methods they want were so widely or prevalently used by MultiPlan's customers during any relevant period so as to justify the burden and expense of a full-scale production of those methods' source code. And their request that the Court order MultiPlan to produce full sets of current and

historical source code for at least **five** additional method codes (without any justification for why they need the source code, as opposed to the many other materials they have) **in less than two weeks** is particularly unworkable. It took MultiPlan almost two months, working flat-out, to prepare and produce the source code for ***two***.

To be clear, MultiPlan remains willing to talk to Plaintiffs about what they may need and why—and to actively look for reasonable grounds to accommodate. But because Plaintiffs insist on putting inaccuracies into a joint filing to the Court, MultiPlan has to correct them.

As to the other categories of materials that Plaintiffs appear to be asking the Court to compel, they either have them or shortly will have them. Regarding their third bullet point, Plaintiffs are simply wrong that MultiPlan has not produced source code that shows how client-specific overrides codes are used. The produced Data iSight and Viant source code already shows how override and configuration values are received and applied by the pricing logic. Moreover, MultiPlan has produced numerous structured data fields within its June 4, 2026 structured data production that reflect the overrides applied to each claim serviced through Data iSight. Plaintiffs have not indicated that they are missing information that they cannot obtain from other sources already produced or shortly forthcoming.

Regarding their fourth bullet point**,** Plaintiffs ignore that MultiPlan has provided extensive technical documentation (including roughly 90,000 documents produced on September 28) in response to Plaintiffs' more recent Fourth Requests for Production—with more to come.[11]

[11] This includes a large volume of documents or other materials related to both global and client-specific changes to various MultiPlan services and/or service configurations, that Plaintiffs have pressed for, and is on top of many thousands of documents previously produced related to source code that MultiPlan produced as part of its overall productions (totaling over 1.1 million documents) to Plaintiffs' primary set of RFPs, the Third Set of RFPs, issued on June 24, 2025.

Plaintiffs' suggestion that they expected such documentation to be waiting in the source code inspection room for them on September 11 is strange because in August, MultiPlan expressly told Plaintiffs that while it intended to make a substantial production of documents in response to Plaintiffs' Fourth RFPs in September, that production would not be ready by early September to accompany the scheduled source code inspection start time. For that exact reason, MultiPlan offered to delay the start of the source code inspection until later in September or early October even in the event that Plaintiffs preferred to wait until they had had the chance to review the documentation production before beginning the clean room. Plaintiffs expressly declined that offer, indicated that they wished to begin the inspection *without* the document production, and MultiPlan accommodated that request—but they don't tell the Court that, instead complaining about a process that they themselves chose. To the extent that MultiPlan identifies additional look up tables, flow charts—or any of the types of documents that Plaintiffs tacked onto their portion of the JSR filing just hours before it was to be filed—as part of its remaining review of certain repositories (which MultiPlan has already told Plaintiffs that it is searching), MultiPlan will produce them promptly and it has never suggested otherwise.

**2. V&E DAPs' Phone Custodians/Production of Text Messages.**

**<u>Plaintiffs' Position</u>:** The bellwether discovery DAPs represented by Vinson & Elkins LLP ("V&E DAPs") dispute that this issue is ripe.[12] The parties are still conferring, and the V&E DAPs will respond to Defendants' September 25, 2026 letter on this issue on or before October 15, 2026. The V&E DAPs will attempt to answer Defendants' questions earlier than that, but they may need

[12] Defendants' section refers to the V&E DAPs generically. In fact, this dispute only relates to certain individuals at Adventist Health System, Community Health Systems, TeamHealth, and Ascension. Defendants' reference to the number of employees working at Houston Methodist and Texas Health Resources is not relevant because there are no disputes at this time with respect to those plaintiffs' cell phone collections.

to ask custodians specific questions about materials cited in Defendants' letter and need time to schedule those interviews. If there are still disputes between the parties, then the V&E DAPs are happy to meet and confer further about those disputes and bring them to the Court on whatever schedule the Court sets for such briefing.

Until September 25, when Defendants made a sudden demand that if the V&E DAPs did not answer numerous questions about over 50 new documents supposedly showing that custodians sent text messages in three business days the parties would be at an impasse, the parties had been working through these issues productively. The V&E DAPs have not categorically refused to produce text messages and are working through custodian-specific issues raised in Defendants' recent letter. The parties should continue to work through these issues and crystalize their disputes for the Court in advance of the next status conference.

Defendants' section contains numerous accusations that are inaccurate and unnecessary to resolving any remaining issues concerning the V&E DAPs' text messages. To the extent it is helpful for the Court, here is context missing from the Defendants' argument. The V&E DAPs followed Special Master Grossman's guidance in identifying cell phone custodians and collected and produced text messages from custodians likely to have substantive business text messages. Defendants first raised concerns about those disclosures on July 24, 2026, less than a week before the substantial completion.

The V&E DAPs reviewed each document Defendants cited and explained in writing on August 13, 20, and 26 why it did not show that a custodian used text messages for substantive business communications. Many concerned non-custodians or former employees whose devices the V&E DAPs do not control; others reflected administrative (such as reminders to sign a document), one-off texts while traveling, or substance already reflected in the produced emails.

The V&E DAPs have not applied a rule that "sent messages count, but received messages don't." Their point is narrower: a document showing only that someone sent a custodian a text, with no indication that the custodian responded, does not by itself show that the custodian uses text messages for substantive business. Defendants took the same position as to their own custodians before the Special Master. Nor did the V&E DAPs apply any such limitation to emails or other documents, which were collected and searched under the ESI Protocol. And the V&E DAPs have never pre-limited their cell phone collections by making preliminary calls on responsiveness. As part of a broader meet-and-confer conversation, the V&E DAPs asked Defendants for information about the RFPs that Defendants believed to be at issue, but this was not intended to suggest the V&E DAPs evaluated responsiveness as part of their collection standard (and the V&E DAPs confirm they did not apply such a criteria).

On September 25, Defendants cited more than 50 additional documents and asked for a response within three business days. The V&E DAPs are reviewing those documents and, where necessary, conferring with the custodians involved. To the extent the V&E DAPs agree to collect from additional custodians, they will produce responsive text messages before those custodians' depositions, which have not yet been noticed.

**Defendants' Position:** Beginning just before the July 30, 2026 substantial discovery deadline, Defendants discovered and identified for V&E Counsel a significant discovery compliance issue with respect to the V&E DAPs: their failure to identify cell phone custodians and search for and produce responsive text messages. Since then, Defendants have uncovered additional indications that V&E DAP custodians used text messages for substantive business purposes and likely have responsive text messages that were neither collected nor produced. Through meet and confer with V&E DAP counsel, Defendants learned, after cell phone discovery

standards were set forth by the Special Master, that the V&E DAPs elected to use a different standard. This was uncovered not through disclosure by V&E counsel but by Defendants only after they identified documents in V&E DAPs' productions that make clear at least some custodians used their cell phones for substantive communications likely to be responsive to Defendants' RFPs. These documents confirmed Defendants' suspicions about the inadequacy of V&E DAPs' cell phone disclosures and discovery: despite representing some of the country's largest multi-state hospital systems and healthcare practices,[13] the V&E DAPs collectively had identified, and defended as adequate, a grand total of 2 custodians for cell phone discovery.

Now we know why. Among other things, rather than assessing whether a custodian was likely to have potentially responsive substantive, non-trivial business text messages and then collecting those phones/searching for responsive texts, V&E DAP counsel limited their collections to only instances in which they determined that a custodian sent such text messages. V&E DAPs repeatedly, including here, have ignored Defendants' stated position that merely receiving a one-off, non-substantive text message would—by itself—not likely be sufficient to meet the Special Master's standard; however, where there is evidence that a custodian sent or received substantive, potentially responsive texts, the standard is met. V&E DAPs also argue that, where content of an email is also in a text message, then V&E DAPs need not collect or produce that text message. That position finds no support in the Special Master's guidance—rather, it concedes that a custodian possesses potentially relevant text messages that were not collected or produced.

They also appear to have improperly made preliminary calls on what was to be deemed responsive to the RFPs, pre-limiting collections, rather than determining if potentially responsive

[13] For example, CHS has approximately 59,000 employees, AHS has 10,000, Methodist has 30,000 and Texas Health Resources has 29,000.

substantive business text messages exist and then collecting the phones to search for responsive texts. Despite describing this approach—which deviates from the standard set by the Special Master—during the meet and confer process, V&E DAPs now suddenly claim that they "followed Special Master Grossman's guidance" in identifying cell phone custodians. Yet, it is only now, in this Joint Statement Report, that V&E DAPs indicate they plan to speak with the relevant custodians about their cell phone usage. Defendants are glad to hear this, but it is much too late. The substantial completion was July 30, 2026—and V&E DAPs' complaint that Defendants only raised their concerns beginning the week before that deadline reflects not Defendants' delinquency in uncovering this discovery gap, but V&E DAPs' lack of diligence in identifying sources reasonably likely to contain responsive materials.

The parties have met and conferred on September 14. V&E counsel asked for additional documents evidencing the existence of potentially responsive text messages by custodians whose phones were not collected and searched, and Defendants have provided a set of additional illustrative examples as requested. V&E DAPs characterize this as a "sudden" demand on 50+ documents. But these were documents V&E DAPs *asked* Defendants to provide on an issue pending since at least July 24. And Defendants' request for a three-day turnaround was *not* on V&E DAPs' views about those numerous examples showing custodians' use of cell phones, but rather for a straightforward commitment that V&E DAPs would deliver on their discovery obligations: that (1) they will collect and search the identified custodians' phones; (2) they will run their cell phone custodian and search process to match the direction of the Special Master, including by not arbitrarily and inexcusably applying a "sent messages count, but received messages don't" standard that has no basis in law or common sense, and (3) V&E DAPs did not also apply this limiting standard (sent but not received) to emails, letters, and other

communications. V&E DAPs commit here to the third item, but their position statement assertion that they have already followed the Special Master's guidance is belied by substantial evidence that responsive text messages were not collected or produced.

Indeed, V&E DAPs both (1) assert that they followed the Special Master's guidance; and (2) defend not having followed the Special Master's guidance by saying their approach matches positions that certain Defendants took prior to the Special Master's ruling. They cannot have it both ways. The only appropriate standard is the one that the Special Master issued and that Defendants have followed.

Defendants raise this issue now because this discovery deficiency is a gating issue for ensuring that Defendants can proceed with Plaintiffs' depositions in an orderly and timely fashion. Waiting until October 15 for V&E DAPs' responses to production deficiencies that were subject to a July 30, 2026 deadline is too long. Further meeting and conferring would surely follow, which would then mean any briefing on the matter would follow further. This unnecessary delay threatens what will already be a jam-packed deposition season. While there is a possibility that Defendants reach resolution with V&E DAPs shortly without the Court's intervention, to date, V&E DAPs have claimed that they need more time to look into these issues, and Defendants believe this issue needs expedited resolution and an expedited motion briefing schedule. Defendants will continue to confer with V&E DAPs on this issue and update the Court of any progress at the status hearing.

**3. GNS DAPs' Production of Documents/Structured Data.**

**<u>Plaintiffs' Position</u>:** Defendants' counsel sent a letter to GNS DAPs' counsel on September 23, 2026, listing issues and questions Defendants have with respect to productions for certain GNS DAPs. Defendants demanded a response within just one week, and GNS DAPs provided

substantive responses to the majority of the issues and questions raised on September 30, 2026, as requested. Several of these issues and questions had already been addressed in prior exchanges.

Few of the issues Defendants raised in the September 23rd letter remain outstanding. GNS DAPs have not refused to provide any documents or structured data to Defendants; and to whatever extent issues remain outstanding, GNS DAPs will continue to work to address those. GNS DAPs are not aware of any dispute for resolution with respect to the issues raised in the September 23rd letter. If a dispute later emerges on any of these issues, the parties will bring that before the Court if they cannot reach resolution otherwise.

**Defendants' Position:** Despite numerous emails and letters to GNS DAPs over the last several months regarding foundational substantive and technical deficiencies in GNS DAPs' structured data and document productions, Defendants have not received meaningful responses (and in some instances no response whatsoever), much less corrections of these issues. Defendants catalogued and re-raised all known deficiencies previously identified in other correspondence in a single letter dated September 23, 2026 in an effort to consolidate the issues for GNS counsel's convenience and facilitate resolution. Plaintiffs' suggestion that GNS DAPs were not previously aware of these deficiencies and only had a week to address them is incorrect.

Defendants' September 23 letter outlined numerous and varied issues across GNS DAPs' structured data and document productions. By way of illustration only, certain GNS DAPs' structured data productions lack patient billing or payment data (e.g., Sadeghi, Luxe Recovery, Wish Recovery); other structured data productions are inconsistent with those Plaintiffs' structured data samples and are missing 20+ fields previously identified (e.g., Luxe Recovery, Tarzana, and Wish Recovery). Further, certain structured data productions (e.g., Sadeghi) have submitted charges, but lack any fields representing health plans or patient payments. And despite promising

that certain structured data productions for Sound DAPs would be replaced by a corrected production in the first week of September, Defendants still have not received that replacement. GNS DAPs' document productions also suffer from myriad technical errors, including among other things, missing metadata fields required by the ESI Protocol.

Finally, and most troubling for the purposes of Defendants' ability to proceed with depositions, DAP Sadeghi disclosed six custodians but have produced no documents whatsoever for half of those custodians, claiming for the first time on September 30 that Sadeghi does not have possession, custody, or control over those custodians' email and other custodial files without explanation as to why these documents have not been preserved nor why this issue has not been raised to Defendants before now.

On September 30, 2026, in response to Defendants' September 23 letter, GNS DAPs acknowledged many of these issues remain outstanding but still have refused to provide a date certain as to when they will be corrected. Defendants have been repeatedly assured (as Plaintiffs have done yet again in their September 30 letter) that a response or resolutions are forthcoming, but the issues remain without any timeline for resolution. These discovery deficiencies need to be resolved before depositions, with enough time to allow Defendants to review GNS DAPs' productions to prepare for depositions. While there is a possibility that Defendants reach resolution with GNS DAPs without the Court's intervention, to date, GNS DAPs have continually said they need more time, and Defendants believe this issue needs expedited resolution and a date certain by which GNS DAPs will address and resolve production deficiencies so that depositions of Plaintiffs can proceed on an appropriate document and data record. Defendants will continue to confer with GNS DAPs on this issue and update the Court of any progress at the status hearing.

**4. Claims Protocol.**

Throughout this year, the Parties have been discussing a possible claims files protocol in which the Parties would jointly agree to produce documents related to specific individual healthcare claims. The parties have to date been unable to reach agreement, and set forth their positions below.

**<u>Plaintiffs' Position</u>:** Plaintiffs believe that the claim sampling protocol proposed by Defendants is unnecessary in light of the extensive amount of structured data and documents produced by Plaintiffs in discovery. Accordingly, Plaintiffs have proposed that the Parties drop the proposed claims sampling protocol at this time. However, Defendants insist that Plaintiffs produce significant additional claims materials for a "sample" of claims. Many of the records Defendants seek through this claims sampling proposal are outside the scope of Defendants' existing Requests for Production and have little to no relevance to this dispute, such as medical records associated with a particular claim. Defendants also seek materials from Plaintiffs that are already in their possession, such as the electronic remittances Defendants sent to Plaintiffs for particular claims. Although Plaintiffs believe that this discovery is disproportionate, Plaintiffs are continuing to meet and confer to determine what, if any, of the additional discovery Defendants seek is appropriate.

**<u>Defendants' Position:</u>** Both sides have issued document requests that seek documents related to individual healthcare claims. Recognizing that the extremely high volume of potentially relevant claims precludes producing the claim file documents for every claim, the parties began negotiating a protocol to select a set of claims for which the parties would produce related claims documents in their possession, custody, or control. Despite many months of negotiations, the parties have been unable to agree on the terms of this protocol, including the covered categories of documents (certain of which Plaintiffs told Defendants for the first time this week that they have

concerns with, despite having had the latest proposed protocol from Defendants since the end of July). Defendants believe they need to identify and develop evidence on individual claims ahead of depositions so that they can adequately examine Plaintiffs' witnesses. Therefore, if the parties are unable to resolve their differences by the date of the upcoming October status conference, Defendants would like to raise a procedure for resolving the parties' impasse with the Court.

**5. Appointment of Settlement Master.**

At the direction of the Court, the parties made proposals concerning nominees to serve as an optional mediator. ECF 650 at 22. If the Court thinks it would be helpful to do so as the case is about to enter depositions, the parties are prepared to discuss such an appointment.

Dated: October 2, 2026

*/s/ Sadik Huseny* .
Sadik Huseny (*pro hac vice*)
**LATHAM & WATKINS LLP**
300 Colorado Street, Suite 2400
Austin, TX 78701
Tel.: (737) 910-7300
sadik.huseny@lw.com

*Defendants' Coordinating Counsel*

*/s/ Shawn J. Rabin (with consent)* .
Shawn J. Rabin (*pro hac vice*)
**SUSMAN GODFREY LLP**
One Manhattan West, 50th Floor
New York, NY 10001-8602
Tel.: (212) 336-8330
srabin@susmangodfrey.com

*Interim Class Liaison Counsel*

*/s/ Christopher A. Seeger (with consent)* .
Christopher A. Seeger
**SEEGER WEISS LLP**
55 Challenger Road 6th Fl.
Ridgefield Park, NJ 07660
Tel.: (973) 639-9100
cseeger@seegerweiss.com

*Plaintiffs' Coordinating Counsel*