# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

| | |
|---|---|
| IN RE: MULTIPLAN HEALTH INSURANCE PROVIDER LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Case No. 1:24-cv-06795<br>MDL No. 3121<br><br>Hon. Matthew F. Kennelly |

**PLAINTIFFS' CORRECTED NOTICE OF RULE 30(B)(6) DEPOSITION OF MULTIPLAN, INC. (NOW KNOWN AS CLARITEV)**

**PLEASE TAKE NOTICE** that pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiffs will take the deposition of a corporate representative of MultiPlan, Inc. (now known as Claritev) ("Defendant") (together with Plaintiffs, the "Parties") on January 11, 2027, beginning at 9:30 a.m. ET, at the offices of Vinson & Elkins, 2200 Pennsylvania Avenue NW, Suite 500 West, Washington, DC, or at such other reasonable time and/or location as the Parties may agree. The deposition will take place pursuant to the parties' agreed-upon Deposition Protocol (CMO 28; ECF No. 663). The deposition will be conducted by oral examination before a notary public or other officer authorized by law to administer oaths and will be recorded using stenographic and videographic means.

Under Rule 30(b)(6), Defendant shall designate one or more officers, directors, representatives, agents, or other persons most knowledgeable regarding all information known or reasonably available to it relating to the topics identified in Exhibit A.

Dated: September 18, 2026

*/s/ Shawn J. Rabin*
Shawn J. Rabin (pro hac vice)
**SUSMAN GODFREY LLP**
One Manhattan West, 50th Floor
New York, NY 10001
Tel: (212) 336-8330
srabin@susmangodfrey.com

*Interim Class Liaison Counsel*

*/s/ Christopher A. Seeger*
Christopher A. Seeger
**SEEGER WEISS LLP**
55 Challenger Road 6th Floor
Ridgefield Park, NJ 07660
Tel: (973) 639-9100
Fax: (973) 679-8656
cseeger@seegerweiss.com

*Plaintiffs' Coordinating Counsel*

# EXHIBIT A

## DEFINITIONS

1. "Action" means *In re MultiPlan Health Insurance Provider Litigation*, Case No. 1:24-cv-06795, MDL No. 3121, pending in the United States District Court for the Northern District of Illinois, including both the class action case and direct action plaintiff bellwether cases.

2. "Adherence" means the extent to which a Payor accepts, follows, uses, applies, or pays claims consistent with a Recommended Amount or other amount calculated, recommended, or returned by one or more of Your Repricing Services, regardless of whether the Payor does so automatically or after manual review, and regardless of the frequency or percentage of claims on which the Payor does so. For clarity, "Adherence" also includes the percentage of OON claims successfully repriced by a Repricing Service for which a Payor uses the Recommended Amount either as the final price paid to a Provider or as the start of a negotiation with a Provider.

3. "Agreement" means a contract, understanding, arrangement, commitment, undertaking, course of dealing, meeting of the minds, common plan, concerted action, or joint action.

4. "Allowed Amount" means an amount used, proposed, recommended, calculated, selected, approved, or paid for an Out-of-Network Service, whether by You or a Payor, including any payment allowance, recognized charge, target amount, negotiated amount, adjusted amount, rate cap, or rate floor.

5. "Appeal Rules" means rules implemented by MultiPlan for adjusting, revising, or re-adjudicating the prices of an OON claim that was initially priced via a Repricing Services after

a Provider inquiry, appeal, or complaint, including rules concerning standing on data, allowing settlement, allow settle/stand, and goals, targets, or limits on the amount that may be offered to a Provider based on an inquiry, appeal, or complaint.

6. "ASO," "Administrative-Services-Only," or "ASO Member" means an administrative-services-only, self-funded, or self-insured arrangement, and the employer, plan sponsor, or group health plan for which a Payor provides claims administration, repricing, network, or cost-containment services without bearing insurance risk, including any such client to whom a Shared-Savings Fee or other fee for OON Services or OON Cost Containment was charged, allocated, or passed through.

7. "Balance Billing" means a Provider billing, seeking, or demanding (whether or not any payment is received) payment from a patient, subscriber, member, guarantor, or financially responsible party for the unpaid difference between the Allowed Amount and the Provider's billed charges for an Out-of-Network Service that is not attributable to Patient Responsibility Amounts.

8. "Broker" means any broker, benefits consultant, benefits advisor, actuarial firm, or other intermediary that advises, procures, evaluates, negotiates, or diligences health benefits, health plans, administrative services, or cost-containment services on behalf of employers, plan sponsors, Subscribers, or members, including Aon, Willis Towers Watson, Mercer, Gallagher, Lockton, and any similar firm.

9. "Claims Data" means any data or information concerning claims for healthcare services, including billed charges, submitted charges, allowed amounts, paid amounts, payment allowances, recognized charges, reimbursement rates, CPT codes, HCPCS codes, DRG or rDRG

values, diagnosis codes, procedure codes, revenue codes, service dates, payment dates, provider identifiers, plan identifiers, claim-line data, plan type, member data, geographic data, network status, appeal data, denial data, adjustment codes, explanation-of-benefits data, balance-billing data, in-network rates, out-of-network rates, cost data, Medicare-based rates, percentile-based rates, and any structured or unstructured data used in connection with Repricing.

10. "Claim Routing Rules" means rules utilized by a client that uses any of Your Repricing Services to route OON claims to a particular Repricing Service, to prioritize or organize the negotiation of particular OON claims, to bypass or skip certain Repricing Services or complementary network services for particular OON claims, or to exclude or blacklist particular Providers. By way of example, Claim Routing Rules includes ProPricer and that machine learning or algorithmic methodologies utilized by your financial and clinical negotiation services to prioritize or organize the negotiation of particular OON claims.

11. "Client-Provided Amount" means an amount that a Payor transmits or provides to You for consideration when calculating a Recommended Amount or the Savings associated with a submitted OON claim, regardless of whether You successfully reprice or negotiate that claim. For clarity, a "Client-Provided Amount" includes a target price, benchmark price, local Blue price, Override, usual and reasonable amount, percentage of FAIR Health, percentage of Medicare, price ceiling, price floor, billed charges, a percentage of billed charges, or the Payor's internally-calculated allowed amount for an Out-of-Network Service.

12. "Communication" means any transmission of words, images, data, or information, whether one-way or more than one-way and regardless of whether any response was made, in any

form or by any means, whether oral, written, electronic, recorded, digital, or otherwise and whether public or private, including without limitation any statement, meeting, presentation, email, text message, instant message, slack message, chat, letter, memorandum, report, slide deck, spreadsheet, phone call, videoconference, conference, seminar, advisory board meeting, forum, trade-association meeting, road show, webinar, or other contact.

13. “Competitive Conditions” means actual or potential competitors, market shares, market power, elasticity of demand, demand and supply conditions, barriers to entry or growth, pricing power, switching between products or services, buying power, and the ability to control prices or exclude competition.

14. “Concerning” means relating to, referring to, describing, evidencing, constituting, reflecting, regarding, analyzing, summarizing, discussing, mentioning, supporting, contradicting, or bearing upon.

15. “Cost Containment” or “OON Cost Containment” means any product, service, program, or activity marketed, sold, purchased, or used to reduce, manage, or contain the amounts paid or payable for Out-of-Network Services, including Repricing, OON Repricing Services, negotiation, benchmarking, and the use of any Repricing Platform.

16. “Data iSight” or “DiS” means MultiPlan’s Data iSight program, methodology, database, algorithm, application, rate-calculation process, Repricing service, claims review unit (and the Toolbox application), client preference process, business criteria process, and any related tool, module, workflow, data input, data output, Override, benchmark, or rate recommendation. For purposes of clarity, “Data iSight” and “DiS” include the facility, outpatient, inpatient, non-

acute, and physician modules, FReD, FReD methods, Duke, and Toolbox, as well as Claim Routing Rules and Appeal Rules utilized in Data iSight workflows.

17. "Document" has the broadest meaning permitted under Rule 34 of the Federal Rules of Civil Procedure and includes all electronically and non-electronically stored information, writings, recordings, correspondence, memoranda, notes, agreements, contracts, policies, procedures, manuals, instructions, photographs, video or audio recordings, presentations, slide decks, spreadsheets, databases, data compilations, code, algorithms, models, reports, studies, analyses, audits, emails, text messages, chat messages, instant messages, voicemails, calendars, meeting minutes, handwritten or typed notes, transcripts, drafts, revisions, metadata, and copies.

18. "FAIR Health" or "FAIR" means FAIR Health, Inc., the independent nonprofit organization that took ownership of the Ingenix UCR database following settlements with the New York Attorney General and became available for use in or around 2010.

19. "Ingenix" means Ingenix, Inc. and any predecessor, successor, subsidiary, database, methodology, service, investigation, settlement, or litigation concerning the historical use of Ingenix data or methodologies to calculate out-of-network reimbursement rates.

20. "In-Network," "INN," or "In-Network Services" means healthcare services furnished by a Provider that has a negotiated in-network contract rate with the applicable Payor or Plan for the patient's claim, as distinct from Out-of-Network Services.

21. "Meetings" means any pitch meeting, presentation, demonstration, business review, quarterly review, annual review, roadshow, client meeting, Client Advisory Board meeting, Claritev Conference, Blue Cross Blue Shield Association forum, or Blue Cross Blue

Shield Association committee or working group meeting where OON prices or Repricing Services were discussed, any ad hoc meeting between or among Payors Concerning OON pricing or Repricing Services, or any other meeting with You or a Payor scheduled to occur at a regular cadence (including weekly, monthly, quarterly, or annual meetings), whether in-person, by videoconference, or by telephone conference.

22. "MultiPlan" means MultiPlan, Inc., Claritev Corporation, MultiPlan Corporation, MultiPlan Holding Corporation, Churchill Capital Corp. III, Viant, Inc., Viant Payment Systems, Inc., National Care Network, LP, National Care Network, LLC, Medical Audit and Review Solutions, Inc., and any current or former parent, subsidiary, affiliate, predecessor, successor, division, department, officer, director, employee, agent, representative, attorney, consultant, contractor, or Person acting or purporting to act on their behalf or at their direction.

23. "Net Effective Discount" means the percentage or dollar amount by which the Allowed Amount or amount paid for an OON Service is less than the billed charge, plan rate, UCR, or other reference price, taking into account any PSAV fee, contingent compensation, shared-savings payment, or other adjustment that reduces the net benefit to the Payor or Plan.

24. "No Surprises Act" or "NSA" means the federal No Surprises Act, Pub. L. No. 116-260, div. BB, and its implementing regulations, including the independent dispute resolution process and qualifying payment amount requirements thereunder.

25. "Other Repricing Services" means Repricing products or services offered by entities other than MultiPlan, such as Zelis ERS.

26. "Out-of-Network Services" or "OON Services" means healthcare services, items,

procedures, treatments, supplies, products, facilities, professional services, or other healthcare goods or services furnished by a healthcare Provider that does not have a negotiated in-network contract rate with the Payor or Plan for the patient's claim, including services for which the patient's Plan provides out-of-network benefits.

27. "Outside Consulting Firm" means any consulting firm, advisory firm, analytics firm, actuarial firm, data analytics provider, management consulting firm, strategy consulting firm, healthcare consulting firm, or other third-party entity or individual retained, engaged, or consulted by You in connection with OON Pricing, OON Repricing Services, or the competitive landscape for OON Services, whether pursuant to a formal engagement agreement or otherwise. This term includes, but is not limited to, McKinsey & Company, Boston Consulting Group, Bain & Company, Deloitte, PricewaterhouseCoopers, Ernst & Young, KPMG, the Segal Group, Bernard Siskin, BLDS LLC, and any of their subsidiaries, affiliates, or successor entities. For the avoidance of doubt, this term does not include Ingenix, FAIR Health, or any entity that is itself a Defendant in this Litigation.

28. "Override" means any setting in any Repricing Platform that alters, constrains, supplements, caps, limits, or replaces a base algorithmic output (or first run price) or otherwise affects the Recommended Amount, Allowed Amount, or Reimbursement Rate, including any client-configurable, MultiPlan-configurable, or system-configurable rule, cap, floor, benefit-limit interaction, margin factor, conversion factor, percentile selection, target price, benchmark, Medicare multiple, percentage-of-charge setting, percentage-of-cost setting, business criterion, client preference, or negotiation parameter. For purposes of clarity, "Override" includes any

default override or standard override utilized by a Repricing Service.

29. “Patient Responsibility Amounts” means the amounts that a health plan member is required to pay for an Out-of-Network Service based on the terms of the member’s health plan, such as co-pays, deductibles, and co-insurance.

30. “Payor” means any health insurance company, health plan, third-party administrator, or other entity that purchases OON Services from healthcare Providers, including but not limited to the Payor Defendants, co-conspirators, and any other entity that has contracted with MultiPlan for OON Repricing Services.

31. “Payor Defendant” means Aetna, Allied National, Benefit Plans Administrators of Eau Claire, Blue Cross Blue Shield of Massachusetts, Blue Cross Blue Shield of Minnesota/Aware Integrated, Blue Cross Blue Shield of Michigan, CareFirst, Centene Corporation, Central States Southeast and Southwest Areas Health and Welfare Fund, Cigna, Consociate, Elevance/Anthem, Health Care Service Corporation, HealthNet of California, Highmark, Horizon/Blue Cross Blue Shield of New Jersey, Kaiser Foundation Health Plan, UnitedHealth Group, and, for each of the foregoing, its parents, subsidiaries, affiliates, and related entities, and any entity through which any of the foregoing issued insurance, administered health plans, or acted as a third-party administrator, served as a managed care organization, served as a third-party administrator, or paid, administered, processed, adjudicated, priced, repriced, negotiated, or reimbursed claims for OON Services.

32. “Person” means any natural person, corporation, partnership, limited liability company, proprietorship, association, joint venture, trust, estate, governmental entity, agency,

department, board, committee, organization, or other legal or business entity.

33. "Plan" means any commercial health insurance plan, PPO plan, fully insured plan, self-funded plan, administrative-services-only plan, hybrid-funded plan, employer-sponsored plan, plan document, certificate of coverage, summary plan description, or other plan or benefit arrangement that provides or administers benefits for healthcare services.

34. "Plaintiff" or "Plaintiffs" means any one or more of the Bellwether Direct Action Plaintiffs and the named Class Representatives in this Action.

35. "Provider" means any healthcare provider or practice that provided, billed for, or sought payment for Out-of-Network Services, including without limitation any such physician, medical practice, hospital, facility, behavioral health provider, therapist, professional corporation, professional limited liability company, group practice, surgery center, or laboratory.

36. "Abrasion" means any actual or anticipated dissatisfaction from Providers, plan members, or Subscribers resulting from low Reimbursement Rates for OON Services.

37. "PSAV" means MultiPlan's percentage-of-savings fee model or any revenue stream, fee, credit, adjustment, rebate, reconciliation, or performance metric based in whole or in part on the difference between Allowed Amounts or Recommended Amount and a Client-Provided Amount or billed charges, including PEPM arrangements, shared-savings arrangements, and any associated performance metrics or adjustments.

38. "Recommended Amount" means an amount of money that You recommend a Payor adjudicate and pay as the Allowed Amount for an Out-of-Network Service, regardless of whether the Payor ultimately utilizes the Recommended Amount or whether You subsequently alter the

Recommended Amount due to negotiations or subsequent review or adjustment of that amount, including via Your Claims Review Unit.

39. "Reimbursement Rate" means any actual, proposed, recommended, calculated, negotiated, approved, allowed, or paid rate, price, amount, percentage, multiple, cap, floor, discount, adjustment, benchmark, allowance, or formula used to determine compensation for Out-of-Network Services.

40. "Relevant Period" means the period for which You produced documents in response to Plaintiffs' Third Set of Requests for Production, unless otherwise stated in a particular topic for examination.

41. "Repricing" means any pricing, repricing, calculation, recommendation, determination, adjustment, review, audit, benchmarking, negotiation, post-payment negotiation, appeal handling, dispute handling, or other process concerning any payment, Allowed Amount, Reimbursement Rate, payment allowance, recognized charge, proposed amount, negotiated amount, adjusted amount, savings amount, or other amount for Out-of-Network Services, whether or not communicated to or accepted by any Provider.

42. "Repricing Platform" means MultiPlan and any product, service, platform, tool, database, algorithm, methodology, program, system, application, workflow, or business process used by MultiPlan or Defendant to price, reprice, determine, calculate, recommend, benchmark, negotiate, review, audit, adjust, or establish any Allowed Amount, Reimbursement Rate, or payment for Out-of-Network Services, including Data iSight, Viant, FRED or Claims Savings Engine, PlanOptix, any "client preferences" process, any "business criteria" process, any

negotiation service, any post-payment negotiation service, and any related product or service.

43. "Repricing Services" or "OON Repricing Services" means MultiPlan's Out-of-Network Services pricing, repricing, negotiation, appeal-handling, and rate-recommendation products and services, including Data iSight, Viant, MARS, HST, FRED, Claims Savings Engine, PlanOptix, Financial Negotiation Services (FNX), clinical negotiation services (CNX), Negotiation Workbench, Claim Routing Rules, Appeal Rules, and any related module, workflow, successor, or rebranded solution.

44. "Savings" means any actual, projected, estimated, calculated, reported, or represented reduction, difference, or avoided cost between billed charges (or another reference amount such as FAIR Health, UCR, Medicare, a Client-Provided Amount, or a target price) and a Recommended Amount, Allowed Amount, or paid amount for Out-of-Network Services, however calculated, labeled, or characterized, and whether calculated by You or any other Person.

45. "Settings" means any client-configurable, MultiPlan-configurable, or system-configurable setting, parameter, rule, cap, floor, percentile, margin factor, conversion factor, Medicare multiple, percentage-of-charge setting, percentage-of-cost setting, business criterion, client preference, target price, benchmark, negotiation parameter, benefit-limit interaction, or other configuration in any Repricing Platform that affects an Allowed Amount, Recommended Amount, or Reimbursement Rate.

46. "Shared-Savings Fee" means any fee, charge, or compensation calculated in whole or in part as a percentage of, or otherwise by reference to, the difference between billed charges (or another reference amount) and the repriced, negotiated, recommended, allowed, or paid amount

for Out-of-Network Services, including any PSAV or percentage-of-savings fee and any portion charged to, allocated to, or passed through to a Payor's Subscriber or ASO Member.

47. "Subscriber" means any employer, plan sponsor, group health plan, policyholder, or other purchaser of insurance or administrative services from a Payor, including any ASO Member, and any member or beneficiary covered thereunder where the context so requires.

48. "Trade Association" means any formal or informal association, group, committee, subcommittee, board, working group, forum, conference, or organization involving health insurers, Payors, managed care organizations, third-party administrators, or healthcare industry participants, including AAPAN, AAPPO, AHIP, BCBSA, HCCI, NAHU, NOLHGA, AMBA, SIIA, and any committee, subcommittee, working group, board, forum, or unit thereof.

49. "UCR" means usual, customary, and reasonable charges, rates, benchmarks, methodologies, data, or determinations concerning compensation for Out-of-Network Services.

50. "White Papers" means MultiPlan-authored, MultiPlan-distributed, Payor-authored, or Payor-distributed Documents describing any Repricing Platform, methodology, input source, data source, algorithmic logic, business criterion, client preference, typical setting, common setting, default setting, recommended setting, Override, rate cap, Medicare multiple, margin factor, benchmark, negotiation parameter, distribution to clients, or use among clients.

51. "You," "Your," or "Defendant" means or refers to Defendant MultiPlan, Inc. (now known as Claritev), its divisions, subsidiaries, related companies, predecessors, and successors, all present and former officers, directors, agents, attorneys, employees, and all Persons acting or purporting to act on behalf of any of them.

## INSTRUCTIONS

1. You must provide testimony concerning the topics for examination for the Relevant Period.

2. Each topic includes Your knowledge, understanding, investigation, analysis, policies, practices, procedures, training, decisions, actions, Communications, Documents, data, systems, records, and the Persons most knowledgeable Concerning the topic, including, for topics Concerning Communications, the participants, dates, and subjects, and, for topics concerning Documents or data, the systems, sources, and custodians where they reside, in each case to the extent known or reasonably available to You.

3. To the extent You object to any topic, You must produce a witness prepared to testify as to the non-objectionable portion of the topic.

4. Plaintiffs reserve their rights to revise and expand the topics of this deposition to account for documents You have or will produce.

## TOPICS FOR EXAMINATION

1. Your ownership, corporate, and business-unit structure relating to OON Repricing and each Repricing Service and the identity, roles, and reporting lines of the Persons responsible for developing, planning, configuring, marketing, pricing, evaluating, supervising, and supporting each of the Repricing Services.

2. Your business plans, financial forecasts, profits, and losses for any business-unit, division, or group containing any of Your Repricing Services.

3. For the time period January 1, 2008 through the date of the deposition on this topic, the acquisition and integration of any of the Repricing Services, including of any predecessor

version of any of the Repricing Services, and Your plans, goals, and analyses of the potential and actual impact of each acquisition on Your OON Repricing business.

4. For the time period January 1, 2008 through the date of the deposition on this topic, the design, development, planning, forecasts, goals, and purpose of each Repricing Service, including, by way of example, White Papers You drafted Concerning the design and purpose of the Repricing Service, baseline Documents or summaries Concerning the design and purpose of the Repricing Service, and analyses Concerning Your Repricing Services.

5. The purpose, goals, design, development, or implementation of significant revisions to each of Your Repricing Services, including revisions to any of Your Repricing Services, including revisions to mark-up or margin factors, standard overrides, default overrides, cost-to-charge ratios, percentiles, gap-fill or missing-value rules, Claim Routing Rules, Appeal Rules, or FReD methods that applied to two or more of Your clients or client codes.

6. The data sources and inputs used by each Repricing Service, including the types of data provided to You by Payors, data sources You acquire from third-parties (including public sources), Your policies and any limitations You set Concerning use of data in connection with any Repricing Service, Your use of data for training of machine learning or algorithms in connection with any Repricing Service, including Claim Routing Rules, Appeal Rules, and Negotiation Workbench.

7. The methodologies used by each Repricing Service to calculate or recommend Recommended Amounts, Allowed Amounts or Reimbursement Rates for OON Services, including formulas, algorithms, and methodologies used for first pass pricing recommendations,

Overrides, and Appeal Rules, including the extent to which there is any variation in the methodologies used for claims repriced for different Payors, the nature of such variations, and the process for deciding on and implementing such variations.

8. The identity and nature of any Settings for Your Repricing Services that can be set or changed by, or provided to You, by Payors; whether You consider or communicated that any Settings for Your Repricing Services were default or standard settings; the frequency with which such Settings are actually changed by Payors from default or standard configurations; Your Communications with Payors Concerning those Settings; and Your internal Communications Concerning actual or potential Settings or changes to Settings for one or more Payors, including client preference forms, defaults, common settings, and any comparison of the Settings used by one Payor to the Settings used by other Payors.

9. The identity and nature of any Client-Provided Amounts or reference prices used by Your Repricing Services, including target prices, benchmark prices, local Blue prices, usual and customary prices, FAIR Health benchmarks, Medicare-based rates, and percentile-based rates, and Your Communications Concerning the selection, use, or modification of such reference prices.

10. The anticipated and actual results of implementing Your Repricing Services, including on Allowed Amounts, amounts paid to Providers for OON claims, Provider revenue and profitability, Savings, PSAV Fees and Shared-Savings Fees, appeals, inquiries, complaints, Provider Abrasion, and Balance Billing.

11. Your process for review and adjudication of initial or first pass pricing calculated by Your Repricing Services, including any automated review or adjudication, any human role(s)

in such review (such as Your claims review unit), how Your claims review unit operates, the types of claims reviewed by Your claims review unit, the use of Your Toolbox application, and the percentage and types of first-pass claims reviewed and adjudicated.

12. Your understanding of, and efforts to understand, estimate, track, or calculate, Adherence to the Recommended Amounts generated by Your Repricing Services and Your understanding of the reasons for any Payor's lack of Adherence to Your Recommended Amounts.

13. The development, proposal, adoption or rejection, implementation, and use of any common pricing, negotiation, or Appeal Rules as part of Your Repricing Services that You applied across two or more Payors, including, by way of example, modifications to mark-up factors and margin factors that applied to two or more Payors.

14. The Claim Routing Rules You use or make, including, by way of example, how OON claims may be routed through multiple Repricing Services sequentially (such as first through Data iSight, then to FNX, then to CNX), the rules You follow for bypassing certain Repricing Services for particular types of Providers, and Your process for blacklisting particular providers.

15. The operation, evaluation, and results of Your financial negotiation service (FNX), including Claim Routing Rules, Settings, Appeal Rules, the data and information provided to negotiators, the platforms, records, and systems used by negotiators, the training and performance analysis or feedback provided to negotiators, the financial or other incentives provided to negotiators, the goals set for negotiators, expected or target turnaround times for OON claims, whether negotiators work on claims from different Payors, the number of claims negotiators are expected to close each day, and the existence of chats or text threads between negotiators working

in Your FNX service line concerning Providers or negotiation tactics.

16. The operation, evaluation, and results of Your clinical negotiation service (CNX or MARS), including Claim Routing Rules, Settings, Appeal Rules, the data and information provided to negotiators, how the scoring and rules functions of MARS and PARS operate in Your CNX workflow, the platforms, records, and systems used by negotiators, the training and performance analysis or feedback provided to negotiators, the financial or other incentives provided to negotiators, the goals set for negotiators, expected or target turnaround times for OON claims, whether negotiators work on claims from different Payors, the number of claims negotiators are expected to close each day, and the existence of chats or text threads between negotiators working in Your CNX service line concerning Providers or negotiation tactics.

17. The operation, evaluation, and results of Your PlanOptix service, including the data and information sources utilized in PlanOptix, pricing and strategy recommendations made or suggested by PlanOptix, and any analyses of trends or changes over time in the data, recommendations, or results of PlanOptix.

18. Analyses, projections, reports, or forecasts Concerning any relationship between Payors' use of Your Repricing Services or Adherence to the Recommended Amounts set by Your Repricing Services on the one hand and Allowed Amounts for OON Services paid by Your clients, Shared-Savings Fees charged by Your clients, or comparisons to how such Payors would otherwise price OON claims on the other hand.

19. The amounts You have been paid by Payors for Your Repricing Services, whether as a PSAV fee, a flat fee, PEPM fee, or another financial arrangement, including the calculation

of those amounts.

20. The development, meaning, purpose, function, modification, and operation of the source code for each of Your Repricing Services.

21. The data systems, databases, and structured data You use in connection with any of Your Repricing Services (e.g., MPI Core, Duke, FrED, Your data warehouse, and Your financial database), including the principal tables, fields, and complete or draft data dictionaries for such systems, training and reference materials Concerning the design, operation or fields in such systems and data, how those systems store and link Claims Data and Repricing results, applicable data-retention practices, and the personnel most knowledgeable about those systems, fields, and data.

22. The names of all Payors that used any of Your Repricing Services during the Relevant Period, which services they used, and when they used those services.

23. Your plans, goals, projections, and efforts to increase the number of Payors using Your Repricing Services and transition Payors from one Repricing Service to another Repricing Service (e.g., from Viant to Data iSight).

24. For the time period January 1, 2008 through the date of the deposition on this topic, Your promotion, marketing, and sales of any of Your Repricing Services to Payors, including Meetings, White Papers, demonstrations, webinars, production explainers, claims regarding the purpose, operation, and results (including projected Savings and revenue) of Your Repricing Services and the basis for such claims, presentations You made to potential clients, and Communications You held or facilitated Concerning Your Repricing Services, including

Communications You facilitated between Payors Concerning OON Repricing, OON pricing, or Your Repricing Services.

25. For the time period January 1, 2008 through the date of the deposition on this topic, the negotiation and terms of Your Agreements with Your Payor clients for Your Repricing Services, including the identity of the individuals involved, any provision addressing a client's ability to modify or decline a Recommended Amount, confidentiality, restrictions on the use of client names and logos, the types of data provided by or to Your clients and restrictions on the use of client data, PSAV Fees, or other fees paid to You for a Payor's use of Your Repricing Services.

26. The methods, formulas, data used to calculate, and actual amounts of any fees charged to Your Payor clients for Your Repricing Services (including PSAV Fees, fixed fees, fee caps, credits, reversals, adjustments, discounts, rebates, revenue-sharing, fee concessions, or other compensation relating to Repricing) and the amounts actually paid by Your Payor clients, including any adjustments or concessions to the fees charged.

27. Your analyses, plans, projections, or Communications comparing the extent and manner of the use of Your Repricing Services by two or more clients, including pricing or negotiation strategy, Allowed Amounts, trends, Overrides, Adherence, or the extent to which a client was he same as or different from one or more of Your other clients with respect to the the extent or manner of using Your Repricing Services.

28. Your Communications or Meetings with one or more of Your clients in which You relayed information Concerning any aspect of another Payor's use of Your Repricing Services, including pricing or negotiation strategy, Allowed Amounts, Overrides, Adherence, or the extent

to which a client was or was not in alignment with one or more other clients, regardless of whether You expressly referenced any Payor by name. This Topic includes, by way of example, Communications or Meetings in which You discussed the benefits of being or remaining in alignment with other Payors concerning OON pricing or OON pricing strategy or the anticipated collective gains from collective adoption or alignment on an OON pricing strategy or methodology.

29. Meetings You attended, held, or facilitated with two or more Payors Concerning OON Repricing Services, OON Allowed Amounts, or OON pricing strategy, including, by way of example, Your Client Advisory Board, Claritev Conference, and Blue Cross Blue Shield Forum meetings, the identity of Your employees or representatives who attended or participated, the identity of Payors present, the subjects discussed, and any Communication of information Concerning Settings, results, plans, goals, or decisions with respect to the use of any of Your Repricing Services.

30. Your Communications at or with Trade Associations Concerning OON prices, OON pricing trends, or OON pricing methodologies and strategy, including the identity of Your employees or representatives who attended or participated, the identity of Payors present, the subjects discussed, and any Communication of information Concerning Settings, results, plans, goals, or decisions with respect to the use of any of Your Repricing Services.

31. Communications or Meetings You have had with Payors Concerning any Payor Defendant's decisions to cease, reduce, or modify use of Your OON Repricing Services, including the reasons for such decisions and any efforts by You to retain such Payor clients, the identity of

Your employees or representatives who attended or participated, the identity of Payors present, and the subjects discussed.

32. Your awareness of Communications among Your clients Concerning two or more of Your clients' use of Your Repricing Services, including pricing or negotiation strategy, Allowed Amounts, trends, Overrides, Adherence, or the extent to which a client was or was not in alignment with one or more other clients.

33. Your determination of whether a claim is for Out-of-Network Services, including the effect of a Provider's participation in any MultiPlan rental network (e.g., PHCS, MultiPlan, Beech Street).

34. Your knowledge, understanding, estimation, analysis, or Communications Concerning the Allowed Amounts or Reimbursement Rates used by Payors for OON Services prior to utilizing Your Repricing Services and comparisons between Allowed Amounts paid by Payors for OON Services before and after utilizing Your Repricing Services.

35. The actual, anticipated, claimed, calculated, estimated, or asserted efficiencies or procompetitive benefits to patients, Subscribers, or Providers associated with, or other procompetitive justifications for, using any of Your Repricing Services, including whether such benefits could be achieved through less restrictive means.

36. The factual basis for any contention by You that any Providers engaged in "egregious billing" or "egregious billing practices" in connection with Out-of-Network Services, including but not limited to: (a) the specific facts, data, analyses, or other evidence on which You rely to support any such contention; (b) how You define the term "egregious billing" or "egregious

billing practices," including any criteria, thresholds, benchmarks, percentiles, or methodologies used; (c) the identity of each Provider named in this Litigation whom You contend engaged in "egregious billing", and the specific billing conduct You contend was "egregious" as to each such Provider; (d) any Communications with other Defendants or third-parties concerning whether any Provider named in this Litigation engaged in "egregious billing"; (e) any Documents, reports, analyses, or studies You prepared, commissioned, or received that support or relate to any contention that a Provider named in this Litigation engaged in "egregious billing" or that it was generally widespread; and (f) whether and how any designation as an "egregious biller" factored into Your Settings, Claim Routing Rules, Adherence decisions, Recommended Amount adjudication, Allowed Amounts, or Reimbursement Rates.

37. Your knowledge, understanding, analysis, or Communications Concerning any Payor's consideration or effort to in-source, develop, or use an in-house or alternative OON pricing method or vendor other than You, including when You became aware of such consideration or effort, the reasons for it, any steps You took to retain the Payor as a client, and any analysis of barriers to switching or the costs a Payor would incur by leaving Your Repricing Services.

38. The marginal, unit, and fully-loaded cost of utilizing each of Your Repricing Services for a single OON claim.

39. Your analyses, reports, or Communications Concerning Competitive Conditions for OON Services and OON Repricing Services.

40. Your knowledge, understanding, estimation, analyses, reports, efforts to track, or Communications Concerning Balance Billing in connection with OON claims that have been

successfully repriced or negotiated using Your Repricing Services, including the prevalence of Balance Billing for OON claims repriced by Your Repricing Services, whether use of Your Repricing Services has any effect on the prevalence of Balance Billing for OON claims, any prohibitions on Balance Billing you imposed or attempted to impose, the prevalence of actual collection or payment of Balance Billing by Providers, and whether You have any evidence that any Plaintiff sent and collected a Balance Bill for any OON claim repriced by Your Repricing Services.

41. Your knowledge, understanding, analyses, reports, estimation, efforts to track, or Communications Concerning Abrasion in connection with Your Repricing Services, including whether use of Your Repricing Services has any effect on the prevalence of Abrasion and whether Your Repricing Services generate Savings with minimal, limited, or no Abrasion.

42. Your representations, disclosures, or Communications to Subscribers, members, Brokers, plan sponsors, or Providers Concerning the nature, use, methodology, costs, fees, or performance of Your Repricing Services, including any representations about how Allowed Amounts are determined, Your role in the repricing process, the fees charged or passed through for OON Repricing Services, any representations about cost savings or Net Effective Discount, and any Communications during claim negotiation, appeal handling, or in response to inquiries from Subscribers, members, Brokers, or Providers.

43. Your use of any Outside Consulting Firms relating to OON Pricing or OON Repricing Services, including any Agreements, contracts, engagement letters, statements of work, amendments, renewals, and termination notices with any Outside Consulting Firm, and any drafts

thereof; any reports, analyses, presentations, models, data sets, spreadsheets, memoranda, recommendations, deliverables, or other work product prepared by, in conjunction with, for, or at the direction of any Outside Consulting Firm; Your policies, procedures, guidelines, or practices governing the sharing of pricing data, claims data, Competitively Sensitive information, or other commercially sensitive information with any Outside Consulting Firms; and Documents concerning any Outside Consulting Firm's provision of services to, or engagement by, any other Payor or Defendant with respect to OON Pricing or OON Repricing Services.

44. Your public representations, disclosures, or Communications Concerning Your OON Repricing Service or Other Repricing Services, including any statements made in earnings calls, investor presentations, shareholder meetings, SEC or regulatory filings, press releases, public websites, marketing materials, responses to media inquiries, legislative or regulatory testimony, Trade Associations, or any other public forum, including the identity of the Person(s) who made or approved such statements.

45. Your knowledge, understanding, analyses, reports, estimation, efforts to track, responses to, or Communications Concerning complaints from or concerns raised by Brokers, Subscribers, plan members, patients, or Providers Concerning Your Repricing Services, including with respect to fees charged to Subscribers for the use of Your Repricing Services, including PSAV Fees and Shared-Savings Fees.

46. Your knowledge, understanding, analysis, or Communications Concerning substitution, switching, or elasticities between OON Services and In-Network Services, whether there is a difference between OON Allowed Amounts and Allowed Amounts for In-Network

Services, whether You manage OON pricing and adjudication separately from In-Network pricing and adjudication, whether there are Providers that provide medical services only on an OON basis, and whether there are regulations that apply only to OON Services.

47. Your knowledge, understanding, analysis, or Communications Concerning the scope and delineation of the relevant geographic market, including whether You and/or Payors have adopted common OON pricing methodologies intended to apply to claims submitted with respect to OON Services provided in all or nearly all states, whether You manage OON repricing on a nationwide basis or on a regional or state-specific basis, and any state-specific or location-specific approaches to OON repricing and adjudication You have adopted and the circumstances that led to adoption of any such approaches.

48. Your reports, analyses, assessments, and competitive intelligence Concerning Other Repricing Services, the identity and nature of any Other Repricing Services, the Persons offering such services, the fee structures for such services, and the extent to which Payors use Other Repricing Services (whether or not a Payor simultaneously uses Your Repricing Services).

49. Your knowledge, understanding, estimation, reports, analyses, or Communications Concerning the Allowed Amounts or Reimbursement Rates used by Payors for OON Services when using any Repricing Service offered by another company and comparisons between Allowed Amounts paid by Payors for OON Services when using Your Repricing Services and when using any Other Repricing Service.

50. Your reports, analyses, knowledge, understanding, estimation, or Communications Concerning Net Effective Discounts, medical loss ratios, actuarial determinations and analyses,

total cost of care, network disruption, network adequacy, and ASO fees associated with Your Repricing Services.

51. Your antitrust, competition, ethics, client confidentiality, and data governance policies and the training You provide to Your executives, sales employees, and senior leadership team concerning those policies.

52. Any suspected or actual violations of Your antitrust, competition, ethics, client confidentiality, and data governance policies with respect to Your Repricing Services or Your Communications, Meetings, or relationships with Payors.

53. Any investigation by the Department of Justice Antitrust Division ("DOJ") concerning MultiPlan's OON Repricing Services, including any civil investigative demands or other requests received by DOJ, any Documents, presentations, white papers, proffers, or other materials provided or presented to DOJ, any investigative hearing, deposition, or interview taken or occurring voluntarily or pursuant to a civil investigative demand from DOJ, and any Communications with DOJ Concerning leniency, conditional leniency, amnesty, or amnesty plus protections.

54. Your knowledge, understanding, analysis, Meetings, or Communications Concerning the legality of Your Repricing Services, whether Your Repricing Services comply with antitrust laws, the extent to which Your Repricing Services are similar to Ingenix, and litigation risks associated with Your Repricing Services.

55. Your handling, repricing, and negotiation of OON claims submitted by the Providers identified as class representatives or bellwether plaintiffs in this Action, including the

Repricing Service or module applied to such claims, the Recommended Amounts generated, any Override applied, any Appeal Rules triggered, any negotiation conducted, and any Claims Data or Client-Provided Amounts used in repricing those claims.

56. When You were aware of the threat of antitrust or unfair competition litigation with respect to Your Repricing Services, including this Action, and the timing and nature of any steps You took to preserve information that may be relevant to this Action, including electronically stored information, texts, or ephemeral messages.

57. Your knowledge of instances during which You or a Payor instructed or suggested that others avoid putting Communications about OON repricing, OON pricing strategy, Payor alignment, or antitrust risk in writing, or move such discussions to phone, in-person, or ephemeral messaging channels, and any policies, practices, or guidance Concerning the use of ephemeral messaging platforms in connection with Your Repricing Services or Communications with Payors.

58. Your responses, objections, amendments, and supplements to Plaintiffs' interrogatories and requests for admission in this Action.

59. The factual basis for Your affirmative defenses.

60. Your facts, data, analyses, Documents, witnesses, and contentions concerning class certification, including numerosity, commonality, typicality, adequacy, predominance, superiority, ascertainability, common proof of impact, common proof of damages, common policies, common data, common methodologies, common Repricing practices, and administrability.

61. Your policies, practices, procedures, Communications, Meetings, analyses, reports, and Communications Concerning Your procedures, strategies, tactics and methods for identifying,

pricing, and negotiating OON claims subject or potentially subject to the No Surprises Act, including guidance, suggestions, or recommendations Your provided to any Payor concerning such procedures, strategies, tactics and methods.

62. Your role, if any, in assisting Payors in determining qualifying payment amounts, initial payment amounts, or arbitration strategies for Out-of-Network claims subject to the No Surprises Act, including any data, methodology, calculation, recommendation, or guidance You provided to Payors for such determination, any Client-Provided Amount used in connection with such determination, and whether claims subject to the No Surprises Act were routed to, excluded from, or repriced by any of Your Repricing Services.

63. Your ability to identify from Your data systems or Claims Data all claims for Out-of-Network Services repriced through Your Repricing Services during the Relevant Period, and for each such claim to identify the Provider (NPI, TIN, name), billed charge, Recommended Amounts, Allowed Amount, amount paid to the Provider, the Repricing Platform or module applied, whether and how the claim was routed through MultiPlan's Repricing Services, any Override applied, whether the claim resulted in Balance Billing and, if so, the amount of any collection thereof or amounts paid by the member — including the queries required and any limitations.

64. Whether the structured data You have produced in this Action contains the fields and keys needed to link individual claims to the responsible Provider, Plan, and Repricing event across Your systems and affiliates, and any limitations on doing so.

65. The composition of MultiPlan's claims database, including the proportion of In-

Network versus Out-of-Network claims data, the sources of that data, its geographic distribution, and any analysis of how including In-Network payment data affects the amounts generated by Data iSight.

66. Your version-control records, change logs, and testing documentation (including any A/B testing or pilot programs) for Data iSight and any successor OON Repricing module, including when and what changes were made to the algorithm and the effect of those changes on the amounts it generates.

67. The authenticity of the documents You produced under Fed. R. Evid 901 and whether the documents You produced are business records within the meaning of Fed. R. Evid. 803(6).

68. MultiPlan's definition of Competitively Sensitive Information, including any definition set forth in its Agreements with insurers, payers, managed care organizations, third-party administrators, or other customers, and any distinction MultiPlan draws between Competitively Sensitive Information and other data received, used, or maintained by MultiPlan.

69. Your knowledge, understanding, analysis, or Communications concerning fraudulent concealment, secrecy, confidentiality, proprietary methodology, provider or patient understanding of Repricing, provider or patient ability to discover the alleged conduct, statutes of limitations, continuing violations, withdrawal, disavowal, or cessation of the challenged conduct.

70. The role, if any, of each Person designated by You to testify pursuant to this Notice in responding to, or otherwise participating in the collection, review, or production of Documents or information called for by, Plaintiffs' discovery requests in this Action.

Dated: September 18, 2026

*<u>/s/ Shawn J. Rabin</u>*
Shawn J. Rabin (pro hac vice)
**SUSMAN GODFREY LLP**
One Manhattan West, 50th Floor
New York, NY 10001
Tel: (212) 336-8330
srabin@susmangodfrey.com

*Interim Class Liaison Counsel*

*<u>/s/ Christopher A. Seeger</u>*
Christopher A. Seeger
**SEEGER WEISS LLP**
55 Challenger Road 6th Floor
Ridgefield Park, NJ 07660
Tel: (973) 639-9100
Fax: (973) 679-8656
cseeger@seegerweiss.com

*Plaintiffs' Coordinating Counsel*

**CERTIFICATE OF SERVICE**

I, Audrey Siegel, hereby certify that on September 18, 2026, I caused a true and correct copy of Plaintiffs' Corrected Notice of Deposition Pursuant to Rule 30(b)(6) of Defendant MultiPlan, Inc. (now known as Claritev) to be served by electronic mail upon counsel of record.

Dated: September 18, 2026,

Respectfully Submitted,

/s/ *Audrey Siegel*
Audrey Siegel