**EXHIBIT 1**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE: MULTIPLAN HEALTH INSURANCE PROVIDER LITIGATION,** | § | **Case No. 1:24-cv-06795**<br>**MDL No. 3121** |
| ***This Document Relates To:*** | § | |
| **AMERICAN PHYSICIAN PARTNERS LIQUIDATING TRUST, HEALTHCARE JUSTICE COALITION, LLC, HEALTHCARE JUSTICE COALITION CT CORP., HEALTHCARE JUSTICE COALITION CA CORP., HEALTHCARE JUSTICE COALITION DE CORP., HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP., HEALTHCARE JUSTICE COALITION NJ, LLC, ECURE CA, LLC**<br>***Plaintiffs,*** | § | **Hon. Matthew F. Kennelly** |
| ***v.*** | § | |
| **MULTIPLAN, INC., MULTIPLAN CORP., VIANT, INC., ET AL.**<br>***Defendants*** | § | |

**<u>COMPLAINT</u>**

Plaintiffs American Physician Partners Liquidating Trust ("APP Trust"), Healthcare Justice Coalition, LLC, Healthcare Justice Coalition CT Corp., Healthcare Justice Coalition CA Corp., Healthcare Justice Coalition DE Corp., Healthcare Justice Coalition of New Jersey Corp., Healthcare Justice Coalition NJ, LLC, eCure CA, LLC, (collectively, "Healthcare Justice"), suing as assignee of and on behalf of APP Trust and NES America Inc. ("NES"), and each of their affiliate out-of-network healthcare providers and provider groups identified herein and on Schedule A attached hereto (collectively, "Plaintiffs"), by and through its undersigned counsel, brings this Complaint against Defendants MultiPlan, Inc., MultiPlan Holding Corporation,

MultiPlan Corporation (f/k/a Churchill Capital Corp. III), Viant, Inc., Viant Payment Systems, Inc., National Care Network, LP, and National Care Network, LLC (collectively, "MultiPlan"), UnitedHealth Group Inc. ("UnitedHealthcare" or "United"), Molina Healthcare, Inc. ("Molina"), Allied National, LLC ("Allied National"), Elevance Health, Inc. (f/k/a Anthem, Inc.) ("Elevance"), Blue Shield of California Life and Health Insurance Company, Horizon Health Services, Inc., Highmark Inc., Centene Corporation ("Centene"), Humana Inc. ("Humana"), Blue Cross Blue Shield of Michigan Mutual Insurance Company ("BCBSMI"), Blue Cross Blue Shield of Massachusetts, Inc., CareFirst, Inc., Health Care Service Corporation ("HCSC"), Kaiser Foundation Health Plan, Inc., Aetna, Inc. ("Aetna"), and The Cigna Group ("Cigna") (collectively, "Defendants"), and alleges as follows:

## I. INTRODUCTION AND NATURE OF THE ACTION

1. For years, the very companies entrusted with paying the doctors and hospitals who save lives in America's emergency rooms have instead run a brazen price-fixing cartel with one ruthless and unmistakable goal: pay those doctors and hospitals as little as they can possibly get away with and pocket the difference for themselves.

2. If this sounds familiar, it should—because these third-party healthcare payors are repeat offenders. They are antitrust recidivists, caught once already colluding to underpay doctors and hospitals for out-of-network care, investigated, exposed, and sanctioned for it. Rather than learn from their wrongdoing, they doubled down and did it again—this time hiding behind a proxy to insulate themselves from liability.

3. For over a decade, from 1996 to 2008, the nation's largest commercial healthcare payors brazenly conspired to fix the prices of out-of-network goods and services nationwide

through a rigged pricing scheme called Ingenix—a scheme so incestuous that Ingenix was secretly owned and operated by one of the very conspirators it was supposed to police: United.

4. By 2008, the payors got caught red-handed. After major investigations, the payors were forced to settle with the New York Attorney General for hundreds of millions of dollars in 2009. As part of those settlements, the payors were compelled to abandon the Ingenix conspiracy entirely and, for five years, use an independent database known as FAIR Health instead of their own collusive, self-serving pricing discretion to set prices for out-of-network services. For the mandated period of time, the payors finally paid the fair and reasonable value for out-of-network services, typically between 70-90% of the out-of-network providers' billed charges. This brief window demonstrated what fair reimbursement should look like when payors were prevented from manipulating the data underlying their own payment obligations.

5. But getting caught did not cure the disease. The payors' motivation to fix and suppress prices for out-of-network services never disappeared—it simply went underground. The payors studied the Ingenix takedown and drew exactly the wrong lesson from it: not to stop colluding, but to stop getting caught. Determined to evade detection this time, the payors devised a scheme to strip providers of their ability to balance bill patients and hatched a plan to launder their conspiracy through a company that was nominally independent and not technically an insurer, so that regulators and the public would not catch on. In other words, they needed a "front."

6. Enter MultiPlan. MultiPlan pitched itself to other payors as having devised a better way to conspire—an "alternative" to Ingenix in which MultiPlan would serve as a "liability shield." This time, the conspirators would hide their conspiracy behind the argument that MultiPlan was not technically an insurer and would attempt to justify their collusion by pointing out that the prices they fixed were at least higher than the unprofitable rates paid by Medicare and

Medicaid. So, as the payors' settlement obligations from the Ingenix conspiracy expired one by one, each payor joined a fresh cartel with its supposed competitors to fix the prices paid for out-of-network services. MultiPlan built that cartel using a web of written contracts and other, less formal understandings.

7. MultiPlan's cartel (the "MultiPlan Cartel") is as simple as it is brazened. MultiPlan and competing payors agreed to stop competing on the prices they pay providers for out-of-network goods and services—entirely. Instead of exercising the independent pricing discretion the antitrust laws required them to exercise, MultiPlan and its competitors agreed to use one common methodology to fix, in lockstep, the prices they pay for out-of-network goods and services.

8. The price-fixing did not stop there. MultiPlan and its competitors went further still, agreeing on the maximum amount they would ever pay for certain out-of-network goods and services—a naked horizontal price cap, agreed upon by direct competitors, of the kind antitrust law has condemned for a century.

9. The cartel members further agreed that MultiPlan would police their agreement by acting as the sole negotiator of out-of-network prices whenever a provider had the temerity to push back on the MultiPlan Cartel's low-ball prices—extinguishing any possibility of genuine, arm's-length negotiation.

10. To effectuate and enforce these agreements, payors funnel petabytes of granular, real-time, and competitively sensitive claims data to MultiPlan. MultiPlan commingles that data—data that competitors would never lawfully share with one another directly—into a massive dataset that it weaponizes to fix prices for out-of-network goods and services.

11. MultiPlan further facilitates and enforces the buyers' cartel by holding frequent private, off-the-record meetings with the other cartel members, where MultiPlan hands out non-

public and competitively sensitive pricing data so the payors can agree on new ways to pay even less for out-of-network goods and services. MultiPlan hosts and continues to host marketing events expressly designed to lock in industry-wide adherence to MultiPlan's pricing methodology, including "client advisory board" meetings at luxury resorts, "road shows" where MultiPlan executives huddle with the executives of competing payors to compare notes on how effectively MultiPlan's methodology is suppressing out-of-network pricing competition and to coach its competitors toward alignment on out-of-network pricing strategy, and secret "white papers" distributed to competitors explaining exactly how MultiPlan's methodology suppresses out-of-network pricing competition. MultiPlan has also directly solicited competing payors to join the conspiracy.

12. When a provider requests payment for out-of-network services from a particular payor, that payor simply hands the request to MultiPlan, and MultiPlan applies its rigged, agreed-upon methodology to dictate a price for that out-of-network good or service that is far lower than what the payor would ever have to pay in a genuinely competitive market. MultiPlan then imposes that price on the healthcare provider, giving the provider only days to respond to what MultiPlan calls an "offer." "Offer" is a fiction. A provider is not technically required to accept the price MultiPlan sets for out-of-network goods and services, but in reality, it has no choice—providers have no ability to negotiate a better price, and if they have the temerity to refuse, MultiPlan simply drives the price even lower as punishment.

13. As a direct result of the MultiPlan Cartel's illegal scheme, the Plaintiffs' providers have been bled of more than a billion dollars—money that should have gone to keeping emergency rooms staffed, hospitals solvent, and life-saving care available to patients across the country. Plaintiffs bring this action to claw back every dollar the Plaintiffs' providers are owed as a result

of Defendants' unlawful price-fixing conspiracy, and seeks treble damages, injunctive relief, interest, costs, and reasonable attorneys' fees to the fullest extent the law allows.

## II. THE PARTIES

### a. Plaintiff and Assignment of Claims

14. Healthcare Justice is an organization whose mission is to pursue full and reasonable payment owed to providers, to protect the accessibility of quality emergency medical care across the United States, and to put a stop to the reprehensible, systemic underpayment to the providers who deliver that care.

15. Healthcare Justice brings this action as assignee of the providers identified below. Each of the providers has, by a Purchase and Assignment Agreement, irrevocably sold, transferred, conveyed, relinquished, and assigned to eCure, LLC, without recourse, all of APP's (through APP Trust) and NES's right, title, and interest in and to its Outstanding Bills (as defined below as to each assignment) owed by Defendants and their affiliated health plans, together with all Legal Causes of Action arising from or related thereto, including without limitation claims for violation of the antitrust laws.

16. The APP Trust received ownership of all assets and rights of APP on March 21, 2024 as a result of the Liquidating Trust Agreement entered in the APP Chapter 11 bankruptcy case. *See* Ex. 1.

17. The APP Trust assigned to eCure LLC the right to APP's outstanding bills:

> 2. Transfer of Outstanding Bills. Assignor hereby sells to eCure as absolute owner, without recourse to Assignor, the Assignor's rights, remedies, titles, and interest in all present and future Outstanding Bills listed in Exhibit F. Assignor shall have no liability to eCure for the failure of Debtor (as defined below) to pay any Outstanding Bills. The purchase of Outstanding Bills hereunder shall be subject to the terms and conditions, representations, warranties, covenants, and agreements contained in this Agreement and the Assignment and Assumption Agreement attached hereto as Exhibit E. Upon purchase, eCure shall have all rights, remedies, titles, and interest in and to any and all Outstanding Bills purchased hereunder.

Exs. 2, 3 (highlighting added).

18. The transfer of all of APP's Outstanding Bills from APP Trust to eCure LLC includes the following rights:

> "Outstanding Bills" means (a) those outstanding bills and accounts of the Trust or APP (i) for which the Trust or APP has not received payment in full directly from a Debtor, or that were processed through a third party arrangement leaving an unsettled balance (including, without limitation, any form of "silent PPO," "leased network," or "umbrella network" form of arrangement) for Underlying Services, and (ii) that are listed on Schedule I attached hereto, and (b) all Legal Causes of Action; provided, however, that Outstanding Bill shall not include any Excluded Claims. The Parties agree that in the event that any In-Network Outstanding Bills are included in Exhibit F of the Purchase Agreement, such In-Network Outstanding Bills shall be deemed included in Schedule I of this Agreement and shall be removed from Exhibit F of the Purchase Agreement without any further action by the Parties. If the Parties included in Schedule I any Outstanding Bill with the understanding that such Outstanding Bill was an In-Network Outstanding Bill but the Parties later discover that such Outstanding Bill was an Out-of-Network Outstanding Bill, such Outstanding Bill may, in eCure's sole discretion, be deemed included in Exhibit F of the Purchase Agreement and removed from Schedule I of this Agreement.

Ex. 3 (highlighting added).

19. A subset of APP's claims were subsequently assigned to Healthcare Justice from Cascade Capital Funding, LLC ("Cascade") who had earlier (in September 2021 and December 2023) purchased certain rights to the claims from the APP Trust. To avoid any doubts about assignment of rights, the APP Trust and Cascade entered into a Second Amendment to the Account Purchase Agreement to clarify that Cascade could sell the right to all Outstanding Bills to eCure LLC. *See* Exs. 4, 5, 6. On May 9, 2025, Cascade sold those rights to eCure LLC:

> 2. Transfer of Outstanding Bills. Assignor hereby sells to eCure as absolute owner, without recourse to Assignor, the Assignor's rights, remedies, titles, and interest in all present Outstanding Bills. Each Outstanding Bill submitted to eCure shall be accompanied by claim information and numbers relating to the Outstanding Bills sufficient to identify the Outstanding Bills. Any failure to provide such information does not limit the Outstanding Bills sold to eCure hereunder. Assignor shall have no liability to eCure for the failure of Debtor (as defined herein) to pay any Outstanding Bills when due and payable under the terms applicable thereto solely as a result of the Debtor's financial inability to pay. The purchase of Outstanding Bills hereunder shall be subject to the terms and conditions, representations, warranties, covenants, and agreements contained in this Agreement and the Assignment and Assumption Agreement attached hereto as Exhibit E. Upon purchase, eCure shall have all rights, remedies, titles, and interest in and to any and all Outstanding Bills purchased hereunder. Notwithstanding the above, eCure does not and shall not assume, become liable for or obligated for any of Assignor's or APP's obligations, liabilities or indebtedness whatsoever, whether known or unknown, direct, contingent or otherwise, related to or associated with any Outstanding Bills or their assignment herein, including but not limited to any allegations or claims of negligent services, malpractice, breach of contract, and/or improper or fraudulent billing asserted by any patient of APP, any health care facility at which APP provides or has provided services, any insurance company or plan to whom Assignor and/or APP submits or submitted Outstanding Bills, or any other party (all such liabilities and obligations of Assignor and/or APP are referred to as the "Excluded Liabilities"). "Debtor" means an insurance company, other company, association, plan, governmental entity or unit, or any other entity (other than a Patient) that is obligated in whole or in part to pay Assignor, APP and/or the American Physician Partners Liquidating Trust ("APP Liquidating Trust"), or otherwise makes payment to Assignor, APP and/or the APP Liquidating Trust for Unpaid Procedures (as defined herein).

*Id*. (highlighting added).

20. In the agreement, Outstanding Bills was defined as follows:

> 2.1. ""Outstanding Bills" means (a) those outstanding bills and accounts of Assignor purchased from APP for which Assignor, the APP Liquidating Trust and/or APP has not received payment in full for Underlying Services directly with the Debtor or that were processed through a third party arrangement leaving an unsettled balance (including, without limitation, any form of "silent PPO," "leased network," or "umbrella network" form of arrangement); and (b) to the extent purchased by Assignor from the APP Liquidating Trust and/or APP, all (i) causes of action, including, without limitation, breach of contract, breach of the covenant of good faith and fair dealing, declaratory relief, violation of statutes, negligence, and estoppels that arise from or relate to the Outstanding Bills, and (ii) Related Claims (collectively, the claims in this clause (b) shall be referred to herein as "Legal Causes of Action"), excluding the portion of Outstanding Bills owing by Patients (the "Excluded Claims"). "Unpaid Procedures" means any Underlying Services, including without limitation evaluations, management services, and other medical, professional, and facility services, for which APP, the APP Liquidating Trust, and/or Assignor has not received payment in full from the Debtors. "Related Claims" means all of Assignor's, APP Liquidating Trust's, and APP's claims against Debtors relating to and/or arising from the Outstanding Bills, including but not limited to all (i) contract claims, (ii) Commercial Tort Claims (as defined in the UCC, "Commercial Tort Claims"), (iii) claims under any unfair competition or unfair trade practices statutes in effect in any jurisdiction, (iv) fraud claims, (v) civil RICO and racketeering claims, and (vi) antitrust claims, along with the right and ability to pursue any remedy available under any such claims, including but not limited to damages, equitable relief (such as, but not limited to, injunctive relief, restitution, and surcharge), declaratory relief, statutory penalties, punitive damages, and attorney's fees. eCure has the right to pursue any of the foregoing claims via any means of its choosing, including without limitation any type of litigation, arbitration, mediation, IDR-type process, class action or otherwise, as permitted by law.

Ex. 5 (highlighting added).

21. Any remaining claims rights not transferred to Healthcare Justice were retained by the APP Trust pursuant to the Liquidating Trust Agreement.

22. NES similarly assigned to eCure LLC the right to all of NES's outstanding bills:

> 2. <u>Transfer of Outstanding Bills</u>. Assignor hereby sells to eCure as absolute owner, without recourse to Assignor, the Assignor's rights, remedies, titles, and interest in all present and future Outstanding Bills which includes without limitation those Outstanding Bills that are: (i) owing by the Debtors identified in Exhibit G, and (ii) arising from Underlying Services rendered in the jurisdictions and in the time periods identified in Exhibit G. Each Outstanding Bill submitted to eCure shall be accompanied by such documentation supporting and evidencing the Outstanding Bills, as eCure shall from time to time request. Within sixty (60) days of execution of this Agreement, Assignor shall provide eCure a Schedule of Outstanding Bills, in the form of <u>Exhibit F</u> attached hereto, which offers further details relating to Outstanding Bills purchased hereunder (a "Schedule"). Any failure to provide such information does not limit the Outstanding Bills sold to eCure hereunder. Assignor shall have no liability to eCure for the failure of Debtor to pay any Outstanding Bills when due and payable under the terms applicable thereto solely as a result the Debtor's financial inability to pay. The purchase of Outstanding Bills hereunder shall be subject to the terms and conditions, representations, warranties, covenants, and agreements contained in this Agreement and the Assignment and Assumption Agreement attached hereto as <u>Exhibit E</u>. Upon purchase, (a) eCure shall have all rights, remedies, titles, and interest in and to any and all (i) Outstanding Bills purchased hereunder, and (ii) Indemnified Claims (as defined herein) and causes of action, including without limitation breach of contract, breach of the covenant of good faith and fair dealing, declaratory relief, violation of statutes, negligence, and estoppels that stem from the Outstanding Bills ("Legal Causes of Action"). Notwithstanding the above, eCure does not and shall not assume, become liable for or obligated for any of Assignor's obligations, liabilities or indebtedness whatsoever, whether known or unknown, direct, contingent or otherwise, related to or associated with any Outstanding Bills or their assignment herein, including but not limited to any allegations or claims of negligent services, malpractice, breach of contract, and/or improper or fraudulent billing asserted by any patient of Assignor, any health care facility at which Assignor provides or has provided services, any insurance company or plan to whom Assignor submits Outstanding Bills, or any other party (all such liabilities and obligations of Assignor are referred to as the "Excluded Liabilities").

Exs. 7, 8 (highlighting added).

23. The transfer of all Outstanding Bills from NES to eCure LLC includes the following rights:

2.1. "Outstanding Bills" means (a) those outstanding bills and accounts of Assignor (i) for which Assignor has not received payment in full for Underlying Services; (ii) that arose from Underlying Services that Assignor performed during a period in which Assignor did not have any kind of payor or other agreement directly with the Debtor or that were processed through a third party arrangement leaving an unsettled balance (including, without limitation, any form of "silent PPO," "leased network," or "umbrella network" form of arrangement), such that Assignor was an out-of-contract provider and would not be limited to a contracted or discounted rate for the Unpaid Procedures (as defined below) rendered to Patients, and (ii) that remain unpaid for more than three hundred sixty five (365) days after the Underlying Services were rendered, and (b) all Related Claims. "Debtor" means an insurance company, other company, association, plan, governmental entity or unit, or any other entity (other than a Patient) that is obligated in whole or in part to pay Assignor, or otherwise makes payment, administers payment, or is involved in any way in determining the amount of payment or whether a claim should be paid to Assignor, for Unpaid Procedures; this definition shall be interpreted as broad as possible to include all entities or parties known or unknown that have any involvement whatsoever in dealing with the reimbursement for medical services provided by Assignor. "Unpaid Procedures" means any Underlying Services, including without limitation evaluations, management services, and other medical, professional, and facility services, for which Assignor has not received payment in full. "Related Claims" means all of Assignor's claims against Debtors relating to and/or arising from the Outstanding Bills, to the extent not already implicitly assigned pursuant to subsection (a) of this Section 2.1, including but not limited to all (i) contract claims, (ii) Commercial Tort Claims (as defined in the UCC, "Commercial Tort Claims"), including but not limited to Commercial Tort Claims described in Exhibit J, (iii) claims under any unfair competition or unfair trade practices statutes in effect in any jurisdiction, (iv) fraud claims, (v) civil RICO and racketeering claims, and (vi) antitrust claims, along with the right and ability to pursue any remedy available under any such claims, including but not limited to damages, equitable relief (such as, but not limited to, injunctive relief, restitution, and surcharge), declaratory relief, statutory penalties, punitive damages, and attorney's fees.

Ex. 8 (highlighting added).

24. eCure, LLC then assigned those rights from APP Trust and NES to Healthcare Justice, for example:

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Assignment Agreement") is by eCure, LLC (the "Assignor") to Healthcare Justice Coalition, LLC (the "Assignee") effective December 1, 2025.

RECITAL

Assignor entered into that certain Purchase and Assignment Agreement with American Physician Partners Liquidating Trust dated as of May 9, 2025 ("Agreement"). Terms not defined herein shall have the meaning ascribed to them in the Agreement.

RECITAL

Assignor entered into that certain Purchase and Assignment Agreement with NES America, Inc. and the entities listed in Schedule C of the Purchase and Assignment Agreement dated as of August 1, 2023 ("Agreement"). Terms not defined herein shall have the meaning ascribed to them in the Agreement.

> 1. The Assignor hereby assigns and transfers to the Assignee all of the Assignor's rights, remedies, title, and interests in the Outstanding Bills. For the avoidance of doubt, this assignment and transfer the Outstanding Bills listed in the schedule attached hereto..
>
> 2. The Assignee hereby accepts the foregoing assignment.

Exs. 9, 10; *see* Exs. 11-22.

25. All requests for payment for the out-of-network goods and services described herein were submitted in the name of, or for the benefit of, the Plaintiffs' providers, which billed the applicable insurers directly for those goods and services.

26. The Plaintiffs' providers are healthcare providers and provider groups that render, or rendered, emergency medicine, hospital-based, and other medically necessary services on an out-of-network basis to patients enrolled in health plans issued, insured, or administrated by Defendants and their co-conspirators. The Plaintiffs' providers include, without limitation, the following:

a. APP is a Delaware limited liability company that was founded in 2015 and managed emergency departments and hospitalists programs across eighteen states. Across the eighteen states, APP operated in approximately 150 hospital and health systems. In 2023, APP was forced into bankruptcy due to the drastic underpayments by payors. Between January 1, 2015 and July 31, 2023, APP provided relevant healthcare services in Alabama, Arkansas, Arizona, , Illinois, Indiana, Kansas, Kentucky, Michigan, Missouri, Mississippi, New Mexico, Nevada, Ohio, Oklahoma, South Carolina, Tennessee, Texas, and Virginia. APP operated through affiliated physician staffing practices, including, without limitation, Acute Care Specialists; APP of Alabama ED, LLC; APP of Alabama HM, LLC; APP of Arkansas ED PLLC; APP of East Tennessee ED PLLC; APP of East Tennessee HM PLLC; APP of Illinois ED, PLLC; APP of Illinois HM, PLLC; APP of Indiana ED, PLLC; APP of Indiana HM, PLLC; APP of Kansas ED, PLLC; APP of

Kentucky ED, PLLC; APP of Mississippi ED, LLC; APP of Nevada ED PLLC; APP of New Mexico ED PLLC; APP of New Mexico HM PLLC; APP of Ohio ED PLLC; APP of South Carolina ED PLLC; APP of Southern Arizona HM, PLLC; APP of Tennessee ED, PLLC; APP of Tennessee HM, PLLC; APPTexasED PLLC; APPTexasHM PLLC; Capital Emergency Physicians Madison PLLC; Capital Emergency Physicians PLLC; Degara APP, PLLC; Emergigroup Physician Associates PLLC; Kalamazoo Emergency Associates, PLC; Kirby Emergency Physicians; Progressive Medical Associates PLLC; San Jacinto Emergency Physicians PLLC; TEP Select Emergency Specialists LLC; Texoma Emergency Physicians PLLC; Town Square Emergency Associates PLLC; Truepartners Comanche Emergency Specialists PLLC; Truepartners Northwest Emergency Associates PLLC; West Houston Emergency Physicians, PLLC; and Woodland's Emergency Physicians, PLLC.

b. APP Trust is a Delaware Statutory Trust established on March 21, 2024, pursuant to APP's confirmed plan of liquidation and the confirmation order entered by the United States Bankruptcy Court for the District of Delaware. Pursuant to APP's confirmed plan of liquidation, all remaining assets of APP, including all reserved estate claims and causes of action, vested in APP Trust.

c. NES is a Missouri corporation that was founded in 1976 managed emergency departments and hospitalists programs across the United States. NES operated across over 50 hospitals nationwide. In 2024, NES was forced into bankruptcy due to the ruthless underpayments by payors. NES operated through affiliated physician staffing practices, including, without limitation, Emergency Medical Services of Lorain, Inc.; HLES of Ohio, Inc.; Lakes/National Emergency Physicians Inc.; Medical Services of Suffolk County P.C.; NES Arizona, Inc.; NES Georgia, Inc.; NES Kentucky, Inc.; NES Louisiana, Inc.; NES Medical Services of Northern

Connecticut, P.C.; NES Medical Services of New England, Inc.; NES Medical Services of New York, P.C.; NES Michigan, Inc.; NES Missouri, Inc.; NES of Sandusky Inc.; NES Oklahoma, Inc.; NES Southwest Medical Services, Inc.; NES Tennessee Inc.; NES Washington, Inc.; NES Western Group, P.C.; and Whitaker National Corporation.

27. Healthcare Justice, in combination with APP Trust, have all rights necessary to prosecute this action on behalf of the APP and NES. Because Healthcare Justice stands in the shoes of the Plaintiffs' providers with respect to the assigned claims, this Complaint refers to the Plaintiffs' providers experience as out-of-network providers subject to Defendants' conduct throughout.

**b. Defendants and Co-Conspirators**

28. MultiPlan, Inc. is a New York corporation. Its principal place of business is located at 115 Fifth Avenue, 7th Floor, New York, NY 10003. MultiPlan, Inc. is wholly owned by MultiPlan Holding Corporation. The ultimate parent company of MultiPlan Holding Corporation is MultiPlan Corporation. MultiPlan Corporation is a publicly traded entity. In 2010, MultiPlan acquired Viant, Inc. ("Viant"), a healthcare cost management company incorporated in Delaware and headquartered in Illinois. In 2011, MultiPlan acquired National Care Network, LP and its affiliate National Care Network, LLC, both healthcare cost management companies incorporated in Delaware and headquartered in Texas. In October 2020, Churchill Capital Corp. III and its related entities acquired MultiPlan, Inc. and its related entities. Churchill Capital Corp. III is a special-purpose acquisition company created to raise funds to take a private company public. It is incorporated in Delaware and headquartered in New York. After completing the acquisition of MultiPlan, Inc. and its related companies, Churchill Capital Corp. III changed its name to MultiPlan Corporation. Unless otherwise specified, this Complaint refers to MultiPlan, Inc.,

MultiPlan Holding Corporation, MultiPlan Corporation, Churchill Capital III, Viant, Inc., Viant Payment Systems, Inc., National Care Network, LP, and National Care Network, LLC collectively as "MultiPlan." According to MultiPlan's website, MultiPlan has an office located in Naperville, Illinois with over 300 employees. MultiPlan's Naperville, Illinois office is its largest office by employee count. In filings with Secretaries of State, MultiPlan lists its mailing address as 535 E. Diehle Road, Naperville, Illinois, 60563. MultiPlan operates as a single integrated business with a single board and executive team, a single set of financial statements, and a single corporate entity overseeing its PPO networks and its claims-suppression business.

29. UnitedHealth Group Inc. ("UnitedHealthcare" or "United") is a Delaware corporation with a principal place of business in Minnetonka, Minnesota. UnitedHealth Group has two divisions: UnitedHealthcare ("United"), which provides health benefits plans, and Optum, which provides health services, including pharmacy benefit manager services. UnitedHealth Group is a vertically integrated healthcare enterprise with a portfolio of wholly owned subsidiaries comprising a massive healthcare ecosystem. These subsidiaries include the largest payor in the United States, United.

30. Molina Healthcare, Inc. ("Molina") is a Delaware corporation with a principal place of business in Long Beach, California. Molina is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

31. Allied National, LLC ("Allied National") is a Missouri limited liability company with its principal place of business in Kansas. Allied National is one of the oldest and largest third-party administrators ("TPAs") in the United States. As a TPA, Allied National performs administrative tasks for health insurance plans, including claims processing and pricing, billing, enrollment, and customer service.

32. Elevance Health, Inc. (formerly known as Anthem, Inc.) ("Elevance") is an Indiana corporation with a principal place of business in Indianapolis, Indiana. Elevance is a member of the Blue Cross and Blue Shield Association, a joint venture of insurance companies that work together to offer their members access to a nationwide network of healthcare providers. Elevance licenses certain trademarks and service marks from the Blue Cross and Blue Shield Association in 14 states: California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, most of Missouri, Nevada, New Hampshire, parts of New York, Ohio, Virginia (except the Washington, D.C. Suburbs), and Wisconsin. Elevance does business under several names, including: Anthem Blue Cross Life and Health Insurance Company, Blue Cross of California, Blue Cross of Southern California, Blue Cross of Northern California, Blue Cross Blue Shield of Georgia, Anthem Health Plans, Inc. d/b/a Anthem Blue Cross Blue Shield of Connecticut, Rocky Mountain Hospital & Medical Service, Inc. d/b/a Anthem Blue Cross Blue Shield of Colorado, Anthem Blue Cross Blues Shield of Nevada, Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross Blue Shield of Indiana, Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross Blue Shield of Kentucky, Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross Blue Shield of Maine, Anthem Blue Cross Blue Shield of Missouri, RightCHOICE Managed Care, Inc., Healthy Alliance Life Insurance Company and HMO Missouri Inc., Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross Blue Shield of New Hampshire, Empire HealthChoice Assurance, Inc.

d/b/a Empire Blue Cross Blue Shield, Community Insurance Company d/b/a Anthem Blue Cross Blue Shield of Ohio, Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia, Anthem Blue Cross Blue Shield of Wisconsin, and Compcare Health Services Insurance Corporation. Elevance is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

33. Blue Shield of California Life & Health Insurance Company ("BSCA") is a health insurance company. It is a California corporation with a principal place of business in Oakland, California. BSCA is a licensee of BCBSA and is licensed to offer Blue Shield-branded health insurance plans in California. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

34. Horizon Health Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey ("Horizon") is a health insurance company. It is a New Jersey corporation with a principal place of business in Newark, New Jersey. Horizon is a licensee of BCBSA and is licensed to offer Blue Cross and Blue Shield-branded health insurance plans in New Jersey. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

35. Highmark Inc. is one of the largest health insurance organizations in the United States. It is incorporated and has its principal place of business in Pittsburgh, Pennsylvania. Highmark is a licensee of BCBSA, and its Blue-branded affiliates are collectively the fourth-largest Blue Cross and Blue Shield-affiliated organization in the country. Highmark is licensed to offer Blue Cross and Blue Shield-branded health insurance plans in Pennsylvania, Delaware, West Virginia, and parts of New York. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

36. Centene Corporation ("Centene") is a Delaware corporation with its principal place of business in St. Louis, Missouri. Centene is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

37. Humana Inc. ("Humana") is a Delaware corporation with its principal place of business in Louisville, Kentucky. Humana is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the United States. The plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

38. Blue Cross Blue Shield of Michigan Mutual Insurance Company ("BCBSMI") is a Michigan mutual insurance company with its principal place of business in Michigan. BCBSMI is a licensee of the Blue Cross Blue Shield Association. BCBSMI is licensed to market health insurance plans using Blue Cross Blue Shield trademarks in Michigan. BCBSMI issues insurance or provides administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

39. Blue Cross and Blue Shield of Massachusetts, Inc. ("BCBSMA") is a Massachusetts corporation with its principal place of business in Boston, Massachusetts. BCBSMA is a licensee of the Blue Cross Blue Shield Association. BCBSMA is licensed to market health insurance plans using Blue Cross Blue Shield trademarks in Massachusetts. BCBSMA issues insurance or provides administrative services concerning healthcare claims that include: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, and/or (3) hybrid-funded health plans.

40. CareFirst, Inc. ("CareFirst") is a Maryland corporation with its principal place of business in Owings Mill, Maryland. CareFirst, through its wholly-owned subsidiaries and affiliates, Group Hospitalization and Medical Services, Inc.; CareFirst of Maryland, Inc.; and CareFirst Blue Choice, Inc., collectively do business as CareFirst Blue Cross Blue Shield. CareFirst is a licensee of the Blue Cross Blue Shield Association. CareFirst is licensed to market health insurance plans using Blue Cross Blue Shield trademarks in the District of Columbia and the counties in Northern Virginia and Maryland that makeup the Washington, D.C. suburbs. CareFirst's insurance plans issue insurance or provide administrative services concerning

healthcare claims that include: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, and/or (3) hybrid-funded health plans.

41. Health Care Service Corporation ("HCSC") is organized as a mutual reserve company under the laws of the state of Illinois with a principal place of business in Chicago, Illinois. HCSC is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the United States, including in Illinois, Montana, New Mexico, Oklahoma, and Texas. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

42. Kaiser Foundation Health Plan, Inc. ("Kaiser") is a California non-profit public benefit corporation with a principal place of business in Oakland, California. Kaiser is the ultimate parent company of several entities including Kaiser Foundation Health Plan of Colorado; Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.; Kaiser Foundation Health Plan of Washington; and Kaiser Foundation Health Plan of the Northwest. Kaiser, through its wholly owned subsidiaries, issues insurance or provides administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and/or (5) Medicaid plans.

43. Aetna, Inc. ("Aetna") is a subsidiary of CVS Health Corporation. It is a Pennsylvania corporation that is headquartered in Hartford, Connecticut. Aetna is one of the largest payors in the United States. It has a commercial insurance network that pays in-network and out-of-network claims from healthcare providers in all 50 states and the District of Columbia. Aetna

is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans and (5) Medicaid plans.

44. The Cigna Group ("Cigna") is a corporation organized under the laws of the State of Delaware, with its principal place of business in Broomfield, Connecticut. Cigna is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans and (5) Medicaid plans.

45. Defendants, Co-Conspirators, and each payor that has executed an out-of-network pricing agreement with MultiPlan (the "competing payors" or the "co-conspirators") have all knowingly abdicated their out-of-network pricing authority to MultiPlan and have taken affirmative acts and made statements in furtherance of the conspiracy. Every member of the MultiPlan Cartel is jointly and severally liable for the acts and omissions of every co-conspirator, whether named in this complaint or not—none of them can hide behind MultiPlan now.

## III. JURISDICTION AND VENUE

46. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, as this action raises federal questions under Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

47. Venue is proper in this Court under Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, because one or more of Defendants maintain business facilities, have agents, transact business, and are otherwise found within the Northern District of Illinois.

48. The Court has personal jurisdiction over Defendants under Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, and Illinois' long-arm statute, 735 Ill. Comp. Stat. 5/2-209(a). Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, may be found in and transact business in Illinois, including by offering health plans in the state; sending confidential, proprietary claims data concerning claims for out-of-network services provided in Illinois to MultiPlan for pricing using MultiPlan's pricing methodology; using MultiPlan's common pricing methodology to set prices and pay claims for out-of-network services provided in Illinois; entering into agreements with counterparties located in Illinois to set prices for out-of-network services using a common pricing methodology; and holding meetings in furtherance of the MultiPlan Cartel with counterparties in Illinois.

49. Defendants' price-fixing conspiracy, as set out in this Complaint, has dramatically affected and remains squarely within the flow of interstate commerce. Healthcare providers paid by MultiPlan and its Co-Conspirators provide goods and services to patients who reside across state lines, and MultiPlan operates its PPO networks nationwide. The conduct of MultiPlan and the members of the MultiPlan Cartel described herein was within the flow of, was intended to, and did in fact have direct, enormous, and reasonably foreseeable anticompetitive effects on interstate commerce throughout the United States.

## IV. FACTUAL BACKGROUND

### I. The MultiPlan Cartel is a Horizontal Price-Fixing Conspiracy.

#### a. MultiPlan Competes Against Other Payors

##### i. *There are Several Types of Competing Payors in the United States.*

50. Each of the Defendants and/or Co-Conspirators in this litigation are payors. Payors set the prices for healthcare goods and services utilized by patients covered by the payors' health plans and then cause payments to be made for those healthcare goods and services. There are several types of payors for healthcare in the U.S., including massive national insurance companies, Blue Cross and Blue Shield health plans, independent health plans, third-party administrators, bill review companies, Taft-Hartly health plans, and other entities that pay medical bills.

51. As of 2020, approximately 298 million individuals out of a total U.S. population of approximately 326 million (91.4%) had some form of third-party payment coverage for healthcare costs. Of those with coverage, 66.5% had private coverage from a commercial third-party payor and 33.5% had coverage from a government payor, such as Medicare or Medicaid.[1]

52. Within the insurance industry, there are different types of healthcare insurance, for example:

a. Commercial Health Insurance is one common type of a payor. Commercial Health Insurance is a contract in which a third-party payor agrees to pay certain future healthcare costs for a subscriber. Commercial Health insurance is one of the most common, but not the only form of commercial third-party payment arrangement utilized by payors.

---

[1] Of those with coverage from a third-party payor, 54.4% had employer-sponsored coverage, 18.4% had Medicare, 17.8% had Medicaid, 10.5% had directly purchased coverage from a commercial third-party payor, 2.8% had Tricare, and 0.9% had coverage through the U.S. Department of Veterans Affairs.

b. A Health Maintenance Organization, or HMO, is a third-party payment plan with a limited network of doctors and facilities that are in-network, restricted patient choice of providers, and very limited out-of-network coverage. HMOs require the selection of a primary care physician and a referral to see a specialist. HMOs often provide integrated care where they directly employ physicians or directly own hospitals.

c. A Preferred Provider Organization, or PPO, is a third-party payment plan that contracts with doctors and facilities to create a network of participating providers. PPOs generally do not require the selection of a primary care physician or a referral to see a specialist. PPO plans are generally more expensive for subscribers, but they offer greater choice of in-network and out-of-network doctors and hospitals.

d. An Exclusive Provider Organization, or EPO, is a third-party payment plan that has a limited network of doctors and facilities with no out-of-network coverage. EPOs generally do not require the selection of a primary care physician or a referral to see a specialist. EPOs are less expensive for subscribers because they offer less choice of physicians and hospitals.

e. A Point of Service Plan, or POS, is a third-party payment plan that combines elements of an HMO and PPO. Like a PPO, it has more enormous coverage for healthcare costs from in-network physicians and facilities, but covers some out-of-network costs. Like an HMO, a POS requires the selection of a primary care physician and a referral to see a specialist.

f. High Deductible Health Plans, HDHPs, are third-party payment plans with a higher deductible and the option to combine coverage with a health savings account, which allows certain expenses to be paid with pre-tax income. HDHPs are generally less expensive for subscribers because of the higher deductibles.

g. Conventional or indemnity plans do not have networks of participating doctors and facilities. Instead, they pay a set percentage of the subscriber's cost for healthcare using fixed benefit amounts defined as a percentage of the provider's billed charges. These plans primarily existed before the growth of HMOs and PPOs and are increasingly rare today.

h. Third Party Administrators, TPAs, are companies that manage the administrative and operational work of health plans. They allow health insurers to outsource several aspects of running a health insurance business, which may be an attractive option for smaller and regional health insurers. Significantly, TPAs receive claims from providers for out-of-network goods and services and adjudicate and price those claims. Prior to the MultiPlan Cartel, TPAs exercised independent business judgment to price and adjudicate those claims. Now, they have abdicated that discretion to MultiPlan.

53. PPOs are the most common type of commercial third-party payment plans offered in the United States.[2]

54. There are two types of funding models for health insurance plans: risk-based (also called "fully insured" or "FI") and ASO (also called "self-funded").

55. Under a risk-based model, the insurance company collects premiums and pays claims. If the premiums exceed the claims, the insurance company profits, but if the claims exceed the premiums, the insurance company carries the risk of loss.

56. Under an ASO model, the employer carries the risk instead—the premiums are paid into the coffers of the employer, and the employer is responsible for paying its employees' claims. The employer pays the insurance company a fixed administrative services fee, per member, per

[2] According to the Kaiser Family Foundation, 47% of Americans who are enrolled in a commercial third-party payment plan are enrolled in PPOs; 29% are enrolled in HDHPs; 13% are enrolled in HMOs; and 10% are enrolled in POS plans.

month (a "PMPM" fee) to administer the ASO plan. Under these ASO contracts, the employers take on the risk and associated insurance companies enter into "shared savings agreements" that permit the insurance company to send out-of-network claims for ASO employers to MultiPlan to set out-of-network prices. Large employers, which make up a substantial portion of the market for commercial insurance, are almost all on ASO contracts. As a result, up to 90% of some payors' business is attributable to ASO contracts.

57. Payors can use multiple models to build networks of healthcare providers, review bills from providers, set prices for services, and pay providers for their services. Payors often do this work directly by assembling their own networks and—absent the conspiracy alleged in this case—exercising their own discretion to review bills, set prices, and pay providers.

58. In many cases, employers with ASO plans turn to TPAs to perform those services on their behalf. TPAs are another form of payor. They are companies that manage the administrative and operational work of health plans. They allow payors to outsource several aspects of running a healthcare payor business. Tellingly, TPAs receive claims from providers for out-of-network goods and services and adjudicate and price those claims.

59. Payors compete with one another in different ways. Some compete to build networks of healthcare providers. Some compete to sign agreements with subscribers to access those networks. One form of competition among payors is relevant to this case. In a market without collusion, each payor should exercise its own independent discretion to set prices for healthcare goods and services. This is known in the industry as claims adjudication and pricing.

60. There are two forms of claims adjudication and pricing: in-network and out-of-network. When a provider agrees to be "in-network," they contract with a payor to accept pre-agreed prices for medical goods and services that are less than the providers' customary charges

for those goods and services, and to not bill in-network patients for the difference between those in-network rates and the providers' customary rates.

61. The difference between in-network and out-of-network pricing varies based on whether the healthcare services were emergency healthcare services provided in a hospital emergency room or non-emergency services.

62. With respect to emergency services, out-of-network pricing is entirely distinct from in-network pricing. Emergency services are performed by hospitals and hospital-based physicians/clinicians in hospital emergency rooms. Patients cannot shop for a doctor who provides them with emergency services. Typically, a patient is experiencing some form of medical distress and goes to the nearest emergency room for treatment. For emergency services performed on an out-of-network basis, there is no up-front pricing negotiation between the provider and the payor prior to a patient receiving healthcare. Instead, out-of-network adjudication and pricing occurs *after* healthcare goods and services have been provided to the patient.

63. For emergency services, healthcare providers have no option but to accept the prices that payors set for out-of-network goods and services. Providers cannot switch between in-network and out-of-network patients with respect to emergency services. They are required by law to treat all incoming patients in need of emergency services regardless of whether those patients are in-network or out-of-network. Nor can providers seek payment from a source other than a third-party payor when emergency services are provided on an out-of-network basis. They are prohibited by law from seeking payment from any source other than the payor for emergency services. Therefore, out-of-network adjudication and pricing is a separate market from in-network claims adjudication and pricing with respect to emergency services. Although emergency providers are required to provide services to out-of-network patients, they are nevertheless harmed by the

MultiPlan Cartel. They are paid less for their out-of-network goods and services than they otherwise would have been paid absent the cartel.

64. For non-emergency services, the MultiPlan Cartel's market dominance leaves providers with no option but to accept the prices imposed upon providers for out-of-network goods and services. Theoretically, healthcare providers can refuse to provide services to out-of-network patients for non-emergency care. However, because the MultiPlan Cartel sets the prices for an overwhelming percentage of out-of-network goods and services, the cartel effectively offers healthcare providers a Hobson's choice with respect to non-emergency services—the healthcare providers can either provide the out-of-network services and be severely underpaid for them (but at least make some revenue) or provide no out-of-network services at all (and forgo all revenue associated with those services). Because of the high fixed costs associated with operating a medical practice (including capital equipment, support staff, licensure, malpractice insurance, and office space), providers are effectively forced to provide out-of-network goods and services despite knowing that they will be severely underpaid for them, just so they can continue to receive the reduced revenues associated with providing those out-of-network services in order to defray those fixed costs. Consequently, healthcare providers who provide non-emergency services are forced to accept artificially suppressed prices set by the MultiPlan Cartel.

**ii. MultiPlan is a Payor and Directly Competes with the Other Members of the MultiPlan Cartel.**

65. MultiPlan is a payor. It operates multiple PPO networks that adjudicate, price, and pay claims for in-network and out-of-network goods and services. With respect to out-of-network services, MultiPlan used to compete the same way that all payors used to compete with respect to out-of-network services. Prior to the MultiPlan Cartel, MultiPlan exercised its independent discretion to set prices for out-of-network goods and services. But, after the cartel began, MultiPlan

stopped exercising its independent discretion. Instead, it conspired with its competitors to pool pricing data and decision-making in its own common pricing methodology.

66. MultiPlan owns and operates several PPO networks—by its own boast, the "oldest and largest independent" PPO network in the United States. The reach of MultiPlan's PPO networks, and thus of the cartel it runs, is staggering. MultiPlan claims its PPO networks have over 1.4 million providers under contract, encompassing approximately "920,000 practitioners, 4,800 acute care hospitals, and 87,000 ancillary facilities"—a footprint that lets MultiPlan dictate terms across virtually the entire U.S. healthcare market.

67. MultiPlan markets its PPO networks to subscribers in two ways: (1) as a complementary or "WRAP" network, and (2) as a primary network.

68. MultiPlan provides competing payors access to a "complementary" PPO network in exchange for a fee. This expands the number of healthcare providers who are effectively "in-network" for the payors contracting with MultiPlan. MultiPlan's "complementary" PPO networks include MultiPlan Network, Beech Street Network, and IHP Network. Payors who purchase access to MultiPlan's PPO networks gain the ability to call the healthcare providers within MultiPlan's network "in-network" in their own PPOs, and the ability to outsource adjudication of claims from those providers to MultiPlan. Payors can then tout the nationwide reach of their networks (comprising their own PPO networks and MultiPlan's) to subscribers and regulators, and command high premiums for the privilege of accessing those networks.[3]

69. MultiPlan also offers "primary" PPO networks, which contract directly with subscribers to give them access to MultiPlan's in-network providers and to pay bills for out-of-network healthcare. A wide variety of entities subscribe to MultiPlan's "primary" PPO networks,

[3] For the avoidance of doubt, claims paid at the contract rates set forth in MultiPlan's wrap network agreements are not at issue in this case. This case concerns only claims priced at out-of-network rates.

including private- and public-sector employers, tribal entities, and union benefit plans. For example, as of January 2021, the University of New Haven, the Mashantucket Pequot Tribal Nation, and UFCW Local 711 & Retail Food Employers Benefit Fund subscribed to MultiPlan's primary PPO networks.

70. Other payors, including members of the MultiPlan Cartel like Humana, United, HCSC, Cigna, Centene, Elevance, and Aetna, also operate their own PPO networks. For instance, Aetna offers Aetna Open Choice PPO plans; Elevance and other Blue Cross Blue Shield entities offer Blue Choice PPO plans; United offers UnitedHealthcare Options PPO plans; and Cigna offers Cigna Healthcare PPO plans.

71. Members of the MultiPlan Cartel also operate WRAP or "rental" PPO networks which compete with MultiPlan's "complementary" networks. For example, Aetna operates First Health Group Corporation (a rental PPO network provider), Elevance similarly operates HealthLink, Inc. (same), Human operates ChoiceCare PPO (same), and Cigna operates Cigna PPO Network (same).

72. MultiPlan operates its PPO networks just as competing payors operate their own PPO networks. MultiPlan signs Participating Professional Group Agreements with physicians' groups and Participating Facility Agreements with hospitals and surgical centers. It ensures that participating healthcare providers meet certain credentialing requirements, issues administrative handbooks to participating providers, audits the billing and medical records of participating providers, and conducts on-site reviews of participating providers' offices to ensure that they are complying with the terms of their agreements with MultiPlan. It also enters into agreements with healthcare providers regarding the amount that the healthcare providers will be paid for providing services to patients in MultiPlan's networks.

73. It is widely recognized that MultiPlan competes against other payors. Numerous hospital groups list MultiPlan, Aetna, Elevance, Cigna, Kaiser, United, and other Defendants or Co-Conspirators as having PPO plans that they accept either for in-network or out-of-network care.

74. Like other payors, MultiPlan makes money from each of these PPO networks by contracting with insurers and others to permit their plan beneficiaries to access the medical providers who are signed up with the networks.

75. MultiPlan holds licenses to operate its PPO networks in various states. For example, in New Jersey, MultiPlan and its subsidiaries, Private Healthcare Systems, Inc. and Beech Street Corporation, are certified to operate as an Organized Delivery System ("ODS") (an ODS is a legal entity that includes PPOs). Likewise, South Dakota lists MultiPlan, Private Healthcare Systems, and Beech Street Corporation as managed care contractors. In Washington state, MultiPlan is registered as a Healthcare Benefit Plan Manager, which is an entity providing services or acting on behalf of a health carrier or employee benefits program.

76. MultiPlan is registered with the Maine Bureau of Insurance as a Preferred Provider Arrangement. In its annual disclosures, MultiPlan says that it "negotiates discounted reimbursement rates for health care services with the providers in the network. Participating Providers agree, through the provider agreement, to accept the negotiated discounted reimbursement rates for health care services provided to enrollees and bill enrollees only for applicable copay, deductible and/or co-insurance."

77. MultiPlan also holds certifications and accreditations from healthcare insurance industry organizations. For instance, since August 2001, MultiPlan has held a certification for credentialing and recredentialing from the National Committee for Quality Assurance ("NCQA"),

an industry association that provides independent health plan accreditations. Similarly, MultiPlan has received an accreditation for healthcare insurance network credentialing from the Utilization Review Accreditation Commission ("URAC"), an organization that credentials health plans, pharmacies, and provider organizations.

78. MultiPlan's networks explicitly compete against TPAs. MultiPlan's PPO networks have filed applications for a certificate of authority with the Texas Department of Insurance to do business as a TPA.

79. MultiPlan cannot escape its own admissions that its PPO networks compete against other payors' PPO networks. In an Annual Report filed with the SEC on March 1, 2023, MultiPlan admitted in black and white: ***"We also compete with PPO networks owned by our large Payor customers[.]"*** MultiPlan's 2021 and 2022 Annual Reports contained similar admissions—admissions that conveniently vanished from MultiPlan's SEC filings the moment MultiPlan was sued for conspiring with its competitors in violation of federal antitrust law.

80. In an August 2020 presentation, MultiPlan's then-Chief Revenue Officer, Dale White, explained that MultiPlan "compete[s] with regional PPOs . . . and network aggregators[.]" In a slide deck accompanying the presentation, MultiPlan listed First Health, a PPO network owned by Aetna, as a selected competitor.

81. MultiPlan's former CEO, Dale White, said the quiet part out loud, openly admitting that MultiPlan competes with other payors at the November 29, 2023, Piper Sandler Healthcare Conference, where he candidly conceded, ***"Our clients are our competitors; our competitors are our clients."***

82. Prior to the MultiPlan Cartel, all of MultiPlan's PPO networks, regardless of whether they are marketed as primary networks or complementary networks, competed against

other payors with respect to out-of-network claims pricing and adjudication. MultiPlan and the other members of the MultiPlan Cartel exercised their independent judgment to set and negotiate the prices they paid for out-of-network goods and services. Absent the MultiPlan Cartel, payors competed with one another to adequately compensate providers for out-of-network goods and services because they understood that it was in their unilateral economic self-interest to ensure that providers would accept the payors' patients on an out-of-network basis. In a market without collusion, providers had the ability to leverage payors against one another when negotiating the prices of out-of-network claims. If Aetna and Cigna were paying $900 for an out-of-network procedure, a provider could point to that fact if United attempted to pay $700 for the same out-of-network procedure. This ability to compare prices from competing buyers is key to all sellers ensuring that their goods and services are sold in a marketplace free from collusion.

83. MultiPlan admits that it specifically competes against other payors on the basis of out-of-network claims adjudication and pricing. In MultiPlan's 2022 10-K, MultiPlan explains that its services address "claims adjudication and pricing."

84. MultiPlan competes against other payors on the basis of out-of-network claims adjudication and pricing regardless of whether MultiPlan's PPO networks are characterized as primary networks or "rental"/complementary networks.

85. Other payors recognize that MultiPlan is a competing payor. John Haben, the former Vice President of Networks at United, has testified under oath that "MultiPlan has the largest network in the country . . . . They have a broad network. Broader than United."

86. Similarly, in a prepared statement before the United States House of Representatives Judiciary Committee Subcommittee on Regulatory Reform, Commercial and Antitrust Law on September 29, 2015, Elevance's then-CEO Joseph Swedish explained that

"traditional insurance providers" and "companies offering rental networks (e.g., MultiPlan . . .)" are engaged in "robust competition."

87. Hospital systems refer to MultiPlan as a "payor" of in-network and out-of-network claims in public filings. For example, Mountain State Health Alliance and Wellmont Health System, two hospital systems operating in the Appalachia Highlands, listed MultiPlan as a "Payor" in their Application for a Letter Authorizing a Cooperative Agreement to the Commonwealth of Virginia.

88. The U.S. Federal Trade Commission has stated that MultiPlan is a payor on multiple occasions. In a 2010 administrative complaint against the Minnesota Rural Health Cooperative, the Federal Trade Commission listed payors operating in certain areas of Minnesota, including MultiPlan. In a March 23, 2006, administrative complaint against Healthcare Alliance of Laredo, L.C., the U.S. Federal Trade Commission listed MultiPlan as a "payor" that does business in Laredo, Texas area. Similarly, a 1998 Consent Order between the Federal Trade Commission and North Tahoe Medical Group, Inc. lists MultiPlan as a "payer."

89. The Department of Justice ("DOJ") also considers MultiPlan a payor. In a February 2011 complaint filed against United Regional Healthcare System, the DOJ and the State of Texas alleged that "[c]ommercial health insurers include managed-care organizations (such as Blue Cross Blue Shield, Aetna, United, CIGNA, Accountable, or other HMOs or PPOs), rental networks (such as Beech Street, Texas True Choice, Multiplan, and PHCS), and self-funded plans . . . . Although not all of these are risk-bearing entities, they can be referred to collectively as 'commercial health insurers.'"

90. Other federal agencies have identified MultiPlan as a payor. In an October 31, 2018 decision and order, the Provider Reimbursement Review Board noted that MultiPlan *paid* $35,889.97 to a provider in connection with a kidney transplant.[4]

91. Other entities have represented to federal antitrust agencies that MultiPlan is a payor. In a June 19, 2009 letter to the Antitrust Division of the U.S. Department of Justice, the Pacific Business Group on Health, the California Public Employees' Retirement System, and the California Health Care Coalition represented to the Antitrust Division of the Department of Justice that "there are dozens of entities offering health care coverage . . . in California today, . . . including Aetna, Blue Cross of California, United, CIGNA, . . . and MultiPlan."

92. MultiPlan even complies with government regulations that apply to payors. In October 2020, the Centers for Medicare and Medicaid Services ("CMS") finalized a rule known as the Transparency in Coverage Rule, which, among other things, requires group health plans and health insurance issues to make information available on their websites in a machine readable format concerning their negotiated rates with in-network providers and historical billed charges and allowed amounts. In April 2022, in accordance with the rule, MultiPlan produced network rate files for its PHCS network, Beech Street network, HealthEOS network, HMA network, and MultiPlan network. MultiPlan also produced out-of-network allowed amounts and billed charges to its MultiPlan network, Beech Street network, and IHP network. MultiPlan made similar machine-readable files available again in December 2023.

93. MultiPlan, its competitors, and government regulators are right to consider Multiplan a competing payor. Like other payors, MultiPlan's PPO networks accept claims from

[4] The Provider Reimbursement Review Board is an independent panel to which a certified Medicare provider of services may appeal if it is dissatisfied with the final determination of a payment made by the Centers for Medicare and Medicaid Services. See 42 C.F.R. § 405, Subpart R.

healthcare providers using either pre-approved paper forms or via electronic data interchange. Healthcare providers submit claims directly to MultiPlan's PPO network. For example, below is a claim submitted to MultiPlan for a $927 charge for an emergency room visit.


Submitter : 133068979 (MULTIPLAN 837 MEDICAL)

1500 Claim TPA ID : [redacted]
Claim Total : $927.00

Patient's Acct# : [redacted]
Batch Number : [redacted]
CCN# : [redacted]
HIC Number : n/a

HEALTH INSURANCE CLAIM FORM
UNOFFICIAL/NOT YET APPROVED BY N.U.C.C. 02/12

PICA PICA

1. MEDICARE (Medicare#) MEDICAID (Medicaid#) TRICARE (ID#/DoD#) CHAMPVA (Member ID#) GROUP HEALTH PLAN (ID#) FECA BLK LUNG (ID#) OTHER X (ID#)

[redacted]

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)
10. IS PATIENT'S CONDITION RELATED TO:
a. OTHER INSURED'S POLICY OR GROUP NUMBER
a. EMPLOYMENT? (Current or Previous) YES NO
b. RESERVED FOR NUCC USE
b. AUTO ACCIDENT? YES NO PLACE (State)
c. RESERVED FOR NUCC USE
c. OTHER ACCIDENT? YES NO
c. INSURANCE PLAN NAME OR PROGRAM NAME
d. INSURANCE PLAN NAME OR PROGRAM NAME
10d. CLAIM CODES (Designated by NUCC)
d. IS THERE ANOTHER HEALTH BENEFIT PLAN? YES NO If yes, complete items 9, 9a, and 9d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING FORM.
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or the party who accepts assignment below.
SIGNED AUTHORIZED SIGNATURE ON FILE DATE 01/08/18
13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.
SIGNED AUTHORIZED SIGNATURE ON FILE

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY(LMP) MM DD YY QUAL.
15. OTHER DATE QUAL. MM DD YY
16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION FROM TO
17. NAME OF REFERRING PROVIDER OR OTHER SOURCE 17a. 17b.
18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES FROM TO
19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)
Referral#= REF= H/L=
20. OUTSIDE LAB? YES NO $ CHARGES
21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY Relate A-L to service line below (24E) ICD Ind. 0
A. K625 B. K8590 C. I10 D.
E. F. G. H.
I. J. K. L.
22. RESUBMISSION CODE 1 ORIGINAL REF. NO.
23. PRIOR AUTHORIZATION NUMBER

| | 24 A. DATES OF SERVICE From MM DD YY | To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. I.D. QUAL. | J. RENDERING PROVIDER I.D. # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 01 08 18 | 01 08 18 | 23 | | 99284 | | A,B,C | 927 00 | 1 | | | 1073933057 |
| 2 | | | | | | | | | | | | |

94. MultiPlan adjudicates and prices those claims for goods and services. For example, a patient was admitted to the Laredo Regional Medical Center on January 6, 2019, with a gastrointestinal obstruction. Doctors at the Laredo Regional Medical Center treated the patient and discharged her two days later. The patient was insured by the Health Plan of West Virginia, Inc.,

which lists MultiPlan, PHCS, and Beech Street among its "partners." According to medical claims data, the Laredo Medical Center submitted $37,224.53 in charges for the services provided to the patient. "MultiPlan PPO" paid $5,341.99 for the claim, or 14.35% of the submitted claim.

95. Another provider has identified hundreds of payment records in which MultiPlan is listed as the payor for healthcare goods and services both on an in-network and out-of-network basis. Below is a sample of statement dates, billed amounts, payment amounts allowed by MultiPlan, and underpayments that MultiPlan generated using its pricing methodology for payments to that provider.

| Date | Billed Amount | MultiPlan Allowed Amount | Underpayment Based on Billed Charges |
|---|---|---|---|
| November 7, 2018 | $120,662.14 | $90,496.63 | $30,165.51 |
| November 18, 2018 | $31,900.66 | $27,753.59 | $4,147.07 |
| December 16, 2018 | $5,160.74 | $3,870.58 | $1,290.16 |
| March 29, 2019 | $77,450.86 | $66,607.75 | $10,843.11 |
| April 19, 2019 | $15,384.38 | $11,538.30 | $3,846.08 |
| April 21, 2019 | $38,093.99 | $33,147.77 | $4,952.22 |
| April 25, 2019 | $134,001.58 | $115,241.36 | $18,760.22 |
| April 25, 2019 | $95,162.86 | $82,791.68 | $12,371.18 |
| June 12, 2019 | $22,479.66 | $19,332.51 | $3,147.15 |
| July 29, 2019 | $27,936.18 | $24,052.11 | $3,911.07 |
| September 1, 2019 | $47,408.05 | $40,770.92 | $6,637.12 |
| September 4, 2019 | $40,267 | $33,018.94 | $7,248.06 |
| September 26, 2019 | $20,072.14 | $16,459.17 | $3,612.97 |

96. Finally, MultiPlan markets a "MultiPlan Payments" service that pays providers on behalf of other payors. On its website, MultiPlan explains that it has paid claims on behalf of 350 competing payors.

97. Any claim by MultiPlan that it is not a health insurance company is a distraction, not a defense. The competition that matters here is competition in claims adjudication and pricing. Countless types of payors compete on that basis, not just health insurance companies—TPAs, for

example, engage in claims adjudication and pricing despite not being health insurance companies, and MultiPlan is no different.

98. In public statements, MultiPlan attempts to characterize itself as a TPA. But, as Sean Crandell, MultiPlan's Senior Vice President of Healthcare Economics testified under oath, "third party administrators . . . do the same thing as the large national health plans." Moreover, even if MultiPlan is a TPA, it enters into horizontal pricing agreements with other TPAs, such as Secure Health, Allied National, and Healthcare Highways.

99. Even if MultiPlan does not compete against other payors on the basis of claim adjudication and pricing, it is certainly a potential competitor. MultiPlan operates multiple PPO networks, recruits providers, and has existing relationships with subscriber groups. MultiPlan could easily begin competing against other payors on the basis of claims adjudication and pricing with little difficulty.

**b. MultiPlan Enters into Agreements with its Competitors to Use a Common Pricing Methodology to Set the Prices Paid for Out-of-Network Goods and Services.**

**i. Overview of MultiPlan's Agreements with Competing Payors**

100. MultiPlan was not content to just run a PPO network and use its own independent discretion to set prices for out-of-network goods and services. It embarked on a plan to build an in-house pricing methodology for out-of-network goods and services that it then marketed to competing payors as a way to decrease prices for out-of-network goods and services in the wake of the Ingenix investigation and settlements. MultiPlan referred to this strategy internally as "MultiPlan 2.0."

101. The first step in that plan was acquiring a proprietary pricing methodology that MultiPlan could market as an alternative to Ingenix.

102. In 2009, MultiPlan acquired Viant from Welsh, Carson, Anderson & Stowe.[5] The Viant pricing formula sets prices for out-of-network goods and services pursuant to pricing parameters that MultiPlan and the competing payor agree on in advance. It also uses hospital-specific cost data obtained from Medicare Cost Reports to calculate individual hospitals' operating expenses, plus an additional margin allowance based on geographic comparators. Thus, prices that MultiPlan sets on behalf of competing payors using its Viant pricing methodology are based, in part, on co-mingled, granular, real-time, and confidential data concerning providers' margins and billed charges.

103. In 2011, MultiPlan acquired National Care Network LLC ("NCN") for $50 million, effectively purchasing NCN's Data iSight pricing methodology. According to MultiPlan's former CEO, Data iSight soon "became the foundation of [MultiPlan's] analytics business."

104. In 2014, MultiPlan acquired Medical Audit & Review Solutions ("MARS"), once again purchasing an out-of-network pricing methodology provider. MARS is a provider of medical necessity auditing and case review services. Its PROBE Audit Risk System (PARS) platform combines actuarial analytics and clinical reviews to identify medical billing errors both before payment and retrospectively.

105. According to MultiPlan, MARS "translates clinical and coding guidance into systemized rules and applies those rules in an automated . . . manner." In reality, MARS is yet another tool for MultiPlan to identify claims where it can underpay providers. By using MARS, MultiPlan and a competing payor agree on the pricing rules that they will apply; a common methodology for setting lower prices for out-of-network goods and services. MARS operates by

[5] U.S. antitrust regulators expressed concerns regarding this acquisition. The U.S. Department of Justice opened a merger investigation and issued a "second request" for several categories of detailed information concerning the transaction.

using an agreed-upon set of pricing rules to systematically "down-code" providers' out-of-network bills by associating the providers' work with billing codes that are typically associated with lower out-of-network prices.

106. After making these acquisitions, MultiPlan marketed its Data iSight, Viant, and MARS pricing methodologies to other payors as a part of a scheme to decrease the amount of money that payors paid to providers for out-of-network goods and services.

107. MultiPlan positioned these pricing methodologies as targeting different types of out-of-network goods and services. In its marketing materials, MultiPlan pitched Data iSight as targeting claims from hospitals for physician services and facility claims. Viant targeted claims for outpatient services. MARS was positioned as a pricing methodology for TPAs to lower claims pricing by switching the Current Procedural Terminology ("CPT") code associated with a good or service to a code that typically has a lower price.

108. Even after orchestrating the conspiracy, MultiPlan continued acquiring new companies to add additional means of setting prices for out-of-network goods and services on behalf of its competitors. In November 2020, MultiPlan acquired HST, a nascent pricing methodology for out-of-network goods and services. At the time of acquisition, MultiPlan announced that it would "incorporate HST tools into MultiPlan's Data iSight service."

109. MultiPlan has also developed proprietary pricing methodologies internally. Around June 2023, MultiPlan introduced a new "AI-enabled" out-of-network claim pricing methodology known as "Pro Pricer." MultiPlan claims that this pricing methodology will set prices for out-of-network goods and services using over 40 years of pricing data, including current and competitively sensitive pricing data.

110. Regardless of the precise formula or algorithm that MultiPlan uses to set prices on behalf of its competitors, MultiPlan's broader common pricing methodology remains the same. Rather than using their own discretion to set prices, competing payors send MultiPlan their out-of-network bills from healthcare providers. MultiPlan prices those out-of-network goods and services on behalf of its competitors, generating massive underpayments for those out-of-network goods and services. The brand names that MultiPlan associates with its common pricing methodology are just window dressing. At the end of the day, all payors are agreeing to not exercise their independent pricing discretion, and instead route out-of-network bills to MultiPlan and use MultiPlan to set prices for those out-of-network goods and services in concert with nearly every other payor.

111. MultiPlan's agreements with its competitors are memorialized in written contracts, typically statements of work that are addenda to MultiPlan's Network Access Agreements with other payors. In these written agreements, MultiPlan's competitors agree to send their out-of-network claims to MultiPlan via an electronic data interface, allow MultiPlan to set the prices for those claims using MultiPlan's pricing methodology, appoint MultiPlan to be the sole negotiator of the prices for those out-of-network goods and services if a provider attempts to negotiate the prices set by MultiPlan, and agree on the maximum price that MultiPlan will set for particular types of out-of-network goods and services, regardless of the outcome of the application of its pricing methodology (which they refer to as "override" agreements).

112. Pursuant to those agreements, MultiPlan uses Pro Pricer, Viant, MARS, and Data iSight to set prices for out-of-network goods and services.

113. In a simplified example of how MultiPlan's pricing methodology works, an individual insured by a payor receives emergency room services at a hospital. The hospital does

not have a pre-existing contract governing the cost of those services with that payor. However, the payor is still required by its agreement with the subscriber to pay for the services rendered to the insured patient. So, the hospital treats the patient and submits a bill to the payor reflecting the hospital's charges. But, instead of paying the hospital's bill or using its own discretion to negotiate the hospital's bill, the payor turns the bill over to MultiPlan. MultiPlan uses an agreed-upon pricing methodology to set the price paid for those goods and services pursuant to MultiPlan's agreement with the payor. MultiPlan then submits its price for the goods and services to the hospital on a take-it-or-leave-it basis. If the hospital does not accept MultiPlan's price, the best it can hope to receive from one-sided "negotiations" with MultiPlan (not the payor) is still a substantial underpayment.

114. Outside the emergency room context, a similar dynamic is at play. A patient who has a PPO plan may prefer to be treated by a specific physician or surgeon, even though that provider is out-of-network under that patient's plan. In a non-emergency room setting, these out-of-network providers have no legal obligation to provide treatment to that patient. Nevertheless, they are effectively forced to provide treatment because medical practices have high fixed costs and treatment an out-of-network patient generates some revenue for a provider, even if it is dramatically lower than what should have been paid but for the cartel.

115. MultiPlan uses the same pricing methodologies in its complementary and primary PPO networks to adjudicate and price out-of-network claims.

116. MultiPlan has disclosed to competing payors, including United, Aetna, and Cigna, that MultiPlan uses its pricing methodologies to set prices for out-of-network services on MultiPlan's PPO networks.

117. As MultiPlan explains on its website, it uses the same payment pricing methodologies that it markets to competing payors "on our network claims."

118. Similarly, MultiPlan provides both a primary PPO network and a WRAP PPO network for Healthcare Highways, LLC. Healthcare Highways' agreements with its subscribers make it clear that MultiPlan's Data iSight methodology will be used to set its prices for out-of-network goods and services.

119. When MultiPlan uses the same pricing methodology as other payors to reduce payments to providers, MultiPlan benefits by continuing to take in the same amount in fees from subscribers who access its PPO networks and by paying less to providers for their out-of-network goods and services.

120. MultiPlan also shares in the MultiPlan Cartel's ill-gotten gains. MultiPlan is paid a fee by the other cartel members based on the difference between a provider's billed charges and the price MultiPlan sets for those goods and services. This fee is usually equal to 5–7% of the "savings," but has been as high as 15%. The common purpose of the cartel is clear—the less money that is paid to healthcare providers, the more money the cartel, and MultiPlan, make. The bounty that payors pay to MultiPlan for running the cartel is known internally at MultiPlan as "percentage of savings" or "PSAV."

121. These bounty payments are staggering even for smaller health plans. In 2022 alone, Central States, even though not a defendant here is a good example, paid MultiPlan $7,145,083 to use MultiPlan's common pricing methodology to drive down what it paid providers for out-of-network goods and services. That $7.14 million payment was merely a drop in an enormous bucket. Below is a chart showing Central States' payments to MultiPlan for, among other things, bankrolling the cartel:

| Tax Year | Central States' Payment to MultiPlan |
|---|---|
| 2022 | $7,145,083 |
| 2021 | $22,327,702 |
| 2020 | $19,703,827 |
| 2019 | $21,131,365 |
| 2018 | $19,609,762 |
| 2017 | $17,852,242 |
| 2016 | $14,442,316 |
| 2015 | $9,292,307 |
| **Total** | **$131,504,604** |

122. Central States would not have paid $131.5 million to MultiPlan over 8 years if it was not getting something of equal or greater value in return. In this case, Central States was obtaining the ability to generate hundreds of millions of dollars in additional revenue by underpaying doctors and hospitals relative to what Central States would have earned were it not colluding with the other payors to reduce the prices set for out-of-network goods and services.

123. The bounties payors pay MultiPlan to run the cartel are its lifeblood: MultiPlan does not merely profit from this scheme, it depends on it. According to a May 10, 2023 Quarterly Report MultiPlan filed with the SEC, a staggering 90.9% of MultiPlan's revenues were generated through this PSAV bounty model in the first three months of 2023 alone.

124. MultiPlan did not merely build a knockoff of Ingenix, it deliberately recruited the very architects of that illegal scheme to run its replacement. For instance, Christopher Dorn, a recently retired Senior Vice President and General Manager of MultiPlan's Payment Integrity and Audit Division, joined MultiPlan after twenty years at Ingenix, where he served as Vice President of Payer Solutions. MultiPlan did not just learn from Ingenix's playbook, it hired Ingenix's own players.

125. MultiPlan's common pricing methodology does not generate mere pricing recommendations that competing payors are free to reject—it generates marching orders that MultiPlan's competitors obediently follow, every time. MultiPlan's competitors do not deviate

from the prices MultiPlan sets for out-of-network goods and services. They pay exactly what MultiPlan tells them to pay, without alteration, without question.

126. For example, MultiPlan's contract with United states that "United shall adjudicate the claim" for out-of-network goods and services "using the recommended [MultiPlan] amount" generated either by the "Data iSight price" or the price that MultiPlan imposes upon a provider after the provider attempts to push back on MultiPlan's out-of-network pricing. In either case, United has abdicated all pricing responsibility for out-of-network claims to MultiPlan.

127. Indeed, MultiPlan's 30(b)(6) witness testified during a deposition in *LD, et al. v. United Behavioral Health, et al.,* No. 4:20-cv-02254-YGR (N.D. Cal.), that she was unaware of a time when United ever altered or rejected a price for out-of-network goods and services set by MultiPlan.

128. A United witness in the very same case confirmed the abdication, testifying that United "leave[s] [the] role and responsibility up to [MultiPlan] and their team to support and defend how they've arrived at those allowed amounts"—an admission that United has surrendered its independent pricing judgment entirely to its supposed competitor.

129. Competing payors authorize MultiPlan to set and negotiate their out-of-network prices, completely abdicating all pricing authority to a company that, on paper, is their competitor. In many cases MultiPlan prices and adjudicates an out-of-network bill for its competitor, "negotiates" that bill against the very provider it is supposed to be dealing with at arm's length, and then pays the bill on the competitor's behalf. Prices set using MultiPlan's common pricing methodology are not merely the opening move of a negotiation—they are the final word.

130. Further underscoring that there is no genuine negotiation at all, MultiPlan forces healthcare providers to accept the prices it dictates for out-of-network services on behalf of its

competitors. MultiPlan's own website boasts that Data iSight pricing is accepted 96% of the time by providers who have no real alternative. A 2018 MultiPlan study touted even higher numbers: MultiPlan claimed that 99.4% of all out-of-network inpatient claims priced by Data iSight are accepted by providers, with similarly coercive acceptance rates for outpatient (98.7%) and professional (94.5%) care. In 2023, MultiPlan's new CEO, Travis Dalton, told Axios that 98% of the claims MultiPlan prices for out-of-network goods and services are "accepted" by providers—the predictable result of leaving providers no real choice.

131. These statistics, contracts, and sworn testimony all tell the same damning story: MultiPlan does not make recommendations, it dictates prices on behalf of an entire industry. Healthcare providers "accept" MultiPlan's pricing not because it is fair, but because they have been cornered: MultiPlan is the only game in town, by design. Because the vast majority of payors have agreed to use MultiPlan's pricing methodology for out-of-network goods and services, providers have no meaningful ability to push back against the collusive pricing forced upon them.

132. Nor are MultiPlan's PPO networks somehow separate from its common pricing methodology. MultiPlan operates its network and analytics businesses as one integrated business. As MultiPlan explained in its 2023 10-K, MultiPlan said: "The breadth of our service offerings allows our customers the flexibility to tailor solutions for a wide range of plan sponsors with varying plan sizes and benefit needs. At the same time, our service offerings are delivered from our common platform and are often bundled together to provide a comprehensive cost management solution for each individual customer. As such, we manage our service offerings as integrated components of a holistic value proposition, rather than as distinct service lines."

133. In the same 10-K, MultiPlan further stated, "[o]ur Analytics-Based Services reduce the per-unit cost of claims using data-driven negotiation and/or reference-based pricing

methodologies. These services can be used standalone but often are used in a solution hierarchy after MultiPlan's network services to reduce claims with no available network contract."

#### ii. There is Direct Evidence of MultiPlan's Agreements with Competing Payors to Use a Common Pricing Methodology to Set Prices for Out-of-Network Goods and Services.

134. There is overwhelming direct evidence that MultiPlan and competing payors agreed to use a common pricing methodology to set and negotiate prices for out-of-network goods and services. This direct evidence includes (1) contracts between MultiPlan and competing commercial healthcare payors, (2) public statements and communications by MultiPlan and other members of the cartel admitting to the existence of these contracts, and (3) internal communications between MultiPlan and other members of the cartel that have been revealed in other litigation.

135. ***Contracts***. MultiPlan enters into written agreements with competing payors in which the competing payor agrees to use MultiPlan's pricing methodology instead of exercising its own discretion to set out-of-network prices. MultiPlan and the competing payor agree to use one of MultiPlan's "proprietary" pricing methodologies to set prices for out-of-network goods and services and to split the revenue generated by underpaying for those goods and services between MultiPlan and the payor.

136. Each of these agreements to use a common pricing methodology or formula instead of exercising independent pricing discretion is illegal *per se*.[6] In addition, the agreements with the competing payors, representing the vast majority of all payors, to use MultiPlan's pricing methodology are collectively illegal *per se*.

137. Despite MultiPlan's efforts to keep many of these agreements away from the public, many facts concerning those agreements are publicly known.

---

[6] As the Federal Trade Commission and Antitrust Division of the U.S. Department of Justice recently noted, fixing prices "with an agreed upon, shared algorithm" rather than in-person is "[s]till illegal."

138. The publicly available versions of MultiPlan's out-of-network pricing contracts with its competitors follow the same form.

139. Initially, MultiPlan and its competitors had agreements allowing MultiPlan's competitors to access MultiPlan's PPO network as a complementary network.

140. Not content merely to share access to MultiPlan's PPO network, MultiPlan and its competitors entered into amendments to those existing agreements. Those amendments contain the agreements between MultiPlan and its competitors to fix the price of out-of-network goods and services and to delegate the authority to negotiate with providers to MultiPlan.

141. For example, on January 1, 2010, United and MultiPlan entered into a Network Access Agreement. In that contract, United agreed to use MultiPlan's PPO network as a complementary PPO network to extend the reach of United's PPO networks.

> **Network Access Agreement**
>
> This Agreement is entered into by and between UnitedHealthcare Insurance Company contracting on behalf of itself and the other entities that are United's Affiliates (collectively referred to as "United") and MultiPlan, Inc. ("Network Manager" or "MPI").
>
> This Agreement is effective on January 1, 2010 (the "Effective Date").

142. Effective October 1, 2017, United and MultiPlan executed an Amendment to Network Access Agreement. Pursuant to this amendment, United agreed to begin using MultiPlan's pricing methodology to set prices for out-of-network goods and services. Specifically, United agreed to use MultiPlan's pricing formula to set prices for out-of-network goods and services. Specifically, United agreed to begin using MultiPlan's Data iSight formula to set prices for out-of-network goods and services. United also agreed that MultiPlan would negotiate the price of out-of-network goods and services for United if a provider pushes back on the prices set by MultiPlan. Under this agreement, MultiPlan charged United a fee equivalent to a percentage of the

underpayment generated by using MultiPlan's pricing methodology. The amendment was signed by MultiPlan's then-CEO Mark Tabak and United's Senior Vice President for Out-of-Network Programs, John Haben. The existence of this agreement was not publicly disclosed until May 2024, when the agreement was entered into evidence in open court at a trial in *Emergency Services of Okla. PC, et al. v. United Ins. Co.*, CJ-2019-482 (Okla. Dist., Cleveland County).

> **AMENDMENT TO**
> **NETWORK ACCESS AGREEMENT**
>
> **THIS AMENDMENT**, effective October 1, 2017(the "Amendment Effective Date") or as otherwise provided herein, is entered into by and among **United Healthcare Insurance Company**, contracting on behalf of itself and the other entities that are United's Affiliates (collectively referred to as "United") and **MultiPlan, Inc.** on behalf of itself and its subsidiaries ("Network Manager or MPI") and amends a certain network access agreement between United and Network Manager dated January 1, 2010, as previously amended (collectively the "Agreement"). All terms contained in this Amendment shall have the meaning defined in the Agreement unless otherwise defined herein.

143. MultiPlan's agreement with Aetna to stop competing on claims pricing and adjudication for out-of-network goods and services followed a similar pattern to United. On January 1, 2011, Aetna and MultiPlan entered into a Network Rental Agreement. Pursuant to this Network Rental Agreement, Aetna agreed to use MultiPlan's PPO network as a complementary PPO network to extend the reach of Aetna's own networks.

> **NETWORK RENTAL AGREEMENT**
>
> This Network Rental Agreement ("Agreement") is made and entered into by and between Aetna Health Management, LLC., on behalf of itself and its Affiliates (as defined below) (hereinafter "Company"), and MultiPlan, Inc. on behalf of itself and its Affiliates (hereinafter "Entity"), to become effective on January 1, 2011 ("Effective Date"). All defined terms in this Agreement and its Attachments shall have the meanings set forth herein and in Section 11 below or otherwise provided in the Attachments.

144. On November 19, 2018, MultiPlan and Aetna entered into an amendment to their Network Rental Agreement. In that amendment, Aetna agreed to use MultiPlan's pricing

methodology to set prices for out-of-network goods and services instead of using its own independent pricing discretion to set the prices for those goods and services. Specifically, Aetna agreed to begin using MultiPlan's Data iSight formula to set prices for out-of-network goods and services. Aetna also agreed that MultiPlan would negotiate the price of out-of-network goods and services for Aetna if a provider pushes back on the prices set by MultiPlan. Under this agreement, MultiPlan charged Aetna a fee equivalent to a percentage of the underpayment generated by using MultiPlan's pricing methodology. Initially, this fee was set at 12% of the underpayment generated by MultiPlan's pricing methodology. This amendment was signed by MultiPlan's then-CEO Mark Tabak on November 15, 2018 and Aetna's Senior Director of National Contracting, Mary Foote, on November 19, 2018. Although the Network Rental Agreement between Aetna and MultiPlan was entered into in 2011 and the price-fixing amendment was entered into on November 19, 2018, the existence of these agreements was not made public until it was filed with the Washington State Insurance Commissioner on December 22, 2021.

5. The following table is hereby added to Attachment 7, Compensation Schedule, Section 2.0, Fees and Savings, of the Agreement:

MEDICAL REIMBURSEMENT ANALYSIS SERVICES

| **Medical Reimbursement Analysis Services** | [redacted] |
|---|---|
| **Data iSight** | 12% of Savings |

145. MultiPlan's agreement with Cigna to stop competing on claims pricing and adjudication for out-of-network goods and services followed a similar pattern with United and Aetna. In 2014, Cigna and MultiPlan entered into a Master Services Agreement, which has been amended several times to include statements of work and addenda. Initially, that Master Services Agreement allowed Cigna to use MultiPlan's PPO network as a complementary network.

146. On April 1, 2015, Cigna and MultiPlan entered into Statement of Work No. 4 to the Master Service Agreement. In that amendment, Cigna agreed to use MultiPlan's pricing methodology to set prices for out-of-network goods and services instead of using its own independent pricing discretion to set the prices for those goods and services. Specifically, Cigna agreed to begin using MultiPlan's Data iSight formula to set prices for out-of-network goods and services. Cigna also agreed that MultiPlan would negotiate the price of out-of-network goods and services for Cigna if a provider pushes back on the prices set by MultiPlan. Under this agreement, MultiPlan charged Cigna a fee equivalent to a percentage of the underpayment generated by using MultiPlan's pricing methodology. This statement of work was signed by MultiPlan's then-CEO, Mark Tabak, on November 15, 2018 and Aetna's Senior Director of National Contracting, Mary Foote, on November 19, 2018. The exact percentage that MultiPlan charged Cigna has been redacted in publicly available versions of the statement of work.



**STATEMENT OF WORK NO. 4**
**Medical Review Analysis Services**

This Statement of Work No. 4 (this "Statement of Work") is dated April 1, 2015 (the "SOW Effective Date") and is entered into between Company and Supplier pursuant to the Master Services Agreement between Cigna Corporate Services, LLC ("Company") and MultiPlan, Inc. on behalf of itself and its operating subsidiaries ("Supplier") dated April 1, 2015 (the "Agreement"). Supplier's principal place of business is located at115 5th Avenue, New York, NY 10003. Capitalized terms used in this Statement of Work but not defined herein shall have the respective meanings set forth in the Agreement, including any Exhibit thereto.

147. In 2018, Kaiser Foundation Health Plan of the Northwest ("Kaiser") and MultiPlan entered into a Medical Reimbursement Analysis Services agreement. In that contract, Kaiser agreed to begin using MultiPlan's out-of-network claims pricing methodology to set prices for out-of-network goods and services instead of using its own independent pricing discretion to set the prices for those goods and services. Specifically, Kaiser agreed to begin using MultiPlan's Data iSight formula to set prices for out-of-network goods and services. Kaiser also agreed that

MultiPlan would negotiate the price of out-of-network goods and services for Kaiser if a provider pushes back on the prices set by MultiPlan. Under this agreement, MultiPlan charged Kaiser a fee equivalent to a percentage of the underpayment generated by using MultiPlan's pricing methodology. Although MultiPlan and Kaiser entered into this contract in 2018, information about the agreement was not made public until it was filed with the Washington State Insurance Commissioner on January 20, 2022.

148. In 2016 several subsidiaries of Cambia, including Asuris Northwest Health, Regence Blue Shield, Bridgespan Health Company, Regence Blue Cross Blue Shield of Oregon, and Regence Blue Cross Blue Shield of Idaho, entered into agreements with MultiPlan. In those agreements, Cambia's subsidiaries agreed to begin using MultiPlan's pricing methodology to set prices for out-of-network goods and services instead of using their own independent pricing discretion to set the prices for those goods and services. Specifically, Cambia and its subsidiaries agreed to begin using MultiPlan's Data iSight formula to set prices for out-of-network goods and services. Cambia's subsidiaries also agreed that MultiPlan would negotiate the price of out-of-network goods and services for them if a provider pushes back on the prices set by MultiPlan. Under this agreement, MultiPlan charged Cambia's subsidiaries a fee equivalent to a percentage of the underpayment generated by using MultiPlan's pricing methodology compared to the provider's billed charges. Information about these agreements was not made public until they were filed with the Washington State Insurance Commissioner in 2022 and 2023.

149. On January 1, 2017, MultiPlan and Healthcare Highways entered into an Amendment to their Master Services Agreement. Under this agreement, Healthcare Highways agreed to use MultiPlan's pricing methodology to "edit" bills received from healthcare providers for out-of-network services. Specifically, Healthcare Highways agreed to begin using MultiPlan's

Data iSight formula to set prices for out-of-network goods and services. Healthcare Highways also agreed to use MultiPlan's fee negotiation services to negotiate the prices of out-of-network goods and services. Under this agreement, MultiPlan charged Healthcare Highways a fee equivalent to a percentage of the underpayment generated by using MultiPlan's pricing methodology.

150. Upon information and belief, MultiPlan has entered into similar contracts with other competing payors, including Allied National, Benefit Plans Administrators, Centene, Elevance, HCSC, Highmark, Horizon, Humana, Kaiser, Molina, Sanford, and other Defendants, that require those payors to use MultiPlan's pricing methodology to set prices for out-of-network goods and services instead of using their own independent pricing discretion to set the prices for those goods and services. Those agreements obligate MultiPlan to negotiate the price of out-of-network goods and services for those payors if a provider pushes back on the prices set by Multiplan. Under these agreements, MultiPlan is paid a percentage of the underpayment that its pricing methodology generates for those out-of-network services. The exact terms of those agreements have not been made public because they have not been filed with state insurance commissioners or on the public docket in litigation.

151. MultiPlan has taken steps to keep the terms of its agreements with competing payors a secret by inserting confidentiality clauses into its contract with competing payors and then bringing litigation to keep the terms of those contracts a secret. For example, MultiPlan has a Service Agreement with Allied National under which Allied National uses MultiPlan's out-of-network pricing methodology instead of using its own pricing discretion. The Service Agreement between MultiPlan and Allied National states that it is "Confidential Not For Distribution." The Service Agreement also contains a Confidentiality and Proprietary Rights provision, which defines "Confidential Information" to include information relating to MultiPlan's pricing methodology.

The Service Agreement prohibits Allied National from using that Confidential Information for any reason other than using MultiPlan's pricing methodology. When Allied National filed a third-party complaint in *Butler v. Unified Life Insurance Company, et al.*, Case No. CV 17-50-SPEW-TJC (D. Mont. Nov. 18, 2021) that contained three paragraphs describing MultiPlan's pricing methodology, MultiPlan sued Allied National for disclosing that information. Ultimately, Allied National removed its filing from the public docket and redacted those paragraphs.

152. MultiPlan's agreements with competing payors are also evident in preference sheets that MultiPlan and its Co-Conspirators fill out memorializing the details of their pricing agreements. Competing payors fill out preference sheets in which MultiPlan and the competing payors specifically agree on the formulas that they will use to price specific types of out-of-network goods and services and the maximum price that MultiPlan will set for those goods and services. Upon information and belief, MultiPlan enters into these preference sheet agreements with every payor that uses MultiPlan's pricing methodology for out-of-network goods and services, including each of the Defendants and Co-Conspirators.

153. ***Plan disclosures***. In disclosure documents and explanations of benefits, competing payors admit that they have entered into agreements with MultiPlan to use MultiPlan's common pricing methodology to set prices for out-of-network goods and services.

154. United's disclosures state that a provider may be offered "[a] rate recommended by Viant," which United says collects and maintains a database of health insurance claims for facilities, then applies proprietary logic to arrive at a recommended rate.

155. Similarly, Blue Cross Blue Shield of Michigan has disclosed that it uses MultiPlan's Data iSight service.

156. A June 1, 2017 Administrative Services Agreement between Owens & Minor Medical, Inc. and a subsidiary of Elevance states that Elevance had begun using MultiPlan to set prices for out-of-network goods and services.

157. In a health plan disclosures and document from 2018, Centene's subsidiary, Health Net, explains that it had started utilizing MultiPlan's Data iSight methodology to determine the maximum amount that it will pay on out-of-network claims submitted by providers.

158. In a May 12, 2023, summary plan description of employee benefits prepared of the Ashland County Employee Benefit Plan, Benefit Plans Administrators explained that it had agreed to use MultiPlan's Data iSight methodology to set the prices paid to providers for out-of-network services.

159. A May 2017 draft agreement between Healthcare Highways and Oklahoma County notes that Healthcare Highways had begun to use MultiPlan's Data iSight methodology to set the prices paid to providers for out-of-network services.

160. In Aetna's 2021 National Accounts Self-Funded Medical Underwriting Disclosures, Aetna noted that it uses MultiPlan's Data iSight pricing formula for out-of-network goods and services. Aetna's May 2022 disclosures similarly state that Aetna uses MultiPlan's Data iSight formula to price out-of-network claims and that MultiPlan negotiates out-of-network pricing on Aetna's behalf.

161. A December 1, 2023 plan document and summary plan description that Consociate Health drafted for Tazewell County, Illinois' self-funded health benefit plan discloses the fact that Consociate Health has agreed to use MultiPlan's Data iSight pricing formula to set prices for out-of-network goods and services.

162. According to a September 13, 2013 summary prepared for the city of Marshal, Blue Cross Blue Shield of Minnesota contracts with MultiPlan to use its pricing methodology for its payments to providers for out-of-network goods and services.

163. ***<u>Public Communications</u>***. In public statements, MultiPlan and other payors concede the existence of their agreements to suppress out-of-network pricing competition.

164. On August 18, 2020, MultiPlan's then-CEO, Mark Tabak, explained to investors that MultiPlan has entered into "multi-year contracts with the leading payors" to use MultiPlan's pricing methodology to adjudicate and price out-of-network claims. He explained that MultiPlan underpays doctors and hospitals by "captur[ing] [out-of-network] claims" from competing payors that contract to use MultiPlan's pricing methodology.

165. MultiPlan acknowledges that it has entered into similar agreements with each of the largest payors in the U.S., who would otherwise be competing with one another by exercising their own independent pricing discretion when setting prices for out-of-network goods and services. In 2021, Sean Crandell, the Senior Vice President of Healthcare Economics at MultiPlan, testified under oath that "all of the top 10 insurers in the U.S." have agreements with MultiPlan

166. MultiPlan told investors the same thing in a 2020 presentation, specifically stating that it has entered into agreements with United, Aetna, Cigna, Anthem, Humana, HCSC, Centene, Kaiser, WellCare, and Molina:



167. MultiPlan similarly acknowledged contractual relationships with payors in a November 15, 2021 stockholder update.

168. At the 2021 Bank of America Leveraged Conference, MultiPlan's then-Chief Financial Officer David L. Redmond stated that MultiPlan was typically "the sole source or the primary source of all out of network claims [pricing] with the major payers." Redmond explained that Anthem (the predecessor to Elevance), Aetna, United, and Cigna were the four largest users of MultiPlan's out-of-network claims pricing methodology.

169. As of June 2023, MultiPlan touted that all of the top 15 payors in the U.S. have agreed to use MultiPlan as their pricer for out-of-network goods and services. Each of those payors previously competed with MultiPlan's PPO networks on the basis of claims adjudication and pricing using their own pricing discretion prior to entering these agreements.

170. The competing payors also acknowledge that they have entered into agreements with MultiPlan in communications with their subscribers. For instance, Secure Health sent a letter to its members in April 2017 with both MultiPlan's and Secure Health's logos at the top of the first page. The letter explained that Secure Health has "partnered with [MultiPlan's] Data iSight to review charges on out-of-network medical claims and bills to [] determine an appropriate fee that the provider should be paid."

171. According to a letter to the United Steelworkers Union dated October 26, 2017, effective January 1, 2017, Highmark began using MultiPlan's Data iSight formula to set prices for out-of-network goods and services.

172. According to a May 2022 presentation to the New Mexico Public Schools Insurance Authority, Blue Cross Blue Shield of New Mexico, a subsidiary of HCSC, disclosed that it was using MultiPlan's Data iSight formula to set prices for out-of-network goods and services.

173. In presentations to New Jersey public employee benefits plan administrators, Horizon Blue Cross Blue Shield of New Jersey touted the amount of underpayments that Horizon was generating using MultiPlan's Data iSight formula. During these presentations, Horizon officials conceded that in several cases Horizon and MultiPlan made more from the fees associated with underpaying for out-of-network goods and services than the doctors and hospitals made from providing the out-of-network care.

174. Similarly, in presentations to California municipalities, Blue Shield of California has acknowledged that it uses MultiPlan's pricing methodology to set prices for out-of-network goods and services.

175. ***Communications to Providers.*** In addition, providers routinely receive communications from MultiPlan in which MultiPlan concedes that it has "contracted with" various payors—i.e., its competitors—and that the result of MultiPlan's agreements with its competitors is that a provider will be radically underpaid for its out-of-network goods and services.

176. For example, Jeffrey Farkas, MD, LLC submitted an out-of-network bill for $332,300 to Great-West Healthcare d/b/a Cigna after performing a surgery on February 17, 2016 that saved a patient's life after she suffered a stroke and multiple brain aneurysms. MultiPlan responded with a fax sent to Dr. Farkas's office on June 13, 2018. The fax revealed that Cigna had sent the claim to MultiPlan to take over negotiations: "Great-West Healthcare, now part of CIGNA has contracted with MultiPlan to facilitate resolution of the above referenced services due to the Provider being out-of-network for this claim. This agreement may expedite payment and decrease the Patient's responsibility." MultiPlan set the price for Dr. Farkas' life-saving brain surgery and related services at $12,407, a difference of $319,893. MultiPlan also stated that if Dr. Farkas agreed to that massive underpayment, Dr. Farkas could not bill the patient for the difference between Dr.

Farkas' billed charges and the meager price that MultiPlan set for the life-saving brain surgery. MultiPlan gave Dr. Farkas two days to decide whether to accept the take-it-or-leave-it offer.

> Great-West Healthcare, now part of CIGNA has contracted with MultiPlan to facilitate resolution of the above referenced services due to the Provider being out of network for this claim. This agreement may expedite payment and decrease the Patient's responsibility.
>
> **Jeffrey Farkas MD LLC** agrees to accept the Proposed Amount listed below as payment-in-full (less any applicable deductible, co-insurance, or co-payment amounts in addition to non-covered items) for services rendered to this Patient on the following date(s):
>
> | Date(s) of Service | Billed Charges | Proposed Amount |
> |---|---|---|
> | 02/17/2018 | $332,300.00 | $12,407.00 |
>
> By signing this agreement, Provider accepts this Proposed Amount and agrees to reduce the liability of the Patient and Payor. Provider agrees not to bill the Patient, or financially responsible party, for the difference between the Billed Charges and the Proposed Amount. Provider retains the right to bill the Patient (or financially responsible party) for items not covered under the Patient's benefit plan and for any applicable deductibles, co-insurance, or co-payments. Provider shall not waive any such patient responsibility amounts due directly from the patient (or other financially responsible party).

When Dr. Farkas pushed back on MultiPlan's price, MultiPlan set an even lower price $7,499.77. Following multiple rounds of MultiPlan pricing and negotiation, Cigna ultimately sent the provider a $6,893.20 check. Dr. Farkas provided an invaluable service—saving a patient's life. When Dr. Farkas sent a bill for his services to Cigna, Cigna forwarded the bill to MultiPlan, and MultiPlan set a price that was significantly below billed charges. MultiPlan exclusively negotiated with Dr. Farkas, and each time Dr. Farkas pushed back on MultiPlan's pricing, MultiPlan set a lower price. That is how the MultiPlan Cartel works: once MultiPlan takes over pricing and negotiation for its competitors, the game is rigged from the start—the provider cannot win, and the only question left is how much they will lose.

177. Similarly, in a July 2023 communication, MultiPlan informed a provider that it has an agreement with Cigna to set the price of the provider's out-of-network goods and services. In it, MultiPlan informed the provider that it had "contracted with" Cigna and that, as a result of that

agreement, MultiPlan set a price of only $1,131.63 for a $15,041.36 bill for out-of-network medical services—a 92.5% underpayment.[7]

**Billed Charges** **$15,041.36**

Expedited Amount $1,131.63

Review & Accept

Reply With Comments

**Patient:** [redacted]
**Account #:** [redacted]
**DOS:** 07/25/2023
**Payor:** Cigna Healthcare

**Contact MultiPlan**
(800) 883-3240
Negotiation Services
Department

Show Additional Terms (0)
Show Additional Details (0)

**MultiPlan Claim #:** [redacted]
**Payor Claim #:** [redacted]

Cigna Healthcare has contracted with MultiPlan to facilitate resolution of the above referenced services due to the Provider being out of network for this claim. Your acceptance may expedite payment and decrease the patient's responsibility.

178. In April of 2019, on behalf of Cigna, MultiPlan set a price for out-of-network services at $324.00 on a bill of $5,750.00.

**Additional Comments:**

*****************BEST OFFER FOR SETTLEMENT*****************
This is the best offer I can extend on this claim. If the offered adjusted amount is declined or changed, I will need to close with no settlement. Please, don't hesitate to contact me with any questions. If we do not resolve this case no additional payment will be made, if applicable follow ERISA guidelines or contact the payer.

Thanks!

Provider agrees to accept the adjusted price shown below as payment in full for the following products/services that have been provided to the above referenced patient.

| DATE OF SERVICE | PROVIDER'S LIST PRICE | ADJUSTED PRICE |
|---|---|---|
| 11/08/2018 to 11/09/2018 | $5,750.00 | $324.00 |

[7] Pursuant to federal law, Plaintiff has redacted personally identifying healthcare information from this and other examples. Plaintiff will provide Defendants with unredacted copies of these records when an appropriate protective order is entered by the Court.

> Provider agrees not to balance bill patient or patient's family (except for deductible, coinsurance, and non-covered items, if applicable).
>
> Provider agrees to accept the above, provided that the Payor waives their right to conduct an on-site audit of the billed charges.
>
> Provider agrees to waive all late charges.

179. Similarly, in November 2021, another medical provider submitted $4,500 in charges incurred on November 13, 2021, to Anthem (a subsidiary of Elevance). MultiPlan responded with a letter stating: "Anthem, Inc. has contracted with MultiPlan to facilitate resolution of the above referenced services due to the Provider being out-of-network for this claim." MultiPlan set the price for those out-of-network goods and services at $673.65.

> Anthem, Inc. has contracted with MultiPlan to facilitate resolution of the above referenced services due to the Provider being out of network for this claim. Your acceptance may expedite payment and decrease the Patient's responsibility.
>
> agrees to accept the Negotiated Amount listed below as payment-in-full (less any applicable deductible, co-insurance, or co-payment amounts in addition to non-covered items) for services rendered to this Patient on the following date(s):
>
> please adjust m
>
> | Date(s) of Service | Billed Charges | Negotiated Amount |
> |---|---|---|
> | 11/13/2021 | $4,500.00 @ $3538 | $673.65 * |
>
> By signing, Provider accepts this Negotiated Amount and agrees to reduce the liability of the Patient and Payor. Provider agrees not to bill the Patient, or financially responsible party, for the difference between the Billed Charges and the Negotiated Amount. Provider retains the right to bill the Patient (or financially responsible party) for items not covered under the Patient's benefit plan and for any applicable deductibles, co-insurance, or co-payments. Payor/Client reserves the right to review medical records, to audit and to adjust incorrect payments in connection with these services. Provider shall not waive any such patient responsibility amounts due directly from the patient (or other financially responsible party).
>
> - Provider agrees to accept the above, provided that payment is released within 15 business days from date of receipt of faxed/digital signature.

180. Likewise, in 2021, a provider submitted a charge of $3,700 to United. MultiPlan responded by setting a price of $323.58 "as payment in full." MultiPlan also warned that the provider could not "balance bill patient or patient's family (except for deductible, coinsurance, and non-covered items, if applicable)."

181. In 2019, a provider in Arizona submitted a bill for $1,190 to United. The claim was paid at only $295.28. The Provider Remittance Advice form referred the member to Data iSight, saying Data iSight would "work with the provider" on the member's behalf. The form also advised

the provider that the bill had been paid using Data iSight, and demanded that the provider not balance bill the patient.

**PATIENT:** [redacted]

| | | | | | |
|---|---|---|---|---|---|
| SUBSCRIBER ID: | [redacted] | SUBSCRIBER NAME: | [redacted] | CLAIM NUMBER: | [redacted] |
| CLAIM DATE: | 01/02/19-01/02/19 | DATE RECEIVED: | 02/28/19 | PRODUCT: | CHOYC |
| REND PROV ID: | 1366914906 | REND PROV: | [redacted] | | |

| PATIENT CONTROL NUMBER | PATIENT ID | AUTH/REF NUMBER | DRG | DRG WEIGHT | CLAIM CHARGE AMOUNT | CLM ADJ AMT | GRP CD | CLM ADJ RSN CD | CLAIM PAYMENT AMOUNT | PATIENT RESPONSIBILITY |
|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | | | | | $1,190.00 | | | | $295.28 | |

SERVICE LINE DETAIL(S)

| LINE CTRL# | DATES OF SERVICE | SUB PROD/ SVC/ MOD | ADJ PROD/ SVC | MOD | REV | UNITS | ADJ QTY | CHARGE | AMOUNT ALLOWED | ADJ AMOUNT | GRP CD | CLM ADJ RSN CD | PAYMENT AMOUNT | REMARK/ NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 322703632 221 | 01/02/19-01/02/19 | | 99284 | | | 1 | | $1,190.00 | $295.28 | $894.72 | CO | 45 | $295.28 | IS |
| CLAIM# [redacted] | | | | | | SUBTOTAL | | $1,190.00 | $295.28 | $894.72 | | | $295.28 | |

NOTES

CO45 CONTRACTUAL OBLIGATIONS - CHARGE EXCEEDS FEE SCHEDULE/MAXIMUM ALLOWABLE OR CONTRACTED/LEGISLATED FEE ARRANGEMENT.

IS MEMBER: THIS SERVICE WAS RENDERED BY AN OUT-OF-NETWORK PROVIDER AND PROCESSED USING YOUR NETWORK BENEFITS. IF YOU'RE ASKED TO PAY MORE THAN THE DEDUCTIBLE, COPAY AND COINSURANCE AMOUNTS SHOWN, PLEASE CALL DATA ISIGHT AT 866-835-4022 OR VISIT DATAISIGHT.COM . THEY WILL WORK WITH THE PROVIDER ON YOUR BEHALF. PROVIDER: THIS SERVICE HAS BEEN REIMBURSED USING DATA ISIGHT WHICH UTILIZES COST DATA IF AVAILABLE (FACILITIES) OR PAID DATA (PROFESSIONALS). PLEASE DO NOT BILL THE PATIENT ABOVE THE AMOUNT OF DEDUCTIBLE, COPAY AND COINSURANCE APPLIED TO THIS SERVICE. IF YOU HAVE QUESTIONS ABOUT THE REIMBURSEMENT CONTACT DATA ISIGHT.

182. The same thing happened two months later to a provider in Pennsylvania. The provider submitted a claim for $1,094 and was paid only $236.22.

PATIENT: [redacted]

| | | | | | |
|---|---|---|---|---|---|
| SUBSCRIBER ID: | [redacted] | SUBSCRIBER NAME: | [redacted] | CLAIM NUMBER: | [redacted] |
| CLAIM DATE: | 03/20/19-03/20/19 | DATE RECEIVED: | 04/10/19 | PRODUCT: | CHOYC+ |
| REND PROV ID: | 1346291143 | REND PROV: | [redacted] | | |

| PATIENT CONTROL NUMBER | PATIENT ID | AUTH/REF NUMBER | DRG | DRG WEIGHT | CLAIM CHARGE AMOUNT | CLM ADJ AMT | GRP CD | CLM ADJ RSN CD | CLAIM PAYMENT AMOUNT | PATIENT RESPONSIBILITY |
|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | | | | | $1,094.00 | | | | $236.22 | $59.06 |

SERVICE LINE DETAIL(S)

| LINE CTRL# | DATES OF SERVICE | SUB PROD/ SVC/ MOD | ADJ PROD/ SVC | MOD | REV | UNITS | ADJ QTY | CHARGE | AMOUNT ALLOWED 119.52 | ADJ AMOUNT 247% | GRP CD | CLM ADJ RSN CD | PAYMENT AMOUNT | REMARK/ NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 333224777-0Z1 | 03/20/19-03/20/19 | | 99284 | | | 1 | | $1,094.00 | $295.28 | $791.72<br>$51.06 | PI<br>PR | 242<br>2 | $236.22 | IS |
| CLAIM# [redacted] | | | | | | | SUBTOTAL | $1,094.00 | $295.28 | $850.78 | | | $236.22 | |

PAYMENT OF BENEFITS HAS BEEN MADE IN ACCORDANCE WITH THE TERMS OF THE MANAGED CARE SYSTEM.

NOTES

PI242 PAYER INITATED REDUCTIONS - SERVICES NOT PROVIDED BY NETWORK/PRIMARY CARE PROVIDERS.

PR2 PATIENT RESPONSIBILITY - COINSURANCE AMOUNT

IS MEMBER: THIS SERVICE WAS RENDERED BY AN OUT-OF-NETWORK PROVIDER AND PROCESSED USING YOUR NETWORK BENEFITS. IF YOU'RE ASKED TO PAY MORE THAN THE DEDUCTIBLE, COPAY AND COINSURANCE AMOUNTS SHOWN, PLEASE CALL DATA ISIGHT AT 866-835-4022 OR VISIT DATAISIGHT.COM. THEY WILL WORK WITH THE PROVIDER ON YOUR BEHALF. PROVIDER: THIS SERVICE HAS BEEN REIMBURSED USING DATA ISIGHT, WHICH UTILIZES COST DATA IF AVAILABLE (FACILITIES) OR PAID DATA (PROFESSIONALS). PLEASE DO NOT BILL THE PATIENT ABOVE THE AMOUNT OF DEDUCTIBLE, COPAY AND COINSURANCE APPLIED TO THIS SERVICE. IF YOU HAVE QUESTIONS ABOUT THE REIMBURSEMENT CONTACT DATA ISIGHT.

183. In March of 2019, a provider submitted a charge for $1,190 and was paid only $413.39 by "UNITED DIS."

| | |
|---|---|
| Payer Name | UNITED HEALTHCARE DIS |
| Provider Name | [redacted] |
| Patient's Name | [redacted] |
| Patient's Date of Birth | |
| Patient Control Number | |
| Date Bill Submitted | 3/4/2019 |
| Admission/Service Date | 1/1/2019 |
| Principal Diagnosis Code | J0300 |
| Total Submitted Charge | $1,190.00 |
| Data ISight Reimbursement Amount | $413.39 |

184. In January 2024, a provider submitted a claim to a TPA for $41,452.62. HST, a MultiPlan company, responded offering a mere $3,566.66 as "payment in full."

Plan Sponsor has contracted with **HSTechnology Solutions Inc.**, ("HST") to conduct an independent comparative analysis of charges billed. Provider agrees to accept as payment in full the Negotiated Amount for covered services rendered to Patient on the Date(s) of Service specified, less any co-payments, deductibles, and co-insurance, if any, and subject to the terms of the Patient's plan.

| **Billed Charges:** | **Negotiated Amount** |
|---|---|
| $41,452.62 | $3,566.66 |

By signing below, Provider agrees not to bill the Plan Sponsor, the Patient or any financially responsible party for the difference between the Billed Charges and the Negotiated Amount for the covered services rendered to Patient on the Date(s) of Service specified, and agrees to accept this amount as final and to waive any late charges. Provider retains the right to bill the Patient (or financially responsible party) for services not covered under the Patient`s plan, and for any applicable co-payments, deductibles, or co-insurance.

185. ***Explanations of Benefits***. Members of the MultiPlan Cartel sent explanation of benefits documents to patients admitting that the cartel members used MultiPlan's pricing methodology to set the prices paid for out-of-network goods and services.

186. For example, in a March 15, 2017, explanation of benefits, when Mercy Hospital and Medical Center (now known as Insight Hospital and Medical Center) in Chicago, Illinois billed $12,471.10 in charges for an emergency surgery and recovery, Allied National sent the claim to MultiPlan to set a price for those out-of-network services using MultiPlan's Data iSight pricing methodology. Using that agreed-upon methodology instead of exercising its independent pricing discretion, Allied National cut the price for those out-of-network services to $5,847.13—a $6,623.97 underpayment. The explanation of benefits listed the code "NAT011" next to the prices set by Allied National. An explanation of codes section on the back of the explanation of benefits notes that "NAT011" means "[f]ee determination made by Data iSight."

187. Similarly, according to a March 16, 2017, explanation of benefits, the same hospital provided $8,023.78 worth of out-of-network services to a patient, and MultiPlan used its Data iSight pricing methodology to set the price for those services at $6,712.77—a $1,311.01

underpayment. That explanation of benefits also listed the code "NAT011" next to the prices set by Allied National.

188. ***Emails, Meetings, and Other Direct Communications***. Plaintiffs also have evidence concerning MultiPlan's communications with members of the MultiPlan Cartel that shows how this buyers' cartel works in practice.

189. On July 1, 2017, United and MultiPlan entered into an explicit agreement to suppress prices for out-of-network goods and services. United and MultiPlan implemented this agreement on or around July 1, 2017, by means of an Amendment to the companies' existing Network Access Agreement.

190. Prior to 2017, it was not possible for United to utilize MultiPlan's pricing methodology.

191. On January 14, 2009, United and several of its subsidiaries entered into a settlement agreement to resolve claims made against the company in *American Medical Association, et al. v. United Healthcare Corporation, et al.*, No. 00-2800 (S.D.N.Y.), *Orborski v. United Healthcare Corporation, et al.*, No. 00-7246 (S.D.N.Y.), and *Malchow, et al. v. Oxford Health Plans, Inc., et al.*, No. 08-935 (D.N.J.). According to that settlement agreement, United was required to fund and facilitate the creation of FAIR Health, an independent database of out-of-network claims data. Among other things, the settlement agreement required United to provide its out-of-network claims data to FAIR Health for a period of five years after FAIR Health first released its database. During that same five-year period, United was required to use FAIR Health to generate prices for out-of-network claims and United was prohibited from owning, operating, or funding "any other database product that provides data pooled from more than one insurer to the other health insurers for

determining [out-of-network] reimbursement rates."[8] Because the FAIR Health database became operational in 2011, United was required to use FAIR Health until at least 2016 and could not use MultiPlan's pricing methodology.

192. During the period of time United, and the other payors that were required to use FAIR Health as part of the Ingenix settlement, actually paid the out-of-network providers the true reasonable value of their services. Indeed, during this time period, the payors paid between 70% and 90% of the out-of-network providers' billed charges. Having to once again pay the fair and reasonable value for out-of-network services, payors such as United looked for another way to cheat out-of-network providers of the fair and reasonable value of their services.

193. Knowing that United could begin using MultiPlan's pricing methodology around late 2016 or early 2017, MultiPlan began recruiting United into the conspiracy in 2015. On or around October 1, 2015, MultiPlan sent United a presentation entitled "Data iSight: Maximize Savings Using a Patented Methodology." This presentation promised United could dramatically increase its revenues if it stopped independently pricing out-of-network payments to healthcare providers and used MultiPlan's common pricing methodology instead.

194. MultiPlan induced United to join the MultiPlan Cartel by explaining that United's competitors had already entered into similar agreements with MultiPlan and by disclosing the pricing levels adopted by those competitors. In 2016, MultiPlan's former Chief Revenue Officer, Dale White, wrote an email to United executives, explaining that 7 of United's top 10 competitors were using MultiPlan's out-of-network pricing methodology. Mr. White encouraged United to do

[8] As a technical matter, FAIR Health provides estimates of prices for healthcare goods and services based on a distribution of billed charges for those goods and services. Prior to the MultiPlan Cartel, providers used the FAIR Health database to make their own decisions about how much they would pay for out-of-network goods and services. In most cases, the prevailing market rate for out-of-network goods and services prior to the MultiPlan Cartel was between the 70th and 80th percentile in the FAIR Health database.

the same, writing: "Implementation of these initiatives in 2016 will go a long way to bring United back into alignment with its primary competitor group [i.e., Blues, Cigna, Aetna] on managing out-of-network costs."

195. One of the recipients of Mr. White's email, Rebecca Paradise, United's Vice President of Out-Of-Network Payment Strategy, explained that a key factor in United's decision to agree to use MultiPlan's out-of-network pricing methodology was that the methodology "was widely used by our competitors."

196. Mr. White relayed to another United executive, John Haben, that, by agreeing to use the 350% of Medicare rates formula in Data iSight, United would "be in line with another competitor" and "leading the pack along with another competitor." Mr. Haben subsequently wrote in an internal United email that, "[i]f we implement benchmark pricing as described, with the intent to reduce the threshold to 350 percent CMS, United would be leading the pack along with a major competitor." In that email, Haben referred to "350 percent CMS" as "recommended benchmark pricing."

197. Mr. White also held telephone calls and off-the-record meetings with officials at United to convince them to join the MultiPlan Cartel. During these meetings, Mr. White explained that MultiPlan could generate enormous streams of revenue by underpaying doctors and hospitals using MultiPlan's pricing methodology, that other payors were already using MultiPlan's pricing methodology successfully, and that United could set its prices for out-of-network goods and services in alignment with its competitors using MultiPlan's pricing methodology. Mr. White was careful to cover his tracks. He shared the most competitively sensitive information with United over the phone to avoid creating a written record.

198. In anticipation of beginning to use MultiPlan's pricing methodology, in 2016, United and MultiPlan employees began working together to implement the technical details of their data connections and out-of-network pricing formulas. On April 21, 2016, Emma Johnson, the Director of Sales and Account Management for National Accounts at MultiPlan, sent an email to Sarah Peterson (Director of Network Programs, United), Marie Rickmyer (Program Manager for United Out-of-Network Affordability), and Amy Barker (Associate Director of Claims at UnitedHealth Group) entitled "Data iSight HCFA and [sic] UB ER [GRI and UNET] and other questions." In the email, Ms. Johnson sought agreements from United on the maximum price that MultiPlan's Data iSight pricing methodology would set for certain emergency room claims provided to MultiPlan via United's UNET claims processing system and claims underwritten by UnitedHealth Group's Golden Rule Insurance Co. ("GRI") affiliate. In the email, Ms. Johnson wrote: "Please confirm your agreement" that the maximum price that MultiPlan could set for certain emergency room claims "would be 350% of [Medicare]" or the Data iSight price. In reality, because the Data iSight price is almost always lower than 350% of Medicare (by design Data iSight generates prices that are around 200% of Medicare), MultiPlan was seeking an agreement to fix the prices that United paid for out-of-network goods and services at 350% of Medicare prices for those services. United subsequently agreed with MultiPlan to set its pricing for those emergency medical services claims at 350% of Medicare rates. MultiPlan's PPO networks also began setting prices for the same services at 350% of Medicare rates.

From: Johnson, Emma [emma.johnson@MultiPlan.com]
Sent: 4/21/2016 11:13:27 AM
To: Sarah R Peterson (sarah_r_peterson@uhc.com) [sarah_r_peterson@uhc.com]; Rickmyer, Marie A (marie_rickmyer@uhc.com) [marie_rickmyer@uhc.com]; Barker, Amy (ambarker@unitedhealthone.com) [ambarker@unitedhealthone.com]
CC: Ginther, Bill [bill.ginther@MultiPlan.com]; Petrozzelli, Patricia [patricia.petrozzelli@MultiPlan.com]; Carolyn S Larson (carolyn_s_larson@uhc.com) [carolyn_s_larson@uhc.com]
Subject: Data iSigt HCFA nd UB ER (GRI and UNET) and other questions

Hi –
As a follow up to our GRIC (UHONE) DiS call, I wanted to send out the definition of HCFA ER claims we currently use to identify the claim as ER:

POS 23 and/or CPT Code 99281-99290

Please confirm your agreement with this definition for both UNET and GRI. Using this definition Data iSight would then apply the rule of 350% of CMS override to never allow less than 350% CMS on the ER HCFA claims. Pricing would be 350% of CMS or the DiS rate whichever is greater.

Specifically for GRI (already in place on UNET) the definition for UB claims we currently use to identify the claim as ER:
Rev Code 450-459, not including 456

Please confirm your agreement with this definition for GRI implementation. Using this definition Data iSight would then apply the rule of 350% of CMS override to never allow less than 350% CMS on the ER UB claims. Pricing would be 350% of CMS or the DiS rate whichever is greater.

Also, for GRI specifically we would like to verify if there will be any U&C/R&C values or liability values that will need to be considered when applying the DiS rate or will DiS be calculating the DiS rate irrespective of any U&C/R&C or liability values?

The ER rules are pretty critical for us to approve so we can get started and complete the required system work to accommodate.

Let me know.
Thanks,
Emma

Emma Johnson
*Director, Sales and Account Management*
*National Accounts*
emma.johnson@multiplan.com

199. MultiPlan provided confidential and competitively sensitive information concerning the prices that United's competitors were paying for out-of-network goods and services to convince United to begin using MultiPlan's pricing methodology. In a September 8, 2016 email, John Haben indicated specific knowledge of competitors' pricing formulas adopted through Data iSight. He wrote that "MultiPlan said seven of our top ten competitors use the tool today." He continued: "BCBS [Blue Cross Blue Shield] is even more aggressive and is accessing the option of moving DIS [Data iSight] up even higher to have IPR/OPR (R&C repricing) which is option 3 . . . ." In this email, Mr. Haben demonstrated specific knowledge of the pricing "option" adopted

by United's competitive rival, Blue Cross Blue Shield, in MultiPlan's Data iSight formula. Testifying under oath, Mr. Haben conceded that this knowledge of Blue Cross Blue Shield's pricing formula came from MultiPlan. Mr. Haben testified in another case that he provided this information concerning Blue Cross Blue Shield pricing to other executives at United so that they would be comfortable moving forward with using MultiPlan's pricing methodology.

200. MultiPlan continued providing assurances to United that United could use MultiPlan's pricing methodology to be in alignment with the prices set by its competitors. In a non-public presentation that MultiPlan provided to United in early 2017, MultiPlan explained that its proprietary pricing methodology would generate "significant savings"—i.e., underpayments to providers—"on non-contracted bills." In the same presentation, MultiPlan noted that its pricing methodology is guaranteed to set out-of-network prices that are lower than the usual and customary prices for out-of-network goods and services that had previously prevailed in the market that existed prior to the MultiPlan Cartel.

201. Mr. Haben summarized MultiPlan's proposal in a 2017 email and presentation he sent to senior management at United entitled "OCM [Outlier Cost Management]-MultiPlan Benchmark Pricing Overview." In the email, Mr. Haben wrote: "Today, our major competitors have some sort of outlier cost management; they use Data iSight. United will be implementing [Data iSight on] July 1, 2017." In the same email, Mr. Haben explained that the agreement between United and MultiPlan could cut United's out-of-network claim reimbursement payments "by $900 million" per year.

202. Mr. Haben wrote in a 2017 United internal presentation about implementing MultiPlan that, "[b]y implementing Outlier Cost Management as currently planned, United catches up to the pack[.]" In other words, based on its communications with MultiPlan, United knew that

it would be acting in parallel with its competitors by agreeing to use MultiPlan's pricing methodology for out-of-network goods and services.

203. United confirmed that it agreed to use MultiPlan's pricing methodology to set prices for out-of-network goods and services because it knew that its competitors were using the same methodology. United wrote in a Customer Impact Advisory Brief that it was "utilizing Data iSight, owned by MultiPlan, to administer [an outlier cost management program]. 90 other payors nationwide use [Data iSight] in a similar manner."

204. United also admitted that it knows that each of its competitors' use Data iSight during its opening statement in *Emergency Services of Oklahoma PC, et al. v. United Healthcare Insurance Company, et al.*, Case No. CJ-2019-482 (Okla. Dist., Cleveland County), saying "[w]hat is undisputed is that . . . every single one of United's major competitors . . . all use MultiPlan and Data iSight, every one."

205. United tracked the amount of money that it underpaid healthcare providers using Data iSight, which was a key component in "OCM," United's acronym for "Outlier Cost Management." United employees prepared a table with a column entitled "No OCM," meaning the additional amount that United would have paid on out-of-network claims had United not agreed to use MultiPlan's pricing methodology to set the prices of out-of-network goods and services. That internal analysis shows that United's agreement with MultiPlan resulted in United paying hundreds of millions of dollars less in out-of-network claims than it would have without its agreement with MultiPlan.

206. After instructing competing commercial payors on how to be in "alignment," MultiPlan pushed the MultiPlan Cartel to cut the prices for out-of-network goods and services even further.

207. On March 13, 2018, MultiPlan officials met with United. During this meeting, MultiPlan provided a presentation entitled "MultiPlan Update for United: 2017 in Review." During this presentation, MultiPlan noted that the agreement between MultiPlan and United had successfully suppressed out-of-network reimbursements paid to healthcare providers and suggested ways to pay providers even less.

208. After instructing competing commercial payors on how to be in "alignment," MultiPlan pushed the MultiPlan Cartel to cut out-of-network reimbursement rates. For example, in a September 29, 2019, presentation to United entitled "Competitive Landscape for Cost Management," MultiPlan urged United to cut its out-of-network pricing even further for particular out-of-network procedures. This meeting was attended by Mr. Haben, who took contemporaneous notes of the meeting, which he sent to Rebecca Paradise, the Vice President of Out-of-Network Strategy for United. Thus, while MultiPlan, United, and their competitors had already agreed to cut the prices set for out-of-network goods and services, they were attempting to agree on ways to make the cartel even more effective by setting even lower prices.

209. The same pattern that transpired with United also occurred with Cigna. MultiPlan had a long-standing Network Access Agreement with Cigna that allowed Cigna to use MultiPlan's PPO network as a complementary network that would extend Cigna's existing PPO network. However, MultiPlan knew that Cigna was required to use the FAIR Health database to set out-of-network prices as a result of Cigna's settlement agreements with class action plaintiffs and the New York Attorney General to resolve claims related to Cigna's use of Ingenix. The earliest that Cigna could begin using MultiPlan's pricing methodology to set out-of-network prices was in 2015 or 2016.

210. In advance of that 2015/2016 window of opportunity, MultiPlan began meeting with Cigna to pitch Cigna on using MultiPlan's common pricing methodology instead of competing to set out-of-network prices independently.

211. Helpfully for MultiPlan, Cigna was also seeking a replacement for Ingenix. In 2015, a Cigna employee sent an internal email regarding out-of-network outpatient behavioral health charges in which the employee expressed concern with developing "medicare equivalent" prices internally. The Cigna employee said "[w]e cannot develop these charges internally (think of when Ingenix was sued for creating out of network reimbursements)[.] We need someone (external to Cigna) to develop acceptable Medicaid or otherwise acceptable charges[.]" Thus, Cigna still wanted to cut out-of-network prices, it just needed someone else to be the ringleader of the scheme. The MultiPlan employees who attended the meetings included Dale White, MultiPlan's Chief Revenue Officer. The Cigna employees who attended these meetings included Terri Cothron, Cigna's Manager of National Ancillary & Non-Par Management.

212. During these meetings and presentations, MultiPlan explained to Cigna that many other payors were already using its pricing methodology and that Cigna could increase its revenue dramatically by bringing itself into alignment with those competitors" pricing methodology and the prices that those competitors set for out-of-network prices via MultiPlan. MultiPlan's presentations to Cigna explicitly compared Cigna's out-of-network pricing for particular types of out-of-network goods and services to pricing of Cigna's competitors and claimed that Cigna would increase its revenue by hundreds of millions of dollars each year by using MultiPlan's common pricing methodology.

213. Based on the understanding that Cigna would pay lower prices for out-of-network goods and services by simultaneously using the same pricing methodology as its competitors,

Cigna agreed to let MultiPlan set and negotiate the prices for out-of-network goods and services billed to Cigna beginning in April 2015.

214. After reaching an agreement with Cigna, MultiPlan continued to meet and communicate with Cigna regularly to report on the underpayments generated by using MultiPlan's pricing methodology and to coach Cigna on how it could pay providers even less. For example, in March 2016, officials from MultiPlan and Cigna met to discuss ways that they could work together to reduce out-of-network reimbursement payments. During this "Non-Par Strategy Summit," Cigna displayed a slide deck that outlined how the company planned to work with MultiPlan to slash its out-of-network reimbursements. Among others, this meeting was attended by Terri Cothron, who was responsible for overseeing Cigna's contractual relationship with MultiPlan.

215. In advance of that meeting, MultiPlan sent Cigna an email with an attached presentation entitled "2016 Network Development Meeting: A Client's Perspective on Out-of-Network Costs." The presentation outlined how Cigna could redirect billions of dollars in out-of-network claims from providers to itself and MultiPlan. During the March 2016 "summit," a MultiPlan representative explained how MultiPlan's out-of-network pricing methodology worked and how it could dramatically lower the prices for out-of-network goods and services.

216. After attending MultiPlan's presentation at the March 2016 summit meeting, Ms. Cothron confided to a co-worker that MultiPlan's pricing methodology "scares me." Nevertheless, Cigna continued to use MultiPlan's pricing methodology for Cigna's out-of-network claims.

217. Cigna kept internal "Whitebook Reports" tracking how much money it earned by underpaying providers using MultiPlan's pricing methodology. Those reports contain line items for each out-of-network claim and the corresponding underpayment generated by using MultiPlan's pricing methodology.

218. During private meetings with Cigna, MultiPlan crowed about how successful its agreement with Cigna was in cutting payments to providers for out-of-network claims. In a slide deck entitled "Cigna & MultiPlan Governance Meeting, June 21, 2021," MultiPlan outlined that it had worked together with Cigna to cut the prices set for out-of-network goods and services. The message to Cigna was simple: the cartel was working.

219. Aetna and MultiPlan engaged in the exact same course of action as MultiPlan engaged in with United and Cigna. Around the same time that MultiPlan was pitching United and Cigna on the benefits of using MultiPlan's pricing methodology, it was making the same pitch to Aetna. MultiPlan explained that by using its common pricing methodology, Aetna would be in alignment with its competitors on out-of-network pricing strategy and would be setting similar prices for the same out-of-network goods and services. MultiPlan made this pitch to Aetna to use the same pricing methodology for out-of-network goods and services as its competitors via in-person meetings, presentations, and telephone calls.

220. Based on those assurances, Aetna and MultiPlan entered into a contract that, among other things, required Aetna to stop exercising independent discretion in setting prices paid to out-of-network providers and to abdicate pricing discretion to MultiPlan. Then MultiPlan and Aetna split the increased margins generated by underpaying out-of-network providers among themselves. Aetna paid MultiPlan a percentage of the underpayment generated by MultiPlan's claim suppression methodology ranging from approximately 10% to 15%. As a result, for many out-of-network claims, MultiPlan and Aetna made more on the claim than the provider did.

221. MultiPlan's agreement with Aetna has led to massive underpayments to providers for their out-of-network services. For example, on September 18, 2020, a surgeon in New Jersey performed a complex and invasive surgical procedure to alleviate a patient's long-standing lower-

back pain. Prior to performing the surgery, the surgeon believed that Meritain Health, an Aetna subsidiary, had pre-authorized an out-of-network charge of $348,900 for the surgery and related care. Instead, on November 25, 2020, Meritain sent the surgeon an explanation of benefits along with an electronic payment for $7,750.59—a $341,149.41 underpayment when compared to the pre-authorization amount. Prior to performing the surgery, the surgeon was not made aware that Meritain Health had an agreement with MultiPlan or that his services would be subject to MultiPlan's pricing methodology for out-of-network goods and services. So, even where healthcare providers attempt to use prior authorizations to ensure that they will be paid adequately for out-of-network care, the MultiPlan Cartel still underpays them using deceptive bait-and-switch tactics.

222. To substantiate its effectiveness in suppressing out-of-network payments, MultiPlan provided Aetna with regular reports showing the underpayments that MultiPlan's pricing methodology generated when it set the prices for out-of-network goods and services.

223. MultiPlan pushed Aetna to use MultiPlan's common pricing methodology to pay less and less to providers (and to pay MultiPlan more and more for doing so). Aetna did so based on the understanding that its competitors were also using MultiPlan to cut out-of-network prices in a similar manner.

224. MultiPlan's communications with United, Cigna, and Aetna are typical of how MultiPlan markets its pricing methodology to competing payors. Upon information and belief, MultiPlan has used similar communications, meetings, and presentations to convince Cambia, Centene, Elevance, HCSC, Highmark, Horizon, Humana, Kaiser, Molina, Consociate Health, Healthcare Highways, and other Defendants to join the cartel by using MultiPlan's common pricing methodology. In those meetings, communications, and presentations, MultiPlan invited its

competitors to use MultiPlan's pricing methodology instead of exercising their own discretion to set prices for out-of-network goods and services. Significantly, MultiPlan told each payor that other payors were using the same methodology and that, by simultaneously using the same pricing methodology, the payor could decrease the amount it pays for out-of-network goods and services.

225. Once a payor accepts MultiPlan's invitation to use the same pricing methodology as its competitors, MultiPlan and the payor memorialize that agreement in a written contract.

226. After signing a contract, MultiPlan provides the payor with a constant flow of competitively sensitive information via meetings, presentations, and video conferences. This information includes comparisons between the prices that the payor is paying for particular out-of-network goods and services and the prices that the payor's competitors are paying for the same out-of-network goods and services. The message from those presentations is clear. Payors who are paying too much for out-of-network goods and services need to get in line and set the same prices as their competitors. If the Payors do so, they stand to benefit tremendously by cutting payments to providers and increasing their revenues.

227. Reporting from *The New York Times* confirmed that MultiPlan and competing payors frequently exchange confidential and competitively sensitive pricing information in order to effectuate the MultiPlan Cartel. *The New York Times* explained, "[a]s MultiPlan became deeply embedded with major insurers, it pitched new tools and techniques that yielded even higher fees [for MultiPlan]," by setting lower prices, "and in some instances told insurers what unnamed competitors were doing, documents and interviews show."

228. The fact that MultiPlan did not mention the names of some competitors is no saving grace. MultiPlan provided payors with the information to identify who those unnamed competitors were. *The New York Times* quoted Lisa McDonnel, a United executive, as writing in an internal

email that "Dale [White, the Chief Revenue Officer of MultiPlan] did not specifically name competitors but from what he did say we were able to glean who was who."

229. MultiPlan holds several types of meetings and sends several types of communications to its Co-Conspirators to reinforce the message that payors should be acting together to use MultiPlan's pricing methodology to set low prices for out-of-network goods and services.

230. MultiPlan engages in "road shows" in which it travels to competing payors and provides updates on the claims pricing methodologies adopted by other payors.

231. MultiPlan executives Dale White and Susan Mohler are involved in these "road show" presentations, wherein MultiPlan produces detailed descriptions of MultiPlan's pricing methodology, reviews the underpayments generated by those pricing methodologies, and offers ways to further suppress payments for out-of-network goods and services.

232. MultiPlan prepares whitepapers for payors, which explain in detail how MultiPlan's pricing methodology lowers the prices set for out-of-network goods and services. MultiPlan routinely shares those whitepapers with other members of the MultiPlan Cartel.

233. These whitepapers are designed to both exchange information between payors and to ensure that all payors agree to the underlying pricing logic embodied in MultiPlan's pricing methodologies.

234. MultiPlan maintains a Client Advisory Board that hosts annual multi-day retreats for executives from MultiPlan and competing payors to discuss out-of-network pricing.

235. According to MultiPlan, the purpose of these meetings is to bring payors together so that they "can talk amongst their peers" about several topics, including out-of-network pricing.

236. Similarly, Rebecca Paradise, Vice President of Out-of-Network Strategy for United, testified at trial in *Emergency Services of Okla. PC, et al. v. United Healthcare Ins. Co.*, CJ-2019-482 (Okla. Dist., Cleveland County) that United and competing payors attend multiday "customer meeting[s]" hosted by MultiPlan where they discussed out-of-network pricing.

237. Employees from MultiPlan and several competing payors attended meetings of the Client Advisory Board. MultiPlan executives routinely attend meetings of the Client Advisory Board, including Susan Mohler, MultiPlan's Vice President of Marketing; Dale White, the former CEO of MultiPlan; Bruce Singleton, MultiPlan's former Senior Vice President of Network Strategy; Michael McEttrick, MultiPlan's former Vice President of Healthcare Economics; and Sean Crandell, MultiPlan's Senior Vice President of Healthcare Economics.

238. During Client Advisory Board meetings, MultiPlan executives presented slides showing how little payors were paying providers as a result of using MultiPlan's out-of-network pricing methodology. These presentations also discussed how MultiPlan and the competing payors could make more money if they all agreed to use MultiPlan's pricing methodology even more aggressively to set even lower prices for out-of-network goods and services.

239. MultiPlan reassured the attendees of the Client Advisory Board meetings that their industry-wide plan to underpay providers for out-of-network goods and services was safe. In presentations at the Client Advisory Board meetings, MultiPlan referred to its common methodology for underpaying claims as a "liability shield" for its Co-Conspirators.

240. Other presentations at the Client Advisory Board meetings took a whimsical approach, asking attendees, "Is it magic or is it MultiPlan?" In reality, it was a cartel.

241. MultiPlan and its competing payors have attempted to keep these Client Advisory Board meetings a secret by holding them off-site at luxury resorts, not recording the presentations,

and assuring the participants at the meetings that they are off-the-record. In deposition and trial testimony concerning these Client Advisory Board meetings in other litigation, attendees at the meetings incredibly state that they remembered almost nothing about the meetings other than the fact that they attended them. However, some public information concerning the Client Advisory Board meetings is publicly available.

242. In 2019, MultiPlan hosted a Client Advisory Board meeting at the luxury spa resort Montage Laguna Beach in Orange County, California. Executives from MultiPlan, United, Aetna, several Blue Cross Blue Shield plans, Cigna, Humana, Kaiser, Consociate Health, and several other payors attended the event.

243. John Haben and Rebecca Paradise, Vice President of Out-of-Network Strategy for United, attended the 2019 MultiPlan Client Advisory Board meeting. Under oath, Ms. Paradise testified that “a lot of people in the insurance industry” were also at the meeting. At the meeting, MultiPlan’s then Vice President of Sales and Account Management, Dale White, presented on ways that commercial payors could “overcom[e] obstacles” with respect to cutting out-of-network pricing. Ms. Paradise also testified that the participants in this Client Advisory Board meeting, “talk[ed] about things they’ve implemented, other things they’re looking at” with respect to pricing and adjudicating out-of-network goods and services.

244. MultiPlan also uses the Client Advisory Board meetings to invite payors to join the MultiPlan Cartel. According to a 2017 MultiPlan document, the 2015 Client Advisory Board meeting featured prospective clients seated next to existing clients at dinner for this purpose. MultiPlan expected its Co-Conspirators to endorse MultiPlan’s pricing methodology and the effectiveness of the cartel during this dinner.

245. From September 26–28, 2021, MultiPlan's Client Advisory Board returned to the Montage Laguna Beach resort for another retreat.

246. The Client Advisory Board Meetings have social functions such as dinners, cocktail hours, and golf outings where MultiPlan and competing payors discuss their experience using MultiPlan's pricing methodology to cut prices for out-of-network goods and services in a less formal setting. The photograph below shows Anthony Gonzalez, a MultiPlan sales executive, Ziad Rubaie, the former Chief Business Development Officer at Consociate Health, and Darren Reynolds, the CEO and President of Consociate Health, at a cocktail party during the 2021 Client Advisory Board Meeting.



247. MultiPlan has hosted Client Advisory Board meetings on a regular basis. The Client Advisory Board met in person each year from 2015 to 2023, with the exception of 2020 (which occurred remotely due to the COVID-19 pandemic).

248. MultiPlan's Client Advisory Board meetings continue to this day, despite the extensive government and media scrutiny into MultiPlan's anticompetitive conduct. In November 2024, the MultiPlan Client Advisory Board met once again at the Montage Laguna Beach resort in Laguna Beach, California.

249. In addition to the secret whitepapers and off-the-record conclaves at luxury resorts, MultiPlan facilitates regular agreement between payors concerning underpaying providers for their out-of-network goods and services in ad hoc sales meetings.

250. MultiPlan holds regular internal meetings of its sales and national account teams. These meetings occur at least quarterly and, at times, occurred as often as monthly. MultiPlan employees who attended these meetings included at least Dale White, Monica Armstrong, Jacqueline Kienzle, Emma Johnson, Susan Dominy, Anthony Gonzalez, and Matthew Butler.

251. During these meetings, MultiPlan employees discuss the current out-of-network underpayments that members of the MultiPlan Cartel are making for particular types of out-of-network services. If MultiPlan identifies an instance where a third-party payor is, in MultiPlan's judgment, paying too much for an out-of-network good or service, the sales and national account team identifies this as an "opportunity" for the third-party payor to pay providers less for that service. MultiPlan's national accounts team and sales team are incentivized to do this because they make more revenue every time that a third-party payor pays less for an out-of-network good or service. MultiPlan's sales employees are specifically incentivized to push these payors to set lower prices for out-of-network goods and services via MultiPlan's pricing methodology because their bonuses and performance evaluations are tied to the amount of underpayments generated by payors using MultiPlan's pricing methodology.

252. MultiPlan's national accounts team and sales team created a list of these opportunities to make more money by advising other payors to underpay providers.

253. Then, MultiPlan's sales and national accounts teams, with the assistance of MultiPlan's Senior Vice President of Healthcare Economics, Sean Crandell, and Senior Vice President of Marketing and Product Management, Susan Mohler, created presentations to third-party payors that contained charts comparing that payor's payments to providers for particular out-of-network goods and services to the payments made by competing payors.

254. The presentations also contained specific recommendations about how the payor (and MultiPlan) could make more money by underpaying providers for those services at rates similar to or even less than their competitors.

255. MultiPlan's sales and national accounts employees presented these recommendations and pricing comparisons to other payors on a regular basis.

256. The message of these presentations was clear. Payors could make more money by underpaying providers. They could do so safe in the knowledge that they would not be undermined by other payors deciding to pay more for the same service, which would have allowed providers to point to those higher reimbursements as a justification for requesting competitive payments for their services in pricing negotiations.

257. Every member of the MultiPlan Cartel would benefit from that payor cutting its payments for particular out-of-network services: MultiPlan would make more money, the payor would make more money, and the other payors would know that their fellow cartel members were holding the line on underpaying for out-of-network services.

258. These regular presentations also allowed the MultiPlan Cartel to monitor and enforce their cartel agreement to stop competing on out-of-network pricing, use a common pricing methodology, and profit from underpaying providers.

259. These meetings also provided a forum in which members of the MultiPlan Cartel reaffirmed their participation in the buyers' cartel. MultiPlan and the other payor met one-on-one, discussed ways to underpay providers, and agreed on a recommended course of action based on what competing payors were paying for the same out-of-network goods and services. MultiPlan communicated that other payors were underpaying for out-of-network services, the payor knew that its competitors would be underpaying for the same services as well, and the payor agreed to make similar underpayments.

**iii. MultiPlan and its Competitors Engaged in Parallel Pricing.**

260. MultiPlan and its competitors engaged in multiple forms of parallel pricing conduct. That parallel conduct cannot be explained as merely payors having similar reactions to similar competitive pressures within an interdependent market. Instead, MultiPlan and its competing payors engaged in parallel pricing conduct that is consistent with each member of the MultiPlan Cartel abiding by a preceding agreement to use a common pricing methodology to set the prices that they paid for out-of-network goods and services.

261. Fundamentally, each Co-Conspirator engaged in the same pricing strategy. They adopted MultiPlan's pricing methodology and stopped using their own pricing discretion. They did so in a tight time period. While the exact dates that some payors agreed to start using MultiPlan's pricing methodology to set prices for out-of-network goods and services are presently unknown, the facts that are available demonstrate that payors began to use MultiPlan's pricing

methodology in the roughly three-and-a-half year period between April 2015 and November 2018, as shown in the table below.

| Date | Agreement |
|---|---|
| April 2015 | Cigna signs Amendment to MultiPlan's Network Access Agreement concerning use of Data iSight pricing methodology |
| 2016 | Cambia enters into agreement with MultiPlan to use Data iSight |
| January 1, 2017 | Highmark begins using MultiPlan's Data iSight pricing methodology |
| January 1, 2017 | Healthcare Highways signs Amendment to Master Services Agreement with MultiPlan |
| April 2017 | Secure Health begins using MultiPlan's Data iSight pricing methodology |
| May 2017 | Elevance discloses that it has started using MultiPlan's Data iSight pricing methodology |
| October 2017 | United signs Amendment to MultiPlan's Network Access Agreement concerning use of Data iSight pricing methodology |
| 2018 | Centene discloses that it has started using MultiPlan's Data iSight pricing methodology |
| 2018 | MultiPlan enters into agreement with Kaiser regarding use of Data iSight |
| November 2018 | Aetna signs Amendment to MultiPlan's Network Access Agreement concerning use of Data iSight pricing methodology |

262. Payors likely would have agreed to use MultiPlan's pricing methodology in closer proximity to one another had several major payors, including United and Aetna, not been prohibited from doing so by their settlements and assurances of discontinuance in the Ingenix investigation.

263. Not only did members of the MultiPlan Cartel enter into agreements to outsource their pricing authority for out-of-network goods and services to MultiPlan, their use of MultiPlan's common pricing methodology also generated parallel prices for the same out-of-network goods and services.

264. MultiPlan generates parallel out-of-network prices even when the FAIR Health and usual and customary rates for those services differ dramatically. As the table below shows, the FAIR Health database indicates that the out-of-network price for the same CPT code should differ dramatically by geography, but MultiPlan generated the same reimbursement price for all the claims regardless of location.

| CPT Code | Location | Date | Submitted Claim | 70% of FAIR Health | MultiPlan Pricing/Payment |
|---|---|---|---|---|---|
| 99284 | Wyoming | 1/21/19 | $799 | $654.36 | $413.39 |
| 99284 | Arizona | 1/25/19 | $1,212 | $1,062.60 | $413.39 |
| 99284 | New Hampshire | 1/25/19 | $1,047 | $632.52 | $413.39 |
| 99284 | Oklahoma | 2/8/19 | $990 | $903.84 | $413.39 |
| 99284 | Kansas | 2/10/19 | $778 | $837.48 | $413.39 |
| 99284 | New Mexico | 2/19/19 | $895 | $1,136.52 | $413.39 |
| 99284 | California | 3/25/19 | $937 | $667.80 | $413.39 |
| 99284 | Nevada | 3/30/19 | $763 | $778.68 | $413.39 |
| 99284 | Pennsylvania | 5/20/19 | $1,094 | $760 | $413.39 |

Had the competing payors been using market-based usual and customary rates ("UCR") to set prices, they would have calculated different prices for out-of-network services performed in different locations. Instead, because the competing payors used MultiPlan's common pricing methodology, they generated parallel prices for those out-of-network procedures.

265. This parallel pricing makes no economic sense absent the existence of an agreement to fix prices. The cost of care in Manhattan, New York, is self-evidently higher than in Manhattan, Kansas, and every legitimate method of reimbursing out-of-network claims accounts for that

geographic difference. The only plausible explanation for Multiplan's cookie-cutter, one-size-fits-all pricing is that MultiPlan and its competitors agreed on pricing designed to produce the same price for a given out-of-network service no matter where it is performed.

266. MultiPlan executives admit under oath that MultiPlan's out-of-network pricing methodology leads to parallel pricing. Tellingly, Sean Crandell, MultiPlan's Senior Vice President of Healthcare Economics, admitted that MultiPlan's pricing methodology ended out-of-network pricing competition. Under oath, he testified:

> Q. During the same time period, 2017 to 2020, was the out-of-network pricing recommended by Data iSight to United[Healthcare] the same or different as that recommended to UnitedHealthcare's competitors?
>
> A. It was the same.

267. In the same testimony, Crandell was asked: "[I]f the Data iSight tool is used among various different companies in the industry, do the recommended payment rates generated by Data iSight tool vary depending on which client you're running that calculation for?" Crandell answered: "No." The attorney conducting the examination followed up: "[C]an the tool even factor in who the client is?" Crandell answered: "No, it can't. The system that generates the methodology cannot even factor in the client."

268. In addition, MultiPlan facilitated a parallel transition away from a marketplace in which payors used their own discretion to set prices for out-of-network goods and services at prevailing market rates to a coordinated regime in which payors cut reimbursement payments to providers. This transition was a radical structural break from how payors had behaved previously that cannot be explained by normal competitive factors.

269. Prior to the MultiPlan Cartel, MultiPlan and its rival payors competed against each other by independently setting the prices at which they would reimburse out-of-network services provided to patients enrolled in their respective networks.

270. For decades, out-of-network rates were determined by reference to a benchmark referred to as the "Usual, Customary, and Reasonable," or UCR, rate. A UCR rate represents a percentile value—usually the 75th or 85th percentile—calculated from the billed charges of providers in the same geographic area. A percentile value indicates a specific point within a dataset expressed as a percentage. For example, a median is the 50th percentile—50 percent of the values in the data fall below it, 50 percent above it.

271. UCR rates helped control healthcare costs for out-of-network goods and services while preserving each payor's ability to set its own out-of-network prices. As William Marino, the former President and CEO of Horizon, explained to the U.S. Senate Committee on Commerce, Science, and Technology in 2009, UCR was "designed to permit payment amounts that would be predictable, change the market-based changes in prevailing payments, and keep insurance costs in check by eliminating excessive charges from the insurance pool." UCR was, and is, a less-restrictive alternative to the MultiPlan Cartel. It provided payors with a means of combatting what some payors believed were high prices for out-of-network goods and services while still setting prices independently based on market conditions.

272. Each of the members of the MultiPlan Cartel used FAIR Health or usual, customary, and reasonable charges to set prices for out-of-network goods and services prior to joining the cartel. Under the terms of a class action settlement in 2010, United and other Co-Conspirator insurers were required to use FAIR Health for five years. However, after these obligations ended,

various payors made parallel decisions to abandon FAIR Health/UCR and join the MultiPlan Cartel.

273. By joining the cartel, they jettisoned their prior approach to setting prices for out-of-network goods and services.

274. Indeed, the payors actively tried to get their customers off the UCR reimbursement amounts. For example, internal United "Talking Points & FAQ" ordered its employees to get United's customers off of "reasonable and customary" and "FAIR Health":

> - At a minimum, meet with clients who have not adopted SSPE and/or remain on R&C; clients are not obligated to change but the goal is to get clients off R&C/Fair Health

275. As federal antitrust regulators have explained, "replac[ing] once-independent pricing decisions with a shared algorithm" like the MultiPlan Cartel has done, constitutes illegal price-fixing. In other words, when "competitor's jointly delegat[e] key aspects of their decision making to a common algorithm," they "deprive the marketplace of independent centers of decision making" and violate Section 1 of the Sherman Act.

276. The same is true here—and then some. The MultiPlan Cartel did not merely delegate pricing to a shared algorithm; it extinguished horizontal competition altogether by delegating industry-wide pricing and negotiation authority for out-of-network goods and services to MultiPlan. For healthcare providers, this makes independent, individualized out-of-network pricing negotiations impossible. It thereby allows MultiPlan and its Co-Conspirators to dramatically suppress out-of-network prices far below what they would have been but for the MultiPlan Cartel.

277. As a result of this industry-wide transition engineered by MultiPlan, UCR prices for out-of-network goods and services, once the industry standard, has gone by the wayside. As

Mr. Haben testified under oath, United, like the rest of its competitors, moved from paying out-of-network claims at "usual and customary" rates, or rates determined by benchmarking databases like FAIR Health, to using MultiPlan's out-of-network pricing methodology.

278. Similarly, Debra Nussbaum, an employee of Optum, which is a subsidiary of United, testified at a deposition in *In re: Out of Network Substance Use Disorder Claims Against UnitedHealthcare*, 19-cv-02075 (C.D. Cal.) that "when [she] first started with Optum/United Behavioral Health, many plans were utilizing reasonable and customary or UCR. I think that, over time, I've seen a major shift to other out-of-network reimbursement methodologies."

279. Members of the MultiPlan Cartel also engaged in parallel conduct by charging exorbitant fees to subscribers in exchange for using MultiPlan's common pricing methodology to lower payments for out-of-network goods and services.

280. In order to profit even more from using MultiPlan's pricing methodology to set low prices for out-of-network goods and services, the cartel members added new terms to their ASO contracts at or around the time that they began using MultiPlan's pricing methodology. In addition to the PMPM fees, those ASO contracts also required self-insured groups to pay a percentage (as high as 50%) on the difference between a billed out-of-network charge and the amount paid for those out-of-network goods and services, known as the "shared savings fee." Often, that fee was higher than the amount paid to the provider or hospital performing the out-of-network goods or services.

281. United disclosed that its "shared savings program" was directly linked to its use of MultiPlan's pricing methodology. For example, a notification concerning Nokia Corporation's ASO plan notes that Nokia participates in a "shared savings program" administered by United.

That notice states that the shared savings fees associated with the program are based on the underpayments generated by Multiplan's Data iSight formula.

282. In addition, Aetna created the "National Advantage Program," or NAP. Under the NAP, ASO subscribers to Aetna's PPO plans paid Aetna an enormous portion of the underpayment generated by Aetna's agreement to use MultiPlan's pricing methodology.

283. Similarly, Elevance (formerly Anthem) created the "Non-Network Savings Fee." Under the Non-Network Savings Fees, ASO subscribers paid Elevance a "savings fee" as high as 50%:

> Non-Network Savings Fee. If Anthem or its Vendor negotiates with a non-Network Provider for Covered Services from the non-Network Provider, Employer will pay a fee equal to 50% of the difference between the non-Network Provider's Billed Charges and the amount Anthem uses to calculate Plan liability for the Covered Service (the "Plan Liability Amount"). In the case of facility-based Provider Claims, Plan Liability Amount will be based on the negotiated rate; if negotiations are not successful, the Plan Liability Amount shall be determined using a pricing tool. In the case of professional Provider Claims, Plan Liability Amount will be based upon the negotiated rate obtained by Anthem or its Vendor, if applicable (in the absence of successfully negotiated Claims, there will be no fee charged as the amount will be determined by the local Blue plan).

284. These shared savings agreements generate tremendous profits for competing payors at the expense of providers. United made approximately $1.3 billion from its shared savings program in 2020 alone. Moreover, in an internal presentation, United stated that it intended to cut its out-of-network reimbursements by $3 billion by 2023 in order to generate even higher shared savings payments from ASO subscribers.

**c. MultiPlan Receives, Pools, and Commingles Proprietary and Confidential Pricing Data to Set and Negotiate Prices for its Competitors' Out-of-Network Goods and Services**

285. The precise nature of how MultiPlan suppresses payments for out-of-network goods and services is non-public and proprietary. However, some details are available in the public record. Those details show that MultiPlan receives petabytes of competitively sensitive and

proprietary claims pricing data from its competitors and that it commingles and pools that data into a dataset that it uses to set and negotiate prices for out-of-network goods and services.

286. MultiPlan's pricing methodologies work by virtue of deep technological connections between MultiPlan and its competitors. Pursuant to their agreements with MultiPlan, competing payors send their out-of-network claims to MultiPlan via an electronic connection. These claims come to MultiPlan with detailed information, such as the procedure code, dates of service, the billed amount, and an alphanumeric code indicating whether the claim is subject to a payor's previously disclosed UCR out-of-network rates.

287. During an interview on the September 16, 2024 DataFramed podcast, MultiPlan's Vice President of Data & Decision Science, Jocelyn Jiang, affirmed that MultiPlan receives its data directly from its competitors: "Typically those claims data come directly from the insurance companies and then we have a series of ingestion data processing steps to normalize and standardize those data coming from the insurance company."

288. The granular and real-time healthcare pricing and claim data that MultiPlan and its competitors share every day on a massive scale is confidential and competitively sensitive.

289. MultiPlan and its Co-Conspirators have long recognized that information concerning the amounts that payors pay to providers is confidential and competitively sensitive. In the January 1, 2010 Network Access Agreement between MultiPlan and United, United and MultiPlan agreed that United could not use MultiPlan's reimbursement rates to develop United's own PPO networks. The parties agreed that if United used MultiPlan's reimbursement rate information, that conduct "would cause irrevocable harm to [MultiPlan] and that [MultiPlan] shall be entitled to injunctive relief" to prevent United from using MultiPlan's reimbursement data.

290. In addition, MultiPlan's Network Rental Agreements with its competitors routinely define the term "proprietary and confidential information" to include "all internal business practices and business records, including, but not limited to, information concerning products, pricing, contracts or business methods in any form whatsoever, not including information otherwise in the public domain." This includes the rates paid to providers, which MultiPlan and its co-conspirators regularly agree to hold "in strict confidentiality."

291. Furthermore, in an April 1, 2016, declaration submitted under penalty of perjury in *Federal Trade Commission v. Advocate Health Care Network, et al.*, No. 15-cv-11473 (N.D. Ill.), Randall Fortuna, who was at that time the Regional Director for MultiPlan's PPO networks in Illinois, Minnesota, Wisconsin, North Dakota, and South Dakota, testified that data concerning out-of-network claims pricing was "highly confidential and sensitive commercial business information" that MultiPlan did not want to expose publicly.

292. Ms. Fortuna explained that MultiPlan stores claims pricing information for its own PPO networks and its competitors' PPO networks on a proprietary system known as the EnterPrice System. A small number of MultiPlan employees working in MultiPlan's Healthcare Economics department have direct access to that system, and those employees receive regular confidentiality training and sign attestations that they will, and have, kept claims data on the EnterPrice System confidential.

293. However, that confidentiality guidance means little in practice. MultiPlan's Healthcare Economics team routinely provides confidential pricing information drawn from the EnterPrice System to MultiPlan's sales and national accounts teams. Those sales executives routinely funnel highly confidential information to MultiPlan's competitors in order to convince them to set lower prices using MultiPlan's common pricing methodology.

294. Nonetheless, MultiPlan's competitors continue to share their competitively sensitive claims pricing data with MultiPlan. MultiPlan then pools and commingles this data to set prices for out-of-network claims both for its own payments to healthcare providers and for its competitors' out-of-network payments to healthcare providers.

295. Once MultiPlan receives confidential and competitively sensitive pricing information from its competitors via a data link, that data is loaded into MultiPlan's "Claims Savings Engine," known internally as FRED. FRED is a massive repository of incoming claims data from nearly all of the payors in the United States. Pursuant to the contracts between MultiPlan and its competitors, FRED routes the data to one of several proprietary pricing methodologies owned by MultiPlan, including Data iSight, Viant, Pro Pricer, and MARS. Those formulas set the price for the out-of-network goods and services at issue by determining how little the MultiPlan Cartel can pay the healthcare provider for that good or service.

296. These pricing formulas are based on commingled and pooled sets of competitor's pricing and claims data. Data iSight provides a good example of how commingling and pooling plays into the process of setting out-of-network prices using MultiPlan's pricing formulas.

297. In a secret whitepaper dated June 2019, entitled "Data iSight Product and Methodology Inpatient Module," MultiPlan explains the methodology Data iSight uses to generate prices for inpatient claims. Data iSight begins by compiling "a national benchmarking group that contains claim and cost data for cases of like severity in hospitals with characteristics that match those of the hospital on the claim being analyzed." This same benchmarking process is employed by every single payor that uses Data iSight set prices for out-of-network goods and services. When providers generate a claim, all payors using Data iSight use the same benchmark group to generate pricing offers for claims from that hospital. Thus, MultiPlan pools and co-mingles all of the

competitor pricing data that it has in its system into a single benchmarking dataset that it uses to set prices for out-of-network goods and services.

298. The next step, according to the whitepaper, is to "adjust costs of all comparison cases based on hospital's wage index." Once again, in this step, all payors using Data iSight are using the same methodology—an adjustment based upon the claim-generating hospital's wage index—to determine the price set for those out-of-network goods and services.

299. The third step is to "calculate the median benchmark cost of the service," according to the whitepaper. MultiPlan pulls the data in this step from the Hospital Provider Cost Report Information System which is maintained by CMS. Again, this methodology is common to all payors who use Data iSight to set prices for out-of-network goods and services.

300. In the final step, Data iSight applies "standard overrides" which set upper and lower bounds on the prices its system would otherwise generate. These overrides "are always in place" and "establish the upper and lower limits for the Data iSight price" for all payors who use Data iSight to set prices. These "overrides" set the maximum price that MultiPlan will set for a particular out-of-network good or service. When a payor agrees to use MultiPlan's pricing methodology, they agree to use a "default override" set to a certain percentage of Medicare pricing for the same good or service. In fact, Sean Crandell, MultiPlan's Senior Vice President of Healthcare Economics, has testified under oath that Data iSight applies "operational overrides" on top of overrides accepted by individual payors. These operational overrides help keep payors' prices in alignment.

301. In another secret whitepaper, entitled "Data iSight Facility Methodology," MultiPlan explains the Data iSight methodology it uses to set prices for outpatient goods and services. It describes a process similar to the one for inpatient claims. The whitepaper also explains that MultiPlan pools and commingles payors' data to generate benchmarks and conversion ratios

used to set the price for outpatient goods and services. As with the inpatient pricing methodology, MultiPlan and its competitors agree on overrides, including default overrides, that set the maximum price that will be paid for a particular good or service.

302. A United States patent (U.S. Patent No. 8,103,522) filed by MultiPlan's subsidiary National Care Network, LLC, also describes MultiPlan pooling and comingling payors' data to set prices for out-of-network goods and services using a common pricing methodology.

303. The first step in this process is pooling and comingling the data. The patent explains that when MultiPlan receives an out-of-network claim, it groups that claim into a refined diagnosis related group ("rDRG")—a standardized method of grouping insurance claims used by Medicare and some commercial health insurance networks that categorizes medical services on the basis of severity and complexity.

304. Then, MultiPlan identifies all claims at similar hospitals for the same rDRG code. In other words, MultiPlan pools and commingles all claims for the same out-of-network goods and services from the same provider to have a basis from which it can set prices for that provider.

305. Next, MultiPlan attempts to estimate the hospital's cost of providing that rDRG-coded service based on: (1) that group of hospitals' cost report submissions to CMS and (2) the wage index of the hospital submitting the out-of-network claim.

306. Next, MultiPlan calculates the markup and margin for each submitted rDRG-coded out-of-network claim using a standard equation that applies to all payors' out-of-network claims.

307. MultiPlan's promotional materials refer to this as a "cost-up" methodology for setting prices paid for out-of-network facility claims, since it involves calculating an estimate of the healthcare provider's costs for furnishing any service and building out a pricing offer from there. In other words, MultiPlan and its Co-Conspirators agree upon a fixed, across-the-board

profit margin that the MultiPlan Cartel will allow healthcare providers to realize on their out-of-network facility claims.

308. Once MultiPlan calculates the estimated margin and markup for a given out-of-network claim, it applies a conversion factor based on the median price that the provider accepts for the same good or service using the commingled and pooled data that MultiPlan receives from competing payors.

309. MultiPlan's Pro Pricer pricing algorithm also uses a massive commingled data set to generate prices for out-of-network goods and services. According to MultiPlan's marketing materials, Prop Pricer "leverages 40+ years of data" by using that commingled and pooled out-of-network pricing data to train the Prop Pricer algorithm on the "optimized" price to set for a particular out-of-network good or service.

310. Once MultiPlan has set the price for a provider's out-of-network goods and services, it communicates that price to the provider via email, an online portal, a letter, or a fax. In these communications, MultiPlan notes that it is working with the payor—i.e., its own competitor—to set the price for the out-of-network good or service at issue.

311. In nearly all cases, the provider is forced to accept the price that MultiPlan sets despite that price being dramatically below the UCR/FAIR Health rate for the out-of-network goods and service in question. In the rare cases where a provider can push back on MultiPlan's pricing, the prices that the provider is paid are still below the UCR/FAIR Health rate.

312. Moreover, providers cannot collect the balance of their charges from patients or any other source.

313. For example, for emergency services, federal and state laws prohibit healthcare providers from balance billing patients for the difference between the payments received from a payor for out-of-network goods and services and the provider's billed charges.

314. Likewise, MultiPlan's communications with the providers specify that, when a provider accepts MultiPlan's price, they are prohibited from balance billing the patient for the portion of the provider's fees that was not paid by the MultiPlan Cartel.

315. That is why providers do not balance bill patients for the difference between the payments received from a payor for out-of-network goods and services and the provider's billed charges. They are prohibited by law and/or the Cartel itself from doing so. Thus, as Leif Murphy, the President and CEO of TeamHealth, explained in an April 19, 2019 email: "We don't balance bill[.]"

316. As a result, the Provider Assignors cannot make up the underpayment caused by the MultiPlan Cartel by seeking payment from another source. Nor are the Provider Assignor's damages contingent upon them not receiving payments from patients on balance bills. The proximate cause of the damages is the MultiPlan Cartel.

317. In fact, in some instances, after MultiPlan sets the price for an out-of-network good or service, MultiPlan's competitor simply pays the provider that amount and only discloses the fact that MultiPlan set the price for the out-of-network good or service in the fine print of an explanation of benefits or remittance advice form.

318. For example, United sends provider remittance advice forms to healthcare providers telling them how much they will be paid for out-of-network services. Buried in the notes section of those forms, United explains that the remark code "IS" indicates that the price for an out-of-network service was actually set by MultiPlan, not the payor.

SERVICE LINE DETAIL(S)

| LINE CTRL# | DATES OF SERVICE | SUB PROD/ SVC/ MOD | ADJ PROD/ SVC | MOD | REV | UNITS | ADJ QTY | CHARGE | AMOUNT ALLOWED | ADJ AMOUNT | GRP CD | CLM ADJ RSN CD | PAYMENT AMOUNT | REMARK/ NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 324304116 4Z1 | 01/05/19 - 01/05/19 | | 99285 | | | 1 | | $1,360.00 | $435.20 | $924.80 | PI | 242 | $0.00 | IS |
| | | | | | | | | | | $435.20 | PR | 1 | | |
| [redacted] | | | | | | | | | | | | | | |
| CLAIM# [redacted] | | | | | | | SUBTOTAL | [redacted] | | | | | | |

002250

PAYMENT OF BENEFITS HAS BEEN MADE IN ACCORDANCE WITH THE TERMS OF THE MANAGED CARE SYSTEM.

NOTES

PI242 PAYER INITIATED REDUCTIONS - SERVICES NOT PROVIDED BY NETWORK/PRIMARY CARE PROVIDERS .

PR1 PATIENT RESPONSIBILITY - DEDUCTIBLE AMOUNT

PR234 PATIENT RESPONSIBILITY - THIS PROCEDURE IS NOT PAID SEPARATELY.

I4 THIS SERVICE OR SUPPLY IS DENIED. IT IS CONSIDERED PART OF ANOTHER SERVICE PERFORMED ON THE SAME DAY, OR IT IS NOT ALLOWED AS A SEPARATE CHARGE.

IS MEMBER: THIS SERVICE WAS RENDERED BY AN OUT-OF-NETWORK PROVIDER AND PROCESSED USING YOUR NETWORK BENEFITS. IF YOU'RE ASKED TO PAY MORE THAN THE DEDUCTIBLE, COPAY AND COINSURANCE AMOUNTS SHOWN, PLEASE CALL DATA ISIGHT AT 866-835-4022 OR VISIT DATAISIGHT.COM . THEY WILL WORK WITH THE PROVIDER ON YOUR BEHALF. PROVIDER: THIS SERVICE HAS BEEN REIMBURSED USING DATA ISIGHT, WHICH UTILIZES COST DATA IF AVAILABLE (FACILITIES) OR PAID DATA (PROFESSIONALS). PLEASE DO NOT BILL THE PATIENT ABOVE THE AMOUNT OF DEDUCTIBLE, COPAY AND COINSURANCE APPLIED TO THIS SERVICE. IF YOU HAVE QUESTIONS ABOUT THE REIMBURSEMENT CONTACT DATA ISIGHT.

319. Similarly, so many Blue Cross Blue Shield health plans use MultiPlan's pricing methodology that several Blue Cross Blue Shield plans adopted the remark code "ZCN" in remittance advice to refer to instances where out-of-network prices were set using MultiPlan's Data iSight pricing formula.

320. If a provider attempts to push back on the prices that MultiPlan sets for out-of-network goods and services, MultiPlan uses commingled and pooled pricing data to enforce the cartel. MultiPlan's fee negotiation, or FNX, team accesses this data to determine how little they can agree to pay a provider for out-of-network goods and services. A member of MultiPlan's FNX team can see in granular detail the out-of-network prices that a provider has accepted for particular goods and services. This detailed pricing data allows MultiPlan to pinpoint exactly the point at which a provider will "break" and accept the cartel's out-of-network pricing

321. The sharing of competitively sensitive information is not a one-way street. MultiPlan provides competitively sensitive information concerning competing payors' claims pricing to its competitors in order to perpetuate the MultiPlan Cartel.

322. MultiPlan's Healthcare Economics team works with MultiPlan's sales and national accounts teams to prepare presentations that explicitly compare payors' pricing for out-of-network services. MultiPlan's pricing methodology accesses this competitive data to generate underpayments to providers for out-of-network services. The purpose of those presentations is to garner further agreements among the payors that they will set even lower prices for out-of-network goods and services.

323. The pricing data exchanged through MultiPlan is detailed and enables identification of particular claims and particular payors. The pricing information is also current or forward-looking. It is competitively sensitive and not publicly available. Exchanges of current pricing data tied to particular companies—standing alone—can have pernicious effects on competition and violate Section 1 of the Sherman Act.

324. The purpose of the agreement to exchange information was to depress prices paid to providers for out-of-network goods and services and keep those prices artificially low. This information exchange agreement only makes economic sense as a means to suppress prices for out-of-network claims. Payors furnished this information to MultiPlan with the understanding and desire that their competitors would use it to suppress payments to healthcare providers. Competitors would otherwise be unlikely to exchange massive volumes of competitively sensitive pricing information.

325. The routine exchange of information among MultiPlan and its competitors occurred simultaneously with an industry-wide shift away from market pricing toward prices for out-of-network goods and services set by MultiPlan. Without access to competitors' sensitive competitive information, members of the MultiPlan Cartel would have no choice but to compete against one another to provide adequate compensation to providers for out-of-network care.

326. As described below in ¶¶ 607-637, the information exchange that MultiPlan facilitates is not reasonably necessary to further any pro-competitive purpose. Even if it had some pro-competitive purpose (which it does not), the information exchange could have been achieved by far less restrictive means, such as through independent and non-profit run data sources like FAIR Health.

327. The Antitrust Division of the U.S. DOJ has signaled increased scrutiny of competitors sharing data with one another through intermediaries such as MultiPlan.

328. Information exchanges used to be tolerated in the healthcare sector under so-called "safety zones" discussed in various policy guidance from the Antitrust Division.

329. In February 2023, however, the Antitrust Division withdrew that policy guidance. As Doha Mekki, the Principal Deputy Assistant Attorney General for the Antitrust Division explained: "[T]here may be markets and industries where long-held sensibilities about when information exchanges are more benign than harmful are insufficiently sensitive to market developments and thus fail to capture the broader range of harm in the modern economy. . . . A softening of competition through tacit coordination, facilitated by information sharing, distorts free market competition in the process."

330. In addition, on the Antitrust Division has provided "examples of conduct that can harm competition in healthcare." With respect to anticompetitive uses of healthcare data, the DOJ provides the example of an "insurer shar[ing] detailed utilization or claims data among competitors."

331. That is exactly what happened here. At every point that matters, MultiPlan is using commingled and pooled confidential pricing data to effectuate the cartel. MultiPlan ingests confidential claims data into a single repository each time that a payor uses MultiPlan's common

pricing methodology. Publicly available information shows that the pricing formulas/algorithms used in MultiPlan's common pricing methodology use commingled confidential pricing data. MultiPlan enforces the cartel using a team of MultiPlan employees armed with access to a data set containing granular, current, and commingled confidential pricing data. And MultiPlan generates further agreements to ratchet down the prices set for out-of-network goods and services by funneling current confidential pricing data to competing payors.

**d. MultiPlan Enters into Agreements with its Competitors to Set the Maximum Price for Out-of-Network Goods and Services.**

332. In addition to entering into agreements to use the same pricing methodology to set the prices paid to providers for out-of-network goods and services, MultiPlan and its Co-Conspirators enter into agreements to fix the maximum prices they will pay for particular out-of-network goods and services. MultiPlan and its Co-Conspirators referred to these maximum pricing agreements as overrides. These overrides are independently illegal per se under long-standing antitrust law.

333. These maximum pricing agreements were entered into around the same time that MultiPlan and its competitors entered into agreements to use MultiPlan's common pricing methodology. Over time, MultiPlan and its competitors entered into agreements to lower the maximum prices they would pay for out-of-network goods and services, further slashing amounts they paid to doctors and hospitals for out-of-network goods and services.

334. MultiPlan and each of the competing payors that use its pricing methodology also agree on an "override" price that will be the maximum price that MultiPlan sets for a particular type of claim. These agreements can be found in both written contracts and documents called preference forms.

335. For example, in 2019, United agreed to further suppress out-of-network pricing for emergency room claims using overrides. Starting in March 2019, MultiPlan and United agreed to cut reimbursements for emergency room services from 350% of Medicare pricing to 250% of Medicare pricing. That price cut was rolled out to providers throughout 2019.

336. Scott Ziemer, Vice President of Customer Solutions–Network at UMR (a United subsidiary), testified under oath that MultiPlan recommended that United use a pricing formula that capped out-of-network payments at 250% of Medicare rates. Mr. Ziemer further admitted that "we [United] don't give . . . instruction" to MultiPlan regarding what prices to set, and instead simply "rely" on MultiPlan's algorithm to determine the reimbursement amount.

337. On February 11, 2021, United and MultiPlan agreed to set the maximum price for out-of-network emergency room services even lower—at 150% of Medicare. This agreement was memorialized in a change request form.

MultiPlan.

## UnitedHealthcare Project / Change Request Form

*Please email this form to* ***medwards@multiplan.com*** *or* [ HYPERLINK "mailto:kim.dugan@multiplan.com" ] *when complete.*

| | |
|---|---|
| **Date Request Submitted:** | 2/11/2021 |
| **Client Name:** | UnitedHealthcare |
| **Requestor Name:**<br>**Title:**<br>**Phone:**<br>**E-Mail:** | Antoinette Vaught-Williams<br>Out of Network Programs<br>(952) 202-6975<br>[ HYPERLINK "mailto:Antoinette_VaughtWilliams@uhc.com" ] |
| **Project Name:** | Emergency Room Reimbursement Reduction |
| **Expected Benefit:** | Gain medical cost savings |
| **Resource Availability Start Date:** | 3/1/2021 |
| **Funding Type:** | Fully Insured & ASO |
| **Packages Impacted, if applicable:** | |
| **Benefit Indicators:** | Benefit I & O |
| **Detailed Requirements of Project:**<br>**** Data iSight: State Rules/Appeal Mgmt Changes?** | • Change ER reimbursement from 250% of CMS to 150% of CMS<br>• Both HCFA and UB<br>• Remove DIS whichever is greater<br>• All ASO |

338. In an internal MultiPlan email dated February 18, 2021, MultiPlan employee Tina Smith explained: "UHC would like to change DIS pricing for ASO & FI [fully insured] ER that is currently at 250% of CMS or DIS whichever is greater to 150% of CMS (remove the greater of language), if no CMS value, use 40% of billed charges." In a March 12, 2021 email chain, United employees further discussed moving ER claims to the lesser of Data iSight and 150% of Medicare for ASO and Fully Insured clients.

339. Numerous other payors, including MultiPlan itself, utilize these price caps to set the maximum prices for out-of-network goods and services. MultiPlan's PPO network also states in plan disclosure documents that it sets maximum prices for goods and services at 150% of

Medicare charges. Cigna, Aetna, Blue Cross and Blue Shield, Humana, Molina, Centene, and other payors have all agreed to use price caps for out-of-network services.

340. The fact that MultiPlan and its competitors agreed to use a percentage of Medicare pricing to set the maximum out-of-network prices is particularly staggering.

341. In a secret August 2019 whitepaper titled "A Better Reference for Pricing: Avoiding the Pitfalls of Charge-and Medicare-Based Methodologies When Pricing Non-Contracted Claims" that was disseminated to United and others, MultiPlan confided that Medicare-referenced pricing was "inherently misleading" because most people "do[] not understand how low Medicare rates are." The whitepaper continued, "[t]he gap between [billed charges] and the barebones Medicare reimbursement can be significant."

342. In that same whitepaper, MultiPlan admits that "[t]he use of Medicare as the basis for calculating out-of-network reimbursement creates a flawed equation from inception," and that "there is no guarantee the resulting allowed amounts will cover a provider's costs." Thus, not only did MultiPlan and United agree to fix prices, they did so in a way that they knew was intentionally misleading and would generate staggering underpayments for providers.

343. As the American Medical Association has explained, "there is no relationship between the Medicare fee schedule and usual, customary, and reasonable fees" for out-of- network goods and services. In fact, Medicare reimbursements have not been related to the usual, customary, and reasonable fees of providers for twenty years.

344. What the MultiPlan Cartel is doing is sleight-of-hand. They are replacing the prior independent pricing discretion that had resulted in UCR prices for out-of-network services prior to the cartel with a collective pricing regime that may sound reasonable to outsiders, but that

everyone involved in medical billing understands is a massive underpayment and a radical break with the prior pricing practices in this industry.

345. If a payor does not want to go along with the maximum prices set by MultiPlan, MultiPlan retains the contractual power to force the payor to implement MultiPlan's chosen maximum price for an out-of-network good or service. According to a MultiPlan executive, MultiPlan reserves the right to set its own maximum price for an out-of-network good or service to ensure that the cartel remains cohesive.

346. The MultiPlan Cartel did not use these agreed-upon common pricing methodologies to generate fair or reasonable prices for out-of-network goods and services; it used those common pricing methodologies as a weapon—to guarantee that the insurer Co-Conspirators could fix, to the penny, the exact amount they wanted to pay providers, market realities be damned.

**e. MultiPlan Enters into Agreements with its Competitors to Act as the Sole Negotiator for Out-of-Network Prices.**

347. MultiPlan enters the agreements with the Co-Conspirators under which MultiPlan negotiates the price for out-of-network goods and services with healthcare providers after MultiPlan sends a pricing notice to that healthcare provider. MultiPlan and its Co-Conspirators refer to this as "fee negotiation and benchmarking services" or "FNX."

348. By appointing a single negotiator of all of their out-of-network claims, MultiPlan and competing payors deprive providers of the competition that would naturally flow from multiple payors making their own decisions about how to negotiate the prices of out-of-network goods and services with providers. If they had multiple negotiations against multiple payors, providers could use the competitive dynamics, and those multiple negotiations would eventually result in a more competitive prevailing prices for out-of-network goods and services relative to the cartel prices that MultiPlan imposes on healthcare providers.

349. MultiPlan's FNX agreements end that competition. In the same way that it would be illegal for every company in a market to appoint a single executive to negotiate all employment contracts for all of them, it is illegal for a broad swath of payors to agree that MultiPlan will negotiate the prices that they pay for out-of-network goods and services.

350. In the instances where MultiPlan "negotiates" the prices it sets for out-of-network goods and services as a part of the FNX program, the negotiations are one-sided. Because MultiPlan and its competing payors have agreed not to compete with one another, the question in these negotiations is not whether the healthcare provider will be harmed by the MultiPlan Cartel, but by how much.

351. In addition, because competing payors have agreed to share their competitively sensitive claims data with MultiPlan, any "negotiations" start from a stacked deck. MultiPlan's negotiators have access to a database containing every payment that a provider has ever accepted for a particular out-of-network procedure from any payor that contracts with MultiPlan. Using this expansive and commingled dataset with dozens of payors' confidential pricing data, MultiPlan can pinpoint precisely the least amount that a provider will accept for a particular out- of-network good or service.

352. MultiPlan's FNX agreements also serve to reinforce the cartel agreement to use the same pricing methodology. Because MultiPlan takes over the pricing negotiation between a payor and a provider, payors cannot deviate from the prices set by MultiPlan. Indeed, if MultiPlan negotiates on the insurer's behalf, the agreement between MultiPlan and the insurer provides that the insurer "shall pay the healthcare provider in accordance with the . . . negotiated reimbursement amounts negotiated by" MultiPlan.

353. Many payors have disclosed that they have agreed that MultiPlan will negotiate the amounts that they pay for out-of-network goods and services either through public disclosures or through their conduct. For example, a "Grievances and Appeals/Inquiry Directory" published by Humana directs providers who "disagree with the claim payment you received" to initiate a negotiation not through Humana, but "via the MultiPlan Provider Portal" or by calling a MultiPlan customer service phone number or sending a message to a MultiPlan email address. And, as noted above, Cigna, United, and Aetna all used MultiPlan to negotiate their out-of-network payments.

354. MultiPlan incentivizes its FNX team to impose the lowest possible payments for out-of-network goods and services. In fact, MultiPlan employees describe an internal culture and incentive structure which discourages them from negotiating reasonable rates with providers. *The New York Times* reported that employee bonuses are tied to payment reductions, quoting former MultiPlan negotiator Kajuana Young, who said, "I knew they were not fair," in reference to the prices generated by MultiPlan.

355. Medical practices interviewed by *The New York Times* confirmed their inability to negotiate over prices generated by MultiPlan. *The New York Times* interviewed a healthcare provider's office manage who said "[i]t's not a real negotiation" when MultiPlan transmits offers of payment on behalf of insurers. *The New York Times* further reported that "[i]nsurers can set negotiation parameters for MultiPlan, including not negotiating at all, records and interviews show. . . . Multiple providers and billing specialists said that in recent years they had increasingly been told their claims weren't eligible for negotiation."

**f. There is Enormous Circumstantial Evidence that MultiPlan Enters Into Agreements with Competing Payors to Suppress Prices Paid for Out-of-Network Goods and Services**

356. Because Plaintiffs cited extensive direct evidence of the MultiPlan Cartel agreements, no circumstantial evidence is needed to infer the existence of the cartel. Nevertheless, reams of circumstantial evidence support the existence of the cartel.

357. Here, multiple economic "plus factors" support the existence of MultiPlan's collusive agreements to suppress out-of-network pricing competition, including (1) high market concentration in the relevant market, (2) high barriers to entry, (3) ample motive to participate in the MultiPlan Cartel, (4) a history of prior collusion, (5) countless opportunities to collude, including those directly facilitated by MultiPlan, (6) actions against self-interest that only make sense as part of a cartel agreement, (7) evidence of cartel enforcement mechanisms, (8) pervasive and systematic information exchange between cartel members, and (9) customary patterns and courses of dealing that can only be explained by the existence of a cartel agreement. These "plus factors" equally support the existence of agreements between MultiPlan under a horizontal price-fixing conspiracy, a "hub-and-spoke" conspiracy, and a vertical price-fixing conspiracy resulting in an unreasonable restraint of trade.

**i. High Collective Market Concentration**

358. Defendants and their Co-Conspirators have obtained a high degree of collective market share and market concentration on the buyer side of the Out-of-Network Goods and Services Market, *see* ¶¶ 493-550. MultiPlan claims that all of the top 15 payors (and many hundreds more as well) use its pricing methodology to set prices for out-of-network goods and services.

359. MultiPlan itself acknowledges this high level of market concentration on the buyer side of the Out-of-Network Goods and Services Market. In an August 18, 2020 Analyst Day presentation, MultiPlan wrote that "[t]he health insurance sector has consolidated to four top

insurers," all of whom use MultiPlan's pricing methodology to set prices for out-of-network goods and services.




360. The high degree of concentration in the buyer side of the Out-of-Network Goods and Services Market is a plus factor indicating that it is susceptible to conspiratorial price-fixing by the MultiPlan Cartel. Where there are fewer buyers in a market, that makes collusion between those buyers relatively easier than in diffuse markets with few staggering buyers.

**ii. High Barriers to Entry**

361. There are high barriers to entry into the buyer side of the Out-of-Network Goods and Services Market. To even gain a foothold, new payors face formidable challenges. They need to be able to bear the extreme expenditures of time and money required to develop a network of healthcare providers large enough to compete as a payor. Even if a new entrant opted not to develop

an insurance network, there would still be significant capital outlays required in order to rent a complementary network and operate as a payor. New payors would also face the formidable challenge of contending with the economies of scale enjoyed by the large incumbent payors. Establishing name recognition in an industry occupied by long-entrenched and well-recognized major players presents an additional hurdle.

362. If a new payor elected to operate as an insurance company, it would also face an actuarial risk. If a new insurance company cannot balance claims paid and revenue generated through premiums or network access fees (such as ASO fees), their capital surplus would be depleted.

363. There are also steep regulatory hurdles to market entry for payors that elect to operate as insurance companies. The provision of health insurance is highly regulated at the federal level and each state has its own varying regulations for the industry, leading to a patchwork system that is difficult for new entrants to navigate. This patchwork is also ever-changing, as new legal and regulatory requirements are created on a regular basis.

364. Even if a new entrant is initially successful, it must survive long enough to develop a broad base of business which allows it to effectively spread risk amongst its insureds.

365. These barriers to entry further cement the dominance of the MultiPlan Cartel by ensuring that new entrants who reject the MultiPlan Cartel's price-fixing scheme cannot undermine the cartel's ability to impose artificially low reimbursement rates on healthcare providers for out-of-network services.

366. These high barriers make it unlikely that a new entrant could disrupt the MultiPlan Cartel and support an inference of collusive agreements.

**iii. Motive to Conspire**

367. MultiPlan and the members of the MultiPlan Cartel have a massive financial motive to underpay providers for their out-of-network goods and services. MultiPlan is paid a percentage of the underpayment that its pricing methodology generates. In other words, it only makes money if the cartel is successful in suppressing out-of-network pricing competition; and when the cartel pays less money to providers for out-of-network goods and services, MultiPlan makes more money.

368. The fees that MultiPlan's competitors pay it for suppressing out-of-network pricing competition are staggering. At one point, Aetna paid MultiPlan 12% of "savings" as a fee for MultiPlan suppressing out-of-network pricing competition.

369. The MultiPlan Cartel also generates fees from its ASO clients, known as "shared savings" fees. Under this structure, MultiPlan and the payors collect a percentage of the purported "savings"—calculated as the difference between a provider's billed charges and the ruthlessly reduced amount the payor ultimately pays based on MultiPlan's methodologies. The ASO client pays this "shared savings" fee, which is often 35% or more, and that payment is divided between MultiPlan and the payor. Through this incentive structure, the MultiPlan Cartel's conspiracy not only results in underpayments to healthcare providers but also transforms these underpayments into bounty profits for cartel members. The cartel has a direct incentive to pay providers less because the less the cartel pays providers the larger their bounty profits. The gross payments to MultiPlan are also staggering. In one year, United paid MultiPlan $300 million for generating underpayments for out-of-network goods and services. That $300 million payment accounted for up to 20% of MultiPlan's annual revenue that year.

370. Likewise, payors are incentivized to pay less for out-of-network goods and services to increase their own profits. For example, in an internal email, United executives stated that by

"driving all OON [out-of-network] claims to a more aggressive pricing," United could generate more profits than if it continued paying out-of-network claims at UCR rates.

371. The motives of MultiPlan and its competitors are aligned, because the less the MultiPlan Cartel pays to healthcare providers, the more revenue and profits they get to keep for themselves. As MultiPlan stated in a presentation to investors, competing payors' "incentives are completely aligned" with MultiPlan's own incentives. Similarly, in MultiPlan's 2023 10-K, MultiPlan said: "our revenue model is aligned with the interests of our customers."

372. While companies are disincentivized from entering into cartel agreements by U.S. antitrust law, MultiPlan strongly implies to its competitors that its out-of-network pricing scheme is entirely legal by offering to enter into formal contracts and pitching its pricing methodology as a "liability shield."

**iv. Prior Industry Collusion**

373. It is easier for firms in a market to conspire with one another if they have done so before. Because payors could not collectively control out-of-network reimbursement rates through legally enforceable contracts (which is the way that they have traditionally controlled in-network rates), they attempted to enter into illegal cartel agreements to suppress out-of-network reimbursements on multiple occasions.

374. In 1996, UnitedHealth formed a wholly owned subsidiary called Ingenix. United then acquired both of the previously independent UCR databases, MDR (in 1997) and PHCS (in 1998). For the next decade, the UCR database was controlled by United.

375. Other insurers quickly signed on to use Ingenix's new database and agreed to contribute to that database by sending their competitively sensitive claims data to their competitor, United's, subsidiary.

376. In 2008, the New York Attorney General began investigating Ingenix. The investigation was soon followed by a lawsuit filed by the American Medical Association and an investigation by the U.S. Senate's Committee on Commerce, Science and Transportation.

377. The investigations concluded that "the out-of-network system [was] broken." As one of the lawyers leading the New York investigation later explained to the Senate Committee: "Reasonable and customary rates are supposed to fairly reflect market rates, but our investigation revealed that Ingenix [was] nothing more than a conduit for rigged information that [was] defrauding consumers of their right to fair reimbursement for their out-of-network healthcare costs." Although insurers promised plan members in their policy documents to reimburse based on UCR rates, they instead reimbursed "based on schedules compiled by one of their own, the nation's [then] second largest health insurer, which has an interest in depressing reimbursement rates." The Ingenix schedules were "unreliable, inadequate and wrong."

378. The investigations also found widespread manipulation of the data inputs to the Ingenix database—both by the insurers submitting data, and by Ingenix itself. Some insurers "scrubbed," or deleted, high value claims before submitting their data to Ingenix. Aetna, for example, eliminated the highest 20% of valid medical charges before sending its data to Ingenix. After Ingenix received that data, it itself scrubbed the data again, removing even more high medical charges from the dataset before inputting it to the database.

379. Another contributor, who submitted data for more than 5 million claims a month, did not submit true claims data. Instead, it "aggregate[d] the data in the relevant time period by zip code for each procedure code" and then "provide[d] Ingenix the average charge regarding each procedure." This dramatically distorted the distribution of charges in the database, as the Senate Office of Oversight explained: "if the insurer submitted an average cost of $75 for two medical

procedures, Ingenix would have no way to determine if the charges that averaged to $75 were from an original distribution of $74 and $76 or from a distribution of $50 and $100. This practice, when applied to millions of submitted charges across hundreds of geozips could have dramatically skewed the distribution of Ingenix's data and made charges like a valid $100 charge appear to be much higher in the distribution than they actually were."

380. Other insurers deleted any charges that reflected modifiers that indicated procedures or services with complications which would justify a higher than usual charge, making it appear as if more complicated procedures were less expensive than they actually were. Others did not collect information that affected the value of the service at all. Some insurers pooled data that should be kept separate, for example by aggregating the rates charged by nurses, physicians assistants, and physicians. And some salted their data with in-network claims—which were paid at lower-than-market rates agreed to by contract.

381. The investigations showed that Ingenix's database resulted in out-of-network claims being underpaid by 10% to 28% depending on the service involved.

382. In early 2009, the New York Attorney General entered into a series of consent decrees with United and a total of 11 other insurers that participated in the Ingenix scheme, including Aetna, Cigna, and HealthNet.

383. On January 13, 2009, United entered into a settlement with the New York Attorney General under which United agreed to shut down the Ingenix database and contribute $50 million toward the creation of a new, independent database that would house more aggregated information. That database became known as FAIR Health.

384. On January 15, 2009, Aetna entered into a settlement with the New York Attorney General under which it agreed to end its relationship with Ingenix and to contribute $20 million

toward the creation of FAIR Health. It further agreed to use the new database for a period of five years, and not to "own, operate, or fund any other database product that provides data pooled from more than one insurer to other health insurers for determining reimbursement rates."

385. Similarly, on February 18, 2009, WellPoint, Inc. (the predecessor to Elevance) agreed to end its relationship with Ingenix and pay $10 million toward the creation of FAIR Health. The WellPoint settlement included the same requirement to use the new database for five years and restriction on owning or operating any other database product.

386. The Ingenix scheme also led to massive civil settlements. For instance, United paid $350 million to settle a class action.

387. Following the settlements, FAIR Health was created as a non-profit company overseen by Syracuse University. FAIR Health was designed to collect, verify, and maintain insurers' claims data, and to calculate fair, transparent, and accurate UCR benchmarks for use by healthcare providers and insurers.

388. The database eventually became operational in approximately January 2011. The insurers' five-year obligation to use FAIR Health ended in 2015.

389. For the next five years, the payors paid the fair and reasonable value for out-of-network services. In most instances, they paid 70% to 90% of the out-of-network providers' billed charges.

390. When insurers' obligations under their settlements with the New York Attorney General to use the FAIR Health database lapsed, insurers still had the same incentive to collude to depress out-of-network reimbursement rates. But now, the prior vehicle for that collusion—Ingenix—was no longer available. MultiPlan filled this gap.

391. As a result of this prior collusion, the Co-Conspirators knew one another and knew that they could trust each other to collude on out-of-network pricing, they knew that using a common pricing methodology was a plausible way to reach an agreement to limit out-of-network pricing competition, and they knew that they could count on one another not to alert the government to the existence of the MultiPlan Cartel. However, each of the largest payors knew that they alone could not develop another scheme to suppress out-of-network prices because the government would recognize its unlawfulness.

392. MultiPlan has been clear that its claim suppression methodology is effectively the same as the Ingenix scheme that resulted in a sprawling attorney general investigation and multi-million dollar penalties. MultiPlan's subsidiary, National Care Network LLC, actually marketed Data iSight as an "alternative to Ingenix."

**v. Opportunities to Conspire**

393. The MultiPlan Cartel has ample opportunities to conspire, which supports an inference of agreements to conspire. As described above, *see* ¶¶ 189-215, MultiPlan itself facilitates extensive private communications between competing payors, which provide the setting and opportunity for them to conspire.

394. Members of the MultiPlan Cartel have extensive additional opportunities to conspire through other industry meetings. For example, many of them, including most of the largest commercial health insurance payors, are members of industry associations such as AHIP (formerly "America's Health Insurance Plans"). Co-Conspirators, including Aetna, Centene, Cigna, CVS Health, Elevance, HCSC, Humana, and many others, are members of AHIP.

395. As AHIP states, it "plays an important role in bringing together member companies and facilitating dialogues to advocate on shared interests."

396. AHIP's Board of Directors is a "who's who" of payor executives, including:

a. Paul Markovich, President and CEO of Blue Shield of California;

b. Daniel Loepp, President and CEO of Blue Cross Blue Shield of Michigan;

c. Jared Short, President and CEO of Cambia;

d. Gail K. Boudreaux, President and CEO of Elevance;

e. Bruce D. Broussard, President and CEO of Humana;

f. David Cordani, Chairman and CEO of Cigna;

g. Sarah London, CEO of Centene;

h. Karen S. Lynch, President and CEO of CVS Health (the parent company of Aetna);

i. Maurice Smith, President, CEO and Vice Chair of HCSC;

j. David L. Holmberg, President and CEO of Highmark;

k. Gary St. Hilaire, President and CEO of Horizon;

l. Greg. A. Adams, Chair and CEO of Kaiser; and

m. Joseph Zubretsky, President and CEO of Molina.

397. AHIP hosts conferences, committee meetings, and board meetings multiple times a year where its members participate in private, closed-door meetings.

398. In 2023, MultiPlan sponsored AHIP's Annual Conference. MultiPlan representatives attended AHIP's 2023 Annual Conference from June 13–15 in Portland, Oregon.

399. The fact that members of the MultiPlan Cartel regularly gather together at closed-door retreats, ad hoc meetings, secret road shows, and at industry events such as AHIP's conferences, board meetings, and committee meetings is circumstantial evidence that their parallel conduct is part of a common scheme to suppress out-of-network pricing competition.

**vi. Actions Against Self-Interest**

400. Payors that joined the MultiPlan Cartel have engaged in actions against self-interest in at least two ways.

401. First, the agreements between MultiPlan and competing payors are economically irrational absent the existence of a cartel. If a single payor entered into an agreement with MultiPlan to shift away from UCR prices and to drastically underpay for out-of-network goods and services, providers would simply refuse to treat insureds affiliated with that payor (absent a scenario requiring treatment, such as emergency services). As a result, the payor would face serious harm to the value and breadth of its insurance offering as healthcare providers refuse treatment, ultimately leading to a loss of subscribers.

402. Such an agreement, standing alone, would also expose a payor to staggering time and cost expenditures associated with pricing negotiations. While healthcare providers cannot effectively negotiate with the MultiPlan Cartel due to the volume of MultiPlan pricing offers, a single payor acting alone would face staggering pushback from providers.

403. Absent a cartel, the net effect of using MultiPlan's pricing methodology would be reduced profits—the lower reimbursement rates from MultiPlan's pricing algorithm would be insufficient to offset the lower patient volumes, increased negotiation costs, and MultiPlan's fee for the payor. The only way the agreement with MultiPlan is not economically self-defeating is if all or nearly all payors agree to join the MultiPlan Cartel.

404. MultiPlan acknowledges that, without industry coordination, a payor cannot single-handedly slash the prices it sets for out-of-network goods and services. But, through MultiPlan, which "can talk to the entire industry," all payors can agree to join the MultiPlan Cartel and eliminate the risks associated with individual price cutting.

405. Absent a conspiracy, payors would make independent decisions on how to pay out-of-network claims, with the freedom to consider the specific circumstances underlying each submitted claim, rather than automatically underpaying claims through MultiPlan's across-the-board methodology.

406. Even if competing payors had a unilateral economic incentive to keep out-of-network claims effectively contained, they would not naturally agree to do so using the same pricing methodology from the same provider, which also happens to be a rival payor. Instead, these competitors should want to compete to find the optimal balance between keeping the costs of claims down, while also minimizing the costs of claims disputes that arise when payment offers are too low.

407. But if the competing payors agree to implement the exact same pricing methodologies, they can collectively maximize their profit while shielding themselves from the costs of disputes. Since all Co-Conspirators adopt the same pricing methodology, providers have no choice but to accept the prices set by that methodology.

408. Second, the payors that have joined the MultiPlan Cartel have refrained from engaging in self-interested, unilateral conduct that would have destabilized the cartel.

409. For example, it was against the unilateral economic self-interest of many individual insurers to abandon using FAIR Health, which charges insurers a modest, flat annual fee. For comparison, MultiPlan assesses its clients a fee for each claim where it sets and negotiates the out-of-network price, which is based on a percentage of the difference between the billed amount and the sum ultimately paid. For many insurers, these contingent fees far exceed the flat annual fee to use FAIR Health benchmarks. Nevertheless, payors accounting for more than 80% of all out-of-network payments to providers in the United States have collectively delegated their out-of-

network pricing decisions to MultiPlan, incurring dramatically higher fees than FAIR Health. Payors would not have switched to a more expensive pricing methodology unless they understood that they would collectively benefit from using that agreed-upon methodology.

410. Similarly, MultiPlan's competitors have abandoned efforts to in-source out-of-network pricing authority despite the vast savings that such efforts would generate and—in at least one case—despite spending considerable sums actually developing an alternative out-of-network pricing methodology.

411. As the nation's single largest payor, United could easily analyze its own historical claims database to ascertain the most efficient pricing levels for out-of-network reimbursements. United could then set prices for out-of-network goods and services based upon that data. This would allow United to eliminate its reliance on MultiPlan's pricing methodology, saving them hundreds of millions of dollars per year.

412. In 2021, United created an out-of-network pricing methodology, known as Naviguard, to do just that. One analyst described Naviguard as "an in-house replacement for MultiPlan." In addition, Rebecca Paradise, United's Vice President of Out of Network Payment Strategy, testified that Naviguard was designed to effectively take MultiPlan's out-of-network pricing methodology in house:

> Q. Basically, you're going to replace MultiPlan, who's charging a fee, take it inhouse so that you y'all can make the money. Right?
>
> A. Well, we weren't copying. Yes, we were looking for solutions that we could support internally.

413. United planned to aggressively price the Naviguard product. Instead of taking a cut of the difference between the billed charge and the allowed amount, United planned to offer a fixed, per-member, per-month fee. As compared to "shared savings fees," this had the potential of

dramatically lowering fees charged to its ASO clients. For example, public meeting minutes from Hays County, Texas reflect that the county paid $263,000 in "shared savings fees" for MultiPlan's services in 2019. Under the Naviguard pricing structure, the county would pay only $2.50 per member each month, or $30,000 per year.

414. United developed a "roadmap" to terminate its contract with MultiPlan by 2023 in anticipation of Naviguard coming online.

415. That plan was ultimately scrapped. United renewed its contract with MultiPlan in January 2023 instead.

416. United's expenditures on Naviguard and its subsequent decision not to bring out-of-network pricing in-house are actions against self-interest, which only make sense in the context of a horizontal conspiracy wherein MultiPlan is fixing prices amongst payors for out-of-network goods and services.

417. Joining the MultiPlan Cartel makes very little sense for massive payors, like United and Cigna, that can afford to create their own in-house pricing methodologies. It costs millions of dollars to build out the data links, associated information technology, and professionals staff necessary to transmit securely a high volume of real-time claims information to MultiPlan for adjudication and pricing in less than 24 hours. It makes no economic sense for a payor to spend millions of dollars building a data link so that it can share raw competitively sensitive information with a competitor. The only rational explanation for taking on that sunk cost is that those payors believe that they can recoup those costs through the windfall profits generated by the MultiPlan Cartel.

**vii. Pervasive Exchanges of Competitively Sensitive Information**

418. Competitors like the members of the MultiPlan Cartel would not exchange massive volumes of competitively sensitive pricing information in the absence of a cartel agreement.

419. However, MultiPlan and competing payors have agreed to exchange real-time, confidential, and competitively sensitive data regarding out-of-network pricing. The data exchanged is voluminous. In December 2021, MultiPlan had access to “over 3 petabytes of structured claims data from across 700 payer customers.” By June 2023, MultiPlan touted that it had “10+ petabytes of [claims] data.”

420. Indeed, during a deposition, when asked whether there was “any information that MultiPlan would not provide for Cigna if Cigna asked,” the Cigna witness responded: “from my experience, if I asked for information, they would provide it to me.” A United witness similarly testified, “I have no reason for MultiPlan not to share or provide answers to any questions that we have asked.”

421. MultiPlan also facilitates ad hoc exchanges of competitively sensitive information with other payors.

422. United representatives have admitted under oath that MultiPlan shares with it sensitive information about competitors’ out-of-network pricing. Ms. Paradise was asked at trial in *Emergency Services of Okla. PC, et al. v. United Healthcare Ins. Co.*, CJ-2019-482 (Okla. Dist., Cleveland County) whether she ever has “the opportunity to learn about what other insurers are allowing for similar [out-of-network claims] amounts.” Ms. Paradise responded that “[f]rom time to time [United] may see that information.” When asked for United’s “sources” of information on its competitors’ pricing, Ms. Paradise responded that MultiPlan was the source of that information.

423. MultiPlan uses this competitively sensitive and confidential data to bring payors into alignment on underpaying healthcare providers for out-of-network goods and services. For

instance, in a March 2017 presentation entitled, "Analysis and Recommended Actions for Enhancing Savings Results," MultiPlan provided United with a chart comparing United's payments for out-of-network services for ambulatory surgical centers, dialysis treatment, hospital inpatient services, and hospital outpatient services. The chart compared United, shown in the chart as "UNH" to three of its competitors, shown as "Client B," "Client C," and "Client D." The purpose of this chart was clear—United was paying too much for out-of-network services and it should lower its payments to match its competitors. Then, MultiPlan provided United with several solutions for how United could pay providers less for out-of-network goods and services. For example, MultiPlan recommended setting United's maximum out-of-network payment at 350% of the Medicare rate for particular out-of-network goods and services. According to the presentation, taking that single step would generate "annual incremental savings of $73 million for fully insured and $1.6 billion for ASO business." Subsequently, United agreed that MultiPlan should implement this 350% price cap on prices set for United's out-of-network goods and services when it implemented MultiPlan's pricing methodology starting in July 1, 2017.

424. United subsequently used this information on its competitors' out-of-network payment strategies to inform how MultiPlan set prices for out-of-network goods and services on United's behalf. On May 8, 2017—just two months after MultiPlan delivered its "Analysis and Recommended Actions for Enhancing Savings Results" presentation to United—United's Executive Council met to consider implementing lower prices for out-of-network goods and services. At that meeting, a presentation was given to the United Executive Committee which explained that one added "value" in outsourcing out-of-network pricing to MultiPlan was that doing so "[l]evels [the] playing field with competitors."

425. After United agreed to adopt MultiPlan's out-of-network pricing methodology, MultiPlan continued to funnel non-public information about competitors' out-of-network pricing to United in order to convince United to set even lower prices for out-of-network goods and services via MultiPlan's common pricing methodology.

426. On September 27, 2018, Ms. Paradise, the Vice President of Out-of-Network Payment Strategy for United, sent an email to Jacqueline Kienzle, the Senior Vice President of Sales and Account Management at MultiPlan, copying Dale White, the then-Executive Vice President and Chief Revenue Officer at MultiPlan. In her email, Ms. Paradise made reference to a text message that John Haben, the Vice President of Networks at United, had sent to Mr. White the day before Paradise requested that MultiPlan send United a chart comparing United's out-of-network payments to the out-of-network payments of three of its competitors. While this information was supposed to be blinded, prior to providing the information to United, Mr. White asked MultiPlan's Senior Vice President of Healthcare Economics, Sean Crandell, who the competitors listed in the chart were so that he could provide that information to United.

427. The information exchanged by MultiPlan and the other members of the MultiPlan Cartel is exactly the type of information exchange that the courts have recognized is likely to have anticompetitive effects. First, the data exchanged is real-time pricing data, transmitted to MultiPlan automatically and expeditiously through electronic data links from competing payors. Second, the data exchanged is not blinded in any way. Third, the data exchanged is not publicly available—although hospitals do publish some pricing information online, it is not updated in real-time. Fourth, the data is granular—meaning that MultiPlan *knows exactly* what its competitors are charging for specific medical services and procedures.

428. MultiPlan funnels the competitively sensitive pricing information that it receives to its competitors in order to end pricing competition by adopting the same pricing methodology. For example, Multiplan disclosed the specific out-of-network pricing strategy used by Blue Cross Blue Shield plans to United executives when recruiting United into the MultiPlan Cartel. United executive Mr. Haben included this competitively sensitive information in a September 8, 2016 email to Lauren Paidosh (another United executive) and later conceded under oath that he received it from MultiPlan.

429. Payors enter the MultiPlan Cartel knowing that MultiPlan will share their commercially sensitive pricing information with other existing and prospective members of the MultiPlan Cartel.

430. While MultiPlan shares reams of information about its proprietary pricing methodology with competing payors, it keeps the same details hidden from providers. When a provider reached out to MultiPlan to learn more about its pricing methodology in July 2019, MultiPlan's executives decided to withhold key information from the provider. In an email sent on July 10, 2019 at 7:50 a.m., Bruce Singleton, MultiPlan's Senior Vice President for Network Development Strategy, told Mike McEttrick, MultiPlan's Vice President of Healthcare Economics, that he wanted to keep the discussion with that provider at "eye level," meaning that he did not want to share the details of how MultiPlan's pricing methodology actually worked with the provider.

431. Competing companies would not risk sharing granular, real-time, and competitively sensitive pricing information with their rivals. The information exchange operated by MultiPlan is more consistent with an agreement to restrain trade than competition on the merits. Therefore, this type of information exchange is circumstantial evidence of a cartel agreement.

### viii. Monitoring and Enforcement Structures

432. Because a cartel agreement is against public policy, members of the cartel cannot go to court to enforce their illicit agreement. As a result, they need to create extra-judicial structures to detect and prevent attempts to disrupt the cartel agreement.

433. United's plan to abandon the MultiPlan Cartel and to use its in-house Naviguard system to set prices for out-of-network goods and services was one such attempted disruption to the cartel agreement. Having the largest healthcare payor in the United States defect from the MultiPlan Cartel would inevitably destabilize the agreement and might cause other payors to reevaluate their participation in the cartel.

434. When news that United may be ending its relationship with MultiPlan came to light, Multiplan's stock price tumbled. MultiPlan knew that it needed to take immediate action to stabilize the cartel and secure its own long-term viability.

435. So, MultiPlan bought off United with a sweetheart deal. Upon information and belief, in 2022, MultiPlan and United negotiated a new contract that went into effect in 2023. MultiPlan gave United extremely favorable commercial terms for continuing to allow MultiPlan to set prices for out-of-network goods and services, allowing United to capture nearly all of the underpayments generated by MultiPlan's pricing methodology.

436. Thus, beginning in 2023, United charged its ASO clients a fixed per-member, per-month fee for the underpayments that MultiPlan's pricing methodology generated for out-of-network goods and services, rather than a "shared savings fee." This agreement meant that MultiPlan would take a considerable hit to the fees it could collect from United: rather than receiving a variable spread price, it could get a consistent, low fee.

437. This sweetheart deal was so good for United that it caused a temporary drop in MultiPlan's financial performance, which MultiPlan executives discussed during quarterly earnings calls with investors in Q4 2022 and Q1 2023. In MultiPlan's Q4 2022 earnings call, MultiPlan's then-CEO, Mr. White, explained, "we have been anticipating that a multiyear contract renewal with one of our largest customers would mute our 2023 revenue growth" and that the contract renewal would be "a headwind against growth in 2023."

438. However, MultiPlan was willing to sacrifice its own short-term revenues and profits in order to stabilize the cartel and keep the largest cartel members in the fold. As Mr. White explained during MultiPlan's earnings call for Q1 2023, renewing pricing agreements with the largest payors in the United States made MultiPlan's leadership "increasingly confident that our revenues are stabilizing and poised for growth over the next several years."

439. MultiPlan's efforts to enforce the cartel agreement by buying the loyalty of one of the largest payors in the cartel appears to have worked. In an August 2, 2023, press release, the CEO of MultiPlan hailed Q2 2023 as an "inflection point" in which MultiPlan "deliver[ed] second quarter results at the high end of our expectations," leading MultiPlan to increase its revenue guidance for investors for 2023. Since August 2023, MultiPlan has generated increasing revenues from its out-of-network claims pricing business despite other lines of its business faltering.

440. MultiPlan's willingness to sacrifice short-term profits does not make economic sense absent its knowledge that perpetuating its conspiracy to underpay healthcare providers would pay off in the long run.

441. In addition, one of the most efficient ways for members of a cartel to reach an agreement on collusive pricing and to ensure that pricing sticks, is for every member of the cartel to allow one competitor to set prices and negotiate those prices. That is exactly what has happened

here. Each of the competing payors, who should have been exercising their own discretion to set prices for out-of-network claims, entered into agreements that gave MultiPlan the right to set prices for each cartel member's out-of-network claims and then made MultiPlan the sole entity responsible for negotiating payment of those collusively set prices.

442. MultiPlan and its competitors were also brazen enough to write formal contracts that included dispute resolution provisions. For example, MultiPlan's contract with Aetna contains a clause enforcing their out-of-network pricing agreement through "mediation . . . administered by the American Arbitration Association under its Mediation Rules for Commercial Financial Disputes . . . in the city of New York." The contract contemplates the possibility that, if that mediation was unsuccessful, MultiPlan could sue Aetna to, among other things, enforce the terms of their out-of-network pricing agreement. This threat of litigation or mediation served as a check that ensured the compliance of cartel members. Moreover, it allowed MultiPlan and Aetna to keep the compliance aspect of the MultiPlan Cartel private because arbitration is confidential and not publicly disclosed.

443. MultiPlan's PSAV payment model also enables MultiPlan's Co-Conspirators to ensure that MultiPlan is underpaying out-of-network claims. MultiPlan sends regular reports to competing payors about how little a healthcare provider is paid for out-of-network claims as a result of MultiPlan's proprietary pricing methodology. From these reports, MultiPlan's competitors can monitor how well MultiPlan is adhering to its agreement to underpay healthcare providers for out-of-network goods and services.

444. In addition, MultiPlan recently increased its ability to exchange real-time pricing data and benchmarking information. In June 2023, it announced a new product known as PlanOptix. MultiPlan said it created PlanOptix as a direct response to its payor-competitors'

demands. The product enables "access" to 400 billion "fully indexed" records. For example, a payor can "search a CPT code and understand the price of that particular service . . . at a provider under a certain network."

445. However, payors told MultiPlan that "[i]t's not enough to simply get to the data and information because the records are vast." They wanted direct competitor pricing information.

446. When MultiPlan first announced PlanOptix, it had already "ingested data on over 70 payers," including "all of the national major carriers as well as many of the regional ones." Per payors' requests, MultiPlan enhanced PlanOptix to show competitor pricing data—"not just at a global level, but even at a service level right, labs and X-rays versus inpatient, inpatient versus outpatient."

447. MultiPlan explained that, using PlanOptix, payors would be able to answer questions such as: "Where do I sit versus my competitor?" and "How do I ensure that I'm negotiating correctly when I measure myself against my competitors?" Indeed, in 2024 Travis Dalton, MultiPlan's current CEO, explained that PlanOptix "provides prescriptive analytics" to commercial healthcare payors.

448. PlanOptix enables the members of the MultiPlan Cartel to monitor one another's adherence to their agreement to eliminate pricing competition on out-of-network goods and services. It does so by allowing payors to directly compare how much they pay to a particular provider for a particular type of out-of-network service, as shown below.




449. In the example shown above, PlanOptix is comparing the prices that Blue Cross Blue Shield PPO plans pay for specific out-of-network services, such as coronary artery bypass grafts, lung transplants, colonoscopies, lumbar spinal fusion, and knee replacement surgeries at the Mayo Clinic Arizona to the prices that United and Aetna pay for the same out-of-network services. PlanOptix shows the average price that Blue Cross Blue Shield pays for those out-of-network services and the percentage difference between those prices and the prices that United and Aetna charge for the same out-of-network services. In fact, as shown above, payors using PlanOptix can directly compare their prices for out-of-network goods and services to the prices set by other payors for the same goods and services.

450. At the November 28, 2023, Bank of America Leveraged Finance Conference, Mr. White openly stated that the purpose of PlanOptix is to "enable payers to benchmark themselves against their competitors." He explained that, using PlanOptix, a payor will know "whether they're

above or below or on par with their competition," including with regard to reimbursements paid to "a specific provider."

451. PlanOptix is a cartelist's dream come true. It allows a member of the MultiPlan Cartel to monitor the effectiveness of the cartel in real time and to detect instantly whether any member of the cartel is "cheating" by paying providers more for out-of-network goods and services—precisely the kind of policing mechanism that turns a fragile agreement into a durable, self-enforcing cartel.

**ix. Customary Patterns, Formulas, and Leadership**

452. The longer a cartel agreement endures, the more likely it is to remain effective. If every member of the cartel knows their role and that they can trust their fellow cartelists to adhere to their pricing agreement, a cartel can last for years.

453. That is the case here. MultiPlan has a long history of facilitating and stabilizing the MultiPlan Cartel. MultiPlan boasts that it is "deeply embedded into [its Co-Conspirators'] claims platforms."

454. MultiPlan emphasizes the long-term nature of its relationships with its competitors with respect to setting prices for out-of-network goods and services. In a June 28, 2023 investor presentation, it stated that its "Average Length of Large Customer Relationships" was over 25 years.

455. MultiPlan has achieved "payer lock" due to MultiPlan's deep and long-standing integration into its clients' claims processing operations.

456. In MultiPlan's Q3 2020 earnings call on November 12, 2020, then-CEO, Mark Tabak, described MultiPlan as having "created a competitive moat around our company that drives high recurring revenues."

457. For over a decade, payors with collective dominance in the Out-of-Network Goods and Services Market have been locked into multi-year contracts to use MultiPlan's out-of-network pricing methodology.

458. MultiPlan's consistent public statements trumpeting this high level of market participation and promoting the high provider acceptance rates of its pricing offers provide reassurances regarding the stability of the cartel to its members.

459. The MultiPlan Cartel has a long-standing and well-functioning ringleader in MultiPlan. MultiPlan takes the lead in recruiting new members into the cartel, shares information with them about the advantages of collusive pricing, threatens that they will suffer financial disadvantage by not joining or defecting from the cartel, and enforces price discipline by encouraging cartel members to match the out-of-network prices set by their competitors.

460. These customary patterns, formulas, and leadership are circumstantial evidence of agreements and a conspiracy to suppress rates.

**g. The MultiPlan Cartel Can be Evaluated as Either Traditional or Algorithmic Price Fixing.**

461. MultiPlan's agreements with competing payors have all of the hallmarks of traditional price fixing—horizontal agreement, information exchange, lack of deviation, collective market power, and enforcement structures.

462. MultiPlan enters into agreements with its competitors concerning: (1) the pricing methodology that they will use to pay providers for out-of-network goods and services instead of exercising independent pricing discretion, and (2) the maximum price that they will pay providers for particular out-of-network goods and services through override agreements.

463. This is not a case in which competitors independently decide to license third-party pricing software through vertical agreements and then occasionally deviate from the prices recommended by that software.

464. MultiPlan is not some neutral third party sitting at a different level of the distribution chain. MultiPlan is a payor. MultiPlan competed with the very payors that now use MultiPlan's pricing methodology. MultiPlan benefits from the cartel exactly as its horizontal competitors do. Because the cartel shields MultiPlan from the competitive pressures that would exist absent collusion, MultiPlan underpays providers for out-of-network goods and services using a common pricing methodology rather than exercising independent pricing discretion—padding its own revenue and profits at the direct expense of the providers who should have been paid fair, market rates for their goods and services.

465. MultiPlan's pricing methodology is not merely recommending prices that payors can deviate from. Instead, payors delegate nearly every aspect of the out-of-network pricing process to MultiPlan. Payors agree to be bound by the prices set by MultiPlan sets. Payors cannot, and do not, deviate from the prices set using MultiPlan's methodology. The cartel prevents a payor from doing so by requiring that MultiPlan handle any interactions with providers that dare to question the prices set by the cartel. Further, payors often agree to delegate payment of claims and the dispute resolution process to MultiPlan. Thus, the payors that entered into agreements with MultiPlan did not retain or exercise any meaningful pricing discretion.

466. No analysis of "algorithmic price-fixing" is necessary for these agreements; they have been *per se* illegal for decades under black letter antitrust law. But even if the Court were to analyze these allegations under recent case law concerning algorithmic price-fixing, they are also illegal *per se* under the rubric as well.

467. MultiPlan is a competing payor that should be using its own independent pricing discretion to pay providers for their services.

468. Instead, MultiPlan and its competitors have agreed to use a common algorithm to set the prices that they will pay providers for out-of-network goods and services.

469. A massive number of payors, representing more than 80% of all out-of-network payments by dollar volume in the U.S. have agreed to use MultiPlan's pricing methodology instead of using their independent pricing discretion.

470. In a tight three-and-a-half year window, countless payors adopted parallel prices and parallel strategies by systematically switching from UCR or FAIR Health benchmarks to MultiPlan's pricing methodology.

471. MultiPlan and its competitors do not deviate from the prices recommended by the algorithm. Those recommended prices are submitted to providers as proposed payments for out-of-network goods and services.

472. Because they effectively have no other option, providers accept these underpayments more than 90% of the time.

473. In the cases where a provider attempts to push back on MultiPlan's underpayments, they quickly find that they have no practical ability to do so. MultiPlan rigs that negotiation by setting a collusively low starting point for the negotiation and then acting as the sole negotiator of the claim using the petabytes of competitively-sensitive claims pricing information from its competitors to pinpoint the lowest price that the providers will accept for their out-of-network goods and services.

474. MultiPlan facilitates and enforces this algorithmic price-fixing in multiple ways. It ingests, pools, and disseminates confidential and competitively sensitive information about

competitors' payments for out-of-network goods and services to payors to coach them on how to underpay providers even more for particular services. MultiPlan also makes detailed and competitively sensitive payment information available to competing payors on-demand through its PlanOptix service. MultiPlan even takes over the negotiation of claims through its FNX service, guaranteeing that there will be no deviation from the cartel agreement.

475. In addition, MultiPlan's agreements with competing payors are not "hybrid" agreements that have vertical and horizontal aspects. MultiPlan's agreements are fundamentally agreements between companies that used to compete with one another to price and adjudicate claims for out-of-network goods and services, to refrain from setting prices independently and to abdicate pricing discretion for out-of-network goods and services to MultiPlan. MultiPlan and its competitors are not companies operating at different levels in a chain of distribution. MultiPlan and its competitors occupy the same level in the relevant market—they each receive bills from providers for out-of-network goods and services and set prices for those out-of-network goods and services.

476. The agreement to restrain pricing competition did not operate in a downstream chain of distribution. Instead, all of the pricing decisions at issue were made at the same horizontal level of the relevant market. MultiPlan does not produce a product or service that is resod by payors. Nor do MultiPlan's competitors sell a product or service to MultiPlan that MultiPlan then resells.

**h. Alternatively, the MultiPlan Cartel is a Hub-and-Spoke Cartel**

477. Even if the MultiPlan Cartel were not a horizontal price-fixing agreement between competitors, it would be a "hub-and-spoke" agreement that is likewise *per se* illegal under the Sherman Act. MultiPlan is the hub of the cartel and the payors' agreements with MultiPlan to set

prices for out-of-network goods and services are the spokes. The rim of the conspiracy is the agreement between the competing payors to use MultiPlan's out-of-network pricing methodology to suppress out-of-network pricing competition.

478. Prior to joining the MultiPlan Cartel, payors made several attempts to underpay healthcare providers through unilateral action. They were unsuccessful in doing so, but the payors knew that they could not join a buyers' cartel because of their settlement agreements in the Ingenix investigation.

479. For example, before it joined the MultiPlan Cartel in 2017, in May 2015, United paid $11.5 million to resolve claims that it used down-coding software algorithms, stalling tactics, and other unfair business practices to underpay healthcare providers in Connecticut, New York, North Carolina, and Tennessee.

480. Likewise, in September 2015, United agreed to pay $9.5 million to settle claims that it systematically underpaid out-of-network claims in California. However, these unilateral efforts could be thwarted by providers, because providers could elect to not provide most forms of care to patients associated with a price-cutting payor.

481. Payors realized the need for collective action. Initially, United attempted to solve that collective action problem using its subsidiary, Ingenix. However, when the New York State Attorney General shut down the Ingenix scheme, payors needed a new way to agree among themselves to set low prices for out-of-network goods and services.

482. MultiPlan solved that collective action problem. It pitched itself to payors as a hub that could be used to collectively reduce out-of-network payments to healthcare providers. As MultiPlan told its investors, using MultiPlan is a "much better mechanism" for payors to collectively slash payments for out-of-network goods and services "versus doing it themselves."

According to MultiPlan, this is because "if a pay[o]r decides to do everything on their own, their ability to go back to providers and push for savings is fundamentally different than ours. . . . [W]e can talk to the entire industry."

483. MultiPlan persuaded the vast majority of competing payors to become spokes in the conspiracy by promising to cut the prices set for out-of-network goods and services while serving as a "liability shield" for the payors. MultiPlan has contracts with the "top 15" payors in the nation and agreements with payors representing over 80% of the volume of out-of-network transactions in the United States. Each of these contracts between a payor and MultiPlan forms another spoke in the MultiPlan Cartel's "hub-and-spoke" conspiracy.

484. MultiPlan uses similar tactics to facilitate collusion along the rim of the alleged hub-and-spoke conspiracy. MultiPlan informs each of the payors that a massive number of other major payors are using MultiPlan's pricing methodology to set prices for out-of-network goods and services, that those payors are generating enormous revenues by setting low prices for out- of-network goods and services, and that the payor can bring itself into alignment with the rest of the industry on out-of-network pricing by working with MultiPlan.

485. Thus, each of the payors knows that its competitors have considered or are considering the same terms offered by MultiPlan—*i.e.*, lowering out-of-network prices by using a common pricing methodology and splitting the revenues generated by doing so. Each competing payor has a strong motive to enter into the conspiracy because they know that without substantially unanimous action, agreeing to unilaterally cut out-of-network prices would be economically self-defeating. And, in the end, each payor agrees to the same course of conduct (cutting out-of-network prices via MultiPlan's pricing methodology), which constitutes an important departure from their

prior practice of using UCR or FAIR Health benchmarks to compete against one another on out-of-network pricing.

486. There is no valid business reason for each of the payors to have entered into agreements allowing MultiPlan to set and negotiate their out-of-network prices. Larger payors could have created their own in-house pricing methodologies (and some came close to doing so). Smaller payors could have used the FAIR Health benchmark to set out-of-network prices. The only plausible explanation for every payor of any consequence agreeing to use MultiPlan's out-of-network pricing methodology instead of their own pricing discretion is that MultiPlan provided them with assurances that they could agree to do so with the common understanding that they would all benefit from ending out-of-network competition.

487. Each of the payors provides detailed and competitively sensitive pricing information to MultiPlan with the knowledge that MultiPlan will use the information to set prices for competing payors. MultiPlan pools and analyzes the petabytes of claims data it collects to benefit all payors by finding the lowest price that providers will accept for their out-of-network goods and services. Moreover, payors are aware that MultiPlan uses their competitively sensitive claims data to benefit all competitors because MultiPlan makes detailed payment information available on-demand through its PlanOptix service.

488. There is extensive circumstantial evidence that payors have agreed with each other to use MultiPlan's pricing methodology to set prices for out-of-network goods and services, thus forming the rim of the hub-and-spoke conspiracy. This includes evidence that MultiPlan facilitated a parallel transition among payors from a competitive pricing regime to a coordinated pricing regime, and a variety of plus factors, detailed above, that tend to exclude the possibility that the parallel conduct was the result of independent and non-conspiratorial action.

### i. Alternatively, MultiPlan Acted As An Agent, Facilitator, or Conduit of Each of the Other Members of the MultiPlan Cartel

489. Even if the MultiPlan Cartel was not a horizontal price-fixing agreement between competitors, or a hub-and-spoke agreement, the MultiPlan Cartel would still violate Section 1 of the Sherman Act because MultiPlan acted as an agent, facilitator, and conduit of the other members of the MultiPlan Cartel and materially aided their anticompetitive goals.

490. MultiPlan had full knowledge that the other members of the MultiPlan Cartel were seeking to use its pricing methodology as a common means to end out-of-network pricing competition. MultiPlan intended to aid the other members of the MultiPlan Cartel in limiting out-of-network pricing competition because it knew that the more it underpaid doctors and hospitals, the more money it would make.

491. MultiPlan materially contributed to the success of the MultiPlan Cartel in multiple ways. In addition to setting each payor's out-of-network prices, MultiPlan communicates the price to the relevant provider, and disposes of any resulting "negotiation." MultiPlan also serves as a regular facilitator and conduit for passing information between the members of the MultiPlan Cartel to help them suppress out-of-network prices.

492. MultiPlan also facilitates the success of the MultiPlan Cartel by informing payors about the out-of-network prices set by their competitors and encouraging them to adopt similarly low pricing. MultiPlan's goal in distributing this confidential information within the MultiPlan Cartel is to ensure that each payor's out-of-network pricing remains in line with its competitors'' out-of-network pricing. MultiPlan also advances this goal by distributing whitepapers and marketing materials to all cartel members extolling the value of outsourcing out-of-network pricing responsibility to MultiPlan.

493. Aware that its conduct on behalf of the other members of the MultiPlan Cartel could result in agency liability under the antitrust laws, MultiPlan has attempted to concoct contrary evidence. After the initial complaint in this litigation was filed, MultiPlan edited the pricing "offers" it sends to providers. In the most recent version of these pricing "offers," MultiPlan has inserted new language insisting that "MultiPlan is not a payor or an agent of any payor." This non sequitur has nothing to do with negotiating the payment of an out-of-network claim, and everything to do with MultiPlan's ongoing efforts to conceal its violations of the antitrust laws.

## II. Even if the Case Were Evaluated Under the Rule of Reason, the MultiPlan Cartel Has Market Power, Harms Competition Throughout the Relevant Market, and Has No Procompetitive Effects.

### a. The MultiPlan Cartel has Collective Market Power in the Relevant Market for Out-of-Network Goods and Services

494. As an initial matter, defining the relevant market is unnecessary in this case. First, because Plaintiffs have pled a plausible claim under the *per se* rule of antitrust analysis, market definition is unnecessary because it must be presumed at this stage that the restraint harmed competition. Second, even if the Court analyzed Plaintiffs' claims under the rule of reason, plaintiffs have offered abundant direct evidence of harm to competition including staggering market-wide underpayments to providers directly caused by the MultiPlan Cartel, obviating the need to analyze a relevant market. Nonetheless, for the sake of completeness, Plaintiffs plead the following facts concerning the scope of the relevant market.

495. The relevant market at issue in this litigation is the market for out-of-network goods and services sold to payors (referred to throughout as the "Out-of-Network Goods and Services Market").

496. In this market, providers sell out-of-network goods and services, patients consume the out-of-network goods and services, and payors like MultiPlan and its Co-Conspirators function as buyers of those goods and services.

497. Because this case is about a buyer-side cartel, the relevant inquiry when defining the relevant market for the providers' claims is, "from whom can providers reasonably seek payment for their out-of-network services?" The inquiry focuses on which buyers of out-of-network healthcare services are reasonably substitutable from the perspective of sellers of those services.

498. The MultiPlan Cartel also expands and undergirds these commercial realities by specifically prohibiting hospital-based providers from seeking payment from any source other than the relevant payor, as a condition of receiving any payment at all.

499. It is not practicable for providers to avoid seeking payment from commercial payors by convincing patients to pay entirely out-of-pocket for out-of-network goods and services. In most cases, patients are unable or unwilling to pay out-of-pocket for the entirety of their care, which is why the vast majority of patients in the U.S. rely on third-party payor.

500. It is also not practicable for providers to use prior authorizations to ensure that they only provide care to in-network patients. In a prior authorization, a healthcare provider calls a health plan to get approval from the health plan prior to the providing out-of-network care to a patient.

501. With respect to emergency services, healthcare providers cannot use prior authorizations to check whether a patient is in-network or out-of-network. Hospital emergency departments must provide emergency healthcare to patients regardless of whether they are in-network or out-of-network.

502. In theory, healthcare providers can refuse to provide services to out-of-network patients for non-emergency care. In practice, that is not possible. The MultiPlan Cartel leaves providers with effectively no option but to accept the prices imposed upon provider for out-of-network goods and services. Since the MultiPlan Cartel sets the prices for an overwhelming percentage of out-of-network goods and services, the cartel effectively offers healthcare providers no choice but to accept MultiPlan's prices for non-emergency out-of-network services. The healthcare providers can either provide the out-of-network services and be devastatingly underpaid for them (but at least make some revenue) or provide no out-of-network services at all (and forgo all revenue associated with those services). Because of the high fixed costs associated with operating a medical practice (including capital equipment, support staff, licensure, insurance, and office space), many providers are effectively forced to provide out-of-network goods and services despite knowing that they will be devastatingly underpaid for them, just so that they can continue to receive the reduced revenues associated with providing those out-of-network services. As a consequence, healthcare providers who provide non-emergency services are forced to accept artificially suppressed prices set by the MultiPlan Cartel.

503. In non-emergency contexts, MultiPlan and competing payors effectively dupe providers into providing up-front goods and services to out-of-network patients by providing no transparency into whether the price for those out-of-network goods and services will be set by MultiPlan. Providers often do not know that when they are providing services to an out-of-network patient that MultiPlan will set the price for those out-of-network goods and services. For instance, a prior authorization will not reveal whether the payor has an agreement with MultiPlan or whether MultiPlan will set the price for the out-of-network goods and services provided to that patient.

504. Once a provider has provided services to an out-of-network patient, that provider cannot seek payment for its services from anyone other than the payor that has agreed to cover that patient's out-of-network goods and services. Indeed, as alleged above, when the MultiPlan Cartel underpays providers, providers are unable to turn to patients to be made whole for the collusive underpayment.

505. For emergency services, federal and state laws prohibit healthcare providers from balance billing patients for the difference between the payments received from a payor for out-of-network goods and services and the provider's billed charges.

506. For non-emergency services, healthcare providers cannot, and do not, balance bill patients for the difference between the payments received from a payor for out-of-network goods and services and the provider's billed charges. For example, as explained above, MultiPlan prohibits providers from balance billing patients as a condition of receiving payments for out-of-network goods and services.

507. As a result, the only seller to which a provider can turn to for an out-of-network claim is the payor associated with that claim.

508. Government-paid forms of insurance do not participate in the relevant market at issue in this case. Providers do not seek payment for out-of-network goods and services from government payors, and government payors are not buyers of such services.

509. Commercial payors recognize that government payors are not buyers of out-of-network goods and services. For instance, an internal United document concerning initiatives to suppress out-of-network payments explains that the initiatives do "not apply to Medicare or Medicaid members" because "[f]ederal and state programs, like Medicare Advantage and Medicaid plans, do not offer out-of-network coverage[.]"

510. A common method to determine the scope of a relevant antitrust market is to assess whether a hypothetical monopolist could impose a small but significant non-transitory increase in price ("SSNIP") in the proposed market, typically 5%. In a case challenging a buyers' cartel, such as this one, the relevant test is whether a hypothetical monopsonist could impose a small but significant reduction in purchase price ("SSRIPP"). In this case, a hypothetical monopsonist—such as the MultiPlan Cartel—could impose a SSRIPP of 5% or more on out-of-network goods and services without causing healthcare providers to switch to providing other types of goods and services because hospitals are required by federal and state laws to provide emergency out-of-network goods and services. A payor can impose an SSRIPP on out-of-network goods and services because the negotiation of prices for those services occurs after the service is provided and the healthcare provider is locked into negotiating with a single payor.

511. Moreover, MultiPlan's imposition of an industry-wide pricing scheme for out-of-network goods and services provides a natural experiment to test the bounds of the relevant market. Despite MultiPlan and its Co-Conspirators decreasing rates for out-of-network goods and services substantially from the prior FAIR Health and UCR charges that existed in the pre-conspiracy period, healthcare providers continued to provide out-of-network goods and services. When MultiPlan imposed these lower prices for out-of-network goods and services, the amount of out-of-network goods and services sold by providers did not change appreciably. In fact, the total amount of out-of-network goods and services sold in the U.S. in 2023 was higher than before the MultiPlan Cartel began, in or around 2015. This suggests that a SSRIPP would not result in a sufficient number of healthcare providers switching to other forms of payment, such as services for government payors or in-network services, to make the SSRIP profitable for the payors.

512. There are also special circumstances that make separate consideration of buyers of out-of-network goods and services appropriate. A change in the price of in-network or government-paid healthcare goods and services does not have an appreciable effect on the price of out-of-network goods and services because those prices are calculated and negotiated in fundamentally different ways. Put another way, the prices paid for in-network services and government-paid services do not constrain the prices charged for out-of-network goods and services because providers cannot switch between out-of-network payment and other forms of payment.

513. A change in the price of in-network or government-paid healthcare goods and services also does not have an appreciable effect on the amount of out-of-network healthcare supplied by providers. Because patients and doctors make the decision about what goods and services to utilize, and those decisions are made on the basis of medical necessity, changes in in-network and government-paid prices for particular goods and services does not affect the supply of out-of-network goods and services.

514. Practical indicia and commercial realities support the inference that in-network goods and services are distinct from the Out-of-Network Goods and Services Market at issue in this case.

515. One such reality is the design of third-party payors' coverage. Payors differentiate between providers who are in-network and providers who are out-of-network. By design, third-party payment plans offer different levels of coverage and financial incentives for in-network and out-of-network goods and services. For example, third-party payment plans have different coinsurance and out-of-pocket costs associated with in-network and out-of-network goods and services.

516. In addition, at the urging of several of the Defendants and Co-Conspirators in this case, courts have also found that statutes governing healthcare providers apply differently to in-network and out-of-network providers. *See, e.g., Emerus Hosp. v. Healthcare Serv. Corp*., 2020 WL 1675665, at *3-4 (N.D. Ill. 2020) (finding that Texas law concerning prompt payments to healthcare providers did not apply to out-of-network services); *Tex. Medicine Res., LLP v. Molina Healthcare of Tx., Inc*., 620 S.W.3d 458, 469-70 (Tex. App. – Dallas 2021), aff'd, 659 S.W.3d 424 (Tex. 2023) (same).

517. Defendants recognize that prices for out-of-network goods and services are distinct from in-network prices based on how they organize their businesses. Defendants have separate employees in different departments that oversee issues related to payments to out-of-network providers. Defendants also create shared savings programs and cost management programs specific to out-of-network providers and track the cost of paying provider claims for out-of-network goods and services separately from in-network goods and services.

518. Similarly, MultiPlan views in-network and out-of-network prices as occupying separate markets. MultiPlan has created pricing methodologies that target only the prices of out-of-network goods and services. In fact, MultiPlan has chosen to focus a substantial portion of its business on out-of-network pricing. For example, during a recent presentation at the 42nd Annual J.P. Morgan Healthcare Conference, MultiPlan's then-CEO, Mr. White, explained "MultiPlan's focus over the past 40 years has been on out-of-network claims."

519. Similarly, in a September 2024 interview on the DataFramed podcast, MultiPlan President & CEO Travis Dalton expressed that "[t]here's essentially two kinds of health insurance in the U.S., so it's government-funded, Medicare and Medicaid, and then there are commercial insurance products." He went on to say, "When someone . . . needs to see a provider . . ., they have

Case 1:26-cv-01588 Document #: 64-1 Filed: 01/28/26 Page 147 of 250 PageID #:1407

the choice to go in-network,. . . . Or, there are some out-of-network options that exist . . . and that's a very different path with a very different cost structure around it."

520. MultiPlan's own website markets its services in distinct "Commercial" and "Government" "Markets." In the same September 2024 interview, Mr. Dalton explained that in-network, out-of-network, and government programs all offer different prices for the same services: "The price for the same service can be different. So, if you're going through a Medicare channel it's a price, if it's in-network negotiated it's a price, if it's out-of-network it can be a price."

521. Other competing payors also recognize that government payors are not buyers of out-of-network goods and services. For instance, an internal United document concerning initiatives to suppress out-of-network payments explains that the initiatives do "not apply to Medicare or Medicaid members" because "[f]ederal and state programs, like Medicare Advantage and Medicaid plans, do not offer out-of-network coverage[.]"

522. Persistent differences in claims volumes and claims pricing also demonstrate that commercial out-of-network pricing and in-network pricing constitute separate markets. If in-network buyers and out-of-network buyers were a part of the same market for purchasing healthcare goods and services, then the prices and sales volumes for those goods and services would be similar because, if they were a part of the same market, buyers would see no difference between the same service provided to an in-network patient and an out-of-network patient. That is not the case. For decades, the prices paid for in-network and out-of-network goods and services have varied significantly for the same services provided in the same geographic region.

523. Healthcare is not the only market in which goods and services can be sold in different ways and occupy distinct markets. One analogy is to recognize differences between futures markets and spot markets for the same goods or services. The market for out-of-network

goods and services is comparable to a spot market. In a spot market, goods or services are exchanged for cash immediately, instead of at a future date. When a patient is treated by an out-of-network healthcare provider, no preexisting agreement on prices or terms exists between the provider and the payor. Instead, out-of-network adjudication and pricing occurs on individual claims after healthcare goods and services have been provided to the patient. By contrast, the market for in-network goods and services is comparable to a futures market. In a futures market, delivery of underlying goods or services occurs on a future date at contractually governed prices and terms. Likewise, when a provider agrees to be "in-network," the provider contracts with a third-party payor to accept pre-agreed network rates for medical goods and services that are less than the providers' customary charges for those goods and services, and to not bill in-network patients for the difference between those in-network rates and the providers' customary rates. Even when the price of a spot market may influence the price of a futures market, they can remain two different relevant product markets when their prices are not synonymous.

524. While healthcare providers operate in other markets, besides the Out-of-Network Goods and Services Market, that represent different phases of their operations, those markets are not the market specifically targeted and restrained by the MultiPlan Cartel.

525. For example, in one phase of competition, providers compete with each other to attract patients to their facilities based on countless factors, such as reputation, expertise, proximity, and range of services.

526. In another phase of competition, providers compete for inclusion in certain payors' provider networks. In this phase, providers may engage in ex ante negotiations with certain interested payors concerning how much they could expect to receive for in-network goods and services provided to patients enrolled in a particular payor's health insurance plan. For a multitude

of reasons, however, a particular provider will typically remain out-of-network for a staggering number of payors.

527. These different phases of competition, which may constitute separate antitrust markets, are not at issue in this case. The relevant market in this case is limited to the payors that providers can turn to when they provide out-of-network goods and services.

528. Even in these other phases of competition, government payors and commercial payors are not reasonably interchangeable. Government-paid forms of insurance, like Medicare, Medicaid, and Tricare, are not viable alternatives for commercial payments and do not compete against commercial health insurance. These forms of government-paid insurance address populations that are not typically served by commercial health insurance. For example, Medicare and Medicaid have statutory age, income, or disability requirements. Similarly, Tricare is available only to current and former members of the U.S. military. Patients in government payor programs do not switch between commercial payor networks and government payor systems in sufficient numbers for government payors and commercial payors to compete against one another.

529. Moreover, government payors typically pay providers negotiated up-front rates that are dramatically lower than the up-front in-network rates negotiated by commercial payors. That is because the government has dramatically more purchasing power that it can use in these upfront rate negotiations.

530. While it is true that payors do not market out-of-network coverage separately to subscribers as a stand-alone product, that fact is immaterial to this litigation. This case is about the range of buyers for healthcare goods and services, not the range of buyers for health plans. In other words, this case concerns the choices that providers can make about to whom they will sell their goods and services; it is not about the choices that subscribers make about from whom they will

purchase health coverage. At any rate, patients do consider out-of-network benefits when deciding the health plans in which they will enroll. They weigh the amount that they will pay for common and anticipated forms of in-network care, such as physicals and well-visits, against their exposure for unplanned and catastrophic out-of-network care, such as what a patient would be financially responsible for if they were involved in a serious car accident. Patients can, and often do, purchase a health plan specifically because of its out-of-network provisions—either because of the financial coverage offered for out-of-network care or because the out-of-network provisions of a health plan allow a patient to continue seeing a trusted doctor.

531. In summary, the discrete product or service that can be purchased is the healthcare goods and services offered by providers on an out-of-network basis. That discrete product or service can be subject to price-fixing because providers cannot turn to other payors to purchase their out-of-network goods or services. The goods and services have already been provided and the third-party payor will purchase them, but the question is the price that they will pay for those out-of-network goods and services. Commercial payors formed the MultiPlan Cartel specifically to exploit these market realities by suppressing prices for out-of-network goods and services.

532. At a minimum, it is clear that healthcare providers cannot substitute between out-of-network goods and services and in-network goods and services with respect to emergency care.

533. Healthcare providers in hospital emergency rooms are *prohibited* from switching between these types of buyers by federal and state laws. Enacted nearly 40 years ago, the Emergency Medical Treatment and Labor Act ("EMTALA"), requires hospitals participating in Medicare and Medicaid—which is effectively all hospitals in the United States—to "scree[n]" and "stabilize" "any individual" who comes to a hospital emergency room with an "emergency medical condition" that jeopardizes the patient's "health." 42 U.S.C. §§ 1395dd(a), (b)(1)(A), (e)(1)(A);

*see also Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249, 250 (1999) (EMTALA "places obligations of screening and stabilization upon hospitals and emergency rooms that receive patients suffering from 'an emergency medical condition.'"). EMTALA bans hospitals from switching from providing healthcare goods and services to out-of-network patients to in-network patients. *See Beller v. Health & Hosp. Corp.*, 703 F.3d 388, 390 (7th Cir. 2012) (EMTALA "was enacted to address the problem of patient 'dumping,' in which hospitals would not provide the same treatment to [disfavored] patients as to [favored] patients, either by refusing care . . . or by transferring them to other facilities."); *Vickers v. Nash. Gen. Hosp., Inc.*, 78 F.3d 139, 143 (4th Cir. 1996) (EMTALA prohibits "disparate treatment" of patients at hospital emergency rooms). EMTALA bans hospitals from switching from providing healthcare goods and services to out-of-network patients to providing those services to in-network patients. Therefore, if a patient who is out-of-network comes to a hospital with an "emergency medical condition," "the hospital must act to stabilize the condition . . . before the patient can be transferred or released." *Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 894 (7th Cir. 2003).

534. For emergency care, State laws also require providers to admit and treat patients regardless of whether they are in-network or out-of-network, effectively prohibiting hospitals from switching between in-network and out-of-network payors. *See, e.g.*, Cal. Health & Safety Code §§ 1317(a)-(b) (licensed hospitals must provide emergency services to all patients and may not discriminate between patients based on their insurance status); Fla. Stat. §§ 395.1041(3)(a), (f) (every hospital must provide emergency services to patients and may not discriminate between patients seeking emergency services based on "insurance status, economic status, or ability to pay for medical services"); La. Rev. Stat. § 2113.4(A) (any hospital that receives benefits or funds from the state of Louisiana "shall make its emergency services available to all persons . . . regardless of

whether the person is covered by private, federal Medicare or Medicaid, or other insurance."); N.Y. Pub. Health Stat. § 2805-b(1) ("Every hospital shall admit any person who is in need of immediate hospitalization with all convenient speed and shall not before admission question the patient or any member of his or her family concerning insurance, credit or payment of charges").

535. EMTALA and equivalent state laws require providers to comply with these admission and non-discrimination obligations at all times. Failure to comply with these statutory requirements can result in crippling penalties, including (a) state criminal liability, (b) enormous fines, (c) suspension of the provider's participation in Medicare and Medicaid, and (d) civil lawsuits. No reasonable provider would knowingly violate these federal and state laws in order to switch from out-of-network patients to in-network patients. The crippling financial penalties for doing so would cause a provider to lose enormous patient volume and sources of funding, causing staggering financial damages to the hospital as a whole. For that reason, providers do not switch between providing emergency services to in-network and out-of-network patients.

536. Outside of co-insurance and deductible obligations, a provider also cannot seek payment from the out-of-network patient. In many cases, such as when providing emergency care, providers are prohibited from seeking payment for those services from patients (i.e., "balance billing") by the No Surprises Act, see 42 U.S.C. § 300gg-111. Violations of the No Suprises Act can result in massive civil penalties of up to $10,000 per violation.

537. In economic terms, EMTALA and the No Surprises Act are switching costs. Because no provider would want to violate the law and expose themselves to significant legal penalties in order to switch to other forms of out-of-network payment, such as balance billing, or to switch between out-of-network and in-network payors, these large switching costs lock a provider into seeking payment from only one payor for out-of-network goods and services. If the

costs of switching from one buyer to another are so prohibitive that no rational seller would switch between them, then the relevant market is limited to only those buyers that a seller can practically turn to in order to sell their goods and services. In this case, the only party to whom a provider can sell their out-of-network goods and services is the payor associated with the patient that consumed the out-of-network goods and services.

538. The statutes and regulations that govern providers also differentiate between in-network and out-of-network goods and services. *See, e.g.*, 28 U.S.C. § 9816 (No Surprises Act); N.J. Stat. § 26:2SS-9(c); Conn. Gen. Stat. § 19a-904a; Mo. Stat. § 376.690; Il. Stat. Comp. § 88/50; Tex. Stat. § 1305.006.

539. Within the market for out-of-network goods and services, there are submarkets for out-of-network goods and services sold to each specific payor.

540. This submarket is not defined according to any single method of payment, or the preferred payment method of a provider. Instead, this market is defined by the commercial reality that there are literally no other payment sources for a provider's medical goods and services when a provider has already provided those goods and services to an out-of-network patient.

541. A payor can impose an SSRIPP on out-of-network goods and services because the negotiation of prices for those services occurs after the services is provided and the hospital is locked into negotiating with a single payor.[9]

542. The relevant geographic market is the United States. Providers in the U.S. cannot practicably turn to payors in other countries, where private medical insurance is uncommon or

[9] This is not to say that payors are free from competitive pressures when negotiating prices for out-of-network healthcare services. As explained, in a competitive market, payors must avoid below-market pricing to maintain the out-of-network provider's willingness to provide out-of-network goods and services to the payor's enrollees in situations where the provider has discretion to refuse and avoid costly disputes. The MultiPlan Cartel was created specifically to eliminate the need for this price competition.

non-existent and nearly all medical care is administered as a part of a comprehensive government program, for payment of out-of-network medical services. The U.S. healthcare industry, including the market for payment of out-of-network goods and services, is universally recognized by industry participants as distinct from healthcare industries in foreign countries, and is subject to a variety of unique federal and state laws and regulations that apply only in the U.S. The relevant geographic market is not smaller than the U.S. because healthcare providers can practicably turn to commercial insurers located in other parts of the country for payment of out-of-network goods and services.

543. MultiPlan and its Co-Conspirators, through their conspiratorial agreements, collectively hold dominant power on the buyer side of the Out-of-Network Goods and Services Market. Nearly every payor that participates in the relevant market has agreed to use MultiPlan's pricing methodology to set the prices for out-of-network goods and services, to fix the maximum price for particular out-of-network goods and services, and to allow MultiPlan to negotiate the price of out-of-network goods and services on behalf of other payors. The members of the MultiPlan Cartel collectively control more than 90% of the relevant market as measured by number of covered patients.

544. MultiPlan claims that the entire nationwide market for out-of-network goods and services is approximately $130 billion annually:




545. Out of that $130 billion, MultiPlan claims that it processed $106 billion in charges in 2019:



546. By claiming to process $106 billion in charges for out-of-network goods and services out of a potential $130 billion, MultiPlan acknowledges that it processes approximately 81.5% of the out-of-network claims submitted in the United States. Therefore, regardless of how the metes and bounds of the relevant market are defined, the MultiPlan Cartel has market power over commercial third-party payments for out-of-network goods and services. The cartel has a dominant market share of both covered members and healthcare claims. The cartel also has a demonstrated ability to collectively control the prices set for healthcare goods and services. In economic terms, the members of the MultiPlan Cartel collectively hold monopsony power.

547. Since acquiring Data iSight in 2011, MultiPlan's analytics business has grown considerably. Revenues generated by Data iSight alone totaled $323.7 million in 2019. By 2020, analytics-based services such as Data iSight made up more than 59% of MultiPlan's annual revenues. In 2021, MultiPlan's analytics-based services generated $709 million of its $1.1 billion in total revenues. MultiPlan explained in 2023 that its analytics business typically earns profit margins "in the mid to high 60% range."

548. The Out-of-Network Goods and Services Market is protected by high barriers to entry. Payors operate in a highly concentrated industry, with a small number of massive payors collectively dominating the market. Indeed, during a trial, Ms. Paradise, the Vice President of Out-of-Network Strategy at United, agreed that MultiPlan's out-of-network pricing methodology "was widely used by our competitors." Moreover, most of MultiPlan's contracts with customers are three years or longer in length, with "high renewal rates." MultiPlan has even touted the "stickiness" of its "long-term customer relationships."

549. This high collective market concentration of the members of the MultiPlan Cartel is probative circumstantial evidence of agreement or agreements to conspire. This dominant

collective market power has allowed the MultiPlan Cartel to impose anticompetitive effects on the entire relevant market.

550. In addition to this collectively dominant market power, when a healthcare provider provides out-of-network goods and services to a patient, its only option for seeking payment for those services is to submit a claim to the particular payor that administers the insurance plan in which that patient is enrolled.

551. As a result, each payor has complete buyer-side power over the pricing and adjudication of out-of-network services provided to the patients to whom it provides coverage.

**b. The MultiPlan Cartel Harmed Providers, Patients, and Subscribers.**

552. ***Harm to Providers***. MultiPlan's agreements with competing payors harmed competition and APP and NES.

553. In its investor presentations, MultiPlan openly touts the fact that it helps its competitors systematically underpay healthcare providers. During a fall 2021 investor roadshow presentation, MultiPlan explained to investors that in an illustrative world "[w]ithout MultiPlan," a doctor could expect to make $800 on an out-of-network claim, but in an illustrative world with MultiPlan, a doctor would only make $600 on the same out-of-network claim—a 25% difference. In another presentation, MultiPlan claimed that its pricing methodology was even more effective, writing that it provided insurers "savings of 61%–81% off billed charges."

554. MultiPlan's provider remittance advice forms also provide direct evidence that the MultiPlan Cartel results in healthcare providers being paid far less on each claim than they would have under the competitive regime that existed prior to the MultiPlan Cartel where out-of-network claims prices were determined by the UCR/FAIR Health rate.

555. For one example of the MultiPlan Cartel's pricing suppression, the claim below shows that a patient was seen at the emergency department of Northeastern Nevada Regional Hospital in Elko, Nevada. That patient had a particularly difficult case, which was coded using CPT code 99285, which is reserved for the most severe and complex emergency medicine cases. The provider submitted a claim for $1,360 for the claim, roughly 70% of the FAIR Health price for that CPT code in Elko, Nevada. Using MultiPlan's pricing, United only paid $435.20 for the claim—22.5% of the amount that FAIR Health determined was the appropriate out-of-network price for CPT code 99285. As the table below shows, that is significantly less than the 70-80% of FAIR Health pricing standard that applied to out-of-network claims prior to the MultiPlan Cartel.

| Submitted Amount | FAIR Health Out-of-Network Cost Estimate | 70% of FAIR Health | MultiPlan Pricing/Payment | Difference Between FAIR Health Benchmark and MultiPlan |
|---|---|---|---|---|
| $1,360 | $1,888 | $1,321.60 | $432.50 | $889.10 |

556. That same pattern has played out with other claims. The table below shows the difference between FAIR-Health-denominated out-of-network prices and the prices set using MultiPlan's pricing methodology for claims submitted to in Elko, Nevada. In every case, the agreement between United and MultiPlan to not compete on claims pricing results in providers being paid far less than they would have under the prior competitive out-of-network pricing regime.

| CPT Code | Submitted Amount | FAIR Health Out-of-Network Cost Estimate | 70% of FAIR Health | MultiPlan Pricing/Payment | Difference Between FAIR Health Benchmark and MultiPlan |
|---|---|---|---|---|---|
| 99283 | $463 | $689 | $482 | $217.77 | $264.23 |

557. According to an internal United document, prior to implementation of Data iSight, United's ASO clients paid 100% of billed charges. After implementation, they often paid less than 60% of billed charges.




**Post Implementation reimbursement rates on claims paid. Pre-Implementation rates were 100% of billed charges.**

558. MultiPlan sends regular closure reports and performance reports to its Co-Conspirators showing the amount that MultiPlan's methodology underpriced each out-of-network claim and the underpayment that the provider received as a result of MultiPlan's agreement to stop competing with its competitors on claims pricing and adjudication. In the case of United, MultiPlan

sent closure and performance reports to the dedicated email address. Later, MultiPlan sent the performance reports and closure reports to United using a Secure File Transfer Protocol process.

559. As an example, in one closure report, MultiPlan and United coordinated to hide the fact that the amount owed to the hospital-based physicians was the billed charges in case it was pulled into discovery in litigation:

**HBP Closure Report -**
Change Request: request a change to the SOD tabs on the HBP and FI closure reports: Do not use "billed charges" as the revised Data iSight allowable but rather leave blank?

3/23/20 - Change Request: request a change to the SOD tabs on the HBP and FI closure reports: Do not use "billed charges" as the revised Data iSight allowable but rather leave blank?
Trying to leave this blank so if pulled into discovery it doesn't present an issue.

560. MultiPlan also provides quarterly, weekly, and daily reports to its Co-Conspirators concerning MultiPlan's ability to slash the prices of out-of-network claims. These reports are typically broken down into ASO and fully insured reports. For example, MultiPlan routinely sent reports on provider appeals from MultiPlan's out-of-network pricing, utilization reports, state reports, situs reports, and specialty reports to competing payors.

561. MultiPlan used the collective market power of the cartel to bully providers into accepting extremely low prices for their out-of-network goods and services. In some cases, MultiPlan set the maximum price for out-of-network goods and services at 150% or 100% of Medicare rates. Those prices are known to be unprofitable for providers and, if sustained, can drive providers out of business.

562. *The New York Times* reporting confirmed the providers' inability to negotiate with MultiPlan. It wrote that "[d]ocuments and interviews revealed tactics meant to pressure medical practices to accept low payments. Some offers came with all-caps admonitions and deadlines just

hours away. Accept and receive prompt payment; refuse and risk an even lower payout. Practices and billing specialists said this often wasn't an empty threat."

563. MultiPlan also threatens to drop their reimbursements if healthcare providers do not accept their cut-rate offers. In a fax to a healthcare provider, MultiPlan gave the provider eight days to respond to a low-ball offer. But the fax warned, "Please note that if you do not wish to sign the attached proposal . . . this claim is subject to a payment as low as 110% of Medicare rates based on the guidelines and limits on the plan for this patient." In other words, if the provider disagrees with MultiPlan's offer, MultiPlan will lower the reimbursement rate even further.

564. Similarly, in February of 2019, MultiPlan (through Viant) offered an "adjusted price" to a provider of $3,328.00 on a bill for $9,284.00. When the provider tried to counter, Viant replied that they could not accept the counter and that, if denied, the claim would be returned for processing as low as 110% of Medicare and Cigna would not allow any appeals.

565. In a recent trial in Oklahoma, an economic expert testified on behalf of certain plaintiff entities who contract with one industry participant. During his testimony, he was asked "[h]ave you seen, in all the thousands of pieces of paper you've looked at, any connection between what happens to the rates allowed to ER doctors once an insurance company starts to dance with that shared savings and iSight?" He responded, simply, "[t]he reimbursement goes down."

566. As a result of these reimbursement rate cuts, physician groups have been forced to cut physician salaries and benefits because of the artificially low prices the MultiPlan Cartel sets for out-of-network goods and services. This is not a case about providers seeking a windfall or trying to charge inflated prices for out-of-network healthcare. Plaintiffs' providers and other providers want only what any honest seller of goods and services is entitled to—the chance to sell

those goods and services in a market free from collusion, instead of one rigged from the start by the MultiPlan Cartel.

567. ***Harm to Patients***. In addition to suppressing payments to providers for out-of-network claims, the MultiPlan Cartel also harms patients because those underpayments limit the amount of revenue that healthcare providers can spend on improving care or offering charitable care. Many hospitals are committed to providing charity care and making a positive impact on the communities they serve. Because providers throughout the United States were systematically underpaid as a result of the MultiPlan Cartel, they have less funds to devote to those charitable efforts.

568. Moreover, America's hospitals are facing an economic crisis, with many struggling to break even due to rising costs and insufficient reimbursements. Over half of U.S. hospitals ended 2022 operating at a loss, a trend that continued into 2023. In addition, a 2023 survey from the American Medical Group Association that collected data from over 15,000 providers found that "median loss per physician for system-affiliated groups is now more than $249,000, as operating expense increases outpace revenue gains."

569. The MultiPlan Cartel's underpayments have already caused some healthcare providers to fail, thereby limiting the supply of healthcare goods and services available to consumers. For example, in a separate lawsuit filed in San Francisco County Superior Court, VHS Liquidating Trust alleged that Verity Health System went bankrupt as a result of the MultiPlan Cartel. On August 31, 2018, Verity Health System filed for Chapter 11 bankruptcy. As a part of that bankruptcy process, on January 6, 2020, Verity Health System announced the closure of the St. Vincent Medical Center in Los Angeles, California. In fact, involved in this very lawsuit are

two groups, APP and NES, that were forced into bankruptcy in 2023 and 2024, respectively, as a result of the MultiPlan Cartel's underpayments.

570. Small and independent providers are especially susceptible to the price-fixing of the MultiPlan Cartel. In the recent *The New York Times* exposé on MultiPlan, the reporter interviewed healthcare providers about MultiPlan's effect on their businesses. Kelsey Toney is a behavioral therapist for children with autism in rural Virginia. She typically charges the rates that Virginia pays for people on Medicaid. As reported by *The New York Times*, "last year, she said, Meritain Health, an Aetna subsidiary, informed her that fair payment for her services was less than half what Medicaid paid, based on calculations by MultiPlan." She was then faced with the prospect of turning her patients away: "I don't want to say, 'I'm sorry I can no longer accept you,' especially when I'm the only provider within an hour," she said. Toney told *The New York Times* she "has not billed the parents of her two patients covered by Meritain, but going forward she will not accept patients with similar insurance."

571. On May 1, 2024, *The New York Times* further reported that "[o]ne provider reported slashed payments from United, Cigna and an Aetna subsidiary after the insurers routed claims to MultiPlan's most aggressive pricing tool."

572. In addition, the MultiPlan Cartel's effect of slashing out-of-network reimbursements suppresses revenue for rural hospitals that are in serious danger of failing—cutting off a key source of healthcare goods and services for many communities. According to the Center for Healthcare Quality and Payment Reform, between 2005 and 2019, over 150 rural hospitals closed. Another 28 rural hospitals closed between 2020 and 2022, despite the COVID-19 pandemic driving record demand for hospital services. Many of the rural hospitals that are still operating are doing so on shoestring budgets. More than 700 rural hospitals, representing nearly 30% of all rural

hospitals in the United States, are at risk of closing. Over 350 rural hospitals are at immediate risk of closing because they are losing money on patient services and have more debts than assets.

573. Since rural hospitals treat fewer patients than urban and suburban hospitals, they have a higher cost of care per patient. As a result, many rural hospitals are at risk of closing because they receive inadequate reimbursements for their services. Therefore, the MultiPlan Cartel's agreement to suppress reimbursement rates to all healthcare providers, including rural hospitals, threatens to drastically cut the supply of healthcare services in several parts of the country. If rural hospitals fail because of the MultiPlan Cartel, the cost of healthcare will increase throughout the United States because patients in areas previously served by those hospitals will only seek acute medical care when they are experiencing very severe symptoms, raising the cost of care.

574. In its May 1, 2024 report, *The New York Times* quoted one anonymous rural healthcare provider as saying that MultiPlan "has decimated my life" and caused "the closing of my business," which "left patients having to travel 2.5 hrs for surgery."

575. Furthermore, the MultiPlan Cartel takes advantage of hospital emergency departments that cannot lawfully avoid the cartel's underpayment scheme. In essence, hospital emergency rooms are sitting ducks. There is nothing that they can do to avoid the effects of the MultiPlan Cartel, short of filing this lawsuit.

576. Emergency department utilization is extremely high throughout the United States. According to the United States Centers for Disease Control and Prevention, there were 131.2 million emergency department visits in 2020, equating to 40.5 visits per 100 people. A total of 39.8 million emergency department visits were covered by some form of commercial health insurance.

577. As of 2018, there were approximately 4,500 emergency departments at hospitals throughout the United States staffed by approximately 45,000 physicians.

578. Demand for emergency department medical services is highly inelastic. Patients often have little choice regarding to which hospital they are taken and are rarely able to avoid or defer emergency medical treatment.

579. Emergency departments also play an increasing role in the provision of healthcare services. From 1993 to the present, emergency department visits have grown faster than population growth, and emergency departments have become the primary way that patients are admitted to hospitals.

580. Although emergency departments face increasing and inelastic demand, hospitals must serve all patients who come to the emergency department. As discussed above, under EMTALA and analogous state laws, hospitals and physicians who staff emergency medical departments must treat and stabilize all patients, without regard to their method of payment, and hospitals are subject to civil liability for violating these laws.

581. Moreover, although commercial insurance networks typically require medical providers to seek preauthorization before providing certain medical services, hospitals do not need to seek insurance preauthorization prior to providing emergency medical services. *See, e.g.,* 26 U.S.C. § 9816(a)(1)(A) (requiring that emergency services be covered "without the need for any prior authorization determination"); N.Y. Ins. Law § 3221(k)(4)(A)(i) ("Every group policy . . . shall include coverage for services to treat an emergency condition . . . without the need for any prior authorization determination"); Fla. Stat. § 627.64194(2)(A) (an insurer "[m]ay not require prior authorization" for emergency services).

582. Because hospital emergency departments are required to treat all persons seeking emergency medical treatment, they rely on commercial insurance networks like the MultiPlan Cartel members to fairly compensate them for out-of-network charges at UCR rates.

583. Courts recognize that this statutory requirement to treat all persons seeking emergency treatment is ripe for abuse by commercial health insurance networks. *See, e.g., N.Y. City Health & Hosps. Corp. v. Wellcare of N.Y., Inc.*, 937 N.Y.S. 2d 540, 545 (N.Y. Sup. Ct. 2011) ("An insurance company is unjustly enriched if it fails to pay the hospital in full for the costs incurred in rendering the necessary treatment of the insurer's enrollees.").

584. By colluding to underpay providers, paying the minimum possible amount to still maintain relationships with hospitals and emergency healthcare providers, the MultiPlan Cartel has been systematically bleeding emergency rooms dry.

585. Providers certainly cannot turn to Medicare and Medicaid to make up for the losses caused by the MultiPlan Cartel. Reimbursements by Medicare and Medicaid have long failed to keep pace with inflation. Although total hospital expenses increased by 17.5% between 2019 and 2022, Medicare reimbursements for inpatient care increased only 7.5% over the same period. As a result, hospitals' margin on care provided to Medicare patients sank to a historic low of -12%—meaning that for every $100 a hospital spends to treat a recipient of Medicare, Medicare reimburses only $89.

586. This dynamic is only exacerbated in times of national public health crisis like the COVID-19 pandemic. While hospital emergency departments generate a massive amount of out-of-network claims from saving patient lives, the MultiPlan Cartel generates massive profits for MultiPlan and other cartel members by systematically underpaying those out-of-network claims.

587. As a result of the MultiPlan Cartel, payors typically pay 50% or less of the value of emergency department out-of-network claims. According to an analysis of a sample of 10% of Florida emergency department visits between 2014 and 2015, the average emergency physician charge was $679. That charge is not exorbitant. FAIR Health, a database that contains publicly

available data based on billions of out-of-network claims, calculates the 80th percentile charge for a high acuity emergency department visit in Florida to be $950. Despite that fact, payors' average out-of-network payment on those claims was $307. As a result, an emergency physician in Florida provides an average of $138,000 in uncompensated care each year.

588. In addition, knowing that Plaintiffs' providers are required to admit and stabilize patients in emergency departments and must accept underpayments as a result of the No Surprises Act, payors who are members of the MultiPlan Cartel have begun forcing in-network providers out-of-network in order to underpay them as a part of the MultiPlan Cartel. For example, in 2021 Blue Cross and Blue Shield member companies sent letters to providers demanding massive in-network discounts—15% or more—or threatening to expel them from their networks in order to underpay them as out-of-network providers.

589. Private medical groups are also struggling to stay above water. On average, their expenses are outpacing the payments that they receive for providing care. While revenue per physician has increased by 9.1% since 2020, the median expense per physician has increased by 25.6%. Just like other providers, these medical groups cannot afford to be underpaid by the MultiPlan Cartel. The Multiplan Cartel puts wide swaths of providers at the edge of bankruptcy.

590. The MultiPlan Cartel leaves patients worse off. They have less access to care. They have less choice. They too are harmed by the cartel.

591. ***Harm to Subscribers***. The MultiPlan Cartel also harms subscribers. After entering into agreements with MultiPlan to limit out-of-network pricing competition, payors turn around and charge exorbitant fees to administrative services only, or ASO, subscribers in exchange for setting low out-of-network prices. Those charges to subscribers can often dwarf the actual amount paid to the provider. Theoretically, payors could pass along the "savings" generated by

underpaying out-of-network providers in the form of lower per member per month fees for providing administrative services. That is not happening. As explained below (*see* ¶¶ 607-637), the sole beneficiaries of the MultiPlan Cartel are the cartel members—they reap the benefits of massive profits, surpluses, executive compensation, and stock buy-backs, while the rest of the healthcare system in the United States attempts to survive on the miniscule amounts that the cartel deigns to pay for out-of-network goods and services. Therefore, as a result of the MultiPlan Cartel, providing health insurance gets more expensive for employers and other health plan subscribers.

592. Many subscribers' contracts with third-party payors are private and not disclosed publicly. However, state and local government entities routinely make information about their healthcare benefits available to the public.

593. An October 28, 2024 *New York Times* investigation concluded that the MultiPlan Cartel is overcharging subscribers for the underpayments that the cartel makes to healthcare providers.

594. *The New York Times* investigation concluded that members of the MultiPlan Cartel, including Elevance, United, Aetna, and Cigna, force state and local government employers to subscribe to health plans that include "shared savings" plans that allow the payors to charge subscribers exorbitant sums for the underpayments that they make to providers.

595. These "shared savings" payments are calculated using a percentage of savings, or PSAV, model. Under this PSAV model, the payor charges the subscriber a percentage of the difference between an out-of-network healthcare provider's billed charges and the amount that the MultiPlan Cartel pays for those out-of-network services.

596. In many cases, these "shared savings" payments are actually higher than the amount of money that the MultiPlan Cartel pays to the healthcare provider who actually did the work.

597. Subscribers know that these "shared savings" charges are a sham. There is no savings and there is nothing that they can do about it.

598. Referring to Elevance's shaved savings program, a human resources officer for a California county told *The New York Times*, "We don't like it, but there's not much we can do."

599. A human resources officer for another local government told the *New York Times* that the basic proposition of these "shared savings" programs is a lie. She explained, "What they're trying to say is, 'Look how much it saved you,' but that's really not savings.

600. A benefits manager for a small Midwestern town said of these "shared savings" programs, "I don't like it morally, conceptually."

601. Subscribers are told that these "shared savings" programs are "not something you can opt out of."

602. Competing payors also tell subscribers that if they attempt to opt out of these "shared savings" programs, the payors will raise other administrative fees associated with their health plan, effectively punishing subscribers for attempting to forgo these massive charges.

603. Many competing payors also make it difficult to track the true cost of these "shared savings" programs by burying the cost of the savings program in a flat monthly charge and not providing a claim-specific breakdown of their "shared savings" charges. As one insurance broker put it, "I'm sure many employers are out there paying this and not even aware that they're paying it."

604. Members of the MultiPlan Cartel have long worried about the "optics" associated with these shared savings programs while continuing to pocket massive profits from them. In a 2018 presentation, United acknowledged that it had generated "significant revenue" from its out-of-network "savings" program, which totaled $1.1 billion in a single year.

605. The revenue generated from these massive shared savings payments incentivized payors to use the MultiPlan Cartel to pay providers even less for their out-of-network services. In a 2020 presentation, UMR, a subsidiary of United, wrote: "Strategy for 2021 is force clients to move to more aggressive [shared savings] programs."

606. Thus, the MultiPlan Cartel creates a negative feedback loop that harms subscribers and providers. Because payors benefit from colluding to pay healthcare providers even less and charging subscribers even more for that "service," payors are constantly working with MultiPlan to find ways to pay healthcare providers even less for their out-of-network services.

607. The MultiPlan Cartel harms competition by systematically underpaying healthcare providers, limiting the amount of revenue that healthcare providers can spend on improving and expanding care, and putting at-risk healthcare providers closer to bankruptcy. The cartel harms patients by leaving them with less access to care and less choice. The cartel harms subscribers by charging them exorbitant fees as a result of the conspiracy.

**c. There is No Procompetitive Justification for the MultiPlan Cartel**

608. MultiPlan attempts to justify its behavior as intended to keep prices down for healthcare consumers, but that is not the case. As an August 5, 2020 analysis explained: "Theoretically, MultiPlan's harsh negotiation tactics should be good for rising American health care costs; insurers are supposed to lower costs by negotiating lower prices on behalf of the patient. But instead, MultiPlan acts like a mafia enforcer for insurers, forcing doctors to accept low payments while insurance premiums for patients . . . somehow continue to rise."

609. Although MultiPlan claims that its out-of-network pricing methodology helped decrease healthcare costs, the data shows otherwise. According to CMS, in 2016, a year before several payors joined the MultiPlan Cartel, private health insurance expenditures in the United

States were $1.03 trillion. By 2021, private health insurance expenditures in the United States were $1.21 trillion. By 2025, private health insurance expenditures in the United States are projected to be $1.53 trillion, a 48% increase over 2016.

610. MultiPlan's argument that it generates savings also ignores who those purported "savings" benefit—MultiPlan and the other members of the MultiPlan Cartel. As explained above, through its PSAV payment model, MultiPlan makes more money when doctors, nurses, and hospitals make less money. Moreover, MultiPlan's Co-Conspirators have designed third-party payment plans that include "shared savings programs" that entitle the co-conspirators to a percentage of the "savings"—as high as 50%—generated by underpaying doctors and hospitals for out-of-network services. This often results in MultiPlan and its co-conspirators being paid more than the provider when a provider provides out-of-network services to a patient. Consider, for example, an instance in which a provider bills $1,500 for an out-of-network service and the MultiPlan Cartel only pays $150 to the provider for that service. If MultiPlan has a 15% PSAV for that charge, it will make $202.50 on that claim ($50 more than the provider and 15% of the $1,350 "savings"). If MultiPlan's Co-Conspirator has a 40% shared saving program, it will make $540 on the claim (40% of the $1,350 "savings"). In that scenario, MultiPlan and its co-conspirator make nearly six times as much as the provider on that claim.

611. The remaining underpayment does not benefit subscribers or patients. Competing payors use these underpayments to enrich themselves and funnel cash into eye-watering executive compensation, stock buybacks, and massive surpluses.

612. In fact, while average Americans have seen their deductibles and premiums increase every year, the members of the MultiPlan Cartel have been getting rich.

613. Between 2012 and 2022, a period in which the size and effectiveness of the MultiPlan Cartel increased dramatically, the revenues of the seven largest payors (United, Elevance, Aetna, Cigna, Centene, Humana, and Molina) increased by 300% growing from $412.9 billion in 2012 to $1.25 trillion in 2022, far faster than their revenues increased prior to the cartel.

614. During the same ten-year period, the profits of those seven companies increased by 287% from $24 billion in 2012 to $69.3 billion in 2022.

615. For example, in 2009, the first year before it began doing business with MultiPlan, United earned $7.35 billion in profits. In 2022, United made $31.85 billion in profits.

616. And, compared to FAIR Health, using Data iSight was incredibly lucrative: as a UnitedHealth executive admitted under oath, the MultiPlan Cartel enabled the insurer to raise its margins from $5 per member, per month when it was forced to use FAIR Health as a benchmark, to $30 per member, per month when it joined the MultiPlan Cartel—a 600% increase.

617. In 2023, the CEOs of the six largest payors (United, Elevance, Aetna, Cigna, Centene, and Humana) earned a combined $122 million in total compensation.

618. Sir Andrew Witty, the CEO of United, made $23.5 million in compensation in 2023—352 times the median salary at United.

619. Gail Boudreaux, the CEO of Elevance Health, made $21.8 million in compensation in 2023—389 times the median salary at Elevance.

620. Karen Lynch, the CEO of Aetna's parent company, CVS Health, made $21.6 million in compensation in 2023—392 times the median salary at CVS Health.

621. David Cordani, the CEO of Cigna, made $21.04 million in compensation in 2023—279.9 times the median salary at Cigna.

622. Sarah London, the CEO of Centene, made $18.5 million in total compensation in 2023—234 times the median salary at Centene.

623. Bruce Broussard, the CEO of Humana, made $16.3 million in compensation in 2023—192 times the median salary at Humana.

624. The compensation paid to the CEOs of MultiPlan Cartel members are even more stark when examined over time. The following chart shows the total compensation paid to the seven largest payor's CEOs between 2012 and 2022. The compensation paid these CEOs increased faster during the MultiPlan Cartel than it did prior to the cartel.

| Payor | Total CEO Compensation (2012-2022) |
|---|---|
| Cigna | $366.9 million |
| United | $349.4 million |
| Centene | $322.6 million |
| Aetna | $265.7 million |
| Elevance | $166.5 million |
| Molina | $122.1 million |

625. Rather than passing the purported savings generated by the MultiPlan Cartel on to patients, the members of the MultiPlan Cartel also spent billions of dollars on stock buybacks that had no benefit for patients, but did serve to line the pockets of executives and strategic investors.

626. In less than a two-year period between March 31, 2020 and December 31, 2022, United, Elevance, Cigna, Aetna, Humana, Centene, and Molina collectively spent $47.4 billion on share buybacks. Between January 1, 2024 and July 31, 2024 alone, Cigna spent $5 billion buying back its own shares. Similarly, in 2022 Aetna's corporate parent, CVS Health, announced that it would spend $10 billion on stock buybacks.

627. If that were not enough, while the MultiPlan Cartel has paid doctors and hospitals less and less, the members of the MultiPlan Cartel have engaged in increasingly extravagant internal spending. In 2022, a few days after posting earnings that beat Wall Street expectations, Aetna executives flew to Walt Disney World—with some executives using private jets—for a private concert with John Legend.

628. Members of the MultiPlan Cartel also have capital and statutory surpluses that are far more than is necessary to satisfy requirements of state insurance commissioners and independent ratings agencies. For instance, as of December 31, 2023, United had to keep a capital surplus of $18.3 billion to meet regulatory requirements. However, the company had a capital surplus of $38.5 billion—more than $20 billion than it needed to keep in order to satisfy state regulators. Similarly, as of December 31, 2023, Cigna had to keep a capital surplus of $4.3 billion to meet regulatory requirements. However, the company had a capital surplus of $14.9 billion—$10 billion more than it needed in order satisfy state regulators.

629. While some members of the MultiPlan Cartel are purportedly non-profit entities, they have funneled the gains from their participation in the cartel into excessive executive compensation, extravagant executive fringe benefits, and surpluses far in excess of requirements of state regulators and ratings agencies. For example, although Highmark is purportedly a non-profit entity, in its Form 990 filing with the Internal Revenue Service, it reported $708 million in assets and $227 million in liabilities, leaving the purportedly non-profit company with $480 million in net assets. Highmark's executives made out like bandits too. David Holmberg, the CEO and President of Highmark, made $8.5 million in total compensation in 2021. According to the same 2021 Form 990 tax return, Mr. Holmberg received staggering fringe benefits including private jet flights for himself and a companion, first class air travel, and a country club

membership. Although members of the MultiPlan Cartel that are purportedly non-profits typically retain independent executive compensation consultants to advise them on the proper amount of compensation and benefits to pay to their executives, these consultants compare compensation between members of the MultiPlan Cartel. This makes the overpayment of executives in the MultiPlan Cartel a self-fulfilling prophecy.

630. Similarly, while Central States[10] claim to be a non-profit, it made over $5.1 billion in revenue in 2022 according to IRS records. After deducting claims expenses and overheard, Central States made a net income of $1.1 billion in 2022—a significant increase from the $933 million in net income that Central States made in 2021. Central States also had a surplus that is far larger than what is necessary to pay its anticipated annual claims. In 2022, Central States had plan assets of $7.7 billion. Central States paid over $203 million to administrative costs, including employee compensation, in 2022.

631. In theory, medical loss ratios, or MLRs, prescribed by federal regulations should prevent insurers from spending less and less of subscribers' premiums on paying healthcare claims. But, in practice, payors manipulate MLRs through conduct that one former payor executive has called a "magician's trick" that involves "figur[ing] out clever ways to shuffle costs around, reclassify expenses, and game the system, so they can rake in massive profits while technically staying within the MLR limits[.]" As that former executive explained, "[i]n a fair world[,] . . . if insurers spent less on your care, you'd get some money back or pay lower premiums. But in this world, they keep finding ways to keep those extra dollars and you're wondering why your premiums keep rising even though you barely go to the doctor."

[10] Even though Central States is not a defendant in this case, it serves as a good example of the MultiPlan Cartel.

632. To put all of this in plain English, the members of the MultiPlan Cartel like to justify their conduct as generating "savings" or "bending the cost curve." That is not happening. Each year, regular Americans pay more out-of-pocket before their health insurance even kicks in, and pay more for having insurance coverage even if they do not use it. At the same time, unknown to patients, MultiPlan and its competing payors are often making much more money than their doctor when they see an out-of-network physician. While the MultiPlan Cartel makes billions of dollars from underpaying doctors and hospitals, patients do not see that money.

633. While MultiPlan and its Co-Conspirators attempt to justify the MultiPlan Cartel as tackling exorbitant fees charged by hospitals, they tell a different story when they are testifying under oath. During a trial, Mr. Haben, the former Vice President of Networks at United, testified that despite United's public position that emergency department charges are "egregious," emergency department bills are actually "not a lot of money" when "you put it in the perspective of saving somebody's life." When Mr. Haben was informed that an emergency department had charged $1,428 for a patient's medical care and that United, using MultiPlan, had only offered to pay $254 for that claim, Mr. Haben testified that "$1,400 is not a lot of money," the emergency department bill was "reasonable," and United's MultiPlan-induced offer to pay $254 for that out-of-network service was "low."

634. Mr. Haben is right: emergency care is highly valuable and can lower total medical spending for acutely ill patients. As Dr. Laura Burke, an emergency room physician at Beth Israel Deaconess Medical Center, explained: "Too often discussion of the cost of emergency care fail[s] to consider the bigger picture—that spending on emergency care can save lives, alleviate suffering and in some instances avoid the need for more expensive hospitalization. . . . Emergency physicians treat anyone, anytime and serve as the safety net for the nation's acute care system."

635. In *Adventist Health System Sunbelt Healthcare Corporation v. MultiPlan, Inc.*, 1:23-cv-07031-ER (S.D.N.Y.), MultiPlan attempted to suggest that its pricing methodology is procompetitive because of "the patient's own interest in having their portion of the ultimate payment to AHS for OON services reduced." But that has not happened. Patients' cost of care has not been reduced by MultiPlan. Co-insurance, deductible, and other out-of-pocket costs for health plans have continued to increase each year under the MultiPlan Cartel.

636. The MultiPlan Cartel also charges exorbitant "shared savings" fees to employer groups, increasing the cost of self-insured employers offering healthcare coverage. The benefits of the MultiPlan Cartel flow one way only—to the cartelists, their executives, and their investors.

637. Therefore, MultiPlan cannot justify its conduct. MultiPlan does not contain costs. Its cartel has taken advantage of a rapidly growing healthcare sector to enrich itself at the expense of doctors, nurses, and patients. And the life-saving care provided by healthcare providers is not "exorbitant" as the cartel likes to claim (until they are sworn to tell the truth).

638. Even if there were some real savings associated with the MultiPlan Cartel, that savings could be achieved in less restrictive means that do not harm providers and patients, such as each payor using FAIR Health and its independent business judgment as the basis for pricing and negotiating claims for out-of-network goods and services.

**d. The MultiPlan Cartel Will Get Worse If It Is Not Enjoined**

639. If the MultiPlan Cartel's conduct is not stopped, it will surely get worse. MultiPlan and its Co-Conspirators are not content with suppressing reimbursement of out-of-network claims. In a 2020 investor presentation, Mr. Tabak (as the then-CEO) outlined the company's vision for "MultiPlan 3.0."

640. With MultiPlan 3.0, MultiPlan plans to "[e]xtend [its] [p]latform" by "[s]caling adjacent customer segments." In other words, MultiPlan intends to extend use of its common pricing methodologies "into [the] in-network cost management segment." MultiPlan estimates that extending its analytics business into the in-network segment will generate up to $1.15 billion in additional annual revenue and up to $720 million in additional annual profits.

641. MultiPlan describes MultiPlan 3.0 as a three-part "Enhance, Extend, and Expand" strategy. This strategy focuses on growth in "existing and key adjacent markets" and aims to "identify greater savings." MultiPlan is explicit about who exactly is getting those savings—the "Enhance" element refers to enhancing MultiPlan's "cost containment product" to "generate more savings for payor customers." These so-called "savings" for payors (MultiPlan's Co-Conspirator customer base) mean decreased compensation for providers.

642. MultiPlan predicts that MultiPlan 3.0 will result in "more savings for payor customers" and double the revenue for MultiPlan.

643. During its May 27, 2021 annual stockholder meeting, MultiPlan explained that Discovery Health Partners, which was acquired by MultiPlan, would help "expand [its] services and customer footprint" and enable MultiPlan to develop common pricing methodologies for "in-network claims."

644. MultiPlan escalated its efforts in 2023. MultiPlan's CEO at the time, Mr. White, told investors on a February 28, 2023 earnings call: "[I]n 2023, we plan to launch a new data and analytics service line which we believe holds transformative potential for MultiPlan. . . . The data and analytics service line will help us . . . expand beyond our commercial health out-of- network footprint by enabling us to address new flows of in-network commercial and Medicare Advantage

charge volumes and claims, which we anticipate to increase significantly for MultiPlan by year-end 2023."

645. During a March 2, 2023 presentation, Mr. White elaborated that the in-network underpayment capability was a part of a "wish list" from MultiPlan's competing healthcare networks. Indeed, Mr. White explained that MultiPlan and its competitors are "sitting across the table collaborating on . . . what we can do to . . . generate more value and savings for them[.]" In other words, all members of the MultiPlan Cartel agree that this new product will further enhance the anticompetitive goals of the cartel.

646. MultiPlan also shared its goal to improve its technological capabilities by the end of 2023 so that it can "take a claim that [] comes in our front door and route[] [it] to the solution that" most effectively slashes provider reimbursements. Essentially, MultiPlan seeks to ensure that it is always maximizing the amount it can suppress from both in-network and out-of-network claims.

647. MultiPlan has been transparent about the motivations for its new in-network services. It wants to deepen its collusive relationships with competing networks to short-change and underpay healthcare providers for in-network claims as well as out-of-network claims. As then-CEO Mr. White explained at the March 14, 2023 Barclays Global Healthcare Conference, "the opportunity for us in terms of new revenue it's really looking at our existing customers"—i.e., competing payors—"and collaborating with them on ways to generate more savings"—i.e., ways to pay healthcare providers less.

648. At the September 11, 2023 Morgan Stanley Global Healthcare Conference, Mr. White similarly emphasized that "cross[ing] over into in-network" and "turning us loose on [those] claims" would be tremendously profitable for MultiPlan. Describing the competitive landscape for

in-network claims at the November 28, 2023 Bank of America Leveraged Finance Conference, Mr. White again explained: "[W]e're embedded inside the four walls of the payors, and we're linked to each of their claims platforms. . . . we see a payor's view right, 360 degrees of claims, meaning they're in-network and out-of-network." In other words, the in-network payments MultiPlan seeks to suppress originate from the same competing payors who have already turned over their out-of-network claims pricing decisions to MultiPlan.

649. MultiPlan's push into in-network claims re-pricing will massively expand the scope of its cartel. As Mr. White told investors, in-network claims "outnumber out-of-network claims by a factor of 10:1" and account for "85% to 90%" or even "90 to 95%" of the claims already inside MultiPlan's system. MultiPlan believes there is "$400 billion of untapped potential for those in-network claims"—that is, $400 billion in claims where MultiPlan wants to take over setting prices for its competitors.

650. MultiPlan shows no signs of stopping its cartel expansion efforts to in-network claims. During MultiPlan's Q3 2023 earnings call, Mr. White told investors: "For 2024, we are shifting our attention to our network based services."

## III. Plaintiffs Have Suffered Antitrust Injury and Have Antitrust Standing

651. Regardless of whether the MultiPlan Cartel agreement is characterized as an agreement between horizontal competitors, a hub-and-spoke agreement, or a vertical agreement, Plaintiffs have antitrust standing to bring claims against MultiPlan and have suffered a classic antitrust injury.[11]

652. Plaintiffs have suffered direct damages to their business and property as a result of the MultiPlan Cartel agreement. The MultiPlan Cartel has caused massive damages to each

[11] Plaintiffs have sued with respect to the interests of NES and APP through the assignment of such claims, as discussed above.

healthcare provider by collectively setting prices for out-of-network goods and services far below what they would have been but for the cartel. Each member of the MultiPlan Cartel uses MultiPlan's common pricing methodology to massively underpay doctors and hospitals for out-of-network goods and services.

653. For example, during the damages period, APP and NES submitted 344,180 bills for out-of-network services to United. In those bills, APP and NES sought payments of more than $362 million. However, using MultiPlan's common pricing methodology, United paid roughly only $92 million on those bills—an underpayment of 75%. The prices that United set for those out-of-network goods and services using MultiPlan's common pricing methodology were well below the prices that would have been set for those goods and services absent the cartel. The prices were dramatically lower than both UCR and FAIR Health prices for those goods and services.

654. Thus, Plaintiffs have sustained, and continue to sustain, significant economic losses from underpayments made by members of the MultiPlan Cartel and directly caused by the MultiPlan Cartel agreement. Plaintiffs will calculate the full amount of such underpayment damages after discovery and upon proof at trial. Currently, Plaintiffs values its damages at least at $600 million. Unless the conduct of MultiPlan and other members of the MultiPlan Cartel is stopped, damages will continue to accrue.[12]

655. As noted above (*see, e.g.,* ¶¶ 11, 97, 357, 367-368, 390, 427, 468, 476, 482, 485, 489), the MultiPlan Cartel eliminates pricing competition. Prior to the formation of the MultiPlan Cartel, third-party payors competed with one another to set prices for out-of-network goods and services. If a third-party payor did not compensate a provider fairly for out-of-network services, the provider had the ability to bargain fairly for a proper payment for their services by pointing to

[12] Plaintiffs are not seeking damages for claims submitted to MultiPlan's PPO primary or wrap networks.

the prices that other payors were willing to pay for the same service. The MultiPlan Cartel destroyed that pricing competition.

656. There is direct evidence that the MultiPlan Cartel caused anticompetitive harm to Plaintiffs. MultiPlan provides monthly "savings reports" that calculate the exact amount of money that MultiPlan has caused specific members of the MultiPlan Cartel to underpay healthcare providers. These savings reports show the amount of charges billed by providers, the prices set by the MultiPlan's pricing methodology, and the portion of the underpayment that MultiPlan attributes to its claims suppression methodology. Each of these savings reports are direct evidence of the anticompetitive harm caused by MultiPlan's agreements with its Co-Conspirators.

657. MultiPlan's own filings with the SEC illustrate the harm that the MultiPlan Cartel has caused to providers. According to the May 10, 2023 Quarterly Report that MultiPlan filed with the SEC, MultiPlan processed $18.4 billion in charges from commercial health plans in the first three months of 2023. MultiPlan estimates that its agreed-upon pricing methodology resulted in a 61–81% underpayment to providers. These underpayment percentages and the billions of dollars in underpayments generated by the MultiPlan Cartel each year indicate that the MultiPlan Cartel has caused massive harm to providers, competition, and Plaintiffs.

658. Because of the revenues that they lost due to the MultiPlan Cartel, the providers who assigned their claims to Healthcare Justice and other healthcare providers had to cut back on other expenses, including physician compensation and benefits, capital equipment purchases and leases, and hiring additional staff. For example, in a March 13, 2020 email, the TeamHealth Providers[13] noted that due to massive underpayments that the TeamHealth Providers were receiving from United for out-of-network goods and services, TeamHealth had made cuts to

[13] "TeamHealth Providers" are the plaintiffs in *Hill Country Emergency Medical Associates, et al. v. MultiPlan, Inc., et al.*, No. 1:24-cv-11234 (N.D. Ill.).

compensation and benefits for physicians and advanced practice clinicians. Relatedly, NES and APP had to completely shut their doors and filed for bankruptcy.

659. Even if the providers who assigned their claims to Healthcare Justice were able to negotiate with MultiPlan over these out-of-network prices, the best they can hope for is being forced to accept a massive underpayment. The underpayments that MultiPlan negotiates on behalf of its competitors do not differ materially from the initial price set by MultiPlan. For example, David Steinfeld, the Vice President of Clinical and Consumerism Solutions at United, explained in a July 30, 2018 email that even when a provider appealed a price set by MultiPlan, United assumed that the provider would still accept 97.4% of that underpayment.

660. What makes this even more galling is that United executives privately admitted that they could and would pay providers 100% of their billed charges for out-of-network services, if necessary. In a separate July 30, 2018 email, Mr. Steinfeld stated, "If it came down to it UHC would pay billed charges[.]" Sarah R. Peterson, the Director of Network Programs at United, responded to Mr. Steinfeld's email on July 31, 2018, explaining that United was secretly willing to pay 100% of billed charges because, "UHC is not taking on legal risk for OCM," referring to outlier cost management, the internal code word at United for using MultiPlan.

661. In other words, although United realized that there was a legal risk in using MultiPlan and that the company was secretly willing to pay 100% of billed charges to avoid taking on legal risks associated with using MultiPlan, United continued to use MultiPlan's out-of-network claim suppression methodology to underpay providers billions of dollars and force providers to accept those underpayments.

662. Rather than competing with other payors to offer reasonable payments for out-of-network services, the members of the MultiPlan Cartel cut their payments to providers with

impunity, knowing that they could do so because other payors had agreed to underpay providers as a part of the MultiPlan Cartel. For example, Dan Schumacher, the President and Chief Operating Officer of United., told one provider that United would cut payments to that provider for out-of-network services by as much as 50%. When the provider asked Mr. Schumacher why United was cutting the payments to that provider for out-of-network services so ruthlessly, Mr. Schumacher replied, "because we can."

663. MultiPlan's pricing methodology generates significant underpayments when compared to non-collusive methods of setting prices for out-of-network goods and services.

664. Plaintiffs' injuries are of the type that the antitrust statutes were intended to forestall. Namely, the providers who assigned their claims to Healthcare Justice were harmed because they were underpaid by members of the MultiPlan Cartel because MultiPlan and other members of the cartel agreed to suppress payments to healthcare providers for out-of-network claims.

665. There are no more direct victims of the MultiPlan Cartel than the providers who assigned their claims to Healthcare Justice. Plaintiffs' providers provided medical goods and services to patients. Plaintiffs' providers submitted bills directly to members of the MultiPlan Cartel. Acting on direction from MultiPlan and pursuant to their anticompetitive agreement, members of the MultiPlan Cartel systematically underpaid for those claims. Were it not for the MultiPlan Cartel agreement, Plaintiffs' providers would have been compensated fairly and at a competitive level for those claims and the care they provided.

666. There is no potential for speculative damages, duplicative recovery, or complex apportionment of damages. Each claim submitted to members of the MultiPlan Cartel for out-of-

network goods and services was underpaid compared to the amount that the providers would have been paid as a reimbursement but for the cartel agreement.

667. Nor is there any other proximate or intervening cause of Plaintiffs' providers' losses due to MultiPlan's underpayments. For the reasons stated above, when the MultiPlan Cartel systematically underpays Plaintiffs' providers for their out-of-network goods and services, Plaintiffs' providers did not have the ability to obtain the balance of those charges from the patients or any other payor.

668. While the No Surprises Act ("NSA") contains an independent dispute resolution mechanism for disputed out-of-network claims subject to the NSA, Plaintiffs' providers cannot avoid the effects of the MultiPlan Cartel using that process. By artificially depressing prices for out-of-network claims across such a wide range of payors, and then categorically refusing to negotiate in most instances, MultiPlan makes the cost of disputing its cartel's underpayments too high to be worthwhile.

669. MultiPlan admits that: (1) a small fraction of claims go into arbitration, and (2) once there, the independent dispute resolution process is "clunky" and "inefficient." During the 42nd Annual J.P. Morgan Healthcare Conference, former MultiPlan CEO Mr. White said about NSA: "The process itself is relatively efficient and smooth, except for when it gets to the IDR stage. When it gets to the IDR stage, which is the smallest percentage of claims, of our no-surprises claims, the ones that end up in arbitration is a fraction of their overall NSA claim volume. Once it gets there, it's very clunky, very inefficient, and we've had to invest in it. We had to dedicate some expenses in '22 and '23, in support of just that IDR component. We'll continue to do so. We think there's opportunity for us. It's a complex process. As I said earlier, we've invested in it."

670. MultiPlan counts on the sheer breadth of its cartel and the crushing volume of pricing notices that it sends to payors to overwhelm the No Suprises Act's independent dispute resolution process. MultiPlan sends some providers multiple pricing notices each day, leading to a queue of underpayments on out-of-network claims that the provider has no effective means to push back on. The MultiPlan Cartel underpays providers for their out-of-network services tens of thousands of times each day. Providers must challenge *each* of those underpayments *individually* in the independent dispute resolution process. In many cases, the fees and cost of pursuing independent dispute resolution quickly outstrips the loss caused by the underpayment on a particular claim. Thus, there is no way for a provider to effectively use the independent dispute resolution process to reverse the effects of the MultiPlan Cartel's underpayments.[14]

671. Government data confirms the futility of pursuing independent dispute resolution. According to a joint report from the U.S. Department of Health and Human Services, U.S. Department of Labor, and U.S. Department of Treasury, during the fourth quarter of 2022, only 11,443 disputes concerning MultiPlan's payments for out-of-network services were contested in the independent dispute resolution process during that period. Those 11,443 dispute claims represent less than 0.1% of all underpayments from the MultiPlan Cartel during that period.

672. For all out-of-network goods and services, MultiPlan also "erect[s] a bureaucratic layer so thick and complicated that few can navigate it" when pushing back on MultiPlan's pricing for out-of-network goods and services. MultiPlan relies on the fact that providers overseeing a massive flow of out-of-network claims will not have the time to fight back on individual claims. MultiPlan prices nearly every out-of-network claim, giving medical billers less than 10 days to respond to those prices. When a provider asks the payor how MultiPlan set the prices for its out-

[14] This is especially true since the providers focus their time and attention on providing life saving emergency medicine.

of-network claims, the payor claims that it is not responsible for MultiPlan's pricing. When the provider tries to negotiate with MultiPlan, MultiPlan often redirects the provider to the payor in order to play a days-long game of telephone instead of actually negotiating the out-of-network price set by MultiPlan.

673. In short, while there are procedures for providers to dispute reimbursement amounts through arbitration, the sheer volume of claims that are underpaid by the MultiPlan Cartel make arbitrating each individual claim practically and financially impossible.

674. Plaintiffs' providers suffered antitrust injury as a result of the MultiPlan Cartel. As explained above, the actions of MultiPlan and the MultiPlan Cartel have directly harmed Plaintiffs' providers. For decades, federal courts have recognized that agreements between competitors to underpay providers for goods and services are illegal *per se* because buyers' cartels are so pernicious that they will almost always harm competition.

675. Plaintiffs' providers are the most efficient enforcer of the antitrust laws with respect to the MultiPlan Cartel. Plaintiffs' providers were directly injured when they were underpaid for submitted out-of-network claims due to the cartel agreement. The damages that Plaintiffs' providers suffered are not contingent, speculative, or complex. Due to the MultiPlan Cartel's conduct, and as a practical and legal matter, Plaintiffs cannot seek payment for these charges from any other source.

## IV. Plaintiffs' Claims Are Not Arbitrable.

676. Plaintiffs' claims are not subject to an arbitration clause in any contract that they may have with MultiPlan or any other payor concerning in-network rates.[15]

[15] Plaintiffs shall make a good faith effort in their Short Form Complaint to identify and assert claims only against those Defendants from which they have been paid solely on an out-of-network basis or otherwise have no agreement to arbitrate disputes concerning the prices of out-of-network goods and services.

677. Plaintiffs' causes of action for damages, injunctive relief, and declaratory relief relate solely to the prices MultiPlan and Co-Conspirators set for claims that were entirely out-of-network and were not subject to any prior contractual agreement between Plaintiffs' providers and any Defendant. Plaintiffs are not seeking any relief for in-network claims pricing or prices set for claims on MultiPlan's complementary network. Plaintiffs' claims against Defendants do not pertain to, arise out of, or relate in any way to the contractual in-network rates set in their contracts (if any) with Defendants.

678. Defendants all recognize that out-of-network claims are not governed by contracts and have publicly stated as much. For example:

a. "Our Analytics-Based Services reduce the per-unit cost of claims using data-driven negotiation and/or reference-based pricing methodologies. These services can be used standalone but often are used in a solution hierarchy after MultiPlan's network services to reduce claims with no available network contract." – MultiPlan

b. "[W]e do not have contracts with all providers that render services to our members and, as a result, may not have a pre-established agreement about the amount of compensation those out-of-network providers will accept for the services they render." – Elevance

c. "If a provider isn't under contract with your plan, they are known as an 'out-of-network provider.'" – United

d. "Out-of-network providers do not have contracts with Humana." – Humana

e. "If a doctor or facility has no contract with your health plan, they're considered out-of- network[.]" – Cigna

f. An out-of-network doctor "has not agreed to a contract price for the covered service." – Aetna

g. "An out-of-network provider is a physician, hospital or other health care provider who has not signed an agreement to provide services through our PPO network." – Blue Cross Blue Shield of Michigan

h. "Providers and facilities that do not have a contract with a health insurer are considered out-of-network." – Highmark Health

i. "Out-of-network [] [t]ypically refers to physicians, hospitals or other health care providers who do not contract with an insurance plan to provide services to its members." – Consociate Health

j. "Out-of-network describes providers and facilities that haven't signed a contract with your health plan." – Healthcare Highways

k. "Out-of-network describes providers and facilities that haven't signed a contract with your health plan." – Team Care

679. Defendants' agreements with MultiPlan also explicitly contemplate that MultiPlan's proprietary pricing methodologies will be used to set prices only for healthcare claims that are not subject to any form of written contract. In its contract with Cigna, MultiPlan agreed to apply its proprietary pricing methodologies to "claims of providers [that] do not participate in [Cigna's] network." Likewise, in its contract with MultiPlan, Aetna agreed to send MultiPlan "only out-of-network, non-contracted claims" to be priced according to MultiPlan's proprietary pricing methodology. Finally, in its contract with MultiPlan, United agrees to route only out-of-network and non-contracted claims to MultiPlan in order to set prices for those claims.

680. None of the claims at issue are subject to any in-network agreement or any other form of contact with any Defendant named in its complaint that requires any of Plaintiffs' providers to arbitrate disputes concerning out-of-network pricing.

681. Even if there were, somehow, an enforceable arbitration clause that applied to the Plaintiffs' claims against Defendants (and there is not such clause), many Defendants have waived the right to enforce those clauses. For example, MultiPlan has litigated motions to dismiss against Adventist Health System in the U.S. District Court for the Southern District of New York and did not file a motion to compel arbitration in those proceedings. Moreover, MultiPlan's counsel has told this Court that it will not be filing a motion to compel arbitration in this action.

682. The contracts that MultiPlan and its Co-Conspirators entered into with Plaintiffs' providers regarding in-network goods and services confer no benefits on non-contracting parties and cannot serve as the basis to compel arbitration between Plaintiffs and a third-party. Many of those contracts contain clauses that expressly state that the contract confers no benefits on any third-party and that no entity is a third-party beneficiary of the contract.

**V. The Defendants Also Use Deceptive and Unfair Tactics to Further Their Unlawful Scheme.**

683. Defendants also have created a web of deceit, and use strongarm tactics to carry out their common purpose of paying Plaintiffs' providers and other providers at rates far below the rates paid in a more competitive market absent collusion. In doing so, Defendants enriched themselves through fees and the benefit of underpaying for the Plaintiffs' providers' out-of-network goods and services. Among other things, the Defendants routinely misrepresent to providers in "verification of benefits" communications before services are provided that the payor pays for such services at competitive market rates—and fails to tell providers that, in fact, prices will be determined using MultiPlan's common pricing methodology. And none of the cartel

Case 1:24-cv-07915 Document #: 186-1 Filed: 10/28/26 Page 191 of 250 PageID #:120

members tell providers that the pricing is being determined through collusion and the use of commingled data, as opposed to each payor independently determining what price it will pay. Defendants couple their bait-and-switch pricing with strong-arm tactics, obfuscation, and a bureaucratic maze designed to leave providers with no practical choice but to take the Defendants' low-ball payments.

684. One of the main reasons PPO plans generally cost more is because plan members can choose to receive out-of-network goods and services. The willingness of providers (including Plaintiffs' providers) to provide services to a PPO plan's members on an out-of-network basis is thus material to the value and appeal of a PPO plan. In turn, when employers select a PPO plan to offer to their employees—and when employees opt to enroll in a PPO plan from among the different types of plans an employer may offer—accessibility to providers on an out-of-network basis is a material consideration.

685. In furtherance of their common plan, Defendants routinely and falsely represent that they allegedly provide reasonable, competitive, and negotiated rates to out-of-network providers. For example, United represents that it "reimburses at competitive rates" when a patient exercises their choice to use an out-of-network provider and engages in "negotiation" with providers over such rates. Aetna similarly represents that it uses MultiPlan to set prices "based on typical competitive charges and/or payments for a service." Cigna represents that it offers out-of-network providers "an amount based on a market-based rate," or UCR amounts. There is no disclosure that MultiPlan is using the MultiPlan Cartel's commingled data, that the other payors have substituted MultiPlan Cartel pricing of out-of-network goods and services for their own independent decisions on pricing, or that pricing is suppressed through a series of caps

("overrides") that MultiPlan coordinates so that the cartel members remain in alignment in pushing out-of-network prices lower and lower.

686. Except in the case of emergency services that are covered by EMTALA or similar state laws, before providing out-of-network goods and services, a provider typically contacts the patient's insurer (or agent of the insurer) for a verification of benefits and, if needed, preauthorization for the services. This allows the provider to confirm that the treatment will be paid for even though the provider is not in-network for that patient's plan. Such confirmation is a standard practice in the healthcare industry that induces Plaintiffs' providers to provide services and facilities to patients on an out-of-network basis.

687. Defendants are aware that Plaintiffs' providers and other out-of-network providers seek out and routinely rely on such pre-treatment verifications. Defendants take advantage of this dynamic to victimize the Plaintiffs' providers. Throughout the relevant period, agents and representative of each Defendant regularly and routinely represented to Plaintiffs' providers that the competing payors would pay for out-of-network goods and services and facilitates, for example, a UCR rate or a specified multiple of Medicare rates—only to have MultiPlan come back after the goods and services are provided with cartel pricing that is far below what was indicated in the pre-service communications. MultiPlan presents its low-ball, non-market rates on a take-it-or-leave-it basis—often with deadlines of 24 hours or less and with threats that any push back from the provider will just result in a lower payment rate.

688. The MultiPlan employees making these communications are instructed and incentivized to pay the Plaintiffs' providers low rates—which rates are then communicated to other MultiPlan employees to facilitate race to the bottom. Moreover, the rates paid to the Plaintiffs'

providers often are tied to predetermined price "caps" set in a coordinated manner as part of Defendants' scheme.

689. Defendants know these tactics work because the Plaintiffs' providers are under the misimpression (deliberately generated through Defendants' misrepresentations and half-truths) that the rates MultiPlan is communicating to them are market based and determined independently by each payor. The Plaintiffs' providers do not have the data, resources, or time to understand that the rates being paid are the product of collusion.

## VI. The Statute of Limitations Should be Tolled Under the Fraudulent Concealment and Continuing Violation Doctrines.

### a. Fraudulent Concealment

690. From at least January 1, 2015 through the present, MultiPlan and members of the MultiPlan Cartel have affirmatively and fraudulently concealed the existence of the MultiPlan Cartel from the Plaintiffs' providers by various means and methods.

691. Defendants and their Co-Conspirators did so in at least two ways. First, they misled the Plaintiffs' providers and other providers about how they set compensation rates. Second, they actively worked to conceal the MultiPlan Cartel and ensure its secrecy.

692. MultiPlan colludes with competing payors by entering into horizontal agreements to end pricing competition for out-of-network goods and services. The Plaintiffs' providers are not a party to those agreements. Due to non-disclosure and confidentiality clauses in the contracts, the Plaintiffs' providers did not access, and could not have reasonably accessed, the underlying terms that would have alerted the Plaintiffs' providers of a potential antitrust claim.

693. MultiPlan has also taken steps to maintain the secrecy of its agreements with competing payors. For instance, its Network Rental Agreement with United requires United to take steps "to preserve the confidential and proprietary nature of [MultiPlan's] repricing information."

694. The same Network Rental Agreement between MultiPlan and United requires United and MultiPlan to conceal their agreement from the public. The agreement states, "neither party will make any public announcement of this Agreement," and that United and MultiPlan will "restrict knowledge of the terms and conditions of this Agreement to those who need to know."

695. Moreover, MultiPlan publicly disseminates misleading and false information to cover up the fact that it is a payor, thereby hiding the fact that it was colluding with its competitors (other payors) to suppress payments to providers.

696. The landing page of MultiPlan's website currently states prominently at the top of the page: "**We are not an insurance company**" (original emphasis). MultiPlan's website also states: "MultiPlan is not a health insurance company and does not sell insurance directly or indirectly through agents or brokers."

697. In the "About MultiPlan" section of its press releases, MultiPlan also (mis)characterizes itself as merely a "partner" to health insurance companies and describes those companies only as MultiPlan's "clients[]." MultiPlan does not mention that it is actually a payor.

698. MultiPlan submits to providers through its Negotiation Services Portal pricing offers which state falsely that "MultiPlan is not a payor or an agent of any payor." In fact, MultiPlan is both a payor *and* an agent of competing payors, who enter into agreements authorizing MultiPlan to make pricing offers and negotiate out-of-network claims on their behalf.

699. These statements are highly misleading at best, if not entirely inaccurate. MultiPlan is a payor. MultiPlan has one of the oldest and largest PPO networks in the United States. MultiPlan's claims that it is "not a health insurance company" are irrelevant and incorrect. Like many payors, Multiplan is not an insurer. But MultiPlan still competes against other payors by adjudicating and pricing claims.

700. MultiPlan's statements made to the Plaintiffs' providers and the public that MultiPlan is "not an insurance company" were misleading, and MultiPlan intended for the Plaintiffs' providers, other healthcare providers, and the public to rely upon them.

701. Likewise, MultiPlan's Co-Conspirators made statements to the public that were designed to obscure the difference between the out-of-network price set by the MultiPlan Cartel and the UCR rates for out-of-network services that existed prior to the MultiPlan Cartel. For example, in a certificate of coverage for United's Student Injury and Sickness Insurance Plan for enrolled students at the University of Mississippi, United claimed that it "uses data from . . . Data iSight to determine Usual and Customary Charges." United failed to explain that there is a vast difference between prices set by MultiPlan's pricing methodology and usual and customary rates.

702. On information and belief, MultiPlan's Co-Conspirators have also submitted false payment communications intended to trick providers into accepting MultiPlan's artificially low reimbursements for out-of-network services. Federal regulation requires that when a payor reimburses a medical claim at a different rate than the billed amount, the payor must explain the reason for the discrepancy to the provider. When these communications, which are commonly referred to as explanations of benefits (or "EOBs"), are submitted electronically, they are subject to federal regulations governing the form and content of electronic healthcare transactions. These regulations require that EOBs use a standardized set of claim adjustment reason codes ("X12 Codes") to explain why a claim was reimbursed differently than the billed amount.

703. Payors use the X12 Code "CO" (short for "Contractual Obligation") to indicate that a claim was reimbursed pursuant to a contractual agreement between the payor and the provider, or a government-sponsored plan like Medicare, which has pre-set reimbursement rates. For instance, a payor is supposed to submit an EOB using the code CO when the payor has reimbursed

a claim pursuant to a network contract with the healthcare provider, under which the payor and provider have agreed to a lower rate than the charged amount. The X12 Code "PR" (short for "Patient Responsibility") means that the patient is responsible for a portion of the submitted charge. When a payor reimburses an out-of-network claim—which is not subject to a preexisting agreement with the provider—below the billed amount, the payor is supposed to send the provider an EOB using the "PR" reason code.

704. On information and belief, MultiPlan's Co-Conspirators sometimes submit electronic EOBs using the code "CO" for OON claims priced by MultiPlan, even though the rates determined by MultiPlan are not subject to any contract between the provider and payor, and the EOBs should therefore use the code "PR." MultiPlan's Co-Conspirators do this because they believe that healthcare providers and their billing service providers are less likely to carefully review and appeal claims paid below the charged amount when the reimbursement rate is set by a preexisting contract. It is common practice for medical billing service providers to automatically accept reimbursements accompanied by the code CO, because they assume that the reimbursed amount has already been negotiated and agreed to by the provider and payor (or set by the government). Conversely, MultiPlan's Co-Conspirators believe that healthcare providers and their medical billing services providers will be more likely to scrutinize and potentially appeal reimbursements using the code PR, which are not set by contract.

705. The competing payors' statements to the Plaintiffs' providers and other healthcare providers that out-of-network claims priced by MultiPlan were reimbursed pursuant to a "contractual obligation" were false, and the Co-Conspirators intended for the Plaintiffs' providers and other healthcare providers to rely upon them. The Co-Conspirators' false and misleading billing practices caused the Plaintiffs' providers and other healthcare providers to accept

unreasonably low prices for out-of- network claims set by MultiPlan, which they may have appealed if the payors had submitted EOBs using accurate X12 Codes.

706. While MultiPlan was attempting to hide its role in the cartel by claiming that it did not compete against other payors, the members of the MultiPlan Cartel were busy trying to deflect attention from the cartel by blaming physicians for allegedly charging too much for out-of-network services. They did that using false comparisons, invented numbers, and laundered academic research.

707. In a December 4, 2018 email exchange between Lambert van der Wade, Dan Schumacher, Jon Wander, and Jeff Lucht, executives of United, they discussed a draft United research paper entitled, "Inflated Charge by Out-of-Network Emergency Physicians Total $8 Billion Each Year." However, they acknowledged that this headline number was built on a false comparison. Mr. Lucht pushed for the article to compare billed out-of-network charges to Medicare reimbursement amounts, stating: "It seems we could tell a similar story by just showing non-par billed amounts as a percentage of Medicare – they look ludicrously high and should make our point." Mr. Wade responded that while that comparison was "a viable option," "to be clear, using invented Medicare rate benchmarks, rather than real numbers, will adversely affect the deliverable." Mr. Wade went on to explain that the figures in the report were "invented" and not "real," because "100% Medicare is too low. Policy makers know and appreciate the fact that commercial rates are higher than public program rates, and believe this should remain the case, in part to cross subsidize (and lower the direct cost to government of) public programs." In the end, Mr. Wade agreed to use "Medicare rates" because "the OON charges . . . will indeed look high, allowing us to make our intended point[.]"

708. United secretly laundered its viewpoint through seemingly neutral academic writing from Professor Zack Cooper, an Associate Professor of Public Health and Associate Professor of Economics at the Yale University's School of Public Health. United executives reviewed Professor Cooper's academic writing on out-of-network pricing prior to its publication and edited the writing to better fit with United's chosen narrative concerning out-of-network pricing. Professor Cooper published his academic work on out-of-network pricing without fully disclosing the degree to which United executives had been involved in reviewing and editing his work.

709. Professor Cooper's research was not just slanted. It was wrong. In reality, emergency medicine was not generating the surprise out-of-network bills that Professor Cooper claimed. In 2019, on average, the TeamHealth Providers billed $150 per patient encounter in hospital emergency departments.

710. MultiPlan also took steps designed to make it more difficult for the cartel to be detected. MultiPlan and other competing payors kept their meetings off-the-record. They exchanged their most sensitive information via telephone conversations and text messages and not on corporate email servers. They also took steps to prevent providers from balance billing when MultiPlan set out-of-network prices, making it less likely that patients would begin complaining about "surprise" medical bills.

711. Defendants and the Co-Conspirators also privately submitted their own non-public claims data to MultiPlan, and MultiPlan in turn used its proprietary repricing tools, the details of which remain confidential, to propose compensation rates. The inner workings and true nature of this process are secrets that are not shared with providers like the Plaintiffs' providers and other providers.

712. Defendants and the Co-Conspirators had private communications and meetings to discuss out-of-network claims repricing, MultiPlan's repricing tools, and use of those tools, including by each of Defendant's competitors.

713. The Plaintiffs' providers therefore had neither actual nor constructive knowledge of the facts giving rise to their claims for relief. The Plaintiffs' providers did not discover, nor could they have discovered through the exercise of reasonable diligence, the existence of the MultiPlan Cartel until shortly before filing this Lawsuit.

714. Through Defendants' and the Co-Conspirator's knowing and active concealment of their misconduct, the Plaintiffs' providers did not receive information that should have put them, or any reasonable person or provider standing in their shoes, on sufficient notice of collusion worthy of further investigation.

715. Given the MultiPlan Cartel's massive effort at misdirection and blame-shifting, the Plaintiffs' providers exercised reasonable diligence at all times since January 1, 2015, but they had no reason to suspect wrongdoing by MultiPlan until *The New York Times* broke a story on April 7, 2024 outlining how MultiPlan slashed reimbursement in order to enrich itself. *See* https://www.nytimes.com/2024/04/07/us/health-insurance-medical-bills.html. The Plaintiffs' providers could not have discovered the MultiPlan Cartel at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques described above, including MultiPlan's multiple misleading statements that it is not a health insurance company, to conceal the existence of the cartel.

716. Even if notice had arisen earlier, an ordinary person acting reasonably diligently would not have had the time, resources, or specialized training to uncover the misconduct that the Plaintiffs allege herein, earlier than May 2024.

717. Defendants' and Co-Conspirators' fraudulent concealment of their wrongful misconduct has tolled and suspended the running of the statute of limitations concerning the claims and rights of action of the Plaintiffs' providers arising from the conspiracy, including all parts of the class period earlier in time than the four years immediately preceding the date this action was filed.

**b. Continuing Violation**

718. MultiPlan's conduct has also resulted in a continuing violation against the Plaintiffs' providers.

719. Following its initial combination with its Co-Conspirators, MultiPlan has committed overt acts, each of which constitutes part of the ongoing violation.

720. Members of the MultiPlan Cartel met frequently to refine their cartel agreement and to ensure that the agreement was effective in suppressing out-of-network reimbursement payments to healthcare providers. Members of the MultiPlan Cartel met during Client Advisory Board meetings to discuss the effectiveness of MultiPlan's products in cutting out-of-network payments to healthcare providers. MultiPlan representatives also met weekly or daily with executives at United concerning out-of-network reimbursements.

721. Members of the MultiPlan Cartel took steps to maintain and adjust their anticompetitive agreement by renewing contracts with MultiPlan for out-of-network claim suppression and changing the agreed-upon methodology that MultiPlan would use to suppress out-of-network reimbursement payments. Indeed, MultiPlan told investors in May 2023 that, in the short period between Q3 2022 and Q1 2023 alone, MultiPlan "renewed multiyear contracts with 3 of our larger customers." According to MultiPlan, "those 3 contracts accounted for more than 50%

of [MultiPlan's] revenue." These new agreements that solidify and perpetuate the MultiPlan Cartel are continuing violations of the antitrust laws.

722. MultiPlan Cartel members also imposed shared savings agreements on employee benefit plans to ensure that the cartelists would generate profits by cutting out-of-network reimbursement payments.

723. MultiPlan's overt actions and the overt actions of its fellow cartelists were new acts beyond the initial cartel agreement that were necessary to perpetuate the conspiracy. Those overt acts continued from at least January 1, 2015 through the present. By constantly renewing and refining their agreement to suppress out-of-network reimbursement payments, the members of the MultiPlan Cartel inflicted new and accumulating injury to the Plaintiffs' providers.

## V. CAUSES OF ACTION

### I. First Claim for Relief: Horizontal Agreements in Restraint of Trade (Section 1 of the Sherman Act, 15 U.S.C. § 1)

724. The Plaintiffs reincorporate and reallege by reference the preceding paragraphs, as though fully set forth herein.

725. Beginning at least as early as January 1, 2015, and through the present, MultiPlan engaged in a continuing contract, combination, or conspiracy with the other members of the MultiPlan Cartel to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

726. MultiPlan is a horizontal competitor with other payors in the Out-of-Network Goods and Services Market.

727. MultiPlan's PPO networks compete against other payors to set prices for out-of-network goods and services. By entering into the MultiPlan Cartel agreement, MultiPlan and its Co-Conspirators removed this form of rivalry amongst themselves by illegally coordinating the

prices that they set for out-of-network goods and services. But for the MultiPlan Cartel agreement, payors would have exercised their independent business judgment when setting and negotiating prices for out-of-network goods and services.

728. MultiPlan and its horizontal competitors in the MultiPlan Cartel reached agreements to stop competing against one another by setting their own prices for out-of-network goods and services. Instead, they agreed to (1) use MultiPlan's pricing methodology to set prices for out-of-network goods and services, (2) fix maximum prices that they would pay for particular out-of-network goods and services, and (3) use MultiPlan as the sole negotiator of out-of-network prices.

729. In this manner, the MultiPlan Cartel had a conscious commitment to this common scheme concerning fixing prices among competitors in the Out-of-Network Goods and Services Market.

730. Providers, including Plaintiffs' providers, were directly and proximately harmed by the horizontal price-fixing of the MultiPlan Cartel. Plaintiffs' providers submitted billed charges for out-of-network goods and services to members of the MultiPlan Cartel, and MultiPlan and its Co-Conspirators conspired to systematically underpay Plaintiffs' providers for their out-of-network goods and services. These conspiratorial underpayments caused a direct, foreseeable, concrete, and redressable injury to Plaintiffs' providers.

731. The injuries suffered by Plaintiffs' providers as a result of the MultiPlan Cartel are of a type that the antitrust laws are intended to prevent. Economic losses caused by an agreement among competitors to restrain trade are a classic example of injuries that the antitrust laws are intended to prevent.

732. Plaintiffs' providers' injuries flow from MultiPlan's illegal agreements with the members of the MultiPlan Cartel. Were it not for those agreements, Plaintiffs' providers would have received higher reimbursement payments for out-of-network medical services.

733. Plaintiffs' providers suffered compensable damages as a result of the MultiPlan Cartel. The exact calculation and amount of those damages will be disclosed in Plaintiffs' providers' expert reports and expert testimony at trial. It is currently estimated that the damages are in excess of $600 million.

734. Plaintiffs' providers continue to be harmed by the MultiPlan Cartel's ongoing horizontal price-fixing conspiracy.

735. Plaintiffs' providers exercised reasonable diligence in attempting to ascertain the existence of the MultiPlan Cartel's illegal horizontal price-fixing.

736. The MultiPlan Cartel fraudulently concealed its horizontal price-fixing from Plaintiffs' providers and the public such that the illegal nature of the scheme only became ascertainable after certain lawsuits and regulatory filings made relevant information accessible to the public.

737. The MultiPlan Cartel's horizontal price-fixing is a *per se* violation of Section 1 of the Sherman Act.

738. In the alternative, the MultiPlan Cartel's horizontal price-fixing violates the rule of reason under either a quick look or more fulsome analysis because MultiPlan and its competitors entered into agreements that restrained trade in a properly defined relevant market and there is no pro-competitive justification for the MultiPlan Cartel.

739. In the alternative, even if MultiPlan is not a payor, it is still liable for a per se violation of Section 1 of the Sherman Act because it was either a potential competitor of the cartel

members or the agent of the payors' horizontal agreement in violation of Section 1 of the Sherman Act. MultiPlan operated as the agent of payors that were engaged in a per se illegal conspiracy to restrain trade by suppressing competition for out-of-network reimbursements paid to healthcare providers. MultiPlan was aware of the payors' intent to suppress competition by using a common methodology for pricing out-of-network services and using a common vendor for negotiating reimbursement payments to healthcare providers. MultiPlan facilitated the payors' efforts to suppress competition among themselves concerning reimbursement payments for out-of-network services. MultiPlan intended to facilitate this per se violation of Section 1 of the Sherman Act because it had a financial stake in doing so—MultiPlan was paid more if it assisted the payors in paying less to healthcare providers for out-of-network services. MultiPlan also contributed materially to the restraint of the payors' restraint of trade. It provided each of the payors with access to its common pricing methodology, which the payors could not have recreated on their own.

## II. Second Claim for Relief: Hub-and-Spoke Agreement in Restraint of Trade (Section 1 of the Sherman Act, 15 U.S.C. § 1) (Plead in the Alternative to Claims 1, 3, and 4)

740. Plaintiffs reincorporate and reallege by reference the preceding paragraphs, as though fully set forth herein.

741. In the alternative to the Plaintiffs first cause of action, from at least as early as January 1, 2015 through the present, MultiPlan entered into an illegal "hub-and-spoke" agreement with the other members of the MultiPlan Cartel to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

742. MultiPlan is the "hub" of the hub-and-spoke conspiracy. It initiated the conspiracy, induced the Co-Conspirators to join, facilitates the price-fixing undertaken by the conspiracy, and profits from that facilitation.

743. MultiPlan's agreements with payors to participate in the MultiPlan Cartel constitute the various "spokes" of the conspiracy. As stated above, MultiPlan and the payors reached agreements to stop competing against one another by setting their own prices for out-of-network goods and services. Instead, they agreed to (1) use MultiPlan's pricing methodology to set prices for out-of-network goods and services, (2) fix maximum prices that they would pay for particular out-of-network goods and services, and (3) use MultiPlan as the sole negotiator of out-of-network prices.

744. The "rim" of the hub-and-spoke conspiracy is formed by the agreements between and among payors to adopt MultiPlan's pricing methodology for out-of-network goods and services. Voluminous circumstantial evidence supports the existence of these "rim" agreements, including parallel conduct among members of the MultiPlan Cartel and "plus factors" indicating that this conduct was the result of an anticompetitive agreement (i.e., high market concentration, barriers to market entry, ample motive, opportunities to conspire, previous collusion, actions against self-interest, exchange of competitively sensitive information, monitoring and enforcement structures, customary patterns and leadership, and sweetheart deals to retain cartel members).

745. The injuries suffered by Plaintiffs' providers as a result of the MultiPlan Cartel are of a type that the antitrust laws are intended to prevent. Economic losses caused by an agreement among competitors to restrain trade are a classic example of injuries that the antitrust laws are intended to prevent.

746. Plaintiffs' providers suffered compensable damages as a result of the hub-and-spoke conspiracy formed by the MultiPlan Cartel. The exact calculation and amount of those damages will be disclosed in Plaintiffs' providers' expert reports and expert testimony at trial. It is currently estimated that the damages are in excess of $600 million.

747. Plaintiffs' providers' injuries flow from the MultiPlan Cartel's illegal hub-and-spoke conspiracy. Were it not for the conspiracy, Plaintiffs' providers would have received higher reimbursement payments for out-of-network services.

748. Plaintiffs' providers continue to be harmed by the MultiPlan Cartel's ongoing hub-and-spoke conspiracy.

749. Plaintiffs' providers exercised reasonable diligence in attempting to ascertain the existence of the MultiPlan Cartel's illegal hub-and-spoke conspiracy.

750. The MultiPlan Cartel fraudulently concealed its hub-and-spoke conspiracy from the Plaintiffs' providers and the public such that the illegal nature of the scheme only became ascertainable after certain lawsuits and regulatory filings made relevant information accessible to the public.

751. The MultiPlan Cartel's hub-and-spoke conspiracy constitutes a *per se* violation of Section 1 of the Sherman Act.

752. In the alternative, even if no "rim" agreement is present, the MultiPlan Cartel is still a hub-and-spoke agreement that violates the rule of reason because MultiPlan and the payors have agreed to unreasonably restrain trade in the Out-of-Network Goods and Services Market and there is no procompetitive justification for their conduct. Even if such a procompetitive justification did exist (and it were not a pretext), the alleged procompetitive benefits of the MultiPlan Cartel could still be obtained by less restrictive means, such as using FAIR Health to determine out-of-network prices.

## III. Third Claim for Relief: Principal-Agent Combinations in Restraint of Trade (Section 1 of the Sherman Act, 15 U.S.C. § 1) (Plead in the Alternative to Claims 1, 2, and 4)

753. Plaintiffs reincorporate and reallege by reference the preceding paragraphs as though fully set forth herein.

754. In the alternative to the Plaintiffs first, second, and fourth causes of action, from at least as early as January 1, 2015 through the present, MultiPlan acted as an agent, facilitator, or conduit of each of the other members of the MultiPlan Cartel to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act.

755. MultiPlan operated as the agent of competing payors that were engaged in a *per se* illegal conspiracy to restrain trade by suppressing competition for out-of-network payments to healthcare providers. MultiPlan was aware of the competing payors' intent to suppress competition by using a common methodology for setting prices out-of-network goods and services and using a common agent for negotiating those prices. MultiPlan facilitated the payors' efforts to suppress competition among themselves concerning payments for out-of-network goods and services. MultiPlan intended to facilitate this *per se* violation of Section 1 of the Sherman Act because it had a financial stake in doing so—MultiPlan was paid more if it assisted the competing payors in paying less to healthcare providers for out-of-network goods and services. MultiPlan also contributed materially to the competing payors' restraint of trade. It provided each of the payors with access to its common pricing methodology, which the competing payors could not have recreated on their own, and served as a conduit for the members of the MultiPlan Cartel to indirectly communicate with each other about their pricing of out-of-network payments.

756. The MultiPlan Cartel has dominant collective market power in the Out-of-Network Goods and Services Market. It also has complete power in each relevant submarket, where healthcare providers have no choice but to submit their billed charges to the specific payor

operating the health plan in which the patient is enrolled and cannot turn to another buyer for payment of those out-of-network charges.

757. MultiPlan and each of the other payors entered into anticompetitive agreements that harmed competition in the Out-of-Network Goods and Services Market and its submarkets by intentionally suppressing the prices paid to out-of-network healthcare providers, including Plaintiffs' providers. By the MultiPlan Cartel suppressing the prices for all of out-of-network claims, the entire market of claims was impacted and, as a result, paid at an artificially low rate.

758. The MultiPlan Cartel's price-fixing agreements are each an unreasonable restraint on trade in violation of Section 1 of the Sherman Act. MultiPlan and its Co-Conspirators entered into agreements that used their combined market power to restrain trade in the relevant market and relevant submarkets without any procompetitive justification. Even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

759. Plaintiffs' providers' injuries flow from MultiPlan's illegal agreements with each member of the MultiPlan Cartel. Were it not for those agreements, Plaintiffs' providers would have received higher payments for out-of-network medical services.

760. Plaintiffs providers' suffered compensable damages as a result of the MultiPlan Cartel. The exact calculation and amount of those damages will be disclosed in Plaintiffs' expert reports and expert testimony at trial. Plaintiffs' providers continue to be harmed by the MultiPlan Cartel's ongoing combination or conspiracy. It is currently estimated that the damages are in excess of $600 million.

### IV. Fourth Claim for Relief: Agreements to Unreasonably Restrain Trade (Section 1 of the Sherman Act, 15 U.S.C. §1) (Plead in the Alternative to Claims 1, 2, and 3)

761. Plaintiffs reincorporate and reallege by reference the preceding paragraphs, as though fully set forth herein.

762. In the alternative to the Plaintiffs' first, second, and third causes of action, from at least as early as January 1, 2015 through the present, MultiPlan entered into an illegal "hub-and-spoke" agreement with the other members of the MultiPlan Cartel to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

763. The MultiPlan Cartel has dominant collective market power in the Out-of- Network Goods and Services Market. It also has complete power in each relevant submarket, where healthcare providers have no choice but to submit their billed charges for out-of-network goods and services to the specific payor operating the health plan in which the patient is enrolled and cannot turn to another buyer for payment of those out-of-network charges.

764. MultiPlan and each of the other payors entered into anticompetitive agreements that harmed competition in the Out-of-Network Goods and Services Market and its submarkets by agreeing to (1) use MultiPlan's pricing methodology to set prices for out-of-network goods and services, (2) fix maximum prices that they would pay for particular out-of-network goods and services, and (3) use MultiPlan as the sole negotiator of out-of-network prices.

765. The MultiPlan Cartel's price-fixing agreements are each an unreasonable restraint on trade in violation of Section 1 of the Sherman Act. MultiPlan and its Co-Conspirators entered into agreements that used their combined market power to restrain trade in the relevant market and relevant submarkets without any pro-competitive justification. Even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

766. Plaintiffs' providers' injuries flow from MultiPlan's illegal agreements with each member of the MultiPlan Cartel. Were it not for those agreements, Plaintiffs' providers would have competed with one another to independently set and negotiate prices for out-of-network goods and services, resulting in higher payments for out-of-network goods and services.

767. Plaintiffs' providers suffered compensable damages as a result of the MultiPlan Cartel. The exact calculation and amount of those damages will be disclosed in the Assignors' expert reports and expert testimony at trial. Plaintiffs' providers continue to be harmed by the MultiPlan Cartel's ongoing vertical price-fixing conspiracy. It is currently estimated that the damages are in excess of $600 million.

### V. Fifth Claim for Relief: Anticompetitive Information Exchange (Section 1 of the Sherman Act, 15 U.S.C. § 1)

768. Plaintiffs reincorporate and reallege by reference the preceding paragraphs as though fully set forth herein.

769. From at least as early as January 1, 2015 through the present, MultiPlan engaged in a continuing arrangement with each of the other members of the MultiPlan Cartel to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, through an anticompetitive information exchange.

770. Because Plaintiffs' rely on evidence of information sharing (*see supra* Section IV(i)(c)), the elements of a Section 1 violation can be satisfied by showing either an anticompetitive agreement to fix prices, where information sharing supports the inference of such an agreement, or an anticompetitive agreement to share information. The First and Second Causes of Action relate to the former. This Cause of Action relates to the latter.

771. MultiPlan and the other members of the MultiPlan Cartel engaged in concerted action by entering into an anticompetitive arrangement to regularly exchange detailed, current,

competitively sensitive, and non-public information about the prices that they set and negotiated for out-of-network goods and services.

772. The information being exchanged among the MultiPlan Cartel consists primarily of critical and sensitive pricing information.

773. The information being exchanged among the MultiPlan Cartel is increasingly granular. The information consists of detailed, non-aggregated, and intimate details about the cartel member's competitive affairs.

774. The information being exchanged among the MultiPlan Cartel is not publicly available, and is not disseminated to healthcare providers, healthcare consumers, or other market participants. Instead, it is shared only with members of the MultiPlan Cartel.

775. The information being exchanged among the MultiPlan Cartel reflects recent, present, and planned future conditions. Advancements in MultiPlan's technology allows cartel members' current and future prices and plans to be shared quickly and frequently.

776. The purpose and effect of this arrangement to exchange information is to stifle pricing competition for out-of-network goods and services and to depress payments to healthcare providers, including Plaintiffs' providers, for out-of-network goods and services.

777. The MultiPlan Cartel has dominant collective market power in the Out-of-Network Goods and Services Market. It also has complete power in each relevant submarket, where healthcare providers have no choice but to submit their billed charges to the specific payor operating the health plan in which the patient is enrolled and cannot turn to another buyer for payment of those out-of-network charges.

778. This information exchange harms competition in the Out-of-Network Goods and Services Market and its submarkets because the suppressed payments to healthcare providers are

lower than they would have been had those companies competed with one another to set prices independently without exchanging vast amount of information of current pricing information in order to bring their out-of-network pricing into alignment. The information exchange also harms consumers of healthcare services because the underpayments limit healthcare providers' investments on improving care.

779. There is no procompetitive justification for the anticompetitive information exchange among the MultiPlan Cartel. Even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition, such as utilizing FAIR Health pricing information.

## VI. Sixth Claim for Relief: Violation of State and D.C. Antitrust Statutes (Plead in the Alternative to Claims 1-5)

780. Plaintiffs reincorporate and reallege by reference the preceding paragraphs as though fully set forth herein.

781. Defendants are engaged in a continuing contract, combination, or conspiracy and/or exchange of information that has operated from at least as early as January 1, 2015 through the present with respect to the prices paid for out-of-network goods and services in unreasonable restraint of trade in commerce, in violation of the various state antitrust and consumer protection statutes set forth below.

782. Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for Out-of-Network Goods and Services Market and relevant submarkets.

783. Plaintiffs' providers' injuries flow from Defendants' illegal agreements and conduct in furtherance of the MultiPlan Cartel. Were it not for those agreements and conduct, Defendants

would have competed with one another to independently set and negotiate prices for out-of-network goods and services, resulting in higher payments for out-of-network goods and services.

784. As a result of Defendants' unlawful conduct, each of Plaintiffs' providers have been injured by being paid for their Out-of-Network Goods and Services at prices lower than they would have been paid if Defendants competed with one another to independently price out-of-network goods and services.

785. Plaintiffs' providers suffered compensable damages as a result of Defendants' unlawful agreements and conduct. The exact calculation and amount of those damages will be disclosed in Plaintiffs' expert reports and expert testimony at trial.

786. By engaging in the foregoing conduct, Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the following state antitrust laws pleaded below.

787. ***Alabama***: Defendants have entered into an unlawful agreement in restraint of trade in violation of **Ala. Code § 6-5-60, et seq.**, with respect to pricing of out-of-network goods and services provided in Alabama by one or more of Plaintiffs' providers.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Alabama;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Alabama;

3. Plaintiffs' providers were deprived of free and open competition; and

4. Plaintiffs' providers were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct dramatically affected Alabama commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs' providers have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **Ala. Code § 6-5-60, et seq.**

e. Accordingly, Plaintiffs' providers seek all forms of relief available under **Ala. Code § 6-5-60, et seq.**

788. ***__Alaska__***: Defendants have entered into an unlawful agreement in restraint of trade in violation of **Alas. Stat. § 45.50.562, et seq.**, with respect to pricing of out-of-network goods and services provided in Alaska by one or more of Plaintiffs' providers.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Alaska;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Alaska;

3. Plaintiffs' providers were deprived of free and open competition; and

4. Plaintiffs' providers were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct dramatically affected Alaska commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs' providers have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **Alas. Stat. § 45.50.562, et seq.**

e. Accordingly, Plaintiffs' providers seek all forms of relief available under **Alas. Stat. § 45.50.562, et seq.**

789. ***Arizona***: Defendants have entered into an unlawful agreement in restraint of trade in violation of **Ariz. Rev. Stat. § 44-1402, et seq.**, with respect to pricing of out-of-network goods and services provided in Arizona by one or more of Plaintiffs' provider.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Arizona;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Arizona;

3. Plaintiffs' providers were deprived of free and open competition; and

4. Plaintiffs' providers were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct dramatically affected Arizona commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs' providers have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **Ariz. Rev. Stat. § 44-1401, et seq.**

e. Accordingly, Plaintiffs' providers seek all forms of relief available under **Ariz. Rev. Stat. § 44-1402, et seq.**

790. ***Arkansas***: Defendants have entered into an unlawful agreement in restraint of trade in violation of **A.C.A. § 4-75-101, et seq.**, with respect to pricing of out-of-network goods and services provided in Arkansas by one or more of Plaintiffs' providers.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Arkansas;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Arkansas;

3. Plaintiffs' providers were deprived of free and open competition; and

4. Plaintiffs' providers were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct dramatically affected Arkansas commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs' providers have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **A.C.A. § 4-75-101, et seq.**

e. Accordingly, Plaintiffs' providers seek all forms of relief available under **A.C.A. § 4-75-101, et seq.**

791. ***California***: Defendants have entered into an unlawful agreement in restraint of trade in violation of **Cal. Bus. Prof. Code § 16720, et seq.**, with respect to pricing of out-of-network goods and services provided in California by one or more of Plaintiffs' providers.

a. Defendants entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Cal. Bus. Prof. Code § 16720. Defendants, each of them, have acted in violation of Cal. Bus. Prof. Code § 16720 to fix, suppress, and maintain prices of out-of-network goods and services at sub-competitive levels and to unlawfully exchange pricing information.

b. The aforesaid violations of Cal. Bus. Prof. Code § 16720, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants, the enormous terms of which were to fix, suppress, and maintain prices of out-of-network goods and services at sub-competitive levels and unlawfully exchange pricing information.

c. For the purpose of forming and effectuating the unlawful trust, Defendants have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above and the following: fixing, suppressing, and maintaining prices of out-of-network goods and services at sub-competitive levels and unlawfully exchanging pricing information for out-of-network goods and services.

d. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout California;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout California;

3. Plaintiffs' providers were deprived of free and open competition; and

4. Plaintiffs' providers were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

e. Defendants' illegal conduct dramatically affected California commerce.

f. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs' providers have been injured in their business and property and are threatened with further injury.

g. Defendants entered into agreements in restraint of trade in violation of **Cal. Bus. Prof. Code § 16720, et seq.**

h. As a result of Defendants' violation of Cal. Bus. Prof. Code § 16720, Plaintiffs' providers seek all forms of relief available under Cal. Bus. Prof. Code § 16750(a), including treble damages and their cost of suit, including a reasonable attorney's fee.

792. ***Connecticut***: Defendants have entered into an unlawful agreement in restraint of trade in violation of **Conn. Gen. Stat. Ann. § 35-26, et seq.**, with respect to pricing of out-of-network goods and services provided in Connecticut by one or more of Plaintiffs' providers.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Connecticut;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Connecticut;

3. Plaintiffs' providers were deprived of free and open competition; and

4. Plaintiffs' providers were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct dramatically affected Connecticut commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs' providers have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **Conn. Gen. Stat. Ann. § 35-26, et seq.**

e. Accordingly, Plaintiffs seek all forms of relief available under **Conn. Gen. Stat. Ann. § 35-26, et seq.**

793. ***Illinois***: Defendants have entered into an unlawful agreement in restraint of trade in violation of **740 Ill. Comp. Stat. Ann. § 10/1, et seq**., with respect to pricing of out-of-network goods and services provided in Illinois by one or more of Plaintiffs' providers.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Illinois;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Illinois;

3. Plaintiffs' providers were deprived of free and open competition; and

4. Plaintiffs' providers were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct dramatically affected Illinois commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs' providers have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **740 Ill. Comp. Stat. Ann. § 10/1, et seq.**

e. Accordingly, Plaintiffs' providers seek all forms of relief available under **740 Ill. Comp. Stat. Ann. § 10/1, et seq.**

794. ***Indiana***: Defendants have entered into an unlawful agreement in restraint of trade in violation of **IC 24-1-1-1, et seq**., with respect to pricing of out-of-network goods and services provided in Indiana by one or more of Plaintiffs' provider.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Indiana;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Indiana;

3. Plaintiffs' providers were deprived of free and open competition; and

4. Plaintiffs' providers were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct dramatically affected Indiana commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs' providers have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **IC 24-1-1-1, et seq**.

e. Accordingly, Plaintiffs' providers seek all forms of relief available under **IC 24-1-1-1, et seq**.

795. ***Kansas***: Defendants have entered into an unlawful agreement in restraint of trade in violation of **Kansas Stat. Ann. § 50-101, et seq.,** with respect to pricing of out-of-network goods and services provided in Kansas by one or more of Plaintiffs' providers.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Kansas;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Kansas;

3. Plaintiffs' providers were deprived of free and open competition; and

4. Plaintiffs' providers were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct dramatically affected Kansas commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs' providers have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **Kansas Stat. Ann. § 50-101, et seq.**

e. Accordingly, Plaintiffs' providers seek all forms of relief available under **Kansas Stat. Ann. § 50-101, et seq.**

796. ***Kentucky***: Defendants have entered into an unlawful agreement in restraint of trade in violation of **KRS 367.175, et seq.,** with respect to pricing of out-of-network goods and services provided in Kentucky by one or more of Plaintiffs' providers.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Kentucky;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Kentucky;

3. Plaintiffs' providers were deprived of free and open competition; and

4. Plaintiffs' providers were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct dramatically affected Kentucky commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs' providers have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **KRS 367.175, et seq.**

e. Accordingly, Plaintiffs' providers seek all forms of relief available under **KRS 367.175, et seq.**

797. ***Louisiana***: Defendants have entered into an unlawful agreement in restraint of trade in violation of **La. R.S. 51:121, et seq.,** with respect to pricing of out-of-network goods and services provided in Louisiana by one or more of Plaintiffs' providers.

a. Defendants' combination or conspiracy had the following effects:

Case 1:24-cv-07915 Document #: 86-4 Filed: 09/20/24 Page 223 of 250 PageID #:2492

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Louisiana;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Louisiana;

3. Plaintiffs' providers were deprived of free and open competition; and

4. Plaintiffs' providers were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct dramatically affected Louisiana commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs' providers have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **La. R.S. 51:121, et seq.**

e. Accordingly, Plaintiffs' providers seek all forms of relief available under **La. R.S. 51:121, et seq.**

798. ***Maine***: Defendants have entered into an unlawful agreement in restraint of trade in violation of **Me. Rev. Stat. Ann. tit. 10 § 1101, et seq.**, with respect to pricing of out-of-network goods and services provided in Maine by one or more of Plaintiffs' providers.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Maine;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Maine;

3. Plaintiffs' providers were deprived of free and open competition; and

4. Plaintiffs' providers were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct dramatically affected Maine commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs' providers have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **Me. Rev. Stat. Ann. tit. 10 § 1101, et seq.**

e. Accordingly, Plaintiffs' providers seek all forms of relief available under **Me. Rev. Stat. Ann. tit. 10 § 1101, et seq**.

799. ***<u>Massachusetts</u>***: Defendants have entered into an unlawful agreement in restraint of trade in violation of **M.G.L. c. 93, § 1, et seq.**, with respect to pricing of out-of-network goods and services provided in Massachusetts by one or more of Plaintiffs' providers.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Massachusetts;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Massachusetts;

3. Plaintiffs' providers were deprived of free and open competition; and

4. Plaintiffs' providers were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct dramatically affected Massachusetts commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs' providers have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **M.G.L. c. 93, § 1, et seq.**

800. Accordingly, Plaintiffs' providers seek all forms of relief available under **M.G.L. c. 93, § 1, et seq.**,

801. ***Michigan***: Defendants have entered into an unlawful agreement in restraint of trade in violation of **Mich. Comp. Laws Ann. § 445.772, et seq**., with respect to pricing of out-of-network goods and services provided in Michigan by one or more of Plaintiffs' providers.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Michigan;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Michigan;

3. Plaintiffs' providers were deprived of free and open competition; and

4. Plaintiffs' providers were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct dramatically affected Michigan commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs' providers have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **Mich. Comp. Laws Ann. § 445.772, et seq.**

e. Accordingly, Plaintiffs' providers seek all forms of relief available under **Mich. Comp. Laws Ann. § 445.772, et seq.**

802. ***<u>Mississippi</u>***: Defendants have entered into an unlawful agreement in restraint of trade in violation of **Miss. Code Ann. § 75-21-3, et seq.**, with respect to pricing of out-of-network goods and services provided in Mississippi by one or more of Plaintiffs' providers.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Mississippi;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Mississippi;

3. Plaintiffs' providers were deprived of free and open competition; and

4. Plaintiffs' providers were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct dramatically affected Mississippi commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs' providers have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **Miss. Code Ann. § 75-21-3, et seq.**

e. Accordingly, Plaintiffs' providers seek all forms of relief available under **Miss. Code Ann. § 75-21-3, et seq.**

Case 1:26-cv-06915 Document #: 86-11 Filed: 10/20/26 Page 227 of 250 PageID #:20496

803. ***Missouri***: Defendants have entered into an unlawful agreement in restraint of trade in violation of **Mo. Rev. Stat. § 416.011, et seq.**, with respect to pricing of out-of-network goods and services provided in Missouri by one or more of Plaintiffs' providers.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Missouri;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Missouri;

3. Plaintiffs' providers were deprived of free and open competition; and

4. Plaintiffs' providers were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct dramatically affected Missouri commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs' providers have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **Mo. Rev. Stat. § 416.011, et seq.**

e. Accordingly, Plaintiffs' providers seek all forms of relief available under **Mo. Rev. Stat. § 416.011, et seq.**

804. ***Nevada***: Defendants have entered into an unlawful agreement in restraint of trade in violation of **Nev. Rev. Stat. Ann. § 598A.060, et seq**., with respect to pricing of out-of-network goods and services provided in Nevada by one or more of Plaintiffs' providers.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Nevada;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Nevada;

3. Plaintiffs' providers were deprived of free and open competition; and

4. Plaintiffs' providers were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct dramatically affected Nevada commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs' providers have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **Nev. Rev. Stat. Ann. § 598A.060, et seq.**

e. Accordingly, Plaintiffs' providers seek all forms of relief available under **Nev. Rev. Stat. Ann. § 598A.060, et seq.**

805. ***New Hampshire***: Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.H. Rev. Stat. Ann. § 356.2, et seq**., with respect to pricing of out of-network goods and services provided in New Hampshire by one or more of Plaintiffs' providers.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout New Hampshire;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout New Hampshire;

3. Plaintiffs' providers were deprived of free and open competition; and

4. Plaintiffs' providers were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct dramatically affected New Hampshire commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs' providers have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **N.H. Rev. Stat. Ann. § 356.2, et seq.**

e. Accordingly, Plaintiffs' providers seek all forms of relief available under **N.H. Rev. Stat. Ann. § 356.2, et seq.**

806. ***New Jersey***: Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.J.S.A. 56:9-1, et seq**., with respect to pricing of out-of-network goods and services provided in New Jersey by one or more of Plaintiffs' providers.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout New Jersey;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout New Jersey;

3. Plaintiffs' providers were deprived of free and open competition; and

4. Plaintiffs' providers were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

Case 1:24-cv-07951 Document #: 86-1 Filed: 10/28/24 Page 230 of 250 PageID #:20499

b. Defendants' illegal conduct dramatically affected New Jersey commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs' providers have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **N.J.S.A. 56:9-1, et seq**.

e. Accordingly, Plaintiffs' providers seek all forms of relief available under **N.J.S.A. 56:9-1, et seq**.

807. ***New Mexico***: Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.M. Stat. Ann. § 57-1-1, et seq**., with respect to pricing of out-of-network goods and services provided in New Mexico by one or more of Plaintiffs' providers.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout New Mexico;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout New Mexico;

3. Plaintiffs' providers were deprived of free and open competition; and

4. Plaintiffs' providers were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct dramatically affected New Mexico commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs' providers have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **N.M. Stat. Ann. § 57-1-1, et seq.**

e. Accordingly, Plaintiffs' providers seek all forms of relief available under **N.M. Stat. Ann. § 57-1-1, et seq.**

808. ***New York***: Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.Y. Gen. Bus. L. § 340, et seq**., with respect to pricing of out-of-network goods and services provided in New York by one or more of Plaintiffs' providers.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout New York;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout New York;

3. Plaintiffs' providers were deprived of free and open competition; and

4. Plaintiffs' providers were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct dramatically affected New York commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs' providers have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **N.Y. Gen. Bus. L. § 340, et seq.**, including a per se violation.

e. Accordingly, Plaintiffs' providers seek all forms of relief available under **N.Y. Gen. Bus. L. § 340, et seq**.

809. ***Ohio***: Defendants have entered into an unlawful agreement in restraint of trade in violation of **Oh. Rev. Code § 1331, et seq**., with respect to pricing of out-of-network goods and services provided in Ohio by one or more of Plaintiffs' providers.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Ohio;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Ohio;

3. Plaintiffs' providers were deprived of free and open competition; and

4. Plaintiffs' providers were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct dramatically affected Ohio commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs' providers have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **Oh. Rev. Code § 1331, et seq**., including a per se violation.

e. Accordingly, Plaintiffs' providers seek all forms of relief available under **Oh. Rev. Code § 1331, et seq**.

810. ***Oklahoma***: Defendants have entered into an unlawful agreement in restraint of trade in violation of **79 O.S. § 79-201, et seq**., with respect to pricing of out-of-network goods and services provided in Oklahoma by one or more of Plaintiffs' providers.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Oklahoma;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Oklahoma;

3. Plaintiffs' providers were deprived of free and open competition; and

4. Plaintiffs' providers were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct dramatically affected Oklahoma commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs' providers have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **79 O.S. § 79-201, et seq**., including a per se violation.

811. Accordingly, Plaintiffs' providers seek all forms of relief available under **79 O.S. § 79-201, et seq**.

812. ***South Carolina***: Defendants have entered into an unlawful agreement in restraint of trade in violation of **S.C. Code Ann. § 39-3-10, et seq**., with respect to pricing of out-of-network goods and services provided in South Carolina by one or more of Plaintiffs' providers.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout South Carolina;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout South Carolina;

3. Plaintiffs' providers were deprived of free and open competition; and

4. Plaintiffs' providers were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct dramatically affected South Carolina commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs' providers have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **S.C. Code Ann. § 39-3-10, et seq**., including a per se violation.

813. Accordingly, Plaintiffs' providers seek all forms of relief available under **S.C. Code Ann. § 39-3-10, et seq**.

814. ***Tennessee***: Defendants have entered into an unlawful agreement in restraint of trade in violation of **Tenn. Code Ann. § 47-25-101, et seq**., with respect to pricing of out-of-network goods and services provided in Tennessee by one or more of Plaintiffs' providers.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Tennessee;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Tennessee;

3. Plaintiffs' providers were deprived of free and open competition; and

4. Plaintiffs' providers were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct dramatically affected Tennessee commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs' providers have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **Tenn. Code Ann. § 47-25-101, et seq.**

e. Accordingly, Plaintiffs' providers seek all forms of relief available under **Tenn. Code Ann. § 47- 25-101, et seq.**

815. ***<u>Texas</u>***: Defendants have entered into an unlawful agreement in restraint of trade in violation of **Tex. Bus. & Com. Code § 15.01, et seq**., with respect to pricing of out-of-network goods and services provided in Texas by one or more of Plaintiffs' providers.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Texas;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Texas;

3. Plaintiffs' providers were deprived of free and open competition; and

4. Plaintiffs' providers were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct dramatically affected Texas commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs' providers have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **Tex. Bus. & Com. Code § 15.01, et seq**.

e. Accordingly, Plaintiffs' providers seek all forms of relief available under **Tex. Bus. & Com. Code § 15.01, et seq**.

816. ***Virginia***: Defendants have entered into an unlawful agreement in restraint of trade in violation of **Va. Code Ann. § 59.1-9.1, et seq**., with respect to pricing of out-of-network goods and services provided in Virginia by one or more of Plaintiffs' providers.

a. Defendants' combination or conspiracy had the following effects:

1. Price competition for out-of-network goods and services was restrained, suppressed, and eliminated throughout Virginia;

2. Out-of-network goods and services prices were suppressed, fixed, maintained and stabilized at artificially low levels throughout Virginia;

3. Plaintiffs' providers were deprived of free and open competition; and

4. Plaintiffs' providers were paid prices for out-of-network goods and services that were artificially suppressed below competitive levels.

b. Defendants' illegal conduct dramatically affected Virginia commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs' providers have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of **Va. Code Ann. § 59.1-9.1, et seq**.

817. Accordingly, Plaintiffs' providers seek all forms of relief available under **Va. Code Ann. § 59.1-9.1, et seq**.

## VII. Seventh Claim for Relief: Violation of State Consumer Protection Laws

818. Plaintiffs reincorporate and reallege by reference the preceding paragraphs as though fully set forth herein.

819. To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

820. Defendants have engaged in unfair or deceptive acts or practices from at least as early as January 1, 2015 through the present with respect to the prices paid for out-of-network goods and services in violation of the state deceptive trade practices and consumer protection laws set forth below.

821. Defendants worked together to fix, suppress, and maintain prices of out-of-network goods and services at sub-competitive levels, and to unlawfully exchange pricing information.

822. To the extent such proof may be required under the law of any individual state:

a. Defendants' conduct causes widespread and substantial harm to consumers of out-of-network goods and services, including because Defendants' widespread scheme to suppress and pay sub-market and/or sub-UCR rates for out-of-network goods and services: (1) exposes consumers to potential liability for the difference between the suppressed rates Defendants pay and the UCR rates and (2) results in eventual denial of services by and/or closure of certain providers (particularly in rural areas), thereby suppressing consumer choice of out-of-network goods and services; and

b. Defendants' scheme is immoral, unethical, oppressive, and unscrupulous and the crippling harm it inflicts on Plaintiffs' providers is not outweighed by any supposed utility to the healthcare system. The crippling, sub-market rates Defendants force on Plaintiffs' providers put the availability of a robust choice of healthcare providers at risk for millions of patients as some

of Plaintiffs' providers will no longer be able to provide services on an out-of-network basis given the financial constraints—and some (especially in already underserved rural areas) may go out of business altogether.

823. Defendants also used deceptive and high-pressure communications and tactics to carry out their scheme, on which Plaintiffs' providers and others reasonably relied and/or had no practical choice but to rely.

824. Were it not for Defendants' unfair or deceptive acts or practices, Defendants would have made higher payments to each of Plaintiffs' providers for their respective out-of-network goods and services.

825. Each of Plaintiffs' providers has been injured by Defendants' unfair or deceptive acts or practices in that Plaintiffs' providers' business or profession.

826. Each of Plaintiffs' provider's injuries flow from Defendants' unfair or deceptive acts or practices.

827. Each of Plaintiffs' providers has suffered an ascertainable, pecuniary loss or money loss as a result of Defendants' unfair or deceptive acts or practices.

828. Each of Plaintiffs' providers has suffered compensable damages as a result of Defendants' unlawful agreements and conduct. The exact calculation and amount of those damages will be disclosed in Plaintiffs' providers' expert reports and expert testimony at trial.

829. The conduct of each Defendant, as described above, individually and/or collectively was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of plan members, and

Case 1:24-cv-07958 Document #: 86-1 Filed: 09/28/25 Page 239 of 250 PageID #:2508

warrants an award of punitive damages in an amount sufficient to punish each Defendant and deter others from like conduct.

830. ***Alabama***: Defendants have engaged in unfair or deceptive acts or practices in violation of **Ala. Code § 8-19-1, et seq**. with respect to pricing of out-of-network goods and services provided in Alabama by Plaintiffs' providers and/or to Alabama residents.

a. Defendants' illegal conduct had an enormous effect on Alabama commerce.

b. As a direct and proximate cause of Defendants' unlawful conduct, one or more of Plaintiffs' provider has been injured in their business and property and are threatened with further injury.

c. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of **Ala. Code § 8-19-1, et seq**.

d. Accordingly, one or more of Plaintiffs is entitled to all relief available under **Ala. Code § 8-19-1, et seq**.

831. ***Alaska***: Defendants have engaged in unfair or deceptive acts or practices in violation of **Alaska Stat. § 45.50.471, et seq.** with respect to pricing of out-of-network goods and services provided in Alaska by Plaintiffs' providers and/or to Alaska residents.

a. Defendants' illegal conduct had an enormous effect on Alaska commerce.

b. As a direct and proximate cause of Defendants' unlawful conduct, one or more of Plaintiffs' providers has been injured in their business and property and are threatened with further injury.

c. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of **Alaska Stat. § 45.50.471, et seq**.

d. Accordingly, one or more of Plaintiffs is entitled to all relief available under **Alaska Stat. § 45.50.471, et seq**.

832. ***Arizona***: Defendants have engaged in unfair or deceptive acts or practices in violation of **Ariz. Rev. Stat. § 44.1521, et seq**., with respect to pricing of out-of-network goods and services provided in Arizona by Plaintiffs' providers' and/or to Arizona residents.

a. Defendants' illegal conduct had an enormous effect on Arizona commerce.

b. As a direct and proximate cause of Defendants' unlawful conduct, one or more of Plaintiffs' providers has been injured in their business and property and are threatened with further injury.

c. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of **Ariz. Rev. Stat. § 44.1521, et seq**.

d. Accordingly, one or more of Plaintiffs' providers is entitled to all relief available under **Ariz. Rev. Stat. § 44.1521, et seq**.

833. ***Arkansas***: Defendants have engaged in unfair or deceptive acts or practices in violation of **A.C.A. § 4-88-101, et seq.,** with respect to pricing of out-of-network goods and services provided in Arkansas by Plaintiffs' providers' and/or to Arkansas residents.

a. Defendants' illegal conduct had an enormous effect on Arkansas commerce.

b. As a direct and proximate cause of Defendants' unlawful conduct, one or more of Plaintiffs' providers has been injured in their business and property and are threatened with further injury.

c. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of **A.C.A. § 4-88-101, et seq.**

834. Accordingly, one or more of Plaintiffs is entitled to all relief available under **A.C.A. § 4-88-101, et seq.**

835. ***California***: Defendants have engaged in unfair or deceptive acts or practices in violation of **Cal. Bus. & Prof. Code § 17200, et seq**. with respect to pricing of out-of-network goods and services provided in California by the Plaintiffs' Providers' and/or to California residents.

a. Defendants' illegal conduct had an enormous effect on California commerce.

b. As a direct and proximate cause of Defendants' unlawful conduct, one or more of Plaintiffs' providers has been injured in their business and property and are threatened with further injury.

c. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of **Cal. Bus. & Prof. Code § 17200, et seq**.

d. Accordingly, one or more of Plaintiffs is entitled to all relief available under **Cal. Bus. & Prof. Code § 17200, et seq**.

836. ***Connecticut***: Defendants have engaged in unfair or deceptive acts or practices in violation of **Conn. Gen. Stat. §§ 41-110a, et seq**. with respect to pricing of out-of-network goods and services provided in Connecticut by Plaintiffs' providers and/or to Connecticut residents.

a. Defendants' illegal conduct had an enormous effect on Connecticut commerce.

b. As a direct and proximate cause of Defendants' unlawful conduct, one or more of Plaintiffs' providers has been injured in their business and property and are threatened with further injury.

c. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of **Conn. Gen. Stat. §§ 41-110a, et seq**.

d. Accordingly, one or more of Plaintiffs is entitled to all relief available under **Conn. Gen. Stat. §§ 41-110a, et seq**.

837. ***Illinois***: Defendants have engaged in unfair or deceptive acts or practices in violation of **815 ILCS 505/1 et seq.** with respect to pricing of out-of-network goods and services provided in Illinois by Plaintiffs' providers and/or to Illinois residents.

a. Defendants' illegal conduct had an enormous effect on Illinois commerce.

b. As a direct and proximate cause of Defendants' unlawful conduct, one or more of Plaintiffs' providers has been injured in their business and property and are threatened with further injury.

838. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of **815 ILCS 505/1 et seq.**

839. Accordingly, one or more of Plaintiffs is entitled to all relief available under **815 ILCS 505/1 et seq.**

840. ***Indiana***: Defendants have engaged in unfair or deceptive acts or practices in violation of **Ind. Code § 24-5-0.5-1, et seq.** with respect to pricing of out-of-network goods and services provided in Indiana by Plaintiffs' providers and/or to Indiana residents.

a. Defendants' illegal conduct had an enormous effect on Indiana commerce.

b. As a direct and proximate cause of Defendants' unlawful conduct, one or more of Plaintiffs' providers has been injured in their business and property and are threatened with further injury.

841. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of **Ind. Code § 24-5-0.5-1, et seq.**

842. Accordingly, one or more of Plaintiffs is entitled to all relief available under **Ind. Code § 24-5-0.5-1, et seq.**

843. ***Louisiana***: Defendants have engaged in unfair or deceptive acts or practices in violation of **La. R.S. § 51:1401, et seq.** with respect to pricing of out-of-network goods and services provided in Louisiana by Plaintiffs' providers and/or to Louisiana residents.

a. Defendants' illegal conduct had an enormous effect on Louisiana commerce.

b. As a direct and proximate cause of Defendants' unlawful conduct, one or more of Plaintiffs' providers has been injured in their business and property and are threatened with further injury.

844. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of **La. R.S. § 51:1401, et seq.**

845. Accordingly, one or more of Plaintiffs' providers is entitled to all relief available under **La. R.S. § 51:1401, et seq.**

846. ***Massachusetts***: Defendants have engaged in unfair or deceptive acts or practices in violation of **Mass. Gen. Laws ch. 93A, § 1, et seq.** with respect to pricing of out-of-network goods and services provided in Massachusetts by Plaintiffs' providers and/or to Massachusetts residents.

a. Defendants' illegal conduct had an enormous effect on Massachusetts commerce.

b. As a direct and proximate cause of Defendants' unlawful conduct, one or more of Plaintiffs' providers has been injured in their business and property and are threatened with further injury.

847. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of **Mass. Gen. Laws ch. 93A, § 1, et seq.**

848. Accordingly, one or more of Plaintiffs is entitled to all relief available under **Mass. Gen. Laws ch. 93A, § 1, et seq.**

849. ***Michigan***: Defendants have engaged in unfair or deceptive acts or practices in violation of **MCL § 445.901, et seq.** with respect to pricing of out-of-network goods and services provided in Michigan by Plaintiffs' providers and/or to Michigan residents.

a. Defendants' illegal conduct had an enormous effect on Michigan commerce.

b. As a direct and proximate cause of Defendants' unlawful conduct, one or more of Plaintiffs' providers has been injured in their business and property and are threatened with further injury.

850. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of **MCL § 445.901, et seq.**

851. Accordingly, one or more of Plaintiffs is entitled to all relief available under **MCL § 445.901, et seq.**

852. ***Missouri***: Defendants have engaged in unfair or deceptive acts or practices in violation of **Mo. Ann. Stat. § 407.010, et seq.** with respect to pricing of out-of-network goods and services provided in Missouri by Plaintiffs' providers and/or to Missouri residents.

a. Defendants' illegal conduct had an enormous effect on Missouri commerce.

b. As a direct and proximate cause of Defendants' unlawful conduct, one or more of Plaintiffs' providers has been injured in their business and property and are threatened with further injury.

c. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of **Mo. Ann. Stat. § 407.010, et seq.**

d. Accordingly, one or more of Plaintiffs is entitled to all relief available under **Mo. Ann. Stat. § 407.010, et seq.**

853. ***New Hampshire***: Defendants have engaged in unfair or deceptive acts or practices in violation of **RSA 358-A:2, et seq.** with respect to pricing of out-of-network goods and services provided in New Hampshire by Plaintiffs' providers and/or to New Hampshire.

a. Defendants' illegal conduct had an enormous effect on New Hampshire commerce.

b. As a direct and proximate cause of Defendants' unlawful conduct, one or more of Plaintiffs' providers has been injured in their business and property and are threatened with further injury.

c. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of **RSA 358-A:2, et seq.**

d. Accordingly, one or more of Plaintiffs is entitled to all relief available under **RSA 358-A:2, et seq.**

854. ***New Jersey***: Defendants have engaged in unfair or deceptive acts or practices in violation of **N.J. Stat. Ann. § 56:8-1, et seq.** with respect to pricing of out-of-network goods and services provided in New Jersey by Plaintiffs' providers and/or to New Jersey.

a. Defendants' illegal conduct had an enormous effect on New Jersey commerce.

b. As a direct and proximate cause of Defendants' unlawful conduct, one or more of Plaintiffs' providers has been injured in their business and property and are threatened with further injury.

c. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of **N.J. Stat. Ann. § 56:8-1, et seq.**

855. Accordingly, one or more of Plaintiffs is entitled to all relief available under **N.J. Stat. Ann. § 56:8-1, et seq.**

856. ***Nevada***: Defendants have engaged in unfair or deceptive acts or practices in violation of **NRS 41.600, et seq./ NRS 598.0915, et seq.** with respect to pricing of out-of-network goods and services provided in Nevada by Plaintiffs' providers and/or to Nevada residents.

a. Defendants' illegal conduct had an enormous effect on Nevada commerce.

b. As a direct and proximate cause of Defendants' unlawful conduct, one or more of Plaintiffs' providers has been injured in their business and property and are threatened with further injury.

c. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of **NRS 41.600, et seq./ NRS 598.0915, et seq.**

d. Accordingly, one or more of Plaintiffs is entitled to all relief available under **NRS 41.600, et seq./ NRS 598.0915, et seq.**

857. ***New Mexico***: Defendants have engaged in unfair or deceptive acts or practices in violation of **N.M. Stat. Ann. § 57-12-3, et seq**. with respect to pricing of out-of-network goods and services provided in New Mexico by Plaintiffs' providers and/or to New Mexico residents.

a. Defendants' illegal conduct had an enormous effect on New Mexico commerce.

b. As a direct and proximate cause of Defendants' unlawful conduct, one or more of Plaintiffs' providers has been injured in their business and property and are threatened with further injury.

c. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of **N.M. Stat. Ann. § 57-12-3, et seq**.

d. Accordingly, one or more of Plaintiffs is entitled to all relief available under **N.M. Stat. Ann. § 57-12-3, et seq**.

858. ***New York***: Defendants have engaged in unfair or deceptive acts or practices in violation of **N.Y. Gen. Bus. Law. § 349, et seq.** with respect to pricing of out-of-network goods and services provided in New York by Plaintiffs' providers and/or to New York residents.

a. Defendants' illegal conduct had an enormous effect on New York commerce.

b. As a direct and proximate cause of Defendants' unlawful conduct, one or more of Plaintiffs' providers has been injured in their business and property and are threatened with further injury.

c. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of **N.Y. Gen. Bus. Law § 349.**

d. Accordingly, one or more of Plaintiffs is entitled to all relief available under **N.Y. Gen. Bus. Law § 349.**

859. ***Oklahoma***: Defendants have engaged in unfair or deceptive acts or practices in violation of **Okla. Stat. tit. 15, § 751, et seq.** with respect to pricing of out-of-network goods and services provided in Oklahoma by Plaintiffs' providers and/or to Oklahoma residents.

a. Defendants' illegal conduct had an enormous effect on Oklahoma commerce.

b. As a direct and proximate cause of Defendants' unlawful conduct, one or more of Plaintiffs' providers has been injured in their business and property and are threatened with further injury.

c. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of **Okla. Stat. tit. 15, § 751, et seq.**

d. Accordingly, one or more of Plaintiffs is entitled to all relief available under **Okla. Stat. tit. 15, § 751, et seq.**

860. ***South Carolina***: Defendants have engaged in unfair or deceptive acts or practices in violation of **S.C. Code Ann. § 39-5-10, et seq**. with respect to pricing of out-of-network goods and services provided in South Carolina by Plaintiffs' providers and/or to South Carolina residents.

a. Defendants' illegal conduct had an enormous effect on South Carolina commerce.

b. As a direct and proximate cause of Defendants' unlawful conduct, one or more of Plaintiffs' providers has been injured in their business and property and are threatened with further injury.

c. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of **S.C. Code Ann. § 39-5-10, et seq**.

d. Accordingly, one or more of Plaintiffs is entitled to all relief available under **S.C. Code Ann. § 39-5-10, et seq**.

861. ***Tennessee***: Defendants have engaged in unfair or deceptive acts or practices in violation of **Tenn. Code Ann. § 47-18-191, et seq**. with respect to pricing of out-of-network goods and services provided in Tennessee by Plaintiffs' providers and/or to Tennessee residents.

a. Defendants' illegal conduct had an enormous effect on Tennessee commerce.

b. As a direct and proximate cause of Defendants' unlawful conduct, one or more of Plaintiffs' providers has been injured in their business and property and are threatened with further injury.

c. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of **Tenn. Code Ann. § 47-18-191, et seq**.

d. Accordingly, one or more of Plaintiffs is entitled to all relief available under **Tenn. Code Ann. § 47-18-191, et seq**.

## VI. PRAYER FOR RELIEF

862. Plaintiffs' providers demand that judgment be entered against Defendants and Co-Conspirators, jointly and severally, for every dollar their price-fixing cartel took from the doctors and hospitals who kept their emergency rooms staffed and their patients alive—including the treble damages, injunctive relief, and declaratory judgment outlined below. Specifically, Plaintiffs' providers seek an order and judgment from the Court that:

a. Defendants and Co-Conspirators pay damages to Plaintiffs for underpayments made to Plaintiffs' providers as a result of the MultiPlan Cartel in an amount to be determined at trial and that may be trebled by operation of law;

b. Defendants pay punitive damages as required by state law and common law;

c. Defendants pay pre-judgment and post-judgment interest on such monetary relief;

d. Defendants disgorge all proceeds that any of them unlawfully or inequitably received;

e. Defendants pay Plaintiffs' providers' costs of bringing this lawsuit, including Plaintiffs' reasonable attorneys' fees; Defendants are permanently enjoined from continuing to operate and participate in the MultiPlan Cartel;

f. A declaratory judgment that Defendants have violated Section 1 of the Sherman Act and have violated state unfair competition and antitrust laws; and

g. All other relief to which Plaintiffs may be entitled at law or equity.

## VII. JURY DEMAND

863. Plaintiffs respectfully request a jury trial on all causes of action so triable.

Dated: September 28, 2026

Respectfully submitted,

**FOSTER YARBOROUGH KILLINGSWORTH PLLC**

*/s/ Michael Killingsworth*
Michael Killingsworth
Texas Bar No. 24110089
Benjamin Foster
Texas Bar No. 24080898
Patrick Yarborough (Pro Hac Forthcoming)
Texas Bar No. 24084129
Michael@fyktriallaw.com
Ben@fyktriallaw.com
Patrick@fyktriallaw.com
440 Louisiana Street, Suite 1800
Houston, Texas 77002
Telephone: (713) 331-5254
Facsimile: (713) 513-5202

*Counsel For Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2026, I served a true and correct copy of this filing on all counsel of record via e-filing.

*/s/ Benjamin Foster*
Benjamin Foster