**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: MULTIPLAN HEALTH INSURANCE PROVIDER LITIGATION | ) ) ) | Case No. 1:24-cv-06795<br>MDL 3121 |
| *This Document Relates to All Actions* | ) ) | Hon. Matthew F. Kennelly |

# THE PARTIES' SUBMISSION REGARDING PROPOSED SELECTED CLAIM DOCUMENTS PRODUCTION PROTOCOL

The Parties jointly submit their respective positions regarding the Parties' competing claims sampling protocols. Plaintiffs' Proposed Protocol is attached as Exhibit A ("Plfs.' Prot."), and Defendants' Proposed Protocol is attached as Exhibit B ("Defs.' Prot."). A redline showing changes in Defendants' Proposed Protocol against Plaintiffs' Proposed Protocol is attached as Exhibit C.

## I. PLAINTIFFS' POSITION:

During negotiation over RFPs, the Parties agreed to reduce the burden of responding to certain requests by "sampling" some claims-related documents from underlying claims records. For example, rather than producing an Explanation of Benefits ("EOB") form for every claim, a party might produce EOBs for only a sample of claims. The Parties then attempted to negotiate a protocol to govern such a sampling process but have reached an impasse over (1) which documents the Parties must produce, (2) how the Parties will collect them, and (3) how the Parties will select the sample.

The Court should enter Plaintiffs' protocol. It is limited to documents that show how each sampled claim was billed and paid; it is even-handed and simple to administer; and it will let the Parties complete sampling without delaying the case schedule. Defendants' protocol, by contrast, would turn a limited, low-burden exercise into a vehicle for broad, invasive discovery—including into patient medical records—that bears no relation to the conduct at issue and would invite cherry-picking and needless disputes. In short, Defendants want to comb through patient medical records, play doctor, and second-guess, with the benefit of litigation hindsight, both the care Plaintiffs provided and what that care was worth. Defendants did not consider any of this information when deciding how much to pay Plaintiffs, and it has no relevance to whether Defendants fixed and suppressed compensation to Plaintiffs using MultiPlan's repricing tools.

### A. Categories Subject to Protocol: Defendants' additional categories are irrelevant, invasive, and duplicative.

Under Plaintiffs' protocol, each named Plaintiff would produce, for each sampled claim—

- the invoices it submitted to the payor;
- EOBs, explanations of payment (EOPs), and remittances it received from the payor explaining how the payor paid the claim; and
- correspondence reflecting the provider's attempts, if any, to bill or collect payment from patients. Plfs.' Prot. § 4(A)(1)–(3).

Plaintiffs' protocol would require each Payor Defendant[1] to produce, for each sampled claim—

- EOBs, EOPs, and remittances; and
- the insurance plan documents governing the claim. Plfs.' Prot. § 4(C)(1)–(3).

Finally, under Plaintiffs' protocol, MultiPlan would have to produce only the signed agreements (if any) governing any claim in the Parties' samples. Plfs.' Prot. § 4(B).

Defendants' protocol goes far beyond these categories. In addition to every category above, Defendants seek from Plaintiffs all "communications regarding the claim," whatever their subject, and all of the patient's underlying "medical records for the claim." Defs.' Prot. § 4(A)(2), (7). Defendants' protocol also includes a broad catch-all for documents "reflecting attempts to bill and/or collect any amounts for which the patient or any payor is responsible, including but not limited to"

> any balance bills for any amount owed by the member (including co-insurance and deductibles), any record of complaints by members to providers regarding billing or collections, and communications with any insurer / MCO, the member, the plan sponsor, third-party collection or billing companies, or MultiPlan, or documents reflecting decisions not to bill or collect any amounts for which the patient or any payor is responsible.

Defs.' Prot. § 4(A)(2), (6).

Defendants' additional categories are disproportionate and irrelevant—a reality underscored by the fact that Defendants never sought some of them in their RFPs. Patient medical records are not mentioned in any of Defendants' numerous RFPs, and the topic never came up during the extended meet-and-confer process on those RFPs.[2] Had Defendants served such an RFP, every Plaintiff would have objected, and the issue would have come squarely before the

---

[1] Both protocols refer to Payor Defendants as "MCO Defendants."
[2] Defendants served a request for medical records "for every claim" submitted to an insurance company one business day before this briefing was submitted.

Court. When Defendants first raised patient medical records in the sampling negotiations, Plaintiffs asked Defendants to explain their relevance. Defendants responded that the records might show provider billing fraud, including so-called "upcoding." Defendants thus seek to use a sampling protocol to stage hundreds of mini-trials over alleged billing fraud. But this Court has already held that alleged provider billing fraud is not a defense to Plaintiffs' antitrust claims. *See* CMO No. 33 (ECF No. 752) (holding unclean hands based on provider billing fraud is not a viable defense to federal antitrust claims).

Defendants now suggest that discovery into medical records is needed to test "why [a Payor] Defendant allowed a certain amount, and why MultiPlan suggested a certain reimbursement on that claim." *See infra* Defs.' Position at 14. This makes no sense: The "allowed amount" is the maximum that a health insurance company is willing to pay for a particular kind of service; it is not determined in the context of any individual patient's care. Any documents that reflect "why" a payor paid whatever it did on a particular claim are already in Defendants' possession. Medical records that the payor did not have when it set a reimbursement rate cannot possibly explain why it set that rate.[3] Discovery into these records now—so Defendants can relitigate these claims after the fact and insinuate fraud—would be intrusive, wasteful, prejudicial, and irrelevant.

Even if patient medical records had some tangential relevance—and they do not—the Court should not compel their production. Plaintiffs include mental health practices, addiction rehabilitation clinics, and trauma providers whose records contain intimate details that patients expect to remain strictly confidential. That intrusion is disproportionate to the needs of the case.

---

[3] Providers generally do not submit patient medical records to payors; they submit claims bearing the relevant diagnosis and treatment codes, and payors pay claims based on those codes. To the extent a provider submitted medical records to a payor in support of an appeal, those records are already in that payor's claim file.

The remaining categories—claims-related communications and billing documents—are duplicative and disproportionate given the expansive discovery record produced here. Defendants served broad RFPs covering nearly every aspect of Plaintiffs' billing practices and their interactions with Defendants over payment for OON services.[4] In response, Plaintiffs produced their billing policies, patient responsibility forms and disclosures, and a substantial volume of claims-related communications (including claim negotiations and appeal records). Plaintiffs also produced extensive structured claims data showing, for each claim, the amounts Plaintiffs billed, the billing codes they applied, and the amounts they received from insurers and patients.[5] And they agreed to produce correspondence reflecting any attempts to bill or collect from patients.[6] Thus, the additional categories in Defendants' cumbersome protocol are duplicative and unnecessary: Defendants already have or will receive "patient responsibility forms," "proof-of-payment records," "attempts to bill/collect," "letters or communications regarding payments," and "appeal records." *See* Defs.' Position at 13–14. Producing an additional sample of these same materials would be overly burdensome and disproportionate.[7]

---

[4] *See, e.g.*, RFP Nos. 9 ("standard Documents, assignments, paperwork, policies, or disclosures" provided to patients); 11 ("all office manuals, policies, and procedures relating to . . . billing; collection of fees[; and] balance billing"); 34 ("All Documents and Communications showing attempted negotiations . . . between You and any Health Plan Entity . . . regarding Reimbursement Rates"); 36 ("All Communications between You or any of Your agents, including billing agents, and Defendants regarding payment or reimbursement for OON Healthcare Goods and Services"); 42 ("All Documents reflecting any complaints, appeals, criticisms, objections, or grievances regarding the Reimbursement Rates or other contractual terms with any Health Plan Entity . . .").

[5] If specific Plaintiffs' claims data contain gaps, Defendants should raise the issue directly with the affected Parties.

[6] This correspondence is all Defendants need to test "whether [each named] Plaintiff[] engaged in balance billing patients" on claims repriced by MultiPlan, their stated purpose for this discovery. *See* Defs.' Position at 15. Defendants also demand "records of member complaints regarding billing or collections" and "documents reflecting decisions not to bill or collect," which are burdensome, vague, and disproportionate.

[7] The premise that Defendants need any of these documents from Plaintiffs is unconvincing. Defendants include the largest health insurance companies in the world. They have more than

The categories in Plaintiffs' protocol are tied to the actual claims and defenses in this litigation and are proportional to the needs of the case, given the discovery the Parties have already completed. The Court should adopt those categories and reject Defendants' additions.

**B. Collection Standard: Plaintiffs' "readily located and exported" standard should govern.**

During the meet-and-confer process, the Parties agreed that sampling should not require new custodial searches and should involve only low-burden "go-get" collections. Consistent with that agreement, Plaintiffs' protocol limits collection to documents that can "be readily located and exported" from a centralized claims system. Plfs.' Prot. § 4(A). Defendants' protocol contains no such limit and would require Plaintiffs to undertake laborious searches and collections. For example, Defendants demand that Plaintiffs manually take "screenshots" of any claims system containing information requested in their protocol whenever that information cannot be exported as a document. Defs.' Position at n.12. This obligation—which is far more burdensome than even custodial searches using search terms and TAR—would extend even to Plaintiffs' third-party billing vendors, who are not parties to this case. Plaintiffs' "readily located and exported" standard makes clear that no Party would be required to create screenshots or other new documents capturing information that does not already exist as an exportable record, and would keep sampling to what the Parties intended: a quick, low-burden collection. The Court should adopt it.

**C. Claims Selection: Claims sample should be randomly selected.**

Plaintiffs propose drawing the claims for the sample by randomly selecting claim numbers identified in the structured claims data each Party has produced, which can then be used to track down the underlying documentation for each claim in the sample. Plfs.' Prot. § 3. A random draw

---

adequate evidence in their possession to develop a record on the ability of providers to negotiate, the impact of MultiPlan on reimbursement rates, and "why MultiPlan's services exist." *See* Defs.' Position at 9.

serves the purpose Defendants themselves identify—developing evidence of how payors processed, adjudicated, and paid particular claims to "facilitate presentation of their case" (Defs.' Prot. § 3)—without allowing either side to cherry-pick the sample.

Defendants, by contrast, seek to hand-select the claims in the sample. Defs.' Prot. § 3. Defendants apparently want to cherry-pick a few claims (out of the millions at issue) to identify purported billing fraud. Such a hand-picked sample would be tailor-made to prejudice Plaintiffs and have virtually no probative value as to Plaintiffs' billing practices (which are, in any event, irrelevant). Random selection is also necessary to maintain a neutral process, given the information asymmetry between the Parties. Defendants maintain significant internal information about each Plaintiff and its claims history that has never been produced, and their proposal would let them use it to target the claims most likely to put purported billing irregularities in front of the Court. Plaintiffs have no comparable basis on which to select claims for Defendants to produce. Indeed, whether or not the Court accepts Plaintiffs' proposal, Plaintiffs' claim selection process will effectively be random. A protocol meant to reduce the burden on both sides should not become a device for one side to exploit an advantage the other does not have.

Defendants' suggestion that a random selection favors Plaintiffs is just plain wrong. Plaintiffs' proposal allows all Parties to sample a mix of in-network, out-of-network, and MultiPlan claims. Each side would specify in advance how many claims to draw from each opposing Party and how many of those must be drawn from the universe of claims MultiPlan repriced, from other out-of-network claims, and from in-network claims. The claims are randomly selected from within the categories each side selects. Plfs.' Prot. § 3. As such, Defendants can test the differences in how claims are handled when MultiPlan is involved, and when it is not. Nor is Plaintiffs' proposal likely to result in delay. Plaintiffs' protocol resolves every substantive question

about selection now: the total number of claims, the per-Party caps, and the number of MultiPlan-repriced, other out-of-network, and in-network claims each side will draw from each opposing Party. Plfs.' Prot. §§ 1–3. All that remains is the mechanical step of drawing claims at random from the claim numbers set forth in the structured data that has already been produced.

**D. Replacement Process: No replacement process is needed.**

Defendants' proposal would allow them to select additional claims from Plaintiffs if they are not satisfied with the structured data that exists for a particular claim. But the point of this protocol is to produce information that has not already been produced as part of Plaintiffs' structured data. Accordingly, whether structured data exists for a selected claim is irrelevant, and this unnecessary, one-sided process would introduce further delay.

* * *

In sum, Plaintiffs respectfully request that the Court reject Defendants' disproportionate claims sampling protocol and enter Plaintiffs' protocol. In the alternative, Plaintiffs request that the Court find no claims protocol is necessary.

**II. DEFENDANTS' POSITION**:

In this case, Plaintiffs claim that MultiPlan and the payor defendants ("MCO Defendants") agreed to form an alleged "cartel" to suppress reimbursements to providers for out-of-network ("OON") healthcare claims over more than a decade, and as a result, providers allegedly had no choice but to accept reimbursements that were lower than they would have been without the alleged cartel. Defendants need to test that theory, in part with key information typically contained in individual claim files, which provides critical context that billions of lines of data alone cannot. This claim file information—which includes things like the back-and-forth communications between Plaintiffs and MultiPlan or an MCO in the course of negotiating an OON reimbursement, as well as provider appeal records and patient responsibility forms—shows the processes and human negotiations that resulted in various reimbursements to providers, and the various approaches taken by payors to proposing OON reimbursements to different providers.

This evidence is critical for questioning Plaintiffs' witnesses and providing fundamental context to the Court and a jury. Among other things, Defendants need to be able to explore the bargaining tools at providers' disposal to avoid or accept payor reimbursement proposals involving MultiPlan services for OON claims; the various ways in which providers approach OON proposals from payors using MultiPlan services versus OON proposals generated by payors *not* using those services; and whether providers, in fact, fare differently in terms of their ultimate reimbursements under these two scenarios. Defendants also must test Plaintiffs' claims that their reimbursements have been lower but-for MultiPlan, that they have no choice but to accept any MultiPlan generated recommendation, and that they cannot balance bill patients. And this evidence will show why MultiPlan's services exist and are independently of value to each MCO Defendant who unilaterally decides to use MultiPlan's services as directed by their own clients (employers/plan sponsors), who in turn seek to reduce the enormous burden of providers' OON bills.

Two examples are illustrative. *First*, Plaintiffs have insisted throughout this case that they suffered an antitrust injury because they cannot recover the alleged value of their services by "balance billing" patients for the difference between whatever they receive in payor reimbursement and what they believe they are owed. Plaintiffs' structured data productions have significant gaps when it comes to showing the existence of this balance billing (*see* Sec. 3), but even the most fulsome data production cannot fully replicate the evidence that exists in individual claim files, such as what a provider represented to the patient regarding that patient's financial obligation before or after service, and the reasoning offered for that alleged obligation. *Second*, Plaintiffs have also insisted that they had no choice but to accept whatever an MCO or MultiPlan initially offered in terms of OON reimbursement on a claim. Documents regarding negotiations and appeals will illustrate what an MCO or MultiPlan conveyed with a reimbursement offer or how the Plaintiff responded, whether it was able to obtain a higher counter-offer as a result, or whether the Plaintiff successfully appealed any reimbursement proposal; and what an MCO Defendant told its plan member (the patient) about what benefits the plan would reimburse and how that compared to what a Plaintiff received.

Recognizing its relevance, both sides sought this type of claim-file information in their requests for documents. But given the massive volume of claims at issue, the parties initially agreed to discuss a protocol to determine a reasonable set of individual claims on which they can develop this key evidence. While Defendants' proposal targets these categories of information in a reasonable way, Plaintiffs—after over a year of pursuing highly burdensome discovery from Defendants—wish to avoid producing this critical (and not particularly burdensome) information at all. Defendants set forth their position on the three major areas of dispute below.

**1. Selection Methodology:** The parties already have data on the universe of potentially disputed claims, but they haven't exchanged the underlying documents that help explain what that data shows. Defendants propose each side selects up to 300 claims. This structure allows each side to obtain critical illustrative documents on the types of claims they believe are most central to their claims or defenses at class certification, summary judgment, and trial.

This approach permits Defendants to develop critical claim-file evidence *for both claims involving MultiPlan services and for claims not involving MultiPlan services*; for claims involving Plaintiffs and payors that are alleged conspirators and those that aren't; and for claims involving balance billing and those not. Plaintiffs complain that Defendants will be able to "cherry-pick" claims, and they use this complaint to improperly try to force Defendants to preemptively take a position on whether any selected claim is representative of any other claim. But Defendants' proposal gives both sides equal opportunity to choose claims they believe will bear on their claims and defenses, and the billions of claims records in the set of structured data will make it clear how prevalent the details in any selected claim might be within the broader context of the case. To force Defendants to attest otherwise before claims have even been selected is improper and unworkable. Separately, any information asymmetry works both ways: Defendants don't have a line of sight into Plaintiffs' claim documents, and vice versa, which is why the parties are seeking claims documents in the first place. Targeted selection will also allow both sides to choose examples of claims important for briefing class certification by developing evidence that is not available in claims data, including potential differences among Plaintiffs on who and when they balance bill, when and how Plaintiffs negotiate claims or choose to accept an offer, and the different benefit elections that MCO Defendants' plan sponsors choose to cover for OON claims.

Plaintiffs' undefined proposal for "random selection" not only fails to serve these purposes,

it is not actually random. Plaintiffs' proposal would, in fact, allow them to exclusively select 300 claims involving MultiPlan services (*see* Pls'. Prot. ¶ 3), and they have refused to permit any limits on how many claims involving MultiPlan may be selected (while limiting how many claims the *Defendants* may select from Plaintiffs' own structured data). While MultiPlan does not object to having to produce more documents as part of this protocol—and in fact has agreed to remove any limitation on the number of claims under the protocol for which it will produce records—the problem with Plaintiffs' "random selection" approach is that it improperly skews the substantive evidence under the protocol in Plaintiffs' favor. Specifically, Plaintiffs' approach would allow Plaintiffs to freely select the kinds of claims *they* think are most relevant to their claims (i.e., claims involving MultiPlan services), while hampering Defendants' ability to select claims that are particularly useful in testing Plaintiffs' theories (i.e., claims that did not involve balance billing, claims in which providers negotiated MultiPlan offers, etc.), all under the false rubric of a "random" selection process. Not only is that approach deeply prejudicial to Defendants, it has no countervailing benefit, since "random" sampling serves no purpose where the sample is not statistically significant, which is the case here.

*Finally*, Plaintiffs' proposal would cause further delays by leaving open the specifics of their proposed random selection process. Specifically, Plaintiffs' proposal calls for the parties to meet and confer 45 days *after* the Court enters the protocol to determine the "procedure for randomly selecting claims," (Pls'. Prot. ¶ 3), thus ensuring this Court must subsequently resolve any dispute regarding the random selection process down the road. Given the other deadlines in the protocols, claims file productions would stretch to March 2027, jeopardizing the case schedule.

**2. Claim Document Categories:** Defendants seek eight categories of Plaintiffs' claim file documents, each of which reflects information that will not be contained in the claims data, but

which are key to tell a more complete story of how Plaintiffs billed and were paid. Plaintiffs fully object to five and have unreasonably narrowed one other, but none of those objections has merit.

Patient Responsibility Forms. Patients sign these forms to acknowledge what a Plaintiff told them at the outset about what they may owe for the Plaintiff's services. Among other things, this information will show whether and how Plaintiffs communicated to patients that they would be ultimately financially responsible regardless of what their plan covered and, along with other claim file documents, will show if Plaintiffs' billing and collection decisions (1) changed after Plaintiff received payment and (2) differed when MultiPlan was involved. This information will enable Defendants to test Plaintiffs' allegations about the workings of their alleged conspiracy.

Proof-of-Payment Records. Records sufficient to show proof of payment that Plaintiffs received from any source will allow Defendants to understand what payments Plaintiffs have on record and how those payments compare to what is available in the claims data.

Attempts to Bill/Collect (or Not) and Related Communications. Plaintiffs' proposal unreasonably narrows this category to only communications reflecting their attempts to bill or collect patient responsibility. But that information will not reveal the extent of Plaintiffs' communications with patients or payors regarding bills, which is necessary to discover any reasons a Plaintiff may have given when it sought to collect balance bills on both MultiPlan and non-MultiPlan repriced claims, or when it decided not to collect a balance bill, and any complaints from patients or payors about their billing. This information will allow Defendants to test whether Plaintiffs balance billed patients on claims repriced by MultiPlan, contrary to their allegations that they could not do so, and whether that was different from any other type of OON claim.

Letters or Communications Regarding Payments. These documents will show how and whether payment for claims was actually negotiated and whether Plaintiffs reached an agreement

with a payor or vendor, such as MultiPlan. For example, Plaintiffs have alleged that pricing proposals exchanged between Plaintiffs and Defendants (or their vendors) will reflect what reimbursements Plaintiffs were willing to accept for claims, as well as whether Plaintiffs negotiated claims repriced by MultiPlan, allowing Defendants to test Plaintiffs' allegations that MultiPlan refused to negotiate and instead made "take-it-or-leave-it" offers.

Appeal Records. Records of Plaintiffs' appealed claim decisions will reflect Plaintiffs' positions on what they were owed versus what they received on given claims and why they disagree with the payors' reimbursement. This will allow Defendants to test the consistency of Plaintiffs' antitrust theories against what Plaintiffs said about supposed underpayments when they occurred. They will also show Plaintiffs' knowledge of supposed underpayments when they happened, which is relevant to Defendants' statute of limitations defense.

Medical Records.[8] Claims data reflect how providers code their services, but procedure codes do not show the full extent of the services provided or the services' intensity and complexity. A patient's medical records contain that information. The purpose of these medical records is not to conduct "mini-trials" on provider billing fraud; it is to enable the factfinder to understand—with more than just a code—why a Plaintiff charged a certain amount, why an MCO Defendant allowed a certain amount, and why MultiPlan suggested a certain reimbursement on that claim. At class certification, the medical records will show the wide variability of the services at issue. And because they provide the basis for what Plaintiffs charged and the value of their services, they are directly relevant to plaintiffs' damages theory.[9]

---

[8] Defendants listed medical records in their first proposed protocol in November 2025, but Plaintiffs didn't argue until October 5, 2026 that Defendants' RFPs didn't cover medical records. Defendants disagree, but to avoid a dispute, Defendants have served an RFP seeking these records.

[9] Plaintiffs' complaints about the sensitivity of medical records are also misplaced, given the HIPAA-Qualified Protective Order entered in this case. *See* ECF 242, CMO No. 12.

Finally, Plaintiffs' general concerns about breadth are surprising. Defendants seek claim file documents that Plaintiffs (on their own or through billing vendors) maintain in "centralized systems" and that are "reasonably accessible." These are the same documents that Plaintiffs would refer to when a payor or patient has questions for them about a claim. The number of claims (and burden) is very limited: smaller Plaintiffs need only collect documents for up to 25 claims each, and the massive health system Plaintiffs need only do so for up to 50 claims each.[10] While Plaintiffs complain that Defendants also possess *some* of these documents, they ignore that Defendants do not have the key internal claim-specific documents of the Provider or its billing vendors (i.e., internal notes that the offered reimbursement is reasonable, expected, or appropriate), and overlook that non-defendants may have priced some claims. In a case where Plaintiffs have pushed hard for wide-ranging discovery, issuing over 100 requests for documents and over seventy 30(b)(6) deposition topics, their claim that Defendants' proposal is overbroad rings hollow.

**3. Recourse Where Plaintiffs Do Not Maintain Certain Structured Data:** Defendants' proposal provides that the Parties will meet and confer to determine whether they should select additional claims if a Plaintiff "does not maintain structured data reflecting whether the provider has billed or collected amounts from a patient." This provision ensures that the parties receive enough evidence to show, among other things, whether Plaintiffs engaged in balance billing on a given claim, which at least some Plaintiffs' data does not reflect. Plaintiffs' omission of such a provision in their protocol is particularly problematic given that their "random" selection process is more likely to result in the selection of claims missing this information.

---

[10] Plaintiffs oppose Defendants' collection standard because they contend no party should have to "screenshot" documents. (Pls'. Pos. at I.B.) But parties should provide screenshots of information that exists in centralized systems *only if it's not stored as a separate document*. This only affects parties that maintain a type of document in non-exportable formats, and there's no serious burden given a party need only do this for a subset of documents for up to 25 or 50 claims.

Dated: October 26, 2026

Respectfully submitted,

*/s/ Warren Haskel*
Warren Haskel (*pro hac vice*)
**MCDERMOTT WILL & SCHULTE LLP**
One Vanderbilt Avenue
New York, NY 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
whaskel@mcdermottlaw.com

*On behalf of Defendants*

*/s/ Shawn J. Rabin*
Shawn J. Rabin (*pro hac vice*)
**SUSMAN GODFREY LLP**
One Manhattan West, 50th Floor
New York, NY 10001-8602
Tel.: (212) 336-8330
srabin@susmangodfrey.com

*Interim Class Liaison Counsel*

*/s/ Christopher A. Seeger*
Christopher A. Seeger
**SEEGER WEISS LLP**
55 Challenger Road 6th Fl.
Ridgefield Park, NJ 07660
Tel.: (973) 639-9100
cseeger@seegerweiss.com

*Plaintiffs' Coordinating Counsel*